**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK | * | |
| Plaintiff, | * | |
| v. | * | CASE NO.: 1:01-CV-786 |
| JOHN M. ORTENZIO | * | |
| Defendant. | * | |

FILED
MAR 21 2002
PER _____
HARRISBURG, PA  DEPUTY C

**MOTION TO RESET CASE
FOR THE JUNE, 2002 TRIAL LIST**

Plaintiff, ALLFIRST BANK, by its undersigned counsel, moves for an Order placing the above referenced case on the June, 2002 trial list rather than the July, 2002 trial list. The grounds for this motion are as follows:

1. In the Joint Case Management Plan filed with this Court on or about October 15, 2001, the parties suggested a June, 2002 trial date.

2. In this Court's Case Management Order, entered on October 30, 2001, the case was placed on the June, 2002 trial list and scheduling dates were set to have the case ready for a June, 2002 trial.

3. On or about December 27, 2001, Defendant moved for the case to be placed on the July, 2002 trial list because Defendant had scheduled a sailing trip in Alaska for the week of June 23, 2002. At the time the Motion was made by Defendant, Plaintiff had no objection to the continuance and filed a consent to the Motion.

4. By Order dated January 14, 2002, this Court granted the continuance and ordered that the case be placed on the July, 2002 trial list. No other dates set in the Joint Case Management

S:\LJG\19527\plead\mot.reset

Order were changed. Hence, the schedule still permits the case to be tried in June, as originally set.

5.  On March 13, 2002, Plaintiff took the deposition of Sheri Phillips, the former Chief Financial Officer of CCI Construction. Plaintiff was unable to take this deposition prior to March 13, 2002 because Defendant failed to provide Plaintiff with information regarding Sheri Phillips' location sufficient to enable her to be contacted and the deposition, noted.

6.  At the deposition of Sheri Phillips, Plaintiff learned, for the first time, that Sheri Phillips is unavailable as a witness in the month of July, when this trial is presently set. Ms. Phillips is employed as the Deputy Secretary of Administration and General Services for the Commonwealth of Pennsylvania. On July 1, 2002, the Commonwealth of Pennsylvania will unroll it's Image P.A. statewide computer system. Ms. Phillips is an integral part of this process. The Commonwealth of Pennsylvania has imposed a no leave policy for all of it's employees who are significantly involved in that project for the Commonwealth of Pennsylvania. While scheduled for the month of July, it is possible that this project will extend into August and beyond. Although Ms. Phillips is unavailable as a witness as of July 1, 2002, she is fully available to testify in June, 2002. See Exhibit A (Excerpts from Phillips deposition).

7.  Based on the testimony given in her deposition, Sheri Phillips is an essential and critical witness for Plaintiff. Her testimony goes to the very issues in dispute in this case and will contradict the testimony of the Defendant, John Ortenzio. The credibility of Sheri Phillips and John Ortenzio will be directly at issue in this case. Defendant has prayed a jury trial, and Plaintiff believes that the jury should have the opportunity to see the personal testimony of John Ortenzio and Sheri Phillips to determine which witness is, and which witness is not, telling the truth. The ability of the jury to assess witness credibility and honesty is central to Plaintiff's claim that John Ortenzio

committed fraud in the transactions at issue in this case. A *de benne esse* deposition, even if video taped, will be entirely inadequate for a jury presentation.

8. The main issue in this case is the propriety of John Ortenzio causing CCI Construction Company to issue a check drawn upon a $4 million unguaranteed line of credit to repay, on the eve of CCI's financial collapse, a $1.2 million short term loan guaranteed by Ortenzio that was not yet due. In her deposition, Sheri Phillips testified that:

> A. She opposed borrowing under the $4 million line to repay the $1.2 million guaranteed loan and refused to write the check herself because the payment would hurt the Company, but her opposition to the payment was overridden by Ortenzio.
>
> B. She and Ortenzio had discussed CCI's dire financial condition and CCI's filing for bankruptcy prior to the February 18, 2000 meeting with Allfirst that Ortenzio scheduled after making the payment on February 11, 2001, without disclosing to Allfirst that the payment had come from a borrowing under the line.
>
> C. Having been the person who negotiated the $4 million dollar line of credit and signed the loan documents, and as Chief Financial Officer of the company, she believed CCI was not authorized to borrow on the $4 million dollar line to repay the $1.2 million guaranteed loan and that doing so was not consistent with CCI's agreement with Allfirst.

See Exhibit B (Excerpts from Phillips deposition).

S:\LJG\19527\plead\mot.reset

9. Plaintiff is requesting that the case be replaced on the June trial list to permit Ms. Phillips to testify in person before the jury. This case should not take longer than three days and there is no reason why the Defendant cannot still undertake his June 23, 2002 vacation after the trial has concluded if the trial is placed on the June trial list.

