ORIGINAL

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK                           :
                                        :
        Plaintiff,                      :    CASE NO. 1:01-CV-786
                                        :
    v.                                  :
                                        :
JOHN M. ORTENZIO                        :
                                        :
        Defendant.                      :

FILED
MAR 2 6 2002
PER _____
HARRISBURG, PA  DEPUTY

### DEFENDANT'S ANSWER IN OPPOSITION TO MOTION FOR LEAVE TO INTRODUCE REBUTTAL EXPERT TESTIMONY DURING CASE IN CHIEF

Defendant, by his undersigned counsel, answers and opposes Plaintiff's motion as follows:

INTRODUCTION

Plaintiff seeks to introduce rebuttal expert testimony during its case in chief. While plaintiff's motion alleges various irrelevancies regarding confusion over the taking of depositions of the experts, the only real issue is whether the plaintiff should be excused for failing to comply with the Court's Case Management Order which, in essence, required the plaintiff to file and serve its expert report almost three (3) months ago, i.e., on or before January 4, 2002. Since plaintiff failed to comply with this Court's mandate, and fails to even attempt to provide any excuse for such non-compliance, the plaintiff's motion should be denied. By way of further answer, defendant avers as follows:

1-4.    Admitted.

5. Admitted, except that defendant's counsel consciously elected not to depose plaintiff's expert.

6. Denied. On the contrary, defendant's counsel consciously and intentionally elected not to depose plaintiff's expert. At all relevant times, defendant's counsel made his expert available for deposition.

7. Defendant avers that plaintiff's belief regarding the effectiveness of its expert's testimony is, indeed, irrelevant. The simple fact is that plaintiff failed to timely file and serve his expert report, as required by the Case Management Order, and plaintiff fails to even attempt to provide an excuse for such failure.

8. It is admitted that defendant has been given disclosure of plaintiff's expert's opinions and has had a full opportunity to depose plaintiff's expert. However, defendant is, indeed, surprised by plaintiff's belated request to introduce expert testimony during plaintiff's case in chief and, indeed, would be prejudiced if plaintiff is excused from non-compliance with this Court's Case Management Order.

*[Signature]*
Edward I. Swichar, Esquire
Attorney I.D. No. 15175
Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA 19103
(215) 569-5500

Dated: 3/25/02

Attorneys for Defendant

2

113449.00601/21007129v1

## CERTIFICATE OF SERVICE

Edward I. Swichar, attorney for Defendant, John Ortenzio, hereby certifies that he caused a true and correct copy of Defendant's Answer in Opposition to Motion for Leave to Introduce Rebuttal Expert Testimony During Case in Chief upon the following on this 25 day of March, 2002, by first-class mail, postage prepaid:

> Lawrence Gebhardt, Esquire
> Gebhardt & Smith, LLP
> The World Trade Center, Ninth Floor
> Baltimore, MD   21020-3064

_____
EDWARD I. SWICHAR

**Page 69**

1  reduce the balance on the $4 million line of credit?
2  A   If there was an excess amount, yes, it
3  would.
4  Q   That's why I'm confused. You say it would
5  be invested. But it's my understanding, correct me
6  if I am wrong, that if there were excess funds in
7  that account, it would be deducted from any balance
8  owed on the $4 million line of credit first?
9  A   I think you're misinterpreting what I'm
10 saying. In the total picture, if, in the $4 million
11 at the end of the day if we got deposits in of $5
12 million, therefore, we had an extra million, that
13 would be invested.
14      If you're just looking at the deposits for
15 the day, it's applied against the line of credit.
16 But what I'm saying when I say that if there's an
17 overage amount, if our credit goes to zero, that it
18 would be invested.
19 Q   That's what I thought. The investment part
20 of this transaction only occurs when there is nothing
21 due on the $4 million line of credit --
22 A   That's correct.
23 Q   -- and the balance is zero?
24 A   That's correct.
25 Q   Otherwise, any moneys deposited in the

**Page 70**

1  checking account which would constitute a surplus
2  would be used to reduce the $4 million line of
3  credit?
4  A   That's correct.
5  Q   Now, if interest payments are paid on the
6  equipment note, that would have an impact on the $4
7  million line of credit, would it not?
8  A   Yes, it would.
9  Q   And what would that impact be?
10 A   It would draw on the line of credit.
11 Q   How about principal payments on the
12 equipment note? How are they paid?
13 A   In the same fashion.
14 Q   And that would also have the same impact on
15 the $4 million line of credit?
16 A   Yes, it would.
17 Q   Okay. By the way, principal payments, were
18 they by checks or were they swept automatically by
19 the bank?
20     MR. GEBHARDT: Objection. Using -- I don't
21 know if you're using the term swept in a consistent
22 --
23     MR. SWICHAR: I'll rephase it. Fair
24 objection.
25 BY MR. SWICHAR:

**Page 71**

1  Q   Were the principal payments for the
2  equipment note paid by CCI checks; or were they
3  automatically deducted by the bank, by the checking
4  accounts, or none of the above?
5  A   I don't recall if we were making -- I'm
6  just trying to remember if we made principal payments
7  or if we were making interest-only payments.
8  Q   I will represent to you that I think it's
9  correct that there were principal payments on the $2
10 million note.
11 A   If we were making principal payments -- I
12 think they were; I just don't recall exactly -- if we
13 were making principal payments, they would be handled
14 the same way.
15 Q   Which would be checks?
16 A   Which would be checks.
17 Q   And that would reduce the availability on
18 the $4 million line?
19 A   That's correct.
20 Q   How about interest payments on the $1.2
21 million note? How were they paid, by checks or
22 automatic deductions --
23 A   As I recall --
24 Q   -- or none of the above?
25 A   As I recall, they were paid by check.

