(45)

4/4/

2 to ct

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**ALLFIRST BANK**

     Plaintiff,

v.

**JOHN M. ORTENZIO**

    Defendant.

**ORIGINAL**

\*

\*    CASE NO.:   1:01-CV-786

\*

\*

\*

**FILED**

APR 0 3 2002

PER _____
HARRISBURG, PA / DEPUTY C

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MOTION TO STRIKE JURY DEMAND

Plaintiff, Allfirst Bank, by its undersigned counsel, moves for an order striking the jury demand of Defendant, John M. Ortenzio. The grounds for this motions, which are more fully set forth in the accompanying memorandum, are as follows:

1.    In this case, the claims made and the relief requested by Plaintiff are essentially equitable in nature.  Plaintiff seeks to rescind and nullify a payment made by CCI Construction Company from a $4 million line of credit to satisfy a $1.2 million loan guarantied by Defendant and to enforce that guaranty against Defendant.

2.    There is no right to have an action which raises equitable claims and which seeks equitable relief  tried to a jury.

In Support of this Motion, Plaintiff submits the following Exhibits:

Documents

| | | |
|---|---|---|
| Exhibit A | - | Commitment Letter dated March 23, 1999. |
| Exhibit B | - | Film Promissory Note dated March 24, 1999. |
| Exhibit C | - | Schwartz Memorandum dated November 4, 1999. |

S:\LJG\19527\plead\MotionStrikeJury.wpd

| Exhibit D | - | Commitment Letter dated November 5, 1999. |
| Exhibit E | - | Suretyship |
| Exhibit F | - | CCI Financial Statement 1998. |
| Exhibit G | - | CCI Internal Financial Statement1999 |
| Exhibit H | - | CCI Cash Flow Projection |
| Exhibit I | - | Default Letter |

Deposition Excerpts

| Exhibit J | - | Sherri Phillips |
| Exhibit K | - | John Ortenzio |
| Exhibit L | - | Craig Schwartz |
| Exhibit M | - | Gerard Elias |

Lawrence J. Gebhardt, *Pro Hac Vice*
Ramsay M. Whitworth, PA Bar # 85208
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202
(410) 752-5100
*Attorneys for Allfirst Bank*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of April, 2002 a copy of *Motion to Strike Jury Demand and Memorandum in Support* was sent by Federal Express to:  Edward I. Swichar, Esquire and Robert A. Burke, Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA 19103, *Attorneys for Defendant.*

_____
Lawrence J. Gebhardt



A

DEFENDANT'S
EXHIBIT

# FIRST NATIONAL BANK OF MARYLAND

### A Division of FMB Bank

Regional Corporate Group, Mail Code 133-02-01
3045 Market Street, Camp Hill, PA 17011-4530
Telephone: 717 612-5026 Facsimile: 717 612-5027

March 23, 1999

Ms. Sheri Phillips
Chief Financial Officer
CCI Construction Co., Inc.
P.O. Box 1129
Mechanicsburg, PA 17055

Dear Ms. Phillips:

I am pleased to advise you that The First National Bank of Maryland, a Division of FMB Bank (hereafter "Bank") has increased and reaffirmed an unsecured line of credit (hereafter "Loan") to CCI Construction Co., Inc. (hereafter "Borrower") as follows:

| | |
|---|---|
| Principal Amount of Loan: | $4,000,000.00 |
| Interest Rate: | Bank's Base Rate as in effect from time to time, minus ½% |
| Repayment Schedule: | Interest monthly, principal on demand |
| Use of Proceeds: | Finance work in process and accounts receivable |
| Collateral: | Unsecured |

Borrowings under the Loan will bear interest at an annual rate equal to the Bank's Base Rate as in effect from time to time, minus one-half percent (-1/2%). This interest rate will change when and as the Bank's Base Rate changes. Interest shall be calculated on the basis of the actual number of days in the current calendar year divided by 360. Interest will be payable monthly upon submission of the Bank's statement therefor.

Borrowings under the Loan will be payable on demand. If no demand is made, the Loan will expire and all borrowings will be due and payable, together with interest thereon, on April 30, 2000.

C 0033

Ms. Sheri Phillips
CCI Construction Co., Inc.
March 23, 1999
Page Two

Terms and Conditions:

1. Annual CPA – audited financial statements of CCI Construction Co., Inc.

2. Quarterly work in process reports for CCI Construction Co., Inc.

3. Quarterly Company prepared financial statements of CCI Construction Co., Inc.

4. Monthly borrowers certification with monthly accounts receivable aging and listing.

5. Primary business deposits of CCI Construction Co., Inc. to be maintained at The First National Bank of Maryland, a Division of FMB Bank.

6. Negative pledge of assets other than purchase money.

7. The Company shall maintain a minimum tangible net worth of $4,500,000.00 measured at year end.

8. Advances not to exceed 80% of qualified accounts receivable less than 90 days past dues, excluding retainages.

Availability of the Loan is contingent upon the Borrower and the Bank entering into mutually acceptable loan documentation setting forth terms and conditions stated herein and such other terms and conditions, covenants, warranties and representations as may be required by the Bank and be mutually acceptable to the Borrower and the Bank. All terms and conditions contained herein shall survive the execution of such loan documentation.

This commitment is contingent upon the right of the Bank at any time hereafter and from time to time to review the commitment, to adjust terms and conditions, or to discontinue the commitment should the Bank in a reasonable exercise of its sole business discretion deem it necessary to do so.

C 0034

Ms. Sheri Phillips
CCI Construction Co., Inc.
March 23, 1999
Page Three

Please acknowledge your concurrence with these terms and conditions by signing, dating and returning the enclosed copy of this letter to the Bank on or before March 31, 1999.

Very truly yours,

Craig J. Schwartz
Vice President

CJS/jkp

Enclosure

ACKNOWLEDGED AND ACCEPTED THIS 24th DAY OF March , 1999.

ATTEST:                                    CCI CONSTRUCTION CO., INC.

BY: _____            BY: _____
   Title: ASSISTANT SECRETARY              Title: CFO

C 0035



**EXHIBIT**
Ortenzio-3
2|13|01 TKB

*B*

\* a division of
**FMB Bank**

**FILM/CASH SOLUTIONS PROMISSORY NOTE**
**(PENNSYLVANIA)**

**Instructions to Loan Officer:** Use for (a) loans to corporations, regardless of amount, and (b) loans to non-corporate borrowers when the only purpose of any such loan is business and the principal amount of such loan exceeds $50,000.

$ _4,000,000.00_      _Mechanicsburg, PA_      _March 24_ , _1999_
                          (City)     (State)

       FOR VALUE RECEIVED, the undersigned ("Borrower") promises to pay on demand to the order of THE FIRST NATIONAL BANK OF MARYLAND, ~~████████████~~ ("Bank"), at any of Bank's offices, or at such other place as the holder of this Promissory Note may from time to time designate, the principal sum of _FOUR MILLION_ and _00_ /100 Dollars ($ _4,000,000.00_ ), or such other amount as may be advanced from time to time to Borrower, together with interest thereon at the rate or rates hereafter specified and any and all other sums which may be owing to Bank by Borrower pursuant to this Promissory Note. The following terms, as well as the applicable terms on Exhibit A, attached hereto and incorporated herein by reference, shall apply to this Promissory Note.

1.   **DEFINITIONS.** The following terms have the following definitions:
    A.   "Account" means the commercial checking account maintained by Borrower with Bank and designated as Account No. _28864514_ , together with any replacement account therefor.
    B.   "Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in the Commonwealth of Pennsylvania are authorized to close.
    C.   "Incremental Advance Amount" means the amount indicated on Exhibit A as the Incremental Advance Amount. Each Loan must be an integral multiple of such amount.
    D.   "Initial Excess Balance" means, for any Business Day, the amount by which the collected balance in the Account at the end of such Business Day after posting all credits to the Account (subject to funds availability), but prior to posting any debits to the Account, exceeds the Target Balance.
    E.   "Line Availability" means, for any Business Day, an amount equal to the difference obtained by subtracting the aggregate principal balance outstanding under all Loans from the Maximum Line Amount.
    F.   "Loan" means an advance of monies from Bank to Borrower pursuant to the terms of this Promissory Note; and the term "Loans" means more than one Loan.
    G.   "Maximum Advance Amount" means an amount equal to the highest integral multiple of the Incremental Advance Amount which does not exceed the Line Availability.
    H.   "Maximum Line Amount" means the amount indicated on Exhibit A as the Maximum Line Amount, which amount is the maximum aggregate principal balance of the Loans which may be outstanding at any one time.
    I.   "Minimum Loan Advance" means the amount indicated on Exhibit A as the Minimum Loan Advance, which amount is the minimum principal amount of each Loan.
    J.   "Presented Items" means, for any Business Day, the aggregate amount of debits which have been presented for payment against the Account.
    K.   "Prime Rate" means a fluctuating annual rate of interest equal to the greater of: (i) that rate announced from time to time by Bank as its "prime rate;" or (ii) the rate obtained by adding one percent (1%) to the average rate, rounded to the nearest one-tenth of one percent, for three month maturity dealer placed commercial paper for the week most recently reported in the Federal Reserve Statistical Release No. H.15(519) entitled "Selected Interest Rates" or any succeeding publication.
    L.   "Target Balance" means the amount indicated on Exhibit A as the Target Balance, which amount is the minimum collected balance that must be maintained in the Account.

2.   **PROCEDURES FOR LOANS.** All Loans shall be made in the form of a transfer of funds into the Account in accordance with the procedures set forth in this paragraph. Borrower hereby irrevocably authorizes Bank to make Loans in accordance with the procedures set forth herein. At the end of each Business Day, Bank shall calculate the Initial Excess Balance and the aggregate amount of the Presented Items. In the event the Initial Excess Balance is less than the aggregate amount of the Presented Items, Bank shall make a Loan by transferring funds into the Account in an amount equal to the amount, which when added to the Initial Excess Balance, would be equal to the aggregate amount of the Presented Items; provided, however, that: (a) the principal amount of the Loan shall not be less than the Minimum Loan Advance; (b) the principal amount of the Loan must be an integral multiple of the Incremental Advance Amount, and therefore, if it would not otherwise be an integral multiple of the Incremental Advance Amount, the amount of the Loan will be rounded up to the next higher integral multiple of the Incremental Advance Amount unless there is insufficient Line Availability in which case the Loan amount will be the Maximum Advance Amount; and (c) the principal amount of the Loan shall not exceed the Maximum Advance Amount. If at any time the amount of the Initial Excess Balance is less than the amount of the Presented Items by an amount greater than the Maximum Advance Amount, Bank shall: (i) make a Loan by transferring funds into the Account in an amount equal to the Maximum Advance Amount; and (ii) determine, in its sole discretion, which Presented Items will be paid, and which Presented Items will not be paid. In the event the Initial Excess Balance is greater than the amount of the Presented Items, Bank shall post and pay all of the Presented Items. If, following Bank's posting and paying of all of the Presented Items, there remains a balance in the Account in excess of the Target Balance, Bank is hereby irrevocably authorized to debit the Account in an amount up to the portion of the balance in the Account which exceeds the Target Balance, and apply such sums to the outstanding balance of the Loans. Bank agrees to make such debit of the Account to repay sums outstanding under the Loans as of the end of each Business Day; provided, however, that in the event the option labeled "Cash Solutions Protection" is marked on Exhibit A attached hereto, Bank shall not automatically debit the Account to make payments on the Loans, but may do so, in its sole and absolute discretion.

3.   **TERMINATION.** The procedure for making Loans, and the obligation of Bank to provide Loans, as set forth in this Promissory Note, may be terminated by Borrower upon ten (10) days prior written notice to Bank and may be terminated by Bank upon thirty (30) days prior written notice to Borrower. Upon termination, no further Loans shall be made under this Promissory Note, but all other terms of this Promissory Note (including, but not limited to, the holder's right to demand payment at any time and for any reason) shall remain in full force and effect.

BS-3108A-9811 PAGE 1                                          PK 10

4.    INTEREST. From the date hereof until all sums due hereunder, including principal, interest, charges, fees and expenses are paid in full, the principal amount outstanding from time to time pursuant to this Promissory Note shall bear interest as follows (Check One):

[ ]    Fluctuating Rate. At a fluctuating rate equal to _____% per annum above the Prime Rate in effect from time to time. Bank at its discretion may charge a lesser rate from time to time. Interest on the principal amount outstanding shall be adjusted daily, with the rate for each day being adjusted to reflect the Prime Rate in effect at the close of business on that day. Bank makes loans at interest rates at, above and below the Prime Rate.

[X]    Other. (describe):   Interest shall accrue at a rate per annum equal to the Bank's Base Rate minus 1/2% as in effect from time to time.

5.    CALCULATION OF INTEREST. Interest shall be calculated on the basis of a three hundred sixty (360) days per year factor applied to the actual days on which there exists an unpaid balance hereunder.

6.    REPAYMENT. Borrower shall make payments of principal and interest in accordance with the following terms:
(a)    Principal:    ALL SUMS OUTSTANDING UNDER THIS PROMISSORY NOTE, INCLUDING THE PRINCIPAL AMOUNT OF ALL OF THE LOANS, ARE IMMEDIATELY DUE IN FULL UPON THE FIRST TO OCCUR OF: (i) THE DEMAND OF THE HOLDER OF THIS PROMISSORY NOTE, WHICH DEMAND MAY BE MADE AT ANY TIME AND FOR ANY REASON, IN THE SOLE AND ABSOLUTE DISCRETION OF THE HOLDER OF THIS PROMISSORY NOTE; OR (ii) THE OCCURRENCE OF ANY DEFAULT UNDER THE TERMS OF THIS PROMISSORY NOTE. *with 30 days written notice* sjp
(b)    Interest:    Borrower shall make payments of all accrued and unpaid interest on the  31st  day of each successive month, beginning on  March 31, 1999  and continuing until all sums outstanding hereunder are paid in full.
Borrower may prepay this Promissory Note in whole or in part at any time or from time to time without premium or additional interest.

7.    LATE PAYMENT CHARGE. If any payment due hereunder (including any payment in whole or in part of principal) is not received by the holder within fifteen (15) calendar days after its due date, Borrower shall pay a late payment charge equal to five percent (5%) of the amount then due.

8.    APPLICATION OF PAYMENTS. All payments made pursuant to this Promissory Note shall be applied first to accrued and unpaid interest, then to unpaid expenses and charges payable hereunder, and then to principal, or in such other order or proportion as the holder, in the holder's sole discretion, may elect from time to time.

9.    SECURITY. *See below→Unsecured*  Sums due under this Promissory Note are secured by, and Borrower grants to Bank a security interest in, all deposits and property of Borrower now or at any time hereafter in the possession of or on deposit with Bank whether as custodian or depository or in any other capacity. Bank shall have the right to set-off and apply against the obligations of Borrower to Bank evidenced by this Promissory Note any sums of Borrower at any time on deposit with Bank whether such deposits are special, time or demand, provisional or final. In addition, this Promissory Note is secured by any property described as collateral in any security agreement, pledge agreement or other document previously, simultaneously, or hereafter entered into by Borrower in connection with any obligation or liability of Borrower to Bank or any corporate affiliate of Bank, such other security documents include but are not limited to the following:  sjp

[ ]    Security Agreement(s)

[ ]    Real estate mortgage or deed of trust on property known as _____ located in _____ County/City, State of _____.

[X]    Other (describe):   Unsecured
_____
_____

This Promissory Note specifically incorporates by reference, as if fully set forth herein, all of the language and provisions of the security documents described generally or specifically above.

10.    REPRESENTATIONS AND WARRANTIES. Borrower (and if more than one Borrower, each Borrower) represents and warrants to Bank that the following statements are true, correct and complete as of the date hereof, and as of the date each Loan is made hereunder: (a) it is duly organized and in good standing under the laws of the state in which it is organized; (b) it has the full power and authority to execute, deliver and perform this Promissory Note; (c) neither such execution, delivery and performance, nor compliance by it with the provisions of this Promissory Note will conflict with or result in a breach or violation of its organizational documents, or any judgment, order, regulation, ruling or law to which it is subject or any contract or agreement to which it is a party or to which any of its assets and properties are subject; (d) this Promissory Note constitutes the legal, valid and binding obligation enforceable in accordance with its terms; (e) there is no litigation or proceeding pending or, to the knowledge of its representative signing this Promissory Note on its behalf, threatened against or affecting it which might materially adversely affect its business, financial condition or operations or its ability to perform and comply with this Promissory Note; (f) all financial statements and information furnished or to be furnished to Bank hereunder have been and will be prepared in accordance with generally accepted accounting principles and fairly present its financial condition as of the dates thereof and the results of its operations for the period covered thereby; (g) it is not in violation of any applicable federal, state or local law, statute, rule, regulation or ordinance and has not received any notice nor is the subject of any investigation to the effect that its operations are not in material compliance with any such law, statute, rule, regulation or ordinance, including, without limitation, applicable environmental, health and safety laws and regulations; (h) since September 2, 1974, no pension, employee benefit, multi-employer, profit sharing, savings, stock bonus or other deferred compensation plan ("Plan") maintained by it or any trade or business group with which it is affiliated subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA") has been terminated, no lien exists against Borrower in favor of the Pension Benefit Guaranty Corporation ("PBGC"), and no "reportable event" (as such term is defined in ERISA) has occurred with respect to any such Plan, and Borrower has not incurred any "accumulated funding deficiency" within the meaning of ERISA or any liability to the PBGC in connection with any Plan; and (i) no information, exhibit, report, statement, certificate or document furnished by Borrower or any other person to Bank in connection with the Loans, this Promissory Note or the negotiation thereof contains any material

misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained herein or therein not misleading.

11.  DEFAULT.  Any of the following will be a default under this Promissory Note:  (a) failure to pay any principal, expense, fee, charge or interest when due, or failure to perform any other obligations hereunder; (b) a default by any Borrower upon any of the existing or future obligations of any Borrower to Bank; (c) a default by any guarantor or other person other than Borrower that is now or hereafter liable upon or in connection with any of the obligations of any Borrower to Bank or that has granted any lien or security interest to or for the benefit of Bank to secure any of the obligations of any Borrower to Bank ("Other Obligor"), upon any of the existing or future obligations of any Other Obligor to Bank; (d) a default in any other agreement, instrument or document between any Borrower or Other Obligor and Bank, or any corporate affiliate of Bank, including, without limitation, any security document referred to above, whether previously, simultaneously, or hereafter entered into; (e) ~~a material adverse change in the financial condition of any Borrower or Other Obligor from that~~ *[initials]* ~~expressed in the financial statement most recently submitted to Bank prior to the date of this Promissory Note, as~~ ~~determined in good faith by Bank in its sole discretion;~~ (f) institution of bankruptcy, insolvency, reorganization or receivership proceedings by or against any Borrower or Other Obligor in any state or federal court; (g) the appointment of a receiver, assignee, custodian, trustee or similar official under any federal or state insolvency or creditors' rights law for any property of any Borrower or Other Obligor; ~~(h) failure of any Borrower or Other Obligor to furnish to Bank such collateral~~ *[initials]* ~~or additional collateral as Bank may in good faith request;~~ (i) any warranty, representation, or statement to Bank by or on behalf of any Borrower or Other Obligor proving to have been incorrect in any material respect when made or furnished; (j) the occurrence of any event which is, or would be with the passage of time or the giving of notice or both, a default under any indebtedness of any Borrower or Other Obligor to any person other than Bank; (k) any material loss, theft or substantial damage, which is not fully insured, to any of the assets of any Borrower or Other Obligor, or the sale, transfer, lease, encumbrance or other disposition of all or any material part of the assets of any Borrower or Other Obligor other than in the ordinary course of business of Borrower or Other Obligor; (l) the entry of any final judgment against any Borrower or Other Obligor for the payment of money in excess of $5,000.00; (m) the levy upon or attachment of any assets of any Borrower or Other Obligor; ~~(n) the recordation of any federal, state or local tax lien against any Borrower or Other Obligor;~~ *[initials]* (o) a change of ownership or dissolution, merger, consolidation, liquidation or reorganization of any Borrower or Other Obligor which is a corporation, partnership or other legal entity; (p) ~~the death of any Borrower or Other Obligor who is a~~ *[initials]* ~~natural person;~~ (q) failure of any Borrower or Other Obligor to furnish to Bank such financial information as Bank may require from time to time, including, but not limited to, such financial statements as Bank may require; (r) failure of any Borrower or Other Obligor to comply with all laws, rules, regulations and decrees to which such Borrower or Other Obligor may be subject, the violation of which may have a material adverse effect on the business operation or financial condition of such Borrower or Other Obligor; ~~(s) the acquisition by a Borrower of all or substantially all of the assets, properties or equity~~ *[initials]* ~~interest of any other person or entity without Bank's prior written consent;~~ (t) failure of any Borrower to maintain its existence in good standing in the jurisdiction of its organization; (u) any of the licenses or permits which are necessary to the conduct of any Borrower's business as now conducted is not maintained in full force and effect; or (v) ~~the determination~~ *[initials]* ~~in good faith by Bank, in its sole discretion, that the ability of any Borrower or Other Obligor to pay or perform any of their~~ *[initials]* ~~respective obligations to Bank is impaired for any reason.~~

12.  REMEDIES.  Upon a default, in addition to all other rights and remedies available to the holder of this Promissory Note under any document or agreement between Borrower and Bank or under applicable law, the holder of this Promissory Note, in the holder's sole discretion and without notice or demand, may raise the rate of interest accruing on the unpaid principal balance outstanding under this Promissory Note by two (2) percentage points above the rate of interest otherwise applicable.  The Bank shall have no further obligation to provide any Loans to Borrower following: (a) a demand by Bank for payment hereunder; or (b) a default under this Promissory Note.  Borrower agrees that a default under this Promissory Note is a default by Borrower under all other liabilities and obligations of Borrower to the holder, and that the holder shall have the right to declare immediately due and payable all liabilities and obligations owed by Borrower to the holder of this Promissory Note.

13.  CONFESSION OF JUDGMENT.  Borrower irrevocably and unconditionally authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Borrower in any court in one or more proceedings, or before any clerk thereof or prothonotary or other court official, and appear for, to confess and enter judgment against Borrower, at any time, whether before or after the occurrence of any default hereunder, with or without averment of default, with or without complaint filed, and without prior notice or opportunity of Borrower for prior hearing, in favor of the holder of this Promissory Note in the full amount outstanding on this Promissory Note (including principal, accrued interest and any and all charges, fees and expenses) plus court costs, plus attorneys' fees equal to fifteen percent (15%) of the unpaid balance of principal, interest, charges, and other sums outstanding hereunder, with release of all errors and without right of appeal.  Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Borrower any right or privilege of exemption, homestead rights, appraisement, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment.  (To the extent prohibited by applicable law, any judgment obtained by confession shall not constitute a lien on any real property located in Pennsylvania which is the residence of the Borrower.)  The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions from time to time, in the same or different jurisdictions, as often as the holder shall deem necessary or advisable.  BORROWER HEREBY ACKNOWLEDGES THAT THE CONFESSION OF JUDGMENT PROVISIONS HEREIN CONTAINED WHICH AFFECT AND WAIVE CERTAIN LEGAL RIGHTS OF BORROWER HAVE BEEN READ, UNDERSTOOD AND VOLUNTARILY AGREED TO BY BORROWER.

14.  EXPENSES.  Borrower shall pay all costs and expenses, including attorneys' fees (to the extent not prohibited by law) incident to the making of the Loans.  Borrower shall pay all costs and expenses incurred by Bank in collecting sums due under this Promissory Note, including without limitation the costs of any lien, judgment or other record searches, appraisals, travel expenses and the like.  In addition, if this Promissory Note is referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, Borrower shall pay all of the holder's costs, fees (including, but not limited to, the holder's attorneys' fees, charges and expenses) and all other expenses resulting from such referral.

15.  AMENDMENTS.  The fees and charges required to be paid by Borrower in connection with the Loans may, at any time and from time to time, be amended by Bank, upon prior written notice thereof to Borrower and otherwise in compliance with applicable law.  Any such amendment shall become effective on the first day of the month in which Borrower obtains a Loan, after the date specified in the notice of amendment (which date shall be not less than thirty (30) days from the date

BS-3108A-9811 PAGE 3                                                      PK 10

the notice was mailed to Borrower), or upon such other date as may be required in accordance with applicable law. If Borrower obtains a Loan after the date specified in the notice, the changes in the fees and charges described in the amendment shall apply to all outstanding unpaid indebtedness and obligations under this Promissory Note, whether incurred or arising prior to, upon, or after the effective date of the amendment.

16.    NEGOTIABLE INSTRUMENT.  Borrower agrees that this Promissory Note shall be deemed to be a negotiable instrument, even though this Promissory Note may not qualify under applicable law, absent this paragraph, as a negotiable instrument.

17.    WAIVERS.  Borrower, and all parties to this Promissory Note, whether maker, indorser, or guarantor, waive presentment, demand, notice of dishonor and protest.

18.    EXTENSIONS OF MATURITY.  All parties to this Promissory Note, whether maker, indorser, or guarantor, agree that the maturity of this Promissory Note, or any payment due hereunder, may be extended at any time or from time to time without releasing, discharging, or affecting the liability of such party.

19.    NOTICES.  Any notice or demand required or permitted by or in connection with this Promissory Note, without implying the obligation to provide any notice or demand, shall be in writing at the address set forth below or to such other address as may be hereafter specified by written notice to Bank by Borrower.  Any such notice or demand shall be deemed to be effective as of the date of hand delivery or facsimile transmission, one (1) day after dispatch if sent by telegram, mailgram, overnight delivery, express mail or federal express, or three (3) days after mailing if sent by first class mail with postage prepaid.

20.    ASSIGNABILITY.  This Promissory Note may be assigned by Bank or any holder at any time.

21.    JOINT AND SEVERAL LIABILITY.  If more than one person or entity is executing this Promissory Note as Borrower, all liabilities under this Promissory Note shall be joint and several with respect to each of such persons or entities.

22.    BINDING NATURE.  This Promissory Note shall inure to the benefit of and be enforceable by Bank and Bank's successors and assigns and any other person to whom Bank may grant an interest in Borrower's obligations to Bank, and shall be binding and enforceable against Borrower and Borrower's personal representatives, successors and assigns.

23.    INVALIDITY OF ANY PART.  If any provision or part of any provision of this Promissory Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Promissory Note and this Promissory Note shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality or unenforceability.

24.    MAXIMUM RATE OF INTEREST; COMMERCIAL LOAN.  Notwithstanding any provision of this Promissory Note to the contrary, Borrower shall not be obligated to pay interest hereunder in excess of the maximum rate of interest permitted by the laws of any state determined to govern this Promissory Note or the laws of the United States applicable to loans in such state.  If any provision of this Promissory Note shall ever be construed to require the payment of any amount of interest in excess of that permitted by applicable law, then the interest to be paid hereunder shall be held subject to reduction to the amount allowed under applicable law, and any sums paid in excess of the interest rate allowed by law shall be applied in reduction of the principal balance outstanding under this Promissory Note.  Borrower acknowledges that it has been contemplated at all times by Borrower that the laws of the Commonwealth of Pennsylvania will govern the maximum rate of interest that it is permissible for the holder of this Promissory Note to charge Borrower under this Promissory Note. Borrower warrants that this Promissory Note evidences a loan made solely to acquire or carry on a business or commercial enterprise.

