# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK,                          :       CIVIL ACTION NO. 1:01-CV-786
                                        :       (Honorable Sylvia H. Rambo)
        Plaintiff,                 :
                                        :
    v.                                :       **FILED**
                                        :       HARRISBURG, PA
JOHN M. ORTENZIO,                       :
                                        :       APR 18 2002
        Defendant.                 :
                                        :       MARY E. D'ANDREA, CLERK
                                                Per _____
                                                Deputy Clerk

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION TO STRIKE JURY DEMAND

### I.    INTRODUCTION

Defendant, John M. Ortenzio, by his undersigned counsel, opposes the plaintiff's motion to strike jury demand. In essence, as demonstrated below, the plaintiff has sued defendant for money damages in Count I, for breach of contract, an action at law and, accordingly, defendant is entitled to a jury trial. With respect to plaintiff's Count II, for equitable subrogation, which plaintiff describes as similar to unjust enrichment, plaintiff's Complaint, as a matter of law, fails to even state a cause of action, as further demonstrated below. Since, in essence, this lawsuit is one at law, defendant is entitled to a jury trial.

113449.00601/21015888v1

## II.    BACKGROUND[1]

This lawsuit involves the interpretation of three notes:  A Promissory Note that a corporation, CCI Construction Co., Inc. ("CCI") executed on March 24, 1999, pursuant to which plaintiff provided CCI a long term, unsecured $4 million line of credit ("the line of credit"); a Commercial Loan (equipment) Note dated November 20, 1998, pursuant to which plaintiff extended a $2 million loan to CCI, secured by CCI's equipment ("the equipment note"); and a Commercial Loan Note dated November 8, 1999, in the amount of $1.2 million, which had been guaranteed by the defendant ("the guaranteed note").

Plaintiff contends that defendant acted unlawfully when it caused CCI to repay the guaranteed note from funds available from the line of credit.

In essence, CCI maintained a single checking account at Allfirst and all of the aforementioned loans were tied into a cash management facility (Schwartz Dep., at 85, 102-103).[2]  More specifically, any checks written on CCI's account at Allfirst increased the balance owed on the line of credit and, conversely, all revenues deposited to CCI's account had the effect of reducing the balance and, thereby, increasing the availability of funds that could be borrowed on the line of credit (Id. at 142).  Accordingly, when Allfirst lent CCI the sum of $1.2 million, pursuant to the guaranteed note, it increased the availability on the $4 million line of credit by $1.2 million and, conversely, decreased the balance owed on the line of credit by the same amount (Id. at 87-88).  It is also

---

[1] Plaintiff, once again, has seen fit to set forth in its Memorandum a version of "Basic Facts" which is both disputed and irrelevant with respect to the pending Motion.  Plaintiff is compelled to respond with a counter-statement of facts.

113449.00601/21015888v1

undisputed that all payments that CCI made from its checking account, such as payroll, taxes, payments to vendors and re-payments on the $2 million equipment note were drawn from the line of credit, and thereby had the same effect of increasing the balance on the $4 million line of credit.

According to the deposition of Craig J. Schwartz, plaintiff's loan officer, who was responsible for the loans to CCI, the $1.2 million guaranteed note was provided at the request of CCI, on a short-term basis, when it was encountering cash flow difficulties (Id. at 56). Mr. Schwartz acknowledged in his deposition that there were no restrictions in the guaranteed note as to the source of funds that could be used to repay the note (Id. at 62). He acknowledged that the guaranteed note was short-term, temporary and, indeed, had to be repaid no later than March 31, 2000 (Id. at 57, 62). Mr. Schwartz never monitored CCI's use of the $1.2 million guaranteed note funds (Id. at 68). He acknowledged that the plaintiff had initially contemplated increasing the $4 million line of credit to a $5 million line of credit, and had requested Mr. Ortenzio, the defendant, to guarantee the full $5 million, but agreed to limit the defendant's guaranty to the $1.2 million guaranteed note after Mr. Ortenzio refused to guarantee more than that amount. (Id. at 69).

Pursuant to the parties' agreement, the form language in the $1.2 million guaranteed note was stricken to make it clear that defendant's guarantee would extend to the $1.2 million guaranteed note only, and not to the $4 million line of credit or to any

---

[2] All references are to the deposition transcript of the plaintiff's loan officer, Craig L. Schwartz, attached hereto as Exhibit "A."

other loan facility at the plaintiff's bank (Id. at 79). Mr. Schwartz acknowledged that the plaintiff could have asked the defendant to guarantee up to $1.2 million of any loan facility, i.e., not limit the guaranteed amount to the guaranteed note only, but failed to do so.

Mr. Schwartz acknowledged in his deposition that there were no restrictions in the guaranteed note as to the source of funds that could be used to repay the note (Id. at 62). He admitted that there was no document that deals with how the loan was to be repaid, nor was there any document that states that the $1.2 million guaranteed note could not be repaid by writing a check on CCI's checking account, thereby drawing on the line of credit (Id. at 144). Mr. Schwartz acknowledged that the plaintiff had expected that the guaranteed note would be paid from cash flow, but admitted that the expectation is not memorialized in any document (Id. at 146). Remarkably, Mr. Schwartz acknowledged that there was absolutely no reason why the plaintiff could not have documented an express prohibition so that the $1.2 million guaranteed note could not be repaid by drawing down on the $4 million line of credit (Id. at 147).

In connection with the plaintiff's allegation in the Complaint at paragraph 17, Mr. Schwartz acknowledged that he was not aware of any facts which supported the plaintiff's allegation that the repayment of CCI's $1.2 million guaranteed loan was a "conditional payment" and would not be effective until the entire $4 million line of credit had been repaid and satisfied (Id. at 157). Mr. Schwartz was not aware of any banking practice, custom or regulation that would act as an impediment to the plaintiff stating in

113449.00601/21015888v1

any loan document that the $1.2 million guaranteed note could not be paid off unless and until the $4 million line of credit had been paid off first (Id. at 159).

In connection with the plaintiff's fraud count, Mr. Schwartz admitted that the defendant never made any direct representation that the $1.2 million guarantee loan would not be paid from the $4 million line of credit (Id. at 163). Mr. Schwartz reiterated that there was no document anywhere that prohibited repayment of the $1.2 guaranteed note from the $4 million line of credit (Id. at 193). He reiterated that there had been no impediment to the bank requiring the defendant to sign a document which would have prohibited the use of the line of credit to repay the $1.2 million guaranteed note (Id. at 193). Mr. Schwartz acknowledged that there was no impediment to the plaintiff putting in any document that the loan could only be repaid from excess cash flow or excess profits (Id. at 194-195).

