

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK,      :

        Plaintiff,      :

         :

       v.      :    CASE NO. 1:01-CV-786

         :

JOHN M. ORTENZIO,      :

        Defendant.      :

FILED
HARRISBURG, PA

MAY 1 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Defendant, John M. Ortenzio ("Mr. Ortenzio"), by his undersigned counsel, submits this Memorandum of Law in Support of Defendant's Motion pursuant to Fed.R.Civ.P. 56 for an Order granting Defendant's Motion for Summary Judgment and dismissing Plaintiff's Complaint in its entirety. In its Complaint, Plaintiff, Allfirst Bank ("Allfirst"), seeks to hold Mr. Ortenzio personally liable for the corporate obligations of CCI Construction Co., Inc. ("CCI") by bypassing the clear language of the contract between Allfirst and Mr. Ortenzio. However, Allfirst cannot establish any of its claims because it cannot establish that the manner in which CCI paid its contractual obligation was prohibited by the loan documents.

## II.    BACKGROUND

This lawsuit involves the interpretation of the contract between Mr. Ortenzio and Allfirst Bank (the "Suretyship Agreement") and its application to three notes: A line of credit that CCI executed on March 24, 1999, pursuant to which plaintiff provided CCI a long term, unsecured $4 million line of credit ("the Line of Credit"); a Commercial Loan (equipment) Note dated November 20, 1998, pursuant to which plaintiff extended a $2 million loan to CCI, secured by

CCI's equipment ("the Equipment Note"); and a Commercial Loan Note dated November 8, 1999, in the amount of $1.2 million, ("the Short-term Note"), guaranteed by Mr. Ortenzio.[1]  See, a true and correct copy of Plaintiff's Complaint, which is attached hereto as Exhibit "A" ("Complaint") at Exhibit "C" thereto.  Allfirst contends that Mr. Ortenzio acted unlawfully when CCI repaid the short-term note from funds available from the line of credit.

In essence, CCI maintained a single checking account at Allfirst and all of the aforementioned loans were tied into a cash management facility.  See, Deposition of Craig J. Schwartz ("Schwartz Dep.") at 85, 102-103, which is attached hereto as Exhibit "B."  More specifically, any checks written on CCI's account at Allfirst increased the balance owed on the line of credit and, conversely, all revenues deposited to CCI's account had the effect of reducing the balance and, thereby, increasing the availability of funds that could be borrowed on the line of credit (Schwartz Dep. at 142).  According to the commitment letter, CCI was required to maintain its primary account at Allfirst and was required to deposit all profits and all revenues from cash flow into this account.  (Complaint, Exhibit "D"; Schwartz Dep. at 66-67).  In addition, CCI's customers wire transferred payments directly to Allfirst to be deposited directly into the checking account. See Deposition of Sherri Phillips ("Phillips Dep.") at 17-18, which is attached hereto as Exhibit "C."  When Allfirst loaned CCI the sum of $1.2 million, pursuant to the short-term note, it decreased the balance owed on the line of credit by $1.2 million. (Schwartz Dep. at 87-88).  It is also undisputed that all payments that CCI made from its checking account, such as payroll, taxes, payments to vendors and re-payments on the $2 million equipment note were drawn from the line of credit, and thereby had the same effect of increasing the balance on the $4 million line of credit.  (Phillips Dep. at 65-66, 70-71).

---

[1] Interpretation of contracts poses a question of law for the court to decide.  <u>Charles D. Stein Revocable Trust v. General Felt Indus., Inc.</u>, 749 A.2d 978, 980 (2000).

2

According to the deposition of Craig J. Schwartz, plaintiff's loan officer, who was responsible for the loans to CCI, the $1.2 million short-term note was provided at the request of CCI, on a short-term basis, when CCI was encountering cash flow difficulties. (Schwartz Dep. at 56). Mr. Schwartz acknowledged in his deposition that there were no restrictions in the short-term note as to the source of funds that could be used to repay the note. (Schwartz Dep. at 62). He acknowledged that the short-term note was temporary and, indeed, had to be repaid no later than March 31, 2000. (Schwartz Dep. at 57, 62). He acknowledged that the plaintiff had initially sought to increase the $4 million line of credit to a $5 million line of credit, and had requested that Mr. Ortenzio guarantee the full $5 million, but agreed to limit the defendant's guaranty to the $1.2 million short-term note after Mr. Ortenzio refused to guarantee more than that amount. (Schwartz Dep. at 69).

Pursuant to the parties' agreement, the form language in the $1.2 million short-term note was stricken to make it clear that Mr. Ortenzio's guarantee would extend to the $1.2 million short-term note only, and not to the $4 million line of credit or to any other loan facility at Allfirst. (Schwartz Dep. at 79). Mr. Schwartz acknowledged that Allfirst could have asked Mr. Ortenzio to guarantee up to $1.2 million of any loan facility, i.e., not limit the guaranteed amount to the short-term note only, but failed to do so. (Schwartz Dep. at 193-194).

Mr. Schwartz acknowledged in his deposition that there were no restrictions in the short-term note as to the source of funds that could be used to repay the note. (Schwartz Dep. at 62). He admitted that there was no document that deals with how the loan was to be repaid, nor was there any document that states that the $1.2 million short-term note could not be repaid by writing a check on CCI's checking account, thereby drawing on the line of credit. (Schwartz Dep. at 144). Mr. Schwartz acknowledged that Allfirst had expected that the short-term note would be paid from cash flow, but admitted that the expectation is not memorialized in any

3

document. (Schwartz Dep. at 146). Remarkably, Mr. Schwartz acknowledged **that there was absolutely no reason why Allfirst could not have documented an express prohibition so that the $1.2 million short-term note could not be repaid by drawing down on the $4 million line of credit**. (Schwartz Dep. at 147).

In connection with Allfirst's allegation in the Complaint at paragraph 17, Mr. Schwartz acknowledged that he was not aware of any facts which supported Allfirst's allegation that the repayment of CCI's $1.2 million short-term loan was a "conditional payment" and would not be effective until the entire $4 million line of credit had been repaid and satisfied. (Schwartz Dep. at 157). Mr. Schwartz was not aware of any banking practice, custom or regulation that would act as an impediment to Allfirst stating in any loan document that the $1.2 million short-term note could not be paid off unless and until the $4 million line of credit had been paid off first. (Schwartz Dep. at 159).

In connection with Allfirst's fraud count, Mr. Schwartz admitted that Mr. Ortenzio never made any direct representation that the $1.2 million short-term note would not be paid from the $4 million line of credit. (Schwartz Dep. at 163). Mr. Schwartz reiterated that there was no document anywhere that prohibited repayment of the $1.2 short-term note from the $4 million line of credit. (Schwartz Dep. at 193). He reiterated that there had been no impediment to Allfirst requiring Mr. Ortenzio to sign a document which would have prohibited the use of the line of credit to repay the $1.2 million short-term note. (Schwartz Dep. at 193). Mr. Schwartz acknowledged that there was no impediment to Allfirst putting in any document that the loan could only be repaid from excess cash flow or excess profits. (Schwartz Dep. at 194-195).

On February 11, 2002, approximately one month prior to the due date, CCI repaid the $1.2 million short-term note by drawing on the $4 million line of credit and, thereby, merely reversing the book-entry transaction that was made when Allfirst had lent CCI the $1.2 million a

few months earlier.  At the time, CCI owed only approximately $1.2 million on the $4 million line of credit, so that the total amount due after the repayment was approximately $2.4 million. (Schwartz Dep. at 90-91).   In other words, according to Mr. Schwartz, at the time of the repayment of $1.2 million short-term loan, there was a sufficient cushion under the $4 million line of credit to repay the short-term note.   (Schwartz Dep. at 200-201).[2]  Notably, Mr. Schwartz admitted that **in hindsight, it would have been "prudent" for Allfirst to require Mr. Ortenzio to execute a document that would have specifically prohibited the repayment of the $1.2 million short-term note from the $4 million line of credit**.  (Schwartz Dep. at 211-212).

On February 24, 2000, Allfirst declared a default under both the line of credit and the equipment note, but failed to provide CCI the 30 day notice and opportunity to cure, as required in the $4 million note.  Allfirst immediately seized all of CCI's assets, froze its checking account and dishonored all checks including payroll and taxes.  (Schwartz Dep. at 122, 125).  CCI's bankruptcy followed thereafter.

## III.   ARGUMENT – MR. ORTENZIO IS ENTITLED TO SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Whether a fact is material will be determined by reference to the "substantive evidentiary standards that apply to the case."  <u>Anderson v. Liberty Lobby,</u>

---

[2] Allfirst's Complaint seeks to paint defendant as an opportunist who caused CCI to pay off the short-term note in order to avoid personal liability in view of the severity of CCI's financial distress, an assertion that is irrelevant in view of the documentation involved.  In any event, it is worth noting that CCI's former Chief Financial Officer, Sheri Phillips, has testified that at the same time that CCI paid off the short-term note, CCI had over $6.5 million in valid claims against governmental entities (Phillips Dep. at 97) and that CCI had, in fact, assumed and notified Allfirst that the short-term note would be timely re-paid by March, 2000 (Phillips Dep. at 49, 111).  Ms. Phillips also testified that she had no recollection of Allfirst ever advising CCI or Mr. Ortenzio that the short-term note could not be repaid from the line of credit (Phillips Dep. at 76).

Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).  Whether a genuine issue of material fact is presented will be determined by asking if "a reasonable jury could return a verdict for the non-moving party."  Id.

**A.    Allfirst Has Failed to Establish a Claim for Breach of Contract Against Mr. Ortenzio.**

Under Pennsylvania law, in order to prove a breach of contract, a plaintiff must show:

> (1) the existence of a valid and binding contract to which the plaintiff and defendants were parties; (2) the contract's essential terms; (3) that plaintiff complied with the contract's terms; (4) that the defendant breached a duty imposed by the contract; and (5) damages resulting from the breach.

Wausau Underwriter's Ins. Co. v. Shisler, No. CIV.A. 98-5145, 2000 WL 233236 *5 (E.D. Pa. Feb. 28, 2000) (citing Gundlach v. Reinstein, 924 F. Supp. 684, 688 (E.D. Pa. 1996)).

In this case, the evidence shows that a valid and binding contract existed between Allfirst and Mr. Ortenzio, i.e., the suretyship agreement pursuant to which Mr. Ortenzio guaranteed CCI's obligation under the short-term note, and that the terms of the short-term note did not prohibit repaying the short-term note from the line of credit.  (Complaint, ¶¶25-30; Schwartz Dep. at 62, 144, 147).  Because the short-term note was paid in a manner consistent with its terms, Mr. Ortenzio cannot be liable for breach of that agreement.  Further, since Allfirst cannot establish breach, it cannot establish that damages resulted.

Allfirst is unable to establish that Mr. Ortenzio breached the short-term note for the following reasons:

**1.    The Bank Documents Did Not Preclude CCI from Paying the $1.2 Million Note By Using the Available Line of Credit.**

According to Mr. Schwartz, Allfirst's loan officer, there were no restrictions in the short-term note as to the source of funds that could be used to repay the note. (Schwartz Dep. at 62; Complaint, Exhibit "C").    While nothing prohibited Allfirst from negotiating a provision

6

restricting the source of funds, it failed to do so. (Schwartz Dep. at 193-195). The court cannot enforce a provision to an agreement that does not exist. See, <u>Glen-Gery Corp. v. Wargel Constr. Co.</u>, 734 A.2d 926, 929 (Pa. Super. 1999) (stating that reviewing court may not rewrite the terms of a contract nor give them a meaning that conflicts with the language used).

**2.    The Bank Documents Did Not Specify How the $1.2 Million Note was to be Repaid.**

Mr. Schwartz further admitted that there were no documents dealing with how the loan was to be repaid, nor was there any document stating that the $1.2 million short-term note could not be repaid by writing a check on CCI's only checking account, thereby drawing on the line of credit. (Schwartz Dep. at 144). In addition, Mr. Schwartz acknowledged that Allfirst had expected that the short-term note would be paid from cash flow, but admitted that the expectation is not memorialized in any document. (Schwartz Dep. at 46). Allfirst's failure to have its "expectation" integrated into the contract prevents it from establishing breach of contract. Because a fully integrated agreement was entered into by the parties, this court cannot enforce Allfirst's "expectations," which were not made part of the document. See, <u>Anchel v. Shea</u>, 762 A.2d 346, 352 (Pa. Super. 2000) (stating that when court is interpreting intention of parties to a contract, court must give effect to clear and unambiguous terms without reference to matters outside the contract).

**3.    The Only Way the $1.2 Million Note Could Be Repaid Was by Using the Cash Management Facility Thereby Drawing on the Line of Credit.**

As Allfirst was well aware, CCI maintained a single checking account at Allfirst and all of CCI's loans (the line of credit, the equipment note and the short-term note) were tied into a cash management facility. (Schwartz Dep. at 85, 102-103). Furthermore, CCI was required to deposit all collected receivables into this account. (Complaint, Exhibit "D"; Phillips Dep. at 17-18). Thus, CCI had no other account from which it could pay the $1.2 million short-term note.

In fact, the bank's documents required CCI to maintain its primary account at Allfirst. (Schwartz Dep. at 66-67; Complaint at Exhibit "D").

### 4. The $1.2 Million Short-term Note Was Repaid in the Same Manner as the Other Loans CCI had With Allfirst.

As Mr. Schwartz and Ms. Phillips, CCI's former controller testified, all payments that CCI made came from CCI's Allfirst Bank checking account that was tied to the cash management facility.[3]  These payments included not only payroll, taxes and  payments to vendors, but also repayments on the equipment note. (Schwartz Dep. at 84-85; Phillips Dep. at 65-66, 70-71).  Further, Allfirst accepted equipment note payments consistently and without question.  However, despite accepting principal and interest equipment note payments written on the CCI checking account, Allfirst is now claiming that CCI's payment of the $1.2 million short-term note from the exact same account is improper and constitutes breach of contract by CCI.[4]

### 5. The Repayment of the $1.2 Million Note Was Merely a Reversal of the Initial Transaction.

When Allfirst loaned CCI the $1.2 million, pursuant to the short-term note, it deposited the funds into the cash management facility.  This deposit had the effect of increasing the availability on the line of credit by $1.2 million and conversely, decreasing the balance owed on the line of credit by $1.2 million. (Schwartz Dep. at 87-88).  Therefore, when CCI repaid the

---

[3]  In an attempt to bypass Allfirst's total failure to include any prohibition of repayment of the short-term note from the line of credit in any of the loan documents, Allfirst contends such repayment was prohibited since the purpose of the loan, per the commitment, required CCI to use the loan proceeds to finance accounts receivable and work in progress.  This contention overlooks that 1) the provision deals with CCI's use of funds in operating its business and not repayment of the short-term note; 2) Allfirst was aware at all relevant times that CCI was drawing on the line of credit to make payments to the IRS and monthly principal and interest payments on the equipment note; and 3) CCI had to repay the short-term note from the checking account as it was CCI's only account.

[4]  There is no evidence that CCI violated the terms of any of its agreements with Allfirst when it repaid the $1.2 million short-term note.  However, even if CCI somehow acted improperly, that fact does not advance Allfirst's efforts to hold Mr. Ortenzio personally liable here.

$1.2 million short-term note by writing a check on its Allfirst account, this initial transaction was merely reversed. (Schwartz Dep. at 160-161).

Based upon the foregoing evidence, Allfirst cannot establish that the $1.2 million short-term note was breached. Rather, the evidence shows that neither CCI nor Mr. Ortenzio did anything that was prohibited by the loan documents.

**B.    Allfirst Has Failed To Establish That Mr. Ortenzio Was Unjustly Enriched**

**1.    The Quasi Contract Remedy of Unjust Enrichment Does Not Apply When the Parties' Relationship is Defined by a Contract.**

In Count II of Allfirst's complaint, Allfirst claims that "[b]ecause CCI and Ortenzio used the proceeds of the revolving line of credit of CCI with Allfirst to repay the One Million Two Hundred Thousand Dollar loan without Allfirst's knowledge or consent and because Ortenzio was unjustly enriched thereby" Allfirst is entitled to the equitable remedy of equitable subrogation. (Complaint, ¶32). However, Count I of Allfirst's complaint alleges that numerous contracts existed between the bank and Mr. Ortenzio, which Mr. Ortenzio allegedly breached. (Complaint, ¶¶25-30). In other words, Allfirst has sued Mr. Ortenzio on both a breach of contract theory **and** a theory of equitable subrogation/quantum meriut, which is not proper.

Quantum meriut is "a quasi-contractual remedy in which a contract is implied-in-law under a theory of unjust enrichment; the contract is one that is implied in law, and 'not an actual contract at all.'" Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 998-99 (3rd Cir. 1987) (citing Ragnar Benson, Inc. v. Bethel Mart Assoc., 308 Pa. Super. 405, 414, 454 A.2d 599, 603 (1982)). However, it is well settled under Pennsylvania law, that a claim for the quasi-contractual doctrine of unjust enrichment will not lie when the relationship between the parties is based upon a written agreement or express contract. Hershey Foods, 828 F.2d at 999 (citing Benefit Trust Life Ins. Co. v. Union Nat. Bank, 776 F.2d 1174 (3rd Cir. 1985). See also,

Halstead v. Motorcycle Safety Foundation, Inc., 71 F. Supp.2d 455 (E.D. Pa. 1999) (the finding of a valid contract prevents a party from recovering for unjust enrichment); Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. 1999)(a court may not make a finding of unjust enrichment where a written or express contract exists); Birchwood Lakes Communtiy Ass'n v. Com., 296 Pa. Super. 77, 442 A.2d 304, 308 (1982) (plaintiff cannot recover on a claim for unjust enrichment if such claim is based on breach of a written contract).

Here, Allfirst relies upon the contractual relationship between the bank and Mr. Ortenzio pursuant to the suretyship agreement as the basis for its breach of contract claim. (Complaint, Count I). In fact, it is undisputed that a contractual relationship existed between Allfirst and Mr. Ortenzio. This contract, the suretyship agreement, is attached to plaintiff's complaint. (Complaint, Exhibit B). Accordingly, summary judgment should be entered in favor of Mr. Ortenzio, as the cause of action for quantum meriut may not lie in light of the fact that it is undisputed that the parties' relationship is governed by a written contract.

C. **Allfirst Has Failed To Establish A Cause Of Action For Equitable Subrogation.**

1. **There is No Equitable Reason to Grant Subrogation to Allfirst Because Allfirst Had the Ability to Negotiate for the Rights it Now Seeks to Acquire by Subrogation and Failed To Do So.**

Pennsylvania recognizes the doctrine of equitable subrogation, which is defined as "the substitution of one entity in the place of another with reference to a lawful claim, demand, or right so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies or securities." Public Serv. Mut. Ins. Co. v. Kidder-Friedman, 743 A.2d 485, 488 (Pa. Super. 1999) (quoting Molitoris v. Woods, 422 Pa. Super. 1, 9, 618 A.2d 985, 989 (1992). In order to successfully establish a claim for equitable subrogation, the plaintiff must show: "(1) the claimant paid the creditor to protect its own interests; (2) the claimant did

not act as a volunteer; (3) the claimant was not primarily liable for the debt; and (4) allowing subrogation will not cause injustice to the rights of others." Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co., 968 F.2d 357, 362 (3rd Cir. 1992) (citing United States Fidelity & Guar. Co. v. United Penn Bank, 362 Pa. Super. 440, 524 A.2d 958 (1987).

However, as the court pointed out in Tudor Dev. Group, equitable subrogation is not an appropriate remedy when the party was in a position to negotiate for the rights it seeks through subrogation but failed to do so. Id. at 363 (citing In re Carley Capital Group, 119 B.R. 646, 650 (W.D. Wis. 1990); In re Muzenrieder Corp., 58 B.R. 228, 231 (Bankr. M.D. Fla. 1986)). In Tudor Dev. Group, plaintiff-bank issued a letter of credit in favor of the township for the benefit of a real estate developer. Id. at 358. According to the terms of the letter of credit, the developer agreed to reimburse the bank if the bank honored the letter of credit. Id. at 359. As security, the bank received a collateral note from the developer's general partner in the project and an assignment of the proceeds from certain performance bonds. Id. Upon the township's demand, the bank paid the township in accordance with the letter of credit but was never reimbursed by the developer. Id.

In addition to finding that the bank failed to meet the technical requirements of equitable subrogation, the court held that because the bank was in a position to bargain for whatever security it thought appropriate when agreeing to issue the letter of credit, equitable subrogation would not be granted. Id. at 363. Accordingly, the court stated:

> [N]ow that [the bank] has discovered that it made a poor business decision in not contracting for an assignment of rights in [certain performance bonds], it seeks our help in gaining additional rights. As the district court properly concluded, **there is no apparent reason why the court should exercise its equitable powers to rewrite the contract between the parties to give [the bank] more security than it bargained to receive.**" Id. (emphasis added).

In its complaint, Allfirst, as creditor under the line of credit, seeks to be equitably subrogated to the rights of Allfirst, as creditor under the $1.2 million short-term note, so that it can hold Mr. Ortenzio personally liable for the balance due under the line of credit. (Complaint, ¶32). Allfirst's theory is based upon its claim that the balance on the line of credit had to be reduced to zero before CCI could use the line of credit to pay the $1.2 million short-term note. (Complaint, ¶17). According to Allfirst, because CCI used the line of credit to repay the short-term note before the balance reached zero, Allfirst under the line of credit is entitled to all of the remedies available to Allfirst under the suretyship agreement.

Yet, Mr. Schwartz acknowledged in his deposition that there were no restrictions in the short-term note as to the source of funds that could be used to repay the note. (Schwartz Dep. at 62). Mr. Schwartz also admitted that there was no document stating that the $1.2 million short-term note could not be repaid by writing a check on CCI's checking account, thereby drawing on the line of credit. (Schwartz Dep. at 144). Further, Mr. Schwartz stated that while Allfirst expected that the short-term note would be paid from cash flow, there was no document memorializing that expectation. (Schwartz Dep. at 146). Most importantly, Mr. Schwartz admitted that there was absolutely no reason why Allfirst could not have documented an express prohibition against CCI using the line of credit to repay the short-term note. (Schwartz Dep. at 147). Because Allfirst, by its own admission, did not negotiate for and obtain the rights it now seeks through equitable subrogation, the doctrine is inapplicable. Consequently summary judgment should be entered in favor of Mr. Ortenzio on Count II of Allfirst's complaint.

## 2. Allfirst is Not Entitled to an Equitable Remedy Because an Adequate Remedy Exists At Law.

In Pennsylvania, equitable relief is not permissible when a party has an adequate legal or statutory remedy. Tudor Dev. Group, 968 F.2d at 364 (citing Clark v. Pennsylvania State Police,

496 Pa. 310, 436 A.2d 1383, 1385 (1981).  See also, Redmond Finishing Co., Inc. v. Ginsburg, 301 Pa. Super. 51, 446 A.2d 1330 (dismissing action in equity because plaintiff had earlier elected to proceed at law for monetary damages).  "In determining whether a remedy is 'adequate,' [the court] must look to its availability and not to the likelihood of success." Tudor Dev. Group, 968 F.2d at 364.[5]

Here, Allfirst has the option of proceeding with its breach of contract claim against Mr. Ortenzio or it can file a claim against CCI in the bankruptcy proceedings, both of which are available legal remedies.  Regardless of whether Allfirst will be made whole under either of these adequate and available options, Allfirst is not entitled to the equitable remedy of subrogation.  Thus, Mr. Ortenzio is entitled to summary judgment on Count II of Allfirst's complaint.

### D.    Allfirst Has Failed To Establish A Cause Of Acton For Fraud.

In Count III of its complaint, Allfirst purports to state a claim for fraud and seeks money damages.  (Complaint, ¶34).  In order to prove fraud, Pennsylvania law requires that the plaintiff establish the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  See, Lind v. Jones, Lang LaSalle Americas, Inc., 135 F. Supp.2d 616, 620 (E.D. Pa. 2001) (citing Gibbs v. Ernst, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994); Gruenwald v. Advanced Computer

---

[5]  In Tudor Dev. Group, the court found that the bank had two legal remedies (seeking judgment against the developer's general partner under the promissory note or suing the developer under the reimbursement agreement) and one statutory remedy available.  Id.  Therefore, the court concluded that "the fact that the remedies set forth above might not make [the bank] whole does not mandate a finding that such remedies are inadequate, thereby requiring this court to grant equitable relief."  Id.

Applications, 730 A.2d 1004, 1014 (Pa. Super. 1999)).    Additionally, these elements must be proven by clear and convincing evidence, not the lesser preponderance of the evidence standard. Lind, 135 F. Supp.2d at 621.  "Pennsylvania law requires that the trial judge to decide as a matter of law before he submits a case to the jury whether plaintiffs' evidence attempting to prove fraud is sufficiently clear, precise, and convincing to make out a prima facie case."  Id.  (citing Northeastern Power Co. v. Balcke- Durr, Inc., 49 F. Supp.2d 783 (1999).

     1.    **Allfirst Cannot Establish that Mr. Ortenzio Made a False Statement Upon Which it Relied.**

Here, Allfirst cannot establish, by clear and convincing evidence, that Mr.Ortenzio made a false statement upon which Allfirst relied.  In its complaint, Allfirst alleges that Mr. Ortenzio's delivery of the check written drawn upon CCI's line of credit with Allfirst was a representation that the payment of the $1.2 short-term note was being made with funds other than those borrowed under the revolving line of credit.  (Complaint, ¶34).  However, in his deposition, Mr. Schwartz admitted that Mr. Ortenzio never made any direct representation that the $1.2 million short-term loan would not be paid from the $4 million line of credit and also testified that he did not investigate the source of the funds because he did not care.  (Schwartz Dep. at 163).  Mr. Schwartz further admitted that there was no loan document **anywhere** that prohibited repayment of the $1.2 million short-term note from the line of credit.  (Schwartz Dep. at 193).  He also reiterated that there had been no impediment to the bank requiring that Mr. Ortenzio sign a document which would have prohibited use of the line of credit to repay the $1.2 million short-term note.  (Schwartz Dep. at 193).  Finally, none of the loan documents require that Mr. Ortenzio make any representation to Allfirst regarding the source of the funds prior to repayment of the short-term note.  Accordingly, Allfirst has failed to establish that Mr. Ortenzio made a

false statement upon which it relied and therefore, summary judgment should be entered in favor of Mr. Ortenzio on Count III.

### 2. Allfirst Cannot Establish that Mr. Ortenzio Intended to Deceive Allfirst.

Even if Allfirst were able to establish that Mr. Ortenzio made a false statement, it cannot establish, by clear and convincing evidence that Mr. Ortenzio intended to deceive Allfirst. As Allfirst admits in its Complaint, the payment of the $1.2 million short-term note was a check written on CCI's line of credit with Allfirst. (Complaint, ¶34). Thus, because Mr. Ortenzio personally presented **an Allfirst check**, bearing the account number of CCI's line of credit with Allfirst, to Allfirst when repaying the short-term note, Allfirst cannot establish that Mr. Ortenzio failed to deceive Allfirst. Mr. Ortenzio made no attempt to hide the source of the funds. His failure to explicitly state the source of the funds, when none of the loan documents required any such representation, does not establish an intent to deceive.

## IV. CONCLUSION

Based upon the forgoing reasons, Defendant, John M. Ortenzio, respectfully requests that this Honorable Court enter summary judgment in his favor.

Respectfully submitted,

BLANK ROME COMISKY & McCAULEY LLP

Dated: 4/30/02                    BY: _____

EDWARD I. SWICHAR, ESQUIRE
One Logan Square
Philadelphia, PA 19103
(215) 569-5500
*Attorneys for Defendant, John M. Ortenzio*

## CERTIFICATE OF SERVICE

Edward I. Swichar, attorney for Defendant, John Ortenzio, hereby certifies that he caused

a true and correct copy of Defendant's Memorandum of Law in Support of his Motion for

Summary Judgment to be served upon the following on this 29th day of April, 2002, by first-

class mail, postage prepaid:

Lawrence Gebhardt, Esquire
Gebhardt & Smith, LLP
The World Trade Center, Ninth Floor
Baltimore, MD   21020-3064


EDWARD I. SWICHAR

113449.00601/21015169v1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

COPY

| | |
|---|---|
| ALLFIRST BANK<br>25 S. Charles Street<br>Baltimore, MD 21201 | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *    CASE NO.: |
| | * |
| JOHN M. ORTENZIO<br>510 Orchard Drive<br>Lemoyne, PA | * |
| | * |
| Defendant. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

Plaintiff, Allfirst Bank ("Allfirst"), by its undersigned attorneys, sues Defendant, John M.

Ortenzio ("Ortenzio"), and states as follows:

    1.    Allfirst is a banking institution chartered under the laws of the State of Maryland, with

its principal place of business in Baltimore, Maryland. For this reason, Allfirst is a citizen of the State

of Maryland.

    2.    Ortenzio is a citizen of the Commonwealth of Pennsylvania.

    3.    The matter in controversy in this case exceeds the sum or value of Seventy-Five

Thousand Dollars ($75,000.00), exclusive of interests and costs.

    4.    Subject matter jurisdiction exists in this case on the basis of diversity of citizenship and

amount in controversy pursuant to 28 U.S.C. Section 1332.

    5.    Ortenzio is the sole shareholder and president of CCI Construction Co., Inc. ("CCI"),

a construction company with its principal office in the Commonwealth of Pennsylvania.

    6.    On or about March 24, 1999, Allfirst reestablished for the benefit of CCI a Four

Million Dollar unsecured revolving line of credit and cash management facility pursuant to a Film Cash Solutions Promissory Note ("Film Note"). A true and accurate copy of the Film Note is attached hereto as Exhibit A.

7.    Pursuant to the revolving line of credit and cash management facility established in connection with the Film Note, CCI could borrow sums under the revolving line of credit by the issuance of checks drawn on its account with Allfirst up to the sum of Four Million Dollars. All collections made by CCI from customers were deposited, either directly by customers or by CCI upon receipt from customers, into CCI's account with Allfirst. Such deposits were applied on at least a daily basis to reduce the outstanding balance advanced under the revolving line of credit or, to the extent no amounts were outstanding under the revolving line of credit, into an interest bearing account, whose interest accrued to the benefit of CCI.

8.    Ortenzio did not guaranty the revolving line of credit and had no obligation to Allfirst with respect to the repayment of the revolving line of credit. The sole obligor under the revolving line of credit was CCI.

9.    In November of 1999, CCI experienced financial difficulties with respect to the cash flow generated by its business in the sense that its anticipated cash receipts were expected to be substantially less than its anticipated cash expenditures. To address the problem of CCI's expected cash flow shortfall, Ortenzio requested an additional extension of credit in the amount of One Million Two Hundred Thousand Dollars from Allfirst to or for the benefit of CCI.

10.    Allfirst was unwilling to extend additional credit to CCI on the basis of its credit alone. Allfirst agreed to extend additional credit to CCI in the requested amount of One Million Two Hundred Thousand Dollars, but only upon the condition that Ortenzio guaranty and become a surety

and co-obligor with CCI on the additional One Million Two Hundred Thousand Dollars of indebtedness. To induce Allfirst to extend the additional One Million Two Hundred Thousand Dollars of credit to CCI, Ortenzio agreed to guaranty and become a surety and co-obligor on the additional One Million Two Hundred Thousand Dollars to be extended by Allfirst to CCI.

11.     On November 8, 1999, CCI executed a Commercial Loan Note ("Commercial Note") in the face amount of One Million Two Hundred Thousand Dollars, payable on demand, and Allfirst advanced to CCI the principal amount of the Commercial Note. Exhibit B is a true and accurate copy of the Commercial Note executed by CCI on November 8, 1999.

12.     Also on November 8, 1999, Ortenzio executed a Suretyship Agreement in which he guaranteed and became a surety for and a co-obligor with CCI with respect to the One Million Two Hundred Thousand Dollar loan extended by Allfirst to CCI., including all principal, interest, and attorneys fees and collection expenses with respect to collecting the sums due on the Commercial Note. In addition, Ortenzio agreed to pay all attorneys fees and costs of collection incurred by Allfirst in connection with enforcing the Suretyship Agreement and obtaining from Ortenzio the sums due thereon. A true and accurate copy of the Suretyship Agreement is attached hereto as Exhibit C.

13.     Despite the advance of One Million Two Hundred Thousand Dollars by Allfirst to CCI pursuant to the Commercial Note, CCI's cash flow problems continued to exist and to worsen significantly.

14.     On or about February 12, 2000, Ortenzio drew a check upon the account of CCI with Allfirst established in connection with the revolving line of credit in an amount sufficient to repay all sums then due and owing on the Commercial Note and delivered the aforementioned check to a teller of Allfirst with the instruction that the check was being delivered to Allfirst for the purpose of

satisfying in full all sums owed by CCI under the Commercial Note.  In accordance with Ortenzio's instructions, the teller accepted the check and provided Ortenzio with a receipt therefore.

15.    At the time Ortenzio drew the check on the account of CCI and delivered the check to Allfirst to repay the sums owed on the Commercial Note, CCI had an outstanding balance under its revolving line of credit. Payment of this check, drawn on the account of CCI established in connection with the revolving line of credit, required an advance under the revolving line of credit. Through this procedure, Ortenzio caused CCI to repay Allfirst on a loan which he had guarantied with money borrowed from Allfirst under a revolving line of credit which he had not guarantied.

16.    In accepting the check presented by Ortenzio in payment of the One Million Two Hundred Thousand Dollar loan and in processing and paying the check drawn on the account of CCI, Allfirst was unaware that the payment being made by Ortenzio of the One Million Two Hundred Thousand Dollar loan was simply a further borrowing under the revolving line of credit.

17.    The repayment of CCI's loan by Ortenzio was a conditional payment and was not effective unless and until such time as the outstanding balance and all advances under the revolving line of credit had been repaid and satisfied.

18.    Ortenzio delivered the CCI check representing a draw upon the revolving line of credit to Allfirst in payment of the One Million Two Hundred Thousand Dollar loan for the express and sole purpose of ostensibly discharging his guaranty of the One Million Two Hundred Thousand Dollar loan and to avoid the obligations which he undertook in executing the Suretyship Agreement.

19.    On or about February 18, 2000, Ortenzio met with representatives of Allfirst and provided them with detailed information relating to CCI's continuing cash flow shortages.  This information indicated that CCI anticipated severe and substantial cash flow shortages over the

succeeding months, approximating $3.8 million in February and reaching almost $6 million by June, and that its business was in danger of failing.

20.    As a result of the information provided by Ortenzio at the meeting on February 18, 2000, Allfirst on or about February 24, 2000 declared a default under an equipment loan extended to CCI on the basis of a material adverse change in CCI's financial condition and, as a result of the default under the equipment note, also declared a default under the Film Note. Allfirst notified CCI that no further advances would be made on the revolving line of credit and that Allfirst was demanding immediate repayment of all sums due and owing from CCI. Exhibit D attached hereto is a true and accurate copy of the default letter issued by Allfirst to CCI.

21.    Between the date of Ortenzio's meeting with representatives of Allfirst on February 18, 2000 and the declaration of default on February 24, 2000, Allfirst realized that Ortenzio had caused CCI to repay the One Million Two Hundred Thousand Dollar loan with a borrowing under the revolving line of credit for the purpose of attempting to effect a discharge of his personal liability to Allfirst under the Suretyship Agreement.

22.    Pursuant to the cash management facility established under the Film Note, collections from CCI customers were received by Allfirst on February 22, 24, and 25, 2000, aggregating the sum of $2,317,291.28, which amount was applied by Allfirst to reduce the outstanding balance under the revolving line of credit.

23.    On May 19, 2000, CCI filed for relief under Chapter 11 of the United States *Bankruptcy Code*. At the time of the filing of the petition under Chapter 11, the outstanding balance under the revolving line of credit owed by CCI to Allfirst for principal and interest, but exclusive of the costs and expenses of collection, was the sum of $300,373.16. Allfirst has incurred costs and

expenses, including attorneys fees, in connection with the CCI bankruptcy case and will continue to incur such costs and expenses until the bankruptcy case has concluded.

24.    On or about January 10, 2001, CCI, as debtor and debtor-in-possession, instituted an adversary proceeding in the United States Bankruptcy Court for the Middle District of Pennsylvania in a case entitled *CCI Construction Co., Inc. v. Allfirst Bank* (Adversary No. 1-01-00011A) in which CCI seeks to recover either as preferential or as an improper setoff the $2,317,291.28 dollars in payments received by Allfirst on February 22, 24, and 25, 2000. Allfirst is contesting the claims of CCI in the bankruptcy case and has denied that the receipt of the payments were either a preference or an improper setoff. Allfirst has incurred litigation costs and expenses in connection with the defense of this preference action and will continue to incur litigation costs and expenses until the preference action has concluded.

## COUNT I

25.    Allfirst incorporates by reference the matters and facts alleged in paragraphs 1 through 24.

26.    The purported payment by Ortenzio on behalf of CCI on or about February 12, 2000, was a conditional payment and did not have the effect of repaying the Commercial Note or discharging the One Million Two Hundred Thousand Dollar obligation of CCI to Allfirst except to the extent that Allfirst received non-avoidable repayments on the revolving line of credit in an amount sufficient to discharge in full the entire revolving line of credit and all sums due under the Film Note, including attorneys fees and collection expenses.

27.    The revolving line of credit was never discharged in full and presently has an outstanding balance of $326,655.72 with respect to principal and to interest accrued to May 1, 2001.

In addition, Allfirst has incurred attorneys fees and collection costs with respect to collection of the revolving line of credit and defense of the preference action in the bankruptcy case.

28.    Because the revolving line of credit has never been satisfied and discharged in full, the One Million Two Hundred Thousand Dollar loan evidenced by the Commercial Note was never repaid in full and remains an obligation of CCI.

29.    Because the One Million Two Hundred Thousand Dollar loan from Allfirst to CCI was never paid or discharged in full, the obligation of Ortenzio, as guarantor and surety and co-obligor with respect to the One Million Two Hundred Thousand Dollar loan and the Commercial Note, was never discharged or satisfied, such that Ortenzio remains liable under the Suretyship Agreement for all sums owed by CCI pursuant to the One Million Two Hundred Thousand Dollar loan and the Commercial Note.

30.    The amount owed by Ortenzio pursuant to the Suretyship Agreement equals the lesser of (a) the unpaid balance of all principal and interest owed on the Commercial Note as though the February 12, 2000 payment had not been made or (b) the greater of (i) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, or (b) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, plus the amount of any recovery made by CCI in the preference action pending in the bankruptcy case, together with, in either case (a) or (b), all attorneys fees and collection costs in enforcing the Suretyship Agreement as provided therein.

## COUNT II

31.    Allfirst incorporates by reference the matters and facts alleged in paragraphs 1 through

24.

32.    Because CCI and Ortenzio used the proceeds of the revolving line of credit of CCI with Allfirst to repay the One Million Two Hundred Thousand Dollar loan without Allfirst's knowledge or consent and because Ortenzio was unjustly enriched thereby, Allfirst, as creditor under the revolving line of credit, is equitably subrogated to the rights of Allfirst, as creditor under the One Million Two Hundred Thousand Dollar loan, including through such equitable subrogation the right to enforce and collect upon the Suretyship Agreement executed by Ortenzio.

33.    The amount to which Allfirst is entitled to be equitably subrogated in the enforcement of the Suretyship Agreement against Ortenzio equals the lesser of (a) the unpaid balance of all principal and interest owed on the Commercial Note as though the February 12, 2000 payment had not been made or (b) the greater of (i) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, or (b) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, plus the amount of any recovery made by CCI in the preference action pending in the bankruptcy case, , together with, in either case (a) or (b), all attorneys fees and collection costs in enforcing the Suretyship Agreement as provided therein.

## COUNT III

34.    The payment by Ortenzio of the One Million Two Hundred Thousand Dollar loan extended by Allfirst to CCI through the use of a check drawn upon and reflecting an advance on CCI's revolving line of credit with Allfirst constituted common law fraud by Ortenzio in that (a) delivery of the check amounted to and was the equivalent of a representation by Ortenzio that payment of the One Million Two Hundred Thousand Dollar loan was being made by CCI or by

Ortenzio through CCI with monies other than those borrowed under the revolving line of credit. This representation by Ortenzio was knowingly false when made and was justifiably relied upon by Allfirst in giving Ortenzio and CCI a receipt for the payment and noting on its record that the obligations under the Commercial Note and Suretyship Agreement had been satisfied. Allfirst has suffered damages as a direct and proximate result of the knowingly false representation made by Ortenzio upon which it justifiably relied in an amount equal to the lesser of (a) the unpaid balance of all principal and interest owed on the Commercial Note as though the February 12, 2000 payment had not been made or (b) the greater of (i) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, or (b) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, plus the amount of any recovery made by CCI in the preference action pending in the bankruptcy case, , together with, in either case (a) or (b), all attorneys fees and collection costs in enforcing the Suretyship Agreement as provided therein.

WHEREFORE, Allfirst requests judgment:

1.      As to Counts One, Two and Three for compensatory damages against Ortenzio in an amount equal to the lesser of (a) the unpaid balance of all principal and interest owed on the Commercial Note as though the February 12, 2000 payment had not been made or (b) the greater of (i) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, or (b) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, plus the amount of any recovery made by CCI in the preference action pending in the bankruptcy case, , together with, in either case (a) or (b), all attorneys fees and collection costs in enforcing the

Suretyship Agreement as provided therein;

     2.   As to Count Three, punitive damages in an amount equal to One Million Two Hundred

Thousand Dollars or such other amount as is appropriate under the circumstances; and

     3.   As to Counts One, Two, and Three, an award of costs.


                              *(signature)*

Lawrence J. Gebhardt
(Motion for *Pro Hac Vice* Admission Pending)
Michael D. Nord
Pennsylvania Bar # 52486
Ramsay M. Whitworth
Pennsylvania Bar # 85208
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202

(410) 752-5830

Attorneys for Allfirst Bank

# EXHIBIT A



EXHIBIT
Ortenzio-3
21/3b/FKB

* a division of
FMB Bank

**FILM/CASH SOLUTIONS PROMISSORY NOTE**
**(PENNSYLVANIA)**

**Instructions to Loan Officer:** Use for (a) loans to corporations, regardless of amount, and (b) loans to non-corporate borrowers when the only purpose of any such loan is business and the principal amount of such loan exceeds $50,000.

$ __4,000,000.00__            __Mechanicsburg, PA__            __March 24__ , __1999__
                             (City)            (State)

FOR VALUE RECEIVED, the undersigned ("Borrower") promises to pay on demand to the order of THE FIRST NATIONAL BANK OF MARYLAND,* ~~_____~~ ("Bank"), at any of Bank's offices, or at such other place as the holder of this Promissory Note may from time to time designate, the principal sum of __FOUR MILLION__ _____ and _____00__ /100 Dollars ($ __4,000,000.00__ ), or such other amount as may be advanced from time to time to Borrower, together with interest thereon at the rate or rates hereafter specified and any and all other sums which may be owing to Bank by Borrower pursuant to this Promissory Note. The following terms, as well as the applicable terms on Exhibit A, attached hereto and incorporated herein by reference, shall apply to this Promissory Note.

1. **DEFINITIONS.** The following terms have the following definitions:
   A. "Account" means the commercial checking account maintained by Borrower with Bank and designated as Account No. ___28864514_____, together with any replacement account therefor.
   B. "Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in the Commonwealth of Pennsylvania are authorized to close.
   C. "Incremental Advance Amount" means the amount indicated on Exhibit A as the Incremental Advance Amount. Each Loan must be an integral multiple of such amount.
   D. "Initial Excess Balance" means, for any Business Day, the amount by which the collected balance in the Account at the end of such Business Day after posting all credits to the Account (subject to funds availability), but prior to posting any debits to the Account, exceeds the Target Balance.
   E. "Line Availability" means, for any Business Day, an amount equal to the difference obtained by subtracting the aggregate principal balance outstanding under all Loans from the Maximum Line Amount.
   F. "Loan" means an advance of monies from Bank to Borrower pursuant to the terms of this Promissory Note; and the term "Loans" means more than one Loan.
   G. "Maximum Advance Amount" means an amount equal to the highest integral multiple of the Incremental Advance Amount which does not exceed the Line Availability.
   H. "Maximum Line Amount" means the amount indicated on Exhibit A as the Maximum Line Amount, which amount is the maximum aggregate principal balance of the Loans which may be outstanding at any one time.
   I. "Minimum Loan Advance" means the amount indicated on Exhibit A as the Minimum Loan Advance, which amount is the minimum principal amount of each Loan.
   J. "Presented Items" means, for any Business Day, the aggregate amount of debits which have been presented for payment against the Account.
   K. "Prime Rate" means a fluctuating annual rate of interest equal to the greater of: (i) that rate announced from time to time by Bank as its "prime rate;" or (ii) the rate obtained by adding one percent (1%) to the average rate, rounded to the nearest one-tenth of one percent, for three month maturity dealer placed commercial paper for the week most recently reported in the Federal Reserve Statistical Release No. H.15(519) entitled "Selected Interest Rates" or any succeeding publication.
   L. "Target Balance" means the amount indicated on Exhibit A as the Target Balance, which amount is the minimum collected balance that must be maintained in the Account.

2. **PROCEDURES FOR LOANS.** All Loans shall be made in the form of a transfer of funds into the Account in accordance with the procedures set forth in this paragraph. Borrower hereby irrevocably authorizes Bank to make Loans in accordance with the procedures set forth herein. At the end of each Business Day, Bank shall calculate the initial Excess Balance and the aggregate amount of the Presented Items. In the event the Initial Excess Balance is less than the aggregate amount of the Presented Items, Bank shall make a Loan by transferring funds into the Account in an amount equal to the amount, which when added to the Initial Excess Balance, would be equal to the aggregate amount of the Presented Items; provided, however, that: (a) the principal amount of the Loan shall not be less than the Minimum Loan Advance; (b) the principal amount of the Loan must be an integral multiple of the Incremental Advance Amount, and therefore, if it would not otherwise be an integral multiple of the Incremental Advance Amount, the amount of the Loan will be rounded up to the next higher integral multiple of the Incremental Advance Amount unless there is insufficient Line Availability in which case the Loan amount will be the Maximum Advance Amount; and (c) the principal amount of the Loan shall not exceed the Maximum Advance Amount. If at any time the amount of the Initial Excess Balance is less than the amount of the Presented Items by an amount greater than the Maximum Advance Amount, Bank shall: (i) make a Loan by transferring funds into the Account in an amount equal to the Maximum Advance Amount; and (ii) determine, in its sole discretion, which Presented Items will be paid, and which Presented Items will not be paid. In the event the Initial Excess Balance is greater than the amount of the Presented Items, Bank shall post and pay all of the Presented Items. If, following Bank's posting and paying of all of the Presented Items, there remains a balance in the Account in excess of the Target Balance, Bank is hereby irrevocably authorized to debit the Account in an amount up to the portion of the balance in the Account which exceeds the Target Balance, and apply such sums to the outstanding balance of the Loans. Bank agrees to make such debit of the Account to repay sums outstanding under the Loans as of the end of each Business Day; provided, however, that in the event the option labeled "Cash Solutions Protection" is marked on Exhibit A attached hereto, Bank shall not automatically debit the Account to make payments on the Loans, but may do so, in its sole and absolute discretion.

3. **TERMINATION.** The procedure for making Loans, and the obligation of Bank to provide Loans, as set forth in this Promissory Note, may be terminated by Borrower upon ten (10) days prior written notice to Bank and may be terminated by Bank upon thirty (30) days prior written notice to Borrower. Upon termination, no further Loans shall be made under this Promissory Note, but all other terms of this Promissory Note (including, but not limited to, the holder's right to demand payment at any time and for any reason) shall remain in full force and effect.

4.    INTEREST. From the date hereof until all sums due hereunder, including principal, interest, charges, fees and expenses are paid in full, the principal amount outstanding from time to time pursuant to this Promissory Note shall bear interest as follows (Check One):

[ ]    Fluctuating Rate.  At a fluctuating rate equal to _____ % per annum above the Prime Rate in effect from time to time.  Bank at its discretion may charge a lesser rate from time to time. Interest on the principal amount outstanding shall be adjusted daily, with the rate for each day being adjusted to reflect the Prime Rate in effect at the close of business on that day.  Bank makes loans at interest rates at, above and below the Prime Rate.

[X]    Other. (describe):  <u>Interest shall accrue at a rate per annum equal to the Bank's Base Rate minus 1/2% as in effect from time to time.</u>

5.    CALCULATION OF INTEREST.  Interest shall be calculated on the basis of a three hundred sixty (360) days per year factor applied to the actual days on which there exists an unpaid balance hereunder.

6.    REPAYMENT.  Borrower shall make payments of principal and interest in accordance with the following terms:
(a)    Principal:    ALL SUMS OUTSTANDING UNDER THIS PROMISSORY NOTE, INCLUDING THE PRINCIPAL AMOUNT OF ALL OF THE LOANS, ARE IMMEDIATELY DUE IN FULL UPON THE FIRST TO OCCUR OF: (I) THE DEMAND OF THE HOLDER OF THIS PROMISSORY NOTE, WHICH DEMAND MAY BE MADE AT ANY TIME AND FOR ANY REASON, IN THE SOLE AND ABSOLUTE DISCRETION OF THE HOLDER OF THIS PROMISSORY NOTE; OR (III) THE OCCURRENCE OF ANY DEFAULT UNDER THE TERMS OF THIS PROMISSORY NOTE.*with 30 days written*
(b)    Interest:    Borrower shall make payments of all accrued and unpaid interest on the _31st_ day of each *notice* successive month, beginning on _March 31, 1999_ and continuing until all sums outstanding hereunder are paid *sp* in full.

Borrower may prepay this Promissory Note in whole or in part at any time or from time to time without premium or additional interest.

7.    LATE PAYMENT CHARGE.  If any payment due hereunder (including any payment in whole or in part of principal) is not received by the holder within fifteen (15) calendar days after its due date, Borrower shall pay a late payment charge equal to five percent (5%) of the amount then due.

8.    APPLICATION OF PAYMENTS.  All payments made pursuant to this Promissory Note shall be applied first to accrued and unpaid interest, then to unpaid expenses and charges payable hereunder, and then to principal, or in such other order or proportion as the holder, in the holder's sole discretion, may elect from time to time.

*see below → unsecured*

9.    SECURITY.  Sums due under this Promissory Note are secured by, and Borrower grants to Bank a security interest in, all deposits and property of Borrower now or at any time hereafter in the possession of or on deposit with Bank whether as custodian or depository or in any other capacity. Bank shall have the right to set-off and apply against the obligations of Borrower to Bank evidenced by this Promissory Note any sums of Borrower at any time on deposit with Bank whether such deposits are special, time or demand, provisional or final.  In addition, this Promissory Note is secured by any property described as collateral in any security agreement, pledge agreement or other document previously, simultaneously, or hereafter entered into by Borrower in connection with any obligation or liability of Borrower to Bank or any corporate affiliate of Bank, such other security document(s) include but are not limited to the following:  *sp*

[ ]    Security Agreement(s)

[ ]    Real estate mortgage or deed of trust on property known as _____ located in _____ County/City, State of _____.

[X]    Other (describe):    <u>Unsecured</u>

This Promissory Note specifically incorporates by reference, as if fully set forth herein, all of the language and provisions of the security documents described generally or specifically above.

10.    REPRESENTATIONS AND WARRANTIES.  Borrower (and if more than one Borrower, each Borrower) represents and warrants to Bank that the following statements are true, correct and complete as of the date hereof, and as of the date each Loan is made hereunder:  (a) it is duly organized and in good standing under the laws of the state in which it is organized; (b) it has the full power and authority to execute, deliver and perform this Promissory Note; (c) neither such execution, delivery and performance, nor compliance by it with the provisions of this Promissory Note will conflict with or result in a breach or violation of its organizational documents, or any judgment, order, regulation, ruling or law to which it is subject or any contract or agreement to which it is a party or to which any of its assets and properties are subject; (d) this Promissory Note constitutes its legal, valid and binding obligation enforceable in accordance with its terms; (e) there is no litigation or proceeding pending or, to the knowledge of its representative signing this Promissory Note on its behalf, threatened against or affecting it which might materially adversely affect its business, financial condition or operations or its ability to perform and comply with this Promissory Note; (f) all financial statements and information furnished or to be furnished to Bank hereunder have been and will be prepared in accordance with generally accepted accounting principles and fairly present its financial condition as of the dates thereof and the results of its operations for the period covered thereby; (g) it is not in violation of any applicable federal, state or local law, statute, rule, regulation or ordinance and has not received any notice nor is the subject of any investigation to the effect that its operations are not in material compliance with any such law, statute, rule, regulation or ordinance, including, without limitation, applicable environmental, health and safety laws and regulations; (h) since September 2, 1974, no pension, employee benefit, multi-employer, profit sharing, savings, stock bonus or other deferred compensation plan ("Plan") maintained by it or any trade or business group with which it is affiliated subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA") has been terminated, no lien exists against Borrower in favor of the Pension Benefit Guaranty Corporation ("PBGC"), and no "reportable event" (as such term is defined in ERISA) has occurred with respect to any such Plan, and Borrower has not incurred any "accumulated funding deficiency" within the meaning of ERISA or any liability to the PBGC in connection with any Plan; and (i) no information, exhibit, report, statement, certificate or document furnished by Borrower or any other person to Bank in connection with the Loans, this Promissory Note or the negotiation thereof contains any material

misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained herein or therein not misleading.

11.   DEFAULT. Any of the following will be a default under this Promissory Note: (a) failure to pay any principal, expense, fee, charge or interest when due, or failure to perform any other obligations hereunder; (b) a default by any Borrower upon any of the existing or future obligations of any Borrower to Bank; (c) a default by any guarantor or other person other than Borrower that is now or hereafter liable upon or in connection with any of the obligations of any Borrower to Bank or that has granted any lien or security interest to or for the benefit of Bank to secure any of the obligations of any Borrower to Bank ("Other Obligor"), upon any of the existing or future obligations of any Other Obligor to Bank; (d) a default in any other agreement, instrument or document between any Borrower or Other Obligor and Bank, or any corporate affiliate of Bank, including, without limitation, any security document referred to above, whether previously, simultaneously, or hereafter entered into; (e) a material adverse change in the financial condition of any Borrower or Other Obligor from that expressed in the financial statement most recently submitted to Bank prior to the date of this Promissory Note, as determined in good faith by Bank in its sole discretion; (f) institution of bankruptcy, insolvency, reorganization or receivership proceedings by or against any Borrower or Other Obligor in any state or federal court; (g) the appointment of a receiver, assignee, custodian, trustee or similar official under any federal or state insolvency or creditors' rights law for any property of any Borrower or Other Obligor; (h) failure of any Borrower or Other Obligor to furnish to Bank such collateral or additional collateral as Bank may in good faith request; (i) any warranty, representation, or statement to Bank by or on behalf of any Borrower or Other Obligor proving to have been incorrect in any material respect when made or furnished; (j) the occurrence of any event which is, or would be with the passage of time or the giving of notice or both, a default under any indebtedness of any Borrower or Other Obligor to any person other than Bank; (k) any material loss, theft or substantial damage, which is not fully insured, to any of the assets of any Borrower or Other Obligor, or the sale, transfer, lease, encumbrance or other disposition of all or any material part of the assets of any Borrower or Other Obligor other than in the ordinary course of business of Borrower or Other Obligor; (l) the entry of any final judgment against any Borrower or Other Obligor for the payment of money in excess of $5,000.00; (m) the levy upon or attachment of any assets of any Borrower or Other Obligor; (n) the recordation of any federal, state or local tax lien against any Borrower or Other Obligor; (o) a change of ownership or dissolution, merger, consolidation, liquidation or reorganization of any Borrower or Other Obligor which is a corporation, partnership or other legal entity; (p) the death of any Borrower or Other Obligor who is a natural person; (q) failure of any Borrower or Other Obligor to furnish to Bank such financial information as Bank may require from time to time, including, but not limited to, such financial statements as Bank may require; (r) failure of any Borrower or Other Obligor to comply with all laws, rules, regulations and decrees to which such Borrower or Other Obligor may be subject, the violation of which may have a material adverse effect on the business operation or financial condition of such Borrower or Other Obligor; (s) the acquisition by a Borrower of all or substantially all of the assets, properties or equity interest of any other person or entity without Bank's prior written consent; (t) failure of any Borrower to maintain its existence in good standing in the jurisdiction of its organization; (u) any of the licenses or permits which are necessary to the conduct of any Borrower's business as now conducted is not maintained in full force and effect; or (v) the determination in good faith by Bank, in its sole discretion, that the ability of any Borrower or Other Obligor to pay or perform any of their respective obligations to Bank is impaired for any reason.

12.   REMEDIES. Upon a default, in addition to all other rights and remedies available to the holder of this Promissory Note under any document or agreement between Borrower and Bank or under applicable law, the holder of this Promissory Note, in the holder's sole discretion and without notice or demand, may raise the rate of interest accruing on the unpaid principal balance outstanding under this Promissory Note by two (2) percentage points above the rate of interest otherwise applicable. The Bank shall have no further obligation to provide any Loans to Borrower following: (a) a demand by Bank for payment hereunder; or (b) a default under this Promissory Note. Borrower agrees that a default under this Promissory Note is a default by Borrower under all other liabilities and obligations of Borrower to the holder, and that the holder shall have the right to declare immediately due and payable all liabilities and obligations owed by Borrower to the holder of this Promissory Note.

13.   CONFESSION OF JUDGMENT.   Borrower irrevocably and unconditionally authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Borrower in any court in one or more proceedings, or before any clerk thereof or prothonotary or other court official, and appear for, to confess and enter judgment against Borrower, at any time, whether before or after the occurrence of any default hereunder, with or without averment of default, with or without complaint filed, and without prior notice or opportunity of Borrower for prior hearing, in favor of the holder of this Promissory Note in the full amount outstanding on this Promissory Note (including principal, accrued interest and any and all charges, fees and expenses) plus court costs, plus attorneys' fees equal to fifteen percent (15%) of the unpaid balance of principal, interest, charges, and other sums outstanding hereunder, with release of all errors and without right of appeal.  Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Borrower any right or privilege of exemption, homestead rights, appraisement, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment. (To the extent prohibited by applicable law, any judgment obtained by confession shall not constitute a lien on any real property located in Pennsylvania which is the residence of the Borrower.) The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions from time to time, in the same or different jurisdictions, as often as the holder shall deem necessary or advisable.  BORROWER HEREBY ACKNOWLEDGES THAT THE CONFESSION OF JUDGMENT PROVISIONS HEREIN CONTAINED WHICH AFFECT AND WAIVE CERTAIN LEGAL RIGHTS OF BORROWER HAVE BEEN READ, UNDERSTOOD AND VOLUNTARILY AGREED TO BY BORROWER.

14.   EXPENSES. Borrower shall pay all costs and expenses, including attorneys' fees (to the extent not prohibited by law) incident to the making of the Loans.  Borrower shall pay all costs and expenses incurred by Bank in collecting sums due under this Promissory Note, including without limitation the costs of any lien, judgment or other record searches, appraisals, travel expenses and the like.  In addition, if this Promissory Note is referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, Borrower shall pay all of the holder's costs, fees (including, but not limited to, the holder's attorneys' fees, charges and expenses) and all other expenses resulting from such referral.

15.   AMENDMENTS. The fees and charges required to be paid by Borrower in connection with the Loans may, at any time and from time to time, be amended by Bank, upon prior written notice thereof to Borrower and otherwise in compliance with applicable law.  Any such amendment shall become effective on the first day of the month in which Borrower obtains a Loan, after the date specified in the notice of amendment (which date shall be not less than thirty (30) days from the date

PK 10

the notice was mailed to Borrower), or upon such other date as may be required in accordance with applicable law. If Borrower obtains a Loan after the date specified in the notice, the changes in the fees and charges described in the amendment shall apply to all outstanding unpaid indebtedness and obligations under this Promissory Note, whether incurred or arising prior to, upon, or after the effective date of the amendment.

16. **NEGOTIABLE INSTRUMENT.** Borrower agrees that this Promissory Note shall be deemed to be a negotiable instrument, even though this Promissory Note may not qualify under applicable law, absent this paragraph, as a negotiable instrument.

17. **WAIVERS.** Borrower, and all parties to this Promissory Note, whether maker, indorser, or guarantor, waive presentment, demand, notice of dishonor and protest.

18. **EXTENSIONS OF MATURITY.** All parties to this Promissory Note, whether maker, indorser, or guarantor, agree that the maturity of this Promissory Note, or any payment due hereunder, may be extended at any time or from time to time without releasing, discharging, or affecting the liability of such party.

19. **NOTICES.** Any notice or demand required or permitted by or in connection with this Promissory Note, without implying the obligation to provide any notice or demand, shall be in writing at the address set forth below or to such other address as may be hereafter specified by written notice to Bank by Borrower. Any such notice or demand shall be deemed to be effective as of the date of hand delivery or facsimile transmission, one (1) day after dispatch if sent by telegram, mailgram, overnight delivery, express mail or federal express, or three (3) days after mailing if sent by first class mail with postage prepaid.

20. **ASSIGNABILITY.** This Promissory Note may be assigned by Bank or any holder at any time.

21. **JOINT AND SEVERAL LIABILITY.** If more than one person or entity is executing this Promissory Note as Borrower, all liabilities under this Promissory Note shall be joint and several with respect to each of such persons or entities.

22. **BINDING NATURE.** This Promissory Note shall inure to the benefit of and be enforceable by Bank and Bank's successors and assigns and any other person to whom Bank may grant an interest in Borrower's obligations to Bank, and shall be binding and enforceable against Borrower and Borrower's personal representatives, successors and assigns.

23. **INVALIDITY OF ANY PART.** If any provision or part of any provision of this Promissory Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Promissory Note and this Promissory Note shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality or unenforceability.

24. **MAXIMUM RATE OF INTEREST; COMMERCIAL LOAN.** Notwithstanding any provision of this Promissory Note to the contrary, Borrower shall not be obligated to pay interest hereunder in excess of the maximum rate of interest permitted by the laws of any state determined to govern this Promissory Note or the laws of the United States applicable to loans in such state. If any provision of this Promissory Note shall ever be construed to require the payment of any amount of interest in excess of that permitted by applicable law, than the interest to be paid hereunder shall be held subject to reduction to the amount allowed under applicable law, and any sums paid in excess of the interest rate allowed by law shall be applied in reduction of the principal balance outstanding under this Promissory Note. Borrower acknowledges that it has been contemplated at all times by Borrower that the laws of the Commonwealth of Pennsylvania will govern the maximum rate of interest that it is permissible for the holder of this Promissory Note to charge Borrower under this Promissory Note. Borrower warrants that this Promissory Note evidences a loan made solely to acquire or carry on a business or commercial enterprise.

25. **CHOICE OF LAW; CONSENT TO VENUE AND JURISDICTION.** This Promissory Note shall be governed, construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania, even if the Commonwealth of Pennsylvania rules governing conflicts of laws would otherwise require that the laws of another jurisdiction govern this Promissory Note. Borrower consents to the jurisdiction and venue of the courts of any city or county in the Commonwealth of Pennsylvania or to the jurisdiction and venue of the United States District Court for the Middle District of Pennsylvania in any action or judicial proceeding brought to enforce, construe or interpret this Promissory Note.

26. **UNCONDITIONAL OBLIGATIONS.** Borrower's obligations under this Promissory Note shall be the absolute and unconditional duties and obligations of Borrower and shall be independent of any rights of set-off, recoupment or counterclaim which Borrower might otherwise have against the holder of this Promissory Note, and Borrower shall pay absolutely the payments of principal, interest, fees, charges and expenses required hereunder, free of any deductions and without abatement, diminution or set-off.

27. **ACTIONS AGAINST BANK.** Any action brought by Borrower against Bank which is based, directly or indirectly, or in whole or in part, upon this Promissory Note or any matter related to this Promissory Note shall be brought only in the courts of the Commonwealth of Pennsylvania.

28. **WAIVER OF JURY TRIAL.** Borrower (by execution of this Promissory Note) and Bank (by acceptance of this Promissory Note) agree that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by Borrower, Bank, or any successor or assign of Borrower or Bank on or with respect to this Promissory Note or which in any way relates, directly or indirectly, to the obligations of Borrower to Bank under this Promissory Note, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. BORROWER AND BANK HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING. Borrower and Bank acknowledge and agree that this provision is a specific and material aspect of the agreement between the parties and that Bank would not enter into the transaction with Borrower if this provision were not a part of their agreement.

[SIGNATURES CONTAINED ON NEXT PAGE]

BS-3105A-9811 PAGE 4

PK 10

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned executes this Promissory Note under seal, as Borrower, as of the date first written above.

WITNESS/ATTEST*:

_CCI Construction Co. Inc_
(Name of Organization)

_7500 Old Gettysburg Rd_
(Street Address)

_Camp Hill, Pa 17011_
(City-State-Zip)

_717-909-4224    717-909-4460_
(Telephone)                              (Facsimile)

_E. M. Avery_

E. M. AVERY  ASSISTANT SECRETARY
(Print Name)

By: _Sheri Phillips, CFO_ (SEAL)
(Authorized Signature)

_Sheri Phillips, CFO_
(Print Name and Title)

By: _____ (SEAL)
(Authorized Signature)

_____
(Print Name)

_____
(Print Name and Title)

*NOTE: Attestation by a corporate officer of another corporate officer's capacity to sign is required in all corporate transactions.

If Borrower is an individual he or she should sign below:

WITNESS:

_____

_____ (SEAL)

(Print Name)

_____
(Print Name)

_____
(Street Address)

_____
(City-State-Zip)

_____
(Telephone)                              (Facsimile)

BS-3102A-9211 PAGE 5                                    PK 10

**EXHIBIT A**
**FILM/Cash Solutions Promissory Note**

Account Number: ___28864514___

Borrower: ___CCI Construction Company, Inc.___

The terms and provisions of the option checked below are incorporated in and made a part of the FILM/Cash Solutions Promissory Note executed by Borrower to which this Exhibit A is attached:

[X]     **FILM LOAN OPTION** - The following terms apply to this option:

    i)      Maximum Line Amount  -  ___$4,000,000.00___

    ii)     Minimum Loan Advance  -  $0.01

    iii)    Incremental Advance Amount  -  ___$1.00___

    iv)     Target Balance  -  $___0___

    v)      Fees  -  ___0___

[ ]     **CASH SOLUTIONS PROTECTION OPTION** - The following terms apply to this option:

    i)      Maximum Line Amount  -  _____

    ii)     Minimum Loan Advance  -  $500.00

    iii)    Incremental Advance Amount  -  $500.00

    iv)     Target Balance  -  $_____

    v)      Fees  -  _____

[ ]     **CASH SOLUTIONS MAXIMIZER OPTION** - The following terms apply to this option:

    i)      Maximum Line Amount  -  _____

    ii)     Minimum Loan Advance  -  $500.00

    iii)    Incremental Advance Amount  -  $500.00

    iv)     Target Balance  -  $_____

    v)      Fees  -  _____

    vii)    Balance in Account is not transferred to investments until all Loans are paid in full.

[ ]     **CASH SOLUTIONS LOAN OPTION** - The following terms apply to this option:

    i)      Maximum Line Amount  -  _____

    ii)     Minimum Loan Advance  -  $500.00

    iii)    Incremental Advance Amount  -  $500.00

    iv)     Target Balance  -  $_____

    v)      Fees  -  _____

WITNESS/ATTEST:                                          BORROWER:

                                              ___CCI Construction Co., Inc.___

_____          By: ___[signature]___ CFO ___(SEAL)
                                         Name: ___Sheri Phillips___
                                         Title: ___CFO___

If Borrower is an individual he or she should sign below:

_____          _____(SEAL)
                                          Name: _____

# EXHIBIT B

 allfirst





$ _____ 1,200,000.00 _____          Date 11-8-99 _____

FOR VALUE RECEIVED, the undersigned, _CCI Construction Co., Inc._
a (corporation/partnership/limited liability company/individual) (the "Borrower"), jointly and severally (if more than one), promise
to pay to the order of ALLFIRST BANK, a Maryland state-chartered commercial bank (the "Bank") or its assigns, the principal
amount of ONE MILLION TWO HUNDRED THOUSAND & NO/100 DOLLARS
to be paid as follows:
Principal is payable on demand.

Interest is payable monthly, accrued to date of Bank's notice thereof,
with all accrued and unpaid interest, and unpaid fees and charges, due
with the principal payment.



Interest shall accrue at a rate per annum equal to the Bank's Base Rate minus .50000%
as in effect from time to time. The term "Bank's Base Rate," which is not
necessarily the lowest rate of interest charged by the Bank, is defined as the prime
rate of interest for loans established by the Bank from time to time.

Interest shall be calculated on the basis of the actual number of days elapsed and a year of 360 days. Both principal and
interest are payable in lawful money of the United States of America at any office of Bank in immediately available funds. If
any payment due hereunder is received by the Bank more than fifteen (15) calendar days after its due date, the Borrower
shall pay a late payment charge equal to five percent (5%) of the amount then due or $10.00, whichever is greater.

APPLICATION OF PAYMENTS. All payments made hereunder shall be applied first to late payment charges or other
sums owed to the Bank, next to accrued interest, and then to principal, or in such other order or proportion as the Bank, in
its sole and absolute discretion, may elect from time to time.

SECURITY. The payment of this note and any renewals, extensions and modifications thereof, and the payment,
performance and discharge of all other present or future indebtedness, obligations and undertakings (individual, joint,
several, direct, contingent, or otherwise) of the Borrower to or for the benefit of the Bank, whether arising directly to the
Bank under this note or under any other agreement, promissory note or undertakings now existing or hereinafter entered
by the Borrower to the Bank (collectively, the "Liabilities") is secured by the property described in, and under and pursuant
to the terms and conditions of that certain:
Collateral as set forth in a Security Agreement – Specific Collateral dated _11_ / _8_ / _99_.

As additional security for the Liabilities, Borrower grants the Bank a lien upon and a security interest in any securities,
instruments or other personal property of Borrower now or hereafter in Bank's possession and in any deposit balances now
or hereafter held by Bank for Borrower's account and in all proceeds of any such personal property or deposit balances.
Such liens and security interests shall be independent of Bank's right of setoff.

STATEMENT OF ACCOUNT. The Bank will furnish the Borrower with a statement of account on a periodic basis. Each
and every statement of account shall be final, conclusive and binding upon the Borrower in all respects as to the
outstanding balance of principal and as to all loans, fees, interest, charges, payments, receipts, balances, and all other
matters reflected therein unless the Borrower, within ten (10) days after the posting thereof in the United States mail, shall
give notice to the Bank in writing of any objections which the Borrower may have to any such statement of account; and
in such event, only those items expressly objected to in such written notice shall be considered to be disputed by the
Borrower and all other items shall be binding.

PAYMENT OF COSTS. In addition to the principal and interest payments specified above, the Borrower shall pay to the
Bank or any other holder of this note, upon demand, all costs and expenses (including reasonable attorneys' fees, whether
or not litigation is commenced) which may be incurred by the Bank or such holder in the collection or enforcement of this
note. Said costs shall include reasonable attorneys' fees and costs in bankruptcy proceedings and any costs and attorneys'
fees incurred for any action or proceeding in relation to the loan transaction, including but not limited to the joinder of
Bank in any action between the Borrower and a third party.

*DEFAULTS.* The Borrower shall be in default hereunder upon the occurrence of any of the following events: (a) the nonpayment when due of any amount payable on any of the Liabilities, or the failure of any Obligor to observe or perform any agreement of any nature whatsoever with the Bank (the term "Obligor" as used herein being meant to include the Borrower and all persons liable on the note or any renewals, extensions, or modification thereof, such as endorsers, sureties, or guarantors); (b) if any Obligor becomes insolvent or makes an assignment for the benefit of creditors, or if any petition is filed by or against any Obligor under any provisions of any law or statute alleging that such Obligor is insolvent or unable to pay debts as they mature; (c) the entry of any judgment against any Obligor or the issuing of any attachment or garnishment against any property of any Obligor or the occurrence of any change in the financial condition of any Obligor which in the sole judgment of the Bank is materially adverse; (d) the dissolution, merger, consolidation or reorganization of any Obligor, which is an entity such as a corporation, limited partnership, partnership or limited liability company; (e) the death of any Obligor who is a natural person; (f) any information heretofore or hereinafter furnished to the Bank by any Obligor in connection with the loan evidenced hereby or any suretyship or guaranty should be materially false; and (g) the failure of any Obligor to furnish such financial and other information as the Bank may reasonably request. If this Note is payable on demand, Bank's right to demand payment hereof shall not be restricted or impaired by the absence of, non-occurrence of or waiver of a default hereunder, and it is understood that Bank may demand payment at any time after giving borrower a 30-day written notice of demand.

*ACCELERATION AND ENFORCEMENT RIGHTS.* Whenever the Borrower shall be in default as aforesaid, (1) unless the Bank elects otherwise, the entire unpaid amount of such of the Liabilities as are not then due and payable shall become immediately due and payable without notice to or demand on any Obligor, and (2) the Bank may at its option exercise from time to time any or all rights and remedies available to it at law or in equity. The Borrower waives all right to stay of execution or garnishment and exemption of property in any action to enforce any of the Liabilities.

*JUDGMENT.* The Borrower does hereby authorize and empower any attorney of any court of record of Pennsylvania or elsewhere to appear for and enter judgment against Borrower for the above sum, with or without declaration, with costs of suit, including reasonable attorneys' fees and fees in bankruptcy proceedings, if any, release of errors, without stay of execution, and with fifteen (15%) percent added for collection fees, and the Borrower further agrees that real, personal or mixed property may be sold or garnished upon any writ of execution or writ of garnishment as now or hereafter provided by law or the Pennsylvania Rules of Civil Procedure governing the enforcement of judgments; and Borrower hereby waives and releases all relief from any appraisement, stay or exemption laws of any state now in force or hereafter enacted. If a copy hereof, verified by affidavit, shall have been filed in such proceeding, it shall not be necessary to file the original as a warrant of attorney. The Borrower (and each of them, if more than one) hereby waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of this warrant and power to confess judgment shall be deemed to exhaust this power, whether or not any such exercise shall be held by any court to be invalid, voidable or void, but this power shall continue undiminished and may be exercised from time to time as often as Bank shall elect until all sums due hereunder shall have been paid in full.

*WAIVERS.* The Borrower hereby, waives presentment, notice of dishonor and protest. The Borrower hereby waives and releases all errors, defects and imperfections of a procedural nature in any proceedings instituted by the Bank hereunder, as well as all benefit that might accrue to the Borrower by virtue of any present or future laws exempting any property, real or personal, or any part of the proceeds arising from any sale of such property, from garnishment, attachment, levy or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment. The Borrower agrees that any property, real or personal, that may be levied upon pursuant to any writ of execution or writ of garnishment issued on any judgment by virtue of this note, may be sold, in whole or in part, in any order desired by the Bank.

*HOLDERS IN DUE COURSE.* This note may be assigned by the Bank or any subsequent holder of this note at any time or from time to time. The Borrower hereby agrees that no subsequent holder of this note to whom the note was transferred for value shall be subject to any claims or defenses which the Borrower may have against a prior holder, all of which are waived as to such subsequent holder, and that all such subsequent holders shall have all of the rights of a holder in due course even though the subsequent holder may not qualify, under applicable law, absent this paragraph, as a holder in due course.

*MISCELLANEOUS.* Any failure of the Bank to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any other time. If the Borrower consists of more than one person, such persons shall be jointly and severally liable hereunder. The Borrower intends this to be a sealed instrument and to be legally bound hereby. This note shall inure to the benefit of and be enforceable by the Bank and its successors and assigns and be binding and enforceable against the Borrower, its legal representatives, successors and permitted assigns. All issues arising hereunder shall be governed by the laws of Pennsylvania without giving effect to choice of law rules.

CCI Construction Co., Inc.

WITNESS OR ATTEST:                                   BORROWER:

_____

_____           (Name of Individual, Corporation,
                                 Partnership or Limited Liability Company)

_____ (Seal)     By: _____ (Seal)
Name and Title                              Name and Title

_____ (Seal)     By: _____ (Seal)
Name and Title                              Name and Title

_____ (Seal)     By: _____ (Seal)
Name and Title                              Name and Title

_____ (Seal)     By: _____ (Seal)
Name and Title                              Name and Title

2500 Old Gettysburg Road Camp Hill, PA 17001
Address
_____

# EXHIBIT C

 allfirst

 EXHIBIT

SURETYSHIP AGREEMENT

under the $1,200,000 commercial loan note dated 11-8-99

Date 11-8-99

For value received, the Undersigned, jointly and severally, hereby unconditionally agree to make prompt payment of all obligations, indebtedness and liabilities due Allfirst Bank, a Maryland state-chartered commercial bank, hereinafter called "Bank," of any kind (whether now existing or hereafter arising) due or which may become due, whether by acceleration or otherwise, absolute or contingent joint or several, direct or indirect, secured or unsecured by CCI Construction Co., Inc.

hereinafter called "Borrower," all such obligations being hereinafter further described and collectively called the "Liabilities," and the Undersigned agree(s) to pay all expenses (including attorneys' fees and legal expenses, whether or not litigation is commenced) paid or incurred by the Bank in endeavoring to collect the Liabilities, or any part thereof, whether or not bankruptcy has been declared, and in enforcing this Suretyship Agreement. The liability of the Undersigned hereunder is a primary and direct obligation without regard to any other obligor or security or collateral held by the Bank.

The Undersigned hereby waive all notices of any character whatsoever with respect to this Suretyship Agreement and the Liabilities of the Borrower for which the Suretyship Agreement has been executed, including but not limited to notice of the acceptance hereof and reliance hereon and notice of default by the Borrower. The Undersigned hereby give consent to the Bank to the taking of, or failure to take, from time to time, without notice to the Undersigned, any action of any nature whatsoever with respect to the Liabilities of the Borrower, with respect to any rights against any person or persons, including the Borrower and any of the Undersigned, in any property, including, but not limited to, any postponements, compromises, indulgences, waivers, extensions, exchanges, releases, and satisfactions. The Undersigned shall remain fully liable on this Suretyship Agreement, notwithstanding any of the foregoing.

This Suretyship Agreement shall in all respects be a continuing, absolute and unconditional one, and shall remain in full force and effect (notwithstanding, without limitation, the death, incompetency or dissolution of any of the Undersigned or that at any time, or from time to time, all Liabilities may have been paid in full). This Suretyship Agreement is subject to discontinuance as to any of the Undersigned only upon actual receipt by the Bank of written notice from such Undersigned, or any person duly authorized and acting on behalf of such Undersigned, of the discontinuance hereof as to such Undersigned; provided, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such Undersigned hereunder with respect to (a) any and all Liabilities existing prior to the time of actual receipt of such notice by the Bank, (b) any and all Liabilities created or acquired thereafter pursuant to any previous binding commitments made by the Bank, (c) any and all extensions or renewals of any of the foregoing, (d) any and all interest on any of the foregoing, and (e) any and all expenses paid or incurred by the Bank in endeavoring to collect any of the foregoing and in enforcing this Suretyship Agreement against such Undersigned. All obligations of the Undersigned under this Suretyship Agreement shall, notwithstanding any such notice of discontinuance, remain fully in effect until all Liabilities not subject to an effective notice of discontinuance (including any extensions or renewals of any thereof) and all such interest and expenses shall have been paid in full. Any notice of discontinuance by or on behalf of any one of the Undersigned shall not affect or impair the obligations hereunder of any other of the Undersigned.

At the option of Bank, all Liabilities of Borrower shall become immediately due and payable by the Undersigned, without demand or notice, in the event any of the following shall occur: (a) Borrower shall fail to make any payment or meet any other liability when due; (b) Borrower or the Undersigned shall fail to observe or perform any obligation, term, condition or provision of Borrower under any document evidencing or securing the Liabilities, this Suretyship Agreement or any other agreement, document, certificate, instrument of security, suretyship or guaranty given by Borrower to Bank; (c) Any representation, warranty or certificate made or furnished by Borrower to Bank, in connection with the Liabilities or any other agreement, document, certificate, instrument of security, suretyship or guaranty given by Borrower to Bank or in any certificate, financial statement or separate assignment made hereunder shall be materially false; (d) Borrower or any of the Undersigned shall make an assignment for the benefit of creditors; (e) Proceedings in bankruptcy or for reorganization of Borrower or any of the Undersigned or for the readjustment of any of their debts under the Bankruptcy Act, as amended, or in any part thereof, or under any other act or law, whether state or federal, for the relief of debtors now or hereafter existing, shall be commenced by or against Borrower or the Undersigned; (f) A receiver or trustee shall be appointed for Borrower or any of the Undersigned or for any substantial part of their assets; or any proceedings are instituted for the dissolution, or the full or partial liquidation, of Borrower or any of the Undersigned; (g) Material adverse changes in the financial condition of the Borrower or any of the Undersigned; (h) A death of Borrower or any of the Undersigned or, if Borrower or the Undersigned is a partnership, the death of any general partner; or (i) Borrower or any of the Undersigned ceases doing business as a going concern.

As security for the Liabilities hereunder, the Undersigned hereby grants Bank a security interest in the following:
NONE

Together with a right, without demand or notice of any kind, at any time and from time to time when any amount shall be due and payable by the Undersigned hereunder and in such order of application as the Bank may elect, to set-off against all monies, deposits or other property of any kind, without limitation, owned by the Undersigned or in which the Undersigned has a joint or contingent interest and which are in possession of Bank for any reason whatsoever.

The Undersigned further agree that, if at any time, any part of any payment theretofore applied by the Bank to any of the Liabilities is or must be returned by the Bank for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Borrower), such Liabilities shall, for the purposes of this Suretyship Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Bank, and this Suretyship Agreement shall continue to be effective or be reinstated, as the case may be as to such Liabilities, all as though such application by the Bank had not been made. In such an event the Undersigned hereby waives any right of contribution, subrogation or indemnification against the Borrower, for a period of twelve (12) months subsequent to the last payment made or due to be made from Borrower to Bank.

The Bank may, from time to time, whether before or after any discontinuance of this Suretyship Agreement, at its sole discretion and without notice to the Undersigned (or any of them), take any or all of the following actions: (a) retain or obtain a security interest in any property to secure any of the Liabilities or any obligation hereunder; (b) retain or obtain the primary or secondary obligation of any obligor or obligors in addition to the Undersigned, with respect to any of the Liabilities; (c) extend or renew for one or more periods (whether or not longer than the original period), alter or exchange any of the Liabilities, or release or compromise any obligation of any of the Undersigned hereunder or any obligation of any nature of any other obligor with respect to any of the Liabilities; (d) release its security interest in, or surrender, release or permit any substitution or exchange for, all or any part of any property securing any of the Liabilities or any obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such property; and (e) resort to the Undersigned (or any of them) for payment of any of the Liabilities, whether or not the Bank shall have resorted to any property securing any of the Liabilities for payment of any of the Liabilities, or any obligation hereunder or shall have proceeded against any other of the Undersigned or any other obligor primarily or secondarily obligated with respect to any of the Liabilities.

Any amounts received by the Bank from whatsoever source on account of the Liabilities may be applied by Bank toward the payment of such of the Liabilities and in such order of application, as the Bank may from time to time elect; and, notwithstanding any payments made by or for the account of the Undersigned pursuant to this Suretyship Agreement, the Undersigned shall not be subrogated to any rights of the Bank until such time as this Suretyship Agreement shall have been discontinued as to all of the Undersigned and the Bank shall have received payment of the full amount of all Liabilities and of all obligations of the Undersigned hereunder. The Bank shall not be obligated under any theory of law relating to the marshalling of payment received or security interest granted under the terms of this Suretyship Agreement

CE-128-1                                                                                                    6/99

The Bank may, from time to time, ⋯ before or after any discontinuance of this Suretyship Agreement, without notice to the undersigned (or any of them), assign or transfer any or all of the Liabilities or any interest therein; and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Liabilities shall be and remain Liabilities for the purpose of this Suretyship Agreement and each and every immediate and successive assignee or transferee of any of the Liabilities or of any interest therein shall, to the extent of the interest of such assignee or transferee in the Liabilities, be entitled to the benefits of this Suretyship Agreement to the same extent as if such assignee or transferee were the Bank; provided, however, that unless the Bank shall otherwise consent in writing, the Bank shall have an unimpaired right prior and superior to that of any such assignee or transferee, to enforce this Suretyship Agreement for the benefit of the Bank, as to those of the Liabilities which the Bank has not assigned or transferred.

No modification or waiver of any of the provisions of this Suretyship Agreement shall be binding upon the Bank except as expressly set forth in a writing duly signed by each of the Undersigned and the Bank. No action of the Bank permitted hereunder shall in any way affect or impair the rights of the Bank and the obligation of the Undersigned under this Suretyship Agreement. For the purpose of this Suretyship Agreement, Liabilities shall include any invalidity or unenforceability of any such obligation and no such claim or defense shall alter or impair the obligations of the Undersigned hereunder.

*futher 1,200,000 commercial loan note dated 11-8-99 JMO OP*

The Liability of the Undersigned for Liabilities of Borrower incurred on or prior to the date hereof shall not exceed, at any time, the aggregate principal amount of **ONE MILLION TWO HUNDRED THOUSAND & NO/100 DOLLARS** ($ **1,200,000.00** ), plus interest as stated in the evidence of indebtedness given by Borrower to Bank and fifteen percent (15%) attorneys' commission; provided that this Suretyship Agreement shall also be applicable to and extend to any and all Liabilities, plus interest and costs as aforesaid, of Borrower arising after the date hereof even if the total of such Liabilities plus the Liabilities outstanding on or prior to the date hereof exceed the aforementioned aggregate principal amount. If no limitation is inserted in this paragraph, there is no limit to the liability of the Undersigned to the Bank.

The creation or existence from time to time of Liabilities in excess of any amount to which the right of recovery under this Suretyship Agreement is limited is hereby authorized, without notice to the Undersigned (or any of them), and shall in no way affect or impair the rights of the Bank and the obligation of the Undersigned under this Suretyship Agreement.

The Undersigned, jointly and severally, do hereby authorize and empower any prothonotary or clerk or attorney of any court of record of Pennsylvania or elsewhere, to appear for and confess judgment against any or all of the Undersigned in favor of Bank for the total liability of the Undersigned as set forth herein together with interest thereon, with or without declaration, with costs of suit, release of errors, without stay of execution or garnishment and with fifteen percent (15%) for collection fees, and waive the right of inquisition, and the benefit of all exemption laws now or hereinafter enacted, and agree to condemnation and the sale of real estate or personal property, or a writ of execution.

In the event the Bank acquires any property securing this Suretyship Agreement after a foreclosure sale as to real property or a public auction sale as to personal property, the Undersigned agrees to indemnify and hold the Bank harmless from any loss, costs, or expense which the Bank may sustain as a result of: (a) selling the real or personal property so acquired for less than the total sums owed by the Borrower to the Bank, provided, however, that any such sale by the Bank is done in a commercially reasonable manner or (b) any action brought against the Bank under §548 or §544(b) of the United States *Bankruptcy Code*, as amended, on the ground that the consideration paid by the Bank for the real or personal property was not "fair equivalent value," within the contemplation of §544(b) of the United States *Bankruptcy Code*, as amended, or any applicable state fraudulent conveyance act.

The Undersigned waive and release the Bank from any damages which the Undersigned may incur as a result of any intentional or unintentional or negligent action or inaction of the Bank impairing, diminishing, or destroying any of the Undersigned's rights of subrogation which the Undersigned may have upon payment of any of the Borrower's obligations. The Undersigned acknowledges previously having waived, under certain conditions, any such rights.

The Undersigned hereby agrees that this Suretyship Agreement shall apply to any obligation which the Bank may incur as the result of any payment to Bank by or on behalf of the Borrower which is determined to be a preference payment benefiting the undersigned.

*1,200,000 commercial loan note dated 11-8-99 JMO OP*

If a photostatic copy hereof shall have been filed in any of said proceedings, it shall not be necessary to file the original as a warrant of attorney. The foregoing warrant and power to confess judgment shall not be deemed to have been exhausted by any single exercise thereof, whether or not any such exercise shall be held by any court to be invalid, voidable or void, but may be exercised from time to time, as often as the Bank shall elect, until all sums payable that may become payable by each of the Undersigned have been paid in full.

A subsequent guaranty or suretyship by the Undersigned or any other guarantor or surety of the Borrower's Liabilities given to the Bank shall not be deemed to be in lieu of or to supersede or terminate this Suretyship Agreement but shall be construed to be additional or supplementary unless otherwise expressly provided therein; and in the event the Undersigned or any other guarantor or surety has given to the Bank a previous guaranty or Suretyship Agreement, this Suretyship Agreement shall be construed to be additional or supplementary, and not to be in lieu thereof or to terminate such previous Suretyship Agreement, guaranty or guaranties unless expressly so provided herein.

This Suretyship Agreement shall be binding upon the Undersigned, and upon the heirs, legal representatives, successors and assigns of the Undersigned, and to the extent that the Borrower or any of the Undersigned is an entity such as a partnership, limited partnership, limited liability company, corporation or any other similar entity, all references herein to the Borrower and to the Undersigned, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such entity. If more than one party shall execute this Suretyship Agreement, the term "Undersigned" as used herein shall mean all parties executing this Suretyship Agreement and each of them, and all such parties shall be jointly and severally obligated hereunder.

This Suretyship Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania without giving effect to choice of law rules. Wherever possible each provision of this Suretyship Agreement shall be interpreted in such manner as to be effective and valid under applicable law but if any provision of this Suretyship Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Suretyship Agreement.

INTENDING TO BE LEGALLY BOUND HEREBY, the Undersigned have set their respective hands and seals the day and year first above written.

WITNESS OR ATTEST:

(SURETY) **John M Ortenzio**

_____

Title _____     By: _____ (SEAL)
                                     Title:

Title _____     By: _____ (SEAL)
                                     Title

Title _____     By: _____ (SEAL)
                                     Title

# EXHIBIT D

LAW OFFICES

# GEBHARDT & SMITH LLP

NINTH, FLOOR
THE WORLD TRADE CENTER
BALTIMORE, MARYLAND 21202-3064

BALTIMORE    (410) 752-5830
WASHINGTON    (301) 470-7468

WRITER'S DIRECT DIAL NUMBER

(410) 385-5100
Writer's E-Mail Address
lgebh@gebsmith.com

FACS
4:01 385

E}

Refer To File No. 18610

February 24, 2000

*Via Facsimile and Federal Express*
4027 1282 2484

CCI CONSTRUCTION CO., INC.
2500 Old Gettysburg Road
Camp Hill, Pennsylvania 17011-7307

Attn:   John M. Ortenzio, President

RE:   $4,000,000 Unsecured Revolving Line Of Credit and
$2,000,000 Secured Equipment Purchase Line of Credit
Extended By Allfirst Bank To CCI Construction Co., Inc.

Dear Mr. Ortenzio:

This firm represents Allfirst Bank ("Lender"), which has extended to CCI Construction Co., Inc. ("Borrower") (a) a revolving line of credit in the maximum principal amount of $4,000,000 pursuant to a FILM/Cash Solutions Promissory Note dated March 24, 1999 ("Film Note") and related documents, and (b) a secured equipment purchase line of credit in the stated principal amount of $2,000,000 pursuant to a Commercial Loan Note ("Commercial Note") and a Security Agreement, both dated November 20, 1998, and related documents. This letter is being sent at the specific request and direction of the Lender.

As a result of the occurrence of various events which are materially adverse to the financial condition of the Borrower, and as a further result of the insolvency of the Borrower, the Lender hereby declares a default under the Commercial Loan Note and under the Security Agreement. In consequence of this declaration of default under the equipment purchase line of credit, the Lender hereby accelerates and declares immediately due and payable all sums presently outstanding and owing under the equipment purchase line of credit.

As a result of the default under the equipment line of credit, the Borrower is, in turn, in default under the cross-default provisions of Section 11 of the FILM Promissory Note, and the Lender hereby declares the default. In consequence of this default the Bank hereby accelerates and demands immediate payment of all sums presently due and owing under the FILM Promissory Note.

Because of the default under the FILM Promissory Note and the Bank's acceleration and demand for immediate payment of the sums due thereunder no further sums will be advanced under the revolving line of credit evidenced by the FILM/Cash Solutions Promissory Note, **effective immediately**  Any checks or other payments items in transit will not be honored by the Lender.

## GEBHARDT & SMITH

CCI CONSTRUCTION CO., INC.
February 24, 2000
Page 2

The total sums presently due and outstanding under the equipment purchase line of credit and the revolving line of credit, respectively, are as follows:

Equipment Purchase Line Of Credit
    Principal                                 $1,244,116.74
    Interest through February 23 2000    $    5,237.80
    Total                                 $ 1,249,354.54
    Interest per day thereafter: $231.54

Revolving Line Of Credit
    Principal                                 $2,601,514.01
    Interest through February 23, 2000    $   26,524.83
    Total                                 $2,628,038.84
    Interest per day thereafter: $596.18

As previously stated, the Lender by this letter is demanding immediate payment in full of all sums due and owing to it by the Borrower under both loans. Unless full payment is made by the Borrower immediately upon receipt of this letter, all remedies available to the Lender under applicable law will be pursued without further notice to the Borrower, including the institution of judgment by confession and the enforcement of the Lender's security interest.

This letter is not intended to be a waiver of any rights, remedies, or recourse available to the Lender, nor an election of remedies arising as a result of the defaults or of any other default which may now or hereafter exist with respect to the revolving line of credit and the equipment line of credit. The collection of interest or acceptance of partial payments (that is, less than the total amount due in accordance with the terms of the debt instruments) by the Lender shall not constitute an extension of the maturity date of the revolving line of credit or equipment line of credit or a waiver of the Lender's acceleration of the indebtedness evidenced by the respective debt instruments or of any other rights under the loan documents.

Very truly yours,

Lawrence J. Gebhardt

LJG/dls
cc:    Gerard L. Elias, SVP
         - ALLFIRST BANK
    Robert E. Chernicoff, Esquire
         - CUNNINGHAM & CHERNICOFF, P.C.

# Craig J. Schwartz

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
3  ALLFIRST BANK          :
4      Plaintiff    :
5    v.        :  CA NO. 1:CV-01-0786
6  JOHN M. ORTENZIO      :
7      Defendant    :  Pages 1 - 216
8          ----------
9
10
11
12      Deposition of Craig J. Schwartz
13        Baltimore, Maryland
14      Friday, February 15, 2002
15
16
17
18
19
20
21  Reported by:  Kathleen R. Turk, RPR-RMR

**Page 2**

1
2
3
4
5      February 15, 2002
6        10:17 a.m.
7
8  Deposition of Craig J. Schwartz held at the offices
9  of:
10
11
12    Blank, Rome, Comisky & McCauley, L.L.P.
13    250 West Pratt Street
14    Eleventh Floor
15    Baltimore, MD  21201
16
17
18  Pursuant to notice, before Kathleen R. Turk, RPR-RMR,
19  a Notary Public of the State of Maryland.
20
21

**Page 3**

1  APPEARANCES:
2
3    Gebhardt & Smith, L.L.P.
4    For the Plaintiff ALLFIRST BANK
5      The World Trade Center
6      401 East Pratt Street
7      Ninth Floor
8      Baltimore, MD  21202
9      (410) 385-5100
10  BY:  Lawrence J. Gebhardt, Esq.
11
12    Blank, Rome, Comisky & McCauley, L.L.P.
13    For the Defendant JOHN M. ORTENZIO
14      One Logan Square
15      Philadelphia, PA  19103-6998
16      (215) 569-5641
17  BY:  Edward I. Swichar, Esq.
18
19  Also Present:
20      John M. Ortenzio
21

**Page 4**

1
2        C O N T E N T S
3  EXAMINATION OF CRAIG J. SCHWARTZ BY:    PAGE:
4  MR. SWICHAR:          6
5  MR. GEBHARDT:        175
6  MR. SWICHAR:        192
7  MR. GEBHARDT:        207
8  MR. SWICHAR:        210
9        E X H I B I T S
10  SCHWARTZ DEPOSITION EXHIBITS:      PAGE:
11   1 Commercial Loan Note Line of Credit      6
12   2 Complaint          6
13   3 Fax to Nord from Gibson, 2/14/01      6
14   4 PA Commercial Loan Writeup        6
15   5 Memo to File from Schwartz, 11/4/99      6
16   6 Discussion Outline, 11/2/99      6
17   7 Commercial Loan Note Line of Credit      6
18   8 Letter to Ortenzio from Schwartz, 11/5/99  6
19   9 Accumulated Tran List        6
20  10 Memo to Gibson from Schwartz, 3/3/00      6
21  11 Borrower Rating Summary        6

1 (Pages 1 to 4)

# Craig J. Schwartz

Page 5

1    12  Letter to Phillips from Schwartz, 3/23/99  6
2    13  Letter to Ortenzio from Schwartz, 2/15/00  6
3    14  Charge-Off Memorandum                6
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 6

1    Thereupon,
2       CRAIG J. SCHWARTZ
3    A Witness, called for oral examination by counsel for
4    the Defendant, having been first duly sworn by the
5    Notary Public, was examined and testified as follows:
6               (Documents were premarked
7                by counsel Schwartz
8                Deposition Exhibit
9                Nos. 1 - 14.)
10      EXAMINATION BY COUNSEL FOR THE DEFENDANT
11   BY MR. SWICHAR:
12      Q  Good morning, Mr. Schwartz. My name is Ed
13   Swichar, attorney for the Defendant, John Ortenzio, in
14   this lawsuit.
15         We've never met. Have you ever been
16   deposed?
17      A  Yes.
18      Q  Approximately how many times?
19      A  Once.
20      Q  Was that in connection with your being a
21   loan officer for the bank?

Page 7

1       A  No.
2       Q  Personal matter?
3       A  Yes.
4       Q  Okay. Well, I'm going to ask you questions
5    involving this case that we're here for, and if at any
6    time you feel that you don't understand the question
7    or it needs clarification, please let me know.
8          Do not nod your head; you have to either say
9    yes or no or something verbal so the Court Reporter
10   can pick it up.
11         If at any time you want to leave to go to
12   the men's room or for any reason you want to take a
13   break, just let me know, okay?
14      A  Yes.
15      Q  Thank you.
16         Mr. Schwartz, would you be kind enough to
17   tell me your educational background?
18      A  I have a Bachelor degree from Pennsylvania
19   State University in Accounting.
20      Q  In Accounting.
21         And when did you obtain that degree?

Page 8

1       A  1980.
2       Q  Any subsequent degrees of any kind?
3       A  No.
4       Q  Okay. Did you attend any formal college
5    courses subsequent to your B.S. degree?
6       A  No.
7       Q  Any banking-type seminars?
8       A  Yes.
9       Q  For example, what kind of seminars and how
10   often did you attend in connection with your banking
11   responsibilities?
12      A  We're constantly attending seminars as they
13   relate to the -- all the aspects -- I shouldn't say
14   that -- as it relates to our job as far as lending,
15   credit, underwriting, documentation.
16      Q  Would you in bank parlance be called a
17   lender?
18      A  Yes.
19      Q  That's your responsibility?
20      A  Yes.
21      Q  Okay. Starting with your current employment

2 (Pages 5 to 8)

# Craig J. Schwartz

Page 9

1 background, could you describe for me by whom or what
2 you are employed, your title, and your
3 responsibilities, since -- from now going back to
4 1980?
5    A   I've been at Allfirst Bank for eighteen and
6 a half years.
7    Q   Can I stop you there?
8 Allfirst Bank, as it was originally known as
9 Dauphin Deposit?
10   A   And before that, Bank of Pennsylvania.
11   Q   Okay.  And when did it become Allfirst Bank?
12       MR. GEBHARDT:  For the record, because
13 the witness may be confused, it actually began as the
14 First National Bank of Maryland, which was historical
15 over the years, they converted to a state charter, and
16 for a short period they were known as FNB Bank, and
17 then it was changed to Allfirst Bank, all within that
18 one-year period of time.
19       So the witness --
20       MR. SWICHAR:  Okay.
21       MR. GEBHARDT:  That's why you may see

Page 10

1 on some documents First National, a Division of FNB
2 Bank, or something like that.
3    Q   (By Mr. Swichar) You were an employee of all
4 those entities, banking entities, that your attorney
5 just mentioned?
6    A   Yes.
7    Q   Beginning in 19-when?
8    A   1980.
9    Q   1980.
10       But your first job was with the -- this
11 bank?
12   A   No, my first job was with a public
13 accountant --
14   Q   Okay.
15   A   -- from 1980 until 1983.
16   Q   Okay.  And then in 1983, where did you go to
17 work?
18   A   Bank of Pennsylvania, which was a bank that
19 Dauphin Deposit had purchased.
20   Q   Okay.  Describe for me going forward your
21 titles and banking responsibilities as a banker, as a

Page 11

1 lender.
2    A   Beginning when?
3    Q   Beginning with the first -- with your first
4 job with the bank.
5    A   I was a credit analyst, reviewed financial
6 statements, prepared loan writeups for commercial loan
7 officers.
8        The best I can recall, I did that for
9 approximately three years.
10       Then I was promoted and became the Manager
11 of the Credit Department.
12   Q   What was the approximate year when that
13 occurred?  Approximately.
14       What all did you do?
15   A   1985?
16   Q   Okay.  That was a question; the voice went
17 up.
18   A   I was Credit Department Manager then for a
19 year and a half to two years.  Then I became a junior
20 lender in the Small Business Lending Unit for another
21 year.  And after that, then, was into the commercial

Page 12

1 lending area, middle market lending.
2    Q   Is that what you are in now?
3    A   Yes.
4    Q   When did you go into the commercial middle
5 market lending area?
6        And by the way, that's as a Vice-President?
7    A   No, that was first as an Assistant
8 Vice-President.
9    Q   Okay.  When did you enter that area of
10 banking?
11       Approximately.
12   A   1986, '87.
13   Q   Okay.  When did you grow to be a
14 Vice-President in that area?
15   A   I don't remember.
16   Q   Okay, but that's your current position?
17   A   Yes.
18   Q   What are your duties and responsibilities in
19 that -- as Vice-President in that area?
20   A   To maintain my existing lending portfolio,
21 generate new business for the bank, refer other

3 (Pages 9 to 12)

# Craig J. Schwartz

Page 13

1  business to the bank, other areas of the bank.
2      Q   As part of your responsibilities, do you
3  periodically evaluate your portfolio?
4      A   I don't understand what you mean.
5      Q   Well --
6      A   Do I --
7      Q   -- you indicated that your responsibility is
8  basically to maintain and attract clients.
9      A   Yes.
10     Q   But with respect to your existing or new
11 clients, do you have any other duties, such as
12 evaluating the financial, your financial relationship
13 with those clients to determine if the loans are still
14 viable, to evaluate clients to determine if new loans
15 should be made if requested by your clients?
16     A   Okay.  First, we do review financial
17 information on our clients as it is requested by the
18 bank or agreed to in any loans that may be outstanding
19 by the customer at the time.
20         The terms and conditions of the loan
21 determine, determine that.

Page 14

1      Q   Is there a procedures manual that guides you
2  as to when and how and how often to evaluate a
3  particular loan portfolio?
4      A   Not that I'm aware of.
5      Q   Okay.  Is that within your discretion, then?
6      A   No, not in my discretion.  It's part of the
7  review, part of the review process of each loan that
8  we have on the books or what is the -- under what
9  conditions each loan was approved and are we to review
10 these financial statements on a periodic basis.
11     Q   What guides you in determining whether or
12 not there should be a review or a periodic review or
13 an interim review?
14     A   The credit approval process of the bank.
15     Q   What is that?
16         I don't understand.
17         Assume that a loan has already been
18 approved.  What determines in your discretion how
19 often or how you should evaluate that particular loan
20 relationship?
21     A   On loans that as part of the credit approval

Page 15

1  process determine that the loans are to be reviewed on
2  a periodic basis as far as when financial statements
3  are provided, are to be provided to the bank by the
4  customer, that's how often those get, get reviewed.
5      Q   How is that determined?
6      A   Those in charge of approving the loan
7  usually determine how often that we want to receive
8  financial information.
9      Q   Is that you?
10     A   No.
11     Q   You don't approve the loan?
12     A   I have no lending authority.
13     Q   Okay.  Who has the -- let's say in 1999 and
14 in 2000, 2001 -- who had the lending authority with
15 whom you would be related?
16     A   Depending -- how much would the loan be?
17         It varied depending on how much the, the
18 loan would be to a customer.
19     Q   Someone above you would determine how often
20 to evaluate a loan or review a loan relationship?
21     A   Yes.

Page 16

1      Q   And that would be a person who had the
2  initial lending authority?
3      A   Yes.
4      Q   Now, even though you didn't have the lending
5  authority, you basically were the point man, the
6  relationship officer, with the customer?
7      A   Yes.
8      Q   Okay.  Did you have any input at all in the
9  loan approval process?
10     A   What do you mean by input?
11     Q   Was your input requested by those who had
12 the authority?
13     A   I prepared what would be the approval -- I
14 would start the approval process from the customer and
15 gather up the information required for them to approve
16 the loan.
17         That would be my input.
18     Q   You described yourself as a middle market
19 lender.
20         What is a middle market lender?
21     A   Middle market is the way the bank clarifies,

# Craig J. Schwartz

Page 17

1 classifies how much, what type of customers I am
2 supposed to be lending to or trying to attract to the
3 bank determined by sales volume of the customer and
4 also by the amount of money to be borrowed by the
5 customer.
6    Q  Are there parameters?
7    A  Not in writing; just ball park numbers that
8 have been determined.
9    Q  What would be ball park numbers?
10     Are they ball park numbers related to a
11 borrower's revenues, or a borrower's loans to be, or
12 something else?
13    A  A little of both.
14    Q  If someone came to you with a certain
15 request for a certain number, would it have to fall
16 within your authority, or would you refer it somewhere
17 else?
18     In other words, I'm just trying to figure
19 out --
20    A  If it fell within my authority that I'm
21 supposed to be doing, I would end up keeping that.

Page 18

1     Otherwise, I would have referred it out.
2    Q  Excuse me, let me go through the back door.
3     CCI Construction was a middle market
4 borrower?
5    A  Yes.
6    Q  What made it a middle market borrower?
7    A  Their revenue level and the amount of loans
8 that they had on the books.
9    Q  What was that revenue level?
10    A  Well, it was, it was -- it would be less
11 than a hundred and fifty million dollars.
12    Q  Per year?
13    A  Yeah.
14    Q  Okay.  And how about a loan on the books?
15    A  Well, anything less than about thirty
16 million dollars would fall into the middle market
17 area.
18    Q  Okay.  Going back to 1999, 2000, tell me
19 your business relationship with Michael Zarcone.
20    A  I really don't -- I don't recall what
21 Michael's title was at that time.

Page 19

1     He would have -- I think he would have been
2 my boss' boss; senior, senior lender in
3 Pennsylvania -- senior commercial loan -- senior
4 commercial lender in Pennsylvania.
5    Q  All right, let's go back.
6     Who was your boss?
7    A  Daryl Myers.
8    Q  Okay.  Did Daryl Myers have authority to
9 make loans?
10    A  Up to a dollar limit, yes.
11    Q  What was that dollar limit?
12    A  I don't recall.
13     I believe -- no, I, I don't know.  I would
14 have to guess.
15    Q  Okay.  So Daryl Myers was your immediate
16 boss?
17    A  Yes.
18    Q  Would you have daily contact with him?
19    A  Yes.
20    Q  Okay.  For what purpose would you have daily
21 contact with him?

Page 20

1    A  Normal day-to-day operations.
2    Q  Okay.  How about Michael Zarcone?
3     He was above Daryl Myers?
4    A  Yes.
5    Q  How did his job responsibilities differ from
6 Daryl Myers?
7     I mean, why would Daryl Myers go to Michael
8 Zarcone, is another way of asking?
9    A  Daryl would not have sufficient lending
10 authority.
11     Daryl would report to Michael on what's
12 going on in the, the bank's area or in the unit that
13 he's in charge of.
14    Q  How about Jim Trout?
15    A  Jim Trout was a credit officer at that time.
16 He -- his main focus was to, to -- for credit
17 approval, approval of credits.
18    Q  Was he above or below you -- I'm not clear
19 on that -- or equal?
20    A  I did not report to him.  I had to go to him
21 for credit approval.

**Esquire Deposition Services**

# Craig J. Schwartz

Page 21

1    The credit area is separate from the lending
2 function.
3    Q    Explain to me the difference.
4    A    Jim Trout as part of the credit area had no
5 sales focus for the bank, was strictly credit,
6 approving, reviewing credit.
7    Q    When you say reviewing credit, is that
8 different than reviewing whether loans should be
9 granted, or is that the same thing?
10    A    That's the same thing.
11    Q    Okay. Is he a numbers cruncher?
12    A    No, no.
13    Q    Well, it's not clear to me what he did for a
14 living, or does.
15    A    The writeup, the loan fact sheet, the
16 spreadsheets of the financial statements of customers
17 that are packaged together, he receives that package
18 from me to review and makes a decision as far as
19 granting or not granting any loans.
20    Q    And how does that differ from Mr. Zarcone or
21 Mr. Myers?

Page 22

1    Let me strike that, okay? Let's get to the
2 heart of this.
3    If I came to you in 1999 and had the
4 greatest financials in the world and I wanted to
5 borrow from the bank -- I came to you personally -- a
6 million dollars. What would be the process?
7    A    I would prepare what I'd need to present the
8 loan. I would give it to my boss for his review.
9    Q    Your boss being Mr. Myers?
10    A    Correct.
11    Q    Okay.
12    A    If the loan was above his authority, he
13 could then go to Mr. Trout and/or Mr. Zarcone for
14 approval of that loan.
15    Q    That's it?
16    A    It could go -- could have gone higher than
17 that, to Mr. Shannon.
18    That's -- in real basic, that's what
19 happens.
20    Q    Okay. Mr. Myers is still at the bank?
21    A    Yes.

Page 23

1    Q    Mr. Zarcone is not with the bank?
2    A    Correct.
3    Q    What were the circumstances of his leaving?
4    A    I have no idea.
5    Q    You don't know if he was asked to leave?
6    A    I have no idea.
7    Q    Mr. Gibson; what was your relationship with
8 Mr. Gibson in 1999, 2000?
9    A    Jamin?
10    Q    Yes.
11    When would you involve yourself with him?
12    A    When there is a problem situation with a
13 loan.
14    Q    And Mr. Gibson --
15    MR. GEBHARDT:  Just for clarification,
16 are you talking when he would involve himself in 1999,
17 or when would he involve himself today?
18    I think there's a difference.
19    Q    Well, the question was 1999 and 2000.
20    If there's a difference between 1999 and
21 2000, let me know.

Page 24

1    MR. GEBHARDT:  Not to beat around the
2 bush, Mr. Gibson had a different job --
3    MR. SWICHAR:  I appreciate that.
4    MR. GEBHARDT:  He had a different job.
5    MR. SWICHAR:  I understand that -- I
6 knew that, actually.
7    MR. GEBHARDT:  Okay.
8    Q    (By Mr. Swichar) In the year 2000, beginning
9 with January 1, 2000, Mr. Gibson worked in the
10 Baltimore office of the bank?
11    A    No, he worked in Harrisburg.
12    Q    He worked in Harrisburg, all right.
13    What would be your relationship -- what was
14 his job in relation to your job?
15    A    His job is special credits that repayment of
16 bank -- of the loans made to customers may be
17 questionable. We would get him involved and his
18 expertise on the situation.
19    Q    In early 2000, was he in what bankers would
20 call workout?
21    A    Yes.

**Esquire Deposition Services**

## Craig J. Schwartz

Page 25

1    Q   Okay.  Workout really means either work out
2  or do what you got to do to call the loan, right?
3        But they call it workout, work out the
4  bank's problem?
5    A   Yes.
6    Q   Okay.  How about Mr. Gerard Elias?
7        What was your business relationship with him
8  in, let's say as of January 1, 2000?
9    A   Well, he was Jamin's boss.
10   Q   Where -- was he in Harrisburg?
11   A   No, he's in Baltimore.
12   Q   He's in Baltimore?
13   A   Yes.
14   Q   And what did he do for a living?
15   A   He was the manager of the workout area of
16  the bank.
17       I believe he would get called in when -- at
18  Jamin's request, not my request.
19   Q   Okay.  Let's now talk about CCI
20  Construction.
21       That was your borrower, so to speak?

Page 26

1    A   Yes.
2    Q   When did CCI Construction come to you and
3  become your -- develop its relationship with the bank?
4        Do you recall?  If you don't, why don't I
5  just see if I can help you, perhaps.
6        I'm going to show you what has been marked
7  for identification as Exhibit S-1, or Schwartz 1.  I
8  don't know if I spelled your name right on there; if I
9  didn't, I apologize.
10   A   Looks correct.
11   Q   Good.
12       In going through the records that were
13  furnished to me, Mr. Schwartz, this appears to be the
14  first note or loan transaction that CCI had with the
15  bank, then Dauphin Deposit Bank.
16       Does this refresh your recollection, or is
17  my presumption inaccurate?
18   A   I don't recall this.
19       CCI was a customer of the bank before I
20  became its relationship manager, loan officer.
21   Q   Okay.  What was the relationship when you

Page 27

1  developed your relationship or had a relationship with
2  CCI Construction?
3        What year was that?
4    A   I don't recall when that was.
5    Q   Do you recall what the credit relationship
6  was, the loan relationship, the amount that was owed,
7  any notes outstanding, when the bank came to -- when
8  Mr. Ortenzio and CCI came to you as a borrower?
9    A   They were a customer of the bank, and I
10  don't recall the circumstance why --
11   Q   What did you inherit?
12   A   -- when they became that.
13   Q   What did you inherit is another way of
14  asking the question.
15   A   I don't recall.
16   Q   No recollection at all?
17   A   No.
18   Q   It wasn't originally four million dollars,
19  was it?
20   A   I don't recall.
21   Q   Okay.

Page 28

1        MR. SWICHAR:  Well, I want the record
2  to reflect, with Mr. Gebhardt here, that the earliest
3  relationship document I have is S-1.  If there is
4  anything earlier, I would appreciate receiving it.
5        We can do that at lunch.
6        MR. GEBHARDT:  You've got the same
7  problem as we have.
8        MR. SWICHAR:  I know, because I think
9  this is the earliest one I could find.
10       MR. GEBHARDT:  There was something
11  referring to -- in '92 -- saying they had been a
12  customer since 1990, a letter of recommendation,
13  but --
14       MR. SWICHAR:  Okay.  This is at least
15  one of the earliest, we can agree to that?
16       MR. GEBHARDT:  Yeah.
17   Q   (By Mr. Swichar) I'm going to show you a
18  copy of the Complaint that's been filed in this
19  lawsuit, and I'll be referring to the various exhibits
20  that were attached, Mr. Schwartz.
21       And if you turn to Exhibit A, there is a

7 (Pages 25 to 28)

# Craig J. Schwartz

Page 29

1 four million dollar promissory note, apparently signed
2 by CCI in favor of the bank.
3      Do you recall this note? And this note is
4 dated March 24, 1999.
5   A   Yes.
6   Q   Okay. Were you involved in the process that
7 led to this note?
8   A   Yes.
9   Q   Can you explain to me how this note came
10 about?
11      Did someone come into the bank and ask you
12 for it, more money, or what? What's your
13 recollection?
14   A   It would appear that as a result of Dauphin
15 Deposit and the merger between First National Bank of
16 Maryland came about, this FILM Cash Solutions
17 Promissory Note, was a replacement document for a
18 loan -- for a line of credit note that was previously
19 issued by Dauphin Deposit.
20   Q   Let me stop you there.
21      Was it in the same amount or a lesser

Page 30

1 amount?
2   A   That, I don't recall.
3   Q   Okay. This was a substitute note?
4   A   Yes.
5   Q   But you do not recall if this was the result
6 of a request for increased credit facility?
7   A   Not just by looking at the note, I can't
8 determine that.
9   Q   Okay. Well, we'll show you some more
10 documents later, but let's keep that in the back of
11 our minds.
12      This is an unsecured, Exhibit A of the
13 Complaint?
14   A   Yes.
15   Q   Do you recall any of the approval process in
16 connection with this note off the top of your head?
17   A   No, I don't.
18   Q   Was this considered part of a long-term loan
19 between the bank and CCI?
20      This was part of a long existing --
21 preexisting relationship that was intended to go

Page 31

1 forward, in contrast to a short-term?
2   A   Well, these lines of credit are only
3 approved for a year at a time, so every year it has to
4 be renewed.
5   Q   Umh-humh.
6      And had it been renewed in prior years?
7   A   I believe so.
8   Q   If I told you that the four million dollar
9 note of March 24, 1999, was the eventual outgrowth of
10 the six hundred thousand dollar note of S-1 that goes
11 back to 1992, would that refresh your recollection?
12   A   No, but that seems reasonable.
13   Q   So this was a long-term relationship?
14   A   Since 1992.
15   Q   At least?
16   A   At least.
17   Q   Okay. And the four million dollar note was
18 a note that in some form, in some amount, continued to
19 grow and be renewed as of -- at least beginning in
20 1992 through March, 1999?
21      I'm just trying to establish --

Page 32

1   A   Apparently.
2   Q   Okay. Now, to further refresh your
3 recollection, it's my understanding that in 1999, at
4 least, CCI had two accounts at the bank, a checking
5 account and a payroll account; is that correct?
6   A   It sounds correct.
7   Q   And there was also something called a cash
8 management facility; is that correct?
9   A   Yes.
10   Q   And where would CCI's revenues or business
11 deposits be deposited?
12      In the checking account?
13   A   Yes.
14   Q   Okay. Now, if you look at that Complaint,
15 if you turn to Paragraph 7 -- and just take a moment
16 and read it to refresh your recollection, and then I'm
17 going to ask for some clarifications.
18      (Witness reading.)
19   A   Okay.
20   Q   Now, this describes correctly the
21 relationship or the procedural relationship between

8 (Pages 29 to 32)

# Craig J. Schwartz

Page 33

1  the checking and the payroll account on one side and
2  the cash management facility on the other; is that
3  right?
4      Am I putting it the right way?
5  A  I didn't --
6      MR. GEBHARDT: Objection.
7  Q  Does this accurately describe the way the
8  cash management facility worked?
9  A  Yes.
10  Q  Okay. Is my understanding correct that
11  CCI's deposits would be deposited in the checking
12  account first? Is that right?
13  A  Yes.
14  Q  Okay. And each day, the bank would then
15  draw from the line of credit to pay any negative
16  balance on the checking account; is that correct?
17  A  Yes.
18  Q  All right. How -- when would that occur?
19  How often would that occur?
20  A  I believe that occurs once a day.
21  Q  Okay. What time of the day does that occur?

Page 34

1  A  I believe it's after bank hours, banking
2  hours.
3  Q  So the bank after hours, daily, would draw
4  from the line of credit to cover any checks that were
5  written by CCI that day?
6  A  For any checks that were presented for
7  payment on CCI's behalf that day.
8  Q  That's correct. That's a much better way of
9  saying it.
10      Now, the bank conversely, if you will, would
11  on a daily basis sweep from the checking account any
12  business deposits and apply it as a credit to pay down
13  the four million dollar line of credit; is that
14  correct?
15  A  Yes.
16  Q  Okay. And that would occur on a daily
17  basis?
18  A  Yes.
19  Q  And that would occur after hours?
20  A  Yes.
21  Q  Okay. And would you review that process

Page 35

1  daily to determine --
2  A  No.
3  Q  How often would you review that process to
4  determine basically what's been drawn down and what's
5  been swept?
6      Let me ask you first, is that your
7  responsibility?
8  A  No.
9  Q  Who -- whose responsibility was that?
10  A  I don't know whose responsibility that is.
11  Q  Well, would someone at the bank -- maybe you
12  can't identify them, but would someone at the bank
13  have a responsibility to review on any periodic basis
14  the activity in the cash management facility relating
15  to CCI?
16  A  I don't understand the question.
17  Q  There's activity relating to the cash
18  management facility on a daily basis, we've
19  established that.
20  A  Yes.
21  Q  Did anyone at the bank monitor that to

Page 36

1  determine, for example, the draws on the line and the
2  credits against the line of credit -- against the
3  line?
4  A  Not on any predetermined schedule.
5  Q  Well, my question is did anyone do it, first
6  of all.
7      My next question is going to be who would
8  have done that, what department, and would you have
9  ever done that.
10      That's a three-part question, there's an
11  objection, so I'll take it apart.
12      Would you -- do you know anyone at the bank
13  who would periodically on some schedule, sporadic or
14  otherwise, review the activity of CCI's cash
15  management facility?
16  A  Yes.
17  Q  And who or from what department at the bank
18  would do that?
19  A  It could be from the Cash Management
20  Department to the Deposit Operations, to the Credit
21  Department, and possibly even myself if the need would

9 (Pages 33 to 36)

# Craig J. Schwartz

Page 37

1  arise.
2      Q   You said there's a Cash Management
3  Department.
4          Is it their responsibility to review cash
5  management activity for the accounts?
6      A   They are the ones that put the transactions
7  through on a daily basis, so if that's considered
8  review, then that's what their job is.
9      Q   Well, for example, would someone sit at a
10  computer desk and review the activity?
11      A   No. I think the computer does it
12  automatically. They -- as far as checks being
13  presented for payment and any draws off the line
14  happens automatically.
15      Q   But would anybody review what the computer
16  did automatically; look at a screen and say, this is
17  what the computer did?
18          I'm trying to figure out, Mr. Schwartz, and
19  I'm not trying to trick you or be cute, but you have
20  major transactions going in and out of the cash
21  management facility. Somebody at the bank -- correct

Page 38

1  me if I'm wrong -- had to be reviewing that -- like,
2  for example, suppose CCI went over the four million
3  dollar line of credit; someone had to be reviewing
4  this.
5          Am I right?
6      A   If that occurs, a flag comes up, and it --
7  the checks that are there that would have put it over
8  the four million dollar line of credit would come up
9  as NSF on our system.
10      Q   Is that the only time somebody would review
11  it?
12      A   No.
13      Q   When would someone review the daily
14  activity, or the activity in the cash management
15  facility on a periodic basis, whatever that basis may
16  be?
17      A   When the loan's coming up for review, our
18  Credit Department may look at that.
19      Q   When would you look at it?
20          What would prompt you to look at it, and how
21  often would you look at it?

Page 39

1      A   I would be prompted to look at it at a
2  request of the borrower to take a look if there was a
3  problem. If somebody in the bank indicated there was
4  a problem, I would review it.
5          Other than that, I wouldn't review it,
6  unless there would be a problem -- a problem would
7  be -- would come up.
8      Q   So even though CCI is your borrower, so to
9  speak, you would not review periodically the activity
10  to determine what's happening with the cash management
11  facility, what's happening with the four million
12  dollar line of credit?
13      A   That's correct.
14      Q   And no one at the bank would unless there's
15  a problem?
16      A   That, I don't know who else would review it.
17      Q   Is there any procedures manual at the bank
18  that predetermines who reviews activity in a cash
19  management facility and/or how often?
20      A   I don't know.
21      Q   Does the bank have a procedures manual?

Page 40

1      A   I don't know.
2      Q   You've never looked at one if there is one?
3      A   That's correct.
4      Q   You don't recall ever seeing one?
5      A   Yes.
6      Q   There's no book of guidelines on when you
7  could, for example, make a loan, when you can call a
8  loan, when you -- what you should do about guarantees,
9  et cetera, et cetera?
10          There's no book that provides guidelines for
11  that to lenders?
12      A   A book of guidelines? A policy manual?
13      Q   Well, I don't know what your bank calls it
14  because I've never been there, never had the
15  opportunity to review it.
16          Is there a policy manual -- tell me what,
17  what manuals you have on your desk or utilize in
18  relation to your job. Let's put it that way.
19      A   Well, right now, everything's in the
20  computer. I don't have any manuals.
21      Q   Well, how about in 1999 and 2000?

# Craig J. Schwartz

Page 41

1    Was everything in the computer, or did you
2  have manuals?
3    A  I don't recall at that point if we had
4  manuals or it was all on the computer.
5    Q  Do you have any old manuals laying around?
6    A  Not anymore I don't.
7    Q  You tossed them?
8    A  I was told to give them back, and somebody
9  got rid of them.
10    Q  When was that?
11    A  When Allfirst took over.
12    Q  Okay.  They told you to get rid of them?
13    A  We were to resubmit them.
14    Q  And were new ones ever provided?
15    A  Everything was on the computer.
16    Q  Okay.  What is on the computer that would
17  help me as a lender determine when and what guidelines
18  to follow in the making of a loan?
19    A  Would you restate that?  Ask --
20        MR. SWICHAR:  Would you read that back,
21  please?

Page 42

1        (Question was read by the Reporter.)
2    A  What kind of loan?
3    Q  (By Mr. Swichar) A loan that would have gone
4  to CCI.
5    A  I don't recall there's any specific policy
6  to lending to CCI and the business they were in as a
7  general contractor.
8    Q  Not as a general contractor, but -- I don't
9  want to limit it to that, please understand.
10      Is there anything on your computer that
11  provides guidelines or procedures for the granting of
12  a loan to a company of the size of CCI or of a loan of
13  the size made to CCI?
14      Any guidelines or procedures?
15    A  I don't specifically recall.
16    Q  Well, if someone came into the bank in 1999
17  or 2000 and wanted a loan, four million dollar line of
18  credit, commercial, is there anything on the computer
19  that you would look at to guide you?
20    A  No.
21    Q  Why do you say no?

Page 43

1    A  I've had experience doing this, and those
2  that are going to end up approving the loan have
3  experience doing that.
4    Q  Assuming you didn't have experience, is
5  there anything on your computer that you would be able
6  to look at to guide you?
7    A  I don't know.  It's been quite some time
8  that I've taken a look at that.
9    Q  Okay.
10        MR. SWICHAR:  Well, if there are any
11  loan guidelines that are computerized, I'm making a
12  request for them.
13        MR. GEBHARDT:  I don't know that such,
14  such a thing exists.  I strongly doubt it.
15        And, you know, we've produced what
16  we're going to produce.
17        MR. SWICHAR:  I don't know what that
18  means, but I would frankly be shocked if there are no
19  either computerized or -- documents or a manual which
20  would provide procedures and guidelines to a loan
21  officer for the granting of loans.

Page 44

1        I would, frankly, be shocked, but maybe
2  not with this bank, perhaps.
3    Q  (By Mr. Swichar) Are there any guidelines or
4  procedures either in a manual or on the computer that
5  deal with the process of a cash management facility?
6    A  I don't know.
7        MR. SWICHAR:  I'm making the same
8  request, if there are any manuals or computerized
9  documents that provide guidelines or procedures
10  dealing with a cash management facility.
11        MR. GEBHARDT:  And I have the same
12  response.
13        And I think this is something that's
14  already been taken up with the judge and ruled upon,
15  and our response is as it was before, we complied with
16  the Court Order.
17        MR. SWICHAR:  And I'm making a new
18  request.
19      Are you refusing to produce them?
20        MR. GEBHARDT:  I am, basically, if
21  that's what you would like to interpret, yes.

# Craig J. Schwartz

Page 45

1    MR. SWICHAR: I'm not interpreting it.
2 I'm taking it as a no because you're saying --
3    MR. GEBHARDT: Taking it as --
4    MR. SWICHAR: I've made a new request.
5    MR. GEBHARDT: Well --
6    MR. SWICHAR: And the answer is you're
7 not going to produce them because it's not in the
8 Court Order.
9    MR. GEBHARDT: Exactly.
10    MR. SWICHAR: Okay. We'll take that up
11 with the judge, too.
12    Q    (By Mr. Swichar) Does the bank have any
13 manuals or computerized records that deal with the
14 procedures and guidelines for providing multiple loans
15 or multiple facilities to the same borrower?
16    A    Not that I'm aware of.
17    Q    Is it possible they're in the computer?
18    A    I highly doubt that.
19    MR. SWICHAR: I'm going to ask again
20 for the bank to look into that, and if there are any
21 such computerized records or manuals, I'm requesting

Page 46

1 it.
2    And I understand you're providing the
3 same answer, which is a negative.
4    Q    (By Mr. Swichar) Does the bank have any
5 computerized records or manuals which deal with
6 obtaining or requesting guarantees from borrowers?
7    A    Not that I'm aware of.
8    MR. SWICHAR: Same request; same
9 negative response.
10    Q    (By Mr. Swichar) Does the bank have any
11 computerized records or manuals that provide
12 guidelines or procedures that deal with the
13 declaration of defaults on loans?
14    A    Not that I'm aware of.
15    MR. SWICHAR: Same request; same
16 negative response.
17    Q    (By Mr. Swichar) Does the bank have any
18 computerized guidelines or manuals that deal with the
19 bank's freezing of bank accounts, such as checking
20 accounts and/or bouncing checks or dishonoring checks?
21    A    Not that I'm aware of.

Page 47

1    MR. SWICHAR: Same request.
2    Mr. Gebhardt, let me make it clear that
3 I would at least like to know before we go to the
4 judge if these documents or computerized or otherwise
5 exist. If, obviously, they don't exist, there would
6 be no reason to go to the judge. But if you are
7 refusing in the first place to not even check out to
8 see if this exists, then I'd like to know that.
9    MR. GEBHARDT: Well, first of all, such
10 documents were not requested by the Defendant in this
11 document production request.
12    Thereafter, there was a request for
13 such materials that formulated itself in a production
14 of the credit policy manual of Allfirst, which is a
15 computerized, extensive, proprietary, and confidential
16 document that does exist.
17    And we took that request to
18 Judge Rambo, we argued what would or would not be
19 produced, and Judge Rambo gave a ruling, and we are
20 living by that ruling.
21    We have given you everything that that

Page 48

1 ruling requires us to give, and that's it.
2    Now, if you're asking me -- and I've
3 represented the bank for twenty-five years -- is there
4 a book that says call a default if this, this, and
5 that occurs, offset a line of credit if this occurs, I
6 have never heard of such a thing, and I'm not simply
7 going to go through a scouring of an eighteen billion
8 dollar institution to see if there is any such
9 unrelated material.
10    MR. SWICHAR: Well, point one, you
11 mentioned there is a computerized loan policy.
12    MR. GEBHARDT: Loan policy manual.
13    MR. SWICHAR: Loan policy manual.
14    And if, in fact, it deals with any of
15 the areas that I am now requesting anew, for the first
16 time, would you provide -- would you let me know?
17    MR. GEBHARDT: You have -- that was
18 asked and that was argued in front of Judge Rambo.
19    MR. SWICHAR: Your answer is no?
20    MR. GEBHARDT: My answer is it has been
21 ruled upon by the Court, and I'm not going to waive

12 (Pages 45 to 48)

# Craig J. Schwartz

Page 49

1  the benefit of, or assume obligations beyond what that
2  ruling was.
3          MR. SWICHAR: I understand.
4  So your answer is no.
5          Would you also refuse to provide me an
6  index to that computerized manual so that I can
7  determine for myself what areas or what chapters might
8  be relevant in this case?
9          All subject to an appropriate
10  confidentiality agreement.
11  MR. GEBHARDT: I am not producing
12  anything beyond what Judge Rambo's ruling required the
13  bank to produce after argument on a discovery dispute.
14      Q   (By Mr. Swichar) Mr. Schwartz, let's go back
15  to you.
16          Is there --
17          MR. GEBHARDT: Also enhanced by the
18  irrelevancy as to any subject matter -- excuse me --
19  as to any claim or defense in this case, which is what
20  we argued in front of Judge Rambo, and certainly
21  applies to the request that you have right now.

Page 50

1      Q   Mr. Schwartz, are there any computerized
2  records or a manual that would cover a situation where
3  a bank finances accounts receivable and/or work in
4  progress of a borrower?
5      A   Not that I'm aware of.
6      Q   Okay.
7          MR. SWICHAR: Same request; same
8  denial, I assume.
9      Q   (By Mr. Swichar) Would you take a look at
10  the four million dollar note, Exhibit A?
11          Exhibit A, the four million dollar note, is
12  a bank form; is that correct?
13      A   Yes.
14      Q   Do you know how the changes reflected by
15  scratchouts and initials, et cetera, came about?
16          MR. GEBHARDT: Note an objection for
17  the record because I don't know that the scratchouts
18  reflect changes. They reflect markings put on the --
19          MR. SWICHAR: They're changes to the
20  document.
21          MR. GEBHARDT: There are markings on

Page 51

1  the document.
2          There's an issue whether those markings
3  do or do not change anything in the document.
4      Q   (By Mr. Swichar) For example, Mr. Schwartz,
5  Paragraph 9 is stricken, Paragraph 11 has various
6  strikeouts that are stricken and initialed in the
7  margin.
8          Do you have any idea how those items came
9  about?
10      A   It appears as if Sheri Phillips, who worked
11  for CCI, scratched those out -- made the changes.
12      Q   Did someone at the bank approve those
13  changes?
14      A   There's no acknowledgment along with her
15  initials.
16      Q   Do you have a -- would you have been
17  involved?
18          Do you recall meeting with Sheri Phillips
19  and discussing those changes or seeing those changes
20  come about?
21      A   I don't recall.

Page 52

1      Q   You have no recollection as to how those
2  items came about?
3      A   Not specifically.
4      Q   Okay. Is it fair to say that the four
5  million dollar note, Exhibit A, was signed by the bank
6  with the changes noted?
7          MR. GEBHARDT: Objection.
8          There's no signature of the bank on
9  this document.
10      Q   Is there a four million dollar note signed
11  by the -- approved by the -- is this the four million
12  dollar note approved by the bank?
13      A   This is --
14          MR. GEBHARDT: Object to the word
15  approved.
16      A   Am I to answer?
17      Q   Go ahead.
18      A   This is a result of the approval of the bank
19  of the four million dollar line of credit.
20      Q   So the bank, therefore, approved this note
21  in the form attached as Exhibit A to the Complaint?

13 (Pages 49 to 52)

**Esquire Deposition Services**

**1-800-441-3376**

# Craig J. Schwartz

Page 53

1    A   I wouldn't agree to that.
2    Q   Why not?
3    A   There's no acknowledgment by anybody from
4  the bank on this note of any of the changes.
5    Q   Okay. So you're saying that the changes on
6  Exhibit A were not approved by the bank?
7    A   Yes.
8    Q   Were you -- but you were not involved in
9  seeing the scratchouts or any discussions being made
10  when --
11    A   Not to my recollection.
12    Q   -- the note was executed?
13    A   Not to my recollection.
14    Q   What is your recollection about this
15  particular note, the four million dollar note?
16      Do you remember someone coming from CCI and
17  signing it?
18      As the point man, the relationship officer,
19  wasn't it in your possession when it was signed?
20    A   I don't recall.
21    Q   You don't recall any circumstances of the

Page 54

1  signing of this note?
2    A   No, I don't.
3    Q   The granting of a four million dollar loan
4  facility in 1999, you have no recollection of that?
5      MR. GEBHARDT: Objection.
6    Q   I'll reword the question.
7      The granting of a four million dollar loan
8  facility in 1999 by way of this note and the signing
9  of this note, you have no recollection of the
10  circumstances of the signing of this note?
11    A   I have no recollection of the signing of
12  this note.
13    Q   Or the circumstances of the note?
14    A   Define circumstances.
15    Q   Someone sitting down and signing it.
16    A   I do not recall if I was present or not when
17  this note was signed.
18    Q   Okay. Let's go to the 1.2 million dollar
19  note, which is Exhibit B of the Complaint, the
20  Complaint being Exhibit Schwartz 2.
21      Can you -- do you have a recollection -- I

Page 55

1  realize it was a few years ago -- do you have a
2  recollection how that note came about?
3    A   Yes.
4    Q   Tell me, please.
5    A   What would you like to know?
6    Q   I'd like to know how it came about.
7      Did someone come to you and ask for more
8  money? Did it fly out of the sky? What happened?
9    A   This is the result of an approval from a
10  request from CCI for a million two.
11    Q   Who requested it?
12      What were the circumstances?
13      Did someone come into your office and say I
14  need money, here's what I need and here's why I need
15  it and here's my financials, or did someone just call
16  and say I need 1.2 and you mailed them this note?
17      What happened?
18      MR. GEBHARDT: Objection to form.
19    Q   You know what I'm talking about,
20  Mr. Schwartz.
21    A   One question at a time and I'll answer it.

Page 56

1    Q   Well, I'm trying to give you examples of the
2  information I'm looking for.
3      How did this note come about?
4    A   There was a request made from CCI of
5  additional funds.
6    Q   By whom?
7    A   Either Sheri Phillips or Mr. Ortenzio.
8    Q   Do you recall specifically which person?
9    A   No, specifically.
10    Q   And do you recall either of those persons
11  telling you why they required the 1.2 million
12  dollar --
13    A   Yes.
14    Q   -- advance or facility?
15      What did that person tell you?
16    A   There was a current cash flow shortage of
17  the company, and additional funds were required to
18  continue operation.
19    Q   You don't remember who told you that?
20    A   I believe it was in a meeting, and
21  Mr. Ortenzio and Sheri Phillips were both there.

**Esquire Deposition Services**

# Craig J. Schwartz

Page 57

1    Q   Was there any discussion whether this was
2    going to be a short-term or a long-term facility?
3    A   Short-term, I believe.
4    Q   What is short-term in relation to long-term?
5        Make sure we're on the same wavelength.
6    A   Short-term would be less than a year.
7    Q   Okay.  Were any documents presented to you
8    by CCI in connection with your granting the 1.2
9    million dollar loan facility?
10   A   Yes, I believe they were.
11   Q   What documents were provided to you and
12   relied upon?
13   A   I don't specifically recall exactly what
14   documents were, were given.
15   Q   No -- no general idea as to what documents
16   were provided?
17   A   Financial statements, current financial
18   statements of the customer.
19       There may have been others.
20   Q   Do you recall that, or are you just assuming
21   it?

Page 58

1    A   I can recall that, financial statements.
2    Q   Anything else?
3    A   No.
4    Q   Okay.  Is the 1.2 million dollar note a bank
5    form?
6    A   Yes.
7    Q   You'll notice that there are, again, some
8    certain strikeouts, for example, at the bottom of the
9    first page, and there are some inserts in the first
10   and third paragraphs of Page 2.
11       Do you recall how they came about, sir?
12   A   There was some question by Mr. Ortenzio
13   that -- apparently, he didn't like the language in the
14   notes.
15   Q   And who approved the changes?
16   A   I did.
17   Q   You did?
18   A   Yes.
19   Q   Did you need authority of anyone?
20   A   I should have had authority, yes.
21   Q   Okay.  Why don't you look at Schwartz 3 --

Page 59

1    I'm sorry -- Schwartz, Schwartz 4 -- I just have a
2    question on Schwartz 3.
3        Let me show you Schwartz 3.  Let me know
4    when you are finished looking at it.
5        (Witness reading.)
6    Q   I have a very simple question, Mr. Schwartz.
7    If you want to read the whole thing, feel free to.
8        (Witness reading.)
9    A   Okay.
10   Q   Based on the documents that have been
11   produced, that have been produced by the bank,
12   Schwartz 3 appears to be the latest cash management
13   agreement that was signed by CCI.
14       Do you have any reason to state otherwise?
15       MR. GEBHARDT:  Objection.
16       I think that misstates the record.  If
17   you look at the note that's in the Complaint on
18   Exhibit -- which is Exhibit A to the Complaint, you'll
19   see a description of the cash management system in
20   effect with that, and that's six years, or five years
21   after this note.

Page 60

1        MR. SWICHAR:  Okay.
2    Q   (By Mr. Swichar) This, then, appears to be
3    the original cash management note, except this may be
4    modified or superseded by anything in any of the notes
5    signed by CCI; is that correct?
6        MR. SWICHAR:  I appreciate your
7    correction.
8    A   Yes.
9    Q   (By Mr. Swichar) Okay.  I show you what's
10   been marked for identification as Exhibit Schwartz 4.
11   Take a minute and look at it.
12       (Witness reading.)
13   A   Okay.
14   Q   Now, according to the last page, this --
15   this Exhibit S-4 reflects that the 1.2 million dollar
16   note was approved only by you but by
17   Messrs. Myers and Zarcone; is that correct?
18   A   That's correct.
19   Q   So you did have some approval authority
20   along with the others?
21   A   No, I signed this because I have to.

15 (Pages 57 to 60)

# Craig J. Schwartz

Page 61

1    Q  Okay, but you -- but you were not involved
2  in the approval, then?  You couldn't have been?
3    A  I did not have the authority to say yes or
4  no.
5        This could have been approved without my
6  signature.
7    Q  Okay.  Now, with respect to the 1.2 million
8  dollar note which, again, if you want to look at it,
9  it's Exhibit B in the Complaint, principal is payable
10  on demand; is that right?
11    A  Oh, yes.
12    Q  Okay.  Was there any restriction -- what is
13  your understanding insofar as there being or not being
14  any restriction on the note as to when the note could
15  be prepaid by CCI?
16        Could the note be prepaid by CCI anytime
17  prior to the demand?
18    A  Yes.
19    Q  Okay.  The bank -- so CCI didn't have to
20  wait for the demand; it could just prepay it at any
21  time if it wanted to, had the funds?

Page 62

1    A  Yes.
2    Q  Okay.  Was there any restriction with
3  respect to the 1.2 million dollar note as to the
4  source of funds that could be used to repay the note?
5    A  The note should have been repaid -- okay,
6  ask the question -- what was the question?
7    Q  Is there any restriction in the note in
8  regard to the source of funds that could be used to
9  repay the note?
10    A  Not in the note.
11    Q  I understand, I'm only sticking to the note.
12    A  Not in the note.
13    Q  Okay.  Now, we'll come back to that because
14  I know you're anxious to say something.
15        Let's look at Schwartz 5.
16        This Schwartz 5, this is your memo; is that
17  correct?
18    A  Yes.
19    Q  And it says that we decided that an increase
20  of 1.2 million will be done on a temporary basis and
21  CCI will get an additional five hundred thousand from

Page 63

1  private sources; is that correct?
2    A  Yes.
3    Q  Did CCI ever obtain an additional five
4  hundred thousand, if you know, from private sources?
5    A  I do not know.
6    Q  Was it monitored in any way by the bank as
7  to whether or not there was an additional five hundred
8  thousand obtained by CCI?
9    A  No, it was not.
10    Q  The memo then goes on to say that this
11  should be sufficient to meet their current cash flow
12  shortage.
13        Tell me what you mean by that from the
14  banker's perspective.
15    A  I must have received documents showing what
16  their cash flow position was going to be over the next
17  couple months and determined by that that this should
18  get them over the hurdle.
19    Q  How was this note to be repaid?
20    A  Profits.
21    Q  Is that your answer?

Page 64

1        MR. GEBHARDT:  Is there a question?
2        MR. SWICHAR:  Yeah.
3  I asked is that your answer, profits?
4        MR. GEBHARDT:  He's answered.
5        MR. SWICHAR:  Well, he's thinking --
6  he's mulling it over, I think, but if you want, I'll
7  accept it.
8        I'm just giving him a second chance
9  because I can see he wants to say more.
10    Q  (By Mr. Swichar) If profits is your answer,
11  fine.
12    A  Well, this would have been repaid -- yeah.
13    Q  From profits?
14    A  (Nodding head affirmatively.)
15    Q  Is that right?
16    A  Umh-humh, abundance of cash and -- okay,
17  profits and abundance of cash flow.
18    Q  Okay.  Abundance of cash flow means from
19  excess cash flow from excess, not used to pay
20  expenses?
21    A  And any other debt.

**Esquire Deposition Services**

# Craig J. Schwartz

Page 65

1    Q   Okay. Where was cash flow to be deposited
2  at the bank?
3    A   Cash flow could have been deposited -- they
4  could have deposited it anyplace they wanted to,
5  didn't necessarily have to be at the bank.
6    Q   Well, there are loan documents that say all
7  business deposits are to be deposited in the checking
8  account --
9    A   Okay.
10   Q   -- is that correct?
11   A   I don't know.
12   Q   Well, we can review that, but there are
13  documents --
14       MR. GEBHARDT: Maybe you'd like to
15  point out where it says --
16       MR. SWICHAR: Sure.
17       MR. GEBHARDT: -- that it has to be
18  deposited in the checking account.
19       MR. SWICHAR: It says primary deposits
20  will be deposited in the bank.
21       MR. GEBHARDT: Primary is not --

Page 66

1        MR. SWICHAR: I know.
2        MR. GEBHARDT: The word primary doesn't
3  mean exclusive, and I understand what was done and how
4  it was done and it said primary, but you're
5  interpreting -- you made a representation that the
6  bank's documents said they couldn't have an account
7  anywhere but the bank, and I don't think there's
8  anything that says that.
9        MR. SWICHAR: Well, let's find the
10  exact language so there's no confusion about that.
11       Do you know off the top of your head
12  where it is?
13  .    MR. GEBHARDT: No, but I'm sure it says
14  primary, not exclusive.
15       MR. SWICHAR: Okay. It says the
16  primary business deposits will be deposited in the
17  bank's checking account; is that fair, Mr. Gebhardt?
18       MR. GEBHARDT: I think they've
19  indicated that the primary accounts for CCI shall be
20  maintained at the bank.
21       MR. SWICHAR: Okay.

Page 67

1    Q   (By Mr. Swichar) Where were the bank's
2  profits to be deposited, as far as you're concerned?
3        MR. GEBHARDT: The bank's profits?
4    A   The bank's?
5    Q   CCI's profits, to be deposited, as far as
6  you're concerned.
7    A   In their deposit account.
8    Q   Okay. And where was revenues from cash flow
9  to be deposited from CCI?
10       In the bank's checking account as well?
11   A   Yes.
12   Q   Okay. Did you ever have any specific
13  discussions, if you recall, with Mr. Ortenzio as to
14  when and how the 1.2 million dollar note would be
15  repaid?
16   A   I believe there was a letter indicating when
17  it had to be paid by.
18   Q   Okay. Anything else?
19   A   Not that I can recall.
20   Q   I think we're going to come to the letter.
21  I think there's a commitment letter, we'll come to

Page 68

1  that.
2        Did you ever monitor CCI's use of the
3  1.2 million dollar loan funds?
4    A   No.
5    Q   I show you what has been marked for
6  identification as Exhibit Schwartz 6.
7    A   Okay.
8    Q   Do you recall how this document came about?
9        Was it prepared by you?
10   A   Yes.
11   Q   How did it come about?
12       Why was this document prepared?
13   A   This was a result of a meeting with CCI,
14  that they were going to need additional funds because
15  of cash flow shortages.
16   Q   Was this -- was this S-6 preceded by the
17  1.2 million dollar note, which is dated six days
18  later?
19   A   Yes.
20   Q   Okay. Was it initially contemplated by the
21  bank that the four million dollar line of credit would

# Craig J. Schwartz

1 be increased to five million as reflected on S-6?

2    A  Yes.

3    Q  Okay. What caused the bank to contemplate

4 that in contrast to what ultimately occurred?

5    A  Mr. Ortenzio's objection to the surety.

6    Q  Okay. So correct me if I'm wrong, the bank

7 initially contemplated increasing the four million

8 dollar line of credit to a five million dollar line of

9 credit, correct?

10    A  Yes.

11    Q  And the bank initially requested that

12 Mr. Ortenzio guarantee the full five million dollars?

13    A  Yes.

14    Q  And that was refused by Mr. Ortenzio?

15    A  Yes.

16    Q  And did that require the bank and CCI to go

17 back and basically rework the facility to the

18 1.2 million dollar loan that it ultimately became?

19    A  Yes.

20    Q  Did the bank ever request Mr. Ortenzio at

21 any time to guarantee any part of the four million

1 dollar line in contrast to the four -- in contrast to

2 the full four million dollar line reflected on S-6?

3    MR. GEBHARDT: I'm going to -- I think

4 you've got your --

5    MR. SWICHAR: I'll say it differently.

6    MR. GEBHARDT: Okay, because I think

7 you got the numbers confused.

8    MR. SWICHAR: All right.

9    Q  (By Mr. Swichar) Did the bank ever request

10 at any time Mr. Ortenzio to guarantee any part of the

11 four million dollar line of credit in contrast to the

12 complete four million dollar amount?

13    For example --

14    MR. GEBHARDT: You mean the four plus

15 the one million?

16    MR. SWICHAR: No, no. Let's isolate

17 the four million dollar line of credit.

18    Q  (By Mr. Swichar) Did the bank ever say,

19 Mr. Ortenzio, we want you to guarantee one million

20 dollars worth of the four million dollar line of

21 credit?

1    A  Not that I recall.

2    Q  Okay. Did the bank then -- hopefully, we

3 understand what I'm saying -- did the bank then ever

4 request Mr. Ortenzio to guarantee any part of the four

5 million dollar line of credit?

6    I used one million as an example. Now I'm

7 just forgetting that example.

8    Any part of the four million, in any amount.

9    A  Not that I recall.

10    Q  Was there any discussion when the

11 1.2 million dollar note facility was granted as to

12 when it would be paid, when it had to be paid, other

13 than on demand?

14    A  Yes, I believe there was a, a date that it

15 was to be paid by.

16    Q  That's in the loan commitment?

17    A  Yes, I believe so.

18    Q  I'm just curious.

19    From a banking procedures point of view, why

20 wouldn't that be put in the note itself in contrast

21 to -- it has to be paid on a certain date in contrast

1 to on demand basis?

2    Is that normal procedure to do that?

3    A  To do --

4    Q  To have a date in the loan commitment

5 letter, a specific date, but whereas the actual note

6 would say payable on demand.

7    A  Yes, that is normal.

8    Q  Why wouldn't the bank put the date on as the

9 outside date -- for example, it's due on April 30th,

10 2000 -- or prior thereto on demand?

11    A  I don't know.

12    Q  You don't see that in your banking

13 experience?

14    A  See what?

15    Q  See an outside date coupled with an on

16 demand note in the note itself.

17    A  Those are two -- if it has a date on it,

18 they are two different notes.

19    Notes are either on demand, or if they are a

20 term loan.

21    Q  Was it ever contemplated that the four

**Esquire Deposition Services**

# Craig J. Schwartz

1  million dollar note would be repaid before the
2  1.2 million dollar note?
3      A   It would hope that that four million would
4  be repaid before the 1.2 would be repaid.
5      Q   Let's forget hopes.
6          Did the bank provide any documents that were
7  signed that required repayment of the four million
8  before the 1.2 million?
9      A   Not specific to that fact.
10     Q   How about generally to that fact?
11     A   No, no documents.
12     Q   Okay.  There's no document that require the
13  repayment of the four million prior to the
14  1.2 million, were there?
15     A   No.
16     Q   And, in fact, the four million dollar line
17  of credit was long-term; is that correct?
18     A   No, that is incorrect.
19     Q   It was not long-term?
20     A   That was on a year-to-year basis.
21     Q   Okay, but it went back to at least ten

1  years, didn't it?
2      A   It still had to be renewed annually.
3      Q   Okay, but there was no reason to think it
4  wouldn't continue to be renewed annually as it had
5  been for the prior ten years or so?
6      A   There's always that possibility.
7      Q   Okay.  The 1.2 million dollar note facility
8  was a temporary facility, wasn't it?
9      A   Yes.
10     Q   Okay.  The four million dollar facility was
11  not deemed to be or considered to be temporary; is
12  that correct?
13     A   That's correct.
14     Q   Let's look at Exhibit C of the Complaint,
15  which is the Ortenzio guarantee.
16         This is on a bank form dated November 8,
17  1999?
18     A   Yes.
19     Q   Did you prepare it?
20         Were you involved in the signing and
21  preparation of this note?

1          MR. GEBHARDT:  The suretyship.
2      Q   The suretyship.
3      A   I was involved with the signing.
4          MR. SWICHAR:  Let's go off the record
5  for a minute.
6          (Discussion off the record.)
7          MR. SWICHAR:  Let's take a break, okay?
8          (Thereupon, a recess was taken.)
9      Q   (By Mr. Swichar) Let's go back for a moment
10  to S-6, which is your memo of November 2, 1999.
11         I note that when you were contemplating
12  increasing the four million dollar line of credit to
13  four million dollars -- to five million -- the note --
14  you noted on S-6 that the increase would expire on
15  February 28th, 2000.
16         Where did that date come from?
17     A   It was the bank's date that we decided
18  upon --
19     Q   Okay.
20     A   -- how long the increase would be good for.
21     Q   Okay, except now -- and we'll come to it in

1  a minute -- but when I go to Schwartz 8 later, which
2  is your commitment letter, it states that the loan
3  would expire a month later, on March 31, 2000.
4          Do you know how that one-month extension
5  came about?
6      A   Could I see that?
7      Q   Yeah, I'll show that to you now; I'm sorry,
8  I should have done that.
9          (Document was handed to the witness.)
10     Q   Do you see that there?
11     A   Well, this is for the million two.
12     Q   Yes.
13     A   This has nothing to do with the line.
14     Q   No, I understand, but if you look at S-6,
15  which dealt with the ultimate increase, correct, in
16  the facility?
17         Let me take it by the numbers.
18         S-6 reflects the bank's initial
19  contemplation of increasing the line from four to five
20  million and to be fully guaranteed by Mr. Ortenzio and
21  to expire on February 28, 2000, correct?

# Craig J. Schwartz

1    A   Yes.

2    Q   But ultimately what happened was there was a

3   1.2 million dollar new note guaranteed by

4   Mr. Ortenzio, but the expiration date as reflected in

5   S-8 was a month later.

6        So how did it go from February 28th to

7   March 31st is my question.

8    A   I don't recall the specifics.

9    Q   How about the generalities?

10    A   I don't recall the generalities, either.

11    Q   You understand whenever you answer a

12   question you don't recall the specifics, I've got to

13   come back and ask you how about generalities?

14    A   Yes.

15    Q   Okay, but you have no recollection

16   specifically or generally as to that one-month

17   extension?

18    A   That is correct.

19    Q   Okay.  All right, now -- you can hold on

20   that.  We'll come back to it later.

21        I'm going to show you Exhibit Schwartz 7,

1   which is the equipment note of November 20, 1998, for

2   two million dollars.

3        Were you involved in the preparation and

4   execution of this?

5    A   The execution.

6    Q   Yes.

7        Were you?

8    A   Only the execution.

9    Q   Okay, I want to come back to that.  I forgot

10   to ask you -- let's go back to the guarantee, which is

11   going to be Exhibit C of the Complaint.

12        Do you have that in front of you?

13        There are changes on that; is that correct?

14    A   Yes.

15    Q   How did those changes come about, if you

16   recall?

17    A   I don't recall how they actually came about.

18    Q   Do you recall their being requested by

19   Mr. Ortenzio or Sheri Phillips?

20    A   By Mr. Ortenzio, yes.

21    Q   And did you approve the changes?

1    A   Yes.

2    Q   Okay.  Tell me from a banker's perspective,

3   if you turn to Page 2, there's an asterisk in the

4   second paragraph, then it goes on to say under the

5   twelve -- 1.2 million dollar commercial loan note.

6        What does that change reflect from your

7   perspective?

8    A   That the surety applies to the million two

9   note.

10    Q   And it doesn't apply to any other liability

11   of CCI?

12    A   That appears to be correct.

13    Q   Okay.  So the initial form, if signed by

14   Mr. Ortenzio, would have been a guarantee of not only

15   the 1.2 million, but of the four million as well as

16   any other loan facility; is that correct?

17    A   Yes.

18    Q   And the 1.2 million dollar note was

19   modified -- guarantee -- was modified, or a suretyship

20   was modified to make it understood that the guarantee

21   would only extend to the 1.2 million dollar facility;

1   is that correct?

2    A   Yes.

3    Q   Okay.  All right, let's go back to the

4   equipment note.

5        You were present at the signing of that?

6    A   Yes, I was.

7    Q   Were interest payments made on the equipment

8   note monthly?

9    A   Along with principal, yes.

10    Q   And principal payments were made on a

11   monthly basis on account of the equipment note; is

12   that correct?

13    A   Monthly principal payments were made on the

14   equipment note.

15    Q   Okay.  It's my understanding up to February,

16   2000, or so the balance on the two million dollar

17   equipment note was down to about 1.2 million in

18   principal.

19        Does that sound correct?

20        Do you have any reason to doubt that?

21   That's what I read from the note -- loan documents.

**Esquire Deposition Services**

## Craig J. Schwartz

Page 81

```
1      A   Okay.
2      Q   Okay.  You don't have any reason to doubt
3  that?
4      A   No.
5      Q   Okay.  How -- how were those payments on
6  account of the equipment note, the principal or
7  interest, repaid?
8          What was the mechanism for that?
9      A   I'm not sure I totally understand the
10 question.
11     Q   Well, there were repayments monthly, both
12 interest and principal, on the equipment note?
13     A   Umh-humh.
14     Q   How were they done?
15         Did Mr. Ortenzio come in with a bucket of
16 cash?  How did it -- how was it accomplished?
17     A   By check, as far as I can recall.
18     Q   Are you sure about that?
19     A   Not one hundred percent.
20     Q   Well, how would I know that?
21     A   There -- there would be two methods to repay
```

Page 82

```
1  it.
2          Either we would automatically take the money
3  out of the account because of an agreement that was
4  prior, or they would pay us by check.
5      Q   Was it done either way?
6      A   No.
7      Q   There's a document that your attorney
8  provided me just yesterday, or last week actually,
9  which are a printout of the computer screens for the
10 Allfirst CCI loans.
11         Would this -- looking at this document,
12 would this help you answer that question as to how the
13 repayments on the equipment note were made?
14         (Document was handed to the witness.)
15     A   No.
16     Q   It doesn't help you answer the question?
17     A   No.
18     Q   Well, how would I know, other than asking
19 Mr. Ortenzio how he made payments on the equipment
20 note, including interest and principal, whether they
21 were by check or sweeps from the checking account?
```

Page 83

```
1      A   If they were an automatic payment, there
2  would -- there was a document that --
3      Q   Aren't automatic payments reflected on that?
4      A   No, not automatic payments.
5      Q   Are payments reflected?
6      A   Payments are reflected.
7      Q   And how are they reflected?
8      A   Just as a reduction of principal.
9      Q   Okay.  And is it done on the same time each
10 month, approximately, same amount each month, on
11 principal, approximately?
12         Does that help you out?
13     A   It doesn't appear as if the payments were
14 taken automatically by the bank.
15     Q   Why do you say that?
16     A   Because they occur on different dates.
17         If they were taken by the bank, it would be
18 the same day every month.
19     Q   Interest, also?
20         Were there separate checks for interest
21 payments, or were they automatically debited?
```

Page 84

```
1      A   Ask the question again.
2      Q   How were interest payments made?
3          Debited from the checking account on an
4  automatic basis or --
5      A   To which loan are we talking?
6      Q   The equipment note.
7      A   It appears principal and interest payments
8  were made by check.
9      Q   Because of the different dates?
10     A   Yes.
11     Q   If Mr. Ortenzio were to tell you that there
12 were automatic debits and not checks, would you say
13 that's not true, or is it possibly true?
14         You know what, Mr. Schwartz?  If you don't
15 know, you don't know, and at the end of the day, it
16 doesn't matter.
17     A   It's going to take some time to determine
18 that for sure.
19     Q   Okay, let's put this aside.
20         The checks as you think occurred were
21 written to make payment on the equipment note,
```

21 (Pages 81 to 84)

# Craig J. Schwartz

Page 85

1  principal or interest, that would be from the checking
2  account, right?
3        That -- CCI's checking account at the bank?
4    A  Yes.
5    Q  Okay.  And that -- it's the same checking
6  account that was tied into the cash management
7  facility and the four million dollar line of credit?
8    A  I would think so.
9    Q  All right.  So if CCI made a repayment on
10  account of the equipment note, principal or interest,
11  that would have the impact of drawing down on the line
12  of credit, wouldn't it?
13    A  Possibly.
14    Q  Possibly?
15        You mean sometimes it's possible, sometimes
16  it's not, depending on when it's hit, or what?
17    A  No, you are correct; it would have the
18  impact of drawing down the line of credit, yes.
19    Q  Okay.  And it would reduce availability on
20  the line of credit; is that correct?
21    A  Yes, that's correct.

Page 86

1    Q  Okay.  So when payments were made on the
2  equipment note to the bank by CCI, it would draw the
3  line of credit and reduce availability, right?
4    A  Each month.
5    Q  Each month.
6        Am I right?
7    A  Yes.
8    Q  Okay.  Now, interest on the 1.2 million
9  dollar note was paid monthly; is that correct?
10    A  Yes.
11    Q  And that was tied in to the cash management
12  facility as well; is that correct?
13    A  What do you mean tied in?
14    Q  Well, when interest payments were paid to
15  the bank on the 1.2 million dollar note, that had the
16  same impact as payments on the equipment note had;
17  namely, it would be a draw on the four million dollar
18  line of credit.
19        Is that correct?
20    A  Yes.
21    Q  Okay.  Look now at S-8 which you have in

Page 87

1  front of you.
2        MR. GEBHARDT:  Do I have that?
3        MR. SWICHAR:  Oh, I'm sorry; no, I
4  don't think you do.
5        (Document was handed to counsel.)
6    Q  (By Mr. Swichar) This basically -- is S-8
7  basically the commitment letter for the 1.2 million?
8    A  Yes.
9    Q  Now, the 1.2 million was fully advanced at
10  its inception?
11    A  Yes.
12    Q  Okay.  And was it deposited to CCI's
13  checking account at Allfirst Bank?
14    A  Yes.
15    Q  Okay.  And when the 1.2 million was
16  deposited in CCI's checking account, again, that's the
17  same checking account that's tied in to the cash
18  management facility and the four million dollar line
19  of credit; is that correct?
20    A  Yes.
21    Q  Okay.  Now, when the 1.2 million dollar line

Page 88

1  of -- when the 1.2 million dollar loan was deposited
2  into CCI's checking account, that would have increased
3  the borrowing capacity on the four million dollar line
4  of credit; is that correct?
5    A  It would have the effect of paying any
6  principal outstanding back on the four million dollar
7  facility.
8    Q  Okay.  So put another way, when the 1.2
9  million dollar deposit was made in the CCI bank
10  account that was tied in to the four million dollar
11  line of credit, it would have had the effect of
12  decreasing the loan balance owed on the four million
13  dollar line of credit by 1.2 million dollars?
14    A  Yes.
15    Q  Okay.  Let me show you what has been marked
16  for identification as Exhibit Schwartz 9, the document
17  that was furnished by the bank.
18        Do you know whose handwriting is at the
19  bottom of S-9, whose notes?
20    A  No, I do not.
21    Q  Okay.  Is this a type of document that

**Esquire Deposition Services**

# Craig J. Schwartz

Page 89

1  you've seen before today?
2     A  I've seen this.
3     Q  When did you first see it?
4     A  Oh, this particular document?
5     Q  Yes.
6       Well, is this part of the document that you
7  would have reviewed in connection with your review of
8  the cash management facility at the bank?
9       This would reflect activity on a particular
10  day or days?
11     A  This is the transaction history on the line
12  of credit.
13     Q  For the day that the 1.2 million dollar was
14  repaid, February 11th?
15       I'll represent to you that these are the
16  bank's notes on this exhibit. They're not mine or
17  anyone else's that I know.
18     A  No, I'm -- I -- if part -- if the million
19  two is part of this million three, that occurred, yes.
20     Q  Well, consistent with Answers to
21  Interrogatories, it would appear to me that CCI repaid

Page 90

1  the 1.2 million dollar note on February 11th, 2000.
2       Is that consistent with the document?
3     A  Yes.
4     Q  And it would reflect that the repayment
5  increased the balance on the four million dollar line
6  of credit by 1.2 million, is that correct, plus
7  interest that was owed somewhere?
8     A  Yes.
9     Q  And on February 10th, one million two
10  hundred and thirty-two thousand three hundred and
11  twenty-eight dollars was owed on the four million
12  dollar line of credit; is that correct?
13     A  Yes.
14     Q  And after the 1.2 million dollar note was
15  paid, the loan balance on the four million dollar line
16  increased by one million three hundred and one
17  thousand eight hundred and twenty-six dollars; is that
18  correct?
19     A  Yes.
20     Q  And the total loan balance after the sweep,
21  after the 1.2 million dollar loan was repaid, on the

Page 91

1  four million dollar line was two point -- two and a
2  half -- two million five hundred and thirty-four
3  thousand one hundred fifty-four dollars and
4  eighty-four cents; is that correct?
5     A  Yes.
6     Q  Okay. Now, this is basically the same way
7  it would work with the equipment note, is that
8  correct, the same type procedure, the same type of
9  printout?
10       MR. GEBHARDT: Objection.
11     Q  The same type of calculations would be made;
12  is that correct?
13       MR. GEBHARDT: Wait, wait.
14     Q  The form.
15       MR. GEBHARDT: You've asked about three
16  different questions using different terms that -- I
17  mean, a printout is a printout, and you're talking
18  about procedures and what was done and what's
19  reflected on the printout.
20       MR. SWICHAR: That's fair. I'll
21  rephrase the question.

Page 92

1       MR. GEBHARDT: Yeah, just rephrase it.
2       MR. SWICHAR: It's a confusing
3  question. I didn't mean to do that.
4       Maybe I can't answer the question -- I
5  can't ask the question the right way, but I'll try.
6     Q  (By Mr. Swichar) When the 1.2 -- when the
7  payments were made on the one point -- on the two
8  million dollar equipment note, whether they be
9  principal or interest, would similar-type calculations
10  be computerized as we see with respect to S-9?
11       Did that question make sense?
12       There were no objections, so maybe it did.
13       MR. GEBHARDT: Not necessarily, but --
14  still struggle with it.
15     Q  In other words, sir --
16     A  I don't know --
17     Q  I'll rephrase -- go ahead.
18       Are you able to answer the question?
19     A  No, I'll hear what you have to say.
20     Q  Okay. If I wanted to see what happened on a
21  certain date, if a particular payment was made on

23 (Pages 89 to 92)

## Craig J. Schwartz

Page 93

1  account of the equipment note, would I punch up a
2  similar-type document from the same computer program?
3      A   I don't think you'd be able to tell if an
4  equipment payment was made by looking at this.
5      Q   This being S-9?
6      A   Yes.
7      Q   If I wanted to know what the particular
8  balance was or a particular payment was made on the
9  one -- on the two million dollar equipment note, on
10  the two million dollar equipment note, what document
11  would the bank have to retrieve to tell me that?
12     A   I would look at their checking account
13  statement.
14     Q   Yes.
15     A   Yes.
16     Q   And what would that show?
17     A   That would show the check written for the
18  equipment line.
19     Q   Well, suppose there was a -- there was a
20  check written and deposited in the CCI account,
21  correct?

Page 94

1      The check would have to be deposited first,
2  right?
3      MR. GEBHARDT:  Wait a minute.
4      You're -- CCI is writing the check and
5  depositing --
6      Q   CCI is depositing a check into its checking
7  account, right?  Let's assume.
8      The next step would be for the bank to sweep
9  that check on account of a credit to the equipment
10  note; is that correct?
11     A   I'm confused.
12     Q   How -- how would -- how would I know that
13  the bank took a particular deposit from me as CCI and
14  credited it towards the equipment note?
15     What document would you have to reflect
16  that?
17     Because your -- the checking account
18  wouldn't tell me what happened to that deposit.  The
19  checking account statement wouldn't tell me what
20  happened to that deposit.
21     How would I know that on a particular day a

Page 95

1  particular deposit was credited to the equipment note?
2      MR. GEBHARDT:  I object to that.
3      A   A deposit or a payment?
4      Q   A payment.
5      A   How would --
6      Q   How would I know on a particular day I had
7  on deposit X dollars in my checking account of which Y
8  dollars utilized as a payment towards the
9  equipment note?
10     And if I asked the bank for a document
11  showing me that, would the bank be able to produce
12  such a document that would show me that?
13     Because the checking account statement
14  wouldn't show that.
15     MR. GEBHARDT:  Objection.
16     Are you asking, or are you testifying?
17     MR. SWICHAR:  I'm asking.
18     Q   (By Mr. Swichar) Do you understand the
19  question?
20     A   No.
21     Q   No, okay.

Page 96

1      I put money into my CCI checking account.
2  At the end of the month, I get a statement, correct?
3      A   Yes.
4      Q   Would that statement show me that certain
5  deposits had been allocated on account of the payment
6  of the equipment note?
7      A   No.
8      Q   Okay.  How would I know when -- if that has
9  been done?
10     How would I know that a certain deposit was
11  allocated as a credit towards the equipment note?
12     What document would I have, or what would I
13  request to see that?
14     A   A deposit --
15     MR. GEBHARDT:  Let me put an objection
16  on the record, and you can step out so I'm not accused
17  of coaching the witness.
18     (The witness left the conference room.)
19     MR. SWICHAR:  You want this on the
20  record?
21     MR. GEBHARDT:  Yeah.

# Craig J. Schwartz

1    MR. SWICHAR:  Okay.

2    MR. GEBHARDT:  My objection is that you

3  are misdescribing to him the function of the line of

4  credit.

5    Checks would come in, or wire transfers

6  would come into the bank.  If there was a positive

7  balance the aggregate would reflect, and the checks

8  that were presented would be paid.  If there was a

9  negative balance after crediting the checks, there

10  would be a draw on the line of credit.

11    MR. SWICHAR:  Right.

12    MR. GEBHARDT:  You're suggesting in

13  some way that a check may come from a specific

14  customer --

15    MR. SWICHAR:  No, I didn't mean to.

16    MR. GEBHARDT:  -- of CCI.

17    MR. SWICHAR:  I didn't mean to.

18    MR. GEBHARDT:  And then that that

19  specific check credit --

20    MR. SWICHAR:  Larry --

21    MR. GEBHARDT:  -- would be allocated to

1  the equipment note.

2    MR. SWICHAR:  Larry, I just want to

3  know, so you understand, how would a borrower such as

4  CCI know that a payment was made on a particular day

5  against -- as a credit towards the equipment note.

6    The check -- the checking account

7  statement wouldn't tell me that.

8    MR. GEBHARDT:  Well, I don't know if it

9  would or wouldn't, but that's a different question.

10    You've been asking him about a specific

11  deposit --

12    MR. SWICHAR:  I'll try to ask him the

13  right way.

14    MR. GEBHARDT:  -- and how would we know

15  that that deposit got applied --

16    MR. SWICHAR:  I'll try to --

17    MR. GEBHARDT:  -- to the payment.

18    MR. SWICHAR:  I'll broaden it.

19    MR. GEBHARDT:  Just -- yeah.  I mean,

20  just ask him like you asked me; how would you know

21  when --

1    MR. SWICHAR:  Well, it's a lot easier

2  when he's gone.

3    (The witness returned to the conference

4  room.)

5    Q  (By Mr. Swichar) Mr. Schwartz, how would I

6  know as CCI when and how a particular payment has been

7  made on account of the equipment note?

8    A  Next month's bill --

9    Q  Okay.

10    A  -- would show the reduction.

11    Q  Okay.  Now, if I went back to the bank and I

12  said, show me your document that reflects that on a

13  certain day a payment was made, is there a

14  computerized document such as S-9?

15    A  Yes.

16    Q  Okay.  And would there be a corresponding

17  increase on the four million dollar line of credit?

18    MR. GEBHARDT:  Objection.

19    A  If that was the only check presented that

20  day, yes.

21    Q  Okay, I don't understand that answer.

1    Would you explain it?

2    Let me go back and rephrase it.

3    The 1.2 -- I keep saying the 1.2 -- the

4  equipment note, principal payments or interest were

5  paid, let's assume, by checks, CCI checks; is that

6  correct?

7    A  Yes.

8    Q  And those checks were deposited in the CCI

9  checking account, right?

10    The checks were -- the checks were initially

11  deposited in the CCI checking account, right?

12    A  Checks from where?

13    Q  Checks from -- checks from profit, checks

14  from wherever checks come from.

15    A  Customers?

16    Q  Customers.

17    A  Okay.

18    Q  Those checks would then be deposited in the

19  checking account at Allfirst Bank, and payments on --

20  and they would be directed to repay the equipment note

21  and/or interest on the equipment note, correct?

# Craig J. Schwartz

Page 101

1    A  No.
2    Q  No?
3    A  The checks coming in from a customer that
4  CCI is depositing is going to go into their checking
5  account and then be applied to the line.
6    Q  Okay.  Are you suggesting, then, that when
7  CCI made a repayment on account of the equipment note
8  it was a separate check?
9    A  Yes.
10    Q  Okay.  CCI writes a separate check on
11  account of the equipment note.
12      Does it contact you to take that deposit and
13  apply it?
14      MR. GEBHARDT:  Objection.
15      Deposit?
16    Q  When CCI takes a check and deposits it in
17  the checking account, how do you know to apply it to
18  the equipment note?
19    A  I wouldn't do anything with the deposit.
20    Q  Okay.  What do you mean you wouldn't do
21  anything with the deposit?

Page 102

1      MR. GEBHARDT:  I mean, let me pose an
2  objection.
3      You're confusing checks that come from
4  customers that are deposited in the account with
5  checks that CCI might write from its account in
6  payment of some bill.
7    Q  Okay.  CCI writes a check out of its
8  checking account in payment of -- as a repayment of
9  the equipment note.
10      Does that happen?
11    A  Yes.
12    Q  Okay.  And that bank -- that check is
13  written to the bank, correct?
14    A  Yes.
15    Q  And it will say on it in repayment of
16  equipment note, correct?
17    A  Something to that effect.
18    Q  Okay.  Now, when that check is presented and
19  paid to the bank, it has the same effect of drawing --
20  it draws a corresponding amount on the four million
21  dollar line of credit?

Page 103

1    A  Yes.
2    Q  Okay.  Do you have any -- does the bank have
3  any document similar to S-9 that would relate to the
4  deposit made by the bank of the initial 1.2 million
5  dollar note proceeds?
6    A  Yes.
7      MR. SWICHAR:  Can I request that,
8  please?
9      MR. GEBHARDT:  You should have it.
10      MR. SWICHAR:  I don't have it.  I
11  don't.
12      All I have -- off the record.
13      (Discussion off the record.)
14    Q  (By Mr. Swichar) Mr. Schwartz, can you tell
15  from that document the entry that deals with the
16  deposit of the 1.2 million in November of '99?
17    A  This is going to take some time.
18      MR. GEBHARDT:  Let me just say for the
19  record, my understanding is that if the 1.2 million
20  was deposited on November 9, if that's the actual date
21  of the disbursement, if there were other checks that

Page 104

1  may have come in from CCI's customers, it may be an
2  aggregate at the end of the day deposit, so it
3  wouldn't just say one million two.
4      MR. SWICHAR:  I understand.
5      MR. GEBHARDT:  It might be a million
6  eight --
7      MR. SWICHAR:  Right, right.
8      MR. GEBHARDT:  -- three thirty-nine or
9  something.
10    Q  (By Mr. Swichar) Can you find November 9 or
11  thereabouts and see if that is reflected on there?
12    A  Yes.
13    Q  Did you find it there?
14    A  Umh-humh.
15    Q  Can you just put a little X next to it?
16      (Witness complying.)
17    Q  Let me have it back.
18      (Document was handed to counsel.)
19    Q  Now, does what you just X'd off reflect the
20  draw of the four million dollar line of credit similar
21  to a situation as in S-9?

**Esquire Deposition Services**

# Craig J. Schwartz

Page 105

1      MR. GEBHARDT: Wait a minute.
2      You said a draw. Draw means you're
3  taking money out.
4      MR. SWICHAR: Right.
5      MR. GEBHARDT: You're asking him to
6  indicate where money was put in.
7      MR. SWICHAR: I'm sorry, an increase on
8  the four million dollar line of credit, if it
9  increased availability.
10     Does it reflect -- I'll rephrase it.
11  Q   (By Mr. Swichar) Does what you just X'd off,
12  a deposit of the 1.2 million on November 9th, reflect
13  the impact on the four million dollar line of credit
14  as we have with respect to S-9?
15  A   You can't specifically see the million two.
16  Q   I can't.
17     Well, out there in the bank's universe, is
18  there a document similar to S-9 that provides me the
19  same information, the relationship between the 1.2
20  million and the four million dollar line of credit?
21  A   I believe you have this right here, but it's

Page 106

1  what occurred for the day on 11/9. You don't see a
2  million two coming in because checks were presented
3  for payment that were paid that day, also.
4  Q   What do you have on November 9th that you
5  feel would be encompassed -- that would encompass the
6  1.2 million?
7      Describe to me the transaction because I
8  can't read bank language.
9      The best of your ability, what occurred on
10  that day?
11  A   Well, on that day, we had to advance off the
12  line a hundred and eight thousand dollars.
13  Q   Off the four million dollar line?
14  A   Yeah, we increased the outstanding on the
15  four point -- on the four million dollar line that
16  day.
17  Q   By how much?
18  A   One hundred and eight thousand dollars.
19  Q   Okay. Where does the 1.2 million come into
20  play?
21     Is there any mention or indication of it?

Page 107

1  A   No.
2  Q   Well, then, that's not the right day, then,
3  is it?
4  A   Yes.
5  Q   This doesn't deal with the 1.2 million, does
6  it?
7  A   Yes, it does.
8  Q   How?
9      Was the -- does it reflect the increase in
10  the availability of the four million dollar line of
11  credit to compensate for the 1.2 million deposit,
12  similar to a document such as S-9?
13     That's what I'm trying to figure out.
14     In other words, on November 9, 2000, when
15  the 1.2 million dollar facility was deposited, what
16  impact did that have on the four million dollar line
17  of credit?
18     Did it go from what to what?
19  A   Okay. There was a payment here that was
20  made similarly that the balance went from two million
21  three hundred fifty-three thousand seven hundred

Page 108

1  fifty-one dollars to one million one hundred
2  sixty-four thousand eight hundred eighteen dollars on
3  the line of credit.
4  Q   On the four million dollar line of credit?
5  A   Yes.
6  Q   Can you say that again so I listen better
7  this time?
8      On the day the 1.2 million dollar facility
9  was deposited, what happened to the four million
10  dollar line of credit?
11  A   The loan balance went from approximately
12  2.3 million to 1.1 million.
13  Q   Okay. So the 1.2 million, as we said
14  earlier, reduced the balance on the four million
15  dollar line of credit and increased the availability
16  on the same four million dollar line of credit,
17  correct?
18     MR. GEBHARDT: It depends.
19  Q   On the day that the 1.2 million dollar was
20  deposited, it increased the four million dollar line
21  of credit availability by 1.2 million, correct?

27 (Pages 105 to 108)

# Craig J. Schwartz

Page 109

1   A   Yes.
2   Q   And it decreased the balance owed on the
3   four million by the 1.2 million as well?
4       Decreased the balance owed.
5   A   Yes.
6   Q   Okay. All right, fine, we got there.
7       So am I correct, then, that the four million
8   dollar facility, the 1.2 million dollar note, and the
9   two million dollar equipment note were all tied in to
10  a single checking account?
11      MR. GEBHARDT: Objection.
12  Q   You can answer it.
13  A   I don't know how you're tying loans and
14  checking accounts together.
15  Q   Well, there was only one checking account
16  where the loans were deposited, and there was only one
17  checking account from which repayments were made.
18      MR. GEBHARDT: You don't know --
19  A   I don't know that.
20      MR. GEBHARDT: You haven't established
21  that.

Page 110

1       You don't know where the equipment loan
2   was deposited, or whether it was or wasn't.
3       MR. SWICHAR: Well, he has testified --
4   and correct me if I'm wrong -- I'll go back.
5   Q   (By Mr. Swichar) The 1.2 -- the two million
6   dollar equipment note, where was that money deposited
7   when it was granted?
8   A   Into the checking account at All -- at
9   Dauphin Deposit.
10  Q   Okay. And that's the same checking account
11  that was related to the four million dollar line of
12  credit and the cash management facility?
13  A   Yes.
14  Q   Okay. And when the 1.2 million dollar loan
15  was made in November, 2000 -- November, '99, rather --
16  that was deposited into CCI's checking account at the
17  bank as well?
18  A   Yes.
19  Q   And that's the same checking account where
20  the equipment note proceeds were deposited, correct?
21  A   Yes.

Page 111

1   Q   And where the cash management facility was
2   tied in to the four million dollar line of credit; is
3   that correct?
4   A   Yes.
5   Q   Okay, thank you.
6       Suppose CCI wanted to make a payment on
7   account of the 1.2 million dollar note. How would it
8   do that?
9       How would you expect it to do that?
10  A   The same way they make a payment on any of
11  their other notes.
12  Q   Which would be to write a check to the bank,
13  correct?
14  A   Yes.
15  Q   Deposit it in the checking account, correct?
16  A   No.
17  Q   Well, turn it over to the bank.
18  A   They would write a check and give it to the
19  bank.
20  Q   Okay. What would the bank do with it?
21  A   Process the payment.

Page 112

1   Q   Okay. And when the check -- when the
2   payment was processed, that would increase as it --
3   that would be -- that would operate as a draw on the
4   four million dollar line of credit; is that correct?
5   A   Yes.
6   Q   Okay.
7       MR. GEBHARDT: I have an objection to
8   that question as phrased.
9   Q   Okay. You understood the question, you
10  answered it. I'm satisfied with the answer.
11      Prior to mid-February, 2000, February 18th,
12  had Allfirst ever declared a default with respect to
13  any of CCI's loan facilities?
14  A   Is that the date that the default was
15  declared?
16  Q   Let's assume it was February 18th or on or
17  about.
18      Prior to the default, with a capital D --
19      MR. GEBHARDT: Wait a minute.
20      MR. SWICHAR: Do you have an objection?
21      MR. GEBHARDT: Yeah, there's no

28 (Pages 109 to 112)

# Craig J. Schwartz

**Page 113**

1  evidence that there was a default declared on
2  February 18.
3        The default letter was February 24.
4        MR. SWICHAR: Fine.
5        Q  (By Mr. Swichar) Prior to the default
6  reflected on Exhibit D of the Complaint -- thank you
7  for that -- had the bank ever had the occasion to
8  declare a default on any of CCI's loan facilities?
9        A  Not to my knowledge.
10       Q  Okay. All interest payments were made
11  timely?
12       A  I would believe so.
13       Q  All principal payments were made timely?
14       A  Without going back and looking, I believe
15  so.
16       Q  All right.
17       MR. SWICHAR: What do you want to do --
18  let's go off the record.
19       (Discussion off the record.)
20       (Thereupon, at 12:20 p.m., a luncheon
21  recess was taken.)

**Page 114**

1        AFTERNOON SESSION    (1:03 p.m.)
2        MR. SWICHAR: Let's resume.
3        Q  (By Mr. Swichar) Mr. Schwartz, in connection
4  with this lawsuit, have you had any conversations with
5  any former loan officer of CCI?
6        A  Any former --
7        Q  Loan officers.
8        Any former officers of CCI.
9        A  No.
10       Q  Since the declaration of the default, which
11  we've seen a copy of, have you had any conversations
12  with any former officer of CCI, including
13  Mr. Ortenzio, Miss Phillips, anyone else?
14       A  No.
15       Q  Do you recall that a meeting occurred on
16  February 18, 2000, at Allfirst Bank in Harrisburg?
17       A  Yes.
18       Q  How did that meeting come about?
19       A  Can you put in the chronological order, the
20  dates?
21       Q  Sure, whatever is helpful to you.

**Page 115**

1        A  No, I mean as far as -- can you tell me?
2        Q  I can tell you that the meeting occurred on
3  February 18, 2000.
4        MR. GEBHARDT: Which is a Friday.
5        Q  Which is a Friday, according to
6  Mr. Gebhardt.
7        And there was a meeting in Harrisburg, and I
8  believe that Mr. Gibson and Mr. Elias were present by
9  telephone.
10       A  Okay.
11       Q  And there was a whole lot of people.
12       A  Okay. And the question was?
13       Q  How did the meeting come about?
14       How did the scheduling of that meeting come
15  about? How did the attendance of those who were there
16  come about?
17       A  To the best of my recollection, CCI called
18  and wanted to talk to the bank about cash flow, more
19  cash flow problems.
20       Q  Called you?
21       A  I don't recall.

**Page 116**

1        Q  Okay. And you wouldn't recall who at CCI
2  made the call?
3        A  Correct.
4        Q  What happened next?
5        A  The meeting was scheduled.
6        Q  How did it come about that those who
7  attended the meeting in person or by phone attended
8  the meeting?
9        A  I believe we were informed that the loss CCI
10  was -- had for 1999 was in the six million dollar
11  range.
12       Q  Before the meeting?
13       A  Yes.
14       Q  Okay. By -- do you know who said that?
15       A  No, I don't. I don't recall.
16       Q  Okay, okay.
17       And then, for example, who saw to it that
18  Mr. Gibson and Mr. Elias attended the meeting by
19  phone, if you know?
20       A  I don't recall exactly who called them --
21       Q  Did you call them?

**Esquire Deposition Services**

# Craig J. Schwartz

1     A   -- or got in contact with them.
2         I do not recall.
3     Q   Okay. It's possible that you did?
4     A   It is possible.
5     Q   And is that because of what was said by CCI
6  on the phone to whomever it was said to that they
7  decided to --
8     A   That was a result of that, yes.
9     Q   Okay. What happened at that meeting, to the
10 best of your recollection?
11    A   The bank was told that the cash flow
12 problems for CCI had -- were continuing, they were
13 pretty severe.
14    Q   Was that CCI's word, severe, or was that
15 your construction of it?
16    A   This would be my construction of it.
17    Q   I'd rather you just tell me what you recall
18 being said.
19        MR. GEBHARDT: Do you want --
20    A   Well, then, I do not recall --
21        MR. GEBHARDT: You want a quote --

1     A   -- exactly.
2         MR. GEBHARDT: -- or to give the
3  substance of what he recalls?
4         There's a difference.
5         MR. SWICHAR: Right, there is a
6  difference.
7         I'm asking him to tell me if he has a
8  recollection of what I -- of what he was told at that
9  meeting.
10        MR. GEBHARDT: Exactly?
11        MR. SWICHAR: It doesn't have to be
12 exactly. I don't expect him to be that great of
13 things, remembering things.
14    Q   (By Mr. Swichar) Just generally, what do you
15 recall being told factually by CCI at that meeting?
16        MR. GEBHARDT: When you ask him to put
17 it in his own words, is it a quote or --
18        MR. SWICHAR: He interpreted those
19 words as severe, and that's a little bit different.
20    Q   (By Mr. Swichar) I want to know what, what
21 was said to you that led you to believe that it was a

1  severe financial situation, for example.
2     A   Well, we knew the loss to the company was
3  around the six million dollar mark. Cash flow
4  continued to be a problem for CCI. CCI had stopped
5  making some payments to some of their subcontractors
6  on some jobs.
7         That's about the best I can recall now.
8     Q   Now, do you remember the various comments by
9  the various bank representatives?
10    A   No, I do not recall.
11    Q   Did you take any notes at that meeting?
12    A   No, I did not.
13    Q   Did you ever see any memorandum prepared
14 contemporaneous with or in connection with that
15 meeting shortly thereafter by anyone?
16    A   No, I did not.
17    Q   Were you ever shown any memo of that
18 meeting?
19    A   Shortly thereafter, no.
20    Q   Well, at any time, then.
21        Have you seen a memorandum dealing with that

1  meeting?
2     A   I've seen some notes.
3     Q   Okay. Whose notes?
4     A   Mr. Gibson's.
5     Q   Okay. What was the -- what were the
6  circumstances of your seeing those notes?
7     A   Preparation for this.
8     Q   For this deposition?
9     A   Yes.
10    Q   Okay. You didn't see them in connection
11 with the actual meeting, then?
12    A   Oh, no.
13    Q   Okay.
14    A   No.
15    Q   Do you recall if CCI furnished to you any
16 documents at that meeting?
17    A   An internal-prepared financial statement on
18 CCI, possibly a cash flow.
19    Q   Do you recall Mr. Elias saying anything on
20 the phone at that meeting, participating in any
21 fashion, by making comments?

## Craig J. Schwartz

Page 121

1    A    Not that I recall.
2    Q    Okay.  Where was it left at that meeting
3    before -- when, when the CCI representative left, had
4    there been any conclusions reached, or what was said?
5        What was the next step going to be, at least
6    before the adjournment of that meeting?
7        Was anything concluded?
8    A    I don't really recall what was to be
9    concluded at that point.
10    Q    Okay.  Well, do you recall where it was left
11    at that meeting, what was going to happen next?
12    A    No.
13    Q    Did the bank have any other meeting after
14    that February 18th meeting without CCI representatives
15    to discuss the next step?
16    A    Not that I was a part of.
17    Q    But do you recall that there was such a
18    meeting, even though you were not a part of it?
19    A    No, I do not know if there was a meeting.
20    Q    Okay.  Did you take any action as a result
21    of the meeting?

Page 122

1        Were you requested to do anything, or did
2    you do anything on your own?
3    A    Not that I can recall.
4    Q    At the meeting, do you recall Mr. Ortenzio
5    being requested to guarantee all or part of the four
6    million dollar note?
7    A    I do not recall.
8    Q    Either way?
9    A    Either way.
10    Q    Do you recall Mr. Ortenzio requesting the
11    bank to be patient while it meets -- while CCI meets
12    with its bonding companies?
13    A    I don't recall.
14    Q    Did Mr. Ortenzio on behalf of CCI request
15    any additional monies from the bank at that meeting?
16    A    I don't recall.
17    Q    Now, in relation to that meeting, which
18    we'll say was February 18th, a Friday, do you recall
19    when the bank froze CCI's accounts?
20    A    I believe it was the next -- during the next
21    week.  I --

Page 123

1    Q    Let me ask you --
2    A    I'm not exact -- I'm not sure.
3    Q    If the 18th was a Friday, do you have any
4    recollection?
5        Were you contacted to do that?
6    A    No, I was not.
7    Q    But you heard about it?
8    A    Yes.
9    Q    And, again, can you tell me the approximate
10    day or date?
11        Within how many days of the 18th would you
12    say?
13    A    Five, six.
14    Q    Okay.  Maybe a week, then?
15    A    If that's five or six to you.
16    Q    Well, I want it to be to you, not to me.
17        MR. GEBHARDT:  You've got the witness
18    guessing.  He says he doesn't know.
19        MR. SWICHAR:  I understand.
20        MR. GEBHARDT:  So --
21        MR. SWICHAR:  I'm just trying to

Page 124

1    refresh his recollection, but I appreciate your
2    interruption.
3        MR. GEBHARDT:  No, I mean --
4        THE WITNESS:  That's the best that I
5    can do.
6        MR. SWICHAR:  Fine.
7    Q    (By Mr. Swichar) Are there any documents
8    that would tell me the date that the bank froze the
9    account?
10        How would I know that?  Because I would like
11    to know that date, and I don't see any documents that
12    reflect that.
13    A    I don't know.
14    Q    Okay.
15        MR. SWICHAR:  Could you furnish me,
16    Larry, with any document that would reflect that date?
17        MR. GEBHARDT:  You have all documents
18    that relate to the termination of the loan --
19        MR. SWICHAR:  I understand --
20        MR. GEBHARDT:  And --
21        MR. SWICHAR:  -- but there's no

31 (Pages 121 to 124)

# Craig J. Schwartz

Page 125

1  document that I could find or interpret that would
2  tell me that date. And if there is such a document, I
3  would ask that the bank interpret it for me and just
4  call it to my attention.
5      The alternative is to take all thousand
6  documents and go page by page, which I don't want to
7  do. I assume there's --
8      MR. GEBHARDT: You might take a
9  thousand documents. If something -- I mean, my
10  understanding is that on the Wednesday prior to the
11  declaration of default, the credit line was cut off,
12  and there are some internal memoranda telling people
13  to not honor the checks, and so you have copies of
14  those.
15      MR. SWICHAR: What day -- I'm not
16  questioning you, but if you will help me out, because
17  I know you want to -- what was the date when the
18  declaration -- what was the day of the declaration of
19  default, the 24th?
20      MR. GEBHARDT: The 24th, a Thursday.
21      MR. SWICHAR: Thursday.

Page 126

1      And on what day prior to that was there
2  a freezing of the accounts?
3      MR. GEBHARDT: Wednesday afternoon, CCI
4  was called and told that the account was being frozen.
5      MR. SWICHAR: As of that day?
6      MR. GEBHARDT: Yes, sir.
7      MR. SWICHAR: And that was the same
8  with the bouncing of checks?
9      MR. GEBHARDT: Yes. Everything was --
10  that was it.
11      MR. SWICHAR: On the 23rd?
12      MR. GEBHARDT: Right.
13      Mr. Elias is the one that put that into
14  effect.
15      MR. SWICHAR: Okay. That saved me a
16  lot of time.
17      Q  (By Mr. Swichar) Now that Mr. Gebhardt has
18  clarified that, were you involved in that process at
19  all?
20      A  No.
21      Q  Now, there was a subsequent meeting, I'll

Page 127

1  represent to you, in Baltimore on February 23rd, 2000.
2      Did you attend that meeting?
3      A  No.
4      Q  Were you aware of it?
5      A  No.
6      Q  Did you hear anything about it after the
7  meeting?
8      A  No.
9      Q  I'm just curious, as the relationship of
10  loan officer, wouldn't they tell you what's going on?
11      It sounds like you didn't really -- really
12  weren't kept informed after the first meeting of the
13  18th.
14      A  That is correct.
15      Q  Is there a reason for that?
16      A  At that point, it was no longer my account.
17  It was not being handled -- I was not to be involved
18  in the account anymore.
19      Q  Well, when was that, and how was that
20  decided?
21      A  Once Mr. Elias and Mr. Gibson are involved

Page 128

1  in an account, we're not involved in accounts anymore.
2      That's standard operating procedure.
3      Q  And that would have been right immediately
4  after the meeting of February 18?
5      A  Yeah, I don't believe I participated in
6  anything, any decision-making, what was going on
7  there.
8      Q  Do you recall when the account was
9  transferred to Workout?
10      A  No, I don't.
11      Q  Let me help you.
12      I'll show you Schwartz 10, which is a
13  document dated March 3, 3000 (sic), from you to
14  Special Credits, Mr. Gibson, transferring CCI to his
15  area.
16      Does that refresh your recollection?
17      A  Yes.
18      Q  Was, in fact, it transferred away from you
19  on March 3rd, 3000 (sic)?
20      A  Formally.
21      Q  Formally.

32 (Pages 125 to 128)

# Craig J. Schwartz

Page 129

1    But from on and after the 18th of February,
2 it had been informally taken away from you?
3    A  Yes.
4    Q  And you weren't kept informed as the point
5 man or loan officer with CCI as to what was happening?
6    A  An occasional nut as to the specifics.
7    Generally, I had a little bit idea what was
8 going on at that time.
9    Q  How did you acquire that idea?
10    A  Phone calls.
11    Q  To whom?
12    A  From.
13    Q  Or from whom?
14    A  To the best that I can recall, Jamin,
15 Mr. Gibson.
16    Q  And what, would he call you and tell you
17 what's happening?
18    A  I believe he requested this from me --
19    Q  Did he tell you --
20    A  -- for me to transfer this.
21    Q  Did he tell you on or about, but before the

Page 130

1 23rd, that CCI's accounts were going to be frozen?
2    A  On or about.
3    Q  Did you participate in the freezing of those
4 accounts?
5    A  No.
6    Q  Take any mechanics to do that?
7    You weren't involved?
8    A  Not that I recall.
9    Q  Okay.  Did he tell you why the bank did
10 that -- was doing that?
11    A  Not that I recall.
12    Q  Did you ever ask?
13    You knew the bank was freezing the accounts
14 of your long-time customer, and you never asked what's
15 going on?  Why?
16    Did you care?
17    A  I don't recall if I asked or if I didn't
18 ask.
19    Q  Would you --
20    A  Of course, I care.
21    Q  Would you have normally asked?

Page 131

1    A  Yes.
2    Q  Don't you think as a long-term loan officer,
3 the point man having the relationship with CCI and
4 Mr. Ortenzio, you should have known what was going on
5 and been involved in the process, or at least been
6 informed?
7    A  Which one of those do you want me to answer?
8    Q  All three, whichever way you want it.
9    A  I was informed of what was going on.
10    Q  Did you agree with what was going on?
11    A  My opinion didn't really matter.
12    I don't recall if I agreed or if I didn't
13 agree.
14    Q  So you had no opinion at all?
15    A  None that I issued to anybody.
16    Q  Well, that's not my question.
17    Did you have an opinion on the propriety of
18 what the bank was doing, whether or not you issued it
19 to anybody?
20    A  Yes.
21    Q  What was that opinion?

Page 132

1    A  I don't recall.
2    Q  But you had an opinion, but you don't
3 recall?
4    A  Yes.
5    Q  Well, how do you recall you had an opinion
6 if you don't recall what it was?
7    A  I have an opinion on everything.
8    Q  You have an opinion on today, I assume.
9    A  Possibly, yes.
10    Q  Okay.  I want you to be consistent.
11    So you had an opinion that you kept to
12 yourself on the propriety of what the bank was doing
13 to CCI on or about February 23, 2000?
14    A  After the meeting on February 18th, and
15 those that were in attendance at that meeting, I was
16 low man on the totem pole.
17    After that meeting, somebody other than
18 myself made a decision to proceed what you previously
19 explained.
20    I usually do not find out what is done when
21 an account starts to be handled by Special Credits,

33 (Pages 129 to 132)

# Craig J. Schwartz

Page 133

1  Mr. Gibson or Mr. Elias, and the document that, that
2  is Schwartz 10 was in response to a request by
3  Mr. Gibson to transfer the CCI account over to him
4  formally in our computer system.
5      Q    Okay, but that wasn't my question.
6          My question was, that as the person who had
7  a longstanding relationship with CCI, even though you
8  were the low man on the totem pole, you necessarily
9  would have had an opinion on what the bank was doing,
10  whether it was proper or not, right?
11         You said you had an opinion on everything.
12      A    Yes.
13      Q    And the answer is yes.
14         And as low man on the totem pole, you didn't
15  want to share that opinion with anyone; is that right?
16      A    My opinion at that point didn't matter.
17      Q    But at the same time, you didn't want to
18  share it with anyone for the reason that it didn't
19  matter?
20      A    My opinion didn't matter at that point.
21      Q    Was that the reason you didn't want to share

Page 134

1  it with anybody?
2      A    I just chose not to share it with anybody.
3      Q    Okay.  Did you agree with what the bank did?
4      A    Yes.
5      Q    Was that your opinion?
6      A    Yes.
7      Q    Okay.  In your history as a loan officer,
8  have you ever approved multiple loans to a single
9  borrower, such as the relationship with CCI?
10         Were there other situations where you had
11  different facilities to a single borrower?
12      A    I have not -- I do not -- did not have the
13  lending authority to approve.
14      Q    I don't mean approve, but did you ever --
15  were you ever involved -- I'm sorry, you're right --
16  were you ever involved in any loan relationships where
17  there was more than one facility to a single borrower,
18  such as existed with CCI?
19      A    Customers have more than one borrowing
20  relationship.
21      Q    And are there situations where a guarantee

Page 135

1  would apply to more than one relationship?
2      A    Yes.
3      Q    For example, someone borrowed one million
4  dollars and the same borrower borrowed three million
5  dollars, and there would be a guarantee that covered
6  both facilities; is that fair?
7      A    Yes.
8      Q    And would be -- would you have a situation
9  where there would be a three million dollar loan and a
10  one million dollar loan, and there would be a
11  guarantee of the last one million dollars of both of
12  those facilities, but limited to one million dollars?
13      A    That could occur.
14      Q    Did it ever occur during your long history
15  as a loan officer?
16      A    I can't recall.
17      Q    But it's possible it could occur, right?
18      A    Yes.
19      Q    There's no impediment to the bank doing
20  that; is that right?
21      A    Yes.

Page 136

1      Q    Who made the decision, if you know, to
2  declare the default?
3          Was that Mr. Elias, to make a long story
4  short, if you know?
5      A    I believe so.
6      Q    Did he talk to you before declaring --
7  before making the decision to declare the default, did
8  he ask you your input?
9      A    Not that I recall.
10      Q    Have you ever seen any document at all in
11  this universe prepared by the bank that analyzes
12  contemporaneously the material adverse change that
13  gave rise to the declaration of default by the bank?
14      A    Can you rephrase that?
15      Q    I thought it was pretty good the first time.
16      A    I didn't understand the first time.
17      Q    Have you ever seen any document in this
18  whole wide world that would constitute an analysis by
19  the bank of CCI's financial condition that gave rise
20  to its declaring the default of the loan; i.e., the
21  material adverse change?

**Esquire Deposition Services**

# Craig J. Schwartz

Page 137

1    A   The note says that.
2    Q   But have you ever seen an analysis done
3  prior to declaring the default that says here is why
4  they're in default, here is why there is a material
5  adverse change that warrants a declaration of a
6  default?
7        Banks analyze things --
8    A   Not that I recall.
9    Q   Okay. Would you look at the last exhibit to
10  the Complaint, sir, Exhibit D, which is Mr. Gebhardt's
11  letter to CCI declaring the default on February 24,
12  2000?
13       Did you review that before it was sent?
14   A   No.
15   Q   Okay. Now, let me ask more specifically.
16  That letter declares a default on the basis
17  of a material adverse change in the financial
18  condition of CCI; is that correct?
19   A   Yes.
20   Q   All right. As the loan officer, are you
21  able to -- were you able to analyze what that material

Page 138

1  adverse change was prior to the declaration of
2  default?
3        MR. GEBHARDT: You're asking were you
4  able, or did you?
5        MR. SWICHAR: Did -- either one.
6        MR. GEBHARDT: Well, wait a minute.
7  They're two different --
8        MR. SWICHAR: I like your question
9  better.
10   Q   (By Mr. Swichar) Did you?
11       MR. GEBHARDT: Okay.
12   A   No.
13   Q   Okay. You haven't seen that analysis
14  anywhere, either, or you don't recall, you said.
15   A   I don't recall.
16   Q   Okay. Presumably, Mr. Gebhardt would have
17  done that, or he wouldn't have sent the letter, right?
18       MR. GEBHARDT: Objection.
19   Q   You don't have to answer that one. That was
20  for my own enjoyment.
21       Let me show you Schwartz 11. Take a minute

Page 139

1  and look at that, Schwartz 11.
2        (Witness complying.)
3    Q   Let me ask the question first, and maybe it
4  will be easier.
5        This document reflects that the four million
6  dollar unsecured line of credit was rated as a number
7  five risk on a scale of one to ten, is that correct,
8  as of March 15, 1999?
9    A   Yes.
10   Q   And that's an acceptable risk to the bank?
11   A   Define acceptable.
12   Q   Well, the bank approved the loan, so I'm
13  assuming it was somewhat acceptable.
14   A   Yes.
15   Q   It was within the parameters of either
16  making or keeping the loan in existence, right?
17   A   Yes.
18   Q   Okay. What does the number five mean, by
19  the way, in bank parlance?
20   A   Average.
21       It's five. It's between one and ten, it's

Page 140

1  right in the middle.
2    Q   Is that unusual or usual, or there is no
3  usual or unusual?
4    A   It's average credit risk.
5    Q   Average credit risk.
6        Now, am I correct in stating that the
7  1.2 million dollar facility also had a number five
8  rating risk? Is that correct?
9    A   That, I don't know. I don't recall.
10   Q   Well, if we go back to the 1.2 million
11  dollar loan approval, or if you look at it now -- go
12  back and look at S-4 -- see that, about the middle of
13  the page, where it says new temporary 1.2 million?
14   A   Yes.
15   Q   The 1.2 million facility standing alone also
16  had an acceptable or average number five credit risk;
17  is that right?
18   A   On November 3rd.
19   Q   That's right.
20       Did you maintain a personal desk file with
21  respect to CCI?

35 (Pages 137 to 140)

# Craig J. Schwartz

Page 141

1    A  Yes.
2    Q  Have you turned that over to Mr. Gebhardt or
3  someone else in connection with this lawsuit?
4    A  Yes.
5        MR. SWICHAR:  Can I assume it's been
6  turned over, Larry?
7        MR. GEBHARDT:  You have it all.
8        MR. SWICHAR:  That's all I want to
9  hear, that's fine.
10       I mean, the way the documents came, it
11  was very difficult what came with what.
12       MR. GEBHARDT:  I mean, we, we went
13  through this, and we went through it with Judge Rambo.
14       MR. SWICHAR:  I'm just asking if we got
15  it, that's all.  That's fine.
16       MR. GEBHARDT:  I said we made those
17  representations and told you all many times --
18       MR. SWICHAR:  If you told me I have his
19  personal desk file, then that's good enough for me.
20    Q  (By Mr. Swichar) Would you look at the
21  Complaint?

Page 142

1        Do you have that there, S-2?
2        Just -- did you review this Complaint before
3  it was filed?
4    A  I'm not sure.  I don't recall if I did or if
5  I didn't.
6    Q  Did you review it in connection with this
7  deposition?
8    A  Yes.
9    Q  Okay.  Would you look at -- just so I can
10  clarify things again -- would you look at
11  Paragraph 7?
12       And, again, my question is, just so I
13  understand the mechanism of the cash management
14  facility, that any checks written from CCI's account
15  with the bank would increase the four million dollar
16  line of credit borrowings; is that correct?
17    A  Yes.
18    Q  And so far as you know, CCI had no business
19  accounts elsewhere?
20    A  As far as I know, they did not.
21    Q  Okay.  If -- if CCI wanted to pay a bill

Page 143

1  from the accounts receivable that it collects from the
2  account at Allfirst without drawing on the four
3  million dollar line of credit, how could it do that,
4  if it could at all?
5    A  One more time, please.
6    Q  All right.  I'm CCI and I want to pay a
7  bill.  I collect my money from the customer, I put it
8  in the account, and I want to pay another bill -- I
9  want to pay a bill, but I don't want it to draw on the
10  line of credit, four million dollar line of credit.
11       How -- could I do that?
12    A  I don't think so.
13    Q  Is there any document in this world that
14  prohibits CCI specifically from repaying the
15  1.2 million dollar note by drawing on the four million
16  dollar line of credit?
17    A  Is there a document that prohibits them?
18    Q  Yes, specifically.
19    A  Yes, I believe so.
20    Q  That prohibits specifically -- is there a
21  specific prohibition?

Page 144

1        And if there is, we'll find it.
2        MR. GEBHARDT:  You've been provided it.
3        MR. SWICHAR:  Pardon me?
4        MR. GEBHARDT:  You've been provided it.
5    A  I believe it states what the line of credit
6  can be used for, and that is not a use of a line of
7  credit.
8    Q  (By Mr. Swichar) All right.  Is there any
9  document that deals with how, how the loan is to
10  be repaid specifically?
11    A  No.
12    Q  Okay.  Is there any document that
13  specifically states it cannot be repaid by writing a
14  check on CCI's business account, checking account?
15       THE WITNESS:  Could you read that back?
16       (Question was read by the Reporter.)
17    A  Not specifically.
18    Q  (By Mr. Swichar) Okay.  Now, the loan
19  commitment, which I think you've been chomping at the
20  bit to want to tell me, states that the loan proceeds
21  were to be used to finance accounts receivable and

# Craig J. Schwartz

Page 145

1  work in progress; is that correct?
2      A   That's correct.
3      Q   Prior to the repayment of the 1.2 million
4  dollar note in February, on February 11, 2000, were
5  you aware of CCI ever using the 1.2 million dollar
6  loan proceeds for any other purpose?
7          MR. GEBHARDT:  For any other purpose?
8      Q   Other than to finance accounts receivable
9  and work in progress, prior to the repayment.
10     A   I am not aware of any.
11     Q   Okay.  In fact, you didn't monitor, you said
12  earlier; am I right?
13         You didn't monitor the use of the
14  1.2 million dollar loan proceeds, did you?
15     A   No.
16     Q   Okay.  Are you aware of any reason why the
17  bank did not put in the commitment letter or in the
18  1.2 million dollar note or guarantee the express
19  prohibition that the four million dollar line of
20  credit could not be used to repay the 1.2 million
21  dollar note?

Page 146

1          MR. GEBHARDT:  Objection.
2      Q   You can answer it.
3          THE WITNESS:  Would you read that back,
4  please?
5          (Question was read by the Reporter.)
6      A   It was a -- the loan amount for 1.2 million
7  dollars was for a cash flow shortage situation that
8  was occurring --
9      Q   (By Mr. Swichar) I understand.
10     A   -- so -- and, also, the line was there to
11  finance the receivables and work in process.
12         So the 1.2 million dollars would normally be
13  paid back after there's no usage on the line because
14  the receivables had been collected and cash flow is
15  sufficient to pay back the 1.2 million dollars over
16  and above the line balance.
17     Q   Where does it say that, other than in your
18  head?
19     A   It's -- it doesn't say that anywhere.
20     Q   Okay.  So let's go back and ask the same
21  question.  I'll say it a little slower this time.

Page 147

1          Are you aware of any reason why the bank
2  couldn't put in the commitment letter for the
3  1.2 million or in the 1.2 million dollar note or
4  in the 1.2 million dollar suretyship an express
5  prohibition that that facility could not be repaid by
6  drawing down on the four million dollar line of
7  credit?
8      A   There's no reason the bank could not have
9  done that.
10     Q   In fact, the loan commitment contains
11  negative covenants; is that right?
12     A   I believe so.
13     Q   And what's a negative covenant?
14     A   Things that the borrower is not allowed to
15  do.
16     Q   And the loan commitment and/or the note
17  contains loan -- negative covenants, correct?
18     A   Yes.
19     Q   Okay.  And the bank could have put in a
20  negative covenant that prohibited the repayment of the
21  1.2 million from the four million dollar line of

Page 148

1  credit; is that correct?
2          Nothing prohibited that, right?
3      A   Nothing prohibited that.
4      Q   No banking practice that I'm unaware of,
5  correct?
6      A   No.
7      Q   No regulation or rule somewhere out there
8  disguised that I'm not aware of?
9      A   Correct.
10     Q   Okay.  Is there any request by the bank to
11  ask Mr. Ortenzio, on Mr. Ortenzio, to guarantee more
12  than the 1.2 million other than the document we saw
13  which was for the five million?
14     A   No.
15     Q   Explain to me when and how you learned that
16  the 1.2 million dollar note had been repaid.
17     A   I received a phone call on the day that the
18  note was repaid --
19     Q   February 11th?
20     A   -- February 11th -- from Mr. Ortenzio, that
21  he was going to bring in a check to pay off the

# Craig J. Schwartz

Page 149

1  1.2 million dollars. I said, okay, fine.
2      I was out on other business when, when he
3  came in and presented the payment. I was told about
4  it when I got back. And --
5      Q  What were you told?
6      A  That Mr. Ortenzio came in and paid off the
7  1.2 million dollar loan.
8      Q  Okay. What happened next?
9      Did you take any action of any kind?
10     A  Not that I recall.
11     Q  Well, at a certain point, you returned the
12  note to him, correct?
13     A  No, I did not.
14     I returned his surety.
15     Q  Okay. You --
16     A  He was -- yes.
17     Q  Okay. You returned the surety, and we'll
18  come to that in a minute.
19     Where did you think the -- what funds did
20  you think were being used to pay off the 1.2, or you
21  didn't think about it?

Page 150

1      A  I don't recall thinking about it.
2      Q  Okay. Frankly, you didn't care.
3      A  I didn't say that.
4      Q  I'm asking.
5      A  Sure, I cared.
6      Q  Well, but you didn't ask, did you --
7      A  No.
8      Q  -- the source of the funds?
9      A  No.
10     Q  But you cared?
11     A  Yes.
12     Q  Why did you care?
13     A  In hopes that their cash flow situation was
14  back where they said it was going to be at that point;
15  it was going to be great, we didn't have a big problem
16  to worry about, and things were going well for them.
17     Q  But you never cared enough to call
18  Mr. Ortenzio to find out the source of the funds?
19     A  I did not call Mr. Ortenzio.
20     Q  All right. I don't think -- I think we
21  talked about the loan commitment letter, but I don't

Page 151

1  think we marked it, so I just want to confirm that
2  Schwartz 12 is the -- what I'll call the loan
3  commitment letter because I know you like that letter.
4      Let's look at it, and at least tell me that
5  that is, indeed, the loan commitment letter.
6      A  This is a commitment letter for the four
7  million dollar line of credit.
8      Q  Okay, that's all.
9      Would you look at Exhibit S-13, which is
10  your letter to Mr. Ortenzio at CCI dated February 15,
11  2000?
12     A  Yes.
13     Q  How did you determine that the 1.2 million
14  dollar loan had been paid in full as of February 11?
15     A  I looked on the computer.
16     Q  And what did the computer show?
17     A  A zero balance.
18     Q  Okay. Did that computer screen deal only
19  with the 1.2, or would it have looked at, more
20  specifically, at the cash management account, the
21  checking account, the four million dollar line of

Page 152

1  credit, et cetera, et cetera?
2      A  Just the 1.2.
3      Q  Okay. But you had the other means of
4  checking to see what the availability was and the
5  balance was of the four million?
6      A  I had the means.
7      Q  You chose not to go into that?
8      A  I don't recall if I did or if I didn't.
9      Q  Is it possible you did?
10     A  I don't recall.
11     Q  You don't recall either way?
12     A  Correct.
13     Q  Okay. Was this mailed or hand-delivered,
14  S-13?
15     A  I don't recall.
16     Q  Did you ever inquire the source of payment?
17     A  No.
18     Q  Okay. Now, when Mr. Ortenzio on behalf of
19  CCI wrote a check and repaid the 1.2 million dollar
20  note, he was acting on behalf of CCI as an officer; is
21  that correct?

**Esquire Deposition Services**

## Craig J. Schwartz

Page 153

1       MR. GEBHARDT:  Objection.
2    A  I don't know.
3    Q  Well, he wrote a check as an officer of CCI,
4  didn't he?
5       MR. GEBHARDT:  Objection.
6    Q  You can answer.
7    A  I don't know who wrote the check.
8    Q  Well, assuming Mr. Ortenzio was responsible
9  for paying the 1.2 million, who was he acting on
10  behalf of?
11       MR. GEBHARDT:  Objection.
12    A  I really don't know because I had very
13  little dealings with the payment of loans from
14  Mr. Ortenzio through my whole relationship at CCI.
15       This was the first time Mr. Ortenzio had
16  made a loan payment that I am aware of.
17    Q  Well, why do you say you had no relationship
18  with respect to repayment of the loan?
19    A  I said contact.
20    Q  Contact.
21       Well, how would that be done?

Page 154

1    A  I -- I dealt with Sheri Phillips --
2    Q  Okay.
3    A  -- on the loan.
4    Q  And would she bring checks in, or --
5    A  No.
6    Q  -- how did it work?  What happened?
7    A  They would mail the checks.
8    Q  Okay.  Well, how -- why did you say you
9  dealt with Sheri Phillips, then, if the checks were
10  mailed?
11       Were there letters that were signed by her
12  or what?
13    A  I dealt with Sheri Phillips as far as the
14  banking relationship.
15       I didn't specifically say the, the payments.
16    Q  Well, you said you didn't have any
17  relationship with Mr. Ortenzio in regard to repayments
18  of loans, you dealt with Sheri Phillips.
19       So my question is -- is that correct, or do
20  you want to change your answer?
21    A  That's okay.

Page 155

1    Q  Okay.  When repayments were made by CCI on
2  account of the equipment note or any other loan
3  facility, how did they come in?
4       Were they mailed in, or did Sheri Phillips
5  hand-deliver them to you, or both?
6    A  No payments ever came directly to me.
7    Q  Okay.  Where did they go?
8    A  Either they were mailed in or delivered to a
9  branch.
10    Q  Okay.  Did -- how did you have a
11  relationship with Sheri Phillips in regard to the
12  repayment on CCI loans?
13    A  If there was ever a problem with the
14  payment, that's who I would contact, her.
15    Q  Was there ever a problem?
16    A  I don't recall.
17    Q  Okay.  So how else would you have a
18  relationship with her in connection with repayment,
19  other than if there was a problem that you don't
20  recall there ever being a problem?
21    A  If she had a question on the, on the bill,

Page 156

1  she would call.  When --
2    Q  Sticking to the repayment.
3    A  When we set up the repayment, she would --
4  we would discuss what the repayment was going to be
5  on, on the loan.
6    Q  You never had similar conversations with
7  Mr. Ortenzio?
8    A  No.
9    Q  Okay.  Would you look at No. 17,
10  Paragraph 17, in the Complaint?
11    A  Okay.
12    Q  Do you agree with that allegation?
13    A  Yes.
14    Q  Would you tell me what is meant by a
15  conditional payment?
16       MR. GEBHARDT:  Objection.
17       That is -- why don't you go out of the
18  room while I put this on the record.
19       MR. SWICHAR:  I'll -- I'll change the
20  question.
21       That's okay, I'll withdraw the

**Esquire Deposition Services**

# Craig J. Schwartz

Page 157

1    question; save time.

2    Q    (By Mr. Swichar) Are you aware of any facts
3    that made the payment conditional as alleged in
4    Paragraph 7?

5    A    No.

6    Q    Am I correct, sir, that both the 1.2 million
7    dollar note and the four million dollar note and the
8    1.2 million dollar surety have default provisions?

9    A    Yes.

10    Q    In any of those three documents, and
11    including the loan commitment letter, is there any
12    prohibition, or does it make an event of default by
13    paying the 1.2 million dollar loan off by utilizing
14    the four million dollar line of credit?

15         MR. GEBHARDT:  Objection to the use of
16    the compound question.

17         Prohibition and event of default,
18    they're two separate --

19         MR. SWICHAR:  I'll strike the
20    prohibition.

21    Q    (By Mr. Swichar) In any of those documents,

Page 158

1    does it state that there is an event of default by
2    paying the 1.2 million dollar note off by utilizing
3    the four million dollar line of credit?

4    A    Not in the documents you mentioned.

5    Q    I mentioned the 1.2 million dollar note,
6    correct?

7    A    Yes.

8    Q    I mentioned the four million dollar note,
9    correct?

10    A    Yes.

11    Q    I mentioned the loan commitment, and I
12    mentioned the two million dollar equipment note, or
13    I'll mention it now because I think that covers
14    everything.

15         Do any of those four documents state that it
16    is an event of default to pay off the 1.2 million
17    dollar note with the four million dollar line of
18    credit?

19    A    No, they do not.

20    Q    Is there any document in this universe that
21    you're aware of that states that the 1.2 million

Page 159

1    dollar note cannot be paid off unless the four million
2    dollar note is paid off first?

3    A    No.

4    Q    Are you aware of any banking practice,
5    custom, or regulation that would act as an impediment
6    to the bank stating in any loan document that the
7    1.2 million dollar note could not be paid off until --
8    unless and until the four million dollar note is paid
9    off first?

10    A    I am not aware of any.

11    Q    Are you aware of any banking practice, rule,
12    or regulation or other impediment that would have
13    prohibited the bank from requiring a guarantee of the
14    last one million dollars in CCI's indebtedness,
15    whether it be the four million dollar line or the
16    1.2 million dollar note, or the two million dollar
17    equipment loan?

18    A    I am not aware of any.

19    Q    Are you aware of any banking regulation,
20    policy, or rule or regulation or other impediment
21    which would have prevented the bank from stating that

Page 160

1    the 1.2 million dollar line had to be paid from funds
2    other than collected accounts receivable or other
3    business deposits of CCI?

4    A    I'm not aware of any.

5    Q    Now, when the 1.2 million dollar facility
6    was deposited in CCI's account, I think you testified
7    earlier that that would have had the financial impact
8    of decreasing the balance on the four million dollar
9    line of credit; is that correct?

10    A    Yes.

11    Q    And it would have also had the impact
12    financially of increasing the availability on the four
13    million dollar line of credit; is that correct?

14    A    Yes.

15    Q    And that would have occurred in November,
16    1999, if I recall correctly?

17    A    Yes.

18    Q    Now, when the 1.2 million dollar note was
19    repaid by drawing on the four million dollar line of
20    credit in February, 2000, that, in effect, reversed
21    that which had previously occurred when the

40 (Pages 157 to 160)

# Craig J. Schwartz

Page 161

1  1.2 million dollar loan was deposited in CCI's bank
2  account a few months earlier; is that correct?
3       MR. GEBHARDT: Objection.
4    A  It increased the line.
5    Q  It had the same impact; it reversed the
6  impact of what occurred earlier when the 1.2 million
7  dollar loan -- I could go through the numbers again,
8  but I don't think I have to, do I?
9    A  No.
10   Q  It really just reversed what had occurred
11 when the 1.2 million dollar loan had been granted and
12 deposited?
13   A  It increased the outstanding on the four
14 million dollar line.
15   Q  The answer to my question is yes, it was a
16 reversal?
17   A  No, it wasn't a reversal.  It increased the
18 outstanding on the line at that time.
19   Q  Okay.  At any time in the history of CCI's
20 relationship with the bank, did it ever exceed the
21 four million dollar cap?

Page 162

1    A  I don't recall.
2    Q  Okay.  Are there documents -- and I know
3  your attorney will say I got them, but I don't think I
4  did -- that would show me if deposits that were made
5  by CCI to its checking account for, let's say the
6  months prior to the closing of the account, February,
7  2000?
8    A  Are there --
9    Q  Documents that reflect deposits made, the
10 amount of deposits made.
11   A  Their checking accounts.
12   Q  Their checking account statements?
13   A  Checking account statements.
14   Q  And the bank would have copies of those
15 documents as well?
16   A  Yes.
17   Q  Okay.
18       MR. GEBHARDT: As do you.
19       MR. SWICHAR: Pardon me?
20       MR. GEBHARDT: As do you.
21       As do you.

Page 163

1       MR. SWICHAR: How do I have them?
2       MR. GEBHARDT: Because you have with
3  Mr. Chernicoff, the same way --
4       MR. SWICHAR: I'm assuming that they're
5  out there somewhere.  I just wanted to make sure if
6  there's anything else other than the checking account
7  statements.
8    Q  (By Mr. Swichar) Would you look at
9  Paragraph 34 of the Complaint?
10      Let me know when you're done reading it.
11      (Witness reading.)
12   A  Okay.
13   Q  Did Mr. Ortenzio ever make any direct
14 representation to you that the 1.2 million dollar loan
15 facility would not be paid from the four million
16 dollar line of credit, it would come from other funds?
17   A  No.
18   Q  Are you familiar with the practice --
19      MR. SWICHAR: Let's stop for a minute.
20      (Discussion off the record.)
21   Q  (By Mr. Swichar) Are you familiar in reading

Page 164

1  the Complaint, do you recall that as part of the
2  Complaint there was a preference action that's been
3  filed against the bank by the debtor, CCI?
4    A  I am aware of that.
5    Q  Okay.  And are you aware that this lawsuit
6  against Mr. Ortenzio seeks indemnification of the
7  preference in the event the bank is required to
8  reimburse CCI of that preference claim?
9       MR. GEBHARDT: That's not an accurate
10 statement.
11   Q  Are you aware that the bank --
12      MR. SWICHAR: I never could figure out
13 that part of the Complaint.
14      MR. GEBHARDT: Well, let me -- why
15 don't I because --
16      MR. SWICHAR: Why don't you do it.
17      MR. GEBHARDT: -- Mr. Burke had some
18 questions about that, too.
19      The maximum amount the bank is seeking
20 to recover is the 1.2 million dollars that was
21 guaranteed plus the costs of collection.

**Esquire Deposition Services**

# Craig J. Schwartz

1    Because of the three payments that came
2    in at or about the time of the default, the line of
3    credit was reduced so that the principal balance was
4    somewhere in the area of three hundred thousand
5    dollars.
6        If those payments do not have to be
7    returned as preferences and are truly pay-downs of the
8    line of credit, then that's what the bank is seeking.
9        But to the extent a preference recovery
10   is made, the bank intends to recover the amount of the
11   preference recovery up to a ceiling of the 1.2 million
12   dollars because that is the limit of the guarantee
13   that Mr. Ortenzio gave.
14       MR. SWICHAR: Thank you.
15       MR. GEBHARDT: So -- I mean, that's --
16       MR. SWICHAR: I appreciate that.
17   Q    (By Mr. Swichar) Do you understand that?
18   A    Yes.
19   Q    Okay. Now, the payments that constitute the
20   preference payments constitute monies that were swept
21   from CCI's checking account to the bank, by and to the

1    bank; is that correct?
2        MR. GEBHARDT: There were payments that
3    were sent in by customers directly and, in accordance
4    with the normal mechanisms, were applied against the
5    line.
6        MR. SWICHAR: Okay, but those were
7    payments by CCI's customers and deposited in CCI's
8    checking account, correct?
9        MR. GEBHARDT: Whatever the collection
10   account was.
11       MR. SWICHAR: Yeah -- well, there was
12   only one checking account, so it would have gone into
13   the checking account; is that correct?
14       MR. GEBHARDT: I guess that's how they
15   set it up.
16       MR. SWICHAR: And the way the monies
17   went to the bank that constitute the alleged
18   preference payments is that the bank swept those
19   monies from the checking account of CCI to the bank.
20       MR. GEBHARDT: That was done every day
21   during the entire relationship.

1        MR. SWICHAR: I understand. I'm not
2    arguing about the preference aspects.
3        I'm only trying to figure out the
4    mechanism by which the monies went to the bank, and
5    that was via the sweep that the bank would make in
6    some fashion from the checking account of CCI to the,
7    to the bank.
8        The bank swept those monies out.
9    Whether it's in the routine ordinary course or
10   whatever, I don't care, but is that correct?
11       MR. GEBHARDT: I mean, I guess.
12       You know, I'm not quite sure what
13   you're asking, or what I'm doing here --
14       MR. SWICHAR: It wasn't a situation
15   where Mr. Ortenzio or someone from CCI said --
16       MR. GEBHARDT: Do it, no.
17       MR. SWICHAR: -- do it --
18       MR. GEBHARDT: No.
19       MR. SWICHAR: -- here's the money, do
20   it?
21       MR. GEBHARDT: No.

1    He had no part in it.
2        MR. SWICHAR: Okay. He had no --
3        MR. GEBHARDT: We're not contending he
4    had any part --
5        MR. SWICHAR: Okay. The bank had no
6    part --
7        MR. GEBHARDT: Mr. Ortenzio.
8        MR. SWICHAR: -- I'm sorry --
9    Mr. Ortenzio had no part in the payment of those
10   preference, alleged preference payments to the bank.
11       MR. GEBHARDT: Other than --
12       MR. SWICHAR: Other than it was his
13   checking account that was --
14       MR. GEBHARDT: It was the company's
15   checking account that authorized that procedure.
16       MR. SWICHAR: Okay.
17   Q    (By Mr. Swichar) Would you look at
18   Schwartz 14, Mr. Schwartz, which I'm about to give
19   you?
20       I have one very simple question. Were you
21   involved in the preparation of S-14, which is an

**Esquire Deposition Services**

## Craig J. Schwartz

Page 169

1  Allfirst charge-off memo?
2      A  No.
3      Q  Do you know the reasons for the bank's
4  declaring the default on February 24?
5      A  No.
6      Q  Okay. I'll leave this out, save that for
7  Mr. Elias.
8          If the bank had collected one million
9  dollars from its customers and deposited it in a rival
10  bank, in another bank, and you knew about that, what
11  would you have done?
12          MR. GEBHARDT: If the bank had
13  collected --
14      Q  I'm sorry.
15          If CCI had collected one million dollars
16  from its customers in the ordinary course and put it
17  in another bank and you found out about it, is that a
18  permissible or impermissible act?
19          MR. GEBHARDT: Objection.
20      A  I don't think it was -- would -- could be
21  deemed as permissible or impermissible.

Page 170

1          I would have asked why, what the purpose
2  was.
3      Q  Well, I'm trying to figure out what the
4  intent of the obligation was where the bank -- where
5  CCI was required to make its primary business deposits
6  at Allfirst.
7          So in that context, if CCI had said, well, I
8  have a million dollars in checks, I'm going to deposit
9  that money somewhere else, in another bank, would you
10  have considered that a breach of that obligation?
11      A  Yes.
12          Can I rephrase that?
13      Q  Sure.
14      A  I don't think that was a breach.
15          I would have inquired as to why they were
16  doing that. I mean, a lot of customers do have
17  accounts at other banks. Their operating account
18  where the transactions occur day-to-day --
19      Q  Is there a similar --
20      A  -- is meant by primary deposit account.
21      Q  I'm sorry, what?

Page 171

1      A  The account where checks that they use to
2  conduct business --
3      Q  Right.
4      A  -- on a day-to-day basis --
5      Q  Right.
6      A  -- and their primary account would be the
7  one tied to cash management.
8          If they have an account at another bank --
9  customers do that -- it wouldn't be a breach.
10      Q  Well, suppose they were collections from
11  customers, and they had an obligation such as the one
12  that CCI had and they put that money in another bank
13  and the borrower used it to buy an airplane.
14      A  I would inquire as to why they're doing
15  that.
16      Q  I'm using it to buy an airplane.
17      A  Why isn't the money coming back into the
18  business?
19      Q  Well, would you have considered that a
20  breach?
21      A  A breach --

Page 172

1      Q  In your view, a permissible act.
2          MR. GEBHARDT: Objection.
3          MR. SWICHAR: I'll withdraw the
4  question. It's a fair objection.
5          Larry, are you -- I'm asking you
6  outright, and I almost hope the answer is yes -- are
7  you planning to use Mr. Schwartz as an expert at the
8  trial?
9          I think I'm entitled to know that.
10          MR. GEBHARDT: Well, as I mentioned,
11  depending on -- if you plan to have someone take the
12  stand that says, and testify as an expert, that it is
13  ordinary banking custom and practice to repay a
14  guaranteed loan facility with the proceeds of an
15  unsecured, unguaranteed line of credit in a situation
16  where the borrower is in default, I may ask
17  Mr. Schwartz if that's his understanding of banking
18  custom and practice, but I have no intention of
19  necessarily calling him in my case in chief as an
20  expert.
21      Q  (By Mr. Swichar) Mr. Schwartz, are you aware

43 (Pages 169 to 172)

# Craig J. Schwartz

Page 173

1 of any custom or practice in the banking industry that
2 requires a borrower to repay a guaranteed loan with
3 funds other than -- which prohibits a borrower from
4 repaying a guaranteed loan from a draw on a
5 nonguaranteed loan?
6        MR. GEBHARDT: Objection.
7        Custom and practice is not a law.
8        MR. SWICHAR: Well, I'm using your
9 quote. I wrote it down when you said ordinary banking
10 custom and practice.
11       MR. GEBHARDT: Right, but you're saying
12 is there a custom and practice that prohibits.
13       MR. SWICHAR: Yes.
14       MR. GEBHARDT: Well, banking customs
15 and practices don't prohibit anything. They're not
16 law. They're how --
17       MR. SWICHAR: I'm asking -- I think the
18 whole banking custom or practice would be irrelevant
19 in this case, but you brought it up.
20       MR. GEBHARDT: It's your expert --
21       MR. SWICHAR: You said you may use him

Page 174

1 for that purpose if I use him, so I'm --
2        MR. GEBHARDT: Your expert --
3        MR. SWICHAR: -- hypothetically asking
4 him the question.
5    Q    (By Mr. Swichar) Are you aware of any
6 banking custom or practice which prohibits a borrower
7 from paying off a guaranteed loan from a loan that is
8 not guaranteed?
9    A    Not to my recollection.
10   Q    Okay. Would your answer change if I said to
11 you are you aware of any banking practice or custom
12 that prohibits a borrower from paying off a guaranteed
13 loan with -- from a nonguaranteed line of credit if it
14 is in financial distress?
15       MR. GEBHARDT: Objection.
16   A    Not to my recollection.
17   Q    All right.
18       MR. SWICHAR: Well, I'm done.
19       MR. GEBHARDT: I have some questions.
20       MR. SWICHAR: Sure.
21              ----

Page 175

1        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
2 BY MR. GEBHARDT:
3    Q    Mr. Schwartz, this particular four million
4 dollar line of credit was, as I think the testimony
5 has been and is reflected in the note, was tied to a
6 cash management facility, right?
7    A    Yes.
8    Q    And the cash management facility would kick
9 in basically at the end of each day, right?
10   A    Yes.
11   Q    And would I be correct that one would take
12 the total number of checks and deposits that came in
13 to the credit of CCI and then compare them to the
14 total number of checks that CCI had issued and that
15 were presented to the bank for payment on each day?
16   A    Yes.
17       MR. SWICHAR: Well, I object because I
18 don't know if the computer made that comparison. I
19 think it works differently.
20       MR. GEBHARDT: Well, I'm asking the
21 witness.

Page 176

1        MR. SWICHAR: Yeah, but you're telling
2 the witness.
3        So why don't you just ask him questions
4 how it works?
5    Q    (By Mr. Gebhardt) If there was a greater
6 number of checks presented for payment than there were
7 deposits received, what would be the effect?
8    A    A draw on the line of credit.
9    Q    Suppose there was an excess of checks
10 received to the credit of CCI's account over items
11 presented for payment?
12   A    A payment on the line of credit.
13   Q    And suppose the line of credit had been
14 fully repaid?
15   A    An investment would occur.
16   Q    So there would be a positive balance in
17 CCI's account?
18   A    Yes.
19   Q    And what would happen -- would that positive
20 balance earn interest?
21   A    Yes.

# Craig J. Schwartz

Page 177

1  Q   And do you recollect whether under the terms
2  of the line of credit CCI was required to have the
3  line of credit at a zero balance for thirty
4  consecutive days in a twelve-month period?
5      MR. SWICHAR: Could I hear that back?
6      (Question was read by the Reporter.)
7      MR. SWICHAR: I don't understand the
8  question, but if your own witness does, fine.
9      And if there is a document, why don't
10 you just show it to him?
11     MR. GEBHARDT: Actually, I will
12 withdraw the question because the March 23rd, 1999,
13 commitment does not have that as a requirement, but
14 the preceding one did.
15     So we're operating under what's been
16 designated Schwartz 12, so I will withdraw the
17 question.
18 Q   (By Mr. Gebhardt) Now, turning to Schwartz
19 Exhibit 12, which is the commitment letter for the
20 four million dollar revolving line of credit, what
21 were the proceeds of draws on the line of credit to be

Page 178

1  used to do?
2  A   Finance work in process and accounts
3  receivable.
4  Q   Is repaying in full any fully funded loan or
5  credit facility an authorized use of loan proceeds?
6      MR. SWICHAR: I object to the form of
7  the question.
8  Q   You may answer.
9      THE WITNESS: Read it back, please.
10     (Question was read by the Reporter.)
11     MR. SWICHAR: I object to the form,
12 particularly the word authorized.
13 A   No.
14 Q   (By Mr. Gebhardt) Okay. Now, what exactly
15 are accounts receivable?
16 A   Payments from customers of the borrower for
17 services rendered.
18 Q   Okay. And this line of credit was intended
19 to provide CCI with --
20     MR. SWICHAR: Are you just leading him
21 down?

Page 179

1      I'm just objecting.
2      MR. GEBHARDT: Then object.
3  Q   (By Mr. Gebhardt) The line of credit was
4  intended to permit CCI to have funds available pending
5  the receipt of payment from customers on the accounts
6  receivable?
7  A   Yes.
8  Q   You were asked some questions relating to
9  the payment of the monthly installments on the two
10 million dollar equipment term loan.
11     Do you recollect those?
12 A   Yes.
13 Q   And I think your testimony was that they
14 were made through the use of the revolving, four
15 million dollar revolving line of credit, right?
16 A   Yes.
17     MR. SWICHAR: No, I don't think he said
18 that.
19     I think he said the repayments were
20 made either through checks or automatic, and then we
21 went to the next step, which was the impact of it.

Page 180

1  Q   Was making the monthly installments of
2  principal and interest on the equipment term loan an
3  authorized use of the four million dollar revolving
4  line of credit?
5  A   Yes.
6  Q   Why is that?
7  A   Because a term loan is to be repaid, of
8  course, over a period of time, monthly, and through
9  profits of the company, and those profits are a part
10 of the receivables that they come in. So that line is
11 used because that -- the profits are in -- a part of
12 the accounts receivable, and the line gets paid down
13 that way.
14     (Gerard L. Elias entered the conference
15 room.)
16 Q   Had there been no term loan from CCI --
17 no -- excuse me, let me rephrase that.
18     Assume there had been no four million dollar
19 line of credit, what would the source of payment have
20 been for CCI to repay the monthly installments of
21 principal and interest on the two million dollar

45 (Pages 177 to 180)

# Craig J. Schwartz

Page 181

1  equipment loan?

2      MR. SWICHAR: Objection as to form.

3   A  Excess cash flow.

4   Q  Where would that come from?

5   A  The collection of accounts receivable.

6   Q  Okay. Now, when the 1.2 million dollar loan

7  was paid off on February 11, 2000, with a draw on the

8  four million dollar revolving line of credit, I

9  believe the testimony has been that a check was

10  delivered by Mr. Ortenzio to make that payment.

11      Does that accord with your recollection?

12  A  Yes.

13  Q  Was that payment delivered directly to you?

14  A  No.

15  Q  Were you at any time ever told by anyone at

16  or about February 11, 2000, that that check

17  represented a draw on the four million dollar

18  revolving line of credit?

19  A  No.

20  Q  Had you known on or about February 11, 2000,

21  that the check presented by Mr. Ortenzio on behalf of

Page 182

1  CCI represented a draw on the four million dollar

2  revolving line of credit, what action, if any, would

3  you have taken?

4   A  I would have not honored the check.

5   Q  If Mr. Ortenzio had called you prior to

6  bringing the check in and expressly stated that he

7  intended to pay the 1.2 million dollar loan with a

8  draw on the four million dollar revolving line of

9  credit, what would your response to Mr. Ortenzio have

10  been?

11      MR. SWICHAR: Objection to form.

12  A  No, don't bother, or why are you paying it

13  off with the line?

14  Q  Now, when the --

15      MR. SWICHAR: Do you want the answer to

16  that?

17  Q  When the 1.2 million dollar line of

18  credit -- excuse me -- when the 1.2 million dollar

19  loan was discussed, what did Mr. Ortenzio tell you was

20  the reason CCI needed that advance of funds?

21  A  They needed the money to keep operating

Page 183

1  because the cash flow situation of the company was in

2  a depo -- disposition.

3   Q  Did Mr. Ortenzio express at all how long he

4  believed that cash flow problem would continue?

5   A  I believe some cash flow projections given

6  to us indicated February, through the end of February.

7   Q  And from what source based on your

8  discussions with Mr. Ortenzio in November of 1999 did

9  you anticipate the 1.2 million dollar loan being

10  repaid?

11  A  Excess cash flow.

12  Q  Okay. And based on Mr. Ortenzio's

13  discussions, did you expect that excess cash flow to

14  put CCI in a positive cash position?

15  A  Yes.

16  Q  And would you have expected at the time of

17  the 1.2 million --

18      MR. SWICHAR: Object to all these

19  leading questions.

20      MR. GEBHARDT: That's fine.

21  Q  (By Mr. Gebhardt) Would you have expected

Page 184

1  the 1.2 million dollar loan had it been repaid from

2  the excess cash flow for there to have been a positive

3  balance on the four million dollar revolving line of

4  credit?

5   A  I would have expected the line to have a

6  zero balance.

7   Q  Now, you were asked --

8      MR. SWICHAR: Wait.

9      Can I hear that question and answer

10  back again?

11      (Record was read by the Reporter.)

12  Q  (By Mr. Gebhardt) Now, I believe the

13  documents establish based on the commitment letters

14  that the 1.2 million dollar loan was to be due on

15  March 31, 2000, if not demanded sooner, and that the

16  four million dollar line of credit expired on

17  April 30, 2000.

18      What was your anticipation of what would

19  occur had CCI Construction not had sufficient cash

20  flow to repay the 1.2 million dollar loan by March 31,

21  2000?

46 (Pages 181 to 184)

# Craig J. Schwartz

Page 185

1    MR. SWICHAR: Same objection; both
2    leading and speculative.
3    A   We would have reviewed the situation and
4    determined what our further action would be at that
5    time.
6    Q   And what kind of further actions or options
7    would have been available to the bank at that time?
8    MR. SWICHAR: Same objections.
9    A   Additional collateral, restructure of the
10   debt.
11   Q   Okay. Now, you were asked some questions
12   about material adverse change in the financial
13   circumstances of CCI.
14   In February of 19 -- or excuse me -- in
15   February of 2000, would you as CCI's account officer
16   have regarded a six million dollar loss for the fiscal
17   year ending December 31, 1999, to have been a material
18   adverse change in CCI's financial situation?
19   A   Yes.
20   Q   Would you have regarded a million dollar
21   negative shareholder equity as of December 31, 1999,

Page 186

1    as being a material adverse change in CCI's financial
2    circumstances?
3    A   Yes.
4    Q   Okay. Do you know whether the suretyship --
5    do you know whether the 1.2 million dollar promissory
6    note contained a material adverse change default
7    provision?
8    MR. SWICHAR: Objection to form; speaks
9    for itself.
10   A   Yes, I believe it does.
11   Q   Okay. If you would like to, take a look at
12   Mr. Ortenzio's suretyship document, suretyship
13   guarantee.
14   Do you have that in front of you -- okay,
15   it's an exhibit.
16   Do you know whether the suretyship provided
17   that Mr. Ortenzio would be in default if there was a
18   material adverse change in the financial circumstances
19   of CCI?
20   MR. SWICHAR: Objection as to form; the
21   document speaks for itself.

Page 187

1    Q   You may answer.
2    A   Yes, I believe it does.
3    MR. SWICHAR: Do you want to point to
4    that provision while we're at it?
5    MR. GEBHARDT: You've got these in the
6    Complaint, don't you?
7    MR. SWICHAR: Okay, let's go on. I'll
8    accept it.
9    I'll accept it, Larry.
10   Q   (By Mr. Gebhardt) Why don't you read it out
11   verbally, Mr. Schwartz?
12   I think it's --
13   MR. SWICHAR: It goes down to G.
14   MR. GEBHARDT: Exactly.
15   Q   (By Mr. Gebhardt) Material adverse change in
16   the financial condition of the borrower or the
17   undersigned.
18   And would I be correct that carrying down on
19   the page there's an authorization for the bank in its
20   sole discretion without notice to collect the
21   guaranteed sums directly from the person giving the

Page 188

1    suretyship, and that's in the paragraph next to the
2    last from the bottom?
3    A   Yes.
4    Q   Now, if we assume that CCI had a six million
5    dollar loss for fiscal year 1999 and had a negative
6    shareholders equity of one million dollars, would you
7    have regarded there to have been a default under the
8    1.2 million dollar loan and Mr. Ortenzio's suretyship
9    at the time the check was presented in payment of that
10   obligation under -- by a draw on the four million
11   dollar line of credit?
12   MR. SWICHAR: I object.
13   Mr. Schwartz has already testified that
14   he was totally uninvolved in the default issues
15   involved in this case, but go ahead, answer it.
16   Q   If you had known -- if you had personally
17   known of the financial circumstances of CCI on
18   February 11, 2000, the day Mr. Ortenzio brought the
19   check in, would you have regarded at that moment
20   Mr. Ortenzio and CCI to have been in default?
21   A   Yes.

**Esquire Deposition Services**

# Craig J. Schwartz

Page 189

1    Q   Now, I think you indicated that you did not
2   know when you spoke with Mr. Ortenzio on or about
3   February 11 what the source of the payment might have
4   been that repaid the 1.2 million dollar loan.
5    A   That's correct.
6    Q   Do you know whether, based on your activity
7   as an account officer, whether Mr. Ortenzio had the
8   personal financial ability to have made that payment?
9       MR. SWICHAR:  Objection as to form.
10   A   Yes, I believe he did.
11   Q   Did you know for a fact whether CCI had
12  accounts with any other banks at the time?
13   A   I was not aware of any.
14   Q   But did you know one way or the other?
15   A   No.
16   Q   Did you know whether CCI was into the line
17  of credit at the time the payment was made?
18       MR. SWICHAR:  Objection.
19       I don't know what that means, into the
20  line of credit.
21   Q   Had a positive balance on the line of credit

Page 190

1   at the time the 1.2 million dollar payment was made.
2       Did you know that on February 11?
3    A   No, I did not.
4    Q   Now, after you learned that the check had
5   come in, did you have any contact with Mr. Ortenzio
6   about the consequences of the payment having been
7   made?
8       In other words, why did you send this letter
9   that's been marked as S-13 to Mr. Ortenzio confirming
10  that the 1.2 million dollar line had about --
11       MR. SWICHAR:  Objection as to form; the
12  letter says why he sent it.
13   Q   That's 13.
14       Why did you send that letter, S-13?
15       MR. SWICHAR:  Objection as to form.
16       It states on the letter why he was
17  sending it.
18   A   As a follow-up to Mr. Ortenzio's request to
19  get his surety back because, because the loan was paid
20  in full.
21   Q   Okay.  Now, that was a request made to you

Page 191

1   directly?
2    A   Yes.
3    Q   And was any sense of urgency expressed by
4   Mr. Ortenzio in the call requesting the return of the
5   suretyship?
6    A   Yes, it would have had to be for me to go
7   through the process to get the surety back quicker
8   than the normal course of business.
9       MR. SWICHAR:  That's not responsive.
10       I object to the answer, form of the
11  answer.
12   Q   Did you take action to get it back quicker
13  than the normal ordinary process?
14       MR. SWICHAR:  He testified he had no
15  recollection.
16       Objection.
17   Q   You may answer.
18   A   Yes, I have -- I did.
19   Q   And why did you take that extra effort?
20   A   Mr. Ortenzio's request.
21   Q   You were also asked a couple questions about

Page 192

1   banking custom and practice.
2       Do you recollect that?
3    A   Yes.
4    Q   Do you know whether banking customs and
5   practice are binding law, enforceable --
6       MR. SWICHAR:  Objection to the
7   question.
8    Q   -- in courts?
9    A   No, I do not.
10   Q   Do you know whether banking customs and
11  practices constitute a prohibition upon borrower
12  conduct?
13   A   No, I do not.
14       MR. GEBHARDT:  No further questions.
15       MR. SWICHAR:  Just a couple.
16       EXAMINATION BY COUNSEL FOR THE DEFENDANT
17  BY MR. SWICHAR:
18   Q   Mr. Schwartz, you testified that the
19  repayment in full of the 1.2 million dollar loan was
20  not an authorized use of the four million dollar line
21  of credit; is that correct?

# Craig J. Schwartz

Page 193

1    A   Yes.

2    Q   Is there any document anywhere in this world
3    that states specifically in regard to repayment in
4    contrast to use of the funds that the funds -- that
5    the four million dollar line could not be used to
6    repay the 1.2?

7    A   There's no documents that says it cannot be
8    used to repay it.

9    Q   Is there any -- would there have been any
10   impediment that you're aware of to the bank stating in
11   any document binding on Mr. -- binding on CCI or
12   Mr. Ortenzio to prohibit the four million dollar line
13   of credit to be used to repay the 1.2 million dollar
14   loan, such as we discussed earlier, a negative
15   covenant?

16   A   Other than the agreed-upon use of proceeds
17   of that four million dollar loan.

18   Q   Right, right.

19       Is there any impediment to the bank
20   expressly stating as a negative covenant that the four
21   million dollar line of credit could not used to repay

Page 194

1    the 1.2 million dollar loan?

2    A   No.

3    Q   The answer's no?

4    A   No.

5    Q   How was CCI to repay the 1.2 million dollar
6    loan?

7    A   From excess cash flow.

8    Q   And I think we -- I asked you earlier, but
9    correct me if I'm wrong, since Mr. Gebhardt asked,
10   touched on that, where is that in any document?

11   A   I don't believe it's in a document.

12   Q   Okay.  Is there any reason or any impediment
13   to the bank not putting that in any document that this
14   loan could only be repaid from excess cash flow or
15   excess profits?

16       MR. GEBHARDT:  Let me object to, again,
17   the compound nature.  Reason and impediment are two
18   different things.

19       MR. SWICHAR:  I'm using his word -- I
20   hear you.

21       MR. GEBHARDT:  You're asking is there a

Page 195

1    reason --

2        MR. SWICHAR:  I'll ask another
3    question.

4    Q   (By Mr. Swichar) Are you aware of any
5    impediment that prevented the bank from stating in any
6    document binding on CCI or Mr. Ortenzio that the
7    1.2 million dollar loan could only be repaid from
8    excess cash flow or profits?

9    A   No.

10   Q   You testified with respect to the equipment
11   note that that was a term loan; is that correct?

12   A   Yes.

13   Q   Is that different than the 1.2 million
14   dollar loan?

15   A   Yes.

16   Q   Okay, because payments were to be made
17   monthly?

18   A   The whole nature of the transaction was
19   different.

20   Q   The equipment note?

21   A   Yes.

Page 196

1    Q   Okay.  You testified that payments on the
2    equipment note had to be repaid through profits of the
3    company, from collected accounts receivable, if I took
4    notes correctly; is that correct?

5    A   Yes.

6    Q   Is that stated anywhere in the equipment
7    note or any related document?

8        In other words, limiting the monies that can
9    be used to repay the equipment note.

10   A   Not that I'm aware of.

11   Q   You testified when the 1.2 million dollar
12   note was repaid on February 11 you were not aware that
13   the payment had been made from a draw on the four
14   million dollar line of credit; is that correct?

15   A   Yes.

16   Q   That information was readily available to
17   you, was it not?

18   A   Within a day or so.

19   Q   Within a day or so?

20   A   Yes.

21   Q   Wouldn't that information have been on your

# Craig J. Schwartz

Page 197

1  computer?
2      A   Not until the payment actually gets posted.
3      Q   Okay.  The next day?
4      A   Possibly.
5      Q   Okay.  Certainly before the note was
6  returned?
7      A   Yes.
8      Q   And marked satisfied?
9      A   Yes.
10     Q   You had the opportunity to learn the source
11  of payment?
12     A   The note was not returned.
13     Q   The note, the guarantee, the suretyship.
14     A   Yes.
15     Q   Prior to your delivery of the guarantee
16  marking it paid, you had the opportunity to determine
17  the source of the money, is that correct -- source of
18  the payment -- is that correct?
19     A   Yes.
20     Q   And you never inquired as to the source of
21  the money -- source of the repayment of the

Page 198

1  1.2 million dollar loan; is that correct?
2      A   Yes.
3      Q   And, again, where did you think the money
4  came from?
5          And I think your earlier answer was you
6  didn't know, you didn't care; is that correct?
7          MR. GEBHARDT:  Objection to the
8  characterizing of the witness' earlier testimony.
9      A   I didn't know where the money came from.
10     Q   Well, you didn't ask, did you?
11     A   No, I did not.
12     Q   And, therefore, you didn't care, did you?
13         MR. GEBHARDT:  Objection.
14     Q   If you had cared, you would have asked; is
15  that right?
16     A   I didn't have the opportunity to speak to
17  Mr. Ortenzio.
18     Q   You could have called him on the phone?
19     A   I -- that's correct.
20     Q   Could have gone over to CCI and knocked on
21  the door and asked him?

Page 199

1      A   Yes.
2      Q   Okay.  You didn't do either, did you?
3      A   No.
4      Q   If you had cared, you would have done it?
5          MR. GEBHARDT:  Objection.
6      A   Most likely.
7      Q   The fact is when the 1.2 million dollar note
8  was repaid, you were just happy to see that it was
9  repaid, weren't you?
10     A   I don't think I'd put it in those words.
11     Q   Were you glad or sad --
12     A   When I get --
13     Q   -- or something in between?
14     A   When I receive payment, I'm always --
15     Q   Grateful?
16     A   Yes.
17     Q   Okay.  Now, Mr. Ortenzio told you you said
18  in November, 1999, that he required the 1.2 million
19  through the end of February, 2000; is that correct?
20         That's what you stated when your attorney
21  asked you.

Page 200

1      A   Okay.
2      Q   Is that correct?
3      A   That was --
4      Q   You said they would need the money, the
5  extra money, the 1.2 million, through the end of
6  February, 2000.
7      A   That was according to the cash flow
8  statements.
9      Q   And that's what Mr. Ortenzio told you,
10  right?
11     A   Yes.
12     Q   Okay.  Now, at the time of the repayment of
13  the 1.2 million coincidently in February, 2000, the
14  balance on the four million dollar line of credit
15  allowed for the repayment of the 1.2 from the four
16  million; is that correct?
17         MR. GEBHARDT:  Objection.
18     Q   There was sufficient cushion there under the
19  four million dollar line of credit to repay the 1.2;
20  is that correct?
21         We went over the numbers.

**Esquire Deposition Services**

# Craig J. Schwartz

Page 201

1    A    Yes.

2    Q    If you want, we can do it again.

3    Am I correct?

4    A    Yes.

5    Q    There was sufficient money, substantially --

6    A    There was availability on the line of

7    credit.

8    Q    Yes.

9    And how much was that availability?

10    It was greater than the 1.2 million, wasn't

11    it?

12    A    Yes.

13    Q    We went over the numbers earlier.

14    It was more than the 1.2 million; is that

15    correct?

16    A    Yes.

17    Q    Okay.  You expected excess cash flow to

18    repay the 1.2 million dollar note; is that what you

19    said earlier?

20    A    Yes.

21    Q    Is that documented in any document signed by

Page 202

1    Mr. Ortenzio or CCI?

2    A    That was -- no, that was based on the, the

3    cash flow pro formas that were given to the bank.

4    Q    Did you hear my question?

5    My question was is there --

6    MR. GEBHARDT: Well, he answered your

7    question.

8    Q    My question is, is there any document signed

9    by CCI or Mr. Ortenzio in which it was stated that the

10    1.2 million dollar note would be paid from excess cash

11    flow?

12    MR. GEBHARDT: He answered the

13    question.

14    The cash flow statements they gave

15    him -- he gave him.

16    MR. SWICHAR: I'm saying any document

17    signed --

18    MR. GEBHARDT: Are you saying a loan

19    document?

20    MR. SWICHAR: Yes, any loan document.

21    MR. GEBHARDT: A loan document the bank

Page 203

1    generated, not something Ortenzio gave him?

2    MR. SWICHAR: Yes, exactly right.

3    Q    (By Mr. Swichar) Is there any document

4    signed and made binding on Mr. Ortenzio or CCI that

5    limited the repayment of the 1.2 million dollar note

6    from excess cash flow?

7    A    No.

8    Q    Now, your attorney asked you a number of

9    questions regarding a material adverse situation;

10    would you have done this, if you had done that, if you

11    had known that --

12    MR. GEBHARDT: Adverse change.

13    Q    -- material adverse change.

14    MR. SWICHAR: Off the record.

15    (Discussion off the record.)

16    Q    (By Mr. Swichar) You were asked a lot of

17    hypothetical questions about what you would have done

18    had you known this, this, or that involving a material

19    adverse change.

20    The fact is that the bank, no one even

21    bothered to consult with you as the loan officer who

Page 204

1    had the relationship with CCI; is that correct?

2    A    At what date --

3    MR. GEBHARDT: Objection.

4    A    What date is this?

5    Q    Prior to the declaration of the default, you

6    were never consulted as to whether or not a default

7    should be declared on the basis of material adverse

8    change or any other basis?

9    MR. GEBHARDT: My questions didn't

10    direct to that.

11    It was February 11.

12    MR. SWICHAR: Well, your question

13    was -- your question was purely hypothetical.  I'm

14    bringing it back to the world of reality.

15    MR. GEBHARDT: No, my question was if

16    he had known the facts that were reflected on the

17    financial statements that CCI had on February 11 --

18    MR. SWICHAR: Okay.

19    MR. GEBHARDT: -- at the time the

20    payment was made, what would he -- and this was before

21    Mr. Elias or anyone was brought in -- would he have

**Esquire Deposition Services**

# Craig J. Schwartz

Page 205

1  regarded in terms of the default situation.

2  Q  (By Mr. Swichar) You were not aware of any

3  of the actual facts prior to the declaration of

4  default on the basis of material adverse change; is

5  that correct?

6  A  No, that is not correct.

7  I knew there was on the meeting of the 18th

8  the following week that the company had lost six

9  million dollars. Up to that point, I was under the

10  impression that the loss was going to be between a

11  million two and two million for the year.

12  Q  Okay. No one came to you and asked you for

13  your input as to whether or not a default should be

14  declared?

15  MR. GEBHARDT: Objection.

16  When?

17  MR. SWICHAR: Prior to the declaration.

18  Between the 18th of February --

19  MR. GEBHARDT: He's already testified

20  no.

21  MR. SWICHAR: Well, thank you.

Page 206

1  Q  (By Mr. Swichar) Is that correct?

2  A  Yes.

3  Q  Okay.

4  MR. GEBHARDT: Ask him again.

5  MR. SWICHAR: That was the answer.

6  Q  (By Mr. Swichar) You testified that

7  Mr. Ortenzio had the personal ability to repay the

8  1.2 million dollar note from his own funds in contrast

9  to the method by which it was actually paid.

10  What is your basis on that?

11  A  The personal financial statement submitted

12  to the bank.

13  Q  What was the date of that financial

14  statement?

15  A  I don't recall.

16  Q  Was there any requirement in any loan

17  document signed by CCI or Mr. Ortenzio that required

18  him to repay the 1.2 million dollar CCI note from his

19  personal funds?

20  MR. GEBHARDT: How about the

21  suretyship?

Page 207

1  I mean, you got it right there for

2  God's sake.

3  Q  In contrast to CCI.

4  A  No.

5  MR. SWICHAR: Let's go outside.

6  (Mr. Swichar and Mr. Ortenzio left the

7  conference room and then returned.)

8  MR. SWICHAR: Okay, have a good trip

9  back.

10  MR. GEBHARDT: I have a couple, couple

11  follow-ups.

12  EXAMINATION BY COUNSEL FOR THE PLAINTIFF

13  BY MR. GEBHARDT:

14  Q  Mr. Schwartz, at the time the 1.2 million

15  dollar loan was being discussed in November of 1999,

16  if you had known that Mr. Ortenzio was going to repay

17  that loan in the manner in which it was repaid, would

18  you have recommended approval of that loan?

19  A  No.

20  Q  Okay. In your dealings with Mr. Ortenzio on

21  behalf of the bank, did you expect him to deal

Page 208

1  honestly and in good faith with the bank?

2  A  Yes.

3  Q  Do you regard his repaying the 1.2 million

4  dollar loan with a draw on the four million dollar

5  line of credit as an honest and good faith act on his

6  part?

7  MR. SWICHAR: Objection as to form.

8  MR. GEBHARDT: Let me rephrase it.

9  MR. SWICHAR: In contrast to taking

10  advantage of the bank's own negligence?

11  Q  (By Mr. Gebhardt) How did you regard

12  Mr. Ortenzio's act of repaying the 1.2 million dollar

13  line -- loan -- with a draw on the four million dollar

14  line in February of 1999?

15  MR. SWICHAR: Can I hear it back,

16  please?

17  Q  You may answer.

18  MR. SWICHAR: I'd like to hear it back,

19  please.

20  MR. GEBHARDT: Well, he can answer, and

21  then you can hear both the question and answer.

52 (Pages 205 to 208)

# Craig J. Schwartz

Page 209

1      MR. SWICHAR:  Well, I'd like to hear it
2  back.
3    Q    (By Mr. Gebhardt) Go ahead.
4      MR. SWICHAR:  Objection.
5      I'd like to hear it back.
6      MR. GEBHARDT:  I'm entitled to have the
7  witness answer the question.
8      MR. SWICHAR:  No, I'm entitled to have
9  the Court Reporter rephrase -- give me back the
10  question before it's answered.
11      Now, I don't want to argue about it.
12  I'd like to hear the question back.
13      MR. GEBHARDT:  Listen to it so you can
14  give an answer after he's heard it.
15      MR. SWICHAR:  Fair enough.
16      (Question was read by the Reporter.)
17      MR. SWICHAR:  Objection as to form.
18    Q    (By Mr. Gebhardt) In terms of --
19      MR. SWICHAR:  As -- as a judge?  As a
20  policeman?  As a fireman?  Or what?
21      MR. GEBHARDT:  Well, let me clarify

Page 210

1  that.
2    Q    (By Mr. Gebhardt) In terms of your
3  expectations that Mr. Ortenzio would act with honesty
4  and good faith, how did you regard the repayment of
5  the line -- the repayment of the 1.2 million dollar
6  loan with a draw on the four million dollar line in
7  February of 1999?
8      MR. SWICHAR:  Objection as to form.
9      His expectations are irrelevant.
10  Expectations are based on the note.
11    Q    You may answer.
12    A   In light of what subsequently followed, a
13  little bold.
14    Q    Okay.
15      MR. SWICHAR:  That's a legal -- nice
16  legal term.
17      MR. GEBHARDT:  No further questions.
18      MR. SWICHAR:  One question.
19    EXAMINATION BY COUNSEL FOR THE DEFENDANT
20  BY MR. SWICHAR:
21    Q    You stated, Mr. Schwartz, that if you had

Page 211

1  known that Mr. Ortenzio -- that CCI would have repaid
2  the 1.2 million dollar note out of the four million
3  dollar line of credit, you would not have recommended
4  approval of the note; is that correct?
5      Isn't that what you just said?
6    A   Yes, yes.
7    Q    Now, if you had known, looking back in
8  hindsight, that Mr. Ortenzio or Mr. -- or CCI would
9  have repaid the 1.2 million from the four million
10  dollar line of credit, would you have made an express
11  prohibition in the 1.2 million dollar note expressly
12  prohibiting CCI from repaying the 1.2 from the four
13  million dollar line of credit?
14      Would you have included an express
15  prohibition of that conduct?
16      MR. GEBHARDT:  Objection.
17    A   It's possible.
18    Q    Would that have been the prudent thing to do
19  in hindsight to go back and say let's prevent this
20  from occurring by specifically prohibiting a repayment
21  of the 1.2 from the four million dollar line of

Page 212

1  credit, as a prudent banker?
2    A   Yes.
3      MR. SWICHAR:  No further questions.
4      MR. GEBHARDT:  We're done.
5      (Thereupon, at 2:56 p.m., the
6  examination of the witness was concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

**Esquire Deposition Services**

**1-800-441-3376**

# Craig J. Schwartz

Page 213

```
1              ACKNOWLEDGMENT OF DEPONENT
2        I, Craig J. Schwartz, do hereby acknowledge
3    I have read and examined the foregoing pages of
4    testimony, and the same is a true, correct and
5    complete transcription of the testimony given by me,
6    and any changes and/or corrections, if any, appear in
7    the attached errata sheet signed by me.
8
9    _____
10   Date              Craig J. Schwartz
11
12
13
14
15
16
17
18
19
20
21
```

Page 215

```
1    February 20, 2002
2    Mr. Lawrence J. Gebhardt
     Gebhardt & Smith, L.L.P.
3    The World Trade Center
     401 East Pratt Street
4    Ninth Floor
     Baltimore, MD 21202
5
6    Re: Allfirst Bank v. John M. Ortenzio
         Deposition of Craig J. Schwartz
7
8    Enclosed for review is your copy of the
     above-referenced deposition, which includes an
9    Acknowledgment of Deponent. Please have the deponent
     read the copy of the transcript and sign the enclosed
10   Acknowledgment of Deponent. Also enclosed is an
     errata sheet which the deponent should use to note
11   corrections. The errata sheet(s) should be signed and
     dated by the deponent.
12
13   Maryland Rules stipulate that the deponent has thirty
     days in which to read and sign the transcript. After
14   the deponent has reviewed the copy of the transcript,
     please return the Acknowledgment of Deponent and any
15   errata sheets to our office at 401 E. Pratt Street,
     Suite 425, Baltimore, MD 21202. If you have any
16   questions regarding this matter, please contact us.
17
18
19
20
21
```

Page 214

```
1              CERTIFICATE OF NOTARY PUBLIC
2        I, Kathleen R. Turk, the officer before
3    whom the foregoing deposition was taken, do hereby
4    certify that the witness whose testimony appears in
5    the foregoing deposition was duly sworn by me; that
6    the testimony of said witness was taken by me in
7    stenotype and thereafter reduced to typewriting under
8    my direction; that said deposition is a true record of
9    the testimony given by said witness; that I am neither
10   counsel for, related to, nor employed by any of the
11   parties to the action in which this deposition was
12   taken; and, further, that I am not a relative or
13   employee of any attorney or counsel employed by the
14   parties hereto, nor financially or otherwise
15   interested in the outcome of the action.
16
17              _____
                Kathleen R. Turk
18              Notary Public in and for the
                State of Maryland.
19   My Commission Expires:
20   March 1, 2003.
21
```

Page 216

```
1    ESQUIRE DEPOSITION SERVICES
     401 E. PRATT STREET
2    SUITE 425
     BALTIMORE, MD 21202
3    (410) 539-6398
4              ERRATA SHEET
5
6    Case Name: Allfirst Bank v. John M. Ortenzio
     Witness Name: Craig J. Schwartz
7    Deposition Date: February 15, 2002
     Job No.: 143249
8
9                        Reason For
     Page No. Line No.  Correction   Correction
10
11
12
13
14
15
16
17
18
19
20   _____        _____
21     Signature                 Date
```

**Esquire Deposition Services**

**1-800-441-3376**

**1**

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK,                  :
           PLAINTIFF            :
                VS             :  NO:  1:01-CV-786
JOHN M. ORTENZIO,             :
           DEFENDANT           :


      DEPOSITION OF:  SHERI PHILLIPS

      TAKEN BY:      PLAINTIFF

      BEFORE:        HILLARY M. HAZLETT, REPORTER
                     NOTARY PUBLIC

      DATE:          MARCH 13, 2002, 10:43 A.M.

      PLACE:         ALLFIRST BANK BUILDING
                     213 MARKET STREET
                     14TH FLOOR
                     HARRISBURG, PENNSYLVANIA

APPEARANCES:

  GEBHARDT & SMITH
  BY:  LAWRENCE J. GEBHARDT, ESQUIRE

          FOR - PLAINTIFF

  BLANK, ROME, COMISKY & McCAULEY, LLP
  BY:  EDWARD I. SWICHAR, ESQUIRE

          FOR - DEFENDANT

  HARTMAN, OSBORNE & JOYCE, P.C.
  BY:  MELINDA S. JOYCE, ESQUIRE

          FOR - SHERI PHILLIPS

ALSO PRESENT:

  JAMIN M. GIBSON
  JOHN M. ORTENZIO
```

**2**

```
                    I N D E X
                     WITNESS
FOR PLAINTIFF      DIRECT  CROSS  REDIRECT  RECROSS
Sheri Phillips        3      60      101      111

                    EXHIBITS
DEPOSITION EXHIBIT NO.                    MARKED
 1 - 3/23/1999 Letter                        12
 2 - Film/cash Solutions                     13
 3 - Audit Report                            21
 4 - 10/26/1999 Inter-office Memorandum      24
 5 - 11/4/1999 Inter-office Memorandum       25
 6 - 11/5/1999 Letter                        31
 7 - Commercial Loan Note                    32
 8 - Income Statement                        40
 9 - Balance Sheet                           40
10 - Cash Flow Projections                   49
```

**3**

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that reading, signing, sealing, and certification are waived; and that all objections except as to the form of the question are reserved to the time of the trial.

SHERI PHILLIPS, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. GEBHARDT:

Q  Would you let us know first your residence and then your business addresses?

A  Residence is 2837 North Front Street, Suite 302, Harrisburg, PA  17110.

Q  And your business address?

A  515 North Office Building, Harrisburg, PA 17125.

Q  And where are you presently employed?

A  Commonwealth of Pennsylvania.

Q  And what do you do for the Commonwealth of Pennsylvania?

A  I'm the Deputy Secretary of Administration

**4**

and General Services.

Q  How long have you had that position?

A  Since July.

Q  Prior to that time, where did you work?

A  I did consulting for one company, and I also worked with another company that was part-time that I had helped start.

Q  And at some point in time, you worked for a company known as CCI Construction?

A  That's correct.

Q  And when did you leave CCI?

A  It was -- I think my last day was around May 5th, 2000.

Q  And when did you begin working for CCI?

A  In September of 1991.

Q  Would you relate for me just briefly what your positions with CCI were from September 1991 through the date you left in terms of a job description and just a brief outline of what your duties were?

A  When I started, I worked for Dave Barber and I was the controller.  I think that was my title. My titles changed kind of in between there.  I was responsible for the accounting, and I reported to Dave.  I think his title was chief financier at the

**5**

1    time.
2          I think Dave left around 1995.  At that
3    point, I assumed his duties; and I was -- again, the
4    titles changed -- the chief financial officer.  I was
5    responsible for managing the accounting department.
6          I was also responsible for obtaining the
7    financing for the company.  Over time, I've
8    accumulated some other things, handling our IMS,
9    which is information management systems.  It was kind
10   of a multitude of things.
11      Q    In terms of overseeing the accounting
12   department for a time period -- let's focus kind of
13   on the 1999/2000 period.  What kinds of things would
14   you do in terms of managing the accounting
15   department?
16      A    In that time period, I -- actually, we had
17   someone leave.  There was an accounting manager --
18   again, we changed titles in there -- slash,
19   controller.  I forget her exact title.  She was
20   responsible for the actual day-to-day management but
21   she had left -- I think that was around the fall of
22   '99.  She was not replaced, so then I was responsible
23   for the day-to-day operations of overseeing everyone
24   in the accounting department.
25      Q    How many people were there in the

**6**

1    accounting department in that 1999/2000 time frame,
2    roughly?
3      A    I would say probably five to seven.
4      Q    As part of the -- and again, staying within
5    the same period unless I tell you otherwise, let's
6    continue to focus on that period of 1999 to 2000.
7    What kinds of regular financial reports internally
8    did the CCI Construction Company generate?
9      A    We would do an income statement, a balance
10   sheet, a trial balance, work in progress report, cash
11   flow reports, accounts receivable, accounts payable,
12   and then your normal things related to payroll and
13   your cash disbursements and cash receipts.
14      Q    And then I would be correct that there was
15   an income statement, and as you've indicated, a
16   balance sheet and a cash flow.  Were they generated
17   monthly?
18      A    Yes.
19      Q    And were they then -- were they first
20   presented to you for review from whoever in the
21   department was working on them?
22      A    Yes, that's correct.
23      Q    What would you do with them after you
24   received what your staff had generated?
25      A    After I reviewed them, made any final

**7**

1    adjustments that might be needed to be made, once
2    they were all final, I had a -- I had to give copies
3    to our bonding company and our bank; and one of them
4    was quarterly, one of them was monthly.
5          And I'd give copies to the president of the
6    company and the chief operating officer of the
7    company.  At that point, I think maybe the senior VP
8    also got copies of them.
9      Q    And the president was Mr. John Ortenzio?
10     A    Yes.
11     Q    And the chief operating officer was who?
12     A    Shane Miller.
13     Q    In the 1999/2000 time frame, was there any
14   instance when you did not convey monthly financial
15   statements -- internally-generated financial
16   statements to Mr. Ortenzio?
17     A    Not that I recall.
18     Q    Was it your practice at all to discuss the
19   substance and content of those financial statements
20   with Mr. Ortenzio after you had given him copies?
21     A    Yes, it was.
22     Q    Based on your observations of Mr. Ortenzio,
23   did he familiarize himself with the financial results
24   reflected in the internally-generated financial
25   statements?

**8**

1      A    I would say yes.  I mean, we discussed
2    them.
3      Q    Based on your discussions with him, he
4    appeared to understand what the financial results
5    were that were reflected on the statements?
6      A    Yes.
7      Q    Now, you've also indicated that you were
8    responsible for obtaining financing for the company?
9      A    That's correct.
10     Q    And during the period of time you were
11   there, the company's primary bank was initially
12   Dauphin Deposit, what ultimately became today
13   Allfirst Bank?
14     A    That's correct.
15     Q    What kinds of things did you do in terms of
16   obtaining financing for the company?
17         MS. JOYCE:  Again, in the 1999/2000 time
18   frame or overall?
19   BY MR. GEBHARDT:
20     Q    Well, did there come a period of time when
21   that function, obtaining financing for the company,
22   became one of your job aspects?
23     A    When I first started, Dave Barber handled
24   that.
25     Q    All right.

**9**

1    A   I don't recall in prior years back in '91
2  if I was in the meeting or not.  I think I might have
3  been, but Dave handled it at that point.  After Dave
4  left, it became my responsibility.
5    Q   What sort of things would you do in terms
6  of obtaining financing from banks?
7    A   I would get quotes from more than one bank.
8  I don't know if I did that every year, but I talked
9  to other banks and got comparisons.  I'd look at
10  interest rates and look at what is going on in the
11  market and talk to our bank and tell them where we
12  stood and negotiated a loan.
13    Q   Would I be correct, during your period of
14  time at CCI, there was a revolving line of credit in
15  place with a bank?
16    A   That's correct.
17    Q   And that was initially Dauphin Deposit
18  which then became Allfirst Bank?
19    A   As I recall, I think it was Dauphin right
20  from the beginning.  There may have been another bank
21  that had loans years ago.  I don't recall exactly,
22  but Dauphin and Allfirst was our bank.
23    Q   And this was an unsecured line of credit?
24    A   In the 1999/2000 year, that's correct.
25  That's correct.  It may not have been the whole time

**10**

1  period.
2    Q   And over the period of time that you were
3  with CCI, the line of credit increased, if my memory
4  is correct, somewhere around 600,000 to a million
5  dollars, ultimately up to $4 million in 1999?
6    A   It did increase to the 4 million.  I don't
7  recall what the exact amount was.  It did increase.
8    Q   In terms of negotiating the line of credit,
9  was Mr. Ortenzio -- let me back that up.
10    In terms of negotiating the line of credit
11  once you took over the function of arranging the bank
12  financing, did Mr. Ortenzio involve himself?
13    MS. JOYCE:  Let me interject.  Are you
14  talking about a specific time frame?
15  BY MR. GEBHARDT:
16    Q   Well, let's start in general.  Once you
17  took over the function after the old CFO left --
18    MR. SWICHAR:  Larry, 1995?
19    MR. GEBHARDT:  Right.
20    THE WITNESS:  In 1995 -- the question was,
21  Did he --
22  BY MR. GEBHARDT:
23    Q   Let me rephrase it.  Starting with the 1995
24  period and going forward, how much involvement did
25  Mr. Ortenzio have in your function in terms of

**11**

1  arranging the financing for the company?
2    A   He did not have a very big involvement
3  initially.  He got very involved when we started
4  having more financial problems at the end; but up
5  until the $4 million line of credit, I negotiated
6  with the bank.
7    Q   And so you would have been the person that
8  negotiated and got into place the $4 million line of
9  credit?
10    A   That's correct.
11    Q   And would I be correct in saying that
12  Mr. Ortenzio was not very involved in obtaining the
13  $4 million line of credit?
14    MS. JOYCE:  I object to the form of
15  question, not very involved.
16  BY MR. GEBHARDT:
17    Q   His involvement -- his more limited
18  involvement, as you've described it in your previous
19  answer, was pertaining to the $4 million line of
20  credit also?
21    MR. SWICHAR:  I object.  Why don't you ask
22  her what was John's --
23    MR. GEBHARDT:  All right.
24  BY MR. GEBHARDT:
25    Q   What was John Ortenzio's involvement in

**12**

1  obtaining the $4 million line of credit?
2    A   He did not actually meet with the bank.  I
3  met with the bank.  He was aware what was going on
4  and talked to me about what I was doing, what my
5  plans were, what the amount of the loan was.  So I
6  had spoken to him about that outside of the meeting
7  with the bank.  But when I actually sat down with the
8  bank, he was not in those meetings as I recall.
9    Q   What was the purpose to your understanding
10  as the CFO of the $4 million line of credit?
11    A   To cover the work in progress and cover our
12  cash flow needs as the receivables were coming in.
13    MR. GEBHARDT:  Will you mark this as the
14  first deposition exhibit?
15    (3/23/1999 letter was marked as Deposition
16  Exhibit No. 1.)
17  BY MR. GEBHARDT:
18    Q   I've handed you what has been marked as
19  Deposition Exhibit 1, which purports to be a letter
20  dated March 23rd, 1999, to you from Craig Schwartz on
21  the letterhead of the First National Bank of
22  Maryland, which is the predecessor name for Allfirst
23  Bank.  Do you recognize your -- is that your
24  signature on the last page?
25    A   Yes, it is.

**13**

1    Q    And this would be a commitment letter for
2  the $4 million line of credit we have been
3  discussing?
4    A    Without reading it word for word, yes.
5  This looks like it.
6    Q    And on the first page where there's a
7  statement, Use of Proceeds, is that use of proceeds
8  consistent with your understanding of the purpose of
9  the loan?
10    A    Yes, it is.
11    Q    Okay.  Now, did you also -- if you look
12  down to the last paragraph, you'll see that there's a
13  date of April 30, 2000.  What significance did you
14  understand that the April 30, 2000 date to have in
15  terms of the line of credit?
16    A    As of April 30th of 2000, it expired; and
17  every year, we would have to renew it to go forward.
18        MR. GEBHARDT:  Call this SP-1?
19        MR. GEBHARDT:  Just Deposition Exhibit 1.
20        MR. SWICHAR:  Call it SP-1.
21        MR. GEBHARDT:  Let's do this one as 2.
22        (Film/cash solutions promissory note was
23  marked as Deposition Exhibit No. 2.)
24  BY MR. GEBHARDT:
25    Q    I've handed you what has been marked as

**14**

1  Deposition Exhibit No. 2.  I would ask you if you
2  understand that exhibit to be a copy of the
3  promissory note evidencing the $4 million line of
4  credit?
5    A    Yes, this looks like the document.
6    Q    And that is your signature on behalf of the
7  borrower on the signature page?
8    A    Yes, it is.
9    Q    Now, there are some initials and
10  line-throughs and so on, on the second and third
11  page.  Would I be correct that those are your
12  initials and that you are the person who drew the
13  lines through?
14    A    That's correct.
15    Q    Could you tell me mechanically or in the
16  context of when and how you placed those marks on the
17  note?
18    A    Whenever I received any document that we
19  had to sign on behalf of the company, I always
20  reviewed them in detail and looked to see if there
21  was anything in there that may not be to the
22  advantage of the company and that is part of what I
23  would look at in part of negotiating the loans.
24        Those are the things that I obviously
25  didn't like in the agreement and later talked to

**15**

1  Craig Schwartz about.
2    Q    Did you talk to him about them before you
3  crossed them out and initialed them or after?
4    A    Before.
5    Q    And what was the result of your discussion
6  with Mr. Schwartz on those points?
7    A    As I recall, he needed to -- he didn't
8  think it would be a problem; but he needed to verify
9  it first, and then he got back to me and said that
10  was fine and go ahead and make the notations and
11  initial them.
12    Q    Did you discuss with Mr. Ortenzio any of
13  the phrases that you X'd out and initialed?
14        MS. JOYCE:  Just those or the document in
15  general?
16  BY MR. GEBHARDT:
17    Q    Well, let's focus specifically on the ones
18  you X'd out and initialed.  Did you discuss any of
19  those with Mr. Ortenzio?
20    A    Yes, I did.
21    Q    Did you discuss all of them or just one or
22  two?
23    A    As I recall, I discussed all of them
24  because there was one comment that I remember he
25  wanted me to put in there.

**16**

1    Q    And these were points that you raised with
2  him or he raised with you first?
3    A    I raised them with him.
4    Q    Now, was there a cash management feature
5  with the --
6    A    Just back up a minute.  I raised them with
7  him, but the one point he raised was with me.
8    Q    What point was that?
9    A    That within the 30 days there would be
10  notice as far as the repayment.
11    Q    Was there a cash management feature that
12  accompanied or was attached or related to the --
13        MR. SWICHAR:  Are you referring to
14  paragraph 6?
15        THE WITNESS:  Yes.
16        MR. SWICHAR:  Thanks.
17  BY MR. GEBHARDT:
18    Q    Was there a cash management feature
19  associated with the line of credit?
20    A    Yes, there was.
21    Q    And what was your understanding of how that
22  cash management feature worked?
23    A    We had the line of credit; and as checks
24  were drawn on our checking account, the money would
25  come from our line of credit to cover that.  If there

**17**

1  was excess money, it would be invested and we would
2  get the income from it.
3     Q   Hypothetically, if -- let me rephrase this.
4        How would customer payments in this 1999
5  period be made to CCI in relation to the cash
6  management feature?
7        MR. SWICHAR:  May I hear the question back?
8        MS. JOYCE:  And you're not talking
9  hypothetically as you started the last question,
10  correct?
11        MR. GEBHARDT:  No.  This is actually how
12  did customers pay CCI in the 1999 time frame.
13        MR. SWICHAR:  I don't need it back.
14        THE WITNESS:  It could have been one of two
15  ways:  One, I would write a check; and we would
16  deposit it in the bank account; or two, as many as
17  possible had set up on a direct payment through a
18  wire transfer from their account into ours.
19        We did a lot of government work, and
20  sometimes it took forever to get it set up.  Most of
21  them, pretty many of them I had set up on wire
22  transfers that would automatically go into our
23  account.
24  BY MR. GEBHARDT:
25     Q   You set up as many as you could in that

**18**

1  fashion?
2     A   Yes.
3     Q   And that carried through also the 2000
4  period as of the time you left?
5     A   That's correct.
6     Q   The wire transfer feature having the CCI
7  customer wire their payments directly to Allfirst is
8  something that benefited CCI?
9     A   Most definitely.
10     Q   If there had been an excess of deposits
11  over any outstanding balance on the line of credit
12  that would have given CCI a positive balance --
13        MR. SWICHAR:  Objection to the form of the
14  question.  I would first establish if there were ever
15  an excess.
16        MR. GEBHARDT:  Well, let's trace --
17        MR. SWICHAR:  Take it out of the world of
18  hypothetical.
19  BY MR. GEBHARDT:
20     Q   In terms of how the cash management feature
21  worked, if there were less deposits on a given day
22  than there were checks that CCI had written to pay
23  bills, what would happen?
24     A   If there were less deposits, we would draw
25  on the line of credit to pay the checks that were in

**19**

1  excess.
2     Q   And if there were more deposits than there
3  were checks written to pay bills, what would happen?
4     A   They would sweep the account and invest the
5  money.
6     Q   Would I be correct if there was an existing
7  outstanding balance on the line of credit, that
8  excess would pay down the line of credit?
9        MS. JOYCE:  Object to the form of the
10  question.  You may answer.
11  BY MR. GEBHARDT:
12     Q   In other words, if there was an outstanding
13  balance on the line of credit of $500,000 and CCI
14  wrote $100,000 of checks that were presented on a
15  specific day but $150,000 of payments came in from
16  customers, there would be an excess of $50,000,
17  right, in the hypothetical?
18        What would happen under the cash management
19  feature to your understanding with that $50,000?
20     A   If there's excess deposits coming in, they
21  would pay down the line of credit.
22     Q   And if there was no balance on the line of
23  credit at the time those excess deposits came in,
24  then they would create a positive balance on CCI's
25  bank account?

**20**

1     A   Yes.
2     Q   And CCI would gain interest on that?
3     A   Yes.  They would be swept and put into
4  purchasing.
5     Q   As of the start or the first quarter of
6  calendar year 1999, CCI had -- let me actually
7  rephrase it.
8        As of the conclusion of calendar year 1999
9  -- in other words, December 31, 1999 -- CCI, in fact,
10  had four credit facilities or loans outstanding with
11  Allfirst, right?
12        MS. JOYCE:  Object to the form of the
13  question.  You can answer.
14  BY MR. GEBHARDT:
15     Q   We have the 4 million --
16     A   As I recall, there was a $4 million line of
17  credit.  There was a $1.2 million line.  There were
18  equipment loans.  I don't remember how many we
19  aggregated together.  I'm not sure how many equipment
20  loans there were, so I can't answer exact number.
21     Q   Do you remember there being a $2 million
22  equipment loan or line of credit financing of
23  equipment?
24     A   Yes, I do.
25     Q   Now --

**21**

1    MR. SWICHAR: Just a minute. You said
2    four, and she said three. She provided three.
3    MR. GEBHARDT: She's correct. I'm
4    incorrect.
5    MR. SWICHAR: I was waiting for her to
6    correct you.
7    BY MR. GEBHARDT:
8    Q    Let's make the record clear. There were
9    actually the three credit facilities available as of
10    December 31, 1999; namely, the $4 million line of
11    credit, the $1,200,000 loan, and a $2 million
12    equipment loan or line of credit?
13    A    And as I'm saying, as I recall, yes, I
14    remember all those loans. I don't remember if we had
15    any other small pieces of equipment financed
16    separately; but yes, I remember all of those three.
17    Those are the three main ones that I remember.
18    MR. GEBHARDT: Let's do this as the next
19    exhibit.
20    (Audit report and financial statements for
21    years ended December 31, 1998 and 1997 was marked as
22    Deposition Exhibit No. 3.)
23    BY MR. GEBHARDT:
24    Q    Okay. I've handed you what has been marked
25    as Deposition Exhibit No. 3 which purports to be the

**22**

1    audit report and financial statements of CCI
2    Construction for the years ended December 31, 1998
3    and 1997. Does that appear to be what this document
4    is to you?
5    A    Yes, it does.
6    Q    Would I be correct, looking at the
7    financial report that's been presented, that CCI did
8    not lose money for the fiscal year 1998?
9    A    That's correct.
10    Q    And if you look at it, it's page 12 of the
11    audited report, BATE stamp number at the bottom,
12    C 7637, there's a Paragraph No. 6, Operating line of
13    credit. The last sentence says, quote, The company
14    has no outstanding balance on the line of credit at
15    December 31, 1998, period, end quote.
16    Testing your memory, does that roughly
17    accord with your recollection of the line of credit
18    as of that year?
19    A    I can't really answer that as a yes/no only
20    because our line of credit was a constant resolving
21    line. I do know at year end, we would hold writing
22    checks if we could and get deposits in to try and
23    have your financial statement look as healthy
24    cashwise as possible. So that makes sense, but do I
25    actually remember it? No.

**23**

1    Q    Over the course of time you were at CCI,
2    were there times when the company had no borrowings
3    under its line of credit?
4    A    Yes, sir.
5    Q    In fact, on some of the lines of credit,
6    there was actually a requirement that CCI be out of
7    the line of credit?
8    MR. SWICHAR: Can I hear that again?
9    (The reporter read back the referred-to
10    portion of the record.)
11    MR. SWICHAR: My objection was, Was there a
12    requirement? There's a document. That was my
13    objection.
14    BY MR. GEBHARDT:
15    Q    Do you recollect whether there in the lines
16    of credit that were in existence over the period of
17    time you were there from 1991 through 2000 whether
18    there was customarily a feature that to those lines
19    of credit that required CCI to have no borrowings
20    for a 30 consecutive day period?
21    MR. SWICHAR: And I object to the form of
22    the question because I don't know what you mean.
23    MR. GEBHARDT: You may answer.
24    MS. JOYCE: If you understand what he
25    means, if you need clarification, you may request it.

**24**

1    THE WITNESS: During the course of the
2    loans that we had with Allfirst, there were
3    definitely times where there was a provision in the
4    loan that said it had to be paid down for 30 days at
5    certain points in time. Whether that was in the last
6    loan, I don't recall.
7    BY MR. GEBHARDT:
8    Q    Now, in fiscal year 1999, did CCI
9    experience some financial reverses?
10    A    Financial reverses? I'm sorry.
11    Q    Did CCI experience some financial
12    difficulties in 1999?
13    A    Our profits started decreasing in -- yes,
14    on our jobs. Yes, they did.
15    MR. GEBHARDT: Let's mark this as the next
16    exhibit.
17    (10/26/1999 inter-office memorandum was
18    marked as Deposition Exhibit No. 4.)
19    BY MR. GEBHARDT:
20    Q    I've handed you Deposition Exhibit 4, which
21    is a memorandum prepared by Craig Schwartz to
22    evidence a meeting that he states. he had with you and
23    with John Ortenzio on or about October 26th, 1999.
24    Do you recollect having a meeting with
25    Mr. Schwartz at the end of October of 1999?

**25**

1  A  Yes, I do.
2  Q  And do you remember -- what was the purpose
3  of that meeting to your recollection apart from what
4  Mr. Schwartz makes --
5  MR. SWICHAR:  Just to clarify, I think you
6  have the same -- do you have three copies of the
7  identical document?
8  MR. GEBHARDT:  It looks that way.  Let's
9  just tear the top one off.
10  BY MR. GEBHARDT:
11  Q  What do you recollect had happened in that
12  meeting?
13  A  We had talked to, as I recall it, Mike
14  Zarcone and John Schwartz and John and I in the
15  meeting.  As I recall, this was one of the first
16  meetings that John was involved in with Allfirst.  We
17  had talked to them about getting an additional amount
18  added to our line of credit because of some financial
19  cash shortages we were having.
20  MR. GEBHARDT:  Let's mark this as the next
21  exhibit.
22  (11/4/1999 inter-office memorandum was
23  marked as Deposition Exhibit No. 5.)
24  BY MR. GEBHARDT:
25  Q  I've handed you Exhibit 5, which is another

**26**

1  memorandum prepared by Craig Schwartz which appears
2  to reflect, what, a meeting that was held on November
3  4, 1999, in which Michael Zarcone met with you and
4  Mr. Ortenzio?
5  Is it possible there were two meetings, one
6  that Mr. Zarcone attended and one that he had not
7  attended?
8  A  That is possible.  I recall everything
9  being talked about in the same meeting, but it is
10  possible it was two separate meetings.
11  Q  Is it fair to say, as reflected in
12  Mr. Schwartz's memorandum which is Exhibit No. 4,
13  that for the 9-month period CCI had lost $1.5
14  million?
15  MS. JOYCE:  Object to the form of the
16  question.  You may answer.
17  THE WITNESS:  The 1.5 million -- I do
18  remember in the meeting discussing our loss at that
19  time, and the 1.5 was correct.  I made sure that I
20  had explained more than once in the meeting that
21  Scott Air Force Base -- and it's noted in here a
22  claim has been filed in the amount of $4 million.
23  The 1.5 million was assuming we would get
24  the $4 million on the Scott Air Force Base claim.  So
25  if we did not get the 4 million, our loan would not

**27**

1  be our loss.  It would have been more like 5 and a
2  half million.
3  So yes, the one and a half, I remember that
4  discussion; but I did explain that it could be
5  larger.  It was based on us receiving that claim or
6  change.
7  BY MR. GEBHARDT:
8  Q  And the Albemarle Prison job was another
9  problem job for CCI at this time?
10  MS. JOYCE:  Objection to the form of the
11  question.  You may answer if you understand what he
12  means by problem just so you're both on the same
13  page.
14  THE WITNESS:  As it's saying not as
15  profitable, we were experiencing declining job
16  profits until loss of Albemarle.
17  BY MR. GEBHARDT:
18  Q  What was the -- these meetings, the one or
19  the two that we're discussing, were they called by
20  the representatives of Allfirst or by representatives
21  of CCI?
22  A  We called a meeting to get an additional
23  loan.  Now, if there were two, like I said, I'm
24  remembering all the discussions as one specific
25  meeting.  But if there were actually two, they may

**28**

1  have called the first one.  I know we called a
2  meeting to talk to them about the additional loan.
3  Q  What was the reason for asking for an
4  additional loan or an additional line?
5  A  We were having serious cash flow problems
6  because we had incurred a lot of expenses on Scott
7  Air Force Base that we had not gotten paid for.
8  There were other things related to other jobs, but
9  the biggest part of it was Scott Air Force Base.
10  Q  And what was the specific, at least the
11  initial request, to Allfirst?  What was CCI asking
12  Allfirst to do?
13  A  To give us an additional loan to cover our
14  cash shortages.  I don't recall -- I was assuming we
15  had asked for 1.2.
16  Q  Was the request to increase the $4 million
17  line to 5 million or 5.2 million, or was there a
18  request for a separate loan?
19  MS. JOYCE:  Object to the form of the
20  question.  You've given her two alternatives.
21  MR. SWICHAR:  I object too because there is
22  a document that would be helpful if shown
23  BY MR. GEBHARDT:
24  Q  Do you recollect what the original request
25  was, not the loan that was made, but whether CCI

**29**

1  asked for the line of credit to be increased for a
2  separate loan or for some other credit that was not
3  ultimately given?
4      A  I think we initially wanted an increase in
5  the line of credit.
6      Q  And what was the response initially from
7  Allfirst to the request?
8      A  As I recall -- I guess I'm not sure what
9  you're looking for.
10     Q  In other words, you asked -- CCI asked
11 Allfirst to increase the line of credit from $4
12 million to $5 million. What was Allfirst's response?
13         MR. SWICHAR:  Objection.
14         MS. JOYCE:  I'm going to object. You
15 mischaracterized her testimony. She indicated that
16 the request was for an additional loan to cover cash
17 shortage. She did not indicate a specific amount.
18 So I'm going to instruct her not to answer that
19 because it mischaracterizes what she testified to.
20 BY MR. GEBHARDT:
21     Q  You indicated, I believe, that CCI
22 initially asked for an increase in the $4 million
23 line of credit?
24     A  Yes, I do.
25     Q  And I think you also indicated that the

**30**

1  amount of the increase that was being requested was
2  at least a million dollars; is that correct?
3         MS. JOYCE:  Object to the form of the
4  question.
5         MR. SWICHAR:  I object to the form of the
6  question.
7  BY MR. GEBHARDT:
8      Q  Is that correct?
9      A  That it was at least a million?
10     Q  Yes.
11     A  Yes.
12     Q  And what was Allfirst's response to the
13 request by CCI to increase the $4 million by a line
14 of credit by at least a million dollars?
15     A  As far as I recall, they wanted to set it
16 up under a separate note because they were handling
17 it differently because the $4 million was an
18 unsecured line of credit. They wanted any additional
19 amount to be personally guaranteed by the president.
20     Q  And whose idea was the guarantee by the
21 president of CCI? Where did that idea originate?
22         MS. JOYCE:  If you know.
23 BY MR. GEBHARDT:
24     Q  Let me rephase the question. Did Allfirst
25 indicate in the meetings that it was willing to give

**31**

1  an additional $1 million of credit to CCI unsecured?
2      A  No, I don't recall that in the meeting.
3      Q  Okay. Was there any indication by Allfirst
4  of conditions -- of the conditions under which they
5  would grant additional credit of a million dollars or
6  more?
7      A  As I recall, it was -- they said that they
8  would do it -- as I recall, there was some discussion
9  about what we could give as collateral for this
10 additional amount. Most of our equipment had already
11 been financed. What wasn't, they said they could
12 take a part of that; but in addition to that, they
13 wanted a personal guarantee on the loan.
14     Q  And that was from Mr. Ortenzio?
15     A  Yes.
16         MR. GEBHARDT:  Could I have this marked the
17 next exhibit?
18         (11/5/1999 letter was marked Deposition
19 Exhibit No. 6.)
20 BY MR. GEBHARDT:
21     Q  I've handed you what has been marked as
22 Deposition Exhibit No. 6 which is a copy of the
23 commitment letter for the $1,200,000 loan that
24 Allfirst made to CCI Construction on or about
25 November 5, 1999.

**32**

1         While your signature is not on this, it has
2  been identified in other depositions. I don't think
3  there is any dispute that this is a copy of the
4  commitment letter.
5         The first question is, Did you see a copy
6  of the commitment letter at or about the time it was
7  issued?
8      A  I did. Actually, that is my signature.
9  I'm just attesting, but it does have my signature.
10         MR. GEBHARDT:  All right. Very good.
11 Let's mark this has Deposition Exhibit No. 7.
12         (Commercial loan note was marked as
13 Deposition Exhibit No. 7.)
14 BY MR. GEBHARDT:
15     Q  I've handed you Deposition Exhibit No. 7
16 which is a commercial line note dated November 8th,
17 1999. Is your signature also on the second page of
18 that attesting?
19     A  As a witness, yes.
20     Q  And Exhibit 7 would be the promissory note
21 reflecting the $1.2 million loan that is described in
22 the commitment letter that's Exhibit 6?
23     A  That's correct.
24     Q  Now, if you look at Exhibit 6, the next to
25 the last paragraph, you'll see a statement that,

**33**

1  quote, if no demand is made, the loan will expire and
2  all borrowings will be due and payable, comma,
3  together with interest thereon, on March 31, 2000 --
4       MS. JOYCE: For the record, you're talking
5  about the second to the last paragraph on page 1 of
6  Exhibit No. 6?
7       MR. GEBHARDT: Yes.
8  BY MR. GEBHARDT:
9      Q  -- period, unquote. Was it your
10 understanding that the $1,200,000 loan was due from
11 CCI on or about March 31, 2000?
12     A  Yes.
13     Q  In the course of the meetings that you may
14 have had with Mr. Zarcone and Mr. Schwartz on behalf
15 of Allfirst, was there any discussion of where CCI
16 was going to get the money to repay the $1,200,000
17 loan by March 31, 2000?
18     A  As I recall, it was definitely discussed.
19 Whether it was at that meeting or in the paperwork
20 afterwards on the phone, I'm pretty sure it was at
21 that meeting. Yes, we had discussions about how that
22 money would be paid back.
23     Q  And what was the substance of those
24 discussions?
25     A  That the cash flow that we would have

**34**

1  coming in from receivables and projects would
2  generate enough cash to pay this down on a short-term
3  basis.
4      Q  In the discussions, was it discussed that
5  CCI would repay the $1.2 million loan by making a
6  borrowing on the $4 million line of credit?
7      A  No, it was not.
8      Q  I note on Exhibit 4 that again there's the
9  reference to the $4 million Scott Air Force Base
10 receivable. Did that $4 million receivable have any
11 relationship to a source of funds to repay the $1.2
12 million loan?
13     A  I don't recall if that -- if that was
14 specifically said or not.
15     Q  Now, at the time the $1.2 million loan was
16 being taken out, I take it you had discussions with
17 Mr. Ortenzio about the borrowing?
18     A  That's correct.
19     Q  And did you and Mr. Ortenzio discuss where
20 CCI would obtain the funds to repay the $1.2 million
21 when it came due which, according to the commitment
22 letter, was March 31, 2000?
23     A  Yes, we did.
24     Q  And what was the substance of those
25 discussions?

**35**

1      A  I had done some cash flow projections. I
2  know John was adamant about having this paid back on
3  a short-term basis. When I gave him the cash flow
4  projections, I had said that if the job profits that
5  are projected hold, we would have the money to pay
6  back this 1.2 million.
7      I also told him that we had seen declining
8  job profit projections over time. I said, I'm not
9  making the projections on the jobs. That's what I've
10 been given from the people in operations. Each month
11 they were decreasing.
12     I said, based on what the most current
13 projections were, if they came in at that amount, we
14 would have the cash flow to pay back the 1.2 million.
15     Q  At the time you were having these
16 discussions with Mr. Ortenzio, were there any
17 discussions about using a borrowing under the $4
18 million line of credit to repay the $1.2 million
19 guaranteed note?
20     A  No, there were not.
21     Q  In 1999 and the year 2000, did
22 Mr. Ortenzio, to your knowledge, have any involvement
23 in the repaying of the loans to Allfirst Bank?
24     A  Which loans?
25     Q  Well, there were three loans. You had the

**36**

1  line of credit -- let's start first with the $4
2  million line of credit. Did he get involved in how
3  that was being paid or repaid at all?
4      A  I'm not sure.
5      MS. JOYCE: What time?
6      MR. GEBHARDT: In 1999 and 2000.
7      THE WITNESS: Did he get involved in how it
8  was repaid?
9  BY MR. GEBHARDT:
10     Q  Or the process, the repayment process?
11     A  No, that was the line of credit. As the
12 cash came in, it was paid down.
13     Q  How about the repayment of the equipment
14 loan?
15     A  No, he did not.
16     Q  Okay. Now, the $1.2 million loan was
17 repaid by CCI on or about February 11, 2000, by the
18 delivery of a check by Mr. Ortenzio personally to
19 Allfirst.
20     Prior to that date, had you had any
21 discussions with Mr. Ortenzio about the repayment of
22 the $1.2 million line of credit?
23     A  Yes. He had come to me about that.
24     Q  And what was the substance of the
25 discussions you had?

**37**

1     A   He wanted to pay down the $1.2 million --
2  the $1.2 million line, he wanted to pay down because
3  he had that personally guaranteed.  He had asked me
4  about writing a check out to pay that off from the
5  line of credit, and I refused.
6     Q   Why did you refuse?
7     A   I didn't think it was in the best interest
8  of the corporation to do that.
9     Q   And could you explain why you had those --
10 that you didn't think it was in the best interest of
11 the corporation?
12    A   One, I guess I didn't think there was any
13 benefit to doing it.  The interest rates were the
14 same in the loans so there was no corporate benefit
15 from paying one -- drawing in one line of credit to
16 pay the other.
17        Two, if we had the extra cash, I would have
18 thought it best suited to pay payroll and accounts
19 payable and subcontractors.
20    Q   And at the time the loan was paid in
21 February, the company was experiencing cash flow
22 difficulties?
23    A   Yes.
24    Q   And did you understand that repaying the
25 $1.2 million loan with a draw on the $4 million line

**38**

1  of credit would reduce the amount of available cash
2  to the company?
3     A   Yes, definitely.
4     Q   Okay.  Now, in terms of the physical paying
5  of the $1.2 million loan, you did not write the
6  check?
7     A   No, I did not.
8     Q   Did you have signature authorities over the
9  checking account?
10    A   Yes, I did.
11    Q   And so if you had wanted to, you could have
12 written a $1.2 million check and sent it in to
13 Allfirst?
14    A   Yes, I could have.
15    Q   Did Mr. Ortenzio have any reaction to your
16 refusal to write the check or make that payment?
17    A   Initially when he had asked me about it and
18 I said no, he didn't do anything.  Then at a later
19 point in time, he came back to me again and said I
20 know you don't agree with this; but I need to do it.
21 I said, you're the president of the company; but I'm
22 not going to be any part of it.
23    Q   Did he at all elaborate on when he said I
24 need to do this, what he was meaning by this?
25    A   He personally guaranteed the 1.2 million

**39**

1  and he wanted that paid off because he had had his
2  personal guarantee.
3     Q   Did you believe using the $4 million line
4  of credit to repay the $1.2 million guaranteed loan
5  was consistent with the agreement that CCI and
6  Allfirst had entered into when Allfirst gave the $4
7  million line of credit?
8        MR. SWICHAR:  I object to the form of the
9  question.  She's not an attorney.  You're asking her
10 to interpret legal documents which is the province of
11 the judge and not Ms. Phillips.
12       MS. JOYCE:  Let me hear the question back.
13       (The reporter read back the referred-to
14 portion of the record.)
15       MR. SWICHAR:  Let me renew my objection.
16 Consistent with the agreement it would require an
17 interpretation of the loan documents which is not the
18 proper function of Ms. Phillips.  You may answer the
19 question.
20 BY MR. GEBHARDT:
21    Q   You may answer the question.
22    A   As chief financial officer and what I knew
23 of the loan documents, no, I did not think it was.
24    Q   And would you explain why that was your
25 thought?

**40**

1     A   Because I looked at the line of credit as
2  being a way for us to pay for our ongoing work in
3  progress and to pay our vendors and subcontractors.
4  And as far as I have recalled in prior notes, there
5  were certain things I thought we weren't allowed to
6  do.  I know that it was in this one; but going to
7  another bank and getting additional loans, I thought
8  there were restrictions in there that prevented it.
9        MR. GEBHARDT:  Let's mark this as the next
10 exhibit and also the next.
11       (Income statement was marked as Deposition
12 Exhibit No. 8.)
13       (Balance sheet was marked as Deposition
14 Exhibit No. 9.)
15 BY MR. GEBHARDT:
16    Q   I've handed you what's been marked as
17 Deposition Exhibits 8 and 9, which appear to be
18 internally-generated financial statements for CCI
19 Construction for a 13-month period beginning in 1999,
20 January 1, I guess, Exhibit 8 being an income
21 statement and Exhibit 9 being the balance sheet.
22       Do you recognize these as
23 internally-generated financial statements?
24    A   Yes, I do.
25    Q   And you would have been involved at this

41

1  time in the generation of these financial
2  statements --
3          MS. JOYCE:  Object to the form of the
4  question.  You may answer.
5  BY MR. GEBHARDT:
6      Q   -- as supervisor of the accounting
7  department?
8      A   Yes, I would have.
9      Q   And would I be correct that after these
10 were generated, they were provided to Mr. Ortenzio?
11     A   Yes.
12     Q   And at the top of the page in the
13 right-hand corner, there's an indication 02-14-2000
14 14:05, is that a reference to when these statements
15 were printed out?
16     A   Yes, it is.
17     Q   Roughly how long after they were printed
18 out would it have been when you gave these to
19 Mr. Ortenzio?
20     A   Probably within -- if he was in the office
21 and we did these, it would have been within a day or
22 two.
23     Q   Now, the income statement, if you look at
24 the second page, would I be correct indicates --
25         MS. JOYCE:  The second page of which

42

1  exhibit?
2          MR. GEBHARDT:  Of Exhibit 8.
3  BY MR. GEBHARDT:
4      Q   -- that there is a net loss the company has
5  sustained of slightly over $6 million?
6      A   That's correct.
7      Q   And did you have occasion to discuss with
8  Mr. Ortenzio that amount of loss of the company for
9  the 13-month period after these statements were
10 generated?
11     A   Yes.
12     Q   Would I be correct that there was a
13 12-month internal income statement also generated at
14 CCI?  Would that have been the normal practice?
15     A   That's the normal practice, but this
16 actually would have been the 12-month statement --
17 you mean because of the 13 months up there?
18     Q   Yes.
19     A   Thirteen months was how our accounting
20 system would give us time at the end of the year to
21 go into the next year so that you could do W-2s in
22 the prior year and keep it open for adjustments and
23 start your next year of business.  So this was
24 actually for 12 months.
25         MS. JOYCE:  Let me just make sure the

43

1  record is clear.  The witness is referencing Exhibit
2  No. 8.
3          MR. GEBHARDT:  Thank you.
4  BY MR. GEBHARDT:
5      Q   Prior to this document, which is Exhibit 8,
6  being generated, was it understood by you that CCI
7  for the fiscal year 1999 was going to sustain an
8  operating loss in the magnitude that's reflected on
9  the statement?
10     A   Could you repeat that?
11     Q   Right.  I mean before February 14 when this
12 statement was printed out, did you have an
13 appreciation that the company was likely to sustain a
14 loss in the $6 million area for the fiscal year 1999?
15     A   Sometime prior to printing this, yes.
16     Q   And based on your discussions with
17 Mr. Ortenzio and things he said to you, did he have
18 an understanding that the company was going to
19 sustain a loss for fiscal year 1999 in this area?
20     A   Prior to this?
21     Q   Yes.
22     A   Prior to this, he would have -- if I can
23 back up.  What generates the profits on the jobs are
24 reports that -- I'm sorry.  What generates the profit
25 or loss on the income statement is information I got

44

1  from operations projecting job profits or losses.  At
2  the time those losses came in, they changed
3  drastically because they deceased.
4          At that time, I had constant conversations
5  with our chief operating officer.  He would meet with
6  John, and I would meet with him sometimes together,
7  sometimes apart.  This is the final result.
8          As we discussed that, we knew that it was
9  going to hit our bottom line in a big way as far as
10 an exact amount.  We knew it was coming together for
11 a big loss.
12     Q   And focusing on the February 11, 2000 date
13 on which Mr. Ortenzio delivered the CCI check to
14 Allfirst to pay the $1.2 million loan, prior to that
15 date and based on your discussions and interactions
16 with Mr. Ortenzio, was he aware of the company's
17 financial situation that was going to result in a
18 loss somewhere in the magnitude reflected on Exhibit
19 8?
20     A   Oh, yes.
21     Q   And based on your discussions with him, did
22 his awareness of that -- did he express any
23 relationship between anticipating this loss and
24 wanting to get the $1.2 million loan paid?
25         MS. JOYCE:  You mean prior to February 11?

**45**

1  Are you still in the same time frame?
2      MR. GEBHARDT: Yes.
3      THE WITNESS: Give me the question again.
4  BY MR. GEBHARDT:
5      Q  Did Mr. Ortenzio in any way relate the
6  anticipated loss in the rough area of $6 million to
7  getting the $1.2 million loan repaid even if he had
8  to borrow on the line of credit?
9      A  Yes.
10     Q  Do you remember anything he may have said
11 to you in that regard?
12     A  When we had these discussions, the chief
13 operating officer was Shane Miller; the president,
14 John; myself -- and I don't recall if the senior VP
15 was involved. I think it was probably just the three
16 of us.
17         Initially, when he talked about the
18 financial condition of the company, the chief
19 operating officer had said that in order to keep
20 going that the company would need more cash put into
21 it.
22         At that time, John had said he was not
23 going to put more cash into the company. That's when
24 in the meetings, Shane, our chief operating officer,
25 said, if you're not going to, we have serious

**46**

1  problems. We need to talk to the bank and bonding
2  company.
3          At that time, we hadn't right then called
4  because it was an issue of whether John would put
5  more money into the company or not. And he had
6  decided that he wanted to pay off the $1.2 million
7  prior to those discussions with going forward with
8  the bank or the bonding company.
9      Q  Now, there was a meeting at Allfirst that
10 Mr. Ortenzio attended with various representatives
11 including Michael Zarcone and Craig Schwartz on
12 February 24, 1999, which was the Friday after
13 February 11, 1999, when the $1.2 million line --
14     MS. JOYCE: The date is incorrect. I think
15 you might want to just change the year.
16     MR. GEBHARDT: 2000.
17     MS. JOYCE: Why don't we start the question
18 again so the form is correct for the witness?
19 BY MR. GEBHARDT:
20     Q  There was a meeting held at Allfirst
21 attended by Mr. Ortenzio and various representatives
22 of Allfirst including Craig Schwartz and Michael
23 Zarcone on February 18, 2000, which was a Friday.
24 That's the Friday after February 11, 2000, when
25 Mr. Ortenzio delivered the check to pay the $1.2

**47**

1  million loan off.
2          Were you aware that that meeting at
3  Allfirst was going to occur prior to February 18,
4  2000?
5      MS. JOYCE: Assuming all that information
6  to be correct.
7      MR. GEBHARDT: Yes, and I think it's
8  without dispute in the litigation. I can represent
9  that to you.
10     THE WITNESS: At that point, John had
11 decided to meet with the bank himself; but yes, I
12 knew he was going to meet with the bank.
13 BY MR. GEBHARDT:
14     Q  What did you understand was the purpose of
15 his meeting with the bank?
16     A  To talk to them about our financial
17 condition of the company.
18     Q  To your understanding, were you going to
19 make any request for financing or additional credit
20 or what was he going to do in the meeting?
21     A  No. He had already said that he didn't
22 want to invest in the company anymore. He was
23 talking to them to say that here's where we are.
24 Here's our position; and at some point, I don't
25 remember the exact dates, but he had given a strong

**48**

1  impression to us that he was not going to continue
2  with company.
3      Q  Now, Mr. Ortenzio attended that meeting
4  with an attorney named Chernicoff. Do you know how
5  Mr. Ortenzio came in contact with Mr. Chernicoff?
6      A  As I recall, he had told me that initially
7  he had talked to Leroy Zimmerman about being his
8  counsel. I thought there was a conflict of interest.
9  I wasn't involved in the conversations, but there was
10 a conflict of interest and that he was going to use a
11 bankruptcy attorney named Bob Chernicoff. I didn't
12 know him.
13     Q  Did Mr. Ortenzio express to you that
14 Mr. Chernicoff was a bankruptcy attorney?
15     A  I don't recall where I learned he was a
16 bankruptcy attorney. We had the discussion of
17 bankruptcy, and he hired Chernicoff. Whether he told
18 me he was a bankruptcy attorney, I don't know.
19     Q  So you and Mr. Ortenzio had had discussions
20 regarding CCI's possible bankruptcy before the
21 February 18, 2000 meeting at Allfirst?
22     A  Yes.
23     MS. JOYCE: Object to the form of the
24 question. That's fine.
25     MR. GEBHARDT: Let's mark this as the next

**49**

1  exhibit.
2      (Cash flow projections were marked as
3  Deposition Exhibit No. 10.)
4      MS. JOYCE: Can we take a short break
5  before you get to that one?
6      MR. GEBHARDT: Sure.
7  BY MR. GEBHARDT:
8      Q   I have handed you what has been marked as
9  Deposition Exhibit No. 10, which has been identified
10  in other depositions as a cash flow statement that
11  Mr. Ortenzio distributed at the meeting at Allfirst
12  on February 18, 2000. Do you recognize this
13  document?
14      A   I do recognize it, yes.
15      Q   Was this a document that you would have
16  been involved, at least in a supervisory capacity, in
17  having prepared?
18      A   Yes.
19      Q   Do you know whether this was prepared
20  especially for the meeting at Allfirst or just as a
21  general overall projection?
22      A   The specific report, I don't recall; but we
23  did these projections on a normal basis.
24      Q   Did you have any discussions with
25  Mr. Ortenzio prior to the February 18, 2000 meeting

**50**

1  about the numbers that are reflected on this cash
2  flow statement that is Exhibit 10?
3      A   Yes, actually -- oh, I'm sorry. Say that
4  again, the date.
5      Q   Well, prior to the meeting with Allfirst,
6  did you have any discussions with Mr. Ortenzio about
7  what these numbers were and their consequences to the
8  company?
9      MS. JOYCE: Prior to the February 18th,
10  2000 meeting so the record is clear?
11      MR. GEBHARDT: Yes.
12      THE WITNESS: We discussed cash flow.
13  Whether it was this specific cash flow report, I
14  don't know. This does have John's writing on it.
15  BY MR. GEBHARDT:
16      Q   Were there any discussions that you had
17  with Mr. Ortenzio about where the company was going
18  to come up with the money that it needed to make up
19  the cash flow shortfalls that are reflected on
20  Deposition Exhibit No. 10?
21      A   I'm sorry. Could you repeat that? I saw
22  this FAX up here.
23      Q   Did you have any discussions with
24  Mr. Ortenzio prior to the meeting at Allfirst where
25  the company was going to get the money to meet these

**51**

1  cash flow shortages that are shown on Deposition
2  Exhibit No. 10?
3      A   Yes, we did.
4      Q   What was the substance of those
5  discussions?
6      A   That -- which time frame are you looking?
7      Q   Well, in other words, the cash flow
8  statement that's Exhibit 10 was generated in showing
9  these cash flow losses that are, at least in my view,
10  fairly significant.
11      Before he went to Allfirst, did you and he
12  discuss how the company was going to try and come up
13  with the money to meet the cash flow shortages?
14      A   Yes. We had several meetings with myself,
15  the chief operating officer, Shane Miller, and John.
16      Q   Did you have any specific meetings with the
17  anticipation of the February 18 meeting at Allfirst
18  to discuss it?
19      A   We met to -- this was more of an ongoing
20  discussion. But when we got to -- I guess that's
21  what prompted the meeting on February 18th, the fact
22  that we had these serious cash flow concerns. We had
23  talked to John, and Shane said the only way -- we're
24  going to need you to put more money into the company
25  in some form in order to get through this until we

**52**

1  get money back on these claims.
2      John refused to do that; and Shane said, if
3  we can't do that, we can't keep going forward. The
4  bonding company will have to step in, or we're going
5  to file bankruptcy or something.
6      We had several meetings discussing that,
7  and the likelihood of the company going forward was
8  slim at that point because John had said he was not
9  making any additional commitments.
10      At some point in time, we had found out
11  that the Scott Air Force Base was not going to come
12  in real quickly. We needed something at that point
13  in time. We discussed the longevity of the company
14  and the fact that we weren't going forward. That's
15  what prompted the discussions with Allfirst.
16      Q   Did you know that this document, which is
17  Exhibit 10, was going to be distributed at the
18  meeting at Allfirst before the meeting?
19      MR. SWICHAR: I object because I think she
20  said she didn't recall the specific document.
21  BY MR. GEBHARDT:
22      Q   Is that correct? You don't recall the
23  specific document?
24      MS. JOYCE: I don't think that was her
25  testimony. You can clarify your response.

**53**

1  BY MR. GEBHARDT:
2      Q    That's fine.  I'm not trying to put words
3  in your mouth.  If I --
4          MS. JOYCE:  No.  I think the
5  mischaracterization was from Mr. Swichar.  I think
6  her statement was she did not recall whether Exhibit
7  No. 10 was prepared specifically for the meeting with
8  Allfirst on February 18th of 2000 or whether it was
9  prepared in the normal course of business.
10         THE WITNESS:  But I do recognize this
11 document.  But like I said, we prepared them on a
12 normal basis.  So actually which one was a specific
13 one, we prepared these at least monthly, sometimes
14 more often during the month especially towards the
15 end.
16 BY MR. GEBHARDT:
17     Q    Do you know whether or not based on your
18 discussions with Mr. Ortenzio and prior to February
19 18 he planned to disseminate this, Exhibit 10, to the
20 people at Allfirst at the meeting?
21     A    He had a copy of this when he said he was
22 going to talk to the bank.  That was probably the
23 first time he's ever met with our bankers by himself.
24 So what actually happened at that meeting, I don't
25 know.  It's the first meeting I think that I had not

**54**

1  been involved in especially because Dave wasn't
2  there.
3      Q    Do you know why you weren't involved in
4  that meeting?
5          MS. JOYCE:  Without guessing or
6  speculating.
7          THE WITNESS:  No, I don't.  We were
8  surprised about it afterwards.
9  BY MR. GEBHARDT:
10     Q    If the meeting happened on a Friday,
11 roughly, when would you have learned that the meeting
12 was going to occur?
13     A    I honestly can't recall exactly when I
14 learned of the meeting.  Things happened pretty fast
15 in that last week when we notified -- we were going
16 to notify Allfirst and the bonding company both at
17 the same time; the bonding company, for whatever
18 reason, delayed the meeting.  Allfirst, John met with
19 them right away.
20     Q    Did you ask to go to the meeting?
21     A    No.
22     Q    Did you at all ask why you weren't being
23 invited to attend?
24     A    Not that I recall.
25     Q    Did you have any discussions with

**55**

1  Mr. Ortenzio about what he expected or anticipated
2  Allfirst's reaction was going to be in that meeting?
3      A    We discussed calling Allfirst and the
4  bonding company.  Both phone calls we discussed at
5  each meeting.  They weren't separate for the bonding
6  company and the bank.
7          As I recall, when John set up the meeting,
8  it happened pretty quickly; and he went to the
9  meeting.  Like I said, it happened pretty fast.
10     Q    And as of the February 18, 2000, meeting
11 which was a Friday, you were aware at least as of
12 that Friday that Mr. Ortenzio had caused CCI to draw
13 on the $4 million line of credit to repay the $1.2
14 million loan preceding Friday?
15     A    Yes, I was.
16     Q    Were there any discussions about whether he
17 would or would not disclose that borrowing on the
18 line of credit to Allfirst at the meeting?
19         MS. JOYCE:  Obviously, prior to the
20 meeting?
21         MR. GEBHARDT:  Prior to the meeting, yes.
22         THE WITNESS:  I don't recall if he said he
23 was going to.
24 BY MR. GEBHARDT:
25     Q    Do you recollect after the meeting having

**56**

1  any discussions reasonably following the meeting and
2  time-wise with Mr. Ortenzio about how he thought the
3  meeting went and so on?
4          MS. JOYCE:  Object to the form of the
5  question in terms of and so on.  You can answer.
6  BY MR. GEBHARDT:
7      Q    Did Mr. Ortenzio tell you how the meeting
8  went in reasonable proximity to the time the meeting
9  occurred?
10     A    I don't recall him being very detailed
11 about the meeting.
12     Q    Now again, the meeting occurred on a
13 Friday; and I believe it was in the afternoon.  Do
14 you know whether CCI wrote any checks or made
15 payments to creditors this succeeding week?
16     A    I'm sorry.  Which succeeding week?
17     Q    In other words, February 18, 2000, was a
18 Friday; so was CCI still writing checks to its
19 vendors or payments to its vendors as of Monday?
20         MS. JOYCE:  Monday the 21st of February
21 2000?
22         MR. GEBHARDT:  Yes.
23         THE WITNESS:  Yes, we were.
24 BY MR. GEBHARDT:
25     Q    And do you know whether Mr. Ortenzio was

**57**

1 aware that those checks were being written and
2 payments were being made?
3    **A**   Yes, he was.  He actually helped make
4 selections as to who was being paid.
5    **Q**   Was it ever your understanding prior to
6 February 18, 2000, that Mr. Ortenzio was meeting with
7 the bank to discuss renewing the $4 million line of
8 credit?
9       MS. JOYCE:  Object to the form of the
10 question.
11       THE WITNESS:  Could you repeat?
12 BY MR. GEBHARDT:
13    **Q**   In other words, prior to the meeting -- the
14 meeting occurred on February 18, 2000.  Did you ever
15 understand based on speaking with Mr. Ortenzio that
16 he was attending the meeting to negotiate a renewal?
17    **A**   At the meeting on the 18th?
18    **Q**   At the meeting, yes.
19    **A**   No.  That was not my understanding.
20       MR. GEBHARDT:  Just a minute.  Excuse us.
21       (Break.)
22       MR. GEBHARDT:  Just a couple quick points,
23 and then we'll be done.
24 BY MR. GEBHARDT:
25    **Q**   Looking back to your answer to the last

**58**

1 question or couple questions, you indicated that
2 Mr. Ortenzio, after the February 18, 2000 meeting
3 with Allfirst, became involved in selecting which
4 creditors would receive checks, I believe; is that
5 correct?
6    **A**   That's correct.
7    **Q**   Prior to that time, had Mr. Ortenzio
8 involved himself in a similar fashion in selecting
9 who would or would not be paid?
10    **A**   He may -- I don't remember the exact time.
11 He may have the week before or within the two weeks
12 before; but prior to that in prior business, that was
13 something he didn't get involved in, the day-to-day
14 accounting.
15    **Q**   If I could, let me just ask you just a
16 couple clarifying points that you might be able to
17 help me with on the lower left-hand corner --
18       MR. SWICHAR:  Which number?
19       MR. GEBHARDT:  No. 10.
20 BY MR. GEBHARDT:
21    **Q**   -- 2/16/00, that would have been the time
22 this was printed off of the computer?
23       MR. GEBHARDT:  It's the cash flow.  It's
24 got Ortenzio 5.
25       MS. JOYCE:  Could we go off the record for

**59**

1 a second?
2       MR. GEBHARDT:  Sure.
3       (Off the record discussion.)
4 BY MR. GEBHARDT:
5    **Q**   Looking at the bottom left-hand corner
6 where it says 2/16/00 and then 7:08 p.m., would that
7 be the time this was printed off the computer?
8    **A**   Yes.
9    **Q**   Looking up to the February column, are the
10 numbers there as of February 1 or would they be as of
11 February 28?
12    **A**   As I recall, the beginning cash balance, I
13 think, was February 1; and the ending cash balance
14 would have been February 28 in the first column.  And
15 then that carries forward to March, so that would be
16 the beginning of March at the top of the column and
17 the end of March at the bottom.
18    **Q**   Where it says the next line after ending
19 cash balance, available line of credit $5,200,000,
20 would that also be a number reflected as of February
21 28?
22    **A**   Yes.  As far as I recall, that was what my
23 projection was.
24    **Q**   The cash flow projection doesn't reflect
25 the repayment of the $1.2 million loan with a draw on

**60**

1 the $4 million line of credit?
2    **A**   No, it didn't.
3    **Q**   And based on your understanding of how the
4 numbers work on this Deposition Exhibit 10, is there
5 any way Allfirst could have learned by looking at
6 this document that Mr. Ortenzio had caused CCI to
7 borrow on the $4 million line of credit to repay the
8 $1.2 million guaranteed loan?
9    **A**   No.
10       MR. GEBHARDT:  I have no further questions.
11       MR. SWICHAR:  Could we either take a
12 15-minute break now or break for lunch.  I'll have
13 about an hour's worth.
14       MS. JOYCE:  It's the witness's call.
15       THE WITNESS:  If we could take about a 10-
16 or 15-minute break now, then I could get back to
17 work.
18       MR. SWICHAR:  Okay.  Let's take 15 minutes.
19 Thanks.
20
21          CROSS EXAMINATION
22
23 BY MR. SWICHAR:
24    **Q**   Ms. Phillips, I sort of want to trace some
25 of the questions that you were previously asked

**61**

1  beginning with Exhibit 2, which is the $4 million
2  note. Do you have that there?
3      I believe you testified that you basically
4  were responsible as far as the CCI was concerned for
5  the changes that were reflected and initialed on the
6  note with the possible exception of Item No. 6 in
7  which Mr. Ortenzio had wanted a 30-day protection
8  reflected in that note; is that correct?
9      A   Yes, that's correct.
10     Q   Knowing what you know now, did the bank
11 provide that 30-day notice requirement for
12 protection, as you called it, reflected in 6?
13         MR. GEBHARDT: Objection.
14         MS. JOYCE: I'm going to object to the
15 form.
16 BY MR. SWICHAR:
17     Q   If you understand, you can answer it.
18     A   Let me just read the paragraph again. What
19 was your question?
20     Q   Did the bank, if you know, provide the
21 30-day notice reflected in paragraph 6 when it
22 entered a default or called a default under the note?
23     A   That's for repayment. I guess I don't know
24 the situation that we had really applies directly to
25 that.

**62**

1      Q   Pardon me. You don't know?
2      A   They didn't ask us to repay it.
3      Q   How about with respect to the declaration
4  of default? Did the bank give a 30-day notice? Do
5  you know?
6          MR. GEBHARDT: Objection.
7          THE WITNESS: No. I don't recall any such
8  notice.
9  BY MR. SWICHAR:
10     Q   Would you turn to the $1.2 million note,
11 which is your Exhibit 7, which I understand you
12 didn't sign except as the attestation clause. Were
13 you responsible in any way or were you involved in
14 any way with respect to the changes initialed in the
15 $1.2 million note?
16     A   As I recall, John and I reviewed this note
17 before he had signed it.
18     Q   And you recall having discussions with the
19 bank and/or with Mr. Ortenzio with respect to the
20 changes as, for example, the change reflected in the
21 second paragraph on page 2 of the note, third
22 paragraph, the second and third. I'm sorry.
23         MS. JOYCE: Your question was, Did she
24 discuss the contents of those --
25         MR. SWICHAR: Was she involved in the

**63**

1  changes in any way that is reflected on page 2 of the
2  note?
3          THE WITNESS: I had discussions with John
4  about the changes.
5  BY MR. SWICHAR:
6      Q   Did you have discussions with the bank?
7      A   About this note?
8      Q   About this note and the changes reflected
9  therein.
10     A   I don't recall if I talked to them about it
11 or if John did.
12     Q   Do you recall having any discussions with
13 the bank or Mr. Ortenzio with respect to limiting
14 Mr. Ortenzio's guarantee to the $1.2 million note and
15 thereby excluding the $4 million note?
16     A   I do remember discussions about that.
17     Q   With whom were those discussions?
18     A   With John.
19     Q   Any with the bank?
20     A   As I recall, I think that that was
21 discussed with the bank also.
22     Q   You were present at the signing when
23 Mr. Ortenzio signed this?
24     A   Yes, I was.
25     Q   And were you present when the bank made the

**64**

1  changes reflected on the note?
2      A   I don't recall that.
3      Q   What do you recall about the discussions
4  with the bank insofar as limiting Mr. Ortenzio's
5  guarantee to the 1.2 million in contrast to extending
6  it to the $4 million line?
7      A   Specifically that, that this was going to
8  be written up as a separate note that would have his
9  personal guarantee and his personal guarantee did not
10 go to the $4 million loan.
11     Q   Do you recall anybody at the bank
12 verbalizing their acceptance of that apart from what
13 is in the note itself apart from Mr. Schwartz?
14     A   Not that I recall.
15     Q   Now, we agree that the bank had three loan
16 facilities: The $4 million line of credit, the $1.2
17 million line note and the related surety, and the
18 equipment note. Am I correct that CCI only had one
19 checking account at Allfirst?
20         MS. JOYCE: At any time or in 1999 and
21 2000?
22         MR. SWICHAR: 1999 and 2000.
23         THE WITNESS: No, that's not correct.
24 BY MR. SWICHAR:
25     Q   When did it have another checking account?

65

1     A   We had -- our accounts were tied together.
2 We had an account for our payroll, and we had an
3 account for our accounts payable. They were all tied
4 to the accounts payable. They were all tied but
5 handled in a different way.
6         In addition to that, we had a small account
7 for a cafeteria plan for money that was presented for
8 their medical health bills.
9     Q   Which accounts were tied into the cash
10 management account, the one where moneys would be
11 swept?
12     A   Accounts payable, payroll, and the line
13 itself.
14     Q   All three -- all the checking accounts were
15 tied into the cash management?
16     A   Yes, they were.
17     Q   As far as you know, CCI had no checking
18 accounts elsewhere with another bank?
19         MS. JOYCE: At any time?
20         MR. SWICHAR: 1999/2000, unless I state
21 otherwise.
22         MS. JOYCE: I wasn't clear from your prior
23 questions, so that's fine.
24         THE WITNESS: Without thinking about it --
25 there may have been some other account for something

66

1 as far as our main transactions for accounts payable
2 and transactions -- they went through Allfirst.
3 BY MR. SWICHAR:
4     Q   Were all accounts receivable or revenues
5 deposited in the checking account at Allfirst as far
6 as you know?
7     A   Prior to --
8     Q   1999/2000, when money came in by either
9 wire transfer or checks, which I believe you stated
10 were the means by which funds were collected, were
11 they all deposited in the checking account at
12 Allfirst which was related to the cash management
13 facility?
14     A   They used to be; but right at the end, John
15 had used another account.
16     Q   Where was that account?
17     A   I don't know. He had -- it was for a job
18 that wasn't bonded. They had a payment that he used
19 another checking account to pay some of the vendors
20 and one of the deposits into that account.
21     Q   Was that at Allfirst or another bank?
22     A   I'm sure it was another bank, but I don't
23 know which one.
24     Q   Apart from that job -- do you recall which
25 job that was?

67

1     A   It was Old Gettysburg Road.
2     Q   Do you know why a separate account was set
3 up for that?
4     A   I don't know if the account was just set up
5 for that or if John had a prior account he was using
6 because he had handled that, but he wanted to -- he
7 didn't want the money to be intermingled with what
8 Allfirst and the bonding company -- he didn't want
9 that money in that account that they made draws on.
10 He wanted to use that.
11     Q   When you say at the very end he used that,
12 what do you mean?
13         MS. JOYCE: I don't believe that's what the
14 witness said at the very end. I don't believe that's
15 what she was referring to. You can go ahead and
16 clarify.
17         THE WITNESS: After the bank and after the
18 bonding company were aware of what happened and after
19 the bonding company got involved and basically took
20 over running the company during that time period, a
21 check for that one job came in or check or checks --
22 the deposits at that point in time, I think it was
23 one check. John put that into a different account.
24 BY MR. SWICHAR:
25     Q   Was that after the bank froze the checking

68

1 account at Allfirst?
2     A   Yes, it was.
3     Q   Going back to the Allfirst account, how
4 were interest payments on the equipment note paid?
5     A   Interest payments on the equipment note?
6     Q   Yes. Would they be automatic or were
7 checks written?
8     A   As I recall, we wrote checks to pay that.
9     Q   Monthly?
10     A   Yes. We were billed. As I recall, we
11 actually got an invoice.
12     Q   And those checks were written on the
13 Allfirst checking account?
14     A   Yes, they were.
15     Q   They were not swept?
16     A   They were not swept automatically by the
17 bank.
18     Q   Checks were written? I just want to make
19 sure. I don't know the answer.
20     A   At the end of each day, the account -- all
21 the checks that were put against our account, that
22 money was taken out of any deposits that were put in.
23 If there was an under amount, it was drawn on the
24 line to cover that.
25     Q   If there was an excess amount, wouldn't it

**69**

1  reduce the balance on the $4 million line of credit?
2      A    If there was an excess amount, yes, it
3  would.
4      Q    That's why I'm confused.  You say it would
5  be invested.  But it's my understanding, correct me
6  if I am wrong, that if there were excess funds in
7  that account, it would be deducted from any balance
8  owed on the $4 million line of credit first?
9      A    I think you're misinterpreting what I'm
10  saying.  In the total picture, if, in the $4 million
11  at the end of the day if we got deposits in of $5
12  million, therefore, we had an extra million, that
13  would be invested.
14          If you're just looking at the deposits for
15  the day, it's applied against the line of credit.
16  But what I'm saying when I say that if there's an
17  overage amount, if our credit goes to zero, that it
18  would be invested.
19      Q    That's what I thought.  The investment part
20  of this transaction only occurs when there is nothing
21  due on the $4 million line of credit --
22      A    That's correct.
23      Q    -- and the balance is zero?
24      A    That's correct.
25      Q    Otherwise, any moneys deposited in the

**70**

1  checking account which would constitute a surplus
2  would be used to reduce the $4 million line of
3  credit?
4      A    That's correct.
5      Q    Now, if interest payments are paid on the
6  equipment note, that would have an impact on the $4
7  million line of credit, would it not?
8      A    Yes, it would.
9      Q    And what would that impact be?
10      A    It would draw on the line of credit.
11      Q    How about principal payments on the
12  equipment note?  How are they paid?
13      A    In the same fashion.
14      Q    And that would also have the same impact on
15  the $4 million line of credit?
16      A    Yes, it would.
17      Q    Okay.  By the way, principal payments, were
18  they by checks or were they swept automatically by
19  the bank?
20          MR. GEBHARDT:  Objection.  Using -- I don't
21  know if you're using the term swept in a consistent
22  --
23          MR. SWICHAR:  I'll rephase it.  Fair
24  objection.
25  BY MR. SWICHAR:

**71**

1      Q    Were the principal payments for the
2  equipment note paid by CCI checks; or were they
3  automatically deducted by the bank, by the checking
4  accounts, or none of the above?
5      A    I don't recall if we were making -- I'm
6  just trying to remember if we made principal payments
7  or if we were making interest-only payments.
8      Q    I will represent to you that I think it's
9  correct that there were principal payments on the $2
10  million note.
11      A    If we were making principal payments -- I
12  think they were; I just don't recall exactly -- if we
13  were making principal payments, they would be handled
14  the same way.
15      Q    Which would be checks?
16      A    Which would be checks.
17      Q    And that would reduce the availability on
18  the $4 million line?
19      A    That's correct.
20      Q    How about interest payments on the $1.2
21  million note?  How were they paid, by checks or
22  automatic deductions --
23      A    As I recall --
24      Q    -- or none of the above?
25      A    As I recall, they were paid by check.

**72**

1      Q    And am I correct in saying, like the
2  equipment note payments, those payments would have
3  the effect of increasing the balance on the $4
4  million line of credit?
5      A    Yes.
6      Q    Now, Ms. Phillips, were you present at the
7  table when the -- bank table when the $1.2 million
8  note and related surety were signed and provided to
9  the bank?  Were you there?
10      A    I don't recall if we actually got together
11  to sign it or if we got the loan documents, reviewed
12  them, signed them, and gave them to Craig Schwartz.
13      Q    Did you have discussions with Mr. Schwartz
14  regarding the revisions that were made on the changes
15  that were made to the $1.2 million note and surety?
16  You can look at them to refresh your recollection.
17      A    I don't recall if I did.  In prior loans, I
18  can honestly say that I had spoken to Craig Schwartz.
19  In this loan, John was very involved; so I don't
20  recall if I specifically talked to them or if John
21  did.  This one was a little different.
22      Q    If my notes are correct and the other
23  lawyers will account if they're not correct, you
24  testified you had discussions regarding how the $1.2
25  million note would be repaid.

**73**

1    I believe you testified that it was
2  anticipated that CCI would repay the 1.2 million from
3  cash flow that was projected if the projections held
4  true.  Is that a fair statement?
5    A   That's correct.
6    Q   Now, with whom did you have those
7  discussions -- Mr. Ortenzio, the bank, or both?
8    A   I definitely had the discussions with John;
9  and as I recall, we had those same discussions with
10  the bank also.
11    Q   Am I correct in stating that the
12  projections that CCI was relying upon turned out not
13  to come to fruition?
14    A   That's correct.
15    Q   When the $1.2 million note and related
16  surety was signed, did you believe those projections
17  to be capable of being fulfilled based on your
18  financial experience with the company?
19    A   As I said, I had concerns; and when I had
20  talked to John about those projections, I said those
21  were based on what operations were projected for the
22  loss or profits on each of those jobs.  I had pointed
23  out at that time that those profits and/or losses,
24  they were decreasing throughout the year.
25    Q   Well, did you tell the bank at any time

**74**

1  that you didn't expect the projections to be
2  accurate?
3    MS. JOYCE:  Object to the form of the
4  question.  You can answer.
5    THE WITNESS:  Say it again.
6  BY MR. SWICHAR:
7    Q   Did you ever tell the bank at or about the
8  time the $1.2 million note was signed that you didn't
9  expect those projections that were going to be the
10  source of the payment to be accurate and true?
11    A   I didn't say they weren't accurate or true.
12  What I said is -- when I gave them to John, I said,
13  this is what I've been given by operations.
14  Operations, in the past, has shown the profits on the
15  jobs decreasing; but as of that point in time,
16  information I gave to him, I said, that's the best
17  that I can do.
18    Q   Did you believe those projections that
19  operations provided to you to be true and correct as
20  far as projections can go?
21    A   I believed at that time that they were
22  given as true as they could project, yes.
23    Q   When did you have discussions with the bank
24  regarding the $1.2 million note where you said that
25  there were discussions that you had that you expected

**75**

1  the note to be repaid from projected cash flow?  When
2  did that occur?
3    A   That's what I'm saying, I think -- I can't
4  guarantee that that discussion occurred with the bank
5  as to how we were paying it back.  I know that John
6  and I discussed it.  I think that that was in -- it
7  may have been part of the discussion with the bank,
8  but I can't recall that part.  I can't recall
9  exactly.
10    Q   You may have told the bank or there may
11  have been discussions with the bank at which you were
12  present that projected cash flow would be the source
13  of repayment.
14    I'm trying to find out whether or not you
15  have an actual recollection of that statement being
16  given to the bank by you or by Mr. Ortenzio in your
17  presence.
18    A   And that's where I'm saying I just don't
19  have an exact recollection of that part of the
20  conversation.
21    Q   Do you recall the bank ever requesting CCI
22  through you or Mr. Ortenzio including a provision in
23  the $1.2 million note which would have required the
24  repayment to come from projected cash flow?
25    A   Say that again.

**76**

1    Q   Would you -- do you have any recollection
2  of the bank ever stating to CCI, either to you or
3  Mr. Ortenzio, that it wanted to include a provision
4  in the $1.2 million note that it could only be repaid
5  from projected excess cash flow?
6    A   I don't recall that, no.
7    Q   Do you recall the bank ever requesting a
8  provision in the $1.2 million note which prohibited
9  -- which would have prohibited the repayment from the
10  $4 million line of credit?
11    A   I do not recall any conversation with the
12  bank of making a payment from the $4 million line of
13  credit one way or the other.
14    Q   One way or the other?
15    A   Yeah.
16    Q   Now, you've seen from the commitment
17  letters that the $4 million note was due on April
18  30th of 2000; and the $1.2 million note was due one
19  month earlier on March 31st, 2000.
20    I'm not going to have this remarked, but it
21  originally was Schwartz 6, if everyone agrees, which
22  appears to be an Allfirst memorandum dated November
23  2, 1999.
24    Just to put this in the proper context, Ms.
25  Phillips, if you look at Phillips 5, which you have

**77**

1  in front of you, it's dated -- Schwartz 6 is dated
2  two days earlier.
3     A    Okay.
4     Q    Now, this Schwartz 6 indicates that the
5  bank initially contemplated increasing the $4 million
6  line to 5 million.  Do you see that?
7     A    I do.
8     Q    And the $1 million increase would expire on
9  February 28th, 2000.  Do you see that?
10    A    Yes.
11    Q    And it also indicates that Mr. Ortenzio
12  would guarantee the entire $5 million line of credit.
13 Do you see that?
14    A    I see that.
15    Q    Do you recall any discussions that you
16 participated in in the bank, with the bank where
17 Mr. Ortenzio was requested to guarantee the $5
18 million line as reflected in Schwartz 6?
19    A    I don't remember this document.
20    Q    In fairness to you, you may never have seen
21 this. I don't know.  I'm only showing you this to
22 refresh your recollection.
23         MS. JOYCE:  Your question to this was --
24         MR. SWICHAR:  I'll rephrase it since you
25 made me forget what the question was.

**78**

1  BY MR. SWICHAR:
2     Q    Do you recall how the changes reflected in
3  the earlier document evolved into what ultimately
4  became -- strike that.
5         Do you recall any discussions with the bank
6  that reflected a transaction -- the transaction in
7  Schwartz 6, in other words, a $5 million note fully
8  guaranteed by Mr. Ortenzio to expire on February 28,
9  2000?
10    A    I don't recall that part of the discussion,
11 but I do know that John never agreed to guarantee the
12 whole 5 million or the 4 million that we already had
13 in place that was already in place.
14    Q    Do you recall the bank requesting
15 Mr. Ortenzio to guarantee the full 5 million?
16    A    I don't.
17    Q    Do you recall that Mr. Ortenzio had
18 initially requested a $1 million loan in contrast to
19 a 1.2 million?
20    A    No.  I just don't recall.  I'm looking at
21 the difference in the two, but I don't recall this.
22    Q    Do you recall Mr. Ortenzio, on behalf of
23 CCI, requesting that the 1 million or $1.2 million
24 note initially expired on February 28, 2000, in
25 contrast to what ultimately turned out to be March

**79**

1  31, 2000?
2     A    I don't know if this was something that
3  John talked to them about previously.  I just don't
4  remember.
5     Q    Fair enough.  If you turn to your Exhibit
6  5, which is the Schwartz memo of 11/4/99, and that
7  refers to a meeting that you did attend with
8  Mr. Ortenzio and Mr. Schwartz and Mr. Zarcone.
9         You'll notice that in the second paragraph,
10 it states that the 1.2 million would be done on a
11 temporary basis.  Was that consistent with your
12 understanding of the $1.2 million note?
13    A    Yes.
14    Q    In contrast with the $4 million line of
15 credit which was longer term?
16    A    I understood the $4 million to be a year;
17 and as I said, we normally renewed it each year.
18 Yes, this was definitely considered short term.
19    Q    A one-time note?
20    A    Yes.
21    Q    It also states that CCI would get an
22 additional 500,000 from private sources.  Do you
23 recall any discussions about that?
24         MS. JOYCE:  It, referring to Deposition
25 Exhibit No. 5, so the record is clear?

**80**

1         MR. SWICHAR:  Yes.  Thank you.
2         THE WITNESS:  No, I don't recall that.
3  BY MR. SWICHAR:
4     Q    Do you recall any discussions with the bank
5  stating that it expected the $4 million line of
6  credit to be repaid before the 1.2 million?
7     A    No.
8     Q    Do you recall any discussions with the bank
9  that it expected the $4 million line of credit to
10 reach a zero balance before the $1.2 million line of
11 credit could be repaid?
12    A    No.
13    Q    Now, we agree that the $1.2 million loan
14 was a short-term note?
15    A    Yes.
16    Q    And we agree that Mr. Ortenzio as you
17 stated earlier told you specifically that he wanted
18 the $1.2 million to be a short-term note?
19    A    Yes, I do.
20    Q    And at the time it was repaid by CCI on
21 February 11, 2000, there was no indication that there
22 was any pending request to the bank to extend the
23 $1.2 million note, was there?
24    A    It didn't expire until March.  I'm not sure
25 I understand your question.

81

1    Q    As far as you know, was there any request
2    on the bank to extend the $1.2 million note?
3    A    To the bank to request that we extend the
4    note?
5    Q    Yes.
6    A    No.
7    Q    And was there any indication as of February
8    11, 2000 -- there was no indication from the bank
9    that it had intended to extend the $1.2 million
10   note --
11   A    No.
12   Q    -- am I correct?
13   A    That's correct.
14   Q    It was your understanding as of February
15   11, 2000, that the $1.2 million note would have
16   expired in any event on March -- as of -- no later
17   than March 31 of 2000; is that correct?
18   A    That's correct.
19   Q    And that's in contrast to the $4 million
20   note which you would have anticipated would have been
21   renewed at the end of April of 2000; is that correct?
22   A    That was always our hope, and it was each
23   time.
24   Q    It was a course of dealing; is that
25   correct?

82

1    A    Yes.
2    Q    Now, you testified about your discussions
3    that you had with Mr. Ortenzio prior to the bank
4    meeting on February 18, 2000.
5        Am I correct in stating that Mr. Ortenzio
6    advised you that he did intend to go to the bonding
7    companies for financial help until moneys came in
8    from the Scott Air Force Base and other jobs?
9    A    Yes, that's correct.
10   Q    And there was a discussion about -- do you
11   recall -- if I recall correctly, you testified that
12   -- strike that.
13       Did Mr. Ortenzio ever state to you that
14   bankruptcy was an alternative prior to the meeting
15   with the bank or did he not or you had no
16   recollection?
17   A    We discussed bankruptcy prior to that.
18   Q    And was it Mr. Ortenzio's primary goal
19   first to go to the bonding companies and ask for
20   financial help until the Scott Air Force Base money
21   came in?
22   A    That's what I recall.
23   Q    Did Mr. Ortenzio tell you that the bonding
24   companies would have to come up with the money until
25   the moneys came in from the Scott Air Force Base and

83

1    other jobs?
2    A    I do recall that, yes.
3    Q    And he said that he expected the bonding
4    companies to cooperate in that fashion?
5    A    I don't know that he expected it from them,
6    but he was going to talk to them about that.
7    Q    And as of the time you had the meeting with
8    Mr. Ortenzio prior to the February 18 meeting with
9    the bank, wasn't it indicated to you through
10   Mr. Ortenzio that it was his primary intention to
11   keep his company operating by getting funds from the
12   bonding companies until such time as the money from
13   the jobs came in?
14   A    We had doubts about whether he wanted to
15   keep the company operating.
16   Q    What was his primary goal, to get money?
17       MR. GEBHARDT:  Objection.  His primary goal
18   for what?
19   BY MR. SWICHAR:
20   Q    To keep the company alive?
21   A    What's the question?
22   Q    Was his primary goal to keep the company
23   alive?
24       MR. GEBHARDT:  Objection.
25       MS. JOYCE:  If you know what his primary

84

1    goal was.
2    BY MR. SWICHAR:
3    Q    Based on your discussions with him?
4    A    At that time, we had serious concerns as to
5    whether he did want to keep the company alive.
6    Q    Do you recall on a certain date the bank
7    freezing the bank accounts of CCI?
8    A    Yes, I do.
9    Q    Do you recall when that occurred?
10   A    Without looking back, I think it happened
11   -- actually, we found out on a Wednesday; but I think
12   it was actually frozen on a Tuesday night.
13       If I recall, based on the dates we've been
14   given here, I was thinking that it would be the
15   Wednesday after the 18th meeting.
16   Q    A few days after the February 18th meeting?
17   A    Yes.
18   Q    Was there any warning by the bank that it
19   was going to freeze the accounts?
20   A    Not to me.
21   Q    What was the nature of the checks -- I'm
22   sorry.  As a result of the bank freezing CCI's
23   checking account, were checks returned?
24   A    Yes.
25   Q    What was the nature of those checks?

**85**

1      A    It was our accounts payable to material
2  suppliers, vendors, subcontractors, payroll, all the
3  checks in the normal course of business that we had
4  written on the account.
5      Q    Approximately what was the amount of the
6  payroll checks that were dishonored?
7      A    I honestly can't recall.  It was all the
8  checks from the last payroll at that time.
9      Q    Can you give any approximation of the
10  dollars that that would be?
11      A    My -- I don't recall the actual payroll
12  numbers.
13      Q    Do you recall the number -- I'm sorry.  Do
14  you recall the number of employees who didn't receive
15  their paychecks as a result of the bank freezing the
16  account?
17      A    The number, no; but it was significant.  I
18  just don't recall the number.  We had -- the reason
19  I'm not recalling is because we had started laying
20  people off so the numbers were changing as people
21  were being laid off, the payroll numbers were getting
22  lower in that time period.  I don't remember how many
23  we had left, but it was a significant number.
24      Q    Well, significant number -- let me try to
25  bring you down.  Over a hundred?

**86**

1      A    I would say probably over a hundred.
2      Q    I don't mean to play games.  Bigger than a
3  breadbasket?  Between 150 and 200?
4      A    I can't recall.
5      Q    Is a hundred your best guess?
6      MS. JOYCE:  Best estimate, because if it's
7  a guess, I'm not going to allow her to guess.
8  BY MR. SWICHAR:
9      Q    Is that your best estimate?  If you can't,
10  you can't.  I just want a general idea.  Over a
11  hundred?
12      A    I would say over a hundred.
13      Q    Now, the $1.2 million note was repaid from
14  the $4 million line of credit on February 11, 2000.
15  We agree on that.
16      At any time, did the bank ever come to you
17  as CFO and ask CCI to sign a document that would have
18  precluded payment from the $4 million line of credit?
19      A    Not that I recall.
20      Q    As CFO, did the bank ever demand any
21  agreement from CCI that would make the $4 million
22  line of credit a prohibited source of funds to repay
23  the $1.2 million note?
24      MR. GEBHARDT:  Objection.
25  BY MR. SWICHAR:

**87**

1      Q    You can answer.
2      A    No.
3      Q    Now, when the bank lent the 1.2 million,
4  changing thoughts now, there was a point in time when
5  the bank lent CCI the $1.2 million in funds.  That
6  money was deposited in CCI's checking account; is
7  that correct?
8      A    That's correct.
9      Q    And that was the same checking account that
10  was tied into the cash management facility; is that
11  correct?
12      A    That's correct.
13      Q    And that had the impact of increasing the
14  availability on the $4 million line of credit by $1.2
15  million; is that correct?
16      A    That's correct.
17      Q    And similarly it had had the impact of
18  decreasing the loan balance on the $4 million line of
19  credit; is that correct?
20      A    That's correct.
21      Q    Now, let's move ahead in time.  When the
22  $1.2 million loan was repaid by drawing on the $4
23  million line, a check was drawn on the checking
24  account; is that correct?
25      A    When the 1.2 --

**88**

1      Q    Was repaid -- we're now moving ahead to
2  February 11th.  The $1.2 million loan was repaid by a
3  CCI check; is that correct --
4      A    That's correct.
5      Q    -- from the same checking account that we
6  just spoke of; is that correct?
7      A    That's correct.
8      Q    And that had the impact of increasing the
9  balance on the $4 million line of credit; is that
10  correct?
11      A    That's correct.
12      Q    And since you're a CFO, I'll ask you this
13  question:  The repayment of the $1.2 million note had
14  the effect of reversing what occurred months earlier
15  when the 1.2 million was first lent to CCI with
16  respect to the $4 million line of credit?
17      A    That's correct.
18      Q    Now, did the bank, in any fashion, monitor
19  CCI's use of the $4 million known proceeds?  Would
20  they ask you daily or weekly, what are you doing with
21  our money?
22      A    We were required to give them reports.
23  It's in the documents here, if I looked at them; but
24  we had to give them an income statement, balance
25  sheet, accounts receivable, aging work in progress.

89

1    Q    Would those reports actually show the
2  payees, for example, of the proceeds of the $4
3  million line of credit, where the moneys went
4  specifically?
5    A    No.  Specific to where it went, no.
6    Q    Did the bank ever audit those requests,
7  those reports?
8    A    That I gave them on a monthly basis?
9    Q    Yes.
10    A    I don't know what they did with them.  I
11  just gave them to them.
12    Q    Did they ever ask you for a list of payees
13  as to where the loan proceeds went?
14    A    Prior to them freezing the account?
15    Q    Yes.
16    A    No, they did not.
17    Q    By the way, when they froze the account, is
18  that when they first requested a list of payees?
19    A    I don't recall if they did that or not.  I
20  know they did before, but I don't recall if they
21  requested it.
22    Q    Did the bank ever ask you to provide a list
23  of payees who would have received any of the proceeds
24  of the $1.2 million note?
25    A    No, they didn't.

90

1    Q    Do you recall a couple of days after
2  February 11, 2000, Mr. Schwartz came to CCI with the
3  $1.2 million note and surety and returned it as
4  satisfied to CCI?
5    A    I don't recall that.
6    Q    Do you recall speaking to Mr. Schwartz at
7  any time after the $1.2 million note was repaid?
8    A    Yes, I do.
9    Q    And were those discussions with respect to
10  the repayment of the 1.2 million?
11    A    No.  What I recall was regarding the
12  collateral --
13    Q    Let me interrupt.
14        MS. JOYCE:  Let her finish.
15  BY MR. SWICHAR:
16    Q    Before the freezing of accounts, did you
17  have discussions with Mr. Schwartz before the
18  accounts were frozen?
19        MS. JOYCE:  Do you want her to finish her
20  answer for the last question because you interrupted
21  her?
22        MR. SWICHAR:  Yes.  And I did that
23  intentionally because I wanted to clarify the
24  question.
25        MS. JOYCE:  Okay.  I wasn't aware the

91

1  question needed clarification.
2        MR. SWICHAR:  Well, in my mind, it did.
3        MS. JOYCE:  That's fine.
4        MR. GEBHARDT:  It's the witness's answer
5  though.
6  BY MR. SWICHAR:
7    Q    My question is:  Did you have any
8  discussions with Mr. Schwartz regarding the repayment
9  of the $1.2 million note prior to the bank freezing
10  CCI's account?
11    A    I don't recall if we did or not.
12    Q    Do you recall Mr. Schwartz ever asking you
13  what the source of the repayment funds were with
14  respect to the $1.2 million note?
15    A    I don't recall.  I remember the bonding
16  company asking that question, but I don't recall if
17  Craig Schwartz did.
18    Q    Well, as of February 11th or prior thereto,
19  was Mr. Schwartz aware of the bank's -- of CCI --
20  strike that.
21        Was Mr. Schwartz aware of CCI's increasing
22  financial distress?
23        MR. GEBHARDT:  Objection.
24        THE WITNESS:  Increasing since we met in
25  November or -- I'm not sure what time frame.

92

1  BY MR. SWICHAR:
2    Q    Yes.  Well, as of November, was
3  Mr. Schwartz aware that CCI was incurring financial
4  problems?
5    A    As of November, they realized we had cash
6  flow difficulties.
7    Q    Between November and February 11th, did you
8  have any other discussions with Mr. Schwartz
9  regarding CCI's financial difficulties?
10    A    Not that I recall.  It would have been
11  right around that time where I would have been giving
12  him the information from the end of the year.
13    Q    Would that have been before or after
14  February 11th, 2000?
15    A    I don't recall that we gave the information
16  prior to -- if John gave it to them.
17    Q    And you don't recall Mr. Schwartz asking
18  you, as CFO, how did CCI come up with this $1.2
19  million?
20    A    No, I didn't.
21    Q    Did you suspect that Mr. Schwartz at any
22  time knew the source of repayment?
23        MR. GEBHARDT:  Objection.
24        MS. JOYCE:  Object, and do not answer.
25  BY MR. SWICHAR:

**93**

1  Q  Do you have any reason to believe -- strike
2  that.
3      Did you have any reason to believe back in
4  the year 2000 that Mr. Schwartz knew the source of
5  the repayment of the $1.2 million note?
6      MR. GEBHARDT:  Objection.
7      MS. JOYCE:  Same objection.  You're asking
8  for beliefs.  If she has concrete knowledge, she's
9  here to tell you that.  Whether or not she believed
10 or didn't believe is not relevant.
11     MR. SWICHAR:  I don't think it's for you to
12 decide what's relevant.  I think that's for the
13 court.  But be that as it may, I'm entitled to her
14 belief.  That's a very fair question.
15     MR. GEBHARDT:  She's not -- she doesn't
16 know what is in that man's head.
17     MS. JOYCE:  Exactly.
18     MR. SWICHAR:  Well, that's my next
19 question.  Don't anticipate the next question.  I'm
20 not asking her if she was able to read Mr. Schwartz's
21 mind.  I'll ask it a different way.
22 BY MR. SWICHAR:
23     Q  Are you aware of any facts that led you to
24 believe that Mr. Schwartz was aware of the source of
25 the repayment of the $1.2 million note?

**94**

1      A  At what point in time?
2      MR. GEBHARDT:  She knows today, for
3  instance.
4  BY MR. SWICHAR:
5      Q  In February of 2000 and thereafter.
6      MS. JOYCE:  Well, I think you have to limit
7  it between February of 2000.  I don't mean to be
8  obstruct, Mr. Swichar; but --
9      MR. SWICHAR:  Well, you are.
10     MS. JOYCE:  Well, no, I'm not, because your
11 question is not fair to this witness.  She left that
12 company in May of 2000, and her testimony gave you
13 that factual piece of information.
14     MR. SWICHAR:  I'll rephrase the question.
15     MS. JOYCE:  I would like to finish my
16 objection so we have a clear record for the court.
17     MR. SWICHAR:  Go ahead, but don't accuse me
18 of misleading the witness.  I'll clarify it; but if
19 you want to give a speech, go ahead.
20     MS. JOYCE:  The witness's testimony was
21 that she left the company in May of 2000.  Your
22 question to her was unfair in the sense that it was
23 open-ended and asked from any time from February of
24 2000 to the present what Mr. Schwartz did or did not
25 know.  That's the basis for my objection.

**95**

1      I understand you're going to rephrase the
2  question, and I don't have to instruct her not to
3  answer that one at this point.  Go ahead and
4  rephrase, please.
5  BY MR. SWICHAR:
6      Q  As of the time you were at CCI after
7  February 11, 2000, until the date that you left, were
8  you aware of any facts which led you to believe that
9  Mr. Schwartz was aware of the source of the repayment
10 of the $1.2 million note?
11     A  Yes.
12     Q  Of what facts are you aware?
13     A  Any time after February 11th.  I don't know
14 exactly when he found that out; but at some point
15 after that, I know that he was aware of it.
16     MR. GEBHARDT:  The whole bank found out at
17 that, for God's sake.
18 BY MR. SWICHAR:
19     Q  How did you become aware that Mr. Schwartz
20 was aware of the source of repayment?
21     A  I had one meeting -- I'm trying to remember
22 exactly when it was, but I had one meeting with Craig
23 and someone else from Allfirst that had come into my
24 office.
25     They were asking questions about the

**96**

1  collateral, and I had given them some information
2  regarding the collateral.  At that time, they were
3  aware of it; but I don't recall the date of that
4  meeting.  It was definitely after February 18th; but
5  I -- as I recall, it was sometime in the next week.
6  I don't recall of an exact time he showed up in his
7  office.
8      Q  Thanks.  Let's focus on the Scott Air Force
9  claim which was, how much, 4 million?
10     A  Over 4 million.
11     Q  What was your understanding of that claim?
12     A  My understanding of it was that there was a
13 meeting that was held during the time the Persian
14 Gulf War was occurring where there were people -- I
15 was not in attendance, but there were people from CCI
16 at a meeting.  There was a general there.
17     We were told that Scott Air Force Base was
18 going to be the premier Air Force Base to be used for
19 the hub for the war.  They needed to accelerate the
20 project.  If we did not accelerate the project, they
21 would have to default us on our contract.
22     If we did go forward on it, we would have
23 to eat the cost and put it in as a change order or
24 claim at the end when we finished the job.  We were
25 worried at that time of the effect of having it on

**97**

1  our record, that we had a project here that if we did
2  not complete it, it would hinder us in getting future
3  projects.
4         We had made the decision to go forward, and
5  that decision cost us a lot of money that we did not
6  get paid.
7      Q   Did you believe the $4 million claim to be
8  a valid claim with respect to Scott Air Force Base?
9      A   Yes, I did.
10     Q   And did you believe -- strike that.
11         You're familiar to a certain extent with
12  the Albemarle Prison claim of $2 and a half million?
13     A   I'm familiar there was a claim, yes.
14     Q   Did you believe that to be a valid claim of
15  CCI?
16     A   Yes.  From everything our chief operating
17  officer told me, I would say yes.
18     Q   And is it fair to say that as of February
19  18th, 2000, you believed to the extent you could from
20  information you had obtained that such claims were
21  valid, the Scott Air Force Base and the Albemarle
22  Prison claim?
23     A   Yes.
24     Q   Now, if you turn to Exhibit 10, which is a
25  cash flow projection, next to the last line on the

**98**

1  left, available line of credit.  Let me just --
2  strike that.
3         When was Exhibit 10 shown to the bank, if
4  at all?
5      MS. JOYCE:  By her?
6      MR. GEBHARDT:  Objection.
7  BY MR. SWICHAR:
8      Q   Do you know if Exhibit 10 was ever given to
9  the bank?
10     A   I don't recall actually handing it to them,
11  no.
12     Q   Do you recall when this document was
13  prepared?
14     A   Yes, I do.
15     Q   When was that?
16     A   Printed as of February 16th.  It was
17  probably prepared prior to that.
18     Q   Now --
19     A   And again, I prepared these on a regular
20  basis.
21     Q   Now, going down to the available line of
22  credit, do you see that on the left, line of credit?
23     A   Yes.
24     Q   Am I correct that it reflects that the line
25  of credit as of February was $5.2 million, correct?

**99**

1      A   Yes, that's correct.
2      Q   And am I correct that if we then go into
3  March, we see that the line of credit was reduced by
4  the 1.2 million, i.e., to 4 million; is that correct?
5      A   That's correct.
6      MR. SWICHAR:  If I could have a minute with
7  my client, that may be my last question.  If I may
8  just ask one more question.
9  BY MR. SWICHAR:
10     Q   I want to get back to the situation where
11  the bank froze CCI's account.  Were there situations
12  where the bank had clear checks of CCI but then
13  reversed those clearings?
14     A   Yes, there were.
15     Q   Tell me what that is about.
16     A   We had -- in my computer system, I had a
17  tie-in to Allfirst that would show the activity in
18  our accounts.  I could see what was going through
19  there on a daily basis.
20         I had seen the checks that had cleared, and
21  we started seeing -- I could see it on our reports
22  that it was taken out of our account as a clear
23  check, and then I started seeing it going back as
24  though it didn't clear.
25         I started seeing those reports.  I said,

**100**

1  they're going back in time.  If I recall correctly --
2  as I said, I think Wednesday is when I had found out
3  the accounts were frozen.  I think they went back as
4  far as Monday and unclearing checks that had shown as
5  clear on our account.
6      Q   Do you recall those payees?
7      MS. JOYCE:  Of which the checks were
8  reversed you mean?
9      MR. SWICHAR:  Yeah.
10     THE WITNESS:  Again, it was any check that
11  we had written.  It was employees.  It was vendors.
12  It was subcontractors.  It was utility payments.
13     Q   Do you recall if one check was to the IRS?
14     A   I recall several checks that had to do with
15  payroll-type issues.  I don't if it was IRS.  I think
16  there was unemployment.  I don't remember exactly
17  what it was, but there were payroll-type issues.
18         It could have been the IRS.  In fact, as
19  I'm speaking about it, Wednesday usually was the day
20  that we did that through a funds transfer.  So that
21  probably was one.
22     Q   An IRS check?
23     A   Yes.
24     Q   How about Cleveland Brothers?  Was that
25  another check that was honored and then reversed?

**101**

1    A    Yes, I do believe that's true.

2    Q    Who was Cleveland Brothers?

3    A    Cleveland Brothers was a large equipment

4 supplier for us. We bought a lot of the equipment,

5 and they did repairs on the equipment.

6    Q    Do you recall the amount of the IRS check

7 that was honored and then reversed?

8    A    I don't think it was a check. I don't

9 recall the amount. I don't recall if it was a check.

10 I think at that point in time that it was

11 automatically taken.

12        MR. SWICHAR: Larry, you're champing at the

13 bit.

14        MR. GEBHARDT: I just wanted to get done.

15

16            REDIRECT EXAMINATION

17

18 BY MR. GEBHARDT:

19    Q    If you look at Exhibit 6, which is the

20 commitment letter for the $1.2 million loan, on the

21 first page, the next to the last paragraph, you'll

22 see a statement saying that the $1.2 million loan is

23 due and payable on March 31 of 2000. Do you see

24 that?

25    A    I do.

**102**

1    Q    And if you look at Exhibit 10, the cash

2 flow statement, my question is: Is the reason the

3 available line of credit is reduced from February's

4 5.2 million to March's $4 million, the March 31, 2000

5 due date of the $1.2 million loan?

6    A    Yes, it is.

7    Q    Now, turn, if you would, to Exhibit 1,

8 which is the commitment letter for the $4 million

9 line of credit.

10        MR. SWICHAR: I'm sorry. What exhibit?

11        MR. GEBHARDT: Exhibit 1.

12        MR. SWICHAR: Okay.

13 BY MR. GEBHARDT:

14    Q    Now, going down to the line, Use of

15 Proceeds, you see it says finance work in progress

16 and accounts receivable. I think you've indicated

17 you understood that to be the purpose of the $4

18 million line of credit; is that right?

19    A    That's correct.

20    Q    Now, accounts receivable would mean the

21 accounts that CCI had billed its customers but which

22 its customers had not as yet paid buy were due and

23 owed to CCI?

24    A    That's correct.

25    Q    So CCI would not have had that money

**103**

1 available to it to pay its month-to-month expenses,

2 right?

3    A    That's correct.

4    Q    And the line of credit would be used to

5 fill in the gap until the actual customers made their

6 payments to CCI?

7    A    That's right.

8    Q    And while were talking about finance work

9 in progress, what that means is the normal monthly

10 expenses of CCI in doing its construction work?

11    A    That's correct.

12    Q    Now, as a chief financial officer, would it

13 be consistent with your understanding of a line of

14 credit that's used to finance accounts receivable and

15 work in progress to use the line to make the normal

16 monthly interest payments on borrowings?

17    A    Yes, it would.

18    Q    Would it also be consistent with that

19 purpose to make the normal monthly principal

20 amortizations on loans that required monthly

21 principal payments?

22    A    Yes, it would.

23    Q    But it would be inconsistent to completely

24 prepay all principal and interest on a loan that was

25 not yet due?

**104**

1    A    I agree with that. That's correct.

2    Q    Now, if you look at the second page,

3 numbered paragraph 8, there's a statement there that

4 advance --

5        MR. SWICHAR: What exhibit?

6        MR. GEBHARDT: Exhibit 1.

7 BY MR. GEBHARDT:

8    Q    Exhibit 1, numbered paragraph 8 on page 2,

9 it says, Advances not to exceed 85 percent of

10 qualified accounts receivable less than 90 days past

11 due excluding retainages. Do you see that?

12    A    Yes. It says 80 percent.

13    Q    Paragraph 8, Advances not to exceed 80

14 percent of qualified accounts receivable less than 90

15 days past due, comma, excluding retainages, right?

16    A    That's right.

17    Q    Now, what that means is that's a limit on

18 the amount of money that CCI could borrow under the

19 line of credit; is that right?

20    A    That's correct.

21    Q    So even though it was a $4 million line of

22 credit, if CCI only had $2 million of accounts

23 receivable that were less than 90 days past due, CCI

24 could not borrow $4 million?

25    A    That's correct.

105

1    Q    And would I be correct that in November --
2    excuse me.
3    A    If I could just add to that.  If we would
4    have gone above that, we would have been in default
5    of our loan.
6    Q    Now, when this commitment -- excuse me.  In
7    November when the $1.2 million loan was taken out and
8    so on, the Scott Air Force Base receivable was not a
9    qualified account receivable, was it?
10    A    No, it wasn't.
11    Q    Because it was past 90 days due?
12    A    That's right.
13    Q    And that would be the same for the
14    receivables due from the Albemarle job?
15    A    That's right.
16    Q    So you couldn't use either Scott Air Force
17    Base or Albemarle in determining the amount of
18    borrowing CCI was able to do under the line of
19    credit?
20    A    That's right.
21    Q    And I think you had indicated that on a
22    monthly -- did you indicate on a monthly basis you
23    would provide the bank with accounts receivable
24    agings?
25    A    Yes, I did.

106

1    Q    And would it be correct to say that when
2    CCI wrote a check drawing on its line of credit in --
3        MR. SWICHAR:  Well, I'm going to object to
4    these leading questions.  Why don't you ask her in
5    not a leading way?
6    BY MR. GEBHARDT:
7    Q    When a check -- when the check was written
8    on February 11, 2000 as a draw on the $4 million line
9    of credit to repay the $1.2 million loan, was there
10    sufficient borrowing availability under paragraph 8
11    on page 2 for that borrowing to be made?
12    A    I can't answer that without looking at
13    numbers from statements back then.
14    Q    Was it your belief back then that that
15    formula -- that the payment could be made and still
16    be consistent with the borrowing base formula?
17        MR. SWICHAR:  Objection.  She already said
18    she can't state that.
19    BY MR. GEBHARDT:
20    Q    But you would agree --
21        MR. SWICHAR:  Objection to form.
22        MR. GEBHARDT:  I haven't said the question
23    yet.
24        MR. SWICHAR:  But when you start out with
25    that -- come on.

107

1    BY MR. GEBHARDT:
2    Q    You would agree that if the eligible
3    accounts receivable were not of a sufficient
4    magnitude to authorize a borrowing of the $1.2
5    million on February 11, that borrowing would not be
6    an authorized borrowing under the terms of the
7    commitment?
8        MS. JOYCE:  Object to the form.  Go ahead.
9    BY MR. GEBHARDT:
10    Q    If there wasn't sufficient borrowing
11    availability, then the $1.2 million check that was
12    written would be in default, wouldn't it?
13    A    That's correct.  It doesn't mean it
14    wouldn't clear.  It just means we would be into
15    default of our loan.
16    Q    Now, if the $4 million line of credit had
17    been increased by $1 million to $5 million back in
18    November of 1999 with the $1 million increase
19    guaranteed by Mr. Ortenzio, the line of credit could
20    not have been used to repay the amount of the
21    increase, could it?
22        MR. SWICHAR:  I object to the question.
23    Can I hear it back, please?  I object to the form.
24        MR. GEBHARDT:  Wait a minute.  If you've
25    objected, the witness understands the question, then

108

1    she can answer.  You don't need to hear it again
2    unless you need to hear it.
3        THE WITNESS:  I need to hear it.
4        MR. SWICHAR:  If I don't understand it --
5        MR. GEBHARDT:  That's all right.  As long
6    as the witness understands it, you don't -- it's not
7    necessary that you do.
8        MR. SWICHAR:  That's why I wanted to hear
9    it read back so I can see if I understood it.
10        MR. GEBHARDT:  Okay.  Read it back.
11        (The reporter read back the referred-to
12    portion of the record.)
13        MS. JOYCE:  Do you understand the question?
14        THE WITNESS:  I do understand it.  We would
15    be writing a check and putting it back in the same
16    account.
17        MR. SWICHAR:  I can't hear you.
18        THE WITNESS:  I said, no, you couldn't.
19    You would be writing a check on the same account.  It
20    would still have the same balance.
21    BY MR. GEBHARDT:
22    Q    Now, as a final question, you were asked
23    some questions about the fact that the $1.2 million
24    was advanced into the CCI account and used to pay
25    down the $4 million line of credit balance.  Do you

**109**

1  recollect those questions?
2    A   Questions about --
3    Q   Yes.
4    A   Yes.
5    Q   And the two -- the loan, the $4 million
6  line of credit and the loan both bear the same
7  interest rate?
8    A   That's correct.
9    Q   So there was no practical effect of
10  disbursing the $1.2 million and paying down the $4
11  million or simply holding the $1.2 million back until
12  it was drawn, was there?
13    A   That's correct.
14    Q   Based on your understanding as the person
15  who negotiated the $4 million line of credit and
16  executed the loan documents, was the draw on the line
17  of credit by way of a check of $1.2 million to repay
18  the $1.2 million guaranteed separate loan a borrowing
19  made, quote, to finance work in progress and accounts
20  receivable, period, end quote?
21    A   No, it wasn't.
22    Q   So therefore, in your view, it was not an
23  authorized borrowing under the line of credit?
24        MR. SWICHAR: Objection to form.
25  BY MR. GEBHARDT:

**110**

1    Q   In your view, was the borrowing authorized
2  under the terms of the line of credit?
3        MR. SWICHAR: Objection to form. Objection
4  to the word authorized. I don't think it's within
5  her promise to interpret the documents.
6        MS. JOYCE: I think you're asking her for
7  an expert witness answer.
8  BY MR. GEBHARDT:
9    Q   Let me just say, based on your
10  understanding as the person who negotiated and
11  executed the $4 million loan and loan documents, was
12  the draw of $1.2 million to pay the personally
13  guaranteed loan and authorized borrow?
14        MR. SWICHAR: Objection to form. Same
15  reason.
16  BY MR. GEBHARDT:
17    Q   Permitted under the terms of the loan?
18        MR. SWICHAR: Objection to form. You're
19  asking her to interpret legal documents.
20        MR. GEBHARDT: All right.
21  BY MR. GEBHARDT:
22    Q   You may answer.
23    A   No, I don't.
24        MR. GEBHARDT: All right. That's it.
25        MR. SWICHAR: No, it's not it. I have a

**111**

1  few questions more.
2        MR. GEBHARDT: It never ends.
3
4              RECROSS EXAMINATION
5
6  BY MR. SWICHAR:
7    Q   Ms. Phillips, Exhibit 10, you stated the
8  reduction in the line of credit from 5.2 to 4 was
9  based on the assumed repayment of a $1.2 million
10  note; is that correct?
11    A   Yes.
12        MS. JOYCE: Object to the form.
13  BY MR. SWICHAR:
14    Q   And the answer is yes?
15    A   Yes.
16    Q   And what was assumed occurred on February
17  11th, 2000; is that correct?
18    A   Say that again.
19    Q   In other words -- let me ask it a different
20  way. When you prepared Exhibit 10, you had assumed
21  that the $1.2 million note would be repaid by the
22  following month; is that correct?
23    A   That's correct.
24    Q   You had assumed that by March, the $1.2
25  million note would be repaid?

**112**

1    A   I assumed that it wouldn't be available
2  anymore.
3    Q   That the short-term note would have
4  expired; is that correct?
5    A   That's correct.
6    Q   Now, Exhibit 1, the loan commitment letter.
7  With respect to the 4 million and specifically the
8  paragraph dealing with use of proceeds to finance
9  work in progress, etc., do you have any reason to
10  believe that until the money -- until the $1.2
11  million note was repaid, the funds were used for any
12  purpose other than as stated in Exhibit 1?
13    A   Not that I recall. I thought they were all
14  for that purpose.
15    Q   Based on your understanding of the loan
16  documents as CFO, was there any provision in Exhibit
17  1 that prohibits -- strike that.
18        That deals specifically with repayment
19  terms and the source of funds that could be used to
20  pay the $1.2 million note?
21        MS. JOYCE: Let me make an objection on the
22  record because the document speaks for itself.
23  That's the same objection that Mr. Burke made on
24  Mr. Ortenzio's behalf at his deposition with respect
25  to the contents of the exhibit. So the document

**113**

1 speaks for itself. You can answer, and you did; so
2 that's fine.
3 BY MR. SWICHAR:
4    Q    If you go to the $1.2 million note loan
5 commitment, which is Exhibit 6, up until the time of
6 the repayment of the $1.2 million note, do you have
7 any knowledge of the proceeds being used for other
8 than finance work in progress in accounts receivable?
9    A    Not that I recall.
10    Q    And is it prohibited -- does Exhibit 6 deal
11 specifically in any fashion with respect to the
12 source of funds that could be used or that could not
13 be used to repay the $1.2 million note?
14        MS. JOYCE:  Same objection.  You may
15 answer.
16        THE WITNESS:  Not that I see.
17 BY MR. SWICHAR:
18    Q    Now, if you go back to Exhibit 1, that had
19 the eligibility formula with respect to the
20 borrowings on the $4 million note; is that correct?
21    A    Are you referring to --
22    Q    To the 80 percent, yes.
23    A    Yes.
24    Q    Now, if you turn to Exhibit 6, the last
25 paragraph on page 1 has the same eligibility formula;

**114**

1 is that correct?
2    A    That's correct.
3    Q    So the $1.2 million note and the $4 million
4 note had the same eligibility formula; is that right?
5    A    That's correct.
6    Q    Now, am I correct that the repayment of the
7 $1.2 million note from the 4 million did not increase
8 CCI's borrowings?  In other words, it merely
9 transferred the $1.2 million note under that note to
10 the $4 million borrowing; is that correct?
11        MS. JOYCE:  Object to the form of the
12 question.  You can answer.
13        THE WITNESS:  That's correct.
14 BY MR. SWICHAR:
15    Q    So the borrowing didn't change at all when
16 the $1.2 million loan was paid from the $4 million
17 line of credit; is that correct?
18    A    No, because now the 1.2 was paid off and
19 now we only had 4 million.
20    Q    The amount remained the same?
21        MR. GEBHARDT:  Objection.
22 BY MR. SWICHAR:
23    Q    The amount due to the bank didn't change,
24 did it?
25    A    The balance due to the bank did not change.

**115**

1 The available credit changed.
2    Q    Now, you stated that the repayment of the
3 $1.2 million note did not have any practical effect
4 as to CCI because the interest rates were the same;
5 is that fair?
6        MS. JOYCE:  Object to the form of the
7 question.  That's not what the witness said.  You're
8 mischaracterizing her testimony.
9 BY MR. SWICHAR:
10    Q    Did I mischaracterize your testimony?
11    A    Yes.  That is one thing I said that is not
12 the reason, but I did say that is one of the things
13 in my thought process.
14    Q    Am I correct in stating that the effect of
15 the repayment of the $1.2 million note was to repay a
16 short-term note that was due to expire the following
17 month?
18    A    Yes, that's correct.
19    Q    As far as you know, the $1.2 million note
20 would become due the following month; is that right?
21    A    That's correct.
22    Q    And we all agree it was a short-term note?
23    A    That's correct.
24        MR. SWICHAR:  Larry?
25        MR. GEBHARDT:  No further questions.

**116**

1        MR. SWICHAR:  One second.  Off the record.
2        (Off the record discussion.).
3        MR. SWICHAR:  One more question.
4 BY MR. SWICHAR:
5    Q    You testified that the $4 million loan line
6 of credit had been used to pay the principal interest
7 that was being paid on the $2 million equipment loan;
8 is that correct?
9    A    I wasn't positive about the principal, how
10 that was handled, but yes.
11    Q    You had no issue with repaying the
12 principal on the equipment note from the $4 million
13 line of credit; is that correct?
14        MR. GEBHARDT:  Objection.
15        MS. JOYCE:  Objection.  Go ahead.  You're
16 counsel for the case.  Go ahead.
17        MR. GEBHARDT:  Her testimony was and the
18 questions I asked were to the monthly installments of
19 principal, not the entire unpaid principal balance
20 which is what you've asked.
21        MR. SWICHAR:  That's fair.
22 BY MR. SWICHAR:
23    Q    I want to ask you then, You had no problem
24 or didn't see any problem with respect to paying
25 principal monthly on the $2 million equipment note

**117**

1  from the $4 million line of credit; is that correct?
2      MR. GEBHARDT: Objection. You still
3  stated --
4      MR. SWICHAR: I'm asking her a different
5  question. I'm entitled to do that. I'll rephrase
6  it.
7  BY MR. SWICHAR:
8      Q   Did you have any problem or any
9  inconsistency with the loan documents in repaying the
10 principal monthly on the equipment note from the $4
11 million line of credit?
12     MR. GEBHARDT: Objection. You're still
13 creating a deceptive ambiguity in the use of the word
14 principal because principal can include prepayments
15 as well as regularly scheduled installments. The
16 questions were about the regularly scheduled
17 installments, not prepayments. She's testified about
18 prepayments and unscheduled.
19     MR. SWICHAR: I'll rephrase it. Thank you.
20 BY MR. SWICHAR:
21     Q   Did you see any problem or inconsistency
22 with the loan documents in repaying the equipment
23 note -- from repaying principal in regular monthly
24 installments for the equipment note from the $4
25 million line of credit?

**118**

1      MS. JOYCE: It's the same question. I'll
2  object. The objection hasn't been cured. I can't
3  let her answer it because it mischaracterizes what
4  she said before.
5      THE WITNESS: It's not a repayment.
6      MS. JOYCE: Right. You said that before.
7      MR. SWICHAR: Pardon me?
8      MS. JOYCE: She said it was not a
9  repayment, which is what she had testified to
10 previously.
11 BY MR. SWICHAR:
12     Q   There were monthly payments of principal
13 paid on the equipment note; is that correct?
14     A   That's correct.
15     Q   Those repayments that were made monthly
16 were paid from the $4 million line of credit; is that
17 correct?
18     MS. JOYCE: Objection to your use of the
19 word repayments since the witness said these were not
20 repayments.
21     MR. SWICHAR: All right.
22 BY MR. SWICHAR:
23     Q   If those payments of principal were derived
24 from the $4 million line of credit; is that correct?
25     A   That's correct.

**119**

1      Q   And you were reducing monthly the principal
2  that was owed on the $2 million equipment note; is
3  that correct?
4      A   That's correct.
5      Q   And you didn't see any problem or see any
6  inconsistency with the loan documents in using the $4
7  million line of credit to pay monthly -- to pay down
8  monthly the principal owed on the $2 million
9  equipment note?
10     A   I actually had talked to Craig Schwartz
11 about that. He said that -- we had a discussion
12 about that at one point because we had a payment that
13 went in late because of something that happened in
14 accounts payable.
15     Craig had called and said the payment
16 wasn't paid. After I found out about it, I said
17 okay. We talked about that; and I said, well, it's
18 actually drawing of the line to pay this down. But
19 no, I did not see problems with and knew that is what
20 was happening.
21     Q   And in your discussions with Craig Schwartz
22 did he indicate that he had a problem in the way that
23 the equipment note was being repaid -- the equipment
24 note payments were being made?
25     A   Monthly payments, no.

**120**

1      MR. SWICHAR: That's it. It took a while,
2  but I got there.
3      MS. JOYCE: Okay. Let me place a statement
4  on the record for the protection of the witness and
5  the Commonwealth of Pennsylvania, which is her
6  employer.
7      There's an indication that this case may
8  potentially be going to trial during the month of
9  July of 2002. On July 1st of 2002, the Commonwealth
10 of Pennsylvania will unroll its Imagine PA statewide
11 computer system of which this witness is an integral
12 part of unrolling that product for this state.
13     There is currently in place by the
14 Commonwealth of Pennsylvania a no-leave policy for
15 its employees who are significantly involved in that
16 project for the Commonwealth.
17     I'm giving you, both of you as attorneys in
18 this case, adequate notice of that; so if the case
19 does proceed during the month of July, alternative
20 arrangements for Phillips' testimony may need to be
21 undertaken because of that issue.
22     If you feel, in your estimate, that the
23 case needs to be moved to a different time frame
24 because of this witness's unavailability, I'm giving
25 you adequate notice to do that since there were

**121**

1   obviously prior problems scheduling this witness's
2   deposition.
3       MR. GEBHARDT: What's the time frame on
4   your unavailability? You said July 1. Is it the
5   entire month of July?
6       MS. JOYCE: Yes. It's my understanding
7   that it is the entire month of July; is that correct?
8       THE WITNESS: It could go longer, but July
9   is the critical time frame.
10      MR. GEBHARDT: But June is all right?
11      THE WITNESS: June is all right.
12      MS. JOYCE: In terms of that issue, yes.
13  Obviously, you would have to work around --
14      MR. GEBHARDT: I understand. We had it in
15  June, and it may have been flipped back to June. I'm
16  not positive. Is there likely a problem in August,
17  if they move it to the August date?
18      MS. JOYCE: If the Commonwealth extends its
19  no-leave policy, it could be a problem. We don't
20  know that at this point in time. All we know is for
21  the month of July, the no-leave policy is in effect
22  for those employees who are significantly involved in
23  the project.
24      MR. GEBHARDT: The best thing would be to
25  put it in June.

**122**

1       MS. JOYCE: For this issue, yes.
2       MR. SWICHAR: Well, I'm not consenting to
3   June.
4       MR. GEBHARDT: No, I understand you're not.
5   It's for the judge.
6       MR. SWICHAR: The record will reflect we
7   already requested that it be moved off of June. You
8   may not be aware of that. It had originally been
9   scheduled by June.
10      MR. GEBHARDT: I understand. It was taken
11  off.
12      MR. GEBHARDT: An Order just came back
13  putting it back in June. The judge can move it back
14  to June the same as she moved it to July.
15      MS. JOYCE: Just so you have adequate
16  notice of that issue for your purposes.
17      MR. SWICHAR: We're finished.
18      (The deposition concluded at 1:57 p.m.)
19
20
21
22
23
24
25

**123**

1   COUNTY OF DAUPHIN        : SS
    COMMONWEALTH OF PENNSYLVANIA :
2
3       I, Hillary M. Hazlett, a Reporter
4   Notary-Public, authorized to administer oaths within
5   and for the Commonwealth of Pennsylvania and take
6   depositions in the trial of causes, do hereby certify
7   that the foregoing is the testimony of
8                SHERI PHILLIPS.
9       I further certify that before the taking of
10  said deposition, the witness was duly sworn; that the
11  questions and answers were taken down
12  stenographically by the said reporter, Hillary M.
13  Hazlett, a Reporter Notary-Public, approved and
14  agreed to, and afterwards reduced to typewriting
15  under the direction of the said Reporter.
16      I further certify that the proceedings and
17  evidence contained fully and accurately in the notes
18  by me on the within deposition, and that this copy is
19  a correct transcript of the same.
20      In testimony whereof, I have hereunto
21  subscribed by hand this 18th day of March, 2002.
22
23

NOTARIAL SEAL
HILLARY M. HAZLETT, Notary Public,
Johnstown, Cambria County, Reporter
My Commission Expires Sept. 29,2003