ORIGINAL

2 to CN

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK                    *

    Plaintiff,                    *

v.                                        *    CASE NO.: 1:01-CV-786          **FILED**
                              Judge Sylvia Rambo          HARRISBURG, PA

JOHN M. ORTENZIO                *
                                                       MAY 1 3 2002

    Defendant.                    *

***********************************************************MARY E. D'ANDREA, CLER
                                                      Per              Deputy Clerk

## PLAINTIFF'S PRETRIAL MEMORANDUM

    Plaintiff, Allfirst Bank, by its undersigned attorneys, submits the following Pretrial Memorandum pursuant to Rule 16 and in accordance with Appendix B of the Local Rules of the United States District Court for the Middle District of Pennsylvania.

        **Date of Rule 16 conference**: May 3, 2002

    **A.**    **Statement as to federal court jurisdiction.**  Subject matter jurisdiction is based upon diversity of citizenship and amount in controversy under 28 U.S.C. § 1332.  Plaintiff is a Maryland banking corporation with its principal place of business in Baltimore, Maryland. Defendant is a citizen of the Commonwealth of Pennsylvania.  The amount in controversy exceeds, exclusive of interest and costs,  the sum of $75,000.

    **B.**    **Summary statement of facts and contentions as to liability.**

        **1.**    **Facts.**  Allfirst extended a $4 million line of credit to CCI Construction Co., Inc. in March of 1999 to finance accounts receivable and work in progress.  Because of anticipated cash flow shortfalls, Allfirst extended an additional loan of $1.2 million in November, 1999 that was due March 31, 2000.  This $1.2 million loan was guaranteed by the Defendant on a direct, immediate, and primary basis.

CCI Construction lost approximately $6 million as of December 31, 1999 and became almost $1 million insolvent. CCI was running out of cash and was contemplating bankruptcy. On Friday, February 11, 2000, Ortenzio caused CCI to issue a check drawn on the line of credit to prepay the $1.2 million loan he and CCI owed. Allfirst was unaware that the line had been used to prepay the guaranteed loan and would not have honored the check if it had. Sheri Phillips, CCI's chief financial officer, refused to agree to the payment because she believed the borrowing was not authorized under the terms as to which the line of credit had been issued.

Within a week after making the payment by borrowing on the line, Ortenzio retained bankruptcy counsel, advised Allfirst that CCI had lost $6 million in 1999, and scheduled a meeting at the Bank on Friday, February 18, 2000. At the meeting, Ortenzio told Allfirst that CCI expected to have a cash flow deficit of almost $6 million over the next five months. He did not tell Allfirst that he had caused CCI to borrow under the line to prepay the $1.2 million loan he guaranteed.

When Ortenzio continued to write checks on the line after promising not to do so in the meeting on February 18, Allfirst froze the account and returned presented checks on February 23, 2000 and declared a default and demanded payment on February 24, 2000. Sometime after declaring the default, Allfirst learned that Ortenzio had used the line to repay the loan he had guaranteed in an effort to escape having to pay on the guaranty.

2.    **Contentions as to liability.**    Allfirst contends:

(a)    the payment on February 11, 2000 by way of a borrowing under the line of credit was a conditional payment that did not become effective unless and until the line of credit was repaid.

(b)      the borrowing under the line of credit to prepay the guaranteed loan without authorization in the loan documents and without Allfirst's knowledge or consent entitles that borrowing to be equitably subrogated to the $1.2 million loan it repaid so as to enforce for the benefit of the borrowing the guaranty of the $1.2 million loan.

(c)      the ploy of using a borrowing under the line to prepay the $1.2 million guaranteed loan constituted common law fraud and fraudulent non-disclosure and concealment.

**C.      Comprehensive statement of undisputed facts as agreed to by counsel at the Rule 16.3 conference.[1]**

1.      CCI Construction Company and Dauphin Deposit, a bank acquired by Allfirst in 1999, began doing business in the early 1990's.  This business included Dauphin Deposit providing CCI with a line of credit

2.      In March of 1999, Allfirst renewed a $2 million line of credit for CCI and increased the line of credit to $4 million.  A commitment letter was issued on march 24, 1999 by Allfirst to CCI with respect to the line of credit.  An undated Film/Cash Solutions Promissory Note was executed by CCI.

3.      The commitment letter for the $4 million line of credit stated that the purpose of the line of credit was to finance CCI's accounts receivable and work in progress.

---

[1]      The above statement of undisputed facts was derived from a comprehensive statement composed by Plaintiff and reflects Defendant's oral comments at the Rule 16.3 conference and Plaintiff's best surmise as to what is acceptable to Defendant.  In some instances, Defendant has not confirmed whether he does or does not agree with the phrasing of a particular statement.  At the Rule 16.3 conference, Defendant did not provide Plaintiff with any statements Defendant wished included in the statements Plaintiff had proposed in writing and forwarded to Defendant prior to the holding of the Rule 16.3 conference.  A draft of the above statements was forwarded to the Defendant immediately following the Rule 16.3 Conference, but Defendant has not commented upon the draft orally or in writing.

Previous commitment letters for CCI's line of credit with Dauphin Bank & Trust also contain this statement. The Film/Cash Solutions Promissory Note does not state a purpose for the $4 million line of credit.

4.      The line of credit had a cash management feature in the Film/Cash Solutions Promissory Note. In summary, payments from CCI's customers would be wire transferred or deposited in an Allfirst account. If there was a balance outstanding on the line, the deposits would be applied against the line. If there was no balance outstanding on the line, the positive balance in the account that day would be swept overnight into an interest bearing investment and the interest credited to CCI. When checks were presented, any positive balance in the account would be used to pay the checks. To the extent any positive balance was insufficient or if there was no positive balance, the line of credit would be accessed and the checks paid by a draw on the line.

