

ORIGINAL

(65)
5-15-02
SC
FILED
HARRISBURG, PA
MAY 14 2002
MARY E. D'ANDREA, CLERK
Per

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK | * | |
| Plaintiff, | * | |
| v. | * | CASE NO.: 1:01-CV-786 |
| JOHN M. ORTENZIO | * | Judge Rambo |
| Defendant. | * | |

**************************************************************

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Allfirst Bank, by its undersigned attorneys, opposes the motion for summary judgment of Defendant, John M. Ortenzio, upon the following grounds, which are more particularly set forth in the accompanying memorandum in support of this opposition.

1. Defendant has ignored the material facts of the case and has instead posited facts which are not material, much less relevant, to the claims Plaintiff has raised in the complaint.

2. Plaintiff has filed its own motion for summary judgment which sets forth the material facts of the case which cannot be genuinely disputed and which demonstrates that Plaintiff is entitled to judgment as a matter of law pursuant to *F. R. Civ. P.* 56.

In support of this opposition, Allfirst submits the following:

a. Response to Defendant's statement of material facts pursuant to Local Rule 56.

b. The following Exhibits.

Documents

| | | |
|---|---|---|
| Exhibit A | - | Commitment Letter dated November 5, 1999 |
| Exhibit B | - | Commitment Letter dated March 23, 1999 |

S:\LJG\19527\plead\Opp.To.Def.Sum.Judge

| | | |
|---|---|---|
| Exhibit C | - | Film Promissory Note dated March 24, 1999 |
| Exhibit D | - | Commercial Loan Note dated November 8, 1999 |
| Exhibit E | - | Suretyship |
| Exhibit F | - | CCI Financial Statement 1998. |
| Exhibit G | - | CCI Internal Financial Statement1999 |
| Exhibit H | - | Ortenzio Personal Financial Statement |
| Exhibit I | - | Default Letter |
| Exhibit J | - | Accumulated Transaction List |
| Exhibit K | - | Correspondence of John Ortenzio dated February 22, 2000 |
| Exhibit L | - | Affidavit of Gerard L. Elias. |

Deposition Excerpts

| | | |
|---|---|---|
| Exhibit M | - | John Ortenzio |
| Exhibit N | - | Craig Schwartz |
| Exhibit O | - | Sheri Phillips |
| Exhibit P | - | Gerard Elias |

Lawrence J. Gebhardt
Ramsay M. Whitworth
GEBHARDT & SMITH, LLP
401 East Pratt Street
Baltimore, Maryland 21202
(410) 752-5830
*Counsel for Plaintiff, Allfirst Bank*

CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of May, 2002, a copy of Plaintiff's Opposition to Defendant's Motion for Summary Judgment was sent by Federal Express to: Edward I. Swichar, Esquire and Robert A. Burke, Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA 19103, *Attorneys for Defendant*.

Lawrence J. Gebhardt

 Allfirst Bank
P.O. Box 2961
Harrisburg, PA 17105-2961

November 5, 1999

Mr. John M Ortenzio, President
CCI Construction Co., Inc
P.O. Box 8800
Mechanicsburg, PA 17055

Dear John:

I am pleased to inform you that Allfirst Bank (hereinafter "Bank") has approved a $1,200,000 partially secured line of credit to CCI Construction Co., Inc. (hereinafter "Borrower") as follows:

| | |
|---|---|
| Principal Amount of Line: | $1,200,000.00 |
| Interest Rate: | Bank's Base Rate as in effect from time to time, minus 1/2%. |
| Repayment: | Interest payable monthly, principal on demand. |
| Use of Proceeds: | Finance work in progress and accounts receivable. |
| Collateral: | Specific equipment financed, including titled vehicles |

Borrowings under Loan will bear interest at an annual rate equal to the Bank's Base Rate as in effect from time to time, minus one-half percent. This interest will change when and as the Bank's Base Rate changes. Interest will be calculated on the basis of the actual number of days in the current calendar year divided by 360. Interest will be payable monthly upon submission of the Bank's notice therefor.

Borrowings under the Loan will be payable on demand. If no demand is made, the Loan will expire and all borrowings will be due and payable, together with interest thereon, on March 31, 2000.

Borrowings under the Loan shall be limited to 80% of the Borrower's qualified accounts receivable which are less than 90 days past due, excluding retainages.

The Loan will be supported by the personal Suretyship of John M. Ortenzio limited to $1,200,000.

The Borrower shall furnish the Bank with financial reporting as follows:

1. Annual CPA- audited financial statements of CCI Construction Co., Inc.

2. Quarterly work in process reports for CCI Construction, Co., Inc.

3. Quarterly Company prepared financial statements of CCI Construction Co., Inc.

4. Monthly borrowers certification with monthly accounts receivable aging and listing.

5. Annual personal financial statement of John M. Ortenzio.

The Borrower shall maintain a primary business deposit relationship with the Bank.

The Borrower will not create, assume or permit to exist, any mortgage, pledge, lien or encumbrance of or upon, or security interest in any of Borrower's property or assets now owned or hereafter acquired in favor of the Bank, other than purchase money, without prior written consent of the Bank.

The availability to the Loan is contingent upon the Borrower and the Bank entering into mutually acceptable loan documentation setting forth the terms and conditions contained herein and such other terms and conditions, covenants, warranties and representations as may be required by the Bank and be mutually acceptable to the Borrower and the Bank. All terms and conditions contained herein shall survive the execution of such loan documentation.

The commitment is contingent upon the right of the Bank at any time hereafter and from time to time to review the commitment, to adjust terms and conditions, or to discontinue the commitment should the Bank in the reasonable exercise of its sole business discretion deem it necessary to do so.

CCI Construction Co., Inc.
November 5, 1999
Page Three

Please indicate the acceptability of these terms and conditions by dating, signing, and returning an executed copy of this letter no later than November 19, 1999.

Very truly yours,

Craig J. Schwartz
Vice President

CJS/mas

Enclosure

ACKNOWLEDGED AND ACCEPTED THIS DAY OF , 1999.

ATTEST:

BY: [signature], Sec.
Title: Sec/Treas

CCI CONSTRUCTION CO., INC.

BY: [signature]
Title: Pres

WITNESS:

[signature]

SURETY:

[signature]
John M. Ortenzio

C 0402



DEFENDANT'S EXHIBIT

FIRST NATIONAL BANK OF MARYLAND
A Division of FMB Bank
Regional Corporate Group, Mail Code 133-02-01
3045 Market Street, Camp Hill, PA 17011-4530
Telephone: 717 612-5026 Facsimile: 717 612-5027

March 23, 1999

Ms. Sheri Phillips
Chief Financial Officer
CCI Construction Co., Inc.
P.O. Box 1129
Mechanicsburg, PA 17055

Dear Ms. Phillips:

I am pleased to advise you that The First National Bank of Maryland, a Division of FMB Bank (hereafter "Bank") has increased and reaffirmed an unsecured line of credit (hereafter "Loan") to CCI Construction Co., Inc. (hereafter "Borrower") as follows:

| | |
|---|---|
| Principal Amount of Loan: | $4,000,000.00 |
| Interest Rate: | Bank's Base Rate as in effect from time to time, minus ½% |
| Repayment Schedule: | Interest monthly, principal on demand |
| Use of Proceeds: | Finance work in process and accounts receivable |
| Collateral: | Unsecured |

Borrowings under the Loan will bear interest at an annual rate equal to the Bank's Base Rate as in effect from time to time, minus one-half percent (-1/2%). This interest rate will change when and as the Bank's Base Rate changes. Interest shall be calculated on the basis of the actual number of days in the current calendar year divided by 360. Interest will be payable monthly upon submission of the Bank's statement therefor.

Borrowings under the Loan will be payable on demand. If no demand is made, the Loan will expire and all borrowings will be due and payable, together with interest thereon, on April 30, 2000.

Terms and Conditions:

1. Annual CPA – audited financial statements of CCI Construction Co., Inc.

2. Quarterly work in process reports for CCI Construction Co., Inc.

3. Quarterly Company prepared financial statements of CCI Construction Co., Inc.

4. Monthly borrowers certification with monthly accounts receivable aging and listing.

5. Primary business deposits of CCI Construction Co., Inc. to be maintained at The First National Bank of Maryland, a Division of FMB Bank.

6. Negative pledge of assets other than purchase money.

7. The Company shall maintain a minimum tangible net worth of $4,500,000.00 measured at year end.

8. Advances not to exceed 80% of qualified accounts receivable less than 90 days past dues, excluding retainages.

Availability of the Loan is contingent upon the Borrower and the Bank entering into mutually acceptable loan documentation setting forth terms and conditions stated herein and such other terms and conditions, covenants, warranties and representations as may be required by the Bank and be mutually acceptable to the Borrower and the Bank. All terms and conditions contained herein shall survive the execution of such loan documentation.

This commitment is contingent upon the right of the Bank at any time hereafter and from time to time to review the commitment, to adjust terms and conditions, or to discontinue the commitment should the Bank in a reasonable exercise of its sole business discretion deem it necessary to do so.

Ms. Sheri Phillips
CCI Construction Co., Inc.
March 23, 1999
Page Three

Please acknowledge your concurrence with these terms and conditions by signing, dating and returning the enclosed copy of this letter to the Bank on or before March 31, 1999.

Very truly yours,

Craig J. Schwartz
Vice President

CJS/jkp

Enclosure

ACKNOWLEDGED AND ACCEPTED THIS 24th DAY OF March, 1999.

ATTEST:

BY: E M Avery
Title: ASSISTANT SECRETARY

CCI CONSTRUCTION CO., INC.

BY: CFO
Title: CFO



* a division of
FMB Bank

FILM/CASH SOLUTIONS PROMISSORY NOTE
(PENNSYLVANIA)

Instructions to Loan Officer: Use for (a) loans to corporations, regardless of amount, and (b) loans to non-corporate borrowers when the only purpose of any such loan is business and the principal amount of such loan exceeds $50,000.

$ 4,000,000.00 Mechanicsburg, PA (City) (State) March 24, 1999

FOR VALUE RECEIVED, the undersigned ("Borrower") promises to pay on demand to the order of THE FIRST NATIONAL BANK OF MARYLAND* [redacted] ("Bank"), at any of Bank's offices, or at such other place as the holder of this Promissory Note may from time to time designate, the principal sum of FOUR MILLION and 00/100 Dollars ($ 4,000,000.00), or such other amount as may be advanced from time to time to Borrower, together with interest thereon at the rate or rates hereafter specified and any and all other sums which may be owing to Bank by Borrower pursuant to this Promissory Note. The following terms, as well as the applicable terms on Exhibit A, attached hereto and incorporated herein by reference, shall apply to this Promissory Note.

1. DEFINITIONS. The following terms have the following definitions:
   - A. "Account" means the commercial checking account maintained by Borrower with Bank and designated as Account No. 28864514, together with any replacement account therefor.
   - B. "Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in the Commonwealth of Pennsylvania are authorized to close.
   - C. "Incremental Advance Amount" means the amount indicated on Exhibit A as the Incremental Advance Amount. Each Loan must be an integral multiple of such amount.
   - D. "Initial Excess Balance" means, for any Business Day, the amount by which the collected balance in the Account at the end of such Business Day after posting all credits to the Account (subject to funds availability), but prior to posting any debits to the Account, exceeds the Target Balance.
   - E. "Line Availability" means, for any Business Day, an amount equal to the difference obtained by subtracting the aggregate principal balance outstanding under all Loans from the Maximum Line Amount.
   - F. "Loan" means an advance of monies from Bank to Borrower pursuant to the terms of this Promissory Note; and the term "Loans" means more than one Loan.
   - G. "Maximum Advance Amount" means an amount equal to the highest integral multiple of the Incremental Advance Amount which does not exceed the Line Availability.
   - H. "Maximum Line Amount" means the amount indicated on Exhibit A as the Maximum Line Amount, which amount is the maximum aggregate principal balance of the Loans which may be outstanding at any one time.
   - I. "Minimum Loan Advance" means the amount indicated on Exhibit A as the Minimum Loan Advance, which amount is the minimum principal amount of each Loan.
   - J. "Presented Items" means, for any Business Day, the aggregate amount of debits which have been presented for payment against the Account.
   - K. "Prime Rate" means a fluctuating annual rate of interest equal to the greater of: (i) that rate announced from time to time by Bank as its "prime rate;" or (ii) the rate obtained by adding one percent (1%) to the average rate, rounded to the nearest one-tenth of one percent, for three month maturity dealer placed commercial paper for the week most recently reported in the Federal Reserve Statistical Release No. H.15(519) entitled "Selected Interest Rates" or any succeeding publication.
   - L. "Target Balance" means the amount indicated on Exhibit A as the Target Balance, which amount is the minimum collected balance that must be maintained in the Account.

2. PROCEDURES FOR LOANS. All Loans shall be made in the form of a transfer of funds into the Account in accordance with the procedures set forth in this paragraph. Borrower hereby irrevocably authorizes Bank to make Loans in accordance with the procedures set forth herein. At the end of each Business Day, Bank shall calculate the Initial Excess Balance and the aggregate amount of the Presented Items. In the event the Initial Excess Balance is less than the aggregate amount of the Presented Items, Bank shall make a Loan by transferring funds into the Account in an amount equal to the amount, which when added to the Initial Excess Balance, would be equal to the aggregate amount of the Presented Items; provided, however, that: (a) the principal amount of the Loan shall not be less than the Minimum Loan Advance; (b) the principal amount of the Loan must be an integral multiple of the Incremental Advance Amount, and therefore, if it would not otherwise be an integral multiple of the Incremental Advance Amount, the amount of the Loan will be rounded up to the next higher integral multiple of the Incremental Advance Amount unless there is insufficient Line Availability in which case the Loan amount will be the Maximum Advance Amount; and (c) the principal amount of the Loan shall not exceed the Maximum Advance Amount. If at any time the amount of the Initial Excess Balance is less than the amount of the Presented Items by an amount greater than the Maximum Advance Amount, Bank shall: (i) make a Loan by transferring funds into the Account in an amount equal to the Maximum Advance Amount; and (ii) determine, in its sole discretion, which Presented Items will be paid, and which Presented Items will not be paid. In the event the Initial Excess Balance is greater than the amount of the Presented Items, Bank shall post and pay all of the Presented Items. If, following Bank's posting and paying of all of the Presented Items, there remains a balance in the Account in excess of the Target Balance, Bank is hereby irrevocably authorized to debit the Account in an amount up to the portion of the balance in the Account which exceeds the Target Balance, and apply such sums to the outstanding balance of the Loans. Bank agrees to make such debit of the Account to repay sums outstanding under the Loans as of the end of each Business Day; provided, however, that in the event the option labeled "Cash Solutions Protection" is marked on Exhibit A attached hereto, Bank shall not automatically debit the Account to make payments on the Loans, but may do so, in its sole and absolute discretion.

3. TERMINATION. The procedure for making Loans, and the obligation of Bank to provide Loans, as set forth in this Promissory Note, may be terminated by Borrower upon ten (10) days prior written notice to Bank and may be terminated by Bank upon thirty (30) days prior written notice to Borrower. Upon termination, no further Loans shall be made under this Promissory Note, but all other terms of this Promissory Note (including, but not limited to, the holder's right to demand payment at any time and for any reason) shall remain in full force and effect.

4. INTEREST. From [hole] date hereof until all sums due hereunder, including prin[hole], interest, charges, fees and expenses are paid in full, the principal amount outstanding from time to time pursuant to this Promissory Note shall bear interest as follows (Check One):

[ ] Fluctuating Rate. At a fluctuating rate equal to ____________% per annum above the Prime Rate in effect from time to time. Bank at its discretion may charge a lesser rate from time to time. Interest on the principal amount outstanding shall be adjusted daily, with the rate for each day being adjusted to reflect the Prime Rate in effect at the close of business on that day. Bank makes loans at interest rates at, above and below the Prime Rate.

[X] Other. (describe): Interest shall accrue at a rate per annum equal to the Bank's Base Rate minus 1/2% as in effect from time to time.

5. CALCULATION OF INTEREST. Interest shall be calculated on the basis of a three hundred sixty (360) days per year factor applied to the actual days on which there exists an unpaid balance hereunder.

6. REPAYMENT. Borrower shall make payments of principal and interest in accordance with the following terms:
(a) Principal: ALL SUMS OUTSTANDING UNDER THIS PROMISSORY NOTE, INCLUDING THE PRINCIPAL AMOUNT OF ALL OF THE LOANS, ARE IMMEDIATELY DUE IN FULL UPON THE FIRST TO OCCUR OF: (I) THE DEMAND OF THE HOLDER OF THIS PROMISSORY NOTE, WHICH DEMAND MAY BE MADE AT ANY TIME AND FOR ANY REASON, IN THE SOLE AND ABSOLUTE DISCRETION OF THE HOLDER OF THIS PROMISSORY NOTE; OR (II) THE OCCURRENCE OF ANY DEFAULT UNDER THE TERMS OF THIS PROMISSORY NOTE with 30 days written notice slp
(b) Interest: Borrower shall make payments of all accrued and unpaid interest on the 31st day of each successive month, beginning on March 31, 1999 and continuing until all sums outstanding hereunder are paid in full.

Borrower may prepay this Promissory Note in whole or in part at any time or from time to time without premium or additional interest.

7. LATE PAYMENT CHARGE. If any payment due hereunder (including any payment in whole or in part of principal) is not received by the holder within fifteen (15) calendar days after its due date, Borrower shall pay a late payment charge equal to five percent (5%) of the amount then due.

8. APPLICATION OF PAYMENTS. All payments made pursuant to this Promissory Note shall be applied first to accrued and unpaid interest, then to unpaid expenses and charges payable hereunder, and then to principal, or in such other order or proportion as the holder, in the holder's sole discretion, may elect from time to time.

See below => unsecured

9. ~~SECURITY. Sums due under this Promissory Note are secured by, and Borrower grants to Bank a security interest in, all deposits and property of Borrower now or at any time hereafter in the possession of or on deposit with Bank whether as custodian or depository or in any other capacity. Bank shall have the right to set-off and apply against the obligations of Borrower to Bank evidenced by this Promissory Note any sums of Borrower at any time on deposit with Bank whether such deposits are special, time or demand, provisional or final. In addition, this Promissory Note is secured by any property described as collateral in any security agreement, pledge agreement or other document previously, simultaneously, or hereafter entered into by Borrower in connection with any obligation or liability of Borrower to Bank or any corporate affiliate of Bank, such other security document(s) include but are not limited to the following:~~ slp

[ ] Security Agreement(s)

[ ] Real estate mortgage or deed of trust on property known as ____________________ located in ____________________ County/City, State of ____________________.

[X] Other (describe): Unsecured

This Promissory Note specifically incorporates by reference, as if fully set forth herein, all of the language and provisions of the security documents described generally or specifically above.

10. REPRESENTATIONS AND WARRANTIES. Borrower (and if more than one Borrower, each Borrower) represents and warrants to Bank that the following statements are true, correct and complete as of the date hereof, and as of the date each Loan is made hereunder: (a) it is duly organized and in good standing under the laws of the state in which it is organized; (b) it has the full power and authority to execute, deliver and perform this Promissory Note; (c) neither such execution, delivery and performance, nor compliance by it with the provisions of this Promissory Note will conflict with or result in a breach or violation of its organizational documents, or any judgment, order, regulation, ruling or law to which it is subject or any contract or agreement to which it is a party or to which any of its assets and properties are subject; (d) this Promissory Note constitutes its legal, valid and binding obligation enforceable in accordance with its terms; (e) there is no litigation or proceeding pending or, to the knowledge of its representative signing this Promissory Note on its behalf, threatened against or affecting it which might materially adversely affect its business, financial condition or operations or its ability to perform and comply with this Promissory Note; (f) all financial statements and information furnished or to be furnished to Bank hereunder have been and will be prepared in accordance with generally accepted accounting principles and fairly present its financial condition as of the dates thereof and the results of its operations for the period covered thereby; (g) it is not in violation of any applicable federal, state or local law, statute, rule, regulation or ordinance and has not received any notice nor is the subject of any investigation to the effect that its operations are not in material compliance with any such law, statute, rule, regulation or ordinance, including, without limitation, applicable environmental, health and safety laws and regulations; (h) since September 2, 1974, no pension, employee benefit, multi-employer, profit sharing, savings, stock bonus or other deferred compensation plan ("Plan") maintained by it or any trade or business group with which it is affiliated subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA") has been terminated, no lien exists against Borrower in favor of the Pension Benefit Guaranty Corporation ("PBGC"), and no "reportable event" (as such term is defined in ERISA) has occurred with respect to any such Plan, and Borrower has not incurred any "accumulated funding deficiency" within the meaning of ERISA or any liability to the PBGC in connection with any Plan; and (i) no information, exhibit, report, statement, certificate or document furnished by Borrower or any other person to Bank in connection with the Loans, this Promissory Note or the negotiation thereof contains any material

misstatement of fact or [illegible] to state a material fact or any fact necessary to make [illegible] statements contained herein or therein not misleading.

11. DEFAULT. Any of the following will be a default under this Promissory Note: (a) failure to pay any principal, expense, fee, charge or interest when due, or failure to perform any other obligations hereunder; (b) a default by any Borrower upon any of the existing or future obligations of any Borrower to Bank; (c) a default by any guarantor or other person other than Borrower that is now or hereafter liable upon or in connection with any of the obligations of any Borrower to Bank or that has granted any lien or security interest to or for the benefit of Bank to secure any of the obligations of any Borrower to Bank ("Other Obligor"), upon any of the existing or future obligations of any Other Obligor to Bank; (d) a default in any other agreement, instrument or document between any Borrower or Other Obligor and Bank, or any corporate affiliate of Bank, including, without limitation, any security document referred to above, whether previously, simultaneously, or hereafter entered into; (e) ~~a material adverse change in the financial condition of any Borrower or Other Obligor from that expressed in the financial statement most recently submitted to Bank prior to the date of this Promissory Note, as determined in good faith by Bank in its sole discretion~~; (f) institution of bankruptcy, insolvency, reorganization or receivership proceedings by or against any Borrower or Other Obligor in any state or federal court; (g) the appointment of a receiver, assignee, custodian, trustee or similar official under any federal or state insolvency or creditors' rights law for any property of any Borrower or Other Obligor; ~~(h) failure of any Borrower or Other Obligor to furnish to Bank such collateral or additional collateral as Bank may in good faith request~~; (i) any warranty, representation, or statement to Bank by or on behalf of any Borrower or Other Obligor proving to have been incorrect in any material respect when made or furnished; (j) the occurrence of any event which is, or would be with the passage of time or the giving of notice or both, a default under any indebtedness of any Borrower or Other Obligor to any person other than Bank; (k) any material loss, theft or substantial damage, which is not fully insured, to any of the assets of any Borrower or Other Obligor, or the sale, transfer, lease, encumbrance or other disposition of all or any material part of the assets of any Borrower or Other Obligor other than in the ordinary course of business of Borrower or Other Obligor; (l) the entry of any final judgment against any Borrower or Other Obligor for the payment of money in excess of $5,000.00; (m) the levy upon or attachment of any assets of any Borrower or Other Obligor; (n) ~~the recordation of any federal, state or local tax lien against any Borrower or Other Obligor~~; (o) a change of ownership or dissolution, merger, consolidation, liquidation or reorganization of any Borrower or Other Obligor which is a corporation, partnership or other legal entity; (p) ~~the death of any Borrower or Other Obligor who is a natural person~~; (q) failure of any Borrower or Other Obligor to furnish to Bank such financial information as Bank may require from time to time, including, but not limited to, such financial statements as Bank may require; (r) failure of any Borrower or Other Obligor to comply with all laws, rules, regulations and decrees to which such Borrower or Other Obligor may be subject, the violation of which may have a material adverse effect on the business operation or financial condition of such Borrower or Other Obligor; (s) ~~the acquisition by a Borrower of all or substantially all of the assets, properties or equity interest of any other person or entity without Bank's prior written consent~~; (t) failure of any Borrower to maintain its existence in good standing in the jurisdiction of its organization; (u) any of the licenses or permits which are necessary to the conduct of any Borrower's business as now conducted is not maintained in full force and effect; or (v) ~~the determination in good faith by Bank, in its sole discretion, that the ability of any Borrower or Other Obligor to pay or perform any of their respective obligations to Bank is impaired for any reason~~.

12. REMEDIES. Upon a default, in addition to all other rights and remedies available to the holder of this Promissory Note under any document or agreement between Borrower and Bank or under applicable law, the holder of this Promissory Note, in the holder's sole discretion and without notice or demand, may raise the rate of interest accruing on the unpaid principal balance outstanding under this Promissory Note by two (2) percentage points above the rate of interest otherwise applicable. The Bank shall have no further obligation to provide any Loans to Borrower following: (a) a demand by Bank for payment hereunder; or (b) a default under this Promissory Note. Borrower agrees that a default under this Promissory Note is a default by Borrower under all other liabilities and obligations of Borrower to the holder, and that the holder shall have the right to declare immediately due and payable all liabilities and obligations owed by Borrower to the holder of this Promissory Note.

