IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK | * | |
| Plaintiff, | * | |
| v. | * | CASE NO.: 1:01-CV-786 |
| JOHN M. ORTENZIO | * | |
| Defendant. | * | |

*************************************************************

## MEMORANDUM IN SUPPORT OF OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.
### Introduction.

Defendant, John M. Ortenzio, has moved for summary judgment, and Plaintiff, Allfirst Bank, has opposed the motion. Allfirst also has moved for summary judgment and has presented facts which cannot be genuinely contested and which demonstrate, as a matter of law, that Allfirst is entitled to judgment against Ortenzio.

In this opposition, Allfirst will not needlessly repeat material contained in its own motion for summary judgment and will confine this memorandum to demonstrating that Ortenzio either has misstated the undisputed facts or has not addressed the claims advanced by Allfirst in this case. In effect, this memorandum will be in the nature of a reply.

### II.
### Counter Statement of Facts.

1. **This case is not about the interpretation of a contract.**

Contrary to Ortenzio's statement, this lawsuit does not involve "the interpretation of a

contract between Mr. Ortenzio and Allfirst Bank ("Suretyship Agreement") and its application to three notes ...." Defendant's Memorandum at 1. There is no contract which requires interpretation. Ortenzio executed a Suretyship Agreement whose provisions are pellucid with respect to the issues in this case. Pursuant to the Suretyship Agreement, he guarantied on a direct and primary basis repayment of the $1.2 million loan. He did not guaranty the line of credit or the equipment note (which is unrelated to the issues in the case). If CCI Construction Co, Inc.'s attempted payment of the $1.2 million loan with a borrowing on the line of credit was effective to discharge the guaranty, then Ortenzio has no liability. If it was not, as Allfirst contends, then Ortenzio is liable to Allfirst on the guaranty.

2.      **The loan documents prohibited use of the line to repay the $1.2 million loan.**

Ortenzio argues that there is no document which prohibited the use of the line of credit to repay the $1.2 million loan. This is not so. It is undisputed that the payment of the temporary $1.2 million loan with a borrowing under the $4 million line of credit was a violation of the terms and conditions under which the line of credit had been issued. The commitment letter of March 23, 1999 governs the use of the $4 million line of credit. The commitment letter specifically states that "All terms and conditions contained herein shall survive the execution of such loan documents." The commitment letter also specifically authorizes Allfirst "to adjust the terms and conditions , or to discontinue the commitment should the bank in a reasonable exercise of its sole business discretion deem it necessary to do so." Exhibit B (Commitment letter).

The purpose for which the line of credit could be used was clearly set forth in the commitment letter. Borrowings under the line were to be used to "Finance work in process and accounts receivable." Exhibit B(Commitment letter). The line was not to be used to prepay a

guaranteed loan just prior to the financial collapse of CCI.

In his deposition, Craig Schwartz specifically testified that the line of credit was to be used solely to finance accounts receivable and work in process and was not to be used to repay the $1.2 million loan. As he testified:

> Q. Is there any document in this world that prohibits CCI specifically from repaying the 1.2 million dollar note by drawing on the four million dollar line of credit?
> A. Is there a document that prohibits them?
> Q. Yes, specifically.
> A. Yes, I believe so.
> Q. That prohibits specifically – is there a specific prohibition?
> ...
> A. I believe it (i.e. the commitment) states what the line of credit can be used for, and that is not a use of the line of credit. (Parenthetical material added)

Schwartz at 143:13 - 144:7; *See also* Schwartz at 177:18 - 178:1-13. Although he was absent when Ortenzio delivered CCI's check, Schwartz testified that he would have caused the check to be dishonored if he had known it represented a draw on the line of credit.

> Q  Had you known on or about February 11, 2000 that the check presented by Mr. Ortenzio on behalf of CCI represented a draw on the four million revolving line of credit, what action, if any, would you have taken?
> A. I would not have honored the check.

Schwartz at 181:20 - 182:3. The commitment letter gave him the authority to do so. Exhibit B.

Sheri Phillips, CCI's chief financial officer, is the person who negotiated the line of credit on behalf on CCI. Phillips at 11:7-9. She concurred with Schwartz as to the purpose of the line and that the use of the line to repay the $1.2 million loan was improper and unauthorized. As she testified:

> Q. What was the purpose to your understanding as the CFO of the $4 million line of credit?
> A. To cover the work in progress and cover our cash flow needs as the

receivables were coming in.

