**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA
MAY 14 2002
MARY E. D'ANDREA, CLERK
Per ___

| | | |
|---|---|---|
| ALLFIRST BANK | * | |
| Plaintiff, | * | |
| v. | * | CASE NO.: 1:01-CV-786 |
| JOHN M. ORTENZIO | * | Judge Rambo |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**I.
Introduction.**

Plaintiff, Allfirst Bank, brought this suit against Defendant, John M. Ortenzio, to nullify his attempt to improperly obtain a discharge of his personal guaranty and to enforce that guaranty against him. The complaint raises three claims based upon a payment which Ortenzio caused his wholly owned company, CCI Construction Co., Inc. to make. This payment was made by CCI drawing on an unguaranteed line of credit to prepay a short term loan which Ortenzio had guaranteed just before Ortenzio disclosed to Allfirst that CCI was on the verge of financial collapse, which followed shortly afterward. The three claims raised in the complaint are that 1) the payment through a borrowing on the line was a conditional payment that did not become effective until the line was repaid, 2) the borrowing under the line, being without Allfirst's knowledge or consent, was entitled to be subrogated to the short term loan and Ortenzio's guaranty, and 3) the circumstances of the payment amounted to common law fraud and fraudulent concealment.

Allfirst has moved for summary judgment pursuant to *F. R. Civ. P* 56 on all three counts.

This memorandum is submitted in support of that motion.

## II.
## The Undisputed Facts.[1]

**A.     The $4 million line is established to finance accounts receivable and work in progress.**

In March of 1999, Allfirst extended to CCI a $4 million line of credit. The sole purpose of the line of credit, as expressly stated in the March 24, 1999 commitment letter, was to finance CCI's accounts receivable and work in progress. This meant that the line of credit funds were to be used solely to provide short term working capital to pay monthly bills until current accounts receivable were paid by customers. No other use of loan proceeds was permitted, as Sheri Phillips, CCI's chief financial officer and the person who negotiated the line with Allfirst, has testified. The line of credit was unsecured and did not carry Ortenzio's guaranty.

The line of credit had a cash management feature. Payments from CCI's customers would be wire transferred by the customers to or deposited by CCI in an Allfirst account. If there was a balance outstanding on the line, the deposits would be applied against the line. If there was no balance outstanding on the line, the positive balance in the account would be swept overnight into an interest bearing investment and the interest credited to CCI. When checks were presented, any positive balance in the account would be used to pay the checks. To the extent any positive balance was insufficient or if there was no positive balance, the line of credit would be accessed and the checks paid by a draw on the line. Hence, CCI would access the line of credit by writing checks on the account, but the line of credit would only be accessed if and to the extent CCI did not have a

---

[1]     Annotations to the record are contained in Allfirst's Local Rule 56.1 Statement and are not repeated in this recitation of the undisputed facts.

positive balance in the account.

Borrowings under the line of credit were evidenced by a promissory note in the face amount of the line. The unpaid principal balance due under this note would fluctuate with paydowns and advances on the line.

### B. The $1.2 million guarantied loan is made to help CCI's short term cash flow problem.

During 1999, CCI's financial situation deteriorated. In November, 1999, Ortenzio requested a temporary loan from Allfirst to tide CCI over what he represented was a short term cash flow shortfall. A meeting was held between Ortenzio and Sheri Phillips, CCI's chief financial officer, and representatives of Allfirst on November 4, 1999. As a result of the meeting, Allfirst agreed to extend a temporary $1.2 million loan to CCI, which would be due on March 31, 2000. Allfirst was unwilling to extend the $1.2 million loan to CCI unless Ortenzio guaranteed the loan. To obtain the loan for CCI, Ortenzio gave his guaranty. This guaranty obligated Ortenzio on the temporary loan and authorized Allfirst to collect the loan directly from Ortenzio to the same extent as if the loan had been made to him. Repayment of the $1.2 million loan was expected to come from the increased cash flow which would result when collections were made on two large, problematic jobs. Although future cash flow was to be the source of repayment, Allfirst knew that Ortenzio had sufficient liquid assets to make the payment personally and that repayment was not dependant on CCI obtaining the cash flow it was expecting.

