IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK                    *

    Plaintiff,                   *

v.                               *    CASE NO.:   1:01-CV-786

JOHN M. ORTENZIO                 *

    Defendant.                   *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S STATEMENT PURSUANT TO LOCAL RULE 56.1

    Plaintiff, Allfirst Bank, by its undersigned attorneys, propounds pursuant to Local Rule 56.1 the following statement of facts which it contends are either undisputed or indisputable.

    1.    In March of 1999, Allfirst extended to CCI a $4 million line of credit.  Exhibit A (Commitment Letter); Exhibit B (Promissory Note).

    2.    The sole purpose of the line of credit, as expressly stated in the March 24, 1999 commitment letter, was to finance CCI's accounts receivable and work in progress.  Exhibit A (Commitment Letter).

    3.    The line of credit was unsecured and did not carry Ortenzio's guaranty.  Exhibit B (Promissory Note).

    4.    The line of credit had a cash management feature.  Exhibit B (Promissory Note). Payments from CCI's customers would be wire transferred by the customers to or deposited by CCI in an Allfirst account.  Exhibit N (Ortenzio at 61-67); Exhibit M (Phillips at 16-23); Exhibit O (Schwartz at 175-177).  If there was a balance outstanding on the line, the deposits would be applied against the line.  Exhibit N (Ortenzio at 61-67); Exhibit M (Phillips at 16-23); Exhibit O (Schwartz

at 175-177). If there was no balance outstanding on the line, the positive balance in the account would be swept overnight into an interest bearing investment and the interest credited to CCI. Exhibit N (Ortenzio at 61-67); Exhibit M (Phillips at 16-23); Exhibit O (Schwartz at 175-177). When checks were presented, any positive balance in the account would be used to pay the checks. Exhibit N (Ortenzio at 61-67); Exhibit M (Phillips at 16-23); Exhibit O (Schwartz at 175-177). To the extent any positive balance was insufficient or if there was no positive balance, the line of credit would be accessed and the checks paid by a draw on the line. Exhibit N (Ortenzio at 61-67); Exhibit M (Phillips at 16-23); Exhibit O (Schwartz at 175-177). CCI would access the line of credit by writing checks on the account, but the line of credit would only be accessed if and to the extent CCI did not have a positive balance in the account. Exhibit N (Ortenzio at 61-67); Exhibit M (Phillips at 16-23); Exhibit O (Schwartz at 175-177).

5.      Borrowings under the line of credit were evidenced by a promissory note in the face amount of the line. Exhibit B (Promissory Note).

6.      The unpaid principal balance due under this note would fluctuate with paydowns and advances on the line. Exhibit N (Ortenzio at 61-67); Exhibit M (Phillips at 16-23).

7.      During 1999, CCI's financial situation deteriorated. Contrast Exhibit F (1998 Financial Statement) with Exhibit G (Internal 1999 Financial Statement); Exhibit M (Phillips at 24).

8.      In November, 1999, Ortenzio requested a temporary loan from Allfirst to tide CCI over an anticipated short term cash flow shortfall. Exhibit N (Ortenzio at 73).

9.      A meeting was held between Ortenzio and Sheri Phillips, CCI's chief financial officer, and representatives of Allfirst on November 4, 1999. Exhibit C (Schwartz Memorandum).

10.      As a result of the meeting, Allfirst agreed to extend a temporary $1.2 million loan to

CCI, which would be due on March 31, 2000.  Exhibit D (Commitment Letter).

11.     Allfirst was unwilling to extend the $1.2 million loan to CCI unless Ortenzio guarantied the loan.  Exhibit N (Ortenzio at 94).

12.     To obtain the loan for CCI, Ortenzio gave his guaranty.  Exhibit E (Suretyship).

13.     This guaranty obligated Ortenzio on the temporary loan and authorized Allfirst to collect the loan directly from Ortenzio to the same extent as if the loan had been made to him. Exhibit E (Suretyship).

14.     Repayment of the $1.2 million loan was expected to come from the increased cash flow which would result when collections were made on two large, problematic jobs.  Exhibit M (Phillips at 34-35); Exhibit N (Ortenzio at 88).

15.     Ortenzio had sufficient liquid assets to pay the $1.2 million loan personally.  Exhibit N (Ortenzio at 95-96); Exhibit I (Personal Financial Statement).

16.     CCI's financial condition worsened after the $1.2 million loan was made.  Exhibit M (Phillips at 24); Exhibit F (1998 Financial Statement); Exhibit G (Internal 1999 Financial Statement). CCI, which made a profit the preceding year, lost over $6 million in 1999.  Exhibit M (Phillips at 24); Exhibit F (1998 Financial Statement); Exhibit G (Internal 1999 Financial Statement).

17.     By February 14, 2000, CCI projected that it would have a cash flow shortfall of several million dollars over the next several months.  Exhibit H (Cash Flow Projection).

18.     Ortenzio was aware of CCI's  financial condition and discussed the Company's financial condition with Sheri Phillips.  Exhibit M (Phillips at 41-44).

19.     Ortenzio refused to invest any more of his money in the Company.  Exhibit M (Phillips at 45; 51-52).

20.     Prior to February 18, 2000, Ortenzio discussed with Sheri Phillips the possibility of a bankruptcy proceeding for CCI.  Exhibit M (Phillips at 48).

21.     Ortenzio was aware of his guaranty of the $1.2 million loan and obligation to pay this sum to Allfirst.  Exhibit N (Ortenzio at 94); Exhibit M (Phillips at 37).

22.     In early February, Ortenzio decided to have CCI repay the $1.2 million loan which he had guaranteed with a borrowing under the $4 million line of credit which he had not guaranteed.  Exhibit N (Ortenzio at 105; 112-122); Exhibit O (Schwartz at 181-182).

23.     Sheri Phillips, the chief financial officer, opposed Ortenzio's plan to repay the $1.2 million loan with a borrowing under the line of credit.  Exhibit M (Phillips at 36-38).

24.     Sheri Phillips refused to write the check to effect the repayment. Exhibit M (Phillips at 37).

25.     Ortenzio had the check written without Sheri Phillips' involvement.  Exhibit M (Phillips at 38); Exhibit N (Ortenzio at 106-107).

26.     On Friday, February 11, 2000, Ortenzio personally went to Allfirst to deliver the check that would repay the $1.2 million loan.  Exhibit N (Ortenzio at 105; 108).

27.     Craig Schwartz, the Allfirst loan officer, was not present when Ortenzio arrived.  Exhibit N (Ortenzio at 110).

28.     Ortenzio gave the check to Schwartz's secretary and asked that it be applied to the $1.2 million loan.  Exhibit N (Ortenzio at 111).

29.     After personally delivering the check, Ortenzio telephoned Craig Schwartz to request an immediate return of his guaranty.  Exhibit O (Schwartz at 190-191).

30.     In the telephone call, Ortenzio did not disclose to Schwartz that the payment had been

made by a draw on the unguaranteed line of credit.  Exhibit N (Ortenzio at 110-122; 182-187); Exhibit O (Schwartz at 181).

31.     At Ortenzio's request, Schwartz put a rush request into Allfirst's document control section and notified Ortenzio on Tuesday, February 15, 2000, that he would return the guaranty to Ortenzio as soon as possible.  Exhibit O (Schwartz at 190-191).

32.     The guaranty was returned to Ortenzio.  Exhibit O (Schwartz at 149).

33.     The $1.2 million note was never returned to CCI.  Exhibit O (Schwartz at 149).

34.     When Allfirst returned the guaranty, it had not been told by Ortenzio that the unguaranteed line of credit had been used to repay the guaranteed $1.2 million loan.  Exhibit O (Schwartz at 181; 196-98).

35.     When Allfirst returned the guaranty, it had not been told by Ortenzio of CCI's current financial condition.  Exhibit N (Ortenzio at 126-127).

36.     After he received his guaranty, Ortenzio requested a meeting with Allfirst.  Exhibit N (Ortenzio at 123).

37.     Ortenzio's purpose in requesting the meeting was to apprize Allfirst of CCI's financial situation.  Exhbit N (Ortenzio at 146-148).

38.     The meeting was held on Friday, February 18, 2001 at Allfirst's office.  Exhibit N (Ortenzio at 124).

39.     Ortenzio was accompanied by Robert Chernicoff, an attorney he had retained just prior to the meeting to represent CCI.  Exhibit N (Ortenzio at 127-128).

40.     Chernicoff was a bankruptcy specialist.  Exhibit N (Ortenzio at 132-133).

41.     At the time of the meeting, Ortenzio knew that CCI had lost over $6 million dollars

in 1999 and was insolvent by almost a million dollars. Exhibit N (Ortenzio at 144; 151); Exhibit G (Internal 1999 Financial Statement).

42.    Prior to Ortenzio requesting the meeting, Allfirst had not been told by Ortenzio that CCI had lost over $6 million dollars in 1999 and was insolvent by almost a million dollars. Exhibit N (Ortenzio at 152; 158 -161).

43.    In the meeting, Ortenzio presented a cash flow projection that showed that CCI would have a cash shortage over the next 5 months of $5,873,456. Exhibit N (Ortenzio at 155); Exhibit H (Cash Flow Projection).

44.    Ortenzio did not reveal during the meeting that the $4 million line of credit had been used to repay the $1.2 million loan he had personally guaranteed. Exhibit N (Ortenzio at 182-183).

45.    The cash flow projection Ortenzio presented at the meeting did not reflect the use of the $4 million line of credit to repay the $1.2 million loan. Exhibit H (Cash Flow Projection); Exhibit M (Phillips at 59-60).

46.    During the meeting, Ortenzio stated that he would be meeting with CCI's bonding company during the next week and planned to solicit financial support from the bonding company. Exhibit P (Elias at 10-12).

47.    During the meeting, Ortenzio agreed to report back to Allfirst on the results of the meeting with the bonding company. Exhibit P (Elias at 10-11).

48.    During the meeting, Ortenzio agreed that CCI would not write any further checks that would draw on the line of credit until he had reported back to Allfirst. Exhibit P (Elias 10-12).

49.    Ortenzio, on the Monday following the Friday meeting, personally supervised the writing of checks that were draws on the line. Exhibit M (Phillips at 38); Exhibit N (Ortenzio at

106-107).

50.     Allfirst dishonored the checks that Ortenzio had CCI issue.  Exhibit P (Elias 19-20).

51.     Allfirst closed down the line of credit on Wednesday, February 23, 2000 and prevented further draws on the line of credit.  Exhibit P (Elias at 19-20).

52.     On February 24, 2000, Allfirst formally declared CCI in default and demanded payment.  Exhibit J (Default Letter).

53.     As of February 24, 2000, Ortenzio had not disclosed to Allfirst that on February 11, 2001 the unguaranteed line had been drawn upon to repay the $1.2 million loan he had guaranteed.  Exhibit P (Elias at 25-26).

54.     On February 22, 24, and 25, 2000, customers of CCI wired payment of their outstanding accounts to Allfirst.   Exhibit K (Bankruptcy Adversary Complaint); Exhibit L (Accumulated Transaction List).  These payments totaled $2,317,291.28 and were credited against the outstanding balance under the line of credit, which now reflected the draw to prepay the $1.2 million line.  Exhibit K (Bankruptcy Adversary Complaint); Exhibit L (Accumulate Transaction List).

55.     On May 19, 2000, CCI filed a petition under Chapter 11 of the *United States Bankruptcy Code*.  Exhibit K (Bankruptcy Adversary Complaint).

56.     On January 10, 2001, CCI, as debtor in possession, instituted an action to recover the customer payments as a preference under *Bankruptcy Code* § 547 in an adversary proceeding entitled CCI Construction Co., Inc. v. Allfirst Bank (Adversary No. 1-01-00011A).  Exhibit K (Bankruptcy Adversary Complaint).

57.     Allfirst is defending against the debtor in possession's claim and the matter is set for

trial before the United States Bankruptcy Court for the Middle District of Pennsylvania on May 30,

2000.

Lawrence J. Gebhardt, *Pro Hac Vice*
Ramsay M. Whitworth, PA Bar # 85208
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202
(410) 385-5100

*Attorneys for Allfirst Bank*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13 day of May, 2002, a copy of the *Plaintiff's Statement Pursuant to Local Rule 56.1* was sent via Federal Express to Edward I. Swichar, Esquire and Robert A. Burke, Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA 19103, *Attorneys for Defendant*.

Lawrence J. Gebhardt



DEFENDANT'S EXHIBIT

# FIRST NATIONAL BANK OF MARYLAND

## A Division of FMB Bank

Regional Corporate Group, Mail Code 133-02-01
3045 Market Street, Camp Hill, PA 17011-4530
Telephone: 717 612-5026 Facsimile: 717 612-5027

March 23, 1999

Ms. Sheri Phillips
Chief Financial Officer
CCI Construction Co., Inc.
P.O. Box 1129
Mechanicsburg, PA  17055

Dear Ms. Phillips:

I am pleased to advise you that The First National Bank of Maryland, a Division of FMB Bank (hereafter "Bank") has increased and reaffirmed an unsecured line of credit (hereafter "Loan") to CCI Construction Co., Inc. (hereafter "Borrower") as follows:

| | |
|---|---|
| Principal Amount of Loan: | $4,000,000.00 |
| Interest Rate: | Bank's Base Rate as in effect from time to time, minus ½% |
| Repayment Schedule: | Interest monthly, principal on demand |
| Use of Proceeds: | Finance work in process and accounts receivable |
| Collateral: | Unsecured |

Borrowings under the Loan will bear interest at an annual rate equal to the Bank's Base Rate as in effect from time to time, minus one-half percent (-1/2%). This interest rate will change when and as the Bank's Base Rate changes. Interest shall be calculated on the basis of the actual number of days in the current calendar year divided by 360. Interest will be payable monthly upon submission of the Bank's statement therefor.

Borrowings under the Loan will be payable on demand. If no demand is made, the Loan will expire and all borrowings will be due and payable, together with interest thereon, on April 30, 2000.

Ms. Sheri Phillips
CCI Construction Co., Inc.
March 23, 1999
Page Two

<u>Terms and Conditions:</u>

1. Annual CPA – audited financial statements of CCI Construction Co., Inc.

2. Quarterly work in process reports for CCI Construction Co., Inc.

3. Quarterly Company prepared financial statements of CCI Construction Co., Inc.

4. Monthly borrowers certification with monthly accounts receivable aging and listing.

5. Primary business deposits of CCI Construction Co., Inc. to be maintained at The First National Bank of Maryland, a Division of FMB Bank.

6. Negative pledge of assets other than purchase money.

7. The Company shall maintain a minimum tangible net worth of $4,500,000.00 measured at year end.

8. Advances not to exceed 80% of qualified accounts receivable less than 90 days past dues, excluding retainages.

Availability of the Loan is contingent upon the Borrower and the Bank entering into mutually acceptable loan documentation setting forth terms and conditions stated herein and such other terms and conditions, covenants, warranties and representations as may be required by the Bank and be mutually acceptable to the Borrower and the Bank. All terms and conditions contained herein shall survive the execution of such loan documentation.

This commitment is contingent upon the right of the Bank at any time hereafter and from time to time to review the commitment, to adjust terms and conditions, or to discontinue the commitment should the Bank in a reasonable exercise of its sole business discretion deem it necessary to do so.

C 0034

Ms. Sheri Phillips
CCI Construction Co., Inc.
March 23, 1999
Page Three

Please acknowledge your concurrence with these terms and conditions by signing, dating and returning the enclosed copy of this letter to the Bank on or before March 31, 1999.

Very truly yours,

Craig J. Schwartz
Vice President

CJS/jkp

Enclosure

ACKNOWLEDGED AND ACCEPTED THIS 24th DAY OF March , 1999.

ATTEST:                                          CCI CONSTRUCTION CO., INC.

BY: _____              BY: _____
    Title: ASSISTANT SECRETARY                  Title: CFO

C 0035



EXHIBIT
Ortenzio-3
21/31/01 FB

\* a division of
FMB Bank



FILM/CASH SOLUTIONS PROMISSORY NOTE
(PENNSYLVANIA)

**Instructions to Loan Officer:** Use for (a) loans to corporations, regardless of amount, and (b) loans to non-corporate borrowers when the only purpose of any such loan is business and the principal amount of such loan exceeds $50,000.

$ _4,000,000.00_ _____    _Mechanicsburg, PA_ ____    _March 24_ , _1999_
                             (City)          (State)

FOR VALUE RECEIVED, the undersigned ("Borrower") promises to pay on demand to the order of THE FIRST NATIONAL BANK OF MARYLAND, ██████████████████ ("Bank"), at any of Bank's offices, or at such other place as the holder of this Promissory Note may from time to time designate, the principal sum of _FOUR MILLION_ _____ and __ _00_ /100 Dollars ($ _4,000,000.00_ ), or such other amount as may be advanced from time to time to Borrower, together with interest thereon at the rate or rates hereafter specified and any and all other sums which may be owing to Bank by Borrower pursuant to this Promissory Note. The following terms, as well as the applicable terms on Exhibit A, attached hereto and incorporated herein by reference, shall apply to this Promissory Note.

1.    DEFINITIONS. The following terms have the following definitions:

A.    "Account" means the commercial checking account maintained by Borrower with Bank and designated as Account No. _28864514_ _____, together with any replacement account therefor.

B.    "Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in the Commonwealth of Pennsylvania are authorized to close.

C.    "Incremental Advance Amount" means the amount indicated on Exhibit A as the Incremental Advance Amount. Each Loan must be an integral multiple of such amount.

D.    "Initial Excess Balance" means, for any Business Day, the amount by which the collected balance in the Account at the end of such Business Day after posting all credits to the Account (subject to funds availability), but prior to posting any debits to the Account, exceeds the Target Balance.

E.    "Line Availability" means, for any Business Day, an amount equal to the difference obtained by subtracting the aggregate principal balance outstanding under all Loans from the Maximum Line Amount.

F.    "Loan" means an advance of monies from Bank to Borrower pursuant to the terms of this Promissory Note; and the term "Loans" means more than one Loan.

G.    "Maximum Advance Amount" means an amount equal to the highest integral multiple of the Incremental Advance Amount which does not exceed the Line Availability.

H.    "Maximum Line Amount" means the amount indicated on Exhibit A as the Maximum Line Amount, which amount is the maximum aggregate principal balance of the Loans which may be outstanding at any one time.

I.    "Minimum Loan Advance" means the amount indicated on Exhibit A as the Minimum Loan Advance, which amount is the minimum principal amount of each Loan.

J.    "Presented Items" means, for any Business Day, the aggregate amount of debits which have been presented for payment against the Account.

K.    "Prime Rate" means a fluctuating annual rate of interest equal to the greater of: (i) that rate announced from time to time by Bank as its "prime rate;" or (ii) the rate obtained by adding one percent (1%) to the average rate, rounded to the nearest one-tenth of one percent, for three month maturity dealer placed commercial paper for the week most recently reported in the Federal Reserve Statistical Release No. H.15(519) entitled "Selected Interest Rates" or any succeeding publication.

L.    "Target Balance" means the amount indicated on Exhibit A as the Target Balance, which amount is the minimum collected balance that must be maintained in the Account.

2.    PROCEDURES FOR LOANS. All Loans shall be made in the form of a transfer of funds into the Account in accordance with the procedures set forth in this paragraph. Borrower hereby irrevocably authorizes Bank to make Loans in accordance with the procedures set forth herein. At the end of each Business Day, Bank shall calculate the Initial Excess Balance and the aggregate amount of the Presented Items. In the event the Initial Excess Balance is less than the aggregate amount of the Presented Items, Bank shall make a Loan by transferring funds into the Account in an amount equal to the amount, which when added to the Initial Excess Balance, would be equal to the aggregate amount of the Presented Items; provided, however, that: (a) the principal amount of the Loan shall not be less than the Minimum Loan Advance; (b) the principal amount of the Loan must be an integral multiple of the Incremental Advance Amount, and therefore, if it would not otherwise be an integral multiple of the Incremental Advance Amount, the amount of the Loan will be rounded up to the next higher integral multiple of the Incremental Advance Amount unless there is insufficient Line Availability in which case the Loan amount will be the Maximum Advance Amount; and (c) the principal amount of the Loan shall not exceed the Maximum Advance Amount. If at any time the amount of the Initial Excess Balance is less than the amount of the Presented Items by an amount greater than the Maximum Advance Amount, Bank shall: (i) make a Loan by transferring funds into the Account in an amount equal to the Maximum Advance Amount; and (ii) determine, in its sole discretion, which Presented Items will be paid, and which Presented Items will not be paid. In the event the Initial Excess Balance is greater than the amount of the Presented Items, Bank shall post and pay all of the Presented Items. If, following Bank's posting and paying of all of the Presented Items, there remains a balance in the Account in excess of the Target Balance, Bank is hereby irrevocably authorized to debit the Account in an amount up to the portion of the balance in the Account which exceeds the Target Balance, and apply such sums to the outstanding balance of the Loans. Bank agrees to make such debit of the Account to repay sums outstanding under the Loans as of the end of each Business Day; provided, however, that in the event the option labeled "Cash Solutions Protection" is marked on Exhibit A attached hereto, Bank shall not automatically debit the Account to make payments on the Loans, but may do so, in its sole and absolute discretion.

3.    TERMINATION. The procedure for making Loans, and the obligation of Bank to provide Loans, as set forth in this Promissory Note, may be terminated by Borrower upon ten (10) days prior written notice to Bank and may be terminated by Bank upon thirty (30) days prior written notice to Borrower. Upon termination, no further Loans shall be made under this Promissory Note, but all other terms of this Promissory Note (including, but not limited to, the holder's right to demand payment at any time and for any reason) shall remain in full force and effect.

BS-3102A-9811 PAGE 1                                                    PK 10

4.    INTEREST. From ~~date~~ ate hereof until all sums due hereunder, including princ~~~~, interest, charges, fees and expenses are paid in full, the principal amount outstanding from time to time pursuant to this Promissory Note shall bear interest as follows (Check One):

[ ]    Fluctuating Rate.  At a fluctuating rate equal to _____% per annum above the Prime Rate in effect from time to time.  Bank at its discretion may charge a lesser rate from time to time.  Interest on the principal amount outstanding shall be adjusted daily, with the rate for each day being adjusted to reflect the Prime Rate in effect at the close of business on that day.  Bank makes loans at interest rates at, above and below the Prime Rate.

[X]    Other. (describe):    <u>Interest shall accrue at a rate per annum equal to the Bank's</u>
<u>Base Rate minus 1/2% as in effect from time to time.</u>

5.    CALCULATION OF INTEREST.  Interest shall be calculated on the basis of a three hundred sixty (360) days per year factor applied to the actual days on which there exists an unpaid balance hereunder.

6.    REPAYMENT.  Borrower shall make payments of principal and interest in accordance with the following terms:
(a)    Principal:    ALL SUMS OUTSTANDING UNDER THIS PROMISSORY NOTE, INCLUDING THE PRINCIPAL AMOUNT OF ALL OF THE LOANS, ARE IMMEDIATELY DUE IN FULL UPON THE FIRST TO OCCUR OF: (i) THE DEMAND OF THE HOLDER OF THIS PROMISSORY NOTE, WHICH DEMAND MAY BE MADE AT ANY TIME AND FOR ANY REASON, IN THE SOLE AND ABSOLUTE DISCRETION OF THE HOLDER OF THIS PROMISSORY NOTE; OR (iii) THE OCCURRENCE OF ANY DEFAULT UNDER THE TERMS OF THIS PROMISSORY NOTE. ~~with 30 days written notice~~
(b)    Interest:    Borrower shall make payments of all accrued and unpaid interest on the _31st_ day of each successive month, beginning on _March 31, 1999_ and continuing until all sums outstanding hereunder are paid in full.
Borrower may prepay this Promissory Note in whole or in part at any time or from time to time without premium or additional interest.

7.    LATE PAYMENT CHARGE.  If any payment due hereunder (including any payment in whole or in part of principal) is not received by the holder within fifteen (15) calendar days after its due date, Borrower shall pay a late payment charge equal to five percent (5%) of the amount then due.

8.    APPLICATION OF PAYMENTS.  All payments made pursuant to this Promissory Note shall be applied first to accrued and unpaid interest, then to unpaid expenses and charges payable hereunder, and then to principal; or in such other order or proportion as the holder, in the holder's sole discretion, may elect from time to time.

9.    See below → UNSECURED
SECURITY.  Sums due under this Promissory Note are secured by, and Borrower grants to Bank a security interest in, all deposits and property of Borrower now or at any time hereafter in the possession of or on deposit with Bank whether as custodian or depository, or in any other capacity. Bank shall have the right to set-off and apply against the obligations of Borrower to Bank guidanced by this Promissory Note any sums of Borrower at any time on deposit with Bank whether such deposits are special, time or demand, provisional or final.  In addition, this Promissory Note is secured by any property described by collateral in any security agreement, pledge agreement or other document previously, simultaneously, or hereafter entered into by Borrower in connection with any obligation or liability of Borrower to Bank or any corporate affiliate of Bank, such other security document(s) include but are not limited to the following:

[ ]    Security Agreement(s)

[ ]    Real estate mortgage or deed of trust on property known as _____
located in _____ County/City, State of _____

[X]    Other (describe):    <u>Unsecured</u>

This Promissory Note specifically incorporates by reference, as if fully set forth herein, all of the language and provisions of the security documents described generally or specifically above.

10.    REPRESENTATIONS AND WARRANTIES.  Borrower (and if more than one Borrower, each Borrower) represents and warrants to Bank that the following statements are true, correct and complete as of the date hereof, and as of the date each Loan is made hereunder: (a) it is duly organized and in good standing under the laws of the state in which it is organized; (b) it has the full power and authority to execute, deliver and perform this Promissory Note; (c) neither such execution, delivery and performance, nor compliance by it with the provisions of this Promissory Note will conflict with or result in a breach or violation of its organizational documents, or any judgment, order, regulation, ruling or law to which it is subject or any contract or agreement to which it is a party or to which any of its assets and properties are subject; (d) this Promissory Note constitutes its legal, valid and binding obligation enforceable in accordance with its terms; (e) there is no litigation or proceeding pending or, to the knowledge of its representative signing this Promissory Note on its behalf, threatened against or affecting it which might materially adversely affect its business, financial condition or operations or its ability to perform and comply with this Promissory Note; (f) all financial statements and information furnished or to be furnished to Bank hereunder have been and will be prepared in accordance with generally accepted accounting principles and fairly present its financial condition as of the dates thereof and the results of its operations for the period covered thereby; (g) it is not in violation of any applicable federal, state or local law, statute, rule, regulation or ordinance and has not received any notice nor is the subject of any investigation to the affect that its operations are not in material compliance with any such law, statute, rule, regulation or ordinance, including, without limitation, applicable environmental, health and safety laws and regulations; (h) since September 2, 1974, no pension, employee benefit, multi-employer, profit sharing, savings, stock bonus or other deferred compensation plan ("Plan") maintained by it or any trade or business group with which it is affiliated subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA") has been terminated, no lien exists against Borrower in favor of the Pension Benefit Guaranty Corporation ("PBGC"), and no "reportable event" (as such term is defined in ERISA) has occurred with respect to any such Plan, and Borrower has not incurred any "accumulated funding deficiency" within the meaning of ERISA or any liability to the PBGC in connection with any Plan; and (i) no information, exhibit, report, statement, certificate or document furnished by Borrower or any other person to Bank in connection with the Loans, this Promissory Note or the negotiation thereof contains any material

Page -2-

misstatement of fact or ~~to state a material fact or any fact necessary to make~~ statements contained herein or therein not misleading.

11.   DEFAULT.  Any of the following will be a default under this Promissory Note:  (a) failure to pay any principal, expense, fees, charge or interest when due, or failure to perform any other obligations hereunder; (b) a default by any Borrower upon any of the existing or future obligations of any Borrower to Bank; (c) a default by any guarantor or other person other than Borrower that is now or hereafter liable upon or in connection with any of the obligations of any Borrower to Bank or that has granted any lien or security interest to or for the benefit of Bank to secure any of the obligations of any Borrower to Bank ("Other Obligor"), upon any of the existing or future obligations of any Other Obligor to Bank; (d) a default in any other agreement, instrument or document between any Borrower and Bank, or any corporate affiliate of Bank, including, without limitation, any security document referred to above, whether previously, simultaneously, or hereafter entered into; (e) ~~a material adverse change in the financial condition of any Borrower or Other Obligor from that expressed in the financial statement most recently submitted to Bank prior to the date of this Promissory Note, as determined in good faith by Bank in its sole discretion;~~ (f) institution of bankruptcy, insolvency, reorganization or receivership proceedings by or against any Borrower or Other Obligor in any state or federal court; (g) the appointment of a receiver, assignee, custodian, trustee or similar official under any federal or state insolvency or creditors' rights law for any property of any Borrower or Other Obligor; (h) ~~failure of any Borrower or Other Obligor to furnish to Bank such collateral or additional collateral as Bank may in good faith request;~~ (i) any warranty, representation, or statement to Bank by or on behalf of any Borrower or Other Obligor proving to have been incorrect in any material respect when made or furnished; (j) the occurrence of any event which is, or would be with the passage of time or the giving of notice or both, a default under any indebtedness of any Borrower or Other Obligor to any person other than Bank; (k) any material loss, theft or substantial damage, which is not fully insured, to any of the assets of any Borrower or Other Obligor, or the sale, transfer, lease, encumbrance or other disposition of all or any material part of the assets of any Borrower or Other Obligor other than in the ordinary course of business of Borrower or Other Obligor; (l) the entry of any final judgment against any Borrower or Other Obligor for the payment of money in excess of $5,000.00; (m) the levy upon or attachment of any assets of any Borrower or Other Obligor; (n) ~~the recordation of any federal, state or local tax lien against any Borrower or Other Obligor;~~ (o) a change of ownership or dissolution, merger, consolidation, liquidation or reorganization of any Borrower or Other Obligor which is a corporation, partnership or other legal entity; (p) ~~the death of any Borrower or Other Obligor who is a natural person;~~ (q) failure of any Borrower or Other Obligor to furnish to Bank such financial information as Bank may require from time to time, including, but not limited to, such financial statements as Bank may require; (r) failure of any Borrower or Other Obligor to comply with all laws, rules, regulations and decrees to which such Borrower or Other Obligor may be subject, the violation of which may have a material adverse effect on the business operation or financial condition of such Borrower or Other Obligor; (s) ~~the acquisition by a Borrower of all or substantially all of the assets, properties or equity interest of any other person or entity without Bank's prior written consent;~~ (t) failure of any Borrower to maintain its existence in good standing in the jurisdiction of its organization; (u) any of the licenses or permits which are necessary to the conduct of any Borrower's business as now conducted is not maintained in full force and effect; or (v) ~~the determination in good faith by Bank, in its sole discretion, that the ability of any Borrower or Other Obligor to pay or perform any of their respective obligations to Bank is impaired for any reason.~~

12.   REMEDIES.  Upon a default, in addition to all other rights and remedies available to the holder of this Promissory Note under any document or agreement between Borrower and Bank or under applicable law, the holder of this Promissory Note, in the holder's sole discretion and without notice or demand, may raise the rate of interest accruing on the unpaid principal balance outstanding under this Promissory Note by two (2) percentage points above the rate of interest otherwise applicable.  The Bank shall have no further obligation to provide any Loans to Borrower following: (a) a demand by Bank for payment hereunder; or (b) a default under this Promissory Note.  Borrower agrees that a default under this Promissory Note is a default by Borrower under all other liabilities and obligations of Borrower to the holder, and that the holder shall have the right to declare immediately due and payable all liabilities and obligations owed by Borrower to the holder of this Promissory Note.

13.   CONFESSION OF JUDGMENT.  Borrower irrevocably and unconditionally authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Borrower in any court in one or more proceedings, or before any clerk thereof or prothonotary or other court official, and appear for, to confess and enter judgment against Borrower, at any time, whether before or after the occurrence of any default hereunder, with or without averment of default, with or without complaint filed, and without prior notice or opportunity of Borrower for prior hearing, in favor of the holder of this Promissory Note in the full amount outstanding on this Promissory Note (including principal, accrued interest and any and all charges, fees and expenses) plus court costs, plus attorneys' fees equal to fifteen percent (15%) of the unpaid balance of principal, interest, charges, and other sums outstanding hereunder, with release of all errors and without right of appeal.  Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Borrower any right or privilege of exemption, homestead rights, appraisement, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment.  (To the extent prohibited by applicable law, any judgment obtained by confession shall not constitute a lien on any real property located in Pennsylvania which is the residence of the Borrower.)  The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions from time to time, in the same or different jurisdictions, as often as the holder shall deem necessary or advisable.  BORROWER HEREBY ACKNOWLEDGES THAT THE CONFESSION OF JUDGMENT PROVISIONS HEREIN CONTAINED WHICH AFFECT AND WAIVE CERTAIN LEGAL RIGHTS OF BORROWER HAVE BEEN READ, UNDERSTOOD AND VOLUNTARILY AGREED TO BY BORROWER.

14.   EXPENSES.  Borrower shall pay all costs and expenses, including attorneys' fees (to the extent not prohibited by law) incident to the making of the Loans.  Borrower shall pay all costs and expenses incurred by Bank in collecting sums due under this Promissory Note, including without limitation the costs of any lien, judgment or other record searches, appraisals, travel expenses and the like.  In addition, if this Promissory Note is referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, Borrower shall pay all of the holder's costs, fees (including, but not limited to, the holder's attorneys' fees, charges and expenses) and all other expenses resulting from such referral.

15.   AMENDMENTS.  The fees and charges required to be paid by Borrower in connection with the Loans may, at any time and from time to time, be amended by Bank, upon prior written notice thereof to Borrower and otherwise in compliance with applicable law.  Any such amendment shall become effective on the first day of the month in which Borrower obtains a Loan, after the date specified in the notice of amendment (which date shall be not less than thirty (30) days from the date

Page -3-

the notice was mailed to Borrower), or upon such other date as may be required in accordance with applicable law. If Borrower obtains a Loan after the date specified in the notice, the changes in the fees and charges described in the amendment shall apply to all outstanding unpaid indebtedness and obligations under this Promissory Note, whether incurred or arising prior to, upon, or after the effective date of the amendment.

16.   NEGOTIABLE INSTRUMENT.  Borrower agrees that this Promissory Note shall be deemed to be a negotiable instrument, even though this Promissory Note may not qualify under applicable law, absent this paragraph, as a negotiable instrument.

17.   WAIVERS.  Borrower, and all parties to this Promissory Note, whether maker, indorser, or guarantor, waive presentment, demand, notice of dishonor and protest.

18.   EXTENSIONS OF MATURITY.  All parties to this Promissory Note, whether maker, indorser, or guarantor, agree that the maturity of this Promissory Note, or any payment due hereunder, may be extended at any time or from time to time without releasing, discharging, or affecting the liability of such party.

19.   NOTICES.  Any notice or demand required or permitted by or in connection with this Promissory Note, without implying the obligation to provide any notice or demand, shall be in writing at the address set forth below or to such other address as may be hereafter specified by written notice to Bank by Borrower.  Any such notice or demand shall be deemed to be effective as of the date of hand delivery or facsimile transmission, one (1) day after dispatch if sent by telegram, mailgram, overnight delivery, express mail or federal express, or three (3) days after mailing if sent by first class mail with postage prepaid.

20.   ASSIGNABILITY.  This Promissory Note may be assigned by Bank or any holder at any time.

21.   JOINT AND SEVERAL LIABILITY.  If more than one person or entity is executing this Promissory Note as Borrower, all liabilities under this Promissory Note shall be joint and several with respect to each of such persons or entities.

22.   BINDING NATURE.  This Promissory Note shall inure to the benefit of and be enforceable by Bank and Bank's successors and assigns and any other person to whom Bank may grant an interest in Borrower's obligations to Bank, and shall be binding and enforceable against Borrower and Borrower's personal representatives, successors and assigns.

23.   INVALIDITY OF ANY PART.  If any provision or part of any provision of this Promissory Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Promissory Note and this Promissory Note shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality or unenforceability.

24.   MAXIMUM RATE OF INTEREST; COMMERCIAL LOAN.  Notwithstanding any provision of this Promissory Note to the contrary, Borrower shall not be obligated to pay interest hereunder in excess of the maximum rate of interest permitted by the laws of any state determined to govern this Promissory Note or the laws of the United States applicable to loans in such state.  If any provision of this Promissory Note shall ever be construed to require the payment of any amount of interest in excess of that permitted by applicable law, then the interest to be paid hereunder shall be held subject to reduction to the amount allowed under applicable law, and any sums paid in excess of the interest rate allowed by law shall be applied in reduction of the principal balance outstanding under this Promissory Note.  Borrower acknowledges that it has been contemplated at all times by Borrower that the laws of the Commonwealth of Pennsylvania will govern the maximum rate of interest that it is permissible for the holder of this Promissory Note to charge Borrower under this Promissory Note.  Borrower warrants that this Promissory Note evidences a loan made solely to acquire or carry on a business or commercial enterprise.

25.   CHOICE OF LAW; CONSENT TO VENUE AND JURISDICTION.  This Promissory Note shall be governed, construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania, even if the Commonwealth of Pennsylvania rules governing conflicts of laws would otherwise require that the laws of another jurisdiction govern this Promissory Note.  Borrower consents to the jurisdiction and venue of the courts of any city or county in the Commonwealth of Pennsylvania or to the jurisdiction and venue of the United States District Court for the Middle District of Pennsylvania in any action or judicial proceeding brought to enforce, construe or interpret this Promissory Note.

26.   UNCONDITIONAL OBLIGATIONS.  Borrower's obligations under this Promissory Note shall be the absolute and unconditional duties and obligations of Borrower and shall be independent of any rights of set-off, recoupment or counterclaim which Borrower might otherwise have against the holder of this Promissory Note, and Borrower shall pay absolutely the payments of principal, interest, fees, charges and expenses required hereunder, free of any deductions and without abatement, diminution or set-off.

27.   ACTIONS AGAINST BANK.  Any action brought by Borrower against Bank which is based, directly or indirectly, or in whole or in part, upon this Promissory Note or any matter related to this Promissory Note shall be brought only in the courts of the Commonwealth of Pennsylvania.

28.   WAIVER OF JURY TRIAL.  Borrower (by execution of this Promissory Note) and Bank (by acceptance of this Promissory Note) agree that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by Borrower, Bank, or any successor or assign of Borrower or Bank on or with respect to this Promissory Note or which in any way relates, directly or indirectly, to the obligations of Borrower to Bank under this Promissory Note, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury.  BORROWER AND BANK HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING.  Borrower and Bank acknowledge and agree that this provision is a specific and material aspect of the agreement between the parties and that Bank would not enter into the transaction with Borrower if this provision were not a part of their agreement.

[SIGNATURES CONTAINED ON NEXT PAGE]

IN WITNESS WHERE~~~, and intending to be legally bound hereby, the undersigned executes this Promissory Note under seal, as Borrower, as of the date first written above.

WITNESS/ATTEST*:

CCI Construction Co, Inc
(Name of Organization)

7500 Old Gettysburg Rd
(Street Address)

Camp Hill, Pa 17011
(City-State-Zip)

717-909-4224    717-909-4610
(Telephone)              (Facsimile)

*E M Avery*

E. M. AVERY  ASSISTANT SECRETARY
(Print Name)

By: _____, CFO              (SEAL)
(Authorized Signature)

Sheri Phillips, CFO
(Print Name and Title)

By: _____        (SEAL)
(Authorized Signature)

_____
(Print Name)

_____
(Print Name and Title)

*NOTE:  Attestation by a corporate officer of another corporate officer's capacity to sign is required in all corporate transactions.

If Borrower is an individual he or she should sign below:

WITNESS:

_____          _____(SEAL)

(Print Name)                   (Print Name)

                               _____
                               (Street Address)

                               _____
                               (City-State-Zip)

                               _____
                               (Telephone)          (Facsimile)

BS-3108A-9811 PAGE 5                                                    PK 10

**EXHIBIT A**
**FILM/Cash Solutions Promissory Note**

Account Number: __28864514__

Borrower: __CCI Construction Company, Inc.__

    The terms and provisions of the option checked below are incorporated in and made a part of the FILM/Cash Solutions Promissory Note executed by Borrower to which this Exhibit A is attached:

[X]    **FILM LOAN OPTION** - The following terms apply to this option:

    i)    Maximum Line Amount - __$4,000,000.00__

    ii)    Minimum Loan Advance - $0.01

    iii)    Incremental Advance Amount - __$1.00__

    iv)    Target Balance - $ __0__

    v)    Fees - __0__

[ ]    **CASH SOLUTIONS PROTECTION OPTION** - The following terms apply to this option:

    i)    Maximum Line Amount - _____

    ii)    Minimum Loan Advance - $500.00

    iii)    Incremental Advance Amount - $500.00

    iv)    Target Balance - $_____

    v)    Fees - _____

[ ]    **CASH SOLUTIONS MAXIMIZER OPTION** - The following terms apply to this option:

    i)    Maximum Line Amount - _____

    ii)    Minimum Loan Advance - $500.00

    iii)    Incremental Advance Amount - $500.00

    iv)    Target Balance - $_____

    v)    Fees - _____

    vii)    Balance in Account is not transferred to investments until all Loans are paid in full.

[ ]    **CASH SOLUTIONS LOAN OPTION** - The following terms apply to this option:

    i)    Maximum Line Amount - _____

    ii)    Minimum Loan Advance - $500.00

    iii)    Incremental Advance Amount - $500.00

    iv)    Target Balance - $_____

    v)    Fees - _____

WITNESS/ATTEST:

BORROWER:

CCI Construction Co., Inc

By: _____ (SEAL)
Name: Sheri Phillips
Title: CFO

If Borrower is an individual he or she should sign below:

_____ (SEAL)
Name: _____

PA-FCS-PN
10/13/98

Exhibit "A" - Page 1



DEFENDANT'S
EXHIBIT

5

## INTER-OFFICE MEMORANDUM

TO:   File

FROM:   Craig Schwartz

DATE:   11/4/99

RE:   CCI Construction

---

A meeting was held with Sherri Phillips CFO and John Ortenzio President of CCI and Michael Zarcone to discuss the requested financing of a line of credit increase.

We decided that an increase of $1,200,000.00 million will be done on a temporary basis and CCI will get an additional $500,000 from private sources. This should be sufficient to meet their current cash flow shortage.

C 0558

 allfirst


DEFENDANT'S
EXHIBIT

Allfirst Bank
P.O. Box 2961
Harrisburg, PA 17105-2961

November 5, 1999

Mr. John M Ortenzio, President
CCI Construction Co., Inc
P.O. Box 8800
Mechanicsburg, PA 17055

Dear John:

I am pleased to inform you that Allfirst Bank (hereinafter "Bank") has approved a $1,200,000 partially secured line of credit to CCI Construction Co., Inc. (hereinafter "Borrower") as follows:

| | |
|---|---|
| Principal Amount of Line: | $1,200,000.00 |
| Interest Rate: | Bank's Base Rate as in effect from time to time, minus 1/2%. |
| Repayment: | Interest payable monthly, principal on demand. |
| Use of Proceeds: | Finance work in progress and accounts receivable. |
| Collateral: | Specific equipment financed, including titled vehicles |

Borrowings under Loan will bear interest at an annual rate equal to the Bank's Base Rate as in effect from time to time, minus one-half percent. This interest will change when and as the Bank's Base Rate changes. Interest will be calculated on the basis of the actual number of days in the current calendar year divided by 360. Interest will be payable monthly upon submission of the Bank's notice therefor.

Borrowings under the Loan will be payable on demand. If no demand is made, the Loan will expire and all borrowings will be due and payable, together with interest thereon, on March 31, 2000.

Borrowings under the Loan shall be limited to 80% of the Borrower's qualified accounts receivable which are less than 90 days past due, excluding retainages.

C 0400

CCI Construction Co., Inc.
November 5, 1999
Page Two

The Loan will be supported by the personal Suretyship of John M. Ortenzio limited to $1,200,000.

The Borrower shall furnish the Bank with financial reporting as follows:

1.  Annual CPA- audited financial statements of CCI Construction Co., Inc.

2.  Quarterly work in process reports for CCI Construction, Co., Inc.

3.  Quarterly Company prepared financial statements of CCI Construction Co., Inc.

4.  Monthly borrowers certification with monthly accounts receivable aging and listing.

5.  Annual personal financial statement of John M. Ortenzio.

The Borrower shall maintain a primary business deposit relationship with the Bank.

The Borrower will not create, assume or permit to exist, any mortgage, pledge, lien or encumbrance of or upon, or security interest in any of Borrower's property or assets now owned or hereafter acquired in favor of the Bank, other than purchase money, without prior written consent of the Bank.

The availability to the Loan is contingent upon the Borrower and the Bank entering into mutually acceptable loan documentation setting forth the terms and conditions contained herein and such other terms and conditions, covenants, warranties and representations as may be required by the Bank and be mutually acceptable to the Borrower and the Bank. All terms and conditions contained herein shall survive the execution of such loan documentation.

The commitment is contingent upon the right of the Bank at any time hereafter and from time to time to review the commitment, to adjust terms and conditions, or to discontinue the commitment should the Bank in the reasonable exercise of its sole business discretion deem it necessary to do so.

CCI Construction Co., Inc.
November 5, 1999
Page Three


Please indicate the acceptability of these terms and conditions by dating, signing, and returning an executed copy of this letter no later than November 19, 1999.

Very truly yours,


Craig J. Schwartz
Vice President

CJS/mas

Enclosure

ACKNOWLEDGED AND ACCEPTED THIS          DAY OF                    , 1999.

ATTEST:                                    CCI CONSTRUCTION CO., INC.

BY: _____             BY: _____
        Title: Sec/Treas                          Title: Pres


WITNESS:                                   SURETY:

_____                 _____
                                          John M. Ortenzio

C 0402

 allfirst

COMMERCIAL LOAN NOTE
LINE OF CREDIT

$    1,200,000.00                                                                    Date 11-8-99

FOR VALUE RECEIVED, the undersigned,  CCI Construction Co., Inc.
a (corporation/partnership/limited liability company/individual) (the "Borrower"), jointly and severally (if more than one), promise
to pay to the order of ALLFIRST BANK, a Maryland state-chartered commercial bank (the "Bank") or its assigns, the principal
amount of ONE MILLION TWO HUNDRED THOUSAND & NO/100 DOLLARS
to be paid as follows:
Principal is payable on demand.

Interest is payable monthly, accrued to date of Bank's notice thereof,
with all accrued and unpaid interest, and unpaid fees and charges, due
with the principal payment.

Interest shall accrue at a rate per annum equal to the Bank's Base Rate minus .50000%
as in effect from time to time. The term "Bank's Base Rate," which is not
necessarily the lowest rate of interest charged by the Bank, is defined as the prime
rate of interest for loans established by the Bank from time to time.

Interest shall be calculated on the basis of the actual number of days elapsed and a year of 360 days. Both principal and
interest are payable in lawful money of the United States of America at any office of Bank in immediately available funds. If
any payment due hereunder is received by the Bank more than fifteen (15) calendar days after its due date, the Borrower
shall pay a late payment charge equal to five percent (5%) of the amount then due or $10.00, whichever is greater.

APPLICATION OF PAYMENTS. All payments made hereunder shall be applied first to late payment charges or other
sums owed to the Bank, next to accrued interest, and then to principal, or in such other order or proportion as the Bank, in
its sole and absolute discretion, may elect from time to time.

SECURITY. The payment of this note and any renewals, extensions and modifications thereof, and the payment,
performance and discharge of all other present or future indebtedness, obligations and undertakings (individual, joint,
several, direct, contingent, or otherwise) of the Borrower to or for the benefit of the Bank, whether arising directly to the
Bank under this note or under any other agreement, promissory note or undertakings now existing or hereinafter entered
by the Borrower to the Bank (collectively, the "Liabilities") is secured by the property described in, and under and pursuant
to the terms and conditions of that certain:
Collateral as set forth in a Security Agreement – Specific Collateral dated 11 / 8 / 99

<div style="border:1px solid">EXHIBIT
7
2/12/0Y  HMH</div>

As additional security for the Liabilities, Borrower grants the Bank a lien upon and a security interest in any securities,
instruments or other personal property of Borrower now or hereafter in Bank's possession and in any deposit balances now
or hereafter held by Bank for Borrower's account and in all proceeds of any such personal property or deposit balances.
Such liens and security interests shall be independent of Bank's right of setoff.

STATEMENT OF ACCOUNT. The Bank will furnish the Borrower with a statement of account on a periodic basis. Each
and every statement of account shall be final, conclusive and binding upon the Borrower in all respects as to the
outstanding balance of principal and as to all loans, fees, interest, charges, payments, receipts, balances, and all other
matters reflected therein unless the Borrower, within ten (10) days after the posting thereof in the United States mail, shall
give notice to the Bank in writing of any objections which the Borrower may have to any such statement of account; and
in such event, only those items expressly objected to in such written notice shall be considered to be disputed by the
Borrower and all other items shall be binding.

PAYMENT OF COSTS. In addition to the principal and interest payments specified above, the Borrower shall pay to the
Bank or any other holder of this note, upon demand, all costs and expenses (including reasonable attorneys' fees, whether
or not litigation is commenced) which may be incurred by the Bank or such holder in the collection or enforcement of this
note. Said costs shall include reasonable attorneys' fees and costs in bankruptcy proceedings and any costs and attorneys'
_s incurred for any action or proceeding in relation to the loan transaction, including but not limited to the joinder of
_nk in any action between the Borrower and a third party.

CE-111-1

C 1057                                                                              6/99

**DEFAULTS.** The Borrower shall be in default hereunder upon the occurrence of any of the following events: (a) the nonpayment when due of any amount payable on any of the Liabilities, or the failure of any Obligor to observe or perform any agreement of any nature whatsoever with the Bank (the term "Obligor" as used herein being meant to include the Borrower and all persons liable on the note or any renewals, extensions, or modification thereof, such as endorsers, sureties, or guarantors); (b) if any Obligor becomes insolvent or makes an  assignment for the benefit of creditors, or if any petition is filed by or against any Obligor under any provisions of any law or statute alleging that such Obligor is insolvent or unable to pay debts as they mature; (c) the entry of any judgment against any Obligor or the issuing of any attachment or garnishment against any property of any Obligor or the occurrence of any change in the financial condition of any Obligor which in the sole judgment of the Bank is materially adverse; (d) the dissolution, merger, consolidation or reorganization of any Obligor, which is an entity such as a corporation, limited partnership, partnership or limited liability company; (e) the death of any Obligor who is a natural person; (f) any information heretofore or hereinafter furnished to the Bank by any Obligor in connection with the loan evidenced hereby or any suretyship or guaranty should be materially false; and (g) the failure of any Obligor to furnish such financial and other information as the Bank may reasonably request. If this Note is payable on demand, Bank's right to demand payment hereof shall not be restricted or impaired by the absence of, non-occurrence of or waiver of a default hereunder, and it is understood that Bank may demand payment at any time ~~after giving Borrower a 30-day written notice of demand.~~ *30 days written notice* *[handwritten initials JM RP]*

**ACCELERATION AND ENFORCEMENT RIGHTS.** Whenever the Borrower shall be in default as aforesaid, (1) unless the Bank elects otherwise, the entire unpaid amount of such of the Liabilities as are not then due and payable shall become immediately due and payable without ~~notice to or~~ demand on any Obligor, and (2) the Bank may at its option exercise from time to time any of all rights and remedies available to it at law or in equity. The Borrower waives all right to stay of execution or garnishment and exemption of property in any action to enforce any of the Liabilities.

*[handwritten JM]* **JUDGMENT.** The Borrower does hereby authorize and empower any attorney of any court of record of Pennsylvania or *reasonable attorney fees* elsewhere to appear for and enter judgment against Borrower for the above sum, with or without declaration, with costs of suit, including reasonable attorneys' fees and fees in bankruptcy proceedings, if any, release of errors, without stay of execution, and with ~~fifteen (15%)~~ percent added for collection fees, and the Borrower further agrees that real, personal or mixed property may be sold or garnished upon any writ of execution or writ of garnishment as now or hereafter provided by law or the Pennsylvania Rules of Civil Procedure governing the enforcement of judgments; and Borrower hereby waives and releases all relief from any appraisement, stay or exemption laws of any state now in force or hereafter enacted. If a copy hereof, verified by affidavit, shall have been filed in such proceeding, it shall not be necessary to file the original as a warrant of attorney. The Borrower (and each of them, if more than one) hereby waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of this warrant and power to confess judgment shall be deemed to exhaust its power, whether or not any such exercise shall be held by any court to be invalid, voidable or void, but this power shall continue undiminished and may be exercised from time to time as often as Bank shall elect until all sums due hereunder shall have been paid in full.

**WAIVERS.** The Borrower hereby, waives presentment, notice of dishonor and protest. The Borrower hereby waives and releases all errors, defects and imperfections of a procedural nature in any proceedings instituted by the Bank hereunder, as well as all benefit that might accrue to the Borrower by virtue of any present or future laws exempting any property, real or personal, or any part of the proceeds arising from any sale of such property, from garnishment, attachment, levy or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment. The Borrower agrees that any property, real or personal, that may be levied upon pursuant to any writ of execution or writ of garnishment issued on any judgment by virtue of this note, may be sold, in whole or in part, in any order desired by the Bank.

**HOLDERS IN DUE COURSE.** This note may be assigned by the Bank or any subsequent holder of this note at any time or from time to time. The Borrower hereby agrees that no subsequent holder of this note to whom the note was transferred for value shall be subject to any claims or defenses which the Borrower may have against a prior holder, all of which are waived as to such subsequent holder, and that all such subsequent holders shall have all of the rights of a holder in due course even though the subsequent holder may not qualify, under applicable law, absent this paragraph, as a holder in due course.

**MISCELLANEOUS.** Any failure of the Bank to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any other time. If the Borrower consists of more than one person, such persons shall be jointly and severally liable hereunder. The Borrower intends this to be a sealed instrument and to be legally bound hereby. This note shall inure to the benefit of and be enforceable by the Bank and its successors and assigns and be binding and enforceable against the Borrower, its legal representatives, successors and permitted assigns. All issues arising hereunder shall be governed by the laws of Pennsylvania without giving  effect to choice of law rules.

CCI Construction Co., Inc.

WITNESS OR ATTEST:

BORROWER:

_____

_____
(Name of Individual, Corporation,
Partnership or Limited Liability Company)

_____
Name and Title                    (Seal)

By: _____
Name and Title                    (Seal)

_____
Name and Title                    (Seal)

By: _____
Name and Title                    (Seal)

_____
Name and Title                    (Seal)

By: _____
Name and Title                    (Seal)

_____
Name and Title                    (Seal)

By: _____
Name and Title                    (Seal)

2500 Old Gettysburg Road Camp Hill, PA  17001
Address

CE-111-2

6/99

C 1058



**allfirst**     **EXHIBIT**     SURETYSHIP AGREEMENT

*under the #1,200,000 commercial loan note dated 11-8-99*

Date __11-8-99__

For value received, the Undersigned, jointly and severally, hereby unconditionally agree to make prompt payment of all obligations, indebtedness and liabilities due Allfirst Bank, a Maryland state-chartered commercial bank, hereinafter called "Bank," of any kind, whether now existing or hereafter arising due or which may become due, whether by acceleration or otherwise, absolute or contingent, joint or several, direct or indirect, secured or unsecured by CCI Construction Co., Inc.

hereinafter called "Borrower," all such obligations being hereinafter further described and collectively called the "Liabilities," and the Undersigned agree(s) to pay all expenses (including attorneys' fees and legal expenses, whether or not litigation is commenced) paid or incurred by the Bank in endeavoring to collect the Liabilities or any part thereof, whether or not bankruptcy has been declared, and in enforcing this Suretyship Agreement. The liability of the Undersigned hereunder is a primary and direct obligation without regard to any other obligor or security or collateral held by the Bank.

The Undersigned hereby waive all notices of any character whatsoever with respect to this Suretyship Agreement and the Liabilities of the Borrower for which the Suretyship Agreement has been executed, including but not limited to notice of the acceptance hereof and reliance hereon and notice of default by the Borrower. The Undersigned hereby give consent to the Bank to the taking of, or failure to take, from time to time, without notice to the Undersigned, any action of any nature whatsoever with respect to the Liabilities of the Borrower, with respect to any rights against any person or persons, including the Borrower and any of the Undersigned, in any respect, including, but not limited to, any postponements, compromises, indulgences, waivers, extensions, exchanges, releases, and satisfactions. The Undersigned shall remain fully liable on this Suretyship Agreement, notwithstanding any of the foregoing.

This Suretyship Agreement shall in all respects be a continuing, absolute and unconditional one, and shall remain in full force and effect (notwithstanding, without limitation, the death, incompetency or dissolution of any of the Undersigned or that at any time, or from time to time, all Liabilities may have been paid in full). This Suretyship Agreement is subject to discontinuance as to any of the Undersigned only upon actual receipt by the Bank of written notice from such Undersigned, or any person duly authorized and acting on behalf of such Undersigned, of the discontinuance hereof as to such Undersigned; provided, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such Undersigned hereunder with respect to (a) any and all Liabilities existing prior to the time of actual receipt of such notice by the Bank, (b) any and all Liabilities created or acquired thereafter pursuant to any previous binding commitments made by the Bank, (c) any and all extensions or renewals of any of the foregoing, (d) any and all interest on any of the foregoing, and (e) any and all expenses paid or incurred by the Bank in endeavoring to collect any of the foregoing and in enforcing this Suretyship Agreement against such Undersigned. All obligations of the Undersigned under this Suretyship Agreement shall, notwithstanding any such notice of discontinuance, remain fully in effect until all Liabilities not subject to an effective notice of discontinuance (including any extensions or renewals of any thereof) and all such interest and expenses shall have been paid in full. Any notice of discontinuance by or on behalf of any one of the Undersigned shall not affect or impair the obligations hereunder of any other of the Undersigned.

At the option of Bank, all Liabilities of Borrower shall become immediately due and payable by the Undersigned, without demand or notice, in the event any of the following shall occur: (a) Borrower shall fail to make any payment or meet any other liability when due; (b) Borrower or the Undersigned shall fail to observe or perform any obligation, term, condition or provision of Borrower under any document evidencing or securing the Liabilities, this Suretyship Agreement or any other agreement, document, certificate, instrument of security, suretyship or guaranty given by Borrower to Bank; (c) Any representation, warranty or certificate made or furnished by Borrower to Bank, in connection with the Liabilities or any other agreement, document, certificate, instrument of security, suretyship or guaranty given by Borrower to Bank or in any certificate, financial statement or separate assignment made hereunder shall be materially false; (d) Borrower or any of the Undersigned shall make an assignment for the benefit of creditors; (e) Proceedings in bankruptcy or for reorganization of Borrower or any of the Undersigned or for the readjustment of any of their debts under the Bankruptcy Act, as amended, or in any part thereof, or under any other act or law, whether state or federal, for the relief of debtors now or hereafter existing, shall be commenced by or against Borrower or the Undersigned; (f) A receiver or trustee shall be appointed for Borrower or any of the Undersigned or for any substantial part of their assets; or any proceedings are instituted for the dissolution, or the full or partial liquidation, of Borrower or any of the Undersigned; or, if Borrower or the Undersigned is a partnership, the death of any general partner; or (i) Borrower or any of the Undersigned ceases doing business as a going concern.

As security for the Liabilities hereunder, the Undersigned hereby grants Bank a security interest in the following:

NONE

Together with a right, without demand or notice of any kind, at any time and from time to time when any amount shall be due and payable by the Undersigned hereunder and in such order of application as the Bank may elect, to set-off against all monies, deposits or other property of any kind, without limitation, owned by the Undersigned or in which the Undersigned has a joint or contingent interest and which are in possession of Bank for any reason whatsoever.

The Undersigned further agree that, if at any time, any part of any payment theretofore applied by the Bank to any of the Liabilities is or must be returned by the Bank for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Borrower), such Liabilities shall, for the purposes of this Suretyship Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Bank, and this Suretyship Agreement shall continue to be effective or be reinstated, as the case may be as to such Liabilities, all as though such application by the Bank had not been made. In such an event the Undersigned hereby waives any right of contribution, subrogation or indemnification against the Borrower, for a period of twelve (12) months subsequent to the last payment made or due to be made from Borrower to Bank.

The Bank may, from time to time, whether before or after any discontinuance of this Suretyship Agreement, at its sole discretion and without notice to the Undersigned (or any of them), take any or all of the following actions: (a) retain or obtain a security interest in any property to secure any of the Liabilities or any obligation hereunder; (b) retain or obtain the primary or secondary obligation of any obligor or obligors in addition to the Undersigned, with respect to any of the Liabilities; (c) extend or renew for one or more periods (whether or not longer than the original period), alter or exchange any of the Liabilities, or release or compromise any obligation of any of the Undersigned hereunder or any obligation of any nature of any other obligor with respect to any of the Liabilities, (d) release its security interest in, or surrender, release or permit any substitution or exchange for, all or any part of any property securing any of the Liabilities or any obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such property; and (e) resort to the Undersigned (or any of them) for payment of any of the Liabilities, whether or not the Bank shall have resorted to any property securing any of the Liabilities for payment of any of the Liabilities, or any obligation hereunder or shall have proceeded against any other of the Undersigned or any other obligor primarily or secondarily obligated with respect to any of the Liabilities.

Any amounts received by the Bank from whatsoever source on account of the Liabilities may be applied by Bank toward the payment of such of the Liabilities and in such order of application, as the Bank may from time to time elect; and, notwithstanding any payments made by or for the account of the Undersigned pursuant to this Suretyship Agreement, the Undersigned shall not be subrogated to any rights of the Bank until such time as this Suretyship Agreement shall have been discontinued as to all of the Undersigned and the Bank shall have received payment of the full amount of all Liabilities and all obligations of the Undersigned hereunder. The Bank shall not be obligated under any theory of law relating to the marshalling of payment received or security interest granted under the terms of this Suretyship Agreement.

(the Bank may, from time to time, ~~~~ before or after any discontinuance of this Suretyship ~~~~~
them), assign or transfer any or all; of ~~~~ Liabilities or any interest therein; and, notwithstanding ~~~~~ Agreement, without notice to the undersigned (or a~~
assignment or transfer thereof, such Liab~~~~~s shall be and remain Liabilities for the purpose of this Suretyship Agreement and each and every immediat~~
and successive assignee or transferee of any of the Liabilities or of any interest therein shall, to the extent of the interest of such assignee or transferee ~~~~
the Liabilities, be entitled to the benefits of this Suretyship Agreement to the same extent as if such assignee or transferee were the Bank; provid~~
however, that unless the Bank shall otherwise consent in writing, the Bank shall have an unimpaired right prior and superior to that of any such assign~~
or transferee, to enforce this Suretyship Agreement for the benefit of the Bank, as to those of the Liabilities which the Bank has not assigned ~~
transferred.

No modification or waiver of any of the provisions of this Suretyship Agreement shall be binding upon the Bank except as expressly set forth in ~~
writing duly signed by each of the Undersigned and the Bank. No action of the Bank permitted hereunder shall in any way affect or impair the rights of the ~~
Bank and the obligation of the Undersigned under this Suretyship Agreement. For the purpose of this Suretyship Agreement, Liabilities shall include ~~
obligations of the Borrower to the Bank notwithstanding any right or power of the Borrower or anyone else to assert any claim or defense as to th~~
invalidity or unenforceability of any such obligation and no such claim or defense shall affect or impair the obligations of the Undersigned hereunder.

The Liability of the Undersigned for Liabilities of Borrower incurred on or prior to the date hereof shall not exceed, at any time, the aggregate principal
amount of **ONE MILLION TWO HUNDRED THOUSAND & NO/100 DOLLARS**
($ **1,200,000.00** ), plus interest as stated in the evidence of indebtedness given by Borrower to Bank and fiftee~~
percent (15%) attorneys' commission; provided that this Suretyship Agreement shall also be applicable to and extend to any and all Liabilities, plu~~
interest and costs as aforesaid, of Borrower arising after the date hereof even if the total of such Liabilities plus the Liabilities outstanding on or prior t~~
the date hereof exceed the aforementioned aggregate principal amount. If no limitation is inserted in this paragraph, there is no limit to the liability of th~~
Undersigned to the Bank.

The creation or existence from time to time of Liabilities in excess of any amount to which the right of recovery under this Suretyship Agreement i~~
limited is hereby authorized, without notice to the Undersigned (or any of them), and shall in no way affect or impair the rights of the Bank and th~~
obligation of the Undersigned under this Suretyship Agreement.

The Undersigned, jointly and severally, do hereby authorize and empower any prothonotary or clerk or attorney of any court of record of Pennsylvani~~
or elsewhere, to appear for and confess judgment against any or all of the Undersigned in favor of Bank for the total liability of the Undersigned as se~~
forth herein together with interest thereon, with or without declaration, with costs of suit, release of errors, without stay of execution or garnishment an~~
with fifteen percent (15%) for collection fees, and waive the right of inquisition, and the benefit of all exemption laws now or hereinafter enacted, and ~~
agree to condemnation and the sale of real estate or personal property, or a writ of execution.

In the event the Bank acquires any property securing this Suretyship Agreement after a foreclosure sale as to real property or a public auction sale a~~
to personal property, the Undersigned agrees to indemnify and hold the Bank harmless from any loss, costs, or expense which the Bank may sustain as ~~
result of: (a) selling the real or personal property so acquired for less than the total sums owed by the Borrower to the Bank, provided, however, that an~~
such sale by the Bank is done in a commercially reasonable manner or (b) any action brought against the Bank under §548 or §544(b) of th~~
United States *Bankruptcy Code*, as amended, on the ground that the consideration paid by the Bank for the real or personal property was no~~
"fair equivalent value," within the contemplation of §544(b) of the United States *Bankruptcy Code*, as amended, or any applicable state fraudulen~~
conveyance act.

The Undersigned waive and release the Bank from any damages which the Undersigned may incur as a result of any intentional or unintentional o~~
negligent action or inaction of the Bank impairing, diminishing, or destroying any of the Undersigned's rights of subrogation which the Undersigned may ~~
have upon payment of any of the Borrower's obligations. The Undersigned acknowledges previously having waived, under certain conditions, any suc~~
rights.

The Undersigned hereby agrees that this Suretyship Agreement shall apply to ~~any~~ obligation which the Bank may incur as the result of any paymen~~
to Bank by or on behalf of the Borrower which is determined to be a preference payment benefiting the undersigned.

If a photostatic copy hereof shall have been filed in any of said proceedings, it shall not be necessary to file the original as a warrant of attorney. The
foregoing warrant and power to confess judgment shall not be deemed to have been exhausted by any single exercise thereof, whether or not any such
exercise shall be held by any court to be invalid, voidable or void, but may be exercised from time to time, as often as the Bank shall elect, until all sums
payable or that may become payable by each of the Undersigned have been paid in full.

A subsequent guaranty or suretyship by the Undersigned or any other guarantor or surety of the Borrower's Liabilities given to the Bank shall not be
~~~~med to be in lieu of or to supersede or terminate this Suretyship Agreement but shall be construed to be additional or supplementary unless otherwise
~~~ressly provided therein; and in the event the Undersigned or any other guarantor or surety has given to the Bank a previous guaranty or Suretyship
~~reement, this Suretyship Agreement shall be construed to be additional or supplementary, and not to be in lieu thereof or to terminate such previous
Suretyship Agreement, guaranty or guaranties unless expressly so provided herein.

This Suretyship Agreement shall be binding upon the Undersigned, and upon the heirs, legal representatives, successors and assigns of the
Undersigned, and to the extent that the Borrower or any of the Undersigned is an entity such as a partnership, limited partnership, limited liability
company, corporation or any other similar entity, all references herein to the Borrower and to the Undersigned, respectively, shall be deemed to include
any successor or successors, whether immediate or remote, to such entity. If more than one party shall execute this Suretyship Agreement, the term
"Undersigned" as used herein shall mean all parties executing this Suretyship Agreement and each of them, and all such parties shall be jointly and
severally obligated hereunder.

This Suretyship Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania without giving
effect to choice of law rules. Wherever possible each provision of this Suretyship Agreement shall be interpreted in such manner as to be effective and
valid under applicable law but if any provision of this Suretyship Agreement shall be prohibited by or invalid under such law, such provision shall be
ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this
Suretyship Agreement.

INTENDING TO BE LEGALLY BOUND HEREBY, the Undersigned have set their respective hands and seals the day and year first above written.

WITNESS OR ATTEST:

(SURETY) **John M. Ortenzio**

_____

_____

_____

Title _____

By: _____
Title: _____ (SEAL)

Title _____

By: _____
Title _____ (SEAL)

Title _____

By: _____
Title: _____ (SEAL)

CE-128-2

*CCI CONSTRUCTION COMPANY, INC.*

*YEARS ENDED*
*DECEMBER 31, 1998 AND 1997*

EXHIBIT

3

3/12/0r    tmH

C 7623

### CCI CONSTRUCTION COMPANY, INC.

YEARS ENDED DECEMBER 31, 1998 AND 1997

CONTENTS

|  | Page |
|---|---|
| Independent auditors' report | 1 |
| Financial statements: | |
| Balance sheets | 2 |
| Statements of income | 3 |
| Statements of shareholder's equity | 4-5 |
| Statements of cash flows | 6-7 |
| Notes to financial statements | 8-13 |
| Accompanying information to financial statements: | |
| Cost of contracts | 14 |
| General and administrative expenses | 15 |
| Earnings from contracts | 16 |
| Completed contracts | 17 |
| Contracts-in-progress | 18 |

C 7624

BROWN SCHU...

**B S**

SHERIDAN FRI...

## Independent Auditors' Report

Board of Directors
CCI Construction Company, Inc.
Mechanicsburg, Pennsylvania

We have audited the accompanying balance sheets of CCI Construction Company, Inc. as of December 31, 1998 and 1997 and the related statements of income, shareholder's equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of CCI Construction Company, Inc. as of December 31, 1998 and 1997 and the results of its operations and its cash flows for the years then ended, in conformity with generally accepted accounting principles.

Our audits of the financial statements were made for the purpose of forming an opinion on the basic financial statements taken as a whole. The accompanying information is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audits of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Brown Schutz Sheridan & Fritz*

February 10, 1999

CERTIFIED PUBLIC ACCOUNTA...

BUSINESS ADVIS...

A PROFESSIONAL CORPORA...

1011 MUMMA R...
WORMLEYSBURG, PA 1...

PO BOX 6...
HARRISBURG, PA 17106-...
717-761-...
PA: 800-2941...
FAX: 717-737-...

1725 OREGON...
LANCASTER, PA 1...
717-560-...
PA: 800-294-...
FAX: 717-560-...

WEBSITE: WWW.BSSF.C...

1

### CCI CONSTRUCTION COMPANY, INC.

BALANCE SHEETS - DECEMBER 31, 1998 AND 1997

ASSETS

| | 1998 | 1997 |
|---|---:|---:|
| **Current assets:** | | |
| Cash and cash equivalents | $ 2,429,866 | $ 1,128,337 |
| Investments in marketable securities | 631,481 | 3,702,992 |
| Accounts receivable, trade: | | |
| Customers: | | |
| Current | 5,964,311 | 8,230,674 |
| Retained | 1,822,224 | 1,121,610 |
| Affiliates | 365,756 | 3,485 |
| Note receivable | | 22,569 |
| Costs and estimated earnings in excess of billings | | |
| on uncompleted contracts | 6,341,726 | 1,072,281 |
| Prepaid expenses | 170,232 | 6,185 |
| Shop inventory | 38,161 | 639 |
| Total current assets | 17,763,757 | 15,288,772 |
| **Property and equipment:** | | |
| Automobiles and trucks | 1,269,567 | 427,342 |
| Furniture | 851,738 | 553,587 |
| Machinery and equipment | 5,947,290 | 1,323,233 |
| Other | 344,128 | 72,453 |
| | 8,412,723 | 2,376,615 |
| Less accumulated depreciation | 1,651,485 | 920,919 |
| | 6,761,238 | 1,455,696 |
| **Other assets:** | | |
| Cash surrender value of officer's life insurance | 55,453 | |
| Investments | 34,000 | |
| | 89,453 | |
| | $ 24,614,448 | $ 16,744,468 |

See notes to financial statements.

C 7626

## LIABILITIES AND SHAREHOLDER'S EQUITY

|  | 1998 | 1997 |
|---|---|---|
| Current liabilities: | | |
| Accounts payable, trade: | | |
| Current | $ 10,974,274 | $  7,846,395 |
| Retained | 2,180,967 | 1,078,950 |
| Notes payable | | 815,781 |
| Current portion of long-term debt | 1,338,280 | |
| Accrued expenses | 333,060 | 808,601 |
| Taxes withheld and accrued | 91,601 | 58,023 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 288,208 | 681,924 |
| | | |
| Total current liabilities | 15,206,390 | 11,289,674 |
| Long-term debt, net of current portion | 4,164,375 | |
| Total liabilities | 19,370,765 | 11,289,674 |
| | | |
| Shareholder's equity: | | |
| Common stock, $1 par, 1,000 shares authorized; 39 shares issued and outstanding | 39 | 39 |
| Capital in excess of par | 9,758 | 9,758 |
| Retained earnings | 5,254,834 | 5,208,489 |
| Accumulated other comprehensive income (loss), unrealized gain (loss) on marketable securities | (    20,948) | 236,508 |
| | 5,243,683 | 5,454,794 |
| | $ 24,614,448 | $ 16,744,468 |

2

C 7627

## CCI CONSTRUCTION COMPANY, INC.

STATEMENTS OF INCOME

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Revenue | $ 52,534,453 | $ 34,921,676 |
| Cost of contracts | 51,145,382 | 32,617,473 |
| Gross profit | 1,389,071 | 2,304,203 |
| General and administrative expenses | 1,505,700 | 1,954,380 |
| Income (loss) from operations | ( 116,629) | 349,823 |
| Other income (expense): | | |
| Gain (loss) on sale of: | | |
| Marketable securities and cash equivalents | 260,927 | ( 6,016) |
| Property and equipment | 10,069 | ( 2,920) |
| Interest | ( 161,296) | |
| Investment | 151,592 | 367,538 |
| Miscellaneous | ( 85,622) | ( 1,546) |
| | 175,670 | 357,056 |
| Net income | $ 59,041 | $ 706,879 |

See notes to financial statements.

3

C 7628

## CCI CONSTRUCTION COMPANY, INC.

STATEMENTS OF SHAREHOLDER'S EQUITY

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | Common stock | Capital in excess of par | Retained earnings | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1996 | $ 39 | $ 9,758 | $ 4,768,011 | $ 42,867 | $ 4,820,675 |
| Comprehensive income: | | | | | |
| Net income | | | 706,879 | | 706,879 |
| Other comprehensive income: | | | | | |
| Unrealized holding gains arising during the period on marketable securities | | | | 187,348 | 187,348 |
| Add reclassification adjustment | | | | 6,293 | 6,293 |
| | | | | | 193,641 |
| Comprehensive income | | | | | 900,520 |
| Distributions | | | ( 266,401) | | ( 266,401) |
| Balance, December 31, 1997 (carried forward) | 39 | 9,758 | 5,208,489 | 236,508 | 5,454,794 |

(continued)

4

C 7629

## CCI CONSTRUCTION COMPANY, INC.

### STATEMENTS OF SHAREHOLDER'S EQUITY (CONTINUED)

#### YEARS ENDED DECEMBER 31, 1998 AND 1997

| | Common stock | Capital in excess of par | Retained earnings | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|
| Balance, December 31, 1997 (brought forward) | $ 39 | $ 9,758 | $ 5,208,489 | $ 236,508 | $ 5,454,794 |
| Comprehensive loss: | | | | | |
| Net income | | | 59,041 | | 59,041 |
| Other comprehensive income (loss): | | | | | |
| Unrealized holding gains arising during the period on marketable securities | | | | 3,469 | 3,469 |
| Less reclassification adjustment | | | | ( 260,925) | ( 260,925) |
| | | | | | ( 257,456) |
| Comprehensive loss | | | | | ( 198,415) |
| Distributions | | | ( 12,696) | | ( 12,696) |
| Balance, December 31, 1998 | $ 39 | $ 9,758 | $ 5,254,834 | $( 20,948) | $ 5,243,683 |

See notes to financial statements.

5

### CCI CONSTRUCTION COMPANY, INC.

STATEMENTS OF CASH FLOWS

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---:|---:|
| Cash flows from operating activities: |  |  |
| Net income |  |  |
| Adjustments: | $  59,041 | $  706,879 |
| Depreciation |  |  |
| (Gain) loss on sale of: | 793,014 | 156,504 |
| Property and equipment | (    10,069) | 2,920 |
| Marketable securities | (   260,927) | 6,293 |
| (Increase) decrease in: |  |  |
| Accounts receivable | 1,203,478 | (  5,516,738) |
| Costs and estimated earnings in excess of billings on uncompleted contracts | (  5,269,445) | (    692,618) |
| Prepaid expenses | (   164,047) | 47,047 |
| Shop inventory | (    37,522) | (        639) |
| Cash surrender value of officer's life insurance | (    55,453) |  |
| Increase (decrease) in: |  |  |
| Accounts payable | 4,229,896 | 4,912,287 |
| Accrued expenses | (   475,541) | 530,442 |
| Taxes withheld and accrued | 33,578 | 47,166 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | (   393,716) | 172,293 |
| Total adjustments | (   406,754) | (    335,043) |
| Net cash provided by (used in) operating activities | (   347,713) | 371,836 |
| Cash flows from investing activities: |  |  |
| Purchase of: |  |  |
| Investments | (   161,670) | ( 11,093,130) |
| Property and equipment | (    98,793) | (    560,929) |
| Repayment of note receivable | 22,569 | 9,120 |
| Proceeds from: |  |  |
| Sale and maturities of investments | 3,202,652 | 9,381,163 |
| Sale of property and equipment | 28,502 | 13,864 |
| Net cash provided by (used in) investing activities | 2,993,260 | (  2,249,912) |

(continued)

6

C 7631

**CCI CONSTRUCTION COMPANY, INC.**

STATEMENTS OF CASH FLOWS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

|  | 1998 | 1997 |
|---|---|---|
| Cash flows from financing activities: |  |  |
| Distributions to shareholder | $( 12,696) | $( 266,401) |
| Proceeds from issuance of notes payable and long-term debt | 17,990,666 |  |
| Repayment of notes payable and long-term debt | ( 19,321,988) | ( 73,301) |
| Net cash used in financing activities | ( 1,344,018) | ( 339,702) |
| Net increase (decrease) in cash and cash equivalents | 1,301,529 | ( 2,217,778) |
| Cash and cash equivalents, beginning of year | 1,128,337 | 3,346,115 |
| Cash and cash equivalents, end of year | $ 2,429,866 | $ 1,128,337 |
| Supplemental disclosure of cash flow information: |  |  |
| Cash paid during the year for interest | $ 161,296 | $ 1,707 |
| Noncash activities: |  |  |
| Net increase (decrease) in unrealized gain on marketable securities (see statements of shareholder's equity) | $( 257,456) | $ 193,641 |
| Notes payable incurred for the acquisition of new equipment | $ 6,018,196 | $ 889,082 |

See notes to financial statements.

7

# CCI CONSTRUCTION COMPANY, INC.

## NOTES TO FINANCIAL STATEMENTS

## YEARS ENDED DECEMBER 31, 1998 AND 1997

1.  **Summary of significant accounting policies:**

    *Operations and operating cycle:*

    The Company constructs and renovates commercial buildings primarily under fixed-price contracts in the eastern United States. The Company's receivables are concentrated among customers in this geographic area. The Company extends credit to its customers and generally requires no collateral.

    The length of the Company's contracts varies but is typically between one to two years. In accordance with normal practice in the construction industry, the Company includes asset and liability accounts relating to construction contacts in current assets and liabilities even when such amounts are realizable or payable over a period in excess of one year.

    *Use of estimates:*

    The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

    *Revenue and cost recognition:*

    Revenues from construction contracts are recognized on the percentage-of-completion method, measured by the percentage of direct cost incurred to date to estimated total direct cost for each contract. That method is used because management considers direct cost to be the best available measure of progress on the contracts. Because of inherent uncertainties in estimating costs, it is at least reasonably possible that the estimates used will change within the near term.

    For purposes of determining percentage of completion estimates, contract costs include all direct material, labor and subcontracting costs and other direct costs related to contract performance. Indirect costs and general and administrative costs are charged to expense as incurred. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are first determined. Changes in job performance, job conditions and estimated profitability may result in revisions to costs and income and are recognized in the period in which the revisions are determined. An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

8

C 7633

## CCI CONSTRUCTION COMPANY, INC.

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

1.    Summary of significant accounting policies (continued):

*Revenue and cost recognition (continued):*

The asset, "Costs and estimated earnings in excess of billings on uncompleted contracts," represents revenues recognized in excess of amounts billed. The liability, "Billings in excess of costs and estimated earnings on uncompleted contracts," represents billings in excess of revenues recognized.

*Cash and cash equivalents:*

For purposes of reporting cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

*Marketable securities:*

Marketable securities are reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of stockholder's equity.  Fair value of the marketable securities is based on quoted market prices for those or similar securities or quotes from brokers. Gains and losses are determined using the specific identification method when securities are sold.

*Property and equipment:*

Property and equipment are stated at cost.  Depreciation is provided using straight-line and accelerated methods over the estimated useful lives of the assets.

*Change in presentation:*

During 1998, the Company adopted Statement of Financial Accounting Standards No. 130, Reporting Comprehensive Income (SFAS No. 130). SFAS No. 130 requires the reporting of comprehensive income in addition to net income from operations. Comprehensive income is a more inclusive financial reporting methodology that includes disclosure of certain financial information that historically has not been recognized in the calculation of net income.  SFAS No. 130 requires that the earlier year provided for comparative purposes be reclassified to conform to the statement.

9

C 7634

## CCI CONSTRUCTION COMPANY, INC.

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

2. **Cash and cash equivalents:**

Cash and cash equivalents consist of the following:

|  | 1998 | 1997 |
|---|---|---|
| Cash | $ 374,464 | $ 451 |
| Money market funds | 1,035 | 403,714 |
| Repurchase agreements | 2,054,367 | 724,172 |
|  | $ 2,429,866 | $ 1,128,337 |

At December 31, 1998, the amount of deposits in cash held at the bank exceeded the Federal Deposit Insurance Corporation (FDIC) insurance by $867,883. The money market funds and the repurchase agreements are not insured by the FDIC. The repurchase agreements sold by a bank were held in custody by this bank for the account of CCI Construction Company, Inc. and were invested in securities, which are not pledged as collateral.

3. **Marketable securities:**

The cost or amortized cost and the aggregate fair value of investments in the debt and equity securities at December 31, 1998 and 1997 are as follows:

|  | 1998 | | |
|---|---|---|---|
|  | Cost or amortized cost | Gross unrealized losses | Estimated fair value |
| Available-for-sale securities, mutual funds | $ 652,429 | $ 20,948 | $ 631,481 |

|  | 1997 | | | |
|---|---|---|---|---|
|  | Cost or amortized cost | Gross unrealized losses | Gross unrealized gains | Estimated fair value |
| Available-for-sale securities: | | | | |
| Mutual funds | $ 3,386,480 | $ 16,845 | $ 253,465 | $ 3,623,100 |
| Obligations of states and political subdivisions | 80,004 | 112 | | 79,892 |
|  | $ 3,466,484 | $ 16,957 | $ 253,465 | $ 3,702,992 |

10

C 7635

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

3.  Marketable securities (continued):

|  | 1998 | 1997 |
|---|---|---|
| Cost of securities sold | $ 2,941,725 | $ 9,387,456 |
| Proceeds from sale | 3,202,652 | 9,381,163 |
| Gross realized gains | 262,391 | |
| Gross realized losses | 1,464 | 6,293 |

4.  Uncompleted contracts:

|  | 1998 | 1997 |
|---|---|---|
| Contract costs | $ 42,225,606 | $ 27,920,734 |
| Estimated earnings thereon | 3,130,223 | 1,638,199 |
| | 45,355,829 | 29,558,933 |
| Less billings applicable thereto | 39,302,311 | 29,168,576 |
| | $ 6,053,518 | $ 390,357 |

|  | 1998 | 1997 |
|---|---|---|
| Included in the balance sheet as: | | |
| Costs and estimated earnings in excess of billings on uncompleted contracts | $ 6,341,726 | $ 1,072,281 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | ( 288,208) | ( 681,924) |
| | $ 6,053,518 | $ 390,357 |

5.  Long-term debt:

Long-term debt consists of the following:

|  | 1998 |
|---|---|
| Obligations to various financing corporations due in current monthly installments totaling $116,074, including interest at fixed rates approximating 7%. The notes, which are secured by the financed equipment, mature at various dates through August 2003. | $ 3,964,581 |

11

C 7636

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

5.   Long-term debt (continued):

|  | 1998 |
|---|---|
| Borrowings under a $2,000,000 bank equipment line of credit are secured by the financed equipment. The agreement requires the December 31, 1998 balance to be repaid by December 2003 in monthly installments of $30,238, including interest at a fixed rate of 6.7%. | $ 1,538,074 |
| Total long-term debt | 5,502,655 |
| Less current portion | 1,338,280 |
| Long-term debt portion | $ 4,164,375 |

Aggregate principal payments due on long-term debt for the five years subsequent to December 31, 1998 are as follows:

| | |
|---|---|
| 1999 | $ 1,338,280 |
| 2000 | 1,415,424 |
| 2001 | 1,242,569 |
| 2002 | 961,559 |
| 2003 | 544,823 |
| | $ 5,502,655 |

6.   Operating line of credit:

The Company has available a $2,000,000 unsecured operating line of credit expiring on April 30, 1999 which requires interest at the bank's prime rate less 1/2%. The Company has no outstanding balance on the line at December 31, 1998.

7.   Rent expense:

Various equipment and operating facilities are leased under noncancellable agreements. Total rent expense for all leases, including the related party lease discussed in Note 8, was $1,689,666 and $432,492 in 1998 and 1997, respectively.

The aggregate minimum rental commitments under all noncancellable leases at December 31, 1998 totaling $28,639 are due in 1999.

12

C 7637

**CCI CONSTRUCTION COMPANY, INC.**

NOTES TO FINANCIAL STATEMENTS (CONTINUED)

YEARS ENDED DECEMBER 31, 1998 AND 1997

8.  Related party transactions:

The Company is leasing an operating facility owned by its sole shareholder through March 31, 1999. The lease requires a monthly rental payment of $4,037. Rent expense for this facility was $48,444 and $45,000 for 1998 and 1997, respectively.

Effective April 1, 1999, the Company will begin leasing an operating facility from Mechanicsburg Land Company, which is owned by the Company's sole shareholder, on a year-to-year basis. The initial lease, which expires December 31, 1999, requires monthly lease payments of $14,329. Additionally, the Company entered into a contract for the construction of this facility with Mechanicsburg Land Company. Billings of $339,203 were included in accounts receivable as of December 31, 1998.

During 1997, the Company incurred warranty insurance expense of $825,000 with Pennsylvania Contractors Insurance Company, a corporation under common control. These costs are allocated as direct cost of contracts. There were no such costs in 1998.

During 1998, two insurance claims for contract losses incurred of $900,000 were paid by Pennsylvania Contractors Insurance Company. These claims were covered under the terms of a remedial work period insurance policy.

In addition, Pennsylvania Contractors Insurance Company has guaranteed a claim of $1,162,460 filed by the Company with a contract owner. If the owner fails to pay all or any part of this claim, the insurance company will pay the unpaid portion.

9.  Income taxes:

No provision has been made for federal or state income taxes. Under provisions of the Internal Revenue Code and the Commonwealth of Pennsylvania Tax Act, the Company has elected not to be taxed as a corporation and the sole shareholder has consented to include the income in his individual return.

10. Year 2000 issues:

Like any other company, advances and changes in available technology can significantly affect the business and operations of the Company. A challenging problem exists as many computer systems worldwide do not have the capability of recognizing the year 2000 or years thereafter. No easy technology "quick fix" has yet been developed for this problem. While the Company has not requested verification of its year 2000 status from its auditors, it believes its computer systems will effectively deal with transactions in the year 2000 and beyond. This "Year 2000 Computer Problem" creates risk for the Company from unforeseen problems from third parties with whom the Company deals on financial transactions. Failures of the third parties' computer systems could have an impact to the Company's ability to conduct its business. The effect, if any, is unknown at this time.

13

C 7638

# CCI CONSTRUCTION COMPANY, INC.

## COST OF CONTRACTS

### YEARS ENDED DECEMBER 31, 1998 AND 1997

| | 1998 | 1997 |
|---|---:|---:|
| **Direct costs:** | | |
| Labor | $ 6,457,982 | $ 2,886,054 |
| Payroll taxes | 702,129 | 335,936 |
| Employee benefits | 667,597 | 677,477 |
| Equipment | 111,207 | 41,373 |
| Equipment rental | 1,625,224 | 381,924 |
| Materials | 10,371,108 | 4,259,253 |
| Other | 1,745,316 | 1,679,129 |
| Subcontractors | 27,802,562 | 22,099,706 |
| | 49,483,125 | 32,360,852 |
| **Indirect costs:** | | |
| Salaries | 528,517 | 86,208 |
| Payroll taxes | 61,224 | 11,217 |
| Employee benefits | 70,560 | 8,324 |
| Blueprints | 163 | 6 |
| Depreciation | 687,512 | 95,723 |
| Dues and permits | 5,340 | 710 |
| Employee recruitment | 44,621 | 7,151 |
| Insurance | 4,486 | 716 |
| Office supplies and expense | 53,393 | 8,112 |
| Postage | 2,187 | 253 |
| Professional services | 37,338 | |
| Rent | 40,731 | 8,636 |
| Repairs and maintenance | 12,655 | 3,648 |
| Safety | 2,732 | 2,157 |
| Telephone | 28,926 | 11,802 |
| Temporary help | 7,591 | |
| Trade books and journals | 1,892 | 556 |
| Training and seminars | 8,303 | |
| Travel and entertainment | 10,290 | 728 |
| Utilities | 10,397 | 1,413 |
| Warehouse expenses | 43,399 | 9,261 |
| | 1,662,257 | 256,621 |
| **Total cost of contracts** | $ 51,145,382 | $ 32,617,473 |

14

C 7639

**CCI CONSTRUCTION COMPANY, INC.**

GENERAL AND ADMINISTRATIVE EXPENSES

YEARS ENDED DECEMBER 31, 1998 AND 1997

| | 1998 | 1997 |
|---|---|---|
| Salaries: | | |
| Officers | $    353,939 | $  1,038,273 |
| Office | 480,807 | 410,023 |
| Payroll taxes | 60,247 | 73,399 |
| Employee: | | |
| Benefits | 53,857 | 33,722 |
| Recruitment | 4,379 | 2,237 |
| Advertising | 3,067 | 1,038 |
| Bad debt | 22,569 | |
| Bank charges | 5,111 | 3,667 |
| Blueprints | 17,551 | 13,507 |
| Company sponsored activities | 2,373 | 1,098 |
| Contributions | 14,220 | 3,030 |
| Depreciation | 105,502 | 60,781 |
| Dues | 16,335 | 8,058 |
| Insurance | 12,399 | 12,162 |
| Licenses and taxes | 44,559 | 44,270 |
| Miscellaneous | | 265 |
| Office supplies | 50,617 | 18,875 |
| Postage | 8,967 | 7,914 |
| Professional services | 109,543 | 95,337 |
| Rent | 23,711 | 33,744 |
| Repairs and maintenance | 6,555 | 7,689 |
| Telephone | 19,164 | 31,328 |
| Temporary help | 1,719 | |
| Trade books and journals | 24,222 | 22,995 |
| Training and seminars | 5,938 | 1,086 |
| Travel and entertainment | 30,687 | 5,948 |
| Utilities | 27,662 | 23,934 |
| | | |
| Total general and administrative expenses | $  1,505,700 | $  1,954,380 |

15

C 7640

## CCI CONSTRUCTION COMPANY, INC.

### EARNINGS FROM CONTRACTS

### YEAR ENDED DECEMBER 31, 1998

|  | Revenues earned | Cost of revenues earned |  | Gross profit (loss) |
|---|---|---|---|---|
| Contracts completed during the year | $  13,541,950 | $  13,969,824 | (a) | $(  427,874) |
| Contracts-in-progress at year-end | 38,721,607 | 35,389,315 | (a) | 3,332,292 |
| Construction management contracts | 83,777 | 20,444 | (a) | 63,333 |
| Time and material jobs | 187,119 | 103,542 | (a) | 83,577 |
|  | 52,534,453 | 49,483,125 |  | 3,051,328 |
| Indirect costs |  | 1,662,257 |  | (  1,662,257) |
|  | $  52,534,453 | $  51,145,382 |  | $  1,389,071 |

(a)  Excludes indirect costs not allocated to specific jobs.

C 7641

## CCI CONSTRUCTION COMPANY, INC.

### COMPLETED CONTRACTS

### YEAR ENDED DECEMBER 31, 1998

| Job number | Contract | Contract totals | | | Before January 1, 1998 | | | During the year ended December 31, 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs | Revenues earned | Cost of revenues earned | Gross profit before indirect costs | Revenues earned | Cost of revenues earned | Gross profit (loss) before indirect costs |
| 428 | U.E.P.H. Complex | $ 19,272,256 | $ 17,479,889 | $ 1,792,367 | $ 17,763,732 | $ 15,878,479 | $ 1,885,253 | $ 1,508,524 | $ 1,601,410 | $( 92,886) |
| 445 | Houtzdale Prison | 10,937,202 | 11,397,234 | ( 460,032) | 4,086,420 | 4,169,371 | ( 82,951) | 6,850,782 | 7,227,863 | ( 377,081) |
| 448 | Outlook Creekview | 4,800,644 | 4,655,443 | 145,201 | 554,419 | 521,254 | 33,165 | 4,246,225 | 4,134,189 | 112,036 |
| 449 | U.E.P.H. Headquarters | 1,456,558 | 1,521,701 | ( 65,143) | 520,139 | 515,339 | 4,800 | 936,419 | 1,006,362 | ( 69,943) |
| | | $ 36,466,660 | $ 35,054,267 | $ 1,412,393 | $ 22,924,710 | $ 21,084,443 | $ 1,840,267 | $ 13,541,950 | $ 13,969,824 | $( 427,874) |

17

C 7642

## CCI CONSTRUCTION COMPANY, INC.

### CONTRACTS-IN-PROGRESS

### DECEMBER 31, 1998

| Job number | Project | Total contract price | Estimated total direct contract costs | Estimated total contract earnings (loss) before indirect costs | Inception to December 31, 1998 Direct contract costs to December 31, 1998 | Contract earnings (loss) accrued to December 31, 1998 before indirect costs | Billings to December 31, 1998 | December 31, 1998 Costs and estimated earnings in excess of billings | Billings in excess of costs and estimated earnings | Year ended December 31, 1998 Revenues earned | Direct cost of revenues earned | Gross profit (loss) before indirect costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 439 | Mahanoy Prison | $ 11,699,418 | $ 10,667,972 | $ 1,031,446 | $ 10,656,608 | $ 1,031,333 | $ 10,461,740 | $ 1,216,401 | | $ 5,623,543 | $ 4,357,586 | $ 1,265,957 |
| 450 | Johnstown | 3,266,600 | 3,245,082 | 21,518 | 1,172,766 | 7,776 | 730,724 | 449,818 | | 1,064,029 | 1,057,305 | 6,724 |
| 451 | Lord Fairfax | 7,082,984 | 7,301,111 | ( 218,127) | 6,659,984 | ( 218,127) | 6,570,468 | | $ 128,611 | 5,998,746 | 6,248,376 | ( 249,630) |
| 454 | Albemarle Prison | 14,524,840 | 12,875,751 | 1,649,089 | 4,819,694 | 617,292 | 4,719,426 | 717,560 | | 5,436,986 | 4,819,694 | 617,292 |
| 455 | Perry Point | 12,937,341 | 11,463,840 | 1,473,501 | 4,734,492 | 608,547 | 3,108,536 | 2,234,503 | | 5,343,039 | 4,734,492 | 608,547 |
| 456 | Outlook - Hilliard | 5,380,745 | 4,801,310 | 579,435 | 2,715,193 | 327,677 | 2,732,602 | 310,268 | | 3,042,870 | 2,715,193 | 327,677 |
| 457 | Camp Hill | 1,495,629 | 1,372,273 | 123,356 | 547,295 | 49,197 | 617,799 | | 21,307 | 596,492 | 547,295 | 49,197 |
| 459 | Scott Air Force Base | 14,870,150 | 13,929,350 | 940,800 | 6,026,575 | 407,040 | 6,571,905 | | 136,290 | 6,433,615 | 6,026,575 | 407,040 |
| 460 | Germ Plasma Center | 15,565,000 | 14,667,024 | 897,976 | 2,905,995 | 177,917 | 2,252,156 | 831,756 | | 3,083,912 | 2,905,995 | 177,817 |
| 461 | Outlook - Chesterfield | 3,842,372 | 3,629,824 | 212,548 | 1,518,251 | 88,902 | 1,097,444 | 509,709 | | 1,607,153 | 1,518,251 | 88,902 |
| 462 | Outlook - Westerville | 5,589,900 | 5,218,140 | 371,760 | 458,553 | 32,669 | 419,511 | 71,711 | | 491,222 | 458,553 | 32,669 |
| | | $ 96,254,979 | $ 89,171,677 | $ 7,083,302 | $ 42,225,606 | $ 3,130,223 | $ 39,302,311 | $ 8,341,726 | $ 288,208 | $ 38,721,607 | $ 35,389,315 | $ 3,332,292 |

18

C 7643

allfirst
3607 Derry Street
Harrisburg, PA  17111
Special Credits 900-03-05
(717) 565-2878
(717) 565-2870 (Fax)

# facsimile transmittal

To: _Eileen K._          Fax: _507-3953_

From: _Lois_             Date: _3/1/00_

Re: _CCI_                Pages: _10_ (Including Cover Page)

CC:

☐ Urgent      ☐ For Review      ☐ Please Comment      ☐ Please Reply      ☐ Please Recycle

Notes:

1st fax   10 pgs  (partial)
2nd fax   13 pgs  (completed)

C 7644

CCI CONSTRUCTION CO., INC.
BALANCE SHEET
12|3|99

```
1000        A S S E T S

1002        *CURRENT ASSETS*
                                              ---------------
1040        CASH & INVESTMENTS             (    594,857.26)
                                              ---------------

1049           TOTAL CASH & INVESTMENTS                  (    594,857.26)

1050        ACCOUNTS RECEIVABLE:
1100        ACCOUNTS RECEIVABLE            12,230,914.30
1110        A/R RETAINAGE                   4,903,477.69
1140        EMPLOYEE RECEIVABLE                 1,973.68
1141        ACCOUNTS RECEIVABLE-ORTENZIO        184.83
1156        DUE FROM AFFILIATES               2,197.66
                                              ---------------
1157           TOTAL ACCOUNTS RECEIVABLE                  17,138,748.16
                                              ---------------
1167        INVENTORY:                        54,384.97
                                              ---------------
1168           INVENTORY                                     54,384.97

1192           OTHER CURRENT ASSETS                          38,354.36

1293           COSTS & EARNINGS > BILLINGS                4,158,685.00
                                                           ---------------
1295           TOTAL CURRENT ASSETS                       20,795,315.23

1196        *LONG TERM ASSETS*

1200        OFFICER LIFE INSURANCE POLICY                    62,094.00
1205        NOTE RECEIVABLE - VEHICLE                        24,621.53

1300        *FIXED ASSETS*
1301        OFFICE FURNITURE AND FIXTURES   1,040,346.51
1302        MACHINERY AND EQUIPMENT         1,181,976.51
1303        AUTOS AND TRUCKS                1,153,516.12
1304        SMALL TOOLS                       317,193.27
1305        SHOP/MECHANICAL EQUIPMENT         347,101.45
                                              ---------------
1390           TOTAL FIXED ASSETS           4,126,849.39

1400        ACCUMULATED DEPRECIATION/AMORT:
1401        ACCUM DEPR - FURNITURE & FIXTURE(   716,766.60)
1402        ACCUM DEPR - MACH & EQUIP       (   396,493.16)
1403        ACCUM DEPR - AUTO & TRUCK       (   341,643.25)
1404        ACCUM DEPR - SMALL TOOLS        (   162,519.74)
1405        ACCUM DEPR - SHOP/MECHANICAL    (   160,079.00)
                                              ---------------
1488           TOTAL ACCUM DEPR/AMORT       ( 1,777,501.75)
                                              ---------------
1490           NET FIXED ASSETS                            2,349,347.64
                                                           ---------------

1999           TOTAL A S S E T S                          23,144,662.87
                                                          ===============
```

EXHIBIT
9
3|2|01  tmtt

1-R08
ATE: 15-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET

| 2000 | L I A B I L I T I E S | | |
|------|------------------------|---|---|
| 2005 | CURRENT LIABILITIES | | |
| 2099 | ACCOUNTS PAYABLE: | | |
| 2100 | ACCOUNTS PAYABLE | 2,951,006.31 | |
| 2101 | SUBCONTRACTOR A/P | 6,130,086.78 | |
| 2102 | A/P RETAINAGE | 3,764,423.64 | |
| | | --------------- | |
| 2120 | TOTAL ACCOUNTS PAYABLE | | 12,845,516.73 |
| 2295 | ACCRUED PAYROLL TAXES | | 202,668.00 |
| 2415 | OTHER CURRENT LIABILITIES | | 320,629.67 |
| 2431 | NOTE PAYABLE-ALLFIRST LINE OF | 1,200,000.00 | |
| 2450 | NOTES PAYABLE-CURRENT | | 3,782,351.64 |
| 2480 | BILLINGS > COSTS & EARNINGS | | 4,402,180.00 |
| | | | --------------- |
| 2490 | TOTAL CURRENT LIABILITIES | | 22,753,346.04 |
| 2870 | NOTES PAYABLE-LONG TERM | | 1,387,079.70 |
| | | | --------------- |
| 2990 | TOTAL L I A B I L I T I E S | | 24,140,425.74 |
| 3000 | E Q U I T Y | | |
| 3110 | CAPITAL SURPLUS | 9,797.00 | |
| 3200 | RETAINED EARNINGS | 286,513.75 | |
| 3220 | RETAINED EARNINGS SUB-S CORP. | 4,343,092.86 | |
| 3275 | OTHER ACCUMULATED ADJUSTMENTS | 480,647.00 | |
| 3300 | CURRENT YEAR EARNINGS | ( 6,115,813.48) | |
| | | --------------- | |
| 3800 | TOTAL E Q U I T Y | | ( 995,762.87) |
| | | | --------------- |
| 3900 | TOTAL LIABILITIES AND EQUITY | | 23,144,662.87 |
| | | | =============== |

C 7735

t-508
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 1

| 1003 | CASH: | |
|------|-------|---|
| 1010 | CASH - DAUPHIN CHECKING | ( 573,734.41) |
| 1011 | CASH - DAUPHIN PAYROLL | ( 55,522.85) |
| 1013 | CASH - FLEX REIMBURSEMENT ACCT | 100.00 |
| 1016 | INVESTMENT IN EPIC | 3,000.00 |
| 1017 | INVESTMENT IN RAFFLES | 31,000.00 |
| 1020 | PETTY CASH | 300.00 |
| 1040 | CASH & INVESTMENTS | ( 594,857.26) |

C 7736

L-R08
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 2

PAGE
02-14-2000 14:

| | | |
|---|---|---|
| 1158 | INVENTORY: | |
| 1160 | SHEET METAL SHOP INVENTORY | 54,384.97 |
| | | --------------- |
| 1167 | INVENTORY: | 54,384.97 |
| | | --------------- |

C 7737

L-R08
ATE: 13-90-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 3



PAGE
02-14-2000 14:0

| 1150 | DUE FROM AFFILIATES | |
|------|--------------------|-------------|
| 1153 | DUE TO/FROM CUSTODIAL | 376.20 |
| 1154 | DUE TO/FROM RELIANCE | ( 45.64) |
| 1155 | DUE TO/FROM MECH LAND CO | 1,867.10 |
| 1156 | DUE FROM AFFILIATES | 2,297.66 |
| | | --------------- |

C 7738

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE  6

```
1169        CURRENT ASSETS:
1175        PREPAID RENT                         2,015.28
1176        SECURITY DEPOSIT - CALIFORNIA        2,015.28
1185        PREPAID TAXES                       25,100.00
1190        PREPAID GENERAL EXPENSES             9,223.80

1192           OTHER CURRENT ASSETS                          40,552.02
```

C 7739

L-R08
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 50

PAGE
02-14-2000  14:0?

| 2190 | ACCRUED PAYROLL TAXES: | |
|------|------------------------|------------|
| 2200 | ACCRUED FED W/H | 57,394.00 |
| 2210 | ACCRUED FICA W/H | 53,592.89 |
| 2220 | ACCRUED FUTA | 4,877.66 |
| 2222 | ACCRUED SUTA - CAL | 196.51 |
| 2223 | ACCRUED STATE W/H - CAL | 6,607.92 |
| 2225 | ACCRUED STATE W/H - PA | 2,570.83 |
| 2226 | ACCRUED LOCAL W/H - PA | 4,817.40 |
| 2227 | ACCRUED OPT W/H - PA | 1,110.00 |
| 2228 | ACCRUED SUTA - PA | 21,787.09 |
| 2232 | ACCRUED STATE W/H - DEL | 36.47 |
| 2241 | ACCRUED SUTA - W VA. | 4,911.32 |
| 2243 | ACCRUED STATE W/H - WEST VA | 5,547.10 |
| 2248 | ACCRUED SUTA - MD | 3,071.83 |
| 2249 | ACCRUED STATE W/H - MD | 9,728.80 |
| 2250 | ACCRUED SUTA - MO | 161.13 |
| 2251 | ACCRUED STATE W/H - MO | 1,341.00 |
| 2256 | ACCRUED SUTA - OHIO | 520.00 |
| 2258 | ACCRUED STATE W/H - OHIO | 485.40 |
| 2275 | ACCRUED STATE W/H - VA | 14,773.69 |
| 2276 | ACCRUED SUTA - VA | 3,282.40 |
| 2281 | ACCRUED STATE W/H - ILLINOIS | 3,130.65 |
| 2282 | ACCRUED SUTA - IL | 2,723.91 |
| 2295 | ACCRUED PAYROLL TAXES | 202,668.00 |

C 7740

C-ROB
ATE: 13-00-1999

CCI CONSTRUCTION CO., INC.
BALANCE SHEET - SCHEDULE 60

PAGE    8
02-14-2000 14:07

| | | |
|---|---|---|
| 2296 | OTHER CURRENT LIABILITIES | |
| 2301 | ACCRUED WORKERS COMP | 190,594.18 |
| 2307 | ACCRUED CAFETERIA DEDUCTIONS | ( 40,624.70) |
| 2310 | ACCRUED PAYROLL | 130,079.77 |
| 2311 | ACCRUED UNION FRINGE PAYABLE | 186.85 |
| 2313 | ACCRUED FRINGE FUND ACCOUNT | 6,079.45 |
| 2315 | ACCRUED 401(K) PLAN | 2,414.12 |
| 2329 | ACCRUED ACCOUNTING FEES | 31,900.00 |
| 2415 | OTHER CURRENT LIABILITIES | 320,629.67 |

C 7741

Feb-18-00 07:10P JOHN MORTENZIO          717 709 4222          P.07

## CCI CONSTRUCTION CO., INC
## CASH FLOW PROJECTIONS
### 2/1/00 THRU 3/31/01 (Completion date of last job)

| | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | REMAINING | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | (6,205,366) | (9,063,691) | (9,199,345) | (9,389,090) | (9,589,773) | (9,973,228) | (9,873,456) | |
| Revenue | 5,593,391 | 6,162,630 | 7,455,167 | 7,782,395 | 7,921,756 | 6,990,371 | 28,835,033 | 70,740,743 |
| Direct Costs | (8,202,659) | (6,039,755) | (7,420,683) | (7,769,575) | (8,074,547) | (5,686,415) | (23,339,679) | (67,503,263) |
| Net Cash from Jobs | (2,609,268) | 122,875 | 34,484 | 12,820 | (152,791) | 303,956 | 5,495,404 | 3,207,480 |
| Overhead | (229,066) | (238,539) | (204,238) | (193,513) | (210,674) | (183,694) | (1,312,620) | (2,572,344) |
| Depreciation | 50,500 | 50,500 | 50,500 | 50,500 | 50,500 | 50,000 | 350,000 | 652,500 |
| Principal Payments | (39,798) | (40,027) | (40,259) | (40,491) | (40,725) | (40,960) | (336,311) | (578,571) ** |
| Interest Expense on Equip Loans | (10,693) | (10,463) | (10,232) | (9,999) | (9,765) | (9,530) | (67,611) | (128,293) |
| Interest Expense on Line of Credit* | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (160,000) | (280,000) |
| Net Cash Flow with Equipment | (2,858,325) | (135,654) | (189,745) | (200,683) | (383,455) | 99,772 | 3,968,862 | 300,772 |
| Ending Cash Balance w/ Equip | (9,063,691) | (9,199,345) | (9,389,090) | (9,589,773) | (9,973,228) | (9,873,456) | (5,904,594) | (62,993,174) |
| Available Line of Credit | 5,200,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | |
| Cash shortage | (3,863,691) | (5,199,345) | (5,389,090) | (5,589,773) | (5,973,228) | (5,873,456) | (1,904,594) | |

**Principal pmts are thru 3/31/01.  At that time, the remaining principal balance will be $1,259,524.

Also, the overhead, depreciation, and interest expense are projected through 3/31/01.  All jobs are projected through the end, which is projected to be 3/31/01.

*Interest expense on the line of credit was projected for $3,000,000 at 8%.

Interest expense on equipment is actual based on amortization schedules.  It does not include any decrease for vehicles that will be sold

EXHIBIT

5,904,000

**CCI CONSTRUCTION CO., INC.**
**REMAINING BILLINGS AND COSTS ON JOBS**

|  |  | C | D | E | F | G | H | I | H-I=J | F-J=K |
|---|---|---|---|---|---|---|---|---|---|---|
| JOB # | JOB NAME | CONTRACT AMOUNT | AMT PD THRU 1/31/00 | MO OF BILL | REMAINING TO BE PD | AMOUNT IN RETENTION | TOTAL PROJECTED COST PER 12/31 CTC | ACTUAL COSTS THRU 01/31/00 | REMAINING COSTS | DIFFERENCE |
| 454 | ALBEMARLE | 14,582,917 | 10,924,799 | | 3,658,118 | 600,551 | 15,544,471 | 13,044,430 | 2,500,041 | 1,158,077 |
| 448 | CREEKVIEW | 4,856,021 | 4,856,021 | | 0 | 0 | 4,677,876 | 4,677,876 | 0 | 0 |
| 456 | HILLIARD | 5,600,748 | 5,318,813 | | 281,935 | 279,938 | 5,081,715 | 5,090,697 | -8,982 | 290,917 |
| 461 | CHESTERFIELD | 4,115,065 | 3,776,419 | | 338,646 | 203,326 | 4,061,553 | 3,990,866 | 70,687 | 267,979 |
| 462 | WESTERVILLE | 5,767,995 | 3,300,307 | | 2,467,688 | 394,184 | 5,679,439 | 3,976,072 | 1,703,367 | 764,321 |
| 476 | SUMMERDALE | 1,942,371 | 983,147 | | 959,224 | 286,615 | 1,867,273 | 1,868,258 | -985 | 960,209 |
| 470 | PERRY CTY | 4,349,802 | 3,795,985 | | 553,817 | 0 | 4,504,792 | 4,113,956 | 390,836 | 162,981 |
| 450 | JOHNSTOWN | 3,732,569 | 3,631,674 | | 100,895 | 99,820 | 3,705,315 | 3,707,462 | -2,147 | 103,042 |
| 485 | JAMES RIVER | 7,242,081 | 3,533,593 | | 3,708,488 | 222,010 | 7,434,677 | 4,010,947 | 3,423,730 | 204,758 |
| 467 | EPV III | 4,060,421 | 3,756,179 | | 304,242 | 203,371 | 3,778,939 | 3,530,088 | 248,851 | 55,391 |
| 478 | EPV 1ST FLOOR | 204,290 | 195,459 | | 8,831 | 0 | 194,270 | 205,308 | -11,038 | 19,869 |
| 475 | SR22 CAMBRIA | 868,337 | 865,540 | | 2,797 | 0 | 874,938 | 865,339 | 9,597 | -6,800 |
| 455 | PERRY PT | 12,999,654 | 11,438,742 | | 1,560,912 | 300,000 | 12,013,954 | 11,537,698 | 476,256 | 1,084,656 |
| 453 | PA TURNPIKE | 226,834 | 226,834 | | 0 | 0 | 78,704 | 78,704 | 0 | 0 |
| 473 | KOST ROAD | 1,767,688 | 1,442,347 | | 325,341 | 0 | 1,686,842 | 1,299,936 | 386,906 | -41,565 |
| 460 | GERMPLASM | 16,155,581 | 9,057,829 | | 7,097,752 | 698,109 | 16,022,012 | 10,365,744 | 5,656,268 | 1,441,484 |
| 477 | COOL & COLD | 12,319,009 | 880,888 | | 11,438,211 | 0 | 11,892,515 | 1,572,220 | 10,120,295 | 1,317,916 |
| 480 | AQUA WATERLINE | 191,083 | 0 | | 191,083 | 0 | 163,915 | 1,982 | 163,933 | 27,150 |
| 459 | SCOTT AFB | 15,081,490 | 14,860,168 | | 221,322 | 472,580 | 18,979,483 | 18,907,941 | 71,542 | 149,780 |
| 466 | VCU | 22,072,607 | 5,925,956 | | 16,146,651 | 472,816 | 20,864,978 | 8,660,944 | 12,204,034 | 3,942,617 |
| 451 | LORD FAIRFAX | 7,230,740 | 6,859,169 | | 371,571 | 381,000 | 7,984,862 | 7,991,224 | -6,342 | 377,913 |
| 439 | MAHANOY | 11,730,187 | 11,729,437 | | 750 | 750 | 10,704,600 | 10,704,600 | 0 | 750 |
| 458 | PA TURN CONST | 22,564,221 | 21,002,469 | | 1,561,752 | 111,516 | 21,139,451 | 2,779,055 | 18,360,396 | 2,042,073 |
| | TOTAL | 179,661,803 | 108,921,060 | | 70,740,743 | 5,016,594 | 178,618,592 | 122,881,367 | 55,737,225 | 15,003,518 |

2/14/00 5:45 PM

Feb-18-00 07:10P JOHN ORTENZIO                    717 909 4222                    P.09

## Cash Flow Revenue Projections by Job by Month

| JOB # | JOB NAME | REMAINING REVENUE TO BE PAID | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | REMAINING | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 454 | ALBEMARLE | 3,658,118 | 369,000 | 400,000 | 600,000 | 500,000 | 600,000 | 300,000 | 889,118 | 3,658,118 |
| 448 | CREEKVIEW | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 450 | HILLIARD | 281,935 | 0 | 0 | 0 | 281,935 | 0 | 0 | 0 | 281,935 |
| 461 | CHESTERFIELD | 338,646 | 86,780 | 0 | 13,220 | 35,320 | 0 | 0 | 203,326 | 338,646 |
| 462 | WESTERVILLE | 2,467,688 | 247,354 | 325,000 | 525,000 | 525,000 | 300,000 | 225,334 | 320,000 | 2,467,688 |
| 476 | SUMMERDALE | 959,224 | 638,911 | 23,697 | 0 | 0 | 0 | 296,616 | 0 | 959,224 |
| 470 | PERRY CTY | 553,817 | 0 | 0 | 0 | 0 | 220,000 | 220,000 | 113,817 | 553,817 |
| 450 | JOHNSTOWN | 100,895 | 0 | 0 | 100,895 | 0 | 0 | 0 | 0 | 100,895 |
| 465 | JAMES RIVER | 3,708,488 | 330,948 | 451,352 | 700,000 | 700,000 | 450,000 | 300,000 | 776,188 | 3,708,488 |
| 467 | EPW III | 304,242 | 107,875 | 196,367 | 0 | 0 | 0 | 0 | 0 | 304,242 |
| 478 | EPW 1ST FLOOR | 8,831 | 8,831 | 0 | 0 | 0 | 0 | 0 | 0 | 8,831 |
| 475 | SR22 CAMBRIA | 2,797 | 2,797 | 0 | 0 | 0 | 0 | 0 | 0 | 2,797 |
| 455 | PERRY PT | 1,560,912 | 400,000 | 400,000 | 460,912 | 0 | 300,000 | 0 | 0 | 1,560,912 |
| 453 | PA TURNPIKE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 473 | KOST ROAD | 325,341 | 0 | 2,370 | 2,370 | 2,370 | 2,370 | 2,370 | 313,491 | 325,341 |
| 460 | GERMPLASM | 7,097,752 | 850,000 | 850,000 | 1,000,000 | 1,100,000 | 1,100,000 | 1,100,000 | 1,097,752 | 7,097,752 |
| 477 | COOL & COLD | 11,438,211 | 900,000 | 1,630,033 | 1,100,000 | 1,400,000 | 1,300,000 | 1,200,000 | 3,908,178 | 11,438,211 |
| 480 | AQUA WATERLINE | 191,083 | 0 | 0 | 0 | 0 | 0 | 0 | 191,083 | 191,083 |
| 459 | SCOTT AFB | 221,322 | 0 | 0 | 0 | 0 | 0 | 0 | 221,322 | 221,322 |
| 466 | VCU | 16,146,651 | 1,167,539 | 1,200,000 | 1,500,000 | 1,600,000 | 1,900,000 | 1,800,000 | 6,979,112 | 16,146,651 |
| 451 | LORD FAIRFAX | 371,571 | 0 | 0 | 0 | 185,000 | 0 | 186,571 | 0 | 371,571 |
| 439 | MAHANOY | 750 | 750 | 0 | 0 | 0 | 0 | 0 | 0 | 750 |
| 458 | PA TURN CONST | 21,002,469 | 482,606 | 683,811 | 1,452,770 | 1,452,770 | 1,452,770 | 1,452,770 | 14,024,972 | 21,002,469 |
| | TOTAL | 70,740,743 | 5,593,391 | 6,162,630 | 7,455,167 | 7,782,395 | 7,921,756 | 6,990,371 | 28,835,033 | 70,740,743 |

2/14/00 5:45 PM

Cash Flow Cost Projections by Job by Month

| JOB # | JOB NAME | REMAINING COSTS | A/P FEB AT V3100 | FEBRUARY SUBS <INC RETNTN | FEBRUARY ALL OTHER | MARCH SUBS | MARCH ALL OTHER | APRIL SUBS | APRIL ALL OTHER | MAY SUBS | MAY ALL OTHER | JUNE SUBS | JUNE ALL OTHER | JULY TOTAL | REMAINING TOTAL | TOTAL | REMAINING COSTS (C.O.) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OVERHEAD & LOWER JOBS | 0 | 368,722 | (242,315) | (136,475) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 521,354 | | |
| 454 | ALBEMARLE | 2,500,041 | 865,147 | 0 | 0 | 290,000 | 200,000 | 300,000 | 360,000 | 250,000 | 235,000 | 300,000 | 300,000 | 300,000 | 0 | 2,500,041 | 0 |
| 448 | CREEKVIEW | (9,962) | 27,683 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 456 | HILLIARD | (9,962) | 273,395 | (234,012) | 0 | 0 | 10,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000 | 10,000 | 0 |
| 481 | CHESTERFIELD | 70,667 | 431,655 | (206,124) | 50,000 | 20,667 | 0 | 20,667 | 0 | 0 | 0 | 0 | 0 | 0 | 78,667 | 78,667 | 0 |
| 482 | WESTERVILLE | 1,703,387 | 602,362 | (213,861) | 90,000 | 200,000 | 125,000 | 325,000 | 200,000 | 325,000 | 200,000 | 300,000 | 100,000 | 88,787 | 112,281 | 1,703,387 | 0 |
| 478 | SUMMERDALE | (965) | 282,171 | (32,987) | 0 | 10,000 | 0 | 0 | 0 | 0 | 150,000 | 0 | 100,000 | 209,124 | 113,281 | 1,703,387 | (18,943) |
| 470 | PERRY CTY | 390,818 | 116,943 | 0 | 30,000 | 10,000 | 25,000 | 0 | 0 | 0 | 0 | 0 | 32,887 | 0 | 110,938 | 390,818 | (10,943) |
| 450 | JOHNSTOWN | (2,147) | 294,900 | (186,000) | 0 | 0 | 0 | 0 | 55,000 | 0 | 188,800 | 0 | 100,000 | 0 | 10,000 | 390,818 | (10,943) |
| 465 | JAMES RIVER | 3,421,730 | 562,659 | (159,872) | 50,000 | 225,000 | 226,000 | 420,000 | 400,000 | 550,000 | 400,000 | 150,000 | 400,000 | 545,802 | 0 | 3,421,730 | [12,147] |
| 487 | EPW III | 248,851 | 6,568 | (221,474) | 50,000 | 150,000 | 48,851 | 221,474 | 0 | 0 | 0 | 0 | 0 | 248,851 | 248,851 | [12,147] |
| 476 | EPW 1ST FLOOR | (11,038) | 1,431 | (9,555) | 5,000 | 16,551 | 4,587 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000 | 10,000 | [21,038] |
| 415 | SR22 CAMBRIA | 9,567 | 978,833 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,557 | 9,557 | 0 |
| 435 | PERRY PT | 478,256 | 0 | (850,648) | 0 | 274,256 | 0 | 200,000 | 0 | 0 | 0 | 850,648 | 0 | 478,256 | 478,256 | 0 |
| 463 | PA TURNPIKE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 473 | KOST ROAD | 87,985 | 87,985 | (43,501) | 0 | 2,500 | 0 | 2,000 | 0 | 2,500 | 0 | 2,000 | 0 | 2,500 | 398,907 | 396,905 | 0 |
| 480 | GERAPLASH | 5,856,298 | 1,055,749 | (413,995) | 50,000 | 400,000 | 400,000 | 500,000 | 500,000 | 500,000 | 500,000 | 600,000 | 1,100,000 | 864,231 | 5,856,298 | 0 |
| 477 | COOL & COLD | 10,120,296 | 359,318 | (68,061) | 100,000 | 1,300,000 | 300,000 | 900,000 | 200,000 | 1,200,000 | 200,000 | 1,100,000 | 1,150,000 | 3,560,246 | 10,120,296 | 0 |
| 480 | AQUA WATERLINE | 183,933 | 1,974 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 73,000 | 84,933 | 183,933 | 0 |
| 438 | SCOTT AFB | 71,542 | 344,963 | (100,000) | 73,000 | 25,000 | 35,000 | 11,542 | 0 | 0 | 0 | 0 | 0 | 0 | 106,000 | 71,542 | 71,542 |
| 486 | VCU | 12,204,034 | 2,910,490 | (445,141) | 3,000,000 | 1,000,000 | 100,000 | 1,435,000 | 200,000 | 1,400,000 | 100,000 | 1,800,000 | 1,800,000 | 4,484,775 | 12,204,034 | 0 |
| 451 | LORD FAIRFAX | (8,343) | 210,539 | (236,024) | 10,000 | 0 | 0 | 0 | 115,000 | 0 | 45,000 | 0 | 121,024 | 10,000 | 0 | (8,343) |
| 429 | MAHANOY | 60,994 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | [18,347] |
| 458 | PA TURN CONSTR | 18,360,396 | 1,195,570 | (100,000) | 20,000 | 825,000 | 25,000 | 1,400,000 | 40,000 | 1,100,000 | 40,000 | 1,400,000 | 1,440,000 | 23,330,679 | 18,360,396 | [79,484] |
| | TOTAL | 55,737,225 | 11,718,544 | (3,825,413) | 311,925 | 4,546,307 | 1,439,448 | 5,641,141 | 1,778,542 | 5,891,100 | 1,818,415 | 8,534,660 | 1,537,887 | 6,696,413 | 12,791,301 | 55,816,718 | (79,484) |

Feb-18-00 07:11P JOHN ORTENZIO                717 909 4222        P.11

## CCI CONSTRUCTION CO., INC.
### GROSS PROFIT COMPARISONS
### DECEMBER 1999

| JOB NUMBER | DESCRIPTION | DECEMBER CONTRACT AMOUNT | ORIGINAL PROJECTED GP AMOUNT | DECEMBER 98 PROJECTED GP AMOUNT | DECEMBER 98 GROSS PROFIT % | AUGUST PROJECTED GP AMOUNT | AUGUST GROSS PROFIT % | SEPTEMBER PROJECTED GP AMOUNT | SEPTEMBER GROSS PROFIT % | OCTOBER PROJECTED GP AMOUNT | OCTOBER GROSS PROFIT % | NOVEMBER PROJECTED GP AMOUNT | NOVEMBER GROSS PROFIT % | DECEMBER PROJECTED GP AMOUNT | DECEMBER GROSS PROFIT % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45100 | ALBEMARLE | 14,582,917 | 1,600,000 | 1,649,069 | 11.35% | 448,768 | 3.08% | 170,846 | 1.16% | 64,597 | 0.44% | (309,776) | -2% | (981,554) | -7% |
| 46,000 | AQUA WATER LINES | 191,083 | 25,168 | N/A | N/A | N/A | N/A | N/A | N/A | 25,168 | 13.17% | 25,168 | 13% | 25,168 | 13% |
| 45700 | CCI-CAMP HILL | 13,318,089 | 0 | 123,368 | 8.25% | 42,111 | 2.82% | 45,837 | 3.08% | 50,190 | 3.36% | 50,181 | 3% | 49,364 | 3% |
| 47700 | COOK & CO ID AQUA | 204,290 | 849,194 | | | 461,783 | 3.79% | 571,997 | 4.89% | 571,997 | 4.69% | 571,997 | 3% | 628,584 | 5% |
| 47800 | EPW I | 4,060,421 | 26,901 | | | 26,901 | 12.70% | 10,631 | 5.43% | 12,362 | 6.05% | 11,004 | 5% | 10,020 | 5% |
| 47900 | EPW III | 10,155,581 | 185,897 | N/A | N/A | 276,882 | 7.40% | 276,881 | 6.93% | 304,759 | 7.60% | 303,077 | 8% | 281,487 | 8% |
| 40700 | GERMAN ASM | 7,242,061 | 930,000 | 897,976 | 5.77% | 852,429 | 4.17% | 563,256 | 3.60% | 478,482 | 2.94% | 435,727 | 3% | 233,569 | -3% |
| 44900 | HOUTZDALE | 0 | 0 | (460,032) | -4.21% | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 44500 | JAMES RIVER | 3,732,569 | 150,000 | N/A | N/A | 33,688 | 0.47% | 3,306 | 0.05% | (21,208) | -0.29% | (196,342) | -3% | (192,506) | 1% |
| 45000 | JOHNSTOWN | 7,230,740 | 100,000 | 21,518 | 0.65% | 81,837 | 2.19% | 80,783 | 2.16% | 60,352 | 1.70% | 40,185 | 1% | 27,254 | -10% |
| 45100 | LONG FAIRFAX | 4,115,065 | 250,000 | (218,127) | -3.08% | (154,698) | -4.0% | (421,003) | -5.88% | (483,330) | -8.23% | (601,608) | -7% | (164,143) | 9% |
| 43900 | MAHANOY (MISO) | 5,600,748 | 150,640 | 1,068,896 | 9.11% | 1,086,027 | 9.08% | 1,027,063 | 8.76% | 1,017,044 | 8.76% | 1,070,480 | 9% | 1,025,587 | 2% |
| 45100 | MANSFIELD | 5,787,395 | 264,000 | 212,548 | 5.53% | 183,044 | 4.63% | 184,031 | 4.70% | 225,484 | 5.62% | 222,105 | 5% | 53,612 | 6% |
| 48100 | OUTLOOK-Chesterfield | 22,584,223 | 133,717 | 145,201 | 3.02% | 158,731 | 3.27% | 178,939 | 3.68% | 174,501 | 3.59% | 177,609 | 4% | 178,145 | 6% |
| 48800 | OUTLOOK-Creekview | 1,787,888 | 579,435 | 579,435 | 10.77% | 577,325 | 10.68% | 577,325 | 10.31% | 542,475 | 9.89% | 519,033 | 9% | 519,023 | 6% |
| 48900 | OUTLOOK-Hazard | 12,999,654 | 350,000 | 371,760 | 6.55% | 331,329 | 5.93% | 348,725 | 6.24% | 348,679 | 6.09% | 348,679 | 6% | 348,679 | -6% |
| 46200 | OUTLOOK-Westerville | 4,349,802 | 1,480,000 | 1,480,000 | | 1,480,000 | 7.40% | 1,425,261 | 6.90% | 1,424,832 | | 1,424,832 | 6% | 80,558 | 8% |
| 47200 | PA TURNPIKE | 868,337 | 100,000 | N/A | N/A | 103,875 | 6.80% | 103,803 | 6.90% | 100,847 | 6.31% | 100,847 | 6% | 1,424,777 | 4% |
| 45500 | PERRY POINT | 19,772,015 | 766,160 | 1,473,501 | 11.39% | 1,515,703 | 11.41% | 1,509,715 | 11.35% | 1,464,861 | 11.01% | 1,444,338 | 11% | 985,700 | 12% |
| 47000 | SR II FERRY CNTY | 1,942,371 | 536,912 | N/A | N/A | 577,968 | 14.01% | 577,968 | 14.01% | 577,987 | 14.01% | 488,443 | 12% | 489,443 | 14% |
| 47500 | SR 22 CAMBRIA CNTY | 22,012,607 | 121,640 | N/A | N/A | 57,038 | 8.93% | 36,659 | 4.39% | 158,955 | 17.81% | 124,580 | 14% | 16,600 | 5% |
| 45900 | SCOTT A F BASE | 19,777,015 | 821,887 | 940,800 | 8.33% | 897,402 | 4.84% | 897,402 | 4.75% | 832,108 | 4.36% | 919,990 | 5% | 792,532 | 0% |
| 47800 | SUMMERDALE | 0 | 152,147 | | | 213,782 | 12.66% | 213,782 | 12.66% | 213,782 | 12.66% | 213,782 | 13% | 226,087 | 0% |
| 42800 | U.E.P.H. | 0 | 0 | 0 | | | | | | | | | | | |
| 44900 | UEPH CO HOTELS | 1,456,558 | 640,000 | 1,792,387 | 9.30% | 1,692,341 | 8.76% | 1,680,215 | 8.72% | 1,678,983 | 8.72% | 1,678,955 | 9% | 1,879,144 | 9% |
| 44600 | VCU LIFE SCIENCE | | 83,260 | (65,143) | -4.47% | | | | | | | | | 75,098 | 0% |
| | | 188,787,859 | 1,286,815 | 8,533,235 | N/A | 11,765,237 | 5.55% | 11,273,647 | 5.57% | 11,070,370 | 5.53% | 11,402,546 | 5% | 7,314,112 | 0% |
| | | | | | | 1,215,405 | | 1,710,146 | | 1,213,101 | | 1,203,310 | | 1,207,629 | |



*JOHN M. ORTENZIO*

*DECEMBER 31, 1998*

Δ π EXHIBIT *18*

Deponent *Ortenzio*

Date *2·11·02* Rptr. *d/c*

WWW.DEPOBOOK.COM

C 7957



CONSTRUCTION

November 9, 1999

Mr. Craig Schwartz
Vice President
Allfirst Bank
3045 Market Street
Camp Hill, PA  17011

RE:    Personal Financial Statement

Dear Craig:

Enclosed is my 1998 personal financial statement.  This is sent to you as it relates to the commercial loan note dated November 8, 1999.

Sincerely,

John M. Ortenzio

Enclosure

CCI CONSTRUCTION CO., INC.

Mailing Address                                    Street Address
P.O. Box 8800                              2500 Old Gettysburg Road
Camp Hill, PA  17001-8800                  Camp Hill, PA  17011-7307
Telephone  (717) 909-4CCI (4224)               Fax  (717) 909-4220

C 7958

*JOHN M. ORTENZIO*

*DECEMBER 31, 1998*

C 7959

BROWN SCHULT

SHERIDAN FRIT

John M. Ortenzio
Mechanicsburg, Pennsylvania

We have compiled the statement of financial condition of John M. Ortenzio as of December 31, 1998 in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. The statement of financial condition is intended to present the assets of John M. Ortenzio at estimated current values and his liabilities at estimated current amounts.

A compilation is limited to presenting in the form of a financial statement information that is the representation of the individual whose financial statement is presented. We have not audited or reviewed the statement of financial condition and, accordingly, do not express an opinion or other form of assurance on it.

John M. Ortenzio has elected to omit substantially all of the disclosures required by generally accepted accounting principles. If the omitted disclosures were included with the statement of financial condition, they might influence the users' conclusions about the financial condition of John M. Ortenzio. Accordingly, this statement of financial condition is not designed for those who are not informed about these matters.

*Brown Schultz Sheridan & Fritz*

June 14, 1999

CERTIFIED PUBLIC ACCOUNTANTS
AND
BUSINESS ADVISORS

A PROFESSIONAL CORPORATION

1011 MUMMA ROAD
WORMLEYSBURG PA 17043

PO BOX 67865
HARRISBURG, PA 17106-7865
717-761-7171
PA: 800-294-7360
FAX: 717-737-6655

1725 OREGON PIKE
LANCASTER, PA 17601
717-560-8375
PA: 800-294-7360
FAX: 717-560-8712

WEBSITE: WWW.BSSF.COM

1

### JOHN M. ORTENZIO

STATEMENT OF FINANCIAL CONDITION

DECEMBER 31, 1998
(See accountants' compilation report)

#### ASSETS

| | |
|---|---:|
| Cash | |
| Investments: | $    308,100 |
| Marketable securities | |
| Mutual funds | 1,157,200 |
| Salary savings plan | 1,910,300 |
| Partnerships: | 156,600 |
| Investment | |
| Real estate | 811,400 |
| Other | 1,125,600 |
| Corporations: | 137,900 |
| Asset management | |
| Construction | 19,100 |
| Finance | 5,257,600 |
| Insurance | 105,000 |
| Real estate ownership | 180,000 |
| Loans receivable: | 3,404,600 |
| Real estate investment partnerships | |
| Corporations | 74,500 |
| Corporate office building | 2,483,600 |
| Personal effects | 440,000 |
| Residences | 50,000 |
| Federal and state income tax refunds | 855,000 |
| | 210,300 |
| | $ 18,686,800 |

#### LIABILITIES, ESTIMATED INCOME TAXES AND NET WORTH

| | |
|---|---:|
| Liabilities: | |
| Divorce settlement agreement | $   1,565,200 |
| Loan payable, individual | 502,400 |
| Mortgage payable | 230,700 |
| State and local income taxes payable | 25,500 |
| Estimated income taxes on the differences between estimated current values of assets and their tax bases | 536,900 |
| Net worth | 15,826,100 |
| | $ 18,686,800 |

2

C 7961

LAW OFFICES

# GEBHARDT & SMITH LLP

NINTH FLOOR
THE WORLD TRADE CENTER
BALTIMORE, MARYLAND 21202-3064

BALTIMORE:     (410) 752-5830
WASHINGTON:    (301) 470-7468

WRITER'S DIRECT DIAL NUMBER:

(410) 385-5100
Writer's E-Mail Address:
lgebh@gebsmith.com

FACSIMILE
(410) 385-5119

Refer To File No. 18610

February 24, 2000

*Via Facsimile and Federal Express*
               4027 1282 2404

CCI CONSTRUCTION CO., INC.
2500 Old Gettysburg Road
Camp Hill, Pennsylvania  17011-7307

Attn:   John M. Ortenzio, President

      RE:   $4,000,000 Unsecured Revolving Line Of Credit and
             $2,000,000 Secured Equipment Purchase Line of Credit
             Extended By Allfirst Bank To CCI Construction Co., Inc.

Dear Mr. Ortenzio:

      This firm represents Allfirst Bank ("Lender"), which has extended to CCI Construction Co., Inc. ("Borrower") (a) a revolving line of credit in the maximum principal amount of $4,000,000 pursuant to a FILM/Cash Solutions Promissory Note dated March 24, 1999 ("Film Note") and related documents, and (b) a secured equipment purchase line of credit in the stated principal amount of $2,000,000 pursuant to a Commercial Loan Note ("Commercial Note") and a Security Agreement, both dated November 20, 1998, and related documents.  This letter is being sent at the specific request and direction of the Lender.

      As a result of the occurrence of various events which are materially adverse to the financial condition of the Borrower, and as a further result of the insolvency of the Borrower, the Lender hereby declares a default under the Commercial Loan Note and under the Security Agreement.  In consequence of this declaration of default under the equipment purchase line of credit, the Lender hereby accelerates and declares immediately due and payable all sums presently outstanding and owing under the equipment purchase line of credit.

      As a result of the default under the equipment line of credit, the Borrower is, in turn, in default under the cross-default provisions of Section 11 of the FILM Promissory Note, and the Lender hereby declares the default.  In consequence of this default the Bank hereby accelerates and demands immediate payment of all sums presently due and owing under the FILM Promissory Note.

      Because of the default under the FILM Promissory Note and the Bank's acceleration and demand for immediate payment of the sums due thereunder no further sums will be advanced under the revolving line of credit evidenced by the FILM/Cash Solutions Promissory Note, **effective immediately**.  Any checks or other payments items in transit will not be honored by the Lender.

GEBHARDT & SMITH

CCI CONSTRUCTION CO., INC.
February 24, 2000
Page 2

The total sums presently due and outstanding under the equipment purchase line of credit and the revolving line of credit, respectively, are as follows:

Equipment Purchase Line Of Credit
    Principal                                    $1,244,116.74
    Interest through February 23 2000    $     5,237.80
    Total                                 $ 1,249,354.54
    Interest per day thereafter: $231.54

Revolving Line Of Credit
    Principal                                    $2,601,514.01
    Interest through February 23, 2000   $   26,524.83
    Total                                 $2,628,038.84
    Interest per day thereafter: $596.18

As previously stated, the Lender by this letter is demanding immediate payment in full of all sums due and owing to it by the Borrower under both loans. Unless full payment is made by the Borrower immediately upon receipt of this letter, all remedies available to the Lender under applicable law will be pursued without further notice to the Borrower, including the institution of judgment by confession and the enforcement of the Lender's security interest.

This letter is not intended to be a waiver of any rights, remedies, or recourse available to the Lender, nor an election of remedies arising as a result of the defaults or of any other default which may now or hereafter exist with respect to the revolving line of credit and the equipment line of credit. The collection of interest or acceptance of partial payments (that is, less than the total amount due in accordance with the terms of the debt instruments) by the Lender shall not constitute an extension of the maturity date of the revolving line of credit or equipment line of credit or a waiver of the Lender's acceleration of the indebtedness evidenced by the respective debt instruments or of any other rights under the loan documents.

Very truly yours,

Lawrence J. Gebhardt

LJG/dls
cc:    Gerard L. Elias, SVP
        - ALLFIRST BANK
    Robert E. Chernicoff, Esquire
        - CUNNINGHAM & CHERNICOFF, P.C.

B 104
(Rev. 8/87)

**ADVERSARY PROCEEDING COVER SHEET**
(Instructions on Reverse)

ADVERSARY PROCEEDING NUMBER
(Court Use Only)

| PLAINTIFFS | DEFENDANTS |
|---|---|
| CCI CONSTRUCTION CO., INC. a/k/a CCI/ORTENZIO COMPANY, INC. | ALLFIRST BANK |
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Cunningham & Chernicoff, P.C.<br>2320 North Second Street<br>Harrisburg, PA 17110 | ATTORNEYS (If Known) Michael D. Nord, Esq.<br>Gebhardt & Smith, LLP<br>401 East Pratt St., 9th Floor<br>Baltimore, MD 21202-3064 |

**PARTY** (Check one box only)   ☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☒ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint for Recovery of Preferential Transfer Pursuant to Bankruptcy Code Section 547 or in the Alternative for Recovery of Improper Setoff pursuant to Bankruptcy Code Section 553

**NATURE OF SUIT**
(Check the one most appropriate box only.)

☒ 454 To Recover Money or Property

☐ 435 To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property

☐ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in property

☐ 424 To object or to revoke a discharge 11 U.S.C. §727

☐ 455 To revoke an order of confirmation of a Chap. 11 or Chap. 13 Plan

☐ 426 To determine the dischargeability of a debt 11 U.S.C. §523

☐ 434 To obtain an injunction or other equitable relief

☐ 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan

☐ 456 To obtain a declaratory judgment relating to any of foregoing causes of action

☐ 459 To determine a claim or cause of action removed to a bankruptcy court

☐ 498 Other (specify)

**ORIGIN OF PROCEEDINGS**
(Check one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed Proceeding   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another Bankruptcy Court   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND** | NEAREST THOUSAND $ 2,300,000.00 | OTHER RELIEF SOUGHT | ☐ JURY DEMAND

**BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES**

NAME OF DEBTOR   CCI Construction Co., Inc. a/k/a CCI/Ortenzio Company, Inc.   BANKRUPTCY CASE NO. 1-00-02239

DISTRICT IN WHICH CASE IS PENDING   Middle District | DIVISIONAL OFFICE   Harrisburg | NAME OF JUDGE   Robert J. Woodside

**RELATED ADVERSARY PROCEEDING (IF ANY)**

PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO.

DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE

**FILING FEE** (Check one box only.)   ☒ FEE ATTACHED   ☐ FEE NOT REQUIRED   ☐ FEE IS DEFERRED

DATE | PRINT NAME Robert E. Chernicoff | SIGNATURE OF ATTORNEY (OR PLAINTIFF)

ADVERSARY

ALL DOCUMENTS REGARDING THIS MATTER
MUST BE IDENTIFIED BY BOTH ADVERSARY
AND BANKRUPTCY CASE NUMBERS.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                                    :

CCI CONSTRUCTION CO., INC.                :    CASE NO. 1-00-02239
a/k/a CCI/ORTENZIO COMPANY,               :
INC.                                      :    CHAPTER 11
                    Plaintiff             :
                                          :    PREFERENCE COMPLAINT
          v.                              :
                                          :    ADVERSARY NO. 1-00-00011A
ALLFIRST BANK,                            :
                                          :
                    Defendant             :

COMPLAINT FOR RECOVERY OF PREFERENTIAL TRANSFER
PURSUANT TO BANKRUPTCY CODE SECTION 547 OR IN
THE ALTERNATIVE FOR RECOVERY OF IMPROPER SETOFF
PURSUANT TO BANKRUPTCY CODE SECTION 553

     CCI Construction Co., Inc. a/k/a CCI/Ortenzio Company,
Inc. (the "Debtor") files this Complaint to avoid preferential
transfers of funds pursuant to 11 U.S.C. §547, or in the
alternative to avoid improper setoffs pursuant to 11 U.S.C.
§553, and in support thereof alleges as follows:

I.    PARTIES.

     1.    CCI Construction Co., Inc., the above named Debtor,
is a Pennsylvania corporation, doing business in Cumberland
County, Pennsylvania.

     2.    On May 19, 2000 (the "Petition Date"), the Debtor
filed a petition for relief under Chapter 11 of the United
States Bankruptcy Code in the Middle District of Pennsylvania.

3.    As a result of the filing of the petition under Chapter 11, the Debtor has been appointed as a Debtor-In-Possession.

4.    Allfirst Bank (the "Bank") is a creditor of the above referenced Debtor, and is a banking institution authorized to do business within the Commonwealth of Pennsylvania and has an address therein of 213 Market Street, Harrisburg, Dauphin County, Pennsylvania.

II.    JURISDICTION AND VENUE.

5.    The within Court has jurisdiction of this matter pursuant to 28 U.S.C. §157 and 28 U.S.C. §1334 as a matter which arises under Title 11, United States Code, or as related to a case under Title 11, United States Code. This matter is a core proceeding under 28 U.S.C. §157. The venue of this case lies in this district pursuant to 28 U.S.C. §1408.

6.    The statutory basis for this action are Section 547(b) of the United States Bankruptcy Code, 11 U.S.C. §547(b), and Section 553(b) of the United States Bankruptcy Code, 11 U.S.C. §553(b).

III. <u>BACKGROUND</u>.

7.   Prior to and at the time of the filing of the Chapter 11 petition in this case, the Debtor was indebted to the Bank pursuant to the terms and conditions of two credit facilities as follows:

(a)   A Film/Cash Solutions Promissory Note dated March 24, 1991 in a face principal amount of $4,000,000.00 and dated March 24, 1991 ("Revolver Note"), as granted by the Debtor to the Bank.

(b)   A Commercial Loan Note line of credit dated November 20, 1998 in the original face amount of $2,000,000.00 and dated November 20, 1998 (the "Equipment Note"), as granted by the Debtor to the Bank.

True and accurate copies of the Revolver Note and the Equipment Note (collectively hereinafter the "Notes") are attached hereto as **Exhibit "A"** and **Exhibit "B"**, respectively, and incorporated by reference herein.

8.   As collateral for the Equipment Note, the Debtor entered into and granted to the Bank a Security Agreement, and executed a UCC-1 as evidence thereof, in favor of the Bank which provides for a lien in:

3

"All present and future equipment for CCI Construction Co., Inc. financed by the First National Bank of Maryland, a national banking association, successor by merger to Dauphin Deposit Bank and Trust Company, that has not been paid in full."

The lien granted to the Bank is only on those items of equipment for which the Bank specifically provided purchase money financing.  A true and correct copy of the UCC-1 is attached hereto as **Exhibit "C"** and incorporated by reference herein.

9.    In addition to the Notes, that is the Revolver Note and the Equipment Note, granted by the Debtor to the Bank, the Debtor also previously granted to the Bank a Commercial Loan Note, Line of Credit, in the amount of $1,200,000.00 which Commercial Loan Note is dated November 8, 1999.  (Such Note is hereinafter the "$1,200,000.00 Note").

10.   As collateral for the $1,200,000.00 Note, the Debtor granted the Bank a security interest in and lien on certain specific delineated equipment.  As evidence of such lien, a UCC-1 was filed on or about November 17, 1999.  A true and correct copy of such UCC-1 is attached hereto as **Exhibit "D"** and incorporated by reference herein.  The second page of such

4

UCC-1 sets forth as Schedule A thereto the specific list of equipment which was provided to the Bank as collateral for the $1,200,000.00 Note.

11.  Except for those items of equipment for which the Bank provided purchase money financing to the Debtor under the Equipment Note, and those specific items of equipment which served as collateral for the $1,200,000.00 Note, the Bank has no other collateral.  (All such items are hereinafter the "Bank Collateral").  Because the value of the Bank Collateral is believed to be less than the total debt owed to the Bank as such remains under the two existing Notes, and most of such collateral has been liquidated, the Bank is believed to be mostly unsecured.

12.  The Bank at no time relevant hereto had a lien upon the Debtor's accounts receivable or proceeds thereof or upon the Debtor's cash.

13.  The Revolver Note operated as a revolving line of credit.  Under the terms of the Revolver Note, the Debtor would place all of its receipts and deposits into an account at the Bank (known as corporate checking account 00288-6451-4 (the "Account")).  The Bank operated what is known as a cash management system with respect to the Account whereby at the end of every business day, under normal practices, the

5

Bank would "sweep" all assets out of the Account so that at the end of each business day the balance in the Account would normally be zero.

14.    Thereafter, under the cash management system, any checks which the Debtor had written and which would be presented for payment the next day after a sweep of the Account would be honored by the Bank, thereby constituting a new draw upon the Revolver Note.  In this manner, the Debtor would reduce its interest costs.  At the same time, under the terms of the Revolver Note, the Debtor was to have available to it an amount up to $4,000,000.00 with which to pay its various obligations.

15.    Subsequent to February 18, 2000, the Bank made no further loan advances to the Debtor under the Revolver Note and to the Account.

16.    Further, by a letter dated February 24, 2000 from the law firm of Gebhardt & Smith, LLP, and directed to the Debtor, the Bank stated that the Debtor is in default under the Revolver Note and under the Equipment Note.  A true and correct copy of such default letter is attached hereto as **Exhibit "E"** and made a part hereof.

17. The default declared by the Bank was "effective immediately". Further, any checks or other payments in transit were not honored by the Bank from the Account. Accordingly, as of February 24, 2000, the Bank began to stop honoring the various checks of the Debtor as such were presented to the Bank for payment from the Account.

18. As set forth on the Debtor's bank statements for the Account for the period from Febtuary 1, 2000 through February 29, 2000, the following transfers to the Bank occurred:

(a) On February 22, 2000, the Bank swept the balance from a prior deposit which had been made into the Account out to itself in the amount of $510,840.84.

(b) On February 24, 2000, the Bank swept a deposit which had been made into the Account out to itself in the amount of $638,911.65.

(c) On February 25, 2000, the Bank swept a deposit which had been made into the Account out to itself in the amount of $1,167,539.00.

7

All of the foregoing transfers are hereinafter the "Transfers". A true and correct copy of the Debtor's bank statements and Revolver Loan statements are attached hereto as **Exhibits "F"** and **"G"**, respectively, and made a part hereof.

19. The total amount of the Transfers from the Debtor's Account is $2,317,291.29. All of the Transfers occurred subsequent to the Bank having stopped advancing funds to the Account of the Debtor under the Revolver Note.

20. The full amount of the Transfers was applied to the Revolver Note as verified by a review of the Debtor's bank statements, Revolver Loan statments and as summarized in **Exhibit "H"**, attached hereto and made a part hereof. **Exhibit "H"** sets forth the Revolver Note Activity, daily balance, setoff and preference analysis as to the Account and Revolver Note. Subsequent to the Transfers, the amount owed under the Revolver Note is $284,222.52.

**COUNT I**
<u>Relief Requested Under Section 547</u>
<u>of the Bankruptcy Code</u>

21. The allegations of Paragraphs 1 through 20 set forth above are incorporated herein by reference as if more fully set forth.

8

22.   For the period from February 22, 2000 through February 25, 2000, which period is within 90 days before the Petition Date, the total sum of $2,317.291.29 was swept from the Account, transferred to the Bank, and applied to the Revolver Note.

23.   The Transfer of $2,317,291.29 to the Bank was done for or on account of an antecedent debt owed by the Debtor to the Bank prior to each such Transfer having been made.

24.   The Transfers were all made while the Debtor was insolvent.

25.   The Transfers will enable the Bank to recover more than it would receive as a creditor if:

(a)   The bankruptcy case were a case under Chapter 7 of Title 11, United States Code;

(b)   The Transfers had not been made; and

(c)   The Bank were to receive payment of its debt to the extent provided by the provisions of the Bankruptcy Code.

WHEREFORE, CCI Construction Co., Inc. a/k/a CCI/Ortenzio Company, Inc. respectfully requests that this Honorable Court:

9

(a)    Enter judgment against the Defendant, Allfirst Bank, and in favor of the Debtor in the amount of $2,317,291.29;

(b)    Award the Debtor pre-judgment and post-judgment interest, costs and its fees in this action; and

(c)    Award the Debtor such other and further relief as this Honorable Court deems just and proper.

## COUNT II
### Relief Requested Under Section 553 of the Bankruptcy Code

26.    The allegations of Paragraphs 1 through 25 set forth above are incorporated herein by reference as if more fully set forth.

27.    In the event that this Honorable Court determines that one or more of the Transfers as set forth above do not constitute preferences under Section 547 of the United States Bankruptcy Code, then, in the alternative, the Debtor is entitled to relief under Section 553 of the United States Bankruptcy Code.

10

28.   Section 553(a) of the United States Bankruptcy Code permits, with certain exceptions, the right of a creditor to offset a mutual debt owed to the Debtor against the claim that the creditor has against the Debtor.

29.   Such right of setoff is, however, limited by the provisions of Section 553(b) of the United States Bankruptcy Code.

30.   Pursuant to Section 553(b) of the United States Bankruptcy Code, a Debtor-In-Possession may recover from a creditor any pre-petition setoffs to the extent that the setoff allows such creditor to improve its position after 90 days before the date of the filing of the Chapter 11 petition.

31.   As set forth above, subsequent to February 24, 2000, the Bank failed under the terms of the Revolver Note to honor various checks of the Debtor as such were presented to the Bank for payment.

32.   As a result of the Bank's failing to honor certain checks, the Account had a negative balance of $51,672.83. Further, subsequent to the Transfers, the amount owed under the Revolver Note is $284,222.52. Accordingly, the total loan balance under the Revolver Note, including the negative balance, was $335,895.35 as of February 26, 2000.

11

33.   The balance owed by the Debtor to the Bank under the Revolver Note as of February 18, 2000 was $2,601,514.01.  The difference between the amount owed under the Revolver Note on February 18, 2000 and February 26, 2000 is $2,265,618.66.

34.   The Transfers set forth above constitute setoffs which occurred during the period from February 18, 2000 through February 25, 2000, which period is within 90 days before the Petition Date.

35.   Because of the Transfers, the Bank improved its unsecured position in the amount of $2,265,618.66.

36.   The Debtor is entitled to recover the amount of $2,265,618.66 as the amount setoff by the Bank.  Such amount is the difference between the insufficiency (or unsecured debt) owed to the Bank 90 days before the Petition Date and the insufficiency as of the Petition Date.

WHEREFORE, CCI Construction Co., Inc. a/k/a CCI/Ortenzio Company, Inc. respectfully requests that this Honorable Court:

(a)   Enter judgment against the Defendant, Allfirst Bank, and in favor of the Debtor in the amount of $2,265,618.66;

12

(b)   Award the Debtor pre-judgment and post-judgment interest, costs and its fees in this action; and

(c)   Award the Debtor such other and further relief as this Honorable Court deems just and proper.

Respectfully submitted,

CUNNINGHAM & CHERNICOFF, P.C.

By: _____
Robert E. Chernicoff, Esquire
Attorney I.D. No. 23380
2320 North Second Street
P. O. Box 60457
Harrisburg, PA  17106-0457
(717) 238-6570

Date: _1-10-00_

SJO\DOCS\COMPLAIN\CCI-PREF

EXHIBIT "A"

FILM/CASH SOLUTIONS PROMISSORY NOTE
(PENNSYLVANIA)

* a division of
FMB Bank·

Instructions to Loan Officer:  Use for (a) loans to corporations, regardless of amount, and (b) loans to non-corporate borrowers when the only purpose of any such loan is business and the principal amount of such loan exceeds $50,000.

$ 4,000,000.00              Mechanicsburg, PA              March 24     1999
                              (City)          (State)

FOR VALUE RECEIVED, the undersigned ("Borrower") promises to pay on demand to the order of THE FIRST NATIONAL BANK OF MARYLAND, ■■■■■■■■■■■■■■■■ ("Bank"), at any of Bank's offices, or at such other place as the holder of this Promissory Note may from time to time designate, the principal sum of _____ FOUR MILLION     · · · · · and ____ 00 /100 Dollars ($ 4,000,000.00       ), or such other amount as may be advanced from time to time to Borrower, together with interest thereon at the rate or rates hereafter specified and any and all other sums which may be owing to Bank by Borrower pursuant to this Promissory Note. The following terms, as well as the applicable terms on Exhibit A, attached hereto and incorporated herein by reference, shall apply to this Promissory Note.

1.   DEFINITIONS.  The following terms have the following definitions:
     A.   "Account" means the commercial checking account maintained by Borrower with Bank and designated as Account No. __28664514__, together with any replacement account therefor.
     B.   "Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in the Commonwealth of Pennsylvania are authorized to close.
     C.   "Incremental Advance Amount" means the amount indicated on Exhibit A as the Incremental Advance Amount.  Each Loan must be an integral multiple of such amount.
     D.   "Initial Excess Balance" means, for any Business Day, the amount by which the collected balance in the Account at the end of such Business Day after posting all credits to the Account (subject to funds availability), but prior to posting any debits to the Account, exceeds the Target Balance.
     E.   "Line Availability" means, for any Business Day, an amount equal to the difference obtained by subtracting the aggregate principal balance outstanding under all Loans from the Maximum Line Amount.
     F.   "Loan" means an advance of monies from Bank to Borrower pursuant to the terms of this Promissory Note; and the term "Loans" means more than one Loan.
     G.   "Maximum Advance Amount" means an amount equal to the highest integral multiple of the Incremental Advance Amount which does not exceed the Line Availability.
     H.   "Maximum Line Amount" means the amount indicated on Exhibit A as the Maximum Line Amount, which amount is the maximum aggregate principal balance of the Loans which may be outstanding at any one time.
     I.   "Minimum Loan Advance" means the amount indicated on Exhibit A as the Minimum Loan Advance, which amount is the minimum principal amount of each Loan.
     J.   "Presented Items" means, for any Business Day, the aggregate amount of debits which have been presented for payment against the Account.
     K.   "Prime Rate" means a fluctuating annual rate of interest equal to the greater of: (i) that rate announced from time to time by Bank as its "prime rate" or (ii) the rate obtained by adding one percent (1%) to the average rate, rounded to the nearest one-tenth of one percent, for three month maturity dealer placed commercial paper for the week most recently reported in the Federal Reserve Statistical Release No. H.15(519) entitled "Selected Interest Rates" or any succeeding publication.
     L.   "Target Balance" means the amount indicated on Exhibit A as the Target Balance, which amount is the minimum collected balance that must be maintained in the Account.

2.   PROCEDURES FOR LOANS.  All Loans shall be made in the form of a transfer of funds into the Account in accordance with the procedures set forth in this paragraph.  Borrower hereby irrevocably authorizes Bank to make Loans in accordance with the procedures set forth herein.  At the end of each Business Day, Bank shall calculate the Initial Excess Balance and the aggregate amount of the Presented Items.  In the event the Initial Excess Balance is less than the aggregate amount of the Presented Items, Bank shall make a Loan by transferring funds into the Account in an amount equal to the amount, which when added to the Initial Excess Balance, would be equal to the aggregate amount of the Presented Items; provided, however, that: (a) the principal amount of the Loan shall not be less than the Minimum Loan Advance; (b) the principal amount of the Loan must be an integral multiple of the Incremental Advance Amount, and therefore, if it would not otherwise be an integral multiple of the Incremental Advance Amount, the amount of the Loan will be rounded up to the next higher integral multiple of the Incremental Advance Amount unless there is insufficient Line Availability in which case the Loan amount will be the Maximum Advance Amount; and (c) the principal amount of the Loan shall not exceed the Maximum Advance Amount.  If at any time the amount of the Initial Excess Balance is less than the amount of the Presented Items by an amount greater than the Maximum Advance Amount, Bank shall: (i) make a Loan by transferring funds into the Account in an amount equal to the Maximum Advance Amount; and (ii) determine, in its sole discretion, which Presented Items will be paid, and which Presented Items will not be paid.  In the event the Initial Excess Balance is greater than the amount of the Presented Items, Bank shall post and pay all of the Presented Items.  If, following Bank's posting and paying of all of the Presented Items, there remains a balance in the Account in excess of the Target Balance, Bank is hereby irrevocably authorized to debit the Account in an amount up to the portion of the balance in the Account which exceeds the Target Balance, and apply such sums to the outstanding balance of the Loans.  Bank agrees to make such debit of the Account to repay sums outstanding under the Loans as of the end of each Business Day; provided, however, that in the event the option labeled "Cash Solutions Protection" is marked on Exhibit A attached hereto, Bank shall not automatically debit the Account to make payments on the Loans, but may do so, in its sole and absolute discretion.

3.   TERMINATION.  The procedure for making Loans, and the obligation of Bank to provide Loans, as set forth in this Promissory Note, may be terminated by Borrower upon ten (10) days prior written notice to Bank and may be terminated by Bank upon thirty (30) days prior written notice to Borrower.  Upon termination, no further Loans shall be made under this Promissory Note, but all other terms of this Promissory Note (including, but not limited to, the holder's right to demand payment at any time and for any reason) shall remain in full force and effect.

4.    INTEREST. From the date hereof until all sums due hereunder, including principal, interest, charges, fees and expenses are paid in full, the principal amount outstanding from time to time pursuant to this Promissory Note shall bear interest as follows (Check One):

[ ]    Fluctuating Rate. At a fluctuating rate equal to _____ % per annum above the Prime Rate in effect from time to time. Bank at its discretion may charge a lesser rate from time to time. Interest on the principal amount outstanding shall be adjusted daily, with the rate for each day being adjusted to reflect the Prime Rate in effect at the close of business on that day. Bank makes loans at interest rates at, above and below the Prime Rate.

[X]    Other. (describe): __Interest shall accrue at a rate per annum equal to the Bank's__
__Base Rate minus 1/4% as in effect from time to time.__

5.    CALCULATION OF INTEREST. Interest shall be calculated on the basis of a three hundred sixty (360) days per year factor applied to the actual days on which there exists an unpaid balance hereunder.

6.    REPAYMENT. Borrower shall make payments of principal and interest in accordance with the following terms:
(a)    Principal:    ALL SUMS OUTSTANDING UNDER THIS PROMISSORY NOTE, INCLUDING THE PRINCIPAL AMOUNT OF ALL OF THE LOANS, ARE IMMEDIATELY DUE IN FULL UPON THE FIRST TO OCCUR OF: (I) THE DEMAND OF THE HOLDER OF THIS PROMISSORY NOTE, WHICH DEMAND MAY BE MADE AT ANY TIME AND FOR ANY REASON, IN THE SOLE AND ABSOLUTE DISCRETION OF THE HOLDER OF THIS PROMISSORY NOTE; OR (II) THE OCCURRENCE OF ANY DEFAULT UNDER THE TERMS OF THIS PROMISSORY NOTE. *with 30 days written notice* ¹⁰
(b)    Interest:    Borrower shall make payments of all accrued and unpaid interest on the __31st__ day of each successive month, beginning on __March 31, 1999__ and continuing until all sums outstanding hereunder are paid in full.
Borrower may prepay this Promissory Note in whole or in part at any time or from time to time without premium or additional interest.

7.    LATE PAYMENT CHARGE. If any payment due hereunder (including any payment in whole or in part of principal) is not received by the holder within fifteen (15) calendar days after its due date, Borrower shall pay a late payment charge equal to five percent (5%) of the amount then due.

8.    APPLICATION OF PAYMENTS. All payments made pursuant to this Promissory Note shall be applied first to accrued and unpaid interest, then to unpaid expenses and charges payable hereunder, and then to principal, or in such other order or proportion as the holder, in the holder's sole discretion, may elect from time to time.

*see below → unsecured*
9.    SECURITY. Sums due under this Promissory Note are secured by, and Borrower grants to Bank a security interest in, all deposits and property of Borrower now or at any time hereafter in the possession of or on deposit with Bank whether as custodian or depository or in any other capacity. Bank shall have the right to set-off and apply against the obligations of Borrower to Bank evidenced by this Promissory Note any sums of Borrower at any time on deposit with Bank whether such deposits are special, time or demand, provisional or final. In addition, this Promissory Note is secured by any property described as collateral in any security agreement, pledge agreement or other document previously, simultaneously, or hereafter entered into by Borrower in connection with any obligation or liability of Borrower to Bank or any corporate affiliate of Bank, such other security documents include but are not limited to the following:   ¹⁰

[ ]    Security Agreement(s)

[ ]    Real estate mortgage or deed of trust on property known as _____ located in _____ County/City, State of _____

[X]    Other (describe):    __Unsecured__
_____
_____

This Promissory Note specifically incorporates by reference, as if fully set forth herein, all of the language and provisions of the security documents described generally or specifically above.

10.    REPRESENTATIONS AND WARRANTIES. Borrower (and if more than one Borrower, each Borrower) represents and warrants to Bank that the following statements are true, correct and complete as of the date hereof, and as of the date each Loan is made hereunder: (a) it is duly organized and in good standing under the laws of the state in which it is organized; (b) it has the full power and authority to execute, deliver and perform this Promissory Note; (c) neither such execution, delivery and performance, nor compliance by it with the provisions of this Promissory Note will conflict with or result in a breach or violation of its organizational documents, or any judgment, order, regulation, ruling or law to which it is subject or any contract or agreement to which it is a party or to which any of its assets and properties are subject; (d) there is no litigation or proceeding pending at, or to the knowledge of its representative signing this Promissory Note on its behalf, threatened against or affecting it which might materially adversely affect its business, financial condition or operations or its ability to perform and comply with this Promissory Note; (f) all financial statements and information furnished or to be furnished to Bank hereunder have been and will be prepared in accordance with generally accepted accounting principles and fairly present its financial condition as of the dates thereof and the results of its operations (or the period covered thereby); (g) it is not in violation of any applicable federal, state or local law, statute, rule, regulation or ordinance and has not received any notice nor is the subject of any investigation to the effect that its operations are not in material compliance with any such law, statute, rule, regulation or ordinance, including, without limitation, applicable environmental, health and safety laws and regulations; (h) since September 2, 1974, no pension, employee benefit, multi-employer, profit sharing, savings, stock bonus or other deferred compensation plan ("Plan") maintained by it or any trade or business group with which it is affiliated subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA") has been terminated, no lien exists against Borrower in favor of the Pension Benefit Guaranty Corporation ("PBGC"), and no "reportable event" (as such term is defined in ERISA) has occurred with respect to any such Plan, and Borrower has not incurred any "accumulated funding deficiency" within the meaning of ERISA or any liability to the PBGC in connection with any Plan; and (i) no information, exhibit, report, statement, certificate or document furnished by Borrower or any other person to Bank in connection with the Loans, this Promissory Note or the negotiation thereof contains any material

misst...ent of fact or omitted to state a material fact or any fact necessary to make the statements contained herein or therein not misleading.

**11. DEFAULT.** Any of the following will be a default under this Promissory Note: (a) failure to pay any principal, expense, fee, charge or interest when due, or failure to perform any other obligations hereunder; (b) a default by any Borrower upon any of the existing or future obligations of any Borrower to Bank; (c) a default by any guarantor or other person other than Borrower that is now or hereafter liable upon or in connection with any of the obligations of any Borrower to Bank or that has granted any lien or security interest to or for the benefit of Bank to secure any of the obligations of any Borrower to Bank ("Other Obligor"), upon any of the existing or future obligations of any Other Obligor to Bank; (d) a default of Bank, including, without limitation, any security document referred to above, whether previously, simultaneously, or hereafter entered into; (e) a material adverse change in the financial condition of any Borrower or Other Obligor from that expressed in the financial statement most recently submitted to the Bank prior to the date of this Promissory Note, as determined in good faith by Bank in its sole discretion; (f) institution of bankruptcy, insolvency, reorganization or receivership proceedings by or against any Borrower or Other Obligor in any state or federal court; (g) the appointment of a receiver, assignee, custodian, trustee or similar official under any federal or state insolvency or creditors' rights law for any property of any Borrower or Other Obligor; (h) failure of any Borrower or Other Obligor to furnish to Bank such collateral or additional collateral as Bank may in good faith request; (i) any warranty, representation, or statement to Bank by or on behalf of any Borrower or Other Obligor proving to have been incorrect in any material respect when made or furnished; (j) the occurrence of any event which is, or would be with the passage of time or the giving of notice or both, a default under any indebtedness of any Borrower or Other Obligor to any person other than Bank; (k) any material loss, theft or substantial damage, which is not fully insured, to any of the assets of any Borrower or Other Obligor, or the sale, transfer, lease, encumbrance or other disposition of all or any material part of the assets of any Borrower or Other Obligor other than in the ordinary course of business of Borrower or Other Obligor; (l) the entry of any final judgment against any Borrower or Other Obligor for the payment of money in excess of $5,000.00; (m) the levy upon or attachment of any assets of any Borrower or Other Obligor; (n) the recordation of any federal, state or local tax lien against any Borrower or Other Obligor; (o) a change of ownership or dissolution, merger, consolidation, liquidation or reorganization of any Borrower or Other Obligor which is a corporation, partnership or other legal entity; (p) the death of any Borrower or Other Obligor who is a natural person; (q) failure of any Borrower or Other Obligor to furnish to Bank such financial information as Bank may require from time to time, including, but not limited to, such financial statements as Bank may require; (r) failure of any Borrower or Other Obligor to comply with all laws, rules, regulations and decrees to which such Borrower or Other Obligor may be subject, the violation of which may have a material adverse effect on the business operation or financial condition of such Borrower or Other Obligor; (s) the acquisition by a Borrower of all or substantially all of the assets, properties or equity interest of any other person or entity without Bank's prior written consent; (t) failure of any Borrower to maintain its existence in good standing in the jurisdiction of its organization; (u) any of the licenses or permits which are necessary to the conduct of any Borrower's business as now conducted is not maintained in full force and effect; or (v) the determination in good faith by Bank, in its sole discretion, that the ability of any Borrower or Other Obligor to pay or perform any of their respective obligations to Bank is impaired for any reason.

**12. REMEDIES.** Upon a default, in addition to all other rights and remedies available to the holder of this Promissory Note under any document or agreement between Borrower and Bank or under applicable law, the holder of this Promissory Note, in the holder's sole discretion and without notice or demand, may raise the rate of interest accruing on the unpaid principal balance outstanding under this Promissory Note by two (2) percentage points above the rate of interest otherwise applicable. The Bank shall have no further obligation to provide any Loans to Borrower following: (a) a demand by Bank for payment hereunder or (b) a default under this Promissory Note. Borrower agrees that a default under this Promissory Note is a default by Borrower under all other liabilities and obligations of Borrower to the holder, and that the holder shall have the right to declare immediately due and payable all liabilities and obligations owed by Borrower to the holder of this Promissory Note.

**13. CONFESSION OF JUDGMENT.** Borrower irrevocably and unconditionally authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Borrower in any court in one or more proceedings, or before any clerk thereof or prothonotary or other court official, and appear for, to confess and enter judgment against Borrower, at any time, whether before or after the occurrence of any default hereunder, with or without averment of default, with or without complaint filed, and without prior notice or opportunity of Borrower for prior hearing, in favor of the holder of this Promissory Note in the full amount outstanding on this Promissory Note (including principal, accrued interest and any and all charges, fees and expenses) plus court costs, plus attorneys' fees equal to fifteen percent (15%) of the unpaid balance of principal, interest, charges, and other sums outstanding hereunder, with release of all errors and without right of appeal. Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Borrower any right or privilege of exemption, homestead rights, appraisement, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings as a judgment. (To the extent prohibited by applicable law, any judgment obtained by confession shall not constitute a lien on any real property located in Pennsylvania which is the residence of the Borrower.) The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions from time to time, in the same or different jurisdictions, as often as the holder shall deem necessary or advisable. BORROWER HEREBY ACKNOWLEDGES THAT THE CONFESSION OF JUDGMENT PROVISIONS HEREIN CONTAINED WHICH AFFECT AND WAIVE CERTAIN LEGAL RIGHTS OF BORROWER HAVE BEEN READ, UNDERSTOOD AND VOLUNTARILY AGREED TO BY BORROWER.

**14. EXPENSES.** Borrower shall pay all costs and expenses, including attorneys' fees (to the extent not prohibited by law) incident to the making of the Loans. Borrower shall pay all costs and expenses incurred by Bank in collecting sums due under this Promissory Note, including without limitation the costs of any lien, judgment or other record searches, appraisals, travel expenses and the like. In addition, if this Promissory Note is referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, Borrower shall pay all of the holder's costs, fees (including, but not limited to, the holder's attorneys' fees, charges and expenses) and all other expenses resulting from such referral.

**15. AMENDMENTS.** The fees and charges required to be paid by Borrower in connection with the Loans may, at any time and from time to time, be amended by Bank, upon prior written notice thereof to Borrower and otherwise in compliance with applicable law. Any such amendment shall become effective on the first day of the month in which Borrower obtains a Loan, after the date specified in the notice of amendment (which date shall be not less than thirty (30) days from the date

the notice was mailed to Borrower), or upon such other date as may be required in accordance with applicable law. If Borrower obtains a Loan after the date specified in the notice, the changes in the fees and charges described in the amendment shall apply to all outstanding unpaid indebtedness and obligations under this Promissory Note, whether incurred or arising prior to, upon, or after the effective date of the amendment.

16.    NEGOTIABLE INSTRUMENT.  Borrower agrees that this Promissory Note shall be deemed to be a negotiable instrument, even though this Promissory Note may not qualify under applicable law, absent this paragraph, as a negotiable instrument.

17.    WAIVERS.  Borrower, and all parties to this Promissory Note, whether maker, indorser, or guarantor, waive presentment, demand, notice of dishonor and protest.

18.    EXTENSIONS OF MATURITY.  All parties to this Promissory Note, whether maker, indorser, or guarantor, agree that the maturity of this Promissory Note, or any payment due hereunder, may be extended at any time or from time to time without releasing, discharging, or affecting the liability of such party.

19.    NOTICES.  Any notice or demand required or permitted by or in connection with this Promissory Note, without implying the obligation to provide any notice or demand, shall be in writing at the address set forth below or to such other address as may be hereafter specified by written notice to Bank by Borrower. Any such notice or demand shall be deemed to be effective as of the date of hand delivery or facsimile transmission, one (1) day after dispatch if sent by telegram, mailgram, overnight delivery, express mail or federal express, or three (3) days after mailing if sent by first class mail with postage prepaid.

20.    ASSIGNABILITY.  This Promissory Note may be assigned by Bank or any holder at any time.

21.    JOINT AND SEVERAL LIABILITY.  If more than one person or entity is executing this Promissory Note as Borrower, all liabilities under this Promissory Note shall be joint and several with respect to each of such persons or entities.

22.    BINDING NATURE.  This Promissory Note shall inure to the benefit of and be enforceable by Bank and Bank's successors and assigns and any other person to whom Bank may grant an interest in Borrower's obligations to Bank, and shall be binding and enforceable against Borrower and Borrower's personal representatives, successors and assigns.

23.    INVALIDITY OF ANY PART.  If any provision or part of any provision of this Promissory Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Promissory Note and this Promissory Note shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality or unenforceability.

24.    MAXIMUM RATE OF INTEREST; COMMERCIAL LOAN.  Notwithstanding any provision of this Promissory Note to the contrary, Borrower shall not be obligated to pay interest hereunder in excess of the maximum rate of interest permitted by the laws of any state determined to govern this Promissory Note or the laws of the United States applicable to loans in such state. If any provision of this Promissory Note shall ever be construed to require the payment of any amount of interest in excess of that permitted by applicable law, then the interest to be paid hereunder shall be held subject to reduction to the amount allowed under applicable law, and any sums paid in excess of the interest rate allowed by law shall be applied in reduction of the principal balance outstanding under this Promissory Note. Borrower acknowledges that it has been contemplated at all times by Borrower that the laws of the Commonwealth of Pennsylvania will govern the maximum rate of interest that it is permissible for the holder of this Promissory Note to charge Borrower under this Promissory Note. Borrower warrants that this Promissory Note evidences a loan made solely to acquire or carry on a business or commercial enterprise.

25.    CHOICE OF LAW; CONSENT TO VENUE AND JURISDICTION.  This Promissory Note shall be governed, construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania, even if the Commonwealth of Pennsylvania rules governing conflicts of laws would otherwise require that the laws of another jurisdiction govern this Promissory Note. Borrower consents to the jurisdiction and venue of the courts of any city or county in the Commonwealth of Pennsylvania or to the jurisdiction and venue of the United States District Court for the Middle District of Pennsylvania in any action or judicial proceeding brought to enforce, construe or interpret this Promissory Note.

26.    UNCONDITIONAL OBLIGATIONS.  Borrower's obligations under this Promissory Note shall be the absolute and unconditional duties and obligations of Borrower and shall be independent of any rights of set-off, recoupment or counterclaim which Borrower might otherwise have against the holder of this Promissory Note, and Borrower shall pay absolutely the payments of principal, interest, fees, charges and expenses required hereunder, free of any deductions and without abatement, diminution or set-off.

27.    ACTIONS AGAINST BANK.  Any action brought by Borrower against Bank which is based, directly or indirectly, or in whole or in part, upon this Promissory Note or any matter related to this Promissory Note shall be brought only in the courts of the Commonwealth of Pennsylvania.

28.    WAIVER OF JURY TRIAL.  Borrower (by execution of this Promissory Note) and Bank (by acceptance of this Promissory Note) agree that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by Borrower, Bank, or any successor or assign of Borrower or Bank on or with respect to this Promissory Note or which in any way relates, directly or indirectly, to the obligations of Borrower to Bank under the Promissory Note, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. BORROWER AND BANK HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING.  Borrower and Bank acknowledge and agree that this provision is a specific and material aspect of the agreement between the parties and that Bank would not enter into the transaction with Borrower if this provision were not a part of their agreement.

[SIGNATURES CONTAINED ON NEXT PAGE]

IN WITNESS    REOF, and intending to be legally bound hereby, the unde...signed executes this Promissory Note under seal, as Borrower, as of the date first written above.

WITNESS/ATTEST*:

CCI Construction Co, Inc.
(Name of Organization)

7500 Old Gettysburg Rd
(Street Address)

Camp Hill, Pa 17011
(City-State-Zip)

717-909-4224    717-909-4160
(Telephone)              (Facsimile)

*E.M.Avery* (signature)

E. McAvery  ASSISTANT SECRETARY
(Print Name)

By: *Sheri Phillips* (signature) CFO    [SEAL]
(Authorized Signature)

Sheri Phillips, CFO
(Print Name and Title)

_____

(Print Name)

By: _____ [SEAL]
(Authorized Signature)

_____
(Print Name and Title)

*NOTE:  Attestation by a corporate officer of another corporate officer's capacity to sign is required in all corporate transactions.

If Borrower is an individual he or she should sign below:

WITNESS:

_____

(Print Name)

_____ [SEAL]

(Print Name)

_____
(Street Address)

_____
(City-State-Zip)

_____
(Telephone)              (Facsimile)

**EXHIBIT A**
**FILM/Cash Solutions Promissory Note**

Account Number: __28864514__

Borrower: __CCI Construction Company, Inc.__

The terms and provisions of the option checked below are incorporated in and made a part of the FILM/Cash Solutions Promissory Note executed by Borrower to which this Exhibit A is attached:

[X]   **FILM LOAN OPTION** - The following terms apply to this option:

i)   Maximum Line Amount  -  __$4,000,000.00__

ii)   Minimum Loan Advance  -  $0.01

iii)   Incremental Advance Amount  -  __$1.00__

iv)   Target Balance  -  $ __0__

v)   Fees  -  __0__

[ ]   **CASH SOLUTIONS PROTECTION OPTION** - The following terms apply to this option:

i)   Maximum Line Amount  -  _____

ii)   Minimum Loan Advance  -  $500.00

iii)   Incremental Advance Amount  -  $500.00

iv)   Target Balance  -  $ _____

v)   Fees  -  _____

[ ]   **CASH SOLUTIONS MAXIMIZER OPTION** - The following terms apply to this option:

i)   Maximum Line Amount  -  _____

ii)   Minimum Loan Advance  -  $500.00

iii)   Incremental Advance Amount  -  $500.00

iv)   Target Balance  -  $ _____

v)   Fees  -  _____

vi)   Balance in Account is not transferred to Investments until all Loans are paid in full.

[ ]   **CASH SOLUTIONS LOAN OPTION** - The following terms apply to this option:

i)   Maximum Line Amount  -  _____

ii)   Minimum Loan Advance  -  $500.00

iii)   Incremental Advance Amount  -  $500.00

iv)   Target Balance  -  $ _____

v)   Fees  -  _____

WITNESS/ATTEST:                              BORROWER:

                                             _CCI Construction Co, Inc_

_____              By: _____, CFO  [SEAL]
                                             Name: _Sheri Phillips_
                                             Title: _CFO_

If Borrower is an individual he or she should sign below:

_____              _____  [SEAL]
                                             Name: _____

FA-756-FB
10/1/2000

EXHIBIT "B"

*CCI Construction Co., Inc.*

**COMMERCIAL LOAN NOTE**
**LINE OF CREDIT**

0102598-9199
C19

**DAUPHIN DEPOSIT BANK AND TRUST COMPANY**
**BANK OF PENNSYLVANIA • FARMERS BANK • VALLEYBANK • THE YORK BANK AND TRUST COMPANY**

*(Divisions of The First National Bank of Maryland)*

$  2,000,000.00                                                       Date  11-20-98

FOR VALUE RECEIVED, the undersigned,   CCI Construction Co., Inc.
a (corporation/partnership/limited liability company/individual) (the "Borrower"), jointly and severally (if more than one),
promise to pay to the order of THE FIRST NATIONAL BANK OF MARYLAND (the "Bank") or its assigns, the principal
amount of    TWO MILLION & NO/100 DOLLARS
to be paid as follows:

Borrowings under the Loan will require the monthly payment of principal and interest
sufficient to fully amortize the Loan over a term not to exceed sixty (60) months.

Borrowings under the Loan will bear interest at an annual rate equal to The
First National Bank of Maryland base rate as in effect from time to time or
fixed rates as offered by Bank.

Interest shall be calculated on the basis of the actual number of days elapsed and a year of 360 days. Both principal and
interest are payable in lawful money of the United States of America at any office of Bank in immediately available funds. If
any payment due hereunder is received by the Bank more than fifteen (15) calendar days after its due date, the Borrower
shall pay a late payment charge equal to five percent (5%) of the amount then due or $10.00, whichever is greater.

*APPLICATION OF PAYMENTS.* All payments made hereunder shall be applied first to late payment charges or other
sums owed to the Bank, next to accrued interest, and then to principal, or in such other order or proportion as the Bank, in
its sole and absolute discretion, may elect from time to time.

*SECURITY.* The payment of this note and any renewals, extensions and modifications thereof, and the payment,
performance and discharge of all other present or future indebtedness, obligations and undertakings (individual, joint,
several, direct, contingent, or otherwise) of the Borrower to or for the benefit of the Bank, whether arising directly to the
Bank under this note or under any other agreement, promissory note or undertakings now existing or hereinafter entered
by the Borrower to the Bank (collectively, the "Liabilities") is secured by the property described in, and under and pursuant
to the terms and conditions of that certain:

Collateral as set forth in a Security Agreement - Specific Collateral dated  11 / 20/98 .

As additional security for the Liabilities, Borrower grants the Bank a lien upon and a security interest in any securities,
instruments or other personal property of Borrower now or hereafter in Bank's possession and in any deposit balances now
or hereafter held by Bank for Borrower's account and in all proceeds of any such personal property or deposit balances.
Such liens and security interests shall be independent of Bank's right of setoff.

*STATEMENT OF ACCOUNT.* The Bank will furnish the Borrower with a statement of account on a periodic basis. Each
and every statement of account shall be final, conclusive and binding upon the Borrower in all respects as to the
outstanding balance of principal and as to all loans, fees, interest, charges, payments, receipts, balances, and all other
matters reflected therein unless the Borrower, within ten (10) days after the posting thereof in the United States mail, shall
give notice to the Bank in writing of any objections which the Borrower may have to any such statement of account and
in such event, only those items expressly objected to in such written notice shall be considered to be disputed by the
Borrower and all other items shall be binding.

*PAYMENT OF COSTS.* In addition to the principal and interest payments specified above, the Borrower shall pay to the
Bank or any other holder of this note, upon demand, all costs and expenses (including reasonable attorneys' fees, whether
or not litigation is commenced) which may be incurred by the Bank or such holder in the collection or enforcement of this
note. Said costs shall include reasonable attorneys' fees and costs in bankruptcy proceedings and any costs and attorneys'
fees incurred for any action or proceeding in relation to the loan transaction, including but not limited to the joinder of
Bank in any action between the Borrower and a third party.

*DEFAULTS.* The Borrower shall be in default hereunder upon the occurrence of any of the following events: (a) the nonpayment when due of any amount payable on any of the Liabilities, or the failure of any Obligor to observe or perform any agreement of any nature whatsoever with the Bank (the term "Obligor" as used herein being meant to include the Borrower and all persons liable on the note or any renewals, extensions, or modifications thereof, such as endorsers, sureties, or guarantors); (b) if any Obligor becomes insolvent or makes an assignment for the benefit of creditors, or if any petition is filed by or against any Obligor under any provisions of any law or statute alleging that such Obligor is insolvent or unable to pay debts as they mature; (c) the entry of any judgment against any Obligor or the issuing of any attachment or garnishment against any property of any Obligor or the occurrence of any change in the financial condition of any Obligor which in the sole judgment of the Bank is materially adverse; (d) the dissolution, merger, consolidation or reorganization of any Obligor, which is an entity such as a corporation, limited partnership, partnership or limited liability company; (e) the death of any Obligor who is a natural person; (f) any information heretofore or hereinafter furnished to the Bank by any Obligor in connection with the loan evidenced hereby or any suretyship or guaranty should be materially false; and (g) the failure of any Obligor to furnish such financial and other information as the Bank may reasonably request. If this Note is payable on demand, Bank's right to demand payment hereof shall not be restricted or impaired by the absence of, non-occurrence of or waiver of a default hereunder, and it is understood that Bank may demand payment at any time.

*ACCELERATION AND ENFORCEMENT RIGHTS.* Whenever the Borrower shall be in default as aforesaid, (1) unless the Bank elects otherwise, the entire unpaid amount of such of the Liabilities as are not then due and payable shall become immediately due and payable without notice to or demand on any Obligor, and (2) the Bank may at its option exercise from time to time any or all rights and remedies available to it at law or in equity. The Borrower waives all right to stay of execution or garnishment and exemption of property in any action to enforce any of the Liabilities.

*JUDGMENT.* The Borrower does hereby authorize and empower any attorney of any court of record of Pennsylvania or elsewhere to appear for and enter judgment against Borrower for the above sum, with or without declaration, with costs of suit, including reasonable attorneys' fees and fees in bankruptcy proceedings, if any, release of errors, without stay of execution, and with fifteen (15%) percent added for collection fees, and the Borrower further agrees that real, personal or mixed property may be sold or garnished upon any writ of execution or writ of garnishment as now or hereafter provided by law or the Pennsylvania Rules of Civil Procedure governing the enforcement of judgments; and Borrower hereby waives and releases all relief from any appraisement, stay or exemption laws of any state now in force or hereafter enacted. If a copy hereof, verified by affidavit, shall have been filed in such proceeding, it shall not be necessary to file the original as a warrant of attorney. The Borrower (and each of them, if more than one) hereby waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of this warrant and power to confess judgment shall be deemed to exhaust this power, whether or not any such exercise shall be held by any court to be invalid, voidable or void, but this power shall continue undiminished and may be exercised from time to time as often as Bank shall elect until all sums due hereunder shall have been paid in full.

*WAIVERS.* The Borrower hereby, waives presentment, notice of dishonor and protest. The Borrower hereby waives and releases all errors, defects and imperfections of a procedural nature in any proceedings instituted by the Bank hereunder, as well as all benefit that might accrue to the Borrower by virtue of any present or future laws exempting any property, real or personal, or any part of the proceeds arising from any sale of such property, from garnishment, attachment, levy or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment. The Borrower agrees that any property, real or personal, that may be levied upon pursuant to any writ of execution or writ of garnishment issued on any judgment by virtue of this note, may be sold, in whole or in part, in any order desired by the Bank.

*HOLDERS IN DUE COURSE.* This note may be assigned by the Bank or any subsequent holder of this note at any time or from time to time. The Borrower hereby agrees that no subsequent holder of this note to whom the note was transferred for value shall be subject to any claims or defenses which the Borrower may have against a prior holder; all of which are waived as to such subsequent holder, and that all such subsequent holders shall have all of the rights of a holder in due course even though the subsequent holder may not qualify, under applicable law, absent this paragraph, as a holder in due course.

*MISCELLANEOUS.* Any failure of the Bank to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any other time. If the Borrower consists of more than one person, such persons shall be jointly and severally liable hereunder. The Borrower intends this to be a sealed instrument and to be legally bound hereby. This note shall inure to the benefit of and be enforceable by the Bank and its successors and assigns and be binding and enforceable against the Borrower, its legal representatives, successors and permitted assigns. All issues arising hereunder shall be governed by the laws of Pennsylvania without giving effect to choice of law rules.

WITNESS OR ATTEST:

CCI Construction Co., Inc.

BORROWER

(Name of Individual, Corporation,
Partnership or Limited Liability Company)

_____ (Seal)
Name and Title  E M PERRY, ASST SECRETARY

By: _____ , CFO (Seal)
Name and Title  Shari Phillips, CFO

_____ (Seal)
Name and Title

By: _____ (Seal)
Name and Title

_____ (Seal)
Name and Title

By: _____ (Seal)
Name and Title

_____ (Seal)
Name and Title

By: _____ (Seal)
Name and Title

PO Box 1129, Mechanicsburg, PA  17055
Address

CB-111-2

10/98

EXHIBIT "C"

## PARTIES

**Debtor** name (last name first if individual) and mailing address:

CCI Construction Co., Inc.
203 Lynndale Court
Mechanicsburg, PA 17055-2893

**Debtor** name (last name first if individual) and mailing address:

**Debtor** name (last name first if individual) and mailing address:

**Secured Party(ies)** name(s) (last name first if individual) and address for security interest information:

The First National Bank of Maryland
3045 Market Street
Camp Hill, PA 17101

**Assignee(s) of Secured Party** name(s) (last name first if individual) and address for security interest information:

**Special Types of Parties** (check if applicable):

☐ The terms "Debtor" and "Secured Party" mean "Lessee" and "Lessor," respectively.

☐ The terms "Debtor" and "Secured Party" mean "Consignee" and "Consignor," respectively.

☐ Debtor is a Transmitting Utility.

## SECURED PARTY SIGNATURE(S)

This statement is filed with only the Secured Party's signature to perfect a security interest in collateral (check applicable box(es)) —

a. ☐ acquired after a change of name, identity or corporate structure of the Debtor.

b. ☐ as to which the filing has lapsed.

c. ☐ already subject to a security interest in another county in Pennsylvania —
☐ when the collateral was moved to this county.
☐ when the Debtor's residence or place of business was moved to this county.

d. ☐ already subject to a security interest in another jurisdiction —
☐ when the collateral was moved to Pennsylvania.
☐ when the Debtor's location was moved to Pennsylvania.

e. ☐ which is proceeds of the collateral described in block 9, in which a security interest was previously perfected (also describe proceeds in block 9, if purchased with cash proceeds and not adequately described on the original financing statement).

**Secured Party Signature(s)**
(required only if box(es) is checked above):

STANDARD FORM – FORM UCC-1
Approved by Secretary of Commonwealth of Pennsylvania

---

## FINANCING STATEMENT
**Uniform Commercial Code Form UCC-1**
**IMPORTANT — Please read instructions on reverse side of page 4 before completing**

Filing No. (stamped by filing officer):    Date, Time, Filing Office (stamped by filing officer):

**29621775**

98 NOV 25 PM 12: 26

This Financing Statement is presented for filing pursuant to the Uniform Commercial Code, and is to be filed with the (check applicable box):

☒ Secretary of the Commonwealth
☐ Prothonotary of _____ County.
☐ real estate records of _____ County.

'DEPT. OF STATE
'CORPORATION BUREAU'

**Number of Additional Sheets** (if any):

**Optional Special Identification** (Max. 10 characters):

### COLLATERAL

Identify collateral by item and/or type:

All present and future equipment for CCI Construction Co., Inc. financed by The First National Bank of Maryland, a national Banking Association, successor by merger to Dauphin Deposit Bank and Trust Company, that has not been paid in full.

☐ (check only if desired) Products of the collateral are also covered.

Identify related real estate, if applicable: The collateral is, or includes (check appropriate box(es)) —
a. ☐ crops growing or to be grown on —
b. ☐ goods which are or are to become fixtures on —
c. ☐ minerals or the like (including oil and gas) as extracted on —
d. ☐ accounts resulting from the sale of minerals or the like (including oil and gas) at the wellhead or minehead on —

the following real estate:
Street Address:
Described at: Book _____ of (check one) ☐ Deeds ☐ Mortgages, at Page(s) _____
for _____ County. Uniform Parcel Identifier _____
☐ Described on Additional Sheet.
Name of record owner (required only if no Debtor has an interest of record):

### DEBTOR SIGNATURE(S)

Debtor Signature(s): CCI Construction Co., Inc.

_Sheri Phillips, CFO_

1a Sheri Phillips, Chief Financial Officer

RETURN RECEIPT TO:

The First National Bank of Maryland
3045 Market Street
Camp Hill, PA 17011
ATTN: Craig J. Schwartz
Mail Code: ; 014-02-01

EXHIBIT "D"

## PARTIES

**Debtor name** (last name first if individual) and mailing address:

CCI Construction Co., Inc.
2500 Old Gettysburg Road
Camp Hill, PA  17011-7307

**1**

**Debtor name** (last name first if individual) and mailing address:

**1a**

**Debtor name** (last name first if individual) and mailing address:

**1b**

**Secured Party(ies) name(s)** (last name first if individual) and address for security interest information:

Allfirst Bank
3045 Market Street
Camp Hill, PA  17011

**2**

**Assignee(s) of Secured Party name(s)** (last name first if individual) and address for security interest information:

**2a**

**Special Types of Parties** (check if applicable):

☐ The terms "Debtor" and "Secured Party" mean "Lessee" and "Lessor," respectively

☐ The terms "Debtor" and "Secured Party" mean "Consignee" and "Consignor," respectively.

☐ Debtor is a Transmitting Utility.

**3**

### SECURED PARTY SIGNATURE(S)

This statement is filed with only the Secured Party's signature to perfect a security interest in collateral (check applicable box(es)) —

a. ☐ acquired after a change of name, identity or corporate structure of the Debtor

b. ☐ as to which the filing has lapsed.

c. ☐ already subject to a security interest in another county in Pennsylvania —

☐ when the collateral was moved to this county.

☐ when the Debtor's residence or place of business was moved to this county.

d. ☐ already subject to a security interest in another jurisdiction —

☐ when the collateral was moved to Pennsylvania.

☐ when the Debtor's location was moved to Pennsylvania.

e. ☐ which is proceeds of the collateral described in block 9, if a security interest was previously perfected (also describe proceeds in block 9, if purchased with cash proceeds and not adequately described on the original financing statement).

**Secured Party Signature(s)**
(required only if box(es) is checked above):

_____

_____

_____

**4**

STANDARD FORM – FORM UCC-1
Approved by Secretary of Commonwealth of Pennsylvania

---

## FINANCING STATEMENT
### Uniform Commercial Code Form UCC-1
**IMPORTANT — Please read instructions on reverse side of page 4 before completing**

**Filing No.** (stamped by filing officer):     **Date, Time, Filing Office** (stamped by filing officer):

## 30950306

## 99 NOV 17  AM 10: 56

## PA DEPT OF STATE

This Financing Statement is presented for filing pursuant to the Uniform Commercial Code, and is to be filed with the (check applicable box):

☒ Secretary of the Commonwealth.

☐ Prothonotary of _____ County.

☐ real estate records of _____ County.

**Number of Additional Sheets** (if any):

**Optional Special Identification** (Max. 10 characters):  0102598-☒☒OOM

### COLLATERAL

**Identify collateral by item and/or type:**

See attached schedule

☐ (check only if desired) Products of the collateral are also covered.

**Identify related real estate**, if applicable: The collateral is, or includes (check appropriate box(es)) —

a. ☐ crops growing or to be grown on —

b. ☐ goods which are or are to become fixtures on —

c. ☐ minerals or the like (including oil and gas) as extracted on —

d. ☐ accounts resulting from the sale of minerals or the like (including oil and gas) at the wellhead or minehead on —

the following real estate:

Street Address:

Described at: Book _____ of (check one) ☐ Deeds ☐ Mortgages, at Page(s) _____

for _____ County.  Uniform Parcel Identifier _____

☐ Described on Additional Sheet.

Name of record owner (required only if no Debtor has an interest of record): _____

### DEBTOR SIGNATURE(S)

Debtor Signature(s):  CCI, Construction Co., Inc.

**1** _[signature]_ CFO  11/8/99

**1a**  Sheri Phillips, Chief Financial Officer

**1b**

RETURN RECEIPT TO:

Allfirst Bank
3045 Market Street
Camp Hill, PA  17011
ATTN:  Craig J. Schwartz
Mail Code:  014-02-01

FILING OFFICE ORIGINAL
NOTE — This page will not be returned by the Department of State.

# SCHEDULE A

30950307

| EQUIP # | DESCRIPTION | S/N# |
|---------|-------------|------|
| BH-06 | CASE 580L | JJG0235790 |
| L-01 | CAT 963B TRACK LOADER | 9BL02023 |
| R-07 | WACKER RT 820 TRENCH ROLLER | 764301040 |
| R-08 | WACKER RT 820 TRENCH ROLLER | 764401365 |
| SP-02 | Morrison Super Screed | 990253103 |
| SP-03 | Allen / Magic Screed | 1271909 |
| TH-03 | PETTIBONE TELEHANDLER | GR798 |
| LB-03 | 10 TON LOWBOY | 4KNUZ1622XL160323 |
| LB-04 | LOWBOY VALLEY | 4YTLC1222WW002994 |

EXHIBIT "E"

LAW OFFICES

# GEBHARDT & SMITH LLP

NINTH FLOOR
THE WORLD TRADE CENTER
BALTIMORE, MARYLAND 21202-3064

BALTIMORE:    (410) 752-5830
WASHINGTON:   (301) 470-7468

WRITER'S DIRECT DIAL NUMBER:

(410) 385-5100
Writer's E-Mail Address:
lgebh@gebsmith.com

FACSIMILE
(410) 385-5119

Refer To File No. 18610

February 24, 2000

*Via Facsimile and Federal Express*
4027 1282 2484

CCI CONSTRUCTION CO., INC.
2500 Old Gettysburg Road
Camp Hill, Pennsylvania 17011-7307

Attn:  John M. Ortenzio, President

RE:   $4,000,000 Unsecured Revolving Line Of Credit and
       $2,000,000 Secured Equipment Purchase Line of Credit
       Extended By Allfirst Bank To CCI Construction Co., Inc.

Dear Mr. Ortenzio:

This firm represents Allfirst Bank ("Lender"), which has extended to CCI Construction Co., Inc. ("Borrower") (a) a revolving line of credit in the maximum principal amount of $4,000,000 pursuant to a FILM/Cash Solutions Promissory Note dated March 24, 1999 ("Film Note") and related documents, and (b) a secured equipment purchase line of credit in the stated principal amount of $2,000,000 pursuant to a Commercial Loan Note ("Commercial Note") and a Security Agreement, both dated November 20, 1998, and related documents.  This letter is being sent at the specific request and direction of the Lender.

As a result of the occurrence of various events which are materially adverse to the financial condition of the Borrower, and as a further result of the insolvency of the Borrower, the Lender hereby declares a default under the Commercial Loan Note and under the Security Agreement.  In consequence of this declaration of default under the equipment purchase line of credit, the Lender hereby accelerates and declares immediately due and payable all sums presently outstanding and owing under the equipment purchase line of credit.

As a result of the default under the equipment line of credit, the Borrower is, in turn, in default under the cross-default provisions of Section 11 of the FILM Promissory Note, and the Lender hereby declares the default.  In consequence of this default the Bank hereby accelerates and demands immediate payment of all sums presently due and owing under the FILM Promissory Note.

Because of the default under the FILM Promissory Note and the Bank's acceleration and demand for immediate payment of the sums due thereunder no further sums will be advanced under the revolving line of credit evidenced by the FILM/Cash Solutions Promissory Note, **effective immediately**.  Any checks or other payments items in transit will not be honored by the Lender.

GEBHARDT & SMITH

CCI CONSTRUCTION CO., INC.
February 24, 2000
Page 2

The total sums presently due and outstanding under the equipment purchase line of credit and the revolving line of credit, respectively, are as follows:

Equipment Purchase Line Of Credit
    Principal                                   $1,244,116.74
    Interest through February 23 2000      $    5,237.80
    Total                                  $ 1,249,354.54
    Interest per day thereafter: $231.54

Revolving Line Of Credit
    Principal                                   $2,601,514.01
    Interest through February 23, 2000     $   26,524.83
    Total                                  $2,628,038.84
    Interest per day thereafter: $596.18

As previously stated, the Lender by this letter is demanding immediate payment in full of all sums due and owing to it by the Borrower under both loans. Unless full payment is made by the Borrower immediately upon receipt of this letter, all remedies available to the Lender under applicable law will be pursued without further notice to the Borrower, including the institution of judgment by confession and the enforcement of the Lender's security interest.

This letter is not intended to be a waiver of any rights, remedies, or recourse available to the Lender, nor an election of remedies arising as a result of the defaults or of any other default which may now or hereafter exist with respect to the revolving line of credit and the equipment line of credit. The collection of interest or acceptance of partial payments (that is, less than the total amount due in accordance with the terms of the debt instruments) by the Lender shall not constitute an extension of the maturity date of the revolving line of credit or equipment line of credit or a waiver of the Lender's acceleration of the indebtedness evidenced by the respective debt instruments or of any other rights under the loan documents.

Very truly yours,

Lawrence J. Gebhardt

LJG/dls
cc:     Gerard L. Elias, SVP
          - ALLFIRST BANK
      Robert E. Chernicoff, Esquire
          - CUNNINGHAM & CHERNICOFF, P.C.

EXHIBIT "F"



CCI CONSTRUCTION INC
P.O. BOX 8800
CAMP HILL PA 17001-8800

OP

Page    1 of    15

# Corporate Checking

February 1, 2000 thru February 29, 2000

CCI CONSTRUCTION INC

**Account Number**
00288-6451-4

**For assistance call**
The Financial Center
*1-800-220-6004*

## Activity Summary

| | | | |
|---|---|---|---|
| Avg daily ledger balance | -46,616.06 | Balance on 01/31 | $323,137.00 |
| | | 000006 deposits | 1,246,518.82 ✓ |
| | | 000373 checks/list post | -5,962,458.45 ✓ |
| | | Funds transfers (net) | 5,260,757.03 ✓ |
| | | Other credits | 754,545.47 ✓ |
| | | Other debits | -1,807,463.58 |
| | | Balance on 02/29 | -184,963.71 |

## Deposits

| Date | Amount | Serial Number | Reference Number | Date | Amount | Serial Number | Reference Number |
|---|---|---|---|---|---|---|---|
| 02/07 | $356,193.16 | | 021399709 | 02/15 | $482,605.52 | | 023457020 |
| 02/11 | 14,000.00 | | 021318866 | 02/16 | 22,277.92 | | 021226319 |
| 02/14 | 359,995.26 | | 021680603 | 02/23 | 11,446.96 | | 021189594 |
| | | | | | $1,246,518.82 | Deposits Total | |

## Checks/List Post
\* Denotes missing sequence number

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000058719 | $134.14 | 02/16 | 020559045 | 0000059593 * | $10.00 | 02/10 | 020685116 |
| 0000059471 * | 11,468.06 | 02/22 | 021659050 | 0000059624 * | 145.82 | 02/02 | 021417752 |
| 0000059491 * | 863.08 | 02/01 | 018640070 | 0000059723 * | 72.48 | 02/14 | 021480092 |
| 0000059492 | 137.27 | 02/24 | 020150693 | 0000059731 * | 5.21 | 02/16 | 021066427 |
| 0000059522 * | 37.33 | 02/01 | 021251518 | 0000059733 * | 9,482.40 | 02/08 | 021528187 |
| 0000059534 * | 176.80 | 02/04 | 021859301 | 0000059756 * | 5.18 | 02/16 | 021044002 |
| 0000059572 * | 144.20 | 02/24 | 021256353 | 0000059780 * | 432.00 | 02/18 | 020090527 |

Continued on back

## Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000059821 * | $1,530.00 | 02/10 | 021023485 | 0000060083 * | $323.66 | 02/04 | 021873940 |
| 0000059847 * | 8,917.62 | 02/04 | 021833494 | 0000060089 * | 133.20 | 02/02 | 021460364 |
| 0000059862 * | 1,848.00 | 02/02 | 021464629 | 0000060090 | 220.00 | 02/01 | 021199169 |
| 0000059870 * | 2,940.91 | 02/01 | 021229418 | 0000060099 * | 9,742.50 | 02/03 | 021658364 |
| 0000059902 * | 425.56 | 02/10 | 012580493 | 0000060101 * | 3,403.02 | 02/02 | 021486146 |
| 0000059930 * | 250.00 | 02/03 | 021645818 | 0000060113 * | 269.26 | 02/01 | 021251708 |
| 0000059945 * | 595.44 | 02/07 | 021227053 | 0000060116 * | 30.00 | 02/02 | 021473280 |
| 0000059946 | 558.70 | 02/09 | 021771347 | 0000060121 * | 138,006.50 | 02/04 | 021863600 |
| 0000059947 | 50.01 | 02/01 | 021204991 | 0000060125 * | 564.00 | 02/01 | 021225055 |
| 0000059950 * | 582.23 | 02/14 | 021515121 | 0000060127 * | 525.00 | 02/02 | 016072897 |
| 0000059952 * | 757.42 | 02/09 | 021717045 | 0000060142 * | 305.28 | 02/01 | 021268042 |
| 0000059956 * | 2,190.01 | 02/04 | 021869236 | 0000060151 * | 481.47 | 02/03 | 021613302 |
| 0000059966 * | 206,758.00 | 02/02 | 021470156 | 0000060155 * | 25,307.10 | 02/23 | 012523451 |
| 0000059971 * | 100.00 | 02/02 | 021443229 | 0000060159 * | 2,561.57 | 02/01 | 021270671 |
| 0000059972 | 154,138.35 | 02/01 | 014238290 | 0000060170 * | 234,701.20 | 02/07 | 016839918 |
| 0000059976 * | 2,673.40 | 02/09 | 021774955 | 0000060172 * | 1,668.50 | 02/01 | 021243309 |
| 0000059977 | 1,982.17 | 02/04 | 021826635 | 0000060173 | 3,280.00 | 02/01 | 021182426 |
| 0000059984 * | 649,978.16 | 02/02 | 021473290 | 0000060177 * | 601.65 | 02/04 | 021812284 |
| 0000059985 | 188.94 | 02/04 | 021859226 | 0000060183 * | 6,677.50 | 02/01 | 021266003 |
| 0000059988 * | 9,881.45 | 02/02 | 021466760 | 0000060184 | 157.38 | 02/16 | 012822153 |
| 0000059994 * | 369.84 | 02/01 | 014238190 | 0000060189 * | 5,038.90 | 02/10 | 021045858 |
| 0000059996 * | 7,645.74 | 02/01 | 021269560 | 0000060203 * | 9,025.00 | 02/17 | 023490292 |
| 0000059998 * | 300.00 | 02/02 | 021443228 | 0000060204 | 36,814.07 | 02/18 | 021536924 |
| 0000059999 | 33,669.50 | 02/03 | 021656270 | 0000060206 * | 557.16 | 02/01 | 021239588 |
| 0000060006 * | 148,539.15 | 02/03 | 021682359 | 0000060209 * | 333.79 | 02/07 | 021159406 |
| 0000060007 | 11,700.00 | 02/03 | 021682360 | 0000060210 | 2,079.00 | 02/07 | 021159405 |
| 0000060010 * | 6,226.76 | 02/03 | 021661330 | 0000060212 * | 705.66 | 02/11 | 021196149 |
| 0000060015 * | 31.00 | 02/01 | 014239195 | 0000060213 | 110,257.00 | 02/08 | 021529598 |
| 0000060018 * | 834.31 | 02/03 | 021668574 | 0000060217 * | 283,500.00 | 02/16 | 021045031 |
| 0000060019 | 11,746.25 | 02/03 | 021655676 | 0000060221 * | 906.89 | 02/09 | 021717044 |
| 0000060020 | 450.00 | 02/03 | 021645316 | 0000060222 | 47,630.60 | 02/07 | 021268327 |
| 0000060021 | 155.70 | 02/02 | 021443227 | 0000060223 | 7,885.08 | 02/28 | 012730608 |
| 0000060023 * | 3,610.00 | 02/25 | 020342030 | 0000060224 | 2,034.75 | 02/01 | 021249126 |
| 0000060026 * | 237.68 | 02/02 | 021443226 | 0000060225 | 6,217.31 | 02/07 | 021227559 |
| 0000060027 * | 74.32 | 02/02 | 021479041 | 0000060226 | 189,513.60 | 02/02 | 021473343 |
| 0000060053 * | 136.43 | 02/01 | 021239589 | 0000060227 | 14.32 | 02/10 | 021891721 |
| 0000060055 * | 210.00 | 02/10 | 021045860 | 0000060228 | 7,823.70 | 02/09 | 021761571 |
| 0000060080 * | 195.72 | 02/02 | 021479593 | 0000060229 | 6,997.65 | 02/04 | 018819885 |
| 0000060081 | 112,188.80 | 02/01 | 021182531 | 0000060230 | 5,850.00 | 02/04 | 021864136 |

Continued on next page



CCI CONSTRUCTION INC

Account Number
00288-6451-4

**?** For assistance call
The Financial Center
*1-800-220-6004*

### Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000060231 | $57.73 | 02/08 | 018305375 | 0000060267 * | $39.68 | 02/08 | 021548529 |
| 0000060232 | 6,531.89 | 02/11 | 021223990 | 0000060268 | 4,304.54 | 02/02 | 021473532 |
| 0000060233 | 131.25 | 02/02 | 021490918 | 0000060269 | 7,767.90 | 02/09 | 021748654 |
| 0000060234 | 251.00 | 02/09 | 021733131 | 0000060270 | 2,367.31 | 02/07 | 018482927 |
| 0000060235 | 46.96 | 02/07 | 021231024 | 0000060271 | 12,290.48 | 02/02 | 020352567 |
| 0000060236 | 24,327.00 | 02/04 | 012281395 | 0000060272 | 4,226.00 | 02/11 | 021227547 |
| 0000060237 | 146.51 | 02/08 | 021563985 | 0000060273 | 3,886.65 | 02/02 | 021481668 |
| 0000060238 | 15,795.00 | 02/03 | 016388967 | 0000060274 | 12,481.14 | 02/02 | 021417634 |
| 0000060239 | 174.70 | 02/08 | 021537911 | 0000060275 | 5,068.95 | 02/03 | 021653141 |
| 0000060240 | 58.95 | 02/07 | 095792742 | 0000060276 | 60.00 | 02/02 | 021445696 |
| 0000060241 | 2,718.05 | 02/03 | 021669955 | 0000060277 | 30,475.80 | 02/02 | 012583532 |
| 0000060242 | 1,603.54 | 02/03 | 021652837 | 0000060278 | 12,034.60 | 02/07 | 021231197 |
| 0000060243 | 34,263.00 | 02/07 | 021257039 | 0000060279 | 124,454.20 | 02/04 | 014215052 |
| 0000060244 | 180.55 | 02/09 | 021747030 | 0000060280 | 315,000.00 | 02/04 | 021848523 |
| 0000060245 | 2,258.66 | 02/02 | 016048001 | 0000060281 | 492.47 | 02/08 | 021474168 |
| 0000060246 | 24,228.45 | 02/03 | 021654728 | 0000060283 * | 5,419.07 | 02/07 | 021248360 |
| 0000060247 | 58,724.84 | 02/03 | 021654729 | 0000060284 | 815.97 | 02/07 | 021215066 |
| 0000060248 | 2,406.84 | 02/14 | 021426801 | 0000060285 | 4,857.00 | 02/11 | 018084410 |
| 0000060249 | 24,003.00 | 02/09 | 021745546 | 0000060286 | 21,600.00 | 02/11 | 021196215 |
| 0000060250 | 7,449.30 | 02/22 | 018715133 | 0000060305 * | 3,127.50 | 02/18 | 021365721 |
| 0000060251 | 24.38 | 02/09 | 021745608 | 0000060309 * | 17.00 | 02/17 | 016677794 |
| 0000060252 | 1,291.00 | 02/03 | 021611618 | 0000060311 * | 502.20 | 02/24 | 020150694 |
| 0000060253 | 478.01 | 02/24 | 021297527 | 0000060312 | 15.45 | 02/22 | 021661049 |
| 0000060254 | 513.98 | 02/02 | 021426456 | 0000060315 * | 260.00 | 02/18 | 021371903 |
| 0000060255 | 19,135.80 | 02/10 | 021054933 | 0000060320 * | 20.00 | 02/18 | 021388819 |
| 0000060256 | 13,624.56 | 02/04 | 021832799 | 0000060324 * | 265.35 | 02/18 | 021412189 |
| 0000060257 | 13.45 | 02/01 | 021226994 | 0000060327 * | 534.57 | 02/24 | 021314140 |
| 0000060258 | 5,733.00 | 02/14 | 021520446 | 0000060330 * | 130.12 | 02/22 | 021665606 |
| 0000060259 | 550.00 | 02/01 | 021222273 | 0000060331 | 603.13 | 02/24 | 021312189 |
| 0000060260 | 57.00 | 02/04 | 018762099 | 0000060349 * | 54.50 | 02/22 | 021671017 |
| 0000060261 | 24,898.17 | 02/07 | 021182617 | 0000060352 * | 749.08 | 02/18 | 018469447 |
| 0000060262 | 5,818.82 | 02/24 | 021286450 | 0000060356 * | 832.99 | 02/14 | 021680602 |
| 0000060263 | 12,233.26 | 02/07 | 021245832 | 0000060358 * | 940.68 | 02/18 | 021381387 |
| 0000060264 | 4,887.00 | 02/22 | 021623007 | 0000060360 * | 150.00 | 02/22 | 021617804 |
| 0000060265 | 31,084.00 | 02/04 | 021853299 | 0000060363 * | 147.65 | 02/25 | 021455909 |

608555
001 98317914869    050

Continued on back

## Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000060364 | $619.63 | 02/18 | 021390951 | 0000060461 | $1,442.12 | 02/22 | 021665661 |
| 0000060365 | 21,353.64 | 02/15 | 021868441 | 0000060464 * | 99.36 | 02/22 | 021650709 |
| 0000060369 * | 18.45 | 02/23 | 021102338 | 0000060473 * | 68.90 | 02/23 | 021063728 |
| 0000060370 | 195.00 | 02/18 | 020052479 | 0000060475 * | 6.06 | 02/16 | 021008470 |
| 0000060371 | 72,923.73 | 02/17 | 023538623 | 0000060490 * | 2,000.00 | 02/24 | 021315946 |
| 0000060372 | 8,330.28 | 02/23 | 012164783 | 0000060491 | 2,829.75 | 02/24 | 021315947 |
| 0000060372 | 8,330.28 | 02/28 | 012041597 | 0000060492 | 53,750.10 | 02/15 | 021804284 |
| 0000060375 * | 184.00 | 02/22 | 021623412 | 0000060499 * | 16.96 | 02/17 | 023504566 |
| 0000060376 | 75.05 | 02/17 | 023525046 | 0000060502 * | 73.19 | 02/28 | 021771082 |
| 0000060378 * | 2,253.09 | 02/16 | 021007079 | 0000060505 * | 90.95 | 02/22 | 021638989 |
| 0000060379 | 1,194.47 | 02/16 | 018725929 | 0000060507 * | 5,017.80 | 02/17 | 023543300 |
| 0000060380 | 4,146.51 | 02/22 | 021666282 | 0000060518 * | 76.27 | 02/23 | 021089102 |
| 0000060382 * | 2,217.52 | 02/18 | 020088643 | 0000060523 * | 9,206.35 | 02/22 | 021609313 |
| 0000060387 * | 8,266.67 | 02/11 | 021329631 | 0000060524 | 125.55 | 02/18 | 021412655 |
| 0000060391 * | 67.25 | 02/24 | 021330426 | 0000060526 * | 180.36 | 02/22 | 021585578 |
| 0000060392 | 584.52 | 02/18 | 021365072 | 0000060528 * | 110.32 | 02/29 | 021139936 |
| 0000060393 | 70.50 | 02/18 | 021374810 | 0000060534 * | 2,574.68 | 02/17 | 023492647 |
| 0000060395 * | 450.00 | 02/22 | 021617805 | 0000060535 | 16,748.11 | 02/22 | 016215691 |
| 0000060403 * | 43.05 | 02/16 | 021008954 | 0000060537 * | 11,935.02 | 02/22 | 021648920 |
| 0000060404 | 369.70 | 02/17 | 016682361 | 0000060538 | 210.31 | 02/22 | 021623833 |
| 0000060407 * | 60.35 | 02/22 | 012549378 | 0000060542 * | 38.16 | 02/23 | 021086433 |
| 0000060408 | 177.17 | 02/15 | 023456939 | 0000060557 * | 95.91 | 02/24 | 021310408 |
| 0000060411 * | 2,614.80 | 02/22 | 021667877 | 0000060564 * | 102.10 | 02/24 | 021316175 |
| 0000060412 | 374.80 | 02/22 | 021656937 | 0000060573 * | 1,871.00 | 02/18 | 014545481 |
| 0000060417 * | 39.57 | 02/22 | 021661036 | 0000060580 * | 176.40 | 02/23 | 021050615 |
| 0000060418 | 1,575.00 | 02/22 | 016513167 | 0000060588 * | 214.62 | 02/24 | 021319462 |
| 0000060419 | 284.41 | 02/24 | 012578174 | 0000060590 * | 374.60 | 02/18 | 020873737 |
| 0000060435 * | 225.00 | 02/22 | 021629257 | 0000060597 * | 4,819.99 | 02/18 | 021413115 |
| 0000060436 | 233.55 | 02/22 | 021617807 | 0000060598 | 2,818.28 | 02/18 | 021414601 |
| 0000060442 * | 13.04 | 02/28 | 021739640 | 0000060599 | 967.24 | 02/17 | 023486115 |
| 0000060445 * | 118.84 | 02/22 | 021617806 | 0000060601 * | 180.00 | 02/18 | 020052467 |
| 0000060448 * | 1,786.00 | 02/22 | 021640471 | 0000060602 | 136.78 | 02/18 | 020052458 |
| 0000060449 | 243.00 | 02/15 | 021874350 | 0000060603 | 255.00 | 02/18 | 020052457 |
| 0000060450 | 19,708.54 | 02/15 | 023481348 | 0000060607 * | 5,092.60 | 02/16 | 021030048 |
| 0000060453 * | 68.84 | 02/18 | 021420759 | 0000060610 * | 221.60 | 02/17 | 023532529 |
| 0000060455 * | 344.93 | 02/29 | 018892342 | 0000060612 * | 72.08 | 02/17 | 023537629 |
| 0000060458 * | 415.52 | 02/18 | 021384064 | 0000060613 | 10,748.49 | 02/22 | 012549105 |
| 0000060459 | 907.60 | 02/17 | 023502796 | 0000060614 | 1,766.97 | 02/18 | 020051666 |
| 0000060460 | 111.48 | 02/23 | 021093727 | 0000060622 * | 4,882.40 | 02/17 | 023525242 |

 **allfirst**

CCI CONSTRUCTION INC

Account Number
00288-6451-4

**?** For assistance call
The Financial Center
*1-800-220-6004*

## Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000060624 * | $65.00 | 02/23 | 021093603 | 0000060687 | $6,300.00 | 02/22 | 021807398 |
| 0000060625 | 615.75 | 02/22 | 021588840 | 0000060688 | 2,230.00 | 02/22 | 021807400 |
| 0000060628 * | 1,200,000.00 | 02/11 | 021329643 | 0000060689 | 500.00 | 02/22 | 021807399 |
| 0000060634 * | 1,380.00 | 02/24 | 021327674 | 0000060690 | 9,090.00 | 02/28 | 021678282 |
| 0000060635 | 39.68 | 02/24 | 021300253 | 0000060692 * | 540.24 | 02/29 | 021088215 |
| 0000060636 | 6,900.00 | 02/24 | 014440388 | 0000060693 | 7,817.85 | 02/25 | 021605076 |
| 0000060637 | 7,869.60 | 02/24 | 021304829 | 0000060694 | 2,940.00 | 02/24 | 023061363 |
| 0000060638 | 73,632.29 | 02/29 | 021107389 | 0000060695 | 58.81 | 02/28 | 021721294 |
| 0000060639 | 69,698.70 | 02/16 | 021144071 | 0000060696 | 23.20 | 02/28 | 021724990 |
| 0000060640 | 2,172.35 | 02/17 | 021314246 | 0000060697 | 21.70 | 02/29 | 018842714 |
| 0000060641 | 78,279.05 | 02/18 | 021424951 | 0000060699 * | 77.85 | 02/25 | 021441722 |
| 0000060642 | 690.00 | 02/18 | 021424950 | 0000060702 * | 76.84 | 02/29 | 021121839 |
| 0000060643 | 69,005.50 | 02/17 | 023535605 | 0000060706 * | 10,400.00 | 02/29 | 021107390 |
| 0000060644 | 4,855.50 | 02/23 | 021094899 | 0000060707 | 2,703.00 | 02/28 | 021745303 |
| 0000060646 * | 3,965.65 | 02/28 | 021759601 | 0000060708 | 1,076.41 | 02/28 | 021746980 |
| 0000060648 * | 107.42 | 02/18 | 021365654 | 0000060709 | 29.00 | 02/29 | 021103365 |
| 0000060657 * | 17,100.00 | 02/25 | 021471675 | 0000060710 | 37,800.00 | 02/28 | 021678350 |
| 0000060660 * | 104.16 | 02/28 | 021721464 | 0000060711 | 3,947.25 | 02/28 | 021678351 |
| 0000060664 * | 445.01 | 02/28 | 021730911 | 0000060712 | 8,064.27 | 02/28 | 021867537 |
| 0000060665 | 1,486.66 | 02/28 | 018738706 | 0000060714 * | 24,480.00 | 02/29 | 021124064 |
| 0000060665 | 1,486.66 | 02/28 | 012833316 | 0000060716 * | 203.16 | 02/24 | 021278956 |
| 0000060669 * | 16,300.00 | 02/23 | 021189314 | 0000060717 | 665.33 | 02/29 | 021134476 |
| 0000060670 | 16,976.34 | 02/23 | 020744570 | 0000060719 * | 1,645.35 | 02/28 | 021315949 |
| 0000060671 | 261.92 | 02/22 | 021003710 | 0000060720 | 182,733.35 | 02/24 | 021315948 |
| 0000060673 * | 2,002.00 | 02/28 | 021693829 | 0000060721 | 23.85 | 02/24 | 021262411 |
| 0000060674 | 50.00 | 02/25 | 021441724 | 0000060723 * | 833.44 | 02/24 | 021262397 |
| 0000060675 | 378.56 | 02/29 | 021117205 | 0000060724 | 245.87 | 02/24 | 021262396 |
| 0000060676 | 45,323.62 | 02/23 | 021170760 | 0000060725 | 38.90 | 02/24 | 021262400 |
| 0000060676 | 45,323.62 | 02/25 | 012419255 | 0000060726 | 22.29 | 02/24 | 021262401 |
| 0000060678 * | 65.00 | 02/28 | 012694765 | 0000060727 | 780.71 | 02/24 | 021262406 |
| 0000060681 * | 14,528.47 | 02/28 | 021715278 | 0000060728 | 105.84 | 02/24 | 021262408 |
| 0000060682 | 16,658.76 | 02/22 | 021003709 | 0000060729 | 464.81 | 02/24 | 021262398 |
| 0000060684 * | 25,110.00 | 02/25 | 021476442 | 0000060730 | 30.00 | 02/24 | 021262403 |
| 0000060685 | 201.36 | 02/25 | 021471502 | 0000060731 | 149.09 | 02/24 | 021262409 |
| 0000060686 | 150.00 | 02/25 | 021441723 | 0000060733 * | 116.13 | 02/24 | 021262404 |

Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000060734 | $101.13 | 02/24 | 021262402 | 0000060784 | $1,112.01 | 02/23 | 021094983 |
| 0000060735 | 209.34 | 02/24 | 021262407 | 0000060785 | 700.66 | 02/25 | 018035298 |
| 0000060736 | 842.14 | 02/24 | 021262399 | 0000060786 | 18.55 | 02/29 | 018841993 |
| 0000060737 | 532.06 | 02/24 | 021262395 | 0000060787 | 2,478.09 | 02/29 | 021125890 |
| 0000060739 * | 309.53 | 02/24 | 021262410 | 0000060793 * | 260.23 | 02/24 | 012094454 |
| 0000060740 | 33.04 | 02/24 | 021262405 | 0000060793 | 260.23 | 02/29 | 018319725 |
| 0000060742 * | 133.27 | 02/28 | 021735671 | 0000060794 | 267.14 | 02/28 | 021737992 |
| 0000060743 | 136.49 | 02/29 | 021131591 | 0000060795 | 8.84 | 02/29 | 021125992 |
| 0000060744 | 12,347.31 | 02/24 | 021302776 | 0000060796 | 1,380.36 | 02/28 | 021629643 |
| 0000060746 * | 769.26 | 02/25 | 021457527 | 0000060799 * | 154.00 | 02/28 | 021693828 |
| 0000060748 * | 9,833.36 | 02/25 | 021528449 | 0000060800 | 43,060.72 | 02/25 | 021453137 |
| 0000060750 * | 9,648.00 | 02/28 | 021772418 | 0000060801 | 37.50 | 02/28 | 021708581 |
| 0000060754 * | 133.16 | 02/28 | 021705980 | 0000060802 | 82.50 | 02/28 | 021708582 |
| 0000060755 | 1,626.39 | 02/24 | 021270459 | 0000060803 | 37.50 | 02/28 | 021708583 |
| 0000060756 | 199.35 | 02/23 | 021164243 | 0000060804 | 199.50 | 02/28 | 021708584 |
| 0000060757 | 35,000.00 | 02/24 | 021297204 | 0000060805 | 199.50 | 02/28 | 021708585 |
| 0000060758 | 134.63 | 02/29 | 021120043 | 0000060806 | 37.50 | 02/28 | 021708587 |
| 0000060760 * | 172.50 | 02/28 | 021752843 | 0000060807 | 82.50 | 02/28 | 021708586 |
| 0000060761 | 11,874.49 | 02/28 | 021751147 | 0000060808 | 283.50 | 02/28 | 021745304 |
| 0000060764 * | 1,476.44 | 02/25 | 021414158 | 0000060810 * | 1,214.00 | 02/29 | 021286520 |
| 0000060767 * | 29.61 | 02/29 | 021159191 | 0000060813 * | 241.27 | 02/25 | 021425743 |
| 0000060768 | 15,625.27 | 02/23 | 021016761 | 0000060814 | 1,084.28 | 02/25 | 021425745 |
| 0000060772 * | 225.01 | 02/28 | 021741548 | 0000060815 | 645.53 | 02/25 | 021425744 |
| 0000060773 | 242.63 | 02/28 | 021757634 | 0000060817 * | 32.55 | 02/25 | 021528450 |
| 0000060774 | 4,590.00 | 02/25 | 021469590 | 0000060818 | 184.01 | 02/29 | 021140756 |
| 0000060775 | 1,456.48 | 02/24 | 021290313 | 0000060819 | 41.15 | 02/28 | 021679796 |
| 0000060777 * | 60.00 | 02/28 | 012694760 | 0000060823 * | 475.30 | 02/24 | 021263944 |
| 0000060778 | 68.39 | 02/28 | 012694761 | 0000060827 * | 241.77 | 02/29 | 021112313 |
| 0000060780 * | 85.00 | 02/28 | 012694768 | 0000060828 | 247.00 | 02/29 | 021154434 |
| 0000060781 | 46.16 | 02/28 | 012694769 | 0000060829 | 15.31 | 02/24 | 021295610 |
| 0000060782 | 5,113.00 | 02/28 | 021676415 | 0000060830 | 540.00 | 02/25 | 021425742 |
| 0000060783 | 310.24 | 02/28 | 021737263 | | $5,962,458.45 | Checks Total | |

Continued on next page

 **allfirst**

CCI CONSTRUCTION INC                           Account Number                  For assistance call
                                               00288-6451-4                    The Financial Center
                                                                               1-800-220-6004

## Funds Transfers

| Date | Description | Amount |
|------|-------------|--------|
| 02/01 | ACH CREDIT 100019544 | $1,889,998.00 |
| | COMMONWEALTH     EDIPAYMENT T0267873 | |
| | 15460017450008CCI CONSTRUCTION20000315992143 | |
| | SWEEP LOAN PAYMENT | -1,833,640.45 |
| | ABS-BALANCE DEBIT | |
| | ZERO BAL TRANSFER DB 28864522 | -28,791.59 |
| | ZBA TRANSFER TO  0028864522 | |
| 02/02 | ACH DEBIT 100013172 | -60,383.54 |
| | IRS          USATAXPYMT 220003363240131 | |
| | 3387702000CCI CONSTRUCTION CO 20000326405401 | |
| | SWEEP LOAN ADVANCE | 1,148,974.12 |
| | ABS-BALANCE CREDIT | |
| | ZERO BAL TRANSFER DB 28864522 | -12,508.41 |
| | ZBA TRANSFER TO  0028864522 | |
| 02/03 | ACH CREDIT 100025567 | 905,785.54 |
| | AGRV TREAS  310  MISC PAY  251587897124000 | |
| | 3101036151CCI CONSTRUCTION CO.20000347192997 | |
| | SWEEP LOAN PAYMENT | -572,299.55 |
| | ABS-BALANCE DEBIT | |
| | ZERO BAL TRANSFER DB 28864522 | -416.22 |
| | ZBA TRANSFER TO  0028864522 | |
| 02/04 | ACH CREDIT 100020762 | 853,269.83 |
| | 36   TREAS  220  MISC PAY  251587897360012 | |
| | 3111036183C C I CONST CO INC  20000357377916 | |
| | SWEEP LOAN PAYMENT | -109,375.10 |
| | ABS-BALANCE DEBIT | |
| | ZERO BAL TRANSFER DB 28864522 | -70,112.97 |
| | ZBA TRANSFER TO  0028864522 | |

Funds Transfers - continued

| Date | Description | Amount |
|------|-------------|--------|
| 02/07 | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | $399,049.51 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -15,355.04 |
| 02/08 | SWEEP LOAN PAYMENT<br>ABS-BALANCE DEBIT | -217,078.14 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -17,039.37 |
| 02/09 | ACH CREDIT 100011006<br>PA TREASURY DEPT PAYROLL   000000000<br>1236003133CCI CONSTRUCTION CO 20000387941462 | 750.00 |
| | ACH DEBIT 100011008<br>IRS         USATAXPYMT 220004080406125<br>3387702000CCI CONSTRUCTION CO 20000398362715 | -51,671.20 |
| | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 103,619.93 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -9,176.79 |
| 02/10 | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 32,392.97 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -6,028.39 |
| 02/11 | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 1,301,826.10 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -69,638.88 |
| 02/14 | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 22,133.21 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -12,505.93 |
| 02/15 | SWEEP LOAN PAYMENT<br>ABS-BALANCE DEBIT | -242,960.14 |

Continued on next page



CCI CONSTRUCTION INC

Account Number
00288-6451-4

For assistance call
The Financial Center
1-800-220-6004

## Funds Transfers - continued

| Date | Description | Amount |
|------|-------------|-------:|
| 02/15 | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO  0028864522 | -20,936.27 |
| 02/16 | ACH DEBIT 100015211<br>IRS        USATAXPYMT 220004709567044<br>3387702000CCI CONSTRUCTION CO 20000461020730<br>ACH DEBIT 100015213 | -51,390.43 |
|  | IRS        USATAXPYMT 220004766633321<br>3387702000CCI CONSTRUCTION CO 20000471178710 | -120.35 |
|  | SWEEP LOAN PAYMENT<br>ABS-BALANCE DEBIT | -62,060.29 |
|  | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO  0028864522 | -6,948.97 |
| 02/17 | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 152,360.75 |
|  | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO  0028864522 | -1,985.06 |
| 02/18 | ACH CREDIT 100021220<br>PA TREASURY DEPT PENNDOT    000000000<br>1236003133CCI CONSTRUCTION CO.20000471672591 | 2,796.72 |
|  | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 197,885.64 |
|  | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO  0028864522 | -66,731.24 |
| 02/22 | ACH CREDIT 100017469<br>AGRV TREAS  310  MISC PAY  251587897124000<br>3101036151CCI CONSTRUCTION CO.20000532267792 | 634,066.54 |
|  | SWEEP LOAN PAYMENT<br>ABS-BALANCE DEBIT | -510,840.84 |

**Funds Transfers - continued**

| Date | Description | Amount |
|---|---|---|
| 02/22 | ZERO BAL TRANSFER DB 28864522 | -10,035.35 |
| | ZBA TRANSFER TO   0028864522 | |
| 02/23 | ACH DEBIT 100014538 | -51,035.91 |
| | IRS          USATAXPYMT 220005426900881 | |
| | 3387702000CCI CONSTRUCTION CO 20000532778926 | |
| | ZERO BAL TRANSFER DB 28864522 | -21,042.22 |
| | ZBA TRANSFER TO   0028864522 | |
| 02/24 | ACH CREDIT 100009801 | 638,911.65 |
| | PA TREASURY DEPT PAYROLL   000000000 | |
| | 1236003133CCI CONSTRUCTION CO 20000532869279 | |
| | ACH DEBIT REVERSAL-NSF 410076706 | 51,035.91 |
| | ZERO BAL TRANSFER DB 28864522 | -8,759.03 |
| | ZBA TRANSFER TO   0028864522 | |
| 02/25 | ACH CREDIT 100018593 | 1,167,539.00 |
| | COMMONWEALTH   EDIPAYMENT T0272412 | |
| | 1546001745000B CCI CONSTRUCTION20000553608270 | |
| | ZERO BAL TRANSFER DB 28864522 | -65,817.54 |
| | ZBA TRANSFER TO   0028864522 | |
| 02/28 | ACH DEBIT 100013924 | -1,167,539.00 |
| | COMMONWEALTH      REVERSAL  T0272412 | |
| | 1546001745000B CCI CONSTRUCTION20000593911056 | |
| | ZERO BAL TRANSFER DB 28864522 | -15,820.26 |
| | ZBA TRANSFER TO   0028864522 | |
| 02/29 | ACH DEBIT REVERSAL-NSF 410028436 | 1,167,539.00 |
| | ZERO BAL TRANSFER DB 28864522 | -19,132.92 |
| | ZBA TRANSFER TO   0028864522 | |

| Funds Transfers Total (net) | $5,260,757.03 |
|---|---|

**Other Credits**

| Date | Description | Amount |
|---|---|---|
| 02/24 | CREDIT OVERRIDE 01257 | $21,042.22 |
| | CREDIT FOR (42) RETURNED CHECKS ON ACCT. | |
| | 28864522 POSTED 02/ | |
| | 23/00. | |

Continued on next page

 **allfirst**

CCI CONSTRUCTION INC

Account Number
00288-6451-4

 **For assistance call**
**The Financial Center**
*1-800-220-6004*

### Other Credits - continued

| Date | Description | Amount |
|------|-------------|-------:|
| 02/24 | DEBIT REVERSAL - NSF 60155 410076707 | $25,307.10 |
| 02/24 | DEBIT REVERSAL - NSF 60369 410076708 | 18.45 |
| 02/24 | DEBIT REVERSAL - NSF 60372 410076709 | 8,330.28 |
| 02/24 | DEBIT REVERSAL - NSF 60460 410076710 | 111.48 |
| 02/24 | DEBIT REVERSAL - NSF 60473 410076711 | 68.90 |
| 02/24 | DEBIT REVERSAL - NSF 60518 410076712 | 76.27 |
| 02/24 | DEBIT REVERSAL - NSF 60542 410076713 | 38.16 |
| 02/24 | DEBIT REVERSAL - NSF 60580 410076714 | 176.40 |
| 02/24 | DEBIT REVERSAL - NSF 60624 410076715 | 65.00 |
| 02/24 | DEBIT REVERSAL - NSF 60644 410076716 | 4,855.50 |
| 02/24 | DEBIT REVERSAL - NSF 60669 410076717 | 16,300.00 |
| 02/24 | DEBIT REVERSAL - NSF 60670 410076718 | 16,976.34 |
| 02/24 | DEBIT REVERSAL - NSF 60676 410076719 | 45,323.62 |
| 02/24 | DEBIT REVERSAL - NSF 60756 410076720 | 199.35 |
| 02/24 | DEBIT REVERSAL - NSF 60768 410076721 | 15,625.27 |
| 02/24 | DEBIT REVERSAL - NSF 60784 410076722 | 1,112.01 |
| 02/25 | CREDIT OVERRIDE 01745 | 8,759.03 |
| | CREDIT FOR (16) RETURNED CHECKS POSTING | |
| | TO ACCT. 28864522 ON | |
| | 02/24/00. | |
| 02/25 | DEBIT REVERSAL - NSF 59492 410096098 | 137.27 |
| 02/25 | DEBIT REVERSAL - NSF 59572 410096099 | 144.20 |
| 02/25 | DEBIT REVERSAL - NSF 60253 410096100 | 478.01 |
| 02/25 | DEBIT REVERSAL - NSF 60262 410096101 | 5,818.82 |
| 02/25 | DEBIT REVERSAL - NSF 60311 410096102 | 502.20 |
| 02/25 | DEBIT REVERSAL - NSF 60327 410096103 | 534.57 |
| 02/25 | DEBIT REVERSAL - NSF 60331 410096104 | 603.13 |
| 02/25 | DEBIT REVERSAL - NSF 60391 410096105 | 67.25 |
| 02/25 | DEBIT REVERSAL - NSF 60419 410096106 | 284.41 |
| 02/25 | DEBIT REVERSAL - NSF 60490 410096107 | 2,000.00 |
| 02/25 | DEBIT REVERSAL - NSF 60491 410096108 | 2,829.75 |

Continued on back

**Other Credits - continued**

| Date | Description | Amount |
|------|-------------|-------:|
| 02/25 | DEBIT REVERSAL - NSF 60557 410096109 | $95.91 |
| 02/25 | DEBIT REVERSAL - NSF 60564 410096110 | 102.10 |
| 02/25 | DEBIT REVERSAL - NSF 60588 410096111 | 214.62 |
| 02/25 | DEBIT REVERSAL - NSF 60634 410096112 | 1,380.00 |
| 02/25 | DEBIT REVERSAL - NSF 60635 410096113 | 39.68 |
| 02/25 | DEBIT REVERSAL - NSF 60636 410096114 | 6,900.00 |
| 02/25 | DEBIT REVERSAL - NSF 60637 410096115 | 7,869.60 |
| 02/25 | DEBIT REVERSAL - NSF 60665 410096116 | 1,486.66 |
| 02/25 | DEBIT REVERSAL - NSF 60694 410096117 | 2,940.00 |
| 02/25 | DEBIT REVERSAL - NSF 60716 410096118 | 203.16 |
| 02/25 | DEBIT REVERSAL - NSF 60719 410096119 | 1,645.35 |
| 02/25 | DEBIT REVERSAL - NSF 60720 410096120 | 182,733.35 |
| 02/25 | DEBIT REVERSAL - NSF 60721 410096121 | 23.85 |
| 02/25 | DEBIT REVERSAL - NSF 60723 410096122 | 833.44 |
| 02/25 | DEBIT REVERSAL - NSF 60724 410096123 | 245.87 |
| 02/25 | DEBIT REVERSAL - NSF 60725 410096124 | 38.90 |
| 02/25 | DEBIT REVERSAL - NSF 60726 410096125 | 22.29 |
| 02/25 | DEBIT REVERSAL - NSF 60727 410096126 | 780.71 |
| 02/25 | DEBIT REVERSAL - NSF 60728 410096127 | 105.84 |
| 02/25 | DEBIT REVERSAL - NSF 60729 410096128 | 464.81 |
| 02/25 | DEBIT REVERSAL - NSF 60730 410096129 | 30.00 |
| 02/25 | DEBIT REVERSAL - NSF 60731 410096130 | 149.09 |
| 02/25 | DEBIT REVERSAL - NSF 60733 410096131 | 116.13 |
| 02/25 | DEBIT REVERSAL - NSF 60734 410096132 | 101.13 |
| 02/25 | DEBIT REVERSAL - NSF 60735 410096133 | 209.34 |
| 02/25 | DEBIT REVERSAL - NSF 60736 410096134 | 842.14 |
| 02/25 | DEBIT REVERSAL - NSF 60737 410096135 | 532.06 |
| 02/25 | DEBIT REVERSAL - NSF 60739 410096136 | 309.53 |
| 02/25 | DEBIT REVERSAL - NSF 60740 410096137 | 33.04 |
| 02/25 | DEBIT REVERSAL - NSF 60744 410096138 | 12,347.31 |
| 02/25 | DEBIT REVERSAL - NSF 60755 410096139 | 1,626.39 |
| 02/25 | DEBIT REVERSAL - NSF 60757 410096140 | 35,000.00 |
| 02/25 | DEBIT REVERSAL - NSF 60775 410096141 | 1,456.48 |
| 02/25 | DEBIT REVERSAL - NSF 60793 410096142 | 260.23 |
| 02/25 | DEBIT REVERSAL - NSF 60823 410096143 | 475.30 |

Continued on next page

 **allfirst**

CCI CONSTRUCTION INC

Account Number
00288-6451-4

**?** For assistance call
The Financial Center
1-800-220-6004

## Other Credits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 02/25 | DEBIT REVERSAL - NSF 60829 410096144 | $15.31 |
| 02/28 | CREDIT OVERRIDE 02793 | 4,172.22 |
|       | CREDIT FOR (09) RETURNED CHECKS POSTING | |
|       | TO ACCT. 28864522 ON | |
|       | 02/25/00. | |
| 02/28 | DEBIT REVERSAL - NSF 60023 410034917 | 3,610.00 |
| 02/28 | DEBIT REVERSAL - NSF 60363 410034918 | 147.65 |
| 02/28 | DEBIT REVERSAL - NSF 60657 410034919 | 17,100.00 |
| 02/28 | DEBIT REVERSAL - NSF 60674 410034920 | 50.00 |
| 02/28 | DEBIT REVERSAL - NSF 60676 410034921 | 45,323.62 |
| 02/28 | DEBIT REVERSAL - NSF 60684 410034922 | 25,110.00 |
| 02/28 | DEBIT REVERSAL - NSF 60685 410034923 | 201.36 |
| 02/28 | DEBIT REVERSAL - NSF 60686 410034924 | 150.00 |
| 02/28 | DEBIT REVERSAL - NSF 60693 410034925 | 7,817.85 |
| 02/28 | DEBIT REVERSAL - NSF 60699 410034926 | 77.85 |
| 02/28 | DEBIT REVERSAL - NSF 60746 410034927 | 769.26 |
| 02/28 | DEBIT REVERSAL - NSF 60748 410034928 | 9,833.36 |
| 02/28 | DEBIT REVERSAL - NSF 60764 410034929 | 1,476.44 |
| 02/28 | DEBIT REVERSAL - NSF 60774 410034930 | 4,590.00 |
| 02/28 | DEBIT REVERSAL - NSF 60785 410034931 | 700.66 |
| 02/28 | DEBIT REVERSAL - NSF 60800 410034932 | 43,060.72 |
| 02/28 | DEBIT REVERSAL - NSF 60813 410034933 | 241.27 |
| 02/28 | DEBIT REVERSAL - NSF 60814 410034934 | 1,084.28 |
| 02/28 | DEBIT REVERSAL - NSF 60815 410034935 | 645.53 |
| 02/28 | DEBIT REVERSAL - NSF 60817 410034936 | 32.55 |
| 02/28 | DEBIT REVERSAL - NSF 60830 410034937 | 540.00 |
| 02/29 | CREDIT OVERRIDE 01312 | 15,820.26 |
|       | CREDIT FOR (34) RETURNED CHECKS POSTING | |
|       | TO ACCOUNT #28864522 | |
|       | ON 02/28/00. | |
| 02/29 | DEBIT REVERSAL - NSF 60223 410028437 | 7,885.08 |

608555
001 98317914863    050

Continued on back

## Other Credits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 02/29 | DEBIT REVERSAL - NSF 60372 410028438 | $8,330.28 |
| 02/29 | DEBIT REVERSAL - NSF 60442 410028439 | 13.04 |
| 02/29 | DEBIT REVERSAL - NSF 60502 410028440 | 73.19 |
| 02/29 | DEBIT REVERSAL - NSF 60646 410028441 | 3,965.65 |
| 02/29 | DEBIT REVERSAL - NSF 60660 410028442 | 104.16 |
| 02/29 | DEBIT REVERSAL - NSF 60664 410028443 | 445.01 |
| 02/29 | DEBIT REVERSAL - NSF 60665 410028444 | 1,486.66 |
| 02/29 | DEBIT REVERSAL - NSF 60673 410028445 | 2,002.00 |
| 02/29 | DEBIT REVERSAL - NSF 60678 410028446 | 65.00 |
| 02/29 | DEBIT REVERSAL - NSF 60681 410028447 | 14,528.47 |
| 02/29 | DEBIT REVERSAL - NSF 60690 410028448 | 9,090.00 |
| 02/29 | DEBIT REVERSAL - NSF 60695 410028449 | 58.81 |
| 02/29 | DEBIT REVERSAL - NSF 60696 410028450 | 23.20 |
| 02/29 | DEBIT REVERSAL - NSF 60707 410028451 | 2,703.00 |
| 02/29 | DEBIT REVERSAL - NSF 60708 410028452 | 1,076.41 |
| 02/29 | DEBIT REVERSAL - NSF 60710 410028453 | 37,800.00 |
| 02/29 | DEBIT REVERSAL - NSF 60711 410028454 | 3,947.25 |
| 02/29 | DEBIT REVERSAL - NSF 60712 410028455 | 8,064.27 |
| 02/29 | DEBIT REVERSAL - NSF 60742 410028456 | 133.27 |
| 02/29 | DEBIT REVERSAL - NSF 60750 410028457 | 9,648.00 |
| 02/29 | DEBIT REVERSAL - NSF 60754 410028458 | 133.16 |
| 02/29 | DEBIT REVERSAL - NSF 60760 410028459 | 172.50 |
| 02/29 | DEBIT REVERSAL - NSF 60761 410028460 | 11,874.49 |
| 02/29 | DEBIT REVERSAL - NSF 60772 410028461 | 225.01 |
| 02/29 | DEBIT REVERSAL - NSF 60773 410028462 | 242.63 |
| 02/29 | DEBIT REVERSAL - NSF 60777 410028463 | 60.00 |
| 02/29 | DEBIT REVERSAL - NSF 60778 410028464 | 68.39 |
| 02/29 | DEBIT REVERSAL - NSF 60780 410028465 | 85.00 |
| 02/29 | DEBIT REVERSAL - NSF 60781 410028466 | 46.16 |
| 02/29 | DEBIT REVERSAL - NSF 60782 410028467 | 5,113.00 |
| 02/29 | DEBIT REVERSAL - NSF 60783 410028468 | 310.24 |
| 02/29 | DEBIT REVERSAL - NSF 60794 410028469 | 267.14 |
| 02/29 | DEBIT REVERSAL - NSF 60796 410028470 | 1,380.36 |
| 02/29 | DEBIT REVERSAL - NSF 60799 410028471 | 154.00 |
| 02/29 | DEBIT REVERSAL - NSF 60801 410028472 | 37.50 |

 **allfirst**

CCI CONSTRUCTION INC

Account Number
00288-6451-4

❓ For assistance call
The Financial Center
*1-800-220-6004*

## Other Credits - continued

| Date | Description | Amount |
|------|-------------|-------:|
| 02/29 | DEBIT REVERSAL - NSF 60802 410028473 | $82.50 |
| 02/29 | DEBIT REVERSAL - NSF 60803 410028474 | 37.50 |
| 02/29 | DEBIT REVERSAL - NSF 60804 410028475 | 199.50 |
| 02/29 | DEBIT REVERSAL - NSF 60805 410028476 | 199.50 |
| 02/29 | DEBIT REVERSAL - NSF 60806 410028477 | 37.50 |
| 02/29 | DEBIT REVERSAL - NSF 60807 410028478 | 82.50 |
| 02/29 | DEBIT REVERSAL - NSF 60808 410028479 | 283.50 |
| 02/29 | DEBIT REVERSAL - NSF 60819 410028480 | 41.15 |
| **Other Credits Total** | | **$754,545.47** |

## Other Debits

| Date | Description | Amount |
|------|-------------|-------:|
| 02/15 | DEBIT MEMO 023474261 | -866.66 |
| 02/18 | ANALYSIS FEE 430002855 | -146.27 |
| 02/24 | DEBIT MEMO 021399087 | -638,911.65 |
| 02/25 | DEBIT MEMO 021605349 | -1,167,539.00 |
| **Other Debits Total** | | **-1,807,463.58** |

## End of Day Ledger Balance

Account balances are updated in the section below only on days when transactions posted to this account.

| Date | Balance | Date | Balance | Date | Balance |
|------|--------:|------|--------:|------|--------:|
| 01/31 | $323,137.00 | 02/09 | .00 | 02/18 | .00 |
| 02/01 | 53,600.00 | 02/10 | .00 | 02/22 | .00 |
| 02/02 | .00 | 02/11 | .00 | 02/23 | -195,215.30 |
| 02/03 | .00 | 02/14 | 359,995.00 | 02/24 | -272,341.30 |
| 02/04 | .00 | 02/15 | 482,605.00 | 02/25 | -216,932.98 |
| 02/07 | 356,193.00 | 02/16 | 22,273.00 | 02/28 | -1,366,133.60 |
| 02/08 | 1,425.00 | 02/17 | 4,400.00 | 02/29 | -184,963.71 |

Average daily ledger balance            -46,616.06

EXHIBIT "G"

ALLFIRST BANK
PO BOX 62114 BALTIMORE MD 21264-2114

PRINCIPAL AND INTEREST BILL

ACCOUNT NO. 001-1828-0102598-0001

| | | | |
|---|---|---|---|
| DUE DATE | 02-29-00 | | .00 |
| BILL DATE | 02-28-00 | INTEREST DUE | 10,821.35 |
| MATURITY DATE | DEMAND | PRIN/INT/FEE DUE | 10,821.35 |

1001010259800000001000100000000229000000000108213500000000000000003

CCI CONSTRUCTION CO INC
PO   BOX 8800
CAMP HILL PA  17011-8800

COMMERCIAL LOAN OPERATIONS
P O BOX 62114
BALTIMORE MARYLAND 21264-2114

PLEASE RETAIN BOTTOM PORTION FOR YOUR RECORDS, RETURN TOP WITH YOUR PAYMENT.

ALLFIRST BANK
PO BOX 62114 BALTIMORE MD 21264-2114            ****   COMING DUE NOTICE   ****
                                                ****                      ****
                                                ****                      ****

ACCOUNT NO. 001-1828-0102598-0001        DUE DATE 02-29-00   REMIT AMT       $10,821.35

| DATE | TRAN | RATE | ESCROW | DEBITS | CREDITS | BALANCE | DAYS | INTEREST |
|---|---|---|---|---|---|---|---|---|
| 01-31-00 | | 8.00000 | | BAL-FORWARD | | 2,511,794.47 | | 16,658.76 |
| 01-28-00 | ADV | 8.00000 | | 39,844.75 | | 2,551,639.22 | | |
| 01-31-00 | ADJ | 8.00000 | | | | | | |
| 01-31-00 | PAMT | 8.00000 | | | | 2,280,685.45 | | 26.56 |
| 02-01-00 | INT | 8.00000 | | | 270,953.77 | 2,280,685.45 | | |
| 02-01-00 | PAMT | 8.00000 | | | | 2,280,685.45 | 1 | 506.82 |
| 02-02-00 | INT | 8.00000 | | | 1,833,640.45 | 447,045.00 | | |
| 02-02-00 | ADV | 8.00000 | | | | 447,045.00 | 1 | 99.34 |
| 02-03-00 | INT | 8.00000 | | 1,148,974.12 | | 1,596,019.12 | | |
| 02-03-00 | PAMT | 8.25000 | | | | 1,596,019.12 | 1 | 354.67 |
| 02-03-00 | RATE | 8.25000 | | | 572,299.55 | 1,023,719.57 | | |
| 02-04-00 | INT | 8.25000 | | | | 1,023,719.57 | 1 | 234.60 |
| 02-04-00 | PAMT | 8.25000 | | | | 1,023,719.57 | 1 | 234.60 |
| 02-07-00 | INT | 8.25000 | | | 109,375.10 | 914,344.47 | | |
| 02-07-00 | ADV | 8.25000 | | 399,049.51 | | 914,344.47 | 3 | 628.61 |
| 02-08-00 | INT | 8.25000 | | | | 1,313,393.98 | | |
| 02-08-00 | PAMT | 8.25000 | | | 217,078.14 | 1,313,393.98 | 1 | 300.99 |
| 02-09-00 | INT | 8.25000 | | | | 1,096,315.84 | | |
| 02-09-00 | ADV | 8.25000 | | 103,619.93 | | 1,096,315.84 | 1 | 251.24 |
| 02-10-00 | INT | 8.25000 | | | | 1,199,935.77 | | |
| 02-10-00 | INT | 8.25000 | | 32,392.97 | | 1,199,935.77 | 1 | 274.99 |
| 02-11-00 | INT | 8.25000 | | | | 1,232,328.74 | | |
| 02-11-00 | ADV | 8.25000 | | 1,301,826.10 | | 1,232,328.74 | 1 | 282.41 |
| 02-14-00 | INT | 8.25000 | | | | 2,534,154.84 | | |
| 02-14-00 | ADV | 8.25000 | | 22,133.21 | | 2,534,154.84 | 3 | 1,742.23 |
| 02-15-00 | INT | 8.25000 | | | | 2,556,288.05 | | |
| 02-15-00 | PAMT | 8.25000 | | | 242,960.14 | 2,556,288.05 | 1 | 585.82 |
| 02-16-00 | INT | 8.25000 | | | | 2,313,327.91 | | |
| 02-16-00 | PAMT | 8.25000 | | | 62,060.29 | 2,313,327.91 | 1 | 530.14 |
| 02-17-00 | INT | 8.25000 | | | | 2,251,267.62 | | |
| 02-17-00 | ADV | 8.25000 | | 152,360.75 | | 2,251,267.62 | 1 | 515.92 |
| 02-18-00 | INT | 8.25000 | | | | 2,403,628.37 | | |
| 02-18-00 | ADV | 8.25000 | | 197,885.64 | | 2,403,628.37 | 1 | 550.83 |
| 02-22-00 | INT | 8.25000 | | | | 2,601,514.01 | | |
| 02-22-00 | PAMT | 8.25000 | | | | 2,601,514.01 | 4 | 2,384.72 |
| 02-22-00 | PAMT | 8.25000 | | | | 2,601,514.01 | | 16,658.76- |
| | | | | | 510,840.84 | 2,090,673.17 | | |

RECEIVED

MAR  - 2 2000



, BALTIMORE MD 21264-2114

A  NT NO. 001-1828-0102598-0001
PAGE    2

DUE DATE      02-29-00                           .00
BILL DATE     02-28-00                           .00
TURITY DATE   DEMAND                             .00


10010102598000000100010000000022900000000010821350000000000000003


CCI CONSTRUCTION CO INC
PO   BOX 8800
CAMP HILL PA  17011-8800

COMMERCIAL LOAN OPERATIONS
P O BOX 62114
BALTIMORE MARYLAND 21264-2114


LLFIRST BANK                              ****  COMING DUE NOTICE   ****
O BOX 62114 BALTIMORE MD 21264-2114       ****                     ****
                                          ****                     ****

ACCOUNT NO. 001-1828-0102598-0001    DUE DATE 02-29-00   REMIT AMT    $10,821.35

| DATE | TRAN | RATE | ESCROW | DEBITS | CREDITS | BALANCE | DAYS | INTEREST |
|------|------|------|--------|--------|---------|---------|------|----------|
| 02-24-00 | INT | 8.25000 | | | | 2,090,673.17 | 2 | 958.23 |
| 02-24-00 | PAMT | 8.25000 | | | 638,911.65 | 1,451,761.52 | | |
| 02-25-00 | INT | 8.25000 | | | | 1,451,761.52 | 1 | 332.70 |
| 02-25-00 | PAMT | 8.25000 | | | 1,167,539.00 | 284,222.52 | | |
| 02-29-00 | INT | 8.25000 | | | | 284,222.52 | 4 | 260.53 |

**** 11/13 LOAN SWEEP INT ADJ FOR 11/13-11/16          ****

BALANCE                                                 284,222.52
TOTAL AMOUNT DUE        $10,821.35   PRINCIPAL =                INTEREST =   $10,821.35


VENDOR # ___40111___
INVOICE # _____
INVOICE DATE _____
AM _____
J _____
_____ # _____
___2110-9___
____ BY ATE ___/___

EXHIBIT "H"

# CCI-Bank Account and Loan Activity for 2/1/00 through 3/31/00

*Preference and Setoff Search*

## Schedule C - Revolver Activity, Daily Balance, Setoff and Preference

**CCI Loans with AllFirst Bank**
**AllFirst Bank-Revolver**
**001-1829-0102899-0001**

| Date | Advances | Pay-Down | Balance | (h) Total Net Loan Balance (Revolver-Cash) | (i) Setoff Insufficiency | (j) Preference | (k) Major Subs. and Suppliers Payments | 90 Days Total |
|---|---|---|---|---|---|---|---|---|
| 1/31/00 | | | 2,290,686.45 | 1,987,649.44 | | | | |
| 2/1/00 | | 1,833,840.45 | 447,045.00 | 393,445.00 | | | 269,327.15 | |
| 2/2/00 | 1,148,974.12 | | 1,596,019.12 | 1,596,019.12 | | | 1,089,206.70 | |
| 2/3/00 | | 572,299.55 | 1,023,719.57 | 1,023,719.57 | | | 314,145.69 | |
| 2/4/00 | | 109,375.10 | 914,344.47 | 914,344.47 | | | 328,789.32 | |
| 2/7/00 | 399,049.51 | | 1,313,363.98 | 957,200.98 | | | 365,760.83 | |
| 2/8/00 | | 217,078.14 | 1,096,315.84 | 1,084,890.84 | | | 119,739.40 | |
| 2/9/00 | 103,619.93 | | 1,199,935.77 | 1,199,935.77 | | | 24,003.40 | |
| 2/10/00 | 32,392.97 | | 1,232,328.74 | 1,232,328.74 | | | 19,135.80 | |
| 2/11/00 | 1,301,826.10 | | 2,534,154.84 | 2,534,154.84 | | | | |
| 2/14/00 | 22,133.21 | | 2,556,288.05 | 2,556,288.05 | | | | |
| 2/15/00 | | 242,960.14 | 2,313,327.91 | 1,830,722.91 | | | 94,812.28 | |
| 2/16/00 | | 62,080.29 | 2,251,267.62 | 2,228,994.62 | | | 353,198.70 | |
| 2/17/00 | 152,360.75 | | 2,403,628.37 | 2,399,228.37 | | | 141,829.23 | |
| 2/18/00 | 197,895.64 | | 2,601,514.01 | 2,601,514.01 | | | 116,093.12 | |
| 2/22/00 | | 510,840.84 | 2,090,673.17 | 2,090,673.17 | 510,840.84 | 510,840.84 | | |
| 2/23/00 | | | 2,090,673.17 | 2,285,888.47 | 315,625.54 | 510,840.84 | | |
| 2/24/00 | | 638,911.65 | 1,451,761.52 | 1,723,658.63 | 877,555.38 | 1,149,752.49 | | |
| 2/25/00 | | 1,187,539.00 | 284,222.52 | 501,155.51 | 2,100,358.50 | 2,317,291.49 | | |
| 2/28/00 | | | 284,222.52 | 1,850,358.13 | 951,167.88 | 2,317,291.49 | | |
| 2/29/00 | | | 284,222.52 | 496,196.24 | 2,132,327.77 | 2,317,291.49 | 109,512.29 | |
| 3/1-3/31 | 3,885,242.23 | 5,364,704.16 | 284,222.52 | 338,986.36 | 2,288,619.96 | 2,317,291.49 | 3,338,653.91 | 108,612.29 |

**Notes:**

> This page reflects the revolver loan and other loans – daily activity and balances.

(h)  The "zero" balance checking account shows a + and – balance on some days.
(i)  Represents the difference between the closing loan balance of 2/18 and balance in subsequent days.
(j)  Loan paydown after 2/18/00.
(k)  Checks in excess of $10 k that cleared the bank in February.

GCI-Bank Account and Loan Activity for 2/1/00 through 9/31/00

*Preference and Setoff Search*

## Schedule D - Other Allfirst Loan Balance and Total Setoff

| Date | Allfirst Bank 001-1629-0102389-0100 | | Allfirst Bank 001-1629-0102389-0101 | | Total Allfirst Bank Net Loan Balance | Setoff Insufficiency |
|---|---|---|---|---|---|---|
| | Pay-Down | Balance | Pay-Down | Balance | | |
| 1/31/00 | | 1,244,116.74 | | 494,316.84 | 4,995,461.04 | |
| 2/1/00 | | 1,244,116.74 | | 494,315.85 | 3,331,877.59 | |
| 2/2/00 | | 1,244,116.74 | | 494,315.85 | 4,534,451.71 | |
| 2/3/00 | | 1,244,116.74 | | 494,315.85 | 3,962,152.16 | |
| 2/4/00 | | 1,244,116.74 | | 494,315.85 | 3,852,777.09 | |
| 2/7/00 | | 1,244,116.74 | | 494,315.85 | 3,895,633.57 | |
| 2/8/00 | | 1,244,116.74 | | 494,315.85 | 4,033,323.43 | |
| 2/9/00 | | 1,244,116.74 | | 494,315.85 | 4,138,368.36 | |
| 2/10/00 | | 1,244,116.74 | | 494,315.85 | 4,170,781.33 | |
| 2/11/00 | | 1,244,116.74 | | 494,315.85 | 4,272,587.43 | |
| 2/14/00 | | 1,244,116.74 | | 494,315.85 | 3,934,725.64 | |
| 2/15/00 | | 1,244,116.74 | | 494,315.85 | 3,669,155.50 | |
| 2/16/00 | | 1,244,116.74 | | 494,315.85 | 3,867,427.21 | |
| 2/17/00 | | 1,244,116.74 | | 494,315.85 | 4,137,660.98 | |
| 2/18/00 | | 1,244,116.74 | | 494,315.85 | 4,339,046.60 | |
| 2/22/00 | | 1,244,116.74 | | 494,315.85 | 3,829,105.76 | 510,840.84 |
| 2/23/00 | | 1,244,116.74 | | 494,315.85 | 4,024,321.06 | 315,620.54 |
| 2/24/00 | | 1,244,116.74 | | 494,315.85 | 3,462,391.22 | 877,555.38 |
| 2/25/00 | | 1,244,116.74 | | 494,315.85 | 2,239,588.10 | 2,100,358.50 |
| 2/28/00 | | 1,244,116.74 | | 494,315.85 | 3,388,788.72 | 951,157.88 |
| 2/29/00 | | 1,244,116.74 | | 494,316.86 | 2,207,618.93 | 2,132,327.77 |

341-331

## CERTIFICATE OF SERVICE

    I, Robert E. Chernicoff, Esquire, hereby certify that on _January 10_, 2000, a true and correct copy of the foregoing COMPLAINT FOR RECOVERY OF PREFERENTIAL TRANSFER PURSUANT TO BANKRUPTCY CODE SECTION 547, OR IN THE ALTERNATIVE, FOR RECOVERY OF IMPROPER SETOFF PURSUANT TO BANKRUPTCY CODE SECTION 553 was served by first-class mail, postage prepaid, on the following:

Office of the U.S. Trustee
P. O. Box 969
Harrisburg, PA  17108-0969

Attention:  Dana Perkins
Internal Revenue Service
Special Procedures Branch
P. O. Box 628
Pittsburgh, PA  15230

John J. Condrige, Senior Deputy
  Attorney General
Office of Attorney General
Financial Enforcement Section
Strawberry Square, 15th Floor
Fourth & Walnut Streets
Harrisburg, PA  17120

Anne K. Fiorenza, Esquire
Assistant U.S. Attorney
P. O. Box 11754
Harrisburg, PA  17108-1754

PA Department of Revenue
Bureau of Compliance
Bankruptcy Division
Dept. 0946
Harrisburg, PA  17128-0946

Michael D. Nord, Esquire
Gebhardt & Smith, LLP
The World Trade Center
401 East Pratt Street 9th Floor
Baltimore, MD 21202-3064

George J. Bachrach, Esquire
Whiteford, Taylor & Preston, LLP
7 St. Paul Street
Baltimore, MD  21202-1626

Gregory L. Daily, Esquire
Matthew L. Silverstein, Esquire
Surety Claims Manager
St. Paul Surety
P. O. Box 1138
Baltimore, MD  21203-1138

John M. Ortenzio
510 Orchard Drive
Lemoyne, PA  17043

Mark Z. Greenberg, CPA
Greenberg & Company, P.C.
765 Poplar Church Road
Camp Hill, PA  17011

CUNNINGHAM & CHERNICOFF, P.C.

By
Robert E. Chernicoff, Esquire

```
             S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:21  01/25
ASSOC 1   APPL CL   BANK 001    BRANCH 0001    PRODUCT DFLT   VIEW 99     PAGE  1
CCI CONSTRU        LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
    EFF DT TR SEQ              PRINCIPAL           INTEREST        LOAN BALANCE
    PROC DT AC FLD                                                 ORG TRAN AMT

_  1025991 40 001              209,195.03              .00        2,515,370.54
   1026991          DESC DATA: SWEEP                                        .00
                                            TIER 1 RT  7.75000
_  1026991 30 001              622,471.59              .00        1,892,898.95
   1027991 A        DESC DATA: SWEEP                                        .00
                                            TIER 1 RT  7.75000
_  1027991 30 001               50,965.93              .00        1,841,933.02
   1028991 A        DESC DATA: SWEEP                                        .00
                                            TIER 1 RT  7.75000
_  1028991 40 001               56,282.54              .00        1,898,215.56
   1029991          DESC DATA: SWEEP                                        .00
                                            TIER 1 RT  7.75000
_  1029991 40 001              405,853.43              .00        2,304,068.99
   1101991          DESC DATA: SWEEP                                        .00
                                            TIER 1 RT  7.75000
LS0392   This is the first page
CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> ____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:26 PM

**C 7750**



Page: 1 Document Name: untitled

```
            S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:47   01/25
ASSOC 1    APPL CL    BANK 001    BRANCH 0001   PRODUCT DFLT    VIEW 99      PAGE  2
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ            PRINCIPAL              INTEREST        LOAN BALANCE
   PROC DT AC FLD                                                 ORG TRAN AMT

_  1101991 40 001            367,528.36                 .00       2,671,597.35
   1102991          DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  7.75000
_  1102991 40 001            256,127.74                 .00       2,927,725.09
   1103991          DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  7.75000
_  1103991 40 001            173,975.75                 .00       3,101,700.84
   1104991          DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  7.75000
_  1104991 40 001             32,626.95                 .00       3,134,327.79
   1105991          DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  7.75000
_  1105991 30 001            780,576.53                 .00       2,353,751.26
   1108991 A        DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  7.75000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> _____   PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:48 PM

C 7751



Page: 1 Document Name: untitled

```
              S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:50    01/25
ASSOC 1    APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99    PAGE  3
CCI CONSTRU           LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ               PRINCIPAL            INTEREST
   PROC DT AC FLD                                              LOAN BALANCE
                                                               ORG TRAN AMT

_  1108991 30 001           1,188,933.15                .00    1,164,818.11
   1109991 A         DESC DATA: SWEEP                                   .00
                                        .TIER 1 RT  7.75000
_  1109991 40 001             108,940.24                .00    1,273,758.35
   1110991           DESC DATA: SWEEP                                   .00
                                        TIER 1 RT  7.75000
_  1110991 30 001             129,802.94                .00    1,143,955.41
   1112991 A         DESC DATA: SWEEP                                   .00
                                        TIER 1 RT  7.75000
_  1112991 40 001             196,736.76                .00    1,340,692.17
   1115991           DESC DATA: SWEEP                                   .00
                                        TIER 1 RT  7.75000
_  1115991 40 001             849,262.36                .00    2,189,954.53
   1116991           DESC DATA: SWEEP                                   .00
                                        TIER 1 RT  7.75000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> ____   PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:50 PM

C 7752



Page: 1 Document Name: untitled

```
            S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:51    01/25
ASSOC 1   APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99      PAGE  4
CCI CONSTRU          LN TYPE 3 PYMT MODE 1 MAT DT 12/31/49
   EFF DT TR SEQ              PRINCIPAL              INTEREST
   PROC DT AC FLD                                                    LOAN BALANCE
                                                                    ORG TRAN AMT

_ 1116991 30 001                   .00          16,292.71         2,189,954.53
  1116991 R  *      DESC DATA:  *GEN*                                  16,292.71
  OP-ID CL806                              TIER 1 RT  8.00000
_ 1116991 30 002              1,370,572.38           .00            819,382.15
  1117991 A          DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  8.00000
_ 1117991 40 001                354,173.19           .00          1,173,555.34
  1118991            DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  8.00000
_ 1118991 40 001                690,400.77           .00          1,863,956.11
  1119991            DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  8.00000
_ 1119991 40 001                341,496.49           .00          2,205,452.60
  1122991            DESC DATA: SWEEP                                       .00
                                          TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====>  ____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:52 PM

C 7753

Page: 1 Document Name: untitled

```
              S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:53   01/25
ASSOC 1    APPL CL    BANK 001   BRANCH 0001    PRODUCT DFLT    VIEW 99     PAGE  5
CCI CONSTRU           LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ              PRINCIPAL           INTEREST
   PROC DT AC FLD                                            LOAN BALANCE
                                                             ORG TRAN AMT

_  1122991 30 001         188,700.64                .00      2,016,751.96
   1123991 A         DESC DATA: SWEEP                                 .00
                                          TIER 1 RT  8.00000
_  1123991 30 001         143,561.32                .00      1,873,190.64
   1124991 A         DESC DATA: SWEEP                                 .00
                                          TIER 1 RT  8.00000
_  1124991 40 001         471,042.28                .00      2,344,232.92
   1126991           DESC DATA: SWEEP                                 .00
                                          TIER 1 RT  8.00000
_  1126991 40 001         180,113.61                .00      2,524,346.53
   1129991           DESC DATA: SWEEP                                 .00
                                          TIER 1 RT  8.00000
_  1129991 40 001         180,908.54                .00      2,705,255.07
   1130991           DESC DATA: SWEEP                                 .00
                                          TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> _____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:53 PM

C 7754



Page: 1 Document Name: untitled

```
             S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:55   01/25
 ASSOC 1    APPL CL    BANK 001   BRANCH 0001    PRODUCT DFLT    VIEW 99      PAGE  6
 CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ          PRINCIPAL            INTEREST
   PROC DT AC FLD                                            LOAN BALANCE
                                                             ORG TRAN AMT

 _ 1130991 30 001           134,260.11               .00    2,570,994.96
   1201991 A        DESC DATA: SWEEP                                 .00
                                        TIER 1 RT  8.00000
 _ 1201991 30 001           896,851.65               .00    1,674,143.31
   1202991 A        DESC DATA: SWEEP                                 .00
                                        TIER 1 RT  8.00000
 _ 1202991 40 001           505,192.27               .00    2,179,335.58
   1203991          DESC DATA: SWEEP                                 .00
                                        TIER 1 RT  8.00000
 _ 1203991 40 001           581,188.02               .00    2,760,523.60
   1206991          DESC DATA: SWEEP                                 .00
                                        TIER 1 RT  8.00000
 _ 1206991 30 001           505,758.62               .00    2,254,764.98
   1207991 A        DESC DATA: SWEEP                                 .00
                                        TIER 1 RT  8.00000

 CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
 ====> ____   PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:55 PM

C 7755

Page: 1 Document Name: untitled

```
          S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:56   01/25
ASSOC 1    APPL CL    BANK 001   BRANCH 0001    PRODUCT DFLT   VIEW 99     PAGE  7
CCI CONSTRU           LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ             PRINCIPAL            INTEREST         LOAN BALANCE
   PROC DT AC FLD                                                 ORG TRAN AMT

_ 1207991 40 001           209,754.70                  .00       2,464,519.68
  1208991           DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000
_ 1208991 30 001         1,070,151.30                  .00       1,394,368.38
  1209991 A         DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000
_ 1209991 40 001           306,514.11                  .00       1,700,882.49
  1210991           DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000
_ 1210991 40 001           229,456.67                  .00       1,930,339.16
  1213991           DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000
_ 1213991 40 001           329,951.79                  .00       2,260,290.95
  1214991           DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> ____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:56 PM

C 7756

Page: 1 Document Name: untitled

```
              S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:43:59   01/25
ASSOC 1   APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99     PAGE  8
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
    EFF DT TR SEQ           PRINCIPAL              INTEREST       LOAN BALANCE
    PROC DT AC FLD                                               ORG TRAN AMT

_  1214991 30 001         435,792.55                   .00      1,824,498.40
   1215991 A        DESC DATA: SWEEP                                      .00
                                          .TIER 1 RT  8.00000
_  1215991 30 001         457,495.47                   .00      1,367,002.93
   1216991 A        DESC DATA: SWEEP                                      .00
                                           TIER 1 RT  8.00000
_  1216991 30 001          18,602.79                   .00      1,348,400.14
   1217991 A        DESC DATA: SWEEP                                      .00
                                           TIER 1 RT  8.00000
_  1217991 30 001               .00              13,571.16      1,348,400.14
   1217991 R  *     DESC DATA:  *GEN*                            13,571.16
   OP-ID CL806                              TIER 1 RT  8.00000
_  1217991 40 001         317,523.59                   .00      1,665,923.73
   1220991           DESC DATA: SWEEP                                     .00
                                           TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> ____   PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:42:59 PM

C 7757



Page: 1 Document Name: untitled

```
          S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:01   01/25
ASSOC 1    APPL CL   BANK 001    BRANCH 0001   PRODUCT DFLT    VIEW 99      PAGE  9
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ           PRINCIPAL            INTEREST        LOAN BALANCE
   PROC DT AC FLD                                              ORG TRAN AMT

_  1220991 30 001         492,689.35               .00        1,173,234.38
   1221991 A         DESC DATA: SWEEP                                   .00
                                       TIER 1 RT  8.00000
_  1221991 30 001         107,765.04               .00        1,065,469.34
   1222991 A         DESC DATA: SWEEP                                   .00
                                       TIER 1 RT  8.00000
_  1222991 30 001         458,328.87               .00          607,140.47
   1223991 A         DESC DATA: SWEEP                                   .00
                                       TIER 1 RT  8.00000
_  1223991 40 001          98,268.22               .00          705,408.69
   1224991           DESC DATA: SWEEP                                   .00
                                       TIER 1 RT  8.00000
_  1224991 40 001          42,984.27               .00          748,392.96
   1227991           DESC DATA: SWEEP                                   .00
                                       TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> ____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:01 PM

C 7758



Page: 1 Document Name: untitled

```
               S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:02   01/25
ASSOC 1   APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99      PAGE 10
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
  EFF DT TR SEQ             PRINCIPAL              INTEREST         LOAN BALANCE
  PROC DT AC FLD                                                   ORG TRAN AMT

_ 1227991 40 001            177,867.20                 .00         926,260.16
  1228991         DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000
_ 1228991 40 001            341,296.32                 .00       1,267,556.48
  1229991         DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000
_ 1229991 40 001            359,920.73                 .00       1,627,477.21
  1230991         DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000
_ 1230991 40 001            837,607.65                 .00       2,465,084.86
  1231991         DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000
_ 1231991 40 001            827,466.59                 .00       3,292,551.45
  0101002         DESC DATA: SWEEP                                        .00
                                      TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> ____   PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:02 PM

C 7759



Page: 1 Document Name: untitled

```
            S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:04   01/25
ASSOC 1   APPL CL    BANK 001   BRANCH 0001   PRODUCT DFLT   VIEW 99    PAGE 11
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ              PRINCIPAL            INTEREST        LOAN BALANCE
   PROC DT AC FLD                                                 ORG TRAN AMT

_  0103002 30 001           222,668.84                 .00        3,069,882.61
   0104002 A        DESC DATA: SWEEP                                       .00
                                        TIER 1 RT  8.00000
_  0104002 40 001           175,919.79                 .00        3,245,802.40
   0105002          DESC DATA: SWEEP                                       .00
                                        TIER 1 RT  8.00000
_  0105002 30 001           745,764.65                 .00        2,500,037.75
   0106002 A        DESC DATA: SWEEP                                       .00
                                        TIER 1 RT  8.00000
_  0106002 40 001           128,879.43                 .00        2,628,917.18
   0107002          DESC DATA: SWEEP                                       .00
                                        TIER 1 RT  8.00000
_  0107002 40 001            79,496.30                 .00        2,708,413.48
   0110002          DESC DATA: SWEEP                                       .00
                                        TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====>  ____   PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:05 PM

C 7760



Page: 1 Document Name: untitled

```
            S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:11    01/25
ASSOC 1   APPL CL   BANK 001   BRANCH 0001   PRODUCT DFLT    VIEW 99     PAGE 12
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
    EFF DT TR SEQ              PRINCIPAL            INTEREST
    PROC DT AC FLD                                              LOAN BALANCE
                                                               ORG TRAN AMT
_  0110002 30 001          326,855.59                 .00      2,381,557.89
   0111002 A         DESC DATA: SWEEP                                  .00
                                          TIER 1 RT  8.00000
_  0111002 30 001          159,724.87                 .00      2,221,833.02
   0112002 A         DESC DATA: SWEEP                                  .00
                                          TIER 1 RT  8.00000
_  0112002 40 001          174,539.78                 .00      2,396,372.80
   0113002            DESC DATA: SWEEP                                 .00
                                          TIER 1 RT  8.00000
_  0113002 30 001                .00            11,452.37      2,396,372.80
   0114002    *      DESC DATA:  *GEN*                            11,452.37
   OP-ID COMNJB                            TIER 1 RT  8.00000
_  0113002 30 002        1,291,625.30                 .00      1,104,747.50
   0114002 A         DESC DATA: SWEEP                                  .00
                                          TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> ____  PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:14 PM

C 7761

```
              S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:15   01/25
    ASSOC 1    APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT   VIEW 99    PAGE 13
    CCI CONSTRU          LN TYPE 3   PYMT MODE 1  MAT DT 12/31/49
      EFF DT TR SEQ              PRINCIPAL              INTEREST          LOAN BALANCE
      PROC DT AC FLD                                                     ORG TRAN AMT

   _ 0114002 40 001           287,001.48                    .00         1,391,748.98
     0118002           DESC DATA: SWEEP                                          .00
                                            TIER 1 RT  8.00000
   _ 0118002 30 001           105,191.73                    .00         1,286,557.25
     0119002 A         DESC DATA: SWEEP                                          .00
                                            TIER 1 RT  8.00000
   _ 0119002 40 001           534,258.91                    .00         1,820,816.16
     0120002           DESC DATA: SWEEP                                          .00
                                            TIER 1 RT  8.00000
   _ 0120002 40 001         1,108,904.84                    .00         2,929,721.00
     0121002           DESC DATA: SWEEP                                          .00
                                            TIER 1 RT  8.00000
   _ 0121002 30 001           139,954.17                    .00         2,789,766.83
     0124002 A         DESC DATA: SWEEP                                          .00
                                            TIER 1 RT  8.00000

 CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
 ====> ____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

C 7762



Page: 1 Document Name: untitled

```
            S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 16:44:16   01/25
ASSOC 1    APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99    PAGE 14
CCI CONSTRU           LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
    EFF DT TR SEQ            PRINCIPAL            INTEREST        LOAN BALANCE
    PROC DT AC FLD                                               ORG TRAN AMT

_  0124002 30 001           500,940.36                .00        2,288,826.47
   0125002 A        DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000
_  0125002 30 001           183,635.66                .00        2,105,190.81
   0126002 A        DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000
_  0126002 40 001            54,989.47                .00        2,160,180.28
   0127002          DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000
_  0127002 40 001           351,614.19                .00        2,511,794.47
   0128002          DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000
_  0128002 40 001            39,844.75                .00        2,551,639.22
   0131002          DESC DATA: SWEEP                                      .00
                                        TIER 1 RT  8.00000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> _____    PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:17 PM

C 7763



Page: 1 Document Name: untitled

```
              S150 TRAC   LS/2000 ACCUMULATED TRAN LIST   01-25 16:44:18    01/25
ASSOC 1    APPL CL    BANK 001   BRANCH 0001    PRODUCT DFLT   VIEW 99      PAGE 15
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
    EFF DT TR SEQ             PRINCIPAL            INTEREST       LOAN BALANCE
    PROC DT AC FLD                                               ORG TRAN AMT

_  0131002 30 001         270,953.77                  .00       2,280,685.45
   0201002 A      DESC DATA: SWEEP                                        .00
                                       TIER 1 RT  8.00000
_  0201002 30 001       1,833,640.45                  .00         447,045.00
   0202002 A      DESC DATA: SWEEP                                        .00
                                       TIER 1 RT  8.00000
_  0202002 40 001       1,148,974.12                  .00       1,596,019.12
   0203002         DESC DATA: SWEEP                                       .00
                                       TIER 1 RT  8.00000
_  0203002 30 001         572,299.55                  .00       1,023,719.57
   0204002 A      DESC DATA: SWEEP                                        .00
                                       TIER 1 RT  8.25000
_  0204002 30 001         109,375.10                  .00         914,344.47
   0207002 A      DESC DATA: SWEEP                                        .00
                                       TIER 1 RT  8.25000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE D* DATE 0000000 PAGE ____
====> ____   PF05=S120 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 04:43:19 PM

C 7764



Page: 1 Document Name: untitled

```
           S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 15:52:39   01/25
ASSOC 1  APPL CL    BANK 001   BRANCH 0001   PRODUCT DFLT    VIEW 99    PAGE 17
CCI CONSTRU         LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
    EFF DT TR SEQ            PRINCIPAL            INTEREST          LOAN BALANCE
    PROC DT AC FLD                                                 ORG TRAN AMT

_  0204002 30 001          109,375.10                 .00          914,344.47
   0207002 A      DESC DATA: SWEEP                                         .00
                                        TIER 1 RT  8.25000
_  0207002 40 001          399,049.51                 .00        1,313,393.98
   0208002        DESC DATA: SWEEP                                         .00
                                        TIER 1 RT  8.25000
_  0208002 30 001          217,078.14                 .00        1,096,315.84
   0209002 A      DESC DATA: SWEEP                                         .00
                                        TIER 1 RT  8.25000
_  0209002 40 001          103,619.93                 .00        1,199,935.77
   0210002        DESC DATA: SWEEP                                         .00
                                        TIER 1 RT  8.25000
_  0210002 40 001           32,392.97                 .00        1,232,328.74
   0211002        DESC DATA: SWEEP                                         .00
                                        TIER 1 RT  8.25000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE ** DATE 0000000 PAGE ____
====>  ____   PF05=S121 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 03:51:44 PM

C 7765



Page: 1 Document Name: untitled

```
         S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 15:52:50  '01/25
ASSOC 1    APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99      PAGE 18
CCI CONSTRU          LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
     EFF DT TR SEQ          PRINCIPAL            INTEREST        LOAN BALANCE
     PROC DT AC FLD                                              ORG TRAN AMT

_ 0211002 40 001         1,301,826.10                .00        2,534,154.84
  0214002          DESC DATA: SWEEP                                      .00
                                        TIER 1 RT   8.25000
_ 0214002 40 001            22,133.21                .00        2,556,288.05
  0215002          DESC DATA: SWEEP                                      .00
                                        TIER 1 RT   8.25000
_ 0215002 30 001           242,960.14                .00        2,313,327.91
  0216002 A        DESC DATA: SWEEP                                      .00
                                        TIER 1 RT   8.25000
_ 0216002 30 001            62,060.29                .00        2,251,267.62
  0217002 A        DESC DATA: SWEEP                                      .00
                                        TIER 1 RT   8.25000
_ 0217002 40 001           152,360.75                .00        2,403,628.37
  0218002          DESC DATA: SWEEP                                      .00
                                        TIER 1 RT   8.25000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE ** DATE 0000000 PAGE ____
====> ____     PF05=S121 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 03:51:51 PM

C 7766



Page: 1 Document Name: untitled

```
           S150 TRAC   LS/2000 ACCUMULATED TRAN LIST  01-25 15:52:53   01/25
ASSOC 1   APPL CL   BANK 001   BRANCH 0001   PRODUCT DFLT   VIEW 99    PAGE 19
CCI CONSTRU         LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
  EFF DT TR SEQ          PRINCIPAL            INTEREST
  PROC DT AC FLD                                            LOAN BALANCE
                                                           ORG TRAN AMT

_ 0218002 40 001        197,885.64                 .00     2,601,514.01
  0222002            DESC DATA: SWEEP                               .00
                                       TIER 1 RT  8.25000
_ 0222002 30 001              .00             16,658.76    2,601,514.01
  0223002    *      DESC DATA: *GEN*                          16,658.76
  OP-ID COMNJB                          TIER 1 RT  8.25000
_ 0222002 30 002        510,840.84                 .00     2,090,673.17
  0223002 A          DESC DATA: SWEEP                               .00
                                       TIER 1 RT  8.25000
_ 0224002 30 001        638,911.65                 .00     1,451,761.52
  0225002 A          DESC DATA:                                     .00
  OP-ID COMJKP                          TIER 1 RT  8.25000
_ 0225002 29 001              .00                  .00     1,451,761.52
  0225002    209    CHNG DATA: 902240015186
                                       TIER 1 RT  8.25000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE ** DATE 0000000 PAGE ____
====> ____    PF05=S121 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 03:51:56 PM

C 7767



Page: 1 Document Name: untitled

```
          S150 TRAC    LS/2000 ACCUMULATED TRAN LIST  01-25 15:52:57    01/25
ASSOC 1    APPL CL    BANK 001    BRANCH 0001    PRODUCT DFLT    VIEW 99     PAGE 20
CCI CONSTRU           LN TYPE 3  PYMT MODE 1  MAT DT 12/31/49
   EFF DT TR SEQ           PRINCIPAL              INTEREST       LOAN BALANCE
   PROC DT AC FLD                                               ORG TRAN AMT

_ 0225002 30 001        1,167,539.00                 .00         284,222.52
  0228002 A      DESC DATA:                                             .00
  OP-ID COMJKP                         TIER 1 RT  8.25000
_ 0306002 29 001             .00                     .00         284,222.52
  0306002    107  CHNG DATA: 07003
  OP-ID COMMJR                         TIER 1 RT  8.25000
_ 0316002 29 001             .00                     .00         284,222.52
  0316002    209  CHNG DATA: 003130007003
                                       TIER 1 RT  8.25000
_ 0322002 28 001             .00                     .00         284,222.52
  0322002         CHNG DATA: N/A-60 11/13 LOAN SWEEP INT
  OP-ID COMDCS                         TIER 1 RT  8.25000
_ 0322002 29 001             .00                     .00         284,222.52
  0322002    033  CHNG DATA: 1
  OP-ID COMDCS                         TIER 1 RT  8.25000

CUSTOMER 0102598 LOAN 0001 PART 0000000 DLR 00000 TYPE ** DATE 0000000 PAGE ____
====> ____   PF05=S121 10=STLN* 11=POLN 12=STPS
```

Date: 1/25/2001 Time: 03:51:59 PM

C 7768

**Amounts Due Under $1.2 Million Loan**

**CCI Construction 0102598**

| From | To | Balance | Rate | Basis | Days | Interest Calc |
|------|-----|---------|------|-------|------|---------------|
| 2/11/2000 | 3/22/2000 | $1,200,000.00 | 8.25% | 360 | 40 | $ 11,000.00 |
| 3/22/2000 | 5/17/2000 | $1,200,000.00 | 8.50% | 360 | 56 | $ 15,866.67 |
| 5/17/2000 | 1/4/2001 | $1,200,000.00 | 9.00% | 360 | 232 | $ 69,600.00 |
| 1/4//2001 | 2/1/2001 | $1,200,000.00 | 8.50% | 360 | 25 | $ 7,933.33 |
| 2/1/2001 | 3/21/2001 | $1,200,000.00 | 8.00% | 360 | 48 | $ 12,800.00 |
| 3/21/2001 | 4/19/2001 | $1,200,000.00 | 7.50% | 360 | 29 | $ 7,250.00 |
| 4/19/2001 | 5/16/2001 | $1,200,000.00 | 7.00% | 360 | 27 | $ 6,300.00 |
| 5/16/2001 | 6/28/2001 | $1,200,000.00 | 6.50% | 360 | 43 | $ 9,316.67 |
| 6/28/2001 | 8/22/2001 | $1,200,000.00 | 6.25% | 360 | 55 | $ 11,458.33 |
| 8/22/2001 | 9/17/2001 | $1,200,000.00 | 6.00% | 360 | 26 | $ 5,200.00 |
| 9/17/2001 | 10/3/2001 | $1,200,000.00 | 5.50% | 360 | 16 | $ 2,933.33 |
| 10/3/2001 | 11/7/2001 | $1,200,000.00 | 5.00% | 360 | 35 | $ 5,833.33 |
| 11/7/2001 | 12/12/2001 | $1,200,000.00 | 4.50% | 360 | 35 | $ 5,250.00 |
| 12/12/2001 | 5/31/2002 | $1,200,000.00 | 4.25% | 360 | 170 | $ 24,083.33 |
| | | | | | | $ 194,825.00 |
| | | $1,200,000.00 | 4.25% | 360 | 1 | $ 141.67 Per Diem |

**Amounts Due Under Line of Credit**

**CCI Construction 0102598**

| From | To | Balance | Rate | Basis | Days | Interest Calc |
|------|------|---------|------|-------|------|---------------|
| 2/25/2000 | 3/22/2000 | $284,222.52 | 8.25% | 360 | 26 | $  1,693.49 |
| 3/22/2000 | 5/17/2000 | $284,222.52 | 8.50% | 360 | 56 | $  3,758.05 |
| 5/17/2000 | 1/4/2001 | $284,222.52 | 9.00% | 360 | 232 | $ 16,484.91 |
| 1/4/2001 | 2/1/2001 | $284,222.52 | 8.50% | 360 | 28 | $  1,879.03 |
| 2/1/2001 | 3/21/2001 | $284,222.52 | 8.00% | 360 | 48 | $  3,031.71 |
| 3/21/2001 | 4/19/2001 | $284,222.52 | 7.50% | 360 | 29 | $  1,717.18 |
| 4/19/2001 | 5/16/2001 | $284,222.52 | 7.00% | 360 | 27 | $  1,492.17 |
| 5/16/2001 | 6/28/2001 | $284,222.52 | 6.50% | 360 | 43 | $  2,206.67 |
| 6/28/2001 | 8/22/2001 | $284,222.52 | 6.25% | 360 | 55 | $  2,713.93 |
| 8/22/2001 | 9/17/2001 | $284,222.52 | 6.00% | 360 | 26 | $  1,231.63 |
| 9/17/2001 | 10/3/2001 | $284,222.52 | 5.50% | 360 | 16 | $    694.77 |
| 10/3/2001 | 11/7/2001 | $284,222.52 | 5.00% | 360 | 35 | $  1,381.64 |
| 11/7/2001 | 12/12/2001 | $284,222.52 | 4.50% | 360 | 35 | $  1,243.47 |
| 12/12/2001 | 5/31/2002 | $284,222.52 | 4.25% | 360 | 170 | $  5,704.19 |
| | | | | | | $ 45,232.83 |
| | | $284,222.52 | 4.25% | 360 | 1 | $     33.55 Per Diem |

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK,          :
        PLAINTIFF       :
        VS              : NO:  1:01-CV-786
JOHN M. ORTENZIO,       :
        DEFENDANT       :


        DEPOSITION OF:  SHERI PHILLIPS

        TAKEN BY:       PLAINTIFF

        BEFORE:         HILLARY M. HAZLETT, REPORTER
                        NOTARY PUBLIC

        DATE:           MARCH 13, 2002, 10:43 A.M.

        PLACE:          ALLFIRST BANK BUILDING
                        213 MARKET STREET
                        14TH FLOOR
                        HARRISBURG, PENNSYLVANIA


APPEARANCES:

 GEBHARDT & SMITH
 BY:  LAWRENCE J. GEBHARDT, ESQUIRE

        FOR - PLAINTIFF

 BLANK, ROME, COMISKY & McCAULEY, LLP
 BY:  EDWARD I. SWICHAR, ESQUIRE

        FOR - DEFENDANT

 HARTMAN, OSBORNE & JOYCE, P.C.
 BY:  MELINDA S. JOYCE, ESQUIRE

        FOR - SHERI PHILLIPS

ALSO PRESENT:

 JAMIN M. GIBSON
 JOHN M. ORTENZIO



**ARCHIVE REPORTING SERVICE**

2336 N. Second Street      (717) 234-5922
Harrisburg, PA 17110    FAX (717) 234-6190

16

```
1        Q    And these were points that you raised with

2   him or he raised with you first?

3        A    I raised them with him.

4        Q    Now, was there a cash management feature

5   with the --

6        A    Just back up a minute.  I raised them with

7   him, but the one point he raised was with me.

8        Q    What point was that?

9        A    That within the 30 days there would be

10  notice as far as the repayment.

11       Q    Was there a cash management feature that

12  accompanied or was attached or related to the --

13            MR. SWICHAR:  Are you referring to

14  paragraph 6?

15            THE WITNESS:  Yes.

16            MR. SWICHAR: Thanks.

17  BY MR. GEBHARDT:

18       Q    Was there a cash management feature

19  associated with the line of credit?

20       A    Yes, there was.

21       Q    And what was your understanding of how that

22  cash management feature worked?

23       A    We had the line of credit; and as checks

24  were drawn on our checking account, the money would

25  come from our line of credit to cover that.  If there
```

1    was excess money, it would be invested and we would

2    get the income from it.

3        Q    Hypothetically, if -- let me rephrase this.

4        How would customer payments in this 1999

5    period be made to CCI in relation to the cash

6    management feature?

7        MR. SWICHAR:  May I hear the question back?

8        MS. JOYCE:  And you're not talking

9    hypothetically as you started the last question,

10   correct?

11       MR. GEBHARDT:  No.  This is actually how

12   did customers pay CCI in the 1999 time frame.

13       MR. SWICHAR:  I don't need it back.

14       THE WITNESS:  It could have been one of two

15   ways:  One, I would write a check; and we would

16   deposit it in the bank account; or two, as many as

17   possible had set up on a direct payment through a

18   wire transfer from their account into ours.

19       We did a lot of government work, and

20   sometimes it took forever to get it set up.  Most of

21   them, pretty many of them I had set up on wire

22   transfers that would automatically go into our

23   account.

24   BY MR. GEBHARDT:

25       Q    You set up as many as you could in that

1  fashion?

2      A      Yes.

3      Q      And that carried through also the 2000

4  period as of the time you left?

5      A      That's correct.

6      Q      The wire transfer feature having the CCI

7  customer wire their payments directly to Allfirst is

8  something that benefited CCI?

9      A      Most definitely.

10     Q      If there had been an excess of deposits

11  over any outstanding balance on the line of credit

12  that would have given CCI a positive balance --

13             MR. SWICHAR:  Objection to the form of the

14  question.  I would first establish if there were ever

15  an excess.

16             MR. GEBHARDT:  Well, let's trace --

17             MR. SWICHAR:  Take it out of the world of

18  hypothetical.

19  BY MR. GEBHARDT:

20     Q      In terms of how the cash management feature

21  worked, if there were less deposits on a given day

22  than there were checks that CCI had written to pay

23  bills, what would happen?

24     A      If there were less deposits, we would draw

25  on the line of credit to pay the checks that were in

1    excess.

2        Q    And if there were more deposits than there

3    were checks written to pay bills, what would happen?

4        A    They would sweep the account and invest the

5    money.

6        Q    Would I be correct if there was an existing

7    outstanding balance on the line of credit, that

8    excess would pay down the line of credit?

9            MS. JOYCE:   Object to the form of the

10   question.  You may answer.

11   BY MR. GEBHARDT:

12       Q    In other words, if there was an outstanding

13   balance on the line of credit of $500,000 and CCI

14   wrote $100,000 of checks that were presented on a

15   specific day but $150,000 of payments came in from

16   customers, there would be an excess of $50,000,

17   right, in the hypothetical?

18           What would happen under the cash management

19   feature to your understanding with that $50,000?

20       A    If there's excess deposits coming in, they

21   would pay down the line of credit.

22       Q    And if there was no balance on the line of

23   credit at the time those excess deposits came in,

24   then they would create a positive balance on CCI's

25   bank account?

```
 1      A      Yes.

 2      Q      And CCI would gain interest on that?

 3      A      Yes.  They would be swept and put into

 4   purchasing.

 5      Q      As of the start or the first quarter of

 6   calendar year 1999, CCI had -- let me actually

 7   rephrase it.

 8           As of the conclusion of calendar year 1999

 9   -- in other words, December 31, 1999 -- CCI, in fact,

10   had four credit facilities or loans outstanding with

11   Allfirst, right?

12           MS. JOYCE:  Object to the form of the

13   question.  You can answer.

14   BY MR. GEBHARDT:

15      Q      We have the 4 million --

16      A      As I recall, there was a $4 million line of

17   credit.  There was a $1.2 million line.  There were

18   equipment loans.  I don't remember how many we

19   aggregated together.  I'm not sure how many equipment

20   loans there were, so I can't answer exact number.

21      Q      Do you remember there being a $2 million

22   equipment loan or line of credit financing of

23   equipment?

24      A      Yes, I do.

25      Q      Now  --
```

1          MR. SWICHAR:  Just a minute.  You said

2     four, and she said three.  She provided three.

3          MR. GEBHARDT:  She's correct.  I'm

4     incorrect.

5          MR. SWICHAR:  I was waiting for her to

6     correct you.

7     BY MR. GEBHARDT:

8     Q     Let's make the record clear.  There were

9     actually the three credit facilities available as of

10    December 31, 1999; namely, the $4 million line of

11    credit, the $1,200,000 loan, and a $2 million

12    equipment loan or line of credit?

13    A     And as I'm saying, as I recall, yes, I

14    remember all those loans.  I don't remember if we had

15    any other small pieces of equipment financed

16    separately; but yes, I remember all of those three.

17    Those are the three main ones that I remember.

18          MR. GEBHARDT:  Let's do this as the next

19    exhibit.

20          (Audit report and financial statements for

21    years ended December 31, 1998 and 1997 was marked as

22    Deposition Exhibit No. 3.)

23    BY MR. GEBHARDT:

24    Q     Okay.  I've handed you what has been marked

25    as Deposition Exhibit No. 3 which purports to be the

1    audit report and financial statements of CCI

2    Construction for the years ended December 31, 1998

3    and 1997.  Does that appear to be what this document

4    is to you?

5         A    Yes, it does.

6         Q    Would I be correct, looking at the

7    financial report that's been presented, that CCI did

8    not lose money for the fiscal year 1998?

9         A    That's correct.

10        Q    And if you look at it, it's page 12 of the

11   audited report, BATE stamp number at the bottom,

12   C 7637, there's a Paragraph No. 6, Operating line of

13   credit.  The last sentence says, quote, The company

14   has no outstanding balance on the line of credit at

15   December 31, 1998, period, end quote.

16             Testing your memory, does that roughly

17   accord with your recollection of the line of credit

18   as of that year?

19        A    I can't really answer that as a yes/no only

20   because our line of credit was a constant resolving

21   line.  I do know at year end, we would hold writing

22   checks if we could and get deposits in to try and

23   have your financial statement look as healthy

24   cashwise as possible.  So that makes sense, but do I

25   actually remember it?  No.

1    Q    Over the course of time you were at CCI,

2  were there times when the company had no borrowings

3  under its line of credit?

4    A    Yes, sir.

5    Q    In fact, on some of the lines of credit,

6  there was actually a requirement that CCI be out of

7  the line of credit?

8         MR. SWICHAR:  Can I hear that again?

9         (The reporter read back the referred-to

10  portion of the record.)

11         MR. SWICHAR:  My objection was, Was there a

12  requirement?  There's a document.  That was my

13  objection.

14  BY MR. GEBHARDT:

15    Q    Do you recollect whether there in the lines

16  of credit that were in existence over the period of

17  time you were there from 1991 through 2000 whether

18  there was customarily a feature that to those lines

19  of credit that required CCI to have no borrowings

20  for a 30 consecutive day period?

21         MR. SWICHAR:  And I object to the form of

22  the question because I don't know what you mean.

23         MR. GEBHARDT: You may answer.

24         MS. JOYCE:  If you understand what he

25  means, if you need clarification, you may request it.

24

THE WITNESS:  During the course of the loans that we had with Allfirst, there were definitely times where there was a provision in the loan that said it had to be paid down for 30 days at certain points in time.  Whether that was in the last loan, I don't recall.

BY MR. GEBHARDT:

Q     Now, in fiscal year 1999, did CCI experience some financial reverses?

A     Financial reverses?  I'm sorry.

Q     Did CCI experience some financial difficulties in 1999?

A     Our profits started decreasing in -- yes, on our jobs.  Yes, they did.

MR. GEBHARDT:  Let's mark this as the next exhibit.

(10/26/1999 inter-office memorandum was marked as Deposition Exhibit No. 4.)

BY MR. GEBHARDT:

Q     I've handed you Deposition Exhibit 4, which is a memorandum prepared by Craig Schwartz to evidence a meeting that he states he had with you and with John Ortenzio on or about October 26th, 1999.

Do you recollect having a meeting with Mr. Schwartz at the end of October of 1999?

1  coming in from receivables and projects would

2  generate enough cash to pay this down on a short-term

3  basis.

4       Q    In the discussions, was it discussed that

5  CCI would repay the $1.2 million loan by making a

6  borrowing on the $4 million line of credit?

7       A    No, it was not.

8       Q    I note on Exhibit 4 that again there's the

9  reference to the $4 million Scott Air Force Base

10  receivable.  Did that $4 million receivable have any

11  relationship to a source of funds to repay the $1.2

12  million loan?

13      A    I don't recall if that -- if that was

14  specifically said or not.

15      Q    Now, at the time the $1.2 million loan was

16  being taken out, I take it you had discussions with

17  Mr. Ortenzio about the borrowing?

18      A    That's correct.

19      Q    And did you and Mr. Ortenzio discuss where

20  CCI would obtain the funds to repay the $1.2 million

21  when it came due which, according to the commitment

22  letter, was March 31, 2000?

23      A    Yes, we did.

24      Q    And what was the substance of those

25  discussions?

1      A     I had done some cash flow projections.  I

2   know John was adamant about having this paid back on

3   a short-term basis.  When I gave him the cash flow

4   projections, I had said that if the job profits that

5   are projected hold, we would have the money to pay

6   back this 1.2 million.

7            I also told him that we had seen declining

8   job profit projections over time.  I said, I'm not

9   making the projections on the jobs.  That's what I've

10  been given from the people in operations.  Each month

11  they were decreasing.

12           I said, based on what the most current

13  projections were, if they came in at that amount, we

14  would have the cash flow to pay back the 1.2 million.

15     Q     At the time you were having these

16  discussions with Mr. Ortenzio, were there any

17  discussions about using a borrowing under the $4

18  million line of credit to repay the $1.2 million

19  guaranteed note?

20     A     No, there were not.

21     Q     In 1999 and the year 2000, did

22  Mr. Ortenzio, to your knowledge, have any involvement

23  in the repaying of the loans to Allfirst Bank?

24     A     Which loans?

25     Q     Well, there were three loans.  You had the

1    line of credit -- let's start first with the $4

2    million line of credit.  Did he get involved in how

3    that was being paid or repaid at all?

4        A    I'm not sure.

5        MS. JOYCE:  What time?

6        MR. GEBHARDT:  In 1999 and 2000.

7        THE WITNESS:  Did he get involved in how it

8    was repaid?

9    BY MR. GEBHARDT:

10        Q    Or the process, the repayment process?

11        A    No, that was the line of credit.  As the

12    cash came in, it was paid down.

13        Q    How about the repayment of the equipment

14    loan?

15        A    No, he did not.

16        Q    Okay.  Now, the $1.2 million loan was

17    repaid by CCI on or about February 11, 2000, by the

18    delivery of a check by Mr. Ortenzio personally to

19    Allfirst.

20        Prior to that date, had you had any

21    discussions with Mr. Ortenzio about the repayment of

22    the $1.2 million line of credit?

23        A    Yes.  He had come to me about that.

24        Q    And what was the substance of the

25    discussions you had?

1    A    He wanted to pay down the $1.2 million --

2    the $1.2 million line, he wanted to pay down because

3    he had that personally guaranteed.  He had asked me

4    about writing a check out to pay that off from the

5    line of credit, and I refused.

6    Q    Why did you refuse?

7    A    I didn't think it was in the best interest

8    of the corporation to do that.

9    Q    And could you explain why you had those --

10   that you didn't think it was in the best interest of

11   the corporation?

12   A    One, I guess I didn't think there was any

13   benefit to doing it.  The interest rates were the

14   same in the loans so there was no corporate benefit

15   from paying one -- drawing in one line of credit to

16   pay the other.

17        Two, if we had the extra cash, I would have

18   thought it best suited to pay payroll and accounts

19   payable and subcontractors.

20   Q    And at the time the loan was paid in

21   February, the company was experiencing cash flow

22   difficulties?

23   A    Yes.

24   Q    And did you understand that repaying the

25   $1.2 million loan with a draw on the $4 million line



38

1   of credit would reduce the amount of available cash

2   to the company?

3        A      Yes, definitely.

4        Q      Okay.  Now, in terms of the physical paying

5   of the $1.2 million loan, you did not write the

6   check?

7        A      No, I did not.

8        Q      Did you have signature authorities over the

9   checking account?

10       A      Yes, I did.

11       Q      And so if you had wanted to, you could have

12  written a $1.2 million check and sent it in to

13  Allfirst?

14       A      Yes, I could have.

15       Q      Did Mr. Ortenzio have any reaction to your

16  refusal to write the check or make that payment?

17       A      Initially when he had asked me about it and

18  I said no, he didn't do anything.  Then at a later

19  point in time, he came back to me again and said I

20  know you don't agree with this; but I need to do it.

21  I said, you're the president of the company; but I'm

22  not going to be any part of it.

23       Q      Did he at all elaborate on when he said I

24  need to do this, what he was meaning by this?

25       A      He personally guaranteed the 1.2 million

1    time in the generation of these financial

2    statements --

3              MS. JOYCE:  Object to the form of the

4    question.  You may answer.

5    BY MR. GEBHARDT:

6         Q     -- as supervisor of the accounting

7    department?

8         A     Yes, I would have.

9         Q     And would I be correct that after these

10   were generated, they were provided to Mr. Ortenzio?

11        A     Yes.

12        Q     And at the top of the page in the

13   right-hand corner, there's an indication 02-14-2000

14   14:05, is that a reference to when these statements

15   were printed out?

16        A     Yes, it is.

17        Q     Roughly how long after they were printed

18   out would it have been when you gave these to

19   Mr. Ortenzio?

20        A     Probably within -- if he was in the office

21   and we did these, it would have been within a day or

22   two.

23        Q     Now, the income statement, if you look at

24   the second page, would I be correct indicates --

25              MS. JOYCE:  The second page of which

1  exhibit?

2            MR. GEBHARDT:  Of Exhibit 8.

3  BY MR. GEBHARDT:

4      Q      -- that there is a net loss the company has

5  sustained of slightly over $6 million?

6      A      That's correct.

7      Q      And did you have occasion to discuss with

8  Mr. Ortenzio that amount of loss of the company for

9  the 13-month period after these statements were

10  generated?

11      A      Yes.

12      Q      Would I be correct that there was a

13  12-month internal income statement also generated at

14  CCI?  Would that have been the normal practice?

15      A      That's the normal practice, but this

16  actually would have been the 12-month statement --

17  you mean because of the 13 months up there?

18      Q      Yes.

19      A      Thirteen months was how our accounting

20  system would give us time at the end of the year to

21  go into the next year so that you could do W-2s in

22  the prior year and keep it open for adjustments and

23  start your next year of business.  So this was

24  actually for 12 months.

25            MS. JOYCE:  Let me just make sure the

1    record is clear.  The witness is referencing Exhibit

2    No. 8.

3            MR. GEBHARDT:  Thank you.

4    BY MR. GEBHARDT:

5        Q      Prior to this document, which is Exhibit 8,

6    being generated, was it understood by you that CCI

7    for the fiscal year 1999 was going to sustain an

8    operating loss in the magnitude that's reflected on

9    the statement?

10       A      Could you repeat that?

11       Q      Right.  I mean before February 14 when this

12   statement was printed out, did you have an

13   appreciation that the company was likely to sustain a

14   loss in the $6 million area for the fiscal year 1999?

15       A      Sometime prior to printing this, yes.

16       Q      And based on your discussions with

17   Mr. Ortenzio and things he said to you, did he have

18   an understanding that the company was going to

19   sustain a loss for fiscal year 1999 in this area?

20       A      Prior to this?

21       Q      Yes.

22       A      Prior to this, he would have -- if I can

23   back up.  What generates the profits on the jobs are

24   reports that -- I'm sorry.  What generates the profit

25   or loss on the income statement is information I got

44

1   from operations projecting job profits or losses.  At

2   the time those losses came in, they changed

3   drastically because they deceased.

4          At that time, I had constant conversations

5   with our chief operating officer.  He would meet with

6   John, and I would meet with him sometimes together,

7   sometimes apart.  This is the final result.

8          As we discussed that, we knew that it was

9   going to hit our bottom line in a big way as far as

10  an exact amount.  We knew it was coming together for

11  a big loss.

12     Q    And focusing on the February 11, 2000 date

13  on which Mr. Ortenzio delivered the CCI check to

14  Allfirst to pay the $1.2 million loan, prior to that

15  date and based on your discussions and interactions

16  with Mr. Ortenzio, was he aware of the company's

17  financial situation that was going to result in a

18  loss somewhere in the magnitude reflected on Exhibit

19  8?

20     A    Oh, yes.

21     Q    And based on your discussions with him, did

22  his awareness of that -- did he express any

23  relationship between anticipating this loss and

24  wanting to get the $1.2 million loan paid?

25          MS. JOYCE:  You mean prior to February 11?

1    Are you still in the same time frame?

2                MR. GEBHARDT:  Yes.

3                THE WITNESS:  Give me the question again.

4    BY MR. GEBHARDT:

5        Q      Did Mr. Ortenzio in any way relate the

6    anticipated loss in the rough area of $6 million to

7    getting the $1.2 million loan repaid even if he had

8    to borrow on the line of credit?

9        A      Yes.

10       Q      Do you remember anything he may have said

11   to you in that regard?

12       A      When we had these discussions, the chief

13   operating officer was Shane Miller; the president,

14   John; myself -- and I don't recall if the senior VP

15   was involved.  I think it was probably just the three

16   of us.

17              Initially, when he talked about the

18   financial condition of the company, the chief

19   operating officer had said that in order to keep

20   going that the company would need more cash put into

21   it.

22              At that time, John had said he was not

23   going to put more cash into the company.  That's when

24   in the meetings, Shane, our chief operating officer,

25   said, if you're not going to, we have serious

48

1    impression to us that he was not going to continue

2    with company.

3        Q    Now, Mr. Ortenzio attended that meeting

4    with an attorney named Chernicoff.  Do you know how

5    Mr. Ortenzio came in contact with Mr. Chernicoff?

6        A    As I recall, he had told me that initially

7    he had talked to Leroy Zimmerman about being his

8    counsel.  I thought there was a conflict of interest.

9    I wasn't involved in the conversations, but there was

10   a conflict of interest and that he was going to use a

11   bankruptcy attorney named Bob Chernicoff.  I didn't

12   know him.

13       Q    Did Mr. Ortenzio express to you that

14   Mr. Chernicoff was a bankruptcy attorney?

15       A    I don't recall where I learned he was a

16   bankruptcy attorney.  We had the discussion of

17   bankruptcy, and he hired Chernicoff.  Whether he told

18   me he was a bankruptcy attorney, I don't know.

19       Q    So you and Mr. Ortenzio had had discussions

20   regarding CCI's possible bankruptcy before the

21   February 18, 2000 meeting at Allfirst?

22       A    Yes.

23       MS. JOYCE:  Object to the form of the

24   question.  That's fine.

25       MR. GEBHARDT:  Let's mark this as the next

1    cash flow shortages that are shown on Deposition

2    Exhibit No. 10?

3        A    Yes, we did.

4        Q    What was the substance of those

5    discussions?

6        A    That -- which time frame are you looking?

7        Q    Well, in other words, the cash flow

8    statement that's Exhibit 10 was generated in showing

9    these cash flow losses that are, at least in my view,

10   fairly significant.

11           Before he went to Allfirst, did you and he

12   discuss how the company was going to try and come up

13   with the money to meet the cash flow shortages?

14       A    Yes.  We had several meetings with myself,

15   the chief operating officer, Shane Miller, and John.

16       Q    Did you have any specific meetings with the

17   anticipation of the February 18 meeting at Allfirst

18   to discuss it?

19       A    We met to -- this was more of an ongoing

20   discussion.  But when we got to -- I guess that's

21   what prompted the meeting on February 18th, the fact

22   that we had these serious cash flow concerns.  We had

23   talked to John, and Shane said the only way -- we're

24   going to need you to put more money into the company

25   in some form in order to get through this until we

1    get money back on these claims.

2          John refused to do that; and Shane said, if

3    we can't do that, we can't keep going forward.  The

4    bonding company will have to step in, or we're going

5    to file bankruptcy or something.

6          We had several meetings discussing that,

7    and the likelihood of the company going forward was

8    slim at that point because John had said he was not

9    making any additional commitments.

10          At some point in time, we had found out

11   that the Scott Air Force Base was not going to come

12   in real quickly.  We needed something at that point

13   in time.  We discussed the longevity of the company

14   and the fact that we weren't going forward.  That's

15   what prompted the discussions with Allfirst.

16     Q     Did you know that this document, which is

17   Exhibit 10, was going to be distributed at the

18   meeting at Allfirst before the meeting?

19          MR. SWICHAR:  I object because I think she

20   said she didn't recall the specific document.

21   BY MR. GEBHARDT:

22     Q     Is that correct?  You don't recall the

23   specific document?

24          MS. JOYCE:  I don't think that was her

25   testimony.  You can clarify your response.

1    a second?

2              MR. GEBHARDT:  Sure.

3              (Off the record discussion.)

4    BY MR. GEBHARDT:

5        Q      Looking at the bottom left-hand corner

6    where it says 2/16/00 and then 7:08 p.m., would that

7    be the time this was printed off the computer?

8        A      Yes.

9        Q      Looking up to the February column, are the

10   numbers there as of February 1 or would they be as of

11   February 28?

12       A      As I recall, the beginning cash balance, I

13   think, was February 1; and the ending cash balance

14   would have been February 28 in the first column.  And

15   then that carries forward to March, so that would be

16   the beginning of March at the top of the column and

17   the end of March at the bottom.

18       Q      Where it says the next line after ending

19   cash balance, available line of credit $5,200,000,

20   would that also be a number reflected as of February

21   28?

22       A      Yes.  As far as I recall, that was what my

23   projection was.

24       Q      The cash flow projection doesn't reflect

25   the repayment of the $1.2 million loan with a draw on

1    the $4 million line of credit?

2        A    No, it didn't.

3        Q    And based on your understanding of how the

4    numbers work on this Deposition Exhibit 10, is there

5    any way Allfirst could have learned by looking at

6    this document that Mr. Ortenzio had caused CCI to

7    borrow on the $4 million line of credit to repay the

8    $1.2 million guaranteed loan?

9        A    No.

10            MR. GEBHARDT:  I have no further questions.

11            MR. SWICHAR:  Could we either take a

12    15-minute break now or break for lunch.  I'll have

13    about an hour's worth.

14            MS. JOYCE:  It's the witness's call.

15            THE WITNESS:  If we could take about a 10-

16    or 15-minute break now, then I could get back to

17    work.

18            MR. SWICHAR:  Okay.  Let's take 15 minutes.

19    Thanks.

20

21                    CROSS EXAMINATION

22

23    BY MR. SWICHAR:

24        Q    Ms. Phillips, I sort of want to trace some

25    of the questions that you were previously asked

1

1

IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

3

4    ALLFIRST BANK,                    :

Plaintiff      :

5                                      :

vs.           :

6                                      :

JOHN M. ORTENZIO,                 :

7              Defendant     :   NO. 1:01-CV-786

8

- - -

9              February 11, 2002

- - -

10

11              Oral Deposition of JOHN M. ORTENZIO,

12   taken pursuant to notice, was held at Cunningham

13   and Chernicoff, 2320 North 2nd Street, Harrisburg,

14   Pennsylvania 17110, beginning at 1:40 p.m., on the

15   above date, before Donna L. Crossan, an Approved

16   Registered Professional Reporter and Notary Public

17   in and for the Commonwealth of Pennsylvania.

18

19                   - - -

20

ESQUIRE DEPOSITION SERVICES

21                15th Floor

1880 John F. Kennedy Boulevard

22         Philadelphia, Pennsylvania 19103

(215) 988-9191

23

24

58

1    question.
2        Q        You knew the revolving line of
3    credit was required to be repaid or renewed or
4    some other manner dealt with by April 30, 2000,
5    didn't you?
6        A        My recollection was that there
7    was a due date when the note would be renewed, but
8    there was a 30-day notice.
9        Q        For demand of payment.  Right?
10       A        That's what it says.
11       Q        There's some markings that appear
12   to be Sheri Phillips' initials on page 3 of the
13   note and then page 2 of the note.  Do you see
14   those?
15       A        Yes, I see them.
16       Q        Were those put on there by her at
17   your direction?
18       A        I'm not exactly sure how they
19   came about, whether or not in her negotiation for
20   the note she negotiated certain points of the
21   note.  She would have advised me of them prior to
22   executing them, so I was aware prior to her
23   executing the note.  I don't know -- I did not
24   participate in the negotiations of the note.  I

59

1    don't believe they were specifically done at my
2    direction.  I think she negotiated the note,
3    reviewed the points with me for my approval, which
4    I granted, and negotiations were completed.
5        Q        Did she discuss with you the
6    terms and conditions upon which the $4 million
7    revolving line of credit was being extended to
8    CCI?
9        A        We discussed the fact that we had
10   at that time submitted for an increase to our line
11   of credit and she was going to begin negotiations
12   for it.  So I was aware of that, yes.
13       Q        You were aware there was a cash
14   management feature accompanying this revolving
15   line of credit?
16       A        At the time that this was
17   negotiated, no.  I think the cash management was
18   something that came afterwards, I believe.
19       Q        After the execution of the
20   documents?
21       A        I think.  I'm not sure, to tell
22   you the truth.  It may have even been before.  I
23   don't believe they were simultaneous.  I think we
24   were under a cash management program with them

60

1    beforehand or it came afterwards, but I don't
2    recall that they were negotiated at the same time.
3        Q        In connection with the $4 million
4    line of credit, was it CCI's practice to ask its
5    customers to forward payments of CCI's billings
6    directly to AllFirst?
7        A        That was something that I
8    think -- at what point in time are you referring
9    to?
10       Q        After the $4 million line of
11   credit was put into effect, which appears to be
12   when the commitment letter was issued on March 23
13   and when the promissory note was signed, I guess,
14   which was sometime shortly thereafter, did you
15   understand the cash management facility to be in
16   place once the commitment letter was issued and
17   the promissory note signed?
18       A        I don't recall if the cash
19   management system was in place after that or not.
20   The exact date of the cash management system was
21   put into effect with the company.  I don't have an
22   exact date as to when that was.
23       Q        In 1999, was it the practice of
24   CCI to request its customers to mail payments

61

1    directly to AllFirst?
2        A        No.  I think that the majority of
3    them mailed them to us and we deposited them.
4        Q        There were customers that paid
5    CCI's billings directly to AllFirst, isn't that
6    right?
7        A        There were some projects where
8    the project owner requested wiring instructions
9    and they would wire funds.
10       Q        What was your understanding of
11   how the line of credit and the cash management
12   feature worked on the $4 million facility?
13           MR. BURKE:  Meaning the witness
14   or CCI's?
15           MR. GEBHARDT:  His personal.
16       A        Well, let's see, line of credits
17   would fluctuate up and down and the cash
18   management system would sweep our account at a
19   certain point in time every night, empty our
20   account, pull the funds back in.  We would get a
21   higher rate of interest on it, no rate deposit,
22   and put the funds in honor of the checks to be
23   presented the following day.
24   BY MR. GEBHARDT:

62

1    Q    Would I be correct in saying that
2  payments received by CCI either directly or that
3  were sent by customers to AllFirst would be
4  deposited?
5    A    Right.
6    Q    CCI only had one bank account
7  into which its receivables were deposited. Right?
8    A    Yes.
9    Q    Those receivables were either
10  deposited by CCI or by the customers directly?
11    A    Yes.
12    Q    And to the extent CCI had
13  outstanding borrowings under the line of credit,
14  the deposits would be used to pay down those
15  borrowings?
16    A    I guess, depending on -- I'm sure
17  the procedure of the bank, if we would deposit the
18  funds into -- funds would come in, be deposited
19  into our account and the bank would sweep those
20  funds, and then any checks that would be presented
21  would then be honored by the bank.
22    Q    If there were not enough funds on
23  deposit to pay the checks that were presented,
24  there would then be an advance on the line of

63

1  credit to cover those checks?
2    A    The line of credit would be drawn
3  down and so it would fluctuate up and down, and
4  that's my understanding that's how it worked.
5    Q    You didn't deal directly with
6  this yourself?
7    A    No.
8    Q    Sheri Phillips did?
9    A    Yes, she was the CFO. She would
10  handle any day-to-day functions of the bank or as
11  far as our deposits and disbursements.
12    Q    Was it your understanding that if
13  the deposits exceeded any existing borrowings
14  under the line of credit that were still
15  outstanding plus any checks that were presented,
16  the excess would be placed in an interest-bearing
17  account on behalf of CCI?
18    A    Any excess funds?
19    Q    If there was $100,000 drawn
20  hypothetically on the CCI account on the line of
21  credit and there was $200,000 of checks presented,
22  but CCI had deposited $1 million, it was your
23  understanding that $700,000 would be placed in an
24  interest-bearing account on behalf of CCI, and it

64

1  would draw interest on behalf of CCI?
2    A    I guess that's probably what
3  would happen or used to offset interest charges
4  that would be billed against us on a line of
5  credit.
6    Q    There would be no further
7  advances on the loan, the revolving line of
8  credit, until that excess deposit and this
9  hypothetical $700,000 had been drawn down?
10    A    That I couldn't say. I wouldn't
11  know -- I know sometimes there were some funds put
12  into some -- possibly put into fixed short-term
13  securities, 30, 60, 90-day paper, in which case
14  something would be sitting there. So you have
15  money and maybe the line was drawn down. I
16  believe we did some of that at some point in time
17  because it was advantageous.
18    Q    You wouldn't do borrowings under
19  the line of credit if there was a positive balance
20  in the account, you meaning CCI?
21    A    Depends on what the company was
22  doing with short-term funds. If, hypothetically,
23  if we had bought some short-term commercial paper
24  because the interest rate was attractive, then we

65

1  would do that at the bank and access the line.
2  So, hypothetically, that's possible, too.
3    Q    Hypothetically?
4    A    Or in theory or reality.
5    Q    How did CCI make borrowings in
6  1999 under the revolving line of credit?
7    A    Mechanically how?
8    Q    Yes. What was the process?
9    A    I guess mechanically we would
10  either draw down on it or -- I guess by request or
11  by presenting the checks.
12    Q    Typically the line of credit was
13  accessed by simply writing checks on CCI's bank
14  account. Isn't that right?
15    A    Could be.
16    Q    Are you aware of any times when
17  CCI requested money to be deposited in the account
18  for the line of credit without checks being
19  presented?
20        - - -
21    (Whereupon the pertinent
22  testimony was read back by the court reporter.)
23        - - -
24    MR. BURKE: Objection to form.

66

1   You can answer.
2       A    I don't know if that occurred or
3   not.
4   BY MR. GEBHARDT:
5       Q    You just have no knowledge one
6   way or another?
7       A    I suppose it could have occurred.
8   I would have to think of a scenario where it might
9   have.  I could not sit here and tell you that it
10  did or did not occur.
11          MR. BURKE:  Maybe now is a good
12  time to take a break.
13              - - -
14          (Whereupon there was a recess in
15  the proceedings.)
16              - - -
17  BY MR. GEBHARDT:
18      Q    That would be because Sheri
19  Phillips was the person principally dealing with
20  the line of credit with AllFirst?
21      A    Well, she handled the day-to-day
22  accounting functions, if that's what you mean by
23  that.  She handled the day-to-day accounting
24  functions.  As far as your question you just asked

67

1   me previously, I would imagine that it would be
2   permissible under the loan documents to draw a
3   line of credit in that fashion for maybe a
4   purchase, for whatever.  So, as far as accessing
5   the line of credit, it would have been permissible
6   to do it in the way you mentioned.  Whether or not
7   it was actually done or how many times it was
8   done, I can't say.
9       Q    My question was, is that because
10  Sheri Phillips was the person handling that
11  function or that process, not you?
12      A    Not necessarily.  It could just
13  be the fact that sitting here three years later, I
14  just don't recall.
15      Q    That's my question.
16          MR. BURKE:  I think he answered
17  it.
18  BY MR. GEBHARDT:
19      Q    You don't recall?
20      A    I don't recall if that was done
21  or not.
22      Q    Did you ever personally request
23  an advance on the line of credit other than
24  through writing a check from 1999 forward?

68

1          MR. BURKE:  You, meaning the
2   witness or CCI?
3          MR. GEBHARDT:  The witness.
4       A    I may have.  I don't recall.  I
5   think the loan documents permitted me to do so.  I
6   just don't recall if the company, if we did or
7   not, accessing in that fashion.
8   BY MR. GEBHARDT:
9       Q    Were you personally involved in
10  the accounts payable or check-writing function of
11  CCI?
12      A    If they were checks on a
13  particular area that I had some issue with, I
14  might have reviewed what was going out to certain
15  vendors or contractors.
16      Q    Did you write the checks
17  personally at all?
18      A    They were set up on a check
19  writer.
20      Q    Did you operate the check writer
21  at all in 1999 forward?
22      A    Did I operate the check writer?
23      Q    Yes.
24      A    No, I did not operate the check

69

1   writer.
2       Q    Did you always sign the checks?
3       A    The check writer signed the
4   checks.
5       Q    Whose signature did they bear?
6       A    Mine.
7       Q    Who was authorized to use the
8   check writer?
9       A    There was a series of --
10  depending on what it was for, project managers had
11  certain authority to authorize disbursements,
12  senior project manager had authority.  There was a
13  number of authority levels to execute checks or
14  approve a check.
15      Q    Did Sheri Phillips have
16  authority?
17      A    Did she have authority to?
18      Q    Have the check writer issue
19  checks.
20      A    Yes, she had authority.
21      Q    Shane Miller, did he have
22  authority?
23      A    Yes.
24      Q    And were most of the checks that

70

1  were written under the authority or the auspices
2  of Sheri Phillips or Shane Miller?
3       A       Checks would have been written
4  under the authority of any three of us, but then
5  there were also checks that other people in the
6  company had authority to approve and submit.
7       Q       Unless there was some actual
8  issue you were concerned with, you didn't get
9  involved in the process of issuing checks?
10           MR. BURKE:  Objection to the
11  form.
12       A       Depending what it was.
13  BY MR. GEBHARDT:
14       Q       Unless it was something you had a
15  particular interest in, that's not one of the
16  functions that you did on a day-to-day basis?
17       A       It could also be a fact that it
18  may be a situation where Shane Miller wasn't in
19  town and so I reviewed checks for disbursement.
20  It could have been an issue where Sheri wasn't in
21  town.  And so in the course of the year there
22  were, I'm sure, many scenarios that came up.  So
23  there really was no one specific way that I'll say
24  disbursements were handled.

71

1       Q       It wasn't your customary
2  day-to-day function to do that?
3           MR. BURKE:  To do what?
4           MR. GEBHARDT:  To issue checks or
5  supervise the issuance of the checks.
6       A       On day-to-day basis?
7  BY MR. GEBHARDT:
8       Q       Yes.
9       A       No, not on a day-to-day basis.
10           MR. BURKE:  Take a break.
11           MR. GEBHARDT:  Okay.
12           - - -
13           (Whereupon there was a recess in
14  the proceedings.)
15           - - -
16  BY MR. GEBHARDT:
17       Q       Were monthly accounts receivable
18  agings provided to AllFirst in accordance with the
19  commitment letter in 1999?
20       A       To my knowledge they were.
21       Q       Who was responsible for
22  forwarding the accounts receivable aging to
23  AllFirst?
24       A       I would suspect probably an AR

72

1  clerk was responsible to run a report at a certain
2  point in time and mail it.
3       Q       Did you have any personal
4  involvement in that process?
5       A       As far as writing the report
6  myself?
7       Q       As far as overseeing and making
8  sure the report was submitted to AllFirst in
9  accordance with the requirements with the line of
10  credit.
11       A       No.  I assume that the bank
12  received it.  Otherwise, I would have been alerted
13  by the bank that they had not received it.
14       Q       I didn't say that they didn't
15  receive it.  I was just asking whether you were
16  involved in the process of getting those reports
17  to the bank and your answer is, I take it, no?
18       A       I did not prepare the accounts
19  receivable report to go to the bank.
20       Q       I understand you didn't prepare
21  it.  You didn't oversee the preparation or the
22  forwarding either, did you?
23       A       Other than directing the
24  department that it was to be done.

73

1       Q       You were aware that it was being
2  done?
3       A       To the best of my knowledge, yes.
4       Q       Now, there came a time in 1999
5  when CCI requested credit from AllFirst in excess
6  of the $4 million revolving line of credit.  Is
7  that correct?
8       A       Yes.
9       Q       What was it that CCI requested of
10  AllFirst in 1999?
11       A       Are you referring to October,
12  November of '99, that time frame?
13       Q       When the request was first made,
14  what did CCI ask?
15       A       There was a request made in
16  October of 1999 for additional borrowing.
17       Q       In what amount?
18       A       $1 million.
19       Q       And who made the request?
20       A       I did.
21       Q       And to whom did you make the
22  request?
23       A       It would have been made to Chris
24  Schwartz and Mike Zarcone or Craig Schwartz who

86

1    A    Well, this one says work in
2  progress, where I think the other one says work in
3  process. So to the extent that would be the
4  difference, I guess.
5    Q    You don't recognize that as a
6  material difference in what the meaning is, do
7  you?
8      MR. BURKE: I'll object to the
9  form to the extent the document speaks for itself.
10    A    Work in progress, work in
11  process, I don't know.
12      MR. BURKE: It's not identical.
13    A    It's not identical.
14  BY MR. GEBHARDT:
15    Q    The purpose of the million two
16  was to provide funds to finance work in progress
17  and accounts receivable. Correct?
18    A    The intent was a short-term loan,
19  a bridge loan to cover that time period from
20  November to February.
21    Q    Because there was a cash flow
22  shortfall?
23    A    We were projecting a cash flow
24  shortfall.

87

1    Q    Caused by the receivables that
2  you thought were due and payable particularly from
3  the two projects, Scott Air Force Base and
4  Albemarle Prison. Right?
5    A    Those were two of the reasons as
6  well as the fact that winter had set in, so
7  receivables of all jobs were going to be slower
8  because work couldn't progress. So we were
9  projecting a cash flow shortfall. Whether or not
10  in reality we would have had one, I don't know,
11  but it was close enough where I felt it prudent to
12  obtain additional funds to have in the event that
13  the worst case scenario we were projecting came to
14  pass.
15    Q    How long was this -- was your
16  intention to have the loan outstanding, this
17  temporary facility?
18    A    Our projections, we only needed
19  it for 90 days.
20    Q    Sufficient cash would come into
21  the company to pay it?
22    A    Those were what the projections
23  were, indicating that the cash flow would increase
24  after that.

88

1    Q    And so this cash increase would
2  be used to repay the temporary facility?
3    A    Well, our cash flow was projected
4  to then increase within about 90 days, and as I
5  indicated to the bank, that was the only amount of
6  time that we needed and that we would pay it back.
7    Q    And the commitment letter
8  provides that it's to be repaid on March 31, 2000.
9  Right?
10      MR. BURKE: Objection to the
11  form. Where are you referencing, counsel?
12      MR. GEBHARDT: Next to last
13  paragraph on the first page.
14      MR. BURKE: Where does it say it
15  will be repaid on March 31?
16      MR. GEBHARDT: If no demand is
17  made, the loan will expire and all borrowings will
18  be due and payable together with interest on March
19  31, 2000.
20    A    Well, when I requested a million
21  dollars for 9O days, what they came back with was
22  they wanted to increase the amount, what they had
23  given me as cushion and they wanted to increase
24  the time frame, which I had requested, from 90 to

89

1  120. So that is what they came back to. I
2  reiterated to them that that was not necessary and
3  was not what I requested. When I signed the note,
4  he indicated he would have to go back and retype
5  the note, or something to that effect, and really
6  sat there and said, what's the difference, in 90
7  days pay it.
8  BY MR. GEBHARDT:
9    Q    The note doesn't have a due date,
10  does it?
11      MR. BURKE: Objection to form.
12    A    I would have to take a look at
13  it.
14      MR. BURKE: The document speaks
15  for itself.
16  BY MR. GEBHARDT:
17    Q    Let's take a look at your note.
18      MR. GEBHARDT: Mark this as 16.
19      ---
20      (Whereupon the document was
21  marked for identification as Deposition Exhibit
22  No. 16.)
23      ---
24  BY MR. GEBHARDT:

94

1    A    Well, it was deposited into our
2  account.
3    Q    Which was the account tied in
4  with the line of credit?
5    A    Accounts tied in with cash
6  management system. The only account we had, so
7  that was the account it went into.
8    Q    Now, this particular $1.2 million
9  loan was personally guaranteed by you. Isn't that
10  right?
11    A    Yes, it was.
12    Q    And would it be fair to say that
13  the AllFirst representatives expressed to you that
14  they would not give CCI the additional loan
15  without your personal guarantee?
16    A    Yes, that's true.
17    Q    And in connection with that
18  requirement, you actually executed the suretyship
19  agreement that is Deposition Exhibit 16. Isn't
20  that right?
21    A    Yes, I did.
22        - - -
23        (Whereupon the document was
24  marked for identification as Deposition Exhibit

95

1  No. 18.)
2        - - -
3  BY MR. GEBHARDT:
4    Q    Exhibit 18 appears to be a
5  personal financial statement for you that was
6  prepared by CCI's accountants Brown, Schultz,
7  Sheridan & Fritz. Do you recognize it as such?
8    A    Appears to be.
9    Q    And this is a statement of your
10  assets and liabilities as of December 31, 1998.
11  Right?
12    A    Yes.
13    Q    This was required by AllFirst
14  before they would agree it to extend the
15  additional $1.2 million loan?
16    A    I don't know if they got this
17  before the loan or after, to tell you the truth.
18  What's the date, the 9th, so I think they got this
19  after.
20    Q    And at the time this financial
21  statement was submitted, was this an accurate
22  recitation of your assets and liabilities?
23    A    To the best of my knowledge.
24    Q    Based on what I see on the last

96

1  page, which is the recitation of assets and
2  liabilities, you had a financial wherewithal to
3  repay personally without the use of CCI funds, the
4  $1.2 million that had been borrowed?
5    A    I would say probably December 31
6  of '98, it appears that I had enough cash on hand.
7  Whether or not I would have been able to liquidate
8  or had the cash to pay, I had the assets.
9    Q    So you would agree that at least
10  as of December 31, 1998, you had available the
11  cash to have repaid the $1.2 million loan and
12  probably at least as of the year 2000, you had
13  assets or resources sufficient to enable you, had
14  you chosen, to personally repay the $1.2 million
15  loan?
16    A    Well, I don't know exactly -- I
17  would have to see what it was at the end of 1999.
18  But looking at 1998, I had the wherewithal to pay
19  it back.
20    Q    Prior to this financial statement
21  that is Exhibit 18, had you ever provided the bank
22  with a personal financial statement previously?
23    A    I'm sure that I had at some point
24  in time.

97

1    Q    You can't remember when?
2    A    Well it was probably when the
3  original relationship began, and if there had been
4  any personal guarantee of anything, I would have
5  had -- most likely would have had to give them a
6  personal financial statement.
7    Q    This $1.2 million loan was also
8  secured by some equipment?
9    A    It was secured by, what the
10  document says, specific equipment financed
11  including titled vehicles.
12        - - -
13        (Whereupon the document was
14  marked for identification as Deposition Exhibit
15  No. 19.)
16        - - -
17  BY MR. GEBHARDT:
18    Q    Do you recognize Exhibit 19 as
19  the security agreement pledging the equipment
20  references in the commitment letter?
21    A    It refers to the collateral, but
22  there's nothing attached, so I don't know
23  specifically what equipment.
24    Q    There's no collateral description

102

1    A    I don't remember seeing anything
2    from the bank.
3    Q    Where did you expect the funds to
4    come from to repay AllFirst in the 90 days that
5    you anticipated the $1.2 million loan to be
6    outstanding at the end of that time?
7    A    Accounts receivable.
8    Q    Collections from the normal
9    course of business?
10    A    Yes, or from the sale of
11    equipment or whatever was occurring in that 90
12    days that would have put money into our account.
13    Q    Did you anticipate the $4 million
14    line of credit to have been paid to a zero balance
15    at that time?
16    A    At what time?
17    Q    At the time the money came in to
18    pay the million two.
19    A    I don't believe there was any
20    contemplation -- in other words, it would be a
21    zero balance?
22    Q    Right.
23    A    Or, in other words -- no, I think
24    the understanding from the bank was that that was

103

1    a revolving line and that would function as it
2    always had, fluctuate up and down.  In fact, I
3    made it clear at the signing of the note that that
4    $1.2 million note would be paid prior to any time
5    frame, whether it be a renewal.
6    Q    The $4 million line of credit
7    commitment letter carried through April 30th and
8    the one million two carried through March 31, so
9    there was a disparity in dates, but did you have
10    any discussions of whether the line of credit
11    would or would not be brought to a zero balance
12    before the million two was repaid or not?
13    A    There was no specific requirement
14    the bank placed on me.
15    Q    I didn't ask you that.  I asked
16    you whether you had discussions with anyone from
17    the bank on that topic.
18    A    You need to be more specific, I
19    guess.  Just general discussions?
20    Q    Yes.  In the course of getting
21    the million two, when you were discussing that,
22    did you have any discussions about whether at the
23    time you repaid the million two, you should have a
24    zero balance on the $4 million revolving line of

104

1    credit?
2    A    No.
3    Q    Just not discussed?
4    A    The only discussed part was, as I
5    indicated, was the discussion that they understood
6    that would be paid off within 90 days and that was
7    going to be ahead of any payments on the $4
8    million line.
9    Q    So, hypothetically, if the $4
10    million line had a $2 million outstanding balance
11    and a customer sent in a $1.2 million of accounts
12    or payables on CCI's billings, you expected to use
13    the $1.2 million coming in from the customer to
14    pay off the million two loan and just leave the
15    million dollar balance where it was?
16    MR. BURKE:  Could you repeat that
17    question?
18    BY MR. GEBHARDT:
19    Q    Let me rephrase it.
20    Hypothetically, would it have
21    been your understanding if we assume the $2
22    million outstanding on the line of credit and $1.2
23    million had come into CCI from a customer, that
24    you could use that $1.2 million to pay off the

105

1    $1.2 million loan, without first reducing the $1.2
2    million loan, without first reducing the $2
3    million hypothetically outstanding under the line
4    of credit?
5    MR. BURKE:  Objection to form.
6    A    If I chose to, sure.  I believe
7    that was my understanding and I believe that was
8    the understanding that the bank had.
9    BY MR. GEBHARDT:
10    Q    On February 11, 2000, the $1.2
11    million loan was repaid.  Correct?
12    A    Yes.
13    Q    Who made the decision to make
14    that payment to the bank on February 11, 2000?
15    A    I did.
16    Q    Did you consult with anyone else
17    in the company about making that payment at that
18    time?
19    A    As I recall, there were
20    discussions that I had reviewing the cash flow
21    situation, where things were on the projects, with
22    the company, and at the end of the discussion or
23    those meetings or review or whatever, I decided
24    that it would be best to pay that note off.

106

1    Q    You made the decision yourself?
2    A    Yes.
3    Q    And did you tell anyone else in
4  the company prior to making the payment that
5  that's what you were going to do?
6    A    I think I believe I informed the
7  chief operating officer and obviously I informed
8  the chief financial officer.
9    Q    You didn't ask their opinion,
10  whether it was in the best interest of the company
11  to pay the million two loan off at that time?
12    A    Well, I did not ask the opinion
13  of Ms. Phillips. In conversations that day, the
14  day before, I think I made the statement that it
15  seemed to be in our best interest and consistent
16  with what I had stated to the bank that I would
17  do, and basically made the decision, made the
18  decision to pay that note back or pay the note off
19  or however you want to do it.
20    Q    Who got the check written to make
21  the payment?
22    A    What do you mean, got the check
23  written?
24    Q    Did you handwrite the check?

107

1    A    No. I called Ms. Phillips and
2  told her to prepare a check.
3    Q    This was signed by the machine's
4  signature, the check?
5    A    No. It was a hand check. I
6  signed it.
7    Q    So someone, either Ms. Phillips
8  or someone under Ms. Phillips' direction, wrote
9  out the check by hand and you signed it?
10    A    No, just computer-generated and
11  called the accounts payable clerk. She would
12  basically go into the computer, make out the
13  check, hit the button and the check would be
14  generated.
15    Q    The check writer wasn't used?
16    A    We only used the check writer
17  because it was -- just when we had a long series
18  of checks to write and this was a series of checks
19  that day.
20    Q    Making interest payments monthly
21  to the bank, though, you didn't hand-sign those
22  checks, did you?
23    A    Well, because those were probably
24  regular, they would have been set up and printed

108

1  with a series of checks.
2    Q    Was the check writer used?
3    A    I take that back. I think the
4  way the bank did it is they automatically debited
5  our account for interest. I would have to check
6  the bank records or their procedure as to how they
7  did it, but my understanding is that's how they
8  handled the interest.
9    Q    Now, what was the procedure, what
10  was your involvement in the delivery of the check
11  to AllFirst?
12    A    I took it to Mr. Schwartz to --
13  at his office.
14    Q    You personally?
15    A    Yes.
16    Q    Why did you personally take the
17  check?
18    A    Because I wanted to talk with
19  him, and it presented a very good opportunity for
20  me to have a discussion with him.
21    Q    What did you want to discuss with
22  him?
23    A    A couple of things. I wanted to,
24  one, thank him for acting quickly back in October,

109

1  November, when we wanted to borrow the funds, for
2  acting quickly in approving it. Also to remind
3  him that I was pleased our projections had worked
4  themselves through. I was able to pay the note
5  when I said I had paid it, and also to talk with
6  him about the possibility or what would be
7  necessary if I ever wanted to come back and borrow
8  again. It presented also an opportunity to begin
9  a discussion depending on how the conversation was
10  going to what the next steps were in terms of I
11  knew the $4 million line was going to be up for
12  renewal and started to talk to him about that.
13    So by taking the check over, it
14  presented a good opportunity for me to sit and
15  have an informal discussion with him.
16    Q    Did you have an appointment?
17    A    I called and I believe I had an
18  appointment with him, though he was not there.
19    Q    You had an appointment and he
20  didn't show up?
21    A    No. I called over and spoke to
22  either -- I really don't recall. It was either to
23  he or his assistant or secretary, whatever, who
24  indicated that he would be there at a certain time

110

1    and I said fine, I would come over to see him.
2        Q    So you just said, I'm coming by?
3        A    I said I'm coming over, I wanted
4    to meet with him and leave my message, and it was
5    to pay the November note, pay it off.
6        Q    You did --
7        A    I don't recall, unfortunately,
8    whether I spoke to him directly or to his
9    assistant, but in either event, I said the same
10   thing to either one, that I was coming over to see
11   him, and that's when I went to the bank.
12       Q    You told them you were coming to
13   pay off the million two loan?
14       A    I believe so. I said I was
15   coming to see him to pay off the note we had in
16   November.
17       Q    When you got there, Mr. Schwartz,
18   as you said, was not present?
19       A    No, he was not.
20       Q    So you never met with him on the
21   day that you delivered the check?
22       A    Now, I waited for awhile.  I
23   think the woman there said he would be returning
24   or she thought he would be returning from a

111

1    meeting shortly, so I waited.
2        Q    How long did you wait?
3        A    Half hour, 40 minutes maybe,
4    maybe along those lines.
5        Q    And you didn't take the check
6    with you when you left, though?
7        A    Well, I started to, but the woman
8    there asked if she could help me.  I told her why
9    I was there and she said if I wanted to, she could
10   take care of it.
11       Q    So you gave her the check?
12       A    Yes, I gave her the check.
13       Q    And told her which loan it was
14   paying off?
15       A    I said it was paying a loan off.
16   I think she looked it up in her system and asked
17   me if I wanted a receipt and I said sure, took a
18   receipt, left a message for Craig to call me when
19   he got back.  She apologized that he wasn't there
20   or he must have left the meeting and gone to lunch
21   or something to that effect, but he was still
22   expected back that day.
23       Q    So solely because the lady asked
24   to help you is the reason you left the check?

112

1        A    I believe so.  She ask me if she
2    could help me and I told her why I was there and
3    she said she could take care of that if I wanted.
4        Q    In practical effect there would
5    have been no difference in making the payment on
6    that Friday as opposed to the next Monday?
7            MR. BURKE:  What's the question?
8        A    Is there a question?
9            - - -
10           (Whereupon the pertinent testimony
11   was read by the court reporter.)
12           - - -
13           MR. BURKE:  Object to the form.
14   I don't believe that's a question.
15       A    Probably not, no.
16   BY MR. GEBHARDT:
17       Q    When you requested the check, you
18   understood that writing that check would result in
19   a draw upon the $4 million line of credit?
20       A    It may or may not have.
21       Q    Did you know that writing the
22   check would result in a draw on the $4 million
23   line of credit?
24       A    Well, depending on how the bank

113

1    was accounting for, that could have been the case.
2        Q    You knew at the time the check
3    was written that CCI had an outstanding balance on
4    the line of credit, didn't you?
5        A    I think, yes.
6        Q    And you knew that writing that
7    check would increase the outstanding balance on
8    the line of credit?
9            MR. BURKE:  Objection, asked and
10   answered.  You can answer it again.
11       A    Well, do you want to ask the
12   question again or repeat it?
13           - - -
14           (Whereupon the pertinent
15   testimony was read by the court reporter.)
16           - - -
17       A    That would depend on whether or
18   not there were funds still sitting in our account
19   that would not have been swept by the bank and
20   their cash management system.  So to the extent
21   there were funds prior to that, then I guess there
22   would have been a zero impact.
23   BY MR. GEBHARDT:
24       Q    But you didn't know that.

114

1          MR. BURKE: Didn't know what?
2   BY MR. GEBHARDT:
3          Q          Whether there were any deposits
4   that had been made that day?
5          A          That were sitting in our account?
6          Q          Yes.
7          A          I know funds had recently come
8   in, so I believe there were funds sitting in the
9   account, but I couldn't tell you how much.
10         Q          Did you verify what the
11  outstanding balance was or what the deposits had
12  been?
13         A          I verified what our overall
14  balance was.
15         Q          So then you knew that writing
16  that check would constitute a draw on the line of
17  credit?
18         A          No.
19         MR. BURKE: Objection, asked and
20  answered. You can answer again.
21         A          It would have drawn a line of
22  credit only to the extent that the funds had
23  possibly been swept by the cash management system.
24  BY MR. GEBHARDT:

115

1          Q          What time did you go into
2   AllFirst, in the afternoon, after lunch, wasn't
3   it?
4          A          Late morning, early afternoon,
5   somewhere in that time frame.
6          Q          Before you left, you would have
7   verified the status of the account that had the
8   line of credit facility?
9          A          Either that or the night before.
10         Q          And based on the information that
11  you had available to you at the time you wrote the
12  check, you were of the belief that writing that
13  check would require a draw on the line of credit?
14         MR. BURKE: Objection for the
15  fourth time to the extent that question has been
16  asked and answered. I'll let my client answer it
17  one more time.
18         A          Depending on whether or not funds
19  had been moved from our account into the cash
20  management system, then there would have been no
21  impact on the line. To the extent that there was,
22  then there would have been an impact theoretically
23  on the line.
24  BY MR. GEBHARDT:

116

1          Q          I understand that, how it works.
2   What I'm asking you, your personal belief, at the
3   time you wrote the check based on your inquiry as
4   to the status of the account and so on, your
5   understanding was that writing that check would
6   require a draw on the line of credit?
7          MR. BURKE: I object and I am
8   going to ask the court reporter to read back the
9   previous instances where that question has been
10  asked and answered.
11         MR. GEBHARDT: The question
12  stands as it is. You have a question pending,
13  phrased differently and he can answer this
14  particular question as to his personal
15  understanding of the account status.
16         MR. BURKE: Read back the last
17  question, please.
18                    - - -
19         (Whereupon the pertinent
20  testimony was read by the court reporter.)
21                    - - -
22         MR. BURKE: Objection again.
23  This answer has been asked five times of this
24  witness and apparently counsel keeps asking the

117

1   same question with the hopes of a different
2   answer. I'll let the witness answer the question
3   again.
4          MR. GEBHARDT: Let me phrase it
5   correctly because the witness has not yet answered
6   the question.
7   BY MR. GEBHARDT:
8          Q          You indicated you verified the
9   status of the account and the line before you
10  wrote the check. Right?
11         A          I verified that funds had come
12  into the company from various sources.
13         Q          What funds?
14         A          Off projects, sale of equipment.
15         Q          You knew the amount of funds that
16  had come in?
17         A          We had taken in some large
18  deposits. Our deposits had increased as we had
19  projected them to do so.
20         Q          Did you quantify what those
21  deposits were before you wrote the check?
22         A          Yes. I knew generally the dollar
23  amount that we recently had taken in over the
24  course of the previous couple of days, even that

118

1  day.
2      Q      It was your view at the time you
3  wrote that check that writing that check would not
4  require a draw on the line of credit?
5          MR. BURKE:  Objection, asked and
6  answered.  Answer it again.
7      A      To the extent that funds had not
8  been swept out of our account by the cash
9  management system, there would have been no impact
10  to the line.  To the extent that there was a
11  difference, then by use of the cash management
12  system, funds would have been taken from that.
13  BY MR. GEBHARDT:
14      Q      The question still remains, I
15  understand to the extent there were collections,
16  to the extent there was this, this is how it would
17  work.  My question to you still is, when you wrote
18  the check and handed it in to AllFirst, did you
19  believe that you were making a borrowing on behalf
20  of CCI under the line of credit or did you think
21  that were sufficient deposits to cover the
22  payment, you personally at the time you wrote it?
23          MR. BURKE:  Objection, asked and
24  answered.

119

1  BY MR. GEBHARDT:
2      Q      I understand what could have
3  occurred and might have occurred and different
4  things, but what did you think was the situation
5  when you wrote the check and handed it in?
6          MR. BURKE:  Same objection.  Go
7  ahead.
8      A      I thought or believed that there
9  were some funds still in our account that had not
10  been swept because there hadn't been time.  Those
11  funds were available.  That in the tally of it, we
12  had funds available to pay this note off.  And so
13  I instructed the check was to be drawn.  Whether
14  or not there was impact on the bank's records on
15  the line of credit or not, I can't say.  You have
16  to go over the bank's records and see what, if
17  any, impact there would have been.
18      Q      In fact, CCI had not collected
19  the cash that it had anticipated collecting when
20  the $1.2 million was borrowed, isn't that true?
21          MR. BURKE:  Objection to form.
22  You can answer.
23      A      Say that again.
24          - - -

120

1          (Whereupon the pertinent
2  testimony was read by the court reporter.)
3          - - -
4      A      Rephrase that, collected the
5  money.
6  BY MR. GEBHARDT:
7      Q      CCI's cash flow problems had
8  increased as of February 2000 beyond what they
9  were in November of 1999, isn't that true?
10      A      No, I don't believe that to be
11  the case.
12      Q      Isn't it a fact that CCI over the
13  next five months, counting from February, was
14  anticipating substantial cash flow shortfalls?
15          MR. BURKE:  What time frame?
16          MR. GEBHARDT:  Five-month period
17  counting from February of 2000.
18          MR. BURKE:  No, the time frame is
19  when did CCI anticipate?
20          MR. GEBHARDT:  From February.
21      A      You have to give me the time
22  frame to which to refer to, the date of February
23  11th?
24  BY MR. GEBHARDT:

121

1      Q      February 11th, you knew that CCI
2  was having cash flow problems on February 11th,
3  didn't you?
4          MR. BURKE:  Objection to form.
5  You can answer.
6      A      I knew that CCI had cash flow
7  problems, issues when I talked to the bank in
8  November, which we clearly told them about.  And I
9  would have to say by February 11th, it appeared as
10  though cash flow problems had improved somewhat,
11  but we still had some issues.
12  BY MR. GEBHARDT:
13      Q      You're saying you thought that
14  CCI's cash flow position had improved as of
15  February 11, 2000 beyond what they were in
16  November of 1999?
17      A      Well, I would have to look at the
18  report, whatever cash report we may have had in
19  November, and compare it to a cash flow report we
20  might have gotten at the end of January or
21  February, and I could more specifically tell you.
22      Q      I'm not asking for the specific
23  numbers.  I'm asking whether at the time you wrote
24  the check, was it your understanding that CCI had

122

1  a cash flow problem that was worse than it had in
2  November when the money was borrowed?
3      A    No, I don't believe it was worse.
4      Q    You thought it was better?
5      A    Well, I think it had improved
6  somewhat.
7      Q    And by somewhat, what do you
8  mean?
9      A    By problem, what do you mean?
10     Q    By problem, I mean not having
11 sufficient money to operate the company.
12     A    Well, we had enough money to
13 operate the company at that point, so I guess by
14 your definition we didn't have a problem.
15     Q    You understood that over the
16 succeeding months CCI was not going to have
17 sufficient funds to operate, didn't you?
18     A    On what date?
19     Q    As of February 11th.
20     A    Not necessarily. I knew that we
21 had not necessarily cleared all of our problems,
22 but the problem you're saying, we didn't have
23 enough money to operate, clearly wasn't the case
24 on February the 11th.

123

1      Q    We've established you made the
2  payment on behalf of CCI on February 11, 2000.
3  And I think it's also without dispute there was a
4  meeting held in which you attended and there were
5  representatives of AllFirst on February the 18th.
6  Does February the 18th accord with your
7  recollection?
8      A    On February 18th, I asked for a
9  meeting with Mr. Schwartz and Mr. -- well, Mr.
10 Schwartz, probably.
11     Q    And there was a meeting that
12 actually was held on February the 18th. Correct?
13     A    Yes.
14     Q    That was a Friday?
15     A    Okay.
16         MR. BURKE: Do you know if it was
17 a Friday or not?
18 BY MR. GEBHARDT:
19     Q    If you need a calendar, we can
20 get one. Was it a Friday?
21     A    Was it a Friday?
22     Q    Yes.
23     A    Okay.
24     Q    You called Mr. Schwartz to ask

124

1  for the meeting?
2      A    As I recall.
3      Q    Let's assume, and I'll represent
4  to you that February 17th was a Friday and, of
5  course, February 11th was then a Friday, when did
6  you call Mr. Schwartz to set the meeting up?
7         MR. BURKE: February 17th was a
8  Friday or February 18th was a Friday?
9         MR. GEBHARDT: February 18th is a
10 Friday and February 11th is a Friday and the
11 meeting was February the 18th.
12 BY MR. GEBHARDT:
13     Q    My question is: You had payment
14 on a Friday and a meeting the succeeding Friday.
15 When did you call Mr. Schwartz to set up the
16 meeting of February the 18th?
17     A    I think I called the morning of
18 the 18th.
19     Q    The morning?
20     A    I think.
21     Q    So the meeting was in the
22 afternoon?
23     A    I believe so, yes.
24     Q    Now, when you attended that

125

1  meeting, who was present?
2      A    Well, let's see, the meeting was
3  supposed to be with Mr. Schwartz and Mr. Zarcone,
4  but also in attendance were about five to six
5  other people from the bank, plus two people on the
6  speaker phone.
7      Q    I can represent to you that those
8  were Mr. Elias and Mr. Gibson.
9      A    On the phone?
10     Q    On the phone, yes. You saw Mr.
11 Schwartz there and you saw Mr. Zarcone there?
12     A    Yes.
13     Q    And the other people who may have
14 been there you don't recollect?
15     A    Mr. Meyers, Mr. Trout, two or
16 three others.
17     Q    Now, did you ask for all these
18 people to be in attendance?
19     A    No.
20     Q    Do you have any understanding of
21 why all these people attended the meeting?
22     A    No.
23     Q    You called up Mr. Schwartz to say
24 I would like to meet with you this afternoon and

126

1  you have five people in a meeting and two people
2  on an extension phone?
3     A     That's right.
4     Q     And did that surprise you?
5     A     Yes.
6     Q     Did you ask why is everybody here
7  or something to that nature?
8     A     Yes.
9     Q     And what were you told?
10    A     There really wasn't much of an
11 answer.
12    Q     Did you tell the bank there were
13 major problems with CCI when you called Mr.
14 Schwartz?
15          MR. BURKE:  Objection to form.
16 You can answer.
17    A     When I called Mr. Schwartz, I
18 said I would like to come in and talk with you,
19 that we received an update to some project reports
20 and that it looked like the problem with Scott Air
21 Force Base in particular had not moved forward to
22 the extent I had hoped and I wanted to come in and
23 sort of talk to him and tell him, keep him
24 informed and tell him where we were at.

127

1  BY MR. GEBHARDT:
2     Q     Did you tell him CCI had suffered
3  as of year end a $6 million loss?
4     A     In the phone conversation?
5     Q     Yes.
6     A     I don't believe so -- I don't
7  recall.
8     Q     Did you attend by yourself?
9     A     I had intended to, but at the
10 meeting I did not.
11    Q     And who attended with you?
12    A     Bob Chernicoff attended.
13    Q     This is the same Mr. Chernicoff
14 whose office we're in now?
15    A     Yes.
16    Q     And did you understand at the
17 time of that meeting that Mr. Chernicoff was a
18 bankruptcy lawyer?
19    A     No, I did not.
20    Q     You had no idea he was bankruptcy
21 lawyer?
22    A     No.  You mean as far as that
23 being his known specialty?
24    Q     Right.

128

1     A     No.
2     Q     When did you contact Mr.
3  Chernicoff?
4     A     I had talked to Mr. Chernicoff
5  for the first time that morning.
6     Q     So Mr. Chernicoff had not
7  represented CCI or you prior to this meeting on
8  February 18th?
9     A     Well, the attorneys that I
10 typically use, I'll say corporate counsel, is
11 located in Pittsburgh, and so I had asked for a
12 recommendation for an attorney in Harrisburg who
13 was used to dealing with loan documents, bank loan
14 documents.
15          MR. BURKE:  I will caution the
16 witness not to reveal any communications he may
17 have had with his lawyer or CCI's lawyer regarding
18 anything.
19    A     Okay.  Anyway --
20          MR. BURKE:  What's the question
21 again?
22 BY MR. GEBHARDT:
23    Q     Had Mr. Chernicoff at any time
24 represented CCI or Mr. Ortenzio individually prior

129

1  to that February 18th date?
2     A     No.
3     Q     He was called for the first time,
4  then, by you on February 18th?
5     A     Yes.  I met him for the first
6  time.
7     Q     At what time did you meet with
8  him?
9     A     I think I met him probably two
10 hours before I was on my way to the bank.
11    Q     And you retained Mr. Chernicoff
12 based on a recommendation from the company's
13 counsel in Pittsburgh?
14          MR. BURKE:  When you say you, do
15 you mean CCI?
16          MR. GEBHARDT:  CCI.
17          MR. BURKE:  Let me just speak
18 with my client regarding the attorney/client
19 privilege issue.  You're asking for substantive
20 substance of the communication.
21          MR. GEBHARDT:  He already said he
22 was referred to Chernicoff by lawyers in
23 Pittsburgh and I would like a clear answer to the
24 statement and I don't think there's any

130

1    confidentiality of communication expressed in
2    that.
3              MR. BURKE: I'll let him answer
4    that so long as it is understood no waiver of
5    attorney/client privilege.
6    BY MR. GEBHARDT:
7        Q      The company's lawyers in
8    Pittsburgh recommended Mr. Chernicoff.
9              MR. BURKE: I want your
10   representation that there's no waiver of
11   attorney/client privilege.
12             MR. GEBHARDT: There's no waiver
13   of attorney/client privilege.
14             MR. BURKE: Did the Pittsburgh
15   lawyers recommend Chernicoff?
16       A      I'm not sure which one in their
17   firm recommended him.
18   BY MR. GEBHARDT:
19       Q      The question is, did the
20   Pittsburgh lawyers recommend Mr. Chernicoff? It
21   could be answered yes or no.
22       A      Actually, no, it was an attorney
23   in Harrisburg that had recommended that I see Bob
24   Chernicoff.

131

1        Q      This attorney in Harrisburg, was
2    this an attorney of CCI's?
3        A      Yes. The firm we had retained,
4    we always had.
5        Q      Which firm was this?
6        A      Eckert Seaman's.
7        Q      And they have a Pittsburgh
8    office, of course?
9        A      Yes, they have a Pittsburgh
10   office and a Harrisburg office.
11       Q      What's the name of the attorney
12   that you talked to?
13       A      There was an attorney in
14   Pittsburgh I talked to who dealt with construction
15   issues and an attorney in Harrisburg, just general
16   advice, so to speak, more of a friend than
17   anything, and because the bank documents I had --
18   I needed to renegotiate my line of credit with
19   AllFirst bank at some point in time coming up, and
20   they declined because they said that it was touchy
21   because they represented AllFirst also, so they
22   had a little bit of a conflict there. And I said
23   I still need somebody to help, still want to get
24   into bank documents, loan documents, restructuring

132

1    my loan, which will be done in 60 days, I said, so
2    I need a recommendation of somebody who is
3    familiar, knowledgeable with bank documents and
4    maybe has experience dealing with the people at
5    AllFirst.
6        Q      Did you have any understanding
7    when you called Mr. Chernicoff that he practiced
8    in the area of bankruptcy law?
9        A      No.
10       Q      You didn't know that at all?
11       A      No. Had I known that, I would
12   not have taken him to the meeting.
13       Q      But you came to find that out
14   sometime after the meeting?
15       A      Yes.
16       Q      When did you first find out Mr.
17   Chernicoff practiced in the area of bankruptcy
18   law?
19       A      It probably didn't hit me that
20   that was a specialty of his probably for, I guess,
21   a week or ten days.
22       Q      But you did come to recognize
23   eventually that bankruptcy law was a specialty of
24   Mr. Chernicoff?

133

1        A      Yes.
2        Q      Why is it you felt the need to
3    take a lawyer to the meeting with the bank to
4    discuss your line of credit?
5              MR. BURKE: I'm going to object
6    to the extent the question calls for Mr. Ortenzio
7    to reveal attorney/client communication, and I'll
8    confer with him about this.
9              MR. GEBHARDT: Let me say the
10   attorney/client privilege pertains to confidential
11   communications. It does not pertain to
12   information or the witness's personal beliefs or
13   views. My question was, why did he feel the need
14   to obtain an attorney to go to the meeting. I
15   haven't ask him what the attorney said, what he
16   discussed with him or anything.
17             MR. BURKE: If the witness felt
18   the need to bring an attorney to the meeting based
19   upon advice given to him by counsel, it does call
20   for an attorney/client communication which is
21   privileged and you're not entitled to.
22   BY MR. GEBHARDT:
23       Q      Is that the statement, you
24   retained Mr. Chernicoff because you were advised

142

1           MR. GEBHARDT: Yes.
2     A     I would say so, yes.
3  BY MR. GEBHARDT:
4     Q     And all this had gone along for a
5  minimum, at least 9, almost 10 years and now
6  you're having a meeting you think might possibly
7  be adversarial?
8           MR. BURKE: I'm going to object
9  to the misstatement of his testimony for a second
10  time. He didn't say the meeting would be
11  adversarial.
12  BY MR. GEBHARDT:
13     Q     Not the meeting, the negotiation
14  of the documents. Why did you think the
15  negotiation of the renewal of the line of credit
16  might become adversarial?
17     A     That was the term Eckert Seaman's
18  used, questioning me as to whether or not it might
19  become adversarial or have some difficulties or
20  something to that effect. All I said was, I can't
21  rule it out. It's possible.
22     Q     Why couldn't you rule it out?
23     A     What's that?
24     Q     Why couldn't you rule it out?

143

1           MR. BURKE: Objection, asked and
2  answered. Go ahead and answer.
3     A     Because it's in the realm of
4  possibility.
5  BY MR. GEBHARDT:
6     Q     And nothing other than that,
7  that's the only explanation?
8           MR. BURKE: Objection. He's
9  answered the question.
10  BY MR. GEBHARDT:
11     Q     Because it's in the realm of
12  possibility?
13     A     They asked me the question if
14  that was a possibility, that it might become
15  adversarial. And they were very nervous about
16  anything that would be --
17     Q     Was there any fact or feature
18  about the upcoming negotiations that you can point
19  to that led you to the conclusion that there might
20  possibly be adversarial discussions or
21  negotiations relating to the line of credit?
22     A     I think what we're getting hung
23  up on is the term adversarial which is --
24     Q     Difficult negotiations.

144

1     A     -- maybe the term I guess that I
2  sort of coined and maybe that's really not --
3  you're getting hung up on. Not necessarily
4  adversarial, but maybe difficult and, you know,
5  because I thought that the company was not in as
6  strong a financial condition as it had been the
7  previous year, and so there's a possibility that
8  the renegotiation of it might become more
9  difficult, let's say.
10     Q     You had not been represented, you
11  meaning CCI, had not been represented by counsel
12  in connection with the line of credit all the way
13  up through December 31, 1999. Isn't that correct?
14     A     I had an attorney look over, make
15  some comments on the November note, made
16  recommendations.
17           MR. BURKE: Again, let me just --
18  counsel, let me just counsel the witness. Let's
19  just leave it that you spoke with an attorney
20  about the note. Let's not go into what the
21  attorney told you or what your discussions were.
22     A     Okay.
23           MR. BURKE: I think he's answered
24  the question. Go ahead.

145

1           MR. GEBHARDT: I don't think he
2  finished answering when you interrupted him.
3  BY MR. GEBHARDT:
4     Q     Other than that instance
5  regarding the $1.2 million loan, had the company
6  been represented by counsel in connection with the
7  other finances from Dauphin Deposit and then
8  AllFirst?
9     A     Represented in the negotiations
10  or --
11     Q     In connection at all.
12     A     Looking over loan documents?
13     Q     Did you use a lawyer?
14     A     I don't believe so.
15     Q     That's all I was asking.
16     A     I don't believe that we did.
17     Q     As the commitment letter
18  indicates the loan approval was not -- excuse
19  me --
20     A     Which loan are we talking about?
21     Q     The 1999 $4 million line of
22  credit commitment indicates that it was not
23  subject to renewal until April 30th, 2000. Why
24  did you feel the necessity to begin negotiations

146

1  in February of that year?
2      A    Well, I didn't in February. I
3  wasn't planning on negotiating in February.
4      Q    I thought you indicated the
5  reason you called the meeting was to discuss the
6  renewal or renegotiation of the line of credit and
7  you needed counsel because there might be
8  difficult discussions.
9          MR. BURKE:  Objection to
10  misstatement of prior statement.
11     A    You're talking about the meeting
12  on the 18th?
13  BY MR. GEBHARDT:
14     Q    Yes.
15     A    No.  That meeting on the 18th was
16  not to discuss, at least on my part, not to
17  discuss the $4 million line of credit. I wasn't
18  there to discuss any of the notes. I called to
19  talk to Craig Schwartz to go in and tell him
20  that -- just what was going on with the company.
21  One, that the project at Scott Air Force Base was
22  still having some problems. Our claim was not
23  going to be submitted when we thought it would be,
24  that I had a meeting with the bonding company and

147

1  that I had been talking to them about that project
2  and another one in particular, and that I had a
3  meeting coming up with them and that we were going
4  to ask them to give us assistance on that project,
5  which is all what I said in the meeting, though I
6  was intending the meeting to be Craig Schwartz and
7  Mike Zarcone. Instead as you stated, I walked
8  into a roomful of people, two people on a
9  conference phone, and so it was more of an
10  inquisition than a meeting that I had set up.
11     Q    You were the only party
12  represented by counsel?
13     A    Unless one of the other people
14  there was an attorney or inhouse counsel, then I
15  was the only -- he was the only attorney,
16  possibly. I don't know for sure.
17     Q    So I'm not confused about what
18  you were calling a meeting for. That meeting was
19  not to discuss or renegotiate the line of credit
20  that CCI had?
21     A    No.
22     Q    It was just to review the
23  company's finances and bring the bank current?
24     A    Just to discuss with Craig

148

1  Schwartz as we -- a practice we had always done,
2  basically keep him informed what was going on with
3  the company, what we were doing, so as I told --
4  as I ended up telling a roomful of people, so they
5  didn't hear something from somebody else, that
6  they heard -- whatever the situation was they
7  heard it from me.
8      Q    I guess my question then still
9  involves, if you were going to sit down with a
10  banker and bring him up to date on what had been
11  happening with a company, why was a lawyer
12  accompanying you?
13         MR. BURKE:  I'll object. I
14  believe the witness has testified regarding the
15  reason the lawyer accompanied him.
16     A    I stated the circumstances under
17  which he suggested that he come along.
18  BY MR. GEBHARDT:
19     Q    I guess the transcript will bear
20  us out. I understood you to say that you were
21  about to enter into negotiations or you were going
22  to begin negotiations about the line of credit.
23  You thought there might be some difficulty or we
24  will call it complex or whatever kind of issues

149

1  you want, that you might need the assistance of
2  counsel to address.
3          MR. BURKE:  Objection.
4          MR. GEBHARDT:  Let me finish what
5  I'm saying first.
6  BY MR. GEBHARDT:
7      Q    Therefore, you contacted Mr.
8  Chernicoff at the recommendation of other counsel
9  and he suggested to attend the meeting, but my
10  understanding now you're telling me you were
11  simply sitting down to bring the bank up to date
12  with what had been happening at CCI.
13         MR. BURKE:  Objection.  Number
14  one, there's no question pending -- and let me
15  just finish my objection -- and I object to the
16  mischaracterization on several facts as to the
17  prior testimony. Counsel --
18         MR. GEBHARDT:  I'm not trying to
19  quote his prior testimony, but I'm confused --
20         MR. BURKE:  Let's limit our
21  questions to the facts and what was happening as
22  opposed to what was previously testified to.
23  BY MR. GEBHARDT:
24     Q    To clear up my confusion, it is

150

1  your testimony that you did not meet with the bank
2  on February 18, 2000, to discuss the terms of the
3  revolving line of credit or its renewal or the
4  loan documents pertaining to it, that was not your
5  intention when you set the meeting up?
6      A    That's correct.
7      Q    But you nevertheless, based on
8  the recommendation of your normal counsel, Eckert
9  Seaman's, the day before the meeting, met with Mr.
10  Chernicoff and at Mr. Chernicoff's suggestion had
11  Mr. Chernicoff accompany you to the meeting with
12  the bank?
13          MR. BURKE:  Objection to the
14  mischaracterization of the prior testimony.
15  BY MR. GEBHARDT:
16      Q    Is that what happened?
17      A    The conclusion of my meeting here
18  at Cunningham Chernicoff, I got ready to leave,
19  Mr. Chernicoff, I had shown him the documents,
20  acquired as to where I was going, I told him where
21  I was going and why I was going there and he
22  suggested -- asked if I was going by myself and I
23  said yes and he suggested, if I wanted it might be
24  good for him to tag along or come along.  That was

151

1  it.  So after thinking about it, I said there is
2  no harm to be done, and I said fine.
3      Q    You knew prior to walking into
4  the meeting with the bank that CCI was going to
5  suffer substantial cash flow shortages over the
6  next five to six months?
7          MR. BURKE:  Objection to form.  You
8  can answer.
9      A    I had received a recent cash
10  flow -- worst case cash flow scenario which showed
11  that we were going to have more serious cash flow
12  problems in the future months and I took that
13  information that I had received, I think I
14  probably received it that morning.
15  BY MR. GEBHARDT:
16      Q    This was Friday morning also?
17      A    I think it was either Friday
18  morning or the end of the day Thursday.  Received
19  the information, worst case scenario, but all the
20  same it was still a scenario and it was -- I felt
21  the need to inform the bank.
22      Q    Tell them you needed more cash at
23  that time?
24      A    Basically a projection we were

152

1  going to need more cash.
2      Q    And had to come from the bank or
3  bonding company?
4      A    I didn't ask the bank for it.
5      Q    Did you tell Mr. Schwartz that
6  you expected CCI to have sustained a $6 million
7  loss for 1999?
8      A    At the meeting or phone
9  conversation?
10      Q    Well, let's talk about the phone
11  conversation prior to the meeting.
12      A    I don't think so.  I don't think
13  I went into too many facts with Mr. Schwartz.  I
14  told him we were having some problems, I think.  I
15  told him we were going to have significant loss,
16  certainly a loss for 1999, since we were unable
17  to -- depending on whether he was able to
18  recognize a claim, but I didn't go into too much
19  detail because I wanted to meet with him face to
20  says.
21          - - -
22          (Whereupon the document was
23  marked for identification as Exhibit Number 25.)
24          - - -

153

1  BY MR. GEBHARDT:
2      Q    I've handed you Deposition
3  Exhibit 25 which I will represent to you are notes
4  taken by Mr. Jamin Gibson, the first page being
5  notes he made after the initial call to him from
6  Mr. Schwartz advising of the meeting and the
7  second page of notes and thereafter from the
8  meeting and times after the meeting.  You'll
9  notice on the first page somewhere down around the
10  middle there's a reference to a $6 million loss
11  for the year.  My question would be, you had never
12  spoken to Mr. Gibson prior to February 18th?
13      A    That's correct.
14      Q    And if these are notes of Mr.
15  Gibson's conversation with Mr. Schwartz setting up
16  the meeting, the $6 million figure would have had
17  to come from someplace.  Isn't that right?
18          MR. BURKE:  I'm going object to
19  the form of the question and the use of this
20  document.  Are you asking --
21  BY MR. GEBHARDT:
22      Q    I'm asking if it refreshes your
23  recollection as to whether you may have divulged
24  to Mr. Schwartz in setting up the meeting that you

**158**

1  that these numbers are inaccurate?
2         MR. BURKE: Objection to form.
3  BY MR. GEBHARDT:
4         Q      Based on the company's records.
5         A      I would have to say that probably
6  our records were pretty good. So if that's what
7  we internally generated, then I would say it was a
8  high probability they would be close to being
9  accurate. Only because in the past our
10  information had been relatively accurate.
11        Q      Turning to the balance sheet for
12  the same period, would you agree, sir, that it
13  shows CCI on Page 2 to be insolvent to the tune of
14  $995,762.87?
15        MR. BURKE: Objection to form.
16        A      That was the negative equity.
17  BY MR. GEBHARDT:
18        Q      So assuming the accuracy of these
19  internally generated numbers as of the date, the
20  13-month date of these statements, CCI was
21  insolvent. Is that right?
22        MR. BURKE: Objection to the form
23  of the question.
24        A      Well, that depends. You're

**159**

1  carrying a million, almost $2 million of
2  depreciation on this statement. So if you back
3  that out --
4  BY MR. GEBHARDT:
5         Q      We're not talking of an income
6  statement where you can count depreciations as a
7  deduction, used equipment that lost value over
8  time, you don't add depreciation back in on the
9  balance sheet.
10        MR. BURKE: We're not here to
11  debate accounting principles Let's let the
12  witness answer.
13        A      I only made the comment it shows
14  $2 million worth of the depreciation in arriving
15  at the total. That's all. You can take that for
16  what it's worth.
17  BY MR. GEBHARDT:
18        Q      This statement shows CCI to be
19  insolvent?
20        MR. BURKE: Objection to the
21  form. The document speaks for itself. The
22  witness can answer.
23        A      It says what it says. It shows
24  negative equity of $995,000.

**160**

1  BY MR. GEBHARDT:
2         Q      Which in laymen's terms shows CCI
3  to be insolvent. Isn't that right?
4         MR. BURKE: Same objection. The
5  witness can answer if he can.
6         A      It shows negative equity of
7  $995,000.
8         Q      In laymen's terms that means
9  insolvent?
10        MR. BURKE: I'm going to object.
11  The witness has answered the question. The
12  document speaks for itself and the witness has
13  already indicated the document provides what it
14  provides.
15  BY MR. GEBHARDT:
16        Q      Does it mean insolvent?
17        A      I don't know. I would have to
18  look further into -- I think it would require
19  further investigation rather than a summary
20  balance sheet.
21        Q      You're not able to answer?
22        MR. BURKE: Based on the two
23  documents that you've shown him, he says he's not
24  able to answer.

**161**

1  BY MR. GEBHARDT:
2         Q      How often did the company
3  generate internal statements such as the ones that
4  are Exhibits 23 and 24?
5         MR. BURKE: That's 22 and 23.
6         A      Once a month.
7  BY MR. GEBHARDT:
8         Q      And they were shown to you?
9         A      I saw them.
10        Q      And that would be each month
11  during the 12-month period?
12        A      For the most part, yeah.
13        Q      So you were kept apprised of the
14  financial situation of the company throughout the
15  year on a current basis?
16        A      Generally speaking.
17        Q      Let me hand you what has been
18  marked as Exhibit 24. Would I be correct that
19  this is the cash flow projection that you handed
20  out at the meeting on February 18th?
21        A      I believe it is.
22        Q      And this was prepared by CCI?
23        A      Yes.
24        Q      In handing this out to AllFirst

182

1    when all was said and done?
2         Q    As of today.
3         A    Yes, as of today.
4         Q    What magnitude is there?
5         A    They're representing
6    approximately a $32 million loss.
7         Q    During the meeting with the bank
8    on February 18th, did you disclose to anyone that
9    the $1.2 million had been repaid by a draw on the
10   line of credit?
11             MR. BURKE:  Objection to form.
12   You can answer.
13        A    My statement in that meeting was
14   in response to the question, was it had been
15   repaid, the company had repaid.
16   BY MR. GEBHARDT:
17        Q    Did you tell anyone that by
18   repaying the loan it was done with a draw on the
19   line of credit?
20             MR. BURKE:  Same objection.
21        A    My words were to ask if it had
22   been repaid, and I said that the company, CCI, had
23   repaid the note.
24   BY MR. GEBHARDT:

183

1         Q    But you didn't give any
2    explanation beyond that?
3         A    I think someone asked -- I think
4    I said with a check drawn out of our account or
5    something to that effect.
6         Q    When you made the payment on
7    February 11th, were you aware of the financial
8    circumstances of the company?
9         A    At that time, that point in time?
10        Q    Yes.
11        A    Generally.
12        Q    And were you aware of the
13   financial circumstances of the company that were
14   reflected on the interim financial statements
15   which are Exhibits 22 and 23 and the cash flow
16   projection which I believe is Exhibit 24?
17             MR. BURKE:  Objection to form.
18             - - -
19             (Whereupon the court reporter
20   read back the pertinent testimony.)
21             - - -
22   BY MR. GEBHARDT:
23        Q    When you made the payment on
24   February 11, 2000, did you have a general

184

1    understanding of what CCI's financial condition
2    was as is reflected on the two financial
3    statements that are Exhibits 22 and 23 and the
4    cash flow statement that is Exhibit 24?
5             MR. BURKE:  Objection to form.
6         A    No.
7    BY MR. GEBHARDT:
8         Q    Completely unaware?
9         A    I'm responding to your question,
10   specifically your question.
11        Q    You had no general understanding
12   when you --
13        A    That wasn't your question.
14        Q    I think it was.
15             MR. BURKE:  It wasn't.
16   BY MR. GEBHARDT:
17        Q    Let me ask it again.  When you
18   made the payment on behalf of CCI on February 11,
19   2000, did you have a general understanding that
20   the financial condition of CCI was similar to
21   what's reflected in Exhibits 22, 23 and 24?
22        A    And my answer was no.  The
23   financial condition of the company was not to that
24   degree.  It wasn't as bad as those numbers

185

1    represent.
2         Q    And in one week did it turn that
3    bad?
4             MR. BURKE:  Objection to form.
5    You can answer.
6         A    I think in one week there was a
7    different scenario run with the removing of the
8    claims that we had hoped to get.  I think there
9    were some other impacts on a job or two which had
10   been unanticipated with respect to some additional
11   problems or delays.  And so when the numbers were
12   rerun, and this is what they were rerun to, it
13   presented a much worse situation financially for
14   the company than what we had been carrying prior
15   to them or what I had been aware of prior to that.
16        Q    You knew when you made the
17   payment that CCI's financial condition was not a
18   good financial condition, didn't you?
19        A    Good as compared to what?  You
20   already asked me how it was in comparison to what
21   it was in November.
22        Q    When you made the payment on
23   February 11th, you knew CCI was going to lose
24   money for the preceding fiscal year?

**186**

1    A    I knew we were going to lose
2    money.  I did not know we were going to lose money
3    to the extent -- even to this projection here or
4    this financial report here.
5    Q    When you made the payment on
6    February 11th on behalf of CCI, you understood CCI
7    or had a general appreciation that CCI was going
8    to sustain cash flow shortages, shortfalls?
9    A    I had a general understanding
10   that we were -- my understanding at that point in
11   time was that we were not out of the woods,
12   certainly, with respect to our cash flow problems,
13   but you're referring to the magnitude and the
14   magnitude presented with these numbers was not
15   known to me on February 11th.
16   Q    But you knew still there was a
17   problem?
18        MR. BURKE:  Objection to form.
19   A    Well, you know, problem, give me
20   something in order of magnitude.
21        MR. BURKE:  Can you define
22   problem?
23   A    Problem compared to --
24   BY MR. GEBHARDT:

**187**

1    Q    A    Difficulty -- you
2    understood when you made the payment, CCI was
3    anticipating having cash shortages over the
4    succeeding months?
5    A    We were still going to have some
6    cash flow problems in the future months.  Now the
7    magnitude, in my estimation, was not to the degree
8    that Exhibits 22, 23 and 24 projected.
9        MR. GEBHARDT:  That's all I have.
10       (The deposition concluded at 6:25 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**188**

1        C E R T I F I C A T E
2
3        I, DONNA L. CROSSAN, a
4    Reporter Notary-Public and Certified Shorthand
5    Reporter of the State of Pennsylvania, do hereby
6    certify that prior to the commencement of the
7    examination, JOHN M. ORTENZIO was duly sworn by me
8    to testify the truth, the whole truth and nothing
9    but the truth.
10       I DO FURTHER CERTIFY that the
11   foregoing is a true and accurate transcript of the
12   testimony as taken stenographically by and before
13   me at the time, place and on the date hereinbefore
14   set forth, to the best of my ability.
15       I DO FURTHER CERTIFY that I
16   am neither a relative nor employee nor attorney
17   nor counsel of any of the parties to this action,
18   and that I am neither a relative nor employee of
19   such attorney or counsel, and that I am not
20   financially interested in this action
21   -----------------------------------------------
22   Notary Public of the State of Pennsylvania
23   Dated:
24       -----------------------------

**189**

1        LAWYER'S NOTES
2    PAGE        LINE
3    ____    ____    _____
4    ____    ____    _____
5    ____    ____    _____
6    ____    ____    _____
7    ____    ____    _____
8    ____    ____    _____
9    ____    ____    _____
10   ____    ____    _____
11   ____    ____    _____
12   ____    ____    _____
13   ____    ____    _____
14   ____    ____    _____
15   ____    ____    _____
16   ____    ____    _____
17   ____    ____    _____
18   ____    ____    _____
19   ____    ____    _____
20   ____    ____    _____
21   ____    ____    _____
22   ____    ____    _____
23   ____    ____    _____
24   ____    ____    _____

# Craig J. Schwartz

---

**Page 1**

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3    ALLFIRST BANK          :

4          Plaintiff     :

5          v.          :  CA NO. 1:CV-01-0786

6    JOHN M. ORTENZIO          :

7          Defendant    :  Pages 1 - 216

8          -----------

9

10

11

12          Deposition of Craig J. Schwartz

13          Baltimore, Maryland

14          Friday, February 15, 2002

15

16

17

18

19

20

21    Reported by:  Kathleen R. Turk, RPR-RMR

---

**Page 2**

1

2

3

4

5          February 15, 2002

6          10:17 a.m.

7

8    Deposition of Craig J. Schwartz held at the offices

9    of:

10

11

12          Blank, Rome, Comisky & McCauley, L.L.P.

13          250 West Pratt Street

14          Eleventh Floor

15          Baltimore, MD  21201

16

17

18    Pursuant to notice, before Kathleen R. Turk, RPR-RMR,

19    a Notary Public of the State of Maryland.

20

21

---

**Page 3**

1    APPEARANCES:

2

3    Gebhardt & Smith, L.L.P.

4    For the Plaintiff ALLFIRST BANK

5          The World Trade Center

6          401 East Pratt Street

7          Ninth Floor

8          Baltimore, MD  21202

9          (410) 385-5100

10    BY:  Lawrence J. Gebhardt, Esq.

11

12    Blank, Rome, Comisky & McCauley, L.L.P.

13    For the Defendant JOHN M. ORTENZIO

14          One Logan Square

15          Philadelphia, PA  19103-6998

16          (215) 569-5641

17    BY:  Edward I. Swichar, Esq.

18

19    Also Present:

20          John M. Ortenzio

21

---

**Page 4**

1

2          C O N T E N T S

3    EXAMINATION OF CRAIG J. SCHWARTZ BY:          PAGE:

4    MR. SWICHAR:                    6

5    MR. GEBHARDT:                   175

6    MR. SWICHAR:                    192

7    MR. GEBHARDT:                   207

8    MR. SWICHAR:                    210

9          E X H I B I T S

10    SCHWARTZ DEPOSITION EXHIBITS:          PAGE:

11    1 Commercial Loan Note Line of Credit     6

12    2 Complaint               6

13    3 Fax to Nord from Gibson, 2/14/01       6

14    4 PA Commercial Loan Writeup          6

15    5 Memo to File from Schwartz, 11/4/99    6

16    6 Discussion Outline, 11/2/99         6

17    7 Commercial Loan Note Line of Credit    6

18    8 Letter to Ortenzio from Schwartz, 11/5/99  6

19    9 Accumulated Tran List             6

20    10 Memo to Gibson from Schwartz, 3/3/00     6

21    11 Borrower Rating Summary           6

---

**Esquire Deposition Services**

DISK
ENCLOSED

# Craig J. Schwartz

Page 149

1  1.2 million dollars. I said, okay, fine.
2      I was out on other business when, when he
3  came in and presented the payment. I was told about
4  it when I got back. And --
5      Q   What were you told?
6      A   That Mr. Ortenzio came in and paid off the
7  1.2 million dollar loan.
8      Q   Okay. What happened next?
9          Did you take any action of any kind?
10     A   Not that I recall.
11     Q   Well, at a certain point, you returned the
12  note to him, correct?
13     A   No, I did not.
14         I returned his surety.
15     Q   Okay. You --
16     A   He was -- yes.
17     Q   Okay. You returned the surety, and we'll
18  come to that in a minute.
19         Where did you think the -- what funds did
20  you think were being used to pay off the 1.2, or you
21  didn't think about it?

Page 150

1      A   I don't recall thinking about it.
2      Q   Okay. Frankly, you didn't care.
3      A   I didn't say that.
4      Q   I'm asking.
5      A   Sure, I cared.
6      Q   Well, but you didn't ask, did you --
7      A   No.
8      Q   -- the source of the funds?
9      A   No.
10     Q   But you cared?
11     A   Yes.
12     Q   Why did you care?
13     A   In hopes that their cash flow situation was
14  back where they said it was going to be at that point;
15  it was going to be great, we didn't have a big problem
16  to worry about, and things were going well for them.
17     Q   But you never cared enough to call
18  Mr. Ortenzio to find out the source of the funds?
19     A   I did not call Mr. Ortenzio.
20     Q   All right. I don't think -- I think we
21  talked about the loan commitment letter, but I don't

Page 151

1  think we marked it, so I just want to confirm that
2  Schwartz 12 is the -- what I'll call the loan
3  commitment letter because I know you like that letter.
4      Let's look at it, and at least tell me that
5  that is, indeed, the loan commitment letter.
6      A   This is a commitment letter for the four
7  million dollar line of credit.
8      Q   Okay, that's all.
9          Would you look at Exhibit S-13, which is
10  your letter to Mr. Ortenzio at CCI dated February 15,
11  2000?
12     A   Yes.
13     Q   How did you determine that the 1.2 million
14  dollar loan had been paid in full as of February 11?
15     A   I looked on the computer.
16     Q   And what did the computer show?
17     A   A zero balance.
18     Q   Okay. Did that computer screen deal only
19  with the 1.2, or would it have looked at, more
20  specifically, at the cash management account, the
21  checking account, the four million dollar line of

Page 152

1  credit, et cetera, et cetera?
2      A   Just the 1.2.
3      Q   Okay. But you had the other means of
4  checking to see what the availability was and the
5  balance was of the four million?
6      A   I had the means.
7      Q   You chose not to go into that?
8      A   I don't recall if I did or if I didn't.
9      Q   Is it possible you did?
10     A   I don't recall.
11     Q   You don't recall either way?
12     A   Correct.
13     Q   Okay. Was this mailed or hand-delivered,
14  S-13?
15     A   I don't recall.
16     Q   Did you ever inquire the source of payment?
17     A   No.
18     Q   Okay. Now, when Mr. Ortenzio on behalf of
19  CCI wrote a check and repaid the 1.2 million dollar
20  note, he was acting on behalf of CCI as an officer; is
21  that correct?

**Esquire Deposition Services**                    1-800-441-3376

# Craig J. Schwartz

Page 173

1  of any custom or practice in the banking industry that
2  requires a borrower to repay a guaranteed loan with
3  funds other than -- which prohibits a borrower from
4  repaying a guaranteed loan from a draw on a
5  nonguaranteed loan?
6      MR. GEBHARDT: Objection.
7      Custom and practice is not a law.
8      MR. SWICHAR: Well, I'm using your
9  quote. I wrote it down when you said ordinary banking
10  custom and practice.
11      MR. GEBHARDT: Right, but you're saying
12  is there a custom and practice that prohibits.
13      MR. SWICHAR: Yes.
14      MR. GEBHARDT: Well, banking customs
15  and practices don't prohibit anything. They're not
16  law. They're how --
17      MR. SWICHAR: I'm asking -- I think the
18  whole banking custom or practice would be irrelevant
19  in this case, but you brought it up.
20      MR. GEBHARDT: It's your expert --
21      MR. SWICHAR: You said you may use him

Page 174

1  for that purpose if I use him, so I'm --
2      MR. GEBHARDT: Your expert --
3      MR. SWICHAR: -- hypothetically asking
4  him the question.
5      Q   (By Mr. Swichar) Are you aware of any
6  banking custom or practice which prohibits a borrower
7  from paying off a guaranteed loan from a loan that is
8  not guaranteed?
9      A   Not to my recollection.
10      Q   Okay. Would your answer change if I said to
11  you are you aware of any banking practice or custom
12  that prohibits a borrower from paying off a guaranteed
13  loan with -- from a nonguaranteed line of credit if it
14  is in financial distress?
15      MR. GEBHARDT: Objection.
16      A   Not to my recollection.
17      Q   All right.
18      MR. SWICHAR: Well, I'm done.
19      MR. GEBHARDT: I have some questions.
20      MR. SWICHAR: Sure.
21          ----

Page 175

1      EXAMINATION BY COUNSEL FOR THE PLAINTIFF
2  BY MR. GEBHARDT:
3      Q   Mr. Schwartz, this particular four million
4  dollar line of credit was, as I think the testimony
5  has been and is reflected in the note, was tied to a
6  cash management facility, right?
7      A   Yes.
8      Q   And the cash management facility would kick
9  in basically at the end of each day, right?
10      A   Yes.
11      Q   And would I be correct that one would take
12  the total number of checks and deposits that came in
13  to the credit of CCI and then compare them to the
14  total number of checks that CCI had issued and that
15  were presented to the bank for payment on each day?
16      A   Yes.
17      MR. SWICHAR: Well, I object because I
18  don't know if the computer made that comparison. I
19  think it works differently.
20      MR. GEBHARDT: Well, I'm asking the
21  witness.

Page 176

1      MR. SWICHAR: Yeah, but you're telling
2  the witness.
3      So why don't you just ask him questions
4  how it works?
5      Q   (By Mr. Gebhardt) If there was a greater
6  number of checks presented for payment than there were
7  deposits received, what would be the effect?
8      A   A draw on the line of credit.
9      Q   Suppose there was an excess of checks
10  received to the credit of CCI's account over items
11  presented for payment?
12      A   A payment on the line of credit.
13      Q   And suppose the line of credit had been
14  fully repaid?
15      A   An investment would occur.
16      Q   So there would be a positive balance in
17  CCI's account?
18      A   Yes.
19      Q   And what would happen -- would that positive
20  balance earn interest?
21      A   Yes.

44 (Pages 173 to 176)

# Craig J. Schwartz

Page 177

1    Q    And do you recollect whether under the terms
2  of the line of credit CCI was required to have the
3  line of credit at a zero balance for thirty
4  consecutive days in a twelve-month period?
5            MR. SWICHAR:  Could I hear that back?
6            (Question was read by the Reporter.)
7            MR. SWICHAR:  I don't understand the
8  question, but if your own witness does, fine.
9            And if there is a document, why don't
10  you just show it to him?
11            MR. GEBHARDT:  Actually, I will
12  withdraw the question because the March 23rd, 1999,
13  commitment does not have that as a requirement, but
14  the preceding one did.
15            So we're operating under what's been
16  designated Schwartz 12, so I will withdraw the
17  question.
18    Q    (By Mr. Gebhardt) Now, turning to Schwartz
19  Exhibit 12, which is the commitment letter for the
20  four million dollar revolving line of credit, what
21  were the proceeds of draws on the line of credit to be

Page 178

1  used to do?
2    A    Finance work in process and accounts
3  receivable.
4    Q    Is repaying in full any fully funded loan or
5  credit facility an authorized use of loan proceeds?
6            MR. SWICHAR:  I object to the form of
7  the question.
8    Q    You may answer.
9            THE WITNESS:  Read it back, please.
10            (Question was read by the Reporter.)
11            MR. SWICHAR:  I object to the form,
12  particularly the word authorized.
13    A    No.
14    Q    (By Mr. Gebhardt) Okay.  Now, what exactly
15  are accounts receivable?
16    A    Payments from customers of the borrower for
17  services rendered.
18    Q    Okay.  And this line of credit was intended
19  to provide CCI with --
20            MR. SWICHAR:  Are you just leading him
21  down?

Page 179

1            I'm just objecting.
2            MR. GEBHARDT:  Then object.
3    Q    (By Mr. Gebhardt) The line of credit was
4  intended to permit CCI to have funds available pending
5  the receipt of payment from customers on the accounts
6  receivable?
7    A    Yes.
8    Q    You were asked some questions relating to
9  the payment of the monthly installments on the two
10  million dollar equipment term loan.
11            Do you recollect those?
12    A    Yes.
13    Q    And I think your testimony was that they
14  were made through the use of the revolving, four
15  million dollar revolving line of credit, right?
16    A    Yes.
17            MR. SWICHAR:  No, I don't think he said
18  that.
19            I think he said the repayments were
20  made either through checks or automatic, and then we
21  went to the next step, which was the impact of it.

Page 180

1    Q    Was making the monthly installments of
2  principal and interest on the equipment term loan an
3  authorized use of the four million dollar revolving
4  line of credit?
5    A    Yes.
6    Q    Why is that?
7    A    Because a term loan is to be repaid, of
8  course, over a period of time, monthly, and through
9  profits of the company, and those profits are a part
10  of the receivables that they come in.  So that line is
11  used because that -- the profits are in -- a part of
12  the accounts receivable, and the line gets paid down
13  that way.
14            (Gerard L. Elias entered the conference
15  room.)
16    Q    Had there been no term loan from CCI --
17  no -- excuse me, let me rephrase that.
18            Assume there had been no four million dollar
19  line of credit, what would the source of payment have
20  been for CCI to repay the monthly installments of
21  principal and interest on the two million dollar

**Esquire Deposition Services**

 

# Craig J. Schwartz

Page 181

1   equipment loan?
2           MR. SWICHAR:  Objection as to form.
3       A   Excess cash flow.
4       Q   Where would that come from?
5       A   The collection of accounts receivable.
6       Q   Okay.  Now, when the 1.2 million dollar loan
7   was paid off on February 11, 2000, with a draw on the
8   four million dollar revolving line of credit, I
9   believe the testimony has been that a check was
10  delivered by Mr. Ortenzio to make that payment.
11          Does that accord with your recollection?
12      A   Yes.
13      Q   Was that payment delivered directly to you?
14      A   No.
15      Q   Were you at any time ever told by anyone at
16  or about February 11, 2000, that that check
17  represented a draw on the four million dollar
18  revolving line of credit?
19      A   No.
20      Q   Had you known on or about February 11, 2000,
21  that the check presented by Mr. Ortenzio on behalf of

Page 182

1   CCI represented a draw on the four million dollar
2   revolving line of credit, what action, if any, would
3   you have taken?
4       A   I would have not honored the check.
5       Q   If Mr. Ortenzio had called you prior to
6   bringing the check in and expressly stated that he
7   intended to pay the 1.2 million dollar loan with a
8   draw on the four million dollar revolving line of
9   credit, what would your response to Mr. Ortenzio have
10  been?
11          MR. SWICHAR:  Objection to form.
12      A   No, don't bother, or why are you paying it
13  off with the line?
14      Q   Now, when the --
15          MR. SWICHAR:  Do you want the answer to
16  that?
17      Q   When the 1.2 million dollar line of
18  credit -- excuse me -- when the 1.2 million dollar
19  loan was discussed, what did Mr. Ortenzio tell you was
20  the reason CCI needed that advance of funds?
21      A   They needed the money to keep operating

Page 183

1   because the cash flow situation of the company was in
2   a depo -- disposition.
3       Q   Did Mr. Ortenzio express at all how long he
4   believed that cash flow problem would continue?
5       A   I believe some cash flow projections given
6   to us indicated February, through the end of February.
7       Q   And from what source based on your
8   discussions with Mr. Ortenzio in November of 1999 did
9   you anticipate the 1.2 million dollar loan being
10  repaid?
11      A   Excess cash flow.
12      Q   Okay.  And based on Mr. Ortenzio's
13  discussions, did you expect that excess cash flow to
14  put CCI in a positive cash position?
15      A   Yes.
16      Q   And would you have expected at the time of
17  the 1.2 million --
18          MR. SWICHAR:  Object to all these
19  leading questions.
20          MR. GEBHARDT:  That's fine.
21      Q   (By Mr. Gebhardt) Would you have expected

Page 184

1   the 1.2 million dollar loan had it been repaid from
2   the excess cash flow for there to have been a positive
3   balance on the four million dollar revolving line of
4   credit?
5       A   I would have expected the line to have a
6   zero balance.
7       Q   Now, you were asked --
8           MR. SWICHAR:  Wait.
9           Can I hear that question and answer
10  back again?
11          (Record was read by the Reporter.)
12      Q   (By Mr. Gebhardt) Now, I believe the
13  documents establish based on the commitment letters
14  that the 1.2 million dollar loan was to be due on
15  March 31, 2000, if not demanded sooner, and that the
16  four million dollar line of credit expired on
17  April 30, 2000.
18          What was your anticipation of what would
19  occur had CCI Construction not had sufficient cash
20  flow to repay the 1.2 million dollar loan by March 31,
21  2000?

# Craig J. Schwartz

 

Page 189

1    Q  Now, I think you indicated that you did not
2  know when you spoke with Mr. Ortenzio on or about
3  February 11 what the source of the payment might have
4  been that repaid the 1.2 million dollar loan.
5    A  That's correct.
6    Q  Do you know whether, based on your activity
7  as an account officer, whether Mr. Ortenzio had the
8  personal financial ability to have made that payment?
9       MR. SWICHAR:  Objection as to form.
10   A  Yes, I believe he did.
11   Q  Did you know for a fact whether CCI had
12  accounts with any other banks at the time?
13   A  I was not aware of any.
14   Q  But did you know one way or the other?
15   A  No.
16   Q  Did you know whether CCI was into the line
17  of credit at the time the payment was made?
18      MR. SWICHAR:  Objection.
19      I don't know what that means, into the
20  line of credit.
21   Q  Had a positive balance on the line of credit

Page 190

1  at the time the 1.2 million dollar payment was made.
2      Did you know that on February 11?
3    A  No, I did not.
4    Q  Now, after you learned that the check had
5  come in, did you have any contact with Mr. Ortenzio
6  about the consequences of the payment having been
7  made?
8      In other words, why did you send this letter
9  that's been marked as S-13 to Mr. Ortenzio confirming
10  that the 1.2 million dollar line had about --
11      MR. SWICHAR:  Objection as to form; the
12  letter says why he sent it.
13   Q  That's 13.
14      Why did you send that letter, S-13?
15      MR. SWICHAR:  Objection as to form.
16      It states on the letter why he was
17  sending it.
18   A  As a follow-up to Mr. Ortenzio's request to
19  get his surety back because, because the loan was paid
20  in full.
21   Q  Okay.  Now, that was a request made to you

Page 191

1  directly?
2    A  Yes.
3    Q  And was any sense of urgency expressed by
4  Mr. Ortenzio in the call requesting the return of the
5  suretyship?
6    A  Yes, it would have had to be for me to go
7  through the process to get the surety back quicker
8  than the normal course of business.
9       MR. SWICHAR:  That's not responsive.
10      I object to the answer, form of the
11  answer.
12   Q  Did you take action to get it back quicker
13  than the normal ordinary process?
14      MR. SWICHAR:  He testified he had no
15  recollection.
16      Objection.
17   Q  You may answer.
18   A  Yes, I have -- I did.
19   Q  And why did you take that extra effort?
20   A  Mr. Ortenzio's request.
21   Q  You were also asked a couple questions about

Page 192

1  banking custom and practice.
2      Do you recollect that?
3    A  Yes.
4    Q  Do you know whether banking customs and
5  practice are binding law, enforceable --
6       MR. SWICHAR:  Objection to the
7  question.
8    Q  -- in courts?
9    A  No, I do not.
10   Q  Do you know whether banking customs and
11  practices constitute a prohibition upon borrower
12  conduct?
13   A  No, I do not.
14      MR. GEBHARDT:  No further questions.
15      MR. SWICHAR:  Just a couple.
16  EXAMINATION BY COUNSEL FOR THE DEFENDANT
17  BY MR. SWICHAR:
18   Q  Mr. Schwartz, you testified that the
19  repayment in full of the 1.2 million dollar loan was
20  not an authorized use of the four million dollar line
21  of credit; is that correct?

**Esquire Deposition Services**

**1-800-441-3376**

 

# Craig J. Schwartz

Page 193

1    A   Yes.
2    Q   Is there any document anywhere in this world
3  that states specifically in regard to repayment in
4  contrast to use of the funds that the funds -- that
5  the four million dollar line could not be used to
6  repay the 1.2?
7    A   There's no documents that says it cannot be
8  used to repay it.
9    Q   Is there any -- would there have been any
10  impediment that you're aware of to the bank stating in
11  any document binding on CCI or
12  Mr. Ortenzio to prohibit the four million dollar line
13  of credit to be used to repay the 1.2 million dollar
14  loan, such as we discussed earlier, a negative
15  covenant?
16    A   Other than the agreed-upon use of proceeds
17  of that four million dollar loan.
18    Q   Right, right.
19        Is there any impediment to the bank
20  expressly stating as a negative covenant that the four
21  million dollar line of credit could not used to repay

Page 194

1  the 1.2 million dollar loan?
2    A   No.
3    Q   The answer's no?
4    A   No.
5    Q   How was CCI to repay the 1.2 million dollar
6  loan?
7    A   From excess cash flow.
8    Q   And I think we -- I asked you earlier, but
9  correct me if I'm wrong, since Mr. Gebhardt asked,
10  touched on that, where is that in any document?
11    A   I don't believe it's in a document.
12    Q   Okay.  Is there any reason or any impediment
13  to the bank not putting that in any document that this
14  loan could only be repaid from excess cash flow or
15  excess profits?
16        MR. GEBHARDT:  Let me object to, again,
17  the compound nature.  Reason and impediment are two
18  different things.
19        MR. SWICHAR:  I'm using his word -- I
20  hear you.
21        MR. GEBHARDT:  You're asking is there a

Page 195

1  reason --
2        MR. SWICHAR:  I'll ask another
3  question.
4    Q   (By Mr. Swichar) Are you aware of any
5  impediment that prevented the bank from stating in any
6  document binding on CCI or Mr. Ortenzio that the
7  1.2 million dollar loan could only be repaid from
8  excess cash flow or profits?
9    A   No.
10    Q   You testified with respect to the equipment
11  note that was a term loan; is that correct?
12    A   Yes.
13    Q   Is that different than the 1.2 million
14  dollar loan?
15    A   Yes.
16    Q   Okay, because payments were to be made
17  monthly?
18    A   The whole nature of the transaction was
19  different.
20    Q   The equipment note?
21    A   Yes.

Page 196

1    Q   Okay.  You testified that payments on the
2  equipment note had to be repaid through profits of the
3  company, from collected accounts receivable, if I took
4  notes correctly; is that correct?
5    A   Yes.
6    Q   Is that stated anywhere in the equipment
7  note or any related document?
8        In other words, limiting the monies that can
9  be used to repay the equipment note.
10    A   Not that I'm aware of.
11    Q   You testified when the 1.2 million dollar
12  note was repaid on February 11 you were not aware that
13  the payment had been made from a draw on the four
14  million dollar line of credit; is that correct?
15    A   Yes.
16    Q   That information was readily available to
17  you, was it not?
18    A   Within a day or so.
19    Q   Within a day or so?
20    A   Yes.
21    Q   Wouldn't that information have been on your

**Esquire Deposition Services**



# Craig J. Schwartz

Page 197

1    computer?
2        A    Not until the payment actually gets posted.
3        Q    Okay.  The next day?
4        A    Possibly.
5        Q    Okay.  Certainly before the note was
6    returned?
7        A    Yes.
8        Q    And marked satisfied?
9        A    Yes.
10       Q    You had the opportunity to learn the source
11   of payment?
12       A    The note was not returned.
13       Q    The note, the guarantee, the suretyship.
14       A    Yes.
15       Q    Prior to your delivery of the guarantee
16   marking it paid, you had the opportunity to determine
17   the source of the money, is that correct -- source of
18   the payment -- is that correct?
19       A    Yes.
20       Q    And you never inquired as to the source of
21   the money -- source of the repayment of the

Page 198

1    1.2 million dollar loan; is that correct?
2        A    Yes.
3        Q    And, again, where did you think the money
4    came from?
5            And I think your earlier answer was you
6    didn't know, you didn't care; is that correct?
7            MR. GEBHARDT:  Objection to the
8    characterizing of the witness' earlier testimony.
9        A    I didn't know where the money came from.
10       Q    Well, you didn't ask, did you?
11       A    No, I did not.
12       Q    And, therefore, you didn't care, did you?
13           MR. GEBHARDT:  Objection.
14       Q    If you had cared, you would have asked; is
15   that right?
16       A    I didn't have the opportunity to speak to
17   Mr. Ortenzio.
18       Q    You could have called him on the phone?
19       A    I -- that's correct.
20       Q    Could have gone over to CCI and knocked on
21   the door and asked him?

Page 199

1        A    Yes.
2        Q    Okay.  You didn't do either, did you?
3        A    No.
4        Q    If you had cared, you would have done it?
5            MR. GEBHARDT:  Objection.
6        A    Most likely.
7        Q    The fact is when the 1.2 million dollar note
8    was repaid, you were just happy to see that it was
9    repaid, weren't you?
10       A    I don't think I'd put it in those words.
11       Q    Were you glad or sad --
12       A    When I get --
13       Q    -- or something in between?
14       A    When I receive payment, I'm always --
15       Q    Grateful?
16       A    Yes.
17       Q    Okay.  Now, Mr. Ortenzio told you you said
18   in November, 1999, that he required the 1.2 million
19   through the end of February, 2000; is that correct?
20           That's what you stated when your attorney
21   asked you.

Page 200

1        A    Okay.
2        Q    Is that correct?
3        A    That was --
4        Q    You said they would need the money, the
5    extra money, the 1.2 million, through the end of
6    February, 2000.
7        A    That was according to the cash flow
8    statements.
9        Q    And that's what Mr. Ortenzio told you,
10   right?
11       A    Yes.
12       Q    Okay.  Now, at the time of the repayment of
13   the 1.2 million coincidently in February, 2000, the
14   balance on the four million dollar line of credit
15   allowed for the repayment of the 1.2 from the four
16   million; is that correct?
17           MR. GEBHARDT:  Objection.
18       Q    There was sufficient cushion there under the
19   four million dollar line of credit to repay the 1.2;
20   is that correct?
21           We went over the numbers.

50 (Pages 197 to 200)

## Gerard L. Elias

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3    ALLFIRST BANK           :

4         Plaintiff      :

5      v.                :   CA NO. 1:CV-01-0786

6    JOHN M. ORTENZIO        :

7         Defendant      :   Pages 1 - 31

8              -----------

9

10

11

12         Deposition of Gerard L. Elias

13           Baltimore, Maryland

14         Friday, February 15, 2002

15

16

17

18

19

20

21    Reported by:  Kathleen R. Turk, RPR-RMR

## Gerard L. Elias

Page 9

1  A  We were advised that the company was in
2  severe distress.
3  Q  By whom?
4  A  By Mr. Ortenzio and, I believe, his attorney
5  was, was present as well.
6  Q  Did he use the word severe distress, or is
7  that your conclusion?
8  A  Oh, I don't recall. I'm paraphrasing.
9  Q  Well, could you just tell me specifically if
10  you can, to the best of your recollection, what you
11  were told rather than what you concluded for the
12  moment?
13  A  We were told that the company was in severe
14  distress.
15  Q  Okay. Why did -- was there any comment as
16  to why the company was in severe distress?
17  A  There were a number of jobs where problems
18  had arisen to where the company's -- that is, CCI's --
19  bonding company needed to be apprised of those
20  problems.
21  We were advised that there was an upcoming

Page 10

1  loss to be reported to the tune of six million
2  dollars, I believe. We were advised that there were
3  some problems with some of the subcontractors on the
4  jobs.
5  Q  All right. Mr. Elias, do you recall if
6  anything was asked of the bank by Mr. Ortenzio or his
7  attorney?
8  Did they ask for more money, for example, at
9  that meeting?
10  A  I don't recall.
11  Q  Well, can you tell me how that meeting
12  concluded? On what footing? Where was it left?
13  A  Generally, it was left that, that the
14  company had stopped making payments sometime well
15  prior to that meeting.
16  Q  To the bank, or to its subs, or to
17  everybody?
18  A  Just making payments in general, yeah, to
19  its subs certainly; that the bonding company had been
20  advised, and I believe that the bonding company was
21  going to be meeting once again the following week with

Page 11

1  the company, and that they would advise the bank of
2  those discussions with the bonding company.
3  Q  Did you take notes at that meeting?
4  A  I don't believe I took notes myself.
5  Q  Do you know of anyone who did?
6  A  Mr. Gibson could have.
7  Maybe some of the people at the meeting
8  itself. Since I wasn't there present, I don't know if
9  those individuals took notes.
10  Q  Did you see Mr. Gibson take notes?
11  A  I don't recall.
12  Q  But you did not?
13  A  Not that I recall.
14  Q  Okay. What happened after that meeting?
15  A  I think my next involvement would have been
16  the following week. I believe I was in Harrisburg at
17  the time, and we were discussing the situation, and it
18  was disclosed that the line of credit had grown; in
19  other words, the outstanding balance had grown in the
20  line of credit. And that concerned us because that
21  was contrary to our understanding that we would wait

Page 12

1  to see the results of the company's meeting with the
2  bonding company, and that understanding was from the
3  prior Friday.
4  Q  Wait a minute, let me go back.
5  Between the 18th and the 23rd, there was
6  increased borrowings against the four million dollar
7  line of credit?
8  A  Yes.
9  Q  Do you recall the amounts?
10  A  I do not.
11  Q  Okay.
12  A  We became concerned because it was our
13  understanding that we were effectively all at a
14  standstill, waiting to see what the bonding company
15  would say, and as it turned out that, that checks were
16  continuing to come and hit against the account.
17  We became alarmed at that since we had been
18  previously told that payments had stopped.
19  Q  Is it conceivable that those checks, by the
20  way, had been sent out prior to the meeting on the
21  13th?

3 (Pages 9 to 12)

## Gerard L. Elias

Page 17

1    A   I don't recall.

2    Q   Did they ask for more money?

3    A   I don't recall.

4    Q   Do you recall telling Mr. Ortenzio that the
5    bank wanted its fucking money or you were leaving?

6    A   I don't recall.

7    Q   Is it possible you would have said that?

8    A   Possible.

9        MR. SWICHAR:  Excuse me.

10   Q   (By Mr. Swichar) Do you recall when the
11   decision was made -- did you -- were you involved in
12   the decision to freeze CCI's bank accounts?

13   A   Yes.

14   Q   When was that decision made?

15   A   I believe it was Wednesday, the 23rd.

16   Q   And did you make that decision yourself?

17   A   I think there were probably a few people
18   involved in the decision --

19   Q   Who else?

20   A   -- but I was in the group.

21   Q   Who else?

Page 18

1    A   Well, I think probably Mr. Zarcone was
2    involved.  I can't recall specifically.

3    Q   Did the bank begin to freeze CCI accounts on
4    the 23rd?

5    A   I think that was the date.

6    Q   That was prior to the declaration of
7    default?

8    A   No.

9    Q   Well, the declaration of default -- letter,
10   at least -- is dated the 24th.

11   A   Correct.

12   Q   When was the declaration of default, and how
13   was that conveyed to CCI?

14   A   I believe it was conveyed that date when we
15   became aware of the fact that the checks were
16   continuing to --

17   Q   What date is that?

18   A   The 23rd.

19   Q   The 23rd?

20   A   -- draw down on the line.

21       I believe we contacted Mr. Ortenzio to make

Page 19

1    inquiry as to why that was occurring and asked for
2    some additional support if we were to be expected to
3    continue to to, to fund.

4    Q   Okay.  So on the 23rd, you did ask for
5    additional support?

6    A   Yes.

7    Q   And what kind of support did you ask for?

8    A   Guarantees, additional collateral, some
9    support payment.

10   Q   What additional guarantees did you request?
11       Guarantee the four million dollar line?

12   A   Yes.

13   Q   And what other decision?

14   A   Additional collateral.

15   Q   As, for example?

16   A   Oh, just whatever additional collateral
17   might be worthwhile.

18   Q   So on the 23rd, I assume Mr. Ortenzio said
19   no.

20   A   Correct.

21   Q   And at that point, you froze the accounts?

Page 20

1    A   Correct.

2    Q   Instantly, on the 23rd?

3    A   I believe so.

4    Q   And you made the decision to bounce CCI's
5    checks on the 23rd as well?

6    A   Correct.

7    Q   And that began on the 23rd?

8    A   I believe that's the date, yes.

9    Q   And that was prior to any written
10   declaration of default?

11   A   Correct.

12   Q   Was it a situation where the bank also
13   decided to reverse certain payments on checks that had
14   already just cleared?

15   A   I don't recall that.

16   Q   Did you review any documents prior to your
17   deciding to declare CCI in default?

18   A   Sure.

19   Q   Which documents did you review?

20   A   The loan documents.

21   Q   Pardon me?

5 (Pages 17 to 20)

## Gerard L. Elias

1    his learning of it.

2        Q    Okay.  Did he tell you how he discovered

3    that?

4        A    If he did, I don't recall.

5        Q    Did any of the loan officers in Harrisburg

6    have power to declare the default without going to you

7    or anyone in Baltimore?

8        A    Yes.

9        Q    And who would that have been in the context

10   of this loan?

11       A    Well, I would say certainly Mr. Zarcone

12   and -- as well as Paul Shannon, but that, that

13   wouldn't be an inclusive, an all-inclusive list.

14           I'm sure there were other people, but

15   certainly those two individuals.

16       Q    Did you consult with either of those prior

17   to you declaring the default?

18       A    I believe we had discussions, yes.

19           MR. SWICHAR:  Okay, just a minute.

20           (Discussion off the record.)

21       Q    (By Mr. Swichar) Let me go back and revisit

**Gerard L. Elias**

Page 26

1    that meeting on February 18th, Mr. Elias.

2         Is it your recollection that you were not

3    told at that meeting that the 1.2 million dollar note

4    had been paid off?

5    A    My recollection is that I didn't learn of

6    the 1.2 million dollars, that loan's existence, until

7    well after that time frame.  So it would be my

8    recollection that I was not told --

9    Q    Okay.

10   A    -- of its having been paid off at that

11   meeting.

12        MR. SWICHAR:  I have no other

13   questions.

14        MR. GEBHARDT:  Just one small topic.

15        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

16   BY MR. GEBHARDT:

17   Q    You indicated that at the February 18, 2000,

18   meeting that Mr. Ortenzio was accompanied by an

19   attorney.

20   A    Correct.

21   Q    Do you know the name of that attorney?

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK      *

  Plaintiff,      *

v.          *   CASE NO.: 1:01-CV-786

JOHN M. ORTENZIO    *

  Defendant.     *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### <u>AFFIDAVIT OF GERARD L. ELIAS</u>

Gerard L. Elias deposes and states as follows:

1.  I am a Senior Vice President of Allfirst Bank ("Allfirst") and the head of its Special Credits Division.

2.  As a Senior Vice President and head of the Special Credits Division of Allfirst Bank, I have personal knowledge of the matters and facts set forth in this affidavit.

3.  Exhibit N reflects the amounts which are owed by Allfirst under the $1.2 million dollar loan extended by Allfirst to CCI Construction Co., Inc. as of May 31, 2002, together with a per day amount of interest thereafter. Exhibit O reflects the amounts due under the $4 million dollar line of credit extended by Allfirst Bank to CCI Construction Co., Inc. as of May 31, 2002, together with per day interest thereafter. The amounts set forth on Exhibit 0 do not reflect any recovery in the pending preference action instituted by CCI Construction Co., Inc. in the United States Bankruptcy Court for the Middle District of Pennsylvania.

              _____
              Gerard L. Elias

## <u>OATH</u>

The undersigned swears under the penalties of perjury that the matters and facts set forth above are true and correct.

_(signature)_
Gerard L. Elias