ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK               :

         Plaintiff,        :       CASE NO. 1:01-CV-786

                      :       J. Rambo

         v.              :

                      :

JOHN M. ORTENZIO      :

                      :

        Defendant.      :

                      :

**FILED**
HARRISBURG, PA

MAY 1 5 2002

MARY E. D'ANDREA, CLER
Per
                  Deputy Clerk

## DEFENDANT'S PRETRIAL MEMORANDUM

Defendant, John M. Ortenzio, by his undersigned attorneys, hereby submits this

Pretrial Memorandum pursuant to Rule 16 and in accordance with Appendix B of the Local

Rules of the United States District Court for the Middle District of Pennsylvania.

**Date conference was held by counsel:** May 3, 2002

    **A.**     **A brief statement as to federal court jurisdiction.** Subject matter

jurisdiction is based upon diversity of citizenship and amount in controversy under 28 U.S.C.

§ 1332.

    **B.**     **Summary statement of facts and contentions as to liability.** Plaintiff,

Allfirst Bank ("Allfirst"), seeks to hold Defendant, John M. Ortenzio ("Mr. Ortenzio")

personally liable for the corporate obligations of CCI Construction Co., Inc. ("CCI") by

bypassing the clear language of the contract between Allfirst and Mr. Ortenzio. However,

Allfirst cannot establish any of its claims because it cannot establish that the manner in which CCI paid its contractual obligation was prohibited by the loan documents.

### a. FACTS.

This lawsuit involves the interpretation of the contract between Mr. Ortenzio and Allfirst Bank (the "Suretyship Agreement") and its application to three notes: a line of credit that CCI executed on March 24, 1999, pursuant to which Allfirst provided CCI a long term, unsecured $4 million line of credit ("the Line of Credit"); a Commercial Loan (equipment) Note dated November 20, 1998, pursuant to which plaintiff extended a $2 million loan to CCI, secured by CCI's equipment ("the Equipment Note"); and a Commercial Loan Note dated November 8, 1999, in the amount of $1.2 million, ("the Short-Term Note"), guaranteed by Mr. Ortenzio[1]. Allfirst contends that Mr. Ortenzio acted unlawfully when CCI repaid the Short-Term Note from funds available from the line of credit. CCI maintained a single checking account at Allfirst and all of the aforementioned loans were tied into a cash management facility. More specifically, any checks written on CCI's account at Allfirst increased the balance owed on the line of credit and, conversely, all revenues deposited to CCI's account had the effect of reducing the balance and, thereby, increasing the availability of funds that could be borrowed on the line of credit. According to the commitment letter, CCI was required to maintain its primary account at Allfirst and was required to deposit all profits and all revenues from cash flow into this account. In addition, CCI's customers wire transferred payments directly to Allfirst to be deposited

directly into the checking account. When Allfirst loaned CCI the sum of $1.2 million, pursuant to the Short-Term Note, it decreased the balance owed on the line of credit by $1.2 million. It is undisputed that all payments that CCI made from its checking account, such as payroll, taxes, payments to vendors and re-payments on the $2 million equipment note were drawn from the line of credit, and thereby had the same effect of increasing the balance on the $4 million line of credit.

The $1.2 million Short-Term Note was provided at the request of CCI, on a short-term basis, when CCI was encountering cash flow difficulties. It had to be repaid no later than March 31, 2000. Allfirst initially sought to increase the $4 million line of credit to a $5 million line of credit, and requested that Mr. Ortenzio guarantee the full $5 million. Allfirst agreed to limit Mr. Ortenzio's guaranty to the $1.2 million Short-Term Note after Mr. Ortenzio refused to guarantee more than that amount.

Pursuant to the parties' agreement, the form language in the $1.2 million Short-Term Note was stricken to make it clear that Mr. Ortenzio's guarantee would extend to the $1.2 million Short-Term Note only, and not to the $4 million line of credit or to any other loan facility at Allfirst. Allfirst could have asked Mr. Ortenzio to guarantee up to $1.2 million of any loan facility, i.e., not limit the guaranteed amount to the Short-Term Note only, but failed to do so. There were no restrictions in the Short-Term Note as to the source of funds that could be used to repay the note. There is no document that deals with how the

---

[1]  Interpretation of contracts poses a question of law for the court to decide.  <u>Charles D. Stein Revocable Trust v. General Feld Indus., Inc.</u>, 749 A.2d 978, 980 (2000).

loan was to be repaid, nor was there any document that states that the $1.2 million Short-Term Note could not be repaid by writing a check on CCI's checking account, thereby drawing on the line of credit.

On February 11, 2002, approximately one month prior to the due date, CCI repaid the $1.2 million Short-Term Note by writing a check on CCI's Allfirst checking account. Pursuant to the cash management system set up by Allfirst, the payment of this check appeared as a draw on the $4 million line of credit and, thereby, merely reversed the book-entry transaction that was made when Allfirst had lent CCI the $1.2 million a few months earlier. At the time of the repayment, and because of several deposits that CCI made, CCI owed only approximately $1.2 million on the $4 million line of credit, so that the total amount due after the repayment was approximately $2.4 million. In other words, at the time of the repayment of $1.2 million short-term loan, there was a sufficient cushion under the $4 million line of credit to repay the Short-Term Note. Allfirst accepted the payment and notified CCI that the $1.2 million Short-Term Note was repaid.

