# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK,                    :

   Plaintiff,              :

     v.                  :  CASE NO. 1:01-CV-786

JOHN M. ORTENZIO,                 :

   Defendant.             :

**FILED**
HARRISBURG, PA
MAY 2 3 2002
MARY E. D'ANDREA
Per_____ CLERK

## DEFENDANT'S REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

  Defendant, John M. Ortenzio ("Mr. Ortenzio"), submits this reply brief in further support of Defendant's motion for summary judgment and brief in opposition to Plaintiff's motion for summary judgment. In its Complaint, Allfirst Bank ("Allfirst") seeks to hold Mr. Ortenzio personally liable for the corporate obligations of CCI Construction Co., Inc. ("CCI") by bypassing the clear language of the contract between Allfirst and Mr. Ortenzio. Allfirst's claims fail, and Mr. Ortenzio is entitled to summary judgment, as Mr. Ortenzio is not personally liable for any amount owed by CCI on the $4 million Line of Credit. Furthermore, Allfirst cannot establish that the manner in which CCI paid its contractual obligation was prohibited by the loan documents.

## I. THIS CASE IS A BREACH OF CONTRACT CASE

### A. Allfirst Has Sued on a Breach of Contract Theory.

  In its Memorandum of Law in Opposition to Ortenzio's Motion for Summary Judgment ("Allfirst's Memorandum in Opposition"), Allfirst claims that this case is not a breach of contract case and no interpretation of contracts is involved. Allfirst's Memorandum in

Opposition at 9.  This flies in the face of the allegations pled by Allfirst in its Complaint and is

contrary to Allfirst's statement in its Motion in Limine.

In Count One of its Complaint, Allfirst alleged the following:

> "Because the One Million Two Hundred Thousand Dollar loan
> from Allfirst to CCI was never paid or discharged in full, the
> obligation of Ortenzio, as guarantor and surety and co-obligor with
> respect to the One Million Two Hundred Thousand Dollar loan and
> the Commercial Note, was never discharged or satisfied, such that
> Ortenzio remains liable under the Suretyship Agreement for all
> sums owed by CCI pursuant to the One Million Two Hundred
> Thousand Dollar loan and the Commercial Note."    Allfirst's
> Complaint, ¶ 29.

These allegations sound in contract, not equity.  Allfirst claims that CCI breached its

obligation under the Commercial Note and that Mr. Ortenzio breached his obligation under the

Suretyship Agreement.  Similarly, in its Motion in Limine, Allfirst acknowledges that: "The

Court is fully capable of reviewing the loan documents and interpreting the terms and provisions

of the loan documents on its own."   Allfirst's Memorandum of Law in Support of its Motion in

Limine at 6.  In addition, in its Memorandum in Opposition, Allfirst argues that CCI's repayment

of the $1.2 million short-term note from the $4 million line of credit was an unauthorized use by

CCI of the line of credit because it was precluded by the loan documents.    Allfirst's

Memorandum in Opposition at 9-12.[1]  In essence, Allfirst is alleging that CCI and Mr. Ortenzio

breached their contractual obligations with Allfirst.  Indeed, as the rights and obligations as

between Allfirst and Ortenzio are set forth in the Suretyship Agreement, Allfirst's claims against

Mr. Ortenzio must sound in contract, not equity.

---

[1] Interestingly, while claiming that this case does not involve breach of contract or interpretation of contracts,
Allfirst relies upon the testimony of Sheri Phillips and her interpretation what she believed was prohibited by the
loan documents.  Allfirst's Memorandum in Opposition at 3-4.  Of course, it is only the Court, and not Ms. Phillips,
that can interpret the loan documents.

2

**B.    Conditional Payment is Not a Cause of Action.**

Allfirst claims that this case "falls squarely into the conditional payment rule."  Allfirst's Memorandum of Law in Support of its Motion for Summary Judgment at 9.  However, in the cases cited by Allfirst in support of this theory, the underlying causes of action were breach of contract, not equity.  See, Citizens' Bank of Wind Gap v. Lipschitz, 296 Pa. 291, 145 A. 831 (1929) (bank brought action against defendant on a note); First Pennsylvania Bank v. Triester, 251 Pa. Super. 372, 380 A.2d 826 (1977) (bank brought action on promissory note); Mechanics National Bank of Burlington v. Kielkopf, 22 Pa. Super. 128 (1903) (assumpsit action on a promissory note).

Further, the cases relied on by Allfirst are merely novation cases, where the ultimate issue was whether it was the parties' intention that a later agreement replace the original agreement. See, Citizens' Bank, 296 Pa. at 293, 145 A. at 831 (when original note became due, renewal note was signed and delivered to bank by same maker); First Pennsylvania Bank, 215 Pa. Super. at 375-376, 380 A.2d at 827-28 (bank agreed to extension of time to repay additional note and renewal note was executed by defendants); Mechanics National Bank, 22 Pa. Super. at 129 (original note became due and instead of payment in full, bank received renewal notes).

The cases cited by Allfirst in support of its novel conditional payment theory in no way relate to the facts of this case.  Here, no new note was offered and no agreement was made between Allfirst, CCI or Mr. Ortenzio that a new obligation would replace the Surety Agreement.  Rather, the ultimate issue in this case is whether CCI's payment of the $1.2 million short-term note by writing a check that caused a draw on the line of credit constituted a breach of contract between Mr. Ortenzio and Allfirst. The answer to that question is "no."

3

**C.    Mr. Ortenzio Did Not Breach Any Agreement With Allfirst.**

Despite the fact that Allfirst has pled a breach of contract action, Allfirst now claims to be seeking to "nullify the effect of the purported payment [by CCI] under theories of conditional payment, equitable subrogation and fraud." Allfirst's Memorandum in Opposition at 9. Yet, realizing that relying on the loan documents will limit Allfirst's recovery to suing CCI for breach of contract, Allfirst switches tactics and claims that this is a suit in equity. Since Allfirst cannot establish that CCI's repayment violated any of the terms of the short-term note, CCI cannot maintain a cause of action for breach of contract and thus, summary judgment should be entered in favor of Mr. Ortenzio on Count One.

**1.    Payment of the $1.2 Million Short-Term Note Was Not a Conditional Payment Because it Was Not Prohibited By the Loan Documents.**

Although Allfirst argues that CCI's payment of the $1.2 short-term note was "conditional" because repayment was made from an unauthorized source of funds, the evidence is to the contrary. There is no document between the parties that specifies the source of funds for repayment. See, Exhibits "B" and "C" to Allfirst's Complaint. Furthermore, Mr. Schwartz, Allfirst's loan officer, admitted that no such document exists:

> Q:    **Is there any document that deals with how the, how the loan is to be repaid specifically?**
>
> A:    **No.**
>
> Q:    Is there any document that specifically states that it cannot be repaid by writing a check on CCI's business account, checking account?
>             ***
> A:    Not specifically.

Schwartz Dep. at 144:8 – 144:17 (emphasis added). Mr. Schwartz further acknowledged

4

that Allfirst was not precluded from negotiating a provision limiting the source of repayment:

> Q:     Are you aware of any reason why the bank couldn't put in the commitment letter for the 1.2 million or in the 1.2 million dollar note or in the 1.2 million dollar suretyship an express prohibition that that facility could not be repaid by drawing down on the four million dollar line of credit?
>
> A:     There's no reason the bank could not have done that.

Schwartz Dep. at 147:1 – 147:9.  Moreover, Mr. Schwartz admitted that neither CCI nor Mr.

Ortenzio were limited regarding the source of funds to repay the short-term note:

> Q:     Is there any document signed and made binding on Mr. Ortenzio or CCI that limited the repayment of the 1.2 million dollar note from excess cash flow?
>
> A:     No.

Schwartz Dep. at 203:3 – 203:7.  Finally, Mr. Schwartz testified that although there were

negative covenants in the loan documents, which imposed prohibitions on CCI and Mr. Ortenzio,

none of those negative covenants prohibited repayment of the loan from the line of credit:

> Q:     And the loan commitment and/or the note contains loan – negative covenants, correct?
>
> A:     Yes.
>
> Q:     Okay.  And the bank could have put in a negative covenant that prohibited the repayment of the 1.2 million from the four million dollar line of credit, is that correct?  Nothing prohibited that, right?
>
> A:     Nothing prohibited that.

Schwartz Dep. at 147:16-148:3.

In addition, according to Allfirst, the line of credit was to be used solely to finance

accounts receivable and work in process.  Allfirst's Memorandum in Opposition at 3.  Allfirst

5

relies heavily on the fact that CCI's use of its $4 million line of credit was restricted by the terms of the commitment letter. Initially, it should be noted that when Allfirst initiated this action on the $4 million Line of Credit, it did not identify the Commitment Letter as being part of the $4 million Line of Credit, nor was the Commitment Letter attached to the Complaint evidencing this loan. See Complaint at paragraph 6 and Exhibit "A". Moreover, Allfirst fails to mention that the $1.2 million short-term note was used for the same purpose – financing accounts receivable and work in process. Ortenzio Dep. at 86; Schwartz Dep. at 145. Mr. Schwartz admitted that as far as he was aware, CCI did not use the proceeds of the $1.2 million short-term note for any purpose other than financing accounts receivable and work in progress:

> Q:    Prior to the repayment of the 1.2 million dollar note in February, on February 11, 2000, were you aware of CCI ever using the 1.2 million dollar loan proceeds for any other purpose . . . Other than to finance accounts receivable and work in progress, prior to the repayment?
>
> A:    I am not aware of any.

Schwartz Dep. at 145:3 – 145:10. Most importantly, Mr. Schwartz admitted that when CCI repaid the $1.2 million short-term note by writing a check on the line of credit, CCI had sufficient availability of funds under the line of credit:

> Q:    Now, at the time of repayment of the 1.2 million coincidently in February 2000, the balance on the four million dollar line of credit allowed for the repayment of the 1.2 from the four million; is that correct?
>
>                           ***
>
> A:    Yes.

Schwartz Dep. at 200:12 – 201:4. Thus, CCI's repayment of the note by using the line of credit did not violate the terms of the commitment letter and as such, does not establish that CCI

6

or Mr. Ortenzio breached their agreements with Allfirst.[2]

> **2.    The Line of Credit Was the Only Source of Funds From Which CCI Could Repay the $1.2 Million Short-Term Note.**

The commitment letter that Allfirst relies so heavily upon also required that CCI establish and maintain its primary business deposits at Allfirst.  See Exhibit "B" to Allfirst's Motion for Summary Judgment, at p. 2.  Consistent with this requirement, CCI deposited all funds received from customers into this account.  Ortenzio Dep. at 62; Phillips Dep. at 65-66.  In addition, Mr. Schwartz acknowledged:

> Q:    Where were the bank's profits to be deposited, as far as you're concerned?
>
> A:    The bank's?
>
> Q:    CCI's profits, to be deposited, as far as you're concerned?
>
> A:    In their deposit account.
>
> Q:    Okay.  And where was revenues from cash flow to be deposited from CCI?  In the bank's checking account as well?
>
> A:    Yes.

Schwartz Dep. at 67:1 – 67:11. Mr. Schwartz further clarified how the cash management system worked:

> Q:    And, again, my question is, just so I understand the mechanism of the cash management facility, that any checks written from CCI's account with the bank would increase the four million dollar line of credit borrowings, is that correct?
>
> A:    Yes.

---

[2] Moreover, although CCI did not violate the terms of the $4 million Line of Credit by paying off the $1.2 million short-term note in the manner it was paid, Mr. Ortenzio cannot be held liable for breach of the terms of the $4 million Line of Credit because Mr. Ortenzio was not a party to that agreement.  Accordingly, even if CCI violated the terms of the $4 million Line of Credit, Allfirst's cause of action must be against CCI, not Mr. Ortenzio.

> Q:    And so far as you know, CCI had no business accounts elsewhere?
>
> A:    As far as I know, they did not.
>
>           * * *
>
> Q:    All right. I'm CCI and I want to pay a bill. I collect my money from a customer, I put it in the account, and I want to pay another bill – I want to pay a bill, but I don't want it to draw on the line of credit, four million dollar line of credit. How – could I do that?
>
> A:    I don't think so.

Schwartz Dep. at 142:12 – 143:12.[3]  However, if Allfirst is to be believed, CCI had to deposit all profits and revenues at Allfirst but could not use those funds to repay CCI's 1.2 million short-term note.  That CCI or Mr. Ortenzio would agree to such terms defies logic. Rather, what does make sense is what was actually agreed -- that Allfirst would extend an additional $1.2 million in credit to CCI on a short-term basis with no restrictions on the source of funds to repay the short-term note.

**D.    Allfirst is Seeking to Hold Mr. Ortenzio Liable on the $4 Million Line of Credit and Enforce Rights for Which it Did Not Negotiate.**

Despite CCI's payment of the $1.2 million short-term note, Allfirst is attempting to extend Mr. Ortenzio's liability to the $4 million line of credit, which Mr. Ortenzio did not

---

[3] The deposition transcript of Mr. Schwartz is attached to Defendant's Motion for Summary Judgment as Exhibit "B". Mr. Schwartz' testimony is consistent with Mr. Ortenzio's testimony that when he wrote the check to pay the $1.2 short term note, he did not know whether the funds would be drawn against the line of credit. Mr. Ortenzio testified as follows:

> Q:    And you knew that writing that check would increase the outstanding balance on the line of credit?
>
>       ***
>
> A:    That would depend on whether or not there were funds sitting in our account that would not have been swept by the bank and their cash management system. So to the extent there were funds prior to that, then I guess there would have been a zero impact.

Ortenzio Dep. at 113:6-113:22, attached hereto as Exhibit "A".

8

guaranty.   In fact, during negotiations, Allfirst proposed to extend the existing line of credit by $1 million with Mr. Ortenzio's guaranteeing the entire $5 million but Mr. Ortenzio refused. Schwartz Dep. at 68-69.  Allfirst then agreed that Mr. Ortenzio would only guarantee the $1.2 million short-term note.  Schwartz Dep. at 69

By claiming that CCI's payment of the $1.2 million short-term note was a "conditional payment," and seeking to nullify such payment, Allfirst is attempting to get what it did not obtain in the loan documents – Mr. Ortenzio's guarantee on the $4 million line of credit.  However, the Court cannot rewrite the terms of the agreement merely because Allfirst now believes in hindsight it made a bad deal.  See, Glen-Gery Corp. v. Wargel Constr. Co., 734 A.2d 926, 929 (Pa. Super. 1999) (stating court may not rewrite terms of contract nor give them meaning that conflicts with the language used); Tudor Dev.  Group Inc. v. United States Fidelity & Guar. Co., 968 F.2d 357, 363 (3rd Cir. 1992) (finding no reason for court to exercise its equitable powers to rewrite the contract between the parties and give one party more security than it bargained for).

Consequently, as Allfirst cannot establish that Mr. Ortenzio violated the terms of the Suretyship Agreement and as this Court cannot rewrite the terms of the Suretyship Agreement to give Allfirst what it did not bargain for, summary judgment should be entered in favor of Mr. Ortenzio on Count One of Allfirst's Complaint.

## II.    THE DOCTRINE OF EQUITABLE SUBROGATION IS NOT APPLICABLE

In its Memorandum in Opposition, Allfirst claims that it is not suing Mr. Ortenzio in quantum meruit but rather for equitable subrogation.  Allfirst's Memorandum in Opposition at 12.  However, this restatement of its cause of action by Allfirst ignores what was pled in its Complaint.  In its Complaint, Allfirst alleged:

9

> Because CCI and Ortenzio used the proceeds of the revolving line of credit of CCI with Allfirst to repay the One Million Two Hundred Thousand Dollar loan without Allfirst's knowledge or consent and **because Ortenzio was unjustly enriched thereby, Allfirst, as creditor under the revolving line of credit, is equitably subrogated to the rights of Allfirst as creditor under the One Million Two Hundred Thousand Dollar loan,** including through such equitable subrogation the right to enforce and collect upon the Suretyship Agreement executed by Ortenzio.

Allfirst's Complaint, ¶24. Despite its claim in its Memorandum in Opposition, Count Two of Allfirst's Complaint alleges that Mr. Ortenzio was unjustly enriched and seeks the remedy of equitable subrogation. This is a cause of action for quantum meruit, which is inappropriate due to the fact that it is undisputed that the parties' relationship was defined by a contract. See, Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 998-99 (3rd Cir. 1987) (stating that a claim for the quasi-contractual doctrine of unjust enrichment will not lie when the relationship between the parties is based upon a written agreement or express contract); Halstead v. Motorcycle Safety Foundation, Inc., 71 F. Supp.2d 455 (E.D. Pa. 1999) (the finding of a valid contract prevents a party from recovering for unjust enrichment); Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. 1999)(a court may not make a finding of unjust enrichment where a written or express contract exists); Birchwood Lakes Communtiy Ass'n v. Com., 296 Pa. Super. 77, 442 A.2d 304, 308 (1982) (plaintiff cannot recover on a claim for unjust enrichment if such claim is based on breach of a written contract).

**A.    Even if Allfirst Had Properly Pled a Cause of Action for Which Equitable Subrogation Was an Available Remedy, Allfirst Has Not Established that Such a Remedy Is Applicable Here.**

In the cases cited by Allfirst in support of its claim for equitable subrogation, the

10

underlying causes of action were either in tort or equity but not contract.[4]  See, <u>Potoczny to Use of City of Philadelphia v. Vallejo</u>, 170 Pa. Super. 377, 85 A.2d 675 (1952) (plaintiff brought suit in trespass to recover for personal injuries); <u>In re McGrath's Estate</u>, 159 Pa. Super. 78, 46 A.3d 735 (1946) (suit in equity seeking subrogation as remedy for unjust enrichment);   <u>In re McCahan'e Estate</u>, 312 Pa. 515, 168 A. 685 (1933) (suit in equity); <u>Gildner, Trustee v. First National Bank and Trust Company of Bethlehem</u>, 342 Pa. 145, 19 A.2d 910 (1941) (action for negligence).

Moreover, under Pennsylvania law, the following prerequisites must be established by the party seeking equitable subrogation:  "(1) the claimant paid the creditor to protect his own interests; (2) the claimant did not act as a volunteer; (3) the claimant was not primarily liable for the debt, i.e. secondary liability; (4) the entire debt has been satisfied; (5) allowing subrogation will not cause injustice to the rights of others." <u>Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co.</u>, 968 F.2d 357 (1992).  Allfirst cannot establish all of the required elements.

First, Allfirst (under the $4 million line of credit) cannot establish that it accepted the $1.2 million payment in order to protect its own interests.  In fact, the opposite would be true.  In order to adequately protect itself, Allfirst (under the $4 million line of credit) should have rejected the $1.2 million payment, because it knew that the $4 million line of credit was not secured by Mr. Ortenzio's guarantee.  Second, Allfirst (under the $4 million line of credit) cannot establish that it paid the $1.2 million short-term note because it was secondarily liable on

---

[3] In its Memorandum in Opposition, Allfirst claims that the type of equitable subrogation it is seeking is known as "legal subrogation," which is not dependent upon an actual or implied contract. Allfirst's Memorandum in Opposition at 12. However, the cases cited by Allfirst in support of this assertion are not Pennsylvania cases, but rather Maryland state court cases. It is undisputed that Pennsylvania law is controlling in this case. As Allfirst has not cited any Pennsylvania case adopting the law of equitable subrogation as defined under Maryland law, the Court should disregard Allfirst's claim that legal subrogation is applicable here.

the note. That is simply not the case. Allfirst had no liability on the $1.2 million short-term note. Allfirst (under the $4 million note) is only now claiming that it is entitled to be equitably subrogated to the rights of Allfirst (under the $1.2 million short-term note) because it cannot sue CCI due to its bankruptcy filing. However, equitable subrogation is **not** the appropriate remedy.

### B.    Allfirst Has an Adequate Remedy at Law.

Additionally, even if Allfirst were able to establish the required elements of equitable subrogation, an equitable remedy is not appropriate when an adequate remedy at law exists. Tudor Dev. Group, 968 F.2d at 364 (citing Clark v. Pennsylvania State Police, 496 Pa. 310, 436 A.2d 1383, 1385 (1981). See also, Redmond Finishing Co., Inc. v. Ginsburg, 301 Pa. Super. 51, 446 A.2d 1330 (dismissing action in equity because plaintiff had earlier elected to proceed at law for monetary damages). "In determining whether a remedy is 'adequate,' [the court] must look to its availability and not to the likelihood of success." Tudor Dev. Group, 968 F.2d at 364.

Here, other remedies are available to Allfirst. For example, Allfirst may proceed with its breach of contract claim against Mr. Ortenzio or it may file a claim against CCI in the bankruptcy proceedings. Regardless of Allfirst's likelihood of success under either option, the availability of these options prevents Allfirst from recovering through equity. Consequently, summary judgment on Count Two of Allfirst's Complaint should be entered in favor of Mr. Ortenzio, as Allfirst cannot establish the required elements of equitable subrogation and because the availability of adequate remedies at law bars equitable relief.

## III.    ALLFIRST CANNOT ESTABLISH THE ELEMENTS OF FRAUD.

In order to prove fraud, Pennsylvania law requires that the plaintiff establish the following elements: (1) a representation; (2) which is material to the transaction at hand; (3)

made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  See, Lind v. Jones, Lang LaSalle Americas, Inc., 135 F. Supp.2d 616, 620 (E.D. Pa. 2001) (citing Gibbs v. Ernst, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994); Gruenwald v. Advanced Computer Applications, 730 A.2d 1004, 1014 (Pa. Super. 1999)).   Additionally, these elements must be proven by clear and convincing evidence, not the lesser preponderance of the evidence standard. Lind, 135 F. Supp.2d at 621.  Allfirst cannot establish all of the required elements by clear and convincing evidence.

### A.    Mr. Ortenzio Did Not Conceal the Source of Funds.

In order to recover under their fraud claim, Allfirst must establish that Mr. Ortenzio made a false statement upon which Allfirst relied.  According to Allfirst, Mr. Ortenzio's failure to specifically state to someone from Allfirst that payment was being made by drawing on the line of credit, when Mr. Ortenzio personally delivered a check drawn on CCI's line of credit with Allfirst, amounts to a false statement.  This argument makes no sense for the following reasons:

First, any employee from Allfirst who came into contact with the check could easily determine the source of funds as it was written on an Allfirst check on which the account number of the line of credit appears.  A true and correct copy of CCI check made payable to Allfirst is attached hereto as Exhibit "B"  Second, if Mr. Ortenzio were trying to conceal the source of funds, he would not have called the bank before delivering the check nor would he have attempted to deliver the check to Mr. Schwartz personally.  Ortenzio Dep. at 108 – 111.[5]  Third,

---

[5] In its Summary Judgment Memorandum, Allfirst claims that Mr. Ortenzio promised not to write any additional check on the line of credit at the February 18 meeting. Allfirst's Summary Judgment Memorandum at 8-9.  This is

Mr. Schwartz testified that Mr. Ortenzio never made any direct representation that the $1.2 million would not be paid from the $4 million line of credit and also testified that he did not investigate the source of funds because he did not care. Schwartz Dep. at 163. Finally, the loan documents did not prohibit CCI from using the line of credit to pay the short-term note nor did the loan documents require that any representation be made by Mr. Ortenzio or CCI to Allfirst regarding the source of funds prior to repayment. See, Exhibits "B" and "C" to Allfirst's Complaint.

