IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK | : | CIVIL ACTION NO. 1:01-CV-786 |
| | : | (Honorable Sylvia H. Rambo) |
| Plaintiff, | : | |
| v. | : | |
| JOHN M. ORTENZIO, | : | |
| Defendant. | : | |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.1 STATEMENT

Defendant, John M. Ortenzio ("Ortenzio"), hereby responds to Plaintiff's Statement Pursuant to Local Rule 56.1. Ortenzio notes that many of the facts raised by Allfirst relating to the financial condition of the company, the extent to which the company was going to file bankruptcy, and any statements by CCI employees as to the propriety of paying off the $1.2 million loan are in dispute. However, these facts are not material to the claims raised by Allfirst in its complaint. Ortenzio submits that the only facts that are material to the cross-motions for summary judgment relate to the terms of the relevant agreements and the manner in which $1.2 million short-term loan was paid. These facts are not in dispute. Accordingly, for the reasons set forth in Ortenzio's Motion for Summary Judgment, and this opposition, Ortenzio's motion for summary judgment should be granted.

1-3.    Disputed. It is undisputed that in March of 1999, Allfirst extended to CCI a $4 million Line of Credit. The terms and conditions of the Line of Credit are set forth in the Promissory Note. It is disputed that the sole purpose of the Line of Credit was to finance CCI's accounts receivable and work in progress. Indeed, nowhere in the Promissory Note or Commitment Letter does it state this. The Line of Credit was unsecured and was not guaranteed

113449.00601/21028317v1

personally by Mr. Ortenzio. See, Commitment Letter and Promissory Note. The remaining statements in paragraphs 1-3 are disputed.

4. Undisputed.

5. Disputed. The Promissory Note sets forth, among other things, the procedures for the loan. The remaining statements in paragraph 5 are disputed. See, Promissory Note.

6. Undisputed.

7-8. Disputed. In approximately October 1999, CCI requested that Allfirst issue a temporary bridge loan to CCI in the amount of $1 million. The bridge loan would be provided on a temporary, short-term basis roughly from November, 1999 to February, 2000. This temporary loan was requested in order to assist CCI in getting over an anticipated short-term cash flow shortage. Exhibit "A", attached hereto, Ortenzio Deposition Transcript at 73:13 - 75:24.

9-13. Disputed. Allfirst initially advised CCI that it was willing to loan CCI the additional $1 million. Allfirst requested that rather than giving a temporary $1 million bridge loan that the $4 million Line of Credit be increased to $5 million. Allfirst requested that Mr. Ortenzio personally guarantee the entire $5 million line of credit. Mr. Ortenzio refused to guarantee the entire amount of the Line of Credit. Allfirst then agreed to issue the temporary short-term loan, but increase the amount that CCI would borrow from $1 million to $1.2 million, and increase the time in which the payments would be due from the end of February 2000 to the end of March 2000. Exhibit "B", attached hereto; Commitment Letter for $1.2 million loan and Suretyship Agreement between Ortenzio and Allfirst. The Suretyship Agreement permitted,

2

among other things, Allfirst to collect on the $1.2 million loan from Mr. Ortenzio, so long as this obligation was due and owing.

14. Disputed. To the contrary, there are no restrictions in the short-term note as to the sources of funds that could be used to repay the note. (Deposition of Bank Officer Craig Schwartz at p. 62, attached as Exhibit "C" hereto. There is no loan document that deals with how the loan was to be repaid, nor is there any document that prohibited CCI from repaying the $1.2 million short-term note by writing a check on CCI's checking account, thereby drawing on the Line of Credit. Schwartz Deposition Transcript at pp. 34, 144 and 193, and applicable loan documents, attached as Exhibit "C", hereto.

15. Undisputed.

16-17. Disputed. Following the issuance of the $1.2 million loan, CCI had a cash flow shortage. Exhibit "A", attached hereto, and cash flow projection attached as Exhibit "H" to Plaintiff's Motion for Summary Judgment.

18. Undisputed.

19. Disputed. The citations cited by Allfirst to support their statement do not do so. The testimony cited by Allfirst merely provides that, at the time, Mr. Ortenzio stated he would not invest more funds in the company.

20. It is undisputed that the issue of the potential bankruptcy of CCI was discussed. However, no decisions were made regarding bankruptcy, at that time.

