ORIGINAL
$2 +_b \mathcal{N}$

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

JUN 0 3 2002

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

| | | |
|---|---|---|
| ALLFIRST BANK | * | |
| Plaintiff, | * | |
| v. | * | CASE NO.:   1:01-CV-786 |
| JOHN M. ORTENZIO | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**REPLY TO DEFENDANT'S OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

In the opening portion of his Opposition to Allfirst's motion for summary judgment, Ortenzio states that Allfirst "seeks to hold Mr. Ortenzio personally liable for the corporate obligations of CCI Construction Co., Inc. by *bypassing the clear language of the contract between Allfirst and Mr. Ortenzio.*" (Emphasis added). Contrary to this assertion, Allfirst does not wish to bypass the clear language of the contract between Allfirst and Ortenzio. Allfirst instead wants to enforce this contract - the guaranty agreement Ortenzio executed to induce Allfirst to provide CCI with $1.2 million of additional credit it was unwilling to give without his guaranty. What Allfirst wants to bypass is not the contract, but the scam Ortenzio perpetrated by repaying Allfirst with its own money to escape liability on his guaranty just before CCI collapsed financially. Allfirst has advanced three valid bases for avoiding the scam and enforcing the contract. These are 1) conditional payment, 2) equitable subrogation, and 3) fraud.

Ortenzio also states in the opening portion of his Opposition that "Allfirst cannot establish that the manner in which CCI paid its contractual obligation was prohibited by the loan documents." This is a baldly incorrect statement repeatedly made by Ortenzio. As Allfirst has continuously

pointed out, the commitment for the $4 million line of credit - which by its express terms was to survive execution of the promissory note - restricted use of the monies borrowed under the line to financing accounts receivable and work in progress. Pl's Exhibit A (Commitment Letter). This means that the line of credit could be used only to pay monthly bills and expenses and not to prepay a loan not yet even due. Phillips at 12, 39-40. And, CCI was required by the terms of the commitment to have a $4.5 million net worth to use the line of credit. Pl's Exhibit A (Commitment Letter). As Ortenzio knew before he paid the $1.2 million loan with a borrowing under the line, CCI had no net worth and was insolvent. Pl's Exhibit H (1999 Internal Financial Statement); Phillips at 41-44. CCI's use of the line to prepay the Ortenzio guaranteed loan was prohibited by the documents that established and governed the $4 million line of credit.

1.    **This is a suit to collect on a guaranty.**

      a.    **Whether or not characterized as a breach of contract case, Allfirst has sued to collect what is due on Ortenzio's guaranty of the $1.2 million loan.**

Continuing his quibbling semantics,[1] Ortenzio argues that Allfirst is suing for breach of contract while at the same time is contending that it's suit is not for breach of contract. Opposition at 1. This is non-sense. Whether called "breach of contract" or one of the more descriptive terms used by Allfirst to designate the counts of the complaint, the reality is that Allfirst has sued Ortenzio to collect on the guaranty of the $1.2 million loan. Because Ortenzio is arguing that CCI repaid the loan he guaranteed, Allfirst has presented three legally valid reasons why the payment made by CCI did not discharge its and Ortenzio's liability for the $1.2 million loan. Through the application of

---

[1]    Throughout his Opposition, Ortenzio quibbles about whether this is a suit at law or equity. This distinction has practical significance only in terms of whether Ortenzio has the right to demand a jury trial. Now that Ortenzio has voluntarily withdrawn his request for a jury in the face of Allfirst's motion to strike the jury demand, the question of whether this case is at law or in equity is moot and of no consequence to the merits of the action.

the legal principles upon which Allfirst's claims rest, Ortenzio becomes liable on the guaranty of the $1.2 million loan he gave. The issue for this Court is whether the attempted payment of the guaranteed $1.2 million loan with a prohibited borrowing under the unguaranteed $4 million line of credit was or was not effective to discharge and satisfy Ortenzio's obligations under his guaranty of the $1.2 million loan. The effectiveness and consequences of the attempted payment is what is in dispute. Whether this suit should be called a suit for breach of contract or some other designation is not meaningful in terms of a resolution of the case on the merits of the issues raised. The simple fact is that Ortenzio has not paid, and Allfirst has sued to collect, what is due on his guaranty under applicable law and the facts of the case.

