IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK | * | |
| Plaintiff, | * | |
| v. | * | CASE NO.: 1:01-CV-786 |
| JOHN M. ORTENZIO | * | |
| Defendant | * | |

ORIGINAL

FILED
HARRISBURG, PA

JUN 21 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

*************************************************************

## ALLFIRST'S OPPOSITION TO DEFENDANT'S
## MOTION FOR RECONSIDERATION

Plaintiff, Allfirst Bank ("Allfirst"), by its undersigned counsel, opposes *Defendant's Motion for Reconsideration and Memorandum of Law in Support Thereof*, on the following grounds.

## I.
## INTRODUCTION

Defendant's Motion for Reconsideration is a baseless attempt to evade the sound reasoning of this Court's June 6th Order. Notwithstanding this Court's pronouncement that the "Defendant cannot now argue that he lacked a reasonable opportunity to discover the witness' opinions, the basis for such opinions, and the methodology for arriving at such conclusions," Defendant seeks to exclude the expert testimony of Messrs. Schwartz, Gibson and Elias. Ignoring the well settled law of this Circuit, Defendant asks this Court to impose the drastic sanction of exclusion without even the slightest allegation of prejudice, unfair surprise, bad faith or willfulness. Instead, Defendant relies solely on the technical grounds that Allfirst failed to supplement its Answers to Interrogatories. As discussed in greater detail below, Allfirst's answers did not require supplementation and Defendant's Motion for Reconsideration must be denied.

## II.
## DISCUSSION

**A.     Defendant's Interrogatory does not apply to "hybrid" fact/expert witnesses.**

Defendant's Interrogatory No. 20 requests Allfirst to identify "all persons [it] expect[s] to call as expert witnesses either on liability or on damages at the trial of this case" and to set forth the subject matter, facts, and opinions to which the expert is expected to testify.  Notwithstanding the unique application of the Federal Rules of Civil Procedure to hybrid fact/expert witnesses, or as this Court described it "the 'hybrid' fact/expert witness conundrum," Defendant did not define the term "expert" in his interrogatories to include such witnesses.  Pg. 5, June 6, 2002 Order.  Allfirst, understanding the term to apply solely to those experts addressed by Rule 26(a)(2), responded by stating that it will "designate its expert witnesses in accordance with the deadlines established in the Scheduling Order" and "provide the information required by Rule 26(a)(2) of the Federal Rules of Civil Procedure."

Understanding the proper application of Rule 26(a)(2), Allfirst's counsel sent a correspondence to Defendant's counsel on February 5, 2002, which: (1) identified Messrs. Schwartz, Gibson and Elias as hybrid fact/expert witnesses; (2) identified the subject matter of their expected testimony; and (3) stated Allfirst's position on the proper application of Rule 26(a)(2) to such witnesses.  *See* Exhibit "A", February 5, 2002 correspondence from Lawrence J. Gebhardt; Exhibit "B", February 6, 2002 correspondence from Lawrence J. Gebhardt.  Defendant's counsel disputed Allfirst's interpretation of Rule 26(a)(2) as it applies to such witnesses.  *See* Exhibit "C, February 5, 2002 correspondence of Edward Swichar.  However, not once during the volley of correspondence exchanged between counsel on this subject did Defendant refer to Allfirst's Answers to

2

Interrogatories or duty to supplement. *See* Exhibit "D", February 7, 2002 correspondence of Edward Swichar; Exhibit "E", February 8, 2002 correspondence of Lawrence J. Gebhardt. Rather, it was only after this Court's June 6th Order that Defendant concocted its current position. Thus, it is clear that the parties both intended and understood the interrogatory to apply solely to those experts addressed by Rule 26(a)(2).

However, even if the interrogatory was intended to refer to hybrid witnesses, Allfirst's February 5, 2002 correspondence provided a sufficient "supplementation" to permit Defendant a "reasonable opportunity to prepare effective cross examination and . . . arrange for expert testimony from other witnesses." Fed.R.Civ.P. 26(a)(2), Advisory Committee's Notes, 1993 Amendment. Although Allfirst did not formally supplement its Answers to Interrogatories, Defendant cannot show, nor even allege, that such failure resulted in undue surprise or prejudice or was a result of bad faith or wilfulness. Therefore, as described below, the drastic sanction of exclusion is unwarranted.

