

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK,                          :          CIVIL ACTION NO. 1:CV-01-0786

          **Plaintiff**          :

          v.                          :

JOHN M. ORTENZIO,                       :

          **Defendant**          :

### M E M O R A N D U M

Before the court are cross motions for summary judgment. The parties have briefed the issues and the motions are ripe for disposition.[1]

### I.        Background

The instant action involves a dispute between Plaintiff, Allfirst Bank, and Defendant, John Ortenzio, over Defendant's liability under a $1.2 million short-term commercial note and a $4 million line of credit. The court's subject matter jurisdiction is based on the parties' diverse state citizenship. *See* 28 U.S.C. § 1332. The following facts are undisputed unless otherwise noted.

At all times relevant to this litigation, Ortenzio was the President of CCI, Inc., a construction company. In March of 1999, Allfirst extended CCI an unsecured $4 million line of credit.[2] The letter of intent accompanying the credit contract authorized CCI to use the line to finance work in progress and accounts

---

[1]The court notes at the outset that both parties' briefs are written in twelve point font. Thus, technically, all briefs in this matter are in violation of Local Rule 5.1(c). The parties are admonished to comply with all local rules in their further dealings with the court.

[2]Actually, First Maryland Bank, Allfirst's predecessor in interest, extended the line of credit to CCI.

receivable. Additionally, the letter of intent sets out certain other terms and conditions governing the line of credit. Those conditions required CCI, *inter alia*, to submit to Allfirst: (1) annual financial audits; (2) quarterly work in progress reports; (3) quarterly financial statements for CCI; and (4) monthly certifications of accounts receivables stating the age of each account. Additionally, Allfirst required CCI to maintain its primary account for business deposits with Allfirst and have a tangible net worth of $4.5 million in order to draft checks drawing on the line. Officers of both Allfirst and CCI signed the letter of intent which states: "All terms and conditions contained herein shall survive the execution of such loan documentation." (Def. Ex. B at 2; Pl. Ex. A at 2.) On March 24, 1999, the parties signed a promissory note formalizing the agreement. The loan document also indicates that the parties agreed that Pennsylvania law would govern any disputes arising under the transaction.

Pursuant to the credit agreement, the line of credit had a cash management feature. Payments from CCI's customers would either be wire transferred by the customers directly to the account or deposited by CCI in an Allfirst account. If there was an outstanding balance on the line, the deposits would be applied against the line. If there was no outstanding balance on the line, then the positive balance in the account would be swept, on a daily basis, into an interest bearing investment. Interest generated through this process would then be credited to CCI. When CCI checks were presented to Allfirst for payment, any positive balance in its accounts would be used first to pay the checks. If this was insufficient, or if there was no positive balance available, the line of credit would be

2

accessed, and the checks would be honored by drawing on the line. Any amount remaining on the line was due in full on April 30, 2000.

During 1999, CCI's financial situation worsened. In November of that year, Ortenzio requested an extension of the unsecured line of credit to assist during a down period in CCI' cash flow cycle. After negotiations, Allfirst instead agreed to extend CCI an additional $1.2 million short-term note. Allfirst, however, required Ortenzio to secure this note by executing a surety agreement pledging his personal assets in the event CCI defaulted. The parties memorialized this agreement in a letter of intent, commercial loan note, and surety agreement. Allfirst contends that the parties mutually understood that repayment of the $1.2 million secured note would come from increased cash flow through collections on two large and problematic CCI accounts. (Pl. Stat. Mat. Facts at ¶ 14.) Ortenzio, however, argues that the terms of the $1.2 million short-term note did not limit the source of funds that could be used to discharge the debt. (Def. Stat. Mat. Facts at ¶ 3.) In any event, the note was to be paid in full by March 31, 2000.

After Allfirst issued the short-term note, CCI experienced more cash flow difficulties. Ortenzio was aware of CCI's financial problems and discussed the company's condition with Sheri Phillips, the Chief Financial Officer of CCI at all times relevant to this litigation. Many of these discussions centered around whether CCI should declare bankruptcy.

On Friday, February 11, 2000, Ortenzio personally delivered a CCI check in the amount of $1.2 million to Allfirst. After delivering the check, Ortenzio called Craig Schwartz, the Allfirst Vice President in charge of managing the CCI accounts, and requested that Allfirst return his personal guaranty on the note.

