**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK, | : | |
| Plaintiff, | : | |
| v. | : | CASE NO. 1:01-CV-786 |
| JOHN M. ORTENZIO, | : | J. Rambo |
| Defendant. | : | |

FILED
HARRISBURG, PA
JUL 19 2002
MARY E. D'ANDREA, Cl.
Per _____ Deputy Clerk

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION PURSUANT TO RULE 56(d)

Defendant, John M. Ortenzio ("Mr. Ortenzio"), by his undersigned counsel, submits this Memorandum of Law in Opposition to Plaintiff, Allfirst Bank's ("Allfirst") Motion pursuant to Fed.R.Civ.P. 56(d).

Allfirst's Motion misapplies the scope and purpose of Rule 56(d). Rule 56(d) permits a district court, where "practicable" to make a summary adjudication of facts that are not in dispute. Rule 56(d). It is apparent that Allfirst's Motion seeks to avoid Allfirst's more exacting clear and convincing standard of proof necessary to establish Allfirst's fraud claim under Count III of Allfirst's Complaint. Such a summary adjudication under Rule 56(d) is inappropriate where, as here, the record for the Court is incomplete as to the fraud claim. Court's July 16, 2002 Opinion at 20. The Court recognized that:

> Based on the record currently before the Court, in addition to the fact that such claims are subject to more exacting clear and convincing standard of proof, the Court will not grant judgment as a matter of law.

Id.

The Court's July 16, 2002 Opinion dismissed the breach of contract and equitable subrogation claims (Counts I and II) thereby significantly narrowing the trial. The Opinion, as set forth above, did not make findings regarding the fraud claim, particularly applying the standard of clear and convincing proof. It is respectfully submitted that the Court reject Allfirst's attempts to avoid its heightened standard of proof and deny its motion. Specifically, according to the Court's Opinion, trial is needed on several issues. Count III of Allfirst's Complaint alleges that Mr. Ortenzio is liable for common law fraud on the basis of a single alleged misrepresentation:

> Delivery of the check amounted to and was the equivalent of a representation by Ortenzio that payment of the One Million Two Hundred Thousand Dollar loan was being made by CCI or by Ortenzio through CCI with monies other than those borrowed under the revolving line of credit.

Complaint at ¶ 34.

Trial is necessary on disputed issues including, but not limited to, the following:

2

— Whether Ortenzio ever represented to Allfirst that the $1.2 Million loan would be repaid by using CCI's excess cash flow;

— Whether Allfirst Bank relied upon a representation that the $1.2 Million loan would be repaid by using excess cash flow only; and

— Whether prior to February 11, 2000 (the date the $1.2 Million loan was repaid by CCI) Mr. Ortenzio intended that the Company file for bankruptcy.

Contrary to the Court's Opinion at page 18, neither Schwartz nor Phillips testified during their depositions that Ortenzio made assurances to Allfirst that the $1.2 Million Note would be paid off by using excess cash flow from CCI's problematic account, and not by drawing on the secured line. The pages of the Phillips and Schwartz' depositions cited in the Court's Opinion at page 18 are attached hereto as Exhibits "A" and "B", respectively. Phillips testified that she relied on cash flow projections that showed that cash flow would be sufficient to repay the $1.2 Million loan, that she believed the projections were accurate, that she provided them to Ortenzio, and that she did not recall telling the bank that cash flow would be source of repayment. Exhibit "A", Phillips Dep. at 34:8-14. See also, id. at 75:3-20. There was no testimony to the effect that Ortenzio represented to Allfirst that the $1.2 Million Note would be repaid by using excess cash flow or any requirement under the CCI/Allfirst loan documents that the repayment come from excess cash flow.

3

Similarly, Schwartz's testimony, at page 183, states only that based on Schwartz' discussions with Mr. Ortenzio and financial documents furnished, that Mr. Schwartz anticipated the $1.2 Million Loan being repaid from excess cash flow. Exhibit "B", Schwartz Dep. at 183:7-11. See also, id. at 57:7-10. There was no representation by Ortenzio and nothing in the $1.2 Million loan document that limited CCI's source of repayment.

