# ORIGINAL

*⇒ to cv*

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

### CASE NO.: 1:01-CV-786  *J Rambo*

---

### ALLFIRST BANK,

#### Plaintiff

#### v.

### JOHN M. ORTENZIO,

#### Defendant

**FILED**
HARRISBURG, P

JUL 2 3 2002

MARY E. D'ANDREA, CLE
Per _____
      **Deputy Clerk**

---

## PLAINTIFF'S TRIAL BRIEF

---

**Lawrence J. Gebhardt**
**Ramsay M. Whitworth**
**GEBHARDT & SMITH, LLP**
**401 East Pratt Street**
**Baltimore, Maryland 21202**
**(410) 752-5830**
*Counsel for Plaintiff, Allfirst Bank*

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   The Facts Allfirst Will Prove By Clear and Convincing Evidence  . . . . 2

    A.    The $4 million line is established to finance accounts
       receivable and work in progress . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The $1.2 million guaranteed loan is made to help CCI's
       short term cash flow problem . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    CCI's financial condition plummets . . . . . . . . . . . . . . . . . . . . . . 6

    D.    Ortenzio's ploy to escape liability under his guaranty . . . . . . . . 7

         1.    Ortenzio knew he was paying the loan with a borrowing
            while CCI was insolvent and hid the fact from Allfirst . . . 7

         2.    Allfirst had no knowledge or ability to know that
            Ortenzio improperly had paid the Bank with its own
            money while CCI was insolvent . . . . . . . . . . . . . . . . . . . . . 9

    E.    Ortenzio discloses CCI's precarious financial condition
       to Allfirst . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    F.    Ortenzio compels Allfirst to shut down the line of credit . . . . . 14

    G.    Allfirst declares a default and CCI files bankruptcy . . . . . . . . . 15

    H.    Allfirst's Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  Law and Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**IV.    Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

**Certification Pursuant to Local Rule 7.8(b)** . . . . . . . . . . . . . . . . . . . . . . . . **21**

**Certificate of Service** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

# TABLE OF POINTS AND AUTHORITIES

*Borelli v. Barthel,*
    205 Pa. Super. 442, 211 A.2d 11 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Bortz v. Noon,*
    556 Pa. 489, 499, 729 A.2d 555, 556 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Delahanty v. First Pennsylvania Bank, N.A.,*
    318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983) . . . . . . . . . . . . . 16, 17

*Derby & Co.,Inc. v. Seaview Petroleum Company,*
    756 F. Supp. 868 (E.D. Pa. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Fox's Foods, Inc. v. Kmart Corp.,*
    870 F. Supp. 599 (M. D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Frowen v. Blank,*
    493 Pa. 137, 143, 425 A.2d 412, 415 (1981) . . . . . . . . . . . . . . . . . . . . . . . 16

*McClellan's Estate,*
    365 Pa. 401, 75 A.2d 595 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Moser v. SeSetta,*
    527 Pa. 157, 589 A.2d 679 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Neuman v. Corn Exchange Nat. Bank & Trust Co.,*
    356 Pa. 442, 51 A.2d 442 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sonfast Corporation v. York International Corporation,*
    875 F. Supp. 1088 (M.D. Pa 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK | * | |
| Plaintiff, | * | |
| v. | * | CASE NO.: 1:01-CV-786 |
| JOHN M. ORTENZIO | * | |
| Defendant. | * | |

*************************************************************

## PLAINTIFF'S TRIAL BRIEF

### I.
### Introduction.

Plaintiff, Allfirst Bank, brought this suit against Defendant, John M. Ortenzio, to nullify his attempt to improperly obtain a discharge of his personal guaranty and to enforce that guaranty against him.  Ortenzio caused his wholly owned company, CCI Construction Co., Inc., to draw on an unguaranteed line of credit to prepay a short term loan which Ortenzio had guaranteed just before  CCI financially collapsed. The circumstances of the payment amounted to common law fraud and fraudulent concealment.  Specifically, Allfirst will prove by clear and convincing evidence that:

1.      Ortenzio knew that the issuance of the check would constitute a borrowing on the unguaranteed line of credit because CCI was in desperate need of

cash and could not repay the $1.2 million loan other than by borrowing on the line of credit.

