ORIGINAL 2 to ct

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK, | : | |
| Plaintiff, | : | |
| v. | : | CASE NO. 1:01-CV-786 |
| JOHN M. ORTENZIO, | : | J. Rambo |
| Defendant. | : | |

**DEFENDANT'S TRIAL BRIEF**

**I. INTRODUCTION**

Defendant, John M. Ortenzio ("Mr. Ortenzio"), by his undersigned counsel, respectfully submits this Trial Brief. The essence of this action is an attempt by Plaintiff, Allfirst Bank ("Allfirst"), to hold Mr. Ortenzio personally liable for the corporate obligations of CCI Construction Co., Inc. ("CCI"). This Court has already determined that Allfirst's efforts to hold Mr. Ortenzio liable for breach of contract and equitable subrogation fail as a matter of law. All that remains is a fraud claim by Allfirst alleging that Mr. Ortenzio defrauded Allfirst by failing to advise Allfirst that CCI was repaying its $1.2 million loan with money borrowed under CCI's line of credit. (Count III of Allfirst's Complaint). For the reasons set forth herein, Allfirst cannot establish this fraud claim as: (1) there was no misrepresentation or omission regarding the method of payment; (2) the method of repayment was not only permitted under the loan documents, it was the only way

113449.00601/21047826v2

Allfirst paid its bills; (3) at no time did Mr. Ortenzio withhold the method of repayment or believe that the method of repayment was in any way improper; (4) Mr. Ortenzio had no intent to mislead Allfirst; (5) There was no justifiable reliance on behalf of Allfirst as (a) Allfirst recorded the method of repayment that evening when the account was swept and (b) the information as to the method of repayment was readily available to Allfirst by merely checking its own records; and (6) Allfirst was in no way injured by the method of repayment.

## II.    BACKGROUND

This lawsuit involves several agreements primarily between CCI and Allfirst. A line of credit that CCI executed on March 24, 1999, pursuant to which Allfirst provided CCI a long term, unsecured $4 million line of credit ("the Line of Credit"); a Commercial Loan (equipment) Note dated November 20, 1998, pursuant to which plaintiff extended a $2 million loan to CCI, secured by CCI's equipment ("the Equipment Note"); and a Commercial Loan Note dated November 8, 1999, in the amount of $1.2 million, ("the Short-term Note"), guaranteed by Mr. Ortenzio. Allfirst contends that Mr. Ortenzio acted unlawfully when CCI wrote a check to repay the short-term note, which turned out to be a borrowing under the line of credit.

In essence, CCI maintained a single checking account at Allfirst and all of the aforementioned loans were tied into a cash management facility. More

specifically, any checks written on CCI's account at Allfirst increased the balance owed on the line of credit and, conversely, all revenues deposited to CCI's account had the effect of reducing the balance and, thereby, increasing the availability of funds that could be borrowed on the line of credit. According to the commitment letter, CCI was required to maintain its primary account at Allfirst and was required to deposit all profits and all revenues from cash flow into this account. Indeed, this checking account was CCI's only checking account and the only way it paid its bills. In addition, CCI's customers wire transferred payments directly to Allfirst to be deposited directly into the checking account. <u>During the month of February 2000 (the time period at issue) over $5.5 million in cash was deposited into CCI's checking account by customers</u>.

When Allfirst loaned CCI the sum of $1.2 million, pursuant to the short-term note, Allfirst applied the $1.2 million directly to the line of credit and decreased the balance owed on the line of credit by $1.2 million. It is also undisputed that all payments that CCI made from its checking account, such as payroll, taxes, payments to vendors and re-payments on the $2 million equipment note were drawn from the line of credit, and thereby had the same effect of increasing the balance on the $4 million line of credit.

Allfirst concedes that the $1.2 million short-term note was provided at the request of CCI, on a short-term basis, when CCI was encountering cash flow

3

difficulties. There were no restrictions in the short-term note as to the source of funds that could be used to repay the note. The short-term note was temporary and, indeed, had to be repaid no later than March 31, 2000. Allfirst initially sought to increase the $4 million line of credit to a $5 million line of credit, and had requested that Mr. Ortenzio guarantee the full $5 million, but agreed to limit the defendant's guaranty to the $1.2 million short-term note after Mr. Ortenzio refused to guarantee more than that amount.

