

108
10/9/02
MA

# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

## CASE NO.: 1:01-CV-786

**FILED**

OCT 0 9 2002

PER _____
HARRISBURG, PA   DEPUTY CLERK

### ALLFIRST BANK,

**Plaintiff**

v.

### JOHN M. ORTENZIO,

**Defendant**

---

## PLAINTIFF'S POST TRIAL BRIEF

---

Lawrence J. Gebhardt
Ramsay M. Whitworth
GEBHARDT & SMITH, LLP
401 East Pratt Street
Baltimore, Maryland 21202
(410) 752-5830
*Counsel for Plaintiff, Allfirst Bank*

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   The Facts Allfirst Proved By Clear and Convincing Evidence . . . . . . . . . . 1

      A.    The $4 million line is established to finance accounts
            receivable and work in process . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    The $1.2 million guarantied loan is made to help CCI's
            short term cash flow problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      C.    CCI's financial condition plummets . . . . . . . . . . . . . . . . . . . . . . . . . 7

      D.    Ortenzio's ploy to escape liability under his guaranty . . . . . . . . . . . 11

            1.    Ortenzio knew he was paying the loan with a
                  borrowing while CCI was insolvent and hid
                  the fact from Allfirst . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            2.    Allfirst had no knowledge or ability to know
                  that Ortenzio had improperly paid the Bank
                  with its own money while CCI was insolvent . . . . . . . . . . . 14

      E.    Ortenzio discloses CCI's precarious financial
            condition to Allfirst . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      F.    Ortenzio compels Allfirst to shut down the line of credit . . . . . . . . 18

      G.    Allfirst declares a default and CCI files bankruptcy . . . . . . . . . . . . 18

      H.    Allfirst's Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.  Law and Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.  Ortenzio's intentional misrepresentation was made
    with the intent of misleading Schwartz . . . . . . . . . . . . . . . . . . . . . 21

    B.  Allfirst's reliance was justifiable . . . . . . . . . . . . . . . . . . . . . . . . . 25

    C.  Allfirst's damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Certification Pursuant to Local Rule 7.8(b) . . . . . . . . . . . . . . . . . . . . . . . . . 33

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF POINTS AND AUTHORITIES

## CASES

*Borelli v. Barthel,*
    205 Pa. Super. 442, 211 A.2d 11 (1965) . . . . . . . . . . . . . . . . . . . . . . 21, 22, 27

*Bortz v. Noon,*
    556 Pa. 489, 499, 729 A.2d 555, 556 (1999) . . . . . . . . . . . . . . . . . . . . . . 21

*Bowman v. Home Life Insurance Company of America,*
    260 F.2d 521 (3rd Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Delahanty v. First Pennsylvania Bank, N.A.,*
    318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983) . . . . . . . . . . . . 20, 21

*Derby & Co.,Inc. v. Seaview Petroleum Company,*
    756 F. Supp. 868 (E.D. Pa. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Emery v. Third National Bank of Pittsburg,*
    308 Pa. 504, 162 A.2d 281 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Fox's Foods, Inc. v. Kmart Corp.,*
    870 F. Supp. 599 (M. D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Frowen v. Blank,*
    493 Pa. 137, 143, 425 A.2d 412, 415 (1981) . . . . . . . . . . . . . . . . . . . . . 20

*Greenberg v. Life Insurance Company of Virginia,*
    177 F.3d 507 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Lake v. Thompson,*
    366 Pa. 352, 77 A.2d 364 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Marian Bank v. International Harvester Credit Corporation,*
    550 F. Supp. 456 (E.D. Pa. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In Re McClellan's Estate,*
     365 Pa. 401, 75 A.2d 595 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Moser v. SeSetta,*
     527 Pa. 157, 589 A.2d 679 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Neuman v. Corn Exchange Nat. Bank & Trust Co.,*
     356 Pa. 442, 51 A.2d 442 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sewak v. Lockhart,*
     699 A.2d. 755 (Pa. Super 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Sonfast Corporation v. York International Corporation,*
     875 F. Supp. 1088 (M.D. Pa 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## STATUTES

*Bankruptcy Code* § 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

13 Pa.C.S.A. §4215 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TREATISES

Restatement (Second ) of Contracts, § 161. . . . . . . . . . . . . . . . . . . . . . . . . . 22

Restatement, Second, Torts § 540; Dobbs, *The Law of Torts,* § 475 . . . . . . . . . . 27

Harper, James & Gray, *The Law of Torts* (2nd Ed.), §7.12 . . . . . . . . . . . . . . . . 27

White & Summers, § 20-4, *Uniform Commercial Code,* Vol. 4 (2002) . . . . . . . . 30

# PLAINTIFF'S POST TRIAL BRIEF
## I.
## Introduction.

On February 11, 2000, John Ortenzio defrauded Allfirst Bank. He perpetrated this fraud through an artifice that combined both affirmative misrepresentations and the intentionally deceptive non-disclosure of facts and circumstances which were required to be disclosed to Allfirst.

Ortenzio committed fraud upon Allfirst by having CCI Construction Co., Inc. borrow on its unguaranteed line of credit to repay a temporary loan which he had personally guaranteed just prior to CCI's financial demise. This borrowing was improper and done at a time when CCI had no right to borrow any money on the line. As a sole result of Ortenzio's fraud, Allfirst was tricked into advancing money on the line of credit that it would not have advanced absent the fraud, money which it has been unable to collect and will lose if Ortenzio is not held accountable.

At the trial of the case, Ortenzio's fraud and the loss it caused Allfirst were proven by clear and convincing evidence.

