IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLFIRST BANK, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 1:01-CV-786 |
| | : | |
| JOHN M. ORTENZIO, | : | |
| | : | |
| Defendant. | : | |

FILED
HARRISBURG, PA

OCT 0 9 2002

MARY E. D'ANDREA, CLERK
Per _____
          Deputy Clerk

## DEFENDANT'S POST-TRIAL BRIEF

Defendant, John M. Ortenzio, by his undersigned counsel, respectfully submits this Post-Trial Brief.

# **TABLE OF CONTENTS**

**Page**

I.   NATURE OF THE CASE ................................................................ 1
   A. Summary Of Parties' Contentions................................................ 1
   B. Summary Of Key Evidence In Ortenzio's Favor ............................. 2
   C. Burden Of Proof ...................................................................... 3

II.  BACKGROUND ........................................................................ 4
   A. The November Meeting............................................................ 5
   B. Loan is Repaid ....................................................................... 8

III. ALLFIRST FAILED TO ESTABLISH THE ELEMENT OF
     JUSTIFIABLE RELIANCE. ..................................................... 10
   A. The Information Regarding The Source Of Repayment Was Readily
      Available To Allfirst............................................................... 10
   B. The Payment Of The $1.2 Million Note Could Have Been Reversed By
      Allfirst.................................................................................. 13

IV.  ALLFIRST DID NOT ESTABLISH THAT ORTENZIO MADE ANY
     MISREPRESENTATION OR OMISSION BECAUSE THE MANNER OF
     REPAYMENT OF THE $1.2 MILLION NOTE WAS CONSISTENT
     WITH THE CCI LOAN DOCUMENTS. ...................................... 16
   A. Zarcone Testified That The Manner Of Repayment Was Not Prohibited
      Because The Proceeds Of Both The $4 Million Line Of Credit And The
      $1.2 Million Note Were To Be Used For The Same Purpose.......................... 18
   B. Ortenzio Did Not Conceal The Fact That The $1.2 Million Loan Was Being
      Repaid By Using The $4 Million Line Of Credit........................................... 20
   C. Allfirst Could Have And Should Have Included In The Loan Documents A
      Provision Prohibiting The $1.2 Million Note From Being Repaid With The
      $4 Million Line Of Credit If It Was "Material" To The Transaction............. 21

V    ALLFIRST FAILED TO ESTABLISH THAT DEFENDANT'S
     CONDUCT WAS THE PROXIMATE CAUSE OF ANY DAMAGES. .... 24
   A. Allfirst Failed To Prove It Was Damaged by the Repayment of the $1.2
      Billion Short-Term Loan. ............................................................ 24

VI.  CONCLUSION............................................................................ 25

113449.00601/21067937v3

# TABLE OF AUTHORITIES

Page

FEDERAL CASES

City of Rome v. Glanton, 958 F. Supp. 1026 (E.D. Pa. 1997) ................................. 20

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604
    (3rd Cir. 1995) ................................................................. 21

Lind v. Jones, Lang LaSalle Americas, Inc., 135 F. Supp. 2d 616 (E.D. Pa.
    2001) ........................................................................ 4, 21

Marian Bank v. International Harvester Credit Corp., 550 F. Supp. 456
    (E.D. Pa. 1982).............................................................. 11

Sunquest Information System, Inc. v. Dean Witter Reynolds, Inc., 40 F.
    Supp. 2d 644 (W.D. Pa. 1999)............................................. 20, 21

STATE CASES

Channel Equipment Co. v. Community State Bank, Inc., 996 S.W.2d 374
    (Tex. App. 1999)............................................................. 15

Delahanty v. First Pennsylvania Bank, 318 Pa. Super. 90, 464 A.2d 1243
    (1983) ..................................................................... 4, 21

Emery v. Third National Bank of Pittsburgh, 308 Pa. 504, 162 A. 281
    (1932)....................................................................... 11

Lombardo v. Mellon Bank, N.A., 454 Pa. Super. 403, 685 A.2d 595 (1996)........ 14

Pittsburgh Live, Inc. v. Servov, 419 Pa. Super. 423, 615 A.2d 438 (1992) ........... 25

Vogel, Administrator, v. Taub, 316 Pa. 41, 173 A.2d 270 (1934) ........................... 4

STATE STATUTES

13 Pa.C.S.A. § 4101(a)...................................................................... 14, 15

13 PACSA § 4302(a) ............................................................................. 14

13 Pa.C.S.A. § 4302(b) ........................................................................ 14

OTHER SOURCES

2 White & Summers, <u>Uniform Commercial Code</u>, § 20-2 (4th ed. 1995) ............. 15

113449.00601/21067937v3

## I.    NATURE OF THE CASE
### A.    Summary Of Parties' Contentions

The essence of this action is an attempt by Plaintiff, Allfirst Bank ("Allfirst") to hold Defendant, John M. Ortenzio ("Ortenzio"), personally liable for the corporate obligations of CCI Construction Co., Inc. ("CCI").  In its summary judgment ruling, this Court already determined that Allfirst's efforts to hold Ortenzio liable for breach of contract and equitable subrogation fail as a matter of law.  All that remained for trial was a fraud claim by Allfirst alleging that Ortenzio defrauded Allfirst by failing to advise Allfirst that CCI was repaying its $1.2 million loan with funds that, because of Allfirst's cash management system, turned out to be a borrowing under CCI's Line of Credit.   (Count III of Allfirst's Complaint).

