IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK,                  :

                     Plaintiff,  :

v.                              :    CASE NO. 1:01-CV-786

JOHN M. ORTENZIO,               :

                     Defendant.  :

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO FILE ADDITIONAL
BRIEF TO ADDRESS NEW PENNSYLVANIA AUTHORITY**

Defendant, John M. Ortenzio, by his undersigned counsel, submits this

Memorandum of Law in Support of Defendant's Motion to File Additional Brief to

Address New Pennsylvania Authority. Defendant seeks permission to file the brief

attached hereto as Exhibit "A". This brief addresses the application of recent

Pennsylvania Commonwealth Appellate authority issued in the case Etoll v.

Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. Nov. 8, 2002). The

Superior Court in Etoll is the first Pennsylvania Commonwealth Appellate case to

address the application of the gist of the action doctrine to a fraud claim. A copy

of the Etoll decision is attached hereto as Exhibit "B".

As set forth in the Etoll decision, and in the attached Brief, the "gist of the

action" doctrine is designed to maintain the conceptual distinction between a

breach of contract claim and a tort claim. Etoll, at 14. "As a practical matter, the

doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into

tort claims." Id. Prior to this decision, and despite a split of authority on this issue

in jurisdictions throughout the country, no appellate level court in the

Commonwealth of Pennsylvania had applied the gist of the action doctrine to

preclude a plaintiff from asserting a fraud claim where the gist of the action was

breach of contract. Id. at 15-16. The application of this decision is of obvious

importance to the matter presently pending before the Court. The gist of Allfirst

Bank's action against Mr. Ortenzio is for breach of contract. Application of the

Etoll decision to this matter reveals that Allfirst Bank may not assert a fraud claim

against Mr. Ortenzio as the alleged act of fraud arose in the course of the parties'

contractual relationship.

The Etoll decision was filed on November 8, 2002. The decision was not

published to the general public in time for it to be included in Defendant's Post-

Trial Brief dated October 8, 2002 or Defendant's Supplemental Post-Trial Brief

dated November 13, 2002. It is respectfully submitted that in the interest of justice

this Court consider the importance of the Etoll decision and the significant weight

it must be given in interpreting Pennsylvania state law. Moreover, the Etoll panel

resolved a split of authority between other state supreme court cases that refused to

apply the gist of the action doctrine to bar a fraud claim and previous federal court

cases that predicted that the Pennsylvania Commonwealth courts would apply the gist of the action doctrine to bar fraud claims in a contract action. Id. at 19-20. Etoll is paramount as it is the first Commonwealth Court decision to address this issue. In the absence of guidance from the Commonwealth's highest court, Federal Courts sitting in diversity "are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." Gares v. Willingboro Twp., 90 F.3d 720, 725 (3d Cir. 1996). See also, United States Underwriters Ins. Co. v. Liberty Mut. Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996) ("The rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise.").

Accordingly, Defendant respectfully requests that this Court consider the application of the Etoll decision and Defendant's additional brief attached hereto as Exhibit "A" in rendering its decision in this matter. Courts will permit a party to supplement the record where new case law is published that applies to a matter pending before the Court. South Central Pennsylvania Waste Haulers Assoc. v. Bedford-Fulton-Huntingdon Solid Waste Auth., 877 F. Supp. 935, 937, n.1 (M.D. Pa. 1994).

Accordingly, for the reasons set forth herein, and in the interest of justice, Defendant respectfully requests that this Court grant his motion to file the Brief

attached hereto as Exhibit "A".  The enclosed Order also permits Plaintiff to file a

brief to address the application of this important decision.

Respectfully submitted,

BLANK ROME LLP

By: _____

EDWARD I. SWICHAR
ROBERT A. BURKE
One Logan Square
Philadelphia, PA  19103
(215) 569-5500
*Attorneys for Defendant*
*John M. Ortenzio*

Dated:  January 9, 2003

4

A

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ALLFIRST BANK,                    :
                                  :
            Plaintiff,            :
                                  :
    v.                            :        CASE NO. 1:01-CV-786
                                  :
JOHN M. ORTENZIO,                 :
                                  :
            Defendant.            :

---

**ADDITIONAL BRIEF OF DEFENDANT
ADDRESSING THE RECENT SUPERIOR COURT
OF PENNSYLVANIA'S DECISION IN
ETOLL, INC. v. ELIAS/SAVION ADVERTISING, INC.**

## Allfirst Cannot Prevail On Its Fraud Claim
## As The Gist Of That Action Lies In Contract.

The recent decision by the Superior Court of Pennsylvania in <u>Etoll, Inc. v. Elias/Savion Advertising, Inc.</u>, 811 A.2d 10 (Pa. Super. Nov. 8, 2002), provides another reason why Allfirst Bank's fraud action against Mr. Ortenzio must be rejected. The <u>Etoll</u> Court's decision is the first by a Pennsylvania State Appellate Court to address the interplay between fraud and the "gist of the action" doctrine.

The gist of the action doctrine is "designed to maintain the conceptual distinction between breach of contract claims and tort claims. As a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." <u>Id</u>. at 14 (citations omitted). The <u>Etoll</u> Court further recognized that "to permit a promisee to sue his promisor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions." <u>Id</u>.

The plaintiff in <u>Etoll</u> brought an action alleging that the defendants executed several schemes designed to allow defendants to fraudulently obtain money from plaintiff. Plaintiff also contended that the defendants lied to plaintiff in order for plaintiff to relax its guard and cover up defendants' efforts to obtain money from plaintiff. After predicting that the Pennsylvania Supreme Court would adopt the gist of the action test to a fraud action, the <u>Etoll</u> Court ruled that plaintiff's actions

1

were barred by the gist of the action doctrine. Id. at 20. The specific allegations in the complaint in Etoll were that defendants, among other things, made numerous misrepresentations to plaintiff, took undisclosed kickbacks and commissions, billed for services that were not performed and concealed these schemes in order to perpetuate the fraud. Id. The Etoll Court recognized that "all of these alleged acts of fraud arose in the course of the parties' contractual relationship." Id. Moreover, the defendants' duties to plaintiff regarding their performance were created and grounded in the parties' contracts. Id.

Application of the gist of the action doctrine and the Etoll decision to the matter *sub judice* similarly reveals that Allfirst Bank's fraud claim against Mr. Ortenzio relates to actions and duties that were created and grounded in the contracts between the parties. Allfirst Bank claims that the manner of repayment of the $1.2 Million Short-Term Note was a violation of the agreements between the parties and that Mr. Ortenzio fraudulently concealed the manner of repayment in order to avoid his obligations under the Suretyship Agreement.[1] Paragraph 34 of Allfirst Bank's Complaint, attached hereto as Exhibit "C", demonstrates that the fraud claim is inextricably intertwined with the agreements executed by the parties. Allfirst Bank alleges in its fraud count that the method of repayment of the Short-Term Note was the equivalent of a representation by Ortenzio that the repayment

2

was not being made with funds that were borrowed under the Agreement relating to the Line of Credit. Id. This alleged representation by Ortenzio allegedly caused Allfirst Bank to record that the obligations under the Commercial Note and the Suretyship Agreement had been satisfied. Id. Accordingly, as the gist of Allfirst Bank's fraud action is inextricably intertwined with the agreements between the parties, Allfirst Bank cannot bring a fraud claim against Mr. Ortenzio.

