IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALLFIRST BANK,** | : | **CIVIL ACTION NO. 1:CV-01-0786** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN M. ORTENZIO,** | : | |
| | : | |
| **Defendant** | : | |

# M E M O R A N D U M

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On July 29-31, 2002, the court conducted a non-jury trial in the captioned matter.  The following constitute the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.      Findings of Fact

### A.      The Parties

Plaintiff, Allfirst Bank, is chartered under Maryland state law.  Its principal place of business is located in Baltimore, Maryland.  Defendant, John M. Ortenzio, is a citizen of the Commonwealth of Pennsylvania.  At all times relevant to this litigation, Ortenzio was the President of CCI, Inc., a construction company.

### B.      The $4 Million Line of Credit

In March of 1999, Allfirst extended CCI an unsecured $4 million line of credit.[1]  The letter of intent accompanying the credit contract authorized CCI to use

---

[1] Actually, First Maryland Bank, Allfirst's predecessor in interest, extended the line of credit to CCI.

the line to finance work in progress and accounts receivable.  Additionally, the letter of intent set out certain other terms and conditions governing the line of credit. Those conditions required CCI, *inter alia*, to submit to Allfirst (1) annual financial audits, (2) quarterly work in progress reports, (3) quarterly financial statements for CCI, and (4) monthly certifications of accounts receivables stating the age of each account.  Additionally, Allfirst required CCI to maintain its primary account for business deposits with Allfirst and have a tangible net worth of $4.5 million in order to draft checks drawing on the line.  Officers of both Allfirst and CCI signed the letter of intent which states: "All terms and conditions contained herein shall survive the execution of such loan documentation."  (Pl. Ex. 1 at p. 2.)  On March 24, 1999, the parties signed a promissory note formalizing the agreement.  The promissory note also indicates that Pennsylvania law would govern any disputes arising out of the transaction.  The agreement also indicated that a material adverse change in CCI's financial condition would constitute a default under the agreement and that a default on any CCI loan with Allfirst would automatically make all of CCI's debts with Allfirst due immediately.

Pursuant to the agreement, the line of credit had a cash management feature.  CCI's customers would either wire transfer their payments directly to CCI's Allfirst account or CCI would deposit them in the account after receiving the payments from their customers.  If there were an outstanding balance on the line at the end of a particular day, the deposits would be applied against the line.  If there were no outstanding balance on the line, then the positive balance in the account would be swept, on a daily basis, into an interest producing investment.  Interest generated through this process would then be credited to CCI.  When CCI checks

were presented to Allfirst for payment, any positive balance in its accounts would be used first to pay the checks. If this were insufficient, or if there were no positive balance available, the line of credit would be accessed, and the checks would be honored by drawing on the line. Any amount remaining on the line was due in full on April 30, 2000.

### C.    The $1.2 Million Note

During the second half of 1999, CCI's financial condition took a turn for the worse. CCI anticipated that its short term payables would exceed its incoming revenue and its borrowing capacity on the line of credit. On October 26, 1999, Ortenzio and Sheri Phillips, CCI's Chief Financial Officer, met with Allfirst Vice President Craig Schwartz to discuss CCI's deteriorating financial condition. During the meeting, Phillips and Ortenzio informed Schwartz that CCI had lost $1.5 million during the first nine months of 1999 and that they estimated year end losses approaching $2 million. Phillips and Ortenzio attributed the loss to delinquent accounts receivable and other logistical issues related to specific CCI construction projects.

On November 4, 1999, Ortenzio and Phillips met again with Schwartz and Michael Zarcone, Allfirst's manager of Pennsylvania corporate banking. During the meeting, Ortenzio requested that Allfirst increase CCI's unsecured line of credit by $1 million. He also presented cash flow projections indicating that CCI's cash intake would sufficiently exceed its expenses and payables to allow it to fully pay down the increased line of credit, with cash to spare, by its due date of April 30, 2000. Based on these projections, Allfirst initially agreed to increase the line of credit

to $5 million, but only if Ortenzio agreed to secure the entire line with his personal assets. Ortenzio balked at such an arrangement.

In the end, Allfirst agreed to extend CCI an additional $1.2 million in borrowing capacity in the form of a short-term commercial note secured by Ortenzio's personal assets in the event CCI defaulted on the note. The commitment letter pertaining to the note indicated that, like the line of credit, the funds would be used to finance CCI's work in progress and accounts receivable. The loan documents memorializing the $1.2 million note indicated that the note was due in full by March 31, 2000. Additionally, those documents contained the same reporting requirements and default provision for material adverse financial change as the line of credit. The note, however, did not require that CCI maintain a net worth of any specific amount. But, the note contained a provision indicating that CCI's insolvency would constitute a default. The parties also altered a few terms of the contract governing the $4 million note. For example, the parties deleted the requirement that CCI maintain a tangible net worth of $4.5 million to borrow on the line and that a material adverse change in CCI's financial status would constitute a default of the $4 million line of credit. The parties also added a provision to the $4 million line of credit promissory note requiring that Allfirst provide CCI with thirty days notice before declaring CCI in default on the line of credit.