10. Plaintiff will be distinctly prejudiced in its presentation if it is unable to present Sheri Phillips testimony in person to the jury to permit the jury to assess the credibility of Ms. Phillips against that of Defendant, John Ortenzio.

Lawrence J. Gebhardt, *Pro Hac Vice*
Ramsay M. Whitworth,
Pennsylvania Bar # 85208
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202
(410) 752-5100
*Attorneys for Allfirst Bank*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20 day of March, 2002 a copy of *Plaintiff's Motion to Reset Case for June, 2002, Trial List* was sent by Federal Express to: Edward I. Swichar, Esquire and Robert A. Burke, Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA 19103, *Attorneys for Defendant* and to Melinda Joyce, Esquire,. HARTMAN, OSBORNE & JOYCE, 126-128 Walnut Street, Harrisburg, PA 17101.

Lawrence J. Gebhardt

S:\LJG\19527\plead\mot.reset

A

120

1          MR. SWICHAR: That's it. It took a while,
2    but I got there.
3          MS. JOYCE: Okay. Let me place a statement
4    on the record for the protection of the witness and
5    the Commonwealth of Pennsylvania, which is her
6    employer.
7          There's an indication that this case may
8    potentially be going to trial during the month of
9    July of 2002. On July 1st of 2002, the Commonwealth
10   of Pennsylvania will unroll its Imagine PA statewide
11   computer system of which this witness is an integral
12   part of unrolling that product for this state.
13         There is currently in place by the
14   Commonwealth of Pennsylvania a no-leave policy for
15   its employees who are significantly involved in that
16   project for the Commonwealth.
17         I'm giving you, both of you as attorneys in
18   this case, adequate notice of that; so if the case
19   does proceed during the month of July, alternative
20   arrangements for Phillips' testimony may need to be
21   undertaken because of that issue.
22         If you feel, in your estimate, that the
23   case needs to be moved to a different time frame
24   because of this witness's unavailability, I'm giving
25   you adequate notice to do that since there were

1  obviously prior problems scheduling this witness's
2  deposition.
3       MR. GEBHARDT: What's the time frame on
4  your unavailability? You said July 1. Is it the
5  entire month of July?
6       MS. JOYCE: Yes. It's my understanding
7  that it is the entire month of July; is that correct?
8       THE WITNESS: It could go longer, but July
9  is the critical time frame.
10      MR. GEBHARDT: But June is all right?
11      THE WITNESS: June is all right.
12      MS. JOYCE: In terms of that issue, yes.
13 Obviously, you would have to work around --
14      MR. GEBHARDT: I understand. We had it in
15 June, and it may have been flipped back to June. I'm
16 not positive. Is there likely a problem in August,
17 if they move it to the August date?
18      MS. JOYCE: If the Commonwealth extends its
19 no-leave policy, it could be a problem. We don't
20 know that at this point in time. All we know is for
21 the month of July, the no-leave policy is in effect
22 for those employees who are significantly involved in
23 the project.
24      MR. GEBHARDT: The best thing would be to
25 put it in June.

```
 1   line of credit -- let's start first with the $4
 2   million line of credit.  Did he get involved in how
 3   that was being paid or repaid at all?
 4        A    I'm not sure.
 5             MS. JOYCE:  What time?
 6             MR. GEBHARDT:  In 1999 and 2000.
 7             THE WITNESS:  Did he get involved in how it
 8   was repaid?
 9   BY MR. GEBHARDT:
10        Q    Or the process, the repayment process?
11        A    No, that was the line of credit.  As the
12   cash came in, it was paid down.
13        Q    How about the repayment of the equipment
14   loan?
15        A    No, he did not.
16        Q    Okay.  Now, the $1.2 million loan was
17   repaid by CCI on or about February 11, 2000, by the
18   delivery of a check by Mr. Ortenzio personally to
19   Allfirst.
20             Prior to that date, had you had any
21   discussions with Mr. Ortenzio about the repayment of
22   the $1.2 million line of credit?
23        A    Yes.  He had come to me about that.
24        Q    And what was the substance of the
25   discussions you had?
```

1  A    He wanted to pay down the $1.2 million --
2  the $1.2 million line, he wanted to pay down because
3  he had that personally guaranteed.  He had asked me
4  about writing a check out to pay that off from the
5  line of credit, and I refused.
6  Q    Why did you refuse?
7  A    I didn't think it was in the best interest
8  of the corporation to do that.
9  Q    And could you explain why you had those --
10  that you didn't think it was in the best interest of
11  the corporation?
12  A    One, I guess I didn't think there was any
13  benefit to doing it.  The interest rates were the
14  same in the loans so there was no corporate benefit
15  from paying one -- drawing in one line of credit to
16  pay the other.
17       Two, if we had the extra cash, I would have
18  thought it best suited to pay payroll and accounts
19  payable and subcontractors.
20  Q    And at the time the loan was paid in
21  February, the company was experiencing cash flow
22  difficulties?
23  A    Yes.
24  Q    And did you understand that repaying the
25  $1.2 million loan with a draw on the $4 million line