**Page 72**

1  Q   And am I correct in saying, like the
2  equipment note payments, those payments would have
3  the effect of increasing the balance on the $4
4  million line of credit?
5  A   Yes.
6  Q   Now, Ms. Phillips, were you present at the
7  table when the -- bank table when the $1.2 million
8  note and related surety were signed and provided to
9  the bank? Were you there?
10 A   I don't recall if we actually got together
11 to sign it or if we got the loan documents, reviewed
12 them, signed them, and gave them to Craig Schwartz.
13 Q   Did you have discussions with Mr. Schwartz
14 regarding the revisions that were made on the changes
15 that were made to the $1.2 million note and surety?
16 You can look at them to refresh your recollection.
17 A   I don't recall if I did. In prior loans, I
18 can honestly say that I had spoken to Craig Schwartz.
19 In this loan, John was very involved; so I don't
20 recall if I specifically talked to them or if John
21 did. This one was a little different.
22 Q   If my notes are correct and the other
23 lawyers will account if they're not correct, you
24 testified you had discussions regarding how the $1.2
25 million note would be repaid.

**73**

1    I believe you testified that it was
2  anticipated that CCI would repay the 1.2 million from
3  cash flow that was projected if the projections held
4  true. Is that a fair statement?
5    A   That's correct.
6    Q   Now, with whom did you have those
7  discussions -- Mr. Ortenzio, the bank, or both?
8    A   I definitely had the discussions with John;
9  and as I recall, we had those same discussions with
10 the bank also.
11   Q   Am I correct in stating that the
12 projections that CCI was relying upon turned out not
13 to come to fruition?
14   A   That's correct.
15   Q   When the $1.2 million note and related
16 surety was signed, did you believe those projections
17 to be capable of being fulfilled based on your
18 financial experience with the company?
19   A   As I said, I had concerns; and when I had
20 talked to John about those projections, I said those
21 were based on what operations were projected for the
22 loss or profits on each of those jobs. I had pointed
23 out at that time that those profits and/or losses,
24 they were decreasing throughout the year.
25   Q   Well, did you tell the bank at any time

**74**

1  that you didn't expect the projections to be
2  accurate?
3        MS. JOYCE: Object to the form of the
4  question. You can answer.
5        THE WITNESS: Say it again.
6  BY MR. SWICHAR:
7    Q   Did you ever tell the bank at or about the
8  time the $1.2 million note was signed that you didn't
9  expect those projections that were going to be the
10 source of the payment to be accurate and true?
11   A   I didn't say they weren't accurate or true.
12 What I said is -- when I gave them to John, I said,
13 this is what I've been given by operations.
14 Operations, in the past, has shown the profits on the
15 jobs decreasing; but as of that point in time,
16 information I gave to him, I said, that's the best
17 that I can do.
18   Q   Did you believe those projections that
19 operations provided to you to be true and correct as
20 far as projections can go?
21   A   I believed at that time that they were
22 given as true as they could project, yes.
23   Q   When did you have discussions with the bank
24 regarding the $1.2 million note where you said that
25 there were discussions that you had that you expected

**75**

1  the note to be repaid from projected cash flow? When
2  did that occur?
3    A   That's what I'm saying, I think -- I can't
4  guarantee that that discussion occurred with the bank
5  as to how we were paying it back. I know that John
6  and I discussed it. I think that that was in -- it
7  may have been part of the discussion with the bank,
8  but I can't recall that part. I can't recall
9  exactly.
10   Q   You may have told the bank or there may
11 have been discussions with the bank at which you were
12 present that projected cash flow would be the source
13 of repayment.
14      I'm trying to find out whether or not you
15 have an actual recollection of that statement being
16 given to the bank by you or by Mr. Ortenzio in your
17 presence.
18   A   And that's where I'm saying I just don't
19 have an exact recollection of that part of the
20 conversation.
21   Q   Do you recall the bank ever requesting CCI
22 through you or Mr. Ortenzio including a provision in
23 the $1.2 million note which would have required the
24 repayment to come from projected cash flow?
25   A   Say that again.

**76**

1    Q   Would you -- do you have any recollection
2  of the bank ever stating to CCI, either to you or
3  Mr. Ortenzio, that it wanted to include a provision
4  in the $1.2 million note that it could only be repaid
5  from projected excess cash flow?
6    A   I don't recall that, no.
7    Q   Do you recall the bank ever requesting a
8  provision in the $1.2 million note which prohibited
9  -- which would have prohibited the repayment from the
10 $4 million line of credit?
11   A   I do not recall any conversation with the
12 bank of making a payment from the $4 million line of
13 credit one way or the other.
14   Q   One way or the other?
15   A   Yeah.
16   Q   Now, you've seen from the commitment
17 letters that the $4 million note was due on April
18 30th of 2000; and the $1.2 million note was due one
19 month earlier on March 31st, 2000.
20      I'm not going to have this remarked, but it
21 originally was Schwartz 6, if everyone agrees, which
22 appears to be an Allfirst memorandum dated November
23 2, 1999.
24      Just to put this in the proper context, Ms.
25 Phillips, if you look at Phillips 5, which you have