25.    CHOICE OF LAW; CONSENT TO VENUE AND JURISDICTION.  This Promissory Note shall be governed, construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania, even if the Commonwealth of Pennsylvania rules governing conflicts of laws would otherwise require that the laws of another jurisdiction govern this Promissory Note.  Borrower consents to the jurisdiction and venue of the courts of any city or county in the Commonwealth of Pennsylvania or to the jurisdiction and venue of the United States District Court for the Middle District of Pennsylvania in any action or judicial proceeding brought to enforce, construe or interpret this Promissory Note.

26.    UNCONDITIONAL OBLIGATIONS.  Borrower's obligations under this Promissory Note shall be the absolute and unconditional duties and obligations of Borrower and shall be independent of any rights of set-off, recoupment or counterclaim which Borrower might otherwise have against the holder of this Promissory Note, and Borrower shall pay absolutely the payments of principal, interest, fees, charges and expenses required hereunder, free of any deductions and without abatement, diminution or set-off.

27.    ACTIONS AGAINST BANK.  Any action brought by Borrower against Bank which is based, directly or indirectly, or in whole or in part, upon this Promissory Note or any matter related to this Promissory Note shall be brought only in the courts of the Commonwealth of Pennsylvania.

28.    WAIVER OF JURY TRIAL.  Borrower (by execution of this Promissory Note) and Bank (by acceptance of this Promissory Note) agree that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by Borrower, Bank, or any successor or assign of Borrower or Bank on or with respect to this Promissory Note or which in any way relates, directly or indirectly, to the obligations of Borrower to Bank under this Promissory Note, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury.  BORROWER AND BANK HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING.  Borrower and Bank acknowledge and agree that this provision is a specific and material aspect of the agreement between the parties and that Bank would not enter into the transaction with Borrower if this provision were not a part of their agreement.

[SIGNATURES CONTAINED ON NEXT PAGE]

Page -4-

BS-3108A-9811 PAGE 4                                                                                             PK 10

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned executes this Promissory Note under seal, as Borrower, as of the date first written above.

WITNESS/ATTEST*:

CCI Construction Co, Inc
(Name of Organization)

750 Old Gettysburg Rd
(Street Address)

Camp Hill, Pa 17011
(City-State-Zip)

717-909-4224    717-909-4610
(Telephone)                    (Facsimile)

*E M Avery*

E. M. AVERY  ASSISTANT SECRETARY
(Print Name)

By: _____ CFO _____ [SEAL]
(Authorized Signature)

Sheri Phillips, CFO
(Print Name and Title)

_____

By: _____ [SEAL]
(Authorized Signature)

_____
(Print Name)

_____
(Print Name and Title)

*NOTE:  Attestation by a corporate officer of another corporate officer's capacity to sign is required in all corporate transactions.

If Borrower is an individual he or she should sign below:

WITNESS:

_____

_____
(Print Name)

_____ [SEAL]

_____
(Print Name)

_____
(Street Address)

_____
(City-State-Zip)

_____
(Telephone)                    (Facsimile)

BS-3108A-9811 PAGE 5                                    PK 10

**EXHIBIT A**
**FILM/Cash Solutions Promissory Note**

Account Number: ___28864514___

Borrower: __CCI Construction Company, Inc.__

    The terms and provisions of the option checked below are incorporated in and made a part of the FILM/Cash Solutions Promissory Note executed by Borrower to which this Exhibit A is attached:

[X]    **FILM LOAN OPTION** - The following terms apply to this option:

    i)    Maximum Line Amount - __$4,000,000.00__

    ii)    Minimum Loan Advance - $0.01

    iii)    Incremental Advance Amount - __$1.00__

    iv)    Target Balance - $__0__

    v)    Fees - __0__

[ ]    **CASH SOLUTIONS PROTECTION OPTION** - The following terms apply to this option:

    i)    Maximum Line Amount -

    ii)    Minimum Loan Advance - $500.00

    iii)    Incremental Advance Amount - $500.00

    iv)    Target Balance - $

    v)    Fees -

[ ]    **CASH SOLUTIONS MAXIMIZER OPTION** - The following terms apply to this option:

    i)    Maximum Line Amount -

    ii)    Minimum Loan Advance - $500.00

    iii)    Incremental Advance Amount - $500.00

    iv)    Target Balance - $

    v)    Fees -

    vi)    Balance in Account is not transferred to investments until all Loans are paid in full.

[ ]    **CASH SOLUTIONS LOAN OPTION** - The following terms apply to this option:

    i)    Maximum Line Amount -

    ii)    Minimum Loan Advance - $500.00

    iii)    Incremental Advance Amount - $500.00

    iv)    Target Balance - $

    v)    Fees -

WITNESS/ATTEST:            BORROWER:

                             _CCI Construction Co., Inc._

                  By: _____ CFO (SEAL)
                       Name: _Sheri Phillips_
                       Title: _CFO_

If Borrower is an individual he or she should sign below:

                                        (SEAL)
                       Name: _____

F4-FCS-PN
10/13/98



DEFENDANT'S
EXHIBIT
5

# INTER-OFFICE MEMORANDUM

TO:    File

FROM:    Craig Schwartz

DATE:    11/4/99

RE:    CCI Construction

---

A meeting was held with Sherri Phillips CFO and John Ortenzio President of CCI and Michael Zarcone to discuss the requested financing of a line of credit increase.

We decided that an increase of $1,200,000.00 million will be done on a temporary basis and CCI will get an additional $500,000 from private sources. This should be sufficient to meet their current cash flow shortage.

C 0558

 **allfirst**



**DEFENDANT'S EXHIBIT**

_Edward S._

Allfirst Bank
P.O. Box 2961
Harrisburg, PA 17105-2961

November 5, 1999

Mr. John M Ortenzio, President
CCI Construction Co., Inc
P.O. Box 8800
Mechanicsburg, PA  17055

Dear John:

I am pleased to inform you that Allfirst Bank (hereinafter "Bank") has approved a $1,200,000 partially secured line of credit to CCI Construction Co., Inc. (hereinafter "Borrower") as follows:

| | |
|---|---|
| Principal Amount of Line: | $1,200,000.00 |
| Interest Rate: | Bank's Base Rate as in effect from time to time, minus 1/2%. |
| Repayment: | Interest payable monthly, principal on demand. |
| Use of Proceeds: | Finance work in progress and accounts receivable. |
| Collateral: | Specific equipment financed, including titled vehicles |

Borrowings under Loan will bear interest at an annual rate equal to the Bank's Base Rate as in effect from time to time, minus one-half percent.  This interest will change when and as the Bank's Base Rate changes.  Interest will be calculated on the basis of the actual number of days in the current calendar year divided by 360.   Interest will be payable monthly upon submission of the Bank's notice therefor.

Borrowings under the Loan will be payable on demand.  If no demand is made, the Loan will expire and all borrowings will be due and payable, together with interest thereon, on March 31, 2000.

Borrowings under the Loan shall be limited to 80% of the Borrower's qualified accounts receivable which are less than 90 days past due, excluding retainages.

C 0400

CCI Construction Co., Inc.
November 5, 1999
Page Two

The Loan will be supported by the personal Suretyship of John M. Ortenzio limited to $1,200,000.

The Borrower shall furnish the Bank with financial reporting as follows:

1.  Annual CPA- audited financial statements of CCI Construction Co., Inc.

2.  Quarterly work in process reports for CCI Construction, Co., Inc.

3.  Quarterly Company prepared financial statements of CCI Construction Co., Inc.

4.  Monthly borrowers certification with monthly accounts receivable aging and listing.

5.  Annual personal financial statement of John M. Ortenzio.

The Borrower shall maintain a primary business deposit relationship with the Bank.

The Borrower will not create, assume or permit to exist, any mortgage, pledge, lien or encumbrance of or upon, or security interest in any of Borrower's property or assets now owned or hereafter acquired in favor of the Bank, other than purchase money, without prior written consent of the Bank.

The availability to the Loan is contingent upon the Borrower and the Bank entering into mutually acceptable loan documentation setting forth the terms and conditions contained herein and such other terms and conditions, covenants, warranties and representations as may be required by the Bank and be mutually acceptable to the Borrower and the Bank. All terms and conditions contained herein shall survive the execution of such loan documentation.

The commitment is contingent upon the right of the Bank at any time hereafter and from time to time to review the commitment, to adjust terms and conditions, or to discontinue the commitment should the Bank in the reasonable exercise of its sole business discretion deem it necessary to do so.

C 0401

CCI Construction Co., Inc.
November 5, 1999
Page Three

Please indicate the acceptability of these terms and conditions by dating, signing, and returning an executed copy of this letter no later than November 19, 1999.

Very truly yours,


Craig J. Schwartz
Vice President

CJS/mas

Enclosure

ACKNOWLEDGED AND ACCEPTED THIS         DAY OF                    , 1999.

ATTEST:                                          CCI CONSTRUCTION CO., INC.

BY: _____ Sec.             BY: _____
        Title: Sec/Treas                                Title: Pres


WITNESS:                                          SURETY:

_____                       _____
                                                 John M. Ortenzio

C 0402

  

**allfirst**

**EXHIBIT**

**SURETYSHIP AGREEMENT**

under the *$1,200,000 commercial loan note dated 11-8-99*

Date ___11-8-99___

For value received, the Undersigned, jointly and severally, hereby unconditionally agree to make prompt payment of all obligations, indebtedness and liabilities due Allfirst Bank, a Maryland state-chartered commercial bank, hereinafter called "Bank," ~~of any kind (whether now existing or hereafter arising)~~ due or which may become due, whether by acceleration or otherwise, ~~absolute or contingent, joint or several, direct or indirect, secured or unsecured~~ by **CCI Construction Co., Inc.** hereinafter called "Borrower," all such obligations being hereinafter further described and collectively called the "Liabilities," and the Undersigned agree(s) to pay all expenses (including attorneys' fees and legal expenses, whether or not litigation is commenced) paid or incurred by the Bank in endeavoring to collect the Liabilities, or any part thereof, whether or not bankruptcy has been declared, and in enforcing this Suretyship Agreement. The liability of the Undersigned hereunder is a primary and direct obligation without regard to any other obligor or security or collateral held by the Bank.

The Undersigned hereby waive all notices of any character whatsoever with respect to this Suretyship Agreement and the Liabilities of the Borrower for which the Suretyship Agreement has been executed, including but not limited to notice of the acceptance hereof and reliance hereon and notice of default by the Borrower. The Undersigned hereby give consent to the Bank to the taking of, or failure to take, from time to time, without notice to the Undersigned, any action of any nature whatsoever with respect to the Liabilities of the Borrower, with respect to any rights against any person or persons, including the Borrower and any of the Undersigned, in any property, including, but not limited to, any postponements, compromises, indulgences, waivers, extensions, exchanges, releases, and satisfactions. The Undersigned shall remain fully liable on this Suretyship Agreement, notwithstanding any of the foregoing.

This Suretyship Agreement shall in all respects be a continuing, absolute and unconditional one, and shall remain in full force and effect (notwithstanding, without limitation, the death, incompetency or dissolution of any of the Undersigned or that at any time, or from time to time, all Liabilities may have been paid in full). This Suretyship Agreement is subject to discontinuance as to any of the Undersigned only upon actual receipt by the Bank of written notice from such Undersigned, or any person duly authorized and acting on behalf of such Undersigned, of the discontinuance hereof as to such Undersigned; provided, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such Undersigned hereunder with respect to (a) any and all Liabilities existing prior to the time of actual receipt of such notice by the Bank, (b) any and all Liabilities created or acquired thereafter pursuant to any previous binding commitments made by the Bank, (c) any and all extensions or renewals of any of the foregoing, (d) any and all interest on any of the foregoing, and (e) any and all expenses paid or incurred by the Bank in endeavoring to collect any of the foregoing and in enforcing this Suretyship Agreement against such Undersigned. All obligations of the Undersigned under this Suretyship Agreement shall, notwithstanding any such notice of discontinuance, remain fully in effect until all Liabilities not subject to an effective notice of discontinuance (including any extensions or renewals of any thereof) and all such interest and expenses shall have been paid in full. Any notice of discontinuance by or on behalf of any one of the Undersigned shall not affect or impair the obligations hereunder of any other of the Undersigned.

At the option of the Bank, all Liabilities of Borrower shall become immediately due and payable by the Undersigned, without demand or notice, in the event any of the following shall occur: (a) Borrower shall fail to make any payment or meet any other liability when due; (b) Borrower or the Undersigned shall fail to observe or perform any obligation, term, condition or provision of Borrower under any document evidencing or securing the Liabilities, this Suretyship Agreement or any other agreement, document, certificate, instrument of security, suretyship or guaranty given by Borrower to Bank; (c) Any representation, warranty or certificate made or furnished by Borrower to Bank, in connection with the Liabilities or any other agreement, document, certificate, instrument of security, suretyship or guaranty given by Borrower to Bank or in any certificate, financial statement or separate assignment made hereunder shall be materially false; (d) Borrower or any of the Undersigned shall make an assignment for the benefit of creditors; (e) Proceedings in bankruptcy or for reorganization of Borrower or any of the Undersigned or for the readjustment of any of their debts under the Bankruptcy Act, as amended, or in any part thereof, or under any other act or law, whether state or federal, for the relief of debtors now or hereafter existing, shall be commenced by or against Borrower or the Undersigned; (f) A receiver or trustee shall be appointed for Borrower or any of the Undersigned or for any substantial part of their assets; or any proceedings are instituted for the dissolution, or the full or partial liquidation, of Borrower or any of the Undersigned; (g) Material adverse changes in the financial condition of the Borrower or any of the Undersigned; (h) A death of Borrower or any of the Undersigned or, if Borrower or the Undersigned is a partnership, the death of any general partner; or (i) Borrower or any of the Undersigned ceases doing business as a going concern.

As security for the Liabilities hereunder, the Undersigned hereby grants Bank a security interest in the following:
**NONE**

Together with a right, without demand or notice of any kind, at any time and from time to time when any amount shall be due and payable by the Undersigned hereunder and in such order of application as the Bank may elect, to set-off against all monies, deposits or other property of any kind, without limitation, owned by the Undersigned or in which the Undersigned has a joint or contingent interest and which are in possession of Bank for any reason whatsoever.

The Undersigned further agree that, if at any time, any part of any payment theretofore applied by the Bank to any of the Liabilities is or must be returned by the Bank for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Borrower), such Liabilities shall, for the purposes of this Suretyship Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Bank, and this Suretyship Agreement shall continue to be effective or be reinstated, as the case may be as to such Liabilities, all as though such application by the Bank had not been made. In such an event the Undersigned hereby waives any right of contribution, subrogation or indemnification against the Borrower, for a period of twelve (12) months subsequent to the last payment made or due to be made from Borrower to Bank.

The Bank may, from time to time, whether before or after any discontinuance of this Suretyship Agreement, at its sole discretion and without notice to the Undersigned (or any of them), take any or all of the following actions: (a) retain or obtain a security interest in any property to secure any of the Liabilities or any obligation hereunder; (b) retain or obtain the primary or secondary obligation of any obligor or obligors in addition to the Undersigned, with respect to any of the Liabilities; (c) extend or renew for one or more periods (whether or not longer than the original period), alter or exchange any of the Liabilities, or release or compromise any obligation of any of the Undersigned hereunder or any obligation of any nature of any other obligor with respect to any of the Liabilities, (d) release its security interest in, or surrender, release or permit any substitution or exchange for, all or any part of any property securing any of the Liabilities or any obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such property; and (e) resort to the Undersigned for any of them) for payment of any of the Liabilities, whether or not the Bank shall have resorted to any property securing any of the Liabilities for payment of any of the Liabilities, or any obligation hereunder or shall have proceeded against any other of the Undersigned or any other obligor primarily or secondarily obligated with respect to any of the Liabilities.

Any monies received by the Bank from whatsoever source on account of the Liabilities may be applied by Bank toward the payment of such of the Liabilities and in such order of application, as the Bank may from time to time elect; and, notwithstanding any payments made by or for the account of the Undersigned pursuant to this Suretyship Agreement, the Undersigned shall not be subrogated to any rights of the Bank until such time as this Suretyship Agreement shall have been discontinued as to all of the Undersigned and the Bank shall have received payment of the full amount of all Liabilities and of all obligations of the Undersigned hereunder. The Bank shall not be obligated under any theory of law relating to the marshalling of payment received or security interest granted under the terms of this Suretyship Agreement.

CE-128-1

The Bank may, from time to time, · · · before or after any discontinuance of this Suretyship Agreement, without notice to the undersigned (or any of, them), assign or transfer any or all of · · Liabilities or any interest therein; and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Liabilities shall be and remain Liabilities for the purpose of this Suretyship Agreement and each and every immediate and successive assignee or transferee of any of the Liabilities or of any interest therein shall, to the extent of the interest of such assignee or transferee of the Liabilities, be entitled to the benefits of this Suretyship Agreement to the same extent as if such assignee or transferee were the Bank; provided, however, that unless the Bank shall otherwise consent in writing, the Bank shall have an unimpaired right prior and superior to that of any such assignee or transferee, to enforce this Suretyship Agreement for the benefit of the Bank, as to those of the Liabilities which the Bank has not assigned or transferred.

*Under* 1,200,00 commercial loan note dated 11-8-99 JMO CP

No modification or waiver of any of the provisions of this Suretyship Agreement shall be binding upon the Bank except as expressly set forth in a writing duly signed by each of the Undersigned and the Bank. No action of the Bank permitted hereunder shall in any way affect or impair the rights of the Bank and the obligation of the Undersigned under this Suretyship Agreement. For the purpose of this Suretyship Agreement, Liabilities shall include all obligations of the Borrower to the Bank notwithstanding any right or power of the Borrower or anyone else to assert any claim or defense as to the invalidity or unenforceability of any such obligation and no such claim or defense shall affect or impair the obligations of the Undersigned hereunder.

The Liability of the Undersigned for Liabilities of Borrower incurred on or prior to the date hereof shall not exceed, at any time, the aggregate principal amount of **ONE MILLION TWO HUNDRED THOUSAND & NO/100 DOLLARS** ($ **1,200,000.00** ). plus interest as stated in the evidence of indebtedness given by Borrower to Bank and fifteen percent (15%) attorneys' commission; provided that this Suretyship Agreement shall also be applicable to and extend to any and all Liabilities, plus interest and costs as aforesaid, of Borrower arising after the date hereof even if the total of such Liabilities plus the Liabilities outstanding on or prior to the date hereof exceed the aforementioned aggregate principal amount. If no limitation is inserted in this paragraph, there is no limit to the liability of the Undersigned to the Bank.

The creation or existence from time to time of Liabilities in excess of any amount to which the right of recovery under this Suretyship Agreement is limited is hereby authorized, without notice to the Undersigned (or any of them), and shall in no way affect or impair the rights of the Bank and the obligation of the Undersigned under this Suretyship Agreement.

The Undersigned, jointly and severally, do hereby authorize and empower any prothonotary or clerk or attorney of any court of record of Pennsylvania or elsewhere, to appear for and confess judgment against any or all of the Undersigned in favor of Bank for the total liability of the Undersigned as set forth herein together with interest thereon, with or without declaration, with costs of suit, release of errors, without stay of execution or garnishment and agree to condemnation and the sale of real estate or personal property, or a writ of inquisition, and the benefit of all exemption laws now or hereinafter enacted, and with fifteen percent (15%) for collection fees, and waive the right of inquisition and the benefit of all exemption laws now or hereinafter enacted, and agree to condemnation and the sale of real estate or personal property, or a writ of execution.

In the event the Bank acquires any property securing this Suretyship Agreement after a foreclosure sale as to real property or a public auction sale as to personal property, the Undersigned agrees to indemnify and hold the Bank harmless from any loss, costs, or expense which the Bank may sustain as a result of: (a) selling the real or personal property acquired for less than the total sums owed by the Borrower to the Bank, provided, however, that any such sale by the Bank is done in a commercially reasonable manner or (b) any action brought against the Bank under §548 or §544(b) of the United States *Bankruptcy Code*, as amended, on the ground that the consideration paid by the Bank for the real or personal property was not "fair equivalent value," within the contemplation of §544(b) of the United States *Bankruptcy Code*, as amended, or any applicable state fraudulent conveyance act.

The Undersigned waive and release the Bank from any damages which the Undersigned may incur as a result of any intentional or unintentional or negligent action or inaction of the Bank impairing, diminishing, or destroying any of the Undersigned's rights of subrogation which the Undersigned may have upon payment of any of the Borrower's obligations. The Undersigned acknowledges previously having waived, under certain conditions, any such rights.

The Undersigned hereby agrees that this Suretyship Agreement shall apply to any obligation which the Bank may incur as the result of any payment to Bank by or on behalf of the Borrower which is determined to be a preference payment benefiting the undersigned. *1,200,000 commercial loan note dated 11-8-99 JMO CP*

If a photostatic copy hereof shall have been filed in any of said proceedings, it shall not be necessary to file the original as a warrant of attorney. The foregoing warrant and power to confess judgment shall not be deemed to have been exhausted by any single exercise thereof, whether or not any such exercise shall be held by any court to be invalid, voidable or void, but may be exercised from time to time, as often as the Bank shall elect, until all sums payable or that may become payable by each of the Undersigned have been paid in full.

A subsequent guaranty or suretyship by the Undersigned or any other guarantor or surety of the Borrower's Liabilities given to the Bank shall not be deemed to be in lieu of or to supersede or terminate this Suretyship Agreement but shall be construed to be additional or supplementary unless otherwise expressly provided therein; and in the event the Undersigned or any other guarantor or surety has given to the Bank a previous guaranty or Suretyship Agreement, this Suretyship Agreement shall be construed to be additional or supplementary, and not to be in lieu thereof or to terminate such previous Suretyship Agreement, guaranty or guaranties unless expressly so provided herein.

This Suretyship Agreement shall be binding upon the Undersigned, and upon the heirs, legal representatives, successors and assigns of the Undersigned, and to the extent that the Borrower or any of the Undersigned is an entity such as a partnership, limited partnership, limited liability company, corporation or any other similar entity, all references herein to the Borrower and to the Undersigned, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such entity. If more than one party shall execute this Suretyship Agreement, the term "Undersigned" as used herein shall mean all parties executing this Suretyship Agreement and each of them, and all such parties shall be jointly and severally obligated hereunder.

This Suretyship Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania without giving effect to choice of law rules. Wherever possible each provision of this Suretyship Agreement shall be interpreted in such manner as to be effective and valid under applicable law but if any provision of this Suretyship Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Suretyship Agreement.

INTENDING TO BE LEGALLY BOUND HEREBY, the Undersigned have set their respective hands and seals the day and year first above written.

WITNESS OR ATTEST:

(SURETY) John M Ortenzio

Title: _____

By: _____
Title: _____ (SEAL)

Title: _____

By: _____
Title: _____ (SEAL)

Title: _____

By: _____
Title: _____ (SEAL)

CE-128-2

*CCI CONSTRUCTION COMPANY, INC.*

*YEARS ENDED*
*DECEMBER 31, 1998 AND 1997*

EXHIBIT

3

3/12/0? ⌐mH

C 7623

# CCI CONSTRUCTION COMPANY, INC.

## YEARS ENDED DECEMBER 31, 1998 AND 1997

CONTENTS

|  | Page |
|---|---|
| Independent auditors' report | 1 |
| **Financial statements:** | |
| Balance sheets | 2 |
| Statements of income | 3 |
| Statements of shareholder's equity | 4-5 |
| Statements of cash flows | 6-7 |
| Notes to financial statements | 8-13 |
| **Accompanying information to financial statements:** | |
| Cost of contracts | 14 |
| General and administrative expenses | 15 |
| Earnings from contracts | 16 |
| Completed contracts | 17 |
| Contracts-in-progress | 18 |

C 7624

BROWN SCHULT

SHERIDAN FRIT

## Independent Auditors' Report

Board of Directors
CCI Construction Company, Inc.
Mechanicsburg, Pennsylvania

We have audited the accompanying balance sheets of CCI Construction Company, Inc. as of December 31, 1998 and 1997 and the related statements of income, shareholder's equity and cash flows for the years then ended.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of CCI Construction Company, Inc. as of December 31, 1998 and 1997 and the results of its operations and its cash flows for the years then ended, in conformity with generally accepted accounting principles.

Our audits of the financial statements were made for the purpose of forming an opinion on the basic financial statements taken as a whole.  The accompanying information is presented for purposes of additional analysis and is not a required part of the basic financial statements.  Such information has been subjected to the auditing procedures applied in the audits of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Brown Schultz Sheridan & Fritz*

February 10, 1999

CERTIFIED PUBLIC ACCOUNT

BUSINESS ADVI

A PROFESSIONAL CORPORA

1011 MUMMA F
WORMLEYSBURG  PA

PO BOX 6
HARRISBURG, PA 17106-
717-761-
PA: 800-294-
FAX: 717-737-

1725 OREGON
LANCASTER, PA 1
717-560-
PA: 800-294-
FAX: 717-560-

WEBSITE: WWW.BSSF

1

## CCI CONSTRUCTION COMPANY, INC.

### BALANCE SHEETS - DECEMBER 31, 1998 AND 1997

ASSETS

| | 1998 | 1997 |
|---|---:|---:|
| **Current assets:** | | |
| Cash and cash equivalents | $ 2,429,866 | $ 1,128,337 |
| Investments in marketable securities | 631,481 | 3,702,992 |
| Accounts receivable, trade: | | |
| Customers: | | |
| Current | 5,964,311 | 8,230,674 |
| Retained | 1,822,224 | 1,121,610 |
| Affiliates | 365,756 | 3,485 |
| Note receivable | | 22,569 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 6,341,726 | 1,072,281 |
| Prepaid expenses | 170,232 | 6,185 |
| Shop inventory | 38,161 | 639 |
| Total current assets | 17,763,757 | 15,288,772 |
| **Property and equipment:** | | |
| Automobiles and trucks | 1,269,567 | 427,342 |
| Furniture | 851,738 | 553,587 |
| Machinery and equipment | 5,947,290 | 1,323,233 |
| Other | 344,128 | 72,453 |
| | 8,412,723 | 2,376,615 |
| Less accumulated depreciation | 1,651,485 | 920,919 |
| | 6,761,238 | 1,455,696 |
| **Other assets:** | | |
| Cash surrender value of officer's life insurance | 55,453 | |
| Investments | 34,000 | |
| | 89,453 | |
| | $ 24,614,448 | $ 16,744,468 |

See notes to financial statements.