On February 11, 2002, approximately one month prior to the due date, CCI repaid the $1.2 million guaranteed note by drawing on the $4 million line of credit and, thereby, merely reversing the book-entry transaction that was made when the plaintiff had lent CCI the $1.2 million a few months earlier. At the time, CCI owed only approximately $1.2 million on the $4 million line of credit, so that the total amount due after the repayment was approximately $2.4 million (Id. at 90-91). In other words, according to Mr. Schwartz, at the time of the repayment of $1.2 million guaranteed loan, there was a sufficient cushion under the $4 million line of credit to repay the guaranteed note (Id. at

200-201).[3]  Remarkably, Mr. Schwartz admitted that in hindsight, it would have been "prudent" for the plaintiff to require the defendant to execute a document that would have specifically prohibited the repayment of the $1.2 million guaranteed note from the $4 million line of credit (Id. at 211-212).

Unlike the $4 million line of credit note, neither the $1.2 million guaranteed note nor the $2 million equipment note contained a waiver of jury trial provision.  In fact, as reflected in Exhibit D of the Complaint, the plaintiff declared CCI's default under the equipment note which contained no waiver of a right to jury trial.  Moreover, there was no waiver of jury trial in the guarantee of the $1.2 million note that the defendant had executed.

On February 24, 2000, the plaintiff declared a default under both the line of credit and the equipment note, but failed to provide CCI the 30 day notice and opportunity to cure, as required in the $4 million note.  The plaintiff immediately seized all of CCI's assets, froze its checking account and dishonored all checks including payroll and taxes (Id. at 122, 125).  CCI's bankruptcy followed thereafter.

---

[3] Plaintiff's Memorandum seeks to paint defendant as an opportunist who caused CCI to pay off the guaranteed note in order to avoid personal liability in view of the severity of CCI's financial distress, an assertion that is irrelevant in view of the documentation involved.  In any event, it is worth noting that CCI's former Chief Financial Officer, Sheri Phillips, has testified that at the same time that CCI paid off the guaranteed note, CCI had over $6.5 million in valid claims against governmental entities (Exhibit "B", at 97) and that CCI had, in fact, assumed and notified the plaintiff that the guaranteed note would be timely re-paid by March, 2000 (Id. at 49, 111).  Ms. Phillips also testified that she had no recollection of the plaintiff ever advising CCI or the defendant that the guaranteed note could not be repaid from the line of credit (Id. at 76).

III.    **ARGUMENT**

A.    **The Court Should Deny Plaintiff's Motion to Strike Jury Demand Because Actions for Money Damages for Breach of Contract are Legal in Nature and are Triable to a Jury.**

The Seventh Amendment to the United States Constitution provides "in Suits at common law, where value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. The Supreme Court of the United States interprets "suits at common law" to mean cases involving legal rights; no jury right attaches to equitable claims. Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 41 (1989). In determining whether a claim is equitable or legal,

> first, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first. If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as factfinder.

Id. at 42 (citations omitted); see also Simler v. Conner, 372 U.S. 221, 222 (1963) ("the right to a jury trial in the federal courts is to be determined as a matter of federal law. . . . The federal policy favoring jury trials is of historic and continuing strength."); Thermo-Stitch, Inc. v. Chemic-Cord Processing Corp., 294 F.2d 486, 490-491 (5th Cir. 1961) ("The mere presence of an equitable cause furnishes no justification for depriving a party to a legal action of his right to a jury trial.").

The gist of the action here is set forth in Count I of the Complaint, which sets forth a claim for money damages for breach of contract. An action for money damages based

on a breach of contract is traditionally a legal claim. See Dairy Queen, Inc. v. Wood, 369 U.S. 469 (1962) (holding that because the complaint did contain a legal claim for breach of contract, the plaintiff was entitled to a jury trial on his legal claims).  In Dairy Queen, the Supreme Court stated succintly:

> As an action on a debt allegedly due under a contract, it would be difficult to conceive of an action of a more traditionally legal character.

Id. at 477, citing Scott v. Neely, 140 U.S. 106, 110 ("In the case before us the debt due the complainants was in no respect different from any other debt upon contract; it was the subject of a legal action only, in which the defendants were entitled to a jury trial in the Federal courts.").   Moreover, a leading treatise on the federal rules of civil practice explains that "actions for money damages for breach of contract are legal in nature and are triable to a jury." See Moore's Federal Practice 3d § 38.30[3].

In this case, paragraph 29 of the plaintiff's Complaint alleges:

> Because the One Million Two Hundred Thousand Dollar loan from Allfirst to CCI was never paid or discharged in full, the obligation of Ortenzio, as guarantor and surety and co-obligor with respect to the One Million Two Hundred Thousand Dollar loan and the Commercial Note, was never discharged or satisifed, such that Ortenzio remains liable under the Suretyship Agreement for all sums owed by CCI pursuant to the One Million Two Hundred Thousand Dollar loan and the Commercial Note.

See Complaint at ¶ 29.  In addition, the Complaint plainly seeks money damages, to which defendant is entitled to demand a jury:

> The amount owed by Ortenzio pursuant to the Suretyship Agreement equals the lesser of (a) the unpaid balance of all principal and interest owed on the Commercial Note as

8

> though the February 12, 2000 payment has not been made or
> (b) the greater of (i) the unpaid prinicpal balance and all
> accrued interst due under the revolving line of credit, together
> with all collection costs and attorneys fees, or (b) the unpaid
> prinicpal blanace and all accrued interest due under the
> resolving line of credit, together with all collection costs and
> attorneys fees, plus the amount of any recovery made by CCI
> in the prefernece action pending in the bankruptcy case,
> together with, in either case (a) or (b), all attorneys fees and
> collection costs in enforcing the Suretyship Agreement as
> provided therein.