5.      The line of credit was unsecured and was not guaranteed by John Ortenzio, CCI's sole shareholder and president.

6.      During 1999, CCI experienced cash flow difficulties.

7.      In October, 1999, CCI requested a temporary increase in the line of credit from $4 million to $5 million. Allfirst requested Ortenzio's guaranty of the entire line of credit. Ortenzio refused to guaranty the entire line of credit.

8.      A meeting was held between Ortenzio and Sheri Phillips, CCI's chief financial officer, and representatives of Allfirst on November 4, 1999.

9.      Allfirst agreed to extend a temporary $1.2 million loan to CCI, which would be due on March 31, 2000. This was $200,000 more than CCI had requested as an increase in the line of credit.

10.    Allfirst requested that Ortenzio guaranty the $1.2 million loan.

11.    To obtain the loan for CCI, Ortenzio gave his guaranty. This guaranty provides that "it is a primary and direct obligation without regard to any other obligor" and that CCI's liabilities "shall become immediately due and payable by the Undersigned" upon the occurrence of various enumerated events, including "material adverse changes in the financial condition of the Borrower."

12.    At the time the guaranty was executed, Ortenzio had the ability to repay the loan personally.

13.    CCI, which made a profit the preceding year, lost over $6 million in 1999.

14.    By February, 2000, CCI projected that it would have a cash flow shortfall of several million dollars over the next several months. This meant that CCI's expected revenues would be millions of dollars short of the funds it needed to continue operating and stay in business.

15.    On Friday, February 11, 2000, CCI repaid the $1.2 million loan. This was the loan which Ortenzio had guaranteed. The payment was made by writing a check on CCI's account at Allfirst. The check resulted in a borrowing under the $4 million line of credit which Ortenzio had not guaranteed.

16.    Sheri Phillips disagreed wit Ortenzio about CCI making the payment.

17.    Ortenzio personally took the CCI check to Allfirst and gave it to a bank employee. as payment of the $1.2 million loan. Ortenzio was told that Craig Schwartz was not present at the time he arrived with the check.

18.    Ortenzio telephoned Allfirst before going to see if Schwartz would be there.

19.    At the time the payment was made on February 11, 2000, CCI owed on the line of credit was $1,232,328. After the payment, CCI owed 2,534,154.

20.    After personally delivering the check, Ortenzio telephoned Craig Schwartz to request the return of his guaranty.

21.    Schwartz put a request into Allfirst's document control section for the guaranty and notified Ortenzio by letter on Tuesday, February 15, 2000, that he would return the guaranty to Ortenzio by Thursday, February 17, 2000.

22.    On Thursday, February 17, 2000, Ortenzio telephoned Schwartz to request a meeting with Allfirst to update Allfirst on CCI's financial condition. This meeting was scheduled for Friday, February 18, 2000 at Allfirst's Harrisburg office.

23.    Ortenzio was accompanied to the meeting by Robert Chernicoff, Esquire..

24.    At the time of the meeting, Ortenzio had seen CCI's internally financial statement for 1999.

25.    In the meeting, Ortenzio presented a cash flow projection.

26.    The cash flow projection he presented at the meeting did not reflect this use of the $4 million line of credit to repay the $1.2 million loan on February 11, 2000.

27.    During the meeting, Ortenzio stated that he would be meeting with CCI's bonding company during the next week and planned to solicit financial support from the bonding company. He agreed to report back to Allfirst on the results of the meeting with the bonding company.

28.    Allfirst closed down the line of credit on Wednesday, February 23, 2000 to prevent further draws.

29.    By letter of February 24, 2000, Allfirst formally declared CCI in default and demanded immediate payment.

30.    At or about this time, CCI's bonding company took control of its operations.

31.    On May 19, 2000, CCI filed a petition under Chapter 11 of the *United States Bankruptcy Code.*

32.    On February 22, 24, and 25, 2000, customers of CCI wired payment of their outstanding accounts to Allfirst. These payments totaled $2,317,291.28.

33.    On January 10, 2001, CCI, as debtor in possession, instituted an action to recover the customer payments as a preference under *Bankruptcy Code* § 547 in an adversary proceeding entitled <u>CCI Construction Co., Inc. v. Allfirst Bank</u> (Adversary No. 1-01-00011A). Allfirst is defending against the debtor in possession's claim and the matter is set for trial before the United States Bankruptcy Court for the Middle District of Pennsylvania on May 30, 2000.

**D.    Description of Damages.**    If the customer payments are not set aside as voidable preferences, the outstanding principal balance on the line of credit is $284,222.52, with interest accruing from February 25, 2000 to May 31, 2002 in the amount of 45,232.83. If all of the payments are set aside, the outstanding balance under the line of credit will be in excess of the $1.2 million guaranteed by Ortenzio. The interest on this amount from February 11, 2000 to May 31, 2001 amounts to $194,825. The damages Allfirst claims is the lesser of (a) principal due under the Suretyship Agreement as if the borrowing on the line of credit had not been made to repay the $1.2 million loan on February 11, 2000 or (b) the principal due under the line of credit up to but not in excess of $1.2 million, together with interest on the applicable principal balance under sub-paragraph (a) or (b) from May 31, 2002 to the date of judgment. The Suretyship Agreement

signed by Ortenzio provides that Allfirst is entitled to recover attorneys fees and litigation expenses. Allfirst has incurred legal fees and other litigation expenses in this case as of April 30, 2002 in the amount of $92,228.21.