13. CONFESSION OF JUDGMENT. Borrower irrevocably and unconditionally authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Borrower in any court in one or more proceedings, or before any clerk thereof or prothonotary or other court official, and appear for, to confess and enter judgment against Borrower, at any time, whether before or after the occurrence of any default hereunder, with or without averment of default, with or without complaint filed, and without prior notice or opportunity of Borrower for prior hearing, in favor of the holder of this Promissory Note in the full amount outstanding on this Promissory Note (including principal, accrued interest and any and all charges, fees and expenses) plus court costs, plus attorneys' fees equal to fifteen percent (15%) of the unpaid balance of principal, interest, charges, and other sums outstanding hereunder, with release of all errors and without right of appeal. Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Borrower any right or privilege of exemption, homestead rights, appraisement, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment. (To the extend prohibited by applicable law, any judgment obtained by confession shall not constitute a lien on any real property located in Pennsylvania which is the residence of the Borrower.) The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions from time to time, in the same or different jurisdictions, as often as the holder shall deem necessary or advisable. BORROWER HEREBY ACKNOWLEDGES THAT THE CONFESSION OF JUDGMENT PROVISIONS HEREIN CONTAINED WHICH AFFECT AND WAIVE CERTAIN LEGAL RIGHTS OF BORROWER HAVE BEEN READ, UNDERSTOOD AND VOLUNTARILY AGREED TO BY BORROWER.

14. EXPENSES. Borrower shall pay all costs and expenses, including attorneys' fees (to the extent not prohibited by law) incident to the making of the Loans. Borrower shall pay all costs and expenses incurred by Bank in collecting sums due under this Promissory Note, including without limitation the costs of any lien, judgment or other record searches, appraisals, travel expenses and the like. In addition, if this Promissory Note is referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, Borrower shall pay all of the holder's costs, fees (including, but not limited to, the holder's attorneys' fees, charges and expenses) and all other expenses resulting from such referral.

15. AMENDMENTS. The fees and charges required to be paid by Borrower in connection with the Loans may, at any time and from time to time, be amended by Bank, upon prior written notice thereof to Borrower and otherwise in compliance with applicable law. Any such amendment shall become effective on the first day of the month in which Borrower obtains a Loan, after the date specified in the notice of amendment (which date shall be not less than thirty (30) days from the date

the notice was mailed to Borrower), or upon such other date as may be required in accordance with applicable law. If Borrower obtains a Loan after the date specified in the notice, the changes in the fees and charges described in the amendment shall apply to all outstanding unpaid indebtedness and obligations under this Promissory Note, whether incurred or arising prior to, upon, or after the effective date of the amendment.

16. NEGOTIABLE INSTRUMENT. Borrower agrees that this Promissory Note shall be deemed to be a negotiable instrument, even though this Promissory Note may not qualify under applicable law, absent this paragraph, as a negotiable instrument.

17. WAIVERS. Borrower, and all parties to this Promissory Note, whether maker, indorser, or guarantor, waive presentment, demand, notice of dishonor and protest.

18. EXTENSIONS OF MATURITY. All parties to this Promissory Note, whether maker, indorser, or guarantor, agree that the maturity of this Promissory Note, or any payment due hereunder, may be extended at any time or from time to time without releasing, discharging, or affecting the liability of such party.

19. NOTICES. Any notice or demand required or permitted by or in connection with this Promissory Note, without implying the obligation to provide any notice or demand, shall be in writing at the address set forth below or to such other address as may be hereafter specified by written notice to Bank by Borrower. Any such notice or demand shall be deemed to be effective as of the date of hand delivery or facsimile transmission, one (1) day after dispatch if sent by telegram, mailgram, overnight delivery, express mail or federal express, or three (3) days after mailing if sent by first class mail with postage prepaid.

20. ASSIGNABILITY. This Promissory Note may be assigned by Bank or any holder at any time.

21. JOINT AND SEVERAL LIABILITY. If more than one person or entity is executing this Promissory Note as Borrower, all liabilities under this Promissory Note shall be joint and several with respect to each of such persons or entities.

22. BINDING NATURE. This Promissory Note shall inure to the benefit of and be enforceable by Bank and Bank's successors and assigns and any other person to whom Bank may grant an interest in Borrower's obligations to Bank, and shall be binding and enforceable against Borrower and Borrower's personal representatives, successors and assigns.

23. INVALIDITY OF ANY PART. If any provision or part of any provision of this Promissory Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Promissory Note and this Promissory Note shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality or unenforceability.

24. MAXIMUM RATE OF INTEREST; COMMERCIAL LOAN. Notwithstanding any provision of this Promissory Note to the contrary, Borrower shall not be obligated to pay interest hereunder in excess of the maximum rate of interest permitted by the laws of any state determined to govern this Promissory Note or the laws of the United States applicable to loans in such state. If any provision of this Promissory Note shall ever be construed to require the payment of any amount of interest in excess of that permitted by applicable law, then the interest to be paid hereunder shall be held subject to reduction to the amount allowed under applicable law, and any sums paid in excess of the interest rate allowed by law shall be applied in reduction of the principal balance outstanding under this Promissory Note. Borrower acknowledges that it has been contemplated at all times by Borrower that the laws of the Commonwealth of Pennsylvania will govern the maximum rate of interest that it is permissible for the holder of this Promissory Note to charge Borrower under this Promissory Note. Borrower warrants that this Promissory Note evidences a loan made solely to acquire or carry on a business or commercial enterprise.

25. CHOICE OF LAW; CONSENT TO VENUE AND JURISDICTION. This Promissory Note shall be governed, construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania, even if the Commonwealth of Pennsylvania rules governing conflicts of laws would otherwise require that the laws of another jurisdiction govern this Promissory Note. Borrower consents to the jurisdiction and venue of the courts of any city or county in the Commonwealth of Pennsylvania or to the jurisdiction and venue of the United States District Court for the Middle District of Pennsylvania in any action or judicial proceeding brought to enforce, construe or interpret this Promissory Note.

26. UNCONDITIONAL OBLIGATIONS. Borrower's obligations under this Promissory Note shall be the absolute and unconditional duties and obligations of Borrower and shall be independent of any rights of set-off, recoupment or counterclaim which Borrower might otherwise have against the holder of this Promissory Note, and Borrower shall pay absolutely the payments of principal, interest, fees, charges and expenses required hereunder, free of any deductions and without abatement, diminution or set-off.

27. ACTIONS AGAINST BANK. Any action brought by Borrower against Bank which is based, directly or indirectly, or in whole or in part, upon this Promissory Note or any matter related to this Promissory Note shall be brought only in the courts of the Commonwealth of Pennsylvania.

28. WAIVER OF JURY TRIAL. Borrower (by execution of this Promissory Note) and Bank (by acceptance of this Promissory Note) agree that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by Borrower, Bank, or any successor or assign of Borrower or Bank on or with respect to this Promissory Note or which in any way relates, directly or indirectly, to the obligations of Borrower to Bank under this Promissory Note, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. BORROWER AND BANK HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING. Borrower and Bank acknowledge and agree that this provision is a specific and material aspect of the agreement between the parties and that Bank would not enter into the transaction with Borrower if this provision were not a part of their agreement.

[SIGNATURES CONTAINED ON NEXT PAGE]

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned executes this Promissory Note under seal, as Borrower, as of the date first written above.

WITNESS/ATTEST*:

CCI Construction Co, Inc
(Name of Organization)

7500 Old Gettysburg Rd
(Street Address)

Camp Hill, Pa 17011
(City-State-Zip)

717-909-4224 717-909-4400
(Telephone) (Facsimile)

E M Avery
E. M. AVERY ASSISTANT SECRETARY
(Print Name)

By: [signature], CFO (SEAL)
(Authorized Signature)

Sheri Phillips, CFO
(Print Name and Title)

_______________

_______________
(Print Name)

By: _______________ (SEAL)
(Authorized Signature)

_______________
(Print Name and Title)

*NOTE: Attestation by a corporate officer of another corporate officer's capacity to sign is required in all corporate transactions.

If Borrower is an individual he or she should sign below:

WITNESS:

_______________

_______________
(Print Name)

_______________ (SEAL)

_______________
(Print Name)

_______________
(Street Address)

_______________
(City-State-Zip)

_______________
(Telephone) (Facsimile)

EXHIBIT A
FILM/Cash Solutions Promissory Note

Account Number: 28864514

Borrower: CCI Construction Co[illegible], Inc.

The terms and provisions of the option checked below are incorporated in and made a part of the FILM/Cash Solutions Promissory Note executed by Borrower to which this Exhibit A is attached:

[X] FILM LOAN OPTION - The following terms apply to this option:

i) Maximum Line Amount - $4,000,000.00

ii) Minimum Loan Advance - $0.01

iii) Incremental Advance Amount - $1.00

iv) Target Balance - $ 0

v) Fees - 0

[ ] CASH SOLUTIONS PROTECTION OPTION - The following terms apply to this option:

i) Maximum Line Amount - ______

ii) Minimum Loan Advance - $500.00

iii) Incremental Advance Amount - $500.00

iv) Target Balance - $______

v) Fees - ______

[ ] CASH SOLUTIONS MAXIMIZER OPTION - The following terms apply to this option:

i) Maximum Line Amount - ______

ii) Minimum Loan Advance - $500.00

iii) Incremental Advance Amount - $500.00

iv) Target Balance - $______

v) Fees - ______

vi) Balance in Account is not transferred to investments until all Loans are paid in full.

[ ] CASH SOLUTIONS LOAN OPTION - The following terms apply to this option:

i) Maximum Line Amount - ______

ii) Minimum Loan Advance - $500.00

iii) Incremental Advance Amount - $500.00

iv) Target Balance - $______

v) Fees - ______

WITNESS/ATTEST:

______

BORROWER:

CCI Construction Co, Inc

By: [signature], CFO (SEAL)

Name: Sheri Phillips

Title: CFO

If Borrower is an individual he or she should sign below:

______

______ (SEAL)

Name: ______

FA-FCS-PN
10/13/98

 COMMERCIAL LOAN NOTE
LINE OF CREDIT

$ 1,200,000.00

Date 11-8-99

FOR VALUE RECEIVED, the undersigned, CCI Construction Co., Inc. a (corporation/partnership/limited liability company/individual) (the "Borrower"), jointly and severally (if more than one), promise to pay to the order of ALLFIRST BANK, a Maryland state-chartered commercial bank (the "Bank") or its assigns, the principal amount of ONE MILLION TWO HUNDRED THOUSAND & NO/100 DOLLARS to be paid as follows:
Principal is payable on demand.

Interest is payable monthly, accrued to date of Bank's notice thereof, with all accrued and unpaid interest, and unpaid fees and charges, due with the principal payment.

Interest shall accrue at a rate per annum equal to the Bank's Base Rate minus .50000% as in effect from time to time. The term "Bank's Base Rate," which is not necessarily the lowest rate of interest charged by the Bank, is defined as the prime rate of interest for loans established by the Bank from time to time.

Interest shall be calculated on the basis of the actual number of days elapsed and a year of 360 days. Both principal and interest are payable in lawful money of the United States of America at any office of Bank in immediately available funds. If any payment due hereunder is received by the Bank more than fifteen (15) calendar days after its due date, the Borrower shall pay a late payment charge equal to five percent (5%) of the amount then due or $10.00, whichever is greater.

*APPLICATION OF PAYMENTS.* All payments made hereunder shall be applied first to late payment charges or other sums owed to the Bank, next to accrued interest, and then to principal, or in such other order or proportion as the Bank, in its sole and absolute discretion, may elect from time to time.

*SECURITY.* The payment of this note and any renewals, extensions and modifications thereof, and the payment, performance and discharge of all other present or future indebtedness, obligations and undertakings (individual, joint, several, direct, contingent, or otherwise) of the Borrower to or for the benefit of the Bank, whether arising directly to the Bank under this note or under any other agreement, promissory note or undertakings now existing or hereinafter entered by the Borrower to the Bank (collectively, the "Liabilities") is secured by the property described in, and under and pursuant to the terms and conditions of that certain:
Collateral as set forth in a Security Agreement - Specific Collateral dated 11/8/99.

EXHIBIT
7
3/12/02 HM

~~As additional security for the Liabilities, Borrower grants the Bank a lien upon and a security interest in any securities, instruments or other personal property of Borrower now or hereafter in Bank's possession and in any deposit balances now or hereafter held by Bank for Borrower's account and in all proceeds of any such personal property or deposit balances. Such liens and security interests shall be independent of Bank's right of setoff.~~

*STATEMENT OF ACCOUNT.* The Bank will furnish the Borrower with a statement of account on a periodic basis. Each and every statement of account shall be final, conclusive and binding upon the Borrower in all respects as to the outstanding balance of principal and as to all loans, fees, interest, charges, payments, receipts, balances, and all other matters reflected therein unless the Borrower, within ten (10) days after the posting thereof in the United States mail, shall give notice to the Bank in writing of any objections which the Borrower may have to any such statement of account; and in such event, only those items expressly objected to in such written notice shall be considered to be disputed by the Borrower and all other items shall be binding.

*PAYMENT OF COSTS.* In addition to the principal and interest payments specified above, the Borrower shall pay to the Bank or any other holder of this note, upon demand, all costs and expenses (including reasonable attorneys' fees, whether or not litigation is commenced) which may be incurred by the Bank or such holder in the collection or enforcement of this note. Said costs shall include reasonable attorneys' fees and costs in bankruptcy proceedings and any costs and attorneys' fees as incurred for any action or proceeding in relation to the loan transaction, including but not limited to the joinder of Bank in any action between the Borrower and a third party.

*DE[redacted]TS.* The Borrower shall be in default hereunder up[redacted] occurrence of any of the following events: (a) the nonpa[redacted]t when due of any amount payable on any of the Liabilities, or the failure of any Obligor to observe or perform any agreement of any nature whatsoever with the Bank (the term "Obligor" as used herein being meant to include the Borrower and all persons liable on the note or any renewals, extensions, or modification thereof, such as endorsers, sureties, or guarantors); (b) if any Obligor becomes insolvent or makes an assignment for the benefit of creditors, or if any petition is filed by or against any Obligor under any provisions of any law or statute alleging that such Obligor is insolvent or unable to pay debts as they mature; (c) the entry of any judgment against any Obligor or the issuing of any attachment or garnishment against any property of any Obligor or the occurrence of any change in the financial condition of any Obligor which in the sole judgment of the Bank is materially adverse; (d) the dissolution, merger, consolidation or reorganization of any Obligor, which is an entity such as a corporation, limited partnership, partnership or limited liability company; (e) the death of any Obligor who is a natural person; (f) any information heretofore or hereinafter furnished to the Bank by any Obligor in connection with the loan evidenced hereby or any suretyship or guaranty should be materially false; and (g) the failure of any Obligor to furnish such financial and other information as the Bank may reasonably request. If this Note is payable on demand, Bank's right to demand payment hereof shall not be restricted or impaired by the absence of, non-occurrence of or waiver of a default hereunder, and it is understood that Bank may demand payment at any time. after giving Borrower a 30-day written notice of demand.

JTM CP

*ACCELERATION AND ENFORCEMENT RIGHTS.* Whenever the Borrower shall be in default as aforesaid, (1) unless the Bank elects otherwise, the entire unpaid amount of such of the Liabilities as are not then due and payable shall become immediately due and payable without ~~notice to~~ 30 days written notice or demand on any Obligor, and (2) the Bank may at its option exercise from time to time any or all rights and remedies available to it at law or in equity. The Borrower waives all right to stay of execution or garnishment and exemption of property in any action to enforce any of the Liabilities.

JTM CP

*JUDGMENT.* The Borrower does hereby authorize and empower any attorney of any court of record of Pennsylvania or elsewhere to appear for and enter judgment against Borrower for the above sum, with or without declaration, with costs of suit, including reasonable attorneys' fees and fees in bankruptcy proceedings, if any, release of errors, without stay of execution, and with ~~fifteen (15%) percent~~ reasonable attorney fees added for collection fees, and the Borrower further agrees that real, personal or mixed property may be sold or garnished upon any writ of execution or writ of garnishment as now or hereafter provid. by law or the Pennsylvania Rules of Civil Procedure governing the enforcement of judgments; and Borrower hereby waives and releases all relief from any appraisement, stay or exemption laws of any state now in force or hereafter enacted. If a copy hereof, verified by affidavit, shall have been filed in such proceeding, it shall not be necessary to file the original as a warrant of attorney. The Borrower (and each of them, if more than one) hereby waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of this warrant and power to confess judgment shall be deemed to exhaust this power, whether or not any such exercise shall be held by any court to be invalid, voidable or void, but this power shall continue undiminished and may be exercised from time to time as often as Bank shall elect until all sums due hereunder shall have been paid in full.

*WAIVERS.* The Borrower hereby waives presentment, notice of dishonor and protest. The Borrower hereby waives and releases all errors, defects and imperfections of a procedural nature in any proceedings instituted by the Bank hereunder, as well as all benefit that might accrue to the Borrower by virtue of any present or future laws exempting any property, real or personal, or any part of the proceeds arising from any sale of such property, from garnishment, attachment, levy or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment. The Borrower agrees that any property, real or personal, that may be levied upon pursuant to any writ of execution or writ of garnishment issued on any judgment by virtue of this note, may be sold, in whole or in part, in any order desired by the Bank.

*HOLDERS IN DUE COURSE.* This note may be assigned by the Bank or any subsequent holder of this note at any time or from time to time. The Borrower hereby agrees that no subsequent holder of this note to whom the note was transferred for value shall be subject to any claims or defenses which the Borrower may have against a prior holder, all of which are waived as to such subsequent holder, and that all such subsequent holders shall have all of the rights of a holder in due course even though the subsequent holder may not qualify, under applicable law, absent this paragraph, as a holder in due course.

*MISCELLANEOUS.* Any failure of the Bank to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any other time. If the Borrower consists of more than one person, such persons shall be jointly and severally liable hereunder. The Borrower intends this to be a sealed instrument and to be legally bound hereby. This note shall inure to the benefit of and be enforceable by the Bank and its successors and assigns and b- binding and enforceable against the Borrower, its legal representatives, successors and permitted assigns. All issu arising hereunder shall be governed by the laws of Pennsylvania without giving effect to choice of law rules.

WITNESS OR ATTEST:

BORROWER: CCI Construction Co., Inc.

_______________________

(Name of Individual, Corporation, Partnership or Limited Liability Company)

[signature] Sec. Name and Title (Seal) — By: [signature] Pres. Name and Title (Seal)

Name and Title (Seal) — By: Name and Title (Seal)

Name and Title (Seal) — By: Name and Title (Seal)

Name and Title (Seal) — By: Name and Title (Seal)

2500 Old Gettysburg Road Camp Hill, PA 17001
Address

CE-111-2

6/99

  

SURETYSHIP AGREEMENT

under the $1,200,000 commercial loan note dated 11-8-99

Date 11-8-99

For value received, the Undersigned, jointly and severally, hereby unconditionally agree to make prompt payment of all obligations, indebtedness and liabilities due Allfirst Bank, a Maryland state-chartered commercial bank, hereinafter called "Bank," ~~of any kind, whether now existing or hereafter arising,~~ due or which may become due, whether by acceleration or otherwise, ~~absolute or contingent, joint or several, direct or indirect, secured or unsecured,~~ by **CCI Construction Co., Inc.**

hereinafter called "Borrower," all such obligations being hereinafter further described and collectively called the "Liabilities," and the Undersigned agree(s) to pay all expenses (including attorneys' fees and legal expenses, whether or not litigation is commenced) paid or incurred by the Bank in endeavoring to collect the Liabilities, or any part thereof, whether or not bankruptcy has been declared, and in enforcing this Suretyship Agreement. The liability of the Undersigned hereunder is a primary and direct obligation without regard to any other obligor or security or collateral held by the Bank.

The Undersigned hereby waive all notices of any character whatsoever with respect to this Suretyship Agreement and the Liabilities of the Borrower for which the Suretyship Agreement has been executed, including but not limited to notice of the acceptance hereof and reliance hereon and notice of default by the Borrower. The Undersigned hereby give consent to the Bank to the taking of, or failure to take, from time to time, without notice to the Undersigned, any action of any nature whatsoever with respect to the Liabilities of the Borrower, with respect to any rights against any person or persons, including the Borrower and any of the Undersigned, in any property, including, but not limited to, any postponements, compromises, indulgences, waivers, extensions, exchanges, releases, and satisfactions. The Undersigned shall remain fully liable on this Suretyship Agreement, notwithstanding any of the foregoing.

This Suretyship Agreement shall in all respects be a continuing, absolute and unconditional one, and shall remain in full force and effect (notwithstanding, without limitation, the death, incompetency or dissolution of any of the Undersigned or that at any time, or from time to time, all Liabilities may have been paid in full). This Suretyship Agreement is subject to discontinuance as to any of the Undersigned only upon actual receipt by the Bank of written notice from such Undersigned, or any person duly authorized and acting on behalf of such Undersigned, of the discontinuance hereof as to such Undersigned; provided, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such Undersigned hereunder with respect to (a) any and all Liabilities existing prior to the time of actual receipt of such notice by the Bank, (b) any and all Liabilities created or acquired thereafter pursuant to any previous binding commitments made by the Bank, (c) any and all extensions or renewals of any of the foregoing, (d) any and all interest on any of the foregoing, and (e) any and all expenses paid or incurred by the Bank in endeavoring to collect any of the foregoing and in enforcing this Suretyship Agreement against such Undersigned. All obligations of the Undersigned under this Suretyship Agreement shall, notwithstanding any such notice of discontinuance, remain fully in effect until all Liabilities not subject to an effective notice of discontinuance (including any extensions or renewals of any thereof) and all such interest and expenses shall have been paid in full. Any notice of discontinuance by or on behalf of any one of the Undersigned shall not affect or impair the obligations hereunder of any other of the Undersigned.

At the option of Bank, all Liabilities of Borrower shall become immediately due and payable by the Undersigned, without demand or notice, in the event any of the following shall occur: (a) Borrower shall fail to make any payment or meet any other liability when due; (b) Borrower or the Undersigned shall fail to observe or perform any obligation, term, condition or provision of Borrower under any document evidencing or securing the Liabilities, this Suretyship Agreement or any other agreement, document, certificate, instrument of security, suretyship or guaranty given by Borrower to Bank; (c) Any representation, warranty or certificate made or furnished by Borrower to Bank, in connection with the Liabilities or any other agreement, document, certificate, instrument of security, suretyship or guaranty given by Borrower to Bank or in any certificate, financial statement or separate assignment made [he]reunder shall be materially false; (d) Borrower or any of the Undersigned shall make an assignment for the benefit of creditors; (e) Proceedings in [ban]kruptcy or for reorganization of Borrower or any of the Undersigned or for the readjustment of any of their debts under the Bankruptcy Act, as [ame]nded, or in any part thereof, or under any other act or law, whether state or federal, for the relief of debtors now or hereafter existing, shall be [comme]nced by or against Borrower or the Undersigned; (f) A receiver or trustee shall be appointed for Borrower or any of the Undersigned or for any [subs]tantial part of their assets; or any proceedings are instituted for the dissolution, or the full or partial liquidation, of Borrower or any of the Undersigned; (g) Material adverse changes in the financial condition of the Borrower or any of the Undersigned; (h) A death of Borrower or any of the Undersigned or, if Borrower or the Undersigned is a partnership, the death of any general partner; or (i) Borrower or any of the Undersigned ceases doing business as a going concern.

As security for the Liabilities hereunder, the Undersigned hereby grants Bank a security interest in the following:

NONE

Together with a right, without demand or notice of any kind, at any time and from time to time when any amount shall be due and payable by the Undersigned hereunder and in such order of application as the Bank may elect, to set-off against all monies, deposits or other property of any kind, without limitation, owned by the Undersigned or in which the Undersigned has a joint or contingent interest and which are in possession of Bank for any reason whatsoever.

The Undersigned further agree that, if at any time, any part of any payment theretofore applied by the Bank to any of the Liabilities is or must be returned by the Bank for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Borrower), such Liabilities shall, for the purposes of this Suretyship Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Bank, and this Suretyship Agreement shall continue to be effective or be reinstated, as the case may be as to such Liabilities, all as though such application by the Bank had not been made. In such an event the Undersigned hereby waives any right of contribution, subrogation or indemnification against the Borrower, for a period of twelve (12) months subsequent to the last payment made or due to be made from Borrower to Bank.

The Bank may, from time to time, whether before or after any discontinuance of this Suretyship Agreement, at its sole discretion and without notice to the Undersigned (or any of them), take any or all of the following actions: (a) retain or obtain a security interest in any property to secure any of the Liabilities or any obligation hereunder; (b) retain or obtain the primary or secondary obligation of any obligor or obligors in addition to the Undersigned, with respect to any of the Liabilities; (c) extend or renew for one or more periods (whether or not longer than the original period), alter or exchange any of the Liabilities, or release or compromise any obligation of any of the Undersigned hereunder or any obligation of any nature of any other obligor with respect to any of the Liabilities, (d) release its security interest in, or surrender, release or permit any substitution or exchange for, all or any part of any property securing any of the Liabilities or any obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such property; and (e) resort to the [Und]ersigned (or any of them) for payment of any of the Liabilities, whether or not the Bank shall have resorted to any property securing any of the [Liab]ilities for payment of any of the Liabilities, or any obligation hereunder or shall have proceeded against any other of the Undersigned or any other [obligor] primarily or secondarily obligated with respect to any of the Liabilities.