Phillips at 12:9-12.

> Q. Did you believe using the $4 million line of credit to repay the $1.2 million guaranteed loan was consistent with the agreement that CCI and Allfirst had entered into when Allfirst gave the $4 million line of credit?
> ...
> A. As the chief financial officer and what I knew of the loan documents, no I did not think it was.
> Q. And would you explain why that was your thought?
> A. Because I looked at the line of credit as being a way for us to pay out ongoing work in progress and to pay out vendors and subcontractors. ...

Phillips at 39:3 - 40:3.

> Q. Based on your understanding as the person who negotiated the $4 million line of credit and executed the loan documents, was the draw on the line of credit by way of a check of $1.2 million to repay the $1.2 million guaranteed separate loan a borrowing made quote to finance work in progress and accounts receivable period end quote?
> A. No it wasn't.

Phillips at 109:14-21. *See also* Phillips at 102:8 \ 104:1 \ 110:9-23. She refused to write the check to repay the $1.2 million loan from the line and told Ortenzio, when he made it clear he intended to do so, that she was "not going to be any part of it." Phillips at 38:21- 22.

### 5. The prohibition was as to borrowing under the line to repay the $1.2 million loan, not in writing a check on CCI's checking account at Allfirst.

Ortenzio implies that CCI could not repay the $1.2 million loan except by accessing the line of credit. This is a baldly incorrect statement.[1] Writing a check accessed the line of credit only if

---

[1] Ortenzio also incorrectly states that CCI could only have a checking account at Allfirst and was required to deposit all of its revenue in this account. The commitment letter only states that CCI's *primary* account at Allfirst, not its sole account. Schwartz testified that there was no prohibition on CCI having accounts at another bank. Schwartz at 65; 1-5 \ 66:4- 67:10;170:15 - 171:18. Phillips testified that Ortenzio had set up an account for CCI with a different bank. Phillips at 65:17 - 67:23..

there were no funds in the account to cover the check. If there were funds in the account to cover a check, the check would be paid from these funds and the line would not be involved. Schwartz at 180:18 - 181:5. CCI was supposed to have a positive balance in the checking account sufficient to repay the $1.2 million loan at the time the loan came due, as the undisputed testimony demonstrates. Schwartz at 180:18 - 182: 4.

CCI borrowed the $1.2 million because it was having short term cash flow problems due to a problem collecting receivables from two large jobs, Scott Airforce Base and Ablemarle Prison. Phillips at 82:5-9. When the $1.2 million was borrowed, repayment was expected to come from an increase in cash flow and revenues, as both Schwartz and Phillips confirmed. Phillips at 34:24-35:14; Schwartz at 183:7-11. Phillips, testifying of the discussions with Schwartz relating to the repayment payment of the $1.2 million loan, "That the cash flow that we would have coming in from receivables and projects would generate enough cash to pay this down on a short term basis." Phillips at 33:23 - 34:3 \ 34:24 - 35:14 \ 73:1-5. Using the unguaranteed line of credit to repay the guaranteed loan was never discussed with Allfirst. Phillips at 34:4-7. Nor did Phillips and Ortenzio discuss using the line to repay the $1.2 million loan when the loan was taken out. Phillips at 35:15-20. Schwartz anticipated that CCI would not have borrowings under the line when payment was made and that payment would come from positive balances in CCI's account.

> Q. And from what source based on your discussions with Mr. Ortenzio in November of 1999 did you anticipate the $1.2 million loan being repaid
> A. Excess cash flow.
> Q. Okay. And based on Mr. Ortenzio's discussions, did you expect that excess cash flow to put CCI in a positive cash position.
> A. Yes.
> ...
> Q. Would you have expected the 1.2 million had it been repaid from the excess cash flow for there to have been a positive balance on the four million

revolving line of credit.?

    A.   I would have expected the line to have a zero balance.

Schwartz at 183:7 - 184:7. *See also* Schwartz at 64:21.

Schwartz's expectation was reasonable. In the past, CCI did not always have an outstanding balance under the line. The audited 1998 financial statement showed the balance of the line at zero. Exhibit F (CCI Financial Statement 1998). Phillips testified that CCI would have positive balances in the account and did not always have to borrow under the line. Phillips at 23:1-4. When the payment was made by Ortenzio on February 11, 2000, Allfirst had not been given any information on CCI's imminent financial collapse. Phillips at 92:7-16. This was information that Ortenzio would provide one week later and only after he received a return of his guaranty. Schwartz did not question the source of the payment. He simply assumed that CCI's November cash flow projection had come true and that all was well. Schwartz at 149:19 - 150:16.