### C. CCI's financial condition continues to deteriorate.

CCI's financial condition worsened after the $1.2 million loan was made. CCI, which made a profit the preceding year, lost over $6 million in 1999. By February, 2000, CCI projected that it

would have a cash flow shortfall of several million dollars over the next several months. This meant that CCI's expected revenues would be millions of dollars short of the funds it needed to continue operating and stay in business. Ortenzio was fully aware of CCI's precarious financial condition and discussed the Company's financial plight and desperate need for cash with Sheri Phillips. Ortenzio, however, refused to invest any more of his money in the Company. He discussed with Sheri Phillips the possibility of a bankruptcy proceeding.

### D.     Ortenzio's ploy to escape liability under his guaranty.

Ortenzio was aware of his guaranty of the $1.2 million loan and obligation to pay this sum to Allfirst. In early February, he decided to have CCI repay the $1.2 million loan which he had guaranteed with a borrowing under the $4 million line of credit which he had not guaranteed. Sheri Phillips, the chief financial officer, opposed Ortenzio's plan. She believed this repayment would only further restrict and reduce CCI's available cash. She also believed that this payment was an unauthorized use of the line of credit, whose purpose was to finance accounts receivable and work in progress and not prepay fully funded loans. She refused to write the check to effect the repayment. Her opposition was overridden by Ortenzio, who personally wrote the check that effected a draw on the line of credit.

On Friday, February 11, 2000, Ortenzio, who had not previously been involved in making payments to Allfirst on outstanding loans, personally went to Allfirst to deliver the check that would repay the $1.2 million loan. Craig Schwartz, the Allfirst loan officer, was not present when Ortenzio arrived. Ortenzio gave the check to Schwartz's secretary and asked that it be applied to the $1.2 million loan. After personally delivering the check, Ortenzio telephoned Craig Schwartz to request an immediate return of his guaranty. He did not disclose that the payment had been made by a draw

on the unguaranteed line of credit. Because of Ortenzio's insistence, Schwartz put a rush request into Allfirst's document control section and notified Ortenzio on Tuesday, February 15, 2000, that he would return the guaranty to Ortenzio as soon as possible. Although the guaranty was returned to Ortenzio, the $1.2 million note was never returned to CCI. At the time Schwartz returned the guaranty, Allfirst was unaware that the unguaranteed line of credit, which was to be used to finance accounts and work in progress, had been used to repay the guaranteed $1.2 million loan. Allfirst also was unaware that CCI was about to collapse from a lack of available cash.

### E.    Ortenzio discloses CCI's precarious financial condition to Allfirst.

With his guaranty in hand and believing he was now free from any obligation to pay the $1.2 million loan, Ortenzio requested a meeting with Allfirst. His purpose was to apprize Allfirst of CCI's situation. The meeting was held on Friday, February 18, 2001 at Allfirst's office, exactly one week after he had CCI borrow money on its line of credit to repay the loan Ortenzio had guaranteed. Ortenzio was accompanied by Robert Chernicoff, a bankruptcy specialist he had retained just prior to the meeting to represent CCI. At the time of the meeting, Ortenzio knew that CCI had lost over $6 million dollars in 1999 and was insolvent by almost a million dollars. Allfirst had no appreciation of the severity of CCI's financial distress until Ortenzio requested the meeting, on Thursday, February 17, 2000, and disclosed the $6 million loss.

In the meeting, Ortenzio presented a cash flow projection that showed that CCI would have a cash shortage over the next 5 months of $5,873,456. He did not reveal during the meeting that the $4 million line of credit had been used to repay the $1.2 million loan he had personally guaranteed. The cash flow projection he presented at the meeting did not reflect this use of the $4 million line of credit for this purpose. As of this meeting, Allfirst had no knowledge of Ortenzio's use of the line

of credit to discharge the loan he had guaranteed.