On February 24, 2000, Allfirst declared a default under both the Line of Credit and the Equipment Note, but failed to provide CCI the 30 day notice and opportunity to cure, as required in the $4 million note. Allfirst immediately seized all of CCI's assets, froze its checking account and dishonored all checks including payroll and taxes. CCI's bankruptcy followed thereafter.

### b.  CONTENTIONS AS TO LIABILITY.

(i)    **Allfirst has failed to establish a claim for breach of contract against Mr. Ortenzio or any other claim as alleged in Count I.**

(1)    The bank documents did not preclude CCI from paying the $1.2 million note by using the available line of credit.

(2)    The bank documents did not specify how the $1.2 million note was to be repaid.

(3)    The only way the $1.2 million note could be repaid was by using the cash management facility thereby drawing on the line of credit.

(4)    The $1.2 million Short-Term Note was repaid in the same manner as the other loans CCI had with Allfirst.

(5)    The repayment of the $1.2 million note was merely a reversal of the initial transaction.

(ii)    **Allfirst cannot establish that Mr. Ortenzio was unjustly enriched.**

(1)    The quasi-contract remedy of unjust enrichment does not apply when the parties' relationship is defined by a contract.

(iii)    **Allfirst cannot establish a cause of action for equitable subrogation.**

(1)    There is no equitable reason to grant subrogation to Allfirst because Allfirst had the ability to negotiate for the rights it now seeks to acquire by subrogation and failed to do so.

(2)    Allfirst is not entitled to an equitable remedy because an adequate remedy exists at law.

**(iv)    Allfirst cannot establish a cause of action for fraud.**

(1)    Allfirst cannot establish that Mr. Ortenzio made a false statement upon which it relied.

(2)    Allfirst cannot establish that Mr. Ortenzio intended to deceive Allfirst.

**C.    A comprehensive statement of undisputed facts as agreed to by counsel at the conference of attorneys required by Local Rule 16.3.[2]  No facts should be denied unless opposing counsel expects to present contrary evidence or genuinely challenges the fact on credibility grounds.  The parties must reach agreement on uncontested facts even though relevancy is disputed.**

1.    CCI Construction Company and Dauphin Deposit, a bank acquired by Allfirst in 1999, began doing business in the early 1990's.  This business included Dauphin Deposit providing CCI with a line of credit.  This line of credit grew from an amount of $600,000 to $4 million.

---

[2]  Defendant objects to the statement of "undisputed" facts filed in Plaintiff's Pretrial Memorandum.  Plaintiff filed this statement despite being put on specific notice that Defendant disputed many of the facts set forth in Plaintiff's statement.  Plaintiff was advised of this verbally and in writing prior to it filing its statement and was also advised that

6

2.      In March of 1999, Allfirst renewed a $2 million line of credit for CCI and increased the line of credit to $4 million.  A commitment letter was issued on March 24, 1999 by Allfirst to CCI with respect to the line of credit.  A film/Cash Solutions Promissory Note was also executed.

3.      The commitment letter for the $4 million line of credit stated that the purpose of the line of credit was to finance CCI's accounts receivable and work in progress.  Previous commitment letters for CCI's line of credit with Dauphin Bank & Trust also contain this statement.  The Film/Cash Solutions Promissory Note does not state a purpose for the $4 million line of credit.

4.      The line of credit had a cash management feature in the Film/Cash Solutions Promissory Note.  In summary, payments from CCI's customers would be wire transferred or deposited in an Allfirst account.  If there was a balance outstanding on the line, the deposits would be applied against the line.  If there was no balance outstanding on the line, the positive balance in the account that day would be swept overnight into an interest bearing investment and the interest credited to CCI.  When checks were presented, any positive balance in the account would be used to pay the checks.  To the extent any positive balance was insufficient or if there was no positive balance, the line of credit would be accessed and the checks paid by a draw on the line.

---

Defendant objected to Plaintiff's statement.  The facts filed herein are the statement of facts that were agreed to by counsel at the Rule 16 conference.

113449.00601/21023722v1

5.   The line of credit was unsecured and was not guaranteed by John Ortenzio, CCI's sole shareholder and president.

6.   During 1999, CCI experienced cash flow difficulties.

7.   In October, 1999, CCI requested a temporary $1 million loan. In response to this request, Allfirst offered to temporarily increase the line of credit from $4 million to $5 million. Allfirst requested Ortenzio's guaranty of the entire line of credit. Ortenzio refused to guaranty the entire line of credit.

8.   A meeting was held between Ortenzio and Sheri Phillips, CCI's chief financial officer, and representatives of Allfirst on November 4, 1999.

9.   Allfirst agreed to extend a separate temporary $1.2 million loan to CCI, which would be due on March 31, 2000. This was $200,000 more than CCI had requested.

10.   Allfirst requested that Ortenzio guaranty the $1.2 million loan.

11.   To obtain the loan for CCI, Ortenzio gave his guaranty.

12.   At the time the guaranty was executed, Ortenzio had the ability to repay the loan personally.

13.   On Friday, February 11, 2000, CCI repaid the $1.2 million loan. This was the loan which Ortenzio had guaranteed. The payment was made by writing a check on CCI's account at Allfirst. The check resulted in a borrowing under the $4 million line of credit which Ortenzio had not guaranteed.