**B.** **Mr. Ortenzio Did Not Commit Fraud By Paying the Short-Term Note Before the Line of Credit.**

In its Summary Judgment Memorandum, Allfirst argues that Mr. Ortenzio "prepaid" the short-term note as part of his plot to deceive Allfirst. This argument ignores the reality of the situation. The due date on the short-term note was determined by Allfirst and was set for one month before the line of credit renewal date. Ortenzio Dep. at 88-90; Schwartz Dep. at 200. Further, although the due date on the $1.2 million short-term note was March 31, 2000, Mr. Ortenzio originally proposed only a 90-day term and never wanted the obligation to extend past February 2000. Ortenzio Dep. at 88-89, 92; Schwartz Dep. at 200. However, Allfirst determined that the time period would be from November 1999 to March 2000. Ortenzio Dep. at 92-93. Regardless of the actual due date, both Allfirst and Mr. Ortenzio were aware that the short-term note would be paid before the $4 million line of credit expired on April 30, 2000. Ortenzio Dep. at 104; Schwartz Dep. at 73. In fact, Mr. Schwartz testified as follows:

> Q:   Did the bank provide any documents that were signed that required repayment of the four million before the 1.2 million?
>
> A:   Not specific to that fact.

simply not true. None of the testimony cited by Allfirst even mentions any such promise being made.

Q:    How about generally to that fact?

A:    No, no documents.

Q:    Okay, there's no document that require the repayment of the four million prior to the 1.2 million were there?

A:    No.

Schwartz Dep. at 73:6 – 73:15.    Thus, CCI's payment of the short-term note before the expiration of the line of credit was not part of some plan to deceive Allfirst but rather was consistent with the parties' agreement.  Because Allfirst cannot establish the required elements of fraud, summary judgment should be entered in favor of Mr. Ortenzio on Count Three of Allfirst's Complaint.

## CONCLUSION

Based upon the forgoing reasons, Defendant, John M. Ortenzio, respectfully requests that this Honorable Court enter summary judgment in his favor and deny the Motion for Summary Judgment submitted by Plaintiff, Allfirst Bank.

Respectfully submitted,
BLANK ROME COMISKY & McCAULEY LLP

BY: _____

EDWARD I. SWICHAR, ESQUIRE
ROBERT A. BURKE, ESQUIRE
One Logan Square
Philadelphia, PA 19103
(215) 569-5500
*Attorneys for Defendant, John M. Ortenzio*

Dated:  May 22, 2002

15

Exhibit A

1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

                        - - -

3

4    ALLFIRST BANK,                      :

                        Plaintiff       :

5                                        :

                        vs.             :

6                                        :

     JOHN M. ORTENZIO,                   :

7                        Defendant       :   NO. 1:01-CV-786

8

                        - - -

9                    February 11, 2002

                        - - -

10

11              Oral Deposition of JOHN M. ORTENZIO,

12   taken pursuant to notice, was held at Cunningham

13   and Chernicoff, 2320 North 2nd Street, Harrisburg,

14   Pennsylvania 17110, beginning at 1:40 p.m., on the

15   above date, before Donna L. Crossan, an Approved

16   Registered Professional Reporter and Notary Public

17   in and for the Commonwealth of Pennsylvania.

18

19                      - - -

20

                   ESQUIRE DEPOSITION SERVICES

21                      15th Floor

                1880 John F. Kennedy Boulevard

22              Philadelphia, Pennsylvania 19103

                      (215) 988-9191

23

24

2

1 APPEARANCES:
2   GEBHARDT & SMITH LLP
    BY: LAWRENCE J. GEBHARDT, ESQUIRE
3   The World Trade Center, Ninth Floor
    401 East Pratt Street
4   Baltimore, Maryland 21202
    (410) 385-5101
5   Representing the Plaintiffs
6   BLANK ROME COMISKY & McCAULEY, LLP
    BY: ROBERT A. BURKE, ESQUIRE
7   One Logan Square
    Philadelphia, Pennsylvania 19101-6998
8   (215) 569-5606
    Representing the Defendants
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1 17    Commercial loan note            90
2 18    Personal financial statement    95
        dated December 31, 1998
3
  19    Security agreement dated 11-8-99    97
4
  20    Letter dated November 9, 1999 from    99
5       Sheri Phillips
6 21    Letter dated November 9, 1999 from    99
        Craig Schwartz
7
  22    CCI Construction Income statement    135
8
  23    CCI Construction Balance Sheet    135
9       dated 12/31/99
10 24   Cash flow projections    135
11 25   Handwritten notes    153
12 26   Work in Process Review dated    170
        February 18, 2000
13
  27    Compilation of letters dated    177
14      February 22, 2000
15 28   Compilation of letters dated    177
        February 24, 2000
16
17
18
19
20
21
22
23
24

3

1         - - -
  Testimony of: John M. Ortenzio
2
  By Mr. Gebhardt . . . . . . . . .   6
3 By Mr. Burke . . . . . . . .       --
4
         E X H I B I T S
5         - - -
6 EXHIBIT NUMBER    DESCRIPTION    PAGE MARKED
7  1    Letter dated July 6, 1998    16
8  2    Letter dated December 7, 1992    29
9  3    Commitment letter dated June 12, 1992    31
10 4    Letter dated October 14, 1993    32
11 5    Commitment letter dated July 21, 1994    36
12 6    Letter dated June 14, 1995    38
13 7    Letter dated May 1, 1996    40
14 8    Letter dated April 15, 1997    40
15 9    Letter dated April 20, 1998    40
16 10   Financial Statements of CCI    49
        Construction Company
17
   11   Letter dated March 23, 1999    51
18
   12   Film/Cash Solutions Promissory Note    55
19
   13   Inter-office memo dated 10-26-99    78
20
   14   Inter-office memo dated 11-4-99    82
21
   15   Letter dated November 5, 1999    85
22
   16   Suretyship agreement    89
23
24

5

1         DEPOSITION SUPPORT INDEX
2
3 Direction to Witness Not to Answer
4 Page  Line    Page  Line    Page  Line
5 NONE
6
7 Request for Production of Documents
8 Page  Line    Page  Line    Page  Line
9 NONE
10
11 Stipulations
12 Page  Line    Page  Line    Page  Line
13 NONE
14
15
16 Question Marked
17 Page  Line    Page  Line    Page  Line
18 NONE
19
20
21
22
23
24

2 (Pages 2 to 5

**6**

1          STIPULATION
2          It is hereby stipulated and agreed
3 by and between counsel for the respective parties
4 that reading, signing, sealing, certification, and
5 filing are waived and that all objections, except
6 as to the form of the question, are reserved until
7 the time of trial.
8          - - -
9          JOHN M. ORTENZIO, after having been
10 first duly sworn, was examined and testified as
11 follows:
12          - - -
13          EXAMINATION
14          - - -
15 BY MR. GEBHARDT:
16     Q     Mr. Ortenzio, prior to the filing
17 by CCI Construction of its Chapter 11 bankruptcy
18 petition in May of 2000, what was your position
19 with the company?
20     A     President.
21     Q     Were you also a shareholder?
22     A     Yes.
23     Q     Were you also a member of the
24 Board of Directors?

**7**

1     A     Yes.
2     Q     Were there any other members of
3 the Board of Directors?
4     A     No, I don't believe so.
5     Q     How long had you been president
6 of CCI Construction?
7     A     Since its inception.
8     Q     Which was what year?
9     A     Somewhere in 1986, '87.
10     Q     And I take it you were the sole
11 shareholder for the entire period of time?
12     A     Yes.
13     Q     Were you the sole director for
14 the entire period of time?
15     A     Yes.
16     Q     In the year 2000, would you
17 describe what your duties consisted of as
18 president of CCI?
19     A     2000, I was the president of the
20 company, so, therefore, responsible for the --
21 ultimately responsible for the company itself.
22     Q     Your day-to-day activities
23 consisted of what kind of tasks?
24     A     Day-to-day my activities in 2000

**8**

1 were, I would say, primarily the more strategic
2 planning of the company, or related more so to
3 that as opposed to -- well, to the strategic
4 planning, overall goals of the company from a work
5 standpoint.
6     Q     So you were not directly involved
7 in the day-to-day tasks of the company?
8     A     Meaning?
9     Q     Well, meaning such things as
10 bidding the jobs or seeing that there were
11 adequate employees on hand, that sort of thing?
12     A     With respect to bidding the jobs,
13 I reviewed the strategies for the bids prior to
14 any bids being submitted, had meetings with
15 individuals in the company to discuss the -- what
16 the type of job, I'll say what the strategy was in
17 terms of obtaining a job, what the nature of the
18 job was, type of work.
19     Q     Would that type of activity, the
20 strategy activity have been consistent with other
21 functions or areas of the company's operation, and
22 for instance, hiring people, deciding what lines
23 of business you were going to go in?
24          MR. BURKE:  Are you still on

**9**

1 2000?
2          MR. GEBHARDT:  Yes.
3     A     As far as hiring individuals, if
4 they were -- somebody was going to be in
5 management, I would review the resume.  Depending
6 on the position, I might meet with them.  Prior to
7 that I would have had a meeting to determine
8 whether or not we had the need for that position,
9 whether replacing somebody or a new position.
10 BY MR. GEBHARDT:
11     Q     Were your duties for CCI, as you
12 described for the year 2000, consistent over the
13 term of the corporation's existence?
14     A     Starting from when?
15     Q     When it was first created in
16 1986, 1987.
17     A     No.
18     Q     Describe how they may have
19 changed over the years.
20     A     When the company started there
21 was only myself, probably one other employee to
22 start with and by the time 2000 came around, it
23 was probably myself and probably a couple hundred
24 individuals.

3 (Pages 6 to 9)

10

1  Q    Was there a particular point in
2  time when you became more involved in the strategy
3  direction of the company?
4  A    It tended to evolve over time.
5  Q    I understand that, but would
6  there be a point in time when your involvement was
7  more strategic than what I'll call day-to-day
8  operational?
9        MR. BURKE:  Objection to the
10 form.
11 A    Could you be a little more
12 specific?
13 BY MR. GEBHARDT:
14 Q    At what point in time did the
15 majority of your activities focus on the strategic
16 area --
17       MR. BURKE:  Objection to the
18 form.
19 BY MR. GEBHARDT:
20 Q    -- from the beginning of the
21 company's inception through the bankruptcy filing?
22 A    There was probably no specific
23 date or point where things changed from -- say
24 from one day all of a sudden changed to the next.

11

1  My duties evolved over a period of time and
2  sometimes they would evolve and then depending on
3  how things were working out, they would regress
4  backwards before they would move forward.  So I
5  describe it generally as an evolving role.
6  Q    How about the year 1999, was your
7  role strategic then?
8  A    I would say so.
9  Q    Consistent with what you've
10 described for the year 2000?
11 A    Well, I think the only thing I
12 described was you asked very specifically relative
13 to bidding projects and so as it relates to that
14 particular area, I'll say that was consistent back
15 into 1999.
16 Q    And I take it the same thing for
17 employment?
18 A    Yes.
19       MR. BURKE:  Objection to the
20 form.  Do you understand the question?
21 A    If what you mean is the way I
22 describe my role relative to employment in 2000
23 the same as in 1999, I would say generally close.
24 BY MR. GEBHARDT:

12

1  Q    What was your role beginning in
2  1999 with finance and lending in connection with
3  the company?
4        MR. BURKE:  Finance and lending?
5        MR. GEBHARDT:  Let me rephrase
6  that.
7  BY MR. GEBHARDT:
8  Q    What involvement did you have in
9  the financing of the company's operations,
10 starting in 1999?
11 A    Well, is there some specific --
12 do you want to give me something more specific
13 that I can respond to?
14 Q    Would you describe your role --
15 A    Is there a particular note or
16 agreement or something that you are trying to
17 refer to because finance and lending --
18 Q    Financing, I understand that,
19 financing the company's day-to-day operations
20 beginning in 1999, was your involvement on a
21 strategic basis consistent with what you've
22 described for the bidding process and the
23 employment process?
24       MR. BURKE:  Objection to the

13

1  form.
2          - - -
3        (Whereupon the court reporter read
4  back the pertinent testimony.)
5          - - -
6  A    There are two different functions
7  of the company.
8  BY MR. GEBHARDT:
9  Q    What was your function in
10 financing the company's operations?
11 A    I guess as far as -- I'm trying
12 to think in 1999, financing of the company was
13 generally to meet with the appropriate
14 individuals.  I met with the bank officers a
15 couple of times, generally just discussing or
16 marketing calls on their part, I think.  In 1999,
17 if there was a specific note that I sat down and
18 discussed with the bank, if that's what you're
19 referring to, then we can talk about that one, but
20 I'm really lost as far as -- before you mentioned
21 a specific -- if you give me something specific,
22 I'd be more than happy to respond.
23 Q    Can you tell me who Sheri
24 Phillips is?

14

1    A      Sheri was the chief financial
2 officer.
3    Q      **How long was she with CCI?**
4    A      Five years, maybe six, maybe
5 less.
6    Q      **What were her duties as CFO?**
7    A      She was a CFO, she was
8 responsible for the day-to-day, I'll say,
9 accounting functions of the company as well as
10 some other ancillary duties that she was involved
11 in, but primarily it was the accounting.
12 Obviously anything that was finance related would
13 fall under her direct responsibilities.
14    Q      **Was she the person who dealt**
15 **directly with the banks that CCI may have dealt**
16 **with?**
17    A      She had dealings with them, yes.
18    Q      **How would the amount of her**
19 **dealings compare with the amount of your dealings?**
20        MR. BURKE:  Are we in '99 or
21 another time period?
22        MR. GEBHARDT:  Over the period
23 she was employed by CCI.
24    A      Well, I would have to say they

15

1 evolved because when she first joined the company
2 she didn't join as the chief financial officer.
3 So when she first joined, her role would have been
4 one thing and then over time her role evolved to
5 the point she became the chief financial officer.
6 BY MR. GEBHARDT:
7    Q      **When she became the chief**
8 **financial officer, was she the person for CCI who**
9 **dealt directly and primarily with the bank?**
10    A      Yes.  She dealt with the bank,
11 yes.
12    Q      **Primarily?**
13    A      I'd say she had more frequent
14 contact with them than I did.  And so by that
15 you're meaning primary, then I would say I guess
16 the answer would be yes.
17    Q      **And she had authority on behalf**
18 **of CCI to execute loan documents for the company?**
19    A      Yes, she did.
20    Q      **When did she get that authority?**
21    A      At some point in time after she
22 became the chief financial officer.
23    Q      **Can you give me an approximate**
24 **year?**

16

1    A      If you gave me the date she
2 became chief financial officer, I would be able to
3 pinpoint it more on a time line from there.
4        - - -
5        (Whereupon the document was
6  marked for identification as Exhibit Number 1.)
7        - - -
8 BY MR. GEBHARDT:
9    Q      **I've handed you what has been**
10 **marked as Deposition Number 1, which purports to**
11 **be a letter from Sheri Phillips as chief financial**
12 **officer to Craig Schwartz of Dauphin Deposit Bank**
13 **dated July 6th, 1998.**
14        **In the last sentence she states,**
15 **quote, I am authorized to execute loan documents**
16 **on behalf of the corporation, period, end quote.**
17 **That was an accurate statement at the time Ms.**
18 **Phillips wrote it?**
19    A      Yes.
20    Q      **And given that she was authorized**
21 **to execute loan documents, was she also authorized**
22 **to negotiate the loan documents?**
23    A      Yes.
24    Q      **When did Ms. Phillips' employment**

17

1 **with the company terminate?**
2    A      It would have been sometime in
3 2000.
4    Q      **After the bankruptcy?**
5    A      Yes.
6    Q      **When is the last time you spoke**
7 **with Sheri Phillips?**
8    A      Well, let's see, I spoke to her
9 yesterday, as a matter of fact.
10    Q      **And what was the substance of the**
11 **discussion with her?**
12    A      I told her that she would
13 probably be getting a subpoena from the bank to --
14 that the bank wanted to take her deposition.
15    Q      **What else did you talk about?**
16    A      That was generally about it.  I
17 told her there was a lawsuit, that the bank was
18 suing me and that the bank wanted to take her
19 deposition.
20    Q      **How long did the conversation**
21 **last?**
22    A      Ten, 15 minutes.
23    Q      **Prior to that conversation, when**
24 **was the last time you had spoken with her?**

5 (Pages 14 to 17)

18

1    A    I'd seen her at some functions,
2 so if you're counting that, to say hello.
3    Q    The direct call from her to you
4 or you to her.
5    A    Oh, a year.
6    Q    Why did you take it upon yourself
7 to place that call yesterday?
8        MR. BURKE:  Let me confer with my
9 client regarding the privilege issue.
10        MR. GEBHARDT:  What privilege
11 issue?
12        MR. BURKE:  That's why I need to
13 talk to him.  In answering that question it may
14 reveal attorney/client privilege.
15            - - -
16    (Witness conferring with counsel.)
17            - - -
18        MR. BURKE:  I'm going to object
19 and instruct the witness not to answer because
20 answering that would reveal attorney/client
21 communication.
22            - - -
23        (Whereupon the court reporter
24 read back the pertinent testimony.)

20

1 entitled to follow up but not to the extent that
2 answering the question would reveal the substance
3 of the communication between myself and Mr.
4 Ortenzio.
5        MR. GEBHARDT:  I didn't ask for
6 that.  I asked for something revealing a yes or no
7 answer.
8        MR. BURKE:  I understand, but
9 it's not what you asked.  It's whether the answer
10 that the witness gives would reveal the substance
11 of communication between himself and his attorney,
12 and on that grounds I'm objecting and instructing
13 the witness not to answer.
14 BY MR. GEBHARDT:
15    Q    Did you discuss with Sheri
16 Phillips things your attorney told you?
17        MR. BURKE:  I'm going to object
18 again, Counsel.  I realize you're entitled to do
19 some follow-up on this, but to the extent you've
20 already asked the witness what he discussed with
21 Ms. Phillips and now you're asking him if some of
22 those things he discussed with Ms. Phillips were
23 things that I may or may not have directed him to
24 ask, and I believe that would reveal

19

1            - - -
2        MR. GEBHARDT:  You're instructing
3 him not to answer that?
4        MR. BURKE:  Correct.
5 BY MR. GEBHARDT:
6    Q    Would I be correct, Mr. Ortenzio,
7 that you placed the call after a discussion with
8 your counsel?
9    A    Yes, that's correct.
10    Q    And you would not have placed the
11 call other than for that discussion with your
12 counsel?
13        MR. BURKE:  I'm going to object
14 on the same grounds that answering that question
15 would reveal attorney/client communication.
16        MR. GEBHARDT:  It's not a
17 question of revealing that a conversation took
18 place.  The privilege applies to the substance of
19 the conversation and I think I'm entitled to the
20 follow-up to establish the context and whether
21 there is a basis for the assertion of
22 attorney/client privilege by preliminary
23 questioning.
24        MR. BURKE:  You're absolutely

21

1 attorney/client communication and I'm not going to
2 permit the witness to answer the question.
3        MR. GEBHARDT:  If he discussed
4 matters with Sheri Phillips that were discussed
5 first with you, then that's a disclosure to a
6 third party that waives the privilege.
7            - - -
8        (Whereupon the court reporter
9 read back the pertinent testimony.)
10            - - -
11        MR. GEBHARDT:  That could be
12 answered yes or no.
13        MR. BURKE:  You already asked him
14 what was discussed and if any of the items that
15 were discussed were things that I had revealed, a
16 separate discussion I had with Mr. Ortenzio, then
17 it does reveal the attorney/client communication.
18 You're permitted to ask this witness what
19 communications he had with this third party.  You
20 can ask all of those questions about what the
21 communication was, but you cannot tie it back to
22 the communication he may have had, in fact did
23 have with his attorney.  So you're free to ask
24 everything about the substance of the

22

1 Phillips/Ortenzio communication, but you're not
2 allowed to ask further to the extent it would
3 reveal a communication I had with my client.
4         MR. GEBHARDT:  You've instructed
5 him not to answer?
6         MR. BURKE:  Correct.
7 BY MR. GEBHARDT:
8     Q      Could you tell me who Shane
9 Miller is, S-H-A-N-E?
10    A      He was the chief financial
11 officer of the company -- excuse me, chief
12 operating officer.
13    Q      How long was he with the company?
14    A      Seven, maybe eight years.
15    Q      What did his duties consist of?
16    A      At what point in time?
17    Q      Over the seven or eight years he
18 worked for the company.
19    A      They evolved from when he first
20 joined the company until when he left the company.
21    Q      So describe what they were when
22 he first joined and tell me how they evolved.
23    A      When he first joined, he joined
24 as a project manager for mechanical work that we

23

1 were managing and when he left in 2000, he was the
2 chief operating officer of the entire company.
3     Q      And what did his duties consist
4 of as the chief operating officer?
5     A      He would have been responsible
6 for day-to-day operational matters in the company.
7     Q      He reported to you?
8     A      Yes.
9     Q      What role, if any, did he have in
10 financing the company's activities?
11    A      Probably whatever his
12 communications, whatever his needs were relative
13 to the company, communicating them to Sheri
14 Phillips, myself.  So as upper management,
15 obviously his opinion was sought.
16    Q      He would, if I'm permitted to
17 paraphrase, describe to you what he viewed the
18 bank's financing needs were and then you or Ms.
19 Phillips would communicate or discuss those with
20 the bank?
21        MR. BURKE:  The bank's financing
22 needs or the company's needs?
23        MR. GEBHARDT:  Company's
24 financing needs.

24

1     A      As the chief operating officer he
2 participated in many discussions that were
3 relevant to what the financial needs of the
4 company were.
5 BY MR. GEBHARDT:
6     Q      Did he ever have any dealings
7 directly with the bank?
8     A      Yeah.
9     Q      And what would those dealings
10 have consisted of?
11    A      I think he participated in
12 meetings, any meetings that would have been with
13 the bank in conjunction with Sheri Phillips and in
14 conjunction with myself and Sheri Phillips if the
15 three of us were meeting with the bank.
16    Q      To your knowledge, did he ever
17 execute any loan documents?
18    A      No, I don't believe so.
19    Q      Did he have authority to execute
20 loan documents?
21    A      Yes, he would have, in certain
22 aspects.  Back to the question, he did have
23 authority to execute loan documents and on
24 occasion he did.

25

1     Q      When did Mr. Miller leave the
2 company's employ?
3     A      2000.
4     Q      After the bankruptcy?
5     A      Yes.
6     Q      When is the last time you spoke
7 with Mr. Miller?
8     A      Can I talk to you for a second?
9        MR. GEBHARDT:  When there's a
10 question pending, you may be entitled to discuss
11 privileged issues but not to discuss the witness's
12 response to the question that's on the floor.
13        MR. BURKE:  Do you have a
14 question on a privilege issue?
15    A      Yes.
16        MR. BURKE:  The witness just
17 turned to me to confer because he had a question
18 about attorney/client and I'll ask the court
19 reporter to read the question back.
20        - - -
21        (Whereupon the court reporter
22 read back the pertinent testimony.)
23        - - -
24        MR. BURKE:  You can answer that.

7 (Pages 22 to 25)

- 26

1    A    I spoke with him last month.
2 BY MR. GEBHARDT:
3    Q    Did you place the call?
4    A    Yes.
5    Q    Where did you place the call to?
6    A    I placed the call to a phone
7 number I had gotten for him.
8    Q    What location?
9    A    He's in California.
10    Q    What part of California?
11    A    I believe the southern part.
12    Q    Is there a city that you are
13 aware of?
14    A    No.
15    Q    Where did you get his phone
16 number?
17    A    I got it from a consultant that
18 the company had used toward the end of 2000, had a
19 number for him, and he gave it to me.
20    Q    Can you identify the consultant?
21    A    Yes. His name is Mr. Versaw.
22    Q    Spell that.
23    A    V-E-R-S-A-W.
24    Q    What was he consulting -- was he

- 27

1 consulting with CCI?
2    A    Yes.
3    Q    About what?
4    A    Construction matters.
5    Q    I understand that. Was there a
6 particular project?
7    A    Yes, Scott Air Force Base
8 project.
9         MR. BURKE: Was Versaw consulting
10 with CCI?
11         MR. GEBHARDT: Yes.
12 BY MR. GEBHARDT:
13    Q    That was in connection with
14 putting together a claim on behalf of CCI for
15 presentation for work done on the Scott Air Force
16 base matter?
17    A    Back at that time, yes.
18    Q    Did you call Mr. Miller as a
19 result of conversations with your counsel?
20    A    Yes.
21    Q    And what did you discuss with Mr.
22 Miller when you called him?
23    A    Told him that there was a lawsuit
24 and that he may be getting a subpoena from the

- 28

1 bank.
2    Q    Did you tell him what the
3 substance of the lawsuit was?
4    A    Told him that the bank was suing
5 me.
6    Q    And did you tell him the reason
7 the bank was suing you?
8    A    I told him it had to do with the
9 notes that the company had, but we didn't go into
10 much detail.
11    Q    And how long did you talk with
12 him?
13    A    I think the total of the
14 conversation was probably 20 minutes to a half an
15 hour.
16    Q    Had you spoken with him at all
17 prior to that conversation and subsequent to his
18 leaving the employ of the company?
19    A    No.
20    Q    How long had CCI been dealing
21 with Dauphin Deposit and then AllFirst Bank?
22    A    I think the first banking
23 relationship would have been initiated probably in
24 the early '90s.