21. Disputed. Mr. Ortenzio was aware of his obligations under the Suretyship Agreement pursuant to the specific terms of the Suretyship Agreement, and at no time was Mr. Ortenzio obligated to pay the $1.2 million loan to Allfirst. (Suretyship Agreement). It is

3

undisputed that CCI decided to repay the $1.2 million loan in February, 2000. However, Exhibit "N" to Allfirst's motion establishes that it was not known by CCI that writing a check on CCI's Allfirst checking account in the amount of $1.2 million would result in a borrowing under the $4 million Line of Credit due to the manner in which these funds were kept in the bank's cash management system. Exhibit "N" to Allfirst's Motion, Ortenzio Deposition Transcript at 114:15-23.

22-25. It is undisputed that Sherri Phillips opposed CCI's plan to repay the $1.2 million short-term loan because Ms. Phillips did not believe that it was in the best interest of CCI. Exhibit "M" to Allfirst's Motion, Phillips' Transcript at 37:1-23. The remaining statements set forth in these paragraphs are disputed.

26-28. Disputed. On Friday, February 11, 2000, Ortenzio personally delivered the check to repay the $1.2 million short-term loan to Allfirst's office. The reason Mr. Ortenzio did this was because he wanted to talk with Mr. Schwartz, the account officer, and hoped that Mr. Schwartz would be present. (Exhibit "N", Ortenzio Transcript at 108:16-20. Unfortunately, Mr. Schwartz was not present when Mr. Ortenzio arrived. Accordingly, a bank employee present at the time asked if the bank employee would be able to assist Mr. Ortenzio. Mr. Ortenzio, at this employee's request, gave the employee the check, written on CCI's Allfirst account to pay off the $1.2 million loan. Id. at 110-111.

29-34. Disputed. After CCI paid the $1.2 million loan, Mr. Ortenzio spoke with Mr. Schwartz and was advised that his guarantee would be returned in light of the fact that the $1.2 million short-term note had been paid in full as of February 11, 2000. At that time, Allfirst Bank was well aware of the manner in which the loan had been repaid due to the fact that the computer system at Allfirst Bank reflected the manner of the loan repayment. Accordingly, there can be

4

no question that Allfirst knew the manner in which the $1.2 million loan had been repaid. Exhibit "N" and "O" to Allfirst's Motion. The issue of whether Mr. Schwartz himself knew of the manner in which the loan was repaid is immaterial. The guarantee was returned to Mr. Ortenzio due to the fact that the $1.2 million loan had been repaid in full.

35-40. The citations attached to Allfirst's Motion do not support these paragraphs. Allfirst was advised of the financial condition of CCI in a manner consistent with the loan documents. Mr. Ortenzio requested a meeting with Allfirst to occur on approximately February 18, 2000 in order to further update Allfirst on the financial condition of CCI. Mr. Ortenzio was accompanied by Robert Chernicoff, an attorney who practices in, among other areas, bankruptcy, as well as loan workouts. Exhibit "N" to Allfirst's Motion at 146-148, 124, 127-128 and 132-133.

41-45. Disputed. The citations relied upon by Allfirst in its motion do not support the statements set forth in paragraphs 41-45. Specifically, there is no evidence that CCI lost over $6 million in 1999; that CCI was insolvent by almost a million dollars; that the cash flow projection showed that CCI would have a cash shortage over the next five months of over $5 million; or that the cash flow projection did not reflect the use of the $4 million Line of Credit to repay the $1.2 million loan. See, Cash Flow Projection and Financial Statements attached as exhibits to Allfirst's motion. Further, as set forth above, at the February 18, 2000 meeting, Allfirst knew that the $1.2 million short-term loan had been repaid and the manner of repayment.

46.  Undisputed.

47.  Undisputed.

5

113449.00601/21028317v1

48. Disputed. The citations relied upon by Allfirst do not support the statements in paragraph 48.

49. Disputed. The citations relied upon by Allfirst do not support the statements in paragraph 49.

50. Undisputed.

51. It is undisputed that Allfirst closed down the Line of Credit on or about February 23, 2000 and prevented further draws on the Line of Credit.

52. Disputed. By letter dated February 24, 2000, Allfirst stated that CCI was in default under the $4 million Line of Credit and a separate $2 million Equipment Note. Allfirst never claimed that CCI was in default under the $1.2 million short-term note. Exhibit "J" to Allfirst's Motion (default letter)

53. Disputed. Again, Allfirst was well aware of the manner in which the $1.2 million loan had been repaid by CCI.

54-57. Undisputed.