Ortenzio also takes issue with Allfirst's assertion that no interpretation of the subject contracts is required. Opposition at 1. He then takes issue in footnote 1 with Allfirst's reliance on Sheri Phillip's testimony concerning her understanding of the documents for the $4 million line of credit. Despite Ortenzio's contentions, the commitment for the $4 million line of credit is very clear that the line can only be used to finance accounts receivable and work in progress - in effect, normal monthly expenses pending collection of customer billings. Exhibit A (Commitment Letter). Sheri Phillips merely confirmed that this restriction on the use of the line of credit was an understanding of both Allfirst and CCI and that Ortenzio knew, if only from his discussions with Phillips, that CCI could not borrow under the line of credit to prepay the loan he had guaranteed.

Although Ortenzio would like to muddy the argument, the issue is not whether the documents for the $1.2 million loan prohibited its repayment from the line of credit. The $1.2 million loan documents, consistent with standard loan documentation in the banking industry, were silent as to the source of repayment of the loan. Affidavit of Elias. The issue is, however, whether the $4

million line of credit documents prohibited the use of line of credit proceeds to make this kind of a loan prepayment. Clearly, the line of credit commitment did. The wrongful act which Ortenzio orchestrated was in borrowing the money in contravention of the written terms and conditions in the commitment pursuant to which the line of credit was made available to CCI.

> **b.    A novation did not occur when the unguaranteed line of credit was used to repay the guaranteed loan.**

Ortenzio tries to avoid the conditional payment rule established by a long line of Pennsylvania cases by stating that these many authorities were "merely novation cases, where the ultimate issue was whether it was the parties intention that a later agreement replace the original agreement." Opposition at 3. He then goes on to state that "no agreement was made between Allfirst, CCI or Mr. Ortenzio that a new obligation would replace the Surety Agreement." Opposition at 3. Contrary to his assertions, this case, like the authorities Allfirst has cited, is a novation case. Precisely because no agreement was made to substitute a borrowing under the unguaranteed line of credit for the guaranteed $1.2 million loan, there was no novation and the failure of CCI to repay the line of credit resulted in a revival of the guaranteed $1.2 million note. *First Pennsylvania Bank v. Triester*, 251 Pa. Super. 372, 380 A.2d 826 (1977); *Nuside Metal Products, Inc. v. Eazor Express, Inc.*, 189 Pa. Super. 593, 152 A.2d 275 (1959); *Mechanics' National Bank of Burlington v. Klielkopf*, 22 Pa. Super. 128 (1903).

The $4 million line of credit was evidenced by a master note whose unpaid principal balance would vary with borrowings and repayments. Each borrowing on the line of credit increased the unpaid principal balance. Each repayment decreased the unpaid principal balance.

What CCI did when it made the February 11, 2000 prepayment of the $1.2 million loan was

to exchange the obligation under the $1.2 million note for an increased obligation under the master note evidencing the $4 million line of credit.  This was a substitution of one obligation for another. The substitution of the increase in the $4 million line of credit for the $1.2 million loan did not discharge and satisfy the $1.2 million loan unless either, as the conditional payment cases all hold, the line of credit was repaid (which did not happen) or a novation occurred.

A novation, however, did not take place.  For there to be a novation, both parties to the original obligation must intend that the new obligation be a complete substitute for the old obligation.  *First Pennsylvania Bank v. Triester*, 251 Pa. Super. 372, 380 A.2d 826 (1977); *Winters v. Wolfskill,* 126 Pa. Super 168, 190 A. 395 (1937).  Ortenzio, who has the burden of proof if he wishes to claim a novation (*Id.*), cannot establish that Allfirst intended to substitute the line of credit borrowing for the $1.2 million loan.  In fact, because Allfirst had no idea what Ortenzio had done, Allfirst, lacking any knowledge, could not have had an actual intention that a substitution occur.

**c.    Prepayment of the $1.2 million loan by borrowing under the $4 million line of credit was prohibited by the loan documents evidencing the $4 million line of credit.**

Ortenzio continues his campaign of misdirection at page 4 of his Opposition by arguing that the documents evidencing the $1.2 million loan do not state that it may not be repaid from the proceeds of the $4 million line of credit.  What he ignores is the prohibition in the $4 million line of credit commitment against the line of credit loan proceeds being used for this purpose. Pl's Exhibit A (Commitment Letter).  He also ignores the fact that CCI's insolvent condition made it ineligible to borrow any amount under the line, much less $1.2 million.   Pl's Exhibit A (Commitment Letter).