**B.    Exclusion is unwarranted.**

Although Rule 37(c)(1) provides for the exclusion of testimony as a discovery sanction, the Third Circuit Court of Appeals has restricted the use of such an "extreme sanction" and has held that it is "not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of the court order by the proponent of the evidence." *Bucher v. Gainey Transportation Service of Indiana, Inc.,* 167 F.R.D. 387, 389 (M.D. Pa. 1996), quoting *Meyers v. Pennyback Woods Home Ownership Assn.,* 559 F.2d 894, 905 (3rd Cir. 1977). There are four factors which courts of this circuit must consider in determining if exclusion of testimony for failure to comply with pre-trial notice requirements is appropriate:

> (1) The prejudice or surprise in fact of the party against whom the excluded

witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing the witness to testify would disrupt the orderly and efficient trial of the case; and (4) bad faith or willfulness in failing to comply with the pre-trial notice procedures.

*DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1201-1202 (3rd Cir. 1978); *Pennyback,* 559 F.2d at 904. Application of these four factors compels this Court to deny Defendant's Motion for Reconsideration.

Despite Defendant's tenuous assertions, he was neither surprised nor prejudiced by Allfirst's failure to supplement its Answers to Interrogatories. Allfirst disclosed the identify of its hybrid fact/expert witnesses and specifically identified the subject matter of their expert testimony. Allfirst's disclosure was made prior to the depositions of these witnesses and Defendant had ample opportunity to explore the subject matter, facts, and opinions to which the witnesses are expected to testify. *See McDonald v. U.S.,* 767 F.Supp. 1295, 1298 (M.D. Pa. 1991) ("It is difficult to conceive of any prejudice suffered by plaintiff which would justify striking the testimony of" witnesses who were identified but whose opinions were not disclosed.); *Bucher v. Gainey Transportation Service of Indiana, Inc.,* 167 F.R.D. 387 (M.D. Pa. 1996) (denying motion to preclude plaintiffs' expert testimony because the defendants were aware of the experts' opinions and the general basis for those opinions). Although Allfirst agrees with Defendant's contention that "a party is permitted to discover the opinion and factual bases of the opinion of hybrid witnesses," Defendant simply chose not to do so.

On February 15, 2002, Defendant conducted the deposition of Craig Schwartz. Contrary to Defendant's assertions, Defendant did not question Mr. Schwartz on "the very subject matter of the proposed expert testimony." Rather, Defendant's counsel simply asked two questions of Mr.

Schwartz regarding his opinion testimony: (1) "Are you aware of any banking custom or practice which prohibits a borrower from paying off a guaranteed loan from a loan that is not guaranteed," and (2) "Would your answer change if I said to you are you aware of any banking practice or custom that prohibits a borrower from paying off a guaranteed loan with – from a nonguaranteed line of credit if it is in financial distress." Schwartz at 174. Mr. Schwartz replied to each of these questions by stating "not to my recollection." Schwartz at 174.

Defendant's contention that he was unable to elicit further opinion testimony from Mr. Schwartz because "Mr. Schwartz claimed not to recall any such banking practice or custom" is specious, at best. So, too, is Defendant's apparent "excuse" for not taking an individual deposition of Jamin Gibson. Mr. Gibson, as well as Mr. Elias, were intimately involved with the CCI and Ortenzio account since learning of CCI's deteriorating financial condition. Gibson at 143-146; Elias at 7-9. Messrs. Gibson and Elias were both present at the February 18, 2000 meetings regarding CCI's financial situation and both were involved in making the determination to declare CCI in default under the line of credit with Allfirst. Gibson at 143-146; Elias at 20-21.

Therefore, Defendant's decision not to depose Mr. Gibson in no way warrants the exclusion of his opinion testimony, nor does Defendant's failure to question Mr. Elias during his deposition regarding his opinion testimony. As stated by this Court in its June 6th Order, "[t]he depositions . . . presented Defendant with a perfect opportunity to discover all of the information that would have been provided through a Rule 26(a)(2)(B) written expert report." Pg. 6, June 6, 2002 Order. Defendant, simply chose not to take advantage of this opportunity.