3

Accordingly, Schwartz put a rush request into Allfirst's document control section. The guaranty was subsequently returned to Ortenzio.

At the time Ortenzio delivered the check to Allfirst, CCI owed approximately $1.2 million on the $4 million line of credit. Because CCI had insufficient funds in its account to cover the check that Ortenzio delivered, Allfirst drew even further on the line of credit. Thus, the check increased CCI's debt to $2.4 million on the unsecured line of credit, while ostensibly discharging CCI's debt in full under the secured note. Allfirst contends that it erroneously returned Ortenzio's surety to him because it was unaware that the check discharging CCI's debt on the $1.2 million note accessed the line of credit. (Pl. Stat. Mat. Facts at ¶¶ 31-35.) Ortenzio, however, contends that Allfirst had to have known of this fact because CCI did not have any other checking accounts with Allfirst and the check bore the account number of CCI's cash management facility with Allfirst. (Def. Stat. Mat. Facts at ¶¶ 29-34.) Although it returned Ortenzio's guaranty, Allfirst never returned the $1.2 million note to CCI.

On February 18, 2000, a week after using the unsecured line of credit to discharge the secured note, a meeting occurred between Ortenzio and Allfirst personnel. At that meeting, Ortenzio presented a cash flow projection showing that CCI would have a cash shortage of almost $6 million through August of 2000. Allfirst contends that Ortenzio knew of CCI's precarious financial situation both when he authorized CCI to draft the $1.2 million check and when he scheduled the February 18, 2001 meeting. Furthermore, the cash flow projection did not take into account the manner that Ortenzio employed to discharge his personal guaranty. (Pl. Stat. Mat. Facts at ¶¶ 18 and 41-45.) Ortenzio again contends that Allfirst had to

4

have known that CCI accessed the $4 million unsecured line of credit by drafting the $1.2 million check. (Def. Resp. to Pl. Stat. Mat. Facts. at ¶¶ 41-45.)

After the meeting on February 18, 2000, Allfirst dishonored all CCI checks presented to it for payment. On February 23, 2001, Allfirst shut down the line of credit. The following day Allfirst declared CCI in default on the line of credit and demanded payment in full. At that point, Allfirst contends, Ortenzio had still not divulged the fact that he had accessed the $4 million unsecured line of credit in an attempt to discharge the $1.2 million note that his personal guaranty secured. (Pl. Stat. Mat. Facts at ¶ 53.) Ortenzio, however, insists that "Allfirst was well aware of the manner in which the $1.2 million loan had been repaid by CCI." (Def. Resp. to Pl. Stat. Mat. Facts at ¶ 53.)

On February 22, 2000 through February 25, 2000, CCI customers wired payments to CCI's Allfirst account totaling $2,317,291.28. This apparently discharged CCI's obligation under the $4 million line of credit except for the $1.2 million check that CCI used to discharge its debt under the $1.2 million commercial note. On May 19, 2000, CCI filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Middle District of Pennsylvania. On January 10, 2001, CCI, as debtor in possession, instituted an action to recover the customer payments as a preference pursuant to § 547 of the Bankruptcy Code. Trial of this matter is pending in the Bankruptcy court.

On May 4, 2001, Allfirst filed suit against Ortenzio. In Count I of the complaint, Allfirst alleges that Ortenzio breached his personal obligation pursuant to the surety agreement accompanying the $1.2 million short-term note. In Count II, Allfirst claims that it is entitled, as unsatisfied creditor under the $4 million

5

unsecured line, to be equitably subrogated to its own rights as creditor on the $1.2 million short-term note to collect the shortfall from Ortenzio personally. In Count III, Allfirst contends that Ortenzio committed common law fraud. On May 1, 2002, Ortenzio filed a motion for summary judgment. On May 14, 2002, Allfirst filed its motion for summary judgment.

## II.        **Legal Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in [his] complaint; instead, [he] must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324

(1986) (internal quotations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Id.*

The standards governing the court's consideration of Federal Rule 56(c) cross-motions are the same as those governing motions for summary judgment, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the non-movant. *Raymond Proffitt Found. v. U.S. Envt'l. Protection Agency*, 930 F. Supp. 1088, 1096 (E.D. Pa. 1996).