These are merely examples of the incomplete nature of the record on the fraud count which require a full hearing on these issues, especially in light of Allfirst's more exacting, clear and convincing standard of proof.

## CONCLUSION

Based upon the forgoing reasons, Defendant, John M. Ortenzio, respectfully requests that this Honorable Court deny Allfirst's Motion Pursuant to Rule 56(d).

Respectfully submitted,

BLANK ROME COMISKY &
McCAULEY LLP

BY: _____
EDWARD I. SWICHAR, ESQUIRE
ROBERT A. BURKE, ESQUIRE
One Logan Square
Philadelphia, PA 19103
(215) 569-5500
*Attorneys for Defendant
John M. Ortenzio*

Dated: July 18, 2002

4

```
  1         IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
  2
     ALLFIRST BANK,              :
  3        PLAINTIFF             :
           VS                    :   NO:  1:01-CV-786
  4  JOHN M. ORTENZIO,           :
           DEFENDANT             :
  5
  6       DEPOSITION OF:    SHERI PHILLIPS
  7       TAKEN BY:         PLAINTIFF
  8       BEFORE:           HILLARY M. HAZLETT, REPORTER
                            NOTARY PUBLIC
  9
 10       DATE:             MARCH 13, 2002, 10:43 A.M.
 11       PLACE:            ALLFIRST BANK BUILDING
                            213 MARKET STREET
                            14TH FLOOR
 12                         HARRISBURG, PENNSYLVANIA
 13
     APPEARANCES:
 14
     GEBHARDT & SMITH
 15  BY:  LAWRENCE J. GEBHARDT, ESQUIRE
 16       FOR - PLAINTIFF
 17  BLANK, ROME, COMISKY & McCAULEY, LLP
     BY:  EDWARD I. SWICHAR, ESQUIRE
 18
          FOR - DEFENDANT
 19
     HARTMAN, OSBORNE & JOYCE, P.C.
 20  BY:  MELINDA S. JOYCE, ESQUIRE
 21       FOR - SHERI PHILLIPS
 22  ALSO PRESENT:
 23  JAMIN M. GIBSON
     JOHN M. ORTENZIO
 24
 25
```

Page 2

```
  1                I N D E X
  2                  WITNESS
  3  FOR PLAINTIFF    DIRECT  CROSS  REDIRECT  RECROSS
  4  Sheri Phillips     3      60     101       111
  5
  6                  EXHIBITS
  7  DEPOSITION EXHIBIT NO.                    MARKED
  8  1 - 3/23/1999 Letter                        12
  9  2 - Film/cash Solutions                     13
 10  3 - Audit Report                            21
 11  4 - 10/26/1999 Inter-office Memorandum      24
 12  5 - 11/4/1999 Inter-office Memorandum       25
 13  6 - 11/5/1999 Letter                        31
 14  7 - Commercial Loan Note                    32
 15  8 - Income Statement                        40
 16  9 - Balance Sheet                           40
 17  10 - Cash Flow Projections                  49
```

Page 3    Exh. A

```
                    STIPULATION
  2       It is hereby stipulated by and between
  3  counsel for the respective parties that reading,
  4  signing, sealing, and certification are waived; and
  5  that all objections except as to the form of the
  6  question are reserved to the time of the trial.
  7
  8       SHERI PHILLIPS, called as a witness, being
  9  duly sworn, testified as follows:
 10
 11              DIRECT EXAMINATION
 12
 13  BY MR. GEBHARDT:
 14  Q    Would you let us know first your residence
 15  and then your business addresses?
 16  A    Residence is 2837 North Front Street, Suite
 17  302, Harrisburg, PA 17110.
 18  Q    And your business address?
 19  A    515 North Office Building, Harrisburg, PA
 20  17125.
 21  Q    And where are you presently employed?
 22  A    Commonwealth of Pennsylvania.
 23  Q    And what do you do for the Commonwealth of
 24  Pennsylvania?
 25  A    I'm the Deputy Secretary of Administration
```