2.      Ortenzio knew that Allfirst was completely unaware of CCI's imminent financial collapse and never disclosed to Allfirst that he was causing the $1.2 million loan to be repaid with a borrowing under the unguaranteed line at a time when CCI was in default and not eligible to borrow any money under the line of credit.

3.      Allfirst did not know of CCI financial condition or that the repayment of the $1.2 million loan came from a borrowing on the line of credit at a time when CCI was in default and ineligible to borrow.  Allfirst only learned of the borrowing to repay the $1.2 million loan after CCI was declared in default and enforcement action had begun.

## II.
### The Facts Allfirst Will Prove By Clear and Convincing Evidence.

### A.      The $4 million line is established to finance accounts receivable and work in progress.

In March of 1999, Allfirst extended to CCI a $4 million line of credit.  The sole purpose of the line of credit, as expressly stated in the March 24, 1999 commitment letter, was to finance CCI's accounts receivable and work in progress.  This meant that the line of credit funds were to be used solely to provide short term working capital to pay monthly bills until current accounts receivable were paid by customers.

No other use of loan proceeds was permitted, as both Craig Schwartz, the Allfirst loan officer, and Sheri Phillips, CCI's chief financial officer and the person who negotiated the line with Allfirst, will testify. The line of credit was unsecured and did not carry Ortenzio's guaranty. CCI was eligible to borrow under the line of credit only if it had a tangible net worth of at least $4.5 million and it was not in default under any of its other loans with Allfirst.

The line of credit had a cash management feature. Payments from CCI's customers would be wire transferred by the customers to or deposited by CCI in an Allfirst account. If there was a balance outstanding on the line, the deposits would be applied against the line. If there was no balance outstanding on the line, the positive balance in the account would be swept overnight into an interest bearing investment and the interest credited to CCI. When checks were presented, any positive balance in the account would be used to pay the checks. To the extent any positive balance was insufficient or if there was no positive balance, the line of credit would be accessed and the checks paid by a draw on the line. Hence, CCI would access the line of credit by writing checks on the account, but the line of credit would only be accessed if and to the extent CCI did not have a positive balance in the account.

Borrowings under the line of credit were evidenced by a promissory note in the face amount of the line. The unpaid principal balance due under this note would

fluctuate with paydowns and advances on the line.

Craig Schwartz did not monitor CCI's borrowings under the line of credit and was unaware at any point in time whether CCI had a positive cash balance in its account or was accessing the line of credit. The only time the line of credit would come to the attention of Schwartz or anyone at Allfirst was if CCI's borrowing exceeded the $4 million limit. This never occurred.

**B.     The $1.2 million guarantied loan is made to help CCI's short term cash flow problem.**

In the latter part of 1999, CCI developed a cash flow problem. CCI expected its short term payables to cause it to exceed its receipts and its borrowing availability under the line of credit. To address this problem, Ortenzio requested a temporary loan from Allfirst, in addition to the $4 million line of credit, to tide CCI over what he represented to Allfirst was a short term cash flow shortfall which CCI expected to experience. A meeting was held between Ortenzio and Sheri Phillips, CCI's chief financial officer, and representatives of Allfirst on November 4, 1999. As a result of the meeting, Allfirst agreed to extend a temporary $1.2 million loan to CCI, which would be due on March 31, 2000. Allfirst was unwilling to extend the $1.2 million loan to CCI unless Ortenzio guarantied the loan. To obtain the loan for CCI, Ortenzio gave his guaranty. This guaranty obligated Ortenzio on the temporary loan and authorized

Allfirst to collect the loan directly from Ortenzio to the same extent as if the loan had been made to him.