Pursuant to the CCI's agreement with Allfirst, the form language in the $1.2 million short-term note was stricken to make it clear that Mr. Ortenzio's guarantee would extend to the $1.2 million short-term note only, and not to the $4 million line of credit or to any other loan facility at Allfirst. Allfirst could have asked Mr. Ortenzio to guarantee up to $1.2 million of any loan facility, i.e., not limit the guaranteed amount to the short-term note only, but failed to do so.

There were no restrictions in the short-term note as to the source of funds that could be used to repay the note. There was no document that deals with how the loan was to be repaid, nor was there any document that states that the $1.2 million short-term note could not be repaid by writing a check on CCI's checking account, thereby drawing on the line of credit. Simply put, it was never a material fact, germane to the transaction. Allfirst now claims that Allfirst expected that the

4

short-term note would be paid from cash flow, but this expectation is not memorialized in any document.

Moreover, a significant fact that Allfirst withholds from the Court is that over $5.5 million in cash flow was deposited into CCI's checking account by CCI's customers during the month of February 2000, alone. These deposits were far in excess of the borrowings under the line of credit. The balance on the line of credit at the start of February 2000 was $2.3 million. At the end of February 2000 the balance on the line of credit was only $284,222 (and this includes CCI's payoff of the $1.2 million short-term loan). Accordingly, the excess cash that came into CCI's checking account in February 2000 was not only enough to cover the repayment of the $1.2 million short-term loan, the excess cash also reduced the balance on the line of credit by $2 million. Allfirst's claims that CCI did not have the excess cash to pay the $1.2 million short-term loan are false.

Allfirst's reliance on a March 23, 1999 commitment letter between Allfirst and CCI (not Mr. Ortenzio) is also misplaced. The first page of the March 23, 1999 commitment letter relating to the $4 million line of credit, states that Allfirst increased and reaffirmed the unsecured line of credit to CCI as follows:

"Use of Proceeds:   Finance work in process and accounts receivable".
<u>Id</u>. The term "work in process" is not defined. This statement in the commitment letter does not support Allfirst's position that CCI breached the terms and

5

conditions of the $4 million line of credit. Contrary to Allfirst's representations to the Court, the statement "Use of Proceeds: Finance work in process and accounts receivable" was not a term or condition of the $4 million line of credit between Allfirst and CCI. The commitment letter, drafted by Allfirst and executed by Sherri Phillips (CCI's CFO) specifically provides for this where it states:

> Availability of the Loan is contingent upon [CCI] and [Allfirst] entering into mutually acceptable loan documentation setting forth terms and conditions stated herein and such other terms and conditions, covenants, warranties and representations as may be required by [Allfirst] and be mutually acceptable to [CCI] and [Allfirst]. All terms and conditions contained herein shall survive the execution of such loan documentation.

Id.

CCI and Allfirst did subsequently execute loan documentation for the $4 million line of credit. Nowhere in that loan documentation does it contain any restriction on CCI's use of proceeds. Furthermore, while the commitment letter does state that all "terms and conditions" contained in the commitment letter shall survive the execution of the loan documentation, the statement "Use of Proceeds: Finance work in process and accounts receivable" <u>is not part of the terms and conditions expressly stated in the commitment letter</u>. The "terms and conditions" of the commitment letter are expressly set forth on page two of the commitment letter directly under the heading "Terms and Conditions". There are eight terms and conditions of the commitment letter. The statement "Use of Proceeds: Finance

113449.00601/21047826v2

work in process and accounts receivable" is not one of the terms and conditions that are listed on page two, but rather is set forth on the first page of the commitment letter before the terms and conditions are listed.

The commitment letter is a document drafted by Allfirst. If Allfirst intended the "Use of Proceeds" to be a term and condition of the $4 million line of credit between CCI and Allfirst, Allfirst certainly would have listed it as one of the terms and conditions. Accordingly, Allfirst cannot now say that the use of proceeds was a term or condition of the $4 million loan between CCI and Plaintiff.

**In any event, because of the way that Allfirst set up the cash management system, writing a check on CCI's checking account was the acceptable (and only) way that CCI paid all its bills -- including payments on other loans.**

On February 11, 2002, approximately one month prior to the due date, CCI repaid the $1.2 million short-term note by writing a check. Mr. Ortenzio did not know (and could not know) if doing this would draw on the line of credit. It turns out that the payment (after the account was swept that night by Allfirst) did amount to a draw on the $4 million line of credit and, thereby, merely reversed the book-entry transaction that was made when Allfirst lent CCI the $1.2 million a few months earlier. At the time, CCI owed only approximately $1.2 million on the $4

7

million line of credit, so that the total amount due after the repayment was approximately $2.4 million.