## II.
## The Facts Allfirst Proved By Clear and Convincing Evidence.

**A.    The $4 million line is established to finance accounts receivable and work in process.**

In March of 1999, Allfirst extended to CCI a $4 million line of credit. The sole

1

purpose of the line of credit, as expressly stated in the March 24, 1999 commitment letter, was to finance CCI's accounts receivable and work in process. P-1. This meant that the line of credit funds were to be used solely to provide short term working capital to pay monthly bills until current accounts receivable were paid by customers. No other use of loan proceeds was permitted, as both Craig Schwartz and Sheri Phillips testified.[1]  Schwartz 10, 16-18; Phillips 310-312.  The line of credit was

---

[1]     The unguaranteed line of credit, with its sole purpose of financing accounts receivable and work in process, could not be used to prepay a fully funded *and guaranteed* temporary loan.  Both Phillips and Schwartz so testified.  Some confusion, however, may have resulted from testimony by Michael Zarcone, a former Allfirst officer.

Zarcone testified that the guaranteed $1.2 million loan was not to be repaid by a borrowing on the unguaranteed line. Zarcone 480-1.  He also testified that repaying a short term loan to finance accounts receivable and work in process with a borrowing under a  line established to finance accounts receivable and work in process would not be improper. Zarcone 485.  What Zarcone was referencing, however, was a refinancing of a temporary loan through a line of credit when both had the same purpose and **both carried the same security.**  If the $4 million line and the $1.2 million loan were both unguaranteed, there is no reason the line could not be used to repay the temporary loan.  The net effect would simply be a reduction in available credit, in effect rolling one loan into the other. Zarcone, on follow up questioning, so testified. Zarcone 492 (Paying temporary loan that finances accounts and work in process by a borrowing under line that also finances accounts and work in process not necessarily improper because "It may have been refinanced into that line.").  Using this case as an example, but assuming that Ortenzio had not provided his personal guaranty, prior to any payment, there would be a total credit available to CCI of $5.2 million. If there was borrowing availability on the line, repaying the $1.2 million with a draw would simply reduce the total credit to $4 million.  The effect would have been the same as increasing the line from $4 million to $5.2 million until March 31, 2000. If total borrowings on March 31, 2000 were $4 million or less, there would simply be a reduction in total credit.

The situation, however, is radically different - as Zarcone testified when he stated the line was not to be used to repay the guaranteed loan - when the line is unguaranteed and unsecured and the temporary loan is guaranteed or secured.  The presence of a guaranty or collateral on one but not the other credit facility changes the purpose for which funds can be used.  This is because a borrowing on the line would no longer be financing accounts receivable or work in process, but would be redeeming a guaranty or collateral subject to a security interest.  This is precisely what occurred in this case.  Ortenzio had CCI borrow, not to finance accounts and work in process, but

unsecured and did not carry Ortenzio's guaranty.

CCI was eligible to borrow under the line of credit only if certain conditions spelled out in the commitment letter and the FILM Note were met. Ex. P-1, P-2. Schwartz 20. These two documents went together with respect to the line of credit. Schwartz 25.

One significant condition in the commitment letter was that CCI had to provide Allfirst with extensive information about its financial condition, including periodic internally generated financial statements. Ex. P-1. Timely receipt of this financial information was extremely important to Allfirst because the line was unsecured. Schwartz 18-19. If Allfirst was not provided the financial information, it could refuse to permit borrowing under the line. Schwartz 23. Ortenzio admitted that he was aware of this obligation. Ortenzio 167. In fact, prior to December 31, 1999, CCI kept Allfirst informed of its finances and financial circumstances. Ortenzio 168; Phillips 314. Another important condition was contained in the FILM Note and provided that CCI could not be in default under any of its other loans with Allfirst and continue to borrow under the line. Ex P-2.

The commitment letter authorized Allfirst, in its discretion, to terminate and

---

to redeem and discharge his guaranty.

3

stop funding the line of credit "should the Bank in a reasonable exercise of its sole business discretion deem it necessary to do so." Ex. P- 1. Hence, if the information CCI was required to provide showed that CCI was in financial distress or in default on other Allfirst loans, Allfirst could refuse to permit any further borrowing on the line. Schwartz 20-24.

The line of credit had a cash management feature tied to its checking account. Ex P-2. Positive balances in the account would be invested overnight and the interest credited to CCI. The line of credit would be accessed if the positive balances in the account were not sufficient to cover checks that were presented for payment each day. Allfirst would only establish the cash management feature for customers who were expected regularly to have positive balances in their accounts. Schwartz 15. Prior to November 1, 1999, CCI regularly had positive balances in its account and its funds were invested overnight. CCI did not always have borrowings under the line. Phillips 313; Ex.P-5.

CCI was a long term customer of Allfirst. It had an excellent reputation with Allfirst. Schwartz 8. Based on this history, Ortenzio was regarded at Allfirst as a man of high integrity. Schwartz 50.

Consistent with the procedure for good customers, Craig Schwartz did not monitor CCI's borrowings under the line of credit and was unaware at any point in

4

time whether CCI had a positive cash balance in its account or was accessing the line

of credit.  Nothing ever caused him to access the CCI line to obtain this information.

Schwartz 24-25.

**B.      The $1.2 million guarantied loan is made to help CCI's short term cash flow problem.**

In the latter part of 1999, CCI developed a cash flow problem.  CCI expected

its short term payables to cause it to exceed its receipts and its borrowing availability

under the line of credit.  To address this problem, Ortenzio requested a temporary

loan from Allfirst of $1 million for 90 days to tide CCI over what he represented to

Allfirst was a short term cash flow shortfall which CCI expected to experience.

Schwartz 29.

A meeting was held between Ortenzio and Phillips and Schwartz and Michael

Zarcone, a senior bank officer with substantial credit authority who could approve the

request (Schwartz 28), on November 4, 1999 to discuss CCI's request for a temporary

increase in available credit.  Ex P-9.  In the meeting, Ortenzio  presented Schwartz

and Zarcone with CCI's financial statements and a cash flow projection.  Ortenzio

171.  The cash flow projection showed CCI receiving increased cash flow from

collections on its receivables in an amount sufficient to repay the $1 million

temporary loan in 90 days.  The cash flow projection showed how CCI would repay

5

the temporary loan and the source of the funds to make the payment 90 days hence. Ortenzio 171-4 ("We showed them a cash flow analysis which laid out where it was going to, where those funds were expected to come from."); Schwartz 29-30. Ortenzio represented to Schwartz that the cash flow projection was a worst case scenario, that he was certain the cash flow projection was accurate, and that CCI would not need more than 90 days for its cash flow to increase to the point that the temporary loan could be repaid. Ortenzio 175-9.