The trial of Allfirst's fraud claim crumbled under the weight of the testimony of Allfirst's own current and former officers.  Allfirst failed to establish each element of its fraud claim by the stringent clear and convincing standard.  The facts established at trial, including the testimony of Allfirst's own witnesses, revealed that Allfirst cannot establish any of the elements of the fraud claim as: (1) there was no material misrepresentation or omission regarding the method of payment; (2) the method of repayment was not only permitted under the loan documents, it was the only way CCI paid its bills – including payment of other

1

loan obligations and interest payments; (3) at no time did Ortenzio withhold the method of repayment or believe that the method of repayment was in any way improper; (4) Ortenzio had no intent to mislead Allfirst; (5) there was no justifiable reliance on behalf of Allfirst as (a) Allfirst recorded the method of repayment that evening when the account was swept and (b) the information as to the method of repayment was readily available to Allfirst by merely checking its own records or asking CCI; and (6) Allfirst suffered no damages by the method of repayment.

### B.    Summary Of Key Evidence In Ortenzio's Favor

—    Michael Zarcone, the former Allfirst senior officer, who approved the CCI loans, testified that there was nothing improper in CCI repaying one loan with the proceeds of another especially where, as here, the "use of proceeds" for both loans was identical. (Zarcone, Vol. 3, 485:4-486:23);[1]

—    Allfirst could not have reasonably relied upon any statement or omission by CCI or Ortenzio as the information as to the method of repayment was readily available to Allfirst. Jamin Gibson, a current Allfirst officer, testified under cross examination that all information regarding CCI's accounts, including payments under the cash management system, was available to Allfirst by merely entering a few keystrokes into Allfirst's computers. (Gibson, Vol. 2, 436:13-438:21).

—    Zarcone concurred that the information was in Allfirst's computers and readily available the next business day. (Zarcone, Vol. 3, 473:8-24 and 481:21-482:21).

—    The printouts of Allfirst's computer screens show this, as well. (Gibson, Vol. 2, 436:13-438:17); and Exhibits "D-10" and "P-14".

—    The CCI/Allfirst loan documents do not preclude the method or source of repayment. (Exhibits "P-1, 2, 10 and 11"). Any ambiguity

---

[1]   The transcript of testimony will be referred to in the following manner: "name of witness, volume, page:line".

113449.00601/21067937v3

on this issue must be resolved in Ortenzio's favor as these were Allfirst's form documents.

— Sherri Phillips, CCI's former CFO, an Allfirst witness, testified that at no time did Ortenzio or anyone at CCI represent to Allfirst that the $1.2 million Short Term Note would be repaid solely with the use of excess cash flow. (Phillips, Vol. 2, 346:4-25).

— Over $5.7 million in excess cash flow came in to CCI's checking account in the month of February 2000, alone. This money could have been used to repay the $1.2 million loan. (Ortenzio, Vol. 3, 503:4-504:8); (Zarcone, Vol. 3, 468:24-470:9); and (Exhibit "D-24").

— Sherri Phillips testified that Allfirst was fully aware of CCI's financial condition in November 1999. At the November 1999 meeting, Allfirst was told that CCI was projecting a potential loss of up to $6.5 million for the year 1999. (Phillips, Vol. 2, 350:7 – 351:19) and (Zarcone, Vol. 3, 477:15-18).

## C.    Burden Of Proof

Count III of Allfirst's Complaint alleges that Ortenzio is liable for common law fraud on the basis of a single alleged misrepresentation:

> Delivery of the check amounted to and was the equivalent of a representation by Ortenzio that payment of the One Million Two Hundred Thousand Dollar loan was being made by CCI or by Ortenzio through CCI with monies other than those borrowed under the revolving Line of Credit.

Complaint at ¶ 34. Although Allfirst is permitted to conform the Complaint to the evidence that was presented, there was no evidence presented as to any mis-statement or omission by Ortenzio that could permit recovery by Allfirst against Ortenzio personally.

In order to prove fraud, Pennsylvania law requires that the plaintiff establish the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness

3

as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. See, Lind v. Jones, Lang LaSalle Americas, Inc., 135 F. Supp.2d 616, 620 (E.D. Pa. 2001). Additionally, these elements must be proven by clear and convincing evidence, not the lesser preponderance of the evidence standard. Id.

The "clear and convincing" standard requires the evidence to be "so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction without hesitancy, of the truth of the precise facts in issue." Delahanty v. First Pennsylvania Bank, 318 Pa. Super. 90, 110-111, 464 A.2d 1243, 1253 (1983). The evidence "is not only found to be credible, but of such weight and directness as to make out the facts alleged beyond a reasonable doubt." Vogel, Administrator, v. Taub, 316 Pa. 41, 43, 173 A.2d 270, 271 (1934).