Moreover, the Etoll Court also highlighted that a fraud claim is intertwined with a contract action where, as here, the damages sought are essentially contract damages. Id. at 20-21. The fraud count of Allfirst Bank's Complaint specifically states that the damages it seeks are contract damages. Allfirst Bank seeks damages equal to (a) "the unpaid balance of all principal and interest owed on the Commercial Note"; (b) "the unpaid principal balance and all accrued interest due under the Line of Credit"; and (c) "all attorney's fees and collection costs in enforcing the Suretyship Agreement as provided therein." Complaint at ¶ 34.

Finally, the gist of the action is contract here because the success of the fraud claim "is wholly dependent on the terms of a contract." Etoll, at 19. There is no question that in interpreting Allfirst Bank's fraud claim, this Court is being asked to interpret numerous contractual provisions between the parties.

---

[1] Of course, Mr. Ortenzio denies that the method of repayment was improper under the agreements or that the method of repayment was concealed from Allfirst Bank.

113449.00601/21107791v1

## CONCLUSION

Accordingly, for the foregoing reasons, it is respectfully requested that this Court apply the gist of the action doctrine and the recent <u>Etoll</u> decision and determine that the gist of Allfirst Bank's fraud claim is so intertwined with the agreements between the parties to preclude Allfirst Bank's recovery on its fraud claim.

Respectfully submitted,

BLANK ROME LLP

By:_____

EDWARD I. SWICHAR
ROBERT A. BURKE
One Logan Square
Philadelphia, PA 19103
(215) 569-5500
*Attorneys for Defendant*
*John M. Ortenzio*

Dated: January 9, 2003

4

811 A.2d 10
2002 PA Super 347
(Cite as: 811 A.2d 10)

**Page 1**

Superior Court of Pennsylvania.

**ETOLL, INC., A Corporation Organized under
the Laws of the Commonwealth
of Pennsylvania, Appellant
v.
ELIAS/SAVION ADVERTISING, INC., a
Corporation Organized under the Laws of the
Commonwealth of Pennsylvania, and Philip L.
Elias, and Ronnie J. Savion, and
Daniel McCarthy, Appellees.**

Argued May 14, 2002.
Filed Nov. 8, 2002.

Software developer brought action against
advertising company and its employees, asserting
claims for fraud, breach of fiduciary duty, and
professional negligence. The Court of Common
Pleas, Allegheny County, Civil Division No.
GD98-7349, Strassburger, J., denied preliminary
objections, and subsequently, Baer, J., dismissed the
claims. Software developer appealed. The Superior
Court, Nos. 2091 & 2092 WDA 2000, Lally-Green,
J., held that: (1) the gist of the action doctrine
precluded software developer from asserting fraud
claims, and (2) agency relationship did not exist,
and thus software developer had no claim for breach
of fiduciary duty.

Affirmed.

West Headnotes

**[1] Action** ☞27(1)
13k27(1)

Generally, the "gist of the action" doctrine is
designed to maintain the conceptual distinction
between breach of contract claims and tort claims,
and as a practical matter, the doctrine precludes
plaintiffs from re-casting ordinary breach of contract
claims into tort claims.

**[2] Action** ☞27(1)
13k27(1)

Although mere nonperformance of a contract does
not constitute a fraud, it is possible that a breach of
contract also gives rise to an actionable tort;
however, to be construed as in tort, the wrong

ascribed to the defendant must be the gist of the
action, the contract being collateral.

**[3] Action** ☞27(1)
13k27(1)

The important difference between contract and tort
actions is that the latter lie from the breach of duties
imposed as a matter of social policy while the
former lie for the breach of duties imposed by
mutual consensus.

**[4] Action** ☞27(1)
13k27(1)

A claim should be limited to a contract claim when
the parties' obligations are defined by the terms of
the contracts, and not by the larger social policies
embodied by the law of torts.

**[5] Appeal and Error** ☞842(1)
30k842(1)

Whether the "gist of the action" doctrine applies to
preclude plaintiff from re-casting ordinary breach of
contract claims into tort claims is an issue of law
subject to plenary review.

**[6] Action** ☞27(1)
13k27(1)

The "gist of the action" test, which precludes
plaintiffs from re-casting ordinary breach of contract
claims into tort claims, is not limited to discrete
instances of conduct; rather, the test is, by its own
terms, concerned with the nature of the action as a
whole.

**[7] Action** ☞27(1)
13k27(1)

The "gist of the action" test, which precludes
plaintiffs from re-casting ordinary breach of contract
claims into tort claims, is a general test concerned
with the essential ground, foundation, or material
part of an entire formal complaint or lawsuit.

**[8] Courts** ☞89
106k89

When presented with an issue for which there is no

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

811 A.2d 10
(Cite as: 811 A.2d 10)

Page 2

clear precedent, Superior Court's role as an intermediate appellate court is to resolve the issue as it predicts the Supreme Court would do.

**[9] Fraud ☜32**
184k32

The "gist of the action" doctrine, which precludes plaintiffs from re- casting ordinary breach of contract claims into tort claims, applies to claims for fraud in the performance of a contract.

**[10] Fraud ☜32**
184k32

The "gist of the action" doctrine, which prevented the re-casting of ordinary breach of contract claims into tort claims, precluded software developer from suing advertising company for fraud in the performance of contract to market an e-mail product.

**[11] Principal and Agent ☜1**
308k1

A principal and agent relationship between software developer and advertising company was not established by fact that advertising company procured goods and services such as printing, typesetting, and freight, and thus software developer could not sue advertising company for breach of fiduciary duty in regard to marketing its e-mail product; advertising company did not bind software developer to a contract with any of the service providers, and the third-party services were merely incidental to the larger goal of providing advertising services to software developer.

**[12] Fraud ☜7**
184k7

That advertising company was allegedly a "trusted advisor" to software developer did not establish that a special relationship existed between the parties, and thus software developer could not sue advertising company for breach of fiduciary duty in regard to contract to market an e-mail product; commercial contracts for professional services generally involved one party relying on other's party's superior skill in providing a particular service, but a fiduciary relationship was not created in that context.

**[13] Fraud ☜7**
184k7

Critical question in determining whether a fiduciary relationship exists is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side.

**[14] Fraud ☜7**
184k7

A confidential relationship, and resulting fiduciary duty, is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power.

*11 Peter N. Georgiades, Pittsburgh, for appellant.

Anthony J. Basinski, Pittsburgh, for appellee.

Before:  FORD ELLIOTT, LALLY-GREEN, and HESTER, JJ.

OPINION BY LALLY-GREEN, J.

¶ 1 Appellant, eToll, Inc., appeals from the order dated November 8, 2000, granting summary judgment to defendants/Appellees, Elias/Savion Advertising, Inc. (Elias/Savion), Philip L. Elias, Ronnie J. *12 Savion, and Daniel McCarthy. [FN1] We affirm.

> FN1. Philip L. Elias is the CEO and Treasurer of Elias/Savion. Ronnie J. Savion is the Creative Director, and Daniel McCarthy is the former Director of Marketing and Communications.

¶ 2 The procedural history of the case is as follows. On August 3, 1998, Appellant filed a complaint alleging the following facts. Appellant developed an email product called "e-mail 97." On February 25, 1997, Appellant entered into an agreement with Elias/Savion to market and advertise the product.