Nothing in the contract governing the $1.2 million note explicitly prohibited CCI from paying off the secured note by effecting a draw on the unsecured $4 million line. However, it is not common practice for banks to limit the source of funds used to repay debt. Instead, it is more common for a bank to limit how the borrower may use loan proceeds. In this respect, the commitment letter

4

pertaining to the $4 million line limited funds drawn from the line to financing work in progress and accounts receivable. That document, therefore, implicitly prohibited CCI from paying off the $1.2 million note with a draw on the line of credit because such a payment would be inconsistent with the limit placed on the use of the funds. Based on the cash flow projections that Ortenzio and Phillips provided, both Schwartz and Zarcone believed that the $1.2 million note would be paid off using CCI's excess cash.[2] Those numbers indicated that CCI would have enough collections during the first few months of the year to cover their expenses and to pay down both loans by their due dates.

After negotiating its terms, CCI and Allfirst signed the $1.2 million note. Ortenzio signed the accompanying suretyship agreement, pledging his personal assets in the event CCI defaulted on the note. Allfirst then took $1.2 million and applied that amount against the $4 million line of credit. The transaction had the effect of increasing the amount of CCI's available borrowing capacity under the line by $1.2 million.

### D.    Ortenzio's Payment for the $1.2 Million Note

After receiving the $1.2 million pursuant to the note, CCI's financial situation did not improve as the cash projections indicated it would. CCI experienced declining profits on many of its projects. Other losses that it had already anticipated turned out worse than previously projected. CCI's internal books

---

[2]When asked about how he expected the loan to be repaid, Schwartz testified as follows: "Q: Did you have any contemplation in November of 1999 that the line of credit borrowings would be used to repay the $1.2 million note? A: No. The money was to come from the excess cash flow that they would accumulate over the next few months." (*See* Tr. (Schwartz) at 40.) Similarly, Zarcone testified as follows: "Q: And the cash flow numbers demonstrated that CCI would have the capacity to repay the 1.2 million dollar loan; right? A: Yes." (Tr.(Zarcone) at 478.)

indicated that the company was using the maximum amount it could borrow under the line of credit. Frequently, Phillips, at Ortenzio's instruction, would not send out CCI checks until CCI had sufficient borrowing capacity on the line to ensure that the checks would be honored. In short, CCI desperately needed every bit of capital it could muster to continue its day-to-day business operations. Because it lacked sufficient cash, CCI used the line of credit to pay employees, vendors, and subcontractors. CCI's 1999 year end financial statement indicated that the company lost $6 million during 1999 and was insolvent by almost $1 million entering 2000.

CCI's financial condition was so dire that Ortenzio, Phillips, and Shane Miller, CCI's Chief Operating Officer, held a meeting to discuss the possibility of CCI filing for bankruptcy protection. Phillips, who monitored CCI's financial condition on a daily basis, indicated that if CCI did not receive an extra infusion of cash, it would be unable to continue as an ongoing enterprise. She also instructed Ortenzio that the cash flow projections, which the two presented to Allfirst in November of 1999, had not come to fruition. In fact, the cash flow situation worsened each month. Despite its obligation to keep Allfirst apprised of its financial condition, CCI did not provide any of the financial information it was required to supply to Allfirst pursuant to the commitment letters for both the note and the line of credit.

On more than one occasion, Ortenzio expressed to Phillips that he would rather have the company file for bankruptcy than risk investing any more of his personal assets in CCI. Additionally, Ortenzio told Phillips that he wanted to pay off the $1.2 million note by drawing on CCI's unsecured $4 million line of credit. He further indicated to Phillips that he wanted to do this to discharge his obligation under

the personal suretyship agreement in the event CCI defaulted on the $1.2 million note. Phillips, however, expressed her opposition to this idea. Her position was that CCI needed the borrowing capacity under the line of credit to continue paying its employees and creditors. She also felt that such a borrowing on the line was inconsistent with the terms of the commitment letter which limited the use of the funds to financing accounts receivable and work in progress.[3]

In early February 2000, Ortenzio decided to go through with his plan to discharge his obligation under the surety agreement by using the unsecured $4 million line of credit to pay off the secured $1.2 million note. He told Phillips that he was going to go through with his plan regardless of whether she agreed with him. Ortenzio then instructed Phillips to write out a CCI check payable to Allfirst in the amount of $1.2 million. Phillips, however, was so adamantly opposed to the idea that she refused to sign the check. Accordingly, Ortenzio went to the accounts payable department and had another employee write out a CCI check payable to Allfirst in the amount of $1.2 million. At that time, Ortenzio knew that the balance on the $4 million line of credit was such that drafting a check in the amount of $1.2 million would result

---

[3]At trial, Phillips testified as follows regarding her objections to Ortenzio's intention to pay off the secured $1.2 million note by drawing on the unsecured $4 million line of credit:

> Q: Okay, in terms of the commitment letter's specification of use of line of credit proceeds for the $4 million line, how did you regard the $1,200,000 payment in terms of the commitment letter requirement?
>
> A: I did not think it agreed with our – the intent of our line of credit was given to us for.
>
> Q: Did you ever convey that position to Mr. Ortenzio prior to February 11, 2000?
>
> A: Yes, I did.