1  of credit would reduce the amount of available cash
2  to the company?
3      A    Yes, definitely.
4      Q    Okay.  Now, in terms of the physical paying
5  of the $1.2 million loan, you did not write the
6  check?
7      A    No, I did not.
8      Q    Did you have signature authorities over the
9  checking account?
10     A    Yes, I did.
11     Q    And so if you had wanted to, you could have
12 written a $1.2 million check and sent it in to
13 Allfirst?
14     A    Yes, I could have.
15     Q    Did Mr. Ortenzio have any reaction to your
16 refusal to write the check or make that payment?
17     A    Initially when he had asked me about it and
18 I said no, he didn't do anything.  Then at a later
19 point in time, he came back to me again and said I
20 know you don't agree with this; but I need to do it.
21 I said, you're the president of the company; but I'm
22 not going to be any part of it.
23     Q    Did he at all elaborate on when he said I
24 need to do this, what he was meaning by this?
25     A    He personally guaranteed the 1.2 million

1 and he wanted that paid off because he had had his
2 personal guarantee.
3   Q   Did you believe using the $4 million line
4 of credit to repay the $1.2 million guaranteed loan
5 was consistent with the agreement that CCI and
6 Allfirst had entered into when Allfirst gave the $4
7 million line of credit?
8       MR. SWICHAR: I object to the form of the
9 question. She's not an attorney. You're asking her
10 to interpret legal documents which is the province of
11 the judge and not Ms. Phillips.
12       MS. JOYCE: Let me hear the question back.
13       (The reporter read back the referred-to
14 portion of the record.)
15       MR. SWICHAR: Let me renew my objection.
16 Consistent with the agreement it would require an
17 interpretation of the loan documents which is not the
18 proper function of Ms. Phillips. You may answer the
19 question.
20 BY MR. GEBHARDT:
21   Q   You may answer the question.
22   A   As chief financial officer and what I knew
23 of the loan documents, no, I did not think it was.
24   Q   And would you explain why that was your
25 thought?

1    A    Because I looked at the line of credit as
2  being a way for us to pay for our ongoing work in
3  progress and to pay our vendors and subcontractors.
4  And as far as I have recalled in prior notes, there
5  were certain things I thought we weren't allowed to
6  do.  I know that it was in this one; but going to
7  another bank and getting additional loans, I thought
8  there were restrictions in there that prevented it.
9         MR. GEBHARDT:  Let's mark this as the next
10 exhibit and also the next.
11         (Income statement was marked as Deposition
12 Exhibit No. 8.)
13         (Balance sheet was marked as Deposition
14 Exhibit No. 9.)
15 BY MR. GEBHARDT:
16    Q    I've handed you what's been marked as
17 Deposition Exhibits 8 and 9, which appear to be
18 internally-generated financial statements for CCI
19 Construction for a 13-month period beginning in 1999,
20 January 1, I guess, Exhibit 8 being an income
21 statement and Exhibit 9 being the balance sheet.
22         Do you recognize these as
23 internally-generated financial statements?
24    A    Yes, I do.
25    Q    And you would have been involved at this

1  impression to us that he was not going to continue
2  with company.
3      Q    Now, Mr. Ortenzio attended that meeting
4  with an attorney named Chernicoff. Do you know how
5  Mr. Ortenzio came in contact with Mr. Chernicoff?
6      A    As I recall, he had told me that initially
7  he had talked to Leroy Zimmerman about being his
8  counsel. I thought there was a conflict of interest.
9  I wasn't involved in the conversations, but there was
10 a conflict of interest and that he was going to use a
11 bankruptcy attorney named Bob Chernicoff. I didn't
12 know him.
13     Q    Did Mr. Ortenzio express to you that
14 Mr. Chernicoff was a bankruptcy attorney?
15     A    I don't recall where I learned he was a
16 bankruptcy attorney. We had the discussion of
17 bankruptcy, and he hired Chernicoff. Whether he told
18 me he was a bankruptcy attorney, I don't know.
19     Q    So you and Mr. Ortenzio had had discussions
20 regarding CCI's possible bankruptcy before the
21 February 18, 2000 meeting at Allfirst?
22     A    Yes.
23          MS. JOYCE: Object to the form of the
24 question. That's fine.
25          MR. GEBHARDT: Let's mark this as the next