77

1  in front of you, it's dated -- Schwartz 6 is dated
2  two days earlier.
3      A    Okay.
4      Q    Now, this Schwartz 6 indicates that the
5  bank initially contemplated increasing the $4 million
6  line to 5 million. Do you see that?
7      A    I do.
8      Q    And the $1 million increase would expire on
9  February 28th, 2000. Do you see that?
10     A    Yes.
11     Q    And it also indicates that Mr. Ortenzio
12 would guarantee the entire $5 million line of credit.
13 Do you see that?
14     A    I see that.
15     Q    Do you recall any discussions that you
16 participated in in the bank, with the bank where
17 Mr. Ortenzio was requested to guarantee the $5
18 million line as reflected in Schwartz 6?
19     A    I don't remember this document.
20     Q    In fairness to you, you may never have seen
21 this. I don't know. I'm only showing you this to
22 refresh your recollection.
23          MS. JOYCE: Your question to this was --
24          MR. SWICHAR: I'll rephrase it since you
25 made me forget what the question was.

78

1  BY MR. SWICHAR:
2      Q    Do you recall how the changes reflected in
3  the earlier document evolved into what ultimately
4  became -- strike that.
5           Do you recall any discussions with the bank
6  that reflected a transaction -- the transaction in
7  Schwartz 6, in other words, a $5 million note fully
8  guaranteed by Mr. Ortenzio to expire on February 28,
9  2000?
10     A    I don't recall that part of the discussion,
11 but I do know that John never agreed to guarantee the
12 whole 5 million or the 4 million that we already had
13 in place that was already in place.
14     Q    Do you recall the bank requesting
15 Mr. Ortenzio to guarantee the full 5 million?
16     A    I don't.
17     Q    Do you recall that Mr. Ortenzio had
18 initially requested a $1 million loan in contrast to
19 a 1.2 million?
20     A    No. I just don't recall. I'm looking at
21 the difference in the two, but I don't recall this.
22     Q    Do you recall Mr. Ortenzio, on behalf of
23 CCI, requesting that the 1 million or $1.2 million
24 note initially expired on February 28, 2000, in
25 contrast to what ultimately turned out to be March

79

1  31, 2000?
2      A    I don't know if this was something that
3  John talked to them about previously. I just don't
4  remember.
5      Q    Fair enough. If you turn to your Exhibit
6  5, which is the Schwartz memo of 11/4/99, and that
7  refers to a meeting that you did attend with
8  Mr. Ortenzio and Mr. Schwartz and Mr. Zarcone.
9           You'll notice that in the second paragraph,
10 it states that the 1.2 million would be done on a
11 temporary basis. Was that consistent with your
12 understanding of the $1.2 million note?
13     A    Yes.
14     Q    In contrast with the $4 million line of
15 credit which was longer term?
16     A    I understood the $4 million to be a year;
17 and as I said, we normally renewed it each year.
18 Yes, this was definitely considered short term.
19     Q    A one-time note?
20     A    Yes.
21     Q    It also states that CCI would get an
22 additional 500,000 from private sources. Do you
23 recall any discussions about that?
24          MS. JOYCE: It, referring to Deposition
25 Exhibit No. 5, so the record is clear?

80

1           MR. SWICHAR: Yes. Thank you.
2           THE WITNESS: No, I don't recall that.
3  BY MR. SWICHAR:
4      Q    Do you recall any discussions with the bank
5  stating that it expected the $4 million line of
6  credit to be repaid before the 1.2 million?
7      A    No.
8      Q    Do you recall any discussions with the bank
9  that it expected the $4 million line of credit to
10 reach a zero balance before the $1.2 million line of
11 credit could be repaid?
12     A    No.
13     Q    Now, we agree that the $1.2 million loan
14 was a short-term note?
15     A    Yes.
16     Q    And we agree that Mr. Ortenzio as you
17 stated earlier told you specifically that he wanted
18 the $1.2 million to be a short-term note?
19     A    Yes, I do.
20     Q    And at the time it was repaid by CCI on
21 February 11, 2000, there was no indication that there
22 was any pending request to the bank to extend the
23 $1.2 million note, was there?
24     A    It didn't expire until March. I'm not sure
25 I understand your question.

**81**

1  Q   As far as you know, was there any request
2  on the bank to extend the $1.2 million note?
3  A   To the bank to request that we extend the
4  note?
5  Q   Yes.
6  A   No.
7  Q   And was there any indication as of February
8  11, 2000 -- there was no indication from the bank
9  that it had intended to extend the $1.2 million
10 note --
11 A   No.
12 Q   -- am I correct?
13 A   That's correct.
14 Q   It was your understanding as of February
15 11, 2000, that the $1.2 million note would have
16 expired in any event on March -- as of -- no later
17 than March 31 of 2000; is that correct?
18 A   That's correct.
19 Q   And that's in contrast to the $4 million
20 note which you would have anticipated would have been
21 renewed at the end of April of 2000; is that correct?
22 A   That was always our hope, and it was each
23 time.
24 Q   It was a course of dealing; is that
25 correct?