C 7626

## LIABILITIES AND SHAREHOLDER'S EQUITY

| | 1998 | 1997 |
|---|---|---|
| Current liabilities: | | |
| Accounts payable, trade: | | |
| Current | $ 10,974,274 | $ 7,846,395 |
| Retained | 2,180,967 | 1,078,950 |
| Notes payable | | 815,781 |
| Current portion of long-term debt | 1,338,280 | |
| Accrued expenses | 333,060 | 808,601 |
| Taxes withheld and accrued | 91,601 | 58,023 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 288,208 | 681,924 |
| | | |
| Total current liabilities | 15,206,390 | 11,289,674 |
| Long-term debt, net of current portion | 4,164,375 | |
| Total liabilities | 19,370,765 | 11,289,674 |
| | | |
| Shareholder's equity: | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | 39 |
| Capital in excess of par | 9,758 | 9,758 |
| Retained earnings | 5,254,834 | 5,208,489 |
| Accumulated other comprehensive income (loss), unrealized gain (loss) on marketable securities | ( 20,948) | 236,508 |
| | 5,243,683 | 5,454,794 |
| | $ 24,614,448 | $ 16,744,468 |

C 7627

# CCI CONSTRUCTION COMPANY, INC.

## STATEMENTS OF INCOME

### YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Revenue | $ 52,534,453 | $ 34,921,676 |
| Cost of contracts | 51,145,382 | 32,617,473 |
| Gross profit | 1,389,071 | 2,304,203 |
| General and administrative expenses | 1,505,700 | 1,954,380 |
| Income (loss) from operations | ( 116,629) | 349,823 |
| Other income (expense): | | |
| Gain (loss) on sale of: | | |
|   Marketable securities and cash equivalents | 260,927 | ( 6,016) |
|   Property and equipment | 10,069 | ( 2,920) |
| Interest | ( 161,296) | |
| Investment | 151,592 | 367,538 |
| Miscellaneous | ( 85,622) | ( 1,546) |
| | 175,670 | 357,056 |
| Net income | $ 59,041 | $ 706,879 |

See notes to financial statements.

3

C 7628

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF SHAREHOLDER'S EQUITY

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | Common stock | Capital in excess of par | Retained earnings | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1996 | $ 39 | $ 9,758 | $ 4,768,011 | $ 42,867 | $ 4,820,675 |
| Comprehensive income: | | | | | |
| Net income | | | 706,879 | | 706,879 |
| Other comprehensive income: | | | | | |
| Unrealized holding gains arising during the period on marketable securities | | | | 187,348 | 187,348 |
| Add reclassification adjustment | | | | 6,293 | 6,293 |
| | | | | | 193,641 |
| Comprehensive income | | | | | 900,520 |
| Distributions | | | ( 266,401) | | ( 266,401) |
| Balance, December 31, 1997 (carried forward) | 39 | 9,758 | 5,208,489 | 236,508 | 5,454,794 |

(continued)

4

C 7629

## CCI CONSTRUCTION COMPANY, INC.

STATEMENTS OF SHAREHOLDER'S EQUITY (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | Common stock | Capital in excess of par | Retained earnings | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1997 (brought forward) | $ 39 | $ 9,758 | $ 5,208,489 | $ 236,508 | $ 5,454,794 |
| Comprehensive loss: | | | | | |
| Net income | | | 59,041 | | 59,041 |
| Other comprehensive income (loss): | | | | | |
| Unrealized holding gains arising during the period on marketable securities | | | | 3,469 | 3,469 |
| Less reclassification adjustment | | | | ( 260,925) | 260,925) |
| | | | | | ( 257,456) |
| Comprehensive loss | | | | | ( 198,415) |
| Distributions | | | ( 12,696) | | ( 12,696) |
| Balance, December 31, 1998 | $ 39 | $ 9,758 | $ 5,254,834 | $( 20,948) | $ 5,243,663 |

See notes to financial statements.

5

C 7823

## CCI CONSTRUCTION COMPANY, INC.

STATEMENTS OF CASH FLOWS

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Cash flows from operating activities: |  |  |
| Net income | $      59,041 | $     706,879 |
| Adjustments: |  |  |
| Depreciation | 793,014 | 156,504 |
| (Gain) loss on sale of: |  |  |
| Property and equipment | (       10,069) | 2,920 |
| Marketable securities | (      260,927) | 6,293 |
| (Increase) decrease in: |  |  |
| Accounts receivable | 1,203,478 | (    5,516,738) |
| Costs and estimated earnings in excess of billings on uncompleted contracts | (   5,269,445) | (      692,618) |
| Prepaid expenses | (      164,047) | 47,047 |
| Shop inventory | (       37,522) | (          639) |
| Cash surrender value of officer's life insurance | (       55,453) |  |
| Increase (decrease) in: |  |  |
| Accounts payable | 4,229,896 | 4,912,287 |
| Accrued expenses | (      475,541) | 530,442 |
| Taxes withheld and accrued | 33,578 | 47,166 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | (      393,716) | 172,293 |
| Total adjustments | (      406,754) | (      335,043) |
| Net cash provided by (used in) operating activities | (      347,713) | 371,836 |
| Cash flows from investing activities: |  |  |
| Purchase of: |  |  |
| Investments | (      161,670) | (  11,093,130) |
| Property and equipment | (       98,793) | (      560,929) |
| Repayment of note receivable | 22,569 | 9,120 |
| Proceeds from: |  |  |
| Sale and maturities of investments | 3,202,652 | 9,381,163 |
| Sale of property and equipment | 28,502 | 13,864 |
| Net cash provided by (used in) investing activities | 2,993,260 | (    2,249,912) |

(continued)

6

C 7631

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF CASH FLOWS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Cash flows from financing activities: | | |
| Distributions to shareholder | $( 12,696) | $( 266,401) |
| Proceeds from issuance of notes payable and long-term debt | 17,990,666 | |
| Repayment of notes payable and long-term debt | ( 19,321,988) | ( 73,301) |
| Net cash used in financing activities | ( 1,344,018) | ( 339,702) |
| Net increase (decrease) in cash and cash equivalents | 1,301,529 | ( 2,217,778) |
| Cash and cash equivalents, beginning of year | 1,128,337 | 3,346,115 |
| Cash and cash equivalents, end of year | $ 2,429,866 | $ 1,128,337 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $ 161,296 | $ 1,707 |
| Noncash activities: | | |
| Net increase (decrease) in unrealized gain on marketable securities (see statements of shareholder's equity) | $( 257,456) | $ 193,641 |
| Notes payable incurred for the acquisition of new equipment | $ 6,018,196 | $ 889,082 |

See notes to financial statements.

7

C 7632

## CCI CONSTRUCTION COMPANY, INC.

### NOTES TO FINANCIAL STATEMENTS

### YEARS ENDED DECEMBER 31, 1998 AND 1997

1.  **Summary of significant accounting policies:**

    *Operations and operating cycle:*

    The Company constructs and renovates commercial buildings primarily under fixed-price contracts in the eastern United States. The Company's receivables are concentrated among customers in this geographic area. The Company extends credit to its customers and generally requires no collateral.

    The length of the Company's contracts varies but is typically between one to two years. In accordance with normal practice in the construction industry, the Company includes asset and liability accounts relating to construction contacts in current assets and liabilities even when such amounts are realizable or payable over a period in excess of one year.

    *Use of estimates:*

    The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

    *Revenue and cost recognition:*

    Revenues from construction contracts are recognized on the percentage-of-completion method, measured by the percentage of direct cost incurred to date to estimated total direct cost for each contract. That method is used because management considers direct cost to be the best available measure of progress on the contracts. Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change within the near term.

    For purposes of determining percentage of completion estimates, contract costs include all direct material, labor and subcontracting costs and other direct costs related to contract performance. Indirect costs and general and administrative costs are charged to expense as incurred. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are first determined. Changes in job performance, job conditions and estimated profitability may result in revisions to costs and income and are recognized in the period in which the revisions are determined. An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

8

C 7633

Case 1:01-cv-00799-SHR    Document 43    Filed 01/08/2002    Page 30 of 103

### CCI CONSTRUCTION COMPANY, INC.

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

1.    **Summary of significant accounting policies (continued):**

*Revenue and cost recognition (continued):*

The asset, "Costs and estimated earnings in excess of billings on uncompleted contracts," represents revenues recognized in excess of amounts billed. The liability, "Billings in excess of costs and estimated earnings on uncompleted contracts," represents billings in excess of revenues recognized.

*Cash and cash equivalents:*

For purposes of reporting cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

*Marketable securities:*

Marketable securities are reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of stockholder's equity. Fair value of the marketable securities is based on quoted market prices for those or similar securities or quotes from brokers. Gains and losses are determined using the specific identification method when securities are sold.

*Property and equipment:*

Property and equipment are stated at cost. Depreciation is provided using straight-line and accelerated methods over the estimated useful lives of the assets.

*Change in presentation:*

During 1998, the Company adopted Statement of Financial Accounting Standards No. 130, Reporting Comprehensive Income (SFAS No. 130). SFAS No. 130 requires the reporting of comprehensive income in addition to net income from operations. Comprehensive income is a more inclusive financial reporting methodology that includes disclosure of certain financial information that historically has not been recognized in the calculation of net income. SFAS No. 130 requires that the earlier year provided for comparative purposes be reclassified to conform to the statement.

C 7634

## CCI CONSTRUCTION COMPANY, INC.

### NOTES TO FINANCIAL STATEMENTS (CONTINUED)

### YEARS ENDED DECEMBER 31, 1998 AND 1997

2. **Cash and cash equivalents:**

   Cash and cash equivalents consist of the following:

   |  | 1998 | 1997 |
   |---|---|---|
   | Cash | $  374,464 | $  451 |
   | Money market funds | 1,035 | 403,714 |
   | Repurchase agreements | 2,054,367 | 724,172 |
   |  | $ 2,429,866 | $ 1,128,337 |

   At December 31, 1998, the amount of deposits in cash held at the bank exceeded the Federal Deposit Insurance Corporation (FDIC) insurance by $867,883. The money market funds and the repurchase agreements are not insured by the FDIC. The repurchase agreements sold by a bank were held in custody by this bank for the account of CCI Construction Company, Inc. and were invested in securities, which are not pledged as collateral.

3. **Marketable securities:**

   The cost or amortized cost and the aggregate fair value of investments in the debt and equity securities at December 31, 1998 and 1997 are as follows:

   | | 1998 | | |
   |---|---|---|---|
   | | Cost or amortized cost | Gross unrealized losses | Estimated fair value |
   | Available-for-sale securities, mutual funds | $  652,429 | $  20,948 | $  631,481 |

   | | 1997 | | | |
   |---|---|---|---|---|
   | | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value |
   | Available-for-sale securities: | | | | |
   | Mutual funds | $ 3,386,480 | $ 16,845 | $ 253,465 | $ 3,623,100 |
   | Obligations of states and political subdivisions | 80,004 | 112 | | 79,892 |
   | | $ 3,466,484 | $ 16,957 | $ 253,465 | $ 3,702,992 |

10

C 7635

### CCI CONSTRUCTION COMPANY, INC.

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

3.  **Marketable securities (continued):**

| | 1998 | 1997 |
|---|---|---|
| Cost of securities sold | $ 2,941,725 | $ 9,387,456 |
| Proceeds from sale | 3,202,652 | 9,381,163 |
| Gross realized gains | 262,391 | |
| Gross realized losses | 1,464 | 6,293 |

4.  **Uncompleted contracts:**

| | 1998 | 1997 |
|---|---|---|
| Contract costs | $ 42,225,606 | $ 27,920,734 |
| Estimated earnings thereon | 3,130,223 | 1,638,199 |
| | 45,355,829 | 29,558,933 |
| Less billings applicable thereto | 39,302,311 | 29,168,576 |
| | $ 6,053,518 | $ 390,357 |

Included in the balance sheet as:

| | 1998 | 1997 |
|---|---|---|
| Costs and estimated earnings in excess of billings on uncompleted contracts | $ 6,341,726 | $ 1,072,281 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | ( 288,208) | ( 681,924) |
| | $ 6,053,518 | $ 390,357 |

5.  **Long-term debt:**

Long-term debt consists of the following:

| | 1998 |
|---|---|
| Obligations to various financing corporations due in current monthly installments totaling $116,074, including interest at fixed rates approximating 7%. The notes, which are secured by the financed equipment, mature at various dates through August 2003. | $ 3,964,581 |

11

C 7636

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

5. **Long-term debt (continued):**

|  | 1998 |
|---|---|
| Borrowings under a $2,000,000 bank equipment line of credit are secured by the financed equipment. The agreement requires the December 31, 1998 balance to be repaid by December 2003 in monthly installments of $30,238, including interest at a fixed rate of 6.7%. | $ 1,538,074 |
| Total long-term debt | 5,502,655 |
| Less current portion | 1,338,280 |
| Long-term debt portion | $ 4,164,375 |

Aggregate principal payments due on long-term debt for the five years subsequent to December 31, 1998 are as follows:

| | |
|---|---|
| 1999 | $ 1,338,280 |
| 2000 | 1,415,424 |
| 2001 | 1,242,569 |
| 2002 | 961,559 |
| 2003 | 544,823 |
| | $ 5,502,655 |

6. **Operating line of credit:**

The Company has available a $2,000,000 unsecured operating line of credit expiring on April 30, 1999 which requires interest at the bank's prime rate less 1/2%. The Company has no outstanding balance on the line at December 31, 1998.

7. **Rent expense:**

Various equipment and operating facilities are leased under noncancellable agreements. Total rent expense for all leases, including the related party lease discussed in Note 8, was $1,689,666 and $432,492 in 1998 and 1997, respectively.

The aggregate minimum rental commitments under all noncancellable leases at December 31, 1998 totaling $28,639 are due in 1999.

12

C 7637

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

8.  **Related party transactions:**

The Company is leasing an operating facility owned by its sole shareholder through March 31, 1999. The lease requires a monthly rental payment of $4,037. Rent expense for this facility was $48,444 and $45,000 for 1998 and 1997, respectively.

Effective April 1, 1999, the Company will begin leasing an operating facility from Mechanicsburg Land Company, which is owned by the Company's sole shareholder, on a year-to-year basis. The initial lease, which expires December 31, 1999, requires monthly lease payments of $14,329. Additionally, the Company entered into a contract for the construction of this facility with Mechanicsburg Land Company. Billings of $339,203 were included in accounts receivable as of December 31, 1998.

During 1997, the Company incurred warranty insurance expense of $825,000 with Pennsylvania Contractors Insurance Company, a corporation under common control. These costs are allocated as direct cost of contracts. There were no such costs in 1998.

During 1998, two insurance claims for contract losses incurred of $900,000 were paid by Pennsylvania Contractors Insurance Company. These claims were covered under the terms of a remedial work period insurance policy.

In addition, Pennsylvania Contractors Insurance Company has guaranteed a claim of $1,162,460 filed by the Company with a contract owner. If the owner fails to pay all or any part of this claim, the insurance company will pay the unpaid portion.

9.  **Income taxes:**

No provision has been made for federal or state income taxes. Under provisions of the Internal Revenue Code and the Commonwealth of Pennsylvania Tax Act, the Company has elected not to be taxed as a corporation and the sole shareholder has consented to include the income in his individual return.

10. **Year 2000 issues:**

Like any other company, advances and changes in available technology can significantly affect the business and operations of the Company. A challenging problem exists as many computer systems worldwide do not have the capability of recognizing the year 2000 or years thereafter. No easy technology "quick fix" has yet been developed for this problem. While the Company has not requested verification of its year 2000 status from its auditors, it believes its computer systems will effectively deal with transactions in the year 2000 and beyond. This "Year 2000 Computer Problem" creates risk for the Company from unforeseen problems from third parties with whom the Company deals on financial transactions. Failures of the third parties' computer systems could have an impact to the Company's ability to conduct its business. The effect, if any, is unknown at this time.

13

C 7638

## CCI CONSTRUCTION COMPANY, INC.

COST OF CONTRACTS

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Direct costs: | | |
| Labor | $ 6,457,982 | $ 2,886,054 |
| Payroll taxes | 702,129 | 335,936 |
| Employee benefits | 667,597 | 677,477 |
| Equipment | 111,207 | 41,373 |
| Equipment rental | 1,625,224 | 381,924 |
| Materials | 10,371,108 | 4,259,253 |
| Other | 1,745,316 | 1,679,129 |
| Subcontractors | 27,802,562 | 22,099,706 |
|  | 49,483,125 | 32,360,852 |
| Indirect costs: | | |
| Salaries | 528,517 | 86,208 |
| Payroll taxes | 61,224 | 11,217 |
| Employee benefits | 70,560 | 8,324 |
| Blueprints | 163 | 6 |
| Depreciation | 687,512 | 95,723 |
| Dues and permits | 5,340 | 710 |
| Employee recruitment | 44,621 | 7,151 |
| Insurance | 4,486 | 716 |
| Office supplies and expense | 53,393 | 8,112 |
| Postage | 2,187 | 253 |
| Professional services | 37,338 | |
| Rent | 40,731 | 8,636 |
| Repairs and maintenance | 12,655 | 3,648 |
| Safety | 2,732 | 2,157 |
| Telephone | 28,926 | 11,802 |
| Temporary help | 7,591 | |
| Trade books and journals | 1,892 | 556 |
| Training and seminars | 8,303 | |
| Travel and entertainment | 10,290 | 728 |
| Utilities | 10,397 | 1,413 |
| Warehouse expenses | 43,399 | 9,261 |
|  | 1,662,257 | 256,621 |
| Total cost of contracts | $ 51,145,382 | $ 32,617,473 |

14

C 7639

### CCI CONSTRUCTION COMPANY, INC.

GENERAL AND ADMINISTRATIVE EXPENSES

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | 1998 | 1997 |
|---|---|---|
| Salaries: | | |
| Officers | $ 353,939 | $ 1,038,273 |
| Office | 480,807 | 410,023 |
| Payroll taxes | 60,247 | 73,399 |
| Employee: | | |
| Benefits | 53,857 | 33,722 |
| Recruitment | 4,379 | 2,237 |
| Advertising | 3,067 | 1,038 |
| Bad debt | 22,569 | |
| Bank charges | 5,111 | 3,667 |
| Blueprints | 17,551 | 13,507 |
| Company sponsored activities | 2,373 | 1,098 |
| Contributions | 14,220 | 3,030 |
| Depreciation | 105,502 | 60,781 |
| Dues | 16,335 | 8,058 |
| Insurance | 12,399 | 12,162 |
| Licenses and taxes | 44,559 | 44,270 |
| Miscellaneous | | 265 |
| Office supplies | 50,617 | 18,875 |
| Postage | 8,967 | 7,914 |
| Professional services | 109,543 | 95,337 |
| Rent | 23,711 | 33,744 |
| Repairs and maintenance | 6,555 | 7,689 |
| Telephone | 19,164 | 31,328 |
| Temporary help | 1,719 | |
| Trade books and journals | 24,222 | 22,995 |
| Training and seminars | 5,938 | 1,086 |
| Travel and entertainment | 30,687 | 5,948 |
| Utilities | 27,662 | 23,934 |
| Total general and administrative expenses | $ 1,505,700 | $ 1,954,380 |

15

C 7640

### CCI CONSTRUCTION COMPANY, INC.

EARNINGS FROM CONTRACTS

YEAR ENDED DECEMBER 31, 1998

|  | Revenues earned | Cost of revenues earned | | Gross profit (loss) |
|---|---|---|---|---|
| Contracts completed during the year | $ 13,541,950 | $ 13,969,824 | (a) | $( 427,874) |
| Contracts–in–progress at year–end | 38,721,607 | 35,389,315 | (a) | 3,332,292 |
| Construction management contracts | 83,777 | 20,444 | (a) | 63,333 |
| Time and material jobs | 187,119 | 103,542 | (a) | 83,577 |
|  | 52,534,453 | 49,483,125 | | 3,051,328 |
| Indirect costs | | 1,662,257 | | ( 1,662,257) |
|  | $ 52,534,453 | $ 51,145,382 | | $ 1,389,071 |

(a) Excludes indirect costs not allocated to specific jobs.

16

C 7641

## CCI CONSTRUCTION COMPANY, INC.

### COMPLETED CONTRACTS

### YEAR ENDED DECEMBER 31, 1998

| Job number | Contract | Contract totals | | | Before January 1, 1998 | | | During the year ended December 31, 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs | Revenues earned | Cost of revenues earned | Gross profit before indirect costs | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs |
| 428 | U.E.P.H. Complex | $ 19,272,256 | $ 17,479,889 | $ 1,792,367 | $ 17,763,732 | $ 15,878,479 | $ 1,885,253 | $ 1,508,524 | $ 1,601,410 | $( 92,886) |
| 445 | Houtzdale Prison | 10,937,202 | 11,397,234 | ( 460,032) | 4,086,420 | 4,169,371 | ( 82,951) | 6,850,782 | 7,227,863 | ( 377,081) |
| 448 | Outlook Creekview | 4,800,644 | 4,655,443 | 145,201 | 554,419 | 521,254 | 33,165 | 4,246,225 | 4,134,189 | 112,036 |
| 449 | U.E.P.H. Headquarters | 1,456,558 | 1,521,701 | ( 65,143) | 520,139 | 515,339 | 4,800 | 936,419 | 1,006,362 | ( 69,943) |
| | | $ 36,466,660 | $ 35,054,267 | $ 1,412,393 | $ 22,924,710 | $ 21,084,443 | $ 1,840,267 | $ 13,541,950 | $ 13,969,824 | $( 427,874) |

17

C 7642

# CCI CONSTRUCTION COMPANY, INC.

## CONTRACTS-IN-PROGRESS

## DECEMBER 31, 1998

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (loss) before indirect costs | Inception to December 31, 1998 Direct contract costs to December 31, 1998 | Contract earnings (loss) accrued to December 31, 1998 before indirect costs | Billings to December 31, 1998 | December 31, 1998 Costs and estimated earnings in excess of billings | Billings in excess of costs and estimated earnings | Year ended December 31, 1998 Revenues earned | Direct cost of revenues earned | Gross profit (loss) before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | Mahanoy Prison | $ 11,699,418 | $ 10,667,972 | $ 1,031,446 | $ 10,666,608 | $ 1,031,333 | $ 10,481,740 | $ 1,216,401 | | $ 5,623,543 | $ 4,357,586 | $ 1,265,957 |
| 450 | Johnstown | 3,256,600 | 3,245,082 | 21,518 | 1,172,766 | 7,776 | 730,724 | 449,818 | | 1,064,029 | 1,057,305 | 6,724 |
| 451 | Lord Fairfax | 7,082,984 | 7,301,111 | ( 218,127) | 6,659,984 | ( 218,127) | 6,570,468 | | $ 128,611 | 5,998,746 | 6,248,376 | ( 249,630) |
| 454 | Albemarle Prison | 14,524,840 | 12,875,751 | 1,649,089 | 4,819,694 | 617,292 | 4,719,426 | 717,560 | | 5,436,986 | 4,819,694 | 617,292 |
| 455 | Perry Point | 12,937,341 | 11,463,840 | 1,473,501 | 4,734,492 | 608,547 | 3,108,536 | 2,234,503 | | 5,343,039 | 4,734,492 | 608,547 |
| 456 | Outlook - Hilliard | 5,380,745 | 4,801,310 | 579,435 | 2,715,193 | 327,677 | 2,732,602 | 310,268 | | 3,042,870 | 2,715,193 | 327,677 |
| 457 | Camp Hill | 1,495,629 | 1,372,273 | 123,356 | 547,295 | 49,197 | 617,799 | | 21,307 | 596,492 | 547,295 | 49,197 |
| 459 | Scott Air Force Base | 14,870,150 | 13,929,350 | 940,800 | 6,026,575 | 407,040 | 6,571,905 | | 138,290 | 6,433,615 | 6,026,575 | 407,040 |
| 460 | Germ Plasma Center | 15,565,000 | 14,667,024 | 897,976 | 2,905,995 | 177,917 | 2,252,156 | 831,756 | | 3,083,912 | 2,905,995 | 177,917 |
| 461 | Outlook - Chesterfield | 3,842,372 | 3,629,824 | 212,548 | 1,518,251 | 88,902 | 1,097,444 | 509,709 | | 1,607,153 | 1,518,251 | 88,902 |
| 462 | Outlook - Westerville | 5,589,900 | 5,218,140 | 371,760 | 458,553 | 32,669 | 419,511 | 71,711 | | 491,222 | 458,553 | 32,669 |
| | | $ 96,254,879 | $ 89,171,677 | $ 7,083,302 | $ 42,225,606 | $ 3,130,223 | $ 39,302,311 | $ 6,341,726 | $ 288,208 | $ 38,721,607 | $ 35,389,315 | $ 3,333,292 |

18

C 7643

allfirst
3607 Derry Street
Harrisburg, PA   17111
Special Credits 900-03-05
(717) 565-2878
(717) 565-2870 (Fax)

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | Eileen K. | Fax: | 507-3953 |
| From: | Lois | Date: | 3/1/00 |
| Re: | CCI | Pages: | 10 (Including Cover Page) |
| CC: | | | |

☐ Urgent     ☐ For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

Notes:

1st fax   10 pgs. (partial)
2nd fax   13 pgs (completed)

C 7644

CCI CONSTRUCTION CO., INC.
BALANCE SHEET
12/31/99

ID: 13-00-1909

```
1000        A S S E T S

1002        *CURRENT ASSETS*
                                        ---------------
1040        CASH & INVESTMENTS          (   594,857.26)
                                        ---------------

1049           TOTAL CASH & INVESTMENTS              (   594,857.26)

1050        ACCOUNTS RECEIVABLE:
1100        ACCOUNTS RECEIVABLE         12,230,914.30
1110        A/R RETAINAGE                4,903,477.69
1140        EMPLOYEE RECEIVABLE              1,973.68
1141        ACCOUNTS RECEIVABLE-ORTENZIO      184.83
1156        DUE FROM AFFILIATES             2,197.66
                                        ---------------

1157           TOTAL ACCOUNTS RECEIVABLE             17,138,748.16
                                                     ---------------
1167        INVENTORY:                      54,384.97
                                        ---------------

1168           INVENTORY                                54,384.97

1192           OTHER CURRENT ASSETS                     38,354.36

1193           COSTS & EARNINGS > BILLINGS           4,158,685.00
                                                     ---------------
1195           TOTAL CURRENT ASSETS                 20,795,315.23

1196        *LONG TERM ASSETS*

1200        OFFICER LIFE INSURANCE POLICY             62,094.00
1205        NOTE RECEIVABLE - VEHICLE                 24,621.53

1300        *FIXED ASSETS*
1301        OFFICE FURNITURE AND FIXTURES  1,040,346.51
1302        MACHINERY AND EQUIPMENT        1,181,976.51
1303        AUTOS AND TRUCKS               1,153,516.12
1304        SMALL TOOLS                      317,193.27
1305        SHOP/MECHANICAL EQUIPMENT        347,101.45
                                        ---------------
1390           TOTAL FIXED ASSETS          4,126,849.39
                                        ---------------

1400        ACCUMULATED DEPRECIATION/AMORT.:
1401        ACCUM DEPR - FURNITURE & FIXTURE(  716,766.60)
1402        ACCUM DEPR - MACH & EQUIP      (  396,493.16)
1403        ACCUM DEPR - AUTO & TRUCK      (  341,643.25)
1404        ACCUM DEPR - SMALL TOOLS       (  162,519.74)
1405        ACCUM DEPR - SHOP/MECHANICAL   (  160,079.00)
                                        ---------------
1488           TOTAL ACCUM DEPR/AMORT      ( 1,777,501.75)
                                        ---------------
1490           NET FIXED ASSETS                      2,349,347.64
                                                     ---------------

1999           TOTAL A S S E T S                    23,144,662.87
                                                    ===============
```