Id. at ¶ 30; see Curtis v. Loether, 415 U.S. 189, 196 (1974) (nature of the remedy is the more important element of the analysis).    As plaintiff's first cause of action states a claim for breach of contract for which Plaintiff seeks money damages, defendant is entitled to the jury trial he has demanded.[4]

Similarly, Count III states a claim for fraud, which also seeks money damages. See Complaint at ¶ 34.  Actions sounding in tort "for damages to a person or property" are also generally considered to be actions at law.  See Ross v. Bernhard, 396 U.S. 531, 533 (1970).  Fraud claims routinely are permitted to go to a jury.  For example, in Butler v. Consolidated Drake Press, 1995 U.S. Dist. LEXIS 2049, *6 (E.D. Pa. Feb. 22, 1995), Judge Rendell denied a motion to strike a jury demand on a claim of fraud.  A leading treatise is in agreement: "In fraud actions in which monetary damages are sought, a right to jury trial may be asserted."  See Moore's Federal Practice 3d § 38.30[1][e][ii].

---

[4] Plaintiff argues that "where the claim for a monetary award is intertwined with a primary request for equitable relief, the action is equitable and does not require a jury."  See Plaintiff's Mem. at 8.  This argument is misleading.  The only relief sought by plaintiff in its prayer for relief is: 1) compensatory damages; 2) punitive damages; 3) an award of costs.  See Complaint, Prayer for Relief.

9

Because defendant is entitled to a trial by jury on the legal claims and remedies set forth in plaintiff's Complaint, plaintiff's motion to strike defendant's demand for a jury must be denied.

### B.    Because Plaintiff's Complaint is Essentially Based on an Alleged Breach of Contract, Plaintiff is Not Entitled to the Equitable Remedy of "Equitable Subrogration".

Count II purports to state a claim for "equitable subrogation" against Ortenzio, but fails to do so. In plaintiff's memorandum of law in support of its motion to strike defendant's jury demand, plaintiff writes that "the basis of equitable subrogation is the equitable concept of unjust enrichment." See Plaintiff's Mem. at 9.

However, Count I of the Complaint alleges that numerous contracts existed between the bank and Ortenzio, which Ortenzio allegedly breached. Complaint, ¶¶ 25-30. In other words, plaintiff has sued Ortenzio on both a breach of contract theory *and* a theory of equitable subrogation / quantum meruit, which is not proper. Quantum meruit is "an implied contract remedy based on payment for services rendered and on prevention of unjust enrichment." Aloe Coal Co. v Department of Transp., 164 Pa. Commw. 453, 643 A.2d 757, 767 (1994). A "promise to pay for services may only be implied when such services are rendered in such circumstances where the performing party entertains a reasonable expectation of being paid by the party benefited." Id., citing Martin v. Little, Brown and Co., 304 Pa. Super. 424, 450 A.2d 984 (1981). As a general principle, if one obtains the money or property of another without authority, the law, independently of an express contract, will compel restitution or compensation. Am. Jur 2d, Restitution and

Implied Contracts §1; Stand. Pa. Pract. § 22:5.  Thus, where no proper contract exists, express or implied, a contract may be implied in law.

However, it is well-settled under Pennsylvania law that a claim for quantum meruit will not lie against a defendant who is also claimed to be a party to a contract. Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. 1999) (a court may not make a finding of unjust enrichment where a written or express contract exists).  See also Birchwood Lakes Community Ass'n v. Com., 296 Pa. Super. 77, 442 A.2d 304, 308 (1982) (a plaintiff cannot recover on a claim for unjust enrichment is such a claim is based on a breach of a written contract); Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987) (same).

In this case, the Complaint purports to assert a claim against Ortenzio on a theory of quantum meruit.  Quantum meruit supplies a remedy where the plaintiff alleges that, although there was no direct promise to pay, a promise should be implied because the defendant sought and received a benefit, it would be unjust to retain that benefit, and wherein there is no other party said to be liable.  Here, however, there is a contract and it is attached to plaintiff's Complaint.  It provides a contractual remedy to plaintiff. Nonetheless, plaintiff sued Ortenzio, hoping to imply the equitable remedy of quantum meruit in circumstances where the law will not permit it to do.  See Mitchell v. Moore, supra (court "may not make a finding of unjust enrichment.. . . where a written or express contract between the parties exists.").  Accordingly, where there is alleged to be a contract, a cause of action for quantum meruit against some other party, may not lie and should be dismissed.  Id. ("Where parties without any fraud or mistake, have deliberately

11

put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.").

Plaintiff's motion to strike defendant's jury demand must be denied because the Complaint does not even properly set forth an equitable claim. The Complaint fails to state a claim for equitable subrogation / quantum meruit against Ortenzio because equity will not imply a cause of action for equitable subrogation / quantum meruit where, as here, a claim for breach of contract is also said to exist.

### C. Contrary to Arguments Made in its Memorandum in Support of Its Motion to Strike the Jury Demand, Plaintiff Has Not Stated a Claim for Rescission.

In plaintiff's memorandum in support of its motion to strike jury demand, plaintiff argues that "suits where the essential nature of the remedy sought is that of recision [sic] or restitution are equitable and do not carry the right to trial by jury." See Plaintiff's Mem., at 7. Under Pennsylvania law, a rescission amounts to the unmaking of a contract. Rescission is the "unmaking of a contract, and is not merely a termination of the rights and obligations of the parties towards each other, but is an abrogation of all rights and responsibilities of the parties towards each other from the inception of the contract." Metropolitan Property and Liability Insurance Co. v. Commonwealth of Pennsylvania, 509 A.2d 1346, 1348 (Pa. Commw. 1986), aff'd, 535 A.2d 588 (Pa. 1987).

Plaintiff's argument fails for several reasons. First, plaintiff's Complaint does not even mention the word rescission. Second, even if plaintiff now asserts that it somehow stated a claim for rescission, such a claim would fail and must be dismissed.

12

It is axiomatic that not every breach of a contract justifies rescission.  See Castle v. Cohen, 676 F. Supp. 620, 627 (E.D. Pa. 1987) (emphasis added), aff'd in relevant part, 840 F.2d 173 (3d Cir. 1988).  The Castle case involved complex litigation related to an employee stock option plan of certain hospitals, subsequent to the plea of guilt to Medicare fraud by the majority stockholders.  Id. at 622.  In order to assure that the hospitals would still be entitled to Medicare reimbursements, the majority shareholders agreed to sell their majority stake at fair market value after an independent appraisal process, to either the trustees or to a third-party as set forth in an agreement.  Id. at 623. The trustees had a right of first refusal.  After the majority shareholders attempted to sell their shares to a third party, rather than the trustees of the plan, the trustees sued the majority stockholders alleging a breach of the stock purchase agreement, as well as violations of ERISA and securities law.  The court found that the defendants were essentially asking the court to rescind the stock purchase agreement.  Id. at 627.  The court noted that the "essence of their agreement was that the stock would change hands at fair market value."  Id.  A jury determined the fair market value by evaluating the competing appraisals.  The Castle court wrote that the rescission sought by the defendants "is appropriate only under extraordinary circumstances when the complaining party has suffered a breach of such a fundamental and material nature that it affects the very essence of the contract and serves to defeat the object of the parties."  Id. (emphasis added).  The court decided that "the contract between the parties is enforceable in every respect."  Id.