E.    **Names and addresses of witnesses and specialities and qualifications of experts.**

1.    **Plaintiff.**

a.    **Fact Witnesses.**

(i)    Sheri Phillips*

(ii)    Craig Schwartz*

(iii)    Gerard Elias*

(iv)    Jamin Gibson*

(v)    Michael Zarcone*

(vi)    John Ortenzio

Those witnesses whose names are designated with an asterisk are principally fact witnesses. Because of their education, training, and experience, the are competent to express opinion in the areas of finance, commercial lending, and banking and lending custom and practice. These witnesses have been identified as such to Defendant during the discovery period and Plaintiff expects their testimony to encompass opinions with respect to the aforementioned areas.

b.    **Retained experts.**

(i)    Ralph Ferrell - Mr. Ferrell is an expert in the areas of finance, commercial lending, and banking and lending custom and practice. By order of this Court, Mr. Ferrell's testimony will only be presented in Plaintiff's rebuttal case. Mr. Ferrell is the principal of Ferrell & Associates, Inc.. His experience in commercial banking and lending

includes being an Executive Vice President and Chief Credit Officer of MNC Financial, a $17 billion multi-bank holding company. Prior to that, he served as an Executive Vice President and Chief Credit Officer of Maryland National Bank (the principal bank owned by MNC Financial) and in Maryland National Bank's real estate lending area. Before joining Maryland National, Mr. Ferrell was an Executive Vice President- Commercial Banking for Equitable Bancorporation, a $5.5 billion multibank holding company that was acquired by MNC Financial.

2.      By agreement with Defendant, Plaintiff has not included addresses for the above witnesses, such addresses are known to both sides.

**F.      Summary of Expert Testimony.**

Mr. Ferrell can be expected to express the following opinions as to banking and lending custom and practice:

1.      It is not common practice in the banking custom and practice for a borrower to utilize one credit facility to extinguish another credit facility at the same bank.

2.      No bank which extends new, additional credit to a borrower experiencing financial difficulties on the security of the principal shareholder's guaranty either would agree to or expect the borrower to repay the new, guaranteed loan with an unguaranteed existing line of credit. This is particularly so when the borrower's financial problems continue and when the borrower is on the verge of financial collapse.

3.      The management of CCI had an obligation to advise Allfirst of the material adverse change in CCI's financial condition once they were aware of the adverse change, particularly where the material adverse change is a default under the guaranteed loan, and to refrain from using an unguaranteed line of credit to repay a guaranteed loan that was in default because of the material adverse change.

S:\LJG\19527\Trial\PlaintiffsPretrialMemorandum.wpd          9

G.    **Special comments about pleadings and discovery.**    None.

H.    **Summary of legal issues involved and legal authorities relied upon.**

1.    **Legal issues.**

a.    Was the February 11, 2000 payment of the $1.2 million loan by a borrowing under the line of credit a conditional payment that did not become effective until the line of credit was repaid ?

b.    Is the borrowing under the line of credit entitled to be equitably subrogated to the rights of the $1.2 million loan with respect to the Ortenzio loan?

c.    Did Defendant commit common law fraud and fraudulent concealment in causing payment of the $1.2 million loan to be repaid with a borrowing under the line of credit?

2.    **Principal authorities relied upon by Plaintiff.**

a.    **Conditional Payment.**

(i)    *Citizens Bank of Wind Gap v. Lipschitz*, 296 Pa. 291, 145 A. 831 (1929) ["The law is well settled that the acceptance of a new obligation in place of the old is not a satisfaction of the earlier one, though made by the same person (citations omitted) and the same is true where the second note is signed by another (citation omitted)]

(ii)    *Grant Service Company v. Levy*, 306 Pa. Super 95, 452 A.2d 19 (1982).

(iii)    *First Pennsylvania Bank v. Triester*, 251 Pa. Super. 372, 380 A.2d 826 (1977).

(iv)    *Mechanics' National Bank of Burlington v. Klielkopf*, 22 Pa. Super. 128, (1903).

### b.   Equitable Subrogation

(i)   *Restatement of Restitution* § 162, (1937) ("Where property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder.")

(ii)   Comment b to *Restatement of Restitution* § 162, (1937) (applying § 162 rule where a person's property "is used by another without his consent in discharging an obligation of the other or a lien upon the other's property.")

(iii)   *Potoczny to Use of City of Philadelphia v. Vallejo*, 170 Pa. Super. 377, 85 A.2d 675 (1952) and *In re McGrath's Estate*, 159 Pa. Super. 78, 46 A.2d 735 (1946), both quoting *Restatement of Restitution* § 162 as stating applicable law.

### c.   (i)   *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991). ("It is well established that fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence word of mouth, or look or gesture.")

(ii)   *Bortz v. Noon*,556 Pa.489, 729 A.2d 555 (1999) (elements)

(iii)   *Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 442 (1947) ("The deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than an intentional affirmation of a material falsity.").

(iv)   *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991) ("The concealment of a material fact can amount to a culpable misrepresentation no less than an intentional false statement.").

**I.**   **Stipulations desired.**   None.

**J.**   **Estimated number of trial days.**   Two days.

**K.**   **Other matter pertinent to the case.**

Plaintiff contends that the amount of its damages is dependant upon the outcome of a preference claim asserted by CCI in an adversary proceeding filed in its bankruptcy case. Trial of the preference action is scheduled for May 30, 2002. In the event the issue of the preference action is not resolved by the time of trial and judgement is to be awarded Plaintiff, , the Court will have to craft the judgement to reflect potential outcomes of the preference litigation.

**L.**   **Pre-numbered schedule of exhibits**.   A pre-numbered schedule of Plaintiff's exhibits on the Clerk's exhibit form is attached as Exhibit L. Plaintiff is advised that Defendant will stipulate only as to authenticity as to all of the Plaintiff's exhibits and will stipulate as to admissibility only as to those limited exhibits so designated on Exhibit L. Defendant, despite Plaintiff's request, has refused to specify the basis for the objections or to engage in any dialog aimed at addressing Defendant's concerns so that the challenged exhibits may be pre-admitted. Plaintiff believes Defendant is objecting to most of the exhibits solely on the basis of relevance in the context of Defendant's theory of the case.