Any amounts received by the Bank from whatsoever source on account of the Liabilities may be applied by Bank toward the payment of such of the [Liab]ilities and in such order of application, as the Bank may from time to time elect; and, notwithstanding any payments made by or for the account of the Undersigned pursuant to this Suretyship Agreement, the Undersigned shall not be subrogated to any rights of the Bank until such time as this Suretyship Agreement shall have been discontinued as to all of the Undersigned and the Bank shall have received payment of the full amount of all Liabilities and of all obligations of the Undersigned hereunder. The Bank shall not be obligated under any theory of law relating to the marshalling of payment received or security interest granted under the terms of this Suretyship Agreement.

The Bank may, from time to time, before or after any discontinuance of this Suretyship Agreement, without notice to the undersigned (or any of them), assign or transfer any or all of the Liabilities or any interest therein; and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Liabilities shall be and remain Liabilities for the purpose of this Suretyship Agreement and each and every immediate and successive assignee or transferee of any of the Liabilities or of any interest therein shall, to the extent of the interest of such assignee or transferee in the Liabilities, be entitled to the benefits of this Suretyship Agreement to the same extent as if such assignee or transferee were the Bank; provided, however, that unless the Bank shall otherwise consent in writing, the Bank shall have an unimpaired right prior and superior to that of any such assignee or transferee, to enforce this Suretyship Agreement for the benefit of the Bank, as to those of the Liabilities which the Bank has not assigned or transferred.

No modification or waiver of any of the provisions of this Suretyship Agreement shall be binding upon the Bank except as expressly set forth in writing duly signed by each of the Undersigned and the Bank. No action of the Bank permitted hereunder shall in any way affect or impair the rights of the Bank and the obligation of the Undersigned under this Suretyship Agreement. For the purpose of this Suretyship Agreement, Liabilities shall include all obligations of the Borrower to the Bank* notwithstanding any right or power of the Borrower or anyone else to assert any claim or defense as to the invalidity or unenforceability of any such obligation and no such claim or defense shall affect or impair the obligations of the Undersigned hereunder.

*under 1,200,000 commercial loan note dated 11-8-99 JMO CP

The Liability of the Undersigned for Liabilities of Borrower incurred on or prior to the date hereof shall not exceed, at any time, the aggregate principal amount of ONE MILLION TWO HUNDRED THOUSAND & NO/100 DOLLARS ($ 1,200,000.00), plus interest as stated in the evidence of indebtedness given by Borrower to Bank and fifteen percent (15%) attorneys' commission; provided that this Suretyship Agreement shall also be applicable to and extend to any and all Liabilities, plus interest and costs as aforesaid, of Borrower arising after the date hereof even if the total of such Liabilities plus the Liabilities outstanding on or prior to the date hereof exceed the aforementioned aggregate principal amount. If no limitation is inserted in this paragraph, there is no limit to the liability of the Undersigned to the Bank.

The creation or existence from time to time of Liabilities in excess of any amount to which the right of recovery under this Suretyship Agreement is limited is hereby authorized, without notice to the Undersigned (or any of them), and shall in no way affect or impair the rights of the Bank and the obligation of the Undersigned under this Suretyship Agreement.

The Undersigned, jointly and severally, do hereby authorize and empower any prothonotary or clerk or attorney of any court of record of Pennsylvania or elsewhere, to appear for and confess judgment against any or all of the Undersigned in favor of Bank for the total liability of the Undersigned as set forth herein together with interest thereon, with or without declaration, with costs of suit, release of errors, without stay of execution or garnishment and with fifteen percent (15%) for collection fees, and waive the right of inquisition, and the benefit of all exemption laws now or hereinafter enacted, and agree to condemnation and the sale of real estate or personal property, or a writ of execution.

In the event the Bank acquires any property securing this Suretyship Agreement after a foreclosure sale as to real property or a public auction sale as to personal property, the Undersigned agrees to indemnify and hold the Bank harmless from any loss, costs, or expense which the Bank may sustain as a result of: (a) selling the real or personal property so acquired for less than the total sums owed by the Borrower to the Bank, provided, however, that any such sale by the Bank is done in a commercially reasonable manner or (b) any action brought against the Bank under §548 or §544(b) of the United States *Bankruptcy Code*, as amended, on the ground that the consideration paid by the Bank for the real or personal property was not "fair equivalent value," within the contemplation of §544(b) of the United States *Bankruptcy Code*, as amended, or any applicable state fraudulent conveyance act.

The Undersigned waive and release the Bank from any damages which the Undersigned may incur as a result of any intentional or unintentional or negligent action or inaction of the Bank impairing, diminishing, or destroying any of the Undersigned's rights of subrogation which the Undersigned may have upon payment of any of the Borrower's obligations. The Undersigned acknowledges previously having waived, under certain conditions, any such rights.

The Undersigned hereby agrees that this Suretyship Agreement shall apply to ~~any~~ 1,200,000 commercial loan note dated 11-8-99 JMO CP obligation which the Bank may incur as the result of any payment to Bank by or on behalf of the Borrower which is determined to be a preference payment benefiting the undersigned.

If a photostatic copy hereof shall have been filed in any of said proceedings, it shall not be necessary to file the original as a warrant of attorney. The foregoing warrant and power to confess judgment shall not be deemed to have been exhausted by any single exercise thereof, whether or not any such exercise shall be held by any court to be invalid, voidable or void, but may be exercised from time to time, as often as the Bank shall elect, until all sums payable or that may become payable by each of the Undersigned have been paid in full.

A subsequent guaranty or suretyship by the Undersigned or any other guarantor or surety of the Borrower's Liabilities given to the Bank shall not be deemed to be in lieu of or to supersede or terminate this Suretyship Agreement but shall be construed to be additional or supplementary unless otherwise expressly provided therein; and in the event the Undersigned or any other guarantor or surety has given to the Bank a previous guaranty or Suretyship Agreement, this Suretyship Agreement shall be construed to be additional or supplementary, and not to be in lieu thereof or to terminate such previous Suretyship Agreement, guaranty or guaranties unless expressly so provided herein.

This Suretyship Agreement shall be binding upon the Undersigned, and upon the heirs, legal representatives, successors and assigns of the Undersigned, and to the extent that the Borrower or any of the Undersigned is an entity such as a partnership, limited partnership, limited liability company, corporation or any other similar entity, all references herein to the Borrower and to the Undersigned, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such entity. If more than one party shall execute this Suretyship Agreement, the term "Undersigned" as used herein shall mean all parties executing this Suretyship Agreement and each of them, and all such parties shall be jointly and severally obligated hereunder.

This Suretyship Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania without giving effect to choice of law rules. Wherever possible each provision of this Suretyship Agreement shall be interpreted in such manner as to be effective and valid under applicable law but if any provision of this Suretyship Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Suretyship Agreement.

INTENDING TO BE LEGALLY BOUND HEREBY, the Undersigned have set their respective hands and seals the day and year first above written.

WITNESS OR ATTEST:

(SURETY) John M Ortenzio

Title: ______

Title: ______

Title: ______

By: ______ Title: ______ (SEAL)

By: ______ Title: ______ (SEAL)

By: ______ Title: ______ (SEAL)

CCI CONSTRUCTION COMPANY, INC.

YEARS ENDED
DECEMBER 31, 1998 AND 1997

EXHIBIT
3
3/13/02 HMH

**CCI CONSTRUCTION COMPANY, INC.**

YEARS ENDED DECEMBER 31, 1998 AND 1997

CONTENTS

| | Page |
|---|---|
| Independent auditors' report | 1 |
| Financial statements: | |
| Balance sheets | 2 |
| Statements of income | 3 |
| Statements of shareholder's equity | 4-5 |
| Statements of cash flows | 6-7 |
| Notes to financial statements | 8-13 |
| Accompanying information to financial statements: | |
| Cost of contracts | 14 |
| General and administrative expenses | 15 |
| Earnings from contracts | 16 |
| Completed contracts | 17 |
| Contracts-in-progress | 18 |

BROWN SCHU[LTZ]
SHERIDAN FR[ITZ]

Independent Auditors' Report

Board of Directors
CCI Construction Company, Inc.
Mechanicsburg, Pennsylvania

We have audited the accompanying balance sheets of CCI Construction Company, Inc. as of December 31, 1998 and 1997 and the related statements of income, shareholder's equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management.. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of CCI Construction Company, Inc. as of December 31, 1998 and 1997 and the results of its operations and its cash flows for the years then ended, in conformity with generally accepted accounting principles.

Our audits of the financial statements were made for the purpose of forming an opinion on the basic financial statements taken as a whole. The accompanying information is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audits of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

Brown Schultz Sheridan & Fritz

February 10, 1999

CERTIFIED PUBLIC ACCOUNTA[NTS]
BUSINESS ADVIS[ORS]
A PROFESSIONAL CORPORAT[ION]
1011 MUMMA R[OAD]
WORMLEYSBURG PA 1[7043]
PO BOX 6[...]
HARRISBURG, PA 17106-[...]
717-761-[...]
PA: 800-294-[...]
FAX: 717-737-[...]
1725 OREGON [PIKE]
LANCASTER, PA 17[...]
717-560-[...]
PA: 800-294-[...]
FAX: 717-560-[...]
WEBSITE: WWW.BSSF.C[OM]

## *CCI CONSTRUCTION COMPANY, INC.*

BALANCE SHEETS - DECEMBER 31, 1998 AND 1997

ASSETS

| | 1998 | 1997 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 2,429,866 | $ 1,128,337 |
| Investments in marketable securities | 631,481 | 3,702,992 |
| Accounts receivable, trade: | | |
| Customers: | | |
| Current | 5,964,311 | 8,230,674 |
| Retained | 1,822,224 | 1,121,610 |
| Affiliates | 365,756 | 3,485 |
| Note receivable | | 22,569 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 6,341,726 | 1,072,281 |
| Prepaid expenses | 170,232 | 6,185 |
| Shop inventory | 38,161 | 639 |
| Total current assets | 17,763,757 | 15,288,772 |
| Property and equipment: | | |
| Automobiles and trucks | 1,269,567 | 427,342 |
| Furniture | 851,738 | 553,587 |
| Machinery and equipment | 5,947,290 | 1,323,233 |
| Other | 344,128 | 72,453 |
| | 8,412,723 | 2,376,615 |
| Less accumulated depreciation | 1,651,485 | 920,919 |
| | 6,761,238 | 1,455,696 |
| Other assets: | | |
| Cash surrender value of officer's life insurance | 55,453 | |
| Investments | 34,000 | |
| | 89,453 | |
| | $ 24,614,448 | $ 16,744,468 |

See notes to financial statements.

LIABILITIES AND SHAREHOLDER'S EQUITY

| | 1998 | 1997 |
|---|---|---|
| Current liabilities: | | |
| Accounts payable, trade: | | |
| Current | $ 10,974,274 | $ 7,846,395 |
| Retained | 2,180,967 | 1,078,950 |
| Notes payable | | 815,781 |
| Current portion of long-term debt | 1,338,280 | |
| Accrued expenses | 333,060 | 808,601 |
| Taxes withheld and accrued | 91,601 | 58,023 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 288,208 | 681,924 |
| Total current liabilities | 15,206,390 | 11,289,674 |
| Long-term debt, net of current portion | 4,164,375 | |
| Total liabilities | 19,370,765 | 11,289,674 |
| Shareholder's equity: | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | 39 |
| Capital in excess of par | 9,758 | 9,758 |
| Retained earnings | 5,254,834 | 5,208,489 |
| Accumulated other comprehensive income (loss), unrealized gain (loss) on marketable securities | ( 20,948) | 236,508 |
| | 5,243,683 | 5,454,794 |
| | $ 24,614,448 | $ 16,744,468 |

C 7627

# CCI CONSTRUCTION COMPANY, INC.

STATEMENTS OF INCOME

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | 1998 | 1997 |
|---|---|---|
| Revenue | $ 52,534,453 | $ 34,921,676 |
| Cost of contracts | 51,145,382 | 32,617,473 |
| Gross profit | 1,389,071 | 2,304,203 |
| General and administrative expenses | 1,505,700 | 1,954,380 |
| Income (loss) from operations | ( 116,629) | 349,823 |
| Other income (expense): | | |
| Gain (loss) on sale of: | | |
| Marketable securities and cash equivalents | 260,927 | ( 6,016) |
| Property and equipment | 10,069 | ( 2,920) |
| Interest | ( 161,296) | |
| Investment | 151,592 | 367,538 |
| Miscellaneous | ( 85,622) | ( 1,546) |
| | 175,670 | 357,056 |
| Net income | $ 59,041 | $ 706,879 |

See notes to financial statements.

## *CCI CONSTRUCTION COMPANY, INC.*

STATEMENTS OF SHAREHOLDER'S EQUITY

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | Common stock | Capital in excess of par | Retained earnings | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1996 | $ 39 | $ 9,758 | $ 4,768,011 | $ 42,867 | $ 4,820,675 |
| Comprehensive income: | | | | | |
| Net income | | | 706,879 | | 706,879 |
| Other comprehensive income: | | | | | |
| Unrealized holding gains arising during the period on marketable securities | | | | 187,348 | 187,348 |
| Add reclassification adjustment | | | | 6,293 | 6,293 |
| | | | | | 193,641 |
| Comprehensive income | | | | | 900,520 |
| Distributions | — | — | ( 266,401) | — | ( 266,401) |
| Balance, December 31, 1997 (carried forward) | 39 | 9,758 | 5,208,489 | 236,508 | 5,454,794 |

(continued)

## *CCI CONSTRUCTION COMPANY, INC.*

STATEMENTS OF SHAREHOLDER'S EQUITY (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | Common stock | Capital in excess of par | Retained earnings | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1997 (brought forward) | $ 39 | $ 9,758 | $ 5,208,489 | $ 236,508 | $ 5,454,794 |
| Comprehensive loss: | | | | | |
| Net income | | | 59,041 | | 59,041 |
| Other comprehensive income (loss): | | | | | |
| Unrealized holding gains arising during the period on marketable securities | | | | 3,469 | 3,469 |
| Less reclassification adjustment | | | | ( 260,925) | ( 260,925) |
| | | | | | ( 257,456) |
| Comprehensive loss | | | | | ( 198,415) |
| Distributions | | | ( 12,696) | | ( 12,696) |
| Balance, December 31, 1998 | $ 39 | $ 9,758 | $ 5,254,834 | $( 20,948) | $ 5,243,683 |

See notes to financial statements.

C 7630

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF CASH FLOWS

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | 1998 | 1997 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net income | $ 59,041 | $ 706,879 |
| Adjustments: | | |
| Depreciation | 793,014 | 156,504 |
| (Gain) loss on sale of: | | |
| Property and equipment | ( 10,069) | 2,920 |
| Marketable securities | ( 260,927) | 6,293 |
| (Increase) decrease in: | | |
| Accounts receivable | 1,203,478 | ( 5,516,738) |
| Costs and estimated earnings in excess of billings on uncompleted contracts | ( 5,269,445) | ( 692,618) |
| Prepaid expenses | ( 164,047) | 47,047 |
| Shop inventory | ( 37,522) | ( 639) |
| Cash surrender value of officer's life insurance | ( 55,453) | |
| Increase (decrease) in: | | |
| Accounts payable | 4,229,896 | 4,912,287 |
| Accrued expenses | ( 475,541) | 530,442 |
| Taxes withheld and accrued | 33,578 | 47,166 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | ( 393,716) | 172,293 |
| Total adjustments | ( 406,754) | ( 335,043) |
| Net cash provided by (used in) operating activities | ( 347,713) | 371,836 |
| Cash flows from investing activities: | | |
| Purchase of: | | |
| Investments | ( 161,670) | ( 11,093,130) |
| Property and equipment | ( 98,793) | ( 560,929) |
| Repayment of note receivable | 22,569 | 9,120 |
| Proceeds from: | | |
| Sale and maturities of investments | 3,202,652 | 9,381,163 |
| Sale of property and equipment | 28,502 | 13,864 |
| Net cash provided by (used in) investing activities | 2,993,260 | ( 2,249,912) |

(continued)

# *CCI CONSTRUCTION COMPANY, INC.*

STATEMENTS OF CASH FLOWS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | 1998 | 1997 |
|---|---|---|
| Cash flows from financing activities: | | |
| Distributions to shareholder | $( 12,696) | $( 266,401) |
| Proceeds from issuance of notes payable and long-term debt | 17,990,666 | |
| Repayment of notes payable and long-term debt | ( 19,321,988) | ( 73,301) |
| Net cash used in financing activities | ( 1,344,018) | ( 339,702) |
| Net increase (decrease) in cash and cash equivalents | 1,301,529 | ( 2,217,778) |
| Cash and cash equivalents, beginning of year | 1,128,337 | 3,346,115 |
| Cash and cash equivalents, end of year | $ 2,429,866 | $ 1,128,337 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $ 161,296 | $ 1,707 |
| Noncash activities: | | |
| Net increase (decrease) in unrealized gain on marketable securities (see statements of shareholder's equity) | $( 257,456) | $ 193,641 |
| Notes payable incurred for the acquisition of new equipment | $ 6,018,196 | $ 889,082 |

See notes to financial statements.

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS

YEARS ENDED DECEMBER 31, 1998 AND 1997

1. Summary of significant accounting policies:

*Operations and operating cycle:*

The Company constructs and renovates commercial buildings primarily under fixed-price contracts in the eastern United States. The Company's receivables are concentrated among customers in this geographic area. The Company extends credit to its customers and generally requires no collateral.

The length of the Company's contracts varies but is typically between one to two years. In accordance with normal practice in the construction industry, the Company includes asset and liability accounts relating to construction contacts in current assets and liabilities even when such amounts are realizable or payable over a period in excess of one year.

*Use of estimates:*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Revenue and cost recognition:*

Revenues from construction contracts are recognized on the percentage-of-completion method, measured by the percentage of direct cost incurred to date to estimated total direct cost for each contract. That method is used because management considers direct cost to be the best available measure of progress on the contracts. Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change within the near term.

For purposes of determining percentage of completion estimates, contract costs include all direct material, labor and subcontracting costs and other direct costs related to contract performance. Indirect costs and general and administrative costs are charged to expense as incurred. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are first determined. Changes in job performance, job conditions and estimated profitability may result in revisions to costs and income and are recognized in the period in which the revisions are determined. An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

## CCI CONSTRUCTION COMPANY, INC.

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

1. Summary of significant accounting policies (continued):

*Revenue and cost recognition (continued):*

The asset, "Costs and estimated earnings in excess of billings on uncompleted contracts," represents revenues recognized in excess of amounts billed. The liability, "Billings in excess of costs and estimated earnings on uncompleted contracts," represents billings in excess of revenues recognized.

*Cash and cash equivalents:*

For purposes of reporting cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

*Marketable securities:*

Marketable securities are reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of stockholder's equity. Fair value of the marketable securities is based on quoted market prices for those or similar securities or quotes from brokers. Gains and losses are determined using the specific identification method when securities are sold.

*Property and equipment:*

Property and equipment are stated at cost. Depreciation is provided using straight-line and accelerated methods over the estimated useful lives of the assets.

*Change in presentation:*

During 1998, the Company adopted Statement of Financial Accounting Standards No. 130, Reporting Comprehensive Income (SFAS No. 130). SFAS No. 130 requires the reporting of comprehensive income in addition to net income from operations. Comprehensive income is a more inclusive financial reporting methodology that includes disclosure of certain financial information that historically has not been recognized in the calculation of net income. SFAS No. 130 requires that the earlier year provided for comparative purposes be reclassified to conform to the statement.

# CCI CONSTRUCTION COMPANY, INC.

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

2. **Cash and cash equivalents:**

Cash and cash equivalents consist of the following:

| | 1998 | 1997 |
|---|---|---|
| Cash | $ 374,464 | $ 451 |
| Money market funds | 1,035 | 403,714 |
| Repurchase agreements | 2,054,367 | 724,172 |
| | $ 2,429,866 | $ 1,128,337 |

At December 31, 1998, the amount of deposits in cash held at the bank exceeded the Federal Deposit Insurance Corporation (FDIC) insurance by $867,883. The money market funds and the repurchase agreements are not insured by the FDIC. The repurchase agreements sold by a bank were held in custody by this bank for the account of CCI Construction Company, Inc. and were invested in securities, which are not pledged as collateral.

3. **Marketable securities:**

The cost or amortized cost and the aggregate fair value of investments in the debt and equity securities at December 31, 1998 and 1997 are as follows:

| | 1998 | | |
|---|---|---|---|
| | Cost or amortized cost | Gross unrealized losses | Estimated fair value |
| Available-for-sale securities, mutual funds | $ 652,429 | $ 20,948 | $ 631,481 |

| | 1997 | | | |
|---|---|---|---|---|
| | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value |
| Available-for-sale securities: | | | | |
| Mutual funds | $ 3,386,480 | $ 16,845 | $ 253,465 | $ 3,623,100 |
| Obligations of states and political subdivisions | 80,004 | 112 | | 79,892 |
| | $ 3,466,484 | $ 16,957 | $ 253,465 | $ 3,702,992 |

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

3. Marketable securities (continued):

| | 1998 | 1997 |
|---|---|---|
| Cost of securities sold | $ 2,941,725 | $ 9,387,456 |
| Proceeds from sale | 3,202,652 | 9,381,163 |
| Gross realized gains | 262,391 | |
| Gross realized losses | 1,464 | 6,293 |

4. Uncompleted contracts:

| | 1998 | 1997 |
|---|---|---|
| Contract costs | $ 42,225,606 | $ 27,920,734 |
| Estimated earnings thereon | 3,130,223 | 1,638,199 |
| | 45,355,829 | 29,558,933 |
| Less billings applicable thereto | 39,302,311 | 29,168,576 |
| | $ 6,053,518 | $ 390,357 |
| Included in the balance sheet as: | | |
| Costs and estimated earnings in excess of billings on uncompleted contracts | $ 6,341,726 | $ 1,072,281 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | ( 288,208) | ( 681,924) |
| | $ 6,053,518 | $ 390,357 |

5. Long-term debt:

Long-term debt consists of the following:

| | 1998 |
|---|---|
| Obligations to various financing corporations due in current monthly installments totaling $116,074, including interest at fixed rates approximating 7%. The notes, which are secured by the financed equipment, mature at various dates through August 2003. | $ 3,964,581 |

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

5. Long-term debt (continued):

| | 1998 |
|---|---|
| Borrowings under a $2,000,000 bank equipment line of credit are secured by the financed equipment. The agreement requires the December 31, 1998 balance to be repaid by December 2003 in monthly installments of $30,238, including interest at a fixed rate of 6.7%. | $ 1,538,074 |
| Total long-term debt | 5,502,655 |
| Less current portion | 1,338,280 |
| Long-term debt portion | $ 4,164,375 |

Aggregate principal payments due on long-term debt for the five years subsequent to December 31, 1998 are as follows:

| | |
|---|---|
| 1999 | $ 1,338,280 |
| 2000 | 1,415,424 |
| 2001 | 1,242,569 |
| 2002 | 961,559 |
| 2003 | 544,823 |
| | $ 5,502,655 |

6. Operating line of credit:

The Company has available a $2,000,000 unsecured operating line of credit expiring on April 30, 1999 which requires interest at the bank's prime rate less 1/2%. The Company has no outstanding balance on the line at December 31, 1998.

7. Rent expense:

Various equipment and operating facilities are leased under noncancellable agreements. Total rent expense for all leases, including the related party lease discussed in Note 8, was $1,689,666 and $432,492 in 1998 and 1997, respectively.

The aggregate minimum rental commitments under all noncancellable leases at December 31, 1998 totaling $28,639 are due in 1999.

8. Related party transactions:

The Company is leasing an operating facility owned by its sole shareholder through March 31, 1999. The lease requires a monthly rental payment of $4,037. Rent expense for this facility was $48,444 and $45,000 for 1998 and 1997, respectively.

Effective April 1, 1999, the Company will begin leasing an operating facility from Mechanicsburg Land Company, which is owned by the Company's sole shareholder, on a year-to-year basis. The initial lease, which expires December 31, 1999, requires monthly lease payments of $14,329. Additionally, the Company entered into a contract for the construction of this facility with Mechanicsburg Land Company. Billings of $339,203 were included in accounts receivable as of December 31, 1998.

During 1997, the Company incurred warranty insurance expense of $825,000 with Pennsylvania Contractors Insurance Company, a corporation under common control. These costs are allocated as direct cost of contracts. There were no such costs in 1998.

During 1998, two insurance claims for contract losses incurred of $900,000 were paid by Pennsylvania Contractors Insurance Company. These claims were covered under the terms of a remedial work period insurance policy.

In addition, Pennsylvania Contractors Insurance Company has guaranteed a claim of $1,162,460 filed by the Company with a contract owner. If the owner fails to pay all or any part of this claim, the insurance company will pay the unpaid portion.