Ortenzio also implies that the $1.2 million loan could be repaid from the line because the regular monthly installments of principal and interest on the equipment term loan had been paid from the line. This was a permitted use of the line because monthly installments of principal and interest are customarily paid from monthly collections of accounts receivable. Using the line to make the monthly payments on a term loan until the monthly receivables were collected from customers is proper and involves the financing of accounts receivable, as Sheri Phillips confirmed. And, unlike Ortenzio's surreptitious payment of the $1.2 million loan, Sheri Phillips obtained Schwartz's concurrence as the use of the line for this purpose before she made any monthly payments on the term loan from borrowings under the line of credit. Making a regular monthly payment on a term loan is vastly different from prepaying an entire loan. As Phillips testified:

> Q    Now, as a chief financial officer, would it be consistent with your understanding of a line of credit that's used to finance accounts receivable and work in progress to use the line to make the normal monthly interest payments on borrowings?
> A.    Yes, it would.
> Q.    Would it also be consistent with that purpose to make the normal monthly principal amortizations on loans that required monthly principal payments?
> A.    Yes, it would.
> Q.    But it would be inconsistent to completely prepay all principal and interest on a loan that was not yet due?
> A.    I agree with that. That's correct.

Phillips 103:12 - 104:1 \ 119:5-25.

When Ortenzio made the $1.2 million payment with a draw on the line, he knew the company was about to fail. He discussed the situation with Sheri Phillips and knew the company could not survive unless he invested more money, which he refused to do. Ortenzio discussed putting the company in bankruptcy. Phillips at 41-44 \ 48:3-22 \ 82:13-17 \ 83:7-15 \ 84:3-5. His sole purpose in borrowing on the line was to escape from liability on his guaranty, as Phillips confirmed based on her discussions with him. Phillips 36:16-37:8 \ 44:12 \ 46:8.

6.   **Loan documents restrict the use of loan proceeds and do not contain restrictions on the source of funds used to repay the loan.**

Ortenzio, ignoring the prohibition on the use of the line to repay the $1.2 million loan, makes much of the fact that the note evidencing the $1.2 million loan does not contain any express language restricting the source of funds that could be used to repay the $1.2 million loan. Apart from the restriction in the line that borrowings be used to finance accounts receivable and inventory, there was no reason for the $1.2 million note to limit its repayment to a particular source of funds. For example, CCI did not have to be the source of repayment. Ortenzio was equally liable on the note and had the admitted ability to have repaid the note from his own funds had he chosen to do so.

Exhibit H (Personal Financial Statement).

Loan documents typically do not restrict the source of funds that can be used to repay the loan. Instead, loan documents restrict the purposes for which the proceeds of the loan can be used. Exhibit K (Elias Affidavit) Given the discussions in November of 1999, Schwartz certainly did not anticipate that Ortenzio would attempt to borrow on the line to repay the guaranteed loan. Had Schwartz believed that he needed to put a written prohibition in the $1.2 million dollar note to prevent Ortenzio from repaying it by improperly borrowing on the line, he probably would not have recommended that Allfirst make the $1.2 million loan in the first place.

### 7. Allfirst was not required to give CCI a 30 day notice before shutting down the line of credit.

Ortenzio states that Allfirst did not give CCI a required 30 day notice before shutting down its access to the line of credit. Allfirst, however, was not required to give a thirty day notice.

The commitment letter fully authorized Allfirst to refuse further use of the line. Exhibit B (Commitment Letter). Allfirst orally notified CCI that the line was frozen on Wednesday, February 23, 2000. Allfirst did not freeze CCI's checking account, it simply refused to honor checks if CCI did not have sufficient funds in the account to cover the checks it had written. This action was taken only after CCI disclosed in the February 18 meeting that it had lost $6 million dollars, was insolvent by a million dollars at year end (violating the net worth requirement in the commitment letter for line availability), and was projecting that it would be short on cash (taking into account the full usage of the $4 million line) by almost $6 million over the next five months.[2] And, the line was frozen only after Ortenzio violated an express promise he made to Allfirst in the February 18 meeting. Ortenzio

---

[2] At the February 18 meeting, Allfirst did not know that Ortenzio had used the line to repay the loan he guaranteed.