### F.   Ortenzio compels Allfirst to shut down the line of credit.

During the meeting, Ortenzio stated that he would be meeting with CCI's bonding company during the next week and planned to solicit financial support from the bonding company. He agreed to report back to Allfirst on the results of the meeting with the bonding company. He also agreed that CCI would not write any further checks that would draw on the line of credit until he had reported back to Allfirst.

Despite his promise, Ortenzio, on the Monday following the Friday meeting, personally supervised the writing of checks that were draws on the line. When these checks were presented for payment, Allfirst dishonored the checks that Ortenzio promised would not be issued. Because of the flurry of checks that were being presented, despite Ortenzio's promise, Allfirst closed down the line of credit on Wednesday, February 23, 2000 to prevent further draws. On February 24, 2001, Allfirst formally declared CCI in default and demanded payment. Allfirst still was unaware that Ortenzio had on February 11, 2001 used the unguaranteed line to repay the $1.2 million loan he had guaranteed.

### G.   Allfirst declares a default and CCI files bankruptcy.

On February 24, 2001, Allfirst formally declared CCI in default and demanded payment. At the time default was declared, Allfirst still was unaware that Ortenzio had on February 11, 2001 used the unguaranteed line to repay the $1.2 million loan he had guaranteed. Allfirst did not learn of this use of the line until after the default had been declared.

On February 22, 24, and 25, 2000, customers of CCI wired payment of their outstanding accounts to Allfirst. These payments totaled $2,317,291.28 and were credited against the

outstanding balance under the line of credit, which now reflected the draw to prepay the $1.2 million line.

On May 19, 2000, CCI filed a petition under Chapter 11 of the *United States Bankruptcy Code*. On January 10, 2001, CCI, as debtor in possession, instituted an action to recover the customer payments as a preference under *Bankruptcy Code* § 547 in an adversary proceeding entitled CCI Construction Co., Inc. v. Allfirst Bank (Adversary No. 1-01-00011A). Allfirst is defending against the debtor in possession's claim and the matter is set for trial before the United States Bankruptcy Court for the Middle District of Pennsylvania on May 1, 2000. Any recovery in this preference action will reinstate the recovered amounts as part of the outstanding balance on the line of credit.

### H.     Allfirst's Damages.

Allfirst is claiming damages an amount equal to either (a) the unpaid principal balance of the line of credit, adjusted for any preference recovery, or (b) the unpaid principal balance of the $1.2 million loan, together with interest on the unpaid principal balance under either (a) or (b) as applicable. Allfirst requests the Court to enter judgment against Ortenzio under subparagraph (b) subject to adjustment based on the results of the bankruptcy preference litigation. This amount totals $1,394,825 as of May 31, 2002, with per day interest thereafter at the rate of 141.67 per day. Allfirst also claims attorneys fees and litigation expenses pursuant to the Suretyship Agreement signed by Ortenzio to guaranty the $1.2 million loan and requests the right to file a motion for an aware of attorneys fees and litigation expenses after entry of judgment and pursuant to *F.R.Civ.P.* 54 (d)(2).

### III.
### Law and Argument

**A.     The payment by a borrowing on the line was only a conditional payment.**

Through a long line of cases, Pennsylvania has recognized and applied the principle of conditional payment. When a debt is paid by providing the creditor with another obligation, either of the debtor or someone else, the original debt is not paid unless the obligation given to the creditor is satisfied. *Winters v. Wolfskill*, 126 Pa. Super 168, 190 A. 395 (1937); *Citizens Bank of Wind Gap v. Lipschitz*, 296 Pa. 291, 145 A. 831 (1929); *Union Electric Steel Co. v. Imperial Bank of Canada*, 286 F. 857 (3rd Cir. 1923). Payment of the debt by providing another obligation is regarded as a conditional payment and collateral security for the original debt. *Alquippa National Bank v. Harvey*, 340 Pa. 223, 16 A.2d 409 (1940) ("Presumably, if the holder of a note accepts a new note, either of the debtor or of someone else, this does not constitute an extinguishment or liquidation of the original instrument. Unless there is proof of a special agreement to the contrary, the assumption is that the precedent debt remains in effect, the new obligation being accepted only by way of collateral security or conditional payment."). If the obligation is not satisfied when it comes due, the creditor has the right to enforce the original debt or the new obligation as long as the creditor receives only one satisfaction. *First Pennsylvania Bank v. Triester*, 251 Pa. Super. 372, 380 A.2d 826 (1977); *Mechanics' National Bank of Burlington v. Klielkopf*, 22 Pa. Super. 128 (1903). The creditor may enforce the original debt against the debtor or any other person liable for the original debt. *Nuside Metal Products, Inc. v. Eazor Express, Inc.*, 189 Pa. Super. 593, 152 A.2d 275 (1959).