113449.00601/21023722v1

14.     Sherri Phillips disagreed with Ortenzio about CCI making the payment.

15.     Ortenzio personally took the CCI Allfirst check to Allfirst and gave it to a bank employee, as payment of the $1.2 million loan.  Ortenzio was told that Craig Schwartz was not present at the time he arrived with the check.

16.     Ortenzio telephoned Allfirst before going to see if Schwartz would be there.

17.     At the time the payment was made on February 11, 2000, the amount CCI owed on the line of credit $1,232,328.74.  After the payment, CCI owed $2,534,154.84.

18.     After personally delivering the check, Ortenzio spoke with Craig Schwartz who advised he would return the guaranty and the note.

19.     Schwartz put a request into Allfirst's document control section for the guaranty and notified Ortenzio by letter on Tuesday, February 15, 2000, that he would return the note and guaranty to Ortenzio by Thursday, February 17, 2000.

20.     Ortenzio telephoned Schwartz to request a meeting with Allfirst to update Allfirst on CCI's financial condition.  This meeting was scheduled for Friday, February 18, 2000 at Allfirst's Harrisburg office.

21.     Ortenzio was accompanied to the meeting by Robert Chernicoff, Esquire.

113449.00601/21023722v1

22.    At the time of the meeting, Ortenzio had seen CCI's internally financial statement for 1999.

23.    In the meeting, Ortenzio presented a cash flow projection.

24.    During the meeting, Ortenzio stated that he would be meeting with CCI's bonding company during the next week and planned to solicit financial support from the bonding company.  He agreed to report back to Allfirst on the results of the meeting with the bonding company.

25.    Allfirst closed down the line of credit on or about Tuesday, February 22, 2000 or Wednesday, February 23, 2000 to prevent further draws.

26.    By letter of February 24, 2000, Allfirst declared CCI in default and demanded immediate payment.

27.    At or about this time, CCI's bonding company took control of its operations.

28.    On May 19, 2000, CCI filed a petition under Chapter 11 of the United States Bankruptcy Code.

29.    On February 22, 24 and 25, 2000, customers of CCI wired payments of their outstanding accounts to Allfirst.  These payments totaled $2,317,291.28.

30.    On January 10, 2001, CCI, as debtor in possession, instituted an action to recover the customer payments as a preference under Bankruptcy Code § 547 in an

10

adversary proceeding entitled <u>CCI Construction Co., Inc. v. Allfirst Bank</u> (Adversary No. 1-01-00011A). Allfirst is defending against the debtor in possession's claim and the matter is set for trial before the United States Bankruptcy Court for the Middle District of Pennsylvania on May 30, 2000.

**D.     A brief description of damages, including, where applicable.**  Defendant contests plaintiff's claim for damages.  Defendant has set forth no theory upon which Mr. Ortenzio can be held liable for any payments that may be set aside in the preference action between Allfirst and CCI.  Defendant further contests plaintiff's claim for attorneys' fees and litigation expenses.  Plaintiff has failed to properly set forth and identify its legal fees and litigation expenses.

**E.     Names and addresses of witnesses, along with the specialties and qualifications of experts to be called.**

     **a.  Facts Witnesses.**

       (i)     John Ortenzio

       (ii)    Robert Chernicoff

       (iii)   Mark Greenberg

       (iv)    Shane Miller

       (v)     Sherri Phillips

       (vi)    Craig Schwartz

       (vii)   Gerard Elias

       (viii)  Jamin Gibson

113449.00601/21023722v1

(ix)    Michael Zarcone

Defendant objects to the witnesses that are designated with an asterisk under plaintiff's list of fact witnesses to the extent these witnesses are called to express expert opinions. These witnesses do not qualify as experts. These witnesses, and their alleged expert opinions, were not properly identified by plaintiff during discovery.

### b. Retained Experts.

(i)    Donald Frueh - Mr. Frueh is an expert in the financial services industry, including, but not limited to, extensive experience in underwriting, administering and collecting commercial loans. Mr. Frueh has additional experience as an advisor to banks in matters of loan policy, loan administration and loan review. He is an expert in the areas of finance, commercial lending, and banking and lending custom and practice.

### F.    Summary of testimony of each expert witness.

Mr. Frueh can be expected to testify in accordance with his expert report dated January 22, 2002, on file with the clerk. By way of summary, Mr. Frueh can be expected to express the following opinions:

(i)    It is not uncommon for borrowers to utilize one accommodation to repay another accommodation from their bank depending on tenure, terms or rate of interest.

(ii)    The payment made by CCI on the $1.2 million Short-Term Note cannot be considered "conditional".

12

113449.00601/21023722v1

(iii)    CCI acted in accordance with the terms of the parties' loan documents and operating procedures that were established between CCI and the bank in the repayment of the $1.2 million Short-Term Note.

(iv)    The usual and customary banking practice would be to require that any payment be made from "collected funds" before a payment is credited, and since the repayment was from Allfirst funds, it was immediately available funds.

**G.    Special comment about pleadings and discovery.**  None.

**H.    A summary of legal issues involved and legal authorities relied upon.**

(i)    Did Mr. Ortenzio breach any of the terms of the Suretyship Agreement?