- 29

1         ---
2         (Whereupon the document was
3 marked for identification as Deposition Exhibit
4 No. 2.)
5         ---
6 BY MR. GEBHARDT:
7    Q    I've handed you a letter dated
8 December 7, 1992 from Wendy Scheib, S-C-H-E-I-B,
9 to the State of Connecticut, Department of
10 Consumer Protection. In that letter Ms. Scheib
11 says, quote, CCI Construction Company, Inc. has
12 been a customer of Dauphin Deposit Bank and Trust
13 Company for the past two years, period, end quote.
14         Does that refresh your
15 recollection as to when CCI may have started
16 dealing with Dauphin Deposit?
17    A    Well, yes, it makes it earlier
18 than maybe what I stating as the early '90s.
19 So that would put it back to December 7th, 1990.
20    Q    Would I be correct that when CCI
21 began doing business with Dauphin Deposit, it was
22 in connection with a line of credit for the
23 company?
24    A    It's possible. I don't recall

8 (Pages 26 to 29)

30

1 exactly when our first relationship was.
2    Q    When you started dealing with --
3 by you, I mean CCI Construction -- when CCI
4 Construction started dealing with Dauphin Deposit,
5 did it obtain a line of credit?
6    A    That was our first relationship?
7    Q    When CCI began dealing with
8 Dauphin Deposit did it ultimately obtain a line of
9 credit?
10    A    Probably.
11    Q    Once it obtained that first line
12 of credit, it maintained that line of credit with
13 Dauphin Deposit right up through the date of the
14 default declaration by AllFirst?
15    A    Yes.
16    Q    Would I be correct that that line
17 of credit increased over the years?
18    A    I believe it did, yes.
19    Q    The final amount of authorized
20 credit was the $4 million that was in effect at
21 the time AllFirst declared the default in 2000?
22    A    Yes.
23    Q    And at all times the line of
24 credit was unsecured?

31

1    A    No, I don't believe that to be
2 the case. I believe the in original relationship
3 the line was secured.
4        MR. GEBHARDT: Mark that as the
5 next exhibit.
6        - - -
7        (Whereupon the document was
8 marked for identification as Deposition Exhibit
9 No. 3.)
10       - - -
11 BY MR. GEBHARDT:
12    Q    I've handed you what has been
13 marked as Deposition Exhibit 3 which purports to
14 be a commitment letter from Wendy Scheib, Dauphin
15 Deposit to Dave Barber, treasurer of CCI
16 Construction. Would I be correct when you've had
17 occasion to review this, that in June of 1992 CCI
18 had a $600,000 line of credit with Dauphin?
19       MR. BURKE: Take your time
20 reading the document.
21       - - -
22       (Whereupon the court reporter
23 read back the pertinent testimony.)
24       - - -

32

1    A    Well, this is a draft and it's
2 not executed.
3 BY MR. GEBHARDT:
4    Q    So you don't know?
5    A    It may have and may not be.
6        MR. GEBHARDT: And let's mark
7 this as Exhibit 4.
8        - - -
9        (Whereupon the document was
10 marked for identification as Deposition Exhibit
11 No. 4.)
12       - - -
13 BY MR. GEBHARDT:
14    Q    I've handed you what has been
15 marked as Deposition Exhibit 4 which purports to
16 be a letter dated October 14, 1993 from Andrew
17 Hetrick, H-E-T-R-I C-K, Dauphin Deposit to CCI
18 Construction. Do you recognize your signature on
19 the last page?
20    A    Yes, I do.
21    Q    And would I be correct as of
22 October 14, 1993 CCI had a $1 million line of
23 credit with Dauphin Deposit?
24    A    Yes.

33

1    Q    Would I be correct that there was
2 no collateral posted as security for the revolving
3 line of credit?
4        MR. BURKE: Are you asking if
5 this is what the document says or what his
6 recollection is?
7        MR. GEBHARDT: Well, both.
8 BY MR. GEBHARDT:
9    Q    We have a commitment letter. Do
10 you see anywhere in the commitment letter that any
11 collateral would be posted?
12       MR. BURKE: I'll object to the
13 form because obviously the document will speak for
14 itself, but the witness can answer. Do you have
15 the actual loan document for this, counsel?
16       MR. GEBHARDT: I have a question
17 pending.
18    A    There does not appear to be any
19 collateral.
20 BY MR. GEBHARDT:
21    Q    Having reviewed this commitment
22 letter, would it be consistent with your
23 recollection to state that at least as of 1993 CCI
24 Construction had not granted a security interest

34

1 in its assets to secure a line of credit with
2 Dauphin Deposit?
3          MR. BURKE:  Objection to form.
4 You can answer.
5      A      Well, I can state as it relates
6 to this commitment letter, October 14, 1993,
7 there's no collateral.
8 BY MR. GEBHARDT:
9      Q      And would I be correct that you
10 personally, John Ortenzio, did not guarantee
11 repayment of the line of credit?
12     A      This one here?
13     Q      Yes.
14     A      That appears to be based on the
15 commitment letter.
16     Q      Would I be correct that as of
17 1993, with the line of credit that was extended
18 that year, CCI was required to be fully paid out
19 of the line of credit for at least 30 consecutive
20 days during the year?
21          MR. BURKE:  Same objection to
22 form in that the document will speak for itself.
23 You can answer.
24     A      It does state that.

35

1 BY MR. GEBHARDT:
2      Q      And did you understand as of 1993
3 when you signed this commitment letter that the
4 proceeds of the line of credit were to be used to
5 finance accounts receivable?
6      A      That's what it says.
7      Q      You had that understanding as the
8 president of the company?
9      A      Well, I'm thinking back to 1993,
10 the use of the line back at that time was
11 probably -- going back that far I can't tell you
12 exactly how the funds were used.
13     Q      You understand the bank intended
14 to loan you money?
15          MR. BURKE:  Are you asking his
16 recollection?
17     A      I signed the document, use of
18 proceeds, finance accounts receivable.
19 BY MR. GEBHARDT:
20     Q      That was your understanding when
21 you signed it?
22     A      I assume it was.
23     Q      As a matter of fact, CCI was
24 required to submit monthly accounts receivable

36

1 agings to the bank during the term of the line of
2 credit.  Isn't that true?
3      A      To the extent that the line was
4 drawn on.
5      Q      Would you tell me what CCI
6 Associates was?
7      A      I don't recall.  I think that we
8 were changing our name at that time and I think
9 this came at that juncture, so they wanted both
10 entities on the loan document.
11          ---
12          (Whereupon the document was marked
13 for identification as Deposition Exhibit No. 5.)
14          ---
15 BY MR. GEBHARDT:
16     Q      Would you take a look, please, at
17 Exhibit 5 which is a letter dated July 21, 1994
18 from Andrew Hetrick to Dave Barber of CCI
19 Construction purporting to be a commitment letter.
20 Do you recognize your signature on the last page?
21     A      Yes, I recognize it.
22     Q      And would I be correct that
23 Deposition Exhibit 5 is a renewal of the $1
24 million line of credit that's referenced as

37

1 Deposition Exhibit 4?
2      A      I don't know if it's a renewal.
3 It looks as though they've crossed out all the
4 dates from the previous one.  It's a $1 million
5 line of credit, the letter is dated July.  So
6 it's -- it's a little early for a renewal.  So
7 it's either a new one or an early renewal.
8      Q      If you look at Deposition Exhibit
9 4, you will see that in the first page there's an
10 expired date of the line of credit of June 30,
11 1994, and this letter was issued in July.
12     A      This came in July, so this would
13 have replaced that.  Based on the document it
14 appears that replaced the other.
15     Q      It continues as a $1 million
16 unsecured line of credit that had not been
17 guaranteed by you?
18          MR. BURKE:  Are you asking what
19 the document says or what his independent
20 recollection is?
21          MR. GEBHARDT:  What his
22 understanding is having had the benefit of
23 reviewing the document.
24     A      That's what it appears.

10  (Pages  34  to  37

38

1 BY MR. GEBHARDT:

2    Q    Would I be correct this renewal
3 was for the purpose of financing the company's
4 accounts receivable?

5    A    That's what it says.

6    Q    And once again, the company was
7 required to submit monthly accounts receivable
8 agings to Dauphin Deposit as a condition of the
9 line of credit being available?

10   A    Yes, that's what it says.

11         ---

12        (Whereupon the document was
13 marked for identification as Deposition Exhibit
14 No. 6.)

15         ---

16 BY MR. GEBHARDT:

17   Q    I've handed you Deposition
18 Exhibit 6, which is a letter dated June 14, 1995
19 from Andrew Hetrick to Sheri Phillips, Controller,
20 CCI Construction, which appears to be a renewal of
21 the line of credit.  Do you recognize Sheri
22 Phillips' signature on the last page?

23   A    Yes.

24   Q    Do you recognize Shane Miller's

39

1 signature as senior vice president?

2    A    Yes.

3    Q    And would I be correct that this
4 is another renewal of the $1 million unsecured
5 resolving line of credit from Dauphin Deposit?

6    A    It appears to be.

7    Q    And again this was unguaranteed
8 by you personally?

9    A    Yes, it appears to be the case.

10   Q    Once again, the purpose for the
11 use of the loan proceeds was to finance accounts
12 receivable?

13   A    That is what it says.

14   Q    There is to be a monthly
15 borrowing base certificate reflecting the
16 company's accounts receivable submitted?

17   A    No.  It's marked as quarterly --
18 excuse me for a minute.

19         ---

20        (Whereupon the documents were
21 marked for identification as Deposition Exhibit
22 Nos. 7, 8 and 9.)

23         ---

24 BY MR. GEBHARDT:

40

1    Q    Take a look at Deposition Exhibit
2 7 that's in front of you.  Do you recognize that
3 as a letter dated May 1, 1996 from Craig Schwartz
4 to Sheri Phillips, again renewing the $1 million
5 line of credit?

6    A    The question is?

7    Q    Do you remember this letter,
8 which is Deposition Exhibit 7, as a renewal of the
9 $1 million unsecured revolving line of credit from
10 Dauphin Deposit to CCI Construction?

11   A    I don't -- looking at the
12 document, I'm not going to be able to say this was
13 a renewal or a new one.  So, I mean, it is clearly
14 what it says, it is a $1 million line of credit,
15 and used the term renewal, for all I know since
16 they were negotiating it or obviously this was
17 done yearly, renew or replacement, but I don't
18 want to get caught up in the semantics, but it is
19 what it says on the face.  There's nothing on
20 there that says renewal.

21   Q    Let's not call it a renewal then.
22 Do you recognize this was a $1 million line of
23 credit from Dauphin Deposit to CCI?

24   A    That's the -- yes, that's what it

41

1 appears to be.

2    Q    And it was unsecured.  Correct?

3    A    That's what it appears to be,
4 yes.

5    Q    And you did not guarantee it?

6    A    It would not appear as though I
7 did.

8    Q    As with the predecessor
9 commitment letters that you reviewed, the use of
10 the line proceeds is for financing accounts
11 receivable?

12   A    That's what the commitment letter
13 says, unless it is for some reason changed by the
14 loan documents themselves.

15   Q    Consistent with what's going on
16 before, the company is required to submit this
17 time on a monthly basis an accounts receivable
18 aging?

19   A    That's what the commitment letter
20 says.  The commitment letter says use of proceeds
21 to finance the accounts receivable.  Whether or
22 not during that year that was the reality of the
23 practice or not, I cannot say, but that is what it
24 says.

11 (Pages 38 to 41)

42

1    Q       You recognize Sheri Phillips'
2 signature on the bottom line on behalf of CCI
3 Construction?
4    A       Yes.  I can testify to what the
5 document says.  Whether or not the practice of the
6 relationship, all the conditions here were adhered
7 to, I couldn't say.
8    Q       CCI intended to live up to its
9 agreements with the bank, didn't it?
10   A       I think we always lived up to our
11 agreements with the bank, to the best of my
12 knowledge.  Whether or not in the length of
13 relationship that we had, whether every covenant
14 was strictly adhered to or not, I can't sit here
15 and tell you for sure.  Obviously I see what it
16 says in the commitment letter.  Whether or not
17 each and every one of the conditions stated in
18 here survived the loan document or in practice
19 were adhered to, I couldn't say.
20   Q       If you look at Page 2, the last
21 paragraph, the last sentence, there's the
22 statement, quote, all terms and conditions
23 contained herein shall survive the execution of
24 such loan documentation, period, end quote.

43

1         So you would agree that these
2 conditions continued after any loan documents were
3 signed?
4         MR. BURKE: I'm going to object
5 to the form of the question.  If you're asking
6 what the document says, that's one thing.  If
7 you're asking a legal conclusion, I believe that's
8 something else.  Are you asking what the document
9 says?
10        MR. GEBHARDT:  I stated the
11 question.  You may answer.  You stated your
12 objection.
13        MR. BURKE:  Would you read the
14 question back, please?
15        MR. GEBHARDT:  Let me rephrase
16 the question.
17 BY MR. GEBHARDT:
18   Q       Would you agree that the
19 commitment letter says that its terms and
20 conditions survived the execution of any follow-up
21 loan documents?
22   A       Which page are you on?
23   Q       Second page, last paragraph, last
24 sentence.

44

1    A       That appears to be as what it
2 says.  That is typical or I'll say standard
3 language.  All I'm saying is whether or not in
4 practice all the terms and conditions were adhered
5 to, specifically, I can't say.
6    Q       Would I be correct that at least
7 as of this letter, which is May 1, 1996, CCI
8 Construction's borrowings were limited to 80
9 percent of the accounts receivable that were less
10 than 90 days old shown on accounts receivable
11 aging, and that's on Page 2?
12   A       That's what it says.  And again,
13 whether or not in practice that that was adhered
14 to or not, I can't say.
15   Q       Let's take a look at Exhibit 8.
16 Would you agree that Deposition Exhibit 8 is a
17 commitment letter dated April 15, 1997 from
18 Dauphin Deposit to CCI Construction extending a $1
19 million line of credit?
20   A       The document is a commitment
21 letter, principal amount of $1 million to finance
22 work in process and accounts receivable.
23   Q       So now in addition to accounts
24 receivable, the commitment letter is committing

45

1 the financing work in progress.  Is that correct?
2    A       Process.  That's what it says.
3    Q       And it's unsecured?
4    A       The commitment letter appears to
5 be.
6    Q       And you did not guarantee it?
7    A       I don't see anywhere on here
8 where I did.
9    Q       And CCI was also required to
10 commit monthly accounts receivable agings?
11   A       I believe it says quarterly --
12 no, monthly on the accounts receivable aging.
13   Q       CCI's borrowing were limited to
14 80 percent of accounts receivable under 90 days.
15 Right?
16        MR. BURKE:  Just so the record is
17 clear, you're again asking him what it says on
18 this document?
19        MR. GEBHARDT:  Yes.
20   A       That's what it says.  However, it
21 is somewhat inconsistent with use of proceeds
22 because it says finance work in process.  Well,
23 work in process doesn't really apply to 80 percent
24 of accounts receivable and 90 days from the

46

1 invoice date. So there's a little bit of an
2 inconsistency there in terms of use of proceeds.
3 BY MR. GEBHARDT:
4    Q    Would you take a look at Exhibit
5 9?
6    A    Okay.
7    Q    And would you agree that Exhibit
8 9 is a commitment letter from Dauphin Deposit
9 dated April 20, 1998 from Craig Schwartz to Sheri
10 Phillips at CCI providing a $2 million revolving
11 line of credit?
12    A    $2 million line of credit, yes.
13    Q    And again, it's still unsecured
14 and does not carry your personal guarantee?
15    A    Appears to be.
16    Q    And again, as with the 1997
17 commitment letter, the purpose for the use of the
18 loan proceeds was to finance work in process and
19 accounts receivable?
20    A    Yes, that's what it says.
21    Q    And consistent with the earlier
22 commitment letters, CCI was required to submit an
23 accounts receivable aging, at this time as with
24 1997 on a monthly basis?

47

1         MR. BURKE: Again, you're asking
2 what the document says?
3         MR. GEBHARDT: Yes.
4    A    The document says monthly basis,
5 accounts receivable aging.
6 BY MR. GEBHARDT:
7    Q    And borrowings are limited to 80
8 percent of accounts receivable under 90 days per
9 the commitment letter. Right?
10    A    That's what it says. Again,
11 there might be some inconsistency there with the
12 front page use of proceeds.
13    Q    Now, feel free to look back at
14 them. It appears that each of these commitment
15 letters requires CCI to be completely paid out of
16 the revolving line of credit for 30 consecutive
17 days in any one-year period. Would you agree with
18 that?
19         MR. BURKE: I'll object to the
20 form of the question to the extent the documents
21 speak for themselves. If you want the witness to
22 go back and look at every document and confirm
23 what it says.
24 BY MR. GEBHARDT:

48

1    Q    If you choose to. I'm asking a
2 question, upon the inception of the line of credit
3 as reflected in the commitment letter, there was a
4 requirement that CCI be paid out of the line of
5 credit for 30 consecutive days. Isn't that a
6 fact?
7         MR. BURKE: I also object to form
8 to the extent that it calls for a legal
9 conclusion.
10    A    It says that in the commitment
11 letters. Whether or not that in practice that was
12 adhered to, I couldn't tell you.
13 BY MR. GEBHARDT:
14    Q    As the president, sole
15 shareholder and sole director of CCI, did you
16 familiarize yourself with the terms of the
17 borrowing arrangements between CCI and Dauphin
18 Deposit?
19    A    Sometimes if there was a specific
20 need, but over the time of the relationship it
21 seemed to flow pretty good and there wasn't much
22 of a need to interpose myself directly, as you can
23 tell from the signing of the documents there other
24 than being aware of them, as far as any

49

1 discussions with the bank, if that's what you're
2 alluding to.
3    Q    No. I'm just saying did you
4 generally understand the terms and conditions of
5 the revolving line of credit CCI had with Dauphin?
6    A    I understood we had a million
7 dollars and it increased over the years as our
8 work volume grew, so I understood that. It was
9 used to finance our work in process and accounts
10 receivable. Whether or not all of the terms and
11 conditions that were stated in the commitment
12 letter as well as maybe even the loan documents
13 were adhered to, I couldn't say specifically.
14         - - -
15         (Whereupon the document was
16 marked for identification as Deposition Exhibit
17 No. 10.)         - - -
18 BY MR. GEBHARDT:
19    Q    I've handed you what has been
20 marked as Deposition Exhibit 10 which purports to
21 be financial statements of CCI Construction
22 Company, Inc. as of December 31, 1998 and 1997
23 with the independent auditor's report of Brown,
24 Schultz, Sheridan & Fritz. Do you recognize this

13 (Pages 46 to 49)

50

1 document as being CCI's financial statements for
2 those two years?
3     A     This is what it appears to be.
4     Q     And Exhibit 10 accurately
5 reflects the financial performance of CCI in 1997
6 and 1998?
7         MR. BURKE:  Objection to the
8 form.  I believe the document speaks for itself.
9 The witness can answer.
10     A     Yes.  These were audit statements
11 so I have no reason to doubt that they don't
12 purport to be the accurate assessment of the
13 company.
14 BY MR. GEBHARDT:
15     Q     As of December 31, 1999, would I
16 be correct in saying that CCI had three credit
17 facilities with -- I guess what was then AllFirst
18 Bank or whatever the name, I'll refer to it as
19 AllFirst Bank for reference, although the names
20 may have varied depending on the specific time.
21 There were three facilities, to your knowledge?
22     A     Yes.
23     Q     There's a revolving line of
24 credit, a $1.2 million loan and a $2 million

51

1 equipment line of credit, right, as of 12/31/99?
2     A     I believe the $2 million
3 equipment was a loan that was being amortized.  I
4 don't believe it was a line of credit.  I think
5 that one was a loan that was being amortized.
6     Q     There was an equipment purchase
7 facility.  Right?
8     A     But it was treated more as, I
9 believe, a loan because it was being amortized
10 over a specific term.  So I think that was
11 characterized as a loan rather than a line of
12 credit.
13         - - -
14         (Whereupon the document was
15 marked for identification as Deposition Exhibit
16 No. 11.)
17         - - -
18 BY MR. GEBHARDT:
19     Q     I've handed you Deposition
20 Exhibit 11, which purports to be a letter dated
21 March 23, 1999 from Craig Schwartz, Vice
22 President, First National Bank of Maryland to
23 Sheri Phillips, Chief Financial Officer of CCI
24 Construction.  Do you recognize this as a

52

1 commitment letter for a $4 million line of credit
2 from First National Bank of Maryland as successor
3 to Dauphin?
4     A     It is what it is.
5         MR. BURKE:  Take your time and
6 read the document.
7     A     $4 million unsecured line of
8 credit.
9 BY MR. GEBHARDT:
10     Q     This was the last commitment
11 letter issued by First National prior to the
12 declaration of default that occurred in February
13 of 2000 for a line of credit?
14     A     Probably, yes.
15     Q     As you've indicated, the amount
16 is now $4 million as opposed to $2 million that
17 was available in 1998?
18     A     Yes.
19     Q     Would I be correct that CCI
20 provided First National with the financial
21 statements that are reflected in Exhibit 10 in
22 connection with obtaining that line of credit and
23 its increased amount?
24     A     They would most likely have

53

1 received financial statements.
2     Q     And as with the earlier
3 commitment letters for '98 and '97, the use of the
4 proceeds was for the purpose of financing work in
5 process and accounts receivable.  Is that what it
6 says?
7     A     Yes.
8     Q     And the commitment letter
9 provides, does it not, that unless an earlier
10 demand is made, all borrowings and the entire loan
11 is due on April 30, 2000?
12         MR. BURKE:  Objection to form.
13     A     Yes, that's what this says.
14 However, I believe the loan document is different.
15 BY MR. GEBHARDT:
16     Q     As with the earlier commitment
17 letters, there's a requirement that CCI submit a
18 monthly accounts receivable aging?
19         MR. BURKE:  Objection to form.
20 You can answer.
21     A     Yes, it does state that.
22 BY MR. GEBHARDT:
23     Q     And that the borrowings are
24 limited to 80 percent of qualified accounts

14 (Pages 50 to 53)

54

1 receivable less than 90 days past due excluding
2 retainages.  Right?
3      A      That's what it says.
4      Q      And this commitment letter, as
5 with the previous ones, provides that all the
6 terms and conditions survive execution of the loan
7 documents.  Do you see that?
8      A      That is where the -- that's what
9 it says, though I can -- at least on one
10 particular item I do believe the language
11 superseded what was in the commitment letter.
12      Q      As with the previous lines of
13 credit, this one was unsecured by the assets of
14 CCI and did not carry your personal guarantee?
15      A      I believe that is correct.
16                    - - -
17              (Whereupon the document was
18 marked for identification as Deposition Exhibit
19 No. 12.)
20                    - - -
21 BY MR. GEBHARDT:
22      Q      I've handed you what has been
23 marked as Deposition Exhibit 12 which purports to
24 be a film/cash solutions promissory note relating

55

1 to the $4 million revolving line of credit.  Do
2 you recognize it as such?
3      A      Yes.
4            MR. BURKE:  One minute, Counsel.
5 Give me an opportunity to look at the document.
6 BY MR. GEBHARDT:
7      Q      Does Exhibit 12 appear to be to
8 your understanding and knowledge the promissory
9 note that was executed in connection with the
10 commitment letter that's Exhibit 11?
11            MR. BURKE:  Object to the form.
12 The document will speak for itself.  You may
13 answer.
14      A      I believe this is one of the
15 documents that accompanied the $4 million line of
16 credit.
17 BY MR. GEBHARDT:
18      Q      It's the promissory note, though,
19 isn't it?
20      A      This one is the promissory note,
21 but there were also other documents associated
22 with the $4 million.
23      Q      There were some disclosure forms
24 about confessions of judgment and so on?