Edward I. Swichar
Attorney I.D. No. 15175
Robert A. Burke
Attorney I.D. No. 61268
Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA  19103
(215) 569-5500

*Attorneys for Defendant*
*John M. Ortenzio*

Dated:  May 22, 2002

6

113449.00601/21028317v1

Exh A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

ALLFIRST BANK,                    :
        Plaintiff       :
                        :        COPY
vs.                               :
                                  :
JOHN M. ORTENZIO,                 :
        Defendant       :   NO. 1:01-CV-786

- - -

February 11, 2002

- - -

      Oral Deposition of JOHN M. ORTENZIO, taken pursuant to notice, was held at Cunningham and Chernicoff, 2320 North 2nd Street, Harrisburg, Pennsylvania 17110, beginning at 1:40 p.m., on the above date, before Donna L. Crossan, an Approved Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
15th Floor
1880 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
(215) 988-9191

```
 1        Q         You were aware that it was being
 2   done?
 3        A         To the best of my knowledge, yes.
 4        Q         Now, there came a time in 1999
 5   when CCI requested credit from AllFirst in excess
 6   of the $4 million revolving line of credit.  Is
 7   that correct?
 8        A         Yes.
 9        Q         What was it that CCI requested of
10   AllFirst in 1999?
11        A         Are you referring to October,
12   November of '99, that time frame?
13        Q         When the request was first made,
14   what did CCI ask?
15        A         There was a request made in
16   October of 1999 for additional borrowing.
17        Q         In what amount?
18        A         $1 million.
19        Q         And who made the request?
20        A         I did.
21        Q         And to whom did you make the
22   request?
23        A         It would have been made to Chris
24   Schwartz and Mike Zarcone or Craig Schwartz who
```

1  brought Mike Zarcone into it.
2        Q       How was it made?
3  Person-to-person meeting, telephone call?
4        A       Telephone call, probably.
5        Q       What was the reason CCI wanted an
6  increase in credit facility beyond the $4 million?
7        A       We requested an additional loan
8  of $1 million to handle a -- basically function as
9  a bridge loan.
10       Q       Bridge loan from what to what?
11       A       From roughly November to
12 February.
13       Q       What was the reason a bridge loan
14 was needed?
15       A       A projection had been run
16 indicating that due to some winter shutdown and
17 some other issues relative to the projects that
18 our income, revenue income would not be -- would
19 be decreased, mostly because work couldn't
20 progress and also because we had -- there was an
21 issue on two of our projects and that we needed --
22 by our projection we needed about a million
23 dollars for a 90-day period to get us through that
24 period.

75

1    Q        A million dollars more than the $4
2  million ceiling that the line of credit provided?
3    A        Well, it was an additional $1
4  million.
5    Q        So you were asking for $5 million
6  total credit for CCI?
7              MR. BURKE:  Objection to the
8  form.
9    A        If you were to add this note to
10 the other borrowings, you would add 1 million to
11 the other notes that were already in existence.
12 BY MR. GEBHARDT:
13   Q        Did CCI ask for the credit line
14 to be increased from 4 million to 5 million?
15   A        No.  I believe we asked for an
16 additional short-term loan.
17   Q        And that was because a projection
18 revealed that CCI's cash flow would be inadequate
19 over that November-to-February period of time?
20   A        Well, our projection showed we
21 were going to be running very tight, let's put it
22 that way, given a worst case scenario.  We
23 reviewed the cash flow projections and determined
24 that a short-term bridge loan would be appropriate

Exh. B





Allfirst Bank
P.O. Box 2961
Harrisburg, PA 17105-2961

# CCI CONSTRUCTION COMPANY, INC.
## Line of Credit Increase
## Discussion Outline

November 2, 1999

| | |
|---|---|
| LINE AMOUNT: | $5,000,000 ( $1,000,000 increase) |
| COLLATERAL: | Specific Security Interest in all unencumbered equipment including titled vehicles. |
| DURATION: | The increase will expire February 28, 2000. |
| SURETY: | John Ortenzio |

1. Satisfactory receipt and review of a personal financial statement.
2. The amount or the Surety shall be for the entire amount of the line.
3. The Surety will decrease to $4,000,000 when the line increase expires.
4. The Surety shall remain in effect until the net worth of CCI Construction Company, Inc. is greater than $4,000,000.

All costs shall be paid by the Borrower.