As Allfirst has emphasized in its motion papers, loan documents do not customarily contain

restrictions on the source of the funds that can be used for repayment. Instead, loan documents routinely restrict, as does the line of credit commitment, the uses to which loan proceeds can be applied. Affidavit of Elias.

Ortenzio, in pursuit of his argument, points to Craig Schwartz's deposition testimony where Schwartz correctly stated that there was no reason Allfirst could not have put a restriction on repaying the $1.2 million loan from the $4 million line of credit in the loan documents for the $1.2 million loan. Apart from the fact that this would have been a highly unusual provision to put in loan documents, Allfirst had no reason to believe Ortenzio would attempt to dodge a liability he voluntarily accepted. Allfirst could have put in the $1.2 million loan documents that Ortenzio could not repay the loan with counterfeit or stolen money, but such a provision, apart from being unusual, would not seem to be the sort of provision needed in a transaction with a person believed to be honest and dealing in good faith.

Ortenzio also argues that "Allfirst fails to mention that the $1.2 million short-term loan was used for the same purpose - financing accounts receivable and work in process." Opposition at 6. He then goes on to argue that Schwartz testified that he was unaware of any use to which CCI put the $1.2 million loan other than to finance accounts receivable and work in process. What Ortenzio does not explain is how this makes his wrongful use of the line of credit proper. Of course the $1.2 million loan documents limited the use of loan proceeds to that of financing accounts receivable and work in progress. The $1.2 million loan was extended to assist CCI in meeting a short term cash flow problem. CCI needed extra money for several months to pay its monthly operating expenses pending the collection of sums owed to it by its customers. The $1.2 million loan was made to address this problem, and the commitment letter restricted the use of the loan proceeds to the purpose

for which the loan was made.

Ortenzio further argues that CCI, at the time the prepayment was made, had not exceeded the $4 million cap on borrowings and had room to draw $1.2 million under the line. What he ignores is the fact that CCI did not have a $4.5 million net worth and was ineligible to borrow at all. He also ignores the fact that the insolvent CCI was in default under the loan documents and that he was in default under the Suretyship at the time of the borrowing because of the material adverse change in CCI's financial condition. He ignores the fact that these conditions gave Allfirst complete discretion to refuse any further borrowing by CCI [Pl's Exhibit A (Commitment Letter)], a discretion which Allfirst would have exercised if Ortenzio had disclosed facts which he, by contractual and the dictates of good faith, was obligated to disclose.

        **d.    A borrowing on the unguaranteed line of credit was not the only source of repayment of the guaranteed $1.2 million loan.**

Ortenzio states at page 7 of his Opposition that CCI could not repay the $1.2 million loan except by borrowing on the line of credit, a completely incorrect statement. This assertion ignores both the way in which the CCI checking account and the line of credit worked and the expected source of repayment discussed in the negotiations for the $1.2 million loan.

CCI's receipts were deposited daily in the Allfirst account. If the receipts plus the existing amount on deposit exceeded daily checks presented for payment, the excess was a positive balance and CCI received interest on the positive balance. Only if the daily receipts plus the existing amount on deposit were less than presented checks would there be a borrowing on the line of credit and then only in the amount of the shortfall. Historically, CCI had run positive cash balances and was not always required to borrow on the line of credit. Phillips at 23. Its 1998 financial statement showed

no borrowings under the line of credit and a positive cash position. Pl's Exhibit G (1998 Financial Statement).

Ortenzio told Allfirst that CCI had a short term cash flow problem that he expected to be resolved before the $1.2 million loan came due. Ortenzio at 86-89; Phillips at 34-35; Schwartz at 182-184. This meant to Schwartz that CCI's collections would exceed its expenditures and it would be in a positive cash position when the loan was repaid. Schwartz at 183-184. Consistent with what Ortenzio told him, Schwartz expected CCI to repay the loan from amounts on deposit in the Allfirst account. Schwartz at 183-184. CCI, had its financial projections come true, would have been in a position to write a check on the Allfirst account that was not a borrowing on the line of credit to repay the $1.2 million loan.

      e.    **Allfirst is not attempting to obtain Ortenzio's guaranty of the $4 million line of credit in addition to the $1.2 million loan.**

Ortenzio argues at page 8 of his Opposition that Allfirst is attempting to obtain Ortenzio's guaranty of the $4 million line of credit in addition to the $1.2 million loan, which Ortenzio refused to give when the $1.2 million loan was negotiated. This argument does not correctly describe Allfirst's position.