The final three factors of the *Meyers* analysis require little comment. Defendant was neither prejudiced nor unduly surprised, therefore, there is no need for Allfirst to "cure" its failure to provide

a supplemental answer to Defendant's interrogatory. Allfirst's hybrid witnesses will be testifying as fact witnesses during the trial, therefore, additional testimony relating to their opinions will in no way disrupt the trial. Finally, Allfirst did not act in bad faith, but rather, did all that was required in order to comply with the Federal Rules.

For these reasons, Defendant's Motion for Reconsideration must be denied.

Lawrence J. Gebhardt, *Pro Hac Vice*
Ramsay M. Whitworth, PA Bar # 85208
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202
(410) 385-5100

*Attorneys for Allfirst Bank*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of June, 2002, a copy of *Allfirst's Opposition to Defendant's Motion for Reconsideration* was sent via facsimile and Federal Express to Edward I. Swichar, Esquire and Robert A. Burke, Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA 19103, *Attorneys for Defendant*.

Ramsay M. Whitworth

FROM : GEBHARDT SMITH LLP          FAX NO.: 410 385 5018          02-05-02  10:54    P.02

LAW OFFICES

# GEBHARDT & SMITH LLP

NINTH FLOOR

THE WORLD TRADE CENTER

BALTIMORE, MARYLAND 21202-3064

BALTIMORE:    (410) 752-5830
WASHINGTON:   (301) 470-7468

FACSIMILE
(410) 385-5119

WRITER'S DIRECT DIAL NUMBER:
(410) 385-5100

February 5, 2002

Writer's E-Mail Address:
lgebh@gebsmith.com

Refer to File No. 19527

VIA FACSIMILE

Edward I. Swichar, Esquire
BLANK ROME COMISKY & MCCAULEY LLP
One Logan Square
Philadelphia, PA 19103

     *Re:*    *Allfirst Bank v. Ortenzio*
           *Case No.: 1:01 -CV - 0786 (Judge Rambo)*

Dear Ed:

     Having received the report of your expert witness, Donald C. Fruch, I am writing to request dates from you for his deposition.

     Regarding the subject of expert witnesses, please be advised that the Bank may provide rebuttal testimony from any of the Bank officers involved in this transaction, including Gerard Elias, Jamin Gibson, Craig Swartz, and Daryl Myers. The rebuttal testimony would be directed to the issue of whether it is consistent with custom and practice in the banking industry to permit a borrower to repay a guaranteed credit facility with a draw upon an unguaranteed revolving line of credit shortly before the company announces that it is in financial distress. We also may present one or more third party experts as rebuttal witnesses on this issue. We do not believe we are obligated to provide any Rule 26(a)(2) report with respect to the Bank's own personnel who may express opinions, but we will provide a report from any third party expert called as rebuttal witnesses to the extent their testimony is to rebut matters raised in your expert's report. Obviously, we are entitled to present a rebuttal expert based upon the live testimony provided by your expert witness and we will not know what this live testimony is until it is given and cannot provide a report aimed at something not reflected in your expert's report.

     I should also advise you that we intend to file a motion in limine objecting to Mr. Fruch's testimony as an expert to the extent he wishes to opine as to the meaning or interpretation of the loan documents. This is not a proper subject for experts testimony, and we will file a motion at the appropriate time.

GEBHARDT & SMITH LLP

Edward I. Swichar. Esquire
February 5, 2002
Page 2


Finally, would you let me know as to the status of your efforts to locate Sherry Phillips and Shane Miller.  We would like to set their depositions prior to the expiration of the discovery deadline.