### III.        <u>Discussion</u>

Allfirst contends that it is entitled to summary judgment because: (1) discharge of the $1.2 million note by accessing the $4 million line of credit was conditioned on CCI satisfying, in full, its obligation under the $4 million line of credit; (2) as a creditor under the $4 million line of credit, Allfirst is entitled to be equitably subrogated to enforce Ortenzio's personal guaranty under the $1.2 million note; and (3) the undisputed facts indicate that Ortenzio committed common law fraud by repaying the $1.2 million secured note by borrowing under the unsecured $4 million line of credit.  Ortenzio, on the other hand, contends that he is entitled to summary judgment because: (1) Allfirst has failed to elucidate facts entitling it to recover from Ortenzio for breach of contract; (2) the doctrine of equitable subrogation is inapplicable under the undisputed facts in this case; and (3) the facts in this case do not establish the elements of fraud.

Because the undisputed facts in this case indicate that Allfirst cannot establish its claims in Counts I and II, the court will grant summary judgment in favor Ortenzio on those claims. However, there remain material issues of fact as to Allfirst's claim of fraudulent misrepresentation in Count III. Accordingly, the court will deny both parties' motions as to that claim.

### A.   **Conditional Payment**

In Count I of the Complaint, Allfirst alleges that it is entitled to pursue payment of the remaining amount due under the unsecured line of credit from Ortenzio based on his personal guaranty on the $1.2 million note. According to Allfirst, by paying off the note using funds under the line of credit, Ortenzio did not extinguish his obligation under the note. Rather, he simply conditioned the extinguishment of his personal guaranty on repayment in full of the unsecured line of credit. Because there remains an unpaid balance on the line of credit, Allfirst contends that it is entitled to recover Ortenzio's assets to satisfy this obligation. This, according to Allfirst, is known as the conditional repayment rule.

Not surprisingly, Ortenzio has a different view. According to his argument, he is not liable on either note. Because nothing in the documents memorializing the $1.2 million note limited the source of funds that could be used to extinguish the debt, the payment by accessing the line of credit was permissible and thus discharged the $1.2 million debt. At the same time, this had the effect of cancelling out Ortenzio's personal guaranty pursuant to the surety agreement. Because Ortenzio was not a party to the agreement governing the unsecured line of credit, he cannot be held personally liable for any remaining balance on that account.

8

The relevant question, however, is not whether the terms and the conditions governing the note prohibited CCI from paying it off by accessing the line of credit.  Instead, the proper inquiry is whether the check actually constituted a "payment" effectively discharging the debt under the note.  Because both the note and the check are negotiable instruments, the parties' rights are defined by Article 3 of the Pennsylvania Commercial Code.  *See* 13 Pa. Cons. Stat. §§ 3104(A) (defining negotiable instrument) and 3102(A) (stating that Article 3 applies to negotiable instruments).

Under the Commercial Code, a party may be discharged from liability on an instrument by any act or agreement that would discharge the obligee's contract for the payment of money.  *Id.* at § 3601(A).  Where a note or uncertified check is provided to satisfy an obligation, "the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken. . . . "  *Id.* at § 3310(B).  Where an uncertified check is offered to discharge an obligation, this suspension lasts "until dishonor of the check or until it is paid or certified."  *Id.* at § 3310(B)(1).  Once the check is paid, however, the underlying obligation is discharged.  *Id.*

In this case, it is uncontested that CCI drafted an uncertified check in an attempt to discharge its $1.2 million obligation to Allfirst.  Ortenzio contends that CCI's payment by accessing the unsecured line of credit discharged CCI's obligation under that note and released Ortenzio's personal guaranty under the accompanying surety agreement.  Although Allfirst contends that such a drafting violated the terms of the unsecured line of credit, it honored the check.  There can be no material dispute as to this fact.  The check was payable on demand.  *See id.* at §

9

3104(F) (defining a check as "a draft, other than a documentary draft, payable on demand and drawn on a bank").  Allfirst demanded payment, and received it in the form of a draw against the $4 million line of credit.  Allfirst never dishonored the check, which cleared because CCI had sufficient credit on the line.  Because the check was paid, the suspension of the obligation expired, discharging CCI's debt under the $1.2 million note and Ortenzio's accompanying surety.  *See id.* at § 3310.  Although drafting a check on the unsecured line of credit to pay off the note may have violated the terms of the line of credit, Ortenzio was not a party to that agreement.  While this may constitute sharp dealing, it is not a breach of the $1.2 million note that would entitle Allfirst to pursue Ortenzio personally.  Therefore, Allfirst has no recourse against Ortenzio for such a breach.