Page 4

```
  1  and General Services.
  2  Q    How long have you had that position?
  3  A    Since July.
  4  Q    Prior to that time, where did you work?
  5  A    I did consulting for one company, and I
  6  also worked with another company that was part-time
  7  that I had helped start.
  8  Q    And at some point in time, you worked for a
  9  company known as CCI Construction?
 10  A    That's correct.
 11  Q    And when did you leave CCI?
 12  A    It was -- I think my last day was around
 13  May 5th, 2000.
 14  Q    And when did you begin working for CCI?
 15  A    In September of 1991.
 16  Q    Would you relate for me just briefly what
 17  your positions with CCI were from September 1991
 18  through the date you left in terms of a job
 19  description and just a brief outline of what your
 20  duties were?
 21  A    When I started, I worked for Dave Barber
 22  and I was the controller. I think that was my title.
 23  My titles changed kind of in between there. I was
 24  responsible for the accounting, and I reported to
 25  Dave. I think his title was chief financier at the
```

33

1 quote, if no demand is made, the loan will expire and
2 all borrowings will be due and payable, comma,
3 together with interest thereon, on March 31, 2000 --
4       MS. JOYCE: For the record, you're talking
5 about the second to the last paragraph on page 1 of
6 Exhibit No. 6?
7       MR. GEBHARDT: Yes.
8 BY MR. GEBHARDT:
9    Q   -- period, unquote. Was it your
10 understanding that the $1,200,000 loan was due from
11 CCI on or about March 31, 2000?
12   A   Yes.
13   Q   In the course of the meetings that you may
14 have had with Mr. Zarcone and Mr. Schwartz on behalf
15 of Allfirst, was there any discussion of where CCI
16 was going to get the money to repay the $1,200,000
17 loan by March 31, 2000?
18   A   As I recall, it was definitely discussed.
19 Whether it was at that meeting or in the paperwork
20 afterwards on the phone, I'm pretty sure it was at
21 that meeting. Yes, we had discussions about how that
22 money would be paid back.
23   Q   And what was the substance of those
24 discussions?
25   A   That the cash flow that we would have

34

1 coming in from receivables and projects would
2 generate enough cash to pay this down on a short-term
3 basis.
4    Q   In the discussions, was it discussed that
5 CCI would repay the $1.2 million loan by making a
6 borrowing on the $4 million line of credit?
7    A   No, it was not.
8    Q   I note on Exhibit 4 that again there's the
9 reference to the $4 million Scott Air Force Base
10 receivable. Did that $4 million receivable have any
11 relationship to a source of funds to repay the $1.2
12 million loan?
13   A   I don't recall if that -- if that was
14 specifically said or not.
15   Q   Now, at the time the $1.2 million loan was
16 being taken out, I take it you had discussions with
17 Mr. Ortenzio about the borrowing?
18   A   That's correct.
19   Q   And did you and Mr. Ortenzio discuss where
20 CCI would obtain the funds to repay the $1.2 million
21 when it came due which, according to the commitment
22 letter, was March 31, 2000?
23   A   Yes, we did.
24   Q   And what was the substance of those
25 discussions?

35

1    A   I had done some cash flow projections. I
2 know John was adamant about having this paid back on
3 a short-term basis. When I gave him the cash flow
4 projections, I had said that if the job profits that
5 are projected hold, we would have the money to pay
6 back this 1.2 million.
7       I also told him that we had seen declining
8 job profit projections over time. I said, I'm not
9 making the projections on the jobs. That's what I've
10 been given from the people in operations. Each month
11 they were decreasing.
12      I said, based on what the most current
13 projections were, if they came in at that amount, we
14 would have the cash flow to pay back the 1.2 million.
15   Q   At the time you were having these
16 discussions with Mr. Ortenzio, were there any
17 discussions about using a borrowing under the $4
18 million line of credit to repay the $1.2 million
19 guaranteed note?
20   A   No, there were not.
21   Q   In 1999 and the year 2000, did
22 Mr. Ortenzio, to your knowledge, have any involvement
23 in the repaying of the loans to Allfirst Bank?
24   A   Which loans?
25   Q   Well, there were three loans. You had the