Repayment of the $1.2 million loan was expected to come from an increase in cash flow that was expected to come in to CCI before the $1.2 million loan came due. Ortenzio and Phillips showed Schwartz a cash flow projection that demonstrated that CCI would have sufficient funds, without borrowing on the line of credit, to meet its day to day bills and repay the $1.2 million loan. Ortenzio never advised Allfirst that CCI intended to borrow on the unguaranteed line of credit to repay the guaranteed loan. Allfirst would not have made the $1.2 million loan if it had any belief that this was something Ortenzio would attempt. Schwartz believed that if CCI did not have sufficient cash available to pay the $1.2 million loan when it came due in March of 2000, he would restructure the $1.2 million loan and the $4 million line of credit, which expired and came due in April, 2000, into one credit facility, either secured by CCI's assets, guaranteed in its entirety by Ortenzio, or a combination of the two options.

Although expected future cash flow was to be the source of repayment, Allfirst knew that Ortenzio had sufficient liquid assets to make the payment personally and that repayment was not dependant on CCI obtaining the cash flow it was expecting. Allfirst would not have made the $1.2 million loan other than in the expectation that Ortenzio's personal wealth was available to repay the loan if CCI did not.

## C.    CCI's financial condition plummets.

CCI's financial condition and cash flow position worsened after the $1.2 million loan was made. CCI, which made a profit the preceding year, lost over $6 million in 1999. By February, 2000, CCI projected that it would have a cash flow shortfall of several million dollars over the next several months. This meant that CCI's expected revenues would be millions of dollars short of the funds it needed to continue operating and stay in business. Ortenzio was fully aware of CCI's precarious financial condition and desperate lack of cash to cover operating expenses. He was kept fully apprized by the receipt of regular internally generated financial reports and cash flow projections provided to him by Phillips. He had continuos discussions with Phillips over the Company's financial plight and desperate need for cash. He was aware of the borrowings CCI had made on the line of credit to cover its growing cash flow shortfall.

Ortenzio, although a wealthy man, refused to invest any more of his money in the Company. He preferred to let the Company fail rather than support it with his personal resources. He discussed with Sheri Phillips on numerous occasions the possibility of a bankruptcy proceeding for CCI.

**D.    Ortenzio's ploy to escape liability under his guaranty.**

    **1.    Ortenzio knew he was paying the loan with a borrowing while CCI was insolvent and hid the fact from Allfirst.**

Ortenzio was acutely aware of his guaranty of the $1.2 million loan and of his personal obligation to pay this sum to Allfirst. He did not intend to honor his commitment to Allfirst given at the time he signed his guaranty. He intended to do whatever he could to avoid paying Allfirst the money he agreed to pay in November of the preceding year.

In early February, Ortenzio contrived a plan to avoid his guaranty liability. He decided to have CCI repay the $1.2 million loan which he had guaranteed with a borrowing under the $4 million line of credit which he had not guaranteed. Sheri Phillips, the chief financial officer, opposed Ortenzio's plan on both ethical and practical grounds. She believed this repayment would only further restrict and reduce CCI's available cash and hasten the financial collapse of the company, particularly when Allfirst learned what had been done. She also believed that this payment was an unauthorized use of the line of credit, whose purpose was to finance accounts receivable and work in progress and not prepay fully funded loans. She refused to write the check to effect the repayment. Her opposition was overridden by Ortenzio, who personally wrote the check that effected a draw on the line of credit.

Ortenzio had never been involved in making payments to Allfirst on CCI's outstanding loans, a process always handled by or under the supervision of Phillips. On Friday, February 11, 2000, Ortenzio called Schwartz at Allfirst and learned from Schwartz's secretary that he would be out of the Bank that afternoon. Knowing that Schwartz would not be there, Ortenzio personally went to Allfirst to deliver the check that would repay the $1.2 million loan. As Ortenzio knew would be the case, Schwartz was not present when Ortenzio arrived at the Bank. Ortenzio gave a check drawn on CCI's account with Allfirst to Schwartz's secretary, Michelle Shepley, and asked that it be applied to repay the $1.2 million loan.