On February 24, 2000, Allfirst declared a default under both the line of credit and the equipment note, but failed to provide CCI the 30 day notice and opportunity to cure, as required in the $4 million note. Allfirst immediately (and improperly) seized all of CCI's assets, froze its checking account and dishonored all checks including payroll and taxes. CCI's bankruptcy followed thereafter.

### III. ALLFIRST CANNOT ESTABLISH A CAUSE OF ACTON FOR FRAUD.

Count III of Allfirst's Complaint alleges that Mr. Ortenzio is liable for common law fraud <u>on the basis of a single alleged misrepresentation</u>:

> Delivery of the check amounted to and was the equivalent of a representation by Ortenzio that payment of the One Million Two Hundred Thousand Dollar loan was being made by CCI or by Ortenzio through CCI with monies other than those borrowed under the revolving line of credit.

Complaint at ¶ 34.

In order to prove fraud, Pennsylvania law requires that the plaintiff establish the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting

8

injury was proximately caused by the reliance. See, <u>Lind v. Jones, Lang LaSalle Americas, Inc.</u>, 135 F. Supp.2d 616, 620 (E.D. Pa. 2001) (citing <u>Gibbs v. Ernst</u>, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994); <u>Gruenwald v. Advanced Computer Applications</u>, 730 A.2d 1004, 1014 (Pa. Super. 1999)). Additionally, these elements must be proven by clear and convincing evidence, not the lesser preponderance of the evidence standard. <u>Lind</u>, 135 F. Supp.2d at 621.

1. **The Clear and Convincing Standard of Proof.**

The party asserting fraud bears the burden of establishing all elements by clear, precise and convincing evidence. <u>See</u>, <u>Lind</u>, 135 F. Supp. 2d at 621; <u>Delahanty v. First Pennsylvania Bank</u>, 318 Pa. Super. 90, 464 A.2d 1243. In <u>Delahanty</u>, the court defined the "clear and convincing" standard as follows:

> the witnesses must be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction without hesitancy, of the truth of the precise facts in issue.

<u>Delahanty</u>, 318 Pa. Super. at 110-111, 464 A.2d at 1253 (quoting <u>Gerfin v. Colonial Smelting & Refining Co.</u>, 374 Pa. 66, 72, 97 A.2d 71, 74 (1953)). The evidence "is not only found to be credible, but of such weight and directness as to make out the facts alleged beyond a reasonable doubt." <u>Vogel, Administrator, v. Taub</u>, 316 Pa. 41, 43, 173 A.2d 270, 271.

9

113449.00601/21047826v2

### 2. Allfirst Cannot Establish That Mr. Ortenzio Had a Duty to Speak.

Allfirst has alleged that Mr. Ortenzio fraudulently concealed the source of funds used to repay the $1.2 million loan. A duty to speak arises when the parties are in a fiduciary or confidential relationship. See, Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 656 (W.D. Pa. 1999); City of Rome v. Glanton, 958 F. Supp. 1026, 1038-39 (E.D. Pa. 1997). Neither is the case in this instance. Moreover, a "typical business relationship does not form the basis for such a relationship unless 'one party surrenders substantial control over some portion of his affairs to the other.'" Sunquest, 40 F. Supp. 2d at 656.

In addition, according to Pennsylvania law on fraudulent concealment, "[a] duty to speak may arise as a consequence of an agreement between the parties, or as a result of one party's reliance on the other's representations, if one party is the only source of information to the other party, or the problems are not discoverable by other reasonable means." Id. Yet, there is no duty to speak "when both a plaintiff and defendant are sophisticated business entities, entrusted with equal knowledge of the facts and equal access to legal representation." Id. at 1039 (citing Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3rd Cir. 1995)).

Even if he knew, Mr. Ortenzio did not have a duty to inform Allfirst that the line of credit was being used to repay CCI's $1.2 million loan, as he was not a party

to the terms and conditions of the loan commitment for the $4 million line of credit between Allfirst and CCI. Further, the $1.2 million suretyship agreement, to which Mr. Ortenzio was a party, did not specify the source of funds to be used to repay the loan. Thus, there is no agreement between Allfirst and Mr. Ortenzio that creates the duty to speak.