As a result of the meeting, Allfirst agreed to extend a temporary $1.2 million loan to CCI, which would be due on March 31, 2000. Ex P- 10, 11. Allfirst, however, was unwilling to extend the $1.2 million loan to CCI unless Ortenzio guarantied the loan. Schwartz 32; Zarcone 479. To obtain the loan for CCI, Ortenzio gave his guaranty. This guaranty obligated Ortenzio on the temporary loan and authorized Allfirst to collect the loan directly from Ortenzio to the same extent as if the loan had been made to him. Ex P-12. Repayment of the $1.2 million loan was expected to come from an increase in cash flow consistent with the cash flow projection. Schwartz 37. To Schwartz, this meant that CCI's cash flow would be sufficient to produce a positive balance in the account sufficient to repay the temporary loan. Neither Schwartz nor Zarcone expected a borrowing on the line of credit to be used to repay the short term loan. Schwartz 38, 40; Zarcone 480-81.

6

Schwartz testified that he did not put a restriction in the $1.2 million loan documents against paying off this temporary loan by borrowing on the line because the commitment letter for the line prohibited such a borrowing by limiting the use of the line to financing accounts receivable and work in process. Schwartz 38-9. He further testified that loan documents restrict the use of loan proceeds but never the source of repayment. Schwartz 39, 100. Schwartz testified that he would not have agreed to make the temporary loan had he had any belief that Ortenzio would repay the temporary loan by borrowing on the line. Schwartz 99. Although the bank expected future cash flow was to be the source of repayment, Ortenzio had the ability to make the payment personally. Ex P-13; Ortenzio 181-2. Repayment of the temporary loan was not dependant on CCI obtaining the cash flow it was expecting. Schwartz 33. Allfirst required Ortenzio's personal financial statement before making the loan. Ex P- 13. Allfirst would not have made the $1.2 million loan other than in the expectation that Ortenzio's personal wealth was available to repay the loan if CCI did not. Schwartz 32; Zarcone 479.

### C.    CCI's financial condition plummets.

CCI's financial condition and cash flow position worsened after the $1.2 million loan was made. Phillips 320. CCI, which made a profit the preceding year, lost over $6 million in 1999 and was balance sheet insolvent by almost $1 million.

7

Contrast Ex P-5 with P-17,18. By February, 2000, CCI projected that it would have a cash flow shortfall of several million dollars over the next several months. Ex P-19. This meant that CCI's expected revenues would be millions of dollars short of the funds it needed to continue operating and stay in business.

From November, 1999 forward, CCI continuously had an outstanding balance under the line. Ex P-14. Use of the line of credit to pay employees, vendors, and subcontractors was essential to CCI's continued existence and CCI needed all of the cash and credit it could muster to stay in business. Phillips 324-7.

Phillips monitored CCI's cash position closely. Phillips 334. She maintained a "cash book" in which she recorded checks written and deposits made to tell her where the company stood. Phillips 336-7. Although CCI had access to Allfirst's computer regarding its account (Phillips 335), this cash book was more current than Allfirst's records, which only reflected checks written and deposits received after the checks had cleared. Phillips 335-6. CCI was frequently maxed out or near being maxed out on the line of credit. Phillips 336-7. Phillips was compelled to hold checks that had been written until she could be sure there was borrowing availability to pay them. Phillips 338.

Phillips kept Ortenzio fully apprized of CCI's precarious financial condition and desperate lack of cash to cover operating expenses, both from personal

8

discussions with him and the financial reports and cash flow projections she prepared. Phillips 307, 336-9. Phillips used the cash book to compile the cash flow projections which she regularly prepared and provided Ortenzio. Phillips 338. Besides these cash flow projections, CCI prepared monthly internal financial statements that also were provided to Ortenzio. Phillips 306-7, 321. The January, 2000 financial statements showed the $6 million loss for fiscal 1999 and the balance sheet insolvency of almost $1 million. Ex P-17,18. Based on Phillips' discussions with him, Ortenzio was fully aware of CCI's financial situation as shown on these financial statements. Phillips 323.

The cash flow statements Phillips prepared showed that CCI had not achieved the cash flow projections provided to Allfirst in November of 1999, when the $1.2 million temporary loan was taken out. These current statements and projections showed that CCI's cash flow situation had worsened, not improved. Phillips 323. Ortenzio knew from his discussions with Phillips that CCI had not achieved the cash flow projection given Allfirst in November of 1999 and that this projection proved to be incorrect. Phillips 332.

Ortenzio, although a wealthy man, refused to invest any more of his money in the Company. Based on the financial condition of the company, he believed that he would lose any additional investment. He preferred to let the Company fail and go

9

into bankruptcy rather than support it with his personal resources. He discussed the possibility of a bankruptcy proceeding for CCI with Sheri Phillips and Shane Miller, CCI's COO, on several occasions. Phillips 325-6.

Despite its history of keeping Allfirst informed, none of this financial information was provided to Allfirst in January or early February, 2000. Schwartz 41. Schwartz had not been given copies of the 1999 balance sheet and income statement (Ex P-17,18) as required by the commitment letter (Ex P-1) and had no knowledge of the $6 million loss, CCI's insolvent state, or its desperate need for cash. Schwartz 42-3. The material adverse change in CCI's financial condition was a default under the $1.2 million loan and Ortenzio's guaranty. Ex P-11,12. Schwartz 36. This default on the temporary loan, CCI's failure to provide Allfirst with the financial information required by the commitment letter, and CCI's drastic financial deterioration was a basis for Allfirst to refuse CCI any further access to the $4 million line of credit under the terms of the commitment and the FILM Note that evidenced the line. Ex P-1,2. Had he known this information (which he was entitled to have), Schwartz would have frozen the line of credit and refused any further advances to CCI. Schwartz 44.