## II.    BACKGROUND

This lawsuit involves a $4 million Line of Credit ("the Line of Credit"); a $2 million Commercial Loan (equipment) Note ("the Equipment Note"); and a Commercial Loan Note dated November 8, 1999, in the amount of $1.2 million, ("the Short-Term Note"), guaranteed by Ortenzio.    Pursuant to Allfirst's procedures, CCI maintained a single checking account at Allfirst and all of the funds from the aforementioned loans were commingled and tied into a single cash management facility.    More specifically, any checks written on CCI's account at

4

Allfirst increased the balance owed on the Line of Credit to the extent that daily checks exceeded same day deposits. Conversely, to the extent deposits exceeded checks presented that day, all revenues deposited to CCI's account had the effect of reducing the balance and, thereby, increasing the availability of funds that could be borrowed on the Line of Credit. (Zarcone, Vol. 3, 469:9-25). CCI was required to maintain its primary account at Allfirst and was required to deposit all revenues from cash flow into this account. (Schwartz, Vol. 1, 105:1-8). Indeed, this checking account was CCI's only checking account and the only way it paid its bills. (Phillips, Vol. 2, 356:24-357:14) and (Ortenzio, Vol. 1, 222:3-223:17; 227:9–16). In addition, CCI's customers wire transferred payments directly to Allfirst to be deposited directly into the checking account. <u>During the month of February 2000 (the time period at issue) over $5.7 million in cash was deposited into CCI's checking account by customers.</u> (Ortenzio, Vol. 3, 503:4-504:8) and Account Statement (Exhibit "D-24").

### A.   <u>The November Meeting</u>

In November 1999, Ortenzio and Phillips of CCI met with Schwartz and Zarcone of Allfirst to advise that CCI was having financial difficulties. Phillips testified that Allfirst was advised in November that CCI was projecting a loss for the year 1999 of at least 2 million dollars and possibly as high as 6.5 million dollars. (Phillips, Vol. 2, 350:7-351:19). Zarcone considered this to be an "extraordinary event" and a "serious issue" that would result in a downgrade of

CCI's credit rating at the bank. (Zarcone, Vol. 3, 460:11-462:11). Such a downgrade caused Allfirst to deem CCI's notes "high risk." (Zarcone, Vol. 3, 461:3--462:5). Allfirst was well aware of the fact that CCI's net worth in November was less than 4 million dollars. (Exhibit "P-7"). Accordingly, despite having knowledge that CCI's net worth was below 4 million dollars and that CCI was projecting a 1999 loss that could be as high as 6.5 million dollars, Allfirst loaned CCI the additional sum of $1.2 million and continued to make loans under the Line of Credit. Allfirst removed the net worth requirement when it loaned the $1.2 million to CCI.[2]

Instead of segregating the two loans, Allfirst applied the $1.2 million directly to the Line of Credit and decreased the balance owed on the Line of Credit by $1.2 million. (Exhibit "P-14"; Bates No. 7751). It is also undisputed that all payments that CCI made from its checking account, such as payroll, taxes, payments to vendors and re-payments on the Equipment Note were drawn from the Line of Credit, and thereby had the same effect of increasing the balance on the $4 million Line of Credit. (Phillips, Vol. 2, 363:2-366:3) and (Ortenzio, Vol. 1, 227:9-16).

There were no restrictions in the Short-Term Note as to the source of funds that could be used to repay the note. The Short-Term Note was temporary and,

---

[2] Compare commitment letter for $4 million Line of Credit ("P-1") with

113449.00601/21067937v3

indeed, had to be repaid no later than March 31, 2000. (Exhibit "P-11"). Allfirst initially unsuccessfully sought to increase the $4 million Line of Credit to a $5 million Line of Credit, and had requested that Ortenzio guarantee the full $5 million, but eventually agreed to limit Ortenzio's guaranty to the $1.2 million Short-Term Note. (Schwartz, Vol. 1, 31:16-22).

Pursuant to CCI's agreement with Allfirst, the form language in the $1.2 million Short-Term Note was stricken to make it clear that Ortenzio's guarantee would extend to the $1.2 million Short-Term Note only, and not to the $4 million Line of Credit or to any other loan facility at Allfirst. (Schwartz, Vol. 1, 98:22-99:9) and Guarantee (Exhibit "P-12"). Allfirst could have extended the guarantee up to $1.2 million to any loan facility, i.e., not limit the guaranteed amount to the Short-Term Note only, but failed to do so. Additionally, the form language in the $4 million Line of Credit was stricken to make clear that a default could not be called in the event of a material adverse change in the financial condition of CCI. (Exhibit "P-2") and (Phillips, Vol. 2, 354:3-355:13). The form language in both the $1.2 million Short Term Note and the $4 million Line of Credit was also changed to make clear that Allfirst must provide CCI with thirty (30) days notice of any default. Id. and (Phillips, Vol. 2, 356:3-9) This gave CCI the opportunity to react. (Phillips, Vol. 2, 356:10-15).

---

commitment letter for $1.2 million Short-Term Note ("P-10"). See also, ("P-7").

113449.00601/21067937v3

Over $5.7 million in cash flow was deposited into CCI's checking account by CCI's customers during the month of February 2000, alone. Account Statement (Exhibit "D-24"). These deposits were far in excess of the borrowings under the Line of Credit for that month. The balance on the Line of Credit at the start of February 2000 was $2.3 million. At the end of February 2000 the balance on the Line of Credit was only $284,222 (and this includes CCI's payoff of the $1.2 million Short-Term Note). Accordingly, the excess cash that came into CCI's checking account in February 2000 was not only enough to cover the repayment of the $1.2 million Short-Term Note, the excess cash also reduced the balance on the Line of Credit by $2 million. This was consistent with Ortenzio's plan to pay down CCI's debt. (Ortenzio, Vol. 3, 502:10-25). Allfirst's claims that CCI did not have the excess cash to pay the $1.2 million Short-Term Note are inaccurate.