¶ 3 Count 1 for fraud was asserted against all Appellees. Appellant asserted that the Appellees told Appellant that they had the knowledge, expertise, and experience to advertise and market the product properly, when in fact they did not.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

811 A.2d 10
(Cite as: 811 A.2d 10, *12)

Moreover, the individual Appellees "executed several schemes designed to allow Elias/Savion to fraudulently obtain money from eToll," including: (1) "contracting for goods and services which were unauthorized, unnecessary, excessive or in some cases entirely fictitious"; and (2) "accepting payments from eToll for services which were not actually performed." In essence, Appellant alleged that the Appellees stole money from Appellant under the guise of performing the contract. Appellant also contended that the Appellees lied to Appellant in order for Appellant to relax its guard, so the overbilling could continue.

¶ 4 Count 2 for breach of fiduciary duty was asserted against all Appellees. Appellant alleged that even though the contract was an arms' length bargain for services, the Appellees took on a position of confidence and trust because they held themselves out as marketing experts. Appellant alleged that a fiduciary duty arose because the Appellees acted as Appellant's agent.

¶ 5 Count 3 for professional negligence was asserted only against the corporate Appellee, Elias/Savion, and only in the alternative to Appellant's breach of contract claim (discussed below). Appellant alleged that Elias/Savion failed to perform under the contract and performed substandard work under the contract.

¶ 6 Count 4 for breach of contract was asserted only against the corporate Appellee, Elias/Savion. Appellant alleged that Elias/Savion failed to perform under the contract and performed substandard work under the contract. [FN2]

> FN2. Appellant's claims for fraud in the inducement of the contract, and for declaratory relief, are no longer part of the action.

¶ 7 Appellees filed preliminary objections in the nature of a demurrer. Appellees argued *inter alia,* that the tort claims should be dismissed under the "gist of the action" doctrine (described furthe *infra* ). The trial court (Strassburger, J.) denied all of the preliminary objections.

¶ 8 The case proceeded to discovery. On July 19, 2000, Appellees filed a motion for summary judgment. [FN3] Appellant *1 filed a "motion to re-open the record" on summary

judgment to include various facts that had come to light after the Appellees filed their summary judgment motion. Appellant argued that after months of stalling, Appellees finally produced voluminous records which helped to establish Appellant's claims.

> FN3. In the motion for summary judgment, Appellees argued as follows. First, Appellant's fraud claims were barred by the parol evidence rule, were belied by the plain terms of the contract itself, and were further barred because Appellant could not have justifiably relied on any misrepresentations in light of the fact that they were in a position to ascertain the truth on its own. Motion for Summary Judgment, 7/19/2000, ¶¶ 20-21. Second, Appellant's fiduciary duty claims failed because the parties entered into an arms' length agreement and because Appellant did not rely on the Appellees "in any fiduciary sense.' *Id.* at ¶ 22-24. Third, Appellant's negligence claim failed because Pennsylvania law "has explicitly held that no such cause of action exists in the advertising context. *Id* ¶ 26. Finally, Appellant's breach of contract claim failed because the contract called for Elias/Savion to perform services over one year, but Appellant canceled the contract within six months. *Id.* at ¶ 28.

¶ 9 On November 8, 2000, the trial court (Baer, J.) granted partial summary judgment and dismissed Appellant's tort claims. The court ruled as follows. Count I for fraud was dismissed based on the "gist of the action" doctrine. Count II for breach of fiduciary duty was dismissed because "as a matter of fact and law no principal-agent relationship existed between [Appellant] and [Appellees]." Trial Court Order, 11/8/2000, at 2. Count III for professional negligence was dismissed under the "gist of the action" doctrine. Count IV for breach of contract was **not** dismissed. The court ruled that most, if not all, of Appellant's claims could be asserted either as express breaches of the contract or as breaches of the implied warranty of good faith and fair dealing. *Id.* On the same day, the court denied Appellant's motion to re-open the record. The court did allow Appellant to depose an official from Elias/Savion.

¶ 10 Because Appellant's breach of contract claim was not dismissed, the November 8, 2000 order was not appealable. To make it so, Appellant voluntarily discontinued the breach of contract claim. Appellant filed a timely appeal from the November 8, 2000 orders. Judge Baer wrote an opinion in support of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

811 A.2d 10

**Page 4**

(Cite as: 811 A.2d 10, *13)

the summary judgment order on November 2, 2001, almost one year after the order itself. This appeal followed.

¶ 11 Appellant raises five issues on appeal:

1. Whether the lower court erred in holding that fraud perpetrated by one contracting party upon the other in the course of a contractual relationship is not a breach of a legal duty independent of the underlying contract, and on that basis dismissing the plaintiff's count for fraud and deceit.

2. Whether the lower court erred in dismissing the plaintiffs' lead count under the "gist of the action" doctrine, where the complaint contained express allegations of deceit.

3. Whether the lower court erred when, in deciding a motion for summary judgment, it limited its review of the record to the complaint.

4. Whether the lower court erred in holding the relationship between an advertising agency and a client was not one of principal and agent, where there was evidence the agency ordered goods and services for its client, and bound the client to contracts with third parties.

5. Whether the lower court erred in holding there was no special relationship of trust and confidence between an advertising agency and its client, where there was evidence the client retained the agency based upon representations by the agency it possessed special skill, knowledge and expertise, and the client relied upon those representations.

Appellant's Brief at 6.

¶ 12 Our standard of review is well settled.

**\*14** Summary judgment properly is granted after the close of the relevant pleadings "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report" and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1). The scope of our review of an order granting or denying a motion for summary judgment is well established. In reviewing an order granting summary judgment, an appellate court must examine the record in the light most favorable to the non-moving party. We will reverse only if there has been an error of law or a clear abuse of discretion.

*Abbott v. Schnader, Harrison, Segal & Lewis, LLP,* 2002 PA Super 2 ' 6, 805 A.2d 547 (citations omitted).

¶ 13 First, Appellant argues that the trial court erred by applying the "gist of the action" doctrine to dismiss Appellant's fraud claim. While the doctrine has not yet been expressly adopted by our Supreme Court, it was recognized by this Court for the first time in *Bash v. Bell Tel. Co* 411 Pa.Super. 347, 601 A.2d 825 (1992).

[1] ' 14 Generally, the doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims *Id.* at 829. As a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims. *Id.* The *Bash* Court explained the difference between contract claims and tort claims as follows:

[a]lthough they derive from a common origin, distinct differences between civil actions for tort and contract breach have developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.... To permit a promisee to sue his promisor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

*Id.* at 82! *citing, Iron Mountain Sec. Storage Corp. v. American Specialty Foods,* 457. F.Supp. 1158, 1165 (E.D.Pa.1978).