(Tr. at 329-30.)

in a draw on the line.  Therefore, Ortenzio knew that presenting such a check would essentially cause Allfirst to pay itself off with its own money instead of CCI's, resulting in a discharge of Ortenzio's personal surety on the $1.2 million note.

On the morning of Friday, February 11, 2000, Ortenzio called Schwartz. During that conversation, Ortenzio indicated that he wanted to come into Schwartz's office to pay off the $1.2 million note.  Schwartz, however, told Ortenzio that he would be out of the office from about noon until 3:30 or 4 p.m.  During that same conversation, Ortenzio falsely told Schwartz that CCI's cash flow projections – as presented to Allfirst during the November meeting – had borne out as predicted by Phillips and Ortenzio in November of 1999.

Sometime between 11 a.m. and 1 p.m., Ortenzio arrived at Schwartz's office in the Allfirst Building located in downtown Harrisburg, Pennsylvania.  Upon his arrival, Schwartz's secretary told Ortenzio that he could wait for Schwartz but that he was out for lunch and would not be returning for about an hour.  Ortenzio waited for a period of time, but ended up giving the check to Schwartz's secretary. The secretary had the check processed and gave Ortenzio a receipt.

On either Monday February 14, 2000 or Tuesday February 15, 2000, Ortenzio called Schwartz and requested that Allfirst return Ortenzio's surety on the note.  Ortenzio did not mention CCI's precarious financial condition at any time during this phone conversation.  In accordance with their conversation, Schwartz put a rush request into Allfirst's document control section.  The surety was subsequently returned to Ortenzio on Thursday February 17, 2000 – less than one week after Ortenzio presented the $1.2 million check to Allfirst.

At the time Ortenzio delivered the check to Allfirst, CCI owed approximately $1.2 million on the $4 million line of credit, with approximately $2.8 million in available credit on the line. Because CCI had insufficient funds in its account to cover the check that Ortenzio delivered, the check caused a deeper draw on the line of credit. Thus, the check increased CCI's debt on the unsecured line of credit to approximately $2.4 million, while ostensibly discharging CCI's debt under the secured note. Because the debt under the secured note had apparently been satisfied, the payment also caused a discharge of Ortenzio's personal surety.

### E.    Ortenzio Notifies Allfirst of CCI's Financial Woes

On the morning of Friday, February 18, 2000 – a week after using the unsecured line of credit to discharge the secured note and one day after Ortenzio received back his personal surety on the $1.2 million note – Phillips called Schwartz and requested a meeting with Allfirst officials to discuss CCI's financial status. A meeting occurred that afternoon. At that meeting, Ortenzio and an attorney, Robert Chernicoff, attended on behalf of CCI. Phillips, however, did not attend.

During the meeting, Ortenzio presented CCI's year end financial statement which reflected that CCI was balance sheet insolvent by almost $1 million. He also presented a cash flow projection demonstrating that CCI would have a cash shortage of almost $6 million through August of 2000. Ortenzio's report also indicated that CCI would immediately begin exceeding its borrowing limit on the $4 million line of credit if it did not receive additional working capital. Ortenzio indicated that although things were not going well, he was going to meet with CCI's bonding company in the next few weeks to secure additional financing. Ortenzio's figures, however, did not reveal the fact that he had paid off the secured $1.2 million

note with a draw on the unsecured $4 million line of credit, nor did Ortenzio mention that fact during the meeting.

At the meeting's conclusion, Ortenzio agreed that CCI would cease writing checks on the line until he heard otherwise from Allfirst officials. However, Allfirst continued to receive CCI checks presented to it for payment. Allfirst dishonored these checks. On February 23, 2001, Allfirst shut down the line of credit. The following day, Allfirst declared CCI in default on the line of credit and demanded payment in full. At that point, Allfirst contends, Ortenzio still had not divulged the fact that he accessed the $4 million unsecured line of credit in an attempt to discharge the $1.2 million note that his personal surety secured.