**82**

1  A   Yes.
2  Q   Now, you testified about your discussions
3  that you had with Mr. Ortenzio prior to the bank
4  meeting on February 18, 2000.
5      Am I correct in stating that Mr. Ortenzio
6  advised you that he did intend to go to the bonding
7  companies for financial help until moneys came in
8  from the Scott Air Force Base and other jobs?
9  A   Yes, that's correct.
10 Q   And there was a discussion about -- do you
11 recall -- if I recall correctly, you testified that
12 -- strike that.
13     Did Mr. Ortenzio ever state to you that
14 bankruptcy was an alternative prior to the meeting
15 with the bank or did he not or you had no
16 recollection?
17 A   We discussed bankruptcy prior to that.
18 Q   And was it Mr. Ortenzio's primary goal
19 first to go to the bonding companies and ask for
20 financial help until the Scott Air Force Base money
21 came in?
22 A   That's what I recall.
23 Q   Did Mr. Ortenzio tell you that the bonding
24 companies would have to come up with the money until
25 the moneys came in from the Scott Air Force Base and

**83**

1  other jobs?
2  A   I do recall that, yes.
3  Q   And he said that he expected the bonding
4  companies to cooperate in that fashion?
5  A   I don't know that he expected it from them,
6  but he was going to talk to them about that.
7  Q   And as of the time you had the meeting with
8  Mr. Ortenzio prior to the February 18 meeting with
9  the bank, wasn't it indicated to you through
10 Mr. Ortenzio that it was his primary intention to
11 keep his company operating by getting funds from the
12 bonding companies until such time as the money from
13 the jobs came in?
14 A   We had doubts about whether he wanted to
15 keep the company operating.
16 Q   What was his primary goal, to get money?
17     MR. GEBHARDT:  Objection.  His primary goal
18 for what?
19 BY MR. SWICHAR:
20 Q   To keep the company alive?
21 A   What's the question?
22 Q   Was his primary goal to keep the company
23 alive?
24     MR. GEBHARDT:  Objection.
25     MS. JOYCE:  If you know what his primary

**84**

1  goal was.
2  BY MR. SWICHAR:
3  Q   Based on your discussions with him?
4  A   At that time, we had serious concerns as to
5  whether he did want to keep the company alive.
6  Q   Do you recall on a certain date the bank
7  freezing the bank accounts of CCI?
8  A   Yes, I do.
9  Q   Do you recall when that occurred?
10 A   Without looking back, I think it happened
11 -- actually, we found out on a Wednesday; but I think
12 it was actually frozen on a Tuesday night.
13     If I recall, based on the dates we've been
14 given here, I was thinking that it would be the
15 Wednesday after the 18th meeting.
16 Q   A few days after the February 18th meeting?
17 A   Yes.
18 Q   Was there any warning by the bank that it
19 was going to freeze the accounts?
20 A   Not to me.
21 Q   What was the nature of the checks -- I'm
22 sorry.  As a result of the bank freezing CCI's
23 checking account, were checks returned?
24 A   Yes.
25 Q   What was the nature of those checks?

85

1  A  It was our accounts payable to material
2  suppliers, vendors, subcontractors, payroll, all the
3  checks in the normal course of business that we had
4  written on the account.
5  Q  Approximately what was the amount of the
6  payroll checks that were dishonored?
7  A  I honestly can't recall. It was all the
8  checks from the last payroll at that time.
9  Q  Can you give any approximation of the
10 dollars that that would be?
11 A  My -- I don't recall the actual payroll
12 numbers.
13 Q  Do you recall the number -- I'm sorry. Do
14 you recall the number of employees who didn't receive
15 their paychecks as a result of the bank freezing the
16 account?
17 A  The number, no; but it was significant. I
18 just don't recall the number. We had -- the reason
19 I'm not recalling is because we had started laying
20 people off so the numbers were changing as people
21 were being laid off, the payroll numbers were getting
22 lower in that time period. I don't remember how many
23 we had left, but it was a significant number.
24 Q  Well, significant number -- let me try to
25 bring you down. Over a hundred?

86

1  A  I would say probably over a hundred.
2  Q  I don't mean to play games. Bigger than a
3  breadbasket? Between 150 and 200?
4  A  I can't recall.
5  Q  Is a hundred your best guess?
6     MS. JOYCE: Best estimate, because if it's
7  a guess, I'm not going to allow her to guess.
8  BY MR. SWICHAR:
9  Q  Is that your best estimate? If you can't,
10 you can't. I just want a general idea. Over a
11 hundred?
12 A  I would say over a hundred.
13 Q  Now, the $1.2 million note was repaid from
14 the $4 million line of credit on February 11, 2000.
15 We agree on that.
16    At any time, did the bank ever come to you
17 as CFO and ask CCI to sign a document that would have
18 precluded payment from the $4 million line of credit?
19 A  Not that I recall.
20 Q  As CFO, did the bank ever demand any
21 agreement from CCI that would make the $4 million
22 line of credit a prohibited source of funds to repay
23 the $1.2 million note?
24    MR. GEBHARDT: Objection.
25 BY MR. SWICHAR:

87

1  Q  You can answer.
2  A  No.
3  Q  Now, when the bank lent the 1.2 million,
4  changing thoughts now, there was a point in time when
5  the bank lent CCI the $1.2 million in funds. That
6  money was deposited in CCI's checking account; is
7  that correct?
8  A  That's correct.
9  Q  And that was the same checking account that
10 was tied into the cash management facility; is that
11 correct?
12 A  That's correct.
13 Q  And that had the impact of increasing the
14 availability on the $4 million line of credit by $1.2
15 million; is that correct?
16 A  That's correct.
17 Q  And similarly it had had the impact of
18 decreasing the loan balance on the $4 million line of
19 credit; is that correct?
20 A  That's correct.
21 Q  Now, let's move ahead in time. When the
22 $1.2 million loan was repaid by drawing on the $4
23 million line, a check was drawn on the checking
24 account; is that correct?
25 A  When the 1.2 --