EXHIBIT

9

3/12/01   HMH

CCI CONSTRUCTION CO., INC.
BALANCE SHEET

| | | | |
|---|---|---|---|
| 2000 | L I A B I L I T I E S | | |
| 2005 | CURRENT LIABILITIES | | |
| 2099 | ACCOUNTS PAYABLE: | | |
| 2100 | ACCOUNTS PAYABLE | 2,951,006.31 | |
| 2101 | SUBCONTRACTOR A/P | 6,130,086.78 | |
| 2102 | A/P RETAINAGE | 3,764,423.64 | |
| | | --------------- | |
| 2120 | TOTAL ACCOUNTS PAYABLE | | 12,845,516.73 |
| 2295 | ACCRUED PAYROLL TAXES | | 202,668.00 |
| 2415 | OTHER CURRENT LIABILITIES | | 320,629.67 |
| 2431 | NOTE PAYABLE-ALLFIRST LINE OF | 1,200,000.00 | |
| 2450 | NOTES PAYABLE-CURRENT | | 3,782,351.64 |
| 2480 | BILLINGS > COSTS & EARNINGS | | 4,402,180.00 |
| | | | --------------- |
| 2490 | TOTAL CURRENT LIABILITIES | | 22,753,346.04 |
| 2870 | NOTES PAYABLE-LONG TERM | | 1,387,079.70 |
| | | | --------------- |
| 2990 | TOTAL L I A B I L I T I E S | | 24,140,425.74 |
| 3000 | E Q U I T Y | | |
| 3110 | CAPITAL SURPLUS | 9,797.00 | |
| 3200 | RETAINED EARNINGS | 286,513.75 | |
| 3210 | RETAINED EARNINGS SUB-S CORP | 4,343,092.86 | |
| 3275 | OTHER ACCUMULATED ADJUSTMENTS | 480,647.00 | |
| 3500 | CURRENT YEAR EARNINGS | ( 6,115,813.48) | |
| | | --------------- | |
| 3800 | TOTAL E Q U I T Y | | ( 995,762.87) |
| | | | --------------- |
| 3900 | TOTAL LIABILITIES AND EQUITY | | 23,144,562.87 |
| | | | =============== |

C 7735

L-R08
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 1

PAGE    3
02-14-2000 14:07

| 1003 | CASH: | |
|------|-------|---|
| 1010 | CASH - DAUPHIN CHECKING | ( 573,734.41) |
| 1011 | CASH - DAUPHIN PAYROLL | ( 55,522.85) |
| 1013 | CASH - FLEX REIMBURSEMENT ACCT | 100.00 |
| 1016 | INVESTMENT IN EPIC | 3,000.00 |
| 1017 | INVESTMENT IN RAFFLES | 31,000.00 |
| 1020 | PETTY CASH | 300.00 |
| | | --------------- |
| 1040 | CASH & INVESTMENTS | ( 594,857.26) |
| | | --------------- |

C 7736

L-R08                                    CCI CONSTRUCTION CO., INC.                        PAGE    4
ATE: 13-00-1999                          BALANCE SHEET - SCHEDULE  2                       02-14-2000  14:07

1158              INVENTORY:
1160                   SHEET METAL SHOP INVENTORY         54,384.97
                                                         --------------
1167              INVENTORY:                              54,384.97
                                                         --------------

C 7737

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE  3

| 1150 | DUE FROM AFFILIATES | |
|------|---------------------|--------------|
| 1153 | DUE TO/FROM CUSTODIAL | 376.20 |
| 1154 | DUE TO/FROM RELIANCE | ( 45.64) |
| 1155 | DUE TO/FROM MECH LAND CO | 1,867.10 |
| 1156 | DUE FROM AFFILIATES | 2,197.66 |
| | | --------------- |

C 7738

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE  6

| | | | |
|---|---|---|---|
| 1165 | CURRENT ASSETS: | | |
| 1175 | PREPAID RENT | 2,015.28 | |
| 1176 | SECURITY DEPOSIT - CALIFORNIA | 2,015.28 | |
| 1185 | PREPAID TAXES | 25,100.00 | |
| 1190 | PREPAID GENERAL EXPENSES | 9,223.80 | |
| 1192 | OTHER CURRENT ASSETS | | 40,552.02 |

C 7739

Case 1:81-cv-88788-SHR   Document 13   Filed 01/08/2002   Page 47 of 103

L-R08
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 50

PAGE    7
02-14-2000 14:07

| 2190 | ACCRUED PAYROLL TAXES: | |
|------|------------------------|--------------|
| 2200 | ACCRUED FED W/H | 57,394.00 |
| 2210 | ACCRUED FICA W/H | 53,592.89 |
| 2220 | ACCRUED FUTA | 4,877.66 |
| 2222 | ACCRUED SUTA - CAL | 196.51 |
| 2223 | ACCRUED STATE W/H - CAL | 6,607.92 |
| 2225 | ACCRUED STATE W/H - PA | 2,570.83 |
| 2226 | ACCRUED LOCAL W/H - PA | 4,817.40 |
| 2227 | ACCRUED OPT W/H - PA | 1,110.00 |
| 2228 | ACCRUED SUTA - PA | 21,787.09 |
| 2232 | ACCRUED STATE W/H - DEL | 36.47 |
| 2241 | ACCRUED SUTA - W VA. | 4,911.32 |
| 2243 | ACCRUED STATE W/H - WEST VA | 5,547.10 |
| 2248 | ACCRUED SUTA - MD | 3,071.83 |
| 2249 | ACCRUED STATE W/H - MD | 9,728.80 |
| 2250 | ACCRUED SUTA - MO | 161.13 |
| 2251 | ACCRUED STATE W/H - MO | 1,341.00 |
| 2256 | ACCRUED SUTA - OHIO | 520.00 |
| 2258 | ACCRUED STATE W/H - OHIO | 485.40 |
| 2275 | ACCRUED STATE W/H - VA | 14,773.69 |
| 2276 | ACCRUED SUTA - VA | 3,282.40 |
| 2281 | ACCRUED STATE W/H - ILLINOIS | 3,130.65 |
| 2282 | ACCRUED SUTA - IL | 2,723.91 |
| 2295 | ACCRUED PAYROLL TAXES | 202,668.00 |

C 7740

Case 1:01-cv-00788-CHR    Document 43    Filed 04/08/2002    Page 48 of 103

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 60

| 2296 | OTHER CURRENT LIABILITIES | |
|------|---------------------------|-----------|
| 2301 | ACCRUED WORKERS COMP | 190,594.18 |
| 2307 | ACCRUED CAFETERIA DEDUCTIONS | ( 40,624.70) |
| 2310 | ACCRUED PAYROLL | 130,079.77 |
| 2311 | ACCRUED UNION FRINGE PAYABLE | 186.85 |
| 2313 | ACCRUED FRINGE FUND ACCOUNT | 6,079.45 |
| 2315 | ACCRUED 401(K) PLAN | 2,414.12 |
| 2329 | ACCRUED ACCOUNTING FEES | 31,900.00 |
| 2415 | OTHER CURRENT LIABILITIES | 320,629.67 |

C 7741

CCI CONSTRUCTION CO., INC

CASH FLOW PROJECTIONS

2/1/00 THRU 3/31/01 (Completion date of last job)

| | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | REMAINING | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | (6,205,366) | (9,063,691) | (9,199,345) | (9,389,090) | (9,589,773) | (9,973,228) | (9,873,456) | |
| Revenue | 5,593,391 | 6,162,630 | 7,455,167 | 7,782,395 | 7,921,756 | 6,990,371 | 28,835,033 | 70,740,743 |
| Direct Costs | (8,202,659) | (6,039,755) | (7,420,683) | (7,769,575) | (8,074,547) | (6,686,415) | (23,339,629) | (67,533,263) |
| Net Cash from Jobs | (2,609,268) | 122,875 | 34,484 | 12,820 | (152,791) | 303,956 | 5,495,404 | 3,207,480 |
| Overhead | (229,066) | (238,539) | (204,238) | (193,513) | (210,674) | (183,694) | (1,312,620) | (2,572,344) |
| Depreciation | 50,500 | 50,500 | 50,500 | 50,500 | 50,000 | 50,000 | 350,000 | 652,500 |
| Principal Payments | (39,798) | (40,027) | (40,259) | (40,491) | (40,725) | (40,960) | (336,311) | (578,571)** |
| Interest Expense on Equip Loans | (10,693) | (10,463) | (10,232) | (9,999) | (9,765) | (9,530) | (67,611) | (128,293) |
| Interest Expense on Line of Credit* | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (160,000) | (280,000) |
| Net Cash Flow with Equipment | (2,858,325) | (135,654) | (189,745) | (200,683) | (383,455) | 99,772 | 3,968,862 | 300,772 |
| Ending Cash Balance w/ Equip | (9,063,691) | (9,199,345) | (9,389,090) | (9,589,773) | (9,973,228) | (9,873,456) | (5,904,594) | (62,993,174) |
| Available Line of Credit | 5,200,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | |
| Cash shortage | (3,863,691) | (5,199,345) | (5,389,090) | (5,589,773) | (5,973,228) | (5,873,456) | (1,904,594) | |

**Principal pmts are thru 3/31/01. At that time, the remaining principal balance will be $1,259,524.

Also, the overhead, depreciation, and interest expense are projected through 3/31/01. All jobs are projected through the end, which is projected to be 3/31/01.

*Interest expense on the line of credit was projected for $3,000,000 at 8%.

Interest expense on equipment is actual based on amortization schedules. It does not include any decrease for vehicles that will be sold.

Feb-18-00 07:10P JOHN ...RTENZIO                717 ...09 4222                P.08

**CCI CONSTRUCTION CO., INC.**
**REMAINING BILLINGS AND COSTS ON JOBS**

| JOB # | JOB NAME | C CONTRACT AMOUNT | D AMT PD THRU 1/31/00 | E MO OF BILL | F REMAINING TO BE PD | G AMOUNT IN RETENTION | H TOTAL PROJECTED COST PER 12/31 CTC | I ACTUAL COSTS THRU 01/31/00 | H-I=J REMAINING COSTS | F-J=K DIFFERENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 454 | ALBEMARLE | 14,582,917 | 10,924,799 | | 3,658,118 | 600,551 | 15,544,471 | 13,044,430 | 2,500,041 | 1,158,077 |
| 448 | CREEKVIEW | 4,856,021 | 4,856,021 | | 0 | 0 | 4,677,876 | 4,677,876 | 0 | 0 |
| 456 | HILLIARD | 5,600,748 | 5,318,813 | | 281,935 | 278,938 | 5,090,697 | 5,099,679 | -8,982 | 290,917 |
| 481 | CHESTERFIELD | 4,115,065 | 3,776,419 | | 338,646 | 203,326 | 4,061,553 | 3,990,886 | 70,667 | 267,979 |
| 462 | WESTERVILLE | 5,767,995 | 3,300,307 | | 2,467,688 | 394,184 | 5,679,439 | 3,976,072 | 1,703,367 | 764,321 |
| 476 | SUMMERDALE | 1,942,371 | 983,147 | | 959,224 | 296,615 | 1,867,273 | 1,868,258 | -985 | 960,209 |
| 470 | PERRY CTY | 4,349,802 | 3,795,985 | | 553,817 | 0 | 4,504,792 | 4,113,956 | 390,836 | 162,981 |
| 450 | JOHNSTOWN | 3,732,569 | 3,631,674 | | 100,895 | 99,820 | 3,705,315 | 3,707,462 | -2,147 | 103,042 |
| 485 | JAMES RIVER | 7,242,081 | 3,533,593 | | 3,708,488 | 222,010 | 7,434,677 | 4,010,947 | 3,423,730 | 284,758 |
| 467 | EPW III | 4,060,421 | 3,756,179 | | 304,242 | 203,371 | 3,778,939 | 3,530,088 | 248,851 | 55,391 |
| 478 | EPW 1ST FLOOR | 204,290 | 195,459 | | 8,831 | 0 | 184,270 | 205,308 | -11,038 | 19,869 |
| 475 | SR22 CAMBRIA | 868,337 | 865,540 | | 2,797 | 0 | 874,936 | 865,339 | 9,597 | -6,800 |
| 455 | PERRY PT | 12,999,654 | 11,438,742 | | 1,560,912 | 300,000 | 12,013,954 | 11,537,698 | 476,256 | 1,084,656 |
| 453 | PA TURNPIKE | 226,834 | 226,834 | | 0 | 0 | 78,704 | 78,704 | 0 | 0 |
| 473 | KOST ROAD | 1,767,688 | 1,442,347 | | 325,341 | 0 | 1,666,842 | 1,299,936 | 366,906 | -41,565 |
| 460 | GERM/PLASM | 16,155,581 | 9,057,829 | | 7,097,752 | 698,109 | 16,022,012 | 10,265,744 | 5,859,260 | 1,441,484 |
| 477 | COOL & COLD | 12,319,099 | 880,888 | | 11,438,211 | 0 | 11,892,515 | 1,572,220 | 10,120,295 | 1,317,916 |
| 480 | AQUA WATERLINE | 191,083 | 0 | | 191,083 | 0 | 165,915 | 1,982 | 163,933 | 27,150 |
| 459 | SCOTT AFB | 15,081,490 | 14,860,168 | | 221,322 | 472,580 | 18,979,483 | 18,907,941 | 71,542 | 149,780 |
| 466 | VCU | 22,072,807 | 5,925,956 | | 16,146,851 | 472,816 | 20,664,978 | 8,660,944 | 12,204,034 | 3,942,817 |
| 451 | LORD FAIRFAX | 7,230,740 | 6,859,169 | | 371,571 | 361,008 | 7,984,862 | 7,991,224 | -6,342 | 377,913 |
| 439 | MAHANOY | 11,730,187 | 11,729,437 | | 750 | 750 | 10,704,600 | 10,704,600 | 0 | 750 |
| 458 | PA TURN CONST | 22,504,225 | 1,561,754 | | 21,002,469 | 111,516 | 21,139,451 | 2,779,055 | 18,360,396 | 2,642,073 |
| | TOTAL | 179,661,803 | 108,921,060 | | 70,740,743 | 5,016,594 | 178,618,592 | 122,081,367 | 55,737,225 | 15,003,518 |

2/14/00 5:45 PM

Cash Flow Jan 2000.xls

Feb-18-00 07:10P JOHN ORTENZIO                    717 909 4222                    P.09

2/14/00 5:45 PM

## Cash Flow Revenue Projections by Job by Month

| JOB # | JOB NAME | REMAINING REVENUE TO BE PAID | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | REMAINING | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 454 | ALBEMARLE | 3,658,118 | 369,000 | 400,000 | 600,000 | 500,000 | 600,000 | 300,000 | 889,118 | 3,658,118 |
| 448 | CREEKVIEW | 0 | 0 | | | | | | | 0 |
| 458 | HILLIARD | 281,935 | 0 | 0 | | 281,935 | | | | 281,935 |
| 461 | CHESTERFIELD | 338,646 | 86,780 | 0 | 13,220 | 35,320 | | 203,326 | | 338,646 |
| 462 | WESTERVILLE | 2,467,688 | 247,354 | 325,000 | 525,000 | 525,000 | 300,000 | 225,334 | 320,000 | 2,467,688 |
| 476 | SUMMERDALE | 969,224 | 638,911 | 23,697 | | | 296,616 | | | 959,224 |
| 470 | PERRY CTY | 553,817 | 0 | 0 | 0 | 0 | 220,000 | 220,000 | 113,817 | 553,817 |
| 450 | JOHNSTOWN | 100,895 | 0 | 0 | 100,895 | 0 | 0 | 0 | | 100,895 |
| 465 | JAMES RIVER | 3,708,488 | 330,948 | 451,352 | 700,000 | 700,000 | 450,000 | 300,000 | 776,188 | 3,708,488 |
| 467 | EPW III | 304,242 | 107,875 | 196,367 | 0 | 0 | 0 | 0 | 0 | 304,242 |
| 478 | EPW 1ST FLOOR | 8,831 | 8,831 | 0 | 0 | 0 | 0 | 0 | 0 | 8,831 |
| 475 | SR22 CAMBRIA | 2,797 | 2,797 | 0 | 0 | 0 | 0 | 0 | 0 | 2,797 |
| 455 | PERRY PT | 1,560,912 | 400,000 | 400,000 | 460,912 | 0 | 300,000 | 0 | 0 | 1,560,912 |
| 453 | PA TURNPIKE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 473 | KOST ROAD | 325,341 | 0 | 2,370 | 2,370 | 2,370 | 2,370 | 2,370 | 313,491 | 325,341 |
| 460 | GERMPLASM | 7,097,752 | 850,000 | 850,000 | 1,000,000 | 1,100,000 | 1,100,000 | 1,100,000 | 1,097,752 | 7,097,752 |
| 477 | COOL & COLD | 11,438,211 | 900,000 | 1,630,033 | 1,100,000 | 1,400,000 | 1,300,000 | 1,200,000 | 3,908,178 | 11,438,211 |
| 480 | AQUA WATERLINE | 191,083 | 0 | 0 | 0 | 0 | 0 | 0 | 191,083 | 191,083 |
| 459 | SCOTT AFB | 221,322 | 0 | 0 | 0 | 0 | 0 | 0 | 221,322 | 221,322 |
| 466 | VCU | 16,146,651 | 1,167,539 | 1,200,000 | 1,500,000 | 1,600,000 | 1,900,000 | 1,800,000 | 6,979,112 | 16,146,651 |
| 451 | LORD FAIRFAX | 371,571 | 0 | 0 | 0 | 185,000 | 0 | 186,571 | 0 | 371,571 |
| 439 | MAHANOY | 750 | 750 | 0 | 0 | 0 | 0 | 0 | 0 | 750 |
| 458 | PA TURN CONST | 21,002,469 | 482,606 | 683,811 | 1,452,770 | 1,452,770 | 1,452,770 | 1,452,770 | 14,024,972 | 21,002,469 |
| | TOTAL | 70,740,743 | 5,593,391 | 6,162,630 | 7,455,167 | 7,782,395 | 7,921,756 | 6,990,371 | 28,835,033 | 70,740,743 |

Case 1:01-cv-00789-SHR   Document 45   Filed 04/08/2002   Page 52 of 103

Cash Flow Cost Projections by Job by Month

| JOB # | JOB NAME | REMAINING COSTS | A/P AS AT 1/21/00 | FEBRUARY SUBS | FEBRUARY ALL OTHER | MARCH SUBS | MARCH ALL OTHER | APRIL SUBS | APRIL ALL OTHER | MAY SUBS | MAY ALL OTHER | JUNE SUBS | JUNE ALL OTHER | JULY TOTAL REMAINING | TOTAL | REMAINING COSTS (C-I) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Overhead & Closed Jobs | 0 | 368,772 | +KMC REINTN | (138,475) | | | | | | 138,475 | | | | | 0 |
| 454 | ALBEMARLE | 2,500,041 | 801,147 | (242,313) | | 200,000 | 200,000 | 300,000 | 300,000 | | 250,000 | 300,000 | 300,000 | 300,000 | 521,354 | 2,500,041 |
| 448 | CREEKVIEW | 0 | 27,683 | | | | | | | | | | | | | 0 |
| 456 | HILLIARD | (8,042) | 273,395 | (234,012) | | | 10,000 | | | | | | | | 10,000 | (18,042) |
| 461 | CHESTERFIELD | 70,687 | 431,655 | (208,124) | | 50,000 | 20,867 | | 11,542 | 325,000 | 200,000 | 234,012 | | 209,124 | 70,687 | 70,687 |
| 482 | WESTERVILLE | 1,703,307 | 802,202 | (213,061) | 80,000 | 200,000 | 125,000 | 325,000 | 200,000 | 325,000 | 200,000 | 150,000 | 100,000 | 88,787 | 112,281 | 1,703,307 |
| 482 | SUMMERDALE | (985) | 282,177 | (32,807) | | 10,000 | | | | | | | | | 10,000 | (10,985) |
| 475 | PERRY CTY | 290,858 | 118,943 | | 30,000 | 10,000 | 25,000 | | 25,000 | | 100,000 | | 100,000 | 118,838 | 390,858 | 0 |
| 470 | JOHNSTOWN | (2,147) | 264,900 | (188,091) | | 10,000 | | | | | | | | | 10,000 | (12,147) |
| 485 | JAMES RIVER | 3,423,739 | 566,129 | (159,672) | 20,000 | 225,000 | 228,000 | 450,000 | 400,000 | 198,800 | 550,000 | 450,000 | 150,000 | 400,000 | 545,802 | 3,423,739 |
| 487 | EPW HI | 244,851 | 582,859 | (221,474) | 50,000 | 150,000 | 65,851 | 221,474 | | | | | | | 248,851 | 248,851 |
| 478 | EPW 1ST FLOOR | (11,036) | 6,548 | (6,551) | | 16,551 | | | | | | | | | 10,000 | (21,036) |
| 475 | SREZ CAMBRIA | 9,567 | 1,431 | | 5,000 | 214,256 | 4,567 | 200,000 | | | | | | | 9,567 | 9,567 |
| 435 | PERRY PT | 476,256 | 878,933 | (650,648) | | | | | | | 650,648 | | | | 478,256 | 478,256 |
| 453 | PA TURNPIKE | 0 | 0 | | | | | | | | | | | | | 0 |
| 473 | HOST ROAD | 206,906 | 87,865 | (43,501) | | 2,500 | | 2,000 | | 2,500 | | 2,000 | | 2,500 | 294,907 | 206,906 |
| 486 | GERAPLASM | 5,858,296 | 1,055,749 | (413,661) | 50,000 | 450,000 | 400,000 | 800,000 | 500,000 | 800,000 | 500,000 | 600,000 | 600,000 | 806,331 | 5,858,296 |
| 477 | COOL & COLD | 10,120,256 | 359,318 | (89,061) | 100,000 | 1,300,000 | 300,000 | 900,000 | 200,000 | 1,200,000 | 200,000 | 1,100,000 | 150,000 | 1,150,000 | 3,500,248 | 10,120,256 |
| 480 | AQUA WATERLINE | 183,033 | 1,074 | (100,000) | | 25,000 | 35,000 | | | | | | | 75,000 | 84,933 | 183,033 |
| 439 | SCOTT AFB | 71,542 | 244,963 | | 75,000 | | | 1,335,000 | 100,000 | 1,400,000 | 100,000 | 1,800,000 | 65,000 | 1,800,000 | 106,063 | 71,542 |
| 488 | VCU | 12,204,054 | 2,910,480 | (445,741) | | 1,000,000 | | | 11,542 | | | | | | 4,884,775 | 12,204,054 |
| 451 | LORD FAIRFAX | (8,342) | 210,539 | (234,074) | 10,000 | | 100,000 | | | 115,000 | | | | 121,024 | 116,838 | (18,342) |
| 429 | MAHANOY | 0 | 86,694 | | | | | | | | | | | | | 0 |
| 435 | PA TURN CONSTR | 18,300,296 | 1,199,570 | (196,000) | 20,000 | 625,000 | 25,000 | 1,400,000 | 40,000 | 1,400,000 | 40,000 | 1,400,000 | 40,000 | 1,440,000 | 12,091,301 | 18,300,296 |
| | **TOTAL** | 55,737,225 | 11,716,544 | (3,825,410) | 211,525 | 4,540,307 | 1,494,448 | 5,544,141 | 1,776,542 | 5,691,100 | 1,878,415 | 8,536,000 | 1,537,987 | 6,806,415 | 23,338,679 | 55,916,718 |