13

Such "extraordinary circumstances" are generally only found to be present after a finding of "a total failure in the performance of the contract." See Nolan v. Williamson Music, Inc., 300 F. Supp. 1311, 1317 (S.D.N.Y. 1969). The Nolan court cited an example where the plaintiff temporarily turned over to the defendant prints from which movies were to be made and then distributed. The contract provided that the defendant was to render weekly accounts of the earnings on the movies and to pay the plaintiff fifty percent thereof. The prints were to be returned at the expiration of the contract term. The court found that the defendant never paid plaintiff the full amount due, deliberately maintained a set of fictitious records, deliberately rendered false accountings, refused to permit inspection of the records as was required by the contract, and failed to return the prints to the plaintiff. Under these factors, the court held that rescission was appropriate.

Applying Castle, Nolan, and the cases cited therein, plaintiff's Complaint sets forth nothing more than allegations of a simple breach of contract – a claim that is triable before a jury -- and nothing that would be considered "extraordinary circumstances" that affects the "very essence of the contract" as is required for a court to rescind the terms of the agreement. Castle, 676 F. Supp. at 627. Plaintiff does not allege that Ortenzio engaged in "a total failure in the performance of the contract." Nolan, 300 F. Supp. at 1317. In fact, plaintiff avers just the opposite -- that Ortenzio executed numerous notes and agreements and proceeded to draw upon the line of credit extended by the plaintiff. See Complaint, at ¶¶ 10-14. There is nothing in the Complaint that alleges the "extraordinary circumstances" that a claimant must plead in order to demonstrate that the other party failed to totally perform under the agreement. Cohen, supra; Nolan, supra.

14

Accordingly, any argument that plaintiff raises that seeks to rescind any of the contracts must be rejected, and all such claims of a simple breach of contract must be tried before a jury.

## IV.    CONCLUSION

For the above reasons, Defendant John M. Ortenzio, respectfully requests that this Honorable Court deny Plaintiff's Motion to Strike Jury Demand.

Respectfully submitted,

BLANK ROME COMISKY & McCAULEY LLP

BY: _____
EDWARD I. SWICHAR, ESQUIRE
One Logan Square
Philadelphia, PA 19103
(215) 569-5500

Attorneys for Defendant, John M. Ortenzio

Dated: April 17, 2002

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant's Memorandum in Opposition to Motion to Strike Jury Demand was served this $\underline{17^{th}}$ day of April, 2002, by first class mail, postage prepaid, upon the following:

Lawrence J. Gebhardt, Esquire
Gebhardt & Smith LLP
The World Trade Center, 9th Floor
Baltimore, MD, 21202
*Attorneys for Plaintiff*


_____
EDWARD I. SWICHAR, ESQUIRE

16

Craig J. Schwartz

Exhibit A

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3   ALLFIRST BANK          :

4        Plaintiff     :

5      v.            : CA NO. 1:CV-01-0786

6   JOHN M. ORTENZIO       :

7        Defendant    : Pages 1 - 216

8            -----------

9

10

11

12      Deposition of Craig J. Schwartz

13        Baltimore, Maryland

14      Friday, February 15, 2002

15

16

17

18

19

20

21   Reported by: Kathleen R. Turk, RPR-RMR

## Craig J. Schwartz

Page 56

1    Q   Well, I'm trying to give you examples of the

2  information I'm looking for.

3      How did this note come about?

4    A   There was a request made from CCI of

5  additional funds.

6    Q  By whom?

7    A  Either Sheri Phillips or Mr. Ortenzio.

8    Q  Do you recall specifically which person?

9    A  No, specifically.

10    Q   And do you recall either of those persons

11  telling you why they required the 1.2 million

12  dollar --

13    A  Yes.

14    Q   -- advance or facility?

15      What did that person tell you?

16    A   There was a current cash flow shortage of

17  the company, and additional funds were required to

18  continue operation.

19    Q   You don't remember who told you that?

20    A   I believe it was in a meeting, and

21  Mr. Ortenzio and Sheri Phillips were both there.

## Craig J. Schwartz

Page 57

1    Q    Was there any discussion whether this was

2    going to be a short-term or a long-term facility?

3    A    Short-term, I believe.

4    Q    What is short-term in relation to long-term?

5         Make sure we're on the same wavelength.

6    A    Short-term would be less than a year.

7    Q    Okay.  Were any documents presented to you

8    by CCI in connection with your granting the 1.2

9    million dollar loan facility?

10   A    Yes, I believe they were.

11   Q    What documents were provided to you and

12   relied upon?

13   A    I don't specifically recall exactly what

14   documents were, were given.

15   Q    No -- no general idea as to what documents

16   were provided?

17   A    Financial statements, current financial

18   statements of the customer.

19        There may have been others.

20   Q    Do you recall that, or are you just assuming

21   it?

# Craig J. Schwartz

Page 62

1    A    Yes.

2    Q    Okay.  Was there any restriction with

3    respect to the 1.2 million dollar note as to the

4    source of funds that could be used to repay the note?

5    A    The note should have been repaid -- okay,

6    ask the question -- what was the question?

7    Q    Is there any restriction in the note in

8    regard to the source of funds that could be used to

9    repay the note?

10    A    Not in the note.

11    Q    I understand, I'm only sticking to the note.

12    A    Not in the note.

13    Q    Okay.  Now, we'll come back to that because

14    I know you're anxious to say something.

15        Let's look at Schwartz 5.

16        This Schwartz 5, this is your memo; is that

17    correct?

18    A    Yes.

19    Q    And it says that we decided that an increase

20    of 1.2 million will be done on a temporary basis and

21    CCI will get an additional five hundred thousand from

**Craig J. Schwartz**

Page 68

1    that.

2         Did you ever monitor CCI's use of the

3    1.2 million dollar loan funds?