Plaintiff does not intend to raise any objection to the admissibility any of the Defendant's exhibits.

**M.**   **Special Verdict Questions.**   With the withdrawal by Defendant of his jury demand, the case is to be tried to the Court.

**N.**   **Defendant's certification.**   This is not applicable to Plaintiff.

**O.**   **Local Rule 30.10.**   The party's do not contemplate using deposition testimony as to any witness other than possibly Sheri Phillips, except with respect to cross-examination and

impeachment.  If Ms. Phillips cannot attend trial, Plaintiff, per this Court's authorization, will take

a videotaped *de benne* deposition and counsel for both sides will comply with Local Rule 30.10

once the deposition has been taken.  If Ms. Phillips can attend trial, the videotaped *de benne*

deposition will not be taken.

     **P.**     **Requests for findings of fact and conclusions of law.**  Plaintiff's requested

findings of fact and conclusions of law  are attached as Exhibit P.

Lawrence J. Gebhardt
Ramsay M. Whitworth
GEBHARDT & SMITH LLP
401 E. Pratt Street, 9th Floor
Baltimore, MD 21202

*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

     I hereby certify that on this 10th day of May, 2002, a copy of Plaintiff's Pretrial

Memorandum was sent by Federal Express to:  Edward I. Swichar, Esquire and Robert A. Burke,

Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA

19103, *Attorneys for Defendant*.

Lawrence J. Gebhardt

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK                              *

      Plaintiff,                        *

v.                                         *        CASE NO.:    1:01-CV-786

JOHN M. ORTENZIO                           *

      Defendant.                        *

      **************************************************************

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

    Plaintiff, Allfirst Bank, by its undersigned counsel, requests the Court to make the following findings of fact and conclusions of law.

### Findings of Fact.

    1.      Plaintiff, Allfirst Bank, is a Maryland banking corporation with its principal place of business in Baltimore, Maryland.  Defendant, John Ortenzio, is a citizen of the Commonwealth of Pennsylvania.  The matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

    2.      In March of 1999, Allfirst Bank extended to CCI Construction Co. Inc. a $4 million line of credit.

    3.      The sole purpose of the line of credit, as expressly stated in the March 24, 1999 commitment letter, was to finance CCI's accounts receivable and work in progress.

    4.      The line of credit was unsecured and did not carry John Ortenzio's guaranty.

    5.      The line of credit had a cash management feature.  Payments from CCI's customers

would be wire transferred by the customers to or deposited by CCI in an Allfirst account. If there was a balance outstanding on the line, the deposits would be applied against the line. If there was no balance outstanding on the line, the positive balance in the account would be swept overnight into an interest bearing investment and the interest credited to CCI. When checks were presented, any positive balance in the account would be used to pay the checks. To the extent any positive balance was insufficient or if there was no positive balance, the line of credit would be accessed and the checks paid by a draw on the line. CCI would access the line of credit by writing checks on the account, but the line of credit would only be accessed if and to the extent CCI did not have a positive balance in the account.

6.      Borrowings under the line of credit were evidenced by a promissory note in the face amount of the line.

7.      The unpaid principal balance due under this note would fluctuate with paydowns and advances on the line.

8.      During 1999, CCI's financial situation deteriorated.

9.      In November, 1999, Ortenzio requested a temporary loan from Allfirst to tide CCI over an anticipated short term cash flow shortfall.

10.     A meeting was held between Ortenzio and Sheri Phillips, CCI's chief financial officer, and representatives of Allfirst on November 4, 1999.

11.     As a result of the meeting, Allfirst agreed to extend a temporary $1.2 million loan to CCI, which would be due on March 31, 2000.

12.     Allfirst was unwilling to extend the $1.2 million loan to CCI unless Ortenzio guarantied the loan

13.    To obtain the loan for CCI, Ortenzio gave his guaranty.

14.    This guaranty obligated Ortenzio on the temporary loan and authorized Allfirst to collect the loan directly from Ortenzio to the same extent as if the loan had been made to him.

15.    Repayment of the $1.2 million loan was expected to come from the increased cash flow which would result when collections were made on two large, problematic jobs.

16.    Ortenzio had sufficient liquid assets to pay the $1.2 million loan personally.

17.    CCI's financial condition worsened after the $1.2 million loan was made. CCI, which made a profit the preceding year, lost over $6 million in 1999.

18.    By February 14, 2000, CCI projected that it would have a cash flow shortfall of several million dollars over the next several months.

19.    Ortenzio was aware of CCI's financial condition and discussed the Company's financial condition with Sheri Phillips.

20.    Ortenzio refused to invest any more of his money in the Company.

21.    Prior to February 18, 2000, Ortenzio discussed with Sheri Phillips the possibility of a bankruptcy proceeding for CCI.

22.    Ortenzio was aware of his guaranty of the $1.2 million loan and obligation to pay this sum to Allfirst.

23.    In early February, Ortenzio decided to have CCI repay the $1.2 million loan which he had guaranteed with a borrowing under the $4 million line of credit which he had not guaranteed.

24.    Sheri Phillips, the chief financial officer, opposed Ortenzio's plan to replay the $1.2 million loan with a borrowing under the line of credit.

25.    Sheri Phillips refused to write the check to effect the repayment.

26.    Ortenzio had the check written without Sheri Phillips involvement.

27.    On Friday, February 11, 2000, Ortenzio personally went to Allfirst to deliver the check that would repay the $1.2 million loan.

28.    Craig Schwartz, the Allfirst loan officer, was not present when Ortenzio arrived.

29.    Ortenzio gave the check to Schwartz's secretary and asked that it be applied to the $1.2 million loan.

30.    After personally delivering the check, Ortenzio telephoned Craig Schwartz to request an immediate return of his guaranty.