9. Income taxes:

No provision has been made for federal or state income taxes. Under provisions of the Internal Revenue Code and the Commonwealth of Pennsylvania Tax Act, the Company has elected not to be taxed as a corporation and the sole shareholder has consented to include the income in his individual return.

10. Year 2000 issues:

Like any other company, advances and changes in available technology can significantly affect the business and operations of the Company. A challenging problem exists as many computer systems worldwide do not have the capability of recognizing the year 2000 or years thereafter. No easy technology "quick fix" has yet been developed for this problem. While the Company has not requested verification of its year 2000 status from its auditors, it believes its computer systems will effectively deal with transactions in the year 2000 and beyond. This "Year 2000 Computer Problem" creates risk for the Company from unforeseen problems from third parties with whom the Company deals on financial transactions. Failures of the third parties' computer systems could have an impact to the Company's ability to conduct its business. The effect, if any, is unknown at this time.

# CCI CONSTRUCTION COMPANY, INC.

## COST OF CONTRACTS

## YEARS ENDED DECEMBER 31, 1998 AND 1997

| | 1998 | 1997 |
|---|---|---|
| Direct costs: | | |
| Labor | $ 6,457,982 | $ 2,886,054 |
| Payroll taxes | 702,129 | 335,936 |
| Employee benefits | 667,597 | 677,477 |
| Equipment | 111,207 | 41,373 |
| Equipment rental | 1,625,224 | 381,924 |
| Materials | 10,371,108 | 4,259,253 |
| Other | 1,745,316 | 1,679,129 |
| Subcontractors | 27,802,562 | 22,099,706 |
| | 49,483,125 | 32,360,852 |
| Indirect costs: | | |
| Salaries | 528,517 | 86,208 |
| Payroll taxes | 61,224 | 11,217 |
| Employee benefits | 70,560 | 8,324 |
| Blueprints | 163 | 6 |
| Depreciation | 687,512 | 95,723 |
| Dues and permits | 5,340 | 710 |
| Employee recruitment | 44,621 | 7,151 |
| Insurance | 4,486 | 716 |
| Office supplies and expense | 53,393 | 8,112 |
| Postage | 2,187 | 253 |
| Professional services | 37,338 | |
| Rent | 40,731 | 8,636 |
| Repairs and maintenance | 12,655 | 3,648 |
| Safety | 2,732 | 2,157 |
| Telephone | 28,926 | 11,802 |
| Temporary help | 7,591 | |
| Trade books and journals | 1,892 | 556 |
| Training and seminars | 8,303 | |
| Travel and entertainment | 10,290 | 728 |
| Utilities | 10,397 | 1,413 |
| Warehouse expenses | 43,399 | 9,261 |
| | 1,662,257 | 256,621 |
| Total cost of contracts | $ 51,145,382 | $ 32,617,473 |

## CCI CONSTRUCTION COMPANY, INC.

GENERAL AND ADMINISTRATIVE EXPENSES

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | 1998 | 1997 |
|---|---|---|
| Salaries: | | |
| Officers | $ 353,939 | $ 1,038,273 |
| Office | 480,807 | 410,023 |
| Payroll taxes | 60,247 | 73,399 |
| Employee: | | |
| Benefits | 53,857 | 33,722 |
| Recruitment | 4,379 | 2,237 |
| Advertising | 3,067 | 1,038 |
| Bad debt | 22,569 | |
| Bank charges | 5,111 | 3,667 |
| Blueprints | 17,551 | 13,507 |
| Company sponsored activities | 2,373 | 1,098 |
| Contributions | 14,220 | 3,030 |
| Depreciation | 105,502 | 60,781 |
| Dues | 16,335 | 8,058 |
| Insurance | 12,399 | 12,162 |
| Licenses and taxes | 44,559 | 44,270 |
| Miscellaneous | | 265 |
| Office supplies | 50,617 | 18,875 |
| Postage | 8,967 | 7,914 |
| Professional services | 109,543 | 95,337 |
| Rent | 23,711 | 33,744 |
| Repairs and maintenance | 6,555 | 7,689 |
| Telephone | 19,164 | 31,328 |
| Temporary help | 1,719 | |
| Trade books and journals | 24,222 | 22,995 |
| Training and seminars | 5,938 | 1,086 |
| Travel and entertainment | 30,687 | 5,948 |
| Utilities | 27,662 | 23,934 |
| Total general and administrative expenses | $ 1,505,700 | $ 1,954,380 |

# CCI CONSTRUCTION COMPANY, INC.

## EARNINGS FROM CONTRACTS

## YEAR ENDED DECEMBER 31, 1998

| | Revenues earned | Cost of revenues earned | | Gross profit (loss) |
|---|---|---|---|---|
| Contracts completed during the year | $ 13,541,950 | $ 13,969,824 | (a) | $( 427,874) |
| Contracts-in-progress at year-end | 38,721,607 | 35,389,315 | (a) | 3,332,292 |
| Construction management contracts | 83,777 | 20,444 | (a) | 63,333 |
| Time and material jobs | 187,119 | 103,542 | (a) | 83,577 |
| | 52,534,453 | 49,483,125 | | 3,051,328 |
| Indirect costs | | 1,662,257 | | ( 1,662,257) |
| | $ 52,534,453 | $ 51,145,382 | | $ 1,389,071 |

(a) Excludes indirect costs not allocated to specific jobs.

## CCI CONSTRUCTION COMPANY, INC.

COMPLETED CONTRACTS

YEAR ENDED DECEMBER 31, 1998

| Job number | Contract | Contract totals | | | Before January 1, 1998 | | | During the year ended December 31, 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs | Revenues earned | Cost of revenues earned | Gross profit before indirect costs | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs |
| 428 | U.E.P.H. Complex | $ 19,272,256 | $ 17,479,889 | $ 1,792,367 | $ 17,763,732 | $ 15,878,479 | $ 1,885,253 | $ 1,508,524 | $ 1,601,410 | $( 92,886) |
| 445 | Houtzdale Prison | 10,937,202 | 11,397,234 | ( 460,032) | 4,086,420 | 4,169,371 | ( 82,951) | 6,850,782 | 7,227,863 | ( 377,081) |
| 448 | Outlook Creekview | 4,800,644 | 4,655,443 | 145,201 | 554,419 | 521,254 | 33,165 | 4,246,225 | 4,134,189 | 112,036 |
| 449 | U.E.P.H. Headquarters | 1,456,558 | 1,521,701 | ( 65,143) | 520,139 | 515,339 | 4,800 | 936,419 | 1,006,362 | ( 69,943) |
| | | $ 36,466,660 | $ 35,054,267 | $ 1,412,393 | $ 22,924,710 | $ 21,084,443 | $ 1,840,267 | $ 13,541,950 | $ 13,969,824 | $(427,874) |

# CCI CONSTRUCTION COMPANY, INC.

## CONTRACTS-IN-PROGRESS

## DECEMBER 31, 1998

| | | | | | Inception to December 31, 1998 | | | December 31, 1998 | | Year ended December 31, 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (loss) before indirect costs | Direct contract costs to December 31, 1998 | Contract earnings (loss) accrued to December 31, 1998 before indirect costs | Billings to December 31, 1998 | Costs and estimated earnings in excess of billings | Billings in excess of costs and estimated earnings | Revenues earned | Direct cost of revenues earned | Gross profit (loss) before indirect costs |
| 439 | Mahanoy Prison | $ 11,699,418 | $ 10,667,972 | $ 1,031,446 | $ 10,666,808 | $ 1,031,333 | $ 10,461,740 | $ 1,216,401 | | $ 5,623,543 | $ 4,357,586 | $ 1,265,957 |
| 450 | Johnstown | 3,266,600 | 3,245,082 | 21,518 | 1,172,766 | 7,776 | 730,724 | 449,818 | | 1,064,029 | 1,057,305 | 6,724 |
| 451 | Lord Fairfax | 7,082,984 | 7,301,111 | ( 218,127) | 6,659,984 | ( 218,127) | 6,570,468 | | $ 128,611 | 5,998,746 | 6,248,376 | ( 249,630) |
| 454 | Albemarle Prison | 14,524,840 | 12,875,751 | 1,649,089 | 4,819,694 | 617,292 | 4,719,426 | 717,560 | | 5,436,986 | 4,819,694 | 617,292 |
| 455 | Perry Point | 12,937,341 | 11,463,840 | 1,473,501 | 4,734,492 | 608,547 | 3,108,536 | 2,234,503 | | 5,343,039 | 4,734,492 | 608,547 |
| 456 | Outlook - Hilliard | 5,380,745 | 4,801,310 | 579,435 | 2,715,193 | 327,677 | 2,732,602 | 310,268 | | 3,042,870 | 2,715,193 | 327,677 |
| 457 | Camp Hill | 1,495,629 | 1,372,273 | 123,356 | 547,295 | 49,197 | 617,799 | | 21,307 | 596,492 | 547,295 | 49,197 |
| 459 | Scott Air Force Base | 14,870,150 | 13,929,350 | 940,800 | 6,026,575 | 407,040 | 6,571,905 | | 138,290 | 6,433,615 | 6,026,575 | 407,040 |
| 460 | Germ Plasma Center | 15,565,000 | 14,667,024 | 897,976 | 2,905,995 | 177,917 | 2,252,156 | 831,756 | | 3,083,912 | 2,905,995 | 177,917 |
| 461 | Outlook - Chesterfield | 3,842,372 | 3,629,824 | 212,548 | 1,518,251 | 88,902 | 1,097,444 | 509,709 | | 1,607,153 | 1,518,251 | 88,902 |
| 462 | Outlook - Westerville | 5,589,900 | 5,218,140 | 371,760 | 458,553 | 32,669 | 419,511 | 71,711 | | 491,222 | 458,553 | 32,669 |
| | | $ 96,254,979 | $ 89,171,677 | $ 7,083,302 | $ 42,225,606 | $ 3,130,223 | $ 39,302,311 | $ 6,341,726 | $ 288,208 | $ 38,721,607 | $ 35,389,315 | $ 3,332,292 |

C 7643

allfirst
3607 Derry Street
Harrisburg, PA 17111
Special Credits 900-03-05
(717) 565-2878
(717) 565-2870 (Fax)

# facsimile transmittal

To: Eileen K. Fax: 507-3953

From: Lois Date: 3/1/00

Re: CCI Pages: 10 (Including Cover Page)

CC:

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

Notes:

1st fax 10 pgs. (partial)
2nd fax 13 pgs. (completed)

12: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET
12/31/99

PAGE 1
02-14-2000 14:07

| Acct | Description | | | |
|---|---|---|---|---|
| 1000 | A S S E T S | | | |
| 1002 | *CURRENT ASSETS* | | | |
| 1040 | CASH & INVESTMENTS | ( 594,857.26) | | |
| 1049 | TOTAL CASH & INVESTMENTS | | ( 594,857.26) | |
| 1050 | ACCOUNTS RECEIVABLE: | | | |
| 1100 | ACCOUNTS RECEIVABLE | 12,230,914.30 | | |
| 1110 | A/R RETAINAGE | 4,903,477.69 | | |
| 1140 | EMPLOYEE RECEIVABLE | 1,973.68 | | |
| 1141 | ACCOUNTS RECEIVABLE-ORTENZIO | 184.83 | | |
| 1156 | DUE FROM AFFILIATES | 2,197.66 | | |
| 1157 | TOTAL ACCOUNTS RECEIVABLE | | 17,138,748.16 | |
| 1167 | INVENTORY: | 54,384.97 | | |
| 1168 | INVENTORY | | 54,384.97 | |
| 1192 | OTHER CURRENT ASSETS | | 38,354.36 | |
| 1193 | COSTS & EARNINGS > BILLINGS | | 4,158,685.00 | |
| 1195 | TOTAL CURRENT ASSETS | | 20,795,315.23 | |
| 1196 | *LONG TERM ASSETS* | | | |
| 1200 | OFFICER LIFE INSURANCE POLICY | | 62,094.00 | |
| 1205 | NOTE RECEIVABLE - VEHICLE | | 24,621.53 | |
| 1300 | *FIXED ASSETS* | | | |
| 1301 | OFFICE FURNITURE AND FIXTURES | 1,040,346.51 | | |
| 1302 | MACHINERY AND EQUIPMENT | 1,181,976.51 | | |
| 1303 | AUTOS AND TRUCKS | 1,153,516.12 | | |
| 1304 | SMALL TOOLS | 317,193.27 | | |
| 1305 | SHOP/MECHANICAL EQUIPMENT | 347,101.45 | | |
| 1390 | TOTAL FIXED ASSETS | 4,126,849.39 | | |
| 1400 | ACCUMULATED DEPRECIATION/AMORT: | | | |
| 1401 | ACCUM DEPR - FURNITURE & FIXTURE | ( 716,766.60) | | |
| 1402 | ACCUM DEPR - MACH & EQUIP | ( 396,493.16) | | |
| 1403 | ACCUM DEPR - AUTO & TRUCK | ( 341,643.25) | | |
| 1404 | ACCUM DEPR - SMALL TOOLS | ( 162,519.74) | | |
| 1405 | ACCUM DEPR - SHOP/MECHANICAL | ( 160,079.00) | | |
| 1488 | TOTAL ACCUM DEPR/AMORT | ( 1,777,501.75) | | |
| 1490 | NET FIXED ASSETS | | 2,349,347.64 | |
| 1999 | TOTAL A S S E T S | | | 23,144,662.87 |

EXHIBIT
9
3/13/02

L-ROB
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET

| | | | | |
|---|---|---|---|---|
| 2000 | L I A B I L I T I E S | | | |
| 2005 | CURRENT LIABILITIES | | | |
| 2099 | ACCOUNTS PAYABLE: | | | |
| 2100 | ACCOUNTS PAYABLE | 2,951,006.31 | | |
| 2101 | SUBCONTRACTOR A/P | 6,130,086.78 | | |
| 2102 | A/P RETAINAGE | 3,764,423.64 | | |
| | | --------------- | | |
| 2120 | TOTAL ACCOUNTS PAYABLE | | 12,845,516.73 | |
| 2295 | ACCRUED PAYROLL TAXES | | 202,668.00 | |
| 2415 | OTHER CURRENT LIABILITIES | | 320,629.67 | |
| 2431 | NOTE PAYABLE-ALLFIRST LINE OF | 1,200,000.00 | | |
| 2450 | NOTES PAYABLE-CURRENT | | 3,782,351.64 | |
| 2480 | BILLINGS > COSTS & EARNINGS | | 4,402,180.00 | |
| | | | --------------- | |
| 2490 | TOTAL CURRENT LIABILITIES | | 22,753,346.04 | |
| 2870 | NOTES PAYABLE-LONG TERM | | 1,387,079.70 | |
| | | | --------------- | |
| 2990 | TOTAL L I A B I L I T I E S | | 24,140,425.74 | |
| 3000 | E Q U I T Y | | | |
| 3110 | CAPITAL SURPLUS | 9,797.00 | | |
| 3200 | RETAINED EARNINGS | 286,513.75 | | |
| 3210 | RETAINED EARNINGS SUB-S CORP | 4,343,092.86 | | |
| 3275 | OTHER ACCUMULATED ADJUSTMENTS | 480,647.00 | | |
| 3300 | CURRENT YEAR EARNINGS | ( 6,115,813.48) | | |
| | | --------------- | | |
| 3800 | TOTAL E Q U I T Y | | ( 995,762.87) | |
| | | | --------------- | |
| 3900 | TOTAL LIABILITIES AND EQUITY | | | 23,144,662.87 |
| | | | | =============== |

L-R08
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 1

PAGE 1
02-14-2000 14:07

| | | |
|---|---|---|
| 1003 | CASH: | |
| 1010 | CASH - DAUPHIN CHECKING | ( 573,734.41) |
| 1011 | CASH - DAUPHIN PAYROLL | ( 55,522.85) |
| 1013 | CASH - FLEX REIMBURSEMENT ACCT | 100.00 |
| 1016 | INVESTMENT IN EPIC | 3,000.00 |
| 1017 | INVESTMENT IN RAFFLES | 31,000.00 |
| 1020 | PETTY CASH | 300.00 |
| | | --------------- |
| 1040 | CASH & INVESTMENTS | ( 594,857.26) |
| | | --------------- |

C 7736

L-RD8
ATE: 13-00-1999
CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 2
PAGE
02-14-2000 14:(

| | | |
|---|---|---|
| 1158 | INVENTORY: | |
| 1160 | SHEET METAL SHOP INVENTORY | 54,384.97 |
| | | --------------- |
| 1167 | INVENTORY: | 54,384.97 |
| | | --------------- |

C 7737

L-R08
ATE: 13-30-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 3

PAGE
02-14-2000 14:0

| | | |
|---|---|---|
| 1150 | DUE FROM AFFILIATES | |
| 1153 | DUE TO/FROM CUSTODIAL | 376.20 |
| 1154 | DUE TO/FROM RELIANCE | ( 45.64) |
| 1155 | DUE TO/FROM MECH LAND CO | 1,867.10 |
| 1156 | DUE FROM AFFILIATES | 2,197.66 |
| | | --------------- |

L-R08
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 6

PAGE 6
02-14-2000 14:07

| | | | |
|---|---|---|---|
| 1169 | CURRENT ASSETS: | | |
| 1175 | PREPAID RENT | 2,015.28 | |
| 1176 | SECURITY DEPOSIT - CALIFORNIA | 2,015.28 | |
| 1185 | PREPAID TAXES | 25,100.00 | |
| 1190 | PREPAID GENERAL EXPENSES | 9,223.80 | |
| 1192 | OTHER CURRENT ASSETS | | 40,552.02 |

C 7739

L-ROB
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 50

PAGE 7
02-14-2000 14:07

| | | | |
|---|---|---|---|
| 2190 | ACCRUED PAYROLL TAXES: | | |
| 2200 | ACCRUED FED W/H | 57,394.00 | |
| 2210 | ACCRUED FICA W/H | 53,592.89 | |
| 2220 | ACCRUED FUTA | 4,877.66 | |
| 2222 | ACCRUED SUTA - CAL | 196.51 | |
| 2223 | ACCRUED STATE W/H - CAL | 6,607.92 | |
| 2225 | ACCRUED STATE W/H - PA | 2,570.83 | |
| 2226 | ACCRUED LOCAL W/H - PA | 4,817.40 | |
| 2227 | ACCRUED OPT W/H - PA | 1,110.00 | |
| 2228 | ACCRUED SUTA - PA | 21,787.09 | |
| 2232 | ACCRUED STATE W/H - DEL | 36.47 | |
| 2241 | ACCRUED SUTA - W VA. | 4,911.32 | |
| 2243 | ACCRUED STATE W/H - WEST VA | 5,547.10 | |
| 2248 | ACCRUED SUTA - MD | 3,071.83 | |
| 2249 | ACCRUED STATE W/H - MD | 9,728.80 | |
| 2250 | ACCRUED SUTA - MO | 161.13 | |
| 2251 | ACCRUED STATE W/H - MO | 1,341.00 | |
| 2256 | ACCRUED SUTA - OHIO | 520.00 | |
| 2258 | ACCRUED STATE W/H - OHIO | 485.40 | |
| 2275 | ACCRUED STATE W/H - VA | 14,773.69 | |
| 2276 | ACCRUED SUTA - VA | 3,282.40 | |
| 2281 | ACCRUED STATE W/H - ILLINOIS | 3,130.65 | |
| 2282 | ACCRUED SUTA - IL | 2,723.91 | |
| 2295 | ACCRUED PAYROLL TAXES | | 202,668.00 |

L-R08
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 60

PAGE 8
02-14-2000 14:07

| | | | |
|---|---|---|---|
| 2296 | OTHER CURRENT LIABILITIES | | |
| 2301 | ACCRUED WORKERS COMP | 190,594.18 | |
| 2307 | ACCRUED CAFETERIA DEDUCTIONS | ( 40,624.70) | |
| 2310 | ACCRUED PAYROLL | 130,079.77 | |
| 2311 | ACCRUED UNION FRINGE PAYABLE | 186.85 | |
| 2313 | ACCRUED FRINGE FUND ACCOUNT | 6,079.45 | |
| 2315 | ACCRUED 401(K) PLAN | 2,414.12 | |
| 2329 | ACCRUED ACCOUNTING FEES | 31,900.00 | |
| 2415 | OTHER CURRENT LIABILITIES | | 320,629.67 |

C 7741



JOHN M. ORTENZIO
DECEMBER 31, 1998
C 7957

Δ π EXHIBIT 18
Deponent Ortenzio
Date 2·11·02 Rptr. d/c
WWW.DEPOBOOK.COM



November 9, 1999

Mr. Craig Schwartz
Vice President
Allfirst Bank
3045 Market Street
Camp Hill, PA 17011

RE: Personal Financial Statement

Dear Craig:

Enclosed is my 1998 personal financial statement. This is sent to you as it relates to the commercial loan note dated November 8, 1999.

Sincerely,

John M. Ortenzio

Enclosure

CCI CONSTRUCTION CO. INC.

Mailing Address
P.O. Box 8800
Camp Hill, PA 17001-8800

Street Address
2500 Old Gettysburg Road
Camp Hill, PA 17011-7307
FAX: (717) 909-4220

***JOHN M. ORTENZIO***

***DECEMBER 31, 1998***

C 7959

BROWN SCHULT[Z]
SHERIDAN FRIT[Z]

John M. Ortenzio
Mechanicsburg, Pennsylvania

We have compiled the statement of financial condition of John M. Ortenzio as of December 31, 1998 in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. The statement of financial condition is intended to present the assets of John M. Ortenzio at estimated current values and his liabilities at estimated current amounts.

A compilation is limited to presenting in the form of a financial statement information that is the representation of the individual whose financial statement is presented. We have not audited or reviewed the statement of financial condition and, accordingly, do not express an opinion or other form of assurance on it.

John M. Ortenzio has elected to omit substantially all of the disclosures required by generally accepted accounting principles. If the omitted disclosures were included with the statement of financial condition, they might influence the users' conclusions about the financial condition of John M. Ortenzio. Accordingly, this statement of financial condition is not designed for those who are not informed about these matters.

Brown Schultz Sheridan & Fritz

June 14, 1999

CERTIFIED PUBLIC ACCOUNTANT[S]
AN[D]
BUSINESS ADVISOR[S]

A PROFESSIONAL CORPORATION

1011 MUMMA ROA[D]
WORMLEYSBURG, PA 1704[3]

PO BOX 6786[?]
HARRISBURG, PA 17106-786[?]
717-761-717[?]
PA: 800-294-736[?]
FAX: 717-737-665[?]

1725 OREGON PIK[E]
LANCASTER, PA 1760[?]
717-560-837[?]
PA: 800-294-736[?]
FAX: 717-560-871[?]

WEBSITE: WWW.BSSF.COM

***JOHN M. ORTENZIO***

STATEMENT OF FINANCIAL CONDITION

DECEMBER 31, 1998
(See accountants' compilation report)

ASSETS

| | |
|---|---|
| Cash | $ 308,100 |
| Investments: | |
| Marketable securities | 1,157,200 |
| Mutual funds | 1,910,300 |
| Salary savings plan | 156,600 |
| Partnerships: | |
| Investment | 811,400 |
| Real estate | 1,125,600 |
| Other | 137,900 |
| Corporations: | |
| Asset management | 19,100 |
| Construction | 5,257,600 |
| Finance | 105,000 |
| Insurance | 180,000 |
| Real estate ownership | 3,404,600 |
| Loans receivable: | |
| Real estate investment partnerships | 74,500 |
| Corporations | 2,483,600 |
| Corporate office building | 440,000 |
| Personal effects | 50,000 |
| Residences | 855,000 |
| Federal and state income tax refunds | 210,300 |
| | $ 18,686,800 |

LIABILITIES, ESTIMATED INCOME TAXES AND NET WORTH

| | |
|---|---|
| Liabilities: | |
| Divorce settlement agreement | $ 1,565,200 |
| Loan payable, individual | 502,400 |
| Mortgage payable | 230,700 |
| State and local income taxes payable | 25,500 |
| Estimated income taxes on the differences between estimated current values of assets and their tax bases | 536,900 |
| Net worth | 15,826,100 |
| | $ 18,686,800 |

C 7961

LAW OFFICES
GEBHARDT & SMITH LLP
NINTH FLOOR
THE WORLD TRADE CENTER
BALTIMORE, MARYLAND 21202-3064

BALTIMORE: (410) 752-5830
WASHINGTON: (301) 470-7468

FACSIMILE
(410) 385-5119

WRITER'S DIRECT DIAL NUMBER:

(410) 385-5100
Writer's E-Mail Address:
lgebh@gebsmith.com

Refer To File No. 18610

February 24, 2000

*Via Facsimile and Federal Express*
4027 1282 2404

CCI CONSTRUCTION CO., INC.
2500 Old Gettysburg Road
Camp Hill, Pennsylvania 17011-7307

Attn: John M. Ortenzio, President

RE: $4,000,000 Unsecured Revolving Line Of Credit and
$2,000,000 Secured Equipment Purchase Line of Credit
Extended By Allfirst Bank To CCI Construction Co., Inc.