S:\LJG\19527\plead\MemOppDefSumJudge.wpd        8

promised that he would not write additional checks that were draws on the line until after he had met with CCI's bonding company the next week and reported back to Allfirst. Despite his promise, Ortenzio had CCI write additional checks that were borrowings on the line on the Monday following the Friday meeting. Phillips 56:12 - 57:4. Allfirst dishonored these checks. Elias at 20.

What shut CCI down was not Allfirst's denying further access to the line of credit, but CCI's bonding company, which took over all of CCI jobs and directed that all of CCI's revenues be paid directly to it. In fact, Ortenzio sent a letter on February 22, 2000 (a day prior to the closing of the line) to all of CCI's customers directing them to make all payment due or to become due to USF&G. Exhibit J (Sample letter).

### III
### Law and Argument.

**A.     Allfirst has not sued Ortenzio for breach of contract.**

The gravamen of Allfirst's case against Ortenzio is not simply breach of contract. Allfirst is suing to nullify the effect of the purported payment under theories of conditional payment, equitable subrogation and fraud. If Ortenzio's attempted payment to discharge his guaranty was not effective under one or more of these theories, then he has liability on his guaranty.

**1.     The commitment letter prohibited the lien from being used to repay the $1.2 million loan.**

Ortenzio myopically continues his argument that Ortenzio could have CCI use the line of credit to repay the $1.2 million loan because the $1.2 million note did not specifically restrict the source of funds used to repay it. As has been discussed, loan documents typically do not contain provisions restricting or limiting the source of funds that can be used to repay the loan. What Ortenzio stolidly ignores in making this argument is the prohibition in the line of credit commitment

against using funds other than to finance accounts receivable and work in progress. What he also ignores is that CCI was not eligible to borrow at all at the time the payment was made. The commitment requires CCI to have a minimum tangible net worth of $4.5 million at year end. Ortenzio knew at the time he wrote the check on February 11, 2000 that CCI did not have any tangible net worth and was insolvent.

### 2. The $1.2 million loan was to be repaid from excess cash flow after the outstanding balance on the line had been repaid.

Similarly, Ortenzio takes issue with the concept that the short term loan was to be repaid from the increased cash flow that was expected to arise in the near future and enable both the balance on the line and the $1.2 million loan to be discharged. He cannot dispute that this was the understanding of all parties at the time the $1.2 million loan was made. He argues instead that this understanding was not reduced to writing. But, it did not have to be. If the line of credit was used only to finance accounts receivable and work in process, there was no other source of payment (apart from John Ortenzio's guaranty). The line could not be used for the purpose of payment. Only CCI's cash flow (or John Ortenzio's funds) could be used.

### 3. Repayment of the $1.2 million loan could be made without borrowing on the line.

Ortenzio argues that because CCI's checking account was tied to the line of credit and a cash management facility, CCI could not repay the $1.2 million loan except by a borrowing on the line. This is utter non-sense and ignores how the line of credit and cash management facility worked. CCI only would use the line if its collections were insufficient at any point in time to pay its monthly bills. CCI, however, could - and did -have positive balances in its checking account. See Exhibit F (1998 Financial Statement). These positive balances were swept into an interest bearing account

overnight and CCI received the interest earned. These positive balances would cover and pay checks that CCI issued, with the line being involved only if and to the extent the positive balances were insufficient at any point in time. These positive balances were intended to be the source of repayment of the $1.2 million loan.

   4.   **The $1.2 million loan was not repaid in the same manner as CCI's other loans with Allfirst.**

Ortenzio argues that the repayment of the $1.2 million loan through a borrowing on the line was consistent with how other loans had been repaid. This is absolutely incorrect.

The $1.2 million was prepaid in its entirety with a borrowing on the loan. Only the regular monthly installments of principal and interest on the equipment loan were repaid via the line of credit. The equipment loan was not prepaid in whole by a borrowing on the line. As Sheri Phillips confirmed, these regular installments on the equipment term loan were normal monthly expenses that were intended to be paid monthly from collection of customer accounts. Only if customer's did not pay their receivables timely would the line be accessed, and then to finance the accounts pending their collection.