In *Citizens Bank of Wind Gap v. Lipschitz*, 296 Pa. 291, 145 A. 831 (1929), the Pennsylvania Supreme Court stated the applicable rule in the following terms: "The law is well settled that the

acceptance of a new obligation in place of the old is not a satisfaction of the earlier one, though made by the same person (citations omitted) and the same is true where the second note is signed by another (citation omitted)." In a subsequent case, the Pennsylvania Superior Court, in an often cited decision, phrased the principle as follows:

> It is settled by a long and unquestioned line of authorities, that when a creditor receives from his debtor the note or check of the latter, or of a third person, on account of the pre-existing debt, such note or check is only collateral to the original indebtedness; that it is taken not as absolute but as conditional payment; and that the debt will be extinguished only if the collateral obligation be paid.

*Mechanics' National Bank of Burlington v. Klielkopf*, 22 Pa. Super. 128 (1903)

*First Pennsylvania Bank v. Triester*, 251 Pa. Super. 372, 380 A.2d 826 (1977) provides an example of the application of the rule. First Pennsylvania Bank extended a 90 day loan to Triester and Mercer to partially finance a real estate project and received a note executed by both. When the note came due, First Pennsylvania renewed the note with a new 90 day note signed by both. Mercer, however, had acquired Triester's interest in the real estate project and signed an agreement indemnifying Triester from liability on the second note, but not the first. When the later note was not paid, First Pennsylvania sued on the first note only. Triester defended that the second note constituted payment of the first and hence First Pennsylvania could not sue on the first note. The trial court disagreed and was affirmed by the Superior Court, which held:

> In all other situations, in the absence of a contrary agreement, when an obligee takes a negotiable instrument which is tendered in payment of a promise to pay money, the obligor is not discharged on the underlying promise of payment until the second instrument itself is paid; once the second instrument is due, the first instrument is revived. The failure to pay on the second instrument gives rise to a cause of action on either instrument.

This case against Ortenzio falls squarely into the conditional payment rule. Allfirst held a

note from CCI in the amount of $1.2 million which was guarantied by Ortenzio. CCI, acting under the direction of Ortenzio, borrowed the amount required to repay the $1.2 million note by issuing a check that was a draw on the $4 million line. The issuance of this check increased the outstanding balance of the line and the principal balance due under the promissory note that evidenced the $4 million line of credit. What Ortenzio did was repay the $1.2 million loan by way of a borrowing under the line and an increase in the principal balance due under the line of credit promissory note. The borrowing and the increase in the line of credit promissory note was a conditional payment. Because the line and the line of credit note were never repaid in full, Allfirst has the right under an unbroken line of Pennsylvania authority to enforce the $1.2 million note and the guaranty of this note given by Ortenzio.

Ortenzio will no doubt argue that CCI issued a check drawn on its account at Allfirst which Allfirst processed and paid. Hence, the payment was not conditional but absolute. The flaw in this argument is that the check was merely a mechanism for accessing the line of credit and increasing the balance under the line of credit note. What Ortenzio gave was not a CCI instrument that was unconditionally and absolutely paid, but a promise by CCI, as reflected in the line of credit note, to repay the borrowing the check represented. Ortenzio's payment, viewed realistically for what it was, simply was the substitution of a new obligation in the form of a borrowing under the line of credit and an increase in the balance due on the line of credit note for the note evidencing the $1.2 million loan. The payment was conditional, not absolute.