(ii)    Can Allfirst Bank hold Mr. Ortenzio liable for CCI's obligations under any of the loans that CCI had with Allfirst.

(iii)    Do any of the agreements between Allfirst and Mr. Ortenzio or CCI preclude CCI from paying the $1.2 million note in the manner that it was paid.

(iv)    Can Allfirst now claim that the repayment of the $1.2 million dollar loan was a "conditional payment".

(v)    Was there any requirement in the documents that required the $4 million line of credit to be repaid in full before any payments could be made on the $1.2 million short-term loan.

113449.00601/21023722v1

(vi)     Can Allfirst be equitably subrogated to its own rights under the $4 million line of credit.

(vii)     Did defendant commit common law fraud and/or fraudulent concealment when CCI repaid the $1.2 million short-term loan.

Principal Authorities Relied Upon by Defendant.

### a.     Conditional Payment

(i)     <u>Chew-Bittle Assoc., Inc. v. Crusader Sav. Bank</u>, 430 Pa. Super 631, 635 A.2d 653 (1993) (Bank may revoke settlement of a check only if it has not finally paid the item and holder of check, having not heard from bank within a reasonable time, must be permitted to assume the check has been paid).

### b.  Equitable Subrogation

(i)     <u>Public Serv. Mut. Ins. Co. v. Kidder-Friedman</u>, 743 A.2d 485, 488 (Pa. Super. 1999) (defining the doctrine of equitable subrogation as "the substitution of one entity in the place of another with reference to a lawful claim, demand, or right so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies or securities."

(ii)     Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co., 968 F.2d 357, 362 (3rd Cir. 1992) (In order to successfully establish a claim for equitable subrogation, the plaintiff must show: "(1) the claimant paid the creditor to protect its own interests; (2) the claimant did not act as a volunteer; (3) the claimant was not primarily liable for the debt; and (4) allowing subrogation will not cause injustice to the rights of others").

14

(iii)    Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co., 968 F.2d 357, 362 (3rd Cir. 1992) (equitable subrogation is not an appropriate remedy when the party was in a position to negotiate for the rights it seeks through subrogation but failed to do so).

### c. The Availability of Equitable Relief

(i)    Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co., 968 F.2d 357, 362 (3rd Cir. 1992) (In Pennsylvania, equitable relief is not permissible when a party has an adequate legal or statutory remedy).

(ii)    Redmond Finishing Co., Inc. v. Ginsburg, 301 Pa. Super. 51, 446 A.2d 1330 (dismissing action in equity because plaintiff had earlier elected to proceed at law for monetary damages).

### d. Fraud

(i)    Lind v. Jones, Lang LaSalle Americas, Inc., 135 F. Supp.2d 616, 620 (E.D. Pa. 2001) (In order to prove fraud, Pennsylvania law requires that the plaintiff establish the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance).

(ii)    Gruenwald v. Advanced Computer Applications, 730 A.2d 1004, 1014 (Pa. Super. 1999)

15

(iii)    <u>Lind v. Jones, Lang LaSalle Americas, Inc.</u>, 135 F. Supp.2d 616, 620 (E.D. Pa. 2001) (The elements of fraud must be proven by clear and convincing evidence, not the lesser preponderance of the evidence standard).

**I.    Stipulations desired.**  None.

**J.    Estimated number of trial days.**  3.

**K.    Any other matter pertinent to the case to be tried.**  Defendant disputes that the amount of damages claimed by plaintiff is dependent upon the outcome of a preference claim asserted by CCI in an adversary proceeding between CCI and Allfirst Bank. The issue in this case is the amount of damages Allfirst has presently suffered, not alleged or speculative damages that Allfirst may suffer in the future.

**L.    Pursuant to Local Rule 16.3 append to this memorandum a prenumbered schedule of exhibits, with brief identification of each, on the clerk's Exhibit Form.**  Defendant's list of exhibits is attached hereto as Exhibit "L".  Defendant does not object to the authenticity of Plaintiff's proposed exhibits that were provided to Defendant.  Defendant objects to the admissibility of the following exhibits:  4(A-F), 5, 6, 13, 17-22(A-R), 23(A-R), 27, 29, 30.  Defendant has not yet viewed, or been provided with, a copy of Plaintiff's Exhibit Nos. 14, 26 or 28.  Accordingly, Defendant is unable to make a determination of any objection it may have as to authenticity or admissibility of these exhibits.  Defendant reserves the right to object to these exhibits when, and if, they are provided to Defendant.

**M.    Append any special verdict questions which counsel desires to submit.**
Not applicable.

**N.    Statement under Local Rule 16.2.**  Mr. Ortenzio has been sued in his individual capacity.  Mr. Ortenzio has full settlement authority.  Settlement does not require the approval of any committee of an insurance carrier.  Mr. Ortenzio has been notified of the requirements of and possible sanctions under Local Rule 16.2.

**O.    Certificate under Local Rule 30.10.**  Defendant does not contemplate using the deposition testimony as to any witness in its direct case.  Plaintiff has advised that in the event Sherri Phillips does not attend the trial in this matter that Plaintiff will videotape the deposition of Sherri Phillips.  Defendant will comply with Local Rule 30.10 in the event Plaintiff takes the videotape deposition of Ms. Phillips.  Defendant reserves the right to use deposition testimony with respect to cross-examination and/or impeachment.