56

1      A      There was the note itself.
2      Q      This is the note itself, isn't
3 it?  That's my question.
4      A      But there were some other
5 documents associated with this.  This is one of
6 the documents.
7      Q      Can you identify any other
8 documents?
9      A      Well, I guess there was a
10 separate confession of judgment as you mentioned,
11 and I believe there was one other.
12      Q      A business purpose disclosure
13 form or something of that nature?
14      A      Last time I reviewed it there
15 were other components to it, but this is the
16 promissory note itself.
17      Q      Do you see anything in that
18 promissory note that overrides or contradicts the
19 due date of borrowings under the line of credit
20 from what the commitment says, namely that they're
21 all due and payable on April 30, 2000?
22            MR. BURKE:  Again, objection to
23 the form of the question to the extent that it
24 asks the witness to interpret a document that is

57

1 right in front of us.
2            Are you asking him what it says
3 or are you asking him what his recollection is?
4            MR. GEBHARDT:  He said April 30,
5 2000 was not necessarily when it was due.  I'm
6 asking him if there was anything in the promissory
7 note he can point to that contradicts the
8 commitment letter's requirement that the line of
9 credit be repaid no later than April 30, 2000.
10      A      Other than there is a 30-day
11 notice required.
12 BY MR. GEBHARDT:
13      Q      For defaults?
14      A      I guess this is under the
15 repayment section, Section 6.
16      Q      You would admit you had notice of
17 the commitment letter in excess of 30 days before
18 April 30, 2000?
19      A      Excuse me?
20      Q      Commitment letter, being
21 Deposition Exhibit 11, was in your possession
22 longer than 30 days prior to April 30, 2000?
23      A      I'm not sure I understand the
24 question.  Maybe you want to go back to your first

15  (Pages 54 to 57

58

1 question.
2    Q    You knew the revolving line of
3 credit was required to be repaid or renewed or
4 some other manner dealt with by April 30, 2000,
5 didn't you?
6    A    My recollection was that there
7 was a due date when the note would be renewed, but
8 there was a 30-day notice.
9    Q    For demand of payment. Right?
10   A    That's what it says.
11   Q    There's some markings that appear
12 to be Sheri Phillips' initials on page 3 of the
13 note and then page 2 of the note. Do you see
14 those?
15   A    Yes, I see them.
16   Q    Were those put on there by her at
17 your direction?
18   A    I'm not exactly sure how they
19 came about, whether or not in her negotiation for
20 the note she negotiated certain points of the
21 note. She would have advised me of them prior to
22 executing them, so I was aware prior to her
23 executing the note. I don't know -- I did not
24 participate in the negotiations of the note. I

59

1 don't believe they were specifically done at my
2 direction. I think she negotiated the note,
3 reviewed the points with me for my approval, which
4 I granted, and negotiations were completed.
5    Q    Did she discuss with you the
6 terms and conditions upon which the $4 million
7 revolving line of credit was being extended to
8 CCI?
9    A    We discussed the fact that we had
10 at that time submitted for an increase to our line
11 of credit and she was going to begin negotiations
12 for it. So I was aware of that, yes.
13   Q    You were aware there was a cash
14 management feature accompanying this revolving
15 line of credit?
16   A    At the time that this was
17 negotiated, no. I think the cash management was
18 something that came afterwards, I believe.
19   Q    After the execution of the
20 documents?
21   A    I think. I'm not sure, to tell
22 you the truth. It may have even been before. I
23 don't believe they were simultaneous. I think we
24 were under a cash management program with them

60

1 beforehand or it came afterwards, but I don't
2 recall that they were negotiated at the same time.
3    Q    In connection with the $4 million
4 line of credit, was it CCI's practice to ask its
5 customers to forward payments of CCI's billings
6 directly to AllFirst?
7    A    That was something that I
8 think -- at what point in time are you referring
9 to?
10   Q    After the $4 million line of
11 credit was put into effect, which appears to be
12 when the commitment letter was issued on March 23
13 and when the promissory note was signed, I guess,
14 which was sometime shortly thereafter, did you
15 understand the cash management facility to be in
16 place once the commitment letter was issued and
17 the promissory note signed?
18   A    I don't recall if the cash
19 management system was in place after that or not.
20 The exact date of the cash management system was
21 put into effect with the company. I don't have an
22 exact date as to when that was.
23   Q    In 1999, was it the practice of
24 CCI to request its customers to mail payments

61

1 directly to AllFirst?
2    A    No. I think that the majority of
3 them mailed them to us and we deposited them.
4    Q    There were customers that paid
5 CCI's billings directly to AllFirst, isn't that
6 right?
7    A    There were some projects where
8 the project owner requested wiring instructions
9 and they would wire funds.
10   Q    What was your understanding of
11 how the line of credit and the cash management
12 feature worked on the $4 million facility?
13       MR. BURKE: Meaning the witness
14 or CCI's?
15       MR. GEBHARDT: His personal.
16   A    Well, let's see, line of credits
17 would fluctuate up and down and the cash
18 management system would sweep our account at a
19 certain point in time every night, empty our
20 account, pull the funds back in. We would get a
21 higher rate of interest on it, no rate deposit,
22 and put the funds in honor of the checks to be
23 presented the following day.
24 BY MR. GEBHARDT:

16 (Pages 58 to 61

62

1    Q        Would I be correct in saying that
2 payments received by CCI either directly or that
3 were sent by customers to AllFirst would be
4 deposited?
5    A        Right.
6    Q        CCI only had one bank account
7 into which its receivables were deposited.  Right?
8    A        Yes.
9    Q        Those receivables were either
10 deposited by CCI or by the customers directly?
11    A        Yes.
12    Q        And to the extent CCI had
13 outstanding borrowings under the line of credit,
14 the deposits would be used to pay down those
15 borrowings?
16    A        I guess, depending on -- I'm sure
17 the procedure of the bank, if we would deposit the
18 funds into -- funds would come in, be deposited
19 into our account and the bank would sweep those
20 funds, and then any checks that would be presented
21 would then be honored by the bank.
22    Q        If there were not enough funds on
23 deposit to pay the checks that were presented,
24 there would then be an advance on the line of

63

1 credit to cover those checks?
2    A        The line of credit would be drawn
3 down and so it would fluctuate up and down, and
4 that's my understanding that's how it worked.
5    Q        You didn't deal directly with
6 this yourself?
7    A        No.
8    Q        Sheri Phillips did?
9    A        Yes, she was the CFO.  She would
10 handle any day-to-day functions of the bank or as
11 far as our deposits and disbursements.
12    Q        Was it your understanding that if
13 the deposits exceeded any existing borrowings
14 under the line of credit that were still
15 outstanding plus any checks that were presented,
16 the excess would be placed in an interest-bearing
17 account on behalf of CCI?
18    A        Any excess funds?
19    Q        If there was $100,000 drawn
20 hypothetically on the CCI account on the line of
21 credit and there was $200,000 of checks presented,
22 but CCI had deposited $1 million, it was your
23 understanding that $700,000 would be placed in an
24 interest-bearing account on behalf of CCI, and it

64

1 would draw interest on behalf of CCI?
2    A        I guess that's probably what
3 would happen or used to offset interest charges
4 that would be billed against us on a line of
5 credit.
6    Q        There would be no further
7 advances on the loan, the revolving line of
8 credit, until that excess deposit and this
9 hypothetical $700,000 had been drawn down?
10    A        That I couldn't say.  I wouldn't
11 know -- I know sometimes there were some funds put
12 into some -- possibly put into fixed short-term
13 securities, 30, 60, 90-day paper, in which case
14 something would be sitting there.  So you have
15 money and maybe the line was drawn down.  I
16 believe we did some of that at some point in time
17 because it was advantageous.
18    Q        You wouldn't do borrowings under
19 the line of credit if there was a positive balance
20 in the account, you meaning CCI?
21    A        Depends on what the company was
22 doing with short-term funds.  If, hypothetically,
23 if we had bought some short-term commercial paper
24 because the interest rate was attractive, then we

65

1 would do that at the bank and access the line.
2 So, hypothetically, that's possible, too.
3    Q        Hypothetically?
4    A        Or in theory or reality.
5    Q        How did CCI make borrowings in
6 1999 under the revolving line of credit?
7    A        Mechanically how?
8    Q        Yes.  What was the process?
9    A        I guess mechanically we would
10 either draw down on it or -- I guess by request or
11 by presenting the checks.
12    Q        Typically the line of credit was
13 accessed by simply writing checks on CCI's bank
14 account.  Isn't that right?
15    A        Could be.
16    Q        Are you aware of any times when
17 CCI requested money to be deposited in the account
18 for the line of credit without checks being
19 presented?
20        - - -
21        (Whereupon the pertinent
22 testimony was read back by the court reporter.)
23        - - -
24        MR. BURKE:  Objection to form.

17 (Pages 62 to 65)

66

1 You can answer.
2    A        I don't know if that occurred or
3 not.
4 BY MR. GEBHARDT:
5    Q        **You just have no knowledge one**
6 **way or another?**
7    A        I suppose it could have occurred.
8 I would have to think of a scenario where it might
9 have. I could not sit here and tell you that it
10 did or did not occur.
11           MR. BURKE:  Maybe now is a good
12 time to take a break.
13              - - -
14           (Whereupon there was a recess in
15 the proceedings.)
16              - - -
17 BY MR. GEBHARDT:
18    Q       **That would be because Sheri**
19 **Phillips was the person principally dealing with**
20 **the line of credit with AllFirst?**
21    A        Well, she handled the day-to-day
22 accounting functions, if that's what you mean by
23 that. She handled the day-to-day accounting
24 functions. As far as your question you just asked

67

1 me previously, I would imagine that it would be
2 permissible under the loan documents to draw a
3 line of credit in that fashion for maybe a
4 purchase, for whatever. So, as far as accessing
5 the line of credit, it would have been permissible
6 to do it in the way you mentioned. Whether or not
7 it was actually done or how many times it was
8 done, I can't say.
9    Q        **My question was, is that because**
10 **Sheri Phillips was the person handling that**
11 **function or that process, not you?**
12    A        Not necessarily. It could just
13 be the fact that sitting here three years later, I
14 just don't recall.
15    Q        **That's my question.**
16           MR. BURKE:  I think he answered
17 it.
18 BY MR. GEBHARDT:
19    Q        **You don't recall?**
20    A        I don't recall if that was done
21 or not.
22    Q        **Did you ever personally request**
23 **an advance on the line of credit other than**
24 **through writing a check from 1999 forward?**

68

1           MR. BURKE:  You, meaning the
2 witness or CCI?
3           MR. GEBHARDT:  The witness.
4    A        I may have. I don't recall. I
5 think the loan documents permitted me to do so. I
6 just don't recall if the company, if we did or
7 not, accessing in that fashion.
8 BY MR. GEBHARDT:
9    Q        **Were you personally involved in**
10 **the accounts payable or check-writing function of**
11 **CCI?**
12    A        If they were checks on a
13 particular area that I had some issue with, I
14 might have reviewed what was going out to certain
15 vendors or contractors.
16    Q        **Did you write the checks**
17 **personally at all?**
18    A        They were set up on a check
19 writer.
20    Q        **Did you operate the check writer**
21 **at all in 1999 forward?**
22    A        Did I operate the check writer?
23    Q        **Yes.**
24    A        No, I did not operate the check

69

1 writer.
2    Q        **Did you always sign the checks?**
3    A        The check writer signed the
4 checks.
5    Q        **Whose signature did they bear?**
6    A        Mine.
7    Q        **Who was authorized to use the**
8 **check writer?**
9    A        There was a series of --
10 depending on what it was for, project managers had
11 certain authority to authorize disbursements,
12 senior project manager had authority. There was a
13 number of authority levels to execute checks or
14 approve a check.
15    Q        **Did Sheri Phillips have**
16 **authority?**
17    A        Did she have authority to?
18    Q        **Have the check writer issue**
19 **checks.**
20    A        Yes, she had authority.
21    Q        **Shane Miller, did he have**
22 **authority?**
23    A        Yes.
24    Q        **And were most of the checks that**

18 (Pages 66 to 69)

**70**

1 were written under the authority or the auspices
2 of Sheri Phillips or Shane Miller?
3     A     Checks would have been written
4 under the authority of any three of us, but then
5 there were also checks that other people in the
6 company had authority to approve and submit.
7     Q     Unless there was some actual
8 issue you were concerned with, you didn't get
9 involved in the process of issuing checks?
10        MR. BURKE: Objection to the
11 form.
12     A     Depending what it was.
13 BY MR. GEBHARDT:
14     Q     Unless it was something you had a
15 particular interest in, that's not one of the
16 functions that you did on a day-to-day basis?
17     A     It could also be a fact that it
18 may be a situation where Shane Miller wasn't in
19 town and so I reviewed checks for disbursement.
20 It could have been an issue where Sheri wasn't in
21 town.  And so in the course of the year there
22 were, I'm sure, many scenarios that came up.  So
23 there really was no one specific way that I'll say
24 disbursements were handled.

**71**

1     Q     It wasn't your customary
2 day-to-day function to do that?
3        MR. BURKE: To do what?
4        MR. GEBHARDT:  To issue checks or
5 supervise the issuance of the checks.
6     A     On day-to-day basis?
7 BY MR. GEBHARDT:
8     Q     Yes.
9     A     No, not on a day-to-day basis.
10        MR. BURKE: Take a break.
11        MR. GEBHARDT:  Okay.
12           - - -
13        (Whereupon there was a recess in
14 the proceedings.)
15           - - -
16 BY MR. GEBHARDT:
17     Q     Were monthly accounts receivable
18 agings provided to AllFirst in accordance with the
19 commitment letter in 1999?
20     A     To my knowledge they were.
21     Q     Who was responsible for
22 forwarding the accounts receivable aging to
23 AllFirst?
24     A     I would suspect probably an AR

**72**

1 clerk was responsible to run a report at a certain
2 point in time and mail it.
3     Q     Did you have any personal
4 involvement in that process?
5     A     As far as writing the report
6 myself?
7     Q     As far as overseeing and making
8 sure the report was submitted to AllFirst in
9 accordance with the requirements with the line of
10 credit.
11     A     No.  I assume that the bank
12 received it.  Otherwise, I would have been alerted
13 by the bank that they had not received it.
14     Q     I didn't say that they didn't
15 receive it.  I was just asking whether you were
16 involved in the process of getting those reports
17 to the bank and your answer is, I take it, no?
18     A     I did not prepare the accounts
19 receivable report to go to the bank.
20     Q     I understand you didn't prepare
21 it.  You didn't oversee the preparation or the
22 forwarding either, did you?
23     A     Other than directing the
24 department that it was to be done.

**73**

1     Q     You were aware that it was being
2 done?
3     A     To the best of my knowledge, yes.
4     Q     Now, there came a time in 1999
5 when CCI requested credit from AllFirst in excess
6 of the $4 million revolving line of credit.  Is
7 that correct?
8     A     Yes.
9     Q     What was it that CCI requested of
10 AllFirst in 1999?
11     A     Are you referring to October,
12 November of '99, that time frame?
13     Q     When the request was first made,
14 what did CCI ask?
15     A     There was a request made in
16 October of 1999 for additional borrowing.
17     Q     In what amount?
18     A     $1 million.
19     Q     And who made the request?
20     A     I did.
21     Q     And to whom did you make the
22 request?
23     A     It would have been made to Chris
24 Schwartz and Mike Zarcone or Craig Schwartz who

19 (Pages 70 to 73)

74

1 brought Mike Zarcone into it.
2     Q     How was it made?
3 Person-to-person meeting, telephone call?
4     A     Telephone call, probably.
5     Q     What was the reason CCI wanted an
6 increase in credit facility beyond the $4 million?
7     A     We requested an additional loan
8 of $1 million to handle a -- basically function as
9 a bridge loan.
10     Q     Bridge loan from what to what?
11     A     From roughly November to
12 February.
13     Q     What was the reason a bridge loan
14 was needed?
15     A     A projection had been run
16 indicating that due to some winter shutdown and
17 some other issues relative to the projects that
18 our income, revenue income would not be -- would
19 be decreased, mostly because work couldn't
20 progress and also because we had -- there was an
21 issue on two of our projects and that we needed --
22 by our projection we needed about a million
23 dollars for a 90-day period to get us through that
24 period.

75

1     Q     A million dollars more than the $4
2 million ceiling that the line of credit provided?
3     A     Well, it was an additional $1
4 million.
5     Q     So you were asking for $5 million
6 total credit for CCI?
7     MR. BURKE:  Objection to the
8 form.
9     A     If you were to add this note to
10 the other borrowings, you would add 1 million to
11 the other notes that were already in existence.
12 BY MR. GEBHARDT:
13     Q     Did CCI ask for the credit line
14 to be increased from 4 million to 5 million?
15     A     No.  I believe we asked for an
16 additional short-term loan.
17     Q     And that was because a projection
18 revealed that CCI's cash flow would be inadequate
19 over that November-to-February period of time?
20     A     Well, our projection showed we
21 were going to be running very tight, let's put it
22 that way, given a worst case scenario.  We
23 reviewed the cash flow projections and determined
24 that a short-term bridge loan would be appropriate

76

1 or would be necessary as an option, as one of the
2 options.
3     Q     And the two projects that there
4 was a problem with or what?
5     A     Well, the two projects we had
6 problems with, which we indicated to the bank, was
7 Scott Air Force Base and the Albemarle prison
8 project.
9     Q     And what was the problems that
10 existed with those two projects?
11     A     Well, in the case of the Scott
12 Air Force Base, there had been an issue of
13 acceleration that had been demanded by the
14 government, and we had a large claim to submit to
15 them, which we were working on, which the
16 government was ready to receive and negotiate with
17 upon receiving substantial completion.  The other
18 one was a prison project in Virginia which was
19 really the result of a lot of design problems from
20 the design firm.
21     Q     And when you say acceleration had
22 to be put into effect with the Scott Air Force
23 Base, that was to be able to finish the project at
24 the time the project was supposed to be finished?

77

1     A     They needed a portion of it to be
2 ready at a certain period of time and directed us
3 to accelerate in order to accomplish that.
4     Q     Was the need for acceleration at
5 all caused by CCI's not having performed in
6 accordance with the normal construction schedule
7 that had been intended at the beginning of the
8 project?
9     A     No.  Acceleration was caused by
10 some interference and project suspension on a
11 portion of the project that the government had
12 caused.
13     Q     And CCI's claim was for cost
14 overruns?
15     A     Yes, well, cost overruns and for
16 acceleration and delays that they had caused.
17     Q     And the prison project, the
18 design problems caused cost overruns also?
19     A     It caused significant delays and
20 costs associated with correcting the design.
21     Q     What was the response of AllFirst
22 to the request that you made on behalf of CCI?
23     A     In the end they granted a
24 short-term loan with a personal guarantee.

20 (Pages 74 to 77)

78

1           ---
2           (Whereupon the document was
3  marked for identification as Deposition Exhibit
4  No. 13.)
5           ---
6  BY MR. GEBHARDT:
7      Q      I've handed you what has been
8  marked as Deposition Exhibit 13 which is a file
9  memorandum prepared by Craig Schwartz on October
10  26th, 1999. Craig Schwartz was the account
11  officer for CCI in 1999. Is that correct?
12     A      I'm sorry. I was reading this.
13     Q      Was Craig Schwartz the account
14  officer for CCI in 1999?
15     A      Yes.
16     Q      Do you recollect having a meeting
17  at the end of October of 1999 with Craig Schwartz
18  in which Sheri Phillips also attended?
19     A      Yes. I believe it was also --
20  Mike Zarcone attended, I believe. There were a
21  number of meetings. I know he attended at least
22  one.
23     Q      Did you present a nine-month
24  statement in that meeting?

79

1      A      I believe we did.
2      Q      Would it be correct, does this
3  memorandum indicate that the nine-month statement
4  showed a loss of 1.5 million?
5      A      That I don't recall.
6      Q      But you have no recollection that
7  that's not a true statement, you just don't know?
8           MR. BURKE: Objection to form.
9      A      Well, at that point, at the end
10  of the ninth month, internally prepared document,
11  it may have shown a $1.5 million loss. Without it
12  in front of me, I couldn't tell you for sure.
13  BY MR. GEBHARDT:
14     Q      You have no recollection to
15  dispute the accuracy of that statement as you sit
16  here now?
17     A      Accuracy or inaccuracy, I don't
18  know what the exact number was without seeing the
19  document.
20     Q      Is it correct in accordance with
21  the last statement of this memorandum that there
22  was a projection of a $2 million loss for your
23  end?
24     A      Do you want to give me a minute

80

1  so I can read this?
2      Q      Sure.
3      A      Your question?
4      Q      Was it told to the bank that
5  there was a year-end anticipation for a $2 million
6  loss?
7      A      We told them there was going to
8  be a loss at that point in time. I think we may
9  have said it may approach -- I think it was more
10  it may approach 2 million depending on recognition
11  of certain costs and claims and what have you.
12     Q      Was this meeting for the purpose
13  of discussing the million dollar increase?
14     A      This meeting here was the
15  discussion where I was requesting an additional
16  million dollars. In keeping with my practice with
17  the bank we gave them a worst case scenario
18  relative to where we thought the company would end
19  up financially.
20     Q      Was CCI paring back at this point
21  its operations?
22     A      We had cut back on our civil
23  division. Heading into that winter, as we were
24  closing down jobs we were paring back down, that

81

1  is correct.
2      Q      And road construction work had
3  been done and was now being eliminated?
4      A      We weren't bidding any more road
5  work. So we were going to finish what we had and
6  then sell the division or liquidate or sell the
7  equipment.
8      Q      And the mechanical portion of the
9  business, as indicated in the memorandum, was
10  being phased out?
11     A      Mechanical, we were not -- the
12  projects we recently obtained we had subbed out
13  the mechanical work, and in order to conserve
14  costs we were cutting that division back, planned
15  to cut that division back also.
16     Q      These were not profitable
17  operations for CCI as of the time of this meeting?
18     A      The mechanical division?
19     Q      Mechanical and civil and road
20  that you're talking about.
21     A      The mechanical and civil
22  divisions had added revenue and profits to the
23  company. However, the cost of maintaining them,
24  we felt in order to cut our costs back we would

82

1 have to cut those divisions way back. So it was
2 more from a standpoint of overall reduction of the
3 size of the company to save, cut costs.
4        - - -
5        (Whereupon the document was
6 marked for identification as Deposition Exhibit
7 No. 14.)
8        - - -
9 BY MR. GEBHARDT:
10      Q        Exhibit 14 is another file
11 memorandum from Craig Schwartz referencing a
12 meeting with you and Sheri Philip that was also by
13 Michael Zarcone of AllFirst. Do you recollect
14 this meeting?
15      A        Yes.
16      Q        This is a different meeting than
17 the meeting referenced in Exhibit 13?
18      A        That was the first meeting.
19      Q        Yes.
20      A        I think the way it came about, we
21 had this initial meeting with Craig Schwartz, and
22 the follow-up meeting then was the one I referred
23 to where Michael Zarcone attended.
24      Q        There's a reference to an

8

1 you had in mind when you made this statement to
2 the bank?
3      A        It could have been any number of
4 sources, personally going to another bank and
5 borrowing, could have been any number of sources.
6      Q        What you're talking of, if I
7 heard you correctly, there was the possibility of
8 you putting in personally or going to another
9 bank?
10      A        If that's what -- you are talking
11 about private sources, it would have been
12 something other than AllFirst. So it would have
13 been or could have been from those two sources you
14 mentioned. I was certainly capable of doing it.
15      Q        You didn't tell them you intended
16 to go out and borrow $500,000 from another bank
17 did you?
18      A        I think where I left it was that
19 I could obtain $500,000. I left it go at that. I
20 wouldn't tell them I was going to another bank.
21      Q        You basically told them you could
22 put the money in, you or people associated with
23 you?
24      A        I don't recall exactly stating

83

1 increase of a $1.2 million done on a temporary
2 basis. You were referencing a million dollar
3 increase. Can you explain how it got from a
4 million to a million two?
5      A        Initially gone in and requested a
6 million. That had been my request for a million.
7      Q        How did it get from a million to
8 a million two, then?
9      A        I think after reviewing our
10 financials and having the discussion with Craig
11 Schwartz at the first meeting, they came back with
12 an offer of 1.2 million.
13      Q        There's a reference in here to,
14 quote, CCI will get an additional $500,000 from
15 private sources, period, end quote.
16             Do you recollect having
17 discussions about CCI obtaining an additional
18 $500,000 from sources other than the bank?
19      A        I don't recall specifically, but
20 that's not to say it may not have come up in
21 conversation and I may have told them if we needed
22 the additional $500,000 that the company would be
23 able to obtain it, other than from AllFirst.
24      Q        And what were the private sources

8

1 that. That's not to say that didn't come up in
2 conversation. All I'm saying is that I could
3 have -- more than likely I could have raised
4 $500,000 from an outside source.
5        - - -
6        (Whereupon the document was
7 marked for identification as Deposition Exhibit
8 No. 15.)
9        - - -
10 BY MR. GEBHARDT:
11      Q        I've handed you what has been
12 marked as Exhibit 15 and purports to be a letter
13 dated November 5, 1999 to you as president of CCI
14 Construction from Craig Schwartz. Do you
15 recognize your signature on the last page?
16      A        Yes, I do.
17      Q        And would I be correct that this
18 is the commitment letter for the $1.2 million that
19 AllFirst extended to CCI in November of 1999?
20      A        It would appear to be.
21      Q        And now looking at the document,
22 the use of loan proceeds is described in the
23 identical same way as the use of loan proceeds in
24 the $4 million commitment. Isn't that correct?