This outline is for discussion purposes only and does not represent a commitment on the part of Allfirst Bank.

This outline is subject to approval by the Bank and subject to satisfactory review by the Bank of requested financial information and related matters as part of the Banks due diligence process.

C 0720

ExhC

# Craig J. Schwartz

Page 1

```
1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
3   ALLFIRST BANK        :
4       Plaintiff       :
5       v.              : CA NO. 1:CV-01-0786
6   JOHN M. ORTENZIO    :
7       Defendant       : Pages 1 - 216
8                         ----------
9
10
11
12      Deposition of Craig J. Schwartz
13           Baltimore, Maryland
14         Friday, February 15, 2002
15
16
17
18
19
20
21  Reported by: Kathleen R. Turk, RPR-RMR
```

Page 2

```
1
2
3
4
5       February 15, 2002
6          10:17 a.m.
7
8   Deposition of Craig J. Schwartz held at the offices
9   of:
10
11
12   Blank, Rome, Comisky & McCauley, L.L.P.
13   250 West Pratt Street
14   Eleventh Floor
15   Baltimore, MD 21201
16
17
18   Pursuant to notice, before Kathleen R. Turk, RPR-RMR,
19   a Notary Public of the State of Maryland.
20
21
```

Page 3

```
1   APPEARANCES:
2
3   Gebhardt & Smith, L.L.P.
4   For the Plaintiff ALLFIRST BANK
5       The World Trade Center
6       401 East Pratt Street
7       Ninth Floor
8       Baltimore, MD 21202
9       (410) 385-5100
10  BY: Lawrence J. Gebhardt, Esq.
11
12  Blank, Rome, Comisky & McCauley, L.L.P.
13  For the Defendant JOHN M. ORTENZIO
14      One Logan Square
15      Philadelphia, PA 19103-6998
16      (215) 569-5641
17  BY: Edward I. Swichar, Esq.
18
19  Also Present:
20      John M. Ortenzio
21
```

Page 4

```
1
2               CONTENTS
3   EXAMINATION OF CRAIG J. SCHWARTZ BY:        PAGE:
4   MR. SWICHAR:              6
5   MR. GEBHARDT:             175
6   MR. SWICHAR:              192
7   MR. GEBHARDT:             207
8   MR. SWICHAR:              210
9            EXHIBITS
10  SCHWARTZ DEPOSITION EXHIBITS:              PAGE:
11  1  Commercial Loan Note Line of Credit     6
12  2  Complaint                               6
13  3  Fax to Nord from Gibson, 2/14/01        6
14  4  PA Commercial Loan Writeup              6
15  5  Memo to File from Schwartz, 11/4/99     6
16  6  Discussion Outline, 11/2/99             6
17  7  Commercial Loan Note Line of Credit     6
18  8  Letter to Ortenzio from Schwartz, 11/5/99  6
19  9  Accumulated Tran List                   6
20  10 Memo to Gibson from Schwartz, 3/3/00    6
21  11 Borrower Rating Summary                 6
```

1 (Pages 1 to 4)

# Craig J. Schwartz

**Page 33**

1   the checking and the payroll account on one side and
2   the cash management facility on the other; is that
3   right?
4       Am I putting it the right way?
5   A   I didn't --
6       MR. GEBHARDT: Objection.
7   Q   Does this accurately describe the way the
8   cash management facility worked?
9   A   Yes.
10  Q   Okay. Is my understanding correct that
11  CCI's deposits would be deposited in the checking
12  account first? Is that right?
13  A   Yes.
14  Q   Okay. And each day, the bank would then
15  draw from the line of credit to pay any negative
16  balance on the checking account; is that correct?
17  A   Yes.
18  Q   All right. How -- when would that occur?
19  How often would that occur?
20  A   I believe that occurs once a day.
21  Q   Okay. What time of the day does that occur?