Ortenzio did not guaranty the $4 million line of credit, and Allfirst is not attempting through this suit to obtain such a guaranty. Rather, Ortenzio guaranteed the $1.2 million loan, which has not been repaid because the borrowing under the line of credit used for repayment was only a conditional payment that itself was never repaid and hence did not discharge the obligation under the $1.2 million loan. Allfirst is seeking to collect from Ortenzio what remains due on the $1.2 million loan, absent the prohibited and wrongful borrowing under the line of credit that itself was not repaid.

2.    **Allfirst is entitled to equitable subrogation.**

a.    **Equitable subrogation, not** *quantum meruit,* **is the applicable doctrine.**

Ortenzio continues his incorrect argument that Allfirst is, in reality, asking for relief in *quantum meruit*, and not equitable subrogation, relief to which, he argues, Allfirst is not entitled because a written contract exists.  Contrary to Ortenzio's argument, Allfirst is not requesting *quantum meruit* relief for Ortenzio's unjust enrichment, but instead is seeking equitable subrogation, an entirely different equitable doctrine, albeit also rooted in the concept of unjust enrichment.

Ortenzio argues that *quantum meruit* does not apply because the parties have a written contract.  What Ortenzio overlooks is that there were two contracts, not just one.  The unguaranteed line of credit and the guaranteed $1.2 million loan were separate and distinct obligations evidenced by separate and distinct documents.  Because Ortenzio wrongfully caused a borrowing under the line of credit and used the money, without Allfirst's knowledge or consent, to discharge his personal obligation as guarantor of the $1.2 million loan, he was unjustly enriched and Allfirst is entitled to be subrogated to the obligation its funds discharged without its knowledge or consent.  The $1.2 million borrowed under the line of credit is entitled to be subrogated to the rights and benefits, including the Ortenzio guaranty, of the obligation it discharged.

b.    **Equitable subrogation is available under the facts of this case.**

Ortenzio argues that Allfirst cannot establish the requisite elements for equitable subrogation.  But, in making this argument, Ortenzio distinguishes peripheral cases cited by Allfirst for general propositions only and ignores the principal authorities upon which Allfirst's claim rests.  There are many varieties of equitable subrogation.  The variety advanced by Allfirst is set forth in *Restatement of Restitution* § 162 (1937), where the rule is stated as follows:

> Where property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder.

Although this principle also has found expression in Pennsylvania appellate decisions -. *see, e.g., Potoczny to Use of City of Philadelphia v. Vallejo*, 170 Pa. Super. 377, 85 A.2d 675 (1952) and *In re McGrath's Estate*, 159 Pa. Super. 78, 46 A.2d 735 (1946) (both quoting *Restatement of Restitution* § 162 as stating applicable law) - Ortenzio ignores the *Restatement* rule, and rather than address it, distinguishes cases not dealing with the *Restatement* rule and cited by Allfirst only for tangential points.

Ortenzio also argues that equitable subrogation does not apply because "Allfirst (under the $4 million line of credit) should have rejected the $1.2 million payment, because it knew that the $4 million line of credit was not secured by Mr. Ortenzio's guaranty." Opposition at 11. But, Allfirst, as Craig Schwartz confirmed, did not know that Ortenzio had paid by a borrowing and could not have known until days later, after the check had cleared and the borrowing showed on the computer, assuming, as was not the case, Allfirst had any reason to inquire in the first place. Schwartz at 196-198. Ortenzio hid from Allfirst the fact that the guaranteed loan was being paid by a borrowing, and Schwartz did not know or suspect what Ortenzio had pulled on the bank. Had he known, he would have taken steps to bounce the check Ortenzio surreptitiously presented to a bank employee as payment at a time when Ortenzio knew Schwartz was out of the office on appointments. Schwartz at 182.

### c.    There is no adequate remedy at law.

Ortenzio argues that Allfirst has an adequate remedy at law because it may sue Ortenzio for breach of contract, a legal remedy not available unless the purported payment by a borrowing on the line of credit is nullified or disregarded.  As Ortenzio's cited authority states, a legal remedy must be available for it to be adequate.  *Tudor Dev. Group, Inc. v. U. S. F.& G* ,968 F.2d 357 (3rd Cir. 1992).  There is no legal remedy available here unless the purported payment is nullified and ignored.