Very truly yours,

Lawrence J. Gebhardt

LJG/cjl
cc:    Jamin M. Gibson. Vice President
       Gerard L. Elias. Senior Vice President

B

LAW OFFICES

# GEBHARDT & SMITH LLP

NINTH FLOOR

THE WORLD TRADE CENTER

BALTIMORE, MARYLAND 21202-3064

BALTIMORE:    (410) 752-5830

WASHINGTON:   (301) 470-7468

FACSIMILE

(410) 385-5119

WRITER'S DIRECT DIAL NUMBER:

(410) 385-5100

Writer's E-Mail Address:

lgebh@gebsmith.com

February 6, 2002

Refer to File No. 19527

**VIA FACSIMILE**

Edward I. Swichar, Esquire

BLANK ROME COMISKY & MCCAULEY LLP

One Logan Square

Philadelphia, PA 19103

> Re:   *Allfirst Bank v. Ortenzio*
>
>         *Case No.: 1:01 -CV - 0786 (Judge Rambo)*

Dear Ed:

I am responding to your letter of February 5, 2002.  February 12, 13, 18 or the afternoon of February 22nd are potentially available dates for your expert's deposition.  I would be willing to take the deposition in your offices in Philadelphia, if that assists in the scheduling.

We have retained a third-party rebuttal expert, whom I expect will be preparing a report within the next few days.  You are certainly welcome to depose this expert once his report has been submitted.  As to the other bankers involved in this matter, we are not required to submit an expert report.  Federal Rule 26(a)(2) requires us to disclose to you the *identity* of "any person who may be used at trial to present evidence under Rules 702, 703 or 705 of the *Federal Rules of Evidence*.  Federal Rule 26(a)(2)(B) only requires a report of "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony."   None of the witnesses associated with Allfirst come within this description.  You have, of course, noted the depositions of the various people from Allfirst to whom I am referring and certainly have every opportunity to depose them to the extent you wish.

Very truly yours,

Lawrence J. Gebhardt

LJG/cjl

cc:    Jamin M. Gibson, Vice President (via facsimile)
        Gerard L. Elias, Senior Vice President (via facsimile)

# BLANK ROME COMISKY & McCAULEY LLP

*Counselors at Law*

|  |  |
|---|---|
| Direct Dial: | (215) 569-5641 |
| Fax: | (215) 832-5641 |
| Email: | swichar@blankrome.com |

*Delaware*
*Florida*
*Maryland*
*New Jersey*
*New York*
*Ohio*
*Pennsylvania*
*Washington, DC*

February 5, 2002

**VIA FACSIMILE**

Lawrence Gebhardt, Esquire
Gebhardt & Smith, LLP
The World Trade Center, Ninth Floor
Baltimore, MD  21020-3064

Re:   **Allfirst Bank v. John M. Ortenzio**

Dear Larry:

In regard to your letter of February 5, 2002, please give me your available dates through the end of the discovery period and I will thereafter coordinate with my expert.

Regarding the subject of expert witnesses, you state that the Bank may have rebuttal experts who will testify in regard to the custom and practice in the banking industry.  It is my view that you are now required to provide me with any and all expert reports.  Thereafter, I would want to depose your expert or experts as well.  If, as it appears, you are refusing to refuse to provide me with a rebuttal expert report until after my expert provides live testimony, then your position would be, of course, without prejudice to my contrary position.  In fact, I would seek to preclude your experts from testifying at trial unless I timely receive all of your expert rebuttal reports and be given the opportunity to timely depose them.

Needless to say, you are free to file a motion in limine, if you deem it appropriate. With respect to our efforts to locate Sherry Phillips and Shane Miller, please refer to Bob Burke's letter of January 23, 2002, which I believe responded to the same inquiry.  We do not control these persons and you are free to contact them directly.

Please call me if you wish to discuss any of the foregoing.

Very truly yours,

Edward I. Swichar

cc:   Robert A. Burke

One Logan Square • Philadelphia, Pennsylvania  19103-6998 • 215.569.5500 • Fax: 215.569.5555
www.blankrome.com

# BLANK ROME COMISKY & MCCAULEY LLP

*Counselors at Law*

| | |
|---|---|
| Direct Dial: | (215) 569-5641 |
| Fax: | (215) 832-5641 |
| Email: | swichar@blankrome.com |

Delaware
Florida
Maryland
New Jersey
New York
Ohio
Pennsylvania
Washington, DC

February 7, 2002

**VIA FACSIMILE**

Lawrence Gebhardt, Esquire
Gebhardt & Smith, LLP
The World Trade Center, Ninth Floor
Baltimore, MD   21020-3064

Re:     <u>Allfirst Bank v. John M. Ortenzio</u>

Dear Larry:

In regard to your fax of today, I have a telephone call into my expert to ascertain his available dates. The only available date that I have is the morning of February 12, 2002. As of February 25, 2002, I will be on 24 hour call for a lengthy trial in Montgomery County, Pennsylvania. However, if you are available any days during the week of February 25, 2002, or even the week of March 4, 2002, please let me know. If I should become unavailable, then I would ask Bob Burke to stand in for me.