Allfirst also briefly argues that "this case, like the authorities Allfirst has cited, is a novation case."  (Pl. Reply Br. in Sup. Mot. for Sum. J. at 4.)  Because Allfirst did not intend to authorize a novation, it argues, the conditional payment rule suspends the obligations under the $1.2 million note until the unsecured line of credit is paid in full.  Because the line was never paid in full, Allfirst contends it is entitled to collect from Ortenzio based on his surety agreement linked to the $1.2 million note.

This interpretation misconceives the concept of a novation, which is defined as "the act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party."  Black's Law Dictionary 1091 (7th ed. 1999).  In this case, CCI did not, by drafting the check on the unsecured line of credit, unauthorizedly substitute a new obligation for an old one.  The line of credit was already in effect

before Allfirst issued the $1.2 million note.  Therefore, CCI did not create a new obligation, but simply transferred its obligation from one account to another.

Moreover, Allfirst's argument fails to recognize the most important fact in a conditional payment analysis.  That is, Allfirst does not mention that it paid the check that CCI drafted to discharge its $1.2 million obligation.  To support its theory of conditional payment, Allfirst relies heavily on the following passage from *First Pennsylvania Bank v. Triester*, 380 A.2d 826 (Pa. Super. Ct. 1977):

> [W]hen an obligee takes a negotiable instrument which is tendered in payment of a promise to pay money, the obligor is not discharged on the underlying promise of payment until the second instrument itself is paid; once the second instrument is due, the first instrument is revived.  The failure to pay on the second instrument gives rise to a cause of action on either instrument.

*Id.* at 830.  However, in this case, the second instrument is not the line of credit.  Instead, the second instrument is the check that CCI tendered to Allfirst in the amount of $1.2 million.  Once Allfirst honored that check, CCI's obligation was discharged as mandated by the conditional payment rule.  *See* 13 Pa. Cons. Stat. § 3310(B)(1) ("In the case of an uncertified check, suspension of the obligation continues until dishonor of the check or until it is paid or certified.  Payment or certification of the check results in discharge of the obligation to the extent of the amount of the check.")  Although Allfirst in essence paid itself off by using its own funds, it previously agreed to extend CCI an unsecured line of credit.[3]  To the extent

---

[3]Once again, even though such a use of the funds available under the line appears to violate the terms and conditions governing the line, CCI is the party responsible for this apparent breach. Despite its many statements that Ortenzio caused CCI to draft the check in question, Allfirst has not raised any basis for piercing the corporate veil in order to hold Ortenzio responsible for actions that he committed in the name of CCI.

that the check itself constituted a new obligation implicating the conditional payment rule, that obligation was discharged when Allfirst honored the check.

Therefore, as a matter of law, CCI did not breach the terms of the $1.2 million note. Consequently, Allfirst has no claim in contract against Ortenzio based on his personal guaranty to the $1.2 million note. Because Ortenzio is entitled to judgment as a matter of law, the court will grant summary judgment in his favor as to Count I of Allfirst's complaint.

### B.    Equitable Subrogation

In Count II of the complaint, Allfirst contends that Ortenzio has been unjustly enriched by using the proceeds of the unsecured line of credit to discharge his personal guaranty under the $1.2 million note. Thus, according to Allfirst, it is entitled to be equitably subrogated to its own rights under the $1.2 million note.

Under Pennsylvania law, equitable subrogation is an equitable doctrine that "aims to avoid unjust enrichment." *Greater New York Mut. Ins. Co. v. North River Ins. Co.*, 85 F.3d 1088, 1095 (3d Cir. 1996) (citing *United States Fid. & Guar. Co. v. United Penn Bank*, 524 A.2d 958, 964 (Pa. Super. Ct. 1987)). Equitable subrogation allows a claimant who pays the debt of another using his own funds to seek reimbursement from the debtor under circumstances in which the debtor would be unjustly enriched by the discharge of his debt to the creditor without reimbursing the claimant. *Gladowski v. Felczak*, 31 A.2d 718, 720 (Pa. 1943) (citations omitted). As an equitable remedy, equitable subrogation " 'does not arise from any contractual provision but is an assignment created by operation of law.' " *United Penn Bank*, 524 A.2d at 963-64 (quoting Comment, *Equitable Subrogation-Too*

12

*Hardy a Plant To Be Uprooted By Article 9 of the UCC?*, 32 Pitt. L. Rev. 580, 583 (1971)).