36

1 line of credit -- let's start first with the $4
2 million line of credit. Did he get involved in how
3 that was being paid or repaid at all?
4    A   I'm not sure.
5       MS. JOYCE: What time?
6       MR. GEBHARDT: In 1999 and 2000.
7       THE WITNESS: Did he get involved in how it
8 was repaid?
9 BY MR. GEBHARDT:
10   Q   Or the process, the repayment process?
11   A   No, that was the line of credit. As the
12 cash came in, it was paid down.
13   Q   How about the repayment of the equipment
14 loan?
15   A   No, he did not.
16   Q   Okay. Now, the $1.2 million loan was
17 repaid by CCI on or about February 11, 2000, by the
18 delivery of a check by Mr. Ortenzio personally to
19 Allfirst.
20      Prior to that date, had you had any
21 discussions with Mr. Ortenzio about the repayment of
22 the $1.2 million line of credit?
23   A   Yes. He had come to me about that.
24   Q   And what was the substance of the
25 discussions you had?

73
1       I believe you testified that it was
2  anticipated that CCI would repay the 1.2 million from
3  cash flow that was projected if the projections held
4  true. Is that a fair statement?
5       A    That's correct.
6       Q    Now, with whom did you have those
7  discussions -- Mr. Ortenzio, the bank, or both?
8       A    I definitely had the discussions with John;
9  and as I recall, we had those same discussions with
10 the bank also.
11      Q    Am I correct in stating that the
12 projections that CCI was relying upon turned out not
13 to come to fruition?
14      A    That's correct.
15      Q    When the $1.2 million note and related
16 surety was signed, did you believe those projections
17 to be capable of being fulfilled based on your
18 financial experience with the company?
19      A    As I said, I had concerns; and when I had
20 talked to John about those projections, I said those
21 were based on what operations were projected for the
22 loss or profits on each of those jobs. I had pointed
23 out at that time that those profits and/or losses,
24 they were decreasing throughout the year.
25      Q    Well, did you tell the bank at any time

74
1  that you didn't expect the projections to be
2  accurate?
3            MS. JOYCE:  Object to the form of the
4  question. You can answer.
5            THE WITNESS:  Say it again.
6  BY MR. SWICHAR:
7       Q    Did you ever tell the bank at or about the
8  time the $1.2 million note was signed that you didn't
9  expect those projections that were going to be the
10 source of the payment to be accurate and true?
11      A    I didn't say they weren't accurate or true.
12 What I said is -- when I gave them to John, I said,
13 this is what I've been given by operations.
14 Operations, in the past, has shown the profits on the
15 jobs decreasing; but as of that point in time,
16 information I gave to him, I said, that's the best
17 that I can do.
18      Q    Did you believe those projections that
19 operations provided to you to be true and correct as
20 far as projections can go?
21      A    I believed at that time that they were
22 given as true as they could project, yes.
23      Q    When did you have discussions with the bank
24 regarding the $1.2 million note where you said that
25 there were discussions that you had that you expected

75
1  the note to be repaid from projected cash flow? When
2  did that occur?
3       A    That's what I'm saying, I think -- I can't
4  guarantee that that discussion occurred with the bank
5  as to how we were paying it back. I know that John
6  and I discussed it. I think that that was in -- it
7  may have been part of the discussion with the bank,
8  but I can't recall that part. I can't recall
9  exactly.
10      Q    You may have told the bank or there may
11 have been discussions with the bank at which you were
12 present that projected cash flow would be the source
13 of repayment.
14           I'm trying to find out whether or not you
15 have an actual recollection of that statement being
16 given to the bank by you or by Mr. Ortenzio in your
17 presence.
18      A    And that's where I'm saying I just don't
19 have an exact recollection of that part of the
20 conversation.
21      Q    Do you recall the bank ever requesting CCI
22 through you or Mr. Ortenzio including a provision in
23 the $1.2 million note which would have required the
24 repayment to come from projected cash flow?
25      A    Say that again.