Although the exact balance on the line of credit would have fluctuated on February 11, 2000 if payments had been received from customers and if checks had been issued by CCI and presented for payment, Ortenzio had no reasonable or credible belief that receipts in the account that day would be of a sufficient magnitude to repay the outstanding balance on the line and result in a credit and positive balance of at least $1.2 million. Ortenzio knew that he was causing CCI to borrow to repay the loan and that he was surreptitiously repaying Allfirst with its own money. Ortenzio knew at the time he presented the check that CCI had no prospect of repaying Allfirst the money it was using to discharge the loan he had guaranteed.

Shepley complied and gave Ortenzio a receipt for the payment. She then took

the payment to the branch that was located below Schwartz's office and had the check processed as a loan repayment. When Schwartz returned at around 4:30 p.m., she told him that Ortenzio had been in to repay the loan and that she had processed the check at the branch.

> **2.    Allfirst had no knowledge or ability to know that Ortenzio improperly had paid the Bank with its own money while CCI was insolvent.**

As a secretary, Shepley's duties were typical for her position: she answered the phone and greeted visitors, typed, and did filing. She had no substantive involvement with any loans and knew nothing of CCI or its credit facilities. Ortenzio did not tell her that the repayment was a borrowing under the line of credit or request that she bring this to Schwartz's attention.

When he returned at 4:30, Shepley told Schwartz that Ortenzio had been in and had paid off the $1.2 million loan. She did not, however, show Schwartz the actual check or a copy of the check. She did not tell Schwartz that the check was drawn on Allfirst or in anyway identify the bank upon which the check was drawn. She did not even tell Schwartz that the check was drawn on a CCI account. She certainly did not tell Schwartz that the check Ortenzio gave her represented a borrowing under the CCI line of credit. In her position as secretary, she did not customarily receive CCI loan payments and had no reason to know anything about CCI's credit facilities with

Allfirst.

Schwartz, thus, had no information about the check or the source of payment for the $1.2 million loan. For all he knew, the check could have been a personal check from Ortenzio, who as guarantor was both liable and able to write such a check. He did not see the check, which had been processed at the branch. Although CCI's commitment for the line of credit required that it use Allfirst as its principal bank, the commitment did not prohibit CCI from having an account at another bank.

Because the branch was closed at the time he returned to his office, Schwartz could not have gone to the branch to inspect the check, even if the check was still available for inspection and had not already been on to a different location for further processing. He had no ability to ascertain any information about the check, the bank upon which it was drawn, or even the maker of the check. Schwartz could not determine from his computer terminal that the repayment check was a draw on the line of credit because the check would not have been reflected on the unpaid balance until the check had cleared and been paid. Even then, the netting of the days deposits with borrowing might have distorted the information on the computer. At best, he could have determined that CCI had an outstanding balance under the line of credit.

Schwartz, however, had no reason to be suspicious. The loan was being repaid a month before its due date. Ortenzio and Phillips had shown him a cash flow

projection demonstrating that the loan could be repaid from cash receipts. When the loan was repaid a month early, Schwartz believed that CCI was doing well financially and that its short term cash flow problem had been resolved, as he hoped and expected would be the case when he made the $1.2 million loan. Schwartz, who did not check or monitor line of credit borrowings for any of his customers, had no idea that CCI had an outstanding balance under the line of credit on February 11, 2000 and had no reason to believe it did or any suspicion to make him check. He believed Mr. Ortenzio, who had been a customer of the Bank for many years, to be a man of integrity and had no suspicion that he would try to repay the Bank with its own money.