### 3. Allfirst Cannot Establish That Mr. Ortenzio Made Any Representation That Was Material To The Transaction.

A representation is "material" if "it is of such character that it determines whether the transaction occurs." Id. See also, Lind, 135 F. Supp. 2d at 620l Delahanty, 464 A.2d at 1252. Whether CCI could draw on $4 million line of credit to repay any other loan facility, was not material to the original transaction. There is no evidence that at any time prior to or during Allfirst's granting of the $4 million loan that it was agreed, let alone even discussed, that CCI would not use $4 million line of credit to repay any other loan facility. In fact, the facts show that CCI routinely used the $4 million line of credit to pay its equipment note and all other debt. It was only after the transaction, that Mr. Schwartz self-servingly stated that he would not have accepted the check if he had known it was paid as a result of a draw on the $4 million line of credit. Contrary to this assertion, evidence will show that Allfirst never advised CCI prior to the execution of the loan documents for the $4 million line of credit or the $1.2 million note (or even

11

prior to CCI's repayment of the $1.2 million) that the $4 million line of credit could not be used to pay any other loan.

4. **Allfirst Cannot Establish By Clear And Convincing Evidence That It Justifiably Relied On Any Material Misrepresentation by Mr. Ortenzio.**

In order to prevail on its fraud claim, Allfirst must establish the element of justifiable reliance by clear and convincing evidence. The "general rule is that a party is charged with knowledge of that which can be readily discovered." Marian Bank v. International Harvester Credit Corp., 550 F. Supp. 456, 462 (E.D. Pa. 1982). Furthermore, if the person to whom the misrepresentation is made is in a position to know or ascertain the facts, his knowledge thereof may be inferred. Emery v. Third Nat'l Bank of Pittsburgh, 308 Pa. 504, 162 A. 281 (1932). The Marian Bank court further explained that "a reasonable inquiry consists of either inspecting [the relevant documents] or questioning the most reasonable source – the defendant." Id. In this case, Allfirst admits that it did not undertake any means of inquiry. The evidence will further show that Allfirst did not look because Allfirst did not care.

CCI presented **an Allfirst check**, bearing the account number of CCI's checking account with Allfirst, to Allfirst when repaying the short-term note. At the time, Mr. Ortenzio did not know if it would be a draw on the line of credit. Mr. Ortenzio made no attempt to hide the method of repayment. CCI's failure to

12

explicitly state the method of repayment, when none of the loan documents or the obligation required any such representation, does not establish an intent to deceive on the part of CCI, and certainly not on the part of Mr. Ortenzio.

Moreover, Allfirst does not dispute that one of its employees received the check and Allfirst processed the check, thereby drawing on the $4 million line of credit when the account was swept that night. Allfirst cannot claim it did not know the source of funds when that information was in possession of its employees who were charged with monitoring the cash management account. Further, Mr. Schwartz admitted that he was informed that Mr. Ortenzio personally delivered a check to pay the $1.2 million note but that he did not inquire as to the source of funds at that time or one week later when Mr. Schwartz returned Mr. Ortenzio's guaranty. Had Mr. Schwartz undertaken any inquiry, he would have easily discovered that the $1.2 million note was repaid by drawing on the $4 million line of credit. The fact is Mr. Schwartz did not look, because he did not care. He did not care, because it did not matter.

13

## IV. CONCLUSION

Based upon the forgoing reasons, Defendant, John M. Ortenzio, respectfully requests that this Honorable Court enter judgment in his favor.

Respectfully submitted,

BLANK ROME COMISKY & McCAULEY LLP

BY: _____
EDWARD I. SWICHAR, ESQUIRE
ROBERT A. BURKE, ESQUIRE
One Logan Square
Philadelphia, PA 19103
(215) 569-5500
*Attorneys for Defendant, John M. Ortenzio*

Dated: July 24, 2002

113449.00601/21047826v2

## CERTIFICATE OF SERVICE

Robert A. Burke, attorney for Defendant, John Ortenzio, hereby certifies that he caused a true and correct copy of Defendant's Trial Brief to be served upon the following on this 24th day of July, 2002, by Federal Express:

Lawrence Gebhardt, Esquire
Gebhardt & Smith, LLP
The World Trade Center, Ninth Floor
Baltimore, MD 21020-3064

_____
ROBERT A. BURKE