**D.    Ortenzio's ploy to escape liability under his guaranty.**

**1.    Ortenzio knew he was paying the loan with a borrowing while CCI was insolvent and hid the fact from Allfirst.**

Ortenzio was acutely aware of his guaranty of the $1.2 million loan and of his personal obligation to pay this sum to Allfirst. Phillips 398. With CCI's inability to pay the $1.2 million loan, he was determined to avoid honoring his guaranty. He intended to do whatever he could to avoid paying Allfirst the money he agreed to pay in November of the preceding year.

To avoid his guaranty liability, Ortenzio decided in February, 2000 to have CCI, which was desperate for cash, repay the $1.2 million loan which he had guaranteed with a borrowing under the $4 million line of credit which he had not guaranteed. His sole reason to have CCI borrow to repay the temporary loan was to avoid his guaranty obligation, even though doing so was not in the best interests of the company. Phillips 328-330. He made this decision with a full appreciation of CCI's perilous cash situation. Ortenzio 192-3.

Phillips adamantly opposed Ortenzio's plan to have CCI borrow to repay the guaranteed loan. She believed this repayment would only further restrict and reduce CCI's available cash and hasten the financial collapse of the company. Phillips 329. She also believed that this payment was an unauthorized use of the line

11

of credit. Phillips 330. Ortenzio could give her no business reason for having CCI borrow to repay the guaranteed loan, which was not yet due. Phillips 328.

So firm was her opposition to Ortenzio's plan that she refused to write the check to effect the repayment. Her opposition was overridden by Ortenzio, who went to CCI's accounting department and had the check written. Phillips 329-330. Under normal procedures, Phillips would have had the check prepared and signed it before forwarding the check to Allfirst.[3] Phillips 331. Ortenzio had never been involved in making payments to Allfirst on CCI's outstanding loans. Phillips 308.

On Friday, February 11, 2000, Ortenzio called Schwartz to inquire about coming by to deliver the check to pay off the $1.2 million loan. Ortenzio 200-4; Schwartz 45. According to Ortenzio in his bankruptcy deposition, he told Schwartz that CCI's financial projections given to him in November, 1999 were accurate and that CCI had collected the receivables needed to repay the $1.2 million loan.[4] Ortenzio 200. Schwartz told Ortenzio that he would be out of the Bank at a luncheon meeting with a customer until that afternoon. Schwartz 45-46. After speaking to

---

[3]     The false testimony of Ortenzio stands in stark contrast to that of Phillips and Schwartz, who testified honestly about the facts as they remembered them. The difference between Ortenzio and Phillips' accounts of the writing of the check provide a glaring example of the contradictory and unreconcilable testimony of these witnesses.

[4]     This bankruptcy deposition was taken before this suit was filed and before Ortenzio had a motive to testify falsely.

12

Schwartz, Ortenzio personally went to Allfirst to deliver the check that would repay the $1.2 million loan between 11:am and 1:00 pm (Ortenzio 205), precisely when he knew that Schwartz would not be there.  As Ortenzio knew would be the case, Schwartz was not present when Ortenzio arrived at the Bank. Schwartz 45-6. Ortenzio gave a check drawn on CCI's account with Allfirst to Schwartz's secretary and asked that it be applied to repay the $1.2 million loan.  Schwartz 45-46.

As he admitted in his bankruptcy deposition, Ortenzio checked the outstanding balance on the line before going to Allfirst to make the payment.  Ortenzio 193. Although the exact balance on the line of credit would have fluctuated on February 11, 2000 if payments had been received from customers and if checks had been issued by CCI and presented for payment, Ortenzio had no reasonable or credible belief that receipts in the account that day would be of a sufficient magnitude to repay the outstanding balance on the line and result in a credit and positive balance of at least $1.2 million. Phillips 339-40.  Ortenzio knew that he was causing CCI to borrow to repay the loan and that he was surreptitiously repaying Allfirst with its own money. Ortenzio knew at the time he presented the check that, given its insolvent condition, CCI had no prospect of repaying Allfirst the money it was borrowing to discharge the loan he had guaranteed.

13

**2.    Allfirst had no knowledge or ability to know that Ortenzio had improperly paid the Bank with its own money while CCI was insolvent.**

When he returned to Allfirst at 4:30 pm, Schwartz learned that Ortenzio had been in and had paid off the $1.2 million loan. Schwartz 46. He did not, however, see either the actual check or a copy of it. He did not even know who the maker of the check was. Schwartz 47,49.

Even had Schwartz seen the check, he would not have been able to tell from looking at it that it represented a borrowing under the line. Schwartz 47; Zarcone 472. Nor could he tell from other sources reasonably available to him. Zarcone 472. The Allfirst computer would not disclose this information because the check had not been cleared or paid on February 11. Schwartz 47-48. The check did not clear and was not paid until the next Monday, when the Allfirst computer showed the Friday account activity. Ex P-14. Even if he had a reason to question the payment on Friday, he could not have determined that the check represented a borrowing on the line from consulting the Allfirst computer. And, Ortenzio's appearing when he knew Schwartz was out of the office prevented any of the normal conversation that could have been expected and that might have revealed CCI's financial condition, which may have caused Schwartz to become suspicious.