Moreover, if Ortenzio believed what CCI was doing was wrong (the intent element of the fraud claim) CCI could have held the deposits at CCI and deposited $1.2 million the same time CCI repaid the $1.2 million Short-Term Note. (Ortenzio, Vol. 3, 507:15-508:19). Allfirst would then have to manufacture some other pretext to try to hold Ortenzio personally liable.

### B.    Loan is Repaid

As a result of the way that Allfirst set up the cash management system, writing a check on CCI's checking account was the acceptable (and only) way that

CCI paid all its bills -- including payments on other loans. (Ortenzio, Vol. 1, 227:9-19).

On February 11, 2002, approximately one month prior to the due date, CCI repaid the $1.2 million Short-Term Note by writing a check.[3] It turns out that the payment did amount to a draw on the $4 million Line of Credit (after the account was swept that night by Allfirst) and, thereby, merely reversed the book-entry transaction that was made when Allfirst lent CCI the $1.2 million a few months earlier. (Ortenzio, Vol. 1, 236:2-9); (Schwartz, Vol. 1, 113:3-115:6); and (Exhibit "P-14", Bates Nos. 7751 and 7766).

On February 24, 2000, Allfirst breached its agreements with CCI when it formerly declared a default under both the $4 million Line of Credit and the Equipment Note, but failed to provide CCI the 30 day notice and opportunity to cure, as required. (Exhibit "P-2"). Even before the formal notice of default, Allfirst improperly seized all of CCI's assets, froze its checking account and dishonored all checks including payroll and taxes and reversed numerous transactions. (Chernicoff, Vol. 3, 544:17-545:14). Even though Allfirst was aware at this time of the method of repayment, the Default Letter (drafted by Allfirst's counsel) did not complain that the $1.2 million Short-Term Note was allegedly

---

[3] The date the check was presented, no one, including Allfirst, CCI or Ortenzio, could possibly know if the $1.2 million check that was presented on Friday was going to result in a draw on the Line of Credit. The reason for this is that no one

paid off improperly or declare a default on that note. Default Letter (Exhibit "P-24"). CCI's bankruptcy followed about three months thereafter.

## III. ALLFIRST FAILED TO ESTABLISH THE ELEMENT OF JUSTIFIABLE RELIANCE.

As set forth above, if Allfirst fails to establish any of the elements of the fraud claim by clear and convincing evidence, this Court must find in favor of Ortenzio. Accordingly, this brief will address the deficiencies in Allfirst's case starting with the elements that contain the most glaring omissions. The most obvious reason why Allfirst cannot prevail on this fraud claim is that all the information was readily available to Allfirst. Accordingly, Allfirst could not have relied on any alleged misrepresentation by CCI or Ortenzio.

### A. The Information Regarding The Source Of Repayment Was Readily Available To Allfirst.

Prior to trial, Allfirst maintained (and represented to this Court on numerous occasions) that there was no way for Allfirst to know that the repayment of the 1.2 million Short-Term Note ended up being a draw on the Line of Credit.[4] Allfirst was forced to abandon this absurd position during trial as it listened to both former and current Allfirst officers testify to the obvious fact that Allfirst officers had

---

knew at that time the deposits or withdrawals Allfirst was going to process Friday night. (Zarcone, Vol. 3, 473:8-24) and (Phillips, Vol. 2, 371:16-372:25).

[4] For example, Allfirst's Trial Brief states that Schwartz "had no information about the check or the source of payment for the $1.2 million loan." Allfirst Trial Brief at p. 10. Moreover, Allfirst misstates the issue. It is not whether Schwartz knew. It is whether Allfirst knew or could have known.

readily available to them all information about CCI's accounts and the method of repayment by simply looking at the computers on their desks.

In order to prevail on its fraud claim, Allfirst must establish the element of justifiable reliance by clear and convincing evidence. The "general rule is that a party is charged with knowledge of that which can be readily discovered." Marian Bank v. International Harvester Credit Corp., 550 F. Supp. 456, 462 (E.D. Pa. 1982). Furthermore, if the person to whom the misrepresentation is made is in a position to know or ascertain the facts, his knowledge thereof may be inferred. Emery v. Third Nat'l Bank of Pittsburgh, 308 Pa. 504, 162 A. 281 (1932). The Marian Bank court further explained that "a reasonable inquiry consists of either inspecting [the relevant documents] or questioning the most reasonable source – the defendant." Id. In this case, Allfirst admits that it did not undertake any means of inquiry. The evidence further showed that Allfirst did not look because Allfirst did not care.

Gibson testified extensively on cross examination that all information regarding CCI's account was readily available to Allfirst. (Gibson, Vol. 2, 432:7-440:12). Despite the fact that Gibson was not familiar with CCI, Gibson was immediately able to discern that the method of repayment of the $1.2 million Short-Term Note resulted in a draw on the Line Of Credit. Gibson was able to discern this merely by looking at the Accumulated Transaction List (Exhibit "D-

11

10") and comparing that information with the Transaction Receipt (Exhibit "D-4").

These are Allfirst documents.  Gibson said he was able to "conclusively" establish

the manner of repayment.  (Gibson, Vol. 2, 434:19-435:15).  Mr. Schwartz had

access to this same information.  (Gibson, Vol. 2, 436:17-437:5).  Indeed, Gibson

was able to make this determination by pulling up Exhibit "D-10" on Allfirst's

computer, as evidenced by his handwriting on the Accumulated Transaction List.