[2][3][4]  15 Thus, "[a]lthough mere non-performance of a contract does not constitute a fraud[,] it is possible that a breach of contract also gives rise to an actionable tort[.] To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral." *Bash,* 601 A.2d at 82! *citing, Closed Circuit Corp. v. Jerrold Electronics C* 426 F.Supp. 361, 364 (E.D.Pa.1977). "The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Redevelopment Auth. v. International Ins. Co.* 454 Pa.Super. 374, 685 A.2d 581, 590 (1996)*en banc* ), *appeal denied,* 548 Pa. 649, 695 A.2d 787 (1997) , *quoting, Phico Ins. Co. v. Presbyterian Med. Srvs. Corp.,* 444 Pa.Super. 221, 663 A.2d 753, 757 (1995). "In other words, a claim should be limited

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

to a contract claim when 'the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts." ' *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 104 (3rd Cir.Pa.2( *cert. denied,* 534 U.S. 1162, 122 S.Ct. 1173, 152 L.Ed.2d 11€ *\*15 (2002), quoting, Bash* 601 A.2d at 830. [FN4]

> FN4. In *Bohler-Uddeholm,* a majority partner in a joint venture was accused of breaching fiduciary duties to the minority partner and appropriating the minority partner's trade secrets. The Third Circuit Court of Appeals held that the breach of fiduciary duty claim was not barred by the gist of the action doctrine because the fiduciary duties flowing from majority partners to minority partners are separate and distinct from the contractual duties contained in the joint venture agreement *Bohler-Uddeholm,* 247 F.3d at 104-105. The court further held that the misappropriation claim was not barred by the gist of the action doctrine so long as the trade secrets were not the subject of contract between the parties. *Id.* at 106. For a contrary result *see Haymond v. Lundy,* 2000 WL 804432, 2000 U.S. Dist. Lexis 8585 (E.D.Pa. June 22, 2000) (breach of fiduciary duty claim barred by gist of the action doctrine where law partners' allegedly tortious activity toward another partner took place before and after the signing of a formal partnership agreement).

[5][6][7] ¶ 16 The question of whether the gist of the action applies is an issue of law subject to plenary review. *Id.* at 106. As one federal court noted:

"[T]he test is not limited to discrete instances of conduct; rather, the test is, by its own terms, concerned with the nature of the action as a whole. [footnote]

[Footnote text:] "Gist" is a term of art in common law pleading that refers to "the essential ground or object of the action in point of law, without which there would be no cause of action." Black's Law Dictionary 689 (6th ed.1990). "Action" is defined by Black's Law Dictionary as "a lawsuit brought in a court; a formal complaint within the jurisdiction of a court of law.... The "gist of the action" test, then, is a general test concerned with the "essential ground," foundation, or material part of an entire "formal complaint" or lawsuit. *American Guar. and Lia. Ins. Co. v. Fojanin* 90 F.Supp.2d 615, 622-623 (E.D.Pa.2000) (citation omitted).

¶ 17 Appellant argues that claims for fraud should not fall under the doctrine. The argument may be summarized as follows. First, the duty to refrain from deliberate deceit is a duty implied by law, not derived from a private contract. Second, fraud has always been considered a moral wrong; moreover, fraud can form a basis for both punitive damages and criminal liability. Third, because society already condemns fraud, parties to a contract do not (and need not) specifically bargain to refrain from fraud. Fourth, numerous Pennsylvania state cases exist "in which actions based upon the defendant's conduct during the performance of a contract gave rise to counts for both fraud and breach of contract, and the two counts proceeded together." [FN5] Next, this Court should adopt the reasoning of cases from federal and out-of-state jurisdictions, as well as the Pennsylvania Court of Common Pleas, holding that the duty to avoid fraud is independent of any contractual terms. Finally, to hold otherwise would essentially turn a contract into a "license to steal," where the tortfeasor could defraud the plaintiff at will, knowing that he need only return the money without further penalty if he is caught.

> FN5. Appellant's Brief at ; *citing, Baskin & Sears v. Edward . Boyle Co.,* 506 Pa. 62, 483 A.2d 1365 (1984) *Kubik v. Letter* 532 Pa. 10, 614 A.2d 1110 (199 *McClellan v. Health Maintenance Organization of Pennsylvan* 413 Pa.Super. 128, 604 A.2d 1053 (1992); an *Martin v. Hale Products,* 699 A.2d 1283 (Pa.Super.1997). We decline to treat these cases as persuasive authority in light of the fact that the gist of the action doctrine was not raised in those cases. *Titelman v. Rite Aid Corp.,* 2001 U.S. Dist. Lexis 24049, *18 n. 5 (E.D.Pa. Nov. 9, 2001).

[8] ¶ 18 To date, no Pennsylvania state appellate case has addressed the interpla *16 between fraud and the gist of the action doctrine. [FN6] We are guided by our understanding that, "when presented with an issue for which there is no clear precedent, our role as an intermediate appellate court is to resolve the issue as we predict our Supreme Court would do.' *Juban v. Scherme* 751 A.2d 1190, 1194 (Pa.Super.2000) (citation omitted). Federal courts occupy the same role when constru *17 Pennsylvania la\ See, Werner Kammann Maschinenfabrik, GmbH, v. Max Levy Autograph, Inc.,* 2002 WL 126634, *6, 2002 U.S. Dist. Lexis 1460, *18 (E.D.Pa.2002) (predicting that the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

811 A.2d 10
(Cite as: 811 A.2d 10, *17 )

Page 6

Pennsylvania Supreme Court would adopt the gist of the action test). Thus, we will begin with an analysis of federal case *See, Chester Carriers, Inc. v. National Union Fire Ins. Co.*, 767 A.2d 555, 560 (Pa.Super.2001) (decisions from federal courts are not binding on this Court, but may be considered as persuasive authority).

> FN6. In *Bash* this Court held that a plaintiff's claim for negligence was barred under the gist of the action doctrine. In that case, the plaintiff entered into a contract with Bell Telephone Company to place a listing and an advertisement for the plaintiff's business in the local Yellow Pages. The plaintiff alleged that Bell breached the contract and acted negligently by failing to place the plaintiff's information in the Yellow Pages. This Court dismissed the negligence claim, reasoning that the obligations of the parties were defined by the terms of the contract, not by the law of torts. *Bash* 601 A.2d at 830. *Bash,* the plaintiff also attempted to assert a claim for fraud. Specifically, the plaintiff alleged that the telephone company falsely represented that it would place the listing and advertisement, when in fact it did not. *Id.* at 832. This Court held that the fraud claim failed on the merits because "the breach of a promise to do something in the future is not fraud," and because "an unperformed promise does not give rise to a presumption that the promisor intended not to perform when the promise was made." *Id* (citations omitted). The *Bash* Court did not link the success or failure of the fraud claim to the gist of the action doctrine.
>
> In *Phico,* a nursing home alleged that a management company breached i contract with the nursing home and acted with gross negligence and willful misconduct by egregiously mismanaging the nursing home. The management company was insured by Phico. The insurance contract covered claims for gross negligence and willful misconduct, but excluded claims arising in connection with the breach of contract. Phico filed a declaratory judgment action, seeking a declaration that it had no duty to defend the management company. To determine whether the nursing home's underlying claims sounded in contract or tort, this Court turned to the gist of the action doctrine as set forth *Bash. Phico* 663 A.2d at 757. This Court concluded that the claims for gross negligence and willful misconduct arose out of the performance of the management contract, and thus were excluded under the insurance policy. This Court reasoned: "while [the nursing home] included allegations that [the management company] engaged in both gross negligence and willful misconduct, the agreement unquestionably was not collateral to any of its

claims. Indeed, this conclusion is supported by the fact that [the nursing home] averred that the actions which it relies upon to demonstrate tortious conduct collectively resulted in the breach of the agreement." *Id.* at 758.