Between February 22, 2000 and February 25, 2000, CCI customers wired payments to CCI's Allfirst account totaling $2,317,291.28. This reduced CCI's outstanding obligation under the $4 million line of credit to $284,222.52. On May 19, 2000, CCI filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Middle District of Pennsylvania. On January 10, 2001, CCI instituted an action to recover the customer payments as a preference pursuant to § 547 of the Bankruptcy Code. Trial of this matter is pending in the Bankruptcy court.

### F.    Allfirst's Internal Procedures

Whenever Allfirst receives a payment on a commercial loan or credit account, it issues a general ledger ticket indicating what the amount of payment is and to what account the payment should be credited. Additionally, Allfirst has a commercial loan system. This is a computer system that allows Allfirst to track payments and debits on all of its commercial loans. Allfirst loan officials such as Jamin Gibson, Allfirst's Manager of the Pennsylvania Special Credits Department,

and Schwartz, a loan relation officer, have access to Allfirst's commercial loan system on their desktop computer terminals via Allfirst's internal computer network. Using this system, authorized Allfirst officials, like Schwartz and Gibson, can monitor all activity related to a particular Allfirst commercial loan account by typing in the account number at the appropriate screen. This account history is what is known as the accumulated transaction list. At trial, Gibson testified that by examining the accumulated transaction list for CCI's account number corresponding to the $4 million line of credit, in addition to referencing the general ledger ticket issued to Ortenzio for CCI's February 11, 2000 payment in the amount of $1.2 million, Gibson was able to definitively determine that CCI discharged its obligation under the secured $1.2 million note by drawing on the unsecured $4 million line of credit.

Despite the fact that the transaction would have showed up on Allfirst's commercial loan system on Monday February 14, 2000, Schwartz did not cross reference the general ledger ticket with the commercial loan system before sending a rush order into Allfirst's collateral clerk for the return of Ortenzio's surety. However, Schwartz did reference the commercial loan system screen corresponding to CCI's account number for the $1.2 million note to determine whether the check covered the interest accrued on the note. That information told Schwartz only that the balance had been paid in full including interest. It did not, however, indicate that the balance had been paid by drawing on the $4 million line of credit.

Schwartz had no reason to check the accumulated transaction list for the line or to take the further step of seeking out the paper copy of the general ledger ticket; the total process necessary to yield the information that would reveal how Ortenzio paid off the $1.2 million note. Schwartz had no information regarding

11

CCI's precarious financial position.  No one at CCI, including Ortenzio, had provided Schwartz with the disclosures required by both the $4 million line of credit and the $1.2 million note.  These disclosures, as stated, would have included the following documents: CCI's 1999 annual financial statement; quarterly work in progress reports; most recent quarterly financial statements; and monthly certification of CCI's monthly accounts receivable list with the ages of all of its outstanding accounts.  Moreover, the commitment letter pertaining to the $4 million line of credit limited use of the funds available under the line to finance work in progress and accounts receivable.  Finally, Allfirst had a relationship with Ortenzio that spanned several years, and Schwartz indicated that he believed Ortenzio to be a man of unquestionable integrity.  Thus, Schwartz had no reason to suspect that Ortenzio would have written a check that would have discharged his personal surety by drawing on the unsecured line of credit.  At trial, Schwartz testified as follows regarding this process:

> Q:  Now, in [Plaintiff's Exhibit 15, a letter from Schwartz to Ortenzio dated February 15, 2000], in the first sentence, you confirm that the $1,200,000 note had been repaid.  Did you do anything to confirm that payment?
>
> A:  Yes, I would have looked on the system and saw that it, in fact, had been paid.
>
> Q:  Now, the system you looked at, what would have been revealed on it?
>
> A:  I would have looked – I would have looked, seen the loan amount and the outstanding balance and any interest that was due.
>
> Q:  What loan?
>
> A:  The million two loan.

12

Q:     Would anything have shown regarding the $4
        million line of credit?

A:     No, none.

Q:     Why did you look up the loan screen for the
        $1,200,000 loan?

A:     To make sure that, in fact, the loan was paid off so I could
        ask for [Ortenzio's] surety back.

Q:     Was there any concern about interest on your part?

A:     Yes, that would have been the process.  I would have made
        sure that the interest was also paid on the loan.  Otherwise,
        the loan would haven't been paid in full and I couldn't have
        returned the surety.

Q:     Why didn't you check the balance on the $4 million
        revolving line of credit when you checked to see if the
        $1,200, 000 loan had been repaid?

A:     I had no reason to check that.

(Tr. (Schwartz) at 53-54.)


## II.          **Discussion**

### A.          **Subject Matter Jurisdiction**

Allfirst contends that Ortenzio committed common law fraud by

repaying the $1.2 million secured note by borrowing from the unsecured $4 million

line of credit.  Because the cause of action arises under state law and the amount in

controversy exceeds $75,000, the court's jurisdiction is based on the parties' diverse

state citizenship.  *See* 28 U.S.C. § 1332(a)(1).  As previously stated, Allfirst is a

citizen of the State of Maryland.  *See id.* at § 1332(c)(1).  Ortenzio is a citizen of the

Commonwealth of Pennsylvania.