88

1  Q  Was repaid -- we're now moving ahead to
2  February 11th. The $1.2 million loan was repaid by a
3  CCI check; is that correct --
4  A  That's correct.
5  Q  -- from the same checking account that we
6  just spoke of; is that correct?
7  A  That's correct.
8  Q  And that had the impact of increasing the
9  balance on the $4 million line of credit; is that
10 correct?
11 A  That's correct.
12 Q  And since you're a CFO, I'll ask you this
13 question: The repayment of the $1.2 million note had
14 the effect of reversing what occurred months earlier
15 when the 1.2 million was first lent to CCI with
16 respect to the $4 million line of credit?
17 A  That's correct.
18 Q  Now, did the bank, in any fashion, monitor
19 CCI's use of the $4 million known proceeds? Would
20 they ask you daily or weekly, what are you doing with
21 our money?
22 A  We were required to give them reports.
23 It's in the documents here, if I looked at them; but
24 we had to give them an income statement, balance
25 sheet, accounts receivable, aging work in progress.

89

1   Q   Would those reports actually show the
2  payees, for example, of the proceeds of the $4
3  million line of credit, where the moneys went
4  specifically?
5   A   No. Specific to where it went, no.
6   Q   Did the bank ever audit those requests,
7  those reports?
8   A   That I gave them on a monthly basis?
9   Q   Yes.
10  A   I don't know what they did with them. I
11 just gave them to them.
12  Q   Did they ever ask you for a list of payees
13 as to where the loan proceeds went?
14  A   Prior to them freezing the account?
15  Q   Yes.
16  A   No, they did not.
17  Q   By the way, when they froze the account, is
18 that when they first requested a list of payees?
19  A   I don't recall if they did that or not. I
20 know they did before, but I don't recall if they
21 requested it.
22  Q   Did the bank ever ask you to provide a list
23 of payees who would have received any of the proceeds
24 of the $1.2 million note?
25  A   No, they didn't.

90

1   Q   Do you recall a couple of days after
2  February 11, 2000, Mr. Schwartz came to CCI with the
3  $1.2 million note and surety and returned it as
4  satisfied to CCI?
5   A   I don't recall that.
6   Q   Do you recall speaking to Mr. Schwartz at
7  any time after the $1.2 million note was repaid?
8   A   Yes, I do.
9   Q   And were those discussions with respect to
10 the repayment of the 1.2 million?
11  A   No. What I recall was regarding the
12 collateral --
13  Q   Let me interrupt.
14     MS. JOYCE: Let her finish.
15 BY MR. SWICHAR:
16  Q   Before the freezing of accounts, did you
17 have discussions with Mr. Schwartz before the
18 accounts were frozen?
19     MS. JOYCE: Do you want her to finish her
20 answer for the last question because you interrupted
21 her?
22     MR. SWICHAR: Yes. And I did that
23 intentionally because I wanted to clarify the
24 question.
25     MS. JOYCE: Okay. I wasn't aware the

91

1  question needed clarification.
2     MR. SWICHAR: Well, in my mind, it did.
3     MS. JOYCE: That's fine.
4     MR. GEBHARDT: It's the witness's answer
5  though.
6  BY MR. SWICHAR:
7   Q   My question is: Did you have any
8  discussions with Mr. Schwartz regarding the repayment
9  of the $1.2 million note prior to the bank freezing
10 CCI's account?
11  A   I don't recall if we did or not.
12  Q   Do you recall Mr. Schwartz ever asking you
13 what the source of the repayment funds were with
14 respect to the $1.2 million note?
15  A   I don't recall. I remember the bonding
16 company asking that question, but I don't recall if
17 Craig Schwartz did.
18  Q   Well, as of February 11th or prior thereto,
19 was Mr. Schwartz aware of the bank's -- of CCI --
20 strike that.
21     Was Mr. Schwartz aware of CCI's increasing
22 financial distress?
23     MR. GEBHARDT: Objection.
24     THE WITNESS: Increasing since we met in
25 November or -- I'm not sure what time frame.

92

1  BY MR. SWICHAR:
2   Q   Yes. Well, as of November, was
3  Mr. Schwartz aware that CCI was incurring financial
4  problems?
5   A   As of November, they realized we had cash
6  flow difficulties.
7   Q   Between November and February 11th, did you
8  have any other discussions with Mr. Schwartz
9  regarding CCI's financial difficulties?
10  A   Not that I recall. It would have been
11 right around that time where I would have been giving
12 him the information from the end of the year.
13  Q   Would that have been before or after
14 February 11th, 2000?
15  A   I don't recall that we gave the information
16 prior to -- if John gave it to them.
17  Q   And you don't recall Mr. Schwartz asking
18 you, as CFO, how did CCI come up with this $1.2
19 million?
20  A   No, I didn't.
21  Q   Did you suspect that Mr. Schwartz at any
22 time knew the source of repayment?
23     MR. GEBHARDT: Objection.
24     MS. JOYCE: Object, and do not answer.
25 BY MR. SWICHAR:

93

1  Q  Do you have any reason to believe -- strike
2  that.
3       Did you have any reason to believe back in
4  the year 2000 that Mr. Schwartz knew the source of
5  the repayment of the $1.2 million note?
6       MR. GEBHARDT: Objection.
7       MS. JOYCE: Same objection. You're asking
8  for beliefs. If she has concrete knowledge, she's
9  here to tell you that. Whether or not she believed
10 or didn't believe is not relevant.
11      MR. SWICHAR: I don't think it's for you to
12 decide what's relevant. I think that's for the
13 court. But be that as it may, I'm entitled to her
14 belief. That's a very fair question.
15      MR. GEBHARDT: She's not -- she doesn't
16 know what is in that man's head.
17      MS. JOYCE: Exactly.
18      MR. SWICHAR: Well, that's my next
19 question. Don't anticipate the next question. I'm
20 not asking her if she was able to read Mr. Schwartz's
21 mind. I'll ask it a different way.
22 BY MR. SWICHAR:
23  Q  Are you aware of any facts that led you to
24 believe that Mr. Schwartz was aware of the source of
25 the repayment of the $1.2 million note?

94

1  A  At what point in time?
2       MR. GEBHARDT: She knows today, for
3  instance.
4  BY MR. SWICHAR:
5   Q  In February of 2000 and thereafter.
6       MS. JOYCE: Well, I think you have to limit
7  it between February of 2000. I don't mean to be
8  obstruct, Mr. Swichar; but --
9       MR. SWICHAR: Well, you are.
10      MS. JOYCE: Well, no, I'm not, because your
11 question is not fair to this witness. She left that
12 company in May of 2000, and her testimony gave you
13 that factual piece of information.
14      MR. SWICHAR: I'll rephrase the question.
15      MS. JOYCE: I would like to finish my
16 objection so we have a clear record for the court.
17      MR. SWICHAR: Go ahead, but don't accuse me
18 of misleading the witness. I'll clarify it; but if
19 you want to give a speech, go ahead.
20      MS. JOYCE: The witness's testimony was
21 that she left the company in May of 2000. Your
22 question to her was unfair in the sense that it was
23 open-ended and asked from any time from February of
24 2000 to the present what Mr. Schwartz did or did not
25 know. That's the basis for my objection.

95

1       I understand you're going to rephrase the
2  question, and I don't have to instruct her not to
3  answer that one at this point. Go ahead and
4  rephrase, please.
5  BY MR. SWICHAR:
6   Q  As of the time you were at CCI after
7  February 11, 2000, until the date that you left, were
8  you aware of any facts which led you to believe that
9  Mr. Schwartz was aware of the source of the repayment
10 of the $1.2 million note?
11  A  Yes.
12  Q  Of what facts are you aware?
13  A  Any time after February 11th. I don't know
14 exactly when he found that out; but at some point
15 after that, I know that he was aware of it.
16      MR. GEBHARDT: The whole bank found out at
17 that, for God's sake.
18 BY MR. SWICHAR:
19  Q  How did you become aware that Mr. Schwartz
20 was aware of the source of repayment?
21  A  I had one meeting -- I'm trying to remember
22 exactly when it was, but I had one meeting with Craig
23 and someone else from Allfirst that had come into my
24 office.
25      They were asking questions about the

96

1  collateral, and I had given them some information
2  regarding the collateral. At that time, they were
3  aware of it; but I don't recall the date of that
4  meeting. It was definitely after February 18th; but
5  I -- as I recall, it was sometime in the next week.
6  I don't recall of an exact time he showed up in his
7  office.
8   Q  Thanks. Let's focus on the Scott Air Force
9  claim which was, how much, 4 million?
10  A  Over 4 million.
11  Q  What was your understanding of that claim?
12  A  My understanding of it was that there was a
13 meeting that was held during the time the Persian
14 Gulf War was occurring where there were people -- I
15 was not in attendance, but there were people from CCI
16 at a meeting. There was a general there.
17      We were told that Scott Air Force Base was
18 going to be the premier Air Force Base to be used for
19 the hub for the war. They needed to accelerate the
20 project. If we did not accelerate the project, they
21 would have to default us on our contract.
22      If we did go forward on it, we would have
23 to eat the cost and put it in as a change order or
24 claim at the end when we finished the job. We were
25 worried at that time of the effect of having it on

**97**

1  our record, that we had a project here that if we did
2  not complete it, it would hinder us in getting future
3  projects.
4      We had made the decision to go forward, and
5  that decision cost us a lot of money that we did not
6  get paid.
7      Q   Did you believe the $4 million claim to be
8  a valid claim with respect to Scott Air Force Base?
9      A   Yes, I did.
10     Q   And did you believe -- strike that.
11         You're familiar to a certain extent with
12 the Albemarle Prison claim of $2 and a half million?
13     A   I'm familiar there was a claim, yes.
14     Q   Did you believe that to be a valid claim of
15 CCI?
16     A   Yes.  From everything our chief operating
17 officer told me, I would say yes.
18     Q   And is it fair to say that as of February
19 18th, 2000, you believed to the extent you could from
20 information you had obtained that such claims were
21 valid, the Scott Air Force Base and the Albemarle
22 Prison claim?
23     A   Yes.
24     Q   Now, if you turn to Exhibit 10, which is a
25 cash flow projection, next to the last line on the

**98**

1  left, available line of credit.  Let me just --
2  strike that.
3      When was Exhibit 10 shown to the bank, if
4  at all?
5      MS. JOYCE:  By her?
6      MR. GEBHARDT:  Objection.
7  BY MR. SWICHAR:
8      Q   Do you know if Exhibit 10 was ever given to
9  the bank?
10     A   I don't recall actually handing it to them,
11 no.
12     Q   Do you recall when this document was
13 prepared?
14     A   Yes, I do.
15     Q   When was that?
16     A   Printed as of February 16th.  It was
17 probably prepared prior to that.
18     Q   Now --
19     A   And again, I prepared these on a regular
20 basis.
21     Q   Now, going down to the available line of
22 credit, do you see that on the left, line of credit?
23     A   Yes.
24     Q   Am I correct that it reflects that the line
25 of credit as of February was $5.2 million, correct?