Feb-18-00 07:11P JOHN ORTENZIO     717 009 4222     P.11

## CCI CONSTRUCTION CO., INC.
## GROSS PROFIT COMPARISONS
## DECEMBER 1999

| JOB NUMBER | DESCRIPTION | DECEMBER CONTRACT AMOUNT | ORIGINAL PROJECTED GP AMOUNT | DECEMBER 98 PROJECTED GP AMOUNT | DECEMBER 98 GROSS PROFIT % | AUGUST PROJECTED GP AMOUNT | AUGUST GROSS PROFIT % | SEPTEMBER PROJECTED GP AMOUNT | SEPTEMBER GROSS PROFIT % | OCTOBER PROJECTED GP AMOUNT | OCTOBER GROSS PROFIT % | NOVEMBER PROJECTED GP AMOUNT | NOVEMBER GROSS PROFIT % | DECEMBER PROJECTED GP AMOUNT | DECEMBER GROSS PROFIT % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45400 | ALBEMARLE | 14,582,917 | 1,600,000 | 1,649,089 | 11.35% | 448,758 | 3.06% | 170,848 | 1.16% | 84,597 | 0.44% | (309,778) | -7% | (981,554) | -7% |
| 48,000 | AQUA WATER LINES | 191,083 | 25,168 | | | N/A | N/A | N/A | N/A | N/A | N/A | 25,168 | 13% | 25,168 | 13% |
| 45,700 | CCI-CAMP HILL | 17,319,099 | 0 | 123,356 | 8.25% | 42,111 | 2.82% | 45,697 | 3.06% | 50,190 | 3.36% | 50,181 | 3% | 49,364 | 3% |
| 47700 | COOL & COLD AQUA | 204,290 | 649,194 | | | 461,783 | 3.79% | 571,997 | 4.65% | 571,997 | 4.69% | 571,997 | 5% | 828,584 | 5% |
| 47800 | EPW I | 4,060,421 | 26,901 | N/A | | 26,901 | 12.70% | 10,631 | 5.43% | 12,362 | 6.05% | 11,004 | 5% | 10,020 | 5% |
| 40700 | EPW III | 16,115,981 | 185,897 | | | 276,882 | 7.40% | 276,861 | 8.93% | 304,759 | 7.60% | 303,077 | 8% | 281,487 | 5% |
| 46000 | GERAPLASM | 7,242,081 | 930,000 | 897,976 | 5.77% | 852,429 | 4.17% | 563,358 | 3.60% | 478,492 | 2.99% | 435,227 | 3% | 233,569 | -3% |
| 44500 | HOUTZDALE | 0 | 200,000 | (460,032) | -4.21% | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 46500 | JAMES RIVER | 3,732,569 | 150,000 | N/A | | 33,688 | 0.47% | 3,306 | 0.05% | (21,208) | -0.29% | (196,342) | -3% | (192,396) | -3% |
| 45000 | JOHNSTOWN | 7,230,740 | 100,000 | 21,518 | 0.66% | 61,837 | 2.19% | 60,763 | 2.16% | 63,352 | 1.70% | 40,185 | 1% | 27,254 | 1% |
| 45100 | LORD FAIRFAX | 4,115,065 | 250,000 | (218,127) | -3.09% | (354,698) | -4.81% | (431,002) | -5.68% | (449,220) | -8.23% | (501,606) | -7% | (754,142) | -10% |
| 43900 | MAHANOY FRISO | 5,600,748 | 150,840 | 1,008,886 | 9.11% | 1,065,027 | 9.08% | 1,027,063 | 8.76% | 1,027,044 | 8.76% | 1,070,498 | 9% | 1,035,587 | 9% |
| 48100 | OUTLOOK-Chestnut | 5,787,985 | 256,000 | 212,548 | 5.59% | 183,044 | 4.93% | 184,031 | 4.70% | 226,484 | 5.62% | 272,105 | 2% | 222,105 | 2% |
| 44800 | OUTLOOK-Creekview | 22,584,723 | 133,712 | 148,201 | 3.02% | 158,731 | 3.27% | 178,939 | 3.68% | 174,501 | 3.59% | 177,609 | 4% | 176,145 | 2% |
| 44200 | OUTLOOK-Hand | 1,767,888 | 350,000 | 578,435 | 10.77% | 593,908 | 10.68% | 577,325 | 10.31% | 542,475 | 9.69% | 521,422 | 6% | 519,033 | 6% |
| 44200 | OUTLOOK-Waterville | 12,993,654 | 350,000 | 371,760 | 6.65% | 331,329 | 5.93% | 348,725 | 6.24% | 346,673 | 6.09% | 348,679 | 6% | 88,558 | 6% |
| 45800 | PA TURNPIKE | 4,345,802 | 1,480,000 | N/A | | 1,480,000 | 7.40% | 1,425,261 | 6.30% | 1,424,832 | 6.31% | 1,424,832 | 6% | 1,424,772 | 4% |
| 47300 | PA TURNPIKE - KOST | 868,337 | 100,000 | N/A | | 103,875 | 5.88% | 103,803 | 5.67% | 100,847 | 5.71% | 100,847 | 6% | 100,846 | -1% |
| 45500 | PERRY POINT | 19,772,015 | 786,180 | 1,473,501 | 11.39% | 1,515,700 | 11.41% | 1,509,715 | 11.35% | 1,464,661 | 11.01% | 1,444,338 | 11% | 985,700 | 4% |
| 47000 | SRI N PERRY CNTY | 1,942,371 | 538,973 | N/A | | 577,966 | 8.83% | 577,987 | 14.01% | 577,987 | 14.01% | 498,443 | 12% | (154,089) | 4% |
| 47500 | SR 22 CAMBRIA CNTY | 22,012,807 | 121,640 | N/A | | 57,038 | 4.84% | 38,859 | 4.39% | 158,958 | 17.81% | 124,580 | 14% | 16,600 | 5% |
| 45900 | SCOTT 1 AF BASE | 19,777,015 | 821,697 | 940,800 | 6.33% | 897,402 | 4.84% | 897,402 | 4.75% | 822,108 | 4.36% | 919,994 | 14% | 792,532 | 13% |
| 47600 | SUMMERDALE | | 152,147 | N/A | | 213,782 | 12.66% | 213,782 | 12.65% | 213,782 | 12.66% | 236,682 | 13% | 75,098 | 0% |
| 42000 | U.E.P.A. | 0 | 1,640,000 | 1,792,387 | 9.30% | 1,692,341 | 8.76% | 1,680,215 | 8.72% | 1,679,983 | 8.72% | 1,679,955 | 9% | 1,679,144 | 0% |
| 44800 | UEPN CO HDTRS | 1,456,558 | 83,260 | (65,143) | -4.47% | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 48600 | VCU LIFE SCIENCE | 0 | 0 | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | 168,767,859 | 1,288,815 | 8,533,235 | N/A | 11,765,237 | 5.55% | 11,273,647 | 5.52% | 11,070,370 | 5.53% | 10,402,546 | 5% | 7,314,112 | 0% |

DISTRIBUTION
Shane Miller
Doug McIntosh
John Ortenzio
Sean Phelps

J 16:00

DEC JOB GP '45

R 4.2 PM

LAW OFFICES

# GEBHARDT & SMITH LLP

NINTH FLOOR
THE WORLD TRADE CENTER
BALTIMORE, MARYLAND 21202-3064

BALTIMORE:    (410) 752-5830
WASHINGTON:   (301) 470-7468

FACSIMILE
(410) 385-5119

WRITER'S DIRECT DIAL NUMBER:

(410) 385-5100
Writer's E-Mail Address:
lgebh@gebsmith.com

Refer To File No. 18610

February 24, 2000

*Via Facsimile and Federal Express*
4027 1282 2404

CCI CONSTRUCTION CO., INC.
2500 Old Gettysburg Road
Camp Hill, Pennsylvania 17011-7307

Attn:   John M. Ortenzio, President

RE:   $4,000,000 Unsecured Revolving Line Of Credit and
$2,000,000 Secured Equipment Purchase Line of Credit
Extended By Allfirst Bank To CCI Construction Co., Inc.

Dear Mr. Ortenzio:

This firm represents Allfirst Bank ("Lender"), which has extended to CCI Construction Co.,
Inc. ("Borrower") (a) a revolving line of credit in the maximum principal amount of $4,000,000
pursuant to a FILM/Cash Solutions Promissory Note dated March 24, 1999 ("Film Note") and
related documents, and (b) a secured equipment purchase line of credit in the stated principal amount
of $2,000,000 pursuant to a Commercial Loan Note ("Commercial Note") and a Security Agreement,
both dated November 20, 1998, and related documents. This letter is being sent at the specific
request and direction of the Lender.

As a result of the occurrence of various events which are materially adverse to the financial
condition of the Borrower, and as a further result of the insolvency of the Borrower, the Lender
hereby declares a default under the Commercial Loan Note and under the Security Agreement. In
consequence of this declaration of default under the equipment purchase line of credit, the Lender
hereby accelerates and declares immediately due and payable all sums presently outstanding and
owing under the equipment purchase line of credit.

As a result of the default under the equipment line of credit, the Borrower is, in turn, in
default under the cross-default provisions of Section 11 of the FILM Promissory Note, and the
Lender hereby declares the default. In consequence of this default the Bank hereby accelerates and
demands immediate payment of all sums presently due and owing under the FILM Promissory Note.

Because of the default under the FILM Promissory Note and the Bank's acceleration and
demand for immediate payment of the sums due thereunder no further sums will be advanced under
the revolving line of credit evidenced by the FILM/Cash Solutions Promissory Note, **effective
immediately**. Any checks or other payments items in transit will not be honored by the Lender.

GEBHARDT · & · SMITH

CCI CONSTRUCTION CO., INC.
February 24, 2000
Page 2

The total sums presently due and outstanding under the equipment purchase line of credit and the revolving line of credit, respectively, are as follows:

Equipment Purchase Line Of Credit
    Principal                                $1,244,116.74
    Interest through February 23 2000      $    5,237.80
    Total                                $ 1,249,354.54
    Interest per day thereafter: $231.54

Revolving Line Of Credit
    Principal                                $2,601,514.01
    Interest through February 23, 2000     $   26,524.83
    Total                                $2,628,038.84
    Interest per day thereafter: $596.18

As previously stated, the Lender by this letter is demanding immediate payment in full of all sums due and owing to it by the Borrower under both loans. Unless full payment is made by the Borrower immediately upon receipt of this letter, all remedies available to the Lender under applicable law will be pursued without further notice to the Borrower, including the institution of judgment by confession and the enforcement of the Lender's security interest.

This letter is not intended to be a waiver of any rights, remedies, or recourse available to the Lender, nor an election of remedies arising as a result of the defaults or of any other default which may now or hereafter exist with respect to the revolving line of credit and the equipment line of credit. The collection of interest or acceptance of partial payments (that is, less than the total amount due in accordance with the terms of the debt instruments) by the Lender shall not constitute an extension of the maturity date of the revolving line of credit or equipment line of credit or a waiver of the Lender's acceleration of the indebtedness evidenced by the respective debt instruments or of any other rights under the loan documents.

Very truly yours,

Lawrence J. Gebhardt

LJG/dls
cc:    Gerard L. Elias, SVP
            - ALLFIRST BANK
    Robert E. Chernicoff, Esquire
            - CUNNINGHAM & CHERNICOFF, P.C.

1    obtaining the $4 million line of credit?

2        A     He did not actually meet with the bank.  I

3    met with the bank.  He was aware what was going on

4    and talked to me about what I was doing, what my

5    plans were, what the amount of the loan was.  So I

6    had spoken to him about that outside of the meeting

7    with the bank.  But when I actually sat down with the

8    bank, he was not in those meetings as I recall.

9        Q     What was the purpose to your understanding

10   as the CFO of the $4 million line of credit?

11       A     To cover the work in progress and cover our

12   cash flow needs as the receivables were coming in.

13             MR. GEBHARDT:  Will you mark this as the

14   first deposition exhibit?

15             (3/23/1999 letter was marked as Deposition

16   Exhibit No. 1.)

17   BY MR. GEBHARDT:

18       Q     I've handed you what has been marked as

19   Deposition Exhibit 1, which purports to be a letter

20   dated March 23rd, 1999, to you from Craig Schwartz on

21   the letterhead of the First National Bank of

22   Maryland, which is the predecessor name for Allfirst

23   Bank.  Do you recognize your -- is that your

24   signature on the last page?

25       A     Yes, it is.

1    coming in from receivables and projects would

2    generate enough cash to pay this down on a short-term

3    basis.

4         Q    In the discussions, was it discussed that

5    CCI would repay the $1.2 million loan by making a

6    borrowing on the $4 million line of credit?

7         A    No, it was not.

8         Q    I note on Exhibit 4 that again there's the

9    reference to the $4 million Scott Air Force Base

10   receivable.  Did that $4 million receivable have any

11   relationship to a source of funds to repay the $1.2

12   million loan?

13        A    I don't recall if that -- if that was

14   specifically said or not.

15        Q    Now, at the time the $1.2 million loan was

16   being taken out, I take it you had discussions with

17   Mr. Ortenzio about the borrowing?

18        A    That's correct.

19        Q    And did you and Mr. Ortenzio discuss where

20   CCI would obtain the funds to repay the $1.2 million

21   when it came due which, according to the commitment

22   letter, was March 31, 2000?

23        A    Yes, we did.

24        Q    And what was the substance of those

25   discussions?

1    A    I had done some cash flow projections.  I

2    know John was adamant about having this paid back on

3    a short-term basis.  When I gave him the cash flow

4    projections, I had said that if the job profits that

5    are projected hold, we would have the money to pay

6    back this 1.2 million.

7         I also told him that we had seen declining

8    job profit projections over time.  I said, I'm not

9    making the projections on the jobs.  That's what I've

10   been given from the people in operations.  Each month

11   they were decreasing.

12        I said, based on what the most current

13   projections were, if they came in at that amount, we

14   would have the cash flow to pay back the 1.2 million.

15   Q    At the time you were having these

16   discussions with Mr. Ortenzio, were there any

17   discussions about using a borrowing under the $4

18   million line of credit to repay the $1.2 million

19   guaranteed note?

20   A    No, there were not.

21   Q    In 1999 and the year 2000, did

22   Mr. Ortenzio, to your knowledge, have any involvement

23   in the repaying of the loans to Allfirst Bank?

24   A    Which loans?

25   Q    Well, there were three loans.  You had the

1  line of credit -- let's start first with the $4

2  million line of credit.  Did he get involved in how

3  that was being paid or repaid at all?

4        A     I'm not sure.

5              MS. JOYCE:  What time?

6              MR. GEBHARDT:  In 1999 and 2000.

7              THE WITNESS:  Did he get involved in how it

8  was repaid?

9  BY MR. GEBHARDT:

10       Q     Or the process, the repayment process?

11       A     No, that was the line of credit.  As the

12 cash came in, it was paid down.

13       Q     How about the repayment of the equipment

14 loan?

15       A     No, he did not.

16       Q     Okay.  Now, the $1.2 million loan was

17 repaid by CCI on or about February 11, 2000, by the

18 delivery of a check by Mr. Ortenzio personally to

19 Allfirst.

20             Prior to that date, had you had any

21 discussions with Mr. Ortenzio about the repayment of

22 the $1.2 million line of credit?

23       A     Yes.  He had come to me about that.

24       Q     And what was the substance of the

25 discussions you had?

1    A    He wanted to pay down the $1.2 million --

2    the $1.2 million line, he wanted to pay down because

3    he had that personally guaranteed.  He had asked me

4    about writing a check out to pay that off from the

5    line of credit, and I refused.

6    Q    Why did you refuse?

7    A    I didn't think it was in the best interest

8    of the corporation to do that.

9    Q    And could you explain why you had those --

10   that you didn't think it was in the best interest of

11   the corporation?

12   A    One, I guess I didn't think there was any

13   benefit to doing it.  The interest rates were the

14   same in the loans so there was no corporate benefit

15   from paying one -- drawing in one line of credit to

16   pay the other.

17        Two, if we had the extra cash, I would have

18   thought it best suited to pay payroll and accounts

19   payable and subcontractors.

20   Q    And at the time the loan was paid in

21   February, the company was experiencing cash flow

22   difficulties?

23   A    Yes.

24   Q    And did you understand that repaying the

25   $1.2 million loan with a draw on the $4 million line

```
 1   of credit would reduce the amount of available cash

 2   to the company?

 3        A     Yes, definitely.

 4        Q     Okay.  Now, in terms of the physical paying

 5   of the $1.2 million loan, you did not write the

 6   check?

 7        A     No, I did not.

 8        Q     Did you have signature authorities over the

 9   checking account?

10        A     Yes, I did.

11        Q     And so if you had wanted to, you could have

12   written a $1.2 million check and sent it in to

13   Allfirst?

14        A     Yes, I could have.

15        Q     Did Mr. Ortenzio have any reaction to your

16   refusal to write the check or make that payment?

17        A     Initially when he had asked me about it and

18   I said no, he didn't do anything.  Then at a later

19   point in time, he came back to me again and said I

20   know you don't agree with this; but I need to do it.

21   I said, you're the president of the company; but I'm

22   not going to be any part of it.

23        Q     Did he at all elaborate on when he said I

24   need to do this, what he was meaning by this?

25        A     He personally guaranteed the 1.2 million
```

1   and he wanted that paid off because he had had his

2   personal guarantee.

3       Q     Did you believe using the $4 million line

4   of credit to repay the $1.2 million guaranteed loan

5   was consistent with the agreement that CCI and

6   Allfirst had entered into when Allfirst gave the $4

7   million line of credit?

8           MR. SWICHAR:  I object to the form of the

9   question.  She's not an attorney.  You're asking her

10  to interpret legal documents which is the province of

11  the judge and not Ms. Phillips.

12          MS. JOYCE:  Let me hear the question back.

13          (The reporter read back the referred-to

14  portion of the record.)

15          MR. SWICHAR:  Let me renew my objection.

16  Consistent with the agreement it would require an

17  interpretation of the loan documents which is not the

18  proper function of Ms. Phillips.  You may answer the

19  question.

20  BY MR. GEBHARDT:

21      Q     You may answer the question.

22      A     As chief financial officer and what I knew

23  of the loan documents, no, I did not think it was.

24      Q     And would you explain why that was your

25  thought?

1      A    Because I looked at the line of credit as

2  being a way for us to pay for our ongoing work in

3  progress and to pay our vendors and subcontractors.

4  And as far as I have recalled in prior notes, there

5  were certain things I thought we weren't allowed to

6  do.  I know that it was in this one; but going to

7  another bank and getting additional loans, I thought

8  there were restrictions in there that prevented it.

9         MR. GEBHARDT:  Let's mark this as the next

10  exhibit and also the next.

11         (Income statement was marked as Deposition

12  Exhibit No. 8.)

13         (Balance sheet was marked as Deposition

14  Exhibit No. 9.)

15  BY MR. GEBHARDT:

16      Q    I've handed you what's been marked as

17  Deposition Exhibits 8 and 9, which appear to be

18  internally-generated financial statements for CCI

19  Construction for a 13-month period beginning in 1999,

20  January 1, I guess, Exhibit 8 being an income

21  statement and Exhibit 9 being the balance sheet.

22         Do you recognize these as

23  internally-generated financial statements?

24      A    Yes, I do.

25      Q    And you would have been involved at this

1    time in the generation of these financial

2    statements --

3            MS. JOYCE:   Object to the form of the

4    question.   You may answer.

5    BY MR. GEBHARDT:

6       Q    -- as supervisor of the accounting

7    department?

8       A    Yes, I would have.

9       Q    And would I be correct that after these

10   were generated, they were provided to Mr. Ortenzio?

11      A    Yes.

12      Q    And at the top of the page in the

13   right-hand corner, there's an indication 02-14-2000

14   14:05, is that a reference to when these statements

15   were printed out?

16      A    Yes, it is.

17      Q    Roughly how long after they were printed

18   out would it have been when you gave these to

19   Mr. Ortenzio?

20      A    Probably within -- if he was in the office

21   and we did these, it would have been within a day or

22   two.

23      Q    Now, the income statement, if you look at

24   the second page, would I be correct indicates --

25            MS. JOYCE:   The second page of which

1    exhibit?

2            MR. GEBHARDT:   Of Exhibit 8.

3    BY MR. GEBHARDT:

4        Q    -- that there is a net loss the company has

5    sustained of slightly over $6 million?

6        A    That's correct.

7        Q    And did you have occasion to discuss with

8    Mr. Ortenzio that amount of loss of the company for

9    the 13-month period after these statements were

10   generated?

11       A    Yes.

12       Q    Would I be correct that there was a

13   12-month internal income statement also generated at

14   CCI?  Would that have been the normal practice?

15       A    That's the normal practice, but this

16   actually would have been the 12-month statement --

17   you mean because of the 13 months up there?

18       Q    Yes.

19       A    Thirteen months was how our accounting

20   system would give us time at the end of the year to

21   go into the next year so that you could do W-2s in

22   the prior year and keep it open for adjustments and

23   start your next year of business.  So this was

24   actually for 12 months.

25            MS. JOYCE:   Let me just make sure the

1    record is clear.  The witness is referencing Exhibit

2    No. 8.

3              MR. GEBHARDT:  Thank you.

4    BY MR. GEBHARDT:

5        Q    Prior to this document, which is Exhibit 8,

6    being generated, was it understood by you that CCI

7    for the fiscal year 1999 was going to sustain an

8    operating loss in the magnitude that's reflected on

9    the statement?

10       A    Could you repeat that?

11       Q    Right.  I mean before February 14 when this

12   statement was printed out, did you have an

13   appreciation that the company was likely to sustain a

14   loss in the $6 million area for the fiscal year 1999?

15       A    Sometime prior to printing this, yes.

16       Q    And based on your discussions with

17   Mr. Ortenzio and things he said to you, did he have

18   an understanding that the company was going to

19   sustain a loss for fiscal year 1999 in this area?

20       A    Prior to this?

21       Q    Yes.

22       A    Prior to this, he would have -- if I can

23   back up.  What generates the profits on the jobs are

24   reports that -- I'm sorry.  What generates the profit

25   or loss on the income statement is information I got

1    from operations projecting job profits or losses.  At

2    the time those losses came in, they changed

3    drastically because they deceased.

4            At that time, I had constant conversations

5    with our chief operating officer.  He would meet with

6    John, and I would meet with him sometimes together,

7    sometimes apart.  This is the final result.

8            As we discussed that, we knew that it was

9    going to hit our bottom line in a big way as far as

10   an exact amount.  We knew it was coming together for

11   a big loss.

12       Q    And focusing on the February 11, 2000 date

13   on which Mr. Ortenzio delivered the CCI check to

14   Allfirst to pay the $1.2 million loan, prior to that

15   date and based on your discussions and interactions

16   with Mr. Ortenzio, was he aware of the company's

17   financial situation that was going to result in a

18   loss somewhere in the magnitude reflected on Exhibit

19   8?

20       A    Oh, yes.

21       Q    And based on your discussions with him, did

22   his awareness of that -- did he express any

23   relationship between anticipating this loss and

24   wanting to get the $1.2 million loan paid?

25            MS. JOYCE:  You mean prior to February 11?

1    Are you still in the same time frame?

2              MR. GEBHARDT:  Yes.

3              THE WITNESS:  Give me the question again.

4    BY MR. GEBHARDT:

5        Q    Did Mr. Ortenzio in any way relate the

6    anticipated loss in the rough area of $6 million to

7    getting the $1.2 million loan repaid even if he had

8    to borrow on the line of credit?

9        A    Yes.

10       Q    Do you remember anything he may have said

11   to you in that regard?

12       A    When we had these discussions, the chief

13   operating officer was Shane Miller; the president,

14   John; myself -- and I don't recall if the senior VP

15   was involved.  I think it was probably just the three

16   of us.

17             Initially, when he talked about the

18   financial condition of the company, the chief

19   operating officer had said that in order to keep

20   going that the company would need more cash put into

21   it.

22             At that time, John had said he was not

23   going to put more cash into the company.  That's when

24   in the meetings, Shane, our chief operating officer,

25   said, if you're not going to, we have serious

1   impression to us that he was not going to continue

2   with company.

3      Q    Now, Mr. Ortenzio attended that meeting

4   with an attorney named Chernicoff.  Do you know how

5   Mr. Ortenzio came in contact with Mr. Chernicoff?

6      A    As I recall, he had told me that initially

7   he had talked to Leroy Zimmerman about being his

8   counsel.  I thought there was a conflict of interest.

9   I wasn't involved in the conversations, but there was

10  a conflict of interest and that he was going to use a

11  bankruptcy attorney named Bob Chernicoff.  I didn't

12  know him.

13      Q    Did Mr. Ortenzio express to you that

14  Mr. Chernicoff was a bankruptcy attorney?

15      A    I don't recall where I learned he was a

16  bankruptcy attorney.  We had the discussion of

17  bankruptcy, and he hired Chernicoff.  Whether he told

18  me he was a bankruptcy attorney, I don't know.

19      Q    So you and Mr. Ortenzio had had discussions

20  regarding CCI's possible bankruptcy before the

21  February 18, 2000 meeting at Allfirst?

22      A    Yes.

23       MS. JOYCE:  Object to the form of the

24  question.  That's fine.

25       MR. GEBHARDT:  Let's mark this as the next

1    cash flow shortages that are shown on Deposition

2    Exhibit No. 10?

3        A    Yes, we did.

4        Q    What was the substance of those

5    discussions?

6        A    That -- which time frame are you looking?

7        Q    Well, in other words, the cash flow

8    statement that's Exhibit 10 was generated in showing

9    these cash flow losses that are, at least in my view,

10   fairly significant.

11           Before he went to Allfirst, did you and he

12   discuss how the company was going to try and come up

13   with the money to meet the cash flow shortages?

14       A    Yes.  We had several meetings with myself,

15   the chief operating officer, Shane Miller, and John.

16       Q    Did you have any specific meetings with the

17   anticipation of the February 18 meeting at Allfirst

18   to discuss it?

19       A    We met to -- this was more of an ongoing

20   discussion.  But when we got to -- I guess that's

21   what prompted the meeting on February 18th, the fact

22   that we had these serious cash flow concerns.  We had

23   talked to John, and Shane said the only way -- we're

24   going to need you to put more money into the company

25   in some form in order to get through this until we

1    get money back on these claims.

2            John refused to do that; and Shane said, if

3    we can't do that, we can't keep going forward.  The

4    bonding company will have to step in, or we're going

5    to file bankruptcy or something.

6            We had several meetings discussing that,

7    and the likelihood of the company going forward was

8    slim at that point because John had said he was not

9    making any additional commitments.

10           At some point in time, we had found out

11   that the Scott Air Force Base was not going to come

12   in real quickly.  We needed something at that point

13   in time.  We discussed the longevity of the company

14   and the fact that we weren't going forward.  That's

15   what prompted the discussions with Allfirst.

16       Q    Did you know that this document, which is

17   Exhibit 10, was going to be distributed at the

18   meeting at Allfirst before the meeting?

19           MR. SWICHAR:  I object because I think she

20   said she didn't recall the specific document.

21   BY MR. GEBHARDT:

22       Q    Is that correct?  You don't recall the

23   specific document?

24           MS. JOYCE:  I don't think that was her

25   testimony.  You can clarify your response.

1    a second?

2              MR. GEBHARDT:  Sure.

3              (Off the record discussion.)

4    BY MR. GEBHARDT:

5        Q      Looking at the bottom left-hand corner

6    where it says 2/16/00 and then 7:08 p.m., would that

7    be the time this was printed off the computer?

8        A      Yes.

9        Q      Looking up to the February column, are the

10   numbers there as of February 1 or would they be as of

11   February 28?

12       A      As I recall, the beginning cash balance, I

13   think, was February 1; and the ending cash balance

14   would have been February 28 in the first column.  And

15   then that carries forward to March, so that would be

16   the beginning of March at the top of the column and

17   the end of March at the bottom.

18       Q      Where it says the next line after ending

19   cash balance, available line of credit $5,200,000,

20   would that also be a number reflected as of February

21   28?

22       A      Yes.  As far as I recall, that was what my

23   projection was.

24       Q      The cash flow projection doesn't reflect

25   the repayment of the $1.2 million loan with a draw on

1    the $4 million line of credit?

2        A    No, it didn't.

3        Q    And based on your understanding of how the

4    numbers work on this Deposition Exhibit 10, is there

5    any way Allfirst could have learned by looking at

6    this document that Mr. Ortenzio had caused CCI to

7    borrow on the $4 million line of credit to repay the

8    $1.2 million guaranteed loan?

9        A    No.

10            MR. GEBHARDT:  I have no further questions.

11            MR. SWICHAR:  Could we either take a

12   15-minute break now or break for lunch.  I'll have

13   about an hour's worth.

14            MS. JOYCE:  It's the witness's call.

15            THE WITNESS:  If we could take about a 10-

16   or 15-minute break now, then I could get back to

17   work.

18            MR. SWICHAR:  Okay.  Let's take 15 minutes.

19   Thanks.

20

21                    CROSS EXAMINATION

22

23   BY MR. SWICHAR:

24       Q    Ms. Phillips, I sort of want to trace some

25   of the questions that you were previously asked

86

1     A     Well, this one says work in
2  progress, where I think the other one says work in
3  process. So to the extent that would be the
4  difference, I guess.
5     Q     You don't recognize that as a
6  material difference in what the meaning is, do
7  you?
8         MR. BURKE: I'll object to the
9  form to the extent the document speaks for itself.
10    A     Work in progress, work in
11 process, I don't know.
12        MR. BURKE: It's not identical.
13    A     It's not identical.
14 BY MR. GEBHARDT:
15    Q     The purpose of the million two
16 was to provide funds to finance work in progress
17 and accounts receivable. Correct?
18    A     The intent was a short-term loan,
19 a bridge loan to cover that time period from
20 November to February.
21    Q     Because there was a cash flow
22 shortfall?
23    A     We were projecting a cash flow
24 shortfall.