4         A    No.

5         Q    I show you what has been marked for

6    identification as Exhibit Schwartz 6.

7         A    Okay.

8         Q    Do you recall how this document came about?

9         Was it prepared by you?

10        A    Yes.

11        Q    How did it come about?

12        Why was this document prepared?

13        A    This was a result of a meeting with CCI,

14   that they were going to need additional funds because

15   of cash flow shortages.

16        Q    Was this -- was this S-6 preceded by the

17   1.2 million dollar note, which is dated six days

18   later?

19        A    Yes.

20        Q    Okay.  Was it initially contemplated by the

21   bank that the four million dollar line of credit would

## Craig J. Schwartz

1    A    Yes.

2    Q    Okay.  Tell me from a banker's perspective,

3    if you turn to Page 2, there's an asterisk in the

4    second paragraph, then it goes on to say under the

5    twelve -- 1.2 million dollar commercial loan note.

6         What does that change reflect from your

7    perspective?

8    A    That the surety applies to the million two

9    note.

10   Q    And it doesn't apply to any other liability

11   of CCI?

12   A    That appears to be correct.

13   Q    Okay.  So the initial form, if signed by

14   Mr. Ortenzio, would have been a guarantee of not only

15   the 1.2 million, but of the four million as well as

16   any other loan facility; is that correct?

17   A    Yes.

18   Q    And the 1.2 million dollar note was

19   modified -- guarantee -- was modified, or a suretyship

20   was modified to make it understood that the guarantee

21   would only extend to the 1.2 million dollar facility;

**Craig J. Schwartz**

Page 85

1    principal or interest, that would be from the checking

2    account, right?

3         That -- CCI's checking account at the bank?

4    A    Yes.

5    Q    Okay.  And that -- it's the same checking

6    account that was tied into the cash management

7    facility and the four million dollar line of credit?

8    A    I would think so.

9    Q    All right.  So if CCI made a repayment on

10   account of the equipment note, principal or interest,

11   that would have the impact of drawing down on the line

12   of credit, wouldn't it?

13   A    Possibly.

14   Q    Possibly?

15        You mean sometimes it's possible, sometimes

16   it's not, depending on when it's hit, or what?

17   A    No, you are correct; it would have the

18   impact of drawing down the line of credit, yes.

19   Q    Okay.  And it would reduce availability on

20   the line of credit; is that correct?

21   A    Yes, that's correct.

**Craig J. Schwartz**

Page 87

1    front of you.

2          MR. GEBHARDT:  Do I have that?

3          MR. SWICHAR:  Oh, I'm sorry; no, I

4    don't think you do.

5          (Document was handed to counsel.)

6    Q   (By Mr. Swichar) This basically -- is S-8

7    basically the commitment letter for the 1.2 million?

8    A   Yes.

9    Q   Now, the 1.2 million was fully advanced at

10   its inception?

11   A   Yes.

12   Q   Okay.  And was it deposited to CCI's

13   checking account at Allfirst Bank?

14   A   Yes.

15   Q   Okay.  And when the 1.2 million was

16   deposited in CCI's checking account, again, that's the

17   same checking account that's tied in to the cash

18   management facility and the four million dollar line

19   of credit; is that correct?

20   A   Yes.

21   Q   Okay.  Now, when the 1.2 million dollar line

## Craig J. Schwartz

1    of -- when the 1.2 million dollar loan was deposited

2    into CCI's checking account, that would have increased

3    the borrowing capacity on the four million dollar line

4    of credit; is that correct?

5        A    It would have the effect of paying any

6    principal outstanding back on the four million dollar

7    facility.

8        Q    Okay.  So put another way, when the 1.2

9    million dollar deposit was made in the CCI bank

10   account that was tied in to the four million dollar

11   line of credit, it would have had the effect of

12   decreasing the loan balance owed on the four million

13   dollar line of credit by 1.2 million dollars?

14       A    Yes.

15       Q    Okay.  Let me show you what has been marked

16   for identification as Exhibit Schwartz 9, the document

17   that was furnished by the bank.

18            Do you know whose handwriting is at the

19   bottom of S-9, whose notes?

20       A    No, I do not.

21       Q    Okay.  Is this a type of document that

## Craig J. Schwartz

Page 102

1              MR. GEBHARDT:  I mean, let me pose an

2    objection.

3              You're confusing checks that come from

4    customers that are deposited in the account with

5    checks that CCI might write from its account in

6    payment of some bill.

7      Q    Okay.  CCI writes a check out of its

8    checking account in payment of -- as a repayment of

9    the equipment note.

10             Does that happen?

11     A    Yes.

12     Q    Okay.  And that bank -- that check is

13   written to the bank, correct?

14     A    Yes.

15     Q    And it will say on it in repayment of

16   equipment note, correct?

17     A    Something to that effect.

18     Q    Okay.  Now, when that check is presented and

19   paid to the bank, it has the same effect of drawing --

20   it draws a corresponding amount on the four million

21   dollar line of credit?

## Craig J. Schwartz

Page 103

1     A   Yes.

2     Q   Okay.  Do you have any -- does the bank have

3   any document similar to S-9 that would relate to the

4   deposit made by the bank of the initial 1.2 million

5   dollar note proceeds?

6     A   Yes.

7         MR. SWICHAR:  Can I request that,

8   please?

9         MR. GEBHARDT:  You should have it.

10        MR. SWICHAR:  I don't have it.  I

11  don't.

12        All I have -- off the record.

13        (Discussion off the record.)

14    Q   (By Mr. Swichar) Mr. Schwartz, can you tell

15  from that document the entry that deals with the

16  deposit of the 1.2 million in November of '99?

17    A   This is going to take some time.

18        MR. GEBHARDT:  Let me just say for the

19  record, my understanding is that if the 1.2 million

20  was deposited on November 9, if that's the actual date

21  of the disbursement, if there were other checks that

**Craig J. Schwartz**

1    Were you requested to do anything, or did

2  you do anything on your own?

3    A    Not that I can recall.

4    Q    At the meeting, do you recall Mr. Ortenzio

5  being requested to guarantee all or part of the four

6  million dollar note?

7    A    I do not recall.

8    Q    Either way?

9    A    Either way.

10    Q    Do you recall Mr. Ortenzio requesting the

11  bank to be patient while it meets -- while CCI meets

12  with its bonding companies?