31.    In the telephone call, Ortenzio did not disclose to Schwartz that the payment had been made by a draw on the unguaranteed line of credit.

32.    At Ortenzio's request, Schwartz put a rush request into Allfirst's document control section and notified Ortenzio on Tuesday, February 15, 2000, that he would return the guaranty to Ortenzio as soon as possible.

33.    The guaranty was returned to Ortenzio.

34.    The $1.2 million note was never returned to CCI. At the time Schwartz returned the guaranty.

35.    When Allfirst returned the guaranty, it had not been told by Ortenzio that the unguaranteed line of credit had been used to repay the guaranteed $1.2 million loan.

36.    When Allfirst returned the guaranty, it had not been told by Ortenzio of CCI's current financial condition.

37.    After he received his guaranty, Ortenzio requested a meeting with Allfirst.

38.    Ortenzio's purpose in requesting the meeting was to apprize Allfirst of CCI's

financial situation.

39.    The meeting was held on Friday, February 18, 2001 at Allfirst's office.

40.    Ortenzio was accompanied by Robert Chernicoff, an attorney he had retained just prior to the meeting to represent CCI.

41.    Chernicoff was a bankruptcy specialist.

42.    At the time of the meeting, Ortenzio knew that CCI had lost over $6 million dollars in 1999 and was insolvent by almost a million dollars.

43.    Prior to Ortenzio requesting the meeting, Allfirst had not been told by Ortenzio that CCI had lost over $6 million dollars in 1999 and was insolvent by almost a million dollars.

44.    In the meeting, Ortenzio presented a cash flow projection that showed that CCI would have a cash shortage over the next 5 months of $5,873,456.

45.    Ortenzio did not reveal during the meeting that the $4 million line of credit had been used to repay the $1.2 million loan he had personally guaranteed.

46.    The cash flow projection Ortenzio presented at the meeting did not reflect the use of the $4 million line of credit to repay the $1.2 million loan.

47.    During the meeting, Ortenzio stated that he would be meeting with CCI's bonding company during the next week and planned to solicit financial support from the bonding company.

48.    During the meeting, Ortenzio agreed to report back to Allfirst on the results of the meeting with the bonding company.

49.    During the meeting, Ortenzio agreed that CCI would not write any further checks that would draw on the line of credit until he had reported back to Allfirst.

50.    Ortenzio, on the Monday following the Friday meeting, personally supervised the

writing of checks that were draws on the line.

51.     Allfirst dishonored the checks that Ortenzio had CCI issue.

52.     Allfirst closed down the line of credit on Wednesday, February 23, 2000 and prevented t further draws on the line of credit.

53.     On February 24, 2000, Allfirst formally declared CCI in default and demanded payment.

54.     As of February 24, 2000, Ortenzio had not disclosed to Allfirst that on February 11, 2001 the unguaranteed line had been drawn upon to repay the $1.2 million loan he had guaranteed.

55.     On February 22, 24, and 25, 2000, customers of CCI wired payment of their outstanding accounts to Allfirst.  These payments totaled $2,317,291.28 and were credited against the outstanding balance under the line of credit, which now reflected the draw to prepay the $1.2 million line.

56.     On May 19, 2000, CCI filed a petition under Chapter 11 of the *United States Bankruptcy Code.*

57.     On January 10, 2001, CCI, as debtor in possession, instituted an action to recover the customer payments as a preference under *Bankruptcy Code* § 547 in an adversary proceeding entitled CCI Construction Co., Inc. v. Allfirst Bank (Adversary No. 1-01-00011A).

58.     Allfirst is defending against the debtor in possession's claim and the matter is set for trial before the United States Bankruptcy Court for the Middle District of Pennsylvania on May 30, 2000.

59.     No recovery was made in the preference action\The amount recovered in the preference action is the sum of _____.]

60.    The amount of principal and interest due on the $1.2 million loan, ignoring the payment purportedly made on February 11, 2000 is the sum of $1,394,825 , as of May 31, 2002, with per day interest thereafter until judgement at the rate of $141.67 per day.

61.    The amount of principal and interest due under the $4 million line of credit, taking into account the preference litigation previously mentioned, as of May 31, 2002 is the sum of $329,455.35, with per day interest thereafter until judgement at the rate of $33.55 per day.

62.    Allfirst has incurred attorneys fees of $92,228.21 as of April 30, 2002 and other litigation expenses of $_____ in the prosecution of this action, which amount the Court finds to be reasonable.

### Conclusions of Law

63.    This Court has subject matter jurisdiction based on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332.

64.    Through a long line of cases, Pennsylvania has recognized and applied the principle of conditional payment. When a debt is paid by providing the creditor with another obligation, either of the debtor or someone else, the original debt is not paid unless the obligation given to the creditor is satisfied. *Winters v. Wolfskill,* 126 Pa. Super 168, 190 A. 395 (1937); *Citizens Bank of Wind Gap v. Lipschitz,* 296 Pa. 291, 145 A. 831 (1929); *Union Electric Steel Co. v. Imperial Bank of Canada,* 286 F. 857 (3rd Cir. 1923).

65.    Payment of the debt by providing another obligation is regarded as a conditional payment and collateral security for the original debt. *Alquippa National Bank v. Harvey,* 340 Pa. 223, 16 A.2d 409 (1940).

66.    If the obligation is not satisfied when it come due, the creditor has the right to enforce

the original debt or the new obligation as long as the creditor receives only one satisfaction. *First Pennsylvania Bank v. Triester*, 251 Pa. Super. 372, 380 A.2d 826 (1977); *Mechanics' National Bank of Burlington v. Klielkopf*, 22 Pa. Super. 128 (1903).