Dear Mr. Ortenzio:

This firm represents Allfirst Bank ("Lender"), which has extended to CCI Construction Co., Inc. ("Borrower") (a) a revolving line of credit in the maximum principal amount of $4,000,000 pursuant to a FILM/Cash Solutions Promissory Note dated March 24, 1999 ("Film Note") and related documents, and (b) a secured equipment purchase line of credit in the stated principal amount of $2,000,000 pursuant to a Commercial Loan Note ("Commercial Note") and a Security Agreement, both dated November 20, 1998, and related documents. This letter is being sent at the specific request and direction of the Lender.

As a result of the occurrence of various events which are materially adverse to the financial condition of the Borrower, and as a further result of the insolvency of the Borrower, the Lender hereby declares a default under the Commercial Loan Note and under the Security Agreement. In consequence of this declaration of default under the equipment purchase line of credit, the Lender hereby accelerates and declares immediately due and payable all sums presently outstanding and owing under the equipment purchase line of credit.

As a result of the default under the equipment line of credit, the Borrower is, in turn, in default under the cross-default provisions of Section 11 of the FILM Promissory Note, and the Lender hereby declares the default. In consequence of this default the Bank hereby accelerates and demands immediate payment of all sums presently due and owing under the FILM Promissory Note.

Because of the default under the FILM Promissory Note and the Bank's acceleration and demand for immediate payment of the sums due thereunder no further sums will be advanced under the revolving line of credit evidenced by the FILM/Cash Solutions Promissory Note, **effective immediately**. Any checks or other payments items in transit will not be honored by the Lender.

The total sums presently due and outstanding under the equipment purchase line of credit and the revolving line of credit, respectively, are as follows:

| Equipment Purchase Line Of Credit | |
|---|---|
| Principal | $1,244,116.74 |
| Interest through February 23 2000 | $ 5,237.80 |
| Total | $ 1,249,354.54 |
| Interest per day thereafter: $231.54 | |

| Revolving Line Of Credit | |
|---|---|
| Principal | $2,601,514.01 |
| Interest through February 23, 2000 | $ 26,524.83 |
| Total | $2,628,038.84 |
| Interest per day thereafter: $596.18 | |

As previously stated, the Lender by this letter is demanding immediate payment in full of all sums due and owing to it by the Borrower under both loans. Unless full payment is made by the Borrower immediately upon receipt of this letter, all remedies available to the Lender under applicable law will be pursued without further notice to the Borrower, including the institution of judgment by confession and the enforcement of the Lender's security interest.

This letter is not intended to be a waiver of any rights, remedies, or recourse available to the Lender, nor an election of remedies arising as a result of the defaults or of any other default which may now or hereafter exist with respect to the revolving line of credit and the equipment line of credit. The collection of interest or acceptance of partial payments (that is, less than the total amount due in accordance with the terms of the debt instruments) by the Lender shall not constitute an extension of the maturity date of the revolving line of credit or equipment line of credit or a waiver of the Lender's acceleration of the indebtedness evidenced by the respective debt instruments or of any other rights under the loan documents.

Very truly yours,

Lawrence J. Gebhardt

LJG/dls

cc: Gerard L. Elias, SVP
- ALLFIRST BANK
Robert E. Chernicoff, Esquire
- CUNNINGHAM & CHERNICOFF, P.C.

S:\LJG\18610\Letters\CCI-01.wpd



Page: 1 Document Name: untitled

```
              S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:21   01/25
ASSOC 1       APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99      PAGE  1
CCI CONSTRU             LN TYPE 3   PYMT MODE 1   MAT DT 12/31/49
   EFF DT TR SEQ              PRINCIPAL                 INTEREST          LOAN BALANCE
  PROC DT AC FLD                                                          ORG TRAN AMT

_ 1025991 40 001            209,195.03                       .00          2,515,370.54
  1026991               DESC DATA: SWEEP                                           .00
                                          TIER 1 RT  7.75000
_ 1026991 30 001            622,471.59                       .00          1,892,898.95
  1027991 A             DESC DATA: SWEEP                                           .00
                                          TIER 1 RT  7.75000
_ 1027991 30 001             50,965.93                       .00          1,841,933.02
  1028991 A             DESC DATA: SWEEP                                           .00
                                          TIER 1 RT  7.75000
_ 1028991 40 001             56,282.54                       .00          1,898,215.56
  1029991               DESC DATA: SWEEP                                           .00
                                          TIER 1 RT  7.75000
_ 1029991 40 001            405,853.43                       .00          2,304,068.99
  1101991               DESC DATA: SWEEP                                           .00
                                          TIER 1 RT  7.75000
LS0392   This is the first page
CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> _____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:26 PM

C 7750



Page: 1 Document Name: untitled

```
            S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:47   01/25
ASSOC 1     APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99     PAGE  2
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ          PRINCIPAL             INTEREST        LOAN BALANCE
  PROC DT AC FLD                                                ORG TRAN AMT

_ 1101991 40 001         367,528.36                  .00        2,671,597.35
  1102991          DESC DATA:  SWEEP                                     .00
                                  TIER 1 RT  7.75000
_ 1102991 40 001         256,127.74                  .00        2,927,725.09
  1103991          DESC DATA:  SWEEP                                     .00
                                  TIER 1 RT  7.75000
_ 1103991 40 001         173,975.75                  .00        3,101,700.84
  1104991          DESC DATA:  SWEEP                                     .00
                                  TIER 1 RT  7.75000
_ 1104991 40 001          32,626.95                  .00        3,134,327.79
  1105991          DESC DATA:  SWEEP                                     .00
                                  TIER 1 RT  7.75000
_ 1105991 30 001         780,576.53                  .00        2,353,751.26
  1108991 A        DESC DATA:  SWEEP                                     .00
                                  TIER 1 RT  7.75000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> ____     PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:48 PM



Page: 1 Document Name: untitled

```
          S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:50   01/25
ASSOC 1   APPL CL   BANK 001   BRANCH 0001   PRODUCT DFLT   VIEW 99    PAGE  3
CCI CONSTRU         LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ          PRINCIPAL              INTEREST       LOAN BALANCE
  PROC DT AC FLD                                                ORG TRAN AMT

_ 1108991 30 001        1,188,933.15                  .00       1,164,818.11
  1109991 A          DESC DATA: SWEEP                                    .00
                                     TIER 1 RT  7.75000
_ 1109991 40 001          108,940.24                  .00       1,273,758.35
  1110991            DESC DATA: SWEEP                                    .00
                                     TIER 1 RT  7.75000
_ 1110991 30 001          129,802.94                  .00       1,143,955.41
  1112991 A          DESC DATA: SWEEP                                    .00
                                     TIER 1 RT  7.75000
_ 1112991 40 001          196,736.76                  .00       1,340,692.17
  1115991            DESC DATA: SWEEP                                    .00
                                     TIER 1 RT  7.75000
_ 1115991 40 001          849,262.36                  .00       2,189,954.53
  1116991            DESC DATA: SWEEP                                    .00
                                     TIER 1 RT  7.75000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> ____     PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:50 PM

Page: 1 Document Name: untitled

```
         S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:51   01/25
ASSOC 1   APPL CL   BANK 001    BRANCH 0001   PRODUCT DFLT   VIEW 99     PAGE  4
CCI CONSTRU         LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ           PRINCIPAL             INTEREST        LOAN BALANCE
  PROC DT AC FLD                                                 ORG TRAN AMT

_ 1116991 30 001                 .00            16,292.71        2,189,954.53
  1116991 R  *    DESC DATA:  *GEN*                                 16,292.71
  OP-ID CL806                          TIER 1 RT  8.00000
_ 1116991 30 002        1,370,572.38                  .00          819,382.15
  1117991 A       DESC DATA:  SWEEP                                       .00
                                       TIER 1 RT  8.00000
_ 1117991 40 001          354,173.19                  .00        1,173,555.34
  1118991         DESC DATA:  SWEEP                                       .00
                                       TIER 1 RT  8.00000
_ 1118991 40 001          690,400.77                  .00        1,863,956.11
  1119991         DESC DATA:  SWEEP                                       .00
                                       TIER 1 RT  8.00000
_ 1119991 40 001          341,496.49                  .00        2,205,452.60
  1122991         DESC DATA:  SWEEP                                       .00
                                       TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> _____     PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:52 PM

Page: 1 Document Name: untitled

```
          S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:53   01/25
ASSOC 1   APPL CL    BANK 001    BRANCH 0001   PRODUCT DFLT   VIEW 99     PAGE  5
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ            PRINCIPAL             INTEREST        LOAN BALANCE
  PROC DT AC FLD                                                  ORG TRAN AMT

_ 1122991 30 001           188,700.64                  .00        2,016,751.96
  1123991 A        DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000
_ 1123991 30 001           143,561.32                  .00        1,873,190.64
  1124991 A        DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000
_ 1124991 40 001           471,042.28                  .00        2,344,232.92
  1126991          DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000
_ 1126991 40 001           180,113.61                  .00        2,524,346.53
  1129991          DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000
_ 1129991 40 001           180,908.54                  .00        2,705,255.07
  1130991          DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> ____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:53 PM



Page: 1 Document Name: untitled

```
              S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:55   01/25
ASSOC 1       APPL CL     BANK 001    BRANCH 0001   PRODUCT DFLT   VIEW 99     PAGE  6
CCI CONSTRU             LN TYPE 3   PYMT MODE 1   MAT DT 12/31/49
   EFF DT TR SEQ                 PRINCIPAL              INTEREST          LOAN BALANCE
  PROC DT AC FLD                                                          ORG TRAN AMT

_ 1130991 30 001              134,260.11                    .00         2,570,994.96
  1201991 A            DESC DATA: SWEEP                                           .00
                                          TIER 1 RT   8.00000
_ 1201991 30 001              896,851.65                    .00         1,674,143.31
  1202991 A            DESC DATA: SWEEP                                           .00
                                          TIER 1 RT   8.00000
_ 1202991 40 001              505,192.27                    .00         2,179,335.58
  1203991              DESC DATA: SWEEP                                           .00
                                          TIER 1 RT   8.00000
_ 1203991 40 001              581,188.02                    .00         2,760,523.60
  1206991              DESC DATA: SWEEP                                           .00
                                          TIER 1 RT   8.00000
_ 1206991 30 001              505,758.62                    .00         2,254,764.98
  1207991 A            DESC DATA: SWEEP                                           .00
                                          TIER 1 RT   8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> ____     PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:55 PM

C 7755



Page: 1 Document Name: untitled

```
            S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:56   01/25
ASSOC 1     APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99     PAGE   7
CCI CONSTRU           LN TYPE 3   PYMT MODE 1   MAT DT 12/31/49
   EFF DT TR SEQ            PRINCIPAL              INTEREST          LOAN BALANCE
  PROC DT AC FLD                                                     ORG TRAN AMT

_ 1207991 40 001             209,754.70                   .00        2,464,519.68
  1208991             DESC DATA: SWEEP                                        .00
                                           TIER 1 RT  8.00000
_ 1208991 30 001           1,070,151.30                   .00        1,394,368.38
  1209991 A           DESC DATA: SWEEP                                        .00
                                           TIER 1 RT  8.00000
_ 1209991 40 001             306,514.11                   .00        1,700,882.49
  1210991             DESC DATA: SWEEP                                        .00
                                           TIER 1 RT  8.00000
_ 1210991 40 001             229,456.67                   .00        1,930,339.16
  1213991             DESC DATA: SWEEP                                        .00
                                           TIER 1 RT  8.00000
_ 1213991 40 001             329,951.79                   .00        2,260,290.95
  1214991             DESC DATA: SWEEP                                        .00
                                           TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> _____     PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:56 PM



```
           S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:59   01/25
ASSOC 1    APPL CL   BANK 001   BRANCH 0001   PRODUCT DFLT   VIEW 99     PAGE  8
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ             PRINCIPAL              INTEREST        LOAN BALANCE
  PROC DT AC FLD                                                    ORG TRAN AMT

_ 1214991 30 001            435,792.55                   .00        1,824,498.40
  1215991 A        DESC DATA: SWEEP                                          .00
                                        TIER 1 RT  8.00000
_ 1215991 30 001            457,495.47                   .00        1,367,002.93
  1216991 A        DESC DATA: SWEEP                                          .00
                                        TIER 1 RT  8.00000
_ 1216991 30 001             18,602.79                   .00        1,348,400.14
  1217991 A        DESC DATA: SWEEP                                          .00
                                        TIER 1 RT  8.00000
_ 1217991 30 001                   .00             13,571.16        1,348,400.14
  1217991 R  *     DESC DATA:  *GEN*                                   13,571.16
  OP-ID CL806                           TIER 1 RT  8.00000
_ 1217991 40 001            317,523.59                   .00        1,665,923.73
  1220991          DESC DATA: SWEEP                                          .00
                                        TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> _____    PF05=S120 10=STLN* 11=POLN 12=STPS
```



Page: 1 Document Name: untitled

```
          S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:01   01/25
ASSOC 1   APPL CL   BANK 001   BRANCH 0001   PRODUCT DFLT   VIEW 99    PAGE  9
CCI CONSTRU         LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ           PRINCIPAL            INTEREST        LOAN BALANCE
  PROC DT AC FLD                                                ORG TRAN AMT

_ 1220991 30 001          492,689.35                 .00        1,173,234.38
  1221991 A        DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000
_ 1221991 30 001          107,765.04                 .00        1,065,469.34
  1222991 A        DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000
_ 1222991 30 001          458,328.87                 .00          607,140.47
  1223991 A        DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000
_ 1223991 40 001           98,268.22                 .00          705,408.69
  1224991          DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000
_ 1224991 40 001           42,984.27                 .00          748,392.96
  1227991          DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> _____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:01 PM

Page: 1 Document Name: untitled

```
          S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:02    01/25
ASSOC 1   APPL CL    BANK 001    BRANCH 0001   PRODUCT DFLT   VIEW 99     PAGE 10
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ            PRINCIPAL             INTEREST
  PROC DT AC FLD                                                LOAN BALANCE
                                                                ORG TRAN AMT

_ 1227991 40 001           177,867.20                   .00        926,260.16
  1228991          DESC DATA: SWEEP                                       .00
                                         TIER 1 RT  8.00000
_ 1228991 40 001           341,296.32                   .00      1,267,556.48
  1229991          DESC DATA: SWEEP                                       .00
                                         TIER 1 RT  8.00000
_ 1229991 40 001           359,920.73                   .00      1,627,477.21
  1230991          DESC DATA: SWEEP                                       .00
                                         TIER 1 RT  8.00000
_ 1230991 40 001           837,607.65                   .00      2,465,084.86
  1231991          DESC DATA: SWEEP                                       .00
                                         TIER 1 RT  8.00000
_ 1231991 40 001           827,466.59                   .00      3,292,551.45
  0101002          DESC DATA: SWEEP                                       .00
                                         TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> _____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:02 PM



Page: 1 Document Name: untitled

```
            S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:04   01/25
ASSOC 1     APPL CL   BANK 001    BRANCH 0001   PRODUCT DFLT   VIEW 99    PAGE 11
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ          PRINCIPAL            INTEREST        LOAN BALANCE
  PROC DT AC FLD                                               ORG TRAN AMT

_ 0103002 30 001          222,668.84                  .00       3,069,882.61
  0104002 A         DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000
_ 0104002 40 001          175,919.79                  .00       3,245,802.40
  0105002           DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000
_ 0105002 30 001          745,764.65                  .00       2,500,037.75
  0106002 A         DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000
_ 0106002 40 001          128,879.43                  .00       2,628,917.18
  0107002           DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000
_ 0107002 40 001           79,496.30                  .00       2,708,413.48
  0110002           DESC DATA: SWEEP                                      .00
                                   TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> ____     PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:05 PM

C 7760



Page: 1 Document Name: untitled

```
          S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:11    01/25
ASSOC 1   APPL CL    BANK 001    BRANCH 0001   PRODUCT DFLT   VIEW 99    PAGE 12
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ            PRINCIPAL              INTEREST          LOAN BALANCE
  PROC DT AC FLD                                                     ORG TRAN AMT

_ 0110002 30 001              326,855.59                  .00        2,381,557.89
  0111002 A        DESC DATA: SWEEP                                           .00
                                     TIER 1 RT  8.00000
_ 0111002 30 001              159,724.87                  .00        2,221,833.02
  0112002 A        DESC DATA: SWEEP                                           .00
                                     TIER 1 RT  8.00000
_ 0112002 40 001              174,539.78                  .00        2,396,372.80
  0113002          DESC DATA: SWEEP                                           .00
                                     TIER 1 RT  8.00000
_ 0113002 30 001                     .00            11,452.37        2,396,372.80
  0114002    *     DESC DATA:  *GEN*                                    11,452.37
  OP-ID COMNJB                       TIER 1 RT  8.00000
_ 0113002 30 002            1,291,625.30                  .00        1,104,747.50
  0114002 A        DESC DATA: SWEEP                                           .00
                                     TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> _____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:14 PM

C 7761

Page: 1 Document Name: untitled

```
          S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:15    01/25
ASSOC 1   APPL CL   BANK 001   BRANCH 0001   PRODUCT DFLT   VIEW 99    PAGE 13
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ          PRINCIPAL              INTEREST        LOAN BALANCE
  PROC DT AC FLD                                                 ORG TRAN AMT

_ 0114002 40 001          287,001.48                    .00      1,391,748.98
  0118002          DESC DATA: SWEEP                                       .00
                                     TIER 1 RT  8.00000
_ 0118002 30 001          105,191.73                    .00      1,286,557.25
  0119002 A        DESC DATA: SWEEP                                       .00
                                     TIER 1 RT  8.00000
_ 0119002 40 001          534,258.91                    .00      1,820,816.16
  0120002          DESC DATA: SWEEP                                       .00
                                     TIER 1 RT  8.00000
_ 0120002 40 001        1,108,904.84                    .00      2,929,721.00
  0121002          DESC DATA: SWEEP                                       .00
                                     TIER 1 RT  8.00000
_ 0121002 30 001          139,954.17                    .00      2,789,766.83
  0124002 A        DESC DATA: SWEEP                                       .00
                                     TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> _____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:15 PM



Page: 1 Document Name: untitled

```
          S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:16   01/25
ASSOC 1   APPL CL   BANK 001   BRANCH 0001   PRODUCT DFLT   VIEW 99   PAGE 14
CCI CONSTRU        LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ           PRINCIPAL            INTEREST        LOAN BALANCE
  PROC DT AC FLD                                                ORG TRAN AMT

_ 0124002 30 001          500,940.36                 .00        2,288,826.47
  0125002 A        DESC DATA: SWEEP                                      .00
                                     TIER 1 RT  8.00000
_ 0125002 30 001          183,635.66                 .00        2,105,190.81
  0126002 A        DESC DATA: SWEEP                                      .00
                                     TIER 1 RT  8.00000
_ 0126002 40 001           54,989.47                 .00        2,160,180.28
  0127002          DESC DATA: SWEEP                                      .00
                                     TIER 1 RT  8.00000
_ 0127002 40 001          351,614.19                 .00        2,511,794.47
  0128002          DESC DATA: SWEEP                                      .00
                                     TIER 1 RT  8.00000
_ 0128002 40 001           39,844.75                 .00        2,551,639.22
  0131002          DESC DATA: SWEEP                                      .00
                                     TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ___
====> _____   PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:17 PM



Page: 1 Document Name: untitled

```
              S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:18   01/25
ASSOC 1       APPL CL     BANK 001     BRANCH 0001    PRODUCT DFLT   VIEW 99    PAGE 15
CCI CONSTRU              LN TYPE 3   PYMT MODE 1   MAT DT 12/31/49
   EFF DT TR SEQ              PRINCIPAL                INTEREST          LOAN BALANCE
  PROC DT AC FLD                                                         ORG TRAN AMT

_ 0131002 30 001            270,953.77                      .00          2,280,685.45
  0201002 A           DESC DATA: SWEEP                                            .00
                                        TIER 1 RT  8.00000
_ 0201002 30 001          1,833,640.45                      .00            447,045.00
  0202002 A           DESC DATA: SWEEP                                            .00
                                        TIER 1 RT  8.00000
_ 0202002 40 001          1,148,974.12                      .00          1,596,019.12
  0203002             DESC DATA: SWEEP                                            .00
                                        TIER 1 RT  8.00000
_ 0203002 30 001            572,299.55                      .00          1,023,719.57
  0204002 A           DESC DATA: SWEEP                                            .00
                                        TIER 1 RT  8.25000
_ 0204002 30 001            109,375.10                      .00            914,344.47
  0207002 A           DESC DATA: SWEEP                                            .00
                                        TIER 1 RT  8.25000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> ____     PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:19 PM



Page: 1 Document Name: untitled

```
           S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 15:52:39   01/25
ASSOC 1    APPL CL    BANK 001    BRANCH 0001   PRODUCT DFLT   VIEW 99    PAGE 17
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ            PRINCIPAL            INTEREST         LOAN BALANCE
  PROC DT AC FLD                                                  ORG TRAN AMT

_ 0204002 30 001          109,375.10                   .00          914,344.47
  0207002 A         DESC DATA: SWEEP                                       .00
                                      TIER 1 RT  8.25000
_ 0207002 40 001          399,049.51                   .00        1,313,393.98
  0208002           DESC DATA: SWEEP                                       .00
                                      TIER 1 RT  8.25000
_ 0208002 30 001          217,078.14                   .00        1,096,315.84
  0209002 A         DESC DATA: SWEEP                                       .00
                                      TIER 1 RT  8.25000
_ 0209002 40 001          103,619.93                   .00        1,199,935.77
  0210002           DESC DATA: SWEEP                                       .00
                                      TIER 1 RT  8.25000
_ 0210002 40 001           32,392.97                   .00        1,232,328.74
  0211002           DESC DATA: SWEEP                                       .00
                                      TIER 1 RT  8.25000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE ** DATE 0000000 PAGE ___
====> _____    PF05=S121 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 03:51:44 PM



Page: 1 Document Name: untitled

```
           S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 15:52:50   01/25
ASSOC 1    APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT   VIEW 99     PAGE 18
CCI CONSTRU           LN TYPE 3   PYMT MODE 1   MAT DT 12/31/49
   EFF DT TR SEQ             PRINCIPAL               INTEREST        LOAN BALANCE
  PROC DT AC FLD                                                     ORG TRAN AMT

_ 0211002 40 001         1,301,826.10                     .00        2,534,154.84
  0214002              DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  8.25000
_ 0214002 40 001            22,133.21                     .00        2,556,288.05
  0215002              DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  8.25000
_ 0215002 30 001           242,960.14                     .00        2,313,327.91
  0216002 A            DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  8.25000
_ 0216002 30 001            62,060.29                     .00        2,251,267.62
  0217002 A            DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  8.25000
_ 0217002 40 001           152,360.75                     .00        2,403,628.37
  0218002              DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  8.25000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE ** DATE 0000000 PAGE ___
====> _____    PF05=S121 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 03:51:51 PM



Page: 1 Document Name: untitled

```
              S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 15:52:53    01/25
ASSOC 1    APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT   VIEW 99     PAGE 19
CCI CONSTRU             LN TYPE 3   PYMT MODE 1   MAT DT 12/31/49
   EFF DT TR SEQ              PRINCIPAL              INTEREST        LOAN BALANCE
  PROC DT AC FLD                                                     ORG TRAN AMT

_ 0218002 40 001             197,885.64                   .00        2,601,514.01
  0222002              DESC DATA:  SWEEP                                       .00
                                           TIER 1 RT   8.25000
_ 0222002 30 001                    .00             16,658.76        2,601,514.01
  0223002    *         DESC DATA:   *GEN*                               16,658.76
  OP-ID COMNJB                             TIER 1 RT   8.25000
_ 0222002 30 002             510,840.84                   .00        2,090,673.17
  0223002 A            DESC DATA:  SWEEP                                       .00
                                           TIER 1 RT   8.25000
_ 0224002 30 001             638,911.65                   .00        1,451,761.52
  0225002 A            DESC DATA:                                              .00
  OP-ID COMJKP                             TIER 1 RT   8.25000
_ 0225002 29 001                    .00                   .00        1,451,761.52
  0225002     209      CHNG DATA: 902240015186
                                           TIER 1 RT   8.25000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE ** DATE 0000000 PAGE ___
====> ____      PF05=S121 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 03:51:56 PM



Page: 1 Document Name: untitled

```
              S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 15:52:57   01/25
 ASSOC 1      APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99      PAGE 20
 CCI CONSTRU             LN TYPE 3   PYMT MODE 1   MAT DT 12/31/49
    EFF DT TR SEQ             PRINCIPAL              INTEREST           LOAN BALANCE
   PROC DT AC FLD                                                       ORG TRAN AMT

 _ 0225002 30 001        1,167,539.00                     .00          284,222.52
   0228002 A          DESC DATA:                                              .00
   OP-ID COMJKP                         TIER 1 RT  8.25000
 _ 0306002 29 001                 .00                     .00          284,222.52
   0306002     107    CHNG DATA: 07003
   OP-ID COMMJR                         TIER 1 RT  8.25000
 _ 0316002 29 001                 .00                     .00          284,222.52
   0316002     209    CHNG DATA: 003130007003
                                        TIER 1 RT  8.25000
 _ 0322002 28 001                 .00                     .00          284,222.52
   0322002            CHNG DATA: N/A-60 11/13 LOAN SWEEP INT
   OP-ID COMDCS                         TIER 1 RT  8.25000
 _ 0322002 29 001                 .00                     .00          284,222.52
   0322002     033    CHNG DATA: 1
   OP-ID COMDCS                         TIER 1 RT  8.25000

 CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE ** DATE 0000000 PAGE ____
 ====> _____     PF05=S121 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 03:51:59 PM

**CCI Construction Co., Inc.**
2500 Old Gettysburg Road
Camp Hill, PA 17011-7307
---------------------
Phone Number: (717) 909-4224

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED AND FIRST CLASS MAIL**
C.M.R.R.R. Receipt Number: Z 345 508 393

February 22, 2000

Albemarle-Charlottesville Regional Jail Authority
401 McIntire Road, Room 211
Charlottesville, VA 22902

| RE: | Principal: | CCI/Ortenzio Company, Inc. |
|---|---|---|
| | Bond No.: | 26-0120-12995-98-7 |
| | Obligee/Owner: | Albermarle-Charlottesville Regional Jail Authority |
| | Description of Project: | Albermarle-Charlottesville Regional Jail |

Dear Sir/Madam:

CCI/Ortenzio Company, Inc., hereby irrevocably requests that all payments due or to become due on account of the above-referenced project due CCI/Ortenzio Company, Inc. be forwarded to United States Fidelity and Guaranty Company d/b/a St. Paul Surety, ATTN: Matthew L. Silverstein, P.O. Box 1138, Baltimore, MD 21203-1138, which company is surety on Performance and Labor and Material Payment bonds given in connection with the aforesaid project.