   5.   **The repayment of the $1.2 million loan by a borrowing on the line was not merely a reversal of the initial transaction.**

Ortenzio argues that the repayment of the $1.2 million loan was merely a reversal of the initial borrowing because the proceeds of the $1.2 million loan were deposited in the checking account and reduced the balance on the line. This argument does violence to the reality of the transaction.

Before the $1.2 million loan was extended, CCI had $4 million of credit available to it. It had an outstanding balance on the line. After the $1.2 million loan was made, CCI had $5.2 million

in credit. The $1.2 million loan could have been disbursed into a separate account if CCI wanted this to occur. But, this would have caused CCI to pay interest on both the $1.2 million and the full balance of the line, in effect, a double payment. CCI, quite sensibly, had the $1.2 million deposited in its cash management account, which reduced the balance on and which gave CCI the ability to draw $1.2 million more than it could before the loan was made.

When CCI repaid the $1.2 million loan by drawing on the line, it contracted the credit available to it. More significantly, the transaction was not a mere reversal because, if the transaction was effective, it eliminated Ortenzio's guaranty as a source of repayment.

**B.    Allfirst is entitled to equitable subrogation.**

**1.    Allfirst is not suing Ortenzio for quantum meruit.**

Ortenzio continues his argument that Allfirst is suing Ortenzio in quasi contract under the doctrine of quantum meruit. Allfirst is suing Ortenzio for equitable subrogation. The variety of equitable subrogation Allfirst advances is known as legal subrogation and is not dependant on any actual or implied contract. It arises by operation of law. *Bachman v. Glazer & Glazer,* Inc., 316 Md. 405, 559 A.2d 365 (1989); *Finance Company of America v. U.S. Fidelity & Guaranty Company,* 277 Md. 177, 353 A.2d 249 (1976).

**C.    Allfirst has established a claim for equitable subrogation.**

Ortenzio argues that Allfirst is not entitled to the benefit of equitable subrogation because it did not put a provision in the $1.2 million note prohibiting use of the lien to repay it. Of course, the line of credit commitment prohibited its use for this purpose and loan documents customarily do not restrict their repayment source. This is not a situation in which a bank seeks rights in collateral which it did not take originally as security. *See Tudor Dev. Group, Inc. v. U.S. Fid. & Guaranty,* 968

F.2d 357 (3rd Cir. 1992). This is a situation in which Ortenzio improperly used Allfirst's money in a manner not authorized by the line of credit commitment and without Allfirst's knowledge or consent to pay and discharge an obligation for which he had direct, immediate, and primary liability, thereby unjustly enriching himself. This is a classic equitable subrogation situation. *See Restatement of Restitution* (1937) § 162 and *comment* b thereto, as approved by the Pennsylvania Supreme Court. . *Potoczny to Use of City of Philadelphia v. Vallejo*, 170 Pa. Super. 377, 85 A.2d 675 (1952) and *In re McGrath's Estate*, 159 Pa. Super. 78, 46 A.2d 735 (1946).

Instead of addressing Allfirst's claim and the authority supporting it, Ortenzio cites cases dealing with letters of credit, where, because of the independence principle,[3] subrogation does not apply. *See Tudor Dev. Group, Inc. v. U.S. Fid. & Guaranty*, 968 F.2d 357 (3rd Cir. 1992) ("We conclude that because the issuing bank was satisfying its own primary liability rather than the liability of another when it made the payment under the letter of credit, it may not avail itself of the common-law remedy of equitable subrogation."). The Third Circuit in *Tudor* aligned itself with the majority view that an issuing bank does not have subrogation rights when a letter of credit is drawn upon and that if the bank had wished to have its customer's independent reimbursement obligation collateralized by certain property, it should have obtained a security interest. The *Tudor* Court did not have the situation in which a defendant wrongfully used another person's money to discharge an obligation he owed.

2.      **Allfirst does not have an adequate legal remedy.**

---

[3]   The independence principle makes the issuer of a letter of credit the primary obligor with respect to the beneficiary of the letter of credit, as opposed to the letter of credit applicant. Hence, unlike the guarantor, who pays because of someone else's primary liability and is entitled to be subrogated, the letter of credit issuer pays because of its own independent liability without reference to anyone else and is not entitled to subrogation.