**B.    The borrowing under the line is entitled to be equitably subrogated to the right of the holder of the $1.2 million loan to enforce the guaranty.**

To the extent proceeds from a borrowing under the line of credit were used to discharge the

$1.2 million loan, Allfirst, as creditor under the line, is entitled to be equitably subrogated to the right it had, as holder of the $1.2 million loan, to enforce the Ortenzio guaranty.

As the Pennsylvania Supreme Court has stated, "Subrogation is an equitable doctrine and is applicable whenever a debt or obligation is paid from funds of one person although properly payable from the funds of another." *In re McCahan's Estate*, 312 Pa. 515, 168 A. 685 (1933). Or, as stated in another case, "All the cases show that subrogation is granted as a means of placing the ultimate burden of the debt upon the person who should bear it." *Gildner, Trustee v. First National Bank and Trust Company of Bethlehem*, 342 Pa. 145, 19 A.2d 910 (1941).

The subrogation principle which Allfirst advances has been expressed best in the *Restatement of Restitution*:

> Where property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder.

*Id.* § 162, at 653 (1937). The *Restatement of Restitution Comments* following section 162 applies this rule where a person's property "is used by another without his consent in discharging an obligation of the other or a lien upon the other's property." *Id.* cmt. b, at 655

This principle also has found expression in Pennsylvania appellate decisions. *See, e.g., Potoczny to Use of City of Philadelphia v. Vallejo*, 170 Pa. Super. 377, 85 A.2d 675 (1952) and *In re McGrath's Estate*, 159 Pa. Super. 78, 46 A.2d 735 (1946), both quoting *Restatement of Restitution* § 162 as stating applicable law.

Furthermore, as explained in the *Restatement of Restitution*, "[a] person who has paid money to or for the account of another not intended by him, is entitled to restitution from the payee or from

the beneficiary of the payment . . . ." RESTATEMENT OF RESTITUTION § 22, at 97 (1937). This rule applies where a person "is mistaken as to the person to whom or to whose credit he makes the payment." *Id.* cmt. a, at 98.

The line of credit was to be used by CCI to finance accounts receivable and work in progress. Proceeds from the line were to pay regular monthly bills and expenses until customers paid their invoices from CCI. The line of credit was not to be used to prepay fully funded loans, particularly when the only purpose of the prepayment was to enable Ortenzio to escape responsibility for an obligation he freely assumed when Allfirst made the $1.2 million loan.

Because, by the terms of the commitment, the line was not to be used to prepay fully funded loans and because Allfirst was not even aware that Ortenzio had used the proceeds of the line for this purpose, the use of Allfirst's money to enable Ortenzio to escape his liability to Allfirst under the guaranty was without the knowledge or consent of Allfirst. And, this use of the line of credit unjustly enriched Ortenzio by enabling him to avoid liability on his guaranty under inequitable and unjust circumstances. Allfirst's money was used, without its knowledge or consent, to repay Allfirst so that Ortenzio would not have to pay what he agreed to pay when Allfirst made the $1.2 million loan in November of 1999.

**C.     Ortenzio committed common law fraud when he repaid the guaranteed loan with a borrowing under the unguaranteed line.**

"It is well established that fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence word of mouth, or look or gesture." *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991). Fraud "is any artifice by which a person is deceived to

his disadvantage." *In re McClellan's Estate*, 365 Pa. 401, 75 A.2d 595 (1950); *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983). "(T)he *sina qua non* of actionable fraud is a showing of a deception. *Frowen v. Blank*, 493 Pa. 137, 143, 425 A.2d 412, 415 (1981).

"The elements of intentional misrepresentation are as follows: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz v. Noon*, 556 Pa. 489, 499, 729 A.2d 555, 556 (1999); *see also Sonfast Corp. v. York International Corp.*, 875 F. Supp. 1088, 1097 (M.D. Pa 1994).