17

**P.    Findings of Fact and Conclusions of Law.**  Defendant's requested findings of fact and conclusions of law are attached hereto as Exhibit "P".

BLANK ROME COMISKY & MCCAULEY
LLP

_____
Edward I. Swichar (I.D. No. 15175)
Robert A. Burke (I.D. No. 61268)
BLANK ROME COMISKY & McCAULEY
LLP
One Logan Square
Philadelphia, Pennsylvania 19103-6998
*Attorneys for Defendant John M. Ortenzio*

Dated:  May 14, 2002

113449.00601/21023722v1

## EXHIBIT "L"

## DEFENDANT'S LIST OF EXHIBITS

**CASE CAPTION: Allfirst Bank v. John M. Ortenzio**

**MIDDLE DISTRICT OF PENNSYLVANIA**

**CASE NUMBER: 1:01-CV-786**

**JUDGE: The Honorable Sylvia Rambo**

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|-----|-----|-------------------------------|------------|----------|--------|------------------|
| | 1 | April 20, 1994 Letter Agreement re Establishment of cash Management Program C 8185-8188 | | | | |
| | 2 | Combined Account Analysis C 6187-6194 | | | | |
| | 3 | Corporate Checking Account Statement C 7401-7415 | | | | |
| | 4 | Transaction Receipt C 7769 | | | | |
| | 5 | Accumulated Transaction List C 7750-7768, C 7398-7400 | | | | |
| | 6 | February 25, 2000 Letter From Craig Schwartz to Gerard Elias (with enclosures) C 6362-6366 | | | | |
| | 7 | Handwritten Notes C 1686-1692 | | | | |
| | 8 | July 22, 1992 Commercial Loan C 0102, Schwarz Deposition Exhibit 1 | | | | |
| | 9 | Commercial Loan Note Line of Credit dated November 20, 1998 C 0151-0156, Schwartz Deposition Exhibit 7 | | | | |
| | 10 | Accumulated Transaction List C 1678, Schwartz Deposition Exhibit 9 | | | | |

113449.00601/21022107v1

| | |
|---|---|
| 11 | March 3, 2000 Memorandum from Craig Schwartz to Jamie Gibson C 7132-7134, Schwartz Deposition Exhibit 10 |
| 12 | Borrower Rating Summary dated March 16, 1999 C 0259-0260, Schwartz Deposition Exhibit 11 |
| 13 | Allfirst Financial Charge-off Memorandum C 0547-0550, Gibson Deposition Exhibit 5 |
| 14 | April 5, 2000 and March 3, 2000 Memoranda from Elaine Kowalski to Jamin Gibson C 0221-0235 |
| 15 | Borrower Rating Summary C 0259-0260 |
| 16 | March 29, 2000 Letter from CCI Construction to Craig Schwartz C 0551 |
| 17 | February 24, 2000 Credit Review Quarterly Status Report C 0554-0557 |
| 18 | Special Credit Division New Account Form C 0385-0388 |
| 19 | Allfirst Bank Commercial Loan Activity Journal for the Period 01/01/99 to 12/31/99, pages 1091-1102 |
| 20 | Allfirst Bank Commercial Loan Activity Journal for the Period 01/01/00 to 12/31/00, pages 5679-5699 |
| 21 | February 24, 2000 Letter from Lawrence J. Gebhardt to CCI Construction Co., Inc. |
| 22 | Allfirst Bank CCI Construction Co., Inc. Account History File C 5705-5738 |
| 23 | CCI Construction Co., Inc. Check No. 060628 |

2

## EXHIBIT "P"

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK             :

                  :

        Plaintiff,        :    CASE NO. 1:01-CV-786

                  :

        v.           :

                  :

JOHN M. ORTENZIO      :

                  :

        Defendant.     :

## DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Findings of Fact

1.     CCI Construction Co, Inc. ("CCI") entered into three loan agreements that are relevant to this action: a line of credit that CCI executed on March 24, 1999, pursuant to which Allfirst Bank ("Allfirst") provided CCI a long term, unsecured $4 million line of credit ("the Line of Credit"); a Commercial Loan (equipment) Note dated November 20, 1998, pursuant to which Allfirst extended a $2 million loan to CCI, secured by CCI's equipment ("the Equipment Note"); and a Commercial Loan Note dated November 8, 1999, in the amount of $1.2 million, ("the Short-Term Note").

2.     Defendant, John M. Ortenzio ("Mr. Ortenzio") entered into a Suretyship Agreement whereby Mr. Ortenzio personally guaranteed the $1.2 million Short-Term Note (the "Suretyship Agreement").

3.     CCI maintained a single checking account at Allfirst and all of the aforementioned loans were tied into a cash management facility. More specifically, any checks written on CCI's account at Allfirst increased the balance owed on the line of credit

and, conversely, all revenues deposited to CCI's account had the effect of reducing the balance and, thereby, increasing the availability of funds that could be borrowed on the line of credit.

4.    CCI was required to maintain its primary account at Allfirst and was required to deposit all profits and all revenues from cash flow into this account.  In addition, CCI's customers wire transferred payments directly to Allfirst to be deposited directly into the checking account.

5.    When Allfirst loaned CCI the sum of $1.2 million, pursuant to the Short-Term Note, it decreased the balance owed on the line of credit by $1.2 million.