86

1   A      Well, this one says work in
2 progress, where I think the other one says work in
3 process. So to the extent that would be the
4 difference, I guess.
5   Q      You don't recognize that as a
6 material difference in what the meaning is, do
7 you?
8          MR. BURKE: I'll object to the
9 form to the extent the document speaks for itself.
10   A      Work in progress, work in
11 process, I don't know.
12          MR. BURKE: It's not identical.
13   A      It's not identical.
14 BY MR. GEBHARDT:
15   Q      The purpose of the million two
16 was to provide funds to finance work in progress
17 and accounts receivable. Correct?
18   A      The intent was a short-term loan,
19 a bridge loan to cover that time period from
20 November to February.
21   Q      Because there was a cash flow
22 shortfall?
23   A      We were projecting a cash flow
24 shortfall.

87

1   Q      Caused by the receivables that
2 you thought were due and payable particularly from
3 the two projects, Scott Air Force Base and
4 Albemarle Prison. Right?
5   A      Those were two of the reasons as
6 well as the fact that winter had set in, so
7 receivables of all jobs were going to be slower
8 because work couldn't progress. So we were
9 projecting a cash flow shortfall. Whether or not
10 in reality we would have had one, I don't know,
11 but it was close enough where I felt it prudent to
12 obtain additional funds to have in the event that
13 the worst case scenario we were projecting came to
14 pass.
15   Q      How long was this -- was your
16 intention to have the loan outstanding, this
17 temporary facility?
18   A      Our projections, we only needed
19 it for 90 days.
20   Q      Sufficient cash would come into
21 the company to pay it?
22   A      Those were what the projections
23 were, indicating that the cash flow would increase
24 after that.

88

1   Q      And so this cash increase would
2 be used to repay the temporary facility?
3   A      Well, our cash flow was projected
4 to then increase within about 90 days, and as I
5 indicated to the bank, that was the only amount of
6 time that we needed and that we would pay it back.
7   Q      And the commitment letter
8 provides that it's to be repaid on March 31, 2000.
9 Right?
10          MR. BURKE: Objection to the
11 form. Where are you referencing, counsel?
12          MR. GEBHARDT: Next to last
13 paragraph on the first page.
14          MR. BURKE: Where does it say it
15 will be repaid on March 31?
16          MR. GEBHARDT: If no demand is
17 made, the loan will expire and all borrowings will
18 be due and payable together with interest on March
19 31, 2000.
20   A      Well, when I requested a million
21 dollars for 90 days, what they came back with was
22 they wanted to increase the amount, what they had
23 given me as cushion and they wanted to increase
24 the time frame, which I had requested, from 90 to

89

1 120. So that is what they came back to. I
2 reiterated to them that that was not necessary and
3 was not what I requested. When I signed the note,
4 he indicated he would have to go back and retype
5 the note, or something to that effect, and really
6 sat there and said, what's the difference, in 90
7 days pay it.
8 BY MR. GEBHARDT:
9   Q      The note doesn't have a due date,
10 does it?
11          MR. BURKE: Objection to form.
12   A      I would have to take a look at
13 it.
14          MR. BURKE: The document speaks
15 for itself.
16 BY MR. GEBHARDT:
17   Q      Let's take a look at your note.
18          MR. GEBHARDT: Mark this as 16.
19          - - -
20          (Whereupon the document was
21 marked for identification as Deposition Exhibit
22 No. 16.)
23          - - -
24 BY MR. GEBHARDT:

23 (Pages 86 to 89)

90

1    Q      I've handed you Deposition
2 Exhibit 16, which is a --
3           MR. GEBHARDT: Excuse me, let's
4 mark this one as 17.
5           - - -
6           (Whereupon the document was
7 marked for identification as Deposition Exhibit
8 No. 17.)
9           - - -
10 BY MR. GEBHARDT:
11    Q      Take a look at Deposition Exhibit
12 17, which is a commercial loan note line of credit
13 dated November 8, 1999. Do you recognize your
14 signature on the last page?
15    A      Yes, I do.
16    Q      And that's the note that you
17 signed on behalf of CCI for the $1.2 million loan?
18    A      Yes, it is.
19    Q      Do you find any due dates
20 specified on this note?
21    A      No, I do not see one.
22    Q      Would you agree that on Page 2 of
23 the commitment letter there's the phrase we've
24 seen before that, quote, all terms and conditions

92

1 legal conclusion. You can answer.
2           MR. GEBHARDT: Say objection to
3 form. I don't need you to educate me on why you
4 think the form is wrong.
5    A      My understanding -- the way it
6 came about was that I made the request for a
7 million dollars for 90 days because that's what we
8 needed. The bank in their judgment came back to
9 me at a meeting with a commitment for a million
10 two for amounts to 120 days and presented both to
11 me. I told them that I didn't need a million two,
12 nor did I need 120 days. I requested 90 days and
13 a million dollars. Mr. Schwartz indicated that he
14 could not modify the letter by crossing it off.
15 He would have to go back and have it retyped. And
16 it was the end of the day and it was inconvenient
17 and the statement to me was, if you want to pay it
18 off in 90 days, go ahead and pay it off in 90
19 days. This is a demand note. But I have put on
20 here extra amount -- in the event you don't have
21 to come back to me, and I'm giving you an extra 30
22 days. I said I appreciated that, but that was not
23 what I had requested.
24           After going back on the 4th, we

91

1 contained herein shall survive execution of such
2 loan documentation?
3           MR. BURKE: Are you asking if
4 that's what it says?
5           MR. GEBHARDT: Yes.
6    A      That's what it says.
7 BY MR. GEBHARDT:
8    Q      So, your understanding, based on
9 the commitment letter and promissory note, was
10 that the actual $1.2 million was not expected to
11 be repaid or due until March 31, 2000?
12           MR. BURKE: Objection to form.
13           (Whereupon the pertinent
14 testimony was read back by the court reporter.)
15           - - -
16    A      No, that's not my recollection.
17 BY MR. GEBHARDT:
18    Q      You don't dispute that the
19 commitment letter, which is to survive execution
20 of the loan document, says that the loan is due on
21 March 31, 2000, do you?
22           MR. BURKE: I'm going to object
23 to form to the extent the documents will speak for
24 themselves and to the extent he is asking for

93

1 decided to execute the commitment letter and the
2 note and leave it as it was. So the commitment
3 letter and the note were signed at the same time.
4 BY MR. GEBHARDT:
5    Q      The due date specified in the
6 commitment letter which survives the execution of
7 the note is March 31, 2000. Isn't that right?
8           MR. BURKE: Same objection.
9    A      It is what the document says. It
10 is not what -- my understanding nor what I had
11 requested.
12 BY MR. GEBHARDT:
13    Q      Even though you only wanted a
14 million dollars, the full $1.2 million was
15 disbursed to CCI. Isn't that right?
16    A      Yes, it was.
17    Q      And the full $1.2 million was
18 used by CCI and its operations, wasn't it?
19    A      Well, we took a deposit of the
20 million two. Whether we actually used all million
21 two, I don't know if that's a true statement.
22    Q      But it was deposited in the
23 checking account and reduced the borrowings under
24 the $4 million line of credit?

24 (Pages 90 to 93)

94

1    A    Well, it was deposited into our
2 account.
3    Q    Which was the account tied in
4 with the line of credit?
5    A    Accounts tied in with cash
6 management system. The only account we had, so
7 that was the account it went into.
8    Q    Now, this particular $1.2 million
9 loan was personally guaranteed by you. Isn't that
10 right?
11    A    Yes, it was.
12    Q    And would it be fair to say that
13 the AllFirst representatives expressed to you that
14 they would not give CCI the additional loan
15 without your personal guarantee?
16    A    Yes, that's true.
17    Q    And in connection with that
18 requirement, you actually executed the suretyship
19 agreement that is Deposition Exhibit 16. Isn't
20 that right?
21    A    Yes, I did.
22        - - -
23        (Whereupon the document was
24 marked for identification as Deposition Exhibit

95

1 No. 18.)
2        - - -
3 BY MR. GEBHARDT:
4    Q    Exhibit 18 appears to be a
5 personal financial statement for you that was
6 prepared by CCI's accountants Brown, Schultz,
7 Sheridan & Fritz. Do you recognize it as such?
8    A    Appears to be.
9    Q    And this is a statement of your
10 assets and liabilities as of December 31, 1998.
11 Right?
12    A    Yes.
13    Q    This was required by AllFirst
14 before they would agree it to extend the
15 additional $1.2 million loan?
16    A    I don't know if they got this
17 before the loan or after, to tell you the truth.
18 What's the date, the 9th, so I think they got this
19 after.
20    Q    And at the time this financial
21 statement was submitted, was this an accurate
22 recitation of your assets and liabilities?
23    A    To the best of my knowledge.
24    Q    Based on what I see on the last

96

1 page, which is the recitation of assets and
2 liabilities, you had a financial wherewithal to
3 repay personally without the use of CCI funds, the
4 $1.2 million that had been borrowed?
5    A    I would say probably December 31
6 of '98, it appears that I had enough cash on hand.
7 Whether or not I would have been able to liquidate
8 or had the cash to pay, I had the assets.
9    Q    So you would agree that at least
10 as of December 31, 1998, you had available the
11 cash to have repaid the $1.2 million loan and
12 probably at least as of the year 2000, you had
13 assets or resources sufficient to enable you, had
14 you chosen, to personally repay the $1.2 million
15 loan?
16    A    Well, I don't know exactly -- I
17 would have to see what it was at the end of 1999.
18 But looking at 1998, I had the wherewithal to pay
19 it back.
20    Q    Prior to this financial statement
21 that is Exhibit 18, had you ever provided the bank
22 with a personal financial statement previously?
23    A    I'm sure that I had at some point
24 in time.

97

1    Q    You can't remember when?
2    A    Well it was probably when the
3 original relationship began, and if there had been
4 any personal guarantee of anything, I would have
5 had -- most likely would have had to give them a
6 personal financial statement.
7    Q    This $1.2 million loan was also
8 secured by some equipment?
9    A    It was secured by, what the
10 document says, specific equipment financed
11 including titled vehicles.
12        - - -
13        (Whereupon the document was
14 marked for identification as Deposition Exhibit
15 No. 19.)
16        - - -
17 BY MR. GEBHARDT:
18    Q    Do you recognize Exhibit 19 as
19 the security agreement pledging the equipment
20 references in the commitment letter?
21    A    It refers to the collateral, but
22 there's nothing attached, so I don't know
23 specifically what equipment.
24    Q    There's no collateral description

25 (Pages 94 to 97)

- 98

1 attached?

2     A     Well, it says see attached
3 schedule, and it's not included.

4     Q     But you recognize your signature?

5     A     Yes, I do.

6     Q     That appears to be the agreement
7 at least without an attached schedule that was
8 executed as a security agreement in connection
9 with $1.2 million loan?

10     A     Appears to be.

11     Q     What was the reason for the
12 pledge of the equipment?

13     A     The bank asked for it.

14     Q     Now, this was equipment other
15 than equipment that had been financed through the
16 $2 million loan?

17     A     It was equipment that was titled
18 that we owned. I think that's what it says.
19 Actually, what it says is specific equipment
20 financed, but I don't know what specific equipment
21 they were referring to, and then including titled
22 vehicles.

23     Q     So you don't know whether this
24 equipment that was being referred to was also the

99

1 same equipment that was purchased with the use of
2 $2 million loan or not?

3     A     I don't know -- they wouldn't
4 have been referring to that because they had
5 already had UCC-1s filed on that equipment. So I
6 doubt they would have wanted -- I don't know they
7 would have gotten anything to ask for that for
8 collateral here. So they must be referring to
9 something else.

10     Q     CCI didn't purchase any equipment
11 with the use of the money from the $2 million
12 loan?

13     A     I don't believe so.

14     - - -

15     (Whereupon the documents were
16 marked for identification as Deposition Exhibit
17 Nos. 20 and 21.)

18     - - -

19 BY MR. GEBHARDT:

20     Q     Deposition Exhibits 20 and 21
21 appear to be letters dated November 9, 1999
22 between Craig Schwartz and Sheri Phillips
23 regarding selling the equipment pledged for the
24 $1.2 million loan. Can you explain to me what was

10

1 going on with the sale of the equipment that ha[d]
2 just been pledged or purportedly pledged?

3     A     Well, I'm going to assume --

4     MR. BURKE: Don't assume. If you
5 know, answer.

6     A     I know generally because we
7 discussed it. There may have been equipment that
8 they had asked to encumber where she would have
9 given a list that we owned. And we were winding
10 up our civil division, as we said, and selling the
11 equipment as we were finished with it. So we
12 requested a release -- requested authorization to
13 sell that that had been encumbered by the million
14 two and sold it at auction. So it appears in the
15 face of the letter that we were requesting his
16 authorization to sell the equipment at auction.

17 BY MR. GEBHARDT:

18     Q     Do you know what was sold?

19     A     Specifically which pieces?

20     Q     Right.

21     A     Heavy equipment pieces. I
22 couldn't tell you what particular backhoe or dozer
23 or truck or whatever. Cross referencing, see the
24 attached list to the note.

10[1]

1     Q     Its permission to sell them, but
2 you don't know whether specifically the items of
3 equipment that were supposed to be attached on a
4 schedule to the security interest were or were not
5 sold?

6     A     As we finished our use of the
7 equipment, then were selling them at auction. So
8 if that was one of the pieces that is going to
9 sale, one of the pieces that had been pledged here
10 as part of the security, then we made the request
11 and, appropriately so, made the request to be
12 released from that and sell it.

13     Q     Do you know what happened to any
14 proceeds of the sale with any of that equipment?

15     A     They would have first gone to pay
16 off any notes that were specifically on that
17 equipment and the proceeds would have gone to our
18 account.

19     Q     To your knowledge, was there any
20 document requesting that the proceeds from the
21 sale of that equipment be used to reduce the $1.2
22 million?

23     A     Letter requested from the bank?

24     Q     Yes.

26 (Pages 98 to 101)

102

1    A    I don't remember seeing anything
2 from the bank.
3    Q    Where did you expect the funds to
4 come from to repay AllFirst in the 90 days that
5 you anticipated the $1.2 million loan to be
6 outstanding at the end of that time?
7    A    Accounts receivable.
8    Q    Collections from the normal
9 course of business?
10    A    Yes, or from the sale of
11 equipment or whatever was occurring in that 90
12 days that would have put money into our account.
13    Q    Did you anticipate the $4 million
14 line of credit to have been paid to a zero balance
15 at that time?
16    A    At what time?
17    Q    At the time the money came in to
18 pay the million two.
19    A    I don't believe there was any
20 contemplation -- in other words, it would be a
21 zero balance?
22    Q    Right.
23    A    Or, in other words -- no, I think
24 the understanding from the bank was that that was

103

1 a revolving line and that would function as it
2 always had, fluctuate up and down. In fact, I
3 made it clear at the signing of the note that that
4 $1.2 million note would be paid prior to any time
5 frame, whether it be a renewal.
6    Q    The $4 million line of credit
7 commitment letter carried through April 30th and
8 the one million two carried through March 31, so
9 there was a disparity in dates, but did you have
10 any discussions of whether the line of credit
11 would or would not be brought to a zero balance
12 before the million two was repaid or not?
13    A    There was no specific requirement
14 the bank placed on me.
15    Q    I didn't ask you that. I asked
16 you whether you had discussions with anyone from
17 the bank on that topic.
18    A    You need to be more specific, I
19 guess. Just general discussions?
20    Q    Yes. In the course of getting
21 the million two, when you were discussing that,
22 did you have any discussions about whether at the
23 time you repaid the million two, you should have a
24 zero balance on the $4 million revolving line of

104

1 credit?
2    A    No.
3    Q    Just not discussed?
4    A    The only discussed part was, as I
5 indicated, was the discussion that they understood
6 that would be paid off within 90 days and that was
7 going to be ahead of any payments on the $4
8 million line.
9    Q    So, hypothetically, if the $4
10 million line had a $2 million outstanding balance
11 and a customer sent in a $1.2 million of accounts
12 or payables on CCI's billings, you expected to use
13 the $1.2 million coming in from the customer to
14 pay off the million two loan and just leave the
15 million dollar balance where it was?
16        MR. BURKE: Could you repeat that
17 question?
18 BY MR. GEBHARDT:
19    Q    Let me rephrase it.
20        Hypothetically, would it have
21 been your understanding if we assume the $2
22 million outstanding on the line of credit and $1.2
23 million had come into CCI from a customer, that
24 you could use that $1.2 million to pay off the

105

1 $1.2 million loan, without first reducing the $1.2
2 million loan, without first reducing the $2
3 million hypothetically outstanding under the line
4 of credit?
5        MR. BURKE: Objection to form.
6    A    If I chose to, sure. I believe
7 that was my understanding and I believe that was
8 the understanding that the bank had.
9 BY MR. GEBHARDT:
10    Q    On February 11, 2000, the $1.2
11 million loan was repaid. Correct?
12    A    Yes.
13    Q    Who made the decision to make
14 that payment to the bank on February 11, 2000?
15    A    I did.
16    Q    Did you consult with anyone else
17 in the company about making that payment at that
18 time?
19    A    As I recall, there were
20 discussions that I had reviewing the cash flow
21 situation, where things were on the projects, with
22 the company, and at the end of the discussion or
23 those meetings or review or whatever, I decided
24 that it would be best to pay that note off.

27 (Pages 102 to 105)

106

1    Q        You made the decision yourself?
2    A        Yes.
3    Q        And did you tell anyone else in
4 the company prior to making the payment that
5 that's what you were going to do?
6    A        I think I believe I informed the
7 chief operating officer and obviously I informed
8 the chief financial officer.
9    Q        You didn't ask their opinion,
10 whether it was in the best interest of the company
11 to pay the million two loan off at that time?
12    A        Well, I did not ask the opinion
13 of Ms. Phillips.  In conversations that day, the
14 day before, I think I made the statement that it
15 seemed to be in our best interest and consistent
16 with what I had stated to the bank that I would
17 do, and basically made the decision, made the
18 decision to pay that note back or pay the note off
19 or however you want to do it.
20    Q        Who got the check written to make
21 the payment?
22    A        What do you mean, got the check
23 written?
24    Q        Did you handwrite the check?

107

1    A        No.  I called Ms. Phillips and
2 told her to prepare a check.
3    Q        This was signed by the machine's
4 signature, the check?
5    A        No.  It was a hand check.  I
6 signed it.
7    Q        So someone, either Ms. Phillips
8 or someone under Ms. Phillips' direction, wrote
9 out the check by hand and you signed it?
10    A        No, just computer-generated and
11 called the accounts payable clerk.  She would
12 basically go into the computer, make out the
13 check, hit the button and the check would be
14 generated.
15    Q        The check writer wasn't used?
16    A        We only used the check writer
17 because it was -- just when we had a long series
18 of checks to write and this was a series of checks
19 that day.
20    Q        Making interest payments monthly
21 to the bank, though, you didn't hand-sign those
22 checks, did you?
23    A        Well, because those were probably
24 regular, they would have been set up and printed

108

1 with a series of checks.
2    Q        Was the check writer used?
3    A        I take that back.  I think the
4 way the bank did it is they automatically debited
5 our account for interest.  I would have to check
6 the bank records or their procedure as to how they
7 did it, but my understanding is that's how they
8 handled the interest.
9    Q        Now, what was the procedure, what
10 was your involvement in the delivery of the check
11 to AllFirst?
12    A        I took it to Mr. Schwartz to --
13 at his office.
14    Q        You personally?
15    A        Yes.
16    Q        Why did you personally take the
17 check?
18    A        Because I wanted to talk with
19 him, and it presented a very good opportunity for
20 me to have a discussion with him.
21    Q        What did you want to discuss with
22 him?
23    A        A couple of things.  I wanted to,
24 one, thank him for acting quickly back in October,

109

1 November, when we wanted to borrow the funds, for
2 acting quickly in approving it.  Also to remind
3 him that I was pleased our projections had worked
4 themselves through.  I was able to pay the note
5 when I said I had paid it, and also to talk with
6 him about the possibility or what would be
7 necessary if I ever wanted to come back and borrow
8 again.  It presented also an opportunity to begin
9 a discussion depending on how the conversation was
10 going to what the next steps were in terms of I
11 knew the $4 million line was going to be up for
12 renewal and started to talk to him about that.
13        So by taking the check over, it
14 presented a good opportunity for me to sit and
15 have an informal discussion with him.
16    Q        Did you have an appointment?
17    A        I called and I believe I had an
18 appointment with him, though he was not there.
19    Q        You had an appointment and he
20 didn't show up?
21    A        No.  I called over and spoke to
22 either -- I really don't recall.  It was either to
23 he or his assistant or secretary, whatever, who
24 indicated that he would be there at a certain time

28 (Pages 106 to 109)

110

1 and I said fine, I would come over to see him.
2    Q    So you just said, I'm coming by?
3    A    I said I'm coming over, I wanted
4 to meet with him and leave my message, and it was
5 to pay the November note, pay it off.
6    Q    You did --
7    A    I don't recall, unfortunately,
8 whether I spoke to him directly or to his
9 assistant, but in either event, I said the same
10 thing to either one, that I was coming over to see
11 him, and that's when I went to the bank.
12    Q    You told them you were coming to
13 pay off the million two loan?
14    A    I believe so. I said I was
15 coming to see him to pay off the note we had in
16 November.
17    Q    When you got there, Mr. Schwartz,
18 as you said, was not present?
19    A    No, he was not.
20    Q    So you never met with him on the
21 day that you delivered the check?
22    A    Now, I waited for awhile. I
23 think the woman there said he would be returning
24 or she thought he would be returning from a

111

1 meeting shortly, so I waited.
2    Q    How long did you wait?
3    A    Half hour, 40 minutes maybe,
4 maybe along those lines.
5    Q    And you didn't take the check
6 with you when you left, though?
7    A    Well, I started to, but the woman
8 there asked if she could help me. I told her why
9 I was there and she said if I wanted to, she could
10 take care of it.
11    Q    So you gave her the check?
12    A    Yes, I gave her the check.
13    Q    And told her which loan it was
14 paying off?
15    A    I said it was paying a loan off.
16 I think she looked it up in her system and asked
17 me if I wanted a receipt and I said sure, took a
18 receipt, left a message for Craig to call me when
19 he got back. She apologized that he wasn't there
20 or he must have left the meeting and gone to lunch
21 or something to that effect, but he was still
22 expected back that day.
23    Q    So solely because the lady asked
24 to help you is the reason you left the check?