**Page 34**

1   A   I believe it's after bank hours, banking
2   hours.
3   Q   So the bank after hours, daily, would draw
4   from the line of credit to cover any checks that were
5   written by CCI that day?
6   A   For any checks that were presented for
7   payment on CCI's behalf that day.
8   Q   That's correct. That's a much better way of
9   saying it.
10      Now, the bank conversely, if you will, would
11  on a daily basis sweep from the checking account any
12  business deposits and apply it as a credit to pay down
13  the four million dollar line of credit; is that
14  correct?
15  A   Yes.
16  Q   Okay. And that would occur on a daily
17  basis?
18  A   Yes.
19  Q   And that would occur after hours?
20  A   Yes.
21  Q   Okay. And would you review that process

**Page 35**

1   daily to determine --
2   A   No.
3   Q   How often would you review that process to
4   determine basically what's been drawn down and what's
5   been swept?
6       Let me ask you first, is that your
7   responsibility?
8   A   No.
9   Q   Who -- whose responsibility was that?
10  A   I don't know whose responsibility that is.
11  Q   Well, would someone at the bank -- maybe you
12  can't identify them, but would someone at the bank
13  have a responsibility to review on any periodic basis
14  the activity in the cash management facility relating
15  to CCI?
16  A   I don't understand the question.
17  Q   There's activity relating to the cash
18  management facility on a daily basis, we've
19  established that.
20  A   Yes.
21  Q   Did anyone at the bank monitor that to

**Page 36**

1   determine, for example, the draws on the line and the
2   credits against the line of credit -- against the
3   line?
4   A   Not on any predetermined schedule.
5   Q   Well, my question is did anyone do it, first
6   of all.
7       My next question is going to be who would
8   have done that, what department, and would you have
9   ever done that.
10      That's a three-part question, there's an
11  objection, so I'll take it apart.
12      Would you -- do you know anyone at the bank
13  who would periodically on some schedule, sporadic or
14  otherwise, review the activity of CCI's cash
15  management facility?
16  A   Yes.
17  Q   And who or from what department at the bank
18  would do that?
19  A   It could be from the Cash Management
20  Department to the Deposit Operations, to the Credit
21  Department, and possibly even myself if the need would

9 (Pages 33 to 36)

# Craig J. Schwartz

Page 61

1  Q  Okay, but you -- but you were not involved
2  in the approval, then? You couldn't have been?
3  A  I did not have the authority to say yes or
4  no.
5     This could have been approved without my
6  signature.
7  Q  Okay. Now, with respect to the 1.2 million
8  dollar note which, again, if you want to look at it,
9  it's Exhibit B in the Complaint, principal is payable
10 on demand; is that right?
11 A  Oh, yes.
12 Q  Okay. Was there any restriction -- what is
13 your understanding insofar as there being or not being
14 any restriction on the note as to when the note could
15 be prepaid by CCI?
16    Could the note be prepaid by CCI anytime
17 prior to the demand?
18 A  Yes.
19 Q  Okay. The bank -- so CCI didn't have to
20 wait for the demand; it could just prepay it at any
21 time if it wanted to, had the funds?

Page 62

1  A  Yes.
2  Q  Okay. Was there any restriction with
3  respect to the 1.2 million dollar note as to the
4  source of funds that could be used to repay the note?
5  A  The note should have been repaid -- okay,
6  ask the question -- what was the question?
7  Q  Is there any restriction in the note in
8  regard to the source of funds that could be used to
9  repay the note?
10 A  Not in the note.
11 Q  I understand, I'm only sticking to the note.
12 A  Not in the note.
13 Q  Okay. Now, we'll come back to that because
14 I know you're anxious to say something.
15    Let's look at Schwartz 5.
16    This Schwartz 5, this is your memo; is that
17 correct?
18 A  Yes.
19 Q  And it says that we decided that an increase
20 of 1.2 million will be done on a temporary basis and
21 CCI will get an additional five hundred thousand from

Page 63

1  private sources; is that correct?
2  A  Yes.
3  Q  Did CCI ever obtain an additional five
4  hundred thousand, if you know, from private sources?
5  A  I do not know.
6  Q  Was it monitored in any way by the bank as
7  to whether or not there was an additional five hundred
8  thousand obtained by CCI?
9  A  No, it was not.
10 Q  The memo then goes on to say that this
11 should be sufficient to meet their current cash flow
12 shortage.
13    Tell me what you mean by that from the
14 banker's perspective.
15 A  I must have received documents showing what
16 their cash flow position was going to be over the next
17 couple months and determined by that that this should
18 get them over the hurdle.
19 Q  How was this note to be repaid?
20 A  Profits.
21 Q  Is that your answer?