### 3.    Ortenzio committed fraud.

In Section III of his Opposition, Ortenzio recites the standard elements of a cause of action for fraud.  In doing so, he ignores the overriding principle under Pennsylvania law that fraud is anything that amounts to a purposeful deception of another person to that person's detriment.  *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991); *In re McClellan's Estate*, 365 Pa. 401, 75 A.2d 595 (1950); *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983);  *Frowen v. Blank*, 493 Pa. 137, 143, 425 A.2d 412, 415 (1981).  Ortenzio set out to and did deceive Allfirst to its detriment.

### a.    Ortenzio concealed the source of repayment of the $1.2 million loan.

Ortenzio argues on page 13 of the Opposition that he did not conceal the source of funds that were being used to repay the $1.2 million loan.  This contention is contrary to the clear and convincing evidence that he did conceal the source of the funds being used to make the payment.

At the conclusion of fiscal1998, CCI had been a profitable and solvent company that had a positive cash position and no amount outstanding under its line of credit.  Pl's Exhibit G (1998 Financial Statement).  In November of 1999, Ortenzio and Sheri Phillips asked Allfirst for

additional, short term funding to see CCI through what was represented to be a temporary cash flow problem. Ortenzio at 73-86. Allfirst was told that the short term loan was expected to be repaid from the increase in cash flow that was expected to occur before the loan came due. Schwartz at 34-35, 183; Ortenzio at 86-88. Allfirst would not give the additional loan on CCI's credit alone and required Ortenzio's direct and primary guaranty pursuant to a Suretyship which permitted Allfirst to collect directly from Ortenzio without attempting to first collect from CCI. Pl's Exhibit F (Suretyship); Ortenzio at 94. Ortenzio admitted that he had the ability to write a check for the amount of the short term loan Allfirst was making. Ortenzio at 95-96. The guaranty was not just a formality but was an anticipated source of repayment.

CCI's financial condition continued to deteriorate and it lost over $6 million for the fiscal year 1999 and was insolvent by almost $1 million. Pl's Exhibit G (1998 Financial Statement); Pl's Exhibit H (1999 Internal Financial Statement); Phillips at 24. The cash flow projection Ortenzio and Phillips gave to Allfirst in November had not proven true. Indeed, as of February, even greater cash flow shortfalls in the area of an additional $6 million were projected over the next five months. Pl's Exhibit I (Cash Flow Projection). Although the commitment letter for the $4 million line of credit required CCI to provide Allfirst with its year end financial information [Pl's Exhibit A (Commitment Letter)], Ortenzio had not shared with Allfirst any information on CCI's financial situation as of February 11, 2000, when he borrowed on the line to make the payment. Ortenzio at 110-122, 126-127; 182-187.

Contrary to what Ortenzio implies in his Opposition, he did not make an appointment to meet with Schwartz and deliver the check to Schwartz. Instead, he called and verified that Schwartz would be out of the office and then went to deliver the check. He knew that Schwartz would not be

there when he arrived. Ortenzio at 109-111. This was the first time Ortenzio had ever been involved personally in making a payment on any of CCI's bank loans over the many years CCI had been dealing with the Bank. He had never before even mailed in, much less personally delivered, a payment. Ortenzio at 67-72. As Ortenzio knew would be the case, Schwartz was not there when he arrived and he gave the check to an employee and stated the check was in payment of the $1.2 million loan. Ortenzio at 109-111. The employee not Schwartz, processed the check and gave Ortenzio a receipt. Ortenzio at 109-111. Although Ortenzio will testify that he had hoped Schwartz would have returned while he was there, he alone will testify to this subjective hope. On the other hand, it is undisputed that he knew Schwartz would not be there when he arrived and Schwartz was not present when he handed in the check. Ortenzio at 109-111.

The check, while drawn on CCI's account at Allfirst, did not indicate or in anyway disclose that the check represented a borrowing on the line of credit. Def's Exhibit B (Check). Allfirst could not have verified that the check was in fact a borrowing until all of the day's activity in the account had closed and the check had been cleared. Schwartz at 196-197. CCI's account was not something that Allfirst monitored on a daily and continuous basis. Schwartz at 196-197.