As for the issue of rebuttal expert reports, I continue to be of the view that all of your expert reports, rebuttal or otherwise, bank representatives or otherwise, are required to be timely submitted. The Court's Case Management Order does not make a distinction. Also, please note that you never provided the requested information in the related expert interrogatories that we previously served. It is simply unwarranted to conceal from us your client's expert opinions and facts relied upon, until trial. If you wish, you are free to arrange a telephone conference with the Judge to resolve this issue, as permitted in a Case Management Order. Otherwise, I reiterate that I would oppose any of your experts testifying at trial in the absence of my timely receiving their expert reports.

Very truly yours,

Edward I. Swichar

113449.00601/20989675v2

E

LAW OFFICES

# GEBHARDT & SMITH LLP

NINTH FLOOR

THE WORLD TRADE CENTER

BALTIMORE, MARYLAND 21202-3064

BALTIMORE:    (410) 752-5830
WASHINGTON:   (301) 470-7468

FACSIMILE
(410) 385-5119

WRITER'S DIRECT DIAL NUMBER:
(410) 385-5100
Writer's E-Mail Address:
lgebh@gebsmith.com

February 8, 2002

Refer to File No. 19527

**VIA FACSIMILE**

Edward I. Swichar, Esquire
BLANK ROME COMISKY & MCCAULEY LLP
One Logan Square
Philadelphia, PA 19103

     *Re:*   *Allfirst Bank v. Ortenzio*
         *Case No.: 1:01 -CV - 0786 (Judge Rambo)*

Dear Ed:

     Regarding your letter of February 7, 2002, please let me know if the morning of February 12, 2002 is available for your expert witness. Otherwise, I believe we will have to push into the week of March 4, 2002 because of conflicting, out of town depositions which I am committed to.

     We will supply you with a report for any expert witness as to whom the *Federal Rules of Civil Procedure* require a report to be prepared and submitted. We will not prepare an expert report for any witness as to whom the *Federal Rules of Civil Procedure* do not require an expert report. The delineating feature in the *Federal Rules of Civil Procedure* is whether the expert has been specially retained for purposes of giving expert testimony or customarily gives expert testimony as part of his or her job. I find nothing in the Case Management Order that overrides the specific provisions of the *Federal Rules of Civil Procedure*. Hence, you will receive a report from our third-party, specially retained expert, but you will not receive reports from any of the bankers who are fact witnesses in this case. If you believe this is something that you need to raise with Judge Rambo, then please feel free to do so. Otherwise, I suggest you simply make your objection at trial and we will address it then.

              Very truly yours,

              Lawrence J. Gebhardt

LJG/cjl
cc:    Jamin M. Gibson, Vice President (via facsimile)
       Gerard L. Elias, Senior Vice President (via facsimile)

F

## Craig J. Schwartz

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3  ALLFIRST BANK     :

4     Plaintiff   :

5   v.     :  CA NO. 1:CV-01-0786

6  JOHN M. ORTENZIO   :

7    Defendant   :  Pages 1 - 216

8       -----------

9

10

11

12     Deposition of Craig J. Schwartz

13       Baltimore, Maryland

14      Friday, February 15, 2002

15

16

17

18

19

20

21  Reported by:  Kathleen R. Turk, RPR-RMR

**Esquire Deposition Services**       **1-800-441-3376**

## Craig J. Schwartz

Page 174

1    for that purpose if I use him, so I'm --

2              MR. GEBHARDT:  Your expert --

3              MR. SWICHAR:  -- hypothetically asking

4    him the question.