The following factors must be satisfied before a claimant is entitled to equitable subrogation. First, the claimant must have paid the creditor. Second, the claimant must have paid the creditor involuntarily. Third, the claimant must not have been primarily liable for the debt. Fourth, the entire debt to the creditor must be satisfied. Fifth, allowing subrogation will not result in injustice to the rights of any other party. *Tudor Dev. Group, Inc. v. United States Fid. & Guar. Co.*, 968 F.2d 357, 361 (3d Cir. 1992) (citing *United Penn Bank*, 524 A.2d at 963-64.

In this case, Allfirst is both the claimant – as the payor of the check from the $4 million line of credit – and the creditor – as the party who was paid under the $1.2 million note. Thus, Allfirst claims that "[t]o the extent proceeds from a borrowing under the line of credit were used to discharge the $1.2 million loan, Allfirst, as creditor under the line, is entitled to be equitably subrogated to the right it had, as holder of the $1.2 million loan, to enforce the Ortenzio guaranty." (Pl. Br. in Sup. Mot. for Sum. J. at 10-11.)[4] Ortenzio, on the other hand, contends that Allfirst is not entitled to equitable subrogation because it cannot establish that it paid the $1.2 million check in order to cover its interest or that it was secondarily liable for the debt; the first and third conditions for allowing equitable subrogation. More fundamentally, Ortenzio claims that Allfirst is not entitled to equitable subrogation because Allfirst has an adequate legal remedy.

Under Pennsylvania law, equitable relief is not appropriate where a party has an adequate legal or statutory remedy. *Clark v. Pennsylvania State Police*,

---

[4] Although Allfirst confuses the terminology, the meaning it intends to import is clear.

13

436 A.2d 1383, 1385 (Pa. 1981).  The legal remedy, however, must be both adequate and complete.  Equitable relief, therefore, is available "despite the existence of a legal remedy when, from the nature and complications of a given case, justice can best be reached by means of equity's flexible machinery." *Hill v. Nationwide Ins. Co.*, 570 A.2d 574, 576 (Pa. Super. Ct. 1990).  In determining whether a legal remedy is adequate, the court evaluates its availability; not the plaintiff's likelihood of prevailing. *Tudor Dev. Group*, 968 F.2d at 364 (holding that the fact that available legal remedies "might not make [the plaintiff] whole does not mandate a finding that such remedies are inadequate, thereby requiring this court to grant equitable relief.").  Instead, equitable relief is available where the plaintiff's injury "is of a repeated or continuing character or where monetary damages are difficult to ascertain or are inadequate." *Louis W. Epstein Family P'ship v. Kmart Corp.*, 828 F. Supp. 328, 337 (E.D. Pa. 1993); *see also Stuart v. Gimble Brothers, Inc.*, 131 A. 728, 730 (Pa. 1926).

In this case, Allfirst can either file a claim against CCI in the bankruptcy proceeding or a claim against Ortenzio personally for fraudulent misrepresentation (which it has done).  Moreover, Allfirst has not suffered an injury capable of repetition or one for which monetary damages would be difficult to calculate.  In fact the damages are quite easily calculable.  Allfirst seeks to recover the unpaid balance under the line of credit plus interest and attorney's fees.  (*See* Pl. Br. in Sup. Mot. Sum. J. at 7.)

Furthermore, on facts similar to those in this case, the Third Circuit held that a bank that issued a letter of credit was not entitled to equitable subrogation to collect funds paid to the customer by a party unrelated to the original

14

letter. *Tudor*, 968 F.2d at 364. In that case, the bank issued a letter of credit indicating that it would pay a local government the cost of completing the customer's construction project in the event its customer failed to complete performance under a subdivision contract with the local government. *Id.* at 358-59. Additionally, as collateral to this agreement, the bank required the customer's general partner to issue a promissory note pledging certain performance bonds as collateral. *Id.* at 359. However, the bank never required the customer to pledge bonds it held. When the customer failed to complete performance, the bank was required to make a large payment to the local government pursuant to the letter of credit. *Id.* In order to recover its loss, the bank sought to be equitably subrogated to its customer's claim in order to recover payments made to the customer under the bonds in which the bank held no interest. The Third Circuit, though, held that equitable subrogation was not available to the bank because it had adequate legal remedies. *Id.* at 364. In making this determination, the court noted that the bank could instead pursue causes of action against its customer for reimbursement under the credit agreement or against the customer's general partner for the performance bonds under the collateral promissory note. *Id.*