76
1       Q    Would you -- do you have any recollection
2  of the bank ever stating to CCI, either to you or
3  Mr. Ortenzio, that it wanted to include a provision
4  in the $1.2 million note that it could only be repaid
5  from projected excess cash flow?
6       A    I don't recall that, no.
7       Q    Do you recall the bank ever requesting a
8  provision in the $1.2 million note which prohibited
9  -- which would have prohibited the repayment from the
10 $4 million line of credit?
11      A    I do not recall any conversation with the
12 bank of making a payment from the $4 million line of
13 credit one way or the other.
14      Q    One way or the other?
15      A    Yeah.
16      Q    Now, you've seen from the commitment
17 letters that the $4 million note was due on April
18 30th of 2000; and the $1.2 million note was due one
19 month earlier on March 31st, 2000.
20           I'm not going to have this remarked, but it
21 originally was Schwartz 6, if everyone agrees, which
22 appears to be an Allfirst memorandum dated November
23 2, 1999.
24           Just to put this in the proper context, Ms.
25 Phillips, if you look at Phillips 5, which you have

Craig J. Schwartz

Exh B

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3    ALLFIRST BANK            :

4        Plaintiff        :

5    v.                :  CA NO. 1:CV-01-0786

6    JOHN M. ORTENZIO            :

7        Defendant    :  Pages 1 - 216

8            ----------

9

10

11

12        Deposition of Craig J. Schwartz

13            Baltimore, Maryland

14        Friday, February 15, 2002

15

16

17

18

19

20

21  Reported by:  Kathleen R. Turk, RPR-RMR

**Esquire Deposition Services**                1-800-441-3376

## Craig J. Schwartz

Page 57

1     Q    Was there any discussion whether this was
2 going to be a short-term or a long-term facility?
3     A    Short-term, I believe.
4     Q    What is short-term in relation to long-term?
5          Make sure we're on the same wavelength.
6     A    Short-term would be less than a year.
7     Q    Okay. Were any documents presented to you
8 by CCI in connection with your granting the 1.2
9 million dollar loan facility?
10    A    Yes, I believe they were.
11    Q    What documents were provided to you and
12 relied upon?
13    A    I don't specifically recall exactly what
14 documents were, were given.
15    Q    No -- no general idea as to what documents
16 were provided?
17    A    Financial statements, current financial
18 statements of the customer.
19         There may have been others.
20    Q    Do you recall that, or are you just assuming
21 it?

## Craig J. Schwartz

1  because the cash flow situation of the company was in
2  a depo -- disposition.
3     Q   Did Mr. Ortenzio express at all how long he
4  believed that cash flow problem would continue?
5     A   I believe some cash flow projections given
6  to us indicated February, through the end of February.
7     Q   And from what source based on your
8  discussions with Mr. Ortenzio in November of 1999 did
9  you anticipate the 1.2 million dollar loan being
10 repaid?
11    A   Excess cash flow.
12    Q   Okay.  And based on Mr. Ortenzio's
13 discussions, did you expect that excess cash flow to
14 put CCI in a positive cash position?
15    A   Yes.
16    Q   And would you have expected at the time of
17 the 1.2 million --
18         MR. SWICHAR:  Object to all these
19 leading questions.
20         MR. GEBHARDT:  That's fine.
21    Q   (By Mr. Gebhardt) Would you have expected

## CERTIFICATE OF SERVICE

Robert A. Burke, attorney for Defendant, John Ortenzio, hereby certifies that he caused a true and correct copy of Defendant's Memorandum of Law in Opposition to Plaintiff's Motion Pursuant to Rule 56(d) to be served upon the following on this 18th day of July, 2002, by Federal Express next day delivery:

Lawrence Gebhardt, Esquire
Gebhardt & Smith, LLP
The World Trade Center, Ninth Floor
Baltimore, MD  21020-3064

_____
ROBERT A. BURKE

5