Schwartz also was unaware of CCI's insolvent status. He had not been presented with a copy of the internally generated 1999 financial statements for CCI which showed a $6 million loss for the year and that CCI was insolvent by almost $1 million. He did not know that CCI, not having a $4.5 million tangible net worth and instead being insolvent, was ineligible to borrow any money on the line of credit and was in default. Although Ortenzio had a copy of the company's financial statements, he neither provided Schwartz with a copy (which CCI was obligated in the commitment letter to do) nor told him what the financial statements reflected before Ortenzio repaid the $1.2 million loan on February 11, 2000. As Ortenzio well knew, providing this information to Schwartz before attempting to repay the guaranteed loan

with a borrowing on the unguaranteed line would have put Schwartz on his guard and foiled the plan. Kept in ignorance, Schwartz assumed that CCI was financially sound.

After personally delivering the check to Schwartz's secretary while Schwartz was away from his office, Ortenzio telephoned Schwartz at the beginning of the next week to request an immediate return of his guaranty. He did not disclose to Schwartz that the payment had been made by a draw on the unguaranteed line of credit. Nor did he disclose that CCI was insolvent and about to fail financially. Schwartz was left in the dark and believed that CCI had accomplished the cash flow it predicted in November of 1999. Because of Ortenzio's insistence, Schwartz put a rush request into Allfirst's document control section and notified Ortenzio on Tuesday, February 15, 2000, that he would return the guaranty to Ortenzio as soon as possible. Although the guaranty was returned to Ortenzio, the $1.2 million note was never returned to CCI. At the time Schwartz returned the guaranty, Allfirst was unaware that the unguaranteed line of credit, which was to be used to finance accounts and work in progress, had been used to repay the guaranteed $1.2 million loan. Allfirst also was unaware that CCI was insolvent and about to collapse from a lack of available cash.

**E.    Ortenzio discloses CCI's precarious financial condition to Allfirst.**

With his guaranty in hand and believing he was now free from any obligation to pay the $1.2 million loan, Ortenzio called Schwartz on Thursday to request a meeting with Allfirst.  He did not disclose in the telephone call that he had cause CCI to repay the $1.2 million loan with a borrowing under the line. Prior to the meeting, Ortenzio retained Robert Chernicoff, a bankruptcy specialist, to represent CCI.

The meeting was held on Friday, February 18, 2001 at Allfirst's office, exactly one week after he had CCI borrow money on its line of credit to repay the loan Ortenzio had guaranteed.  Ortenzio was accompanied to the meeting by  Chernicoff. At the time of the meeting, Ortenzio knew that CCI had lost over $6 million dollars in 1999 and was insolvent by almost a million dollars.  Allfirst had no appreciation of the severity of CCI's financial distress until Ortenzio requested the meeting, on Thursday, February 17, 2000, and disclosed the $6 million loss.

In the meeting, Ortenzio presented a cash flow projection that showed that CCI would have a cash shortage over the next 5 months of $5,873,456. Although disclosing CCI's cash flow emergency, he did not reveal during the meeting that the $4 million line of credit had been used to repay the $1.2 million loan he had personally guaranteed.  The cash flow projection he presented at the meeting did not reflect this use of the $4 million line of credit for this purpose.  As of this meeting, Allfirst had no

knowledge of Ortenzio's use of the line of credit to discharge the loan he had guaranteed. Allfirst was not told of this use of the line of credit and could not have determined the use from an examination of the cash flow projection.

### F.    Ortenzio compels Allfirst to shut down the line of credit.

During the meeting, Ortenzio stated that he would be meeting with CCI's bonding company during the next week and planned to solicit financial support from the bonding company. He agreed to report back to Allfirst on the results of the meeting with the bonding company. He also agreed that CCI would not write any further checks that would draw on the line of credit until he had reported back to Allfirst.

Despite his promise, Ortenzio, on the Monday following the Friday meeting, personally supervised the writing of checks that were draws on the line. When these checks were presented for payment, Allfirst dishonored the checks that Ortenzio promised would not be issued. Because of the flurry of checks that were being presented, despite Ortenzio's promise, Allfirst closed down the line of credit on Wednesday, February 23, 2000 to prevent further draws. On February 24, 2000, Allfirst formally declared CCI in default and demanded payment. Allfirst still was unaware that Ortenzio had on February 11, 2001 used the unguaranteed line to repay the $1.2 million loan he had guaranteed.