Schwartz, however, had no reason to be suspicious. Schwartz 47. The loan was

14

being repaid a month before its due date. Ortenzio and Phillips had shown him a cash flow projection demonstrating that the loan could be repaid from cash receipts. Ortenzio told Schwartz on February 11, 2000 that the projections had been fulfilled. Ortenzio 200. Thus, Schwartz believed that CCI was doing well financially and that its short term cash flow problem had been resolved, as he hoped and expected would be the case when he made the $1.2 million loan. Schwartz 49. Schwartz, who did not check or monitor line of credit borrowings for any of his customers, had no idea that CCI had an outstanding balance under the line of credit on February 11, 2000 and had no reason to believe it did or any suspicion to make him check. He believed Mr. Ortenzio, who had been a customer of the Bank for many years, to be a man of integrity and had no suspicion that he would try to repay the Bank with its own money. Schwartz 47-50.

Although the commitment letter entitled him to the information, Schwartz also was unaware of CCI's insolvent status and its being in default. He had not been presented with a copy of the internally generated 1999 financial statements for CCI which showed a $6 million loss for the year and that CCI was insolvent by almost $1 million. He did not know that CCI was ineligible to borrow any money on the line of credit and was in default. Although Ortenzio had a copy of the company's financial statements (Phillips 321), he neither provided Schwartz with a copy (which CCI was

15

obligated in the commitment letter to do) nor told him what the financial statements reflected before Ortenzio repaid the $1.2 million loan on February 11, 2000. Schwartz 41. Instead, he gave Allfirst the financial statements one week later, on February 18, 2000, when it was too late for Allfirst to refuse to permit the borrowing. Schwartz 60-61. As Ortenzio well knew, providing this information to Schwartz before attempting to repay the guaranteed loan with a borrowing on the unguaranteed line would have put Schwartz on his guard and foiled the plan. Schwartz 20-24. Kept in ignorance, Schwartz assumed that CCI was financially sound.

After personally delivering the check to Schwartz's secretary while Schwartz was away from his office, Ortenzio telephoned Schwartz at the beginning of the next week to request an immediate return of his guaranty. He did not disclose to Schwartz that the payment had been made by a draw on the unguaranteed line of credit. Nor did he disclose that CCI was insolvent and about to fail financially. Schwartz was left in the dark and believed that CCI had accomplished the cash flow it predicted in November of 1999. Ortenzio did not ask to set up a follow up meeting with Schwartz even though he had missed him on February 11. Schwartz 51-2; Ortenzio 207-8.

Because of Ortenzio's insistence, Schwartz put a rush request into Allfirst's document control section and notified Ortenzio on Tuesday, February 15, 2000, that he would return the guaranty to Ortenzio as soon as possible. Ex P- 15; Schwartz 51.

16

The guaranty was returned to Ortenzio by Schwartz on Thursday, February 17, 2000. Schwartz 53. At the time Schwartz returned the guaranty, Allfirst was unaware that the unguaranteed line of credit, which was to be used to finance accounts receivable and work in process, had been used to repay the guaranteed $1.2 million loan. Allfirst also was unaware that CCI was insolvent and about to collapse from a lack of available cash. Schwartz 54.

**E.    Ortenzio discloses CCI's precarious financial condition to Allfirst.**

With his guaranty in hand and believing he was now free from any obligation to pay the $1.2 million loan, Ortenzio had Phillips call Schwartz on Friday, February 18, to request a meeting with Allfirst. Schwartz 56. Prior to the meeting, Ortenzio retained Robert Chernicoff, a bankruptcy specialist, to represent CCI. Ortenzio 217.

The meeting was held on Friday, February 18, 2001 at Allfirst's office, exactly one week after he had CCI borrow money on its line of credit to repay the loan Ortenzio had guaranteed. Schwartz 58. Ortenzio was accompanied to the meeting by Chernicoff. Ortenzio 217. At the time of the meeting, Ortenzio knew that CCI had lost over $6 million dollars in 1999 and was insolvent by almost a million dollars, but had not disclosed these facts to Allfirst. Allfirst had no appreciation of the severity of CCI's financial distress until Ortenzio requested the meeting, on Friday 18, 2000, and disclosed the $6 million loss and huge projected cash flow deficit.

17

In the meeting, Ortenzio presented the internally generated financial statements showing the $6 million loss and the insolvency as well as a cash flow projection that showed that CCI would have a cash shortage over the next 5 months of $5,873,456. Ex P-19; Schwartz 61-2. Although disclosing CCI's cash flow emergency, he did not reveal during the meeting that the $4 million line of credit had been used to repay the $1.2 million loan he had personally guaranteed. As of this meeting, Allfirst had no knowledge of Ortenzio's use of the line of credit to discharge the loan he had guaranteed. Schwartz 63.

**F.    Ortenzio compels Allfirst to shut down the line of credit.**

Despite a promise to stop writing checks on the line of credit pending a meeting with CCI's bonding company, Ortenzio continued CCI's check writing. Phillips 344-5; Gibson 404-5. When these checks were presented for payment, Allfirst dishonored the checks that Ortenzio promised would not be issued. Because of the flurry of checks that were being presented, despite Ortenzio's promise, Allfirst closed down the line of credit on Thursday, February 24, 2000 to prevent further draws. Gibson 408.

**G.    Allfirst declares a default and CCI files bankruptcy.**

On February 24, 2001, Allfirst formally declared CCI in default and demanded payment. Ex P-24. At the time default was declared, Allfirst still was unaware that Ortenzio had on February 11, 2001 used the unguaranteed line to repay the $1.2

18

million loan he had guaranteed. Allfirst did not learn of this use of the line until after the default had been declared. Gibson 412.

On February 22, 24, and 25, 2000, customers of CCI wired payment of their outstanding accounts to Allfirst. These payments totaled $2,317,291.28 and were credited against the outstanding balance under the line of credit, which now reflected the draw to prepay the $1.2 million line. Gibson 413-14.