Zarcone agreed with Gibson's testimony that the information was readily available

on Allfirst's computer the "next business day."  (Zarcone, Vol. 3, 482:10-13).

Schwartz, who on direct initially testified that it would be difficult to obtain this

information (Schwartz, Vol. 1, 47:19-48:8), was more forthcoming on cross

examination.  (Schwartz, Vol. 1, 66:11-67:3).[5]

Had Mr. Schwartz or anyone at Allfirst undertaken any inquiry, they would

have easily discovered that the $1.2 million note was repaid by drawing on the $4

million Line of Credit.  The fact is Allfirst did not look, because it did not care.

---

[5]  Allfirst's main witness, Schwartz, was evasive and, indeed, lacked credibility.
For example, on direct examination, Schwartz testified that he could not have
accessed his computer to determine if the $1.2 Million Short-Term Loan had been
repaid from the Line of Credit as "it wouldn't have been available" . . . and that the
information could not have been determined through "normal access."  (Schwartz,
Vol. 1, 48:9-25).  On cross examination, Schwartz had no alternative but to admit
that he could have accessed the information any time during the business day, that
nothing prevented him from pushing a button to learn that the $1.2 Million Short-
Term Loan was paid from the Line of Credit and, in fact, he did not recall either
way that he might have, indeed, accessed the information when he learned that the
$1.2 Million Short-Term Loan had been repaid.  (Id. at 66:19-70:10).  Schwartz
also testified that Allfirst's database would show, at the end of the day of the
transaction or the following business day, that the Line of Credit was used to pay
the $1.2 Million Short-Term Loan.  (Id. at 73:13-25).

113449.00601/21067937v3

Allfirst did not care, because the method of repayment did not matter. Zarcone testified without contradiction that he did not look because he did not care. (Zarcone, Vol. 3, 470:10-20)

If the manner of repayment of the $1.2 Million Note was important, Allfirst could have looked before it returned the guarantee to Mr. Ortenzio. The truth is that Allfirst did not care about the manner of repayment because it was proper and did not violate any agreement. In either event, fraud cannot be established as the information that would have revealed the <u>alleged</u> fraud was readily available at the fingertips of Schwartz, Gibson, Zarcone, or anyone else at Allfirst that cared to use their computer.

**B.    The Payment Of The $1.2 Million Note Could Have Been Reversed By Allfirst.**

Following the close of Plaintiff's case, Ortenzio moved pursuant to Rule 52(c) for a judgment of partial findings due to the fact that Allfirst did not establish the element of justifiable reliance by clear and convincing evidence. (Transcript at Vol. 2, 441). Having just watched its own bank officers establish that the information was readily available to Allfirst, Allfirst then resorted to the new, never before heard, argument that even though the information was readily available to Allfirst, that Allfirst could do nothing to remedy the alleged fraud.

> THE COURT:    Could Mr. Schwartz had done something on Monday to check this out?
>
> MR. GEBHARDT:  Well, on Monday, it would have been too late.

(Transcript, Vol. 2, 448:22-25). This representation could not be further from the truth.

Allfirst could have reversed CCI's payment of the $1.2 Million Short-Term Note without consequence. Allfirst could have done this either before midnight of the next banking day or beyond that deadline. See, 13 Pa.C.S.A. §§ 4104(a), 4302. According to Section 4302(a), if a payor bank fails to return a demand item (i.e., a check) or send notice of dishonor before its midnight deadline,[6] it is liable for the amount of the item. See, 13 PACSA § 4302(a). However, this liability is not absolute. Section 4302(b) provides that the payor bank may avoid liability if it can prove that the party who presented the item did so with the purpose of defrauding the payor bank. See, 13 Pa.C.S.A. § 4302(b). See also, Lombardo v. Mellon Bank, N.A., 454 Pa. Super. 403, 685 A.2d 595 (1996). In Lombardo, the court held that the payor bank, which initially paid a customer's check but then revoked payment ten days after its midnight deadline, could assert any common law defense to avoid liability. Id. at 410, 685 A.2d at 599.

Even if as Schwartz claims, he failed to discover the source of funds until after midnight on Monday, Allfirst still had recourse under the statute if it discovered fraud. Thus, the testimony of Schwartz that payment could not have been reversed is both disingenuous and contrary to existing law. Furthermore,

Allfirst could not have had any concerns as to potential liability based on a reversal, as it was a repayment of an Allfirst loan, using Allfirst funds, drawn on an Allfirst account, with an Allfirst check, by an Allfirst customer. In essence, no third party bank or payee existed that could have complained about an Allfirst reversal. Indeed, the purpose of § 4302 is to protect third-party banks.[7] Here, there was no third party bank and no third party payee. It was all Allfirst.

Allfirst admits that it was aware of the method of repayment as early as February 18, 2000. (Allfirst Complaint at ¶ 21). Despite being aware of the method of repayment, and CCI's financial condition, there is no evidence that Allfirst at any time complained about or questioned the method of repayment. In fact, Allfirst's internal documentation as to the status of the amounts due from CCI to Allfirst under all CCI loans accurately reflects that the $1.2 Million Loan was properly repaid and was not due to Allfirst. (Exhibits "D-11, 13, 14 and 17"). The first time Allfirst complained about the method of repayment was when Allfirst filed the Complaint in this matter over a year later on May 4, 2001.