In *Redevelopment* a township entered into a contract with the Redevelopment Authority to administer block grant funds and supervise the construction of improvements to the township's water system. The township filed suit against the Redevelopment Authority, contending that it acted negligently and failed to "properly perform" its duties under the contract *Redevelopment* 685 A.2d at 584. The Redevelopment Authority's insurer sought a declaratory judgment that it had no duty to defend under the general liability policy at issue. Specifically, the insurer argued that the Redevelopment Authority's actions did not constitute an "accident or occurrence" under the policy. This Court agreed, reasoning that although the underlying complaint sounded in tort and included charges of negligence, the case actually involved a breach of contract which is not covered by the policy. *Redevelopme* court analogized to the gist of the action doctrine, as set forth in *Bash* and as employed by *Phico.*

It is important to note *Phi.* and *Redevelopment* are not, strictly speaking, gist of the action cases; rather, they employed the doctrine to determine the scope of coverage under an insurance contract. Indeed, in both cases the court expressed concerns germane to insurance coverage disputes. For example, *Phico,* this Court reasoned that "to make Phico responsible under the insurance policy would effectively change its status from a mere insurer to a party to the transaction.' *Phico* 663 A.2d at 758. In *Redevelopment,* this Court reasoned that a contrary holding would essentially convert a general liability policy (covering accidents) into "a professional liability policy or a performance bond." *Redevelopment,* 685 A.2d at 592.

¶ 19 Federal cases within the Third Circuit have consistently applied the gist of the action test to fraud claims. The separate question of whether the fraud claim was actually barred by the doctrine appears to vary based on the individual circumstances and allegations of the plaintiff. In order to illustrate these principles, we will briefly summarize a number of cases applying the doctrine to fraud claims.

¶ 20 In *Foster v. Northwestern Mutual Lij* 2002 U.S. Dist. Lexis 15078 (E.D.Pa. July 25, 2002), an employee sued his employer for fraud with respect

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

to the payment of commissions under a contract. The court held that because the case was in its early stages, it was unclear whether the fraud related to performance under the contract or fraud in the inducement of the contract. The court suggested that fraud in the **inducement** of a contract would not necessarily be covered by doctrine because fraud to induce a person to enter into a contract is generally collateral to *i.e.*, not "interwoven" with) the terms of the contract itself *Id* at *7. [FN7] The court necessarily implied that fraud within the **performance** of a contract would be covered by the gist of the action doctrine.

> FN7. *See also, Asbury Auto. Group LLC, v. Chrysler Ins. Co.* 2002 WL 15925, 2002 U.S. Dist. LEXIS 117 (E.D.Pa. Jan. 7, 2002) (fraud claim based on false statement that an insurance policy would include a particular sort of coverage, thus inducing the purchase of the insurance policy, was not barred by the gist of the action test where the written policy which did not include the promised coverage was not sent to the plaintiff for several months) *compare, Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc* 40 F.Supp.2d 644, 651-652 (W.D.Pa.1999) (applying gist of the action doctrine to bar fraud claims arising from failure to disclose critical information about a corporation before a merger; agreement contained an integration clause); *Titelman v. Rite Aid Corp.,* 2001 U.S.Dist. Lexis 24049 (E.D.Pa. Nov. 9, 2001) (fraud-in-the-inducement claim barred by gist of the action doctrine where contract at issue was fully integrated); *but see, Horizon Unlimited, Inc. v. Silva* 1998 WL 88391, **4-6, 1998 U.S. Dist. Lexis 2223, **13-17 (E.D.Pa. Feb. 26, 1998)(dismissing fraud claims under gist of the action doctrine where plaintiff claimed that defendant made intentional misstatements in promotional literature about the amount of time it would take to build the product at issue).

¶ 21 In *Galdieri v. Monsanto Co.* 2002 U.S. Dist. Lexis 11391 (E.D.Pa. May 7, 2002), executives of Monsanto alleged that their employer induced them to remain employees by promising to create a long-term incentive compensation program, as required by clauses in their employment contracts. The plaintiffs further alleged that Monsanto committed fraud by promising to create these compensation plans while having no intention to do so. *Id.* at *34. The court ruled that the fraud claims were barred by the gist of the action doctrine because the fraud claims were "intertwined" with breach of contract claims. *Ia* ("breach of contract cannot be

'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging the contracting parties never intended to perform.") (citation omitted).

¶ 22 In *Werner Kammann Maschinenfabrik, GmbH, v. Max Levy Autograph, In* 2002 WL 126634, 2002 U.S. Dist. Lexi *18 1460 (E.D.Pa.2002), a purchaser bought a furnace from a manufacturer based on express representations that certain heating elements were enclosed. The furnace did not include the heating elements, and the manufacturer refused to assist in rectifying the problem. A project between the purchaser and a third party [FN8] was delayed as a result. The purchaser included claims of negligent and intentional misrepresentation. Tl *Werner Kamman* court dismissed the fraud claims under the gist of the action doctrine, reasoning that "the duties allegedly breached were created and grounded in the contract itself." *Id.* at *6, 2002 U.S. Dist. Lexis at *20.

> FN8. The third party was actually the original plaintiff in the suit. This party filed suit against the purchaser, who in turn filed a third party action against the manufacturer.

¶ 23 I *Polymer Dynamics, Inc. v. Bayer Corp.,* 2000 WL 1146622, 2000 U.S. Dist. Lexis 11493 (E.D.Pa. Aug. 14, 2000), the purchaser of a set of machines alleged, *inter alia* that the machines did not work properly and that the manufacturer made fraudulent statements with respect to the success of subsequent repairs. The plaintiff further alleged that during the course of this relationship, the manufacturer held out promises of a partnership and a future business relationship *Id* at **2-3, 2000 U.S. Dist. Lexis at **6- 7. In reliance on these promises, the plaintiff exchanged confidential information to the manufacturer, who then misappropriated this information to the detriment of the plaintiff. *Id.* at **2-3, 2000 U.S. Dist. Lexis at *7. The court held that the plaintiff's fraud claims were not necessarily barred by the gist of the action doctrine because they may relate to "promises of future business not contemplated by the sales contracts," and to confidential information which was not already the subject of a disclosure agreement. *Id.* at *7, 2000 U.S. Dist. Lexis at *20. Thus, the court allowed the fraud claims to proceed beyond a motion to dismiss for failure to state a claim. *Id.* [FN9]

FN9. The action in *Polymer Dynamics* was at one of the earliest stages of litigation: a motion to dismiss for failure to state a claim under F.R.C.P. 12(b)(6). *Id.* at *1, 2000 U.S. Dist. Lexis at *1.

¶ 24 In *Caudill Seed & Warehouse Co. v. Prophet 21, Inc.* 123 F.Supp.2d 826 (E.D.Pa.2000), a buyer purchased computer software from the defendant. The buyer alleged that the software never worked as promised; moreover, the seller repeatedly assured the buyer that the software would work when in fact it never did. The court dismissed the buyer's fraud claims under the gist of the action doctrine, even though the buyer further claimed that the seller fraudulently "strung along" the buyer with repeated promises that the software would work. *Id.* at 833. The court reasoned that the agreement was not collateral to the fraud claim, but rather "at the heart" of the fraud , at 834. Therefore, the gist of the action sounded in contract, not in tort *Id.; cf., Northeastern Power Co. v. Balcke-Durr, Inc.* 1999 WL 674332, *12, 1999 U.S. Dist. Lexis 13437, *37 (E.D.Pa.1999) (giving plaintiff "the benefit of the doubt" that fraudulent representations centering on a contractual subject matter were not barred by the doctrine).