## B.    Merits

In Count III of its complaint,[4] Allfirst contends that Ortenzio committed common law fraud when he presented the CCI check that ostensibly discharged Ortenzio's personal surety on the $1.2 million note.  Under Pennsylvania law, to recover for the tort of fraud, a plaintiff must prove the following: (1) that the defendant made a representation to the plaintiff; (2) of a fact material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it was true or false; (4) with the intent of misleading the plaintiff into relying upon the misrepresentation; (5) that the plaintiff justifiably relied upon the misrepresentation to his detriment; and (6) the resulting injury was proximately caused by the reliance.  *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994) (citing Restatement (Second) of Torts § 525 (1977)).  In determining whether reliance is reasonable, the court must take into account the parties' level of sophistication and their course of dealing.  *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs.*, 951 F.2d 1399, 1411-12 (3d Cir. 1991); *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993).

The tort of fraudulent misrepresentation has the same elements as fraud except that, in the case of fraudulent misrepresentation, one party intentionally conceals a material fact instead of making an affirmative misrepresentation.  *GMH Assoc., Inc. v. Prudential Realty Group*, 752 A.2d 889, 901-02 (Pa. Super. Ct. 2000).  The elements of both fraud and misrepresentation must be proved by clear and convincing evidence.  *Lind v. Jones, Lang LaSalle Americas, Inc.*, 135 F.

---

[4]By an order dated July 16, 2002, the court granted summary judgment in favor of Ortenzio on Counts I (conditional payment) and II (equitable subrogation) of Allfirst's complaint.  *See Allfirst Bank v. Ortenzio*, No. CV-01-0786, order at ¶ 1(A) (M.D. Pa. July 16, 2002).

Supp.2d 616, 621 (E.D. Pa. 2001) (citing *Snell v. Commonwealth*, 416 A.2d 468, 470 (Pa. 1980)).

### 1.    Misrepresentation of a Material Fact

Ortenzio contends that Allfirst failed to adduce clear and convincing evidence indicating that he made any false statement of fact.  Thus, according to Ortenzio, Allfirst cannot establish the first element of its cause of action; that Ortenzio made a false misrepresentation.  The court, however, finds that Ortenzio made both affirmative and latent misrepresentations of material fact.

### a.    Ortenzio's Affirmative Misrepresentation

Ortenzio contends that Allfirst has failed to provide evidence indicating that he made any affirmative misrepresentation to Allfirst.  The court disagrees.  Specifically, the court finds that Ortenzio told Schwartz on Friday February 11, 2000 that CCI's cash flow projections had borne out as predicted during the November 4, 1999 meeting.

"The first element – a misrepresentation – is established if the misrepresentation was made knowingly, in conscious ignorance of the truth, or with reckless disregard of the truth or falsity of the statement."  *Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599, 607 (M.D. Pa. 1994) (citing *Delahnaty v. First Pennsylvania Bank*, 464 A.2d 1243, 1252 (Pa. Super. Ct. 1993)).

At the time he made his statement regarding CCI's cash flow projections, Ortenzio knew not only that this statement was false, but that CCI's financial condition was so precarious that he was considering having CCI file for bankruptcy protection.  Moreover, he knew that Allfirst was not in possession of this same information.  Yet, Ortenzio told Schwartz that the cash flow projections of

November 1999 had turned out accurate.  Given the fact that Phillips had told him  on numerous occasions of CCI's financial condition, and the fact that Ortenzio had discussed filing bankruptcy, the court is forced to conclude that this statement was patently false and was made with the intent to deceive Allfirst into returning Ortenzio's personal surety on the $1.2 million note.

### b.    Ortenzio's Latent Misrepresentation

Even if Ortenzio had not made an affirmative misrepresentation regarding the cash flow projections, he fraudulently concealed CCI's financial condition from Allfirst officials while seeking to procure discharge of his personal surety on the $1.2 million note by causing a draw on the unsecured $4 million line of credit.  Ortenzio, however, argues that he had no duty to speak with regard to his dealings with Allfirst.