**99**

1      A   Yes, that's correct.
2      Q   And am I correct that if we then go into
3  March, we see that the line of credit was reduced by
4  the 1.2 million, i.e., to 4 million; is that correct?
5      A   That's correct.
6      MR. SWICHAR:  If I could have a minute with
7  my client, that may be my last question.  If I may
8  just ask one more question.
9  BY MR. SWICHAR:
10     Q   I want to get back to the situation where
11 the bank froze CCI's account.  Were there situations
12 where the bank had clear checks of CCI but then
13 reversed those clearings?
14     A   Yes, there were.
15     Q   Tell me what that is about.
16     A   We had -- in my computer system, I had a
17 tie-in to Allfirst that would show the activity in
18 our accounts.  I could see what was going through
19 there on a daily basis.
20         I had seen the checks that had cleared, and
21 we started seeing -- I could see it on our reports
22 that it was taken out of our account as a clear
23 check, and then I started seeing it going back as
24 though it didn't clear.
25         I started seeing those reports.  I said,

**100**

1  they're going back in time.  If I recall correctly --
2  as I said, I think Wednesday is when I had found out
3  the accounts were frozen.  I think they went back as
4  far as Monday and unclearing checks that had shown as
5  clear on our account.
6      Q   Do you recall those payees?
7      MS. JOYCE:  Of which the checks were
8  reversed you mean?
9      MR. SWICHAR:  Yeah.
10     THE WITNESS:  Again, it was any check that
11 we had written.  It was employees.  It was vendors.
12 It was subcontractors.  It was utility payments.
13     Q   Do you recall if one check was to the IRS?
14     A   I recall several checks that had to do with
15 payroll-type issues.  I don't if it was IRS.  I think
16 there was unemployment.  I don't remember exactly
17 what it was, but there were payroll-type of issues.
18         It could have been the IRS.  In fact, as
19 I'm speaking about it, Wednesday usually was the day
20 that we did that through a funds transfer.  So that
21 probably was one.
22     Q   An IRS check?
23     A   Yes.
24     Q   How about Cleveland Brothers?  Was that
25 another check that was honored and then reversed?

**109**

1  recollect those questions?
2     A   Questions about --
3     Q   Yes.
4     A   Yes.
5     Q   And the two -- the loan, the $4 million
6  line of credit and the loan both bear the same
7  interest rate?
8     A   That's correct.
9     Q   So there was no practical effect of
10 disbursing the $1.2 million and paying down the $4
11 million or simply holding the $1.2 million back until
12 it was drawn, was there?
13    A   That's correct.
14    Q   Based on your understanding as the person
15 who negotiated the $4 million line of credit and
16 executed the loan documents, was the draw on the line
17 of credit by way of a check of $1.2 million to repay
18 the $1.2 million guaranteed separate loan a borrowing
19 made, quote, to finance work in progress and accounts
20 receivable, period, end quote?
21    A   No, it wasn't.
22    Q   So therefore, in your view, it was not an
23 authorized borrowing under the line of credit?
24        MR. SWICHAR: Objection to form.
25 BY MR. GEBHARDT:

**110**

1     Q   In your view, was the borrowing authorized
2  under the terms of the line of credit?
3         MR. SWICHAR: Objection to form. Objection
4  to the word authorized. I don't think it's within
5  her promise to interpret the documents.
6         MS. JOYCE: I think you're asking her for
7  an expert witness answer.
8  BY MR. GEBHARDT:
9     Q   Let me just say, based on your
10 understanding as the person who negotiated and
11 executed the $4 million loan and loan documents, was
12 the draw of $1.2 million to pay the personally
13 guaranteed loan and authorized borrow?
14        MR. SWICHAR: Objection to form. Same
15 reason.
16 BY MR. GEBHARDT:
17    Q   Permitted under the terms of the loan?
18        MR. SWICHAR: Objection to form. You're
19 asking her to interpret legal documents.
20        MR. GEBHARDT: All right.
21 BY MR. GEBHARDT:
22    Q   You may answer.
23    A   No, I don't.
24        MR. GEBHARDT: All right. That's it.
25        MR. SWICHAR: No, it's not it. I have a

**111**

1  few questions more.
2         MR. GEBHARDT: It never ends.
3
4           RECROSS EXAMINATION
5
6  BY MR. SWICHAR:
7     Q   Ms. Phillips, Exhibit 10, you stated the
8  reduction in the line of credit from 5.2 to 4 was
9  based on the assumed repayment of a $1.2 million
10 note; is that correct?
11    A   Yes.
12        MS. JOYCE: Object to the form.
13 BY MR. SWICHAR:
14    Q   And the answer is yes?
15    A   Yes.
16    Q   And what was assumed occurred on February
17 11th, 2000; is that correct?
18    A   Say that again.
19    Q   In other words -- let me ask it a different
20 way. When you prepared Exhibit 10, you had assumed
21 that the $1.2 million note would be repaid by the
22 following month; is that correct?
23    A   That's correct.
24    Q   You had assumed that by March, the $1.2
25 million note would be repaid?