87

1     Q     Caused by the receivables that
2  you thought were due and payable particularly from
3  the two projects, Scott Air Force Base and
4  Albemarle Prison. Right?
5     A     Those were two of the reasons as
6  well as the fact that winter had set in, so
7  receivables of all jobs were going to be slower
8  because work couldn't progress. So we were
9  projecting a cash flow shortfall. Whether or not
10 in reality we would have had one, I don't know,
11 but it was close enough where I felt it prudent to
12 obtain additional funds to have in the event that
13 the worst case scenario we were projecting came to
14 pass.
15    Q     How long was this -- was your
16 intention to have the loan outstanding, this
17 temporary facility?
18    A     Our projections, we only needed
19 it for 90 days.
20    Q     Sufficient cash would come into
21 the company to pay it?
22    A     Those were what the projections
23 were, indicating that the cash flow would increase
24 after that.

88

1     Q     And so this cash increase would
2  be used to repay the temporary facility?
3     A     Well, our cash flow was projected
4  to then increase within about 90 days, and as I
5  indicated to the bank, that was the only amount of
6  time that we needed and that we would pay it back.
7     Q     And the commitment letter
8  provides that it's to be repaid on March 31, 2000.
9  Right?
10        MR. BURKE: Objection to the
11 form. Where are you referencing, counsel?
12        MR. GEBHARDT: Next to last
13 paragraph on the first page.
14        MR. BURKE: Where does it say it
15 will be repaid on March 31?
16        MR. GEBHARDT: If no demand is
17 made, the loan will expire and all borrowings will
18 be due and payable together with interest on March
19 31, 2000.
20    A     Well, when I requested a million
21 dollars for 90 days, what they came back with was
22 they wanted to increase the amount, what they had
23 given me as cushion and they wanted to increase
24 the time frame, which I had requested, from 90 to

89

1  120. So that is what they came back to. I
2  reiterated to them that that was not necessary and
3  was not what I requested. When I signed the note,
4  he indicated he would have to go back and retype
5  the note, or something to that effect, and really
6  sat there and said, what's the difference, in 90
7  days pay it.
8  BY MR. GEBHARDT:
9     Q     The note doesn't have a due date,
10 does it?
11        MR. BURKE: Objection to form.
12    A     I would have to take a look at
13 it.
14        MR. BURKE: The document speaks
15 for itself.
16 BY MR. GEBHARDT:
17    Q     Let's take a look at your note.
18        MR. GEBHARDT: Mark this as 16.
19        ---
20        (Whereupon the document was
21 marked for identification as Deposition Exhibit
22 No. 16.)
23        ---
24 BY MR. GEBHARDT:

94

1    A    Well, it was deposited into our
2  account.
3    Q    Which was the account tied in
4  with the line of credit?
5    A    Accounts tied in with cash
6  management system. The only account we had, so
7  that was the account it went into.
8    Q    Now, this particular $1.2 million
9  loan was personally guaranteed by you. Isn't that
10  right?
11    A    Yes, it was.
12    Q    And would it be fair to say that
13  the AllFirst representatives expressed to you that
14  they would not give CCI the additional loan
15  without your personal guarantee?
16    A    Yes, that's true.
17    Q    And in connection with that
18  requirement, you actually executed the suretyship
19  agreement that is Deposition Exhibit 16. Isn't
20  that right?
21    A    Yes, I did.
22        - - -
23        (Whereupon the document was
24  marked for identification as Deposition Exhibit

95

1  No. 18.)
2        - - -
3  BY MR. GEBHARDT:
4    Q    Exhibit 18 appears to be a
5  personal financial statement for you that was
6  prepared by CCI's accountants Brown, Schultz,
7  Sheridan & Fritz. Do you recognize it as such?
8    A    Appears to be.
9    Q    And this is a statement of your
10  assets and liabilities as of December 31, 1998.
11  Right?
12    A    Yes.
13    Q    This was required by AllFirst
14  before they would agree it to extend the
15  additional $1.2 million loan?
16    A    I don't know if they got this
17  before the loan or after, to tell you the truth.
18  What's the date, the 9th, so I think they got this
19  after.
20    Q    And at the time this financial
21  statement was submitted, was this an accurate
22  recitation of your assets and liabilities?
23    A    To the best of my knowledge.
24    Q    Based on what I see on the last

96

1  page, which is the recitation of assets and
2  liabilities, you had a financial wherewithal to
3  repay personally without the use of CCI funds, the
4  $1.2 million that had been borrowed?
5    A    I would say probably December 31
6  of '98, it appears that I had enough cash on hand.
7  Whether or not I would have been able to liquidate
8  or had the cash to pay, I had the assets.
9    Q    So you would agree that at least
10  as of December 31, 1998, you had available the
11  cash to have repaid the $1.2 million loan and
12  probably at least as of the year 2000, you had
13  assets or resources sufficient to enable you, had
14  you chosen, to personally repay the $1.2 million
15  loan?
16    A    Well, I don't know exactly -- I
17  would have to see what it was at the end of 1999.
18  But looking at 1998, I had the wherewithal to pay
19  it back.
20    Q    Prior to this financial statement
21  that is Exhibit 18, had you ever provided the bank
22  with a personal financial statement previously?
23    A    I'm sure that I had at some point
24  in time.

97

1    Q    You can't remember when?
2    A    Well it was probably when the
3  original relationship began, and if there had been
4  any personal guarantee of anything, I would have
5  had -- most likely would have had to give them a
6  personal financial statement.
7    Q    This $1.2 million loan was also
8  secured by some equipment?
9    A    It was secured by, what the
10  document says, specific equipment financed
11  including titled vehicles.
12        - - -
13        (Whereupon the document was
14  marked for identification as Deposition Exhibit
15  No. 19.)
16        - - -
17  BY MR. GEBHARDT:
18    Q    Do you recognize Exhibit 19 as
19  the security agreement pledging the equipment
20  references in the commitment letter?
21    A    It refers to the collateral, but
22  there's nothing attached, so I don't know
23  specifically what equipment.
24    Q    There's no collateral description

102

1    A    I don't remember seeing anything
2    from the bank.
3    Q    Where did you expect the funds to
4    come from to repay AllFirst in the 90 days that
5    you anticipated the $1.2 million loan to be
6    outstanding at the end of that time?
7    A    Accounts receivable.
8    Q    Collections from the normal
9    course of business?
10    A    Yes, or from the sale of
11    equipment or whatever was occurring in that 90
12    days that would have put money into our account.
13    Q    Did you anticipate the $4 million
14    line of credit to have been paid to a zero balance
15    at that time?
16    A    At what time?
17    Q    At the time the money came in to
18    pay the million two.
19    A    I don't believe there was any
20    contemplation -- in other words, it would be a
21    zero balance?
22    Q    Right.
23    A    Or, in other words -- no, I think
24    the understanding from the bank was that that was

103

1    a revolving line and that would function as it
2    always had, fluctuate up and down.  In fact, I
3    made it clear at the signing of the note that that
4    $1.2 million note would be paid prior to any time
5    frame, whether it be a renewal.
6    Q    The $4 million line of credit
7    commitment letter carried through April 30th and
8    the one million two carried through March 31, so
9    there was a disparity in dates, but did you have
10    any discussions of whether the line of credit
11    would or would not be brought to a zero balance
12    before the million two was repaid or not?
13    A    There was no specific requirement
14    the bank placed on me.
15    Q    I didn't ask you that.  I asked
16    you whether you had discussions with anyone from
17    the bank on that topic.
18    A    You need to be more specific, I
19    guess.  Just general discussions?
20    Q    Yes.  In the course of getting
21    the million two, when you were discussing that,
22    did you have any discussions about whether at the
23    time you repaid the million two, you should have a
24    zero balance on the $4 million revolving line of

104

1    credit?
2    A    No.
3    Q    Just not discussed?
4    A    The only discussed part was, as I
5    indicated, was the discussion that they understood
6    that would be paid off within 90 days and that was
7    going to be ahead of any payments on the $4
8    million line.
9    Q    So, hypothetically, if the $4
10    million line had a $2 million outstanding balance
11    and a customer sent in a $1.2 million of accounts
12    or payables on CCI's billings, you expected to use
13    the $1.2 million coming in from the customer to
14    pay off the million two loan and just leave the
15    million dollar balance where it was?
16    MR. BURKE:  Could you repeat that
17    question?
18    BY MR. GEBHARDT:
19    Q    Let me rephrase it.
20    Hypothetically, would it have
21    been your understanding if we assume the $2
22    million outstanding on the line of credit and $1.2
23    million had come into CCI from a customer, that
24    you could use that $1.2 million to pay off the

105

1    $1.2 million loan, without first reducing the $1.2
2    million loan, without first reducing the $2
3    million hypothetically outstanding under the line
4    of credit?
5    MR. BURKE:  Objection to form.
6    A    If I chose to, sure.  I believe
7    that was my understanding and I believe that was
8    the understanding that the bank had.
9    BY MR. GEBHARDT:
10    Q    On February 11, 2000, the $1.2
11    million loan was repaid.  Correct?
12    A    Yes.
13    Q    Who made the decision to make
14    that payment to the bank on February 11, 2000?
15    A    I did.
16    Q    Did you consult with anyone else
17    in the company about making that payment at that
18    time?
19    A    As I recall, there were
20    discussions that I had reviewing the cash flow
21    situation, where things were on the projects, with
22    the company, and at the end of the discussion or
23    those meetings or review or whatever, I decided
24    that it would be best to pay that note off.

106

1  Q    You made the decision yourself?
2  A    Yes.
3  Q    And did you tell anyone else in
4  the company prior to making the payment that
5  that's what you were going to do?
6  A    I think I believe I informed the
7  chief operating officer and obviously I informed
8  the chief financial officer.
9  Q    You didn't ask their opinion,
10 whether it was in the best interest of the company
11 to pay the million two loan off at that time?
12 A    Well, I did not ask the opinion
13 of Ms. Phillips. In conversations that day, the
14 day before, I think I made the statement that it
15 seemed to be in our best interest and consistent
16 with what I had stated to the bank that I would
17 do, and basically made the decision, made the
18 decision to pay that note back or pay the note off
19 or however you want to do it.
20 Q    Who got the check written to make
21 the payment?
22 A    What do you mean, got the check
23 written?
24 Q    Did you handwrite the check?

107

1  A    No. I called Ms. Phillips and
2  told her to prepare a check.
3  Q    This was signed by the machine's
4  signature, the check?
5  A    No. It was a hand check. I
6  signed it.
7  Q    So someone, either Ms. Phillips
8  or someone under Ms. Phillips' direction, wrote
9  out the check by hand and you signed it?
10 A    No, just computer-generated and
11 called the accounts payable clerk. She would
12 basically go into the computer, make out the
13 check, hit the button and the check would be
14 generated.
15 Q    The check writer wasn't used?
16 A    We only used the check writer
17 because it was -- just when we had a long series
18 of checks to write and this was a series of checks
19 that day.
20 Q    Making interest payments monthly
21 to the bank, though, you didn't hand-sign those
22 checks, did you?
23 A    Well, because those were probably
24 regular, they would have been set up and printed

108

1  with a series of checks.
2  Q    Was the check writer used?
3  A    I take that back. I think the
4  way the bank did it is they automatically debited
5  our account for interest. I would have to
6  check the bank records or their procedure as to how they
7  did it, but my understanding is that's how they
8  handled the interest.
9  Q    Now, what was the procedure, what
10 was your involvement in the delivery of the check
11 to AllFirst?
12 A    I took it to Mr. Schwartz to --
13 at his office.
14 Q    You personally?
15 A    Yes.
16 Q    Why did you personally take the
17 check?
18 A    Because I wanted to talk with
19 him, and it presented a very good opportunity for
20 me to have a discussion with him.
21 Q    What did you want to discuss with
22 him?
23 A    A couple of things. I wanted to,
24 one, thank him for acting quickly back in October,

109

1  November, when we wanted to borrow the funds, for
2  acting quickly in approving it. Also to remind
3  him that I was pleased our projections had worked
4  themselves through. I was able to pay the note
5  when I said I had paid it, and also to talk with
6  him about the possibility or what would be
7  necessary if I ever wanted to come back and borrow
8  again. It presented also an opportunity to begin
9  a discussion depending on how the conversation was
10 going to what the next steps were in terms of I
11 knew the $4 million line was going to be up for
12 renewal and started to talk to him about that.
13 So by taking the check over, it
14 presented a good opportunity for me to sit and
15 have an informal discussion with him.
16 Q    Did you have an appointment?
17 A    I called and I believe I had an
18 appointment with him, though he was not there.
19 Q    You had an appointment and he
20 didn't show up?
21 A    No. I called over and spoke to
22 either -- I really don't recall. It was either to
23 he or his assistant or secretary, whatever, who
24 indicated that he would be there at a certain time

**110**

1  and I said fine, I would come over to see him.
2      Q      So you just said, I'm coming by?
3      A      I said I'm coming over, I wanted
4  to meet with him and leave my message, and it was
5  to pay the November note, pay it off.
6      Q      You did --
7      A      I don't recall, unfortunately,
8  whether I spoke to him directly or to his
9  assistant, but in either event, I said the same
10  thing to either one, that I was coming over to see
11  him, and that's when I went to the bank.
12      Q      You told them you were coming to
13  pay off the million two loan?
14      A      I believe so.  I said I was
15  coming to see him to pay off the note we had in
16  November.
17      Q      When you got there, Mr. Schwartz,
18  as you said, was not present?
19      A      No, he was not.
20      Q      So you never met with him on the
21  day that you delivered the check?
22      A      Now, I waited for awhile.  I
23  think the woman there said he would be returning
24  or she thought he would be returning from a

**111**

1  meeting shortly, so I waited.
2      Q      How long did you wait?
3      A      Half hour, 40 minutes maybe,
4  maybe along those lines.
5      Q      And you didn't take the check
6  with you when you left, though?
7      A      Well, I started to, but the woman
8  there asked if she could help me.  I told her why
9  I was there and she said if I wanted to, she could
10  take care of it.
11      Q      So you gave her the check?
12      A      Yes, I gave her the check.
13      Q      And told her which loan it was
14  paying off?
15      A      I said it was paying a loan off.
16  I think she looked it up in her system and asked
17  me if I wanted a receipt and I said sure, took a
18  receipt, left a message for Craig to call me when
19  he got back.  She apologized that he wasn't there
20  or he must have left the meeting and gone to lunch
21  or something to that effect, but he was still
22  expected back that day.
23      Q      So solely because the lady asked
24  to help you is the reason you left the check?

**112**

1      A      I believe so.  She ask me if she
2  could help me and I told her why I was there and
3  she said she could take care of that if I wanted.
4      Q      In practical effect there would
5  have been no difference in making the payment on
6  that Friday as opposed to the next Monday?
7          MR. BURKE:  What's the question?
8      A      Is there a question?
9              - - -
10          (Whereupon the pertinent testimony
11  was read by the court reporter.)
12              - - -
13          MR. BURKE:  Object to the form.
14  I don't believe that's a question.
15      A      Probably not, no.
16  BY MR. GEBHARDT:
17      Q      When you requested the check, you
18  understood that writing that check would result in
19  a draw upon the $4 million line of credit?
20      A      It may or may not have.
21      Q      Did you know that writing the
22  check would result in a draw on the $4 million
23  line of credit?
24      A      Well, depending on how the bank

**113**

1  was accounting for, that could have been the case.
2      Q      You knew at the time the check
3  was written that CCI had an outstanding balance on
4  the line of credit, didn't you?
5      A      I think, yes.
6      Q      And you knew that writing that
7  check would increase the outstanding balance on
8  the line of credit?
9          MR. BURKE:  Objection, asked and
10  answered.  You can answer it again.
11      A      Well, do you want to ask the
12  question again or repeat it?
13              - - -
14          (Whereupon the pertinent
15  testimony was read by the court reporter.)
16              - - -
17      A      That would depend on whether or
18  not there were funds still sitting in our account
19  that would not have been swept by the bank and
20  their cash management system.  So to the extent
21  there were funds prior to that, then I guess there
22  would have been a zero impact.
23  BY MR. GEBHARDT:
24      Q      But you didn't know that.

114

1          MR. BURKE: Didn't know what?
2 BY MR. GEBHARDT:
3      Q      Whether there were any deposits
4 that had been made that day?
5      A      That were sitting in our account?
6      Q      Yes.
7      A      I know funds had recently come
8 in, so I believe there were funds sitting in the
9 account, but I couldn't tell you how much.
10      Q      Did you verify what the
11 outstanding balance was or what the deposits had
12 been?
13      A      I verified what our overall
14 balance was.
15      Q      So then you knew that writing
16 that check would constitute a draw on the line of
17 credit?
18      A      No.
19          MR. BURKE: Objection, asked and
20 answered. You can answer again.
21      A      It would have drawn a line of
22 credit only to the extent that the funds had
23 possibly been swept by the cash management system.
24 BY MR. GEBHARDT:

115

1      Q      What time did you go into
2 AllFirst, in the afternoon, after lunch, wasn't
3 it?
4      A      Late morning, early afternoon,
5 somewhere in that time frame.
6      Q      Before you left, you would have
7 verified the status of the account that had the
8 line of credit facility?
9      A      Either that or the night before.
10      Q      And based on the information that
11 you had available to you at the time you wrote the
12 check, you were of the belief that writing that
13 check would require a draw on the line of credit?
14          MR. BURKE: Objection for the
15 fourth time to the extent that question has been
16 asked and answered. I'll let my client answer it
17 one more time.
18      A      Depending on whether or not funds
19 had been moved from our account into the cash
20 management system, then there would have been no
21 impact on the line. To the extent that there was,
22 then there would have been an impact theoretically
23 on the line.
24 BY MR. GEBHARDT:

116

1      Q      I understand that, how it works.
2 What I'm asking you, your personal belief, at the
3 time you wrote the check based on your inquiry as
4 to the status of the account and so on, your
5 understanding was that writing that check would
6 require a draw on the line of credit?
7          MR. BURKE: I object and I am
8 going to ask the court reporter to read back the
9 previous instances where that question has been
10 asked and answered.
11          MR. GEBHARDT: The question
12 stands as it is. You have a question pending,
13 phrased differently and he can answer this
14 particular question as to his personal
15 understanding of the account status.
16          MR. BURKE: Read back the last
17 question, please.
18              - - -
19          (Whereupon the pertinent
20 testimony was read by the court reporter.)
21              - - -
22          MR. BURKE: Objection again.
23 This answer has been asked five times of this
24 witness and apparently counsel keeps asking the

117

1 same question with the hopes of a different
2 answer. I'll let the witness answer the question
3 again.
4          MR. GEBHARDT: Let me phrase it
5 correctly because the witness has not yet answered
6 the question.
7 BY MR. GEBHARDT:
8      Q      You indicated you verified the
9 status of the account and the line before you
10 wrote the check. Right?
11      A      I verified that funds had come
12 into the company from various sources.
13      Q      What funds?
14      A      Off projects, sale of equipment.
15      Q      You knew the amount of funds that
16 had come in?
17      A      We had taken in some large
18 deposits. Our deposits had increased as we had
19 projected them to do so.
20      Q      Did you quantify what those
21 deposits were before you wrote the check?
22      A      Yes. I knew generally the dollar
23 amount that we recently had taken in over the
24 course of the previous couple of days, even that

118

1  day.
2      Q      It was your view at the time you
3  wrote that check that writing that check would not
4  require a draw on the line of credit?
5              MR. BURKE:  Objection, asked and
6  answered.  Answer it again.
7      A      To the extent that funds had not
8  been swept out of our account by the cash
9  management system, there would have been no impact
10  to the line.  To the extent that there was a
11  difference, then by use of the cash management
12  system, funds would have been taken from that.
13  BY MR. GEBHARDT:
14      Q      The question still remains, I
15  understand to the extent there were collections,
16  to the extent there was this, this is how it would
17  work.  My question to you still is, when you wrote
18  the check and handed it in to AllFirst, did you
19  believe that you were making a borrowing on behalf
20  of CCI under the line of credit or did you think
21  that were sufficient deposits to cover the
22  payment, you personally at the time you wrote it?
23              MR. BURKE:  Objection, asked and
24  answered.

119

1  BY MR. GEBHARDT:
2      Q      I understand what could have
3  occurred and might have occurred and different
4  things, but what did you think was the situation
5  when you wrote the check and handed it in?
6              MR. BURKE:  Same objection.  Go
7  ahead.
8      A      I thought or believed that there
9  were some funds still in our account that had not
10  been swept because there hadn't been time.  Those
11  funds were available.  That in the tally of it, we
12  had funds available to pay this note off.  And so
13  I instructed the check was to be drawn.  Whether
14  or not there was impact on the bank's records on
15  the line of credit or not, I can't say.  You have
16  to go over the bank's records and see what, if
17  any, impact there would have been.
18      Q      In fact, CCI had not collected
19  the cash that it anticipated collecting when
20  the $1.2 million was borrowed, isn't that true?
21              MR. BURKE:  Objection to form.
22  You can answer.
23      A      Say that again.
24              - - -

120

1              (Whereupon the pertinent
2  testimony was read by the court reporter.)
3              - - -
4      A      Rephrase that, collected the
5  money.
6  BY MR. GEBHARDT:
7      Q      CCI's cash flow problems had
8  increased as of February 2000 beyond what they
9  were in November of 1999, isn't that true?
10      A      No, I don't believe that to be
11  the case.
12      Q      Isn't it a fact that CCI over the
13  next five months, counting from February, was
14  anticipating substantial cash flow shortfalls?
15              MR. BURKE:  What time frame?
16              MR. GEBHARDT:  Five-month period
17  counting from February of 2000.
18              MR. BURKE:  No, the time frame is
19  when did CCI anticipate?
20              MR. GEBHARDT:  From February.
21      A      You have to give me the time
22  frame to which to refer to, the date of February
23  11th?
24  BY MR. GEBHARDT:

121

1      Q      February 11th, you knew that CCI
2  was having cash flow problems on February 11th,
3  didn't you?
4              MR. BURKE:  Objection to form.
5  You can answer.
6      A      I knew that CCI had cash flow
7  problems, issues when I talked to the bank in
8  November, which we clearly told them about.  And I
9  would have to say by February 11th, it appeared as
10  though cash flow problems had improved somewhat,
11  but we still had some issues.
12  BY MR. GEBHARDT:
13      Q      You're saying you thought that
14  CCI's cash flow position had improved as of
15  February 11, 2000 beyond what they were in
16  November of 1999?
17      A      Well, I would have to look at the
18  report, whatever cash report we may have had in
19  November, and compare it to a cash flow report we
20  might have gotten at the end of January or
21  February, and I could more specifically tell you.
22      Q      I'm not asking for the specific
23  numbers.  I'm asking whether at the time you wrote
24  the check, was it your understanding that CCI had

122

1  a cash flow problem that was worse than it had in
2  November when the money was borrowed?
3      A     No, I don't believe it was worse.
4      Q     You thought it was better?
5      A     Well, I think it had improved
6  somewhat.
7      Q     And by somewhat, what do you
8  mean?
9      A     By problem, what do you mean?
10      Q     By problem, I mean not having
11  sufficient money to operate the company.
12      A     Well, we had enough money to
13  operate the company at that point, so I guess by
14  your definition we didn't have a problem.
15      Q     You understood that over the
16  succeeding months CCI was not going to have
17  sufficient funds to operate, didn't you?
18      A     On what date?
19      Q     As of February 11th.
20      A     Not necessarily.  I knew that we
21  had not necessarily cleared all of our problems,
22  but the problem you're saying, we didn't have
23  enough money to operate, clearly wasn't the case
24  on February the 11th.

123

1      Q     We've established you made the
2  payment on behalf of CCI on February 11, 2000.
3  And I think it's also without dispute there was a
4  meeting held in which you attended and there were
5  representatives of AllFirst on February the 18th.
6  Does February the 18th accord with your
7  recollection?
8      A     On February 18th, I asked for a
9  meeting with Mr. Schwartz and Mr. -- well, Mr.
10  Schwartz, probably.
11      Q     And there was a meeting that
12  actually was held on February the 18th.  Correct?
13      A     Yes.
14      Q     That was a Friday?
15      A     Okay.
16          MR. BURKE:  Do you know if it was
17  a Friday or not?
18  BY MR. GEBHARDT:
19      Q     If you need a calendar, we can
20  get one.  Was it a Friday?
21      A     Was it a Friday?
22      Q     Yes.
23      A     Okay.
24      Q     You called Mr. Schwartz to ask

124

1  for the meeting?
2      A     As I recall.
3      Q     Let's assume, and I'll represent
4  to you that February 17th was a Friday and, of
5  course, February 11th was then a Friday, when did
6  you call Mr. Schwartz to set the meeting up?
7          MR. BURKE:  February 17th was a
8  Friday or February 18th was a Friday?
9          MR. GEBHARDT:  February 18th is a
10  Friday and February 11th is a Friday and the
11  meeting was February the 18th.
12  BY MR. GEBHARDT:
13      Q     My question is:  You had payment
14  on a Friday and a meeting the succeeding Friday.
15  When did you call Mr. Schwartz to set up the
16  meeting of February the 18th?
17      A     I think I called the morning of
18  the 18th.
19      Q     The morning?
20      A     I think.
21      Q     So the meeting was in the
22  afternoon?
23      A     I believe so, yes.
24      Q     Now, when you attended that

125

1  meeting, who was present?
2      A     Well, let's see, the meeting was
3  supposed to be with Mr. Schwartz and Mr. Zarcone,
4  but also in attendance were about five to six
5  other people from the bank, plus two people on the
6  speaker phone.
7      Q     I can represent to you that those
8  were Mr. Elias and Mr. Gibson.
9      A     On the phone?
10      Q     On the phone, yes.  You saw Mr.
11  Schwartz there and you saw Mr. Zarcone there?
12      A     Yes.
13      Q     And the other people who may have
14  been there you don't recollect?
15      A     Mr. Meyers, Mr. Trout, two or
16  three others.
17      Q     Now, did you ask for all these
18  people to be in attendance?
19      A     No.
20      Q     Do you have any understanding of
21  why all these people attended the meeting?
22      A     No.
23      Q     You called up Mr. Schwartz to say
24  I would like to meet with you this afternoon and

126

1 you have five people in a meeting and two people
2 on an extension phone?
3    A    That's right.
4    Q    And did that surprise you?
5    A    Yes.
6    Q    Did you ask why is everybody here
7 or something to that nature?
8    A    Yes.
9    Q    And what were you told?
10   A    There really wasn't much of an
11 answer.
12   Q    Did you tell the bank there were
13 major problems with CCI when you called Mr.
14 Schwartz?
15       MR. BURKE:  Objection to form.
16 You can answer.
17   A    When I called Mr. Schwartz, I
18 said I would like to come in and talk with you,
19 that we received an update to some project reports
20 and that it looked like the problem with Scott Air
21 Force Base in particular had not moved forward to
22 the extent I had hoped and I wanted to come in and
23 sort of talk to him and tell him, keep him
24 informed and tell him where we were at.