13    A    I don't recall.

14    Q    Did Mr. Ortenzio on behalf of CCI request

15  any additional monies from the bank at that meeting?

16    A    I don't recall.

17    Q    Now, in relation to that meeting, which

18  we'll say was February 18th, a Friday, do you recall

19  when the bank froze CCI's accounts?

20    A    I believe it was the next -- during the next

21  week.  I --

## Craig J. Schwartz

Page 125

1    document that I could find or interpret that would

2    tell me that date.  And if there is such a document, I

3    would ask that the bank interpret it for me and just

4    call it to my attention.

5            The alternative is to take all thousand

6    documents and go page by page, which I don't want to

7    do.  I assume there's --

8            MR. GEBHARDT:  You might take a

9    thousand documents.  If something -- I mean, my

10   understanding is that on the Wednesday prior to the

11   declaration of default, the credit line was cut off,

12   and there are some internal memoranda telling people

13   to not honor the checks, and so you have copies of

14   those.

15           MR. SWICHAR:  What day -- I'm not

16   questioning you, but if you will help me out, because

17   I know you want to -- what was the date when the

18   declaration -- what was the day of the declaration of

19   default, the 24th?

20           MR. GEBHARDT:  The 24th, a Thursday.

21           MR. SWICHAR:  Thursday.

## Craig J. Schwartz

Page 142

1        Do you have that there, S-2?

2        Just -- did you review this Complaint before

3    it was filed?

4      A   I'm not sure.  I don't recall if I did or if

5    I didn't.

6      Q   Did you review it in connection with this

7    deposition?

8      A   Yes.

9      Q   Okay.  Would you look at -- just so I can

10   clarify things again -- would you look at

11   Paragraph 7?

12       And, again, my question is, just so I

13   understand the mechanism of the cash management

14   facility, that any checks written from CCI's account

15   with the bank would increase the four million dollar

16   line of credit borrowings; is that correct?

17     A   Yes.

18     Q   And so far as you know, CCI had no business

19   accounts elsewhere?

20     A   As far as I know, they did not.

21     Q   Okay.  If -- if CCI wanted to pay a bill

## Craig J. Schwartz

Page 144

1          And if there is, we'll find it.

2              MR. GEBHARDT:  You've been provided it.

3              MR. SWICHAR:  Pardon me?

4              MR. GEBHARDT:  You've been provided it.

5      A    I believe it states what the line of credit

6   can be used for, and that is not a use of a line of

7   credit.

8      Q    (By Mr. Swichar) All right.  Is there any

9   document that deals with how the, how the loan is to

10  be repaid specifically?

11     A    No.

12     Q    Okay.  Is there any document that

13  specifically states it cannot be repaid by writing a

14  check on CCI's business account, checking account?

15             THE WITNESS:  Could you read that back?

16             (Question was read by the Reporter.)

17     A    Not specifically.

18     Q    (By Mr. Swichar) Okay.  Now, the loan

19  commitment, which I think you've been chomping at the

20  bit to want to tell me, states that the loan proceeds

21  were to be used to finance accounts receivable and

**Craig J. Schwartz**

Page 146

1          MR. GEBHARDT:  Objection.

2     Q    You can answer it.

3          THE WITNESS:  Would you read that back,

4  please?

5          (Question was read by the Reporter.)

6     A    It was a -- the loan amount for 1.2 million

7  dollars was for a cash flow shortage situation that

8  was occurring --

9     Q    (By Mr. Swichar) I understand.

10     A    -- so -- and, also, the line was there to

11  finance the receivables and work in process.

12          So the 1.2 million dollars would normally be

13  paid back after there's no usage on the line because

14  the receivables had been collected and cash flow is

15  sufficient to pay back the 1.2 million dollars over

16  and above the line balance.

17     Q    Where does it say that, other than in your

18  head?

19     A    It's -- it doesn't say that anywhere.

20     Q    Okay.  So let's go back and ask the same

21  question.  I'll say it a little slower this time.

## Craig J. Schwartz

Page 147

1          Are you aware of any reason why the bank

2     couldn't put in the commitment letter for the

3     1.2 million or in the 1.2 million dollar note or

4     in the 1.2 million dollar suretyship an express

5     prohibition that that facility could not be repaid by

6     drawing down on the four million dollar line of

7     credit?

8          A    There's no reason the bank could not have

9     done that.

10         Q    In fact, the loan commitment contains

11    negative covenants; is that right?

12         A    I believe so.

13         Q    And what's a negative covenant?

14         A    Things that the borrower is not allowed to

15    do.

16         Q    And the loan commitment and/or the note

17    contains loan -- negative covenants, correct?

18         A    Yes.

19         Q    Okay.  And the bank could have put in a

20    negative covenant that prohibited the repayment of the

21    1.2 million from the four million dollar line of

## Craig J. Schwartz

Page 157

1    question; save time.

2        Q    (By Mr. Swichar) Are you aware of any facts

3    that made the payment conditional as alleged in

4    Paragraph 7?

5        A    No.

6        Q    Am I correct, sir, that both the 1.2 million

7    dollar note and the four million dollar note and the

8    1.2 million dollar surety have default provisions?

9        A    Yes.

10       Q    In any of those three documents, and

11   including the loan commitment letter, is there any

12   prohibition, or does it make an event of default by

13   paying the 1.2 million dollar loan off by utilizing

14   the four million dollar line of credit?

15           MR. GEBHARDT:  Objection to the use of

16   the compound question.

17           Prohibition and event of default,

18   they're two separate --

19           MR. SWICHAR:  I'll strike the

20   prohibition.

21       Q    (By Mr. Swichar) In any of those documents,

## Craig J. Schwartz

Page 159

1    dollar note cannot be paid off unless the four million

2    dollar note is paid off first?

3        A    No.

4        Q    Are you aware of any banking practice,

5    custom, or regulation that would act as an impediment

6    to the bank stating in any loan document that the

7    1.2 million dollar note could not be paid off until --

8    unless and until the four million dollar note is paid

9    off first?

10        A    I am not aware of any.

11        Q    Are you aware of any banking practice, rule,

12    or regulation or other impediment that would have

13    prohibited the bank from requiring a guarantee of the

14    last one million dollars in CCI's indebtedness,

15    whether it be the four million dollar line or the

16    1.2 million dollar note, or the two million dollar

17    equipment loan?