67.    The payment of the $1.2 million loan by Ortenzio falls squarely into the conditional payment rule.

68.    Allfirst held a note from CCI in the amount of $1.2 million which was guarantied by Ortenzio.  CCI, acting under the direction of Ortenzio, borrowed the amount required to repay the $1.2 million note by issuing a check that was a draw on the $4 million line.  The issuance of this check increased the outstanding balance of the line and the principal balance due under the promissory note that evidenced the $4 million line of credit.  What Ortenzio did was repay the $1.2 million loan by way of a borrowing under the line and an increase in the principal balance due under the line of credit promissory note.  The borrowing and the increase in the line of credit promissory note was a conditional payment.

69.    Because the line and the line of credit note were never repaid in full, Allfirst has the right under an unbroken line of Pennsylvania authority to enforce the $1.2 million note and the guaranty of this note given by Ortenzio.

70.    "Subrogation is an equitable doctrine and is applicable whenever a debt or obligation is paid from funds of one person although properly payable from the funds of another." *In re McCahan's Estate*, 312 Pa. 515, 168 A. 685 (1933).

71.    "All the cases show that subrogation is granted as a means of placing the ultimate burden of the debt upon the person who should bear it." *Gildner, Trustee v. First National Bank and Trust Company of Bethlehem*, 342 Pa. 145, 19 A.2d 910 (1941).

S:\LJG\19527\Trial\FindingsandConclusions.wpd        8

72.    The particular subrogation principle applicable to the matter before the Court has been expressed best in the *Restatement of Restitution*:

> Where property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder.

*Id.* § 162, at 653 (1937).

73.    The *Restatement of Restitution Comments* following section 162 applies this rule where a person's property "is used by another without his consent in discharging an obligation of the other or a lien upon the other's property." *Id.* cmt. b, at 655

74.    This principle also has found expression in Pennsylvania appellate decisions. *See, e.g., Potoczny to Use of City of Philadelphia v. Vallejo*, 170 Pa. Super. 377, 85 A.2d 675 (1952) and *In re McGrath's Estate*, 159 Pa. Super. 78, 46 A.2d 735 (1946), both quoting *Restatement of Restitution* § 162 as stating applicable law.

75.    Furthermore, as explained in the *Restatement of Restitution*, "[a] person who has paid money to or for the account of another not intended by him, is entitled to restitution from the payee or from the beneficiary of the payment . . .." RESTATEMENT OF RESTITUTION § 22, at 97 (1937). This rule applies where a person "is mistaken as to the person to whom or to whose credit he makes the payment." *Id.* cmt. a, at 98.

76.    The line of credit was to be used by CCI to finance accounts receivable and work in progress. Proceeds from the line were to pay regular monthly bills and expenses until customers paid their invoices from CCI. The line of credit was not to be used to prepay fully funded loans, particularly when the only purpose of the prepayment was to enable Ortenzio to escape

responsibility for an obligation he freely assumed when Allfirst made the $1.2 million loan.

77.    Because, by the terms of the commitment, the line was not to be used to prepay fully funded loans and because Allfirst was not even aware that Ortenzio had used the proceeds of the line for this purpose, the use of Allfirst's money to enable Ortenzio to escape his liability to Allfirst under the guaranty was without the knowledge or consent of Allfirst. And, this use of the line of credit unjustly enriched Ortenzio by enabling him to avoid liability on his guaranty under inequitable and unjust circumstances.  Allfirst's money was used, without its knowledge or consent, to repay Allfirst so that Ortenzio would not have to pay what he agreed to pay when Allfirst made the $1.2 million loan in November of 1999.

78.    Allfirst is entitled to have the amount borrowed under the line of credit equitably subrogated to the $1.2 million loan and the guaranty thereof and to enforce the guaranty against Ortenzio to collect the amount of the line of credit so used.

79.    "It is well established that fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence word of mouth, or look or gesture." *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991).

80.    Fraud "is any artifice by which a person is deceived to his disadvantage." *In re McClellan's Estate*, 365 Pa. 401, 75 A.2d 595 (1950); *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 107, 464 A.2d 1243, 1252 (1983). "(T)he *sina qua non* of actionable fraud is a showing of a deception.  *Frowen v. Blank*, 493 Pa. 137, 143, 425 A.2d 412, 415 (1981).

81.    "The elements of intentional misrepresentation are as follows: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or

recklessness as to whether it is true or false; (4) with the intent of misleading another into relying

on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately

caused by the reliance." *Bortz v. Noon*, 556 Pa. 489, 499, 729 A.2d 555, 556 (1999). *See also*

*Sonfast Corporation v. York International Corporation*, 875 F. Supp. 1088 (M.D. Pa 1994).

82.    A  misrepresentation  need  not  be  a  positive  statement.   *Delahanty  v.  First*

*Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983). "Fraudulent

representations may be made by ... acts or artifices calculated to deceive". *Borelli v. Barthel*, 205

Pa. Super. 442, 211 A.2d 11 (1965).

83.    The concealment of a material fact or the failure to disclose a material fact that in

good faith should be disclosed amounts to a misrepresentation. *Moser v. SeSetta*, 527 Pa. 157, 589

A.2d 679 (1991).; *Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 442

(1947); *Borelli v. Barthel,* 205 Pa. Super. 442, 211 A.2d 11 (1965) ("fraudulent representations may

be made by ... acts or artifices calculated to deceive").

84.    When good faith and fair dealing require disclosure of a fact as to which another party

is unaware or is operating under a mistaken assumption and disclosure is not made so as to deceive,

there is a fraudulent representation.  *In re McClellan's Estate*, 365 Pa. 401, 75 A.2d 595 (1950).