There will be no modification or change in these instructions without the written authorization and consent of United States Fidelity and Guaranty Company d/b/a St. Paul Surety.

Very truly yours,

CCI/Ortenzio Company, Inc.

By: [signature]
John M. Ortenzio, President

cc: United States Fidelity and Guaranty Company, PO Box 1138, Baltimore, MD 21203-1138 Attention: Matthew L. Silverstein

Δ π EXHIBIT 27
Deponent Ortenzio
Date 2/1/02 Rptr. d/c
WWW.DEPOBOOK.COM

C 7712

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK | * | |
| Plaintiff, | * | |
| v. | * | CASE NO.: 1:01-CV-786 |
| JOHN M. ORTENZIO | * | |
| Defendant. | * | |

*************************************************************

**AFFIDAVIT OF GERARD L. ELIAS**

Gerard L. Elias deposes and states as follows:

1. I am a Senior Vice President of Allfirst Bank ("Allfirst") and head the Special Credits Division of Allfirst. I have been in the Special Credits Division of Allfirst and its predecessor, The First National Bank of Maryland, for approximately eighteen (18) years and have headed the Special Credits Division for approximately ten (10) years.

2. Because of the nature of my duties for Allfirst, I have become familiar with loan documentation of all kinds, types, and varieties, both as used at Allfirst and as used by other banking institutions. I am familiar with banking custom and practice with respect to loan documentation.

3. Based upon my knowledge and experience in banking and with respect to loan documentation, I believe it would be highly unusual for a loan document, such as a promissory note, to contain a restriction on the source of funds used to repay it. Typically, loan documents contain restrictions on the use of loan proceeds and purposes for which loan proceeds may be used. They do not restrict sources of repayment.

4. Consistent with banking custom and practice, it would be typical for documents evidencing a line of credit to contain a restriction on the use of the proceeds of the line of credit, such as occurred with respect to CCI's $4,000,000 line of credit. This line of credit restricted its usage for the purpose of financing accounts receivable and work in process in accordance with the terms of the commitment letter.

5. Conversely, it would be highly unusual in banking custom and practice for a promissory note, such as that evidencing the $1,200,000 short-term loan, to contain a provision stating that the promissory note could not be paid from a particular source, such as the proceeds from a line of credit.

Gerard L. Elias

**OATH**

The undersigned swears under the penalties of perjury that the matters and facts set forth above are true and correct.

Gerard L. Elias

LAW OFFICES
GEBHARDT & SMITH LLP
NINTH FLOOR
THE WORLD TRADE CENTER
BALTIMORE, MARYLAND 21202-3064

BALTIMORE: (410) 752-5830
WASHINGTON: (301) 470-7468

FACSIMILE
(410) 385-5119

WRITER'S DIRECT DIAL NUMBER:

410) 385-5100
E-Mail Address:
Lgebh@gebsmith.com

May 6, 2002

***By Hand Delivery***

Gerard L. Elias, Sr. Vice President
Allfirst Bank
Special Credits Division, 101-515
25 South Charles Street, 14th Floor
Baltimore, MD 21201

*RE: Allfirst Bank v. Ortenzio*
*Our File No.: 19527*

Dear Gerry:

Enclosed is a draft Affidavit for your review. If it appears in order, please give me a call and we will have someone pick it up after you've signed. If you would like to make any revisions, please let me know.

Very truly yours,

Lawrence J. Gebhardt

LJG/cjl
Enclosure

cc: Jamin M. Gibson, Vice President *(By facsimile, w/encl.)*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

ALLFIRST BANK, :
Plaintiff :
:
vs. :
:
JOHN M. ORTENZIO, :
Defendant : NO. 1:01-CV-786

- - -

February 11, 2002

- - -

Oral Deposition of JOHN M. ORTENZIO, taken pursuant to notice, was held at Cunningham and Chernicoff, 2320 North 2nd Street, Harrisburg, Pennsylvania 17110, beginning at 1:40 p.m., on the above date, before Donna L. Crossan, an Approved Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
15th Floor
1880 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
(215) 988-9191

STIPULATION

It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing, sealing, certification, and filing are waived and that all objections, except as to the form of the question, be reserved until the time of trial.

- - -

JOHN M. ORTENZIO, after having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. GEBHARDT:

Q Mr. Ortenzio, prior to the filing by CCI Construction of its Chapter 11 bankruptcy petition in May of 2000, what was your position with the company?

A President.

Q Were you also a shareholder?

A Yes.

Q Were you also a member of the Board of Directors?

A Yes.

Q Were there any other members of the Board of Directors?

A No, I don't believe so.

Q How long had you been president of CCI Construction?

A Since its inception.

Q Which was what year?

A Somewhere in 1986, '87.

Q And I take it you were the sole shareholder for the entire period of time?

A Yes.

Q Were you the sole director for the entire period of time?

A Yes.

Q In the year 2000, would you describe what your duties consisted of as president of CCI?

A 2000, I was the president of the company, so, therefore, responsible for the -- ultimately responsible for the company itself.

Q Your day-to-day activities consisted of what kind of tasks?

A Day-to-day my activities in 2000 were, I would say, primarily the more strategic planning of the company, or related more so to that as opposed to -- well, to the strategic planning, overall goals of the company from a wor[k] standpoint.

Q So you were not directly involved in the day-to-day tasks of the company?

A Meaning?

Q Well, meaning such things as bidding the jobs or seeing that there were adequate employees on hand, that sort of thing?

A With respect to bidding the jobs, I reviewed the strategies for the bids prior to any bids being submitted, had meetings with individuals in the company to discuss the -- what the type of job, I'll say what the strategy was in terms of obtaining a job, what the nature of the job was, type of work.

Q Would that type of activity, the strategy activity have been consistent with other functions or areas of the company's operation, and for instance, hiring people, deciding what lines of business you were going to go in?

MR. BURKE: Are you still on

2000?

MR. GEBHARDT: Yes.

A As far as hiring individuals, if they were -- somebody was going to be in management, I would review the resume. Depending on the position, I might meet with them. Prior to that I would have had a meeting to determine whether or not we had the need for that position, whether replacing somebody or a new position.

BY MR. GEBHARDT:

Q Were your duties for CCI, as you described for the year 2000, consistent over the term of the corporation's existence?

A Starting from when?

Q When it was first created in 1986, 1987.

A No.

Q Describe how they may have changed over the years.

A When the company started there was only myself, probably one other employee to start with and by the time 2000 came around, it was probably myself and probably a couple hundred individuals.

A I don't remember seeing anything from the bank.

Q Where did you expect the funds to come from to repay AllFirst in the 90 days that you anticipated the $1.2 million loan to be outstanding at the end of that time?

A Accounts receivable.

Q Collections from the normal course of business?

A Yes, or from the sale of equipment or whatever was occurring in that 90 days that would have put money into our account.

Q Did you anticipate the $4 million line of credit to have been paid to a zero balance at that time?

A At what time?

Q At the time the money came in to pay the million two.

A I don't believe there was any contemplation -- in other words, it would be a zero balance?

Q Right.

A Or, in other words -- no, I think the understanding from the bank was that that was

a revolving line and that would function as it always had, fluctuate up and down. In fact, I made it clear at the signing of the note that that $1.2 million note would be paid prior to any time frame, whether it be a renewal.

Q The $4 million line of credit commitment letter carried through April 30th and the one million two carried through March 31, so there was a disparity in dates, but did you have any discussions of whether the line of credit would or would not be brought to a zero balance before the million two was repaid or not?

A There was no specific requirement the bank placed on me.

Q I didn't ask you that. I asked you whether you had discussions with anyone from the bank on that topic.

A You need to be more specific, I guess. Just general discussions?

Q Yes. In the course of getting the million two, when you were discussing that, did you have any discussions about whether at the time you repaid the million two, you should have a zero balance on the $4 million revolving line of

credit?

A No.

Q Just not discussed?

A The only discussed part was, as I indicated, was the discussion that they understood that would be paid off within 90 days and that was going to be ahead of any payments on the $4 million line.

Q So, hypothetically, if the $4 million line had a $2 million outstanding balance and a customer sent in a $1.2 million of accounts or payables on CCI's billings, you expected to use the $1.2 million coming in from the customer to pay off the million two loan and just leave the million dollar balance where it was?

MR. BURKE: Could you repeat that question?

BY MR. GEBHARDT:

Q Let me rephrase it.

Hypothetically, would it have been your understanding if we assume the $2 million outstanding on the line of credit and $1.2 million had come into CCI from a customer, that you could use that $1.2 million to pay off the

$1.2 million loan, without first reducing the $1.2 million loan, without first reducing the $2 million hypothetically outstanding under the line of credit?

MR. BURKE: Objection to form.

A If I chose to, sure. I believe that was my understanding and I believe that was the understanding that the bank had.

BY MR. GEBHARDT:

Q On February 11, 2000, the $1.2 million loan was repaid. Correct?

A Yes.

Q Who made the decision to make that payment to the bank on February 11, 2000?

A I did.

Q Did you consult with anyone else in the company about making that payment at that time?

A As I recall, there were discussions that I had reviewing the cash flow situation, where things were on the projects, with the company, and at the end of the discussion or those meetings or review or whatever, I decided that it would be best to pay that note off.

and I said fine, I would come over to see him.
Q So you just said, I'm coming by?
A I said I'm coming over, I wanted to meet with him and leave my message, and it was to pay the November note, pay it off.
Q You did --
A I don't recall, unfortunately, whether I spoke to him directly or to his assistant, but in either event, I said the same thing to either one, that I was coming over to see him, and that's when I went to the bank.
Q You told them you were coming to pay off the million two loan?
A I believe so. I said I was coming to see him to pay off the note we had in November.
Q When you got there, Mr. Schwartz, as you said, was not present?
A No, he was not.
Q So you never met with him on the day that you delivered the check?
A Now, I waited for awhile. I think the woman there said he would be returning or she thought he would be returning from a

meeting shortly, so I waited.
Q How long did you wait?
A Half hour, 40 minutes maybe, maybe along those lines.
Q And you didn't take the check with you when you left, though?
A Well, I started to, but the woman there asked if she could help me. I told her why I was there and she said if I wanted to, she could take care of it.
Q So you gave her the check?
A Yes, I gave her the check.
Q And told her which loan it was paying off?
A I said it was paying a loan off. I think she looked it up in her system and asked me if I wanted a receipt and I said sure, took a receipt, left a message for Craig to call me when he got back. She apologized that he wasn't there or he must have left the meeting and gone to lunch or something to that effect, but he was still expected back that day.
Q So solely because the lady asked to help you is the reason you left the check?

A I believe so. She ask me if she could help me and I told her why I was there and she said she could take care of that if I wanted.
Q In practical effect there would have been no difference in making the payment on that Friday as opposed to the next Monday?
MR. BURKE: What's the question?
A Is there a question?
- - -
(Whereupon the pertinent testimony was read by the court reporter.)
- - -
MR. BURKE: Object to the form. I don't believe that's a question.
A Probably not, no.
BY MR. GEBHARDT:
Q When you requested the check, you understood that writing that check would result in a draw upon the $4 million line of credit?
A It may or may not have.
Q Did you know that writing the check would result in a draw on the $4 million line of credit?
A Well, depending on how the bank

was accounting for, that could have been the case.
Q You knew at the time the check was written that CCI had an outstanding balance on the line of credit, didn't you?
A I think, yes.
Q And you knew that writing that check would increase the outstanding balance on the line of credit?
MR. BURKE: Objection, asked and answered. You can answer it again.
A Well, do you want to ask the question again or repeat it?
- - -
(Whereupon the pertinent testimony was read by the court reporter.)
- - -
A That would depend on whether or not there were funds still sitting in our account that would not have been swept by the bank and their cash management system. So to the extent there were funds prior to that, then I guess there would have been a zero impact.
BY MR. GEBHARDT:
Q But you didn't know that.

MR. BURKE: Didn't know what?
BY MR. GEBHARDT:
Q Whether there were any deposits that had been made that day?
A That were sitting in our account?
Q Yes.
A I know funds had recently come in, so I believe there were funds sitting in the account, but I couldn't tell you how much.
Q Did you verify what the outstanding balance was or what the deposits had been?
A I verified what our overall balance was.
Q So then you knew that writing that check would constitute a draw on the line of credit?
A No.
MR. BURKE: Objection, asked and answered. You can answer again.
A It would have drawn a line of credit only to the extent that the funds had possibly been swept by the cash management system.
BY MR. GEBHARDT:

Q What time did you go into AllFirst, in the afternoon, after lunch, wasn't it?
A Late morning, early afternoon, somewhere in that time frame.
Q Before you left, you would have verified the status of the account that had the line of credit facility?
A Either that or the night before.
Q And based on the information that you had available to you at the time you wrote the check, you were of the belief that writing that check would require a draw on the line of credit?
MR. BURKE: Objection for the fourth time to the extent that question has been asked and answered. I'll let my client answer it one more time.
A Depending on whether or not funds had been moved from our account into the cash management system, then there would have been no impact on the line. To the extent that there was, then there would have been an impact theoretically on the line.
BY MR. GEBHARDT:

Q I understand that, how it works. What I'm asking you, your personal belief, at the time you wrote the check based on your inquiry a to the status of the account and so on, your understanding was that writing that check would require a draw on the line of credit?
MR. BURKE: I object and I am going to ask the court reporter to read back the previous instances where that question has been asked and answered.
MR. GEBHARDT: The question stands as it is. You have a question pending, phrased differently and he can answer this particular question as to his personal understanding of the account status.
MR. BURKE: Read back the last question, please.
- - -
(Whereupon the pertinent testimony was read by the court reporter.)
- - -
MR. BURKE: Objection again. This answer has been asked five times of this witness and apparently counsel keeps asking the

same question with the hopes of a different answer. I'll let the witness answer the question again.
MR. GEBHARDT: Let me phrase it correctly because the witness has not yet answered the question.
BY MR. GEBHARDT:
Q You indicated you verified the status of the account and the line before you wrote the check. Right?
A I verified that funds had come into the company from various sources.
Q What funds?
A Off projects, sale of equipment.
Q You knew the amount of funds that had come in?
A We had taken in some large deposits. Our deposits had increased as we had projected them to do so.
Q Did you quantify what those deposits were before you wrote the check?
A Yes. I knew generally the dollar amount that we recently had taken in over the course of the previous couple of days, even that

day.

Q It was your view at the time you wrote that check that writing that check would not require a draw on the line of credit?

MR. BURKE: Objection, asked and answered. Answer it again.

A To the extent that funds had not been swept out of our account by the cash management system, there would have been no impact to the line. To the extent that there was a difference, then by use of the cash management system, funds would have been taken from that.

BY MR. GEBHARDT:

Q The question still remains, I understand to the extent there were collections, to the extent there was this, this is how it would work. My question to you still is, when you wrote the check and handed it in to AllFirst, did you believe that you were making a borrowing on behalf of CCI under the line of credit or did you think that were sufficient deposits to cover the payment, you personally at the time you wrote it?

MR. BURKE: Objection, asked and answered.

BY MR. GEBHARDT:

Q I understand what could have occurred and might have occurred and different things, but what did you think was the situation when you wrote the check and handed it in?

MR. BURKE: Same objection. Go ahead.

A I thought or believed that there were some funds still in our account that had not been swept because there hadn't been time. Those funds were available. That in the tally of it, we had funds available to pay this note off. And so I instructed the check was to be drawn. Whether or not there was impact on the bank's records on the line of credit or not, I can't say. You have to go over the bank's records and see what, if any, impact there would have been.

Q In fact, CCI had not collected the cash that it had anticipated collecting when the $1.2 million was borrowed, isn't that true?

MR. BURKE: Objection to form. You can answer.

A Say that again.

- - -

(Whereupon the pertinent testimony was read by the court reporter.)

- - -

A Rephrase that, collected the money.

BY MR. GEBHARDT:

Q CCI's cash flow problems had increased as of February 2000 beyond what they were in November of 1999, isn't that true?

A No, I don't believe that to be the case.

Q Isn't it a fact that CCI over the next five months, counting from February, was anticipating substantial cash flow shortfalls?

MR. BURKE: What time frame?

MR. GEBHARDT: Five-month period counting from February of 2000.

MR. BURKE: No, the time frame is when did CCI anticipate?

MR. GEBHARDT: From February.

A You have to give me the time frame to which to refer to, the date of February 11th?

BY MR. GEBHARDT:

Q February 11th, you knew that CCI was having cash flow problems on February 11th, didn't you?

MR. BURKE: Objection to form. You can answer.

A I knew that CCI had cash flow problems, issues when I talked to the bank in November, which we clearly told them about. And I would have to say by February 11th, it appeared as though cash flow problems had improved somewhat, but we still had some issues.

BY MR. GEBHARDT:

Q You're saying you thought that CCI's cash flow position had improved as of February 11, 2000 beyond what they were in November of 1999?

A Well, I would have to look at the report, whatever cash report we may have had in November, and compare it to a cash flow report we might have gotten at the end of January or February, and I could more specifically tell you.

Q I'm not asking for the specific numbers. I'm asking whether at the time you wrote the check, was it your understanding that CCI had

a cash flow problem that was worse than it had in November when the money was borrowed?

A No, I don't believe it was worse.

Q You thought it was better?

A Well, I think it had improved somewhat.

Q And by somewhat, what do you mean?

A By problem, what do you mean?

Q By problem, I mean not having sufficient money to operate the company.

A Well, we had enough money to operate the company at that point, so I guess by your definition we didn't have a problem.

Q You understood that over the succeeding months CCI was not going to have sufficient funds to operate, didn't you?

A On what date?

Q As of February 11th.

A Not necessarily. I knew that we had not necessarily cleared all of our problems, but the problem you're saying, we didn't have enough money to operate, clearly wasn't the case on February the 11th.

Q We've established you made the payment on behalf of CCI on February 11, 2000. And I think it's also without dispute there was a meeting held in which you attended and there were representatives of AllFirst on February the 18th. Does February the 18th accord with your recollection?

A On February 18th, I asked for a meeting with Mr. Schwartz and Mr. -- well, Mr. Schwartz, probably.

Q And there was a meeting that actually was held on February the 18th. Correct?

A Yes.

Q That was a Friday?

A Okay.

MR. BURKE: Do you know if it was a Friday or not?

BY MR. GEBHARDT:

Q If you need a calendar, we can get one. Was it a Friday?

A Was it a Friday?

Q Yes.

A Okay.

Q You called Mr. Schwartz to ask

for the meeting?

A As I recall.

Q Let's assume, and I'll represent to you that February 17th was a Friday and, of course, February 11th was then a Friday, when di you call Mr. Schwartz to set the meeting up?

MR. BURKE: February 17th was a Friday or February 18th was a Friday?

MR. GEBHARDT: February 18th is a Friday and February 11th is a Friday and the meeting was February the 18th.

BY MR. GEBHARDT:

Q My question is: You had payment on a Friday and a meeting the succeeding Friday. When did you call Mr. Schwartz to set up the meeting of February the 18th?

A I think I called the morning of the 18th.

Q The morning?

A I think.

Q So the meeting was in the afternoon?

A I believe so, yes.

Q Now, when you attended that

meeting, who was present?

A Well, let's see, the meeting was supposed to be with Mr. Schwartz and Mr. Zarcone, but also in attendance were about five to six other people from the bank, plus two people on the speaker phone.

Q I can represent to you that those were Mr. Elias and Mr. Gibson.

A On the phone?

Q On the phone, yes. You saw Mr. Schwartz there and you saw Mr. Zarcone there?

A Yes.

Q And the other people who may have been there you don't recollect?

A Mr. Meyers, Mr. Trout, two or three others.

Q Now, did you ask for all these people to be in attendance?

A No.

Q Do you have any understanding of why all these people attended the meeting?

A No.

Q You called up Mr. Schwartz to say I would like to meet with you this afternoon and

your testimony that you did not meet with the bank on February 18, 2000, to discuss the terms of the revolving line of credit or its renewal or the loan documents pertaining to it, that was not your intention when you set the meeting up?

A That's correct.

Q But you nevertheless, based on the recommendation of your normal counsel, Eckert Seaman's, the day before the meeting, met with Mr. Chernicoff and at Mr. Chernicoff's suggestion had Mr. Chernicoff accompany you to the meeting with the bank?

MR. BURKE: Objection to the mischaracterization of the prior testimony.

BY MR. GEBHARDT:

Q Is that what happened?

A The conclusion of my meeting here at Cunningham Chernicoff, I got ready to leave, Mr. Chernicoff, I had shown him the documents, acquired as to where I was going, I told him where I was going and why I was going there and he suggested -- asked if I was going by myself and I said yes and he suggested, if I wanted it might be good for him to tag along or come along. That was

it. So after thinking about it, I said there is no harm to be done, and I said fine.

Q You knew prior to walking into the meeting with the bank that CCI was going to suffer substantial cash flow shortages over the next five to six months?

MR. BURKE: Objection to form. You can answer.

A I had received a recent cash flow -- worst case cash flow scenario which showed that we were going to have more serious cash flow problems in the future months and I took that information that I had received, I think I probably received it that morning.

BY MR. GEBHARDT:

Q This was Friday morning also?

A I think it was either Friday morning or the end of the day Thursday. Received the information, worst case scenario, but all the same it was still a scenario and it was -- I felt the need to inform the bank.

Q Tell them you needed more cash at that time?

A Basically a projection we were

going to need more cash.

Q And had to come from the bank or bonding company?

A I didn't ask the bank for it.

Q Did you tell Mr. Schwartz that you expected CCI to have sustained a $6 million loss for 1999?

A At the meeting or phone conversation?

Q Well, let's talk about the phone conversation prior to the meeting.

A I don't think so. I don't think I went into too many facts with Mr. Schwartz. I told him we were having some problems, I think. I told him we were going to have significant loss, certainly a loss for 1999, since we were unable to -- depending on whether he was able to recognize a claim, but I didn't go into too much detail because I wanted to meet with him face to says.

- - -

(Whereupon the document was marked for identification as Exhibit Number 25.)

- - -

BY MR. GEBHARDT:

Q I've handed you Deposition Exhibit 25 which I will represent to you are notes taken by Mr. Jamin Gibson, the first page being notes he made after the initial call to him from Mr. Schwartz advising of the meeting and the second page of notes and thereafter from the meeting and times after the meeting. You'll notice on the first page somewhere down around the middle there's a reference to a $6 million loss for the year. My question would be, you had never spoken to Mr. Gibson prior to February 18th?

A That's correct.

Q And if these are notes of Mr. Gibson's conversation with Mr. Schwartz setting up the meeting, the $6 million figure would have had to come from someplace. Isn't that right?

MR. BURKE: I'm going object to the form of the question and the use of this document. Are you asking --

BY MR. GEBHARDT:

Q I'm asking if it refreshes your recollection as to whether you may have divulged to Mr. Schwartz in setting up the meeting that you

expected CCI's 1999 financial statements to show a $6 million loss.

A I don't believe in the phone conversation that I represented to Craig Schwartz any loss figures for 1999. At the meeting that I had I believe I showed him the cash flow projection that showed a $6 million cash flow shortfall somewhere in the course of the year 2000. Also the $6 million loss, we had already, I guess, somewhat indicated in November that we were looking at possibly a $2 million loss for 1999.

Q Did CCI sustain a $6 million operating loss for the fiscal year 1999?

A I don't believe so.