Allfirst does not have not have an adequate remedy at law to recover against Ortenzio on his guaranty. Enforcement of the guaranty requires that the purported payment be nullified, which requires equity and not a simple suit on a contract. *Schrader v. Heath*, 408 Pa. 79, 182 A.2d 696 (1962); *Peoples-Pittsburg Trust Co. v. Saupp*, 320 Pa. 128, 182 A. 376 (193).

D.   **Allfirst has established that Ortenzio committed fraud.**

Ortenzio advances two arguments with respect to Allfirst's fraud claim. First, he asserts that he "did not make a false statement upon which Allfirst relied." Defendant's Memorandum at 14. Then he asserts that Allfirst cannot establish that he "intended to deceive Allfirst." Defendant's Memorandum at 15.

Ortenzio forgets that under Pennsylvania law, fraud is any act or artifice done to deceive. *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991); *In re McClellan's Estate*, 365 Pa. 401, 75 A.2d 595 (1950); *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super.90, 107, 464 A.2d 1243, 1252 (1983); *Frowen v. Blank*, 493 Pa. 137, 425, 425 A.2d 412, 415 (1981).

While fraud requires a false representation, a misrepresentation need not be a positive statement. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983); *Borelli v. Barthel,* 205 Pa. Super. 442, 211 A.2d 11 (1965) The concealment of a material fact or the failure to disclose a material fact that in good faith should be disclosed mounts to a misrepresentation. *Moser v. SeSetta,* 527 Pa. 157, 589 A.2d 679 (1991); *Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 442 (1947); *Borelli v. Barthel,* 205 Pa. Super. 442, 211 A.2d 11 (1965). When good faith and fair dealing require disclosure of a fact as to which another party is unaware or is operating under a mistaken assumption and disclosure is not made so as to deceive, there is a fraudulent representation. *In re McClellan's Estate*, 365 Pa. 401,

75 A.2d 595 (1950); *Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599 (M. D. Pa. 1994); *Derby & Co.,Inc. v. Seaview Petroleum Company*, 756 F. Supp. 868 (E.D. Pa. 1991).

Furthermore, an intent to deceive is established from all of the surrounding circumstances in which the deceptive acts are committed. *Rohm & Haas Co. v. Continental Casualty Co.*, 781 A.2d 1172, 1179 (Pa. 2001); *Schecter v. Schecter*, 366 Pa. 30, 76 A.2d 753 (1950). Here, the circumstances show Ortenzio's intention to deceive Allfirst. CCI was on the verge of financial collapse. Ortenzio refused to invest any further money in the company, but he was liable on the guaranty of the $1.2 million loan. He was intent on escaping this liability before CCI failed. Allfirst, at the time, had no knowledge of CCI's financial condition or that CCI was in default for failure to maintain a $4.5 million dollar net worth and for having suffered a material adverse change in its finances. Allfirst had been told in November, 1999 that repayment would come from increased cash flow. In fact, cash flow had vanished and the payment was coming from an improper and unauthorized borrowing on the line. Schwartz believed that the payment had been made from cash flow and that CCI was in robust financial health. Ortenzio delivered the check to a bank employee, not Schwartz. This was the first time he ever involved himself in making loan payments. He telephoned to obtain an immediate return of his guaranty. Only after the guaranty was in hand did he schedule the meeting to tell Allfirst that CCI was about to fail. When he presented the check, he did not disclose that it was a borrowing or that CCI was in extreme financial distress. Schwartz knew only that a payment had been made and had no reason to know what Ortenzio was doing. CCI's own chief financial officer knew what Ortenzio was doing was unauthorized under the terms of the commitment and refused to have anything to do with making the payment. These circumstances add up to a misrepresentation and to an intention to deceive.

## IV.
## Conclusion

For these reasons, Allfirst requests that Ortenzio's motion for summary judgement be denied and that Allfirst's motion for summary judgement be granted.

*Lawrence J. Gebhardt*
Lawrence J. Gebhardt
Ramsay M. Whitworth
GEBHARDT & SMITH, LLP
401 East Pratt Street
Baltimore, Maryland 21202
(410) 752-5830
*Counsel for Plaintiff, Allfirst Bank*

### CERTIFICATION PURSUANT TO LOCAL RULE 7.8(b)

The undersigned hereby certifies to the Court that the above memorandum contains 4938 words according to the word count feature of the word processing system used to prepare the Memorandum.

*Lawrence J. Gebhardt*
Lawrence J. Gebhardt