A misrepresentation need not be a positive statement. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983); *Borelli v. Barthel*, 205 Pa. Super. 442, 211 A.2d 11 (1965) ("fraudulent representations may be made by ... acts or artifices calculated to deceive"). The concealment of a material fact or the failure to disclose a material fact that in good faith should be disclosed mounts to a misrepresentation. *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991) ("The concealment of a material fact can amount to a culpable misrepresentation no less than an intentional false statement."); *Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 442 (1947) ("The deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than an intentional affirmation of a material falsity."); *Borelli v. Barthel*, 205 Pa. Super. 442, 211 A.2d 11 (1965) ("fraudulent representations may be made by ... acts or artifices calculated to deceive").

When good faith and fair dealing require disclosure of a fact as to which another party is

unaware or is operating under a mistaken assumption and disclosure is not made so as to deceive, there is a fraudulent representation. *In re McClellan's Estate*, 365 Pa. 401, 75 A.2d 595 (1950) ("Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of a fact or by silence when good faith required expression."); *Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599 (M. D. Pa. 1994) (suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, especially if suppressed fact is particularly within knowledge of one party and of such a nature that other party is justified in assuming its non-existence.) As one United States District Court held:

> The failure to disclose a material fact amounts to a misrepresentation where disclosure would correct a mistake as to a basic assumption and non-disclosure amounts to a failure to act in good faith and in accordance with standards of fair dealing. Restatement (Second) of Contracts, § 161.

*Derby & Co., Inc. v. Seaview Petroleum Company*, 756 F. Supp. 868 (E.D. Pa. 1991).

Ortenzio's actions in prepaying a personally guaranteed loan by a borrowing under an unguaranteed line of credit granted to finance accounts receivable and work in process on the eve of CCU's financial collapse amounts to fraud. Ortenzio knew that the line was to finance accounts and inventory and, based on his discussions with Sheri Phillips, that the use of the line to repay the $1.2 million loan was an unauthorized borrowing. He knew that a borrowing under the line did not amount to a payment from cash flow as he had originally told Allfirst would occur when the loan came due. He was fully aware of CCI's financial distress, having been kept fully apprized of CCI's financial circumstances by Sheri Phillips, and that bankruptcy was a real possibility. He also knew the $1.2 million loan was not due until March 31, 2000 and certainly realized that CCI might not survive until that date under its financial circumstances.

Ortenzio knew when he made the payment that Allfirst was unaware of CCI's financial distress. He also knew that Allfirst was expecting the $1.2 million to be repaid from increased cash flow and did not expect it to be repaid from a borrowing on the line that would do nothing more than convert guaranteed debt into unguaranteed debt and make a collectible loan uncollectible. At no time did Ortenzio ever disclose to Allfirst the source of the money used to repay the $1.2 million loan, despite numerous opportunities to do so.

He did not disclose CCI's financial condition prior to prepaying the $1.2 million loan. Under his guaranty, a material adverse change in CCI's financial condition was an event of default and authorized Allfirst to collect the $1.2 million loan immediately from him.

Ortenzio simply used the line to prepay his guaranteed loan in the hope that Allfirst would be deceived and not discover what he had done. He requested an immediate return of his guaranty in the hope that the return would confirm that he had succeeded in his deception. Once he had the guaranty, he retained bankruptcy counsel for CCI and scheduled a meeting with Allfirst to reveal CCI's financial situation. Even then, he still did not reveal what he had done and left Allfirst to labor under the mistaken assumption that the money to repay the $1.2 million loan had come from a source other than the line.

To its detriment, Allfirst fell for Ortenzio's artifice, mistakenly believing him to have dealt in good faith and with fair dealing when he in actuality had dealt with fraud and deception.

## IV.

## Conclusion.

For these reasons, Allfirst asks that summary judgment be entered in its favor in the amount of $1,394,825, together with per diem interest in the amount of $141.67 for each day after May 31, 2002.

*(signature)*

Lawrence J. Gebhardt
Ramsay M. Whitworth
GEBHARDT & SMITH, LLP
401 East Pratt Street
Baltimore, Maryland 21202
(410) 752-5830

*Counsel for Plaintiff, Allfirst Bank*