6.    All payments that CCI made from its checking account, such as payroll, taxes, payments to vendors and re-payments on the $2 million equipment note were drawn from the line of credit, and thereby had the same effect of increasing the balance on the $4 million line of credit.

7.    In approximately late October, 1999, CCI was encountering cash flow difficulties.  CCI advised Allfirst that it was encountering these cash flow difficulties and requested a short-term $1 million loan, to be repaid by no later than February 28, 2000.

8.    In response, Allfirst initially sought to increase the $4 million line of credit to a $5 million line of credit, and requested that Mr. Ortenzio guarantee the full $5 million.  Mr. Ortenzio refused.

9.    CCI and Allfirst subsequently agreed that Allfirst would loan CCI the sum of $1.2 million, pursuant to the Short-Term Note and that the $1.2 million would be repaid by no later than March 31, 2000.  This was $200,000 more than CCI initially requested.  The

repayment date was one month later than CCI initially requested. Allfirst agreed to limit Mr. Ortenzio's guaranty to the $1.2 million Short-Term Note after Mr. Ortenzio refused to guarantee more than that amount.

10.     Pursuant to the parties' agreement, the form language in the $1.2 million Short-Term Note was stricken to make it clear that Mr. Ortenzio's guarantee would extend to the $1.2 million Short-Term Note only, and not to the $4 million line of credit or to any other loan facility at Allfirst. Allfirst could have asked Mr. Ortenzio to guarantee up to $1.2 million of any loan facility, i.e., not limit the guaranteed amount to the Short-Term Note only, but failed to do so.

11.     There were no restrictions in the Short-Term Note as to the source of funds that could be used to repay the note. There is no document that deals with how the loan was to be repaid, nor was there any document that states that the $1.2 million Short-Term Note could not be repaid by writing a check on CCI's checking account, thereby drawing on the line of credit.

12.     On February 11, 2002, approximately one month prior to the due date, CCI repaid the $1.2 million Short-Term Note by writing a check on CCI's Allfirst checking account. Pursuant to the cash management system set up by Allfirst, the payment of this check appeared as a draw on the $4 million line of credit and, thereby, merely reversed the book-entry transaction that was made when Allfirst had lent CCI the $1.2 million a few months earlier.

13.     At the time of the repayment, and because of several deposits that CCI made, CCI owed only approximately $1.2 million on the $4 million line of credit, so that the total

3

amount due after the repayment was approximately $2.4 million. In other words, at the time of the repayment of $1.2 million Short-Term Loan, there was a sufficient cushion under the $4 million line of credit to repay the Short-Term Note.

14.     Allfirst accepted the payment and notified CCI that the $1.2 million Short-Term Note was repaid.

15.     On February 24, 2000, Allfirst declared a default under both the line of credit and the equipment note, but failed to provide CCI the 30 day notice and opportunity to cure, as required in the $4 million note. Allfirst immediately seized all of CCI's assets, froze its checking account and dishonored all checks including payroll and taxes. CCI's bankruptcy followed thereafter.

16.     The bank documents did not preclude CCI from paying the $1.2 million note by using the available line of credit.

17.     The bank documents did not specify how the $1.2 million note was to be repaid.

18.     The only way the $1.2 million Short-Term Note could be repaid was by using the cash management facility thereby drawing on the line of credit.

19.     The $1.2 million Short-Term Note was repaid in the same manner as the other loans CCI had with Allfirst.

20.     The repayment of the $1.2 million note was merely a reversal of the initial transaction.

4

21.    There is no equitable reason to grant subrogation to Allfirst because Allfirst had the ability to negotiate for the rights it now seeks to acquire by subrogation and failed to do so.

22.    Allfirst is not entitled to an equitable remedy because an adequate remedy exists at law.

23.    Mr. Ortenzio made no false statements upon which Allfirst relied.

24.    Mr. Ortenzio did not intend to deceive Allfirst.

25.    CCI acted in accordance with the terms of the parties' loan documents and operating procedures that were established between CCI and the bank in the repayment of the $1.2 million Short-Term Note.

26.    It is not uncommon for borrowers to utilize one accommodation to repay another accommodation from their bank depending on tenure, terms or rate of interest.

27.    The usual and customary banking practice would be to require that any payment be made from "collected funds" before a payment is credited, and since the repayment was from Allfirst funds, it was immediately available funds.

## Conclusions of Law

### A.    Allfirst Has Failed to Establish a Claim for Breach of Contract Against Mr. Ortenzio or Any Other Claim Alleged Under Count I.

1.    Under Pennsylvania law, in order to prove a breach of contract, a plaintiff must show:

> (1) the existence of a valid and binding contract to which the plaintiff and defendants were parties; (2) the contract's essential terms; (3) that plaintiff complied with the contract's terms; (4) that the defendant breached a duty imposed by the contract; and (5) damages resulting from the breach.

<u>Wausau Underwriter's Ins. Co. v. Shisler</u>, No. CIV.A. 98-5145, 2000 WL 233236 *5 (E.D. Pa. Feb. 28, 2000) (citing <u>Gundlach v. Reinstein</u>, 924 F. Supp. 684, 688 (E.D. Pa. 1996)).