112

1    A    I believe so. She ask me if she
2 could help me and I told her why I was there and
3 she said she could take care of that if I wanted.
4    Q    In practical effect there would
5 have been no difference in making the payment on
6 that Friday as opposed to the next Monday?
7        MR. BURKE: What's the question?
8    A    Is there a question?
9        - - -
10    (Whereupon the pertinent testimony
11 was read by the court reporter.)
12        - - -
13        MR. BURKE: Object to the form.
14 I don't believe that's a question.
15    A    Probably not, no.
16 BY MR. GEBHARDT:
17    Q    When you requested the check, you
18 understood that writing that check would result in
19 a draw upon the $4 million line of credit?
20    A    It may or may not have.
21    Q    Did you know that writing the
22 check would result in a draw on the $4 million
23 line of credit?
24    A    Well, depending on how the bank

113

1 was accounting for, that could have been the case.
2    Q    You knew at the time the check
3 was written that CCI had an outstanding balance on
4 the line of credit, didn't you?
5    A    I think, yes.
6    Q    And you knew that writing that
7 check would increase the outstanding balance on
8 the line of credit?
9        MR. BURKE: Objection, asked and
10 answered. You can answer it again.
11    A    Well, do you want to ask the
12 question again or repeat it?
13        - - -
14    (Whereupon the pertinent
15 testimony was read by the court reporter.)
16        - - -
17    A    That would depend on whether or
18 not there were funds still sitting in our account
19 that would not have been swept by the bank and
20 their cash management system. So to the extent
21 there were funds prior to that, then I guess there
22 would have been a zero impact.
23 BY MR. GEBHARDT:
24    Q    But you didn't know that.

29 (Pages 110 to 113)

114

1      MR. BURKE: Didn't know what?
2 BY MR. GEBHARDT:
3      Q      Whether there were any deposits
4 that had been made that day?
5      A      That were sitting in our account?
6      Q      Yes.
7      A      I know funds had recently come
8 in, so I believe there were funds sitting in the
9 account, but I couldn't tell you how much.
10     Q      Did you verify what the
11 outstanding balance was or what the deposits had
12 been?
13     A      I verified what our overall
14 balance was.
15     Q      So then you knew that writing
16 that check would constitute a draw on the line of
17 credit?
18     A      No.
19            MR. BURKE: Objection, asked and
20 answered.  You can answer again.
21     A      It would have drawn a line of
22 credit only to the extent that the funds had
23 possibly been swept by the cash management system.
24 BY MR. GEBHARDT:

116

1      Q      I understand that, how it works.
2 What I'm asking you, your personal belief, at the
3 time you wrote the check based on your inquiry as
4 to the status of the account and so on, your
5 understanding was that writing that check would
6 require a draw on the line of credit?
7            MR. BURKE: I object and I am
8 going to ask the court reporter to read back the
9 previous instances where that question has been
10 asked and answered.
11           MR. GEBHARDT: The question
12 stands as it is.  You have a question pending,
13 phrased differently and he can answer this
14 particular question as to his personal
15 understanding of the account status.
16           MR. BURKE: Read back the last
17 question, please.
18            - - -
19           (Whereupon the pertinent
20 testimony was read by the court reporter.)
21            - - -
22           MR. BURKE: Objection again.
23 This answer has been asked five times of this
24 witness and apparently counsel keeps asking the

115

1      Q      What time did you go into
2 AllFirst, in the afternoon, after lunch, wasn't
3 it?
4      A      Late morning, early afternoon,
5 somewhere in that time frame.
6      Q      Before you left, you would have
7 verified the status of the account that had the
8 line of credit facility?
9      A      Either that or the night before.
10     Q      And based on the information that
11 you had available to you at the time you wrote the
12 check, you were of the belief that writing that
13 check would require a draw on the line of credit?
14           MR. BURKE: Objection for the
15 fourth time to the extent that question has been
16 asked and answered.  I'll let my client answer it
17 one more time.
18     A      Depending on whether or not funds
19 had been moved from our account into the cash
20 management system, then there would have been no
21 impact on the line.  To the extent that there was,
22 then there would have been an impact theoretically
23 on the line.
24 BY MR. GEBHARDT:

117

1 same question with the hopes of a different
2 answer.  I'll let the witness answer the question
3 again.
4            MR. GEBHARDT: Let me phrase it
5 correctly because the witness has not yet answered
6 the question.
7 BY MR. GEBHARDT:
8      Q      You indicated you verified the
9 status of the account and the line before you
10 wrote the check.  Right?
11     A      I verified that funds had come
12 into the company from various sources.
13     Q      What funds?
14     A      Off projects, sale of equipment.
15     Q      You knew the amount of funds that
16 had come in?
17     A      We had taken in some large
18 deposits.  Our deposits had increased as we had
19 projected them to do so.
20     Q      Did you quantify what those
21 deposits were before you wrote the check?
22     A      Yes.  I knew generally the dollar
23 amount that we recently had taken in over the
24 course of the previous couple of days, even that

118

1 day.
2    Q    It was your view at the time you
3 wrote that check that writing that check would not
4 require a draw on the line of credit?
5        MR. BURKE: Objection, asked and
6 answered. Answer it again.
7    A    To the extent that funds had not
8 been swept out of our account by the cash
9 management system, there would have been no impact
10 to the line. To the extent that there was a
11 difference, then by use of the cash management
12 system, funds would have been taken from that.
13 BY MR. GEBHARDT:
14    Q    The question still remains, I
15 understand to the extent there were collections,
16 to the extent there was this, this is how it would
17 work. My question to you still is, when you wrote
18 the check and handed it in to AllFirst, did you
19 believe that you were making a borrowing on behalf
20 of CCI under the line of credit or did you think
21 that were sufficient deposits to cover the
22 payment, you personally at the time you wrote it?
23        MR. BURKE: Objection, asked and
24 answered.

119

1 BY MR. GEBHARDT:
2    Q    I understand what could have
3 occurred and might have occurred and different
4 things, but what did you think was the situation
5 when you wrote the check and handed it in?
6        MR. BURKE: Same objection. Go
7 ahead.
8    A    I thought or believed that there
9 were some funds still in our account that had not
10 been swept because there hadn't been time. Those
11 funds were available. That in the tally of it, we
12 had funds available to pay this note off. And so
13 I instructed the check was to be drawn. Whether
14 or not there was impact on the bank's records on
15 the line of credit or not, I can't say. You have
16 to go over the bank's records and see what, if
17 any, impact there would have been.
18    Q    In fact, CCI had not collected
19 the cash that it had anticipated collecting when
20 the $1.2 million was borrowed, isn't that true?
21        MR. BURKE: Objection to form.
22 You can answer.
23    A    Say that again.
24        - - -

120

1        (Whereupon the pertinent
2 testimony was read by the court reporter.)
3        - - -
4    A    Rephrase that, collected the
5 money.
6 BY MR. GEBHARDT:
7    Q    CCI's cash flow problems had
8 increased as of February 2000 beyond what they
9 were in November of 1999, isn't that true?
10    A    No, I don't believe that to be
11 the case.
12    Q    Isn't it a fact that CCI over the
13 next five months, counting from February, was
14 anticipating substantial cash flow shortfalls?
15        MR. BURKE: What time frame?
16        MR. GEBHARDT: Five-month period
17 counting from February of 2000.
18        MR. BURKE: No, the time frame is
19 when did CCI anticipate?
20        MR. GEBHARDT: From February.
21    A    You have to give me the time
22 frame to which to refer to, the date of February
23 11th?
24 BY MR. GEBHARDT:

121

1    Q    February 11th, you knew that CCI
2 was having cash flow problems on February 11th,
3 didn't you?
4        MR. BURKE: Objection to form.
5 You can answer.
6    A    I knew that CCI had cash flow
7 problems, issues when I talked to the bank in
8 November, which we clearly told them about. And I
9 would have to say by February 11th, it appeared as
10 though cash flow problems had improved somewhat,
11 but we still had some issues.
12 BY MR. GEBHARDT:
13    Q    You're saying you thought that
14 CCI's cash flow position had improved as of
15 February 11, 2000 beyond what they were in
16 November of 1999?
17    A    Well, I would have to look at the
18 report, whatever cash report we may have had in
19 November, and compare it to a cash flow report we
20 might have gotten at the end of January or
21 February, and I could more specifically tell you.
22    Q    I'm not asking for the specific
23 numbers. I'm asking whether at the time you wrote
24 the check, was it your understanding that CCI had

31 (Pages 118 to 121

122

1 a cash flow problem that was worse than it had in
2 November when the money was borrowed?
3     A      No, I don't believe it was worse.
4     Q      You thought it was better?
5     A      Well, I think it had improved
6 somewhat.
7     Q      And by somewhat, what do you
8 mean?
9     A      By problem, what do you mean?
10    Q      By problem, I mean not having
11 sufficient money to operate the company.
12    A      Well, we had enough money to
13 operate the company at that point, so I guess by
14 your definition we didn't have a problem.
15    Q      You understood that over the
16 succeeding months CCI was not going to have
17 sufficient funds to operate, didn't you?
18    A      On what date?
19    Q      As of February 11th.
20    A      Not necessarily. I knew that we
21 had not necessarily cleared all of our problems,
22 but the problem you're saying, we didn't have
23 enough money to operate, clearly wasn't the case
24 on February the 11th.

123

1     Q      We've established you made the
2 payment on behalf of CCI on February 11, 2000.
3 And I think it's also without dispute there was a
4 meeting held in which you attended and there were
5 representatives of AllFirst on February the 18th.
6 Does February the 18th accord with your
7 recollection?
8     A      On February 18th, I asked for a
9 meeting with Mr. Schwartz and Mr. -- well, Mr.
10 Schwartz, probably.
11    Q      And there was a meeting that
12 actually was held on February the 18th. Correct?
13    A      Yes.
14    Q      That was a Friday?
15    A      Okay.
16           MR. BURKE: Do you know if it was
17 a Friday or not?
18 BY MR. GEBHARDT:
19    Q      If you need a calendar, we can
20 get one. Was it a Friday?
21    A      Was it a Friday?
22    Q      Yes.
23    A      Okay.
24    Q      You called Mr. Schwartz to ask

124

1 for the meeting?
2     A      As I recall.
3     Q      Let's assume, and I'll represent
4 to you that February 17th was a Friday and, of
5 course, February 11th was then a Friday, when did
6 you call Mr. Schwartz to set the meeting up?
7           MR. BURKE: February 17th was a
8 Friday or February 18th was a Friday?
9           MR. GEBHARDT: February 18th is a
10 Friday and February 11th is a Friday and the
11 meeting was February the 18th.
12 BY MR. GEBHARDT:
13    Q      My question is: You had payment
14 on a Friday and a meeting the succeeding Friday.
15 When did you call Mr. Schwartz to set up the
16 meeting of February the 18th?
17    A      I think I called the morning of
18 the 18th.
19    Q      The morning?
20    A      I think.
21    Q      So the meeting was in the
22 afternoon?
23    A      I believe so, yes.
24    Q      Now, when you attended that

125

1 meeting, who was present?
2     A      Well, let's see, the meeting was
3 supposed to be with Mr. Schwartz and Mr. Zarcone,
4 but also in attendance were about five to six
5 other people from the bank, plus two people on the
6 speaker phone.
7     Q      I can represent to you that those
8 were Mr. Elias and Mr. Gibson.
9     A      On the phone?
10    Q      On the phone, yes. You saw Mr.
11 Schwartz there and you saw Mr. Zarcone there?
12    A      Yes.
13    Q      And the other people who may have
14 been there you don't recollect?
15    A      Mr. Meyers, Mr. Trout, two or
16 three others.
17    Q      Now, did you ask for all these
18 people to be in attendance?
19    A      No.
20    Q      Do you have any understanding of
21 why all these people attended the meeting?
22    A      No.
23    Q      You called up Mr. Schwartz to say
24 I would like to meet with you this afternoon and

32 (Pages 122 to 125

126

1 you have five people in a meeting and two people
2 on an extension phone?
3    A    That's right.
4    Q    And did that surprise you?
5    A    Yes.
6    Q    Did you ask why is everybody here
7 or something to that nature?
8    A    Yes.
9    Q    And what were you told?
10   A    There really wasn't much of an
11 answer.
12   Q    Did you tell the bank there were
13 major problems with CCI when you called Mr.
14 Schwartz?
15        MR. BURKE: Objection to form.
16 You can answer.
17   A    When I called Mr. Schwartz, I
18 said I would like to come in and talk with you,
19 that we received an update to some project reports
20 and that it looked like the problem with Scott Air
21 Force Base in particular had not moved forward to
22 the extent I had hoped and I wanted to come in and
23 sort of talk to him and tell him, keep him
24 informed and tell him where we were at.

127

1 BY MR. GEBHARDT:
2    Q    Did you tell him CCI had suffered
3 as of year end a $6 million loss?
4    A    In the phone conversation?
5    Q    Yes.
6    A    I don't believe so -- I don't
7 recall.
8    Q    Did you attend by yourself?
9    A    I had intended to, but at the
10 meeting I did not.
11   Q    And who attended with you?
12   A    Bob Chernicoff attended.
13   Q    This is the same Mr. Chernicoff
14 whose office we're in now?
15   A    Yes.
16   Q    And did you understand at the
17 time of that meeting that Mr. Chernicoff was a
18 bankruptcy lawyer?
19   A    No, I did not.
20   Q    You had no idea he was bankruptcy
21 lawyer?
22   A    No.  You mean as far as that
23 being his known specialty?
24   Q    Right.

128

1    A    No.
2    Q    When did you contact Mr.
3 Chernicoff?
4    A    I had talked to Mr. Chernicoff
5 for the first time that morning.
6    Q    So Mr. Chernicoff had not
7 represented CCI or you prior to this meeting on
8 February 18th?
9    A    Well, the attorneys that I
10 typically use, I'll say corporate counsel, is
11 located in Pittsburgh, and so I had asked for a
12 recommendation for an attorney in Harrisburg who
13 was used to dealing with loan documents, bank loan
14 documents.
15        MR. BURKE: I will caution the
16 witness not to reveal any communications he may
17 have had with his lawyer or CCI's lawyer regarding
18 anything.
19   A    Okay.  Anyway --
20        MR. BURKE: What's the question
21 again?
22 BY MR. GEBHARDT:
23   Q    Had Mr. Chernicoff at any time
24 represented CCI or Mr. Ortenzio individually prior

129

1 to that February 18th date?
2    A    No.
3    Q    He was called for the first time,
4 then, by you on February 18th?
5    A    Yes.  I met him for the first
6 time.
7    Q    At what time did you meet with
8 him?
9    A    I think I met him probably two
10 hours before I was on my way to the bank.
11   Q    And you retained Mr. Chernicoff
12 based on a recommendation from the company's
13 counsel in Pittsburgh?
14        MR. BURKE: When you say you, do
15 you mean CCI?
16        MR. GEBHARDT: CCI.
17        MR. BURKE: Let me just speak
18 with my client regarding the attorney/client
19 privilege issue.  You're asking for substantive
20 substance of the communication.
21        MR. GEBHARDT: He already said he
22 was referred to Chernicoff by lawyers in
23 Pittsburgh and I would like a clear answer to the
24 statement and I don't think there's any

33 (Pages 126 to 129

130

1 confidentiality of communication expressed in
2 that.
3           MR. BURKE: I'll let him answer
4 that so long as it is understood no waiver of
5 attorney/client privilege.
6 BY MR. GEBHARDT:
7      Q      The company's lawyers in
8 Pittsburgh recommended Mr. Chernicoff.
9           MR. BURKE: I want your
10 representation that there's no waiver of
11 attorney/client privilege.
12          MR. BURKE: There's no waiver
13 of attorney/client privilege.
14          MR. BURKE: Did the Pittsburgh
15 lawyers recommend Chernicoff?
16     A      I'm not sure which one in their
17 firm recommended him.
18 BY MR. GEBHARDT:
19     Q      The question is, did the
20 Pittsburgh lawyers recommend Mr. Chernicoff?  It
21 could be answered yes or no.
22     A      Actually, no, it was an attorney
23 in Harrisburg that had recommended that I see Bob
24 Chernicoff.

131

1      Q      This attorney in Harrisburg, was
2 this an attorney of CCI's?
3      A      Yes.  The firm we had retained,
4 we always had.
5      Q      Which firm was this?
6      A      Eckert Seaman's.
7      Q      And they have a Pittsburgh
8 office, of course?
9      A      Yes, they have a Pittsburgh
10 office and a Harrisburg office.
11     Q      What's the name of the attorney
12 that you talked to?
13     A      There was an attorney in
14 Pittsburgh I talked to who dealt with construction
15 issues and an attorney in Harrisburg, just general
16 advice, so to speak, more of a friend than
17 anything, and because the bank documents I had --
18 I needed to renegotiate my line of credit with
19 AllFirst bank at some point in time coming up, and
20 they declined because they said that it was touchy
21 because they represented AllFirst also, so they
22 had a little bit of a conflict there.  And I said
23 I still need somebody to help, still want to get
24 into bank documents, loan documents, restructuring

13[

1 my loan, which will be done in 60 days, I said, so
2 I need a recommendation of somebody who is
3 familiar, knowledgeable with bank documents and
4 maybe has experience dealing with the people at
5 AllFirst.
6      Q      Did you have any understanding
7 when you called Mr. Chernicoff that he practiced
8 in the area of bankruptcy law?
9      A      No.
10     Q      You didn't know that at all?
11     A      No.  Had I known that, I would
12 not have taken him to the meeting.
13     Q      But you came to find that out
14 sometime after the meeting?
15     A      Yes.
16     Q      When did you first find out Mr.
17 Chernicoff practiced in the area of bankruptcy
18 law?
19     A      It probably didn't hit me that
20 that was a specialty of his probably for, I guess,
21 a week or ten days.
22     Q      But you did come to recognize
23 eventually that bankruptcy law was a specialty of
24 Mr. Chernicoff?

13[

1      A      Yes.
2      Q      Why is it you felt the need to
3 take a lawyer to the meeting with the bank to
4 discuss your line of credit?
5           MR. BURKE: I'm going to object
6 to the extent the question calls for Mr. Ortenzio
7 to reveal attorney/client communication, and I'll
8 confer with him about this.
9           MR. GEBHARDT: Let me say the
10 attorney/client privilege pertains to confidential
11 communications.  It does not pertain to
12 information or the witness's personal beliefs or
13 views.  My question was, why did he feel the need
14 to obtain an attorney to go to the meeting.  I
15 haven't ask him what the attorney said, what he
16 discussed with him or anything.
17          MR. BURKE: If the witness felt
18 the need to bring an attorney to the meeting based
19 upon advice given to him by counsel, it does call
20 for an attorney/client communication which is
21 privileged and you're not entitled to.
22 BY MR. GEBHARDT:
23     Q      Is that the statement, you
24 retained Mr. Chernicoff because you were advised

134

1 by counsel?

2          MR. BURKE: The question was why
3 did Mr. Ortenzio feel the need to bring Mr.
4 Chernicoff to this meeting and if that was based
5 on advice given to him by counsel, then it is a
6 privileged communication.

7          MR. GEBHARDT: Well, I haven't
8 asked for what the advice was.

9          MR. BURKE: Yes, you have.

10          MR. GEBHARDT: I've asked him why
11 he felt the need to bring Mr. Chernicoff to the
12 meeting. If he's going to tell me that was based
13 on advice of counsel, that's the answer and
14 perhaps I am not entitled to ask him what that
15 advice was, but I'm entitled to know if there's a
16 privilege being asserted and why it's being
17 asserted.

18          MR. BURKE: Answer it. Unless
19 you need to confer with me.

20     A     I might as well take the
21 opportunity to confer with you, I guess.

22          - - -

23          (Whereupon the document was
24 marked for identification as Exhibit Nos. 22, 23

135

1 and 24.)

2          - - -

3          MR. BURKE: Mr. Gebhardt, if you
4 will stipulate if there's no waiver of
5 attorney/client privilege, I will permit Mr.
6 Ortenzio to explain the circumstances under which
7 Mr. Chernicoff attended that meeting. Are we
8 agreed?

9          MR. GEBHARDT: Yes.

10          MR. BURKE: Go ahead.

11     A     I called Eckert Seaman's and told
12 them that very shortly I was sure that I was going
13 to have to get into some negotiations,
14 discussions, whatever you want to call it,
15 negotiations with AllFirst bank concerning the
16 renewal of our $4 million line of credit facility
17 and that it was quite possible that it might get
18 adversarial, but I was sure we could reach an
19 agreement that both companies could live with.

20          In that point of the
21 conversation, because I had already taken the
22 various notes, they said look, we have a conflict.
23 If you think there's any way there could be
24 anything that might be, that might be -- I don't

136

1 know if they used the word adversarial, where
2 there would be a disagreement or an argument, we
3 can't represent you because you have a conflict.
4 I said, well -- I was somewhat upset about that
5 because these had been my attorneys for 12 years.

6          So after expressing my
7 disappointment in them, I asked them for a
8 recommendation, somebody that I could then talk to
9 that they would recommend to basically function
10 what I asked them to function, basically help
11 participate in renegotiating for the most part $4
12 million line of credit facility. They hung up and
13 said they'd call me back. They called the
14 Harrisburg office and the Harrisburg office called
15 me and suggested the firm Cunningham Chernicoff
16 and I never heard of them before. I said fine. I
17 said, do you have a phone number, got a phone
18 number.

19          I called and spoke to -- I'm not
20 quite sure who I spoke to on the phone. Basically
21 I got a recommendation from Eckert Seaman's --
22 point in fact, they had called in advance because
23 I asked them, call them, tell them I'm going to
24 call, at least so when I do call, they understand

137

1 where I'm coming from, I'm being recommended by
2 you guys. Fine, they did. I don't know who they
3 spoke to. I said you call and I'll wait and then
4 I'll call later, which I did. I spoke to -- I
5 think I spoke to the secretary or somebody here, I
6 would like to come in, was referred by Eckert
7 Seaman's, blah, blah, blah, came in here, as a
8 matter of fact --

9          MR. BURKE: Don't go into details
10 of communications, just give the general.

11     A     Bob Chernicoff came in and
12 introduced himself and said what's the situation.
13 I said I have these loan documents, kind of went
14 through the whole thing, I am going to have to
15 renegotiate it, could become a little bit
16 adversarial, I said, but I think at the end of the
17 day they have been with me for a long time, we
18 will be able to work it out in some fashion.