Page 64

1     MR. GEBHARDT: Is there a question?
2     MR. SWICHAR: Yeah.
3     I asked is that your answer, profits?
4     MR. GEBHARDT: He's answered.
5     MR. SWICHAR: Well, he's thinking --
6  he's mulling it over, I think, but if you want, I'll
7  accept it.
8     I'm just giving him a second chance
9  because I can see he wants to say more.
10 Q  (By Mr. Swichar) If profits is your answer,
11 fine.
12 A  Well, this would have been repaid -- yeah.
13 Q  From profits?
14 A  (Nodding head affirmatively.)
15 Q  Is that right?
16 A  Umh-humh, abundance of cash and -- okay,
17 profits and abundance of cash flow.
18 Q  Okay. Abundance of cash flow means from
19 excess cash flow from excess, not used to pay
20 expenses?
21 A  And any other debt.

# Craig J. Schwartz

Page 141

1  A  Yes.
2  Q  Have you turned that over to Mr. Gebhardt or
3  someone else in connection with this lawsuit?
4  A  Yes.
5      MR. SWICHAR: Can I assume it's been
6  turned over, Larry?
7      MR. GEBHARDT: You have it all.
8      MR. SWICHAR: That's all I want to
9  hear, that's fine.
10     I mean, the way the documents came, it
11 was very difficult what came with what.
12     MR. GEBHARDT: I mean, we, we went
13 through this, and we went through it with Judge Rambo.
14     MR. SWICHAR: I'm just asking if we got
15 it, that's all. That's fine.
16     MR. GEBHARDT: I said we made those
17 representations and told you all many times --
18     MR. SWICHAR: If you told me I have his
19 personal desk file, then that's good enough for me.
20  Q  (By Mr. Swichar) Would you look at the
21 Complaint?

Page 142

1  Do you have that there, S-2?
2  Just -- did you review this Complaint before
3  it was filed?
4  A  I'm not sure. I don't recall if I did or if
5  I didn't.
6  Q  Did you review it in connection with this
7  deposition?
8  A  Yes.
9  Q  Okay. Would you look at -- just so I can
10 clarify things again -- would you look at
11 Paragraph 7?
12     And, again, my question is, just so I
13 understand the mechanism of the cash management
14 facility, that any checks written from CCI's account
15 with the bank would increase the four million dollar
16 line of credit borrowings; is that correct?
17 A  Yes.
18 Q  And so far as you know, CCI had no business
19 accounts elsewhere?
20 A  As far as I know, they did not.
21 Q  Okay. If -- if CCI wanted to pay a bill

Page 143

1  from the accounts receivable that it collects from the
2  account at Allfirst without drawing on the four
3  million dollar line of credit, how could it do that,
4  if it could at all?
5  A  One more time, please.
6  Q  All right. I'm CCI and I want to pay a
7  bill. I collect my money from the customer, I put it
8  in the account, and I want to pay another bill -- I
9  want to pay a bill, but I don't want it to draw on the
10 line of credit, four million dollar line of credit.
11     How -- could I do that?
12 A  I don't think so.
13 Q  Is there any document in this world that
14 prohibits CCI specifically from repaying the
15 1.2 million dollar note by drawing on the four million
16 dollar line of credit?
17 A  Is there a document that prohibits them?
18 Q  Yes, specifically.
19 A  Yes, I believe so.
20 Q  That prohibits specifically -- is there a
21 specific prohibition?

Page 144

1  And if there is, we'll find it.
2      MR. GEBHARDT: You've been provided it.
3      MR. SWICHAR: Pardon me?
4      MR. GEBHARDT: You've been provided it.
5  A  I believe it states what the line of credit
6  can be used for, and that is not a use of a line of
7  credit.
8  Q  (By Mr. Swichar) All right. Is there any
9  document that deals with how the, how the loan is to
10 be repaid specifically?
11 A  No.
12 Q  Okay. Is there any document that
13 specifically states it cannot be repaid by writing a
14 check on CCI's business account, checking account?
15     THE WITNESS: Could you read that back?
16     (Question was read by the Reporter.)
17 A  Not specifically.
18 Q  (By Mr. Swichar) Okay. Now, the loan
19 commitment, which I think you've been chomping at the
20 bit to want to tell me, states that the loan proceeds
21 were to be used to finance accounts receivable and

36 (Pages 141 to 144)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the within Defendant's Response to Plaintiff's Rule 56.1 Statement was served on this 22nd day of May, 2002 by Federal Express Next Day Delivery upon the following:

>Lawrence J. Gebhardt, Esquire
>Gebhardt & Smith LLP
>The World Trade Center, 9th Floor
>Baltimore, MD 21202
>*Attorneys for Plaintiff*

_____
ROBERT A. BURKE