Ortenzio, on the other hand, knew the check would be a borrowing on the line. Sheri Phillips told him the borrowing would be improper and refused to have any part in it. Phillips 22, 36-38. According to Phillips, Ortenzio was intent on discharging his guaranty and planned to go ahead with the borrowing without her approval. Phillips at 36-37, 44-46. He had refused to invest any more of his money in the company and simply did not want to pay what had become due from him. Phillips at 36-37, 44-46; Ortenzio at 106-107. Ortenzio knew CCI was about to financially implode and had discussed putting the company in bankruptcy with Phillips. Phillips at 41-44, 48, 82-84.

When Schwartz learned of the payment, he assumed CCI was doing well and that its November, 1999 financial projection had been realized. Schwartz at 149-150. He assumed CCI was in a positive cash position and had no outstanding balance on the line. He was not concerned with the source of the funds because he knew Ortenzio, a wealthy man, could make the payment himself if the need arose. Pl's Exhibit J (Ortenzio Financial Statement).

After delivering the check, Ortenzio called Schwartz and asked for an immediate return of his guaranty. Schwartz at 190-191. He did not tell Schwartz that CCI had borrowed on the line to make the payment or that the company was about to fail financially. Ortenzio at 110-122, 182-187; Schwartz at 181. As Schwartz testified, had he known these facts, he would have taken steps to stop the check from clearing. Schwartz at 181-182. Instead, he put a rush order in and returned the guaranty to Ortenzio by Thursday. Schwartz at 190-191.

Having received his guaranty, he called Schwartz on Thursday and scheduled a meeting for Friday to discuss CCI's situation, revealing for the first time the $6 million loss. Ortenzio at 123. He did not, however, reveal how the $1.2 million loan had been repaid. Ortenzio at 110-122, 182-187; Schwartz at 181.

After scheduling the meeting, Ortenzio retained Robert Chernicoff, a bankruptcy attorney, who attended the meeting on Friday. Ortenzio at 127-128, Ortenzio at 132-133. At the meeting on February 18, 2000, Ortenzio disclosed CCI's financial extremis but not how the $1.2 million loan had been repaid. Ortenzio at 155, 182-183. By Tuesday, February 22, the bonding company took control of all of CCI's accounts and revenues. Ortenzio at 177-181. On Wednesday, Allfirst shut down the line and on Thursday, declared a default and demanded payment of the balance due on the line. Elias at 19-20. Allfirst still did not know the source of funds for the February 11 payment by

Ortenzio. Elias at 25-26.

These facts demonstrate, clearly and convincingly, a purposeful deception accomplished by concealment and non-disclosure when a duty to disclose existed.

### b. Payment of the $1.2 loan before its due date indicates fraud by Ortenzio.

At page 14 of his Opposition, Ortenzio argues that he did not commit fraud because the due date of the $1.2 million loan was March 31, 2000, which is before the line of credit came up for renewal on April 30, 2000. Prepaying the line of credit over a month and a half before its due date does indicate fraud. CCI was desperate for cash at the time the $1.2 million loan was prepaid. Reducing the line of credit by $1.2 million simply took away this amount of desperately needed cash from the cash starved company. As Sheri Phillips testified, Ortenzio's act was something that hurt the company. Phillips at 37-38. Ortenzio caused the payment to be made when and as he did pursuant to a deceptive scheme by which he hoped to escape liability on the guaranty he voluntarily gave Allfirst in November, 1999.

### 5.    Conclusion.

For these reasons and those in its memorandum in support of its motion for summary judgement, Allfirst asks for summary judgment in its favor.

Lawrence J. Gebhardt, *Pro Hac Vice*
Ramsay M. Whitworth, PA Bar # 85208
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202
(410) 385-5100
*Attorneys for Allfirst Bank*

## CERTIFICATION PURSUANT TO LOCAL RULE 7.8(b)

The undersigned hereby certifies to the Court that the above Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment contains 4762 words according to the word count feature of the word processing system used to prepare the Memorandum.

_____
Lawrence J. Gebhardt

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of May, 2002 a copy of *Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment* was sent by Federal Express to: Edward I. Swichar, Esquire and Robert A. Burke, Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA 19103, *Attorneys for Defendant.*

_____
Lawrence J. Gebhardt