5        Q    (By Mr. Swichar) Are you aware of any

6    banking custom or practice which prohibits a borrower

7    from paying off a guaranteed loan from a loan that is

8    not guaranteed?

9        A    Not to my recollection.

10       Q    Okay.  Would your answer change if I said to

11   you are you aware of any banking practice or custom

12   that prohibits a borrower from paying off a guaranteed

13   loan with -- from a nonguaranteed line of credit if it

14   is in financial distress?

15             MR. GEBHARDT:  Objection.

16       A    Not to my recollection.

17       Q    All right.

18             MR. SWICHAR:  Well, I'm done.

19             MR. GEBHARDT:  I have some questions.

20             MR. SWICHAR:  Sure.

21                  ----

**Esquire Deposition Services**                    **1-800-441-3376**



Page 141

1   our management.
2       Q       Did you?
3       A       No.
4       Q       Did the bank retain any
5   accounting firm regarding CCI or Mr. Ortenzio?
6       A       We had Ed, who is Ed Bregger,
7   look at and maybe even have conversation with the
8   gentleman who prepared a report for CCI
9   Construction in their effort to refute the
10  government job. I believe it was the Scott Air
11  Force base job that CCI was going to try to make a
12  case against the government to get paid on that
13  job and Mr. Bregger was employed by the bank to
14  talk to that individual or try to reach him. I'm
15  not certain if he had conversation with Mr.
16  Ortenzio or Mr. Churnacoff. I just don't recall.
17  But he would have been -- he would have had one
18  invoice that the bank would have paid for his
19  work, but that was a very short period and it
20  was -- he was out of the loop then.
21      Q       Did he prepare a report?
22      A       No.
23              - - -
24              (Whereupon the document was

Page 142

1   marked for identification as Exhibit Number 7.)
2               - - -
3   BY MR. BURKE:
4       Q       I'll show you what has been
5   marked as Exhibit 7. Where did this come from?
6       A       I would have produced that. That
7   is an example of the commercial loan system, a
8   page of the commercial loan system.
9       Q       And in laymen's terms you would
10  go into the system, pull up a screen and press
11  print. Is that a safe way to characterize it?
12      A       Yes. You can print the screen.
13      Q       What are the handwritten notes on
14  here?
15      A       They're mine, and I'm referring
16  to February 11, 2000, effective date, the
17  transaction was processed on February 14th and
18  I've written checks presented for payment.
19      Q       You don't have to read what you
20  wrote. When did you write this?
21      A       I printed it on 10/24/2000, so I
22  would have to believe that that was the time I
23  wrote it. I can see there at the bottom left-hand
24  corner.

Page 143

1       Q       Did the bank rely on -- other
2   than the loan documents, did the bank rely on any
3   documents in making its decision to call a default
4   on the $2 million equipment loan?
5       A       I think in conjunction with
6   language in the loan agreement, coupled with the
7   gravity of the situation as the bank learned it on
8   February 18th and Mr. Ortenzio's comments in that
9   meeting, that he had stopped paying
10  subcontractors, that the bank knew that it was a
11  very serious situation.
12              And then we had a teleconference on
13  the 23rd and 24th with Mr. Ortenzio and his
14  counsel and tried to see if there was some way for
15  Mr. Ortenzio, given the significant loss that was
16  just communicated to the bank and given that
17  subcontractors weren't being paid and folks were
18  walking off the job, we were trying to get
19  additional collateral and/or a commitment from Mr.
20  Ortenzio to guarantee the bank's exposure. So
21  that information and those discussions, coupled
22  with the material adverse change of the company
23  and the responses that the bank got were all put
24  together and a decision was made to declare a

Page 144

1   default and issue a demand for payment.
2       Q       Whose decision was it to declare
3   the default?
4       A       I believe Mr. Elias. I mean,
5   there were conversations going on once again. I
6   was coming up to speed in very short order and it
7   was just in the process of being transferred into
8   our department. I believe that Mr. Elias
9   through looking at the loan documents and the
10  discussions started.
11      Q       Let me get a clarification of
12  your previous answer. I know there was verbal
13  information that the bank was receiving. My
14  question was more as to documents. Not counting
15  the loan documents, did the bank rely on any other
16  documents in making its decision to declare a
17  default?
18              MR. WHITWORTH:  Objection to the
19  extent the question is outside the scope of the
20  subject matter designated for the deposition
21  today. You may answer the question.
22      A       I would suggest that given the
23  situation, it was presented to us in the meeting
24  of February 18th, the gravity of the situation,