Similarly, Allfirst has viable legal claims against Ortenzio for fraudulent misrepresentation, *see infra* Part III.C., and CCI for breach of the terms of the $4 million line of credit. Although either of these remedies may appear undesirable to Allfirst – the first because it requires Allfirst to satisfy the exacting clear and convincing evidentiary standard and the second because of CCI's impecunious status – that does not render these remedies unavailable or inadequate. *See Willing v. Mazzocone*, 393 A.2d 1155, 1158 (Pa. 1978) ("In Pennsylvania the

15

insolvency of a defendant does not create a situation where there is no adequate remedy at law. In deciding whether a remedy is adequate, it is the remedy itself, and not its possible lack of success that is the determining factor."); *see also Bersch v. Rust, Trustee*, 249 Pa. 512, 514, 95 A. 108 (1915) (quoting *Heilman v. Union Coal Co.*, 37 Pa. 100, 104 (1860)).

Because Allfirst has an adequate remedy at law, the court will not apply the doctrine of equitable subrogation to Allfirst's claim against Ortenzio. Therefore, the court will grant summary judgment in favor of Ortenzio and against Allfirst as to Count II of the complaint.

## C.    **Fraudulent Misrepresentation**

In Count III of the complaint, Allfirst contends that Ortenzio committed common law fraud when he presented the CCI check that ostensibly discharged the $1.2 million note. Ortenzio contends that he is entitled to summary judgment on this count because Allfirst has not adduced facts demonstrating that Ortenzio made a material misrepresentation of fact upon which Allfirst reasonably relied to its detriment. Likewise, Allfirst moves for summary judgment on Count III, arguing that the undisputed facts in this case demonstrate that it is entitled to judgment as a matter of law on its claim of fraud.

Under Pennsylvania law, in order to recover for the tort of fraud, a plaintiff must prove: (1) that the defendant made a representation to the plaintiff; (2) of a fact material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it was true or false; (4) with the intent of misleading the plaintiff into relying upon the misrepresentation; (5) that the plaintiff relied upon the misrepresentation to his detriment; and (6) the resulting injury was

proximately caused by the reliance. *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994) (citing Restatement (Second) of Torts § 525 (1977)). In determining whether reliance is reasonable, the court must take into account the parties' level of sophistication and their course of dealing. *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs.*, 951 F.2d 1399, 1411-12 ; *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993).

The tort of fraudulent misrepresentation has the same elements as fraud except that in the case of fraudulent misrepresentation one party intentionally conceals a material fact instead of making an affirmative misrepresentation. *GMH Assoc., Inc. v. The Prudential Realty Group*, 752 A.2d 889, 901-02 (Pa. Super. Ct. 2000). The elements of both fraud and misrepresentation must be proved by clear and convincing evidence. *Lind v. Jones, Lang LaSalle Americas, Inc.*, 135 F. Supp.2d 616, 621 (E.D. Pa. 2001) (citing *Snell v. Commonwealth*, 416 A.2d 468, 470 (Pa. 1980)).

Ortenzio contends that he is entitled to summary judgment because Allfirst has failed to adduce facts indicating that he made any false affirmative statement of fact. Thus, according to Ortenzio, Allfirst cannot establish the first element of its cause of action; that Ortenzio made a false misrepresentation. The court disagrees.

"The first element – a misrepresentation – is established if the misrepresentation was made knowingly, in conscious ignorance of the truth, or with reckless disregard of the truth or falsity of the statement." *Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599, 607 (M.D. Pa. 1994) (citing *Delahnaty v. First Pennsylvania Bank*, 464 A.2d 1243, 1252 (Pa. Super. Ct. 1993)). The concealment

of a material fact can amount to a culpable misrepresentation to the same extent as an intentional false statement. *Commonwealth v. Monumental Properties, Inc.*, 329 A.2d 812, 829 (Pa. 1974).