### G.    Allfirst declares a default and CCI files bankruptcy.

On February 24, 2001, Allfirst formally declared CCI in default and demanded payment. At the time default was declared, Allfirst still was unaware that Ortenzio had on February 11, 2001 used the unguaranteed line to repay the $1.2 million loan he had guaranteed. Allfirst did not learn of this use of the line until after the default had been declared.

On February 22, 24, and 25, 2000, customers of CCI wired payment of their outstanding accounts to Allfirst. These payments totaled $2,317,291.28 and were credited against the outstanding balance under the line of credit, which now reflected the draw to prepay the $1.2 million line.

On May 19, 2000, CCI filed a petition under Chapter 11 of the *United States Bankruptcy Code.* On January 10, 2001, CCI, as debtor in possession, instituted an action to recover the customer payments as a preference under *Bankruptcy Code* § 547 in an adversary proceeding entitled *CCI Construction Co., Inc. v. Allfirst Bank* (Adversary No. 1-01-00011A). Allfirst is defending against the debtor in possession's claim and the matter, after being set for trial on May 2, 2002, was postponed due to the death of Bankruptcy Judge Woodside and has not been reset. Any recovery in this preference action will reinstate the recovered amounts as part of the outstanding balance on the line of credit.

15

## H.    Allfirst's Damages.

Allfirst is claiming damages in an amount equal to either (a) the unpaid principal balance of the line of credit, adjusted for any preference recovery, or (b) the unpaid principal balance of the $1.2 million loan, together with interest on the unpaid principal balance under either (a) or (b) as applicable.  Allfirst also claims attorneys fees and litigation expenses pursuant to the Suretyship Agreement signed by Ortenzio to guaranty the $1.2 million loan.

## III.
## Law and Argument

"It is well established that fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence word of mouth, or look or gesture." *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991).  Fraud "is any artifice by which a person is deceived to his disadvantage." *In re McClellan's Estate*, 365 Pa. 401, 75 A.2d 595 (1950); *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983). "(T)he *sina qua non* of actionable fraud is a showing of a deception." *Frowen v. Blank*, 493 Pa. 137, 143, 425 A.2d 412, 415 (1981).

"The elements of intentional misrepresentation are as follows: (1) a

representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz v. Noon*, 556 Pa. 489, 499, 729 A.2d 555, 556 (1999). *See also Sonfast Corporation v. York International Corporation*, 875 F. Supp. 1088 (M.D. Pa 1994).

A misrepresentation need not be a positive statement. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983); *Borelli v. Barthel*, 205 Pa. Super. 442, 211 A.2d 11 (1965) ("fraudulent representations may be made by ... acts or artifices calculated to deceive"). The concealment of a material fact or the failure to disclose a material fact that in good faith should be disclosed mounts to a misrepresentation. *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991) ("The concealment of a material fact can amount to a culpable misrepresentation no less than an intentional false statement."); *Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 442 (1947) ("The deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than an intentional affirmation of a material falsity."); *Borelli v. Barthel,* 205 Pa. Super. 442, 211 A.2d 11 (1965) ("fraudulent representations may be made by ... acts or artifices calculated to deceive").

When good faith and fair dealing require disclosure of a fact as to which another party is unaware or is operating under a mistaken assumption and disclosure is not made so as to deceive, there is a fraudulent representation. *In re McClellan's Estate*, 365 Pa. 401, 75 A.2d 595 (1950) ("Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of a fact or by silence when good faith required expression."); *Fox's Foods, Inc. v. Kmart Corp.,* 870 F. Supp. 599 (M. D. Pa. 1994) (suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, especially if suppressed fact is particularly within knowledge of one party and of such a nature that other party is justified in assuming its non-existence.)  As one United States District Court held:

> The failure to disclose a material fact amounts to a misrepresentation where disclosure would correct a mistake as to a basic assumption and non-disclosure amounts to a failure to act in good faith and in accordance with standards of fair dealing.  Restatement (Second ) of Contracts, § 161.