On May 19, 2000, CCI filed a petition under Chapter 11 of the *United States Bankruptcy Code.* On January 10, 2001, CCI, as debtor in possession, instituted an action to recover the customer payments as a preference under *Bankruptcy Code* § 547 in an adversary proceeding entitled *CCI Construction Co., Inc. v. Allfirst Bank* (Adversary No. 1-01-00011A). Allfirst is defending against the debtor in possession's claim and the matter, after being set for trial on May 2, 2002, was postponed due to the death of Bankruptcy Judge Woodside and has not been reset. Ex P- 29-30. Any recovery in this preference action will reinstate the recovered amounts as part of the outstanding balance on the line of credit.

## H.    Allfirst's Damages.

Allfirst advanced money under the line of credit that it would not have advanced but for Ortenzio's fraud. Therefore, Allfirst is claiming as damages the balance of the amount Ortenzio caused CCI to borrow on February 11, 2000 which has not been

19

collected after CCI's default.  The amount due Allfirst equals either (a) the unpaid

principal balance of the line of credit, or (b) the unpaid principal balance of the line

of credit, adjusted upward to reflect  any preference recovery (but not to exceed the

$1.2 million amount borrowed on February 11 to repay the $1.2 million loan), together

with interest on the unpaid principal balance under either (a) or (b) as applicable.  Ex

P- 25,26.  Allfirst also claims attorneys fees and litigation expenses pursuant to the

Suretyship Agreement signed by Ortenzio to guaranty the $1.2 million loan.

### III.
### Law and Argument

"It is well established that fraud consists of anything calculated to deceive,

whether by single act or combination, or by suppression of truth, or suggestion of what

is false, whether it be by direct falsehood or by innuendo, by speech or silence word

of mouth, or look or gesture." *Moser v. SeSetta*, 527 Pa. 157, 589 A.2d 679 (1991).

Fraud "is any artifice by which a person is deceived to his disadvantage." *In re*

*McClellan's Estate*, 365 Pa. 401, 75 A.2d 595 (1950); *Delahanty v. First Pennsylvania*

*Bank, N.A.*, 318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983).  "(T)he *sina qua non*

of actionable fraud is a showing of a deception." *Frowen v. Blank*, 493 Pa. 137, 143,

425 A.2d 412, 415 (1981).

"The elements of intentional misrepresentation are as follows:  (1) a

representation; (2) which is material to the transaction at hand; (3) made falsely, with

knowledge of its falsity or recklessness as to whether it is true or false; (4) with the

intent of misleading another into relying on it; (5) justifiable reliance on the

misrepresentation; and (6) the resulting injury was proximately caused by the

reliance." *Bortz v. Noon*, 556 Pa. 489, 499, 729 A.2d 555, 556 (1999). *See also*

*Sonfast Corporation v. York International Corporation*, 875 F. Supp. 1088 (M.D. Pa

1994).

**A.    Ortenzio's intentional misrepresentation was made with the intent
of misleading Schwartz.**

A misrepresentation need not be a positive statement. *Delahanty v. First*

*Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 107, 464 A.2d 1243, 1252 (1983);

*Borelli v. Barthel*, 205 Pa. Super. 442, 211 A.2d 11 (1965) ("fraudulent

representations may be made by ... acts or artifices calculated to deceive").   The

concealment of a material fact or the failure to disclose a material fact that in good

faith should be disclosed amounts to a misrepresentation. *Moser v. SeSetta*, 527 Pa.

157, 589 A.2d 679 (1991) ("The concealment of a material fact can amount to a

culpable misrepresentation no less than an intentional false statement."); *Neuman v.*

*Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 442 (1947) ("The

deliberate nondisclosure of a material fact amounts to culpable misrepresentation no

21

less than an intentional affirmation of a material falsity."); *Borelli v. Barthel,* 205 Pa. Super. 442, 211 A.2d 11 (1965) ("fraudulent representations may be made by ... acts or artifices calculated to deceive").

When good faith and fair dealing require disclosure of a fact as to which another party is unaware or is operating under a mistaken assumption and disclosure is not made so as to deceive, there is a fraudulent representation. *In re McClellan's Estate,* 365 Pa. 401, 75 A.2d 595 (1950) ("Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of a fact or by silence when good faith required expression."); *Fox's Foods, Inc. v. Kmart Corp.,* 870 F. Supp. 599 (M. D. Pa. 1994) (suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, especially if suppressed fact is particularly within knowledge of one party and of such a nature that other party is justified in assuming its non-existence.) As one United States District Court held:

> The failure to disclose a material fact amounts to a misrepresentation where disclosure would correct a mistake as to a basic assumption and non-disclosure amounts to a failure to act in good faith and in accordance with standards of fair dealing. Restatement (Second) of Contracts, § 161.

*Derby & Co.,Inc. v. Seaview Petroleum Company,* 756 F. Supp. 868 (E.D. Pa. 1991).

Under these principles, Ortenzio made a false representation, either as a false statement, a concealment or failure to disclose when there was a duty to disclose, or

22

a combination thereof. There can be no question that he did so knowingly and with the intention of deceiving Schwartz and Allfirst.

In the November, 1999 meeting, Ortenzio provided a cash flow projection of CCI to demonstrate how CCI would repay the loan. He affirmatively told Schwartz that he was certain this projection was accurate. He told him that he only needed the loan for 90 days because he was so certain of the accuracy of the projection. Despite this assurance, Allfirst made the loan due on March 31, 2000 to give CCI breathing room.

CCI had a contractual obligation to provide Allfirst with information as to its financial situation as a condition of using the line of credit. CCI also could not borrow on the line if it was in default on the $1.2 million loan, as was the case due to the adverse change in CCI's financial position. Allfirst had the absolute right to cut off the line of credit based on this information.

Ortenzio knew that this information had not been presented to Schwartz, and he did not disclose CCI's financial deterioration or default under the $1.2 million loan prior to causing CCI to borrow under the line to make a payment to discharge his guaranty obligation. Once he had caused CCI to borrow money on the line to make the payment, he disclosed CCI's financial deterioration to Allfirst. Had he done so a week earlier or revealed that CCI was borrowing to make the payment, he knew that

23

Allfirst would have shut down the line of credit and foiled his plan to escape liability under the guaranty.