---

[6]  13 Pa. CSA § 4104(a) defines the term "midnight deadline" as midnight of the next banking day following the day the bank receives the item.
[7]  2 White & Summers, Uniform Commercial Code, § 20-2 (4th ed. 1995). See also, Channel Equip. Co. v. Community State Bank, Inc., 996 S.W.2d 374, 380 (Tex. App. 1999) (finding that rationale behind UCC 4-302 is to promote certainty and stability into check collection process and to discourage banks from delaying check payment process in order to protect a favored customer (who writes checks without funds to pay them) at the expense of customer's creditors).

Furthermore, Zarcone testified that it was possible for Allfirst to reverse transactions. (Zarcone, 474:8-475:6). Chernicoff testified extensively that Allfirst did not hesitate to aggressively reverse transactions, well after any applicable deadline, even when Allfirst did not have legal authority to do so. (Chernicoff, Vol. 3, 546:5-547:14; 551:16-553:12) and Exhibit "D-3").[8] Allfirst's history of reversing dozens of CCI transactions in February 2000 betrays its counsel's claim that on Monday following the repayment "it would have been too late." Allfirst did not hesitate to snatch money from the IRS. It is disingenuous for Allfirst to now argue that it could not have reversed a transaction involving a payment from one Allfirst account to another Allfirst account, by one of Allfirst's customers using Allfirst funds.

### IV. ALLFIRST DID NOT ESTABLISH THAT ORTENZIO MADE ANY MISREPRESENTATION OR OMISSION BECAUSE THE MANNER OF REPAYMENT OF THE $1.2 MILLION NOTE WAS CONSISTENT WITH THE CCI LOAN DOCUMENTS.

Schwartz testified that it was his "expectation" that the $1.2 Million Short-Term Note would be repaid solely by using excess cash flow. Even if Schwartz held this expectation, he was the only one that did. Phillips testified that in November 1999, at the time the $1.2 Million was loaned to CCI, she did not recall any discussions as to the manner in which CCI was going to pay back the $1.2

---

[8]  Allfirst even went so far as to reverse a transaction of payroll taxes that had been electronically submitted to the IRS. This became the subject of a claim by the IRS against CCI in the bankruptcy proceeding. Allfirst's reversal of the IRS payroll tax payment has still not yet been resolved. (Chernicoff, Vol. 3, 558:17-21).

Million Short-Term Note. (Phillips, Vol. 2, 316:2-4). Zarcone would not have cared how the loan was paid off. (Zarcone, Vol. 3, 470:10-20). Schwartz' self-serving testimony as to where he personally expected the repayment to come from is immaterial because there was no provision put in any of the loan documents setting forth the source of funds that had to be used to repay the Short-Term Note. Simply put, the method of repayment was never a material fact, germane to the transaction.

The March 23, 1999 commitment letter between Allfirst and CCI (not Ortenzio) relating to the $4 million Line of Credit, states: "Use of Proceeds: Finance work in process and accounts receivable". Id. The term "work in process" is not defined. This statement in the commitment letter does not support Allfirst's position that CCI breached the terms and conditions of the $4 million Line of Credit.[9]

The commitment letter for the November 1999 $1.2 million Short Term Note also states: "Use of Proceeds: Finance work in progress and accounts receivable." (Exhibit "P-10"). But when Allfirst transferred this money to CCI it did not apply it to CCI's monthly bills. Rather, Allfirst deposited the money in CCI's checking account. When the sweep was performed by Allfirst at the end of

---

[9] The reason why the "use of proceeds" is not a "Term or Condition" of the $4 million Line of Credit is set forth in detail in Ortenzio's Trial Brief, at pp. 5-7, that will not be repeated here.

the day, the $1.2 million served to act as a payment against the Line of Credit, thereby lowering the balance on the Line of Credit by $1.2 million. (Zarcone, Vol. 2, 489:8-490:6) and Accumulated Transaction List (Exhibit "P-14", Bates No. 7753). This is consistent with the fact that Allfirst commingled all of CCI's loan accounts with the checking account and that the $4 million Line of Credit was used to pay all of CCI's bills, including payments on other loans. (Ortenzio, Vol. 1, 227:9-19).

Allfirst will try to make much of the fact that Phillips disagreed with the repayment. First, the CCI loan documents govern, not Phillips' opinion. Second, Phillips objected not because of what she thought the loan documents required. She objected because she thought it better for CCI to use the money to pay other bills. (Phillips, Vol. 2, 329:1-14).

### A.    Zarcone Testified That The Manner Of Repayment Was Not Prohibited Because The Proceeds Of Both The $4 Million Line Of Credit And The $1.2 Million Note Were To Be Used For The Same Purpose.

In addition to the fact that there was no prohibition in the Allfirst/CCI loan documents that precluded repaying the $1.2 million Short-Term Note by writing a check that ended up being a draw on the Line of Credit, there is Zarcone's clear testimony that there was no prohibition against the use of the Line of Credit to pay off the $1.2 million Short-Term Note because the "use of proceeds" for both loans were the same. (Zarcone, Vol. 3, 484:6-490:12). Zarcone testified that repaying a

18

fully funded loan with the line of credit was permissible so long as "the purpose of the loan was similar to the line of credit." (Zarcone, Vol. 3, 485:4-15). Comparing the purpose of the loans as identified in the commitment letters, the Court will see that the purpose of both loans is identical. Exhibits "P-1" and "P-10". Accordingly, Zarcone testified without contradiction that funds from the $4 Million Line of Credit could be used to pay off the $1.2 Million Short-Term Note:

> Q:          In this instance, again I'm directing to where the purpose of the loans are the same, can the use of the Line of Credit be used to pay off another facility assuming there are sufficient funds in that other facility?
>
> ZARCONE:    Yes.