¶ 25 In *Fojanini*, 90 F.Supp.2d 615, the defendant allegedly misrepresented the state of his company's business in order to lure the plaintiffs into spending money and time marketing the defendant's product. *Id.* at 623. The court held that the gist of the action sounded primarily in tort, not in contract. The court held that while the parties had a contractual relationship, the contract was merely collateral to the tort *19 claims. [FN10 *Id.; see also, First Republic Bank v. Brand* 50 Pa. D & C 4th 329 (Pa.Com.Pl.2000) (gist of the action doctrine did not bar fraud claims where plaintiffs alleged that, in between the signing of a letter of intent and the closing of a corporate transaction, defendants fraudulently misrepresented the state of the target corporation and looted cash therefrom; the fraud was collateral to the contractual agreements in the letter of intent).

FN10. Like *Phico* and *Redevelopment* Fojanini arose in the context of an insurance dispute. The central question *Fojanini* was whether the defendants' directors and officers liability insurer would be forced to defend and indemnify the defendants. *Id.* at 618.

¶ 26 In *Factory Mkt. v. Schuller Int'l.*, 987 F.Supp. 387 (E.D.Pa.1997), the parties entered into a contract whereby the defendant agreed to repair a chronically leaking roof. When the roof continued to leak after numerous attempts to repair it, the plaintiff brought suit alleging breach of contract, negligence, and fraud. The plaintiffs alleged that the defendant knew at the time of the agreement that the only way to make the roof watertight would be to replace the entire roof, but instead the defendant fraudulently agreed to a series of futile attempts to repair it. *Id.* at 395.

¶ 27 The court held that the plaintiff's negligence claims were barred under the gist of the action doctrine, reasoning that the obligation to make the roof watertight was imposed by the contract, not in tort; indeed, without the contract, the plaintiff would have no claim at . *Id.* at 395. More importantly for purposes of the instant case, the court also dismissed the fraud claim. The court ruled that this claim was also barred because the claim of fraud "arises directly out of the contract dispute." In short, the misrepresentations connected to the repairs were deeply intertwined with the obligations imposed by the contract itself, not collateral to the contract *Id.; see also, Blue Mt. Mushroom Co. v. Monterey Mushroom, Inc.*, 2002 U.S. Dist. LEXIS 17329 (E.D.Pa. Sept. 5, 2002) (fraud relating to contractual issues is barred by the gist of the action doctrine, while fraud related to bankruptcy proceedings would not be covered by the doctrine because the duty to avoid defrauding the court is independent of the contract).

¶ 28 Thus, persuasive authority interpreting Pennsylvania law has restated the gist of the action doctrine in a number of similar ways. These courts have held that the doctrine bars tort claims: (1) "arising solely from a contract between the parties" (*Galdieri, supra* at *33); (2) where "the duties allegedly breached were created and grounded in the contract itself" *Werner Kammann, supra* at **6-7, 2002 U.S. Dist. Lexis at *20); (3) where "the liability stems from a contract"*Asbury, supra* at *3, 2002 U.S. Dist. Lexis at *10); or (4) where the tort claim "essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract."*Polymer Dynamics, supra* at *6, 2000 U.S. Dist. Lexis 11493 at * 19).

¶ 29 These courts have **not** carved out a categorical

exception for fraud, and have not held that the duty to avoid fraud is always a qualitatively different duty imposed by society rather than by the contract itself. Rather, the cases seem to turn on the question of whether the fraud concerned the performance of contractual duties. If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties. If not, then the gist of the action would be the fraud, rather than any contractual relationship between the parties.

[9] ¶ 30 Appellant contends that failure to recognize a separate tort for fraud i *20 the performance of contractual duties would essentially convert the contract into a "license to steal." Some state supreme courts have found this argument persuasive. See, e.g., Grynberg v. Citation Oil & Gas Corp., 1997 SD 121, 573 N.W.2d 493, 502 (1997); Oestreicher v. American Nat' Stores, Inc., 290 N.C. 118, 225 S.E.2d 797, 809 (1976). In the absence of guidance from our Supreme Court, however, we prefer in this case to adopt the reasoning of federal courts applying Pennsylvania law. [FN11] Thus, we conclude that until our Supreme Court holds otherwise, the gist of the action doctrine should apply to claims for fraud in the performance of a contract. We will now apply the test to the instant case to determine whether Appellant's fraud claim is indeed barred by the gist of the action doctrine.

FN11. The Third Circuit Court of Appeals recently discussed the analogous question of whether our Supreme Court would recognize an intentional fraud exception to the "economic loss rule." This rule prohibits plaintiffs from recovering tort damages when a product malfunctions or otherwise causes damage only to the product itself. Werwinski v. Ford Motor Co. 286 F.3d 661, 671 (3rd Cir.Pa.2002). In such a case, contract damages (such as those provided in a breach of warranty action) are the sole remedy. Id.
In Werwinski, the plaintiffs alleged that a particular transmission component was defective, and that the manufacturer had known of the defect for several years but continued to sell the automobiles with the defective parts. Thus, the question Werwinski was whether additional damages, such as punitive damages, should be awardable if the plaintiff could prove fraudulent breach of warranty. As the Werwinski court noted, it "makes sense" to provide tort damages and the threat of punitive damages in order to deter intentionally fraudulent conduct. Id. at 680. On the other hand, from the perspective of the buyer, the manufacturer's state of mind is

largely irrelevant because the economic damages are the same whether the warranty was breached innocently, negligently, maliciously, or fraudulently. "Thus, the need to provide a plaintiff additional tort remedies is diminished greatly when (1) the plaintiff can be made whole under contract law, and (2) allowing additional tort remedies will impose additional costs on socie l The Werwinski court also recognized that current Pennsylvania case law is not "hospitabl[e] to tort liability for purely economic loss Ia (citation omitted). Th Werwinsk court also noted that declining to carve out a general fraud exception is consonant with a general rule of prudence holding that in the absence of guidance from our Supreme Court, courts should generally select the narrower path which limits liability rather than expands it. Id. at 680-681. We find this general line of reasoning persuasive in the context of the gist of the action doctrine as well.

[10] ¶ 31 Turning to the allegations in the instant case, Appellant contends that the Appellees perpetuated a number of fraudulent schemes in the course of the parties' contractual relationship. For example, Appellant alleged that the Appellees: (1) deceived Appellant into thinking that certain goods and services were being billed to Appellant at cost, when in fact the Appellees were charging inflated prices; (2) deliberately submitted bills containing fictitious charges and unauthorized markups; (3) concealed less expensive ways to accomplish a "market launch" of the product; (4) took undisclosed kickbacks and commissions; (5) told appellant that they had performed certain services under the contract when they had not done so; (6) misrepresented to appellant that certain targets had no interest in email products, when in fact interest was high; and (7) concealed these schemes in order to perpetuate the overbilling and fraud. Appellant's Brief at 8-9; 37- 38.