In support of this position, Ortenzio contends that "[a] typical business relationship does not form the basis [of a fiduciary duty to speak] unless 'one party surrenders substantial control over some portion of his affairs to the other.' " *Sunquest Info. Sys. v. Dean Witter Reynolds*, 40 F. Supp.2d 644, 656 (W.D. Pa. 1999) (quoting *Drapeau v. Joy Tech, Inc.*, 670 A.2d 165, 171 (Pa. Super. Ct. 1996) (Beck, J. concurring) (citations omitted)).  While this may be true, the contract between CCI and Allfirst placed significant reporting requirements on CCI.  As previously stated, both the unsecured line of credit and the secured commercial note required that CCI provide Allfirst with the following documents: (1) annual financial audits, (2) quarterly work in progress reports, (3) quarterly financial statements for CCI, and (4) monthly certifications of accounts receivable stating the age of each account.  Despite its duty to do so, CCI did not provide any of these documents to

Allfirst until February 18, 2000, the day after Ortenzio received back his personal surety from Schwartz. Moreover, Ortenzio was acutely aware of CCI's precarious financial condition and the lack of Allfirst's knowledge regarding that situation. Despite being privy to all of this information, at the very least, Ortenzio opted not to let Allfirst know of his company's dire financial condition, in direct contravention of his affirmative obligation to do so. Had Schwartz, or any other Allfirst official, known this information, it surely would have prompted him to take additional measures to ensure that the payment came from CCI's cash flow before returning the surety. Ortenzio was in possession of this information and intended this result.

Ortenzio's failure to reveal information that was uniquely within his knowledge amounted to concealment of a material fact. The concealment of a material fact amounts to a culpable misrepresentation to the same extent as an intentional false statement. *Commonwealth v. Monumental Properties, Inc.*, 329 A.2d 812, 829 (Pa. 1974). Accordingly, the court concludes that Ortenzio made both affirmative false statements of material fact to Allfirst and concealed material facts from Allfirst.[5]

---

[5]The court finds that these misrepresentations involved material facts. The record is replete with testimony indicating that had Allfirst officials known that Ortenzio was discharging his personal obligation by causing a draw on the unsecured $4 million line of credit – a use completely inconsistent with accounts receivable and work in progress – they would have not accepted the payment. Moreover, such a conclusion is consistent with common sense given CCI's impecunious state; a fact known to Ortenzio, but unknown to Allfirst officials. (*See* Tr. (Schwartz) at 41, ln. 19 to 42, ln. 1 and 50, ln. 20 to 51, ln. 2.) Allfirst had required that Ortenzio secure a portion of CCI's debt with his personal assets to protect against the risk of CCI defaulting. Given this situation, the fact that the payment would change the status of CCI's obligation under the $1.2 million note from one secured by Ortenzio's personal assets to one completely unsecured is a material fact. *See Greenwood v. Kadoich*, 357 A.2d 604, 607 (Pa. Super. Ct. 1976) (holding that a misrepresentation is material when it is of such a character that if it had not been made, the transaction would not have been entered into). Additionally, the court finds that Allfirst has presented facts indicating that Ortenzio made these misrepresentations with knowledge of their falsity. Phillips's testimony is determinative of

(continued...)

### 2.    Justifiable Reliance

Given the significant evidentiary standard in fraud cases, the most difficult determination that the court has come across in this case has been determining whether Allfirst justifiably relied on Ortenzio's statements and/or silence regarding the source of funds used to repay the $1.2 million note.  On the one hand, Gibson testified that, by examining the general ledger ticket and the accumulated transaction list, he could tell that CCI's $1.2 million payment caused a draw on the unsecured line of credit.  Because Schwartz had access to these documents, he could have confirmed CCI's method of payment before returning Ortenzio's surety.  Although Schwartz accessed the accumulated transaction list to ensure that the transaction covered the payment of interest, he did not have a paper copy of general ledger ticket and he did not seek out one.  On the other hand, all of the relevant documents limited CCI's use of the funds to financing accounts receivable and work in progress.  Additionally, Ortenzio had a long standing relationship with Allfirst during which he had demonstrated himself a man of unquestionable integrity.  As a result, Allfirst did not monitor his account on a daily basis.  Moreover, Schwartz would have had to go to considerable lengths to obtain the general ledger ticket; a maneuver which must have seemed unnecessary given the other circumstances listed in this paragraph.

The rules for determining whether a plaintiff justifiably relied on a material misrepresentation are found in §§ 540 and 541 of the Restatement (Second) of Torts.  When read together these rules indicate that the party to whom a fraudulent

---

[5](...continued)
this issue.  (*See* Tr. (Phillips) at 328, lns.1-21.)  The court, therefore, will not discuss either of these issues at any length.

misrepresentation is made is justified in relying upon the truth of that statement unless

he knows that it is false or its falsity would be obvious to him upon a cursory

inspection.  *See Silverman v. Bell Sav. & Loan Ass'n*, 533 A.2d 110, 115 (Pa.

Super. Ct. 1987).  As a comment to § 541 explains, a person is

> required to use his senses, and cannot recover if he blindly
> relies upon a misrepresentation the falsity of which would
> be patent to him if he had utilized his opportunity to make a
> cursory examination or investigation.  Thus, if one induces
> another to buy a horse by representing it to be sound, the
> purchaser cannot recover even though the horse has but
> one eye, if the horse is shown to the purchaser before he
> buys it and the slightest inspection would have disclosed
> the defect.  On the other hand, the rule stated in this
> Section applies only when the recipient of the
> misrepresentation is capable of appreciating its falsity at the
> time by the use of his senses.