**112**

1     A   I assumed that it wouldn't be available
2  anymore.
3     Q   That the short-term note would have
4  expired; is that correct?
5     A   That's correct.
6     Q   Now, Exhibit 1, the loan commitment letter.
7  With respect to the 4 million and specifically the
8  paragraph dealing with use of proceeds to finance
9  work in progress, etc., do you have any reason to
10 believe that until the money -- until the $1.2
11 million note was repaid, the funds were used for any
12 purpose other than as stated in Exhibit 1?
13    A   Not that I recall. I thought they were all
14 for that purpose.
15    Q   Based on your understanding of the loan
16 documents as CFO, was there any provision in Exhibit
17 1 that prohibits -- strike that.
18        That deals specifically with repayment
19 terms and the source of funds that could be used to
20 pay the $1.2 million note?
21        MS. JOYCE: Let me make an objection on the
22 record because the document speaks for itself.
23 That's the same objection that Mr. Burke made on
24 Mr. Ortenzio's behalf at his deposition with respect
25 to the contents of the exhibit. So the document

**113**

1  speaks for itself. You can answer, and you did; so
2  that's fine.
3  BY MR. SWICHAR:
4    Q  If you go to the $1.2 million note loan
5  commitment, which is Exhibit 6, up until the time of
6  the repayment of the $1.2 million note, do you have
7  any knowledge of the proceeds being used for other
8  than finance work in progress in accounts receivable?
9    A  Not that I recall.
10   Q  And is it prohibited -- does Exhibit 6 deal
11 specifically in any fashion with respect to the
12 source of funds that could be used or that could not
13 be used to repay the $1.2 million note?
14      MS. JOYCE: Same objection. You may
15 answer.
16      THE WITNESS: Not that I see.
17 BY MR. SWICHAR:
18   Q  Now, if you go back to Exhibit 1, that had
19 the eligibility formula with respect to the
20 borrowings on the $4 million note; is that correct?
21   A  Are you referring to --
22   Q  To the 80 percent, yes.
23   A  Yes.
24   Q  Now, if you turn to Exhibit 6, the last
25 paragraph on page 1 has the same eligibility formula;

**114**

1  is that correct?
2    A  That's correct.
3    Q  So the $1.2 million note and the $4 million
4  note had the same eligibility formula; is that right?
5    A  That's correct.
6    Q  Now, am I correct that the repayment of the
7  $1.2 million note from the 4 million did not increase
8  CCI's borrowings? In other words, it merely
9  transferred the $1.2 million note under that note to
10 the $4 million borrowing; is that correct?
11      MS. JOYCE: Object to the form of the
12 question. You can answer.
13      THE WITNESS: That's correct.
14 BY MR. SWICHAR:
15   Q  So the borrowing didn't change at all when
16 the $1.2 million loan was paid from the $4 million
17 line of credit; is that correct?
18   A  No, because now the 1.2 was paid off and
19 now we only had 4 million.
20   Q  The amount remained the same?
21      MR. GEBHARDT: Objection.
22 BY MR. SWICHAR:
23   Q  The amount due to the bank didn't change,
24 did it?
25   A  The balance due to the bank did not change.

**115**

1  The available credit changed.
2    Q  Now, you stated that the repayment of the
3  $1.2 million note did not have any practical effect
4  as to CCI because the interest rates were the same;
5  is that fair?
6      MS. JOYCE: Object to the form of the
7  question. That's not what the witness said. You're
8  mischaracterizing her testimony.
9  BY MR. SWICHAR:
10   Q  Did I mischaracterize your testimony?
11   A  Yes. That is one thing I said that is not
12 the reason, but I did say that is one of the things
13 in my thought process.
14   Q  Am I correct in stating that the effect of
15 the repayment of the $1.2 million note was to repay a
16 short-term note that was due to expire the following
17 month?
18   A  Yes, that's correct.
19   Q  As far as you know, the $1.2 million note
20 would become due the following month; is that right?
21   A  That's correct.
22   Q  And we all agree it was a short-term note?
23   A  That's correct.
24      MR. SWICHAR: Larry?
25      MR. GEBHARDT: No further questions.

**116**

1      MR. SWICHAR: One second. Off the record.
2      (Off the record discussion.).
3      MR. SWICHAR: One more question.
4  BY MR. SWICHAR:
5    Q  You testified that the $4 million loan line
6  of credit had been used to pay the principal interest
7  that was being paid on the $2 million equipment loan;
8  is that correct?
9    A  I wasn't positive about the principal, how
10 that was handled, but yes.
11   Q  You had no issue with repaying the
12 principal on the equipment note from the $4 million
13 line of credit; is that correct?
14      MR. GEBHARDT: Objection.
15      MS. JOYCE: Objection. Go ahead. You're
16 counsel for the case. Go ahead.
17      MR. GEBHARDT: Her testimony was and the
18 questions I asked were to the monthly installments of
19 principal, not the entire unpaid principal balance
20 which is what you've asked.
21      MR. SWICHAR: That's fair.
22 BY MR. SWICHAR:
23   Q  I want to ask you then, You had no problem
24 or didn't see any problem with respect to paying
25 principal monthly on the $2 million equipment note