127

1 BY MR. GEBHARDT:
2    Q    Did you tell him CCI had suffered
3 as of year end a $6 million loss?
4    A    In the phone conversation?
5    Q    Yes.
6    A    I don't believe so -- I don't
7 recall.
8    Q    Did you attend by yourself?
9    A    I had intended to, but at the
10 meeting I did not.
11   Q    And who attended with you?
12   A    Bob Chernicoff attended.
13   Q    This is the same Mr. Chernicoff
14 whose office we're in now?
15   A    Yes.
16   Q    And did you understand at the
17 time of that meeting that Mr. Chernicoff was a
18 bankruptcy lawyer?
19   A    No, I did not.
20   Q    You had no idea he was bankruptcy
21 lawyer?
22   A    No.  You mean as far as that
23 being his known specialty?
24   Q    Right.

128

1    A    No.
2    Q    When did you contact Mr.
3 Chernicoff?
4    A    I had talked to Mr. Chernicoff
5 for the first time that morning.
6    Q    So Mr. Chernicoff had not
7 represented CCI or you prior to this meeting on
8 February 18th?
9    A    Well, the attorneys that I
10 typically use, I'll say corporate counsel, is
11 located in Pittsburgh, and so I had asked for a
12 recommendation for an attorney in Harrisburg who
13 was used to dealing with loan documents, bank loan
14 documents.
15       MR. BURKE:  I will caution the
16 witness not to reveal any communications he may
17 have had with his lawyer or CCI's lawyer regarding
18 anything.
19   A    Okay.  Anyway --
20       MR. BURKE:  What's the question
21 again?
22 BY MR. GEBHARDT:
23   Q    Had Mr. Chernicoff at any time
24 represented CCI or Mr. Ortenzio individually prior

129

1 to that February 18th date?
2    A    No.
3    Q    He was called for the first time,
4 then, by you on February 18th?
5    A    Yes.  I met him for the first
6 time.
7    Q    At what time did you meet with
8 him?
9    A    I think I met him probably two
10 hours before I was on my way to the bank.
11   Q    And you retained Mr. Chernicoff
12 based on a recommendation from the company's
13 counsel in Pittsburgh?
14       MR. BURKE:  When you say you, do
15 you mean CCI?
16       MR. GEBHARDT:  CCI.
17       MR. BURKE:  Let me just speak
18 with my client regarding the attorney/client
19 privilege issue.  You're asking for substantive
20 substance of the communication.
21       MR. GEBHARDT:  He already said he
22 was referred to Chernicoff by lawyers in
23 Pittsburgh and I would like a clear answer to the
24 statement and I don't think there's any

146

1 in February of that year?
2      A      Well, I didn't in February.  I
3 wasn't planning on negotiating in February.
4      Q      I thought you indicated the
5 reason you called the meeting was to discuss the
6 renewal or renegotiation of the line of credit and
7 you needed counsel because there might be
8 difficult discussions.
9           MR. BURKE:  Objection to
10 misstatement of prior statement.
11      A      You're talking about the meeting
12 on the 18th?
13 BY MR. GEBHARDT:
14      Q      Yes.
15      A      No.  That meeting on the 18th was
16 not to discuss, at least on my part, not to
17 discuss the $4 million line of credit.  I wasn't
18 there to discuss any of the notes.  I called to
19 talk to Craig Schwartz to go in and tell him
20 that -- just what was going on with the company.
21 One, that the project at Scott Air Force Base was
22 still having some problems.  Our claim was not
23 going to be submitted when we thought it would be,
24 that I had a meeting with the bonding company and

147

1 that I had been talking to them about that project
2 and another one in particular, and that I had a
3 meeting coming up with them and that we were going
4 to ask them to give us assistance on that project,
5 which is all what I said in the meeting, though I
6 was intending the meeting to be Craig Schwartz and
7 Mike Zarcone.  Instead as you stated, I walked
8 into a roomful of people, two people on a
9 conference phone, and so it was more of an
10 inquisition than a meeting that I had set up.
11      Q      You were the only party
12 represented by counsel?
13      A      Unless one of the other people
14 there was an attorney or inhouse counsel, then I
15 was the only -- he was the only attorney,
16 possibly.  I don't know for sure.
17      Q      So I'm not confused about what
18 you were calling a meeting for.  That meeting was
19 not to discuss or renegotiate the line of credit
20 that CCI had?
21      A      No.
22      Q      It was just to review the
23 company's finances and bring the bank current?
24      A      Just to discuss with Craig

148

1 Schwartz as we -- a practice we had always done,
2 basically keep him informed what was going on with
3 the company, what we were doing, so as I told --
4 as I ended up telling a roomful of people, so they
5 didn't hear something from somebody else, that
6 they heard -- whatever the situation was they
7 heard it from me.
8      Q      I guess my question then still
9 involves, if you were going to sit down with a
10 banker and bring him up to date on what had been
11 happening with a company, why was a lawyer
12 accompanying you?
13           MR. BURKE:  I'll object.  I
14 believe the witness has testified regarding the
15 reason the lawyer accompanied him.
16      A      I stated the circumstances under
17 which he suggested that he come along.
18 BY MR. GEBHARDT:
19      Q      I guess the transcript will bear
20 us out.  I understood you to say that you were
21 about to enter into negotiations or you were going
22 to begin negotiations about the line of credit.
23 You thought there might be some difficulty or we
24 will call it complex or whatever kind of issues

149

1 you want, that you might need the assistance of
2 counsel to address.
3           MR. BURKE:  Objection.
4           MR. GEBHARDT:  Let me finish what
5 I'm saying first.
6 BY MR. GEBHARDT:
7      Q      Therefore, you contacted Mr.
8 Chernicoff at the recommendation of other counsel
9 and he suggested to attend the meeting, but my
10 understanding now you're telling me you were
11 simply sitting down to bring the bank up to date
12 with what had been happening at CCI.
13           MR. BURKE:  Objection.  Number
14 one, there's no question pending -- and let me
15 just finish my objection -- and I object to the
16 mischaracterization on several facts as to the
17 prior testimony.  Counsel --
18           MR. GEBHARDT:  I'm not trying to
19 quote his prior testimony, but I'm confused --
20           MR. BURKE:  Let's limit our
21 questions to the facts and what was happening as
22 opposed to what was previously testified to.
23 BY MR. GEBHARDT:
24      Q      To clear up my confusion, it is

182

1    when all was said and done?
2        Q    As of today.
3        A    Yes, as of today.
4        Q    What magnitude is there?
5        A    They're representing
6    approximately a $32 million loss.
7        Q    During the meeting with the bank
8    on February 18th, did you disclose to anyone that
9    the $1.2 million had been repaid by a draw on the
10   line of credit?
11           MR. BURKE:  Objection to form.
12   You can answer.
13       A    My statement in that meeting was
14   in response to the question, was it had been
15   repaid, the company had repaid.
16   BY MR. GEBHARDT:
17       Q    Did you tell anyone that by
18   repaying the loan it was done with a draw on the
19   line of credit?
20           MR. BURKE:  Same objection.
21       A    My words were to ask if it had
22   been repaid, and I said that the company, CCI, had
23   repaid the note.
24   BY MR. GEBHARDT:

183

1        Q    But you didn't give any
2    explanation beyond that?
3        A    I think someone asked -- I think
4    I said with a check drawn out of our account or
5    something to that effect.
6        Q    When you made the payment on
7    February 11th, were you aware of the financial
8    circumstances of the company?
9        A    At that time, that point in time?
10       Q    Yes.
11       A    Generally.
12       Q    And were you aware of the
13   financial circumstances of the company that were
14   reflected on the interim financial statements
15   which are Exhibits 22 and 23 and the cash flow
16   projection which I believe is Exhibit 24?
17           MR. BURKE:  Objection to form.
18           - - -
19           (Whereupon the court reporter
20   read back the pertinent testimony.)
21           - - -
22   BY MR. GEBHARDT:
23       Q    When you made the payment on
24   February 11, 2000, did you have a general

184

1    understanding of what CCI's financial condition
2    was as is reflected on the two financial
3    statements that are Exhibits 22 and 23 and the
4    cash flow statement that is Exhibit 24?
5            MR. BURKE:  Objection to form.
6        A    No.
7    BY MR. GEBHARDT:
8        Q    Completely unaware?
9        A    I'm responding to your question,
10   specifically your question.
11       Q    You had no general understanding
12   when you --
13       A    That wasn't your question.
14       Q    I think it was.
15           MR. BURKE:  It wasn't.
16   BY MR. GEBHARDT:
17       Q    Let me ask it again.  When you
18   made the payment on behalf of CCI on February 11,
19   2000, did you have a general understanding that
20   the financial condition of CCI was similar to
21   what's reflected in Exhibits 22, 23 and 24?
22       A    And my answer was no.  The
23   financial condition of the company was not to that
24   degree.  It wasn't as bad as those numbers

185

1    represent.
2        Q    And in one week did it turn that
3    bad?
4            MR. BURKE:  Objection to form.
5    You can answer.
6        A    I think in one week there was a
7    different scenario run with the removing of the
8    claims that we had hoped to get.  I think there
9    were some other impacts on a job or two which had
10   been unanticipated with respect to some additional
11   problems or delays.  And so when the numbers were
12   rerun, and this is what they were rerun to, it
13   presented a much worse situation financially for
14   the company than what we had been carrying prior
15   to them or what I had been aware of prior to that.
16       Q    You knew when you made the
17   payment that CCI's financial condition was not a
18   good financial condition, didn't you?
19       A    Good as compared to what?  You
20   already asked me how it was in comparison to what
21   it was in November.
22       Q    When you made the payment on
23   February 11th, you knew CCI was going to lose
24   money for the preceding fiscal year?

# Gerard L. Elias

Page 21

1     A   The loan documents.

2     Q   The four million dollar line of credit note?

3     A   All of the loan documents.

4     Q   Okay.  The 1.2 million dollar note, the

5   equipment note, are those the documents?

6     A   I don't -- I don't know that I reviewed the

7   1.2 million dollar note because I don't know that I

8   was aware of it.

9     Q   Did you determine on the 23rd that there had

10   been a material adverse change in CCI's financials?

11     A   Well, certainly by that time, but actually

12   prior to that time.

13     Q   Okay.  Is there any written analysis of that

14   anywhere?

15     A   No.

16     Q   What documents did you review and rely upon

17   in determining that there had been a material adverse

18   change?

19     A   Company's financial position, statement.

20     Q   Who gave you those documents?

21     A   I received them probably from Craig Schwartz

Page 22

1   or contained in the file.

2         I mean, I don't know exactly who handed them

3   to me.

4     Q   Let me show you exhibit S-14.

5         I'm going to make this easier.  There's one

6   over there, I think.  Is that it, the charge-off

7   memorandum?

8     A   Yes.

9     Q   Just as a matter of curiosity, Mr. Elias,

10   under the section Reason for Charge-Off Comments, the

11   last sentence on the first paragraph -- and I see

12   you're squinting; I don't make the print this small,

13   that's not me, that's your bank -- it states that due

14   in large part to the information shared on

15   February 18th, the bank demanded payment on

16   February 24th.

17     A   Wait a minute, I'm not reading the same

18   document.

19         Due in large part -- oh, all right, the

20   first paragraph, sorry.

21     Q   Do you see that?

Page 23

1     A   Due in large part --

2     Q   Right.

3         My question is, what was the small part?

4     A   I don't understand that question.

5     Q   Well, the memo -- I don't understand it,

6   either, but the memo says that due in large part to

7   what occurred on the 18th, the bank called the loan.

8     A   Correct.

9     Q   It means there would be another part to

10   this --

11     A   No.

12     Q   -- that played a role in the bank declaring

13   the loan in default.

14     A   That's it.

15     Q   If there's a large part somewhere, there's a

16   small part elsewhere.

17     A   No.

18     Q   There was no small part?  It was all --

19     A   That's, that's -- that's someone's term, due

20   in large part.  People say that all the time, due in

21   large part to.  That doesn't mean that there

Page 24

1   necessarily had to be something else.

2     Q   I'm not suggesting that.  I'm only asking if

3   there was a smaller part that played a role in the

4   bank's declaring the note in default.

5     A   No.

6     Q   When did --

7     A   I would ask you to ask the question again

8   because I don't understand it.

9     Q   When did the bank -- when did you first

10   learn that CCI had repaid the 1.2 million dollar note

11   from the four million dollar line of credit?

12     A   I don't recall, but it was well after the

13   events of the, of the time that we're talking about.

14     Q   Was it before or after the declaration of

15   default --

16     A   Well after.

17     Q   -- on the 23rd or 24th?

18     A   Well after.

19     Q   How did you determine or find out how that

20   occurred?

21     A   I believe that Mr. Gibson advised me upon

6 (Pages 21 to 24)

# Gerard L. Elias

Page 9

1    A    We were advised that the company was in
2  severe distress.
3    Q    By whom?
4    A    By Mr. Ortenzio and, I believe, his attorney
5  was, was present as well.
6    Q    Did he use the word severe distress, or is
7  that your conclusion?
8    A    Oh, I don't recall.  I'm paraphrasing.
9    Q    Well, could you just tell me specifically if
10  you can, to the best of your recollection, what you
11  were told rather than what you concluded for the
12  moment?
13    A    We were told that the company was in severe
14  distress.
15    Q    Okay.  Why did -- was there any comment as
16  to why the company was in severe distress?
17    A    There were a number of jobs where problems
18  had arisen to where the company's -- that is, CCI's --
19  bonding company needed to be apprised of those
20  problems.
21        We were advised that there was an upcoming

Page 10

1  loss to be reported to the tune of six million
2  dollars, I believe.  We were advised that there were
3  some problems with some of the subcontractors on the
4  jobs.
5    Q    All right.  Mr. Elias, do you recall if
6  anything was asked of the bank by Mr. Ortenzio or his
7  attorney?
8        Did they ask for more money, for example, at
9  that meeting?
10    A    I don't recall.
11    Q    Well, can you tell me how that meeting
12  concluded?  On what footing?  Where was it left?
13    A    Generally, it was left that, that the
14  company had stopped making payments sometime well
15  prior to that meeting.
16    Q    To the bank, or to its subs, or to
17  everybody?
18    A    Just making payments in general, yeah, to
19  its subs certainly; that the bonding company had been
20  advised, and I believe that the bonding company was
21  going to be meeting once again the following week with

Page 11

1  the company, and that they would advise the bank of
2  those discussions with the bonding company.
3    Q    Did you take notes at that meeting?
4    A    I don't believe I took notes myself.
5    Q    Do you know of anyone who did?
6    A    Mr. Gibson could have.
7        Maybe some of the people at the meeting
8  itself.  Since I wasn't there present, I don't know if
9  those individuals took notes.
10    Q    Did you see Mr. Gibson take notes?
11    A    I don't recall.
12    Q    But you did not?
13    A    Not that I recall.
14    Q    Okay.  What happened after that meeting?
15    A    I think my next involvement would have been
16  the following week.  I believe I was in Harrisburg at
17  the time, and we were discussing the situation, and it
18  was disclosed that the line of credit had grown; in
19  other words, the outstanding balance had grown in the
20  line of credit.  And that concerned us because that
21  was contrary to our understanding that we would wait

Page 12

1  to see the results of the company's meeting with the
2  bonding company, and that understanding was from the
3  prior Friday.
4    Q    Wait a minute, let me go back.
5        Between the 18th and the 23rd, there was
6  increased borrowings against the four million dollar
7  line of credit?
8    A    Yes.
9    Q    Do you recall the amounts?
10    A    I do not.
11    Q    Okay.
12    A    We became concerned because it was our
13  understanding that we were effectively all at a
14  standstill, waiting to see what the bonding company
15  would say, and as it turned out that that checks were
16  continuing to come and hit against the account.
17        We became alarmed at since we had been
18  previously told that payments had stopped.
19    Q    Is it conceivable that those checks, by the
20  way, had been sent out prior to the meeting on the
21  13th?

3 (Pages 9 to 12)

## Gerard L. Elias

Page 17

1     A   I don't recall.
2     Q   Did they ask for more money?
3     A   I don't recall.
4     Q   Do you recall telling Mr. Ortenzio that the
5   bank wanted its fucking money or you were leaving?
6     A   I don't recall.
7     Q   Is it possible you would have said that?
8     A   Possible.
9         MR. SWICHAR:  Excuse me.
10    Q   (By Mr. Swichar) Do you recall when the
11  decision was made -- did you -- were you involved in
12  the decision to freeze CCI's bank accounts?
13    A   Yes.
14    Q   When was that decision made?
15    A   I believe it was Wednesday, the 23rd.
16    Q   And did you make that decision yourself?
17    A   I think there were probably a few people
18  involved in the decision --
19    Q   Who else?
20    A   -- but I was in the group.
21    Q   Who else?

Page 18

1     A   Well, I think probably Mr. Zarcone was
2   involved.  I can't recall specifically.
3     Q   Did the bank begin to freeze CCI accounts on
4   the 23rd?
5     A   I think that was the date.
6     Q   That was prior to the declaration of
7   default?
8     A   No.
9     Q   Well, the declaration of default -- letter,
10  at least -- is dated the 24th.
11    A   Correct.
12    Q   When was the declaration of default, and how
13  was that conveyed to CCI?
14    A   I believe it was conveyed that date when we
15  became aware of the fact that the checks were
16  continuing to --
17    Q   What date is that?
18    A   The 23rd.
19    Q   The 23rd?
20    A   -- draw down on the line.
21        I believe we contacted Mr. Ortenzio to make

Page 19

1   inquiry as to why that was occurring and asked for
2   some additional support if we were to be expected to
3   continue to, to fund.
4     Q   Okay.  So on the 23rd, you did ask for
5   additional support?
6     A   Yes.
7     Q   And what kind of support did you ask for?
8     A   Guarantees, additional collateral, some
9   support payment.
10    Q   What additional guarantees did you request?
11        Guarantee the four million dollar line?
12    A   Yes.
13    Q   And what other decision?
14    A   Additional collateral.
15    Q   As, for example?
16    A   Oh, just whatever additional collateral
17  might be worthwhile.
18    Q   So on the 23rd, I assume Mr. Ortenzio said
19  no.
20    A   Correct.
21    Q   And at that point, you froze the accounts?

Page 20

1     A   Correct.
2     Q   Instantly, on the 23rd?
3     A   I believe so.
4     Q   And you made the decision to bounce CCI's
5   checks on the 23rd as well?
6     A   Correct.
7     Q   And that began on the 23rd?
8     A   I believe that's the date, yes.
9     Q   And that was prior to any written
10  declaration of default?
11    A   Correct.
12    Q   Was it a situation where the bank also
13  decided to reverse certain payments on checks that had
14  already just cleared?
15    A   I don't recall that.
16    Q   Did you review any documents prior to your
17  deciding to declare CCI in default?
18    A   Sure.
19    Q   Which documents did you review?
20    A   The loan documents.
21    Q   Pardon me?

5 (Pages 17 to 20)

# Craig J. Schwartz

Page 177

1     Q   And do you recollect whether under the terms
2 of the line of credit CCI was required to have the
3 line of credit at a zero balance for thirty
4 consecutive days in a twelve-month period?
5       MR. SWICHAR: Could I hear that back?
6       (Question was read by the Reporter.)
7       MR. SWICHAR: I don't understand the
8 question, but if your own witness does, fine.
9       And if there is a document, why don't
10 you just show it to him?
11       MR. GEBHARDT: Actually, I will
12 withdraw the question because the March 23rd, 1999,
13 commitment does not have that as a requirement, but
14 the preceding one did.
15       So we're operating under what's been
16 designated Schwartz 12, so I will withdraw the
17 question.
18     Q   (By Mr. Gebhardt) Now, turning to Schwartz
19 Exhibit 12, which is the commitment letter for the
20 four million dollar revolving line of credit, what
21 were the proceeds of draws on the line of credit to be

Page 178

1 used to do?
2     A   Finance work in process and accounts
3 receivable.
4     Q   Is repaying in full any fully funded loan or
5 credit facility an authorized use of loan proceeds?
6       MR. SWICHAR: I object to the form of
7 the question.
8     Q   You may answer.
9       THE WITNESS: Read it back, please.
10       (Question was read by the Reporter.)
11       MR. SWICHAR: I object to the form,
12 particularly the word authorized.
13     A   No.
14     Q   (By Mr. Gebhardt) Okay. Now, what exactly
15 are accounts receivable?
16     A   Payments from customers of the borrower for
17 services rendered.
18     Q   Okay. And this line of credit was intended
19 to provide CCI with --
20       MR. SWICHAR: Are you just leading him
21 down?

Page 179

1       I'm just objecting.
2       MR. GEBHARDT: Then object.
3     Q   (By Mr. Gebhardt) The line of credit was
4 intended to permit CCI to have funds available pending
5 the receipt of payment from customers on the accounts
6 receivable?
7     A   Yes.
8     Q   You were asked some questions relating to
9 the payment of the monthly installments on the two
10 million dollar equipment term loan.
11       Do you recollect those?
12     A   Yes.
13     Q   And I think your testimony was that they
14 were made through the use of the revolving, four
15 million dollar revolving line of credit, right?
16     A   Yes.
17       MR. SWICHAR: No, I don't think he said
18 that.
19       I think he said the repayments were
20 made either through checks or automatic, and then we
21 went to the next step, which was the impact of it.

Page 180

1     Q   Was making the monthly installments of
2 principal and interest on the equipment term loan an
3 authorized use of the four million dollar revolving
4 line of credit?
5     A   Yes.
6     Q   Why is that?
7     A   Because a term loan is to be repaid, of
8 course, over a period of time, monthly, and through
9 profits of the company, and those profits are a part
10 of the receivables that they come in. So that line is
11 used because that -- the profits are in -- a part of
12 the accounts receivable, and the line gets paid down
13 that way.
14       (Gerard L. Elias entered the conference
15 room.)
16     Q   Had there been no term loan from CCI --
17 no -- excuse me, let me rephrase that.
18       Assume there had been no four million dollar
19 line of credit, what would the source of payment have
20 been for CCI to repay the monthly installments of
21 principal and interest on the two million dollar

# Craig J. Schwartz

---

**Page 181**

1 equipment loan?

2     MR. SWICHAR: Objection as to form.

3   A  Excess cash flow.

4   Q  Where would that come from?

5   A  The collection of accounts receivable.

6   Q  Okay. Now, when the 1.2 million dollar loan

7 was paid off on February 11, 2000, with a draw on the

8 four million dollar revolving line of credit, I

9 believe the testimony has been that a check was

10 delivered by Mr. Ortenzio to make that payment.

11     Does that accord with your recollection?

12   A  Yes.

13   Q  Was that payment delivered directly to you?

14   A  No.

15   Q  Were you at any time ever told by anyone at

16 or about February 11, 2000, that that check

17 represented a draw on the four million dollar

18 revolving line of credit?

19   A  No.

20   Q  Had you known on or about February 11, 2000,

21 that the check presented by Mr. Ortenzio on behalf of

---

**Page 182**

1 CCI represented a draw on the four million dollar

2 revolving line of credit, what action, if any, would

3 you have taken?

4   A  I would have not honored the check.

5   Q  If Mr. Ortenzio had called you prior to

6 bringing the check in and expressly stated that he

7 intended to pay the 1.2 million dollar loan with a

8 draw on the four million dollar revolving line of

9 credit, what would your response to Mr. Ortenzio have

10 been?

11     MR. SWICHAR: Objection to form.

12   A  No, don't bother, or why are you paying it

13 off with the line?

14   Q  Now, when the --

15     MR. SWICHAR: Do you want the answer to

16 that?

17   Q  When the 1.2 million dollar line of

18 credit -- excuse me -- when the 1.2 million dollar

19 loan was discussed, what did Mr. Ortenzio tell you was

20 the reason CCI needed that advance of funds?

21   A  They needed the money to keep operating

---

**Page 183**

1 because the cash flow situation of the company was in

2 a depo -- disposition.

3   Q  Did Mr. Ortenzio express at all how long he

4 believed that cash flow problem would continue?

5   A  I believe some cash flow projections given

6 to us indicated February, through the end of February.

7   Q  And from what source based on your

8 discussions with Mr. Ortenzio in November of 1999 did

9 you anticipate the 1.2 million dollar loan being

10 repaid?

11   A  Excess cash flow.

12   Q  Okay. And based on Mr. Ortenzio's

13 discussions, did you expect that excess cash flow to

14 put CCI in a positive cash position?

15   A  Yes.

16   Q  And would you have expected at the time of

17 the 1.2 million --

18     MR. SWICHAR: Object to all these

19 leading questions.

20     MR. GEBHARDT: That's fine.

21   Q  (By Mr. Gebhardt) Would you have expected

---

**Page 184**

1 the 1.2 million dollar loan had it been repaid from

2 the excess cash flow for there to have been a positive

3 balance on the four million dollar revolving line of

4 credit?

5   A  I would have expected the line to have a

6 zero balance.

7   Q  Now, you were asked --

8     MR. SWICHAR: Wait.

9     Can I hear that question and answer

10 back again?

11     (Record was read by the Reporter.)

12   Q  (By Mr. Gebhardt) Now, I believe the

13 documents establish based on the commitment letters

14 that the 1.2 million dollar loan was to be due on

15 March 31, 2000, if not demanded sooner, and that the

16 four million dollar line of credit expired on

17 April 30, 2000.

18     What was your anticipation of what would

19 occur had CCI Construction not had sufficient cash

20 flow to repay the 1.2 million dollar loan by March 31,

21 2000?