18        A    I am not aware of any.

19        Q    Are you aware of any banking regulation,

20    policy, or rule or regulation or other impediment

21    which would have prevented the bank from stating that

## Craig J. Schwartz

1          MR. SWICHAR:  How do I have them?

2          MR. GEBHARDT:  Because you have with

3   Mr. Chernicoff, the same way --

4          MR. SWICHAR:  I'm assuming that they're

5   out there somewhere.  I just wanted to make sure if

6   there's anything else other than the checking account

7   statements.

8      Q    (By Mr. Swichar) Would you look at

9   Paragraph 34 of the Complaint?

10         Let me know when you're done reading it.

11         (Witness reading.)

12     A    Okay.

13     Q    Did Mr. Ortenzio ever make any direct

14   representation to you that the 1.2 million dollar loan

15   facility would not be paid from the four million

16   dollar line of credit, it would come from other funds?

17     A    No.

18     Q    Are you familiar with the practice --

19         MR. SWICHAR:  Let's stop for a minute.

20         (Discussion off the record.)

21     Q    (By Mr. Swichar) Are you familiar in reading

**Craig J. Schwartz**

Page 193

1    A   Yes.

2        Q   Is there any document anywhere in this world

3    that states specifically in regard to repayment in

4    contrast to use of the funds that the funds -- that

5    the four million dollar line could not be used to

6    repay the 1.2?

7        A   There's no documents that says it cannot be

8    used to repay it.

9        Q   Is there any -- would there have been any

10   impediment that you're aware of to the bank stating in

11   any document binding on Mr. -- binding on CCI or

12   Mr. Ortenzio to prohibit the four million dollar line

13   of credit to be used to repay the 1.2 million dollar

14   loan, such as we discussed earlier, a negative

15   covenant?

16       A   Other than the agreed-upon use of proceeds

17   of that four million dollar loan.

18       Q   Right, right.

19           Is there any impediment to the bank

20   expressly stating as a negative covenant that the four

21   million dollar line of credit could not used to repay

## Craig J. Schwartz

Page 200

1    A    Okay.

2    Q    Is that correct?

3    A    That was --

4    Q    You said they would need the money, the

5    extra money, the 1.2 million, through the end of

6    February, 2000.

7    A    That was according to the cash flow

8    statements.

9    Q    And that's what Mr. Ortenzio told you,

10    right?

11    A    Yes.

12    Q    Okay.  Now, at the time of the repayment of

13    the 1.2 million coincidently in February, 2000, the

14    balance on the four million dollar line of credit

15    allowed for the repayment of the 1.2 from the four

16    million; is that correct?

17        MR. GEBHARDT:  Objection.

18    Q    There was sufficient cushion there under the

19    four million dollar line of credit to repay the 1.2;

20    is that correct?

21        We went over the numbers.

## Craig J. Schwartz

Page 201

1    A    Yes.

2    Q    If you want, we can do it again.

3         Am I correct?

4    A    Yes.

5    Q    There was sufficient money, substantially --

6    A    There was availability on the line of

7    credit.

8    Q    Yes.

9         And how much was that availability?

10        It was greater than the 1.2 million, wasn't

11   it?

12   A    Yes.

13   Q    We went over the numbers earlier.

14        It was more than the 1.2 million; is that

15   correct?

16   A    Yes.

17   Q    Okay.  You expected excess cash flow to

18   repay the 1.2 million dollar note; is that what you

19   said earlier?

20   A    Yes.

21   Q    Is that documented in any document signed by

**Craig J. Schwartz**

Page 211

1    known that Mr. Ortenzio -- that CCI would have repaid

2    the 1.2 million dollar note out of the four million

3    dollar line of credit, you would not have recommended

4    approval of the note; is that correct?

5        Isn't that what you just said?

6     A   Yes, yes.

7     Q   Now, if you had known, looking back in

8    hindsight, that Mr. Ortenzio or Mr. -- or CCI would

9    have repaid the 1.2 million from the four million

10   dollar line of credit, would you have made an express

11   prohibition in the 1.2 million dollar note expressly

12   prohibiting CCI from repaying the 1.2 from the four

13   million dollar line of credit?

14       Would you have included an express

15   prohibition of that conduct?

16       MR. GEBHARDT:  Objection.

17    A   It's possible.

18    Q   Would that have been the prudent thing to do

19   in hindsight to go back and say let's prevent this

20   from occurring by specifically prohibiting a repayment

21   of the 1.2 from the four million dollar line of

Craig J. Schwartz

Page 212

1    credit, as a prudent banker?

2        A    Yes.

3            MR. SWICHAR:  No further questions.

4            MR. GEBHARDT:  We're done.

5            (Thereupon, at 2:56 p.m., the

6    examination of the witness was concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

*Exhibit B³*

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
   ALLFIRST BANK,                :
 3         PLAINTIFF             :
        VS                       : NO:  1:01-CV-786
 4 JOHN M. ORTENZIO,             :
           DEFENDANT             :
 5
 6    DEPOSITION OF:  SHERI PHILLIPS
 7    TAKEN BY:       PLAINTIFF
 8    BEFORE:         HILLARY M. HAZLETT, REPORTER
                      NOTARY PUBLIC
 9
      DATE:           MARCH 13, 2002. 10:43 A.M.
10
      PLACE:          ALLFIRST BANK BUILDING
11                    213 MARKET STREET
                      14TH FLOOR
12                    HARRISBURG, PENNSYLVANIA
13
   APPEARANCES:
14
   GEBHARDT & SMITH
15 BY:  LAWRENCE J. GEBHARDT, ESQUIRE
16            FOR - PLAINTIFF
17 BLANK, ROME, COMISKY & McCAULEY, LLP
   BY:  EDWARD I. SWICHAR, ESQUIRE
18
              FOR - DEFENDANT
19
   HARTMAN, OSBORNE & JOYCE, P.C.
20 BY:  MELINDA S. JOYCE, ESQUIRE
21            FOR - SHERI PHILLIPS
22 ALSO PRESENT:
23    JAMIN M. GIBSON
      JOHN M. ORTENZIO
24
25
```