85.    The suppression of a material fact which a party is bound in good faith to disclose is

equivalent to a false representation, especially if suppressed fact is particularly within knowledge

of one party and of such a nature that other party is justified in assuming its non-existence. *Fox's*

*Foods, Inc. v. Kmart Corp.,* 870 F. Supp. 599 (M. D. Pa. 1994). "The failure to disclose a material

fact  amounts  to  a  misrepresentation  where  disclosure  would  correct  a  mistake  as  to  a  basic

assumption and non-disclosure amounts to a failure to act in good faith and in accordance with

standards of fair dealing." *Derby & Co., Inc. v. Seaview Petroleum Company*, 756 F. Supp. 868 (E.D. Pa. 1991), citing *Restatement (Second ) of Contracts*, § 161..

86.    Ortenzio's actions in prepaying a personally guaranteed loan by a borrowing under an unguaranteed line of credit granted to finance accounts receivable and work in process on the eve of CCU's financial collapse amounts to fraud.

87.    Ortenzio knew that the line was to finance accounts and inventory and, based on his discussions with Sheri Phillips, that the use of the line to repay the $1.2 million loan was an unauthorized borrowing. He knew that a borrowing under the line did not amount to a payment from cash flow as he had originally told Allfirst would occur when the loan came due. He was fully aware of CCI's financial distress, having been kept fully apprized of CCI's financial circumstances by Sheri Phillips, and that bankruptcy was a real possibility. He also knew the $1.2 million loan was not due until March 31, 2000 and certainly realized that CCI might not survive until that date under its financial circumstances.

88.    Ortenzio knew that the line was to finance accounts and inventory and, based on his discussions with Sheri Phillips, that the use of the line to repay the $1.2 million loan was an unauthorized borrowing. He knew that a borrowing under the line did not amount to a payment from cash flow as he had originally told Allfirst would occur when the loan came due. He was fully aware of CCI's financial distress, having been kept fully apprized of CCI's financial circumstances by Sheri Phillips, and that bankruptcy was a real possibility. He also knew the $1.2 million loan was not due until March 31, 2000 and certainly realized that CCI might not survive until that date under its financial circumstances.

89.    Ortenzio knew when he made the payment that Allfirst was unaware of CCI's

financial distress.  He also knew that Allfirst was expecting the $1.2 million to be repaid from increased cash flow and did not expect it to be repaid from a borrowing on the line that would do nothing more than convert guaranteed debt into unguaranteed debt and make a collectible loan uncollectible.    At no time did Ortenzio ever disclose to Allfirst the source of the money used to repay the $1.2 million loan, despite numerous opportunities to do so.

90.    He did not disclose CCI's financial condition prior to prepaying the $1.2 million loan. Under his guaranty, a material adverse change in CCI's financial condition was an event of default and authorized Allfirst to collect the $1.2 million loan immediately from him.

91.    Ortenzio simply used the line to prepay his guaranteed loan in the hope that Allfirst would be deceived and not discover what he had done.  He requested an immediate return of his guaranty in the hope that the return would confirm that he had succeeded in his deception.  Once he had the guaranty, he retained bankruptcy counsel for CCI and scheduled a meeting with Allfirst to reveal CCI's financial situation.  Even then, he still did not reveal what he had done and left Allfirst to labor under the mistaken assumption that the money to repay the $1.2 million loan had come from a source other than the line.

92.    To its detriment, Allfirst fell for Ortenzio's artifice, mistakenly believing him to have dealt  in good faith and with fair dealing when he in actuality had dealt with fraud and deception.

93.    Allfirst is entitled to regard as cancelled or annulled the purported payment of the $1.2 million loan on February 11, 2000 and to enforce the guaranty against Ortenzio.

94.    Allfirst is entitled to judgment against Ortenzio [on Count One in the amount of $_____ ][on Counts Two and Three in the amount of $_____].

95.    Ortenzio's guaranty authorizes Allfirst to collect its attorneys fees and litigation

expenses in enforcing its provisions.  Judgment is entered against Ortenzio for attorneys fees and

expenses in the amount of $_____.


Lawrence J. Gebhardt
Ramsay M. Whitworth
GEBHARDT & SMITH, LLP
401 East Pratt Street
Baltimore, Maryland 21202
(410) 752-5830

*Counsel for Plaintiff, Allfirst Bank*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May, 2002, a copy of Plaintiff's Proposed Findings of Fact and Conclusions of Law was sent by Federal Express to: Edward I. Swichar, Esquire and Robert A. Burke, Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA 19103, *Attorneys for Defendant*.

Lawrence J. Gebhardt

## LIST OF EXHIBITS

**CASE CAPTION: Allfirst V. Ortenzio**

**MIDDLE DISTRICT OF PENNSYLVANIA**

**CASE NUMBER: 1:01-CV-786**

**JUDGE: Honorable Sylvia Rambo**

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|-----|-----|-------------------------------|------------|----------|--------|------------------|
| 1 | | 03/23/99 Commitment Letter | | | | |
| 2 | | $4 Million FILM/Cash Solutions Promissory Note | | | | |
| 3 | | Allfirst PA Commercial Loan Write-Up Approval Form dated 03/04/99 | | | | |
| 4A | | 10/14/93 Commitment Letter | | | | |
| 4B | | 07/21/94 Commitment Letter | | | | |
| 4C | | 06/14/95 Commitment Letter | | | | |
| 4D | | 05/01/96 Commitment Letter | | | | |
| 4E | | 04/15/97 Commitment Letter | | | | |
| 4F | | 04/20/98 Commitment Letter | | | | |
| 5 | | CCI Construction Company Inc. Financial Statement 11/31/98 & 97 | | | | |
| 6 | | Allfirst Inter-Office Memorandum dated 10/26/99 | | | | |
| 7 | | Line of Credit Increase Discussion Outline dated 11/02/99 | | | | |
| 8 | | Allfirst PA Write-Up Approval Form dated 11/03/99 | | | | |
| 9 | | Allfirst Inter-Office Memorandum dated 11/04/99 | | | | |
| 10 | | 11/5/1999 Commitment Letter | | | | |
| 11 | | $1.2 Million Commercial Loan Note dated 11/08/99 | | | | |