Q Apart from the cash flow statement, did you hand out any other statements at the meeting?

A Which meeting are you talking about?

Q February 18th.

A No.

Q Let me ask you, if you would, to look at Deposition Exhibits 22 and 23. Can you identify these documents?

A One is a balance sheet and one is an income statement.

Q And 22 would be the income statement and 23 the balance sheet?

A Yes.

Q Of CCI?

A Yes.

Q And these are company internally generated statements?

A Yes, they are.

Q Did you provide these to AllFirst on February 18th?

MR. BURKE: You, meaning CCI or Mr. Ortenzio?

MR. GEBHARDT: Mr. Ortenzio was there as a representative of CCI.

BY MR. GEBHARDT:

Q Did you provide these during the meeting?

A I don't believe so. I think the only thing that I provided was the cash flow statement. I believe that there were financial documents sent to them the beginning of the following week, but at the meeting there I don't

think I gave them anything other than what I had, which was the cash flow statement.

Q But you do believe that at least after the Friday meeting that you would have sent the income statement and balance sheet that are Exhibits 22 and 23 to AllFirst?

A There were financial statements sent from -- I directed the CFO to send them whatever current financial information we had the beginning of the following week. So quite possibly these may have been contained in that.

Q Would you look at the second page of Deposition Exhibit 22? Would you agree that this financial statement shows a net loss after taxes of $6,115,813.48?

A That's what it shows.

Q This would be for the annual year 1999, and actually it's for a 13-month period ending January. So it's a 13-month statement rather than a 12-month statement?

A That is what it says at the bottom.

Q Is that a correct number?

A I couldn't say.

Q Well, did CCI sustain an operating loss in the magnitude of $6 million for the year 1999?

A I don't know.

Q Well, you don't think they made a profit, do you?

MR. BURKE: The question was: Did they lose 6 million?

MR. GEBHARDT: Yes. I said in the magnitude of 6 million. If you want to say 5 million 9 or 6 million 1.

BY MR. GEBHARDT:

Q Did CCI sustain a loss somewhere in the magnitude of the $6 million indicated?

MR. BURKE: Do you know?

A I know we would have sustained a loss. Whether it was in the amount of $6 million, I couldn't say.

BY MR. GEBHARDT:

Q Was it greater than 3 million?

A I really don't know. We never got a chance to really complete our first quarter financials.

Q Do you have any reason to believe

# Craig J. Schwartz

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK :
Plaintiff :
v. : CA NO. 1:CV-01-0786
JOHN M. ORTENZIO :
Defendant : Pages 1 - 216

-----------

Deposition of Craig J. Schwartz
Baltimore, Maryland
Friday, February 15, 2002

Reported by: Kathleen R. Turk, RPR-RMR

Page 2

February 15, 2002
10:17 a.m.

Deposition of Craig J. Schwartz held at the offices of:

Blank, Rome, Comisky & McCauley, L.L.P.
250 West Pratt Street
Eleventh Floor
Baltimore, MD 21201

Pursuant to notice, before Kathleen R. Turk, RPR-RMR, a Notary Public of the State of Maryland.

Page 3

APPEARANCES:

Gebhardt & Smith, L.L.P.
For the Plaintiff ALLFIRST BANK
The World Trade Center
401 East Pratt Street
Ninth Floor
Baltimore, MD 21202
(410) 385-5100
BY: Lawrence J. Gebhardt, Esq.

Blank, Rome, Comisky & McCauley, L.L.P.
For the Defendant JOHN M. ORTENZIO
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5641
BY: Edward I. Swichar, Esq.

Also Present:
John M. Ortenzio

Page 4

CONTENTS

| EXAMINATION OF CRAIG J. SCHWARTZ BY: | PAGE: |
|---|---|
| MR. SWICHAR: | 6 |
| MR. GEBHARDT: | 175 |
| MR. SWICHAR: | 192 |
| MR. GEBHARDT: | 207 |
| MR. SWICHAR: | 210 |

EXHIBITS

| SCHWARTZ DEPOSITION EXHIBITS: | PAGE: |
|---|---|
| 1 Commercial Loan Note Line of Credit | 6 |
| 2 Complaint | 6 |
| 3 Fax to Nord from Gibson, 2/14/01 | 6 |
| 4 PA Commercial Loan Writeup | 6 |
| 5 Memo to File from Schwartz, 11/4/99 | 6 |
| 6 Discussion Outline, 11/2/99 | 6 |
| 7 Commercial Loan Note Line of Credit | 6 |
| 8 Letter to Ortenzio from Schwartz, 11/5/99 | 6 |
| 9 Accumulated Tran List | 6 |
| 10 Memo to Gibson from Schwartz, 3/3/00 | 6 |
| 11 Borrower Rating Summary | 6 |

ESQUIRE™ DEPOSITION SERVICES

# Craig J. Schwartz

Q Was there any discussion whether this was going to be a short-term or a long-term facility?
A Short-term, I believe.
Q What is short-term in relation to long-term? Make sure we're on the same wavelength.
A Short-term would be less than a year.
Q Okay. Were any documents presented to you by CCI in connection with your granting the 1.2 million dollar loan facility?
A Yes, I believe they were.
Q What documents were provided to you and relied upon?
A I don't specifically recall exactly what documents were, were given.
Q No -- no general idea as to what documents were provided?
A Financial statements, current financial statements of the customer.
There may have been others.
Q Do you recall that, or are you just assuming it?

A I can recall that, financial statements.
Q Anything else?
A No.
Q Okay. Is the 1.2 million dollar note a bank form?
A Yes.
Q You'll notice that there are, again, some certain strikeouts, for example, at the bottom of the first page, and there are some inserts in the first and third paragraphs of Page 2.
Do you recall how they came about, sir?
A There was some question by Mr. Ortenzio that -- apparently, he didn't like the language in the notes.
Q And who approved the changes?
A I did.
Q You did?
A Yes.
Q Did you need authority of anyone?
A I should have had authority, yes.
Q Okay. Why don't you look at Schwartz 3 --

I'm sorry -- Schwartz, Schwartz 4 -- I just have a question on Schwartz 3.
Let me show you Schwartz 3. Let me know when you are finished looking at it.
(Witness reading.)
Q I have a very simple question, Mr. Schwartz. If you want to read the whole thing, feel free to.
(Witness reading.)
A Okay.
Q Based on the documents that have been produced, that have been produced by the bank, Schwartz 3 appears to be the latest cash management agreement that was signed by CCI.
Do you have any reason to state otherwise?
MR. GEBHARDT: Objection.
I think that misstates the record. If you look at the note that's in the Complaint on Exhibit -- which is Exhibit A to the Complaint, you'll see a description of the cash management system in effect with that, and that's six years, or five years after this note.

MR. SWICHAR: Okay.
Q (By Mr. Swichar) This, then, appears to be the original cash management note, except this may be modified or superseded by anything in any of the notes signed by CCI; is that correct?
MR. SWICHAR: I appreciate your correction.
A Yes.
Q (By Mr. Swichar) Okay. I show you what's been marked for identification as Exhibit Schwartz 4. Take a minute and look at it.
(Witness reading.)
A Okay.
Q Now, according to the last page, this -- this Exhibit S-4 reflects that the 1.2 million dollar note was approved not only by you but by Messrs. Myers and Zarcone; is that correct?
A That's correct.
Q So you did have some approval authority along with the others?
A No, I signed this because I have to.



# Craig J. Schwartz

Q Okay. Where was cash flow to be deposited at the bank?
A Cash flow could have been deposited -- they could have deposited it anyplace they wanted to, didn't necessarily have to be at the bank.
Q Well, there are loan documents that say all business deposits are to be deposited in the checking account --
A Okay.
Q -- is that correct?
A I don't know.
Q Well, we can review that, but there are documents --
MR. GEBHARDT: Maybe you'd like to point out where it says --
MR. SWICHAR: Sure.
MR. GEBHARDT: -- that it has to be deposited in the checking account.
MR. SWICHAR: It says primary deposits will be deposited in the bank.
MR. GEBHARDT: Primary is not --

MR. SWICHAR: I know.
MR. GEBHARDT: The word primary doesn't mean exclusive, and I understand what was done and how it was done and it said primary, but you're interpreting -- you made a representation that the bank's documents said they couldn't have an account anywhere but the bank, and I don't think there's anything that says that.
MR. SWICHAR: Well, let's find the exact language so there's no confusion about that.
Do you know off the top of your head where it is?
MR. GEBHARDT: No, but I'm sure it says primary, not exclusive.
MR. SWICHAR: Okay. It says the primary business deposits will be deposited in the bank's checking account; is that fair, Mr. Gebhardt?
MR. GEBHARDT: I think they've indicated that the primary accounts for CCI shall be maintained at the bank.
MR. SWICHAR: Okay.

Q (By Mr. Swichar) Where were the bank's profits to be deposited, as far as you're concerned?
MR. GEBHARDT: The bank's profits?
A The bank's?
Q CCI's profits, to be deposited, as far as you're concerned.
A In their deposit account.
Q Okay. And where was revenues from cash flow to be deposited from CCI?
In the bank's checking account as well?
A Yes.
Q Okay. Did you ever have any specific discussions, if you recall, with Mr. Ortenzio as to when and how the 1.2 million dollar note would be repaid?
A I believe there was a letter indicating when it had to be paid by.
Q Okay. Anything else?
A Not that I can recall.
Q I think we're going to come to the letter. I think there's a commitment letter, we'll come to

that.
Did you ever monitor CCI's use of the 1.2 million dollar loan funds?
A No.
Q I show you what has been marked for identification as Exhibit Schwartz 6.
A Okay.
Q Do you recall how this document came about?
Was it prepared by you?
A Yes.
Q How did it come about?
Why was this document prepared?
A This was a result of a meeting with CCI, that they were going to need additional funds because of cash flow shortages.
Q Was this -- was this S-6 preceded by the 1.2 million dollar note, which is dated six days later?
A Yes.
Q Okay. Was it initially contemplated by the bank that the four million dollar line of credit would

A Yes.
Q Have you turned that over to Mr. Gebhardt or someone else in connection with this lawsuit?
A Yes.
MR. SWICHAR: Can I assume it's been turned over, Larry?
MR. GEBHARDT: You have it all.
MR. SWICHAR: That's all I want to hear, that's fine.
I mean, the way the documents came, it was very difficult what came with what.
MR. GEBHARDT: I mean, we, we went through this, and we went through it with Judge Rambo.
MR. SWICHAR: I'm just asking if we got it, that's all. That's fine.
MR. GEBHARDT: I said we made those representations and told you all many times --
MR. SWICHAR: If you told me I have his personal desk file, then that's good enough for me.
Q (By Mr. Swichar) Would you look at the Complaint?

Do you have that there, S-2?
Just -- did you review this Complaint before it was filed?
A I'm not sure. I don't recall if I did or if I didn't.
Q Did you review it in connection with this deposition?
A Yes.
Q Okay. Would you look at -- just so I can clarify things again -- would you look at Paragraph 7?
And, again, my question is, just so I understand the mechanism of the cash management facility, that any checks written from CCI's account with the bank would increase the four million dollar line of credit borrowings; is that correct?
A Yes.
Q And so far as you know, CCI had no business accounts elsewhere?
A As far as I know, they did not.
Q Okay. If -- if CCI wanted to pay a bill

from the accounts receivable that it collects from the account at Allfirst without drawing on the four million dollar line of credit, how could it do that, if it could at all?
A One more time, please.
Q All right. I'm CCI and I want to pay a bill. I collect my money from the customer, I put it in the account, and I want to pay another bill -- I want to pay a bill, but I don't want it to draw on the line of credit, four million dollar line of credit.
How -- could I do that?
A I don't think so.
Q Is there any document in this world that prohibits CCI specifically from repaying the 1.2 million dollar note by drawing on the four million dollar line of credit?
A Is there a document that prohibits them?
Q Yes, specifically.
A Yes, I believe so.
Q That prohibits specifically -- is there a specific prohibition?

And if there is, we'll find it.
MR. GEBHARDT: You've been provided it.
MR. SWICHAR: Pardon me?
MR. GEBHARDT: You've been provided it.
A I believe it states what the line of credit can be used for, and that is not a use of a line of credit.
Q (By Mr. Swichar) All right. Is there any document that deals with how the, how the loan is to be repaid specifically?
A No.
Q Okay. Is there any document that specifically states it cannot be repaid by writing a check on CCI's business account, checking account?
THE WITNESS: Could you read that back?
(Question was read by the Reporter.)
A Not specifically.
Q (By Mr. Swichar) Okay. Now, the loan commitment, which I think you've been chomping at the bit to want to tell me, states that the loan proceeds were to be used to finance accounts receivable and

# Craig J. Schwartz

Page 149

1.2 million dollars. I said, okay, fine.
I was out on other business, when, when he came in and presented the payment. I was told about it when I got back. And --
Q What were you told?
A That Mr. Ortenzio came in and paid off the 1.2 million dollar loan.
Q Okay. What happened next?
Did you take any action of any kind?
A Not that I recall.
Q Well, at a certain point, you returned the note to him, correct?
A No, I did not.
I returned his surety.
Q Okay. You --
A He was -- yes.
Q Okay. You returned the surety, and we'll come to that in a minute.
Where did you think the -- what funds did you think were being used to pay off the 1.2, or you didn't think about it?

Page 150

A I don't recall thinking about it.
Q Okay. Frankly, you didn't care.
A I didn't say that.
Q I'm asking.
A Sure, I cared.
Q Well, but you didn't ask, did you --
A No.
Q -- the source of the funds?
A No.
Q But you cared?
A Yes.
Q Why did you care?
A In hopes that their cash flow situation was back where they said it was going to be at that point; it was going to be great, we didn't have a big problem to worry about, and things were going well for them.
Q But you never cared enough to call Mr. Ortenzio to find out the source of the funds?
A I did not call Mr. Ortenzio.
Q All right. I don't think -- I think we talked about the loan commitment letter, but I don't

Page 151

think we marked it, so I just want to confirm that Schwartz 12 is the -- what I'll call the loan commitment letter because I know you like that letter.
Let's look at it, and at least tell me that that is, indeed, the loan commitment letter.
A This is a commitment letter for the four million dollar line of credit.
Q Okay, that's all.
Would you look at Exhibit S-13, which is your letter to Mr. Ortenzio at CCI dated February 15, 2000?
A Yes.
Q How did you determine that the 1.2 million dollar loan had been paid in full as of February 11?
A I looked on the computer.
Q And what did the computer show?
A A zero balance.
Q Okay. Did that computer screen deal only with the 1.2, or would it have looked at, more specifically, at the cash management account, the checking account, the four million dollar line of

Page 152

credit, et cetera, et cetera?
A Just the 1.2.
Q Okay. But you had the other means of checking to see what the availability was and the balance was of the four million?
A I had the means.
Q You chose not to go into that?
A I don't recall if I did or if I didn't.
Q Is it possible you did?
A I don't recall.
Q You don't recall either way?
A Correct.
Q Okay. Was this mailed or hand-delivered, S-13?
A I don't recall.
Q Did you ever inquire the source of payment?
A No.
Q Okay. Now, when Mr. Ortenzio on behalf of CCI wrote a check and repaid the 1.2 million dollar note, he was acting on behalf of CCI as an officer; is that correct?

# Craig J. Schwartz

Q And do you recollect whether under the terms of the line of credit CCI was required to have the line of credit at a zero balance for thirty consecutive days in a twelve-month period?

MR. SWICHAR: Could I hear that back?

(Question was read by the Reporter.)

MR. SWICHAR: I don't understand the question, but if your own witness does, fine.

And if there is a document, why don't you just show it to him?

MR. GEBHARDT: Actually, I will withdraw the question because the March 23rd, 1999, commitment does not have that as a requirement, but the preceding one did.

So we're operating under what's been designated Schwartz 12, so I will withdraw the question.

Q (By Mr. Gebhardt) Now, turning to Schwartz Exhibit 12, which is the commitment letter for the four million dollar revolving line of credit, what were the proceeds of draws on the line of credit to be

used to do?

A Finance work in process and accounts receivable.

Q Is repaying in full any fully funded loan or credit facility an authorized use of loan proceeds?

MR. SWICHAR: I object to the form of the question.

Q You may answer.

THE WITNESS: Read it back, please.

(Question was read by the Reporter.)

MR. SWICHAR: I object to the form, particularly the word authorized.

A No.

Q (By Mr. Gebhardt) Okay. Now, what exactly are accounts receivable?

A Payments from customers of the borrower for services rendered.

Q Okay. And this line of credit was intended to provide CCI with --

MR. SWICHAR: Are you just leading him down?

I'm just objecting.

MR. GEBHARDT: Then object.

Q (By Mr. Gebhardt) The line of credit was intended to permit CCI to have funds available pending the receipt of payment from customers on the accounts receivable?

A Yes.

Q You were asked some questions relating to the payment of the monthly installments on the two million dollar equipment term loan.

Do you recollect those?

A Yes.

Q And I think your testimony was that they were made through the use of the revolving, four million dollar revolving line of credit, right?

A Yes.

MR. SWICHAR: No, I don't think he said that.

I think he said the repayments were made either through checks or automatic, and then we went to the next step, which was the impact of it.

Q Was making the monthly installments of principal and interest on the equipment term loan an authorized use of the four million dollar revolving line of credit?

A Yes.

Q Why is that?

A Because a term loan is to be repaid, of course, over a period of time, monthly, and through profits of the company, and those profits are a part of the receivables that they come in. So that line is used because that -- the profits are in -- a part of the accounts receivable, and the line gets paid down that way.

(Gerard L. Elias entered the conference room.)

Q Had there been no term loan from CCI -- no -- excuse me, let me rephrase that.

Assume there had been no four million dollar line of credit, what would the source of payment have been for CCI to repay the monthly installments of principal and interest on the two million dollar

equipment loan?

MR. SWICHAR: Objection as to form.

A Excess cash flow.

Q Where would that come from?

A The collection of accounts receivable.

Q Okay. Now, when the 1.2 million dollar loan was paid off on February 11, 2000, with a draw on the four million dollar revolving line of credit, I believe the testimony has been that a check was delivered by Mr. Ortenzio to make that payment.

Does that accord with your recollection?

A Yes.

Q Was that payment delivered directly to you?

A No.

Q Were you at any time ever told by anyone at or about February 11, 2000, that that check represented a draw on the four million dollar revolving line of credit?

A No.

Q Had you known on or about February 11, 2000, that the check presented by Mr. Ortenzio on behalf of

CCI represented a draw on the four million dollar revolving line of credit, what action, if any, would you have taken?

A I would have not honored the check.

Q If Mr. Ortenzio had called you prior to bringing the check in and expressly stated that he intended to pay the 1.2 million dollar loan with a draw on the four million dollar revolving line of credit, what would your response to Mr. Ortenzio have been?

MR. SWICHAR: Objection to form.

A No, don't bother, or why are you paying it off with the line?

Q Now, when the --

MR. SWICHAR: Do you want the answer to that?

Q When the 1.2 million dollar line of credit -- excuse me -- when the 1.2 million dollar loan was discussed, what did Mr. Ortenzio tell you was the reason CCI needed that advance of funds?

A They needed the money to keep operating

because the cash flow situation of the company was in a depo -- disposition.

Q Did Mr. Ortenzio express at all how long he believed that cash flow problem would continue?

A I believe some cash flow projections given to us indicated February, through the end of February.

Q And from what source based on your discussions with Mr. Ortenzio in November of 1999 did you anticipate the 1.2 million dollar loan being repaid?

A Excess cash flow.

Q Okay. And based on Mr. Ortenzio's discussions, did you expect that excess cash flow to put CCI in a positive cash position?

A Yes.

Q And would you have expected at the time of the 1.2 million --

MR. SWICHAR: Object to all these leading questions.

MR. GEBHARDT: That's fine.

Q (By Mr. Gebhardt) Would you have expected

the 1.2 million dollar loan had it been repaid from the excess cash flow for there to have been a positive balance on the four million dollar revolving line of credit?

A I would have expected the line to have a zero balance.

Q Now, you were asked --

MR. SWICHAR: Wait.

Can I hear that question and answer back again?

(Record was read by the Reporter.)

Q (By Mr. Gebhardt) Now, I believe the documents establish based on the commitment letters that the 1.2 million dollar loan was to be due on March 31, 2000, if not demanded sooner, and that the four million dollar line of credit expired on April 30, 2000.

What was your anticipation of what would occur had CCI Construction not had sufficient cash flow to repay the 1.2 million dollar loan by March 31, 2000?

# Craig J. Schwartz

Page 189

Q Now, I think you indicated that you did not know when you spoke with Mr. Ortenzio on or about February 11 what the source of the payment might have been that repaid the 1.2 million dollar loan.
A That's correct.
Q Do you know whether, based on your activity as an account officer, whether Mr. Ortenzio had the personal financial ability to have made that payment?
MR. SWICHAR: Objection as to form.
A Yes, I believe he did.
Q Did you know for a fact whether CCI had accounts with any other banks at the time?
A I was not aware of any.
Q But did you know one way or the other?
A No.
Q Did you know whether CCI was into the line of credit at the time the payment was made?
MR. SWICHAR: Objection.
I don't know what that means, into the line of credit.
Q Had a positive balance on the line of credit

Page 190

at the time the 1.2 million dollar payment was made.
Did you know that on February 11?
A No, I did not.
Q Now, after you learned that the check had come in, did you have any contact with Mr. Ortenzio about the consequences of the payment having been made?
In other words, why did you send this letter that's been marked as S-13 to Mr. Ortenzio confirming that the 1.2 million dollar line had about --
MR. SWICHAR: Objection as to form; the letter says why he sent it.
Q That's 13.
Why did you send that letter, S-13?
MR. SWICHAR: Objection as to form.
It states on the letter why he was sending it.
A As a follow-up to Mr. Ortenzio's request to get his surety back because, because the loan was paid in full.
Q Okay. Now, that was a request made to you

Page 191

directly?
A Yes.
Q And was any sense of urgency expressed by Mr. Ortenzio in the call requesting the return of the suretyship?
A Yes, it would have had to be for me to go through the process to get the surety back quicker than the normal course of business.
MR. SWICHAR: That's not responsive.
I object to the answer, form of the answer.
Q Did you take action to get it back quicker than the normal ordinary process?
MR. SWICHAR: He testified he had no recollection.
Objection.
Q You may answer.
A Yes, I have -- I did.
Q And why did you take that extra effort?
A Mr. Ortenzio's request.
Q You were also asked a couple questions about

Page 192

banking custom and practice.
Do you recollect that?
A Yes.
Q Do you know whether banking customs and practice are binding law, enforceable --
MR. SWICHAR: Objection to the question.
Q -- in courts?
A No, I do not.
Q Do you know whether banking customs and practices constitute a prohibition upon borrower conduct?
A No, I do not.
MR. GEBHARDT: No further questions.
MR. SWICHAR: Just a couple.
EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MR. SWICHAR:
Q Mr. Schwartz, you testified that the repayment in full of the 1.2 million dollar loan was not an authorized use of the four million dollar line of credit; is that correct?

# Craig J. Schwartz

Allfirst charge-off memo?
A No.
Q Do you know the reasons for the bank's declaring the default on February 24?
A No.
Q Okay. I'll leave this out, save that for Mr. Elias.
If the bank had collected one million dollars from its customers and deposited it in a rival bank, in another bank, and you knew about that, what would you have done?
MR. GEBHARDT: If the bank had collected --
Q I'm sorry.
If CCI had collected one million dollars from its customers in the ordinary course and put it in another bank and you found out about it, is that a permissible or impermissible act?
MR. GEBHARDT: Objection.
A I don't think it was -- would -- could be deemed as permissible or impermissible.

I would have asked why, what the purpose was.
Q Well, I'm trying to figure out what the intent of the obligation was where the bank -- where CCI was required to make its primary business deposits at Allfirst.
So in that context, if CCI had said, well, I have a million dollars in checks, I'm going to deposit that money somewhere else, in another bank, would you have considered that a breach of that obligation?
A Yes.
Can I rephrase that?
Q Sure.
A I don't think that was a breach.
I would have inquired as to why they were doing that. I mean, a lot of customers do have accounts at other banks. Their operating account where the transactions occur day-to-day --
Q Is there a similar --
A -- is meant by primary deposit account.
Q I'm sorry, what?