2.    In this case, the evidence shows that a valid and binding contract existed between Allfirst and Mr. Ortenzio, i.e., the Suretyship Agreement pursuant to which Mr. Ortenzio guaranteed CCI's obligation under the Short-Term Note, and that the terms of the Short-Term Note did not prohibit repaying the Short-Term Note from the line of credit.

3.    Because the Short-Term Note was paid in a manner consistent with its terms, Mr. Ortenzio cannot be liable for breach of that agreement.

4.    As Allfirst cannot establish breach, it cannot establish that damages resulted.

5.    The bank documents did not preclude CCI from paying the $1.2 million note by using the available line of credit.

6.    There were no restrictions in the Short-Term Note as to the source of funds that could be used to repay the note. While nothing prohibited Allfirst from negotiating a provision restricting the source of funds, it failed to do so. The court will not enforce a provision to an agreement that does not exist. See, <u>Glen-Gery Corp. v. Wargel Constr. Co.</u>, 734 A.2d 926, 929 (Pa. Super. 1999) (stating that reviewing court may not rewrite the terms of a contract nor give them a meaning that conflicts with the language used).

7.    The bank documents did not specify how the $1.2 million note was to be repaid.

8.    There were no documents dealing with how the loan was to be repaid, nor was there any document stating that the $1.2 million Short-Term Note could not be repaid by writing a check on CCI's only checking account, thereby drawing on the line of credit.

6

See, Anchel v. Shea, 762 A.2d 346, 352 (Pa. Super. 2000) (stating that when court is interpreting intention of parties to a contract, court must give effect to clear and unambiguous terms without reference to matters outside the contract).

9.     The only way the $1.2 million note could be repaid was by using the cash management facility thereby drawing on the line of credit.

10.    As Allfirst was well aware, CCI maintained a single checking account at Allfirst and all of CCI's loans (the Line of Credit, the Equipment Note and the Short-Term Note) were tied into a cash management facility. Furthermore, CCI was required to deposit all collected receivables into this account. Thus, CCI had no other account from which it could pay the $1.2 million Short-Term Note. In fact, the bank's documents required CCI to maintain its primary account at Allfirst.

11.    The $1.2 million Short-Term Note was repaid in the same manner as the other loans CCI had with Allfirst.

12.    All payments that CCI made came from CCI's Allfirst Bank checking account that was tied to the cash management facility.

13.    These payments included not only payroll, taxes and payments to vendors, but also repayments on the Equipment Note. Allfirst accepted Equipment Note payments consistently and without question.

14.    The repayment of the $1.2 million Short Term Note was merely a reversal of the initial transaction. When Allfirst loaned CCI the $1.2 million, pursuant to the Short-Term Note, it deposited the funds into the cash management facility. This deposit had the effect of increasing the availability on the Line of Credit by $1.2 million and conversely,

113449.00601/21024161v1

decreasing the balance owed on the Line of Credit by $1.2 million. Therefore, when CCI repaid the $1.2 million Short-Term Note by writing a check on its Allfirst account, this initial transaction was merely reversed.

15.     Based upon the foregoing evidence, Allfirst cannot establish that the $1.2 million Short-Term Note was breached. Rather, the evidence shows that neither CCI nor Mr. Ortenzio did anything that was prohibited by the loan documents.

**B.     Allfirst Has Failed To Establish That Mr. Ortenzio Was Unjustly Enriched**

16.     The quasi contract remedy of unjust enrichment does not apply when the parties' relationship is defined by a contract.

17.     Quantum meriut is "a quasi-contractual remedy in which a contract is implied-in-law under a theory of unjust enrichment; the contract is one that is implied in law, and 'not an actual contract at all.'" Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 998-99 (3rd Cir. 1987) (citing Ragnar Benson, Inc. v. Bethel Mart Assoc., 308 Pa. Super. 405, 414, 454 A.2d 599, 603 (1982)).

18.     It is well settled under Pennsylvania law, that a claim for the quasi- contractual doctrine of unjust enrichment will not lie when the relationship between the parties is based upon a written agreement or express contract. Hershey Foods, 828 F.2d at 999 (citing Benefit Trust Life Ins. Co. v. Union Nat. Bank, 776 F.2d 1174 (3rd Cir. 1985). See also, Halstead v. Motorcycle Safety Foundation, Inc., 71 F. Supp.2d 455 (E.D. Pa. 1999) (the finding of a valid contract prevents a party from recovering for unjust enrichment); Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. 1999)(a court may not make a finding of unjust enrichment where a written or express contract exists); Birchwood Lakes Community Ass'n

8

v. Com., 296 Pa. Super. 77, 442 A.2d 304, 308 (1982) (plaintiff cannot recover on a claim for

unjust enrichment if such claim is based on breach of a written contract).

19.     The cause of action for quantum meriut may not lie here in light of the fact

that it is undisputed that the parties' relationship is governed by a written contract.

### C.     Allfirst Has Failed To Establish A Cause Of Action For Equitable Subrogation.

20.     There is no equitable reason to grant subrogation to Allfirst because Allfirst

had the ability to negotiate for the rights it now seeks to acquire by subrogation and failed to

do so.

21.     Pennsylvania recognizes the doctrine of equitable subrogation, which is

defined as "the substitution of one entity in the place of another with reference to a lawful

claim, demand, or right so that he who is substituted succeeds to the rights of the other in

relation to the debt or claim, and its rights, remedies or securities." Public Serv. Mut. Ins.