19          Then we wrapped it up and I said
20 I have a meeting at the bank, just moved from Camp
21 Hill to downtown, to meet with Craig Schwartz or
22 Mike Zarcone. I was on my way out and he stopped
23 and he said, look, do you think I should attend
24 and go along with you. I said I didn't see it

138

1 necessary. I said, I'm just really going down to
2 talk to them, I called for the meeting. And he
3 said I know the people there and if you're going
4 to get into discussions relative to these notes,
5 whatever, he said, maybe I should be there. I
6 said fine, come along, he's right downtown. And
7 so he said yes, so he followed me down and he came
8 along with me. Mostly he sat there and took notes
9 of the meeting, who said what, that kind of stuff.
10         MR. BURKE: That's good.
11 BY MR. GEBHARDT:
12     Q     When did you have the discussion
13 with the attorneys from Eckert Seaman's in which
14 they conveyed they had a conflict and recommended
15 Mr. Chernicoff?
16     A     I think it was the afternoon
17 before.
18     Q     So the meeting and all occurred
19 on Friday, this was Thursday?
20     A     I believe it was Thursday, yes.
21     Q     You wouldn't have called Mr.
22 Chernicoff until Thursday afternoon, Friday
23 morning?
24     A     If I called him, it would have

140

1 adversarial?
2     A     I didn't.
3     Q     You just said that you related to
4 the lawyers from Eckert Seaman and to Mr.
5 Chernicoff that you thought the meeting might be
6 adversarial?
7     A     That's not what I said.
8         MR. BURKE: Objection.
9 BY MR. GEBHARDT:
10     Q     Tell me what you meant.
11     A     I said the renegotiating of the
12 $4 million credit facility, which was due to be up
13 for renewal, 60 days maybe, something like that,
14 45, 60 days, maybe 90, if you take the 30-day
15 notice provision, I thought that that might
16 possibly become adversarial. There was a
17 possibility.
18     Q     Why did you think it might
19 possibly become adversarial?
20         MR. BURKE: The renegotiations?
21 BY MR. GEBHARDT:
22     Q     The meeting, whatever you thought
23 might be adversarial.
24     A     They asked me if I thought that

139

1 been like the very end of the day. I didn't call
2 him. I called the firm. It was the very end of
3 the day, the 17th or first thing in the morning on
4 the 18th.
5     Q     Did you call him before you set
6 the meeting up with the bank or after?
7     A     I spoke to him after.
8     Q     After you called Craig Schwartz
9 to arrange the meeting?
10     A     I had already gotten a meeting
11 with Craig Schwartz by the time that I made
12 contact with the firm here. Actually, it wasn't
13 Bob Chernicoff. It was just the firm.
14     Q     I think you said you called Craig
15 Schwartz on that morning.
16     A     I think it was that morning and I
17 said I had called him either the end of the day
18 Thursday or first thing Friday morning, but all I
19 left was a message. I didn't speak to anybody.
20     Q     Here, the law firm rather than
21 the bank?
22     A     Here.
23     Q     Why did you think the meeting
24 that you were planning with the bank might be

141

1 it might be, and I said it's possible.
2     Q     But why?
3     A     I think because -- just simply
4 because the company was in a fight with its -- one
5 of its main -- the owners of the Scott Air Force
6 Base, we were having problems on another project,
7 that it's possible it might become adversarial. I
8 didn't say that it would and quite frankly,
9 hopefully that it wouldn't be, but I said it might
10 become as a possibility. They asked me the
11 question and I said, well, it's possible. When I
12 said it was possible was when they, then, whatever
13 you guys call it, conflict, recuse ourselves,
14 whatever. We don't want to get into it with you
15 if there's an outside possibility it might, and I
16 said fine, and that's when the switch was made.
17     Q     You at CCI had been dealing with
18 Dauphin Deposit and AllFirst from 1990 forward.
19 Had you had a good relationship with the bank?
20     A     I thought we did.
21     Q     Basically they tried to
22 accommodate your credit needs and requirements for
23 the business?
24         MR. BURKE: You, meaning CCI?

142

```
1           MR. GEBHARDT: Yes.
2     A     I would say so, yes.
3 BY MR. GEBHARDT:
4     Q     And all this had gone along for a
5 minimum, at least 9, almost 10 years and now
6 you're having a meeting you think might possibly
7 be adversarial?
8           MR. BURKE: I'm going to object
9 to the misstatement of his testimony for a second
10 time. He didn't say the meeting would be
11 adversarial.
12 BY MR. GEBHARDT:
13    Q     Not the meeting, the negotiation
14 of the documents. Why did you think the
15 negotiation of the renewal of the line of credit
16 might become adversarial?
17    A     That was the term Eckert Seaman's
18 used, questioning me as to whether or not it might
19 become adversarial or have some difficulties or
20 something to that effect. All I said was, I can't
21 rule it out. It's possible.
22    Q     Why couldn't you rule it out?
23    A     What's that?
24    Q     Why couldn't you rule it out?
```

143

```
1           MR. BURKE: Objection, asked and
2 answered. Go ahead and answer.
3     A     Because it's in the realm of
4 possibility.
5 BY MR. GEBHARDT:
6     Q     And nothing other than that,
7 that's the only explanation?
8           MR. BURKE: Objection. He's
9 answered the question.
10 BY MR. GEBHARDT:
11    Q     Because it's in the realm of
12 possibility?
13    A     They asked me the question if
14 that was a possibility, that it might become
15 adversarial. And they were very nervous about
16 anything that would be --
17    Q     Was there any fact or feature
18 about the upcoming negotiations that you can point
19 to that led you to the conclusion that there might
20 possibly be adversarial discussions or
21 negotiations relating to the line of credit?
22    A     I think what we're getting hung
23 up on is the term adversarial which is --
24    Q     Difficult negotiations.
```

144

```
1     A     -- maybe the term I guess that I
2 sort of coined and maybe that's really not --
3 you're getting hung up on. Not necessarily
4 adversarial, but maybe difficult and, you know,
5 because I thought that the company was not in as
6 strong a financial condition as it had been the
7 previous year, and so there's a possibility that
8 the renegotiation of it might become more
9 difficult, let's say.
10    Q     You had not been represented, you
11 meaning CCI, had not been represented by counsel
12 in connection with the line of credit all the way
13 up through December 31, 1999. Isn't that correct?
14    A     I had an attorney look over, make
15 some comments on the November note, made
16 recommendations.
17          MR. BURKE: Again, let me just --
18 counsel, let me just counsel the witness. Let's
19 just leave it that you spoke with an attorney
20 about the note. Let's not go into what the
21 attorney told you or what your discussions were.
22    A     Okay.
23          MR. BURKE: I think he's answered
24 the question. Go ahead.
```

145

```
1           MR. GEBHARDT: I don't think he
2 finished answering when you interrupted him.
3 BY MR. GEBHARDT:
4     Q     Other than that instance
5 regarding the $1.2 million loan, had the company
6 been represented by counsel in connection with the
7 other finances from Dauphin Deposit and then
8 AllFirst?
9     A     Represented in the negotiations
10 or --
11    Q     In connection at all.
12    A     Looking over loan documents?
13    Q     Did you use a lawyer?
14    A     I don't believe so.
15    Q     That's all I was asking.
16    A     I don't believe that we did.
17    Q     As the commitment letter
18 indicates the loan approval was not -- excuse
19 me --
20    A     Which loan are we talking about?
21    Q     The 1999 $4 million line of
22 credit commitment indicates that it was not
23 subject to renewal until April 30th, 2000. Why
24 did you feel the necessity to begin negotiations
```

37 (Pages 142 to 145

146

1 in February of that year?
2    A    Well, I didn't in February. I
3 wasn't planning on negotiating in February.
4    Q    I thought you indicated the
5 reason you called the meeting was to discuss the
6 renewal or renegotiation of the line of credit and
7 you needed counsel because there might be
8 difficult discussions.
9        MR. BURKE: Objection to
10 misstatement of prior statement.
11    A    You're talking about the meeting
12 on the 18th?
13 BY MR. GEBHARDT:
14    Q    Yes.
15    A    No. That meeting on the 18th was
16 not to discuss, at least on my part, not to
17 discuss the $4 million line of credit. I wasn't
18 there to discuss any of the notes. I called to
19 talk to Craig Schwartz to go in and tell him
20 that -- just what was going on with the company.
21 One, that the project at Scott Air Force Base was
22 still having some problems. Our claim was not
23 going to be submitted when we thought it would be,
24 that I had a meeting with the bonding company and

147

1 that I had been talking to them about that project
2 and another one in particular, and that I had a
3 meeting coming up with them and that we were going
4 to ask them to give us assistance on that project,
5 which is all what I said in the meeting, though I
6 was intending the meeting to be Craig Schwartz and
7 Mike Zarcone. Instead as you stated, I walked
8 into a roomful of people, two people on a
9 conference phone, and so it was more of an
10 inquisition than a meeting that I had set up.
11    Q    You were the only party
12 represented by counsel?
13    A    Unless one of the other people
14 there was an attorney or inhouse counsel, then I
15 was the only -- he was the only attorney,
16 possibly. I don't know for sure.
17    Q    So I'm not confused about what
18 you were calling a meeting for. That meeting was
19 not to discuss or renegotiate the line of credit
20 that CCI had?
21    A    No.
22    Q    It was just to review the
23 company's finances and bring the bank current?
24    A    Just to discuss with Craig

148

1 Schwartz as we -- a practice we had always done,
2 basically keep him informed what was going on with
3 the company, what we were doing, so as I told --
4 as I ended up telling a roomful of people, so they
5 didn't hear something from somebody else, that
6 they heard -- whatever the situation was they
7 heard it from me.
8    Q    I guess my question then still
9 involves, if you were going to sit down with a
10 banker and bring him up to date on what had been
11 happening with a company, why was a lawyer
12 accompanying you?
13        MR. BURKE: I'll object. I
14 believe the witness has testified regarding the
15 reason the lawyer accompanied him.
16    A    I stated the circumstances under
17 which he suggested that he come along.
18 BY MR. GEBHARDT:
19    Q    I guess the transcript will bear
20 us out. I understood you to say that you were
21 about to enter into negotiations or you were going
22 to begin negotiations about the line of credit.
23 You thought there might be some difficulty or we
24 will call it complex or whatever kind of issues

149

1 you want, that you might need the assistance of
2 counsel to address.
3        MR. BURKE: Objection.
4        MR. GEBHARDT: Let me finish what
5 I'm saying first.
6 BY MR. GEBHARDT:
7    Q    Therefore, you contacted Mr.
8 Chernicoff at the recommendation of other counsel
9 and he suggested to attend the meeting, but my
10 understanding now you're telling me you were
11 simply sitting down to bring the bank up to date
12 with what had been happening at CCI.
13        MR. BURKE: Objection. Number
14 one, there's no question pending -- and let me
15 just finish my objection -- and I object to the
16 mischaracterization on several facts as to the
17 prior testimony. Counsel --
18        MR. GEBHARDT: I'm not trying to
19 quote his prior testimony, but I'm confused --
20        MR. BURKE: Let's limit our
21 questions to the facts and what was happening as
22 opposed to what was previously testified to.
23 BY MR. GEBHARDT:
24    Q    To clear up my confusion, it is

38 (Pages 146 to 149)

150

1 your testimony that you did not meet with the bank
2 on February 18, 2000, to discuss the terms of the
3 revolving line of credit or its renewal or the
4 loan documents pertaining to it, that was not your
5 intention when you set the meeting up?
6    A    That's correct.
7    Q    But you nevertheless, based on
8 the recommendation of your normal counsel, Eckert
9 Seaman's, the day before the meeting, met with Mr.
10 Chernicoff and at Mr. Chernicoff's suggestion had
11 Mr. Chernicoff accompany you to the meeting with
12 the bank?
13        MR. BURKE:  Objection to the
14 mischaracterization of the prior testimony.
15 BY MR. GEBHARDT:
16   Q    Is that what happened?
17   A    The conclusion of my meeting here
18 at Cunningham Chernicoff, I got ready to leave,
19 Mr. Chernicoff, I had shown him the documents,
20 acquired as to where I was going, I told him where
21 I was going and why I was going there and he
22 suggested -- asked if I was going by myself and I
23 said yes and he suggested, if I wanted it might be
24 good for him to tag along or come along.  That was

151

1 it.  So after thinking about it, I said there is
2 no harm to be done, and I said fine.
3    Q    You knew prior to walking into
4 the meeting with the bank that CCI was going to
5 suffer substantial cash flow shortages over the
6 next five to six months?
7        MR. BURKE:  Objection to form.  You
8 can answer.
9    A    I had received a recent cash
10 flow -- worst case cash flow scenario which showed
11 that we were going to have more serious cash flow
12 problems in the future months and I took that
13 information that I had received, I think I
14 probably received it that morning.
15 BY MR. GEBHARDT:
16   Q    This was Friday morning also?
17   A    I think it was either Friday
18 morning or the end of the day Thursday.  Received
19 the information, worst case scenario, but all the
20 same it was still a scenario and it was -- I felt
21 the need to inform the bank.
22   Q    Tell them you needed more cash at
23 that time?
24   A    Basically a projection we were

152

1 going to need more cash.
2    Q    And had to come from the bank or
3 bonding company?
4    A    I didn't ask the bank for it.
5    Q    Did you tell Mr. Schwartz that
6 you expected CCI to have sustained a $6 million
7 loss for 1999?
8    A    At the meeting or phone
9 conversation?
10   Q    Well, let's talk about the phone
11 conversation prior to the meeting.
12   A    I don't think so.  I don't think
13 I went into too many facts with Mr. Schwartz.  I
14 told him we were having some problems, I think.  I
15 told him we were going to have significant loss,
16 certainly a loss for 1999, since we were unable
17 to -- depending on whether he was able to
18 recognize a claim, but I didn't go into too much
19 detail because I wanted to meet with him face to
20 says.
21        - - -
22        (Whereupon the document was
23 marked for identification as Exhibit Number 25.)
24        - - -

153

1 BY MR. GEBHARDT:
2    Q    I've handed you Deposition
3 Exhibit 25 which I will represent to you are notes
4 taken by Mr. Jamin Gibson, the first page being
5 notes he made after the initial call to him from
6 Mr. Schwartz advising of the meeting and the
7 second page of notes and thereafter from the
8 meeting and times after the meeting.  You'll
9 notice on the first page somewhere down around the
10 middle there's a reference to a $6 million loss
11 for the year.  My question would be, you had never
12 spoken to Mr. Gibson prior to February 18th?
13   A    That's correct.
14   Q    And if these are notes of Mr.
15 Gibson's conversation with Mr. Schwartz setting up
16 the meeting, the $6 million figure would have had
17 to come from someplace.  Isn't that right?
18        MR. BURKE:  I'm going object to
19 the form of the question and the use of this
20 document.  Are you asking --
21 BY MR. GEBHARDT:
22   Q    I'm asking if it refreshes your
23 recollection as to whether you may have divulged
24 to Mr. Schwartz in setting up the meeting that you

39 (Pages 150 to 153

154

1 expected CCI's 1999 financial statements to show a
2 $6 million loss.
3    A       I don't believe in the phone
4 conversation that I represented to Craig Schwartz
5 any loss figures for 1999.  At the meeting that I
6 had I believe I showed him the cash flow
7 projection that showed a $6 million cash flow
8 shortfall somewhere in the course of the year
9 2000.  Also the $6 million loss, we had already, I
10 guess, somewhat indicated in November that we were
11 looking at possibly a $2 million loss for 1999.
12    Q       Did CCI sustain a $6 million
13 operating loss for the fiscal year 1999?
14    A       I don't believe so.
15    Q       Apart from the cash flow
16 statement, did you hand out any other statements
17 at the meeting?
18    A       Which meeting are you talking
19 about?
20    Q       February 18th.
21    A       No.
22    Q       Let me ask you, if you would, to
23 look at Deposition Exhibits 22 and 23.  Can you
24 identify these documents?

155

1    A       One is a balance sheet and one is
2 an income statement.
3    Q       And 22 would be the income
4 statement and 23 the balance sheet?
5    A       Yes.
6    Q       Of CCI?
7    A       Yes.
8    Q       And these are company internally
9 generated statements?
10    A       Yes, they are.
11    Q       Did you provide these to AllFirst
12 on February 18th?
13       MR. BURKE:  You, meaning CCI or
14 Mr. Ortenzio?
15       MR. GEBHARDT:  Mr. Ortenzio was
16 there as a representative of CCI.
17 BY MR. GEBHARDT:
18    Q       Did you provide these during the
19 meeting?
20    A       I don't believe so.  I think the
21 only thing that I provided was the cash flow
22 statement.  I believe that there were financial
23 documents sent to them the beginning of the
24 following week, but at the meeting there I don't

15

1 think I gave them anything other than what I had,
2 which was the cash flow statement.
3    Q       But you do believe that at least
4 after the Friday meeting that you would have sent
5 the income statement and balance sheet that are
6 Exhibits 22 and 23 to AllFirst?
7    A       There were financial statements
8 sent from -- I directed the CFO to send them
9 whatever current financial information we had the
10 beginning of the following week.  So quite
11 possibly these may have been contained in that.
12    Q       Would you look at the second page
13 of Deposition Exhibit 22?  Would you agree that
14 this financial statement shows a net loss after
15 taxes of $6,115,813.48?
16    A       That's what it shows.
17    Q       This would be for the annual year
18 1999, and actually it's for a 13-month period
19 ending January.  So it's a 13-month statement
20 rather than a 12-month statement?
21    A       That is what it says at the
22 bottom.
23    Q       Is that a correct number?
24    A       I couldn't say.

15

1    Q       Well, did CCI sustain an
2 operating loss in the magnitude of $6 million for
3 the year 1999?
4    A       I don't know.
5    Q       Well, you don't think they made a
6 profit, do you?
7       MR. BURKE:  The question was:
8 Did they lose 6 million?
9       MR. GEBHARDT:  Yes.  I said in the
10 magnitude of 6 million.  If you want to say 5
11 million 9 or 6 million 1.
12 BY MR. GEBHARDT:
13    Q       Did CCI sustain a loss somewhere
14 in the magnitude of the $6 million indicated?
15       MR. BURKE:  Do you know?
16    A       I know we would have sustained a
17 loss.  Whether it was in the amount of $6 million,
18 I couldn't say.
19 BY MR. GEBHARDT:
20    Q       Was it greater than 3 million?
21    A       I really don't know.  We never
22 got a chance to really complete our first quarter
23 financials.
24    Q       Do you have any reason to believe

40 (Pages 154 to 157

158

1 that these numbers are inaccurate?
2          MR. BURKE:  Objection to form.
3 BY MR. GEBHARDT:
4     Q       Based on the company's records.
5     A       I would have to say that probably
6 our records were pretty good.  So if that's what
7 we internally generated, then I would say it was a
8 high probability they would be close to being
9 accurate.  Only because in the past our
10 information had been relatively accurate.
11    Q       Turning to the balance sheet for
12 the same period, would you agree, sir, that it
13 shows CCI on Page 2 to be insolvent to the tune of
14 $995,762.87?
15         MR. BURKE:  Objection to form.
16    A       That was the negative equity.
17 BY MR. GEBHARDT:
18    Q       So assuming the accuracy of these
19 internally generated numbers as of the date, the
20 13-month date of these statements, CCI was
21 insolvent.  Is that right?
22         MR. BURKE:  Objection to the form
23 of the question.
24    A       Well, that depends.  You're

159

1 carrying a million, almost $2 million of
2 depreciation on this statement.  So if you back
3 that out --
4 BY MR. GEBHARDT:
5     Q       We're not talking of an income
6 statement where you can count depreciations as a
7 deduction, used equipment that lost value over
8 time, you don't add depreciation back in on the
9 balance sheet.
10         MR. BURKE:  We're not here to
11 debate accounting principles  Let's let the
12 witness answer.
13    A       I only made the comment it shows
14 $2 million worth of the depreciation in arriving
15 at the total.  That's all.  You can take that for
16 what it's worth.
17 BY MR. GEBHARDT:
18    Q       This statement shows CCI to be
19 insolvent?
20         MR. BURKE:  Objection to the
21 form.  The document speaks for itself.  The
22 witness can answer.
23    A       It says what it says.  It shows
24 negative equity of $995,000.

160

1 BY MR. GEBHARDT:
2     Q       Which in laymen's terms shows CCI
3 to be insolvent.  Isn't that right?
4          MR. BURKE:  Same objection.  The
5 witness can answer if he can.
6     A       It shows negative equity of
7 $995,000.
8     Q       In laymen's terms that means
9 insolvent?
10         MR. BURKE:  I'm going to object.
11 The witness has answered the question.  The
12 document speaks for itself and the witness has
13 already indicated the document provides what it
14 provides.
15 BY MR. GEBHARDT:
16    Q       Does it mean insolvent?
17    A       I don't know.  I would have to
18 look further into -- I think it would require
19 further investigation rather than a summary
20 balance sheet.
21    Q       You're not able to answer?
22         MR. BURKE:  Based on the two
23 documents that you've shown him, he says he's not
24 able to answer.

161

1 BY MR. GEBHARDT:
2     Q       How often did the company
3 generate internal statements such as the ones that
4 are Exhibits 23 and 24?
5          MR. BURKE:  That's 22 and 23.
6     A       Once a month.
7 BY MR. GEBHARDT:
8     Q       And they were shown to you?
9     A       I saw them.
10    Q       And that would be each month
11 during the 12-month period?
12    A       For the most part, yeah.
13    Q       So you were kept apprised of the
14 financial situation of the company throughout the
15 year on a current basis?
16    A       Generally speaking.
17    Q       Let me hand you what has been
18 marked as Exhibit 24.  Would I be correct if
19 this is the cash flow projection that you handed
20 out at the meeting on February 18th?
21    A       I believe it is.
22    Q       And this was prepared by CCI?
23    A       Yes.
24    Q       In handing this out to AllFirst

41 (Pages 158 to 161)

162

1 you believed the numbers on there to be a
2 reasonably accurate projection?
3     A     I think they represented a worst
4 case scenario.
5     Q     But given the worst case scenario
6 bent, they were still as reasonably accurate as
7 CCI could make them?
8     A     Probably, yes.  We were trying to
9 be accurate.
10    Q     Would I be correct that the
11 beginning cash balance shown on this projection
12 for February is a negative $6,205,366?
13          MR. BURKE:  Objection to the form
14 of the question.  I believe the document speaks
15 for itself.
16          MR. GEBHARDT:  I understand that,
17 but I would like to ask some questions about how
18 numbers are derived.
19 BY MR. GEBHARDT:
20    Q     That's what it shows?
21    A     Yes, that's what it says.
22    Q     That means that CCI had a hole in
23 its cash of that sum of money, had less --
24 generated that much less cash -- let me rephrase

163

1 that.
2          The beginning cash balance was
3 negative of $6,205,366, which I think you've just
4 indicated.
5          MR. BURKE:  That's what the
6 document indicates.
7          MR. GEBHARDT:  Exactly.
8 BY MR. GEBHARDT:
9     Q     The ending cash balance was
10 projected for February to be $9,063,691.  Do you
11 see that?
12    A     Yes.
13    Q     And taking the full $4 million
14 revolving line of credit and the full $1.2 million
15 temporary line, that still left CCI as of the end
16 of February according to this projection with a
17 negative cash number of $3,863,691.  Is that
18 right?
19          MR. BURKE:  Is this indicated
20 somewhere on the document, Counsel?
21          MR. GEBHARDT:  Yes, at the very
22 bottom, it says cash shortage.
23    A     That's what it says.
24 BY MR. GEBHARDT:

16

1     Q     What that means, if I'm
2 understanding this projection correct, the company
3 projected that for the month of February fully
4 using the $4 million revolving line of credit and
5 the $1.2 million loan that it would come up short
6 in paying its bills by over $3,800,000?
7          MR. BURKE:  Are you asking if
8 that is what it says?
9 BY MR. GEBHARDT:
10    Q     Is that what the company's
11 projection was?
12    A     That's what this projection says,
13 yes.
14    Q     But, of course, as of the end of
15 February, the company did not have an available
16 line of credit of $5.2 million, did it?
17    A     No, by the end of February it had
18 4 million.
19    Q     So, in fact, as of the end of
20 February, that 3,863,691 negative number would
21 have been $1.2 million higher?
22          MR. BURKE:  I'm going to object
23 to the form. I'm not sure where you're reading
24 from.  Are you asking what this document says?