ESQUIRE DEPOSITION SERVICES

Page 145

1  the significance of the loss and the fact that
2  there were individuals that are necessary to
3  conduct CCI's business were not going to be paid
4  and were not going to be working for the company,
5  that coupled with follow-up conversations and the
6  language in the bank's loan agreement regarding
7  defaults, that information summarized, discussed
8  and the discussions we had incorporated together
9  led us to the decision that was made to declare
10 the default.
11 BY MR. BURKE:
12      Q     Any documents, did the bank rely
13 on any documents, other than the loan documents in
14 deciding to make its decision.
15      A     As I indicated earlier, I didn't
16 have, nor did Mr. Elias at that meeting on the
17 18th, the picture or anything tangible in our
18 hands regarding if Mr. Ortenzio and his counsel
19 brought something to the meeting, we didn't have
20 it by virtue of us being off site. But I can tell
21 you that the credit file and the information that
22 was discussed in the context of this meeting, and
23 I believe Mr. Ortenzio or one of his
24 representatives faxed to the bank the preliminary

Page 146

1  12/31/99 financial statement, the income statement
2  balance sheet, the jobs report, I believe that
3  came in within those ensuing days as we continued
4  to have dialogue with Mr. Ortenzio and his
5  counsel, Mr. Churnacoff.
6           So the bank was assessing -- my
7  recollection is we were assessing that information
8  along with the discussion we had the previous
9  Friday, along with the bank's rights and remedies
10 and language in the underlying loan agreement that
11 all of that information together and the responses
12 we received whenever we requested additional
13 support for a credit, that in the bank's opinion
14 clearly was in very serious financial situation,
15 that combination of all of information gathered,
16 those discussions that took place, coupled with
17 the language in the loan documents and the
18 responses we got from debtor, the principal of the
19 company and his counsel, the decision was made to
20 declare a default and issue a demand letter.
21      Q     What was the date the decision
22 was made to declare a default?
23      A     May I refer back to the Exhibit
24 6?

Page 147

1      Q     Of course.
2      A     Although I don't definitively
3  have it detailed here, the correspondence I would
4  have -- the handwritten notes I would have taken
5  on February 24th, whenever we asked for additional
6  support from Mr. Ortenzio and his response was
7  that we weren't going to be able to get additional
8  support from him, that we were going to start
9  returning checks. So I believe that in
10 conjunction with that decision, the default was
11 declared and the demand letter was sent on
12 February 24, 2000.
13      Q     So the decision to declare a
14 default was made on the 24th of February?
15           MR. WHITWORTH: I'll object to
16 the extent the question asked for any information
17 outside the scope of the subject matter designated
18 for the deposition. You may answer.
19      A     I can't tell you definitively.
20 BY MR. BURKE:
21      Q     If you don't know, then "I don't
22 know" is the correct answer.
23      A     I don't know.
24      Q     That's fine.

Page 148

1           Has the bank produced to us
2  either in the prior production or this production
3  all the documents that you referred to that were
4  faxed to the bank on or around February 24th?
5      A     I believe from CCI Construction.
6      Q     Well, did the bank get faxed any
7  other documents on February 24th?
8      A     I don't recall the date that the
9  information -- I said it was on or about.
10      Q     That's what I'm saying.
11      A     My recollection is that the
12 company, either Mr. Ortenzio or one of his
13 representatives, faxed supporting financial
14 information during that period of time from
15 February 18th forward for the next couple of days.
16 That would be part of what has been produced and
17 given to you.
18      Q     But that wasn't faxed to either
19 you or Mr. Elias. Correct?
20           MR. WHITWORTH: Objection to the
21 extent the information sought is outside the scope
22 of the designation for this deposition. You may
23 answer the question.
24      A     I don't know. If it was not

38 (Pages 145 to 148)

H)

## Gerard L. Elias

1    Q   Do you recall when and how you first became

2  aware of a borrower, CCI Construction and Mr. John

3  Ortenzio?

4    A   I can't really recall the specific date, but

5  I, I believe it would have been sometime during the

6  week ending February 19th.  I think the year would

7  have been 2000.