        In this case, it is undisputed that Ortenzio did not inform Allfirst that the $1.2 million check would draw upon the $4 million line of credit. Both Schwartz and Phillips testified during their depositions that Ortenzio made assurances to Allfirst that the $1.2 million note would be paid off by using excess cash flow from CCI's problematic accounts, not by drawing on the unsecured line.[5] (*See* Philips Depo. at 34-35; Schwartz Depo. at 183.) Even if Ortenzio never made such a representation, if instead he knew that CCI would have insufficient funds to cover the draft, then this would violate the terms of the line of credit. Those terms specifically limited the use of the line of credit to financing works in progress and accounts receivable and also required that CCI maintain a net worth of $4.5 million to access the line of credit. If Ortenzio knew that the check would violate the terms, then he was under an affirmative obligation to inform Allfirst. A deliberate failure to disclose such a fact constitutes fraud. *See Fox's Foods, Inc.*, 870 F. Supp. at 609 (quoting *Marian Bank v. International Harvester Credit Corp.*, 550 F. Supp. 456, 461 (E.D. Pa. 1982)); *see also* Restatement (Second) of Contracts § 161 (b) (stating that non-disclosure of a material fact constitutes a misrepresentation "disclosure of

---

[5]This evidence, alone, would be insufficient to establish a fraudulent misrepresentation. *See Wood v. R.R. Donnelly & Sons Co.*, 888 F.2d 313, 318 (3d Cir.1989) (Under Pennsylvania law, "promises to do future acts do not constitute a valid fraud claim.") However, it is relevant in establishing Allfirst's reasonable reliance. That is, if Ortenzio made these repeated assertions then, absent any other statement from him to the contrary, Allfirst would reasonably assume that the $1.2 million check would come from that source of money. This is especially true in light of the fact that Ortenzio presented the check to Allfirst on February 11, 2000 – over a month and a half before the note was to become due.

the fact would correct a mistake of the other party as to a  basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing"). Obviously, the fact that the check would change the status of CCI's obligation from one secured by Ortenzio's personal assets to one completely unsecured is a material fact. (*See* Schwartz Depo. at 181-82 ("Q: Had you known on or about February 11, 2000, that the check presented by Mr. Ortenzio on behalf of CCI represented a draw on the four million dollar revolving line of credit, what action, if any, would you have taken? A: I would not have honored the check.").)

However, Ortenzio testified during his depositions that he did not actually know that the funds in the CCI cash management facility would be insufficient to cover the $1.2 million check. (Ortenzio Depo. at 119.) Instead, he contends that he erroneously assumed that the problematic accounts would come through with their payments and that those funds would cover the check. On the other hand, Phillips testified that she had conversations with Ortenzio immediately prior to February 11, 2000 in which Ortenzio tacitly acknowledged that the company would sustain a very large loss and might have to file for bankruptcy. (Phillips Depo. at 41-44.) Thus, there appears to be a genuine dispute as to what Ortenzio knew, at the time he caused CCI to draft the $1.2 million check, regarding CCI's financial condition and its ability to cover the check. Moreover, Ortenzio contends that Allfirst had to have known that the $1.2 million check would draw upon the line of credit because the check bore the account number corresponding to CCI's cash management facility. Therefore, according to Ortenzio, any reliance by

19

Allfirst on its assumptions as to the source of payment for the check were not reasonable.

These differing interpretations indicate that there are genuine disputes of material fact regarding whether Ortenzio deliberately hid the fact that the $1.2 million check would draw upon the $4 million line of credit. If Allfirst can establish that Ortenzio knew that CCI's debtors would be unable to make their payments to CCI and that, consequently, the check would draw upon the $4 million line of credit – thereby discharging his personal obligation under the $1.2 million note – then Ortenzio was required to inform Allfirst of this fact. His failure to do so, if proven, would constitute a fraudulent misrepresentation. However, based on the record currently before the court, in addition to the fact that such claims are subject to the more exacting clear and convincing standard of proof, the court will not grant judgment as a matter of law. Accordingly, the court will deny both parties' motions for summary judgment as to Count III of the complaint.

## IV.    Conclusion

The court will grant in part, and deny in part, Defendant's motion for summary judgment. The court will grant Defendant's motion as to Counts I and II of Plaintiff's complaint. However, the court will deny Defendant's motion as to Count III. The court will deny Plaintiff's motion for summary judgment. An appropriate order will issue.

SYLVIA H. RAMBO
United States District Judge

Dated: July  *16*  , 2002.

20