*Derby & Co.,Inc. v. Seaview Petroleum Company*, 756 F. Supp. 868 (E.D. Pa. 1991).

Ortenzio's actions in prepaying a personally guaranteed loan by a borrowing under an unguaranteed line of credit granted to finance accounts receivable and work in process on the eve of CCI's financial collapse amounts to fraud.  Ortenzio knew that the line was to finance accounts and inventory and, based on his discussions with Sheri Phillips, that the use of the line to repay the $1.2 million loan was an unauthorized

borrowing.  He knew that a borrowing under the line did not amount to a payment from cash flow as he had originally told Allfirst would occur when the loan came due. He was fully aware of CCI's financial distress, having been kept fully apprized of CCI's financial circumstances by Sheri Phillips, and that bankruptcy was a real possibility.  He also knew the $1.2 million loan was not due until March 31, 2000 and certainly realized that CCI might not survive until that date under its financial circumstances.

Ortenzio knew when he made the payment that Allfirst was unaware of CCI's financial distress.  He also knew that Allfirst was expecting the $1.2 million to be repaid from increased cash flow and did not expect it to be repaid from a borrowing on the line that would do nothing more than convert guaranteed debt into unguaranteed debt and make a collectible loan uncollectible.  At no time did Ortenzio ever disclose to Allfirst the source of the money used to repay the $1.2 million loan, despite numerous opportunities to do so.

He did not disclose CCI's financial condition prior to prepaying the $1.2 million loan.  Under his guaranty, a material adverse change in CCI's financial condition was an event of default and authorized Allfirst to collect the $1.2 million loan immediately from him.

Ortenzio simply used the line to prepay his guaranteed loan in the hope that

Allfirst would be deceived and not discover what he had done. He requested an immediate return of his guaranty in the hope that the return would confirm that he had succeeded in his deception. Once he had the guaranty, he retained bankruptcy counsel for CCI and scheduled a meeting with Allfirst to reveal CCI's financial situation. Even then, he still did not reveal what he had done and left Allfirst to labor under the mistaken assumption that the money to repay the $1.2 million loan had come from a source other than the line.

Ortenzio argues that Allfirst knew he used an unauthorized borrowing under the line of credit because he presented a check drawn on CCI's account at Allfirst. The circumstances do not support his view. Even if Shepley saw that the check was drawn on Allfirst, she knew nothing of CCI or its financial and credit arrangements with Allfirst and conveyed no information to Schwartz. Schwartz, on the other hand, had no information beyond the fact that the $1.2 million loan had been repaid. He had no ability at the time he received this information to determine the source of payment and no reason to be suspicious of a man he believed to be honest.

To its detriment, Allfirst fell for Ortenzio's artifice, mistakenly believing him to have dealt in good faith and with fair dealing when he in actuality had dealt with fraud and deception.

## IV.

### Conclusion.

For these reasons, Allfirst asks that judgment be rendered in its favor.

Lawrence J. Gebhardt
Ramsay M. Whitworth
GEBHARDT & SMITH, LLP
401 East Pratt Street
Baltimore, Maryland 21202
(410) 752-5830

*Counsel for Plaintiff, Allfirst Bank*

## CERTIFICATION PURSUANT TO LOCAL RULE 7.8(b)

The undersigned hereby certifies to the Court that the Plaintiff's Trial Brief contains 4,819 words according to the word count feature of the word processing system used to prepare the Trial Brief.

Lawrence J. Gebhardt

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of July, 2002, a copy of Plaintiff's Trial Brief was sent by Federal Express to: Edward I. Swichar, Esquire and Robert A. Burke, Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA 19103, *Attorneys for Defendant.*

_____
Lawrence J. Gebhardt