Worse, Ortenzio falsely told Schwartz that CCI had achieved the November 1999 cash flow projection when he called Schwartz on February 11. He knew, if only from being told so by Phillips, that what he was telling Schwartz was an untrue statement and that CCI had not met its November cash flow projection. This was a blatant misrepresentation that Ortenzio knew would further lull Schwartz into not questioning the source of the money for the payment or inquiring into CCI's finances.

Ortenzio also took steps to conceal and avoid disclosing information that would have put Schwartz on his guard. He appeared at Allfirst when he knew Schwartz would not be there for the obvious reason of avoiding any conversation with Schwartz that might have focused on CCI's financial performance. He certainly knew that Schwartz was operating under a false impression which he had engendered, and he purposely did nothing to correct it.

Ortenzio knew that the purpose of the line was to finance accounts receivable and work in process and that the use of the line to repay the $1.2 million loan was an unauthorized borrowing. He knew that a borrowing under the line did not amount to a payment from cash flow as he had originally told Allfirst would occur when the loan came due. He was fully aware of CCI's financial distress and that bankruptcy

24

was a real possibility. He certainly knew that CCI would be unlikely to be able to repay what it was borrowing on the line to discharge his guaranty obligation. He also knew that the February 11 transaction would do nothing more than convert guaranteed debt into unguaranteed debt and make a collectible loan uncollectible, all to his personal benefit and CCI's ultimate detriment.

**B.    Allfirst's reliance was justifiable.**

Schwartz testified that, had he known Ortenzio was presenting a check that was a borrowing on the line to repay the $1.2 million loan, he would have refused the check and not permitted it to be processed for payment. Schwartz 50. That Schwartz relied upon the check not being a borrowing is a fact that has not been contested. Instead, Ortenzio has argued that Allfirst's reliance on his misrepresentations was not justifiable because Schwartz had the ability to discover that CCI had borrowed on the line of credit to repay the $1.2 million loan. Ortenzio's argument is incorrect as a matter of law and fact.

It is true that a person asserting fraud cannot justifiably rely upon a misrepresentation that is obviously false or if that person has readily available information or material that demonstrates the falsity of the misrepresentation. But, there is no duty on the part of a plaintiff to investigate and, through the investigation, discover the falsity. Nor need a plaintiff look to information or material

25

demonstrating the falsity that, while available, is not readily available or available

without the expenditure of some effort.  For example, in *Emery v. Third National

Bank of Pittsburg*, 308 Pa. 504, 162 A.2d 281 (1932), the plaintiff purchased stock

in a company on the assurance from the defendant that the "company was prosperous

and self-sustaining."  The plaintiff, however, had been given a financial statement

that showed that the company had been losing money and was insolvent, exactly the

opposite to what had been represented.  In holding that justifiable reliance did not

exist where the representation was patently false, the Pennsylvania Supreme Court

cautioned that a mere suspicion or the mere opportunity to learn of the falsity of the

representation would not have negated the reasonableness of reliance.  As the

Supreme Court wrote:

> If a man knows the truth about a representation, he is neither deceived
> nor defrauded, and any loss he may sustain is in effect self-inflicted.
> (Citation omitted).  It is also the law that, if a person to whom
> misrepresentations are made is in a position to know or ascertain the
> facts, his knowledge of them may be inferred.  **But a bare suspicion or
> an opportunity to learn the truth through the exercise of reasonable
> diligence does not constitute knowledge of fraud sufficient to
> prevent recovery.** (Citation omitted) (emphasis added).

*Lake v. Thompson*, 366 Pa. 352, 77 A.2d 364 (1950) ("There is nothing before the

Court which even remotely suggests that Mrs. Lake had reason to doubt any of the

material representations made by Thompson.  She could reasonably rely upon the

26

representations made to her regarding those facts which were not open and notorious upon a **casual inspection**.") (emphasis added).

Apart from being charged with knowledge of that which is obvious or easily available, a plaintiff has no duty to investigate or to exercise any diligence to discover the falsity of a misrepresentation as a condition to reasonable reliance on the misrepresentation. The recipient of a fraudulent representation is justified in relying on the truth of the representation even though the falsity of the representation could have been ascertained upon a thorough investigation. *Borelli v. Barthel*, 205 Pa. Super. 442, 211 A.2d 11 (1965); *Bowman v. Home Life Insurance Company of America*, 260 F.2d 521 (3rd Cir. 1958) (Recipient in business transaction of fraudulent misrepresentation of fact justified in relying on its truth even though an investigation would have disclosed its falsity); *Marian Bank v. International Harvester Credit Corporation*, 550 F. Supp. 456 (E.D. Pa. 1982)(That plaintiff could have discovered existence of tax liens on vehicles did not negate reasonableness of reliance on absence of liens based on defendant's non-disclosure). *Restatement, Second, Torts* § 540; Dobbs, *The Law of Torts*, § 475 ("In actual fraud cases, the plaintiff is ordinarily justified in relying upon the defendant's material representations without any investigation at all"); Harper, James & Gray, *The Law of Torts* (2nd Ed.), §7.12 ("The failure of plaintiff to use ordinary diligence to make an investigation or

27

otherwise discover the truth of the matter will not ordinarily bar his recovery from one who consciously deceived him. The law protects even careless dupes from fraud. And this is true even though the investigation 'could be made without any considerable trouble or expense.'").

The rule excusing the defrauded person from conducting an investigation has particular application where the defendant's deceptive conduct has induced the defrauded person not to investigate or where the true facts have been concealed by the defendant. *See Sewak v. Lockhart*, 699 A.2d. 755 (Pa. Super 1997). *See also Greenberg v. Life Insurance Company of Virginia*, 177 F.3d 507 (6th Cir. 1999) (reliance is justified if "the representation does not appear unreasonable on its face and purchaser has no apparent reason to doubt its veracity.")