(Zarcone, Vol. 3, 490:7-12). Not only is it permitted, Zarcone believes it to be "normal" for this to occur. (Zarcone, Vol. 3, 491:14-21).

Faced with this clear testimony from the only bank official that had the authority to sign off on the CCI loans, it is anticipated that Allfirst may seek to marginalize Zarcone. Allfirst will probably now argue that Zarcone did not have knowledge of what was occurring because he was too high up. This is absurd. Zarcone attended all of the relevant meetings with CCI. (Zarcone, Vol. 3, 463:23-464:3; Schwatz, Vol. 1, 28:6-20, 56:4-58:22). Zarcone was the officer that had the authority to sign off on the loans – Schwartz did not. (Schwartz, Vol. 1, 28:6-20). Finally, Allfirst attempted to offer Zarcone as an expert witness. Allfirst Pretrial Memorandum at 8. The fact that the Court ultimately ruled that Zarcone could not

testify as an expert at Allfirst's behest due to the fact that Allfirst did not properly identify Zarcone, does not take away from Zarcone's knowledge. (June 6, 2002 Order at p. 1, 3-4). The CCI loan documents and Zarcone's testimony are dispositive on whether one loan could be used to pay off another.

**B.    Ortenzio Did Not Conceal The Fact That The $1.2 Million Loan Was Being Repaid By Using The $4 Million Line Of Credit.**

Allfirst has alleged that Ortenzio fraudulently concealed the source of funds used to repay the $1.2 million loan. A duty to speak arises when the parties are in a fiduciary or confidential relationship. See, Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 656 (W.D. Pa. 1999); City of Rome v. Glanton, 958 F. Supp. 1026, 1038-39 (E.D. Pa. 1997). Neither is the case in this instance. Moreover, a "typical business relationship does not form the basis for such a relationship unless 'one party surrenders substantial control over some portion of his affairs to the other.'" Sunquest, 40 F. Supp. 2d at 656.

In addition, according to Pennsylvania law on fraudulent concealment, "[a] duty to speak may arise as a consequence of an agreement between the parties, or as a result of one party's reliance on the other's representations, if one party is the only source of information to the other party, or the problems are not discoverable by other reasonable means." Id. Yet, there is no duty to speak "when both a plaintiff and defendant are sophisticated business entities, entrusted with equal knowledge of the facts and equal access to legal representation." Id. at 1039

20

(citing <u>Duquesne Light Co. v. Westinghouse Elec. Corp.</u>, 66 F.3d 604, 613 (3rd Cir. 1995)).

Even if he knew, Ortenzio did not have a duty to inform Allfirst that the Line of Credit was being used to repay CCI's $1.2 million loan, as he was not a party to the terms and conditions of the loan commitment for the $4 million Line of Credit between Allfirst and CCI.  Further, the $1.2 million suretyship agreement, to which Ortenzio was a party, did not specify the source of funds to be used to repay the loan.  Thus, there is no agreement between Allfirst and Ortenzio that creates the duty to speak.

**C.   Allfirst Could Have And Should Have Included In The Loan Documents A Provision Prohibiting The $1.2 Million Note From Being Repaid With The $4 Million Line Of Credit If It Was "Material" To The Transaction.**

According to Allfirst, Ortenzio's failure to explicitly advise Allfirst of the manner of repayment of the $1.2 million note amounted to a material misrepresentation.  However, the evidence introduced at trial is to the contrary.  A representation is "material" if "it is of such character that it determines whether the transaction occurs." <u>Id.</u> <u>See</u> <u>also</u>, <u>Lind v. Jones, Lang LaSalle Americas, Inc.</u>, 135 F. Supp.2d 616, 620 (E.D. Pa. 2001); <u>Delahanty v. First Pennsylvania Bank</u>, 318 Pa. Super. 90, 464 A.2d 1243 (1983).

At trial, the evidence showed that at no time prior to or during Allfirst's granting of the $1.2 million Short-Term Note was it agreed, let alone even

discussed, that CCI could not use $4 million Line of Credit to repay the note. (Phillips, Vol. 2, 346:10-25) and (Ortenzio, Vol. 2, 236:10-237:13). It was only Mr. Schwartz who self-servingly testified that he "expected" the $1.2 million note to be repaid with excess cash flow. (Schwartz, Vol. 1, 37:16-23). This testimony was contradicted by Sherri Phillips and Mr. Ortenzio.

Moreover, the testimony showed that CCI routinely used the $4 million Line of Credit to pay down Equipment Note and all other debt. (Ortenzio, Vol. 2, 227:9-19). It was only years after the transaction was completed, that Mr. Schwartz testified that he would not have accepted the check if he had known it was paid as a result of a draw on the $4 million Line of Credit. There was nothing in the CCI/Allfirst loan documents that enabled Schwartz to unilaterally reject the transaction.