¶ 32 All of these alleged acts of fraud arose in the course of the parties' contractual relationship. Moreover, the Appellees' duties regarding billing and performance were created and grounded in the parties' contract. Finally, these are th *21 types of damages which would be compensable in an ordinary contract action; thus, the claim would essentially duplicate a breach of contract action to recover the allegedly-overbilled charges. The fraud at issue was not so tangential to the parties' relationship so as to make fraud the gist of the action. Rather, we conclude that the fraud claims

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

are inextricably intertwined with the contract claims. Because the gist of appellant's fraud action lies in contract, the trial court did not err as a matter of law in dismissing the fraud claim under the gist of the action doctrine.

¶ 33 Appellant's second and third claims are closely related. Appellant argues that the trial court took an unduly narrow view of Appellant's claims when ruling that they were barred by the gist of the action doctrine. Appellant also argues that the court looked only to the allegations of the complaint, rather than the entire record on summary judgment. As noted above, we have analyzed all of the fraud claims identified in Appellant's current brief on appeal and have determined that they are all barred by the gist of the action doctrine. Thus, even if the trial court erred as alleged, we would not reverse the court's order because Appellant has failed to identify any fraud claim that would not have been barred by the doctrine. This claim lacks merit.

¶ 34 Next, Appellant argues that the trial court erred as a matter of law by dismissing Count II for breach of fiduciary duty. Appellant argues that an agency relationship (and, thus, a fiduciary relationship) existed between Appellant and Elias/ Savion. Specifically, Appellant argues that Elias/ Savion acted as Appellant's agent because Elias/ Savion "represented [Appellant] in the marketplace, purchased goods for and on account of [Appellant], and committed [Appellant] to pay third parties" for services such as typesetting, photography, printing services, courier charges, freight, and other printing services. Appellant's Brief at 45.

¶ 35 Our Supreme Court recently outlined the parameters of a principal-agent relationship as follows:
> The law is clear in Pennsylvania that the three basic elements of agency are: " 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking' *Scott v. Purcell*, 490 Pa. 109, 117, 415 A.2d 56, 60 (1980), *quoting Restatement (Second) of Agency* § 1, Comment b (1958  *see also Reid v. Ruffin*, 503 Pa. 458, 463, 469 A.2d 1030, 1033 (1983). "Agency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary.' *Smalich v. Westfall* 440 Pa.

409, 413, 269 A.2d 476, 480 (1971). The burden of establishing an agency relationship rests with the party asserting the relationship. *Scott*, 490 Pa. at 117 n. 8, 415 A.2d at 61 n. 8. "An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." *Sutliff v. Sutliff*, 515 Pa. 393, 404, 528 A.2d 1318, 1323 *citing, Restatement (Second) of Agen* ¦ 387 (1958).
> Thus, in all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information. *See Sylvester v. Beck*, 406 Pa. 607, 610-11, 178 A.2d 755, 757 (1962).
> *Basile v. H & R Bloc* 563 Pa. 359, 761 A.2d 1115, 1120 (2000) (emphasis added). The Court stressed that not all acts on behalf of another give rise to an agency relationship:
> **\*22** The special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf. Rather, the action must be a matter of consequence or trust, such as the ability to actually bind the principal or alter the principal's legal relations. Indeed, implicit in the long-standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion that the agent has authority to alter the principal's relationships with third parties, such as binding the principal to a contract. Notably, the Restatement, which we have cited with approval in this area in the past, specifically recognizes as much *See Restatement (Second) of Agency* § 12 ("An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself.").
> *Id.* at 1121.

[11] ¶ 36 In the instant case, as noted above, Appellant argues that Elias/Savion acted as Appellant's agent by procuring goods and services such as printing, typesetting, and freight. Appellant does not contend that Elias/Savion actually bound Appellant to a contract with any of these service providers; rather, Elias/Savion incurred these charges and posted them to Appellant's account. *See,* Appellant's Brief at 44. Thus, Elias/Savion cannot be held to the standards of an agent on this

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

811 A.2d 10
(Cite as: 811 A.2d 10, *22)

Page 11

basis. *See, Basile, supra* at 1122 (H & R Block not considered an agent of taxpayers because it could not bind its clients to legal relationships with the IRS or to banks providing "Rapid Refund" loans). In any event, these third-party services were merely incidental to the larger goal of providing advertising services to Appellant. Because Appellant does not and cannot reasonably argue that these incidental matters involved matters "of consequence or trust" ( *Id.* at 1121), Elias/Savion may not be held to the heightened level of an agent in this respect. This claim fails.

[12] ¶ 37 Finally, Appellant argues that summary judgment was inappropriate with respect to the breach of fiduciary duty claim because Appellant relied upon Elias/Savion, a "trusted advisor" with specialized expertise, skill and experience in the field of marketing. Even assuming that Appellant did rely on Elias/Savion's superior skill and expertise, we would conclude as a matter of law that no confidential or fiduciary relationship existed. First, we note that Appellant has cited no authority holding that an advertising agency is a fiduciary to its clients. Next, as the following analysis makes clear, such a holding would threaten to convert most standard professional services contracts into fiduciary relationships:

A "special relationship" is one involving confidentiality, the repose of special trust or fiduciary responsibilities *See Commonwealth v. E-Z-Parks, Inc.,* 153 Pa. Commw. 258, 620 A.2d 712, 717 (Pa.Commw.1993). It generally involves a situation where by virtue of the respective strength and weakness of the parties, one has the power to take advantage of or exercise undue influence over the other. *Estate of Evasew,* 526 Pa. 98, 584 A.2d 910, 913 (Pa.199 *Also see, e.g., Maritrans G.P., Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277, 1283 (Pa.1990[1992]) (special relationship exists between attorney and client *Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412, 418 (Pa.1981) (special relationship exists between 86 year old widow with no formal education and her sole business counselor) *Estate of Thoma* 463 Pa. 284, 344 A.2d 834, 8 *23* (Pa.1975) (special relationship between attorney- scrivener and testator); *Silver v. Silver* 421 Pa. 533, 219 A.2d 659, 662 (Pa.1966) (special relationship between widow and sons upon whom she relied to manage her property) *Leedom v. Palme* 274 Pa. 22,

117 A. 410, 412 (1922) (special relationship between guardian and ward).

Plaintiff cites no case in which such a special relationship was found to exist between parties to an arms length business contract. If parties to routine arms length commercial contracts for the provision of needed goods or services were held to have a "special relationship," virtually every breach of such a contract would support a tort claim. *See L & M Beverage Co. v. Guinness Import Co.* 1995 WL 771113, *5, 1995 U.S. Dist. LEXIS 19443 (E.D.Pa. Dec. 29, 1995) (parties to exclusive sales contract did not have type of "special relationship" necessary to support negligent interference claim) *Elliott v. Clawson,* 416 Pa. 34, 204 A.2d 272, 273 (Pa.1964) (no special relationship between parties to arms length business contract); *Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Tr* 385o., Pa.Super. 30, 560 A.2d 151, 154 (Pa.Super.1989) (no special relationship between lender and borrower); *E-Z Park* [153 Pa.Cmwlth. 258], 620 A.2d 712 at 717 (no special relationship between parties to arms length commercial lease agreement).