Restatement (Second) of Torts § 541 cmt. a (1977).

The court finds that given the circumstances in this case, Allfirst

personnel justifiably relied on Ortenzio's false statement regarding the source of the

funds used to discharge his personal surety and his silence regarding CCI's financial

condition.  During the November 1999 meeting, Ortenzio and Phillips told Schwartz

that CCI would pay off the $1.2 million note using excess cash flow from two

problematic CCI projects.  When Ortenzio called Schwartz on February 11, 2000, he

told Schwartz that the cash projections had borne out as predicted.  Additionally,

Ortenzio was paying off the loan almost one month before it was due; thus lending

credence to Ortenzio's previous contention that CCI would have sufficient cash flow

to pay down the loan before its due date.  Ortenzio knew that the cash flow

projections given to the bank had turned out inaccurate.  Yet, he made no move to

inform Allfirst of CCI's deteriorating condition until after his personal surety had

been returned to him.  Because CCI had not provided any updated cash flow

projections or financial statements, Schwartz justifiably relied on statements regarding
the accuracy of previous cash flow projections and Ortenzio's silence regarding
CCI's financial condition.  Schwartz made a cursory examination which did not
reveal the manner in which Ortenzio repaid the loan.  Additionally, Ortenzio, an
important Allfirst customer, indicated that he wanted to have his personal surety
returned to him as soon as possible.  Schwartz could not have discovered Ortenzio's
chicanery simply by logging on to the Allfirst mainframe.  Rather, he would have had
to involve other Allfirst personnel in the pursuit of the paper copy of the general
ledger ticket.  Moreover, Schwartz would have only undertaken such an effort if he
had reason to suspect that Ortenzio was attempting to do something completely
inconsistent with the limits placed on the unsecured line of credit.  Given the
extensive history between Ortenzio and Allfirst, Schwartz held no such suspicion.
The court cannot say that Allfirst's reliance on Ortenzio's statements regarding cash
flow, or its reliance on Ortenzio's silence regarding the true source of the funds, was
unjustified simply because Schwartz could have undertaken the ostensibly
unnecessary task of determining the source of payment for the note.  Such excusable
failure does not relieve Ortenzio's liability.  Allfirst did not know the true source of
the funds used to repay the note, nor was that fact obvious to it upon a cursory
examination.

   In short, given the limitations in the loan documents, Ortenzio's
assertions regarding cash flow, Ortenzio's silence regarding CCI's true financial
condition and the manner in which he intended to obtain the return of his surety, in
addition to Ortenzio's reputation, there was no reason for Allfirst to take additional
investigatory steps to determine the source of the funds used to discharge Ortenzio's

20

personal surety on the $1.2 million note.  Accordingly, the court finds that Allfirst justifiably relied on Ortenzio's statements and silence regarding this matter.

### 3.    Proximate Cause

As previously stated, to recover for fraud, a plaintiff must demonstrate by clear and convincing evidence that the fraud was the proximate cause of the defendant's pecuniary damage.  *See Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F. Supp. 557, 563 (W. D. Pa. 1996); *Gibbs v. Ernst*, 647 A.2d at 889. According to the Restatement (Second) of Torts § 548A, a fraudulent misrepresentation is the proximate cause of the plaintiff's loss, "if, but only if, the loss might reasonably be expected to result from reliance."

Ortenzio argues that he cannot be held liable for any loss that Allfirst suffered because his fraudulent conduct was not the proximate cause of Allfirst's damage.  According to Ortenzio, any damage that Allfirst suffered occurred because Allfirst breached the contract governing the line of credit by prematurely declaring CCI in default.  According to the line of credit contract, Allfirst could only declare a default on the line if it provided CCI with thirty days notice.  (*See* Pl. Ex. 2 at ¶ 6.) Ortenzio argues that Allfirst declared CCI in default without giving it the required thirty days notice, essentially robbing CCI of the opportunity to cure the default by obtaining alternative financing.  Without its borrowing capacity under the line of credit, CCI became unable to continue as a viable business entity and consequently failed to pay off the remaining balance on the line of credit.

Ortenzio is correct in his assertion that Allfirst was required to provide CCI with thirty days notice before declaring CCI in default on the line.  However, he fails to mention that Allfirst had the right to demand payment of all sums owed under

21

the line at any time for any reason, with or without notice.  The relevant portion of

that agreement, Paragraph 6, reads as follows, including the addition made by

Phillips.