---

46 (Pages 181 to 184)

# Craig J. Schwartz

Page 189

1    Q   Now, I think you indicated that you did not
2    know when you spoke with Mr. Ortenzio on or about
3    February 11 what the source of the payment might have
4    been that repaid the 1.2 million dollar loan.
5    A   That's correct.
6    Q   Do you know whether, based on your activity
7    as an account officer, whether Mr. Ortenzio had the
8    personal financial ability to have made that payment?
9        MR. SWICHAR:  Objection as to form.
10   A   Yes, I believe he did.
11   Q   Did you know for a fact whether CCI had
12   accounts with any other banks at the time?
13   A   I was not aware of any.
14   Q   But did you know one way or the other?
15   A   No.
16   Q   Did you know whether CCI was into the line
17   of credit at the time the payment was made?
18       MR. SWICHAR:  Objection.
19       I don't know what that means, into the
20   line of credit.
21   Q   Had a positive balance on the line of credit

Page 190

1    at the time the 1.2 million dollar payment was made.
2        Did you know that on February 11?
3    A   No, I did not.
4    Q   Now, after you learned that the check had
5    come in, did you have any contact with Mr. Ortenzio
6    about the consequences of the payment having been
7    made?
8        In other words, why did you send this letter
9    that's been marked as S-13 to Mr. Ortenzio confirming
10   that the 1.2 million dollar line had about --
11       MR. SWICHAR:  Objection as to form; the
12   letter says why he sent it.
13   Q   That's 13.
14       Why did you send that letter, S-13?
15       MR. SWICHAR:  Objection as to form.
16       It states on the letter why he was
17   sending it.
18   A   As a follow-up to Mr. Ortenzio's request to
19   get his surety back because, because the loan was paid
20   in full.
21   Q   Okay.  Now, that was a request made to you

Page 191

1    directly?
2    A   Yes.
3    Q   And was any sense of urgency expressed by
4    Mr. Ortenzio in the call requesting the return of the
5    suretyship?
6    A   Yes, it would have had to be for me to go
7    through the process to get the surety back quicker
8    than the normal course of business.
9        MR. SWICHAR:  That's not responsive.
10       I object to the answer, form of the
11   answer.
12   Q   Did you take action to get it back quicker
13   than the normal ordinary process?
14       MR. SWICHAR:  He testified he had no
15   recollection.
16       Objection.
17   Q   You may answer.
18   A   Yes, I have -- I did.
19   Q   And why did you take that extra effort?
20   A   Mr. Ortenzio's request.
21   Q   You were also asked a couple questions about

Page 192

1    banking custom and practice.
2        Do you recollect that?
3    A   Yes.
4    Q   Do you know whether banking customs and
5    practice are binding law, enforceable --
6        MR. SWICHAR:  Objection to the
7    question.
8    Q   -- in courts?
9    A   No, I do not.
10   Q   Do you know whether banking customs and
11   practices constitute a prohibition upon borrower
12   conduct?
13   A   No, I do not.
14       MR. GEBHARDT:  No further questions.
15       MR. SWICHAR:  Just a couple.
16       EXAMINATION BY COUNSEL FOR THE DEFENDANT
17   BY MR. SWICHAR:
18   Q   Mr. Schwartz, you testified that the
19   repayment in full of the 1.2 million dollar loan was
20   not an authorized use of the four million dollar line
21   of credit; is that correct?

48 (Pages 189 to 192)

# Craig J. Schwartz



Page 193

1    A   Yes.
2    Q   Is there any document anywhere in this world
3  that states specifically in regard to repayment in
4  contrast to use of the funds that the funds -- that
5  the four million dollar line could not be used to
6  repay the 1.2?
7    A   There's no documents that says it cannot be
8  used to repay it.
9    Q   Is there any -- would there have been any
10  impediment that you're aware of to the bank stating in
11  any document binding on Mr. -- binding on CCI or
12  Mr. Ortenzio to prohibit the four million dollar line
13  of credit to be used to repay the 1.2 million dollar
14  loan, such as we discussed earlier, a negative
15  covenant?
16    A   Other than the agreed-upon use of proceeds
17  of that four million dollar loan.
18    Q   Right, right.
19        Is there any impediment to the bank
20  expressly stating as a negative covenant that the four
21  million dollar line of credit could not used to repay

Page 194

1  the 1.2 million dollar loan?
2    A   No.
3    Q   The answer's no?
4    A   No.
5    Q   How was CCI to repay the 1.2 million dollar
6  loan?
7    A   From excess cash flow.
8    Q   And I think we -- I asked you earlier, but
9  correct me if I'm wrong, since Mr. Gebhardt asked,
10  touched on that, where is that in any document?
11    A   I don't believe it's in a document.
12    Q   Okay.  Is there any reason or any impediment
13  to the bank not putting that in any document that this
14  loan could only be repaid from excess cash flow or
15  excess profits?
16        MR. GEBHARDT:  Let me object to, again,
17  the compound nature.  Reason and impediment are two
18  different things.
19        MR. SWICHAR:  I'm using his word -- I
20  hear you.
21        MR. GEBHARDT:  You're asking is there a

Page 195

1  reason --
2        MR. SWICHAR:  I'll ask another
3  question.
4    Q   (By Mr. Swichar) Are you aware of any
5  impediment that prevented the bank from stating in any
6  document binding on CCI or Mr. Ortenzio that the
7  1.2 million dollar loan could only be repaid from
8  excess cash flow or profits?
9    A   No.
10    Q   You testified with respect to the equipment
11  note that that was a term loan; is that correct?
12    A   Yes.
13    Q   Is that different than the 1.2 million
14  dollar loan?
15    A   Yes.
16    Q   Okay, because payments were to be made
17  monthly?
18    A   The whole nature of the transaction was
19  different.
20    Q   The equipment note?
21    A   Yes.

Page 196

1    Q   Okay.  You testified that payments on the
2  equipment note had to be repaid through profits of the
3  company, from collected accounts receivable, if I took
4  notes correctly; is that correct?
5    A   Yes.
6    Q   Is that stated anywhere in the equipment
7  note or any related document?
8        In other words, limiting the monies that can
9  be used to repay the equipment note.
10    A   Not that I'm aware of.
11    Q   You testified when the 1.2 million dollar
12  note was repaid on February 11 you were not aware that
13  the payment had been made from a draw on the four
14  million dollar line of credit; is that correct?
15    A   Yes.
16    Q   That information was readily available to
17  you, was it not?
18    A   Within a day or so.
19    Q   Within a day or so?
20    A   Yes.
21    Q   Wouldn't that information have been on your

**Esquire Deposition Services**

**1-800-441-3376**

# Craig J. Schwartz

Page 197

1  computer?
2      A   Not until the payment actually gets posted.
3      Q   Okay.  The next day?
4      A   Possibly.
5      Q   Okay.  Certainly before the note was
6  returned?
7      A   Yes.
8      Q   And marked satisfied?
9      A   Yes.
10     Q   You had the opportunity to learn the source
11 of payment?
12     A   The note was not returned.
13     Q   The note, the guarantee, the suretyship.
14     A   Yes.
15     Q   Prior to your delivery of the guarantee
16 marking it paid, you had the opportunity to determine
17 the source of the money, is that correct -- source of
18 the payment -- is that correct?
19     A   Yes.
20     Q   And you never inquired as to the source of
21 the money -- source of the repayment of the

Page 198

1  1.2 million dollar loan; is that correct?
2      A   Yes.
3      Q   And, again, where did you think the money
4  came from?
5          And I think your earlier answer was you
6  didn't know, you didn't care; is that correct?
7          MR. GEBHARDT:  Objection to the
8  characterizing of the witness' earlier testimony.
9      A   I didn't know where the money came from.
10     Q   Well, you didn't ask, did you?
11     A   No, I did not.
12     Q   And, therefore, you didn't care, did you?
13         MR. GEBHARDT:  Objection.
14     Q   If you had cared, you would have asked; is
15 that right?
16     A   I didn't have the opportunity to speak to
17 Mr. Ortenzio.
18     Q   You could have called him on the phone?
19     A   I -- that's correct.
20     Q   Could have gone over to CCI and knocked on
21 the door and asked him?

Page 199

1      A   Yes.
2      Q   Okay.  You didn't do either, did you?
3      A   No.
4      Q   If you had cared, you would have done it?
5          MR. GEBHARDT:  Objection.
6      A   Most likely.
7      Q   The fact is when the 1.2 million dollar note
8  was repaid, you were just happy to see that it was
9  repaid, weren't you?
10     A   I don't think I'd put it in those words.
11     Q   Were you glad or sad --
12     A   When I get --
13     Q   -- or something in between?
14     A   When I receive payment, I'm always --
15     Q   Grateful?
16     A   Yes.
17     Q   Okay.  Now, Mr. Ortenzio told you you said
18 in November, 1999, that he required the 1.2 million
19 through the end of February, 2000; is that correct?
20         That's what you stated when your attorney
21 asked you.

Page 200

1      A   Okay.
2      Q   Is that correct?
3      A   That was --
4      Q   You said they would need the money, the
5  extra money, the 1.2 million, through the end of
6  February, 2000.
7      A   That was according to the cash flow
8  statements.
9      Q   And that's what Mr. Ortenzio told you,
10 right?
11     A   Yes.
12     Q   Okay.  Now, at the time of the repayment of
13 the 1.2 million coincidently in February, 2000, the
14 balance on the four million dollar line of credit
15 allowed for the repayment of the 1.2 from the four
16 million; is that correct?
17         MR. GEBHARDT:  Objection.
18     Q   There was sufficient cushion there under the
19 four million dollar line of credit to repay the 1.2;
20 is that correct?
21         We went over the numbers.

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK                    *

    Plaintiff,                    *

v.                               *          CASE NO.:    1:01-CV-786

JOHN M. ORTENZIO                 *

    Defendant.                   *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF MOTION TO STRIKE JURY DEMAND

### I.
### Introduction.

Plaintiff, Allfirst Bank, brought this suit against Defendant, John M. Ortenzio, to nullify his attempt to improperly obtain a discharge of his personal guaranty and to enforce that guaranty against him. The gravamen of Allfirst's action is the rescission of the spurious payment transaction Ortenzio engineered and the collection of what is owed on the guaranty.

Ortenzio filed a demand for trial by jury.  Because the inherently equitable nature of the action, Ortenzio has no right to a jury trial.  For this reason, Allfirst has moved to strike the jury demand to permit the case to be tried to the Court.  This Memorandum is in support of Allfirst's motion.

### II.
### Basic Facts and The Claims Raised.

**A.       The Basic Facts.**

In March of 1999, Allfirst extended to CCI Construction Company a $4 million line of credit. Exhibit A (Commitment Letter); Exhibit B (Promissory Note).  The sole purpose of the line of credit,

as expressly stated in the commitment letter, was to finance CCI's accounts receivable and work in progress. This meant that the line of credit funds were to be used solely to provide short term working capital to pay monthly bills until current accounts receivable were paid by customers. No other use of loan proceeds was permitted. Exhibit J (Phillips at 12; 39-40); Exhibit L (Schwartz at 177-179). The line of credit was unsecured and did not carry Ortenzio's guaranty..

During 1999, CCI's financial situation deteriorated. In November, 1999, Ortenzio requested a temporary loan from Allfirst to tide CCI over what he represented was a short term cash flow shortfall. A meeting was held between Ortenzio and Sheri Phillips, CCI's chief financial officer, and representatives of Allfirst on November 4, 1999. Exhibit C (Schwartz Memorandum ). As a result of the meeting, Allfirst agreed to extend a temporary $1.2 million loan to CCI, which would be due on March 31, 2000. Exhibit D (Commitment). Allfirst was unwilling to extend the $1.2 million loan to CCI unless Ortenzio guarantied the loan. To obtain the loan for CCI, Ortenzio gave his guaranty. Exhibit E (Suretyship). This guaranty obligated Ortenzio on the temporary loan and authorized Allfirst to collect the loan directly from Ortenzio to the same extent as if the loan had been made to him. Repayment of the $1.2 million loan was expected to come from the increased cash flow which would result when collections were made on two large, problematic jobs. Exhibit J (Phillips at 34-35); Exhibit K (Ortenzio at 88). In addition, Ortenzio had sufficient liquid assets to make the payment personally. Exhibit K (Ortenzio at 95-96).

CCI's financial condition worsened after the $1.2 million loan was made. CCI, which made a profit the preceding year, lost over $6 million in 1999. Exhibit F (1998 Financial Statement); Exhibit G ( Internal 1999 Financial Statement). By February, 2000, CCI projected that it would have a cash flow shortfall of several million dollars over the next several months. Exhibit H (Cash Flow

Projection). This meant that CCI's expected revenues would be millions of dollars short of the funds it needed to continue operating and stay in business. Ortenzio was fully aware of CCI's precarious financial condition and discussed the Company's financial plight and desperate need for cash with Sheri Phillips. Exhibit J (Phillips at 41-44). Ortenzio, however, refused to invest any more of his money in the Company. Exhibit J (Phillips at 45; 51-52). He discussed with Sherri Phillips the possibility of a bankruptcy proceeding. Exhibit J (Phillips at 48).

Ortenzio also was aware of his guaranty of the $1.2 million loan and obligation to pay this sum to Allfirst. In early February, he decided to have CCI repay the $1.2 million loan which he had guaranteed with a borrowing under the $4 million line of credit which he had not guaranteed. Sheri Phillips, the chief financial officer, opposed Ortenzio's plan. Exhibit J (Phillips at 36-38). She believed this repayment would only further restrict and reduce CCI's available cash. Exhibit J (Phillips at 37-38). She also believed that this payment was an unauthorized use of the line of credit, whose purpose was to finance accounts receivable and work in progress and not prepay fully funded loans. Exhibit J (Phillips at 39-40). She refused to write the check to effect the repayment. Her opposition was overridden by Ortenzio, who personally wrote the check that effected a draw on the line of credit. Exhibit J (Phillips at 38); Exhibit K (Ortenzio at 106-107).

On Friday, February 11, 2000, Ortenzio, who had not previously been involved in making payments to Allfirst on outstanding loans [Exhibit J (Phillips at 35-36)], personally went to Allfirst to deliver the check that would repay the $1.2 million loan. Exhibit K (Ortenzio at 105; 108). Craig Schwartz, the Allfirst loan officer, was not present when Ortenzio arrived. Ortenzio gave the check to Schwartz's secretary and asked that it be applied to the $1.2 million loan. After personally delivering the check, Ortenzio telephoned Craig Schwartz to request an immediate return of his

3

guaranty. He did not disclose that the payment had been made by a draw on the unguaranteed line of credit. Exhibit K (Ortenzio at 110-122; 182-187); Exhibit L (Schwartz at 181). Because of Ortenzio's insistence, Schwartz put a rush request into Allfirst's document control section and notified Ortenzio on Tuesday, February 15, 2000, that he would return the guaranty to Ortenzio as soon as possible. Exhibit L (Schwartz at 190-191). At the time Schwartz returned the guaranty, Allfirst was unaware that the unguaranteed line of credit, which was to be used to finance accounts and work in progress, had been used to repay the guaranteed $1.2 million loan. Exhibit L (Schwartz at 181; 196-198). Allfirst also was unaware that CCI was about to collapse from a lack of available cash.

With his guaranty in hand and believing he was now free from any obligation to pay the $1.2 million loan, Ortenzio requested a meeting with Allfirst. His purpose was to apprize Allfirst of CCI's situation. Exhibit K (Ortenzio at 146-148). The meeting was held on Friday, February 18, 2001 at Allfirst's office, exactly one week after he had CCI borrow money on its line of credit to repay the loan Ortenzio had guaranteed. Exhibit K (Ortenzio at 124). Ortenzio was accompanied by Robert Chernicoff, a bankruptcy specialist he had retained just prior to the meeting to represent CCI. Exhibit K (Ortenzio at 127-128). At the time of the meeting, Ortenzio knew that CCI had lost over $6 million dollars in 1999 and was insolvent by almost a million dollars. Exhibit G (Internal 1999 Financial Statement). Allfirst had no appreciation of the severity of CCI's financial distress until Ortenzio requested the meeting, on Thursday, February 17, 2000, and disclosed the $6 million loss.

In the meeting, Ortenzio presented a cash flow projection that showed that CCI would have a cash shortage over the next 5 months of $5,873,456. He did not reveal during the meeting that the

$4 million line of credit had been used to repay the $1.2 million loan he had personally guaranteed. Exhibit K (Ortenzio at 182-183). The cash flow projection he presented at the meeting did not reflect this use of the $4 million line of credit for this purpose. Exhibit J (Phillips at 59-60). As of this meeting, Allfirst had no knowledge of Ortenzio's use of the line of credit to discharge the loan he had guaranteed. Exhibit L (Schwartz at 181; 196-198); Exhibit M (Elias at 24).

During the meeting, Ortenzio stated that he would be meeting with CCI's bonding company during the next week and planned to solicit financial support from the bonding company. Exhibit M (Elias at 10-12). He agreed to report back to Allfirst on the results of the meeting with the bonding company. He also agreed that CCI would not write any further checks that would draw on the line of credit until he had reported back to Allfirst. Exhibit M (Elias at 10-12).

Despite his promise, Ortenzio, on the Monday following the Friday meeting, personally supervised the writing of checks that were draws on the line. Exhibit J (Phillips at 38); Exhibit K (Ortenzio at 106-107). When these checks were presented for payment, Allfirst dishonored the checks that Ortenzio promised would not be issued. Exhibit M (Elias at 19-20). Because of the flurry of checks that were being presented, despite Ortenzio's promise, Allfirst closed down the line of credit on Wednesday, February 23, 2000 to prevent further draws. Exhibit M (Elias at 19-20). On February 24, 2001, Allfirst formally declared CCI in default and demanded payment. Exhibit I (Default Letter). Allfirst still was unaware that Ortenzio had on February 11, 2001 used the unguaranteed line to repay the $1.2 million loan he had guaranteed. Allfirst did not learn of this use of the line until after the default had been declared. Exhibit M (Elias at 24).

**B.    The Claims Raised And The Relief Sought In The Complaint.**

The Complaint contains three counts derived from common factual allegations. The first

count asserts that the draw on the $4 million line of credit was a conditional payment that did not become effective as a satisfaction of the $1.2 million loan unless and until the outstanding balance of the line of credit reached zero.  Because the outstanding balance of the line was never reduced to zero after Ortenzio used the line to repay the $1.2 million loan, his guaranty remains in effect.

The second count raises equitable subrogation. This count asserts that the use of the proceeds of the $4 million line to satisfy an Ortenzio guaranteed obligation was without the knowledge or consent of Allfirst, such that Ortenzio will be unjustly enriched unless that portion of the $4 million line used to repay the $1.2 million loan is subrogated to the benefit of the guaranty of the $1.2 million loan.

The third count raises common law fraud and alleges Ortenzio's conduct in using the line to repay the guaranteed loan amounted to a fraudulent misrepresentation upon which Allfirst reasonably relied to its detriment.

The relief sough under the three counts is virtually identical.  Each count, on the various theories expressed, seeks to have the attempted satisfaction of the $1.2 million loan rescinded, canceled, set aside, or disregarded so that the guaranty can be enforced.  The three counts ask for a monetary judgment against Ortenzio for what would otherwise be due under his guaranty if he had not presented the check drawn on the line of credit on February 11, 2000.

## IV.
## Law and Argument.

*F. R. Civ. P.* 38 provides for the  right to trial by jury to the extent required by the Seventh Amendment or by a specific Federal statute.  The Seventh Amendment preserves the right to trial by jury to the extent that right existed at common law.  Historically, the common law permitted a

trial by jury for actions at law but not for actions in equity. *Tull v. United States*, 481 U.S. 412, 417 (1987).  "(T)he Seventh Amendment right to a jury trial attaches to actions at law, not to those in equity." *Mile High Industries v. Cohen*, 222 F.3d 845, 856 (10th Cir. 2000); *Kennedy v. Lasko Company, Inc.*, 414 F.2d 1249, 1251 (3rd Cir. 1969) ("a civil action in the nature of an action at law was triable by jury and one in the nature of an action in equity was not triable by jury.").

The question of whether a party has a right to a jury trial requires a determination of whether the action is one that historically was tried at law or in equity.  This determination involves a two pronged analysis which focuses on the nature of the action and the remedy sought. *Tull v. United States*, 481 U.S. 412, 417-418 (1987). *See also Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990). The second prong of the analysis, the more important of the two, focuses on whether the remedy sought is fundamentally more legal or equitable in nature. *Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990).

Suits where the essential nature of the remedy sought is that of recision or restitution are equitable and do not carry the right to trial by jury. *Simpson v. Office of Thrift Supervision*, 29 F.3d 1418, 1423-24 (9th Cir. 1994) (restitution); *Scheurenbrand v. Wood Gundy Corp.*, 8 F.3d 1547, 1551 (11th Cir. 1993) ("An action for rescission is an equitable proceeding, and as such it carries no right to a jury trial."); *Crews v. Central States, Southeast and Southwest Areas Pension* Fund, 788 F.2d 332, 338 (6th Cir. 1986) ("Historically, an action for restitution seeks an equitable remedy for which there is no Seventh Amendment right to a jury trial."); *Phillips v. Kaplus*, 764 F.2d 807, 812 (11th Cir. 1985) ("And the federal law is clear that an action for rescission is equitable, triable by the court without a jury."); *Gorenflo v. Texaco, Inc.* 735 F.2d 835, 838 (5th Cir. 1984) (suit for cancellation of lease arises in equity and carries no right to jury trial).  Where the remedy sought is the

"nullification of the transaction and the restoration of the parties to the status quo ante" the action

is in the nature of one for rescission and does not provide the right to a jury trial. *Plechner v.*

*Widener College, Inc.*, 569 F.2d 1250, 1258 (3rd Cir. 1977). As the Third Circuit emphasized in

*Plechner* a cause of action focused on obtaining rescission of a transaction will be treated as such

no matter how the claims in the complaint are designated. Quoting:

> The right to a jury trial is to be determined from all the pleadings but the
> words or labels used there are not decisive. The court must consider the real
> nature of the claims and is not bound by the terminology a pleader chooses.

*Plechner v. Widener College, Inc.*, 569 F.2d at 1257. *See also Schuyt v. Rowe Price Prime Reserve*

*Fund, Inc.*, 835 F.2d 45, 46 (2nd Cir. 1987).

Actions for damages for breach of contract or in tort typically are legal and require a jury

trial. *Billing v. Ravin, Greenberg & Zackin, P.A.* 22 F.3d 1242, 1245 (3rd Cir. 1994). Although relief

in the form of monetary damages is typical of actions at law, a request for monetary relief does not

convert what is otherwise a suit seeking an equitable remedy into a suit seeking legal damages and

requiring a jury. Where the claim for a monetary award is intertwined with a primary request for

equitable relief, the action is equitable and does not require a jury. *Local No. 391 v. Terry*, 494 U.S.

558, 571 (1990); *Borst v. Chevron Corp.*, 36 F.3d 1308, 1324 (5th Cir. 1994) ("a request for monetary

recovery sounds in equity, and thus does not guarantee a jury trial when it is restitutionary in

nature"); *Simpson v. Office of Thrift Supervision*, 29 F.3d 1418, 1423-24 (9th Cir. 1994) ("Merely

because this case involves a claim for restitution of money does not detract from its equitable

nature); *Securities & Exchange Commission v. Commonwealth Chemical Securities, Inc.*, 574 F. 2d

90, 95 (2nd Cir. 1978) (no right to jury trial because "the court is not awarding damages to which

plaintiff is legally entitled but is exercising the chancellor's discretion to prevent unjust

enrichment."); *Broadnax Mills, Inc. v. Blue Cross and Blue Shield of Virginia*, 876 F. Supp. 809, 817 (E.D. Va. 1995) ("Where a prayer for monetary relief actually seeks restitution or is 'intertwined' with equitable remedies, the nature of the relief is generally equitable.").

Allfirst may be asking for a monetary award, but its suit is fundamentally a request for restitutional or rescissionary relief. Allfirst is asking that the payment made by CCI at the instance of Ortenzio be cancelled and disregarded so that Allfirst may enforce and collect upon the guaranty given by him.

An examination of the three counts of the Complaint demonstrates the equitable nature of the action. One count asks that Allfirst, as lender with regard to the $4 million line of credit, be equitably subrogated to its position as holder of Ortenzio's guaranty of the $1.2 million loan. Equitable subrogation is available when a person's money is used by another to discharge an obligation without that person's knowledge or consent. *See Restatement of Restitution* § 162, at 653 (1937), which states:

> Where property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder.

The *Restatement of Restitution Comments* following section 162 applies this rule where a person's property "is used by another without his consent in discharging an obligation of the other or a lien upon the other's property." *Id.* cmt. b, at 655. As § 162 of the *Restatement of Restitution* indicates, the basis for equitable subrogation is the equitable concept of unjust enrichment. *See National Surety Co. v. Franklin Trust Co.*, 313 Pa. 501, 507, 170 A. 683 (1934) (right to subrogation arises by operation of, and depends on, equity alone). Without question, Defendant is not entitled to have

Allfirst's equitable subrogation claim decided by a jury. The claim must be decided by this Court.

Another count requests a determination that the payment, being a borrowing on the line and an increase in the amount due under the promissory note of CCI evidencing the line, was a conditional payment that never became effective because the balance on the line of credit and due under the promissory note was never paid after the repayment borrowing was made. As the Pennsylvania Supreme Court stated in an early case:

> Nothing is better stated than that, in the absence of any special agreement to the contrary, **the mere acceptance, by a creditor, from his debtor, of the note or check of a third person, to the creditor's order, for a pre-existing indebtedness, is not absolute, but merely conditional payment, defeasible on the dishonor or non-payment of the note or check; and, in that event, the debtor remains liable for his original debt.**

*Holmes* v. *Briggs,* 131 Pa. 233, 240, 18 A. 928 (1890). The present situation is that of a debtor (Ortenzio) paying his obligation to a creditor ("Allfirst") by delivering to the creditor the obligation of another person (CCI) to make a payment. The payment to the creditor through the medium of the third party obligation is a conditional payment which does not discharge the debtor's indebtedness unless the third party satisfies its obligation.

In this case, Ortenzio discharged his obligation under the guaranty, which was a direct and primary obligation,[1] by a borrowing under CCI's line of credit, which increased the amount due under the line of credit promissory note. This payment of the guaranteed sum through the use of CCI's line of credit was conditional and did not become effective until such time as CCI paid its

---

[1]    The Suretyship Agreement specifically states "The liability of the Undersigned hereunder is a primary and direct obligation without regard to any other obligor or security or collateral held by the Bank." This and other provisions throughout the Suretyship Agreement authorized Allfirst to collect the $1.2 million from Ortenzio without having to resort to CCI. Allfirst had the right to collect the $1.2 million loan from Ortenzio and the balance outstanding under the $4 million line from CCI.

obligations under the line of credit and the promissory note which evidenced it, which has not occurred. Like the equitable subrogation claim, this claim seeks to annul the effect of the ephemeral payment and make the guaranty enforceable, relief which is fundamentally rescissional and restuitutionary.

The final count alleges fraud based upon implied misrepresentation and concealment in connection with the payment. A claim for fraud can be either legal or equitable, depending on the type of relief sought. *Skippy, Inc. v. CPC International, Inc.*, 674 F.2d 209, 214 (4th Cir. 1982). What Allfirst wants is the payment of the $1.2 million loan with a borrowing under the line rescinded and cancelled based on the fraud perpetrated by John Ortenzio in repaying the Allfirst with its own money to escape liability under his guaranty prior to the financial collapse of CCI Construction. This is a claim for equitable relief and not a claim for legal damages.

## IV.
## Conclusion.

This case was filed by Allfirst in anticipation of a court trial. Defendant filed a jury demand. But, as has been discussed, the equitable nature of this suit does not support a right to trial by jury. The jury demand was filed without right and should be stricken to permit the case to proceed as a trial to the Court.

Lawrence J. Gebhardt, *Pro Hac Vice*
Ramsay M. Whitworth, PA Bar # 85208
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202
(410) 752-5100
*Attorneys for Allfirst Bank*