```
                                                    2
 1                    I N D E X
 2                     WITNESS
 3 FOR PLAINTIFF    DIRECT  CROSS  REDIRECT  RECROSS
 4 Sheri Phillips      3      60      101      111
 5
 6                    EXHIBITS
 7 DEPOSITION EXHIBIT NO.                    MARKED
 8  1 - 3/23/1999 Letter                       12
 9  2 - Film/cash Solutions                    13
10  3 - Audit Report                           21
11  4 - 10/26/1999 Inter-office Memorandum     24
12  5 - 11/4/1999 Inter-office Memorandum      25
13  6 - 11/5/1999 Letter                       31
14  7 - Commercial Loan Note                   32
15  8 - Income Statement                       40
16  9 - Balance Sheet                          40
17 10 - Cash Flow Projections                  49
18
19
20
21
22
23
24
25
```

```
 1                    STIPULATION
 2      It is hereby stipulated by and between
 3 counsel for the respective parties that reading,
 4 signing, sealing, and certification are waived; and
 5 that all objections except as to the form of the
 6 question are reserved to the time of the trial.
 7
 8      SHERI PHILLIPS, called as a witness, being
 9 duly sworn, testified as follows:
10
11              DIRECT EXAMINATION
12
13 BY MR. GEBHARDT:
14   Q   Would you let us know first your residence
15 and then your business addresses?
16   A   Residence is 2837 North Front Street, Suite
17 302, Harrisburg, PA 17110.
18   Q   And your business address?
19   A   515 North Office Building, Harrisburg, PA
20 17125.
21   Q   And where are you presently employed?
22   A   Commonwealth of Pennsylvania.
23   Q   And what do you do for the Commonwealth of
24 Pennsylvania?
25   A   I'm the Deputy Secretary of Administration
```

```
                                                    4
 1 and General Services.
 2   Q   How long have you had that position?
 3   A   Since July.
 4   Q   Prior to that time, where did you work?
 5   A   I did consulting for one company, and I
 6 also worked with another company that was part-time
 7 that I had helped start.
 8   Q   And at some point in time, you worked for a
 9 company known as CCI Construction?
10   A   That's correct.
11   Q   And when did you leave CCI?
12   A   It was -- I think my last day was around
13 May 5th, 2000.
14   Q   And when did you begin working for CCI?
15   A   In September of 1991.
16   Q   Would you relate for me just briefly what
17 your positions with CCI were from September 1991
18 through the date you left in terms of a job
19 description and just a brief outline of what your
20 duties were?
21   A   When I started, I worked for Dave Barber
22 and I was the controller.  I think that was my title.
23 My titles changed kind of in between there.  I was
24 responsible for the accounting, and I reported to
25 Dave.  I think his title was chief financier at the
```

**97**

1　our record, that we had a project here that if we did
2　not complete it, it would hinder us in getting future
3　projects.
4　　　　We had made the decision to go forward, and
5　that decision cost us a lot of money that we did not
6　get paid.
7　　Q　Did you believe the $4 million claim to be
8　a valid claim with respect to Scott Air Force Base?
9　　A　Yes, I did.
10　　Q　And did you believe -- strike that.
11　　　You're familiar to a certain extent with
12　the Albemarle Prison claim of $2 and a half million?
13　　A　I'm familiar there was a claim, yes.
14　　Q　Did you believe that to be a valid claim of
15　CCI?
16　　A　Yes. From everything our chief operating
17　officer told me, I would say yes.
18　　Q　And is it fair to say that as of February
19　18th, 2000, you believed to the extent you could from
20　information you had obtained that such claims were
21　valid, the Scott Air Force Base and the Albemarle
22　Prison claim?
23　　A　Yes.
24　　Q　Now, if you turn to Exhibit 10, which is a
25　cash flow projection, next to the last line on the

**98**

1　left, available line of credit. Let me just --
2　strike that.
3　　　When was Exhibit 10 shown to the bank, if
4　at all?
5　　MS. JOYCE: By her?
6　　MR. GEBHARDT: Objection.
7　BY MR. SWICHAR:
8　　Q　Do you know if Exhibit 10 was ever given to
9　the bank?
10　　A　I don't recall actually handing it to them,
11　no.
12　　Q　Do you recall when this document was
13　prepared?
14　　A　Yes, I do.
15　　Q　When was that?
16　　A　Printed as of February 16th. It was
17　probably prepared prior to that.
18　　Q　Now --
19　　A　And again, I prepared these on a regular
20　basis.
21　　Q　Now, going down to the available line of
22　credit, do you see that on the left, line of credit?
23　　A　Yes.
24　　Q　Am I correct that it reflects that the line
25　of credit as of February was $5.2 million, correct?

**99**

1　　A　Yes, that's correct.
2　　Q　And am I correct that if we then go into
3　March, we see that the line of credit was reduced by
4　the 1.2 million, i.e., to 4 million; is that correct?
5　　A　That's correct.
6　　MR. SWICHAR: If I could have a minute with
7　my client, that may be my last question. If I may
8　just ask one more question.
9　BY MR. SWICHAR:
10　　Q　I want to get back to the situation where
11　the bank froze CCI's account. Were there situations
12　where the bank had clear checks of CCI but then
13　reversed those clearings?
14　　A　Yes, there were.
15　　Q　Tell me what that is about.
16　　A　We had -- in my computer system, I had a
17　tie-in to Allfirst that would show the activity in
18　our accounts. I could see what was going through
19　there on a daily basis.
20　　　I had seen the checks that had cleared, and
21　we started seeing -- I could see it on our reports
22　that it was taken out of our account as a clear
23　check, and then I started seeing it going back as
24　though it didn't clear.
25　　　I started seeing those reports. I said,

**100**

1　they're going back in time. If I recall correctly --
2　as I said, I think Wednesday is when I had found out
3　the accounts were frozen. I think they went back as
4　far as Monday and unclearing checks that had shown as
5　clear on our account.
6　　Q　Do you recall those payees?
7　　MS. JOYCE: Of which the checks were
8　reversed you mean?
9　　MR. SWICHAR: Yeah.
10　　THE WITNESS: Again, it was any check that
11　we had written. It was employees. It was vendors.
12　It was subcontractors. It was utility payments.
13　　Q　Do you recall if one check was to the IRS?
14　　A　I recall several checks that had to do with
15　payroll-type issues. I don't if it was IRS. I think
16　there was unemployment. I don't remember exactly
17　what it was, but there were payroll-type of issues.
18　　　It could have been the IRS. In fact, as
19　I'm speaking about it, Wednesday usually was the day
20　that we did that through a funds transfer. So that
21　probably was one.
22　　Q　An IRS check?
23　　A　Yes.
24　　Q　How about Cleveland Brothers? Was that
25　another check that was honored and then reversed?