## LIST OF EXHIBITS

**CASE CAPTION: Allfirst V. Ortenzio**

**MIDDLE DISTRICT OF PENNSYLVANIA**

**CASE NUMBER: 1:01-CV-786**

**JUDGE: Honorable Sylvia Rambo**

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|-----|-----|-------------------------------|------------|----------|--------|------------------|
| 12 | | Ortenzio Suretyship Agreement dated 11/08/99 | | | | |
| 13 | | Ortenzio Personal Financial Statement | | | | |
| 14 | | Accumulated Transaction List | | | | |
| 15 | | Craig Schwartz correspondence dated 02/15/00 | | | | |
| 16 | | Release of Collateral dated 02/15/00 | | | | |
| 17 | | CCI Construction Co., Inc.Income Statement | | | | |
| 18 | | CCI Construction Co., Inc. Balance Sheet | | | | |
| 19 | | CCI Construction Co., Inc. Cash Flow Projections | | | | |
| 20 | | Notes of Jamin Gibson | | | | |
| 21 | | Shane Miller correspondence dated 02/18/00 | | | | |
| 22A | | Correspondence to Albemarle-Charlottesville Jail Authority 02/22/00 | | | | |
| 22B | | Correspondence to Department of Transportation dated 02/22/00 | | | | |
| 22C | | Correspondence to Department of Transportation dated 02/22/00 | | | | |
| 22D | | Correspondence to PA Department of General Services 02/22/00 | | | | |
| 22E | | Correspondence to US Department of Agriculture 02/22/00 | | | | |
| 22F | | Correspondence to US Department of Agriculture 02/22/00 | | | | |

## LIST OF EXHIBITS

**CASE CAPTION: Allfirst V. Ortenzio**

**CASE NUMBER: 1:01-CV-786**

**MIDDLE DISTRICT OF PENNSYLVANIA**

**JUDGE: Honorable Sylvia Rambo**

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| 22G | | Correspondence to US Department of Agriculture 02/22/00 | | | | |
| 22H | | Correspondence to James River Juvenile Detention Commission | | | | |
| 22I | | Correspondence to CENAB, USAD, Baltimore 02/24/00 | | | | |
| 22J | | Correspondence to VA Community College System 02/22/00 | | | | |
| 22K | | Correspondence to BCC Development and Management Co. 02/22/00 | | | | |
| 22L | | Correspondence to BCC Development and Management Co. 02/24/00 | | | | |
| 22M | | Correspondence to BCC Development and Management Company 02/22/00 | | | | |
| 22N | | Correspondence to PA Turnpike Commission 02/22/00 | | | | |
| 22O | | Correspondence to Angelo Iafrate Construction Company 02/22/00 | | | | |
| 22P | | Correspondence to US Department of Veterans Affairs 02/22/00 | | | | |
| 22Q | | Correspondence to USA Department of Army & Air Force 02/22/00 | | | | |
| 22R | | Correspondence to VA Commonwealth University 02/22/00 | | | | |
| 23A | | Correspondence to Albemarle-Charlottesville Jail Authority 02/24/00 | | | | |
| 23B | | Correspondence to Department of Transportation 02/24/00 | | | | |
| 23C | | Correspondence to Department of Transportation 02/24/00 | | | | |
| 23D | | Correspondence to Department of General Service 02/24/00 | | | | |

## LIST OF EXHIBITS

CASE CAPTION: Allfirst V. Ortenzio

CASE NUMBER: 1:01-CV-786

MIDDLE DISTRICT OF PENNSYLVANIA

JUDGE: Honorable Sylvia Rambo

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| | 23E | Correspondence to US Department of Agriculture 02/24/00 | | | | |
| | 23F | Correspondence to US Department of Agriculture 02/24/00 | | | | |
| | 23G | Correspondence to US Department of Agriculture 02/24/00 | | | | |
| | 23H | Correspondence to James River Detention Commission 02/24/00 | | | | |
| | 23I | Correspondence to Department of Army Corps. Of Engineers 02/24/00 | | | | |
| | 23J | Correspondence to VA Community College System 02/24/00 | | | | |
| | 23K | Correspondence to BCC Development and Management Company 02/24/00 | | | | |
| | 23L | Correspondence to BCC Development and Mangaement Company 02/25/00 | | | | |
| | 23M | Correspondence to BCC Development and Management Company 02/25/00 | | | | |
| | 23N | Correspondence to William A. Chesnut 02/24/00 | | | | |
| | 23O | Correspondence to Department of Transportation 02/25/00 | | | | |
| | 23P | Correspondence to VA Maryland Health Systems 02/25/00 | | | | |
| | 23Q | Correspondence to US Property & Fiscal Office 02/24/00 | | | | |
| | 23R | Correspondence to VA Commonwealth University 02/24/00 | | | | |
| | 24 | Default Letter | | | | |
| | 25 | Computation of principal and interest - $1.2 Million Loan Note | | | | |

## LIST OF EXHIBITS

**CASE CAPTION: Allfirst V. Ortenzio**

**MIDDLE DISTRICT OF PENNSYLVANIA**

**CASE NUMBER: 1:01-CV-786**

**JUDGE: Honorable Sylvia Rambo**

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|-----|-----|-------------------------------|------------|----------|--------|------------------|
|  | 26 | Computation of principal and interest - $4 Million Line of Credit |  |  |  |  |
|  | 27 | Invoices of legal fees of Gebhardt & Smith LLP |  |  |  |  |
|  | 28 | Computation of other litigation expenses |  |  |  |  |
|  | 29 | Adversary Complaint - Bankruptcy Proceeding |  |  |  |  |
|  | 30 | Allfirst's Answer to Adversary Complaint |  |  |  |  |