A The account where checks that they use to conduct business --
Q Right.
A -- on a day-to-day basis --
Q Right.
A -- and their primary account would be the one tied to cash management.
If they have an account at another bank -- customers do do that -- it wouldn't be a breach.
Q Well, suppose they were collections from customers, and they had an obligation such as the one that CCI had and they put that money in another bank and the borrower used it to buy an airplane.
A I would inquire as to why they're doing that.
Q I'm using it to buy an airplane.
A Why isn't the money coming back into the business?
Q Well, would you have considered that a breach?
A A breach --

Q In your view, a permissible act.
MR. GEBHARDT: Objection.
MR. SWICHAR: I'll withdraw the question. It's a fair objection.
Larry, are you -- I'm asking you outright, and I almost hope the answer is yes -- are you planning to use Mr. Schwartz as an expert at the trial?
I think I'm entitled to know that.
MR. GEBHARDT: Well, as I mentioned, depending on -- if you plan to have someone take the stand that says, and testify as an expert, that it is ordinary banking custom and practice to repay a guaranteed loan facility with the proceeds of an unsecured, unguaranteed line of credit in a situation where the borrower is in default, I may ask Mr. Schwartz if that's his understanding of banking custom and practice, but I have no intention of necessarily calling him in my case in chief as an expert.
Q (By Mr. Swichar) Mr. Schwartz, are you aware

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK, PLAINTIFF
VS
JOHN M. ORTENZIO, DEFENDANT

NO: 1:01-CV-786

DEPOSITION OF: SHERI PHILLIPS

TAKEN BY: PLAINTIFF

BEFORE: HILLARY M. HAZLETT, REPORTER NOTARY PUBLIC

DATE: MARCH 13, 2002, 10:43 A.M.

PLACE: ALLFIRST BANK BUILDING
213 MARKET STREET
14TH FLOOR
HARRISBURG, PENNSYLVANIA

APPEARANCES:

GEBHARDT & SMITH
BY: LAWRENCE J. GEBHARDT, ESQUIRE

FOR - PLAINTIFF

BLANK, ROME, COMISKY & McCAULEY, LLP
BY: EDWARD I. SWICHAR, ESQUIRE

FOR - DEFENDANT

HARTMAN, OSBORNE & JOYCE, P.C.
BY: MELINDA S. JOYCE, ESQUIRE

FOR - SHERI PHILLIPS

ALSO PRESENT:

JAMIN M. GIBSON
JOHN M. ORTENZIO

arranging the financing for the company?

A He did not have a very big involvement initially. He got very involved when we started having more financial problems at the end; but up until the $4 million line of credit, I negotiated with the bank.

Q And so you would have been the person that negotiated and got into place the $4 million line of credit?

A That's correct.

Q And would I be correct in saying that Mr. Ortenzio was not very involved in obtaining the $4 million line of credit?

MS. JOYCE: I object to the form of question, not very involved.

BY MR. GEBHARDT:

Q His involvement -- his more limited involvement, as you've described it in your previous answer, was pertaining to the $4 million line of credit also?

MR. SWICHAR: I object. Why don't you ask her what was John's --

MR. GEBHARDT: All right.

BY MR. GEBHARDT:

Q What was John Ortenzio's involvement in

obtaining the $4 million line of credit?

A He did not actually meet with the bank. I met with the bank. He was aware what was going on and talked to me about what I was doing, what my plans were, what the amount of the loan was. So I had spoken to him about that outside of the meeting with the bank. But when I actually sat down with the bank, he was not in those meetings as I recall.

Q What was the purpose to your understanding as the CFO of the $4 million line of credit?

A To cover the work in progress and cover our cash flow needs as the receivables were coming in.

MR. GEBHARDT: Will you mark this as the first deposition exhibit?

(3/23/1999 letter was marked as Deposition Exhibit No. 1.)

BY MR. GEBHARDT:

Q I've handed you what has been marked as Deposition Exhibit 1, which purports to be a letter dated March 23rd, 1999, to you from Craig Schwartz on the letterhead of the First National Bank of Maryland, which is the predecessor name for Allfirst Bank. Do you recognize your -- is that your signature on the last page?

A Yes, it is.

Q Over the course of time you were at CCI, were there times when the company had no borrowings under its line of credit?

A Yes, sir.

Q In fact, on some of the lines of credit, there was actually a requirement that CCI be out of the line of credit?

MR. SWICHAR: Can I hear that again?

(The reporter read back the referred-to portion of the record.)

MR. SWICHAR: My objection was, Was there a requirement? There's a document. That was my objection.

BY MR. GEBHARDT:

Q Do you recollect whether there in the lines of credit that were in existence over the period of time you were there from 1991 through 2000 whether there was customarily a feature that to those lines of credit that required CCI to have no borrowings for a 30 consecutive day period?

MR. SWICHAR: And I object to the form of the question because I don't know what you mean.

MR. GEBHARDT: You may answer.

MS. JOYCE: If you understand what he means, if you need clarification, you may request it.

quote, if no demand is made, the loan will expire and all borrowings will be due and payable, comma, together with interest thereon, on March 31, 2000 --

MS. JOYCE: For the record, you're talking about the second to the last paragraph on page 1 of Exhibit No. 6?

MR. GEBHARDT: Yes.

BY MR. GEBHARDT:

Q -- period, unquote. Was it your understanding that the $1,200,000 loan was due from CCI on or about March 31, 2000?

A Yes.

Q In the course of the meetings that you may have had with Mr. Zarcone and Mr. Schwartz on behalf of Allfirst, was there any discussion of where CCI was going to get the money to repay the $1,200,000 loan by March 31, 2000?

A As I recall, it was definitely discussed. Whether it was at that meeting or in the paperwork afterwards on the phone, I'm pretty sure it was at that meeting. Yes, we had discussions about how that money would be paid back.

Q And what was the substance of those discussions?

A That the cash flow that we would have

coming in from receivables and projects would generate enough cash to pay this down on a short-term basis.

Q In the discussions, was it discussed that CCI would repay the $1.2 million loan by making a borrowing on the $4 million line of credit?

A No, it was not.

Q I note on Exhibit 4 that again there's the reference to the $4 million Scott Air Force Base receivable. Did that $4 million receivable have any relationship to a source of funds to repay the $1.2 million loan?

A I don't recall if that -- if that was specifically said or not.

Q Now, at the time the $1.2 million loan was being taken out, I take it you had discussions with Mr. Ortenzio about the borrowing?

A That's correct.

Q And did you and Mr. Ortenzio discuss where CCI would obtain the funds to repay the $1.2 million when it came due which, according to the commitment letter, was March 31, 2000?

A Yes, we did.

Q And what was the substance of those discussions?

A I had done some cash flow projections. I know John was adamant about having this paid back on a short-term basis. When I gave him the cash flow projections, I had said that if the job profits that are projected hold, we would have the money to pay back this 1.2 million.

I also told him that we had seen declining job profit projections over time. I said, I'm not making the projections on the jobs. That's what I've been given from the people in operations. Each month they were decreasing.

I said, based on what the most current projections were, if they came in at that amount, we would have the cash flow to pay back the 1.2 million.

Q At the time you were having these discussions with Mr. Ortenzio, were there any discussions about using a borrowing under the $4 million line of credit to repay the $1.2 million guaranteed note?

A No, there were not.

Q In 1999 and the year 2000, did Mr. Ortenzio, to your knowledge, have any involvement in the repaying of the loans to Allfirst Bank?

A Which loans?

Q Well, there were three loans. You had the

line of credit -- let's start first with the $4 million line of credit. Did he get involved in how that was being paid or repaid at all?

A I'm not sure.

MS. JOYCE: What time?

MR. GEBHARDT: In 1999 and 2000.

THE WITNESS: Did he get involved in how it was repaid?

BY MR. GEBHARDT:

Q Or the process, the repayment process?

A No, that was the line of credit. As the cash came in, it was paid down.

Q How about the repayment of the equipment loan?

A No, he did not.

Q Okay. Now, the $1.2 million loan was repaid by CCI on or about February 11, 2000, by the delivery of a check by Mr. Ortenzio personally to Allfirst.

Prior to that date, had you had any discussions with Mr. Ortenzio about the repayment of the $1.2 million line of credit?

A Yes. He had come to me about that.

Q And what was the substance of the discussions you had?

A He wanted to pay down the $1.2 million -- the $1.2 million line, he wanted to pay down because he had that personally guaranteed. He had asked me about writing a check out to pay that off from the line of credit, and I refused.

Q Why did you refuse?

A I didn't think it was in the best interest of the corporation to do that.

Q And could you explain why you had those -- that you didn't think it was in the best interest of the corporation?

A One, I guess I didn't think there was any benefit to doing it. The interest rates were the same in the loans so there was no corporate benefit from paying one -- drawing in one line of credit to pay the other.

Two, if we had the extra cash, I would have thought it best suited to pay payroll and accounts payable and subcontractors.

Q And at the time the loan was paid in February, the company was experiencing cash flow difficulties?

A Yes.

Q And did you understand that repaying the $1.2 million loan with a draw on the $4 million line

of credit would reduce the amount of available cash to the company?

A Yes, definitely.

Q Okay. Now, in terms of the physical paying of the $1.2 million loan, you did not write the check?

A No, I did not.

Q Did you have signature authorities over the checking account?

A Yes, I did.

Q And so if you had wanted to, you could have written a $1.2 million check and sent it in to Allfirst?

A Yes, I could have.

Q Did Mr. Ortenzio have any reaction to your refusal to write the check or make that payment?

A Initially when he had asked me about it and I said no, he didn't do anything. Then at a later point in time, he came back to me again and said I know you don't agree with this; but I need to do it. I said, you're the president of the company; but I'm not going to be any part of it.

Q Did he at all elaborate on when he said I need to do this, what he was meaning by this?

A He personally guaranteed the 1.2 million

problems. We need to talk to the bank and bonding company.

At that time, we hadn't right then called because it was an issue of whether John would put more money into the company or not. And he had decided that he wanted to pay off the $1.2 million prior to those discussions with going forward with the bank or the bonding company.

Q Now, there was a meeting at Allfirst that Mr. Ortenzio attended with various representatives including Michael Zarcone and Craig Schwartz on February 24, 1999, which was the Friday after February 11, 1999, when the $1.2 million line --

MS. JOYCE: The date is incorrect. I think you might want to just change the year.

MR. GEBHARDT: 2000.

MS. JOYCE: Why don't we start the question again so the form is correct for the witness?

BY MR. GEBHARDT:

Q There was a meeting held at Allfirst attended by Mr. Ortenzio and various representatives of Allfirst including Craig Schwartz and Michael Zarcone on February 18, 2000, which was a Friday. That's the Friday after February 11, 2000, when Mr. Ortenzio delivered the check to pay the $1.2

A We had -- our accounts were tied together. We had an account for our payroll, and we had an account for our accounts payable. They were all tied to the accounts payable. They were all tied but handled in a different way.

In addition to that, we had a small account for a cafeteria plan for money that was presented for their medical health bills.

Q Which accounts were tied into the cash management account, the one where moneys would be swept?

A Accounts payable, payroll, and the line itself.

Q All three -- all the checking accounts were tied into the cash management?

A Yes, they were.

Q As far as you know, CCI had no checking accounts elsewhere with another bank?

MS. JOYCE: At any time?

MR. SWICHAR: 1999/2000, unless I state otherwise.

MS. JOYCE: I wasn't clear from your prior questions, so that's fine.

THE WITNESS: Without thinking about it -- there may have been some other account for something

as far as our main transactions for accounts payable and transactions -- they went through Allfirst.

BY MR. SWICHAR:

Q Were all accounts receivable or revenues deposited in the checking account at Allfirst as far as you know?

A Prior to --

Q 1999/2000, when money came in by either wire transfer or checks, which I believe you stated were the means by which funds were collected, were they all deposited in the checking account at Allfirst which was related to the cash management facility?

A They used to be; but right at the end, John had used another account.

Q Where was that account?

A I don't know. He had -- it was for a job that wasn't bonded. They had a payment that he used another checking account to pay some of the vendors and one of the deposits into that account.

Q Was that at Allfirst or another bank?

A I'm sure it was another bank, but I don't know which one.

Q Apart from that job -- do you recall which job that was?

A It was Old Gettysburg Road.

Q Do you know why a separate account was set up for that?

A I don't know if the account was just set up for that or if John had a prior account he was using because he had handled that, but he wanted to -- he didn't want the money to be intermingled with what Allfirst and the bonding company -- he didn't want that money in that account that they made draws on. He wanted to use that.

Q When you say at the very end he used that, what do you mean?

MS. JOYCE: I don't believe that's what the witness said at the very end. I don't believe that's what she was referring to. You can go ahead and clarify.

THE WITNESS: After the bank and after the bonding company were aware of what happened and after the bonding company got involved and basically took over running the company during that time period, a check for that one job came in or check or checks -- the deposits at that point in time, I think it was one check. John put that into a different account.

BY MR. SWICHAR:

Q Was that after the bank froze the checking

I believe you testified that it was anticipated that CCI would repay the 1.2 million from cash flow that was projected if the projections held true. Is that a fair statement?

A That's correct.

Q Now, with whom did you have those discussions -- Mr. Ortenzio, the bank, or both?

A I definitely had the discussions with John; and as I recall, we had those same discussions with the bank also.

Q Am I correct in stating that the projections that CCI was relying upon turned out not to come to fruition?

A That's correct.

Q When the $1.2 million note and related surety was signed, did you believe those projections to be capable of being fulfilled based on your financial experience with the company?

A As I said, I had concerns; and when I had talked to John about those projections, I said those were based on what operations were projected for the loss or profits on each of those jobs. I had pointed out at that time that those profits and/or losses, they were decreasing throughout the year.

Q Well, did you tell the bank at any time

A Yes.

Q Now, you testified about your discussions that you had with Mr. Ortenzio prior to the bank meeting on February 18, 2000.

Am I correct in stating that Mr. Ortenzio advised you that he did intend to go to the bonding companies for financial help until moneys came in from the Scott Air Force Base and other jobs?

A Yes, that's correct.

Q And there was a discussion about -- do you recall -- if I recall correctly, you testified that -- strike that.

Did Mr. Ortenzio ever state to you that bankruptcy was an alternative prior to the meeting with the bank or did he not or you had no recollection?

A We discussed bankruptcy prior to that.

Q And was it Mr. Ortenzio's primary goal first to go to the bonding companies and ask for financial help until the Scott Air Force Base money came in?

A That's what I recall.

Q Did Mr. Ortenzio tell you that the bonding companies would have to come up with the money until the moneys came in from the Scott Air Force Base and

other jobs?

A I do recall that, yes.

Q And he said that he expected the bonding companies to cooperate in that fashion?

A I don't know that he expected it from them, but he was going to talk to them about that.

Q And as of the time you had the meeting with Mr. Ortenzio prior to the February 18 meeting with the bank, wasn't it indicated to you through Mr. Ortenzio that it was his primary intention to keep his company operating by getting funds from the bonding companies until such time as the money from the jobs came in?

A We had doubts about whether he wanted to keep the company operating.

Q What was his primary goal, to get money?

MR. GEBHARDT: Objection. His primary goal for what?

BY MR. SWICHAR:

Q To keep the company alive?

A What's the question?

Q Was his primary goal to keep the company alive?

MR. GEBHARDT: Objection.

MS. JOYCE: If you know what his primary

goal was.

BY MR. SWICHAR:

Q Based on your discussions with him?

A At that time, we had serious concerns as to whether he did want to keep the company alive.

Q Do you recall on a certain date the bank freezing the bank accounts of CCI?

A Yes, I do.

Q Do you recall when that occurred?

A Without looking back, I think it happened -- actually, we found out on a Wednesday; but I think it was actually frozen on a Tuesday night.

If I recall, based on the dates we've been given here, I was thinking that it would be the Wednesday after the 18th meeting.

Q A few days after the February 18th meeting?

A Yes.

Q Was there any warning by the bank that it was going to freeze the accounts?

A Not to me.

Q What was the nature of the checks -- I'm sorry. As a result of the bank freezing CCI's checking account, were checks returned?

A Yes.

Q What was the nature of those checks?

BY MR. SWICHAR:

Q Yes. Well, as of November, was Mr. Schwartz aware that CCI was incurring financial problems?

A As of November, they realized we had cash flow difficulties.

Q Between November and February 11th, did you have any other discussions with Mr. Schwartz regarding CCI's financial difficulties?

A Not that I recall. It would have been right around that time where I would have been giving him the information from the end of the year.

Q Would that have been before or after February 11th, 2000?

A I don't recall that we gave the information prior to -- if John gave it to them.

Q And you don't recall Mr. Schwartz asking you, as CFO, how did CCI come up with this $1.2 million?

A No, I didn't.

Q Did you suspect that Mr. Schwartz at any time knew the source of repayment?

MR. GEBHARDT: Objection.

MS. JOYCE: Object, and do not answer.

BY MR. SWICHAR:

Q And if you look at Exhibit 10, the cash flow statement, my question is: Is the reason the available line of credit is reduced from February's 5.2 million to March's $4 million, the March 31, 2000 due date of the $1.2 million loan?

A Yes, it is.

Q Now, turn, if you would, to Exhibit 1, which is the commitment letter for the $4 million line of credit.

MR. SWICHAR: I'm sorry. What exhibit?

MR. GEBHARDT: Exhibit 1.

MR. SWICHAR: Okay.

BY MR. GEBHARDT:

Q Now, going down to the line, Use of Proceeds, you see it says finance work in progress and accounts receivable. I think you've indicated you understood that to be the purpose of the $4 million line of credit; is that right?

A That's correct.

Q Now, accounts receivable would mean the accounts that CCI had billed its customers but which its customers had not as yet paid buy were due and owed to CCI?

A That's correct.

Q So CCI would not have had that money

available to it to pay its month-to-month expenses, right?

A That's correct.

Q And the line of credit would be used to fill in the gap until the actual customers made their payments to CCI?

A That's right.

Q And while were talking about finance work in progress, what that means is the normal monthly expenses of CCI in doing its construction work?

A That's correct.

Q Now, as a chief financial officer, would it be consistent with your understanding of a line of credit that's used to finance accounts receivable and work in progress to use the line to make the normal monthly interest payments on borrowings?

A Yes, it would.

Q Would it also be consistent with that purpose to make the normal monthly principal amortizations on loans that required monthly principal payments?

A Yes, it would.

Q But it would be inconsistent to completely prepay all principal and interest on a loan that was not yet due?

A I agree with that. That's correct.

Q Now, if you look at the second page, numbered paragraph 8, there's a statement there that advance --

MR. SWICHAR: What exhibit?

MR. GEBHARDT: Exhibit 1.

BY MR. GEBHARDT:

Q Exhibit 1, numbered paragraph 8 on page 2, it says, Advances not to exceed 85 percent of qualified accounts receivable less than 90 days past due excluding retainages. Do you see that?

A Yes. It says 80 percent.

Q Paragraph 8, Advances not to exceed 80 percent of qualified accounts receivable less than 90 days past due, comma, excluding retainages, right?

A That's right.

Q Now, what that means is that's a limit on the amount of money that CCI could borrow under the line of credit; is that right?

A That's correct.

Q So even though it was a $4 million line of credit, if CCI only had $2 million of accounts receivable that were less than 90 days past due, CCI could not borrow $4 million?

A That's correct.

Q In your view, was the borrowing authorized under the terms of the line of credit?

MR. SWICHAR: Objection to form. Objection to the word authorized. I don't think it's within her promise to interpret the documents.

MS. JOYCE: I think you're asking her for an expert witness answer.

BY MR. GEBHARDT:

Q Let me just say, based on your understanding as the person who negotiated and executed the $4 million loan and loan documents, was the draw of $1.2 million to pay the personally guaranteed loan and authorized borrow?

MR. SWICHAR: Objection to form. Same reason.

BY MR. GEBHARDT:

Q Permitted under the terms of the loan?

MR. SWICHAR: Objection to form. You're asking her to interpret legal documents.

MR. GEBHARDT: All right.

BY MR. GEBHARDT:

Q You may answer.

A No, I don't.

MR. GEBHARDT: All right. That's it.

MR. SWICHAR: No, it's not it. I have a

Q And you were reducing monthly the principal that was owed on the $2 million equipment note; is that correct?

A That's correct.

Q And you didn't see any problem or see any inconsistency with the loan documents in using the $4 million line of credit to pay monthly -- to pay down monthly the principal owed on the $2 million equipment note?

A I actually had talked to Craig Schwartz about that. He said that -- we had a discussion about that at one point because we had a payment that went in late because of something that happened in accounts payable.

Craig had called and said the payment wasn't paid. After I found out about it, I said okay. We talked about that; and I said, well, it's actually drawing of the line to pay this down. But no, I did not see problems with and knew that is what was happening.

Q And in your discussions with Craig Schwartz did he indicate that he had a problem in the way that the equipment note was being repaid -- the equipment note payments were being made?

A Monthly payments, no.

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK :

Plaintiff :

v. : CA NO. 1:CV-01-0786

JOHN M. ORTENZIO :

Defendant : Pages 1 - 31

-----------

Deposition of Gerard L. Elias

Baltimore, Maryland

Friday, February 15, 2002

Reported by: Kathleen R. Turk, RPR-RMR

ESQUIRE™ DEPOSITION SERVICES



A I don't recall.
Q Did they ask for more money?
A I don't recall.
Q Do you recall telling Mr. Ortenzio that the bank wanted its fucking money or you were leaving?
A I don't recall.
Q Is it possible you would have said that?
A Possible.
MR. SWICHAR: Excuse me.
Q (By Mr. Swichar) Do you recall when the decision was made -- did you -- were you involved in the decision to freeze CCI's bank accounts?
A Yes.
Q When was that decision made?
A I believe it was Wednesday, the 23rd.
Q And did you make that decision yourself?
A I think there were probably a few people involved in the decision --
Q Who else?
A -- but I was in the group.
Q Who else?

A Well, I think probably Mr. Zarcone was involved. I can't recall specifically.
Q Did the bank begin to freeze CCI accounts on the 23rd?
A I think that was the date.
Q That was prior to the declaration of default?
A No.
Q Well, the declaration of default -- letter, at least -- is dated the 24th.
A Correct.
Q When was the declaration of default, and how was that conveyed to CCI?
A I believe it was conveyed that date when we became aware of the fact that the checks were continuing to --
Q What date is that?
A The 23rd.
Q The 23rd?
A -- draw down on the line.
I believe we contacted Mr. Ortenzio to make

inquiry as to why that was occurring and asked for some additional support if we were to be expected to continue to, to fund.
Q Okay. So on the 23rd, you did ask for additional support?
A Yes.
Q And what kind of support did you ask for?
A Guarantees, additional collateral, some support payment.
Q What additional guarantees did you request?
Guarantee the four million dollar line?
A Yes.
Q And what other decision?
A Additional collateral.
Q As, for example?
A Oh, just whatever additional collateral might be worthwhile.
Q So on the 23rd, I assume Mr. Ortenzio said no.
A Correct.
Q And at that point, you froze the accounts?

A Correct.
Q Instantly, on the 23rd?
A I believe so.
Q And you made the decision to bounce CCI's checks on the 23rd as well?
A Correct.
Q And that began on the 23rd?
A I believe that's the date, yes.
Q And that was prior to any written declaration of default?
A Correct.
Q Was it a situation where the bank also decided to reverse certain payments on checks that had already just cleared?
A I don't recall that.
Q Did you review any documents prior to your deciding to declare CCI in default?
A Sure.
Q Which documents did you review?
A The loan documents.
Q Pardon me?

# Gerard L. Elias

A The loan documents.
Q The four million dollar line of credit note?
A All of the loan documents.
Q Okay. The 1.2 million dollar note, the equipment note, are those the documents?
A I don't -- I don't know that I reviewed the 1.2 million dollar note because I don't know that I was aware of it.
Q Did you determine on the 23rd that there had been a material adverse change in CCI's financials?
A Well, certainly by that time, but actually prior to that time.
Q Okay. Is there any written analysis of that anywhere?
A No.
Q What documents did you review and rely upon in determining that there had been a material adverse change?
A Company's financial position, statement.
Q Who gave you those documents?
A I received them probably from Craig Schwartz

or contained in the file.
I mean, I don't know exactly who handed them to me.
Q Let me show you exhibit S-14.
I'm going to make this easier. There's one over there, I think. Is that it, the charge-off memorandum?
A Yes.
Q Just as a matter of curiosity, Mr. Elias, under the section Reason for Charge-Off Comments, the last sentence on the first paragraph -- and I see you're squinting; I don't make the print this small, that's not me, that's your bank -- it states that due in large part to the information shared on February 18th, the bank demanded payment on February 24th.
A Wait a minute, I'm not reading the same document.
Due in large part -- oh, all right, the first paragraph, sorry.
Q Do you see that?

A Due in large part --
Q Right.
My question is, what was the small part?
A I don't understand that question.
Q Well, the memo -- I don't understand it, either, but the memo says that due in large part to what occurred on the 18th, the bank called the loan.
A Correct.
Q It means there would be another part to this --
A No.
Q -- that played a role in the bank declaring the loan in default.
A That's it.
Q If there's a large part somewhere, there's a small part elsewhere.
A No.
Q There was no small part? It was all --
A That's, that's -- that's someone's term, due in large part. People say that all the time, due in large part to. That doesn't mean that there

necessarily had to be something else.
Q I'm not suggesting that. I'm only asking if there was a smaller part that played a role in the bank's declaring the note in default.
A No.
Q When did --
A I would ask you to ask the question again because I don't understand it.
Q When did the bank -- when did you first learn that CCI had repaid the 1.2 million dollar note from the four million dollar line of credit?
A I don't recall, but it was well after the events of the, of the time that we're talking about.
Q Was it before or after the declaration of default --
A Well after.
Q -- on the 23rd or 24th?
A Well after.
Q How did you determine or find out how that occurred?
A I believe that Mr. Gibson advised me upon