Co. v. Kidder-Friedman, 743 A.2d 485, 488 (Pa. Super. 1999) (quoting Molitoris v. Woods,

422 Pa. Super. 1, 9, 618 A.2d 985, 989 (1992).

22.     In order to successfully establish a claim for equitable subrogation, the

plaintiff must show: "(1) the claimant paid the creditor to protect its own interests; (2) the

claimant did not act as a volunteer; (3) the claimant was not primarily liable for the debt; and

(4) allowing subrogation will not cause injustice to the rights of others." Tudor Dev. Group,

Inc. v. United States Fidelity & Guar. Co., 968 F.2d 357, 362 (3rd Cir. 1992) (citing United

States Fidelity & Guar. Co. v. United Penn Bank, 362 Pa. Super. 440, 524 A.2d 958 (1987).

23.     However, as the court pointed out in Tudor Dev. Group, equitable

subrogation is not an appropriate remedy when the party was in a position to negotiate for

9

the rights it seeks through subrogation but failed to do so.  Id. at 363 (citing  In re Carley

Capital Group, 119 B.R. 646, 650 (W.D. Wis. 1990); In re Muzenrieder Corp., 58 B.R. 228,

231 (Bankr. M.D. Fla. 1986)).

      24.     Because Allfirst, by its own admission, did not negotiate for and obtain the

rights it now seeks through equitable subrogation, the doctrine is inapplicable.  Consequently

summary judgment should be entered in favor of Mr. Ortenzio on Count II of Allfirst's

complaint.

      25.     Allfirst is not entitled to an equitable remedy because an adequate remedy

exists at law.

      26.     In Pennsylvania, equitable relief is not permissible when a party has an

adequate legal or statutory remedy.  Tudor Dev. Group, 968 F.2d at 364 (citing Clark v.

Pennsylvania State Police, 496 Pa. 310, 436 A.2d 1383, 1385 (1981).  See also, Redmond

Finishing Co., Inc. v. Ginsburg, 301 Pa. Super. 51, 446 A.2d 1330 (dismissing action in

equity because plaintiff had earlier elected to proceed at law for monetary damages).  "In

determining whether a remedy is 'adequate,' [the court] must look to its availability and not

to the likelihood of success."  Tudor Dev. Group, 968 F.2d at 364.

      27.     The fact that the remedies set forth above might not make [the bank] whole

does not mandate a finding that such remedies are inadequate, thereby requiring this court to

grant equitable relief."  Id.

      28.     Here, Allfirst has the option of proceeding with its breach of contract claim

against Mr. Ortenzio or it can file a claim against CCI in the bankruptcy proceedings, both

of which are available legal remedies.  Regardless of whether Allfirst will be made whole

under either of these adequate and available options, Allfirst is not entitled to the equitable remedy of subrogation.

**D.    Allfirst Has Failed To Establish A Cause Of Acton For Fraud.**

29.    In order to prove fraud, Pennsylvania law requires that the plaintiff establish the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  See, Lind v. Jones, Lang LaSalle Americas, Inc., 135 F. Supp.2d 616, 620 (E.D. Pa. 2001) (citing Gibbs v. Ernst, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994); Gruenwald v. Advanced Computer Applications, 730 A.2d 1004, 1014 (Pa. Super. 1999)).

30.    Additionally, these elements must be proven by clear and convincing evidence, not the lesser preponderance of the evidence standard.  Lind, 135 F. Supp.2d at 621. "Pennsylvania law requires that the trial judge to decide as a matter of law before he submits a case to the jury whether plaintiffs' evidence attempting to prove fraud is sufficiently clear, precise, and convincing to make out a prima facie case." Id. (citing Northeastern Power Co. v. Balcke- Durr, Inc., 49 F. Supp.2d 783 (1999).

31.    Allfirst does not establish, by clear and convincing evidence, that Mr. Ortenzio made a false statement upon which Allfirst relied.

32.    Allfirst cannot establish, by clear and convincing evidence that Mr. Ortenzio intended to deceive Allfirst.  As Allfirst admits, the payment of the $1.2 million Short-Term Note was a check  written on CCI's line of credit with Allfirst.  Thus, because Mr. Ortenzio

11

personally presented an Allfirst check, bearing the account number of CCI's checking account with Allfirst, to Allfirst when repaying the Short-Term Note, Allfirst cannot establish that Mr. Ortenzio failed to deceive Allfirst. Mr. Ortenzio made no attempt to hide the source of the funds. His failure to explicitly state the source of the funds, when none of the loan documents required any such representation, does not establish an intent to deceive.

33.    Bank may revoke settlement of a check only if it has not finally paid the item and holder of check, having not heard from bank within a reasonable time, must be permitted to assume the check has been paid. Chew-Bittle Assoc., Inc. v. Crusader Sav. Bank, 430 Pa. Super 631, 635 A.2d 653 (1993).

113449.00601/21024161v1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the aforesaid Pretrial

Memorandum was served this 14th day of May, 2002, by Federal Express, upon the

following:

        Lawrence J. Gebhardt, Esquire
        Ramsay M. Whitworth, Esquire
        Gebhardt & Smith LLP
        The World Trade Center, 9th Floor
        Baltimore, MD  21202

_____
        ROBERT A. BURKE