16

1 BY MR. GEBHARDT:
2     Q     I'm saying this document projects
3 they had available the full $4 million line of
4 credit and the full $1.2 million line of credit as
5 of the end of February, but, in fact, the 1.2
6 million had been repaid.
7          MR. BURKE:  I object.  That's not
8 what the document says.
9          MR. GEBHARDT:  You're not
10 testifying and the witness certainly can explain
11 the numbers.
12 BY MR. GEBHARDT:
13    Q     My question is because the $1.2
14 million had been repaid in the middle of February,
15 shouldn't the 3,863,691 be increased by a million
16 two?
17    A     Well, if you add the -- or you
18 subtract 1 million 2 from 3.8, that would bring
19 you to the number you're looking for.
20    Q     You add it to the 3.8.
21    A     Well, add it, yes, you would add
22 it.
23    Q     So that would show a deficit of
24 approximately $5 million as of the end of February

166

1 of CCI's available cash to pay its operating
2 expenses.
3           MR. BURKE: Objection to the
4 mischaracterization of what the document says.
5     A      If you apply the math you're
6 doing it, yes.
7 BY MR. GEBHARDT:
8     Q      And those cash shortages
9 continued all the way through July and into where
10 it says remaining. Right?
11    A      Yes, according to this
12 projection.
13    Q      According to the projection, and
14 at the end the projection was $5,900,000 was going
15 to be CCI's shortfall in available cash to pay its
16 operating expenses?
17    A      No. I think it says 1 million 9,
18 but I think you're getting 5 million 9 if you add
19 the cash shortages.
20    Q      You presented this cash flow
21 projection, you said, at the meeting on the 18th.
22 Right?
23    A      Yes, I believe I did.
24    Q      In the course of that meeting,

167

1 you had seen the interim financial statements of
2 CCI that were generated monthly and shown to you
3 as president?
4     A      No, I don't believe I had seen
5 those. This is what I was looking at or had
6 received and I had this. I don't believe I had
7 those as yet.
8     Q      You would have had not
9 necessarily Exhibits 22 and 23, but you would have
10 had a 12-month statement ending December 31, 1999,
11 wouldn't you?
12    A      I think the 12-month one we had
13 was more in line with a 9-month one we had had
14 before.
15    Q      All of a sudden a 13-month one is
16 generated, now showing $4 million more of loss?
17    A      Well, actually, between the 11th
18 and the meeting on the 18th, there was -- we
19 revised -- a lot of projections got revised. The
20 claim for Scott Air Force Base and the prison
21 project, I think, were removed and with the
22 removal of those, the projections took a wild
23 swing to the negative.
24    Q      You were aware when you met with

168

1 the bank on the 18th that the internal statements
2 of CCI were showing a loss approximating $6
3 million for 1999, weren't you?
4     A      I'm not sure if I knew it was $6
5 million or not, to tell you the truth. I knew
6 this is what this was, this is what I had
7 received, what I had looked at and what I gave to
8 them.
9     Q      These weren't generated this
10 succeeding week. They were available to you the
11 week you made the meeting with the bank. Right?
12         MR. BURKE: Are you asking when
13 Exhibit 24 was generated?
14 BY MR. GEBHARDT:
15    Q      I think you indicated earlier in
16 your testimony that they were sent to the bank the
17 week after the meeting on the 18th.
18    A      I don't believe I had those in my
19 possession at the time of my meeting on the 18th.
20 I believe they were sent to the back subsequent to
21 the 18th.
22    Q      I understand that. My question
23 was, did you have an awareness that CCI's
24 financial position was approximated what's

169

1 reflected on Exhibits 22 and 23 when you met with
2 the bank?
3     A      On the 18th, I knew with the
4 removal of the Scott Air Force Base claim that it
5 was going to change projections significantly.
6     Q      Did you quantify what you
7 believed the projections would be changed to?
8     A      It would change by the amount of
9 the claim which was about 4.5 or 4.6 million.
10    Q      Did you express all that to the
11 bank?
12    A      In the meeting with the bank I
13 told them that with the claim, both the one at
14 Scott Air Force Base and the $2.5 million claim at
15 the other project that at the end of the day, all
16 the notes could be paid off.
17    Q      Assuming those receivables were
18 collected?
19    A      Assuming that those claims were
20 successful, yes.
21    Q      You had no prospect of getting
22 them paid in February, did you?
23    A      No. We had hoped the claim would
24 have been submitted and negotiated February or

43 (Pages 166 to 169

170

1 March, but some problems developed that prevented
2 the claim from being submitted, which was the
3 reason for the significant change in the financial
4 outlook.
5      Q      Did you send a copy of Exhibit 24
6 to the bonding company?
7      A      They probably had access to it.
8 When, sent it to them when?
9      Q      For the meeting with the bank.
10             MR. BURKE: Before the 18th?
11             MR. GEBHARDT: Yes.
12      A      Before the 18th? No, couldn't
13 have because I had just gotten these presented to
14 me just prior to the day of the meeting at the
15 bank. I don't believe they could have been.
16             MR. GEBHARDT: Let's mark this as
17 Exhibit 26.
18             (Whereupon the document was
19 marked for identification as Exhibit Number 26.)
20                 - - -
21             MR. BURKE: Before we do that,
22 Counsel, it is now 6:00. I have a request that we
23 try to wrap this up in a half hour.
24             MR. GEBHARDT: For the record,

171

1 I'm going to ask the questions I have to ask and I
2 don't expect -- I would hope to be done by then,
3 but if I'm not, I'm not. I'm within the time
4 frame set by Federal Rules and that's all I can
5 say.
6             MR. BURKE: Let's see where we
7 are in a half hour.
8 BY MR. GEBHARDT:
9      Q      Deposition Exhibit 26, Mr.
10 Ortenzio, appears to be a letter sent by David,
11 Dominiani, D-O-M-I-N-I-A-N-I, by Shane Miller,
12 Executive Vice President, relating to work in
13 process. Did you distribute a copy of this
14 Exhibit 26 at the meeting at AllFirst?
15      A      I'm not sure. It's possible.
16      Q      Did you send to the bonding
17 company the cash flow projections at or about the
18 18th?
19      A      These probably were sent to the
20 bonding company.
21      Q      You don't know if it was before
22 or after the meeting with AllFirst?
23      A      It would have had to be after
24 because they had just been generated. It would be

17

1 late in the day they handed me, the night before
2 or that morning.
3      Q      But there was a meeting scheduled
4 with the bonding company for the 23rd. Isn't that
5 correct?
6      A      The 23rd or the 25th. We had a
7 meeting in Harrisburg at the bonding company on
8 the 23rd, and I had a follow-up meeting on the
9 25th in Baltimore.
10      Q      Mr. Gibson's notes, to the extent
11 they are a basis to refresh your recollection, has
12 St. Paul USF&G meeting on Tuesday, 2/22nd. Would
13 it be fair to say there was a meeting scheduled
14 with USF&G for the succeeding week on or about
15 Tuesday?
16      A      Yes. I informed them of that.
17 That meeting, I believe, was in Harrisburg. The
18 one on the 23rd was in Harrisburg.
19      Q      You don't know whether you gave
20 them the cash flow projection before or after the
21 bank's meeting?
22      A      It would have had to have been
23 after the bank meeting.
24      Q      Exhibits 22 and 23 indicate in

17

1 the top right-hand corner that these exhibits were
2 generated on February 14th, 2000. Take a look at
3 them.
4      A      I don't have them anymore. Which
5 ones are they?
6      Q      Exhibits 22 and 23. Do you see
7 that?
8      A      Okay. What are we looking at?
9      Q      Exhibits 23 and 23 in upper
10 right-hand corner appears to be an indication that
11 they were generated on February 14, 2000 at 2:05
12 in the afternoon, if I'm reading military time
13 correctly. Do you see that?
14      A      Yes, I see it.
15      Q      And would they have been
16 presented to you after being generated?
17             MR. BURKE: As opposed to before
18 they were generated?
19 BY MR. GEBHARDT:
20      Q      What I am saying -- what I want
21 to know is did you see these before you met with
22 the bank?
23      A      Before I met with the bank on the
24 18th?

44 (Pages 170 to 173

174

1    **Q     Yes.**
2    A      I don't know if I reviewed these
3 prior to meeting with the bank or not.  I don't
4 have any exact recollection.
5    **Q     Is it likely you would have seen**
6 **them before the meeting with the bank?**
7         MR. BURKE: I'll object.  Asked
8 and answered.  You can go ahead and answer it
9 again.
10   A      It seems to me at that particular
11 time of that week, I was more interested in cash
12 flow projection.  So this report was probably
13 generated and being looked over.  Generally, I'll
14 get those reports a couple days after they've been
15 printed.
16 BY MR. GEBHARDT:
17   **Q     I think you indicated the cash**
18 **flow projection, which is 24, wasn't given to you**
19 **until the 18th or the day before.**
20   A      The 17th, yes, that's true.
21   **Q     These appear to have been**
22 **generated on the 14th, which is four days earlier.**
23 **So even if you were focusing on cash flow, is**
24 **there any reason you wouldn't have looked at**

175

1 **these?**
2         MR. BURKE: Objection.  He's
3 asked and answered as to whether or not he
4 remembers seeing these documents prior to the
5 meeting on the 18th.  He can answer it again.
6         MR. GEBHARDT: Why don't you say
7 objection rather than try to coach and say answer
8 what you've already said.
9         MR. BURKE: I'm not trying to
10 coach.
11        MR. GEBHARDT: As long as you say
12 objection, that covers all your form of
13 objections.  You don't need to make a statement
14 each time.
15        MR. BURKE: My objection is to
16 reasking questions numerous times.
17        MR. GEBHARDT: I understand.  You
18 said that.  Make your objection, please just say
19 objection and that covers the record for me.
20        MR. BURKE: What's the question
21 pending?
22 BY MR. GEBHARDT:
23   **Q     Is it likely that you would have**
24 **seen these on or about the 14th when they were**

176

1 **generated?**
2    A      Probably not on the 14th,
3 probably a day or so later.  Usually, I think,
4 they were reviewed for any corrections or anything
5 that needed to be added or deleted before they
6 were actually then distributed.  So actually, the
7 run date doesn't necessarily mean the date that I
8 laid my eyes on them.
9    **Q     But it is likely you saw these**
10 **before you met with AllFirst on the 18th?**
11        MR. BURKE: Objection.
12   A      It's possible.  I don't
13 independently recall.  Had I, I probably would
14 have taken them with me and given it to them.  So
15 if I gave it to them, that would have been an
16 indication that I had reviewed it
17              ---
18        (Whereupon the document was
19 marked for identification as Exhibit Number 27.)
20              ---
21 BY MR. GEBHARDT:
22   **Q     Do you recognize your signature**
23 **on Exhibit 27?**
24   A      Yes.

177

1    **Q     Would it be fair to say this is a**
2 **letter sent by you on behalf of CCI Construction**
3 **requesting CCI's customers to send payments**
4 **directly to USF&G?**
5    A      That is what the letter states.
6 However, it wasn't sent on that date, nor was it
7 signed on that date.
8    **Q     Do you know when it was sent?**
9    A      It was signed on February 25th
10 and it was released on March the 6th, I believe,
11 or thereabouts.
12   **Q     Do you know why it's dated**
13 **February 22nd?**
14   A      Yes.
15   **Q     Why?**
16   A      The bonding company wanted it
17 backdated to the date the bank swept the account.
18              ---
19        (Whereupon the document was
20 marked for identification as Exhibit Number 28.)
21              ---
22 BY MR. GEBHARDT:
23   **Q     Exhibit 28 is a letter from an**
24 **attorney from Duane, Morris & Heckscher to**

45 (Pages 174 to 177)

178

1 customers of CCI. Were you aware of this letter
2 going out?
3    A    I received a copy of it.
4        MR. BURKE: There's a series of
5 letters to 28.
6        MR. GEBHARDT: That's correct.
7    A    I believe this was a letter
8 basically trying to redirect any potential that
9 there would be funds sent directly to AllFirst
10 since the bank was sweeping the account, so there
11 was a scrambling on USF&G's part to get letters
12 out to hopefully avoid anybody accidentally
13 sending any money directly into the CCI account.
14 BY MR. GEBHARDT:
15    Q    The top of the second paragraph
16 on the first page of the first letter carries on
17 throughout all the letters says, quote, CCI has
18 admitted to USF&G that it is financially unable to
19 complete work under its contract with -- and then
20 the statement of each customer's name -- and CCI
21 is unable to pay labor and material subcontractors
22 and suppliers whose work and materials were used
23 on or incorporated in the project, period, end
24 quote. Is that a true statement?

18

1    Q    I think that's when the notes of
2 February 18 indicated --
3    A    It was either the 22nd or the
4 23rd that representatives from the bonding company
5 were in our office in Mechanicsburg.
6    Q    What was the substance of the
7 discussions at the meeting with the bonding
8 company?
9    A    They were reviewing project
10 records trying to -- they were meeting with our
11 personnel to gather information on the projects as
12 a prelude to my meeting with the bonding company
13 on the 25th. So they were, for the most part, in
14 and going over current job status reports, numbers
15 23rd, 24th or 22nd or 23rd, as a preparation for
16 the meeting we were going to have on the 25th.
17    Q    Did that meeting on the 25th
18 occur?
19    A    Yes.
20    Q    Where did it occur?
21    A    In Baltimore.
22    Q    Who was in attendance?
23    A    Well, there was initially myself,
24 various individuals from St. Paul and for a cameo

179

1    A    Not necessarily, but that was
2 what they directed their attorneys in the letters
3 to send.
4    Q    Did CCI admit to USF&G as of
5 February 24, 2000, it was financially unable to
6 complete the work under its contracts with various
7 customers?
8    A    No.
9    Q    That's not a true statement?
10    A    No.
11    Q    Were you aware that USF&G was
12 sending out these letters on or about the 24th of
13 February?
14    A    No, I don't believe that letter
15 actually went out the 24th. It was like the other
16 letters, I think it was dated the 24th, but it
17 wasn't mailed until a period of time afterwards.
18 And I didn't author the letter nor draft it, so I
19 really can't speak to their content of it.
20    Q    Did a meeting occur on February
21 22nd, 2000, with the bonding company?
22        MR. BURKE: February 22nd?
23    A    February 22nd?
24 BY MR. GEBHARDT:

18

1 appearance Jerry Elias, and I believe yourself.
2    Q    And the bank declared CCI in
3 default as of that meeting?
4    A    Prior to that meeting.
5    Q    Prior to the meeting. What was
6 the bonding company's position with respect to CCI
7 and that meeting?
8    A    Well, the meeting had been
9 originally set up to try to work out the problems,
10 identify where the problems were and to try to
11 develop some kind of recovery plan.
12    Q    And I take it that was
13 unsuccessful, the result of the meeting?
14    A    Well, there was an attempt to try
15 to work with the bank also. However, when the
16 bank took the action that they did, it kind of
17 changed the tenor of the meeting and what the
18 possibilities were. So we never were able to
19 truly work out a recovery plan, so the meeting
20 ended at the end of the day somewhat
21 inconclusively.
22    Q    Were you aware of the loss USF&G
23 sustained as a result of CCI's bonds?
24    A    At the end of the day, you mean,

182

1 when all was said and done?
2    Q       As of today.
3    A       Yes, as of today.
4    Q       What magnitude is there?
5    A       They're representing
6 approximately a $32 million loss.
7    Q       During the meeting with the bank
8 on February 18th, did you disclose to anyone that
9 the $1.2 million had been repaid by a draw on the
10 line of credit?
11           MR. BURKE:  Objection to form.
12 You can answer.
13    A       My statement in that meeting was
14 in response to the question, was it had been
15 repaid, the company had repaid.
16 BY MR. GEBHARDT:
17    Q       Did you tell anyone that by
18 repaying the loan it was done with a draw on the
19 line of credit?
20           MR. BURKE:  Same objection.
21    A       My words were to ask if it had
22 been repaid, and I said that the company, CCI, had
23 repaid the note.
24 BY MR. GEBHARDT:

183

1    Q       But you didn't give any
2 explanation beyond that?
3    A       I think someone asked -- I think
4 I said with a check drawn out of our account or
5 something to that effect.
6    Q       When you made the payment on
7 February 11th, were you aware of the financial
8 circumstances of the company?
9    A       At that time, that point in time?
10    Q       Yes.
11    A       Generally.
12    Q       And were you aware of the
13 financial circumstances of the company that were
14 reflected on the interim financial statements
15 which are Exhibits 22 and 23 and the cash flow
16 projection which I believe is Exhibit 24?
17           MR. BURKE:  Objection to form.
18           - - -
19           (Whereupon the court reporter
20 read back the pertinent testimony.)
21           - - -
22 BY MR. GEBHARDT:
23    Q       When you made the payment on
24 February 11, 2000, did you have a general

184

1 understanding of what CCI's financial condition
2 was as is reflected on the two financial
3 statements that are Exhibits 22 and 23 and the
4 cash flow statement that is Exhibit 24?
5           MR. BURKE:  Objection to form.
6    A       No.
7 BY MR. GEBHARDT:
8    Q       Completely unaware?
9    A       I'm responding to your question,
10 specifically your question.
11    Q       You had no general understanding
12 when you --
13    A       That wasn't your question.
14    Q       I think it was.
15           MR. BURKE:  It wasn't.
16 BY MR. GEBHARDT:
17    Q       Let me ask it again.  When you
18 made the payment on behalf of CCI on February 11,
19 2000, did you have a general understanding that
20 the financial condition of CCI was similar to
21 what's reflected in Exhibits 22, 23 and 24?
22    A       And my answer was no.  The
23 financial condition of the company was not to that
24 degree.  It wasn't as bad as those numbers

185

1 represent.
2    Q       And in one week did it turn that
3 bad?
4           MR. BURKE:  Objection to form.
5 You can answer.
6    A       I think in one week there was a
7 different scenario run with the removing of the
8 claims that we had hoped to get.  I think there
9 were some other impacts on a job or two which had
10 been unanticipated with respect to some additional
11 problems or delays.  And so when the numbers were
12 rerun, and this is what they were rerun to, it
13 presented a much worse situation financially for
14 the company than what we had been carrying prior
15 to them or what I had been aware of prior to that.
16    Q       You knew when you made the
17 payment that CCI's financial condition was not a
18 good financial condition, didn't you?
19    A       Good as compared to what?  You
20 already asked me how it was in comparison to what
21 it was in November.
22    Q       When you made the payment on
23 February 11th, you knew CCI was going to lose
24 money for the preceding fiscal year?

47 (Pages 182 to 185

186

1    A    I knew we were going to lose
2 money.  I did not know we were going to lose money
3 to the extent -- even to this projection here or
4 this financial report here.
5    Q    When you made the payment on
6 February 11th on behalf of CCI, you understood CCI
7 or had a general appreciation that CCI was going
8 to sustain cash flow shortages, shortfalls?
9    A    I had a general understanding
10 that we were -- my understanding at that point in
11 time was that we were not out of the woods,
12 certainly, with respect to our cash flow problems,
13 but you're referring to the magnitude and the
14 magnitude presented with these numbers was not
15 known to me on February 11th.
16    Q    But you knew still there was a
17 problem?
18        MR. BURKE:  Objection to form.
19    A    Well, you know, problem, give me
20 something in order of magnitude.
21        MR. BURKE:  Can you define
22 problem?
23    A    Problem compared to --
24 BY MR. GEBHARDT:

187

1    Q    A    Difficulty -- you
2 understood when you made the payment, CCI was
3 anticipating having cash shortages over the
4 succeeding months?
5    A    We were still going to have some
6 cash flow problems in the future months.  Now the
7 magnitude, in my estimation, was not to the degree
8 that Exhibits 22, 23 and 24 projected.
9        MR. GEBHARDT:  That's all I have.
10        (The deposition concluded at 6:25 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

188

1        C E R T I F I C A T E
2
3        I, DONNA L. CROSSAN, a
4 Reporter Notary-Public and Certified Shorthand
5 Reporter of the State of Pennsylvania, do hereby
6 certify that prior to the commencement of the
7 examination, JOHN M. ORTENZIO was duly sworn by me
8 to testify the truth, the whole truth and nothing
9 but the truth.
10        I DO FURTHER CERTIFY that the
11 foregoing is a true and accurate transcript of the
12 testimony as taken stenographically by and before
13 me at the time, place and on the date hereinbefore
14 set forth, to the best of my ability.
15        I DO FURTHER CERTIFY that I
16 am neither a relative nor employee nor attorney
17 nor counsel of any of the parties to this action,
18 and that I am neither a relative nor employee of
19 such attorney or counsel, and that I am not
20 financially interested in this action
21 ------------------------------------------------
22 Notary Public of the State of Pennsylvania
23 Dated:
24      --------------------------

189

1        LAWYER'S NOTES
2 PAGE        LINE
3 _____      _____      _____
4 _____      _____      _____
5 _____      _____      _____
6 _____      _____      _____
7 _____      _____      _____
8 _____      _____      _____
9 _____      _____      _____
10 _____      _____      _____
11 _____      _____      _____
12 _____      _____      _____
13 _____      _____      _____
14 _____      _____      _____
15 _____      _____      _____
16 _____      _____      _____
17 _____      _____      _____
18 _____      _____      _____
19 _____      _____      _____
20 _____      _____      _____
21 _____      _____      _____
22 _____      _____      _____
23 _____      _____      _____
24 _____      _____      _____

| DATE | INVOICE | DESCRIPTION | | | | |
|------|---------|-------------|---|---|---|---|
| 02/100 | 021100 | ACCT #001-1828-0102598-0200 | 1200000.00 | Exh B. | 1200000000 |

TOTALS:        1200000.00          1200000.00

CCI CONSTRUCTION CO., INC.



**CCI CONSTRUCTION CO., INC.**
2500 OLD GETTYSBURG ROAD
CAMP HILL, PA 17011

DAUPHIN DEPOSIT BANK
HARRISBURG, PA

60-83
313

0060628

| CHECK NO. | DATE | AMOUNT |
|-----------|------|--------|
| 0060628 | 2-11-00 | ***1200000.00 |

PAY    ONE MILLION TWO HUNDRED THOUSAND DOLLARS AND 00 CENTS

TO THE
ORDER
OF

ALLFIRST BANK
3045 MARKET STREET
CAMP HILL, PA 17011

NON-NEGOTIABLE

CCI CONSTRUCTION CO., INC.

⑈0060628⑈ ⑆031300834⑆ 28⑈86 451 4⑈

## CERTIFICATE OF SERVICE

Robert A. Burke, attorney for Defendant, John Ortenzio, hereby certifies that he caused a

true and correct copy of Defendant's Memorandum of Law in Support of his Motion for

Summary Judgment to be served upon the following on this  22nd day of May, 2002, by Federal

Express Next Day Delivery:

> Lawrence Gebhardt, Esquire
> Gebhardt & Smith, LLP
> The World Trade Center, Ninth Floor
> Baltimore, MD   21020-3064

_____
ROBERT A. BURKE, ESQUIRE

16