8    Q   And how did you become aware of CCI

9  Construction?

10    A   I believe Mr. Gibson advised me that he had

11  received a call from an officer of the bank alerting

12  us to a meeting that we should plan on attending.

13    Q   And were you advised of what was

14  precipitating that meeting?

15    A   In general terms, I was -- I was advised

16  that there was a company in distress having some

17  difficulty and that our services may be required.

18    Q   Okay.  Was Mr. Gibson here in Baltimore on

19  that --

20    A   No.

21    Q   -- time?

## Gerard L. Elias

Page 8

1      Were you the only person from Baltimore who

2   was -- who attended that meeting by telephone?

3      A   Well, Mr. Gibson was in Baltimore --

4      Q   Okay.

5      A   -- for the telephone call --

6      Q   Right.

7      A   -- that you're referring to.

8      Q   But the meeting was in Harrisburg; is that

9   right?

10      The first meeting, which I think we agree

11   was on February 18th.

12         MR. GEBHARDT:  Correct.

13      A   Yes, I recall it was Friday, February 18th.

14   I believe the meeting was in Harrisburg, but we were

15   in Baltimore.

16      Q   You and Mr. Gibson attended by telephone?

17      A   Correct.

18      Q   Everyone else was up in Harrisburg?

19      A   I believe so.

20      Q   Okay.  What occurred at that meeting to the

21   best of your recollection?

**Gerard L. Elias**

1    A   We were advised that the company was in

2    severe distress.

3    Q   By whom?

4    A   By Mr. Ortenzio and, I believe, his attorney

5    was, was present as well.

6    Q   Did he use the word severe distress, or is

7    that your conclusion?

8    A   Oh, I don't recall.  I'm paraphrasing.

9    Q   Well, could you just tell me specifically if

10   you can, to the best of your recollection, what you

11   were told rather than what you concluded for the

12   moment?

13   A   We were told that the company was in severe

14   distress.

15   Q   Okay.  Why did -- was there any comment as

16   to why the company was in severe distress?

17   A   There were a number of jobs where problems

18   had arisen to where the company's -- that is, CCI's --

19   bonding company needed to be apprised of those

20   problems.

21       We were advised that there was an upcoming

**Gerard L. Elias**

1    A    Correct.

2    Q    Instantly, on the 23rd?

3    A    I believe so.

4    Q    And you made the decision to bounce CCI's

5    checks on the 23rd as well?

6    A    Correct.

7    Q    And that began on the 23rd?

8    A    I believe that's the date, yes.

9    Q    And that was prior to any written

10    declaration of default?

11    A    Correct.

12    Q    Was it a situation where the bank also

13    decided to reverse certain payments on checks that had

14    already just cleared?

15    A    I don't recall that.

16    Q    Did you review any documents prior to your

17    deciding to declare CCI in default?

18    A    Sure.

19    Q    Which documents did you review?

20    A    The loan documents.

21    Q    Pardon me?

## Gerard L. Elias

Page 21

1    A    The loan documents.

2    Q    The four million dollar line of credit note?

3    A    All of the loan documents.

4    Q    Okay.  The 1.2 million dollar note, the

5    equipment note, are those the documents?

6    A    I don't -- I don't know that I reviewed the

7    1.2 million dollar note because I don't know that I

8    was aware of it.

9    Q    Did you determine on the 23rd that there had

10    been a material adverse change in CCI's financials?

11    A    Well, certainly by that time, but actually

12    prior to that time.

13    Q    Okay.  Is there any written analysis of that

14    anywhere?

15    A    No.

16    Q    What documents did you review and rely upon

17    in determining that there had been a material adverse

18    change?

19    A    Company's financial position, statement.

20    Q    Who gave you those documents?

21    A    I received them probably from Craig Schwartz