There was nothing that made it obvious to Schwartz that CCI had repaid the $1.2 million loan with a borrowing at a time when it was in default and on the verge of bankruptcy. The check, which Schwartz did not even have available to him, did not disclose that the funds needed to pay it had to come from a borrowing. Schwartz's computer reflected activity only through the previous day and would show the check as a borrowing only on Monday, after the check had been irrevocably paid. Ortenzio, who knew there would be a borrowing and that CCI was in financial distress, told Schwartz nothing. Indeed, Ortenzio never disclosed that he had caused

28

CCI to borrow to repay the $1.2 million loan and waited until the next Friday, after he received his guaranty back, to disclose that CCI was about to fail.

Schwartz had no reason to even be suspicious. Ortenzio had shown him a cash flow projection in November that demonstrated that the $1.2 million loan would be repaid in 90 days from increased receivable collections. Ortenzio told Schwartz that he was certain the projection was accurate and that he did not need more than 90 days for CCI to repay the loan. Although the term of the loan ran to March 31, 2000, it was being paid off early, on February 11. And, Ortenzio called Schwartz on February 11 to tell him that CCI's November projections were accurate and that he was paying the loan off for this reason. At that time Schwartz understood CCI to be a good, long term customer of Allfirst and Ortenzio, a man of high integrity. Schwartz knew that the line was to be used to finance accounts receivable and work in process and that repayment of the $1.2 million loan would not have been an authorized borrowing under the terms of the commitment he and Phillips had put in place. CCI had not given Allfirst any financial information since November, 1999, despite the requirements of the line of credit commitment. Schwartz had no idea the $1.2 million loan, and in turn the line of credit, were in default and that Allfirst was entitled under the commitment to stop funding the line of credit. Schwartz, consistent with his practice with all good customers, did not monitor via his computer CCI's usage of the

29

line of credit and was unaware on Friday that there was an outstanding balance. Unlike Ortenzio, he did not have the information in CCI's cash book that showed CCI was using the line heavily. In this context, Schwartz had no reason to be suspicious, much less investigate, the source of the money used by CCI to repay the temporary loan. As he testified, Schwartz believed his good customer, CCI, had met its projections and all was well.

Even if he were suspicious, Schwartz could not have learned the truth at any time that would have enabled him to take steps to protect the Bank. Ortenzio appeared at Allfirst when he knew Schwartz was not there. This prevented Schwartz from making any verbal inquiry. Ortenzio gave the check to a secretary, who took it to a teller in the downstairs branch for processing. When Schwartz returned to his office at 4:30, the check was gone and was being processed offsite for payment. There was no information available on the computer. The computer did not show the borrowing, or what checks had been presented and deposits, received, until Monday, when the check had already been paid and nothing could be done to reverse the payment. *See,* 13 Pa.C.S.A. §4215 (2002); *See also,* White & Summers, § 20-4, *Uniform Commercial Code,* Vol. 4 (2002).

Ortenzio's scam was not obvious to Schwartz, and he had no ability through reasonable means to discover what Ortenzio was perpetrating.

## C.    Allfirst's damages.

Because of Ortenzio's fraud, Allfirst advanced money on the line of credit that it would not have advanced if it had not been deceived. This advance repaid Ortenzio's obligation under the guaranty. Absent the scam, Allfirst would not have made the advance on the line of credit and would have collected the full $1.2 million from Ortenzio, who had the ability to pay this obligation. Because of the amount it advanced as a result of fraud, Allfirst was left with an unpaid balance on the line of credit that would not have existed except for the fraud.

Depending on whether Allfirst retains payments made by CCI's customers prior to the bankruptcy that have been challenged as preferences, the amount of loss caused by Ortenzio's fraud is either (a) $284,222.52, as the unpaid balance on the line giving credit to the preference payments (together with interest of $47,279.38 through 7/31/02 and per day interest thereafter of $33.55), or (b) $1,200,000, as the full amount of the fraudulently induced borrowing on the line if the challenged preference payments are set aside (together with interest of $203,466.87 through 7/31/02 and per day interest thereafter of $141.67) .

In sum, Ortenzio's fraud caused Allfirst to advance money on the line of credit that it cannot collect. To the extent Allfirst cannot collect the amount it was fraudulently induced by Ortenzio to advance, it has been damaged.

31

# IV.
## Conclusion.

For these reasons and those presented at trial, Allfirst requests that judgment be entered in its favor.

Lawrence J. Gebhardt, *Pro Hac Vice*
Ramsay M. Whitworth, PA Bar: 85208
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
Baltimore, MD 21202
(410) 385-5100
*Attorneys for Allfirst Bank*

32

## CERTIFICATION PURSUANT TO LOCAL RULE 7.8(b)

The undersigned hereby certifies to the Court that the Plaintiff's Post Trial Brief contains 7,813 words according to the word count feature of the word processing system used to prepare the Trial Brief. This count is within the 333 words per page average established by Local Rule 7.8(b).

Ramsay M. Whitworth

## CERTIFICATE OF SERVICE

Pursuant to Judge Rambo's 9/26/02 Order, I HEREBY CERTIFY that on September 27, 2002 an original and two copies of *Plaintiff, Allfirst Bank's Post Trial Brief* was sent via Federal Express to: Chambers, Judge Sylvia H. Rambo, Federal Building & U.S. Courthouse, 228 Walnut Street. P.O. Box 983, Harrisburg, PA 17108.

I further certify that, in accordance with the Order, a copy of the aforementioned *Brief* will be served on October 9, 2002 by U.S. Mail, postage prepaid to: Edward I. Swichar, Esquire and Robert Burke, Esquire, BLANK ROME COMISKY & MCCAULEY LLP, One Logan Square, Philadelphia, PA 19103, *Attorneys for Defendant.*

Ramsay M. Whitworth

34