In addition, the loan documents directly contradict Allfirst's assertion that Mr. Ortenzio was required to repay the $1.2 million Short-Term Note with excess cash flow. In fact, as Mr. Schwartz admitted, none of the loan documents for the $1.2 million note restrict the source of funds to be used for repayment. (Schwartz, Vol. 1, 103:18-23). Further, the evidence introduced at trial showed that Allfirst never advised CCI or Mr. Ortenzio prior to the execution of the loan documents for the $1.2 million note (or even prior to CCI's repayment of the $1.2 million) that the $4 million Line of Credit could not be used to pay any other loan. (Phillips, Vol. 2,

346:4-25) and (Ortenzio, Vol. 1, 236:16-237:13).  Schwartz also admitted at trial that if such a prohibition were "material" to the granting of the $1.2 million note, Allfirst should have included it in the loan documents.  (Schwartz, Vol. 1, 85:12-25).  Furthermore, Mr. Zarcone testified that since the purpose of both the $4 million line of credit and the $1.2 million note were identical, the repayment of the $1.2 million note by a draw on the Line of Credit was not prohibited.  (Zarcone, Vol. 3, 485:4-486:23).

Ortenzio's actions were not those of someone that was trying to defraud the bank.  First, he walked into Allfirst to pay the loan directly and spoke to Schwartz later that day.  If he wanted to hide the repayment method, he could have used other means and not brought attention to the repayment.  Second, he successfully paid down the Allfirst debt to a total of only $284,000 by the end of February, 2000.  (Exhibit "D-24").  He wanted to do this so he could go to the bonding company for possible financial assistance.  (Ortenzio, Vol. 3, 502:14-507:10).  He did not intend to bankrupt CCI.  (Chernicoff, Vol. 3, 536:1-537:4).  Rather Ortenzio himself called the February 18, 2000 meeting to fully appraise Allfirst of the situation and his plan to save the company.  (Chernicoff, Vol. 3, 537:24-540:6).  That would have worked had Allfirst not improperly seized the funds.  Finally, Ortenzio stopped taking a salary from CCI from August 1999.  (Ortenzio, Vol. 3,

533:16-24). If he was only in this for himself, to the detriment of CCI and Allfirst, he would not have stopped paying himself.

## V. ALLFIRST FAILED TO ESTABLISH THAT DEFENDANT'S CONDUCT WAS THE PROXIMATE CAUSE OF ANY DAMAGES.

### A. Allfirst Failed To Prove It Was Damaged by the Repayment of the $1.2 Million Short-Term Loan.

Allfirst claims that it is entitled to recovery from Mr. Ortenzio of any amounts that Allfirst is held liable for in the preference dispute between Allfirst and CCI's debtor-in-possession. Allfirst cannot establish by clear and convincing evidence that it is entitled to these damages as a result of Mr. Ortenzio's actions in directing the repayment of the $1.2 million Short-Term Note. First, the preference was caused by Allfirst improperly sweeping the $2.4 million out of CCI's checking account in late February, 2000. Allfirst's potential liability for this preference was caused by Allfirst's actions, not the actions of CCI (or Ortenzio) in repaying the $1.2 million Short-Term Loan.

Second, as set forth in detail above, Ortenzio cannot be personally liable to Allfirst for amounts due on the $4 million Line of Credit because the Guarantee that Ortenzio executed is expressly limited to the amounts due on the $1.2 million Short-Term Note. (Exhibit "P-12", handwritten changes on page 1, first paragraph and page 2, second paragraph). Ortenzio cannot be held liable for any claimed breach of the $1.2 million Note because, as this Court already determined, "CCI did not breach the terms of the $1.2 million Note." July 16, 2002 Summary

24

Judgment Opinion, at 12. While CCI did not breach the terms of the $4 million Line of Credit, any claim that Allfirst has for damages arising out of any alleged breach of that agreement must be brought against CCI in the bankruptcy proceeding. Id. at 14.

Finally, as part of its damages, Allfirst requests that Ortenzio be ordered to pay its attorneys' fees in this action. However, because summary judgment was granted to Ortenzio on Allfirst's claim against Ortenzio for breach of the Suretyship Agreement, Allfirst is not entitled to recover any of its attorneys' fees. As Ortenzio is not a party to the $4 million Line of Credit and as attorneys' fees are not recoverable in a fraud action, Allfirst's claim for attorneys' fees must be rejected. See, Pittsburgh Live, Inc. v. Servov, 419 Pa. Super. 423, 429-30, 615 A.2d 438, 441 (1991).

## VI.    CONCLUSION

Based upon the forgoing reasons, Defendant, John M. Ortenzio, respectfully requests that this Honorable Court enter judgment in his favor.

Respectfully submitted,

BLANK ROME COMISKY & McCAULEY LLP

BY: _____

EDWARD I. SWICHAR, ESQUIRE
ROBERT A. BURKE, ESQUIRE
*Attorneys for Defendant, John M. Ortenzio*

Dated:  October 8, 2002

## <u>CERTIFICATE OF SERVICE</u>

Robert A. Burke, attorney for Defendant, John Ortenzio, hereby certifies that

he caused a true and correct copy of Defendant's Post-Trial Brief to be served upon

the following on this 8th day of October, 2002, by regular mail:

Lawrence Gebhardt, Esquire
Gebhardt & Smith, LLP
The World Trade Center, Ninth Floor
Baltimore, MD   21020-3064

ROBERT A. BURKE

26