Plaintiff contends that a "special relationship" arose when it gave defendant "substantial control of its advertising support." There is a crucial distinction between surrendering control of one's affairs to a fiduciary or confidant or party in a position to exercise undue influence and entering an arms length commercial agreement, however important its performance may be to the success of one's business.

*Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.* 28 F.Supp.2d 947, 952-953 (E.D.Pa.1998).

¶ 38 We agree with this reasoning, and hereby adopt it. Most commercial contracts for professional services involve one party relying on the other party's superior skill or expertise in providing that particular service. Indeed, if a party did no believe that the professional possessed specialized expertise worthy of trust, the contract would most likely never take place.

[13][14] ¶ 39 This does not mean, however, that a fiduciary relationship arises merely because one party relies on and pays for the specialized skill or expertise of the other party. Otherwise, a fiduciary relationship would arise whenever one party had any

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

811 A.2d 10
(Cite as: 811 A.2d 10, *23)

Page 12

marginally greater level of skill and expertise in a particular area than another party. Rather, the critical question is whether the relationship goes **beyond** mere reliance on superior skill, and into a relationship characterized by "overmastering influence" on one side or "weakness, dependence, or trust, justifiably reposed" on the other side. *Basile v. H & R Block* 777 A.2d 95, 101 (Pa.Super.2001). A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power. *Id.* at 102. [FN12]

> FN12. In *Basile*, this Court reversed a grant of summary judgment in favor of H & R Block. The Court held that H & R Block's customers presented a genuine issue of material fact as to whether a confidential relationship existed between H & R Block and customers seeking Rapid Refund loans. Specifically, the Court noted that customers tending to use these services were in a position of "pronounced economic and intellectual weakness," and that they completely trusted H & R Block to act in their best interests. *Id.* at 104.

¶ 40 In the instant case, Appellant focuses its argument almost exclusively on t *24* fact that Elias/Savion held (or purported to hold) greater knowledge and expertise in national marketing than was held by Appellant's officers and directors. Appellant's Brief at 46-48. As noted above, this is not the proper standard from which to judge the existence of a fiduciary or confidential relationship. Moreover, Appellant presents no evidence that the

relationship between the parties was so markedly imbalanced as to give rise to a confidential relationship as defined by Pennsylvania law. The trial court did not err as a matter of law in dismissing Count II for breach of fiduciary duty. [FN13]

> FN13. In its brief, Elias/Savion argues that Count II for breach of fiduciary duty is barred by the gist of the action doctrine. We need not address this issue because we have held that no fiduciary relationship existed in this case. We do, however, take note of federal authority holding that fiduciary duties extend beyond contractual duties and, thus, are not barred by the gist of the action doctrine. *Bohler-Uddeholm,* 247 F.3d at 104-105.
>
> Finally, we note that Appellant has developed no argument on appeal concerning Count III for professional negligence. Similarly, Appellant has developed no argument on appeal that Elias/ Savion's officers and directors should be held individually liable for any particular cause of action. Thus, these issues are waived.

¶ 41 Order affirmed. [FN14]

> FN14. We wish to commend both Appellant's counsel and Appellees' counsel for their thorough, clear, and thoughtful presentation of the difficult issues in this case, particularly with respect to the gist of the action doctrine.

811 A.2d 10, 2002 PA Super 347

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

24.

32.    Because CCI and Ortenzio used the proceeds of the revolving line of credit of CCI

with Allfirst to repay the One Million Two Hundred Thousand Dollar loan without Allfirst's

knowledge or consent and because Ortenzio was unjustly enriched thereby, Allfirst, as creditor under

the revolving line of credit, is equitably subrogated to the rights of Allfirst, as creditor under the One

Million Two Hundred Thousand Dollar loan, including through such equitable subrogation the right

to enforce and collect upon the Suretyship Agreement executed by Ortenzio.

33.    The amount to which Allfirst is entitled to be equitably subrogated in the enforcement

of the Suretyship Agreement against Ortenzio equals the lesser of (a) the unpaid balance of all

principal and interest owed on the Commercial Note as though the February 12, 2000 payment had

not been made or (b) the greater of (i) the unpaid principal balance and all accrued interest due under

the revolving line of credit, together with all collection costs and attorneys fees, or (b) the unpaid

principal balance and all accrued interest due under the revolving line of credit, together with all

collection costs and attorneys fees, plus the amount of any recovery made by CCI in the preference

action pending in the bankruptcy case, , together with, in either case (a) or (b), all attorneys fees and

collection costs in enforcing the Suretyship Agreement as provided therein.

## COUNT III

34.    The payment by Ortenzio of the One Million Two Hundred Thousand Dollar loan

extended by Allfirst to CCI through the use of a check drawn upon and reflecting an advance on

CCI's revolving line of credit with Allfirst constituted common law fraud by Ortenzio in that (a)

delivery of the check amounted to and was the equivalent of a representation by Ortenzio that

payment of the One Million Two Hundred Thousand Dollar loan was being made by CCI or by

Ortenzio through CCI with monies other than those borrowed under the revolving line of credit. This representation by Ortenzio was knowingly false when made and was justifiably relied upon by Allfirst in giving Ortenzio and CCI a receipt for the payment and noting on its record that the obligations under the Commercial Note and Suretyship Agreement had been satisfied. Allfirst has suffered damages as a direct and proximate result of the knowingly false representation made by Ortenzio upon which it justifiably relied in an amount equal to the lesser of (a) the unpaid balance of all principal and interest owed on the Commercial Note as though the February 12, 2000 payment had not been made or (b) the greater of (i) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, or (b) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, plus the amount of any recovery made by CCI in the preference action pending in the bankruptcy case, , together with, in either case (a) or (b), all attorneys fees and collection costs in enforcing the Suretyship Agreement as provided therein.

WHEREFORE, Allfirst requests judgment:

1.    As to Counts One, Two and Three for compensatory damages against Ortenzio in an amount equal to the lesser of (a) the unpaid balance of all principal and interest owed on the Commercial Note as though the February 12, 2000 payment had not been made or (b) the greater of (i) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, or (b) the unpaid principal balance and all accrued interest due under the revolving line of credit, together with all collection costs and attorneys fees, plus the amount of any recovery made by CCI in the preference action pending in the bankruptcy case, , together with, in either case (a) or (b), all attorneys fees and collection costs in enforcing the

Suretyship Agreement as provided therein;

    2.    As to Count Three, punitive damages in an amount equal to One Million Two Hundred

Thousand Dollars or such other amount as is appropriate under the circumstances; and

    3.    As to Counts One, Two, and Three, an award of costs.

<br>

Lawrence J. Gebhardt
(Motion for *Pro Hac Vice* Admission Pending)
Michael D. Nord
Pennsylvania Bar # 52486
Ramsay M. Whitworth
Pennsylvania Bar # 85208
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202

(410) 752-5830

Attorneys for Allfirst Bank

## CERTIFICATE OF SERVICE

Robert A. Burke, attorney for Defendant, John Ortenzio, hereby certifies that

he caused a true and correct copy of Defendant's Motion to File Additional Brief to

Address New Pennsylvania Authority and supporting Memorandum of Law to be

served upon the following on this 9th day of January, 2003, by Federal Express:

Lawrence Gebhardt, Esquire
Gebhardt & Smith, LLP
The World Trade Center, Ninth Floor
Baltimore, MD   21020-3064

ROBERT A. BURKE