> All sums outstanding under this promissory note, including
> the principal amount of all of the loans, are immediately due
> in full upon the first to occur of: (I) the demand of the
> holder of this promissory note, which demand may be
> made at any time and for any reason, in the sole and
> absolute discretion of the holder of this promissory note; *or*
> (II) the occurrence of any default under the terms of this
> promissory with thirty days written notice.

(Pl. Ex. 2 at ¶ 6 (emphasis added).)

Thus, all sums outstanding under the line of credit could become

immediately due if Allfirst made a demand, which it could do for any reason at any

time, *or* if Allfirst declared a default, for one of the reasons listed in Paragraph 11 of

the line of credit contract, and provided CCI with thirty days notice.[6]  Additionally,

upon occurrence of either CCI's default or Allfirst's demand, Allfirst had the right to

shut down the line of credit.  (*See id.* at ¶ 12 ("The Bank shall have no further

obligation to provide any Loans to Borrower following: (a) a demand by the Bank for

payment hereunder; *or* (b) a default under this Promissory Note.") (emphasis

added).)  The February 24, 2000 letter from Allfirst's counsel to Ortenzio states, the

following:

> In consequence of this default the Bank hereby accelerates
> and demands immediate payment of all sums presently due
> and owing under the [line of credit].  Because of the default

---

[6]Although at first blush it might not seem so, the difference between a demand and a default is
material under the terms of the line of credit contract.  Under Paragraph 12, if Allfirst had declared CCI in
default, Allfirst could have raised the rate of interest it was charging CCI by two percentage points until CCI
satisfied the debt in full.  Additionally, a default under the line of credit contract would have allowed Allfirst to
demand payment from CCI for all loans it had with Allfirst.  These remedies, however, were unavailable upon a
demand.  (*See* Pl. Ex. 2 at ¶ 12.)

> under the [line of credit] and the Bank's acceleration and
> demand for immediate payment of the sums due thereunder
> no further sums will be advanced under the revolving line of
> credit . . . effective immediately.

(Pl. Ex. 24.)

Even though Allfirst may not have been able to accomplish this result upon the declaration of a default without first providing CCI with thirty days notice, it was authorized to shut down the line pursuant to a demand for payment. Although it may have employed improper terminology in this letter, Allfirst did not take any action that was inconsistent with a demand, an action permitted under the line of credit contract. Allfirst was allowed to demand payment from CCI and to shut down the line of credit at any time. Thus, its action was not premature and does not constitute a breach of the line of credit agreement which would relieve Ortenzio of his liability.

Additionally, had Ortenzio not procured the discharge of his surety through fraud, Allfirst could have recovered up to $1.2 million on any outstanding balance that CCI owed to it by recourse to Ortenzio's personal assets. Thus, any loss that occurred under that amount is a direct and foreseeable result of Ortenzio's fraud.

In short, the court finds that Allfirst's loss was a foreseeable result of Ortenzio's fraud. As such, Ortenzio's fraud proximately caused Allfirst's loss.

4.    Damages

Having determined that Ortenzio is liable to Allfirst, the court now turns to the issue of damages. Allfirst contends that its losses are equal to what it would have recovered had Ortenzio not procured discharge of the surety through his fraud. This amount, however, is contingent upon what amount, if any, CCI recovers from Allfirst in the pending adversarial bankruptcy proceedings. Because Ortenzio's surety on the note was limited to $1.2 million, the cap on damages is $1.2 million. Between February 22 and 25, 2000, CCI customers wired $2,317,291.28 in payments to CCI's account. Allfirst credited these payments against the line, leaving an unpaid balance of $284,222.52 on the line. Thus, as of this date, these are Allfirst's damages.

CCI, however, has initiated a preference action against Allfirst to recover the $2,317,291.28 pursuant to § 547 of the Bankruptcy Code. As of the date of trial in the captioned matter, the bankruptcy proceeding had not been resolved. Therefore, the damages are unknown at this time. The damages could be either $284,222.52, $1.2 million, or some other number, dependent upon whether CCI recovers in the Bankruptcy action and what amount it recovers.

Accordingly, the court will defer ruling on the issue of damages until resolution of the matter before the bankruptcy court. The court will require the parties to issue status reports every sixty days regarding the bankruptcy court's proceeding.

**III.**        <u>**Conclusion of Law**</u>

        1.  The court has subject matter jurisdiction over this matter based on the parties' diverse state citizenship.  *See* 28 U.S.C. § 1332.

        2.  Ortenzio committed fraud against Allfirst.

        3.  As a result of his fraud, Ortenzio is liable to Allfirst.

        4.  The court will defer its ruling on the amount of damages until resolution of *CCI Construction Co, Inc. v. Allfirst Bank* (Adversary No. 1-01-00011A), currently pending before the United States Bankruptcy Court for the Middle District of Pennsylvania.


                                        s/Sylvia H. Rambo
                                        SYLVIA H. RAMBO
                                        United States